# Exhibit B

1
2   ROWLAND MARCUS ANDRADE
    9414 Plaza Point Drive
3   Missouri City, Texas 77459   USA

4
5   In Pro Se

6
7
8                      UNITED STATES DISTRICT COURT

9        NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

10

| 11  UNITED STATES OF AMERICA, | Case No. 4:20-cv02013-KAW |
|---|---|
| 12                    Plaintiff, | **ROWLAND MARCUS ANDRADE'S ANSWER TO COMPLAINT FOR CIVIL FORFEITURE *IN REM*** |
| 13            v. | |
| 14  ONE PARCEL OF REAL PROPERTY LOCATED AT 9414 PLAZA POINT DRIVE, MISSOURI CITY, TEXAS 77459, | Trial Date:            None Set |
| 15 | |
| 16                    Defendant. | |
| 17 | |
| 18  ROWLAND MARCUS ANDRADE, | |
| 19                    Claimant. | |

20
21          Pursuant to Supplemental Rule G(5)(b) and Rule 8(b) of the Federal Rules of Civil
22  Procedure, ROWLAND MARCUS ANDRADE, In Pro Se ("Claimant" or "Andrade"), answers
23  the Complaint of Plaintiff ("Plaintiff").  If an averment is not specifically admitted, it is hereby
    denied.
24
25                         **ANSWER TO COMPLAINT**

26          1.      Andrade himself has been the victim of corruption: First, from those powerful
27  Washington insiders he initially saw as early supporters of his digital currency project, including
28  lobbyist Jack Abramoff and Congressman Dana Rohrabacher. The entirety of those in Jack

3161-1002 / 1611507.1

1    Abramoff's circle who Jack involved in Andrade's technology project is unknown, but includes

2    Jarred Kushner, the President's son-in-law as well as a former Israeli intelligence officer. Andrade,

3    his resources, and technology were nothing but a pawn by the group led by Abramoff. Secondly,

4    Andrade is the victim of political corruption within the justice department. With an important

5    election on the horizon, a team of federal investigators, including some involved in the politically

6    motivated Russian collusion investigation, have increased their efforts at futile attempts to

7    implicate Andrade as a co-conspirator with those insiders who victimized Andrade in order to

8    influence the federal election. Many of the federal investigators who have been targeting Andrade

9    have been part of the futile Russian Collusion investigation, including part of the "Operation Cross

10   Fire Hurricane" which resulted in the wrongful conviction of General Michael Flynn.

11        2.     The government deliberately misstates facts or states misleading information as

12   reprisal for Andrade filing a civil rights complaint against government investigators and to use

13   Andrade as a target to intimidate and target politicians and other prominent leaders who have

14   supported Andrade's ventures.

15        3.     The politically motivated investigation against Andrade began during the Mueller

16   Russia Investigation in 2018. Jack Abramoff, an early supporter of Andrade, was already under

17   federal investigation for his foreign ties during this time.  In 2018, the government, through their

18   US Attorney's office, informed Andrade's counsel that their investigation pertained to "National

19   Affairs and/or Security", indicating their political intentions. In 2018, the government obtained a

20   search warrant and raided Andrade's office along with the home of Jack Abramoff. Attached as

21   Exhibit A is a copy of a page of the search warrant for Jack Abramoff's home, identifying certain

22   prominent individuals the government associated with Andrade and Jack Abramoff.

23        4.     One of the names of Jack Abramoff's associates listed on Exhibit A is Paul

24   Erickson, who had been a longtime colleague of his. Paul Erickson had been in a long-term

25   relationship with Russian agent Maria Butina, and was even mentioned in her federal indictment.

26   Attached as Exhibit "B" is a news article discussing their relationship. Attached as Exhibit "C" is

27   an article referencing Jack Abramoff and his holding company, Landfair Capital along with a

28   Wells Fargo transaction that allegedly originated from Maria Butina.

1    5.    Today, the government is continuing this futile investigation and attempting to

2   utilize Andrade as a pawn to continue their efforts to influence the election. The same FBI agents

3   who participated in the investigation against Paul Erickson as shown in Exhibit "D" are attempting

4   to target Andrade.

5    6.    It is important to note that one of Jack Abramoff's contacts listed on Exhibit A, the

6   government's search warrant, is "Muzin Capital Partners", which announced they were hiring

7   General Michael Flynn in September of 2018. Attached as Exhibit "E" is a news article discussing

8   General Flynn's new position. This is further evidence of the government's intention of using

9   Andrade to target others in attempt to influence the election.

10    7.    After 2 years of not finding any "victims" of Andrade's from the thousands of

11   supporters who purchased digital currency from Andrade's company, the government created a

12   victim, known as "VICTIM ONE" in the government's petition. It was the government who

13   contacted "VICTIM ONE" and suggested to him that he had been defrauded and that Andrade was

14   a fraud. Attached as Exhibit "F" is an e-mail from "VICTIM ONE" to Andrade whereby he says it

15   was the FBI who informed him that Andrade was a fraud knowing that Andrade didn't even know

16   who he was during the time of his purchases. By doing so, FBI agents Rohan Wynar and Ethan

17   Quinn violated their own rules and procedures which calls for questioning of victims and

18   witnesses instead of declaring legal conclusions they are not qualified to make.

19    8.    In later detail in this response, Andrade will show he had nothing to do with

20   "VICTIM ONE"'s financial transactions where were seemingly spurred by "JD", also referenced

21   in the government's petition. Attached as Exhibit "G" is a declaration by Andrade's compliance

22   attorney, Chris Ray, which further exemplifies that Andrade was not involved with the

23   transactions between J.D.'s company and "VICTIM ONE".

24    9.    As previously mentioned, this is the second attempt of the government to misstate

25   the facts and to create a victim. During the height of the Russian investigation, the government

26   attempted to create a victim out of Cory Jodoin, a former partner of Andrade. In depositions, Cory

27   Jodoins's story fell apart. Reviewing the website www.dojreform.com, one will find depositions

28

ANSWER TO COMPLAINT FOR CIVIL FORFEITURE *IN REM*

1  of Cory Jodoins which contradict what the agents gave the U.S. Magistrate in Nevada in

2  September 2018.

3       10.     The motivating behind the government trying to setup Andrade for a convictable

4  offense are clear:

5              a.     Prevent Andrade's technology from launching, which occurred in April,

6  2020, in order to support their allegation that Andrade had no marketable technology, supporting

7  the government's allegation of fraud and money laundering.

8              b.     Force Andrade's company to run out of money to pay legal and

9  development costs so when the operation against Andrade and his alleged associates went into

10  effect, so Andrade would not have the finances to put up a proper defense.

11             c.     With Andrade's company on verge of collapse, force Andrade to testify

12  and/or provide evidence against politicians, especially those close to President Trump's staff, such

13  as Congressman Rohrabacher, in order to influence the 2020 election.

14      11.     Since  2018, the government has cost Andrade millions in legal fees in their attempt

15  to sabotage Andrade's technology. The government files this attempt at civil forfeiture as Andrade

16  was progressing on his civil complaint against those government investigators, one or more with a

17  history of abuse.

18      12.     Answering Paragraph 1, Andrade states that Paragraph 1 contains only legal

19  conclusions and argument as to which no response is required.

20      13.     Answering Paragraph 2, Andrade states that Paragraph 2 contains only legal

21  conclusions and argument as to which no response is required. Andrade does not contest this

22  Court's jurisdiction.

23      14.     Answering Paragraph 3, Andrade states that Paragraph 3 contains only legal

24  conclusions and argument as to which no response is required.

25      15.     Answering Paragraph 4, Andrade states that Paragraph 4 contains only legal

26  conclusions and argument as to which no response is required.

27      16.     Answering Paragraph 5, Andrade states that Paragraph 5 contains only legal

28  conclusions and argument as to which no response is required. Since the unethical behavior of the

1  Plaintiff's, along with FBI Agent Roahn Wynar, FBI Agent Ethan Quinn, and IRS Agent Bryan

2  Wong originated initiated in the San Francisco division of the Northern District of California, we

3  understand how the court may have venue over this matter.

4          17.     Answering Paragraph 6, Andrade admits the allegations contained therein.

5          18.     Answering Paragraph 7, Andrade admits the allegations contained therein.

6          19.     Answering Paragraph 8, Andrade denies that he engaged in a scheme to defraud

7  anyone, including but not limited to "VICTIME ONE". Andrade denies ever being in concert with

8  "JD" or others mentioned in the government's petition, to defraud investors. Andrade was not in

9  the business of soliciting investors. Andrade admits having a brief business relationship with

10  "Block Bits Capital, LLC" ("BBC") and its partners, which included "JD", in 2017. However this

11  relationship was limited to BBC purchasing AML Bitcoin Tokens as well as "JD" providing

12  "JD"'s business contacts and general business strategy to Andrade and not to facilitate the sale of

13  cryptocurrency through "JD"'s equity fund called Block Bits AML Holdings, LLC or through

14  BBC. Andrade admits that he and his company, NAC Foundation ("NAC") worked on and created

15  a new digital currency, AtenCoin, which was continuously upgraded to include new features when

16  it became known as AML Bitcoin. While both currencies featured AML and KYC features, the

17  latter also included the ability for users to create their own digital assets which was a major

18  achievement/upgrade from the AtenCoin. The AML Bitcoin Token, which was issued when the

19  AML Bitcoin was in development, clearly stated that it did not have any AML/KYC features tied

20  to the coin, which would later launch and such tokens would be converted on a 1:1 basis.  On

21  April 12, 2020, Beginning in November, 2019, the general public was able to begin testing the

22  AML Bitcoin technology, which can be accessed at www.AMLBitcoinvideos.com. On March 6,

23  2020, Andrade sent a newsletter to over 20,000 token holders and supporters announcing that the

24  AML Bitcoin was ready to launch pending an audit. Attached as Exhibit "H" is a copy of said

25  newsletter. With completion of the audit, AML Bitcoin project launched on April 12, 2020.

26  Andrade denies that any statements he made regarding his company and the cryptocurrency in

27  development were fraudulent. Except as expressly admitted herein, Andrade denies each and every

28  allegation contained therein. While Andrade did make statements to his supporters regarding the

Case No. 4:20-cv-2013-KAW

ANSWER TO COMPLAINT FOR CIVIL FORFEITURE *IN REM*

1    progress of the AML Bitcoin, these statements were specifically discussing the completion of

2    phases of development. For example, Andrade made statements to the public announcing the

3    completing of the internal testing of the AML Bitcoin and another announcement concerning the

4    completion of the public beta testing. It wasn't until April of 2020 that Andrade announced the

5    completion of the AML Bitcoin project. At no point did Andrade ever misinform the public or

6    anyone individually that the AML Bitcoin was complete, when it wasn't.

7         20.     Furthermore, Andrade believes the government misstated the facts in their

8    pleadings deliberately as any rational person could visit Amlbitcoin.com and AMLwallet.com and

9    realize the technology is legitimate. The public started beta-testing the technology in 2019.

10        21.     Answering Paragraph 9, Andrade denies each and every allegation contained

11   therein. "JD" and his contacts facilitated the purchase of AML Bitcoin Tokens through his

12   company called Block Bits Capital, LLC, without solicitation or involvement by Andrade. NAC

13   treated BBC's purchase of AML Bitcoin Tokens through NAC's token pre-ICO the same as any

14   other consumer purchaser. Andrade denies having any knowledge or foresight into the activities or

15   solicitations made by JD or his newly created company called Block Bits AML Holdings, LLC

16   which resembles an equity fund, that created Victim One had an agreement with. This equity fund

17   that dealt with "investors" did not purchase digital currency from Andrade or NAC. Andrade did

18   not have any contracts or agreements between himself and/or NAC, with the company that

19   "VICTIM ONE" invested money in.

20        22.     Regarding the government's allegation regarding representations pertaining to

21   ports, the government knows this is misleading as they are aware that NAC's associates who were

22   handling such discussions and generated the press releases were the former Panamanian

23   ambassador to the United States, the honorable Carlos Delagurdia and the current chair of the

24   Panama Canal, the honorable Catin Vasquez. Since the government has a history of contacting

25   witnesses outside of the United States without first approaching their government, they should

26   have had no problem with interviewing Mr. Delagurdia or Mr. Vasquez. Unfortunately, the

27   government's efforts in attacking Andrade destroyed the opportunity for NAC in reference to

28   Panama and other countries because their misrepresentations over the last few years has traveled

ANSWER TO COMPLAINT FOR CIVIL FORFEITURE *IN REM*

Case No. 4:20-cv-2013-KAW

3161-1002 / 1611507.1

1  internationally already. As to the government's allegations regarding the Port of San Francisco,

2  Andrade was of the belief that the press release issued was approved by the Port of San Francisco

3  Commissioner, Leslie Katz, as shown on the email attached as Exhibit I.

4          23.      Answering Paragraph 10, Andrade lacks sufficient knowledge or information to

5  form a belief concerning the truth of the factual allegations contained therein with respect to

6  "VICTIM ONE" and on that basis denies such allegations. Andrade had no contact with "VICTIM

7  ONE" prior to or during the time in which he invested money into JD's equity fund called Block

8  Bits AML Holdings, LLC. The company that actually purchased digital currency from Andrade

9  was Block Bits Capital, LLC "BBC" which "VICTIM ONE" was not a member of. Prior to BBC's

10  purchase of AML Bitcoin Tokens during the ICO in January 2018, Andrade had no knowledge of

11  "VICTIM ONE" or that "JD" and/or his associates had solicited funds from him.  NAC treated

12  BBC's purchase the same as any other purchaser of tokens during the ICO sale who did there

13  purchases online. Further, Andrade had no knowledge that JD and "VICTIM ONE" created

14  "Block Bits AML Holdings, LLC" for "VICTIM ONE" to transfer money into and that BBC, the

15  purchaser of the AML Bitcoin Tokens, had received the funds from. Since Andrade and NAC

16  treated BBC's purpose the same as any purchaser in the ICO, they had no knowledge where the

17  funds for the purchase came from.

18          24.      In order for BBC to complete the purchase of the AML Bitcoin Tokens, they had to

19  first agree to the terms and conditions on the ICO website. A copy of the terms and conditions are

20  attached as Exhibit "J". Additionally, a copy of the refund policy, is attached as Exhibit "K",

21  which provides that anyone who purchases AML Bitcoin Tokens from NAC, before, during, or

22  after the ICO has the option to a refund if anyone on the AML Bitcoin staff ever mislead the

23  purchaser. Next, BBC had to provide information on a third party website to generate an invoice

24  for the purchase of the Tokens. A copy of BBC's purchase invoice, which they generated and lists

25  BBC as the purchaser, is attached as Exhibit L. Attached as Exhibit M is an email from JD to

26  NAC staff identifying BBC as the purchaser of the tokens, and not "VICTIM ONE". Also

27  included on Exhibit M is an e-mail from "VICTIM ONE" in which he admits he contracted with

28  and transferred funds into "Block Bits AML Holdings, LLC" and NOT with Andrade or NAC, as

7

Case No. 4:20-cv-2013-KAW

ANSWER TO COMPLAINT FOR CIVIL FORFEITURE *IN REM*

well as a statement "VICTIM ONE" was provided from Block Bits AML Holdings, LLC showing his purchase directly into their equity fund. Nowhere in the purchase order does JD ever mention the existence or identity of any individuals whose funds have ended up in BBC. BBC then transferred the purchase funds to "DSA"'s trust account, a Nevada attorney. Andrade did not control that account which is another misrepresentation by the government. Furthermore, Exhibit L shows that the funds were clearly transferred to an attorney trust account and in no way directly to Andrade, as the government continues to falsely claim for personal gain. According to the agreement between NAC and DSA, DSA could not release the funds to NAC or Andrade until Andrade's CPA confirmed that the purchaser of the Tokens had in fact received them, as the government is aware of. As Andrade did not control said trust account as the government deliberately misrepresents the facts for personal gain.

25.     Answering Paragraph 11, Andrade lacks sufficient knowledge or information to form a belief concerning the truth of the factual allegations contained in the first sentence of Paragraph 11 with respect to "VICTIM ONE," and on that basis denies such allegations. Andrade never spoke to "VICTIM ONE" prior to his "investment" into "JD"'s fund Block Bits AML Holding, LLC. Andrade had no knowledge of "JD"'s solicitation of funds from "VICTIM ONE" or others into their fund. Andrade denies each and every allegation contained in the second sentence of Paragraph 11.

26.     Answering Paragraph 12, Andrade lacks sufficient knowledge or information to form a belief concerning the truth of the factual allegations contained therein with respect to "VICTIM ONE," and on that basis denies such allegations. Except as expressly admitted herein, Andrade denies each and every allegation contained therein.

27.     The government deliberately misleads the facts as it pertains to "VICTIM ONE" depositing money directly into NAC's payroll account. As previously stated, as part of the January, 2018 purchase, it was BBC which purchased the AML Bitcoin Tokens. The government misrepresents the facts by failing to mention that "VICTIM ONE" later directly purchased $125,000 worth of AML Bitcoin Tokens from Andrade in October, 2018 because the ICO had ended. Without request, BBC contacts Andrade with a request to brokerage some digital currency

ANSWER TO COMPLAINT FOR CIVIL FORFEITURE *IN REM*

Andrade owned. Andrade and "VICTIM ONE" entered into two brokered purchase agreements, a copy of which are attached as Exhibit N. The government infers in Paragraph 12 that "VICTIM ONE" transferred the 5 transactions listed in Paragraph 10, totaling $1,105,000 in January, 2018 directly into NAC's payroll account. This is false as "VICTIM ONE" only directly purchased from Andrade, $125,000 of Tokens 9 months later. The purchase agreements between Andrade and "VICTIM ONE" made no representations regarding the viability of the AML Bitcoin Token as an investment or anything other than a medium of exchange since Andrade had never spoken to "VICTIM ONE" at that time. Accordingly, neither the government nor "VICTIM ONE" have made any allegations that Andrade misled "VICTIM ONE" prior to this direct purchase in October, 2018. Yet, the government is misleading the court and attempting to combine the events of January, 2018 with October, 2018, to support their allegation that Andrade had anything to do with the business transaction between "VICTIM ONE" and JD, and their joint equity fund known as Blockbits AML Holdings, LLC. The government deliberately fails to mention Block Bits AML Holdings, LLC.

28. In November of 2018, NAC discovered via compliance calls with NAC's compliance attorney, Chris Ray ("Ray") that BBC, and its associates may have been making unapproved statements in connection with AML Bitcoin Tokens to at least one other AML Bitcoin Token purchaser. Because "VICTIM ONE" had directly purchased the $125,000 of Tokens in October, 2018, Ray reached out to "VICTIM ONE". Ray spoke to "VICTIM ONE" once on the phone, who demanded email communications and never responded. He refused to answer follow up calls and emails. "VICTIM ONE" subsequently made a statement that JD and BBC instructed him to ignore the calls and not to communicate with Ray or Andrade. In December, 2018, JD's Partner David Mata, informed Andrade not to worry about "VICTIM ONE" because they had bought out all of "VICTIM ONE"'s tokens. This statement later turned out to be untrue. Attached as Exhibit "O" is a series of emails between Ray and "VICTIM ONE" as well as from BBC partner David Mata and from "VICTIM ONE" in which he admits he was told not to communicate with Ray or anyone from NAC. As previously mentioned, the attached Exhibit G includes a declaration from Ray regarding his contact with "VICTIM ONE".

ANSWER TO COMPLAINT FOR CIVIL FORFEITURE *IN REM*

29.     Answering Paragraph 13, Andrade lacks sufficient knowledge or information to form a belief concerning the truth of the factual allegations contained therein, and on that basis denies such allegations.

30.     Answering Paragraph 14, Andrade lacks sufficient knowledge or information to form a belief concerning the truth of the factual allegations contained therein with respect to "VICTIM ONE," and on that basis denies such allegations. Andrade admits that he purchased the two cashier's checks identified in Paragraph 14 on the dates listed, and that they were funded from the Woodforest ANDRADE account.

31.     Collectively answering Paragraphs 13, 14, and 15, Andrade admits that on May 10, 2018, he and his wife purchased the RESIDENCE from a Texas homebuilding firm, and that they paid over $747,000 for the home, primarily using the $730,538.89 cashier's check from Woodforest National Bank dated May 10, 2018. The funds received were from NAC's ICO sale of the AML Bitcoin Tokens to the general public, including BBC's purchase, which did not constitute investments from the general public, but rather the sale of the AML Bitcoin Token, a medium of exchange. Additionally to other things, Andrade was owed over $1 million in backpay by NAC for his work in developing the digital currency, the transfer of funds constituted a payment of debt and as such, was proper and Andrade was free to do with the funds as he chose. Andrade denies each and every allegation otherwise contained therein. The government also deliberately failed to mention that when Andrade's funding got low due to the unethical actions of the Plaintiff, Andrade pulled a mortgage on his house and sold his land in an effort to finalize the development of the Aml Bitcoin and for legal fees. Andrade even sold some of his other assets.

32.     Answering Paragraph 16, Andrade denies each and every allegation contained therein. Andrade denies the statement that no progress was ever made on AtenCoin or the AML Bitcoin. "ABTC" is actually the abbreviation of the Aml Bitcoin and also the name of a development company that Andrade also owns. In contrast to the allegations in the government's petition, AtenCoin was finished and released to the general public in 2014. AML Bitcoin was finished and released to the public in 2020 as previously mentioned in this response. The government filed their complaint under the threat of perjury knowing these facts were misleading.

33.     The government has attempted to deactivate Andrade's servers, seized his bank accounts during the pandemic and searched his properties (knowing that he had been traveling to China) so that Andrade would not be able to show the Court that his technology does work and does contain the biometric features and to prevent Andrade from being able to present a proper defense and to label Andrade as a conspiracy theorist if the government were to indict Andrade and his former political supporters. The acts of the government are nothing more than a relentless abuse of power and corruption.

34.     The government has continuously waged and conspired a war against Andrade for political reasons by preemptively reaching out to supporters and coin-holders and suggesting to them that Andrade and the AML Bitcoin was a fraud. The previously referenced Exhibit F is an e-mail from "VICTIM ONE" in which he admits that it was the Peter Strzok-influenced FBI agents who approached him and gave him the idea that Andrade's technology was a fraud. As evidence of the government's bias and vendetta against Andrade, the government never contacted Andrade to inquire about setting up a demonstration of the technology to determine whether or not it was legitimate. Showing them the technology is not beneficial to their operation. Instead, the government has spent 2 years contacting coin holders, supporters, NAC contractors and developers and telling many of them that they have been de-frauded. Furthermore, the government has used aliases of potential coin buyers in attempt to entrap Andrade into offering misrepresentations and otherwise breaking federal SEC laws and regulations. These attempts have been fruitless as Andrade has never held out his currency as an investment and anything other than a medium of exchange. In desperation and in anticipation of the 2020 elections, the government has resorted to using "VICTIM ONE", which they created. The perpetrators intent has always been to ensure Andrade's technology fails to protect their allegation that Andrade defrauded purchasers of his currency. **Now the government wishes to use the allegations for Andrade to serve as a "bridge" to convict those it sees as bigger political based targets, such as Jack Abramoff and his associates, including Congressman Dana Rohrabacher, conveniently timed before the 2020 elections. You see, if the digital currency is a fraud, in the government's**

**1** **eyes, all those that were supporting it is an associate and now this is a conspiracy. This**

**2** **includes more people not even mentioned in Exhibit "A".**

**3**     35.     Pertaining to "VICTIM ONE", he is a sophisticated business owner who has

**4** invested in numerous technology ventures through his own equity fund, Tenaya Capital. "VICTIM

**5** ONE" is well versed in due diligence checks as he operates an equity fund which performs such

**6** checks regularly as part of its business. The government's position that "VICTIM ONE" was

**7** misled by anyone is unrealistic given his background. For "VICTIM ONE" to meet JD on an

**8** airplane and then create the "Blockbits AML Holdings, LLC" with JD, without even starting a due

**9** diligence check as he is accustomed to doing is unrealistic and alarming. A copy of the "Blockbits

**10** AML Holdings, LLC" agreement between "VICTIM ONE" and Block Bits Holding, LLC, later

**11** provided to Andrade by "VICTIM ONE", is attached as Exhibit P.

**12**     36.     Additionally, one of "VICTIM ONE" which co-owns a company that was a lead

**13** investor in a $12.1 million dollars in financing in a series c round in ThreatMetrix in 2010. In

**14** January of 2018 soon after "VICTIM ONE" transferred money to become a participant in Block

**15** Bits AML Holding, LLC, "VICTIM ONE" sends an email to JD indicating that ThreatMetrix is

**16** infringing on Andrade related technology. ThreatMetrix was sold to Relx for $800+ million and

**17** the purchaser was assumingly not made aware by "VICTIM ONE" prior to the sale of the

**18** infringement of Andrade's technology and assumingly this may have been one of the reason why

**19** "VICTIM ONE" transferred funds to the equity fund without customary due diligence as

**20** "VICTIM ONE" knew Andrade already had ThreatMetrix on his radar. This is likely why the

**21** government was able to transform "VICTIM ONE" into a "victim" since he knew the true value of

**22** Andrade's technology.

**23**     37.     Answering Paragraph 17, Andrade lacks sufficient knowledge or information to

**24** form a belief concerning the truth of the factual allegations contained in the first sentence of

**25** Paragraph 17, and on that basis denies such allegations. Andrade denies each and every allegation

**26** contained in the second sentence of Paragraph 17.

**27**     38.     Answering Paragraph 18, Andrade incorporates by reference the answer to each

**28** allegation in paragraphs 1 through 12 as though fully set forth herein.

39.     Answering Paragraph 19, Andrade states that Paragraph 19 contains only legal conclusions and argument as to which no response is required.

40.     Answering Paragraph 20, Andrade states that Paragraph 20 contains only legal conclusions and argument as to which no response is required.

41.     Answering Paragraph 21, Andrade states that Paragraph 21 contains only legal conclusions and argument as to which no response is required.

42.     Answering Paragraph 22, Andrade states that Paragraph 22 contains only legal conclusions and argument as to which no response is required.

43.     Answering Paragraph 23, Andrade states that Paragraph 23 contains only legal conclusions and argument as to which no response is required.

44.     Answering Paragraph 24, Andrade denies each and every allegation contained therein.

45.     Plaintiffs have either submitted knowingly false or misleading documents to either FISA Judges and / or U.S. magistrates for purposes of illegally spying or for the searches and seizure requests against Andrade and his former supporters. The alleged abuse mirrors the misconduct exposed by DOJ IG Michael Horowitz's report on the FISA abuses committed by the FBI's Crossfire Hurricane team. In both cases, prosecutors exploited their information advantage relative to judges to impede on defendants' civil liberties. The FBI's Crossfire Hurricane actions extended all the way down to the Northern District of California.

46.     If the government's unlawful persecution continues, the professional career of Andrade, his personal life, and his company will continue to be ruined along with the AML Bitcoin project which has tens of thousands of supporters and purchasers of Andrade's digital currency because of the motives of the AUSA's in filing this cases without properly vetting the evidence since doing so would not be beneficial to the government's operation.

47.     Now, in a desperate attempt, the government will likely change its strategy and try to associate Andrade with previous contractors, including one ex-contractor who Andrade filed a police report against.

ANSWER TO COMPLAINT FOR CIVIL FORFEITURE *IN REM*

Case No. 4:20-cv-2013-KAW

48.     Additionally, the government misstates those involved in ownership and finance of the real property at the center of this case. Jerrell Clay, who previously released his interest in the property in a publicly recorded release, is erroneously listed on the petition. Additionally, the government lists the wrong lender.

## AFFIRMATIVE DEFENSES

Claimant pleads the following separate defenses.  Claimant reserves the right to assert additional affirmative defenses that discovery indicates are proper.

### FIRST AFFIRMATIVE DEFENSE

#### (Failure to State a Claim)

1.     As a separate and first affirmative defense to the Complaint, and to the purported causes of action set forth therein, Claimant alleges that the Complaint fails to state facts sufficient to constitute a cause of action.

### SECOND AFFIRMATIVE DEFENSE

#### (Noncompliance with Supplemental Rule G)

2.     As a separate and second affirmative defense to the Complaint, and to the purported causes of action set forth therein, Claimant states that Plaintiff's Complaint does not comply with the requirement of Supplemental Rule G to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." The government has not presented and will not be able to present evidence proving by a preponderance of the evidence that Claimant conspired with "JD" and/or "JD"'s associates in soliciting investment into any entity they created such as "Blockbits AML Holdings, LLC". Further, the government misrepresents facts related to the progress and actual development of Claimant's digital currencies, claiming that no progress had been made on the Aten Coin or AML Bitcoin, while knowing that the Atencoin was released in 2014 and the AML Bitcoin was released in 2020.

### THIRD AFFIRMATIVE DEFENSE

#### (No Violation of Criminal Law)

3161-1002 / 1611507.1

ANSWER TO COMPLAINT FOR CIVIL FORFEITURE *IN REM*

3. As a separate and third affirmative defense to the Complaint, and to the purported causes of action set forth therein, Claimant alleges that the defendant property was not involved in a violation of any federal criminal law, including wire fraud or any other criminal law identified in the Complaint.

## FOURTH AFFIRMATIVE DEFENSE

### (Estopell)

4. The government is estopped from obtaining a forfeiture judgment because it obtained the seizure warrant through incorrect, misleading or knowingly incomplete or false allegations. To receive the warrant, the government relied on information it knew to be false or misleading. For example, the government knew Andrade had no communications with "VICTIM ONE" prior to his investment into "Blockbits Capital AML Holdings, LLC" and that Andrade had no involvement in "JD"'s and "JD"'s associates in soliciting funds from "VICTIM ONE". There is no evidence that Andrade ever participated in a plan to defraud anyone.

## FIFTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

5. The government cannot obtain a forfeiture judgment pursuant to the unclean hands doctrine, for reasons including but not limited to the fact that the government's Complaint was filed in retaliation against the Claimant's filing of a federal civil rights complaint with the Department of Treasury in September, 2019 and an extensive follow up in late December, 2019, against Agent Bryan Wong, who signed the Verified Complaint, and his co-conspirators, pursuant to TRN Complaint #1911-0078. Agent Wong may have failed to disclose this information to various Courts which is a further need for FISA Reform along with the Search and Seizure applications.

## SIXTH AFFIRMATIVE DEFENSE

### (Innocent Owner)

3161-1002 / 1611507.1

ANSWER TO COMPLAINT FOR CIVIL FORFEITURE *IN REM*

6. As a separate and fourth affirmative defense to the Complaint, and to the purported causes of action set forth therein, Claimant alleges that he is an innocent owner under 18 U.S.C. § 983(d), and so the RESIDENCE is not subject to forfeiture.

## SEVENTH AFFIRMATIVE DEFENSE

### (Excessive Forfeiture)

7. As a separate and fifth affirmative defense to the Complaint, and to the purported causes of action set forth therein, Claimant alleges that forfeiture of the RESIDENCE is disproportionately excessive under 18 U.S.C. § 983(g) and the Eighth Amendment of the Constitution.

## EIGHT AFFIRMATIVE DEFENSE

### (Appropriations Clause)

8. As a separate and sixth affirmative defense to the Complaint, and to the purported causes of action set forth therein, Claimant alleges that forfeiture is barred under the Appropriate Clause to the United States Constitution (Article I, § 9, Cl. 7) because the forfeiture statutes, 18 U.S.C. § 981, et seq., enable the Department of Justice Asset Forfeiture Fund to bypass the United States Treasury and to become self-funding.

## NINTH DEFENSE

### (Article III, Section 3)

9. As a separate and seventh affirmative defense to the Complaint, and to the purported causes of action set forth therein, Claimant alleges that the forfeiture statutes are void and unenforceable under the United States Constitution, Article III, § 3.

## TENTH AFFIRMATIVE DEFENSE

### (Fourth Amendment)

10. Plaintiff's seizure of the defendant property violates the Claimants' Fourth Amendment right to be free from illegal searches and seizures.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Fifty Amendment)

3161-1002 / 1611507.1

ANSWER TO COMPLAINT FOR CIVIL FORFEITURE *IN REM*

11.     As a separate and eighth affirmative defense to the Complaint, and to the purported causes of action set forth therein, Claimant alleges that forfeiture is barred under the Due Process Clause of the Fifth Amendment to the United States Constitution because of the government's unjustified and prejudicial delay in commencing this action.

## PRAYER

WHEREFORE, Claimant prays for relief as follows:

1.     That the Complaint be dismissed, with prejudice and in its entirety;

2.     That Plaintiff take nothing by reason of this Complaint and that judgment be entered against Plaintiff and in favor of Defendant and Claimant;

3.     That the Court order the defendant property returned to Claimant;

4.     That Plaintiff pay Claimants' attorneys' fees and costs pursuant to 28 U.S.C. § 2465(b)(1)(A);

5.     That Plaintiff pay pre-and-post-judgment interest on the defendant property to Claimant pursuant to 28 U.S.C. § 2465(b)(1)(B);

6.     That Claimant be awarded a jury trial;

7.     That a federal district judge hear any matters pertaining to this case in lieu of a magistrate judge;

8.     That the Court compel the Plaintiff to respond to the Discovery in a timely manner. Claimant hopes Plaintiff timely responds to the Discovery request as required by the Federal Rules of Civil Procedure so as to prevent a drawn out legal battle over various motions to compel. Claimant hopes Plaintiff does not delete any data or communications in their presence so that US Attorney David Anderson, Andrade, the court, and others in the government may examine them to determine how the Andrade-related Russian hoax originated.

9.     That Claimant be granted such other and further relief as the Court may deem just and proper.

10.     For the Court to see this for what it really is, not only a relentless abuse of power, but outright corruption.

Dated:  May 18, 2020                              Respectfully submitted,


                                    By:    _P. Marcus Andrade_____
                                           Marcus Andrade, In Pro Se
                                           Service Disabled Veteran
                                           Si Se Puede

3161-1002 / 1611507.1

ANSWER TO COMPLAINT FOR CIVIL FORFEITURE *IN REM*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 18th day of May, 2020, I caused a copy of the foregoing **ROWLAND MARCUS ANDRADE'S ANSWER TO COMPLAINT FOR CIVIL FORFEITURE *IN REM*** to be filed with the Court using the ECF system, which will provide notice to all counsel of record.

*R. Marcus Andrade*

Rowland Marcus Andrade

Case No. 4:20-cv-2013-KAW

ANSWER TO COMPLAINT FOR CIVIL FORFEITURE *IN REM*

3161-1002 / 1611507.1

# EXHIBIT A

## ATTACHMENT B

*Property to be seized*

1.     All records relating to violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1349 (conspiracy to commit mail, wire, or bank fraud), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1956 (money laundering); 18 U.S.C. § 1957 (money laundering.); and 2 U.S.C. § 1606 (Lobbying Disclosure Act), those violations involving JACK ABRAMOFF, MARCUS ANDRADE, JAPHETH DILLMAN, and PAUL ERICKSON, and occurring after January 1, 2015, including:

    a.   Records and information relating to the following individuals and entities:

- Dana Rohrabacher and members of his staff;
- Marcus Andrade
- Japheth Dillman
- AML BitCoin
- Landfair Capital Consulting
- Sepo Holdings and Eli Zicherman
- Muzin Capital Partners
- Ghost Management Group
- Pangea LLC
- Brian Darling and Darling Associates
- Shalli Kumar
- Paul Erickson
- "ADI," "Kroll Global," "Rothschild Public Affairs," and "Erickson Group."
- Chase Kroll

DLA_0024646

Andrade with Congressman Dana Rohrabacher



# EXHIBIT B



**boingboing** / XENI JARDIN / 3:07 PM MON

## Maria Butina to plead guilty to conspiracy, accused Russian agent flips to help investigations



Maria Butina, 30, was either a perky gun nut with a fetish for sex-starved GOP losers, or a **secret agent in Russia's covert influence operation** to influence the 2016 United States elections.

We had a **pretty good idea.** But now we know. And she's flipping.

Today Maria Butina's lawyers said she **agrees to plead guilty to conspiracy and cooperate with federal, state and local authorities in any ongoing investigations.**

**"The agreement, which Butina signed** on Saturday, Dec. 8, also notes that the conspiracy charge carries ... up to five years in prison, but the deal could see Butina receive a lesser sentence, depending on the level of her cooperation, before likely being deported back to Russia."

Previous reporting links her to the NRA.

The already broke NRA is now in extremely deep shit.

Butina is reported to have admitted, as part of the **deal copy obtained by ABC News that is expected to be filed** to the court, that....

> She and an unnamed "U.S. Person 1," which sources have identified as longtime Republican operative Paul Erickson, with whom she had a multiyear romantic relationship, "agreed and conspired, with a Russian government official ("Russian Official") and at least one other person, for Butina to act in the United States under the direction of Russian Official without prior notification to the Attorney General."
>
> Based on the description, the "Russian Official" appears to be Alexander Torshin, deputy governor of the Russian Central Bank and a close ally of Russian President Vladimir Putin. Under his direction, the agreement said, she "sought to establish unofficial lines of communication with Americans having power and influence over U.S. politics."
>
> The agreement, which Butina signed on Saturday, Dec. 8, also notes that the conspiracy charge carries a maximum penalty of up to five years in prison, but the deal could see Butina receive a lesser sentence, depending on the level of her cooperation, before likely being deported back to Russia.
>
> It is unclear what Butina's cooperation might entail, but federal prosecutors have reportedly notified Erickson that he is a target of an ongoing investigation. The target letter sent to Erickson is from federal prosecutors in Washington, sources familiar with the case told ABC News, and separate from any South Dakota-based federal fraud investigation into his business dealings that has been the subject of earlier media reports.

Read the rest of the reporting at **ABC News.**

Anyone seen **"Sheriff" David Clarke** lately?

Also, from back in July, **"We now know 'U.S. Person 2' is George O'Neill Jr, an heir to the Rockefeller fortune."** Outgoing California congressman Dana 'I love Russia' Rohrabacher was also implicated, and it's possible any of her forthcoming cooperation could impact them both. Watch both of their names as Butina's case unfolds. They are in big trouble.





Maria Butina, presumed Russian agent, and Paul Erickson GOP political operative, pictured in an undated personal photo first published by ABC News.



**southpaw**
@nycsouthpaw

What a thing to jot down abcnews.go.com/Politics/maria…

"Unrelated to specific presidential campaigns," Erickson wrote in an October 2016 email to an acquaintance that was later obtained by the FBI, "I've been involved in securing a VERY private line of communication between the Kremlin and key [unnamed political party] leaders through, of all conduits, the [unnamed gun-rights organization]."

And during an FBI raid of Erickson's South Dakota home, investigators discovered a handwritten note suggesting Erickson may have been aware of a possible job offer from Russian intelligence services: "How to respond to FSB offer of employment?" Erickson scratched, an apparent reference to the Russian equivalent of the CIA.

6,805   7:12 PM - Dec 10, 2018

3,107 people are talking about this



**Ed Bott**
@edbott

Conspiracy.

Not failing to register as a foreign agent, conspiracy.

And a cooperation agreement?

Oh my. twitter.com/pamadden/statu…

**Pete Madden**   @pamadden
BREAKING: Maria Butina has agreed to plead guilty to conspiracy and cooperate with authorities in any ongoing investigations.
abcnews.go.com/Politics/maria…

11   5:59 PM - Dec 10, 2018

See Ed Bott's other Tweets



**Rachel Maddow MSNBC**
@maddow

After the meeting, Butina sent the Russian Official a message, which was translated as saying "We should let them express their gratitude now, we will put pressure on them quietly later."abcnews.go.com/Politics/maria…

**Maria Butina, accused Russian agent, reaches plea deal with …**
Maria Butina, a Russian gun rights activist who stands accused developing a covert influence operation in the United States, has abcnews.go.com

15.6K   6:20 PM - Dec 10, 2018

7,751 people are talking about this



**Natasha Bertrand**
@NatashaBertrand

ABC got a copy of the Maria Butina plea agreement, which says she and an unnamed "person 1" (likely Erickson) conspired with a Russian government official —and at least one other person— for Butina to act" as a Russian agent. abcnews.go.com/Politics /maria…

**Maria Butina, accused Russian agent, reaches plea deal with …**
Maria Butina, a Russian gun rights activist who stands accused developing a covert influence operation in the United States, has abcnews.go.com

5,992   6:25 PM - Dec 10, 2018

3,154 people are talking about this



**The Beat with Ari Melber on MSNBC**
@TheBeatWithAri

"To have a Presidential candidate in the back pocket of Putin when we had such bad relations with him"

"This is an all hands on deck emergency" - Former Prosecutor @JonFlan



301   6:48 PM - Dec 10, 2018

150 people are talking about this



**Carrie Johnson**
@johnson_carrie

Maria Butina, Accused Of Being Russian Agent, Reaches Plea Deal With Feds - New Details Here  npr.org/2018/12/10/675...

**Maria Butina, Accused Of Being Russian Agent, Reaches Plea...**
The Russian woman apparently was part of an effort to build clandestine ties between Moscow and important parts of the npr.org

90   6:43 PM - Dec 10, 2018

31 people are talking about this



**Noah Shachtman**
@NoahShachtman

Speaking of Maria Butina ... I'll never forget the time [NAME REDACTED] reached out to me and said, "Noah, I've found the real Trump-Russia connection."

The result was this story:thedailybeast.com/the-kremlin-an…

**The Kremlin and GOP Have a New Friend—and Boy, Does She...**
Depending on who's asking, Maria Butina is either a Russian central bank staffer, a gun rights advocate, or a connection between D.C.
thedailybeast.com

67   11:40 AM - Dec 10, 2018

35 people are talking about this

 **Anna Massoglia**
@annalecta

THREAD: Here's a nugget about televangelist Pat Robertson that didn't make it into our into our deep dive about alleged Russian spy Maria Butina, NRA leader David Keene, Jack Abramoff & GOP operative Paul Erickson crp.org/nramb

> **NRA leader, Jack Abramoff and GOP operati...**
> NRA leader David Keene, Jack Abramoff and GOP operative Paul Erickson have a long history as foreign agents lobbying together over a
> opensecrets.org

4,222   2:21 PM - Dec 10, 2018 · Washington, DC

3,279 people are talking about this

 **Anna Massoglia**
@annalecta

Replying to @annalecta
FARA records that revealed David Keene, Jack Abramoff & Paul Erickson lobbying together had a note about "Pat Robertson freelancing," claiming "we have no knowledge of "what he may do next."

So why was a televangelist advocating for a dictator accused of human rights violations?

Case 1:18-cv-02013-RJL Document 43   Filed 05/28/22   Page 31 of 165

ERICKSON ASSOCIATES, INC.
1425 EADS ST.
SUITE 1206
ARLINGTON, VA 22202
TELEPHONE (703)-979-1990
FACSIMILE (703)-979-1991

TO: ___Tom Callahan___   FAX: __(202)-224-0836__

FR: _Paul Erickson_____

DATE: __May 19, 1995____

RE: _____Pat Robertson free lancing._____

Number of Pages (Including This Cover Page): _____1_____

This material is circulated by Erickson Associates, Inc., which is registered
under the Department of Justice, Washington, D. C., as an agent for Andre
Soussan, Adjoint Au Directeur, Politique Internationale, 114 Avenue
Mozart, Paris, France 75016. Copies of this material are filed with the
Department of Justice, as well as the registration statement, both of which
are available for public inspection. Note that registration does not indicate
approval of the content of this material by the United States Government.

COMMENTS:

2,001   2:21 PM - Dec 10, 2018 · Washington, DC

1,073 people are talking about this

 **Anna Massoglia**
@annalecta

Replying to @annalecta

Well, Pat Robertson's Operation Blessing planes were
transporting diamond-mining equipment for the African
Development Corporation, a Robertson-owned venture initiated
with the cooperation of Mobutu Sese Seko—the Congolese
dictator who paid for lobbying to seek entry into the US

3,453   2:21 PM - Dec 10, 2018

2,230 people are talking about this

 **Anna Massoglia**
@annalecta

Replying to @annalecta

Virginia's consumer affairs office found that Pat Robertson
"willfully induced contributions from the public through the use of
misleading statements" secretly using funds for cargo planes to
aid refugees from Rwanda to transport diamond-mining
equipment for his business venture.

7,325   2:22 PM - Dec 10, 2018 · Washington, DC

5,652 people are talking about this

SHARE / TWEET / 89 COMMENTS

BUTINA / CONSPIRACY / DONALD TRUMP / MARIA BUTINA / NEWS / PICKS / POLITICS / RUSSIA / TRUMP

# EXHIBIT C



**BuzzFeed News**

REPORTING TO YOU

THE MONEY TRAIL

# Here Is The Money Trail From The Russian "Agent" And Her Republican Partner

Federal investigators say some of the money went to Maria Butina's campaign to help Russia infiltrate American politics.


**Jason Leopold**
BuzzFeed News Reporter


**Anthony Cormier**
BuzzFeed News Reporter

Posted on July 31, 2018, at 5:49 p.m. ET





**2020: Where History Is Made Every. Single. Day.**

Get the good, the bad, and the "wait, what??" with our new podcast: News O'Clock

Listen Now

as a Russian agent.

*CSPAN; AP Photo / Via c-span.org*

A $45,000 payment to an undisclosed law firm. A cash withdrawal for $14,000. Almost $90,000 sent to or from a Russian bank. These and other bank transactions totaling nearly $300,000, none of which have been made public, offer the first detailed look at how an accused foreign agent and a Republican operative financed what prosecutors say was a Russian campaign to influence American politics.

Anti-fraud investigators at Wells Fargo flagged the transactions — by Paul Erickson, a conservative consultant from South Dakota, and Maria Butina, who is in jail awaiting trial on charges of secretly acting as a Russian agent — as "suspicious," noting in some cases that they could find no "apparent economic, business, or lawful purpose" to explain them. Now FBI counterintelligence officers say the duo's banking activity could provide a road map of back channels to powerful American entities such as the National Rifle Association, and information about the Kremlin's attempt to sway the 2016 US presidential election.

Cash withdrawals, most of them from Erickson's personal and business accounts, make up $107,000 of the financial transactions now being investigated. The largest of those withdrawals — $14,000 — occurred in December 2015, when Erickson reportedly traveled to Moscow as part of an NRA delegation. The visit was sponsored by a Russian gun rights organization started by Butina, federal authorities say.

The duo also deposited about $90,000 in cash in their accounts, which

**2020: Where History Is Made Every. Single. Day.**

Get the good, the bad, and the "wait, what??" with our new podcast: News O'Clock

Listen Now

and shared with the bureau and the US Department of the Treasury's financial crimes division, Wells Fargo officials expressed suspicion about the "significant control" Erickson had over Butina's account. He had access, Wells Fargo found, to her personal checking account, which she opened in 2014. He frequently made payments on her behalf; the recipients have not been identified. He sometimes appeared to write checks that Butina signed. The bank closed the duo's personal and business accounts in late 2017.

Erickson did not return a message left on his cellphone or detailed emails seeking comment. He has not been charged with wrongdoing.

# Bank officials could find no "apparent economic, business, or lawful purpose" for the transactions.

Among the suspicious transactions cited by the bank and federal investigators:

• About $89,000 passed between Erickson's US accounts and one held by Butina at Russia's Alfa Bank. In 2014, Erickson received $8,000 from Butina's Alfa account. Between June 2016 and March 2017, Erickson sent a dozen wires to her Alfa account totaling $27,000.

• About $93,000 was sent or received during a single four-month period — from May to August 2017, after Butina had arrived in the US and was attending graduate school at American University in Washington, DC. Bank officials discovered wires, checks, transfers, and

## 2020: Where History Is Made Every. Single. Day.

Get the good, the bad, and the "wait, what??" with our new podcast: News O'Clock

Listen Now

Driscoll, told BuzzFeed News that his firm was not the recipient of the money.

• Last summer, Erickson sent two wires for $15,000 to a California company established by the son and brother of Jack Abramoff, a disgraced former lobbyist who is Erickson's longtime friend, political ally, and business partner. The company, Landfair Capital Consulting, was incorporated in March 2017. Abramoff's son, Alex, a recent college graduate, is the CEO and sole director; Abramoff's brother, Robert, is the registered agent. Because the company was newly established and based out of the home of Alex Abramoff, who does not list it on his public profiles, bank investigators flagged it as a possible shell company established to hide Jack Abramoff's interests.

Abramoff has not been accused of wrongdoing and neither he, his son, nor his brother returned messages from BuzzFeed News.

Investigators from Wells Fargo flagged dozens of other suspicious transactions involving Butina and Erickson for FBI agents and the Treasury Department's financial crimes division. Bank investigators told Treasury officials they were suspicious about where the money came from and that they could find no "apparent economic, business, or lawful purpose" for the transactions. The cash withdrawals are of particular interest to federal agents, a source with knowledge of the matter told BuzzFeed News.

Last month, Butina was arrested and indicted on charges of "conspiracy to act as an agent of a foreign government." Court documents in the case state that she sought to establish relationships

**2020: Where History Is Made Every. Single. Day.**

Get the good, the bad, and the "wait, what??" with our new podcast: News O'Clock

Listen Now

Butina's banking activities will show no illegal, or even remarkable, activity. As she is a Russian national with a Russian bank account, it is hardly surprising that some of her international transactions triggered reports. It is unfortunate that the FBI chose to leak information based on such reports and/or to allow its investigative concerns to become public."

## Getting "the project" off the ground

According to federal prosecutors, Butina began her secret influence campaign in 2014 with the help of an unnamed US political operative. That operative, law enforcement sources told BuzzFeed News, is Erickson.

Court documents say the 29-year-old Butina was romantically involved with Erickson, a 56-year-old political consultant from South Dakota. Bank officials found that he paid her rent, her tuition at American University, and even a monthly furniture bill, and that he received money from individuals described as personal connections. Some of the funds were characterized as "family support."

But bankers also saw that Erickson was often in dire financial straits. His personal and business accounts were overdrawn by a total of $2,300. He was hit with 77 overdraft fees. He took out payday loans of about $3,000 and had a balance of just $9 in one of his accounts.

Butina, meanwhile, began visiting the US in 2014 and making allies in conservative politics, particularly among guns rights advocates,

## 2020: Where History Is Made Every. Single. Day.

Get the good, the bad, and the "wait, what??" with our new podcast: News O'Clock

Listen Now

Case 2:20-cr-00203-RSL Document 112 Filed 05/19/2021 Page 38 of 165

enrolled in a graduate program at American University, which was part of her cover story, prosecutors alleged.

But her first known financial transaction with Erickson was much earlier than that. In December 2014, she sent a pair of wires from her Alfa Bank account to Erickson in the US. They totaled $8,000, and Butina noted they were for "grant assistant." Shortly after the email suggesting that she would need money to get her "special project" off the ground, Erickson sent a dozen wires to her Russian bank account for more than $27,000 and an additional $30,000 to a US account.

The two also appeared to use a company, Bridges LLC, to conduct suspicious transactions. Bank officials said they couldn't determine the purpose of the company, which was incorporated in South Dakota in February 2016. Butina was listed as the "sole signer" on its checking account, but Erickson wrote and signed checks from it. He told McClatchy that Bridges was formed to help Butina obtain financial assistance for her graduate studies.

Last year their financial activity seemed to escalate.

In summer 2017, the two made about $93,000 in wires, checks, transfers, and cash transactions that were deemed suspicious, including more deposits to Butina's Russian account. In June and July, Erickson sent two checks labeled "Butina retainer" to a Washington law firm. It appeared to bank examiners that he was filling out checks for her rent and utilities, but she was signing them. She paid a Washington limousine service $5,300.

## 2020: Where History Is Made Every. Single. Day.

Get the good, the bad, and the "wait, what??" with our new podcast: News O'Clock

Listen Now

suspected operation.

Erickson is also the subject of a <u>federal fraud investigation</u> in South Dakota, and some of the transactions flagged by Wells Fargo pertain to that probe, law enforcement sources told BuzzFeed News. Last week, Driscoll, Butina's attorney, <u>disclosed a letter</u> from a federal prosecutor offering her a chance to provide any information she has on the "illegal activity of others."

Erickson has not been charged with a crime.

## Torshin's role

**2020: Where History Is Made Every. Single. Day.**

Get the good, the bad, and the "wait, what??" with our new podcast: News O'Clock

Listen Now

at the direction of a high-level official in the Russian government."

That person, federal authorities told BuzzFeed News, is Alexander Torshin — Butina's former boss, once a member of Russia's upper house of parliament, and a close confidant of President Vladimir Putin.

In 2015, Torshin was appointed deputy governor of the Central Bank of the Russian Federation and Butina was hired as his special assistant. Torshin is believed to have close ties to gun rights activists in the US, and McClatchy underline reported that the FBI is investigating whether Torshin illegally funneled money to the NRA.

According to her indictment, Butina worked for Torshin until May 2016, and she came to the US on a student visa later that summer. The same month, Spanish authorities reported that Torshin had been laundering money for the Moscow-based Taganskaya crime syndicate.

This year, Torshin was among the Russian oligarchs sanctioned by the US Treasury Department for playing a key role in "advancing Russia's malign activities." Law enforcement sources told BuzzFeed News that tens of millions of dollars in his suspicious financial transactions were flagged by Treasury officials working on the FBI's counterintelligence investigation into Russian influence.

These transactions included large, round-number wire transfers — a hallmark of money laundering — from Istanbul and Dubai, the sources said. Reports on this suspicious behavior, which do not involve Wells Fargo, were shared with the FBI last year.

## 2020: Where History Is Made Every. Single. Day.

Get the good, the bad, and the "wait, what??" with our new podcast: News O'Clock

Listen Now

Butina case, which was brought by prosecutors in the national security division.

Democrats on the Senate Finance Committee have also <u>requested access</u> to the records of suspicious financial activity by Torshin, Erickson, and Butina.

## CORRECTION

July 31, 2018, at 6:26 p.m.

Alfa Bank is not under sanction by the United States. An earlier version of this post said it was.

 Jason Leopold is a senior investigative reporter for BuzzFeed News and is based in Los Angeles. He is a 2018 Pulitzer finalist for international reporting, recipient of the IRE 2016 FOI award and a 2016 Newseum Institute National Freedom of Information Hall of Fame inductee.

Contact <u>Jason Leopold</u> at <u>jason.leopold@buzzfeed.com</u>.

Got a confidential tip? <u>Submit it here</u>.

 Anthony Cormier is an investigative reporter for BuzzFeed News and is based in New York. While working for the Tampa Bay Times, Cormier won the 2016 Pulitzer Prize for Investigative Reporting.

Contact <u>Anthony Cormier</u> at <u>anthony.cormier@buzzfeed.com</u>.

## 2020: Where History Is Made Every. Single. Day.

Get the good, the bad, and the "wait, what??" with our new podcast: News O'Clock

Listen Now

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION



FILED

APR 19 2018

*Matthew ____*
CLERK

In the Matter of the Search re:

18-044-04

No. $18 - mj - 30$

AFFIDAVIT IN SUPPORT OF
SEARCH WARRANT "REDACTED"

STATE OF SOUTH DAKOTA  )
                       :SS
COUNTY OF MINNEHAHA    )

I, Matthew J. Miller, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a warrant to search the premises described in Attachment A as:



   a.   A residence and home office located at [REDACTED], Sioux Falls, South Dakota 57106.

   b.   A commercial property located at [REDACTED] in Sioux Falls, South Dakota 57108.

2. Items to be seized at both addresses are described in Attachment B.

3. I am a Special Agent of the Federal Bureau of Investigation and have served in that capacity for 25 years. During this time, I have received specialized training in white collar crime investigation by attending various seminars and classes specifically related to white collar crime. I have also worked a substantial

number of white collar crime cases during my 25 years with the FBI, including multiple cases related to mail fraud and wire fraud.

4. Information contained within this Affidavit is based on my investigation, training and experience, as well as information developed and relayed to me by other law enforcement officers. I have set forth facts that I believe are necessary to establish probable cause to seize instrumentalities, fruits, and evidence in violations of 18 U.S.C. §§ 1341 (Mail Fraud) and 1343 (Wire Fraud). The FBI has been investigating what appears to be a scheme to defraud investors. The investigation, as detailed below, has revealed that Paul Erickson has been obtaining investor money to produce specialized wheel chairs via a company known as "Investing with Dignity," to build retirement centers around the country through a company known as "Compass Care," and to build housing for oil workers in the Bakken Oil Region of North Dakota. It appears Erickson has obtained approximately $2.2 million from 76 investors, but has not used this money toward the projects he indicated he would be using it for. This Affidavit sets forth facts establishing probable cause that evidence, fruits, and instrumentalities of the scheme will be located in Erickson's home office located on ▓ and at his Compass Care office located on ▓ ▓.

2

## RELEVANT STATUTES

5. The application for a Search Warrant, which this Affidavit is offered in support thereof, is being applied to seize instrumentalities, fruits, evidence, more particularly described in Attachment B for violations of:

- a. 18 U.S.C. § 1343, which makes it a crime to engage in a scheme or artifice to defraud another, and obtain the money and property of another, by false and fraudulent pretenses, that involves a wire transmission and interstate or foreign commerce for the purpose of executing the scheme or artifice.

- b. 18 U.S.C. § 1341, which makes it a crime to engage in a scheme or artifice to defraud another and obtain the money and property of another, by false and fraudulent pretenses, that involves the use of the United States Postal Service.

## PAUL ERICKSON AND BUSINESS ENTITIES

6. Paul Erickson filed articles of incorporation for "Investing with Dignity, LLC" with the South Dakota Secretary of State's Office on September 20, 2010, and provided an address of                                      , Sioux Falls, South Dakota 57106. Erickson was listed as the Registered Agent and Manager. Investing with Dignity was dissolved with a Certificate of Administrative Dissolution on April 20, 2015, but was subsequently reinstated on March 24, 2016, and is currently in good standing.

3

7. Paul Erickson filed articles of incorporation for "Compass Care, Inc." with the South Dakota Secretary of State's Office on December 20, 1996, and provided the address of operation to be ⬛⬛⬛⬛⬛⬛⬛⬛. A series of address changes occurred and the most recent address filed with the Secretary of State's Office on October 28, 2017, was ⬛⬛⬛⬛⬛⬛⬛⬛, Sioux Falls, South Dakota 57108-2237. This filing showed Erickson to be the President of "Compass Care, Inc."

## BACKGROUND

8. Paul Erickson came to the attention of the FBI in 2016 when Joan Sammon reported a fraud by Erickson. Sammon was selling parcels of land in Williston, North Dakota, in the Bakken region for residential development. In about 2015, Erickson contacted Sammon and wanted paperwork to evaluate the possibility of investing in Sammon's land. Sammon emailed him paperwork related to the property but Erickson did not invest. Later, however, Sammon was contacted by a group of investors who indicated they had paid Erickson $100,000 for an investment in the same land. Because Erickson did not have an interest in the land (which was owned by Sammon), Sammon believed the investors had been defrauded.

9. The FBI then obtained bank records in an attempt to learn of other investors. I have reviewed the results of a financial analysis conducted by FBI Special Agent Roahn Wynar. Wynar reviewed bank records subpoenaed from Wells Fargo Bank for accounts held by Paul Erickson for the period of December

4

# EXHIBIT E

# Nick Muzin and Joey Allaham launch public affairs consulting firm

📅 05 September 2018 | Consulting.us

*Stonington Global, a new public affairs consultancy, will be opening its doors in NYC and Washington, DC. Headed by a powerhouse duo with extensive experience in political strategy, lobbying, and business, the firm will provide services ranging from investment strategy to cybersecurity.*

Political consultants Nick Muzin and Joey Allaham have launched a new public affairs consulting firm named Stonington Global LLC. With offices in New York and Washington, DC, the firm provides services to domestic and global clients in the areas of lobbying, procurement, and public affairs. The firm will also help investors – including sovereign wealth funds – identify opportunities in the US and abroad. Further offerings will include cybersecurity, election strategy, defense procurement, and government consulting.

Co-Founder Nick Muzin has deep connections with high-ranking Republicans, having served as the Chief of Staff to two current Senators, Director of Coalitions for the House Republican Majority, and Senior Advisor to multiple Ted Cruz campaigns. Muzin also worked on Trump's presidential campaign, as well as on the Transition Team that recruited candidates for the new administration. The New York Times has called Muzin one of 'Washington's most influential deal-makers.'

ppe    Middle East    Africa    Asia    Oceania | 🌐 Select Country ▾

• Projects  • Jobs  • Career  • Consulting Industry  • Partners
ᴜ̃ɪᴄᴄ.



Nick Muzin and Joey Allaham launch public affairs consulting firm

The new firm will leverage their close connections with politicians and business leaders, while offering access to top lobbyists and PR specialists in Washington. Clients will benefit from the leaders' working experience and relationships with members of the Senate, House, and all federal agencies. As such, the firm can offer political know-how and connections to the currently constituted White House and Congress.

Muzin and Allaham built a high level of caché from their recent work for Qatar. As part of an increased lobbying effort from the embattled Gulf state, Muzin and Allaham compiled a list of 250 Trump influencers to help favorably change US policy for Qatar. The list included Alan Dershowitz, Mike Huckabee, NYC developer Steve Witkoff, and radio host John Batchelor. The pair's lobbying effort culminated in stronger US-Qatari relations, and a meeting between President Trump and the Emir, Sheikh Tamim bin Hamad al Thani.

The new firm's 'About Us' page states that Michael Flynn will be joining the firm as Director of Global Strategy, responsible for the firm's business development and strategic consulting on military and peacekeeping activities. On July 10, numerous news outlets reported that Flynn's legal team stated that he was not actually a part of the firm, and that Stonington's statements regarding him joining the consultancy, and quotes attributed to him, were the result of a 'misunderstanding.' Flynn's lawyers say he didn't intend for the statements to be issued at the time they were.

"We cannot comment on General Flynn's considerations about the timing of the announcement, but we have faith in his patriotism and long history of service to our country. We look forward to working together," Muzin said in response to Flynn's legal team.

Flynn is currently awaiting sentencing after pleading guilty to lying to the FBI about his contact with Russian officials during the presidential transition, at which time he was Trump's national security adviser. Flynn's sentencing has been repeatedly delayed as he continues to co-operate with the Mueller investigation into Russian interference in the 2016 election.

# EXHIBIT F



**Marcus Andrade** ▮▮▮▮▮▮▮▮▮

---

## Circling back

**Marcus Andrade** <ceo@amlbitcoin.com>                                    Wed, Jul 10, 2019 at 3:15 PM
To: Ben Boyer ▮▮▮▮▮▮▮

Ben, I fully understand. I understand your situation.

Actually as crazy as it sounds, I am more than happy for you to join the company and take a look from inside out.

Do you actually have possession of the aml tokens or does the other company have them?

Thanks,

Marcus

On Wed, Jul 10, 2019 at 10:48 AM Ben Boyer <▮▮▮▮▮▮▮▮▮▮> wrote:
> Marcus,
> I didn't mean to alarm you with my comments yesterday. If you were in my shoes and the FBI determined that an
> ICO that you invested in was a fraud (I know they haven't filed charges), I suspect you'd be looking to sue the token
> issuer as well. That said, given that charges haven't been filed, I have absolutely no issue with you or NAC.
>
> I understand that you're not interested in buying back the tokens and while my strong desire is to sell them back to
> Japheth (per my asset purchase agreement), my collections attorney believes he may just declare bankruptcy to rid
> himself of the liability of my judgement. At that point, I'll likely sue Blockbits (if I can determine they have any
> assets) but I'd also like to explore if there's anything I can do to help you finish the project and try to get the token
> value back up to something closer to the ICO price. I own 2.5M tokens and, like you, I have a great incentive to see
> the price increase.
>
> -Ben
>
>
> Ben Boyer
> Partner
> Tenaya Capital
>
> [black redaction box]
>
>
> --
>
> Marcus Andrade, Founder
> NAC Foundation, LLC
>
> [black redaction box]

# EXHIBIT G

**Affidavit**

STATE OF _Colorado_

COUNTY OF _Mesa_

BEFORE ME, the undersigned authority, personally appeared **CHRISTOPHER RAY** who, being by me duly sworn, deposed as follows:

1.      "My name is **CHRISTOPHER RAY**. I am over 18 years of age, of sound mind, and capable of making this affidavit.

2.      I am a licensed attorney residing and operating in New Hampshire.

3.      I have served as a compliance attorney for Rowland Marcus Andrade ("Andrade") since about June of 2018.

4.      As a compliance attorney, my primary duty was to interview any individual or individual on behalf of an entity who purchased digital currency directly from Andrade, including the AML Bitcoin Token ("Tokens"). These limited purchases are distinct from the vast majority of purchases of Tokens which occurred through the Initial Coin Offering ("ICO") in which the seller was NAC Foundation, LLC.

5.      When a purchaser purchased Tokens directly from Andrade, my role was to interview the purchaser to ensure they were not misled insofar as what they had purchased. For direct Token purchases from 2017 to present, I personally called every purchaser who purchased Tokens from Andrade and I asked a series of questions to verify they understood what the Tokens represented and what they didn't. More specifically, I ensured the purchaser understood that the Tokens were not the finished digital currency, but that they were a medium of exchange which would/could be converted into the finished AML Bitcoin once the project was completed by Andrade. While the finished product (the AML Bitcoin) would feature anti-money laundering (AML) and know-your-customer (KYC) features, I ensured the purchasers understood the

Tokens did not include these features. Finally, I ensured the purchasers understood that the Tokens were not tied to any physical, financial, or other asset and that the Tokens did not constitute an investment or security. Collectively, the acknowledgements in this Paragraph 5 are here forth referred to as the "Acknowledgements".

6.      On August 28, 2017, Block Bits Capital, LLC ("BBC"), a Delaware limited liability company purchased 287,556 tokens from Andrade.

7.      In November, 2018, I called and spoke to Daniel Aharanoff, an individual who purchased Tokens directly from Andrade in October, 2018. BBC served as a broker for the purchase and sale. In my phone call with Aharanoff, I discovered he was mislead by BBC as he was under the impression that the Tokens were tied or backed by a physical asset, namely patents. Andrade offered to immediately refund Aharanoff's purchase. However, Aharanoff refused the offer, agreeing to keep the Tokens after agreeing to the Acknowledgements.

8.      As result of Aharnoff's misunderstanding, I began contacting and interviewing everyone who had purchased Tokens directly from Andrade in November and December, 2018. With regard to BBC's purchase from the year prior, I spoke with BBC's owner Japheth Dillman first and then spoke to them together on another call. David Mata. BBC acknowledged as the purchaser that Andrade nor NAC had ever misled them.

9.      Other than Daniel Aharanoff, BBC brokered one other sale of Tokens from Andrade directly. The purchaser was Ben Boyer who had purchased $125,000 worth of Tokens from Andrade in October, 2018. In November and December, 2018, I repeatedly tried to call Boyer to interview him to ensure he was not misled by BBC. After numerous attempts to call and E-mail Boyer, I was able to have a phone conversation with Boyer. On the phone call, Boyer seemed apprehensive about the call, insisting on me e-mailing him the questionnaire rather than

completing it over the phone. I was never able to complete the interview as Boyer was unresponsive to phone calls and e-mails from that point moving forward. I later discovered that Boyer was instructed by the broker, BBC, to ignore my calls and e-mails." BBC had told Andrade via email that they had purchased all the Aml Bitcoin Tokens from Ben Boyer and that is why he is not returning my calls.

**CHRISTOPHER RAY**

STATE OF _Colorado_
COUNTY OF _Mesa_

SWORN TO AND SUBSCRIBED before me on the _12_ day of _May_ ,
2020 by **CHRISTOPHER RAY.**

Notary Public, State of _Colorado_

THERESE LUELLEN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20014010801
MY COMMISSION EXPIRES 04/05/2021

# EXHIBIT H



# Hello AML Token Holders, Beta Testers and Supporters,

We are super excited to announce that we are NEAR COMPLETION OF THE PHASE 3 beta testing of the AML Bitcoin Wallet platform. Today we are updating to version 1.1.7 and are gearing up for a security audit by a third party. Once said audit is done, **we are ready for launch.**

We will then participate in various conferences worldwide, and get on podcasts, talk to YouTubers and show the world what we have accomplished. We are also in planning stages for TV appearances across major networks in the US and other countries.

## Our sandbox blockchain explorer environment is available for testing. Please click here to take a look.

Blockchain, as a technology, has been described as a disruptor of industries over and over again for years. But we've seen little commercialization of actual product portfolios. With AML Bitcoin, we want to change that.

### Think about e-commerce platforms such as eBay.

Would it be possible to offer more security to their millions of customers? Yes, you just need to know the true identity of the sender and receiver. That's why we've built the world's best AML & KYC privately regulated, public blockchain that is a decentralized payment cryptocurrency platform based on Proof of Identity.

### Think about in-car payment systems. Would this be great for Telsa?

Would they benefit from their very own compliant asset - maybe called TeslaCoin. For in-car-payments, to get access to special features - be it performance, be it entertainment. What about a biometric payment system? Just scan your eye and you are good to go.

### Think about all the potential product use cases for the technology.

Governments, and organizations will soon be able to use our white-label platform to create their own digital currency while allowing other entities like banks to create their own digital currency as well.

Companies will be able to create their own anti-anonymous digital currency utilizing the AML Bitcoin wallet platform in a matter of seconds while receiving back some of the asset creation fees directly from the transactions.

### Would banks like this?

What if a user had the option of sharing all his or her digital currency transaction data with their financial institution? What if the bank could be able to confirm all of the users

transactions along with the identity of the person they are transacting with? We are making it possible with the AML Bitcoin Banking API. *What if a bank would require this in an effort for them to maintain an account?*

## *Testing the AML Bitcoin Wallet Platform using V1.1.5*

**AML Bitcoin 2020: How To Create Your Own Compliant Digital Asset in 30 Seconds. Click here to view the video.**

**AML Bitcoin 2020: How Mining works fully explained in 3 minutes. Click here to view the video.**

### IIMPORTANT IDAX EXCHANGE UPDATE

If you haven't already, if you currently have AML Tokens on the IDAX Exchange, please read our important statement  here. We are extending the documents submission deadline an additional 60 days. The new deadline is May 6th, 2020.

If you are interested in participating in AML BitCoin Beta Testing Program, it is not too late to join! You need to create a Chainbook account and be added to the Phase 3 Chainbook group. Additionally, you can also go and create an account directly at Amlwallet.

The Beta Testing Program is a great way for Token Holders to test the upcoming technology before it goes live to the public.

Thank you all for your continued support.

AML BITCOIN TEAM

**Disclaimer:** AML BitCoin is still in its token stages. All the features of AML BitCoin are still in its developmental stages and are pending compliance and legal approval. Upon completion and activation of the AML BitCoin, AML BitCoin Token holders will have the opportunity to exchange them for AML BitCoins on a 1:1 ratio. Further, the Digital Identity features has yet to be operationally deployed. By reading this newsletter, you agree and understand the above disclaimer.
You agree that you may not rely on any information in this Newsletter and that we reserve the right to update, change or replace any part of this Newsletter by posting updates and/or changes to our website. Modifications to our Platform are subject to change without notice to you.
THESE TERMS AND CONDITIONS CONTAIN AN EXPRESS WARRANTY DISCLAIMER. USING ANY ABTC PRODUCTS OR SERVICES SHALL BE SOLELY AT THE RISK OF THE END USER. TO THE MAXIMUM EXTENT PERMISSIBLE UNDER ANY APPLICABLE LAW, ANY APPLICABLE WARRANTIES, INCLUDING WARRANTIES OF MERCHANTABILITY AND WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, ARE EXPRESSLY DISCLAIMED. YOU EXPRESSLY INDEMNIFY AND HOLD HARMLESS THE COMPANY FOR ANY DAMAGES ARISING FROM YOUR PURCHASE, ITS USE, DOWNLOADING, INSTALLATION, UNINSTALLATION, OR ANY OTHER USE, INCLUDING TO THE MAXIMUM EXTENT PERMISSIBLE UNDER ANY APPLICABLE LOCAL LAW ACTUAL DAMAGES, MULTIPLICATIVE DAMAGES, SPECIAL OR CONSEQUENTIAL DAMAGES. THERE ARE NO LIQUIDATED DAMAGES UNDER THESE TERMS AND CONDITIONS. NO ADVICE GIVEN TO YOU BY ABTC MAY BE CONSTRUED AS TAX ADVICE OR LEGAL ADVICE. SUCH ADVICE IS GENERALIZED (NOT SPECIFIC TO YOUR NEEDS OR CIRCUMSTANCES). YOU MAY NOT RELY TO YOUR DETRIMENT ON ANY REPRESENTATIONS MADE BY ABTC AT ANY TIME, THROUGH THE WEBSITE OR OTHERWISE.

# EXHIBIT I

Case 3:20-cr-00249-RS Document 143 Filed 05/28/2022 Page 62 of 165



Marcus Andrade

## Thoughts on this as a possible press release?
3 messages

**Japheth Dillman**
To:                              Jack Abramoff

Thu, Sep 7, 2017 at 12:45 AM

(quotes from Leslie and myself in bold)

AML BitCoin (http://amlbitcoin.com/) is pleased to announce it has entered discussions with the Port of San Francisco regarding the acceptance of its AML KYC compliant cryptocurrency. CEO and Founder Marcus Andrade recently met with the San Francisco Port Commissioner Leslie Katz (and partner at Greenburg Traurig law firm: https://www.gtlaw.com/en/professionals/k/katz-leslie-r).

During the meeting Katz expressed great interest in exploring what AML BitCoin could do for the Port of San Francisco. San Francisco is well known as a high demand cruise port and import/export location especially for Asian markets. Additionally, HomeLand Security has an operation on site in the SF Port. **Katz stated, "San Francisco is a very tech-forward thinking city, and we have been keeping a keen eye on cryptocurrency as a possible future payments solution for the Port. However, due to the coins lacking AML KYC compliance we have been hesitant to fully evaluate any real solutions... that is until I met with Marcus! We are very interested in examining the legal aspects of their offering and how this might help benefit the Port of San Francisco."**

Little known fact: San Francisco also operates the Free Trade Zone for all of the Bay Area. The San Francisco Free Trade Zone expands significantly north of the city into the bay and was initially instituted in order to promote an economic boost to the city of San Francisco. Brainstorming during the meeting, **Katz later went on to say, "We would love to promote the under utilized San Francisco Free Trade Zone, and we feel that the AML BitCoin would be a mutually beneficial partnership to explore."** Leslie Katz is also has a very good working relationship with the Ports of Oakland, San Diego, LA/Long Beach, and Seattle. Together, Marcus and Leslie think it would be a unique offering to approach the other major ports along the West Coast in exploring a fortuitous partnership collectively with AML BitCoin.

Tech industry insider and notorious cryptocurrency investor Japheth Dillman (https://www.linkedin.com/in/japhethdillman/) believes this potential partnership means bigger things than just a single deal with one coastal port, expressing his excitement he said **"In my investments in cryptocurrencies many times I have bumped against the wall with government compliance issues, especially in regards to AML KYC, and it is truly wonderful to see the heart of Silicon Valley finally embracing on a policy level the coming tide of cryptocurrency. Moreover, it is astoundingly fantastic news that a new currency tears down those walls of regulation that stood as a barrier between blockchain technology and government. I can't wait to see where AML Coin takes us!"**

AML BitCoin is excited to continue the conversations with the Port of San Francisco and will provide further updates in the future.

--
**Japheth Dillman**
CEO & Co-Founder

---

**Marcus Andrade**                 Fri, Jul 19, 2019 at 3:31 PM
To: Jack Abramoff

[Quoted text hidden]
--

Marcus Andrade, Founder
NAC Foundation, LLC

---

**Marcus Andrade**                 Fri, Jul 19, 2019 at 3:31 PM
To:

---------- Forwarded message ----------
From: **Japheth Dillman**
Date: Thu, Sep 7, 2017 at 12:45 AM
Subject: Thoughts on this as a possible press release?
To: _____, Jack Abramoff <_____>

[Quoted text hidden]

[Quoted text hidden]

# EXHIBIT J

# Terms And Conditions (version 1)

In using this website and/or registering for purchase and/or storage of AML BitCoin Tokens and/or for an AML BitCoin Wallet or a wallet related to the purchase or storage of AML BitCoins and/or AML BitCoin Tokens, You make the representations below and acknowledge that You have carefully read, that You understand, that You agree to the terms and conditions set forth below, and that they and Your representations below are a part of the contract and agreement between You and NAC Foundation, LLC (hereinafter "NAC"). You agree that these Terms and Conditions and the truth of Your representations are a condition to Your use of NAC Websites (including this one), all Your purchases, uses, sales, transfers, exchanges, transactions, and mining relating to the AML BitCoin, the AML BitCoin Token, Your use of an AML BitCoin Wallet and Your use of an AML BitCoin Token Wallet. Neither this document, nor any other document produced or signed by NAC is an offer or solicitation to buy coins or tokens.

A. Definitions. The following terms (listed alphabetically) are defined as follows:

1. "AML BitCoin" refers to the AML BitCoin digital currency.
2. "amlbitcoin.com" refers to the Website with the URL address of https://amlbitcoin.com, which is owned by NAC.
3. "AML BitCoin Wallet" refers to the digital wallet used for sending, receiving and mining AML BitCoins.
4. "amlbitcoinwallet.com" refers to the Website with the URL address of http://amlbitcoinwallet.com, which is owned by NAC.
5. "AML Compliant" refers to features or attributes of the AML BitCoin by which the AML BitCoin code and or combined with NAC's operating protocols and activities such as monitoring and reporting of activities concerning the purchase, use, sale, exchange and maintenance of the AML BitCoin, endeavor to be compliant with the AML Laws.
6. "AML Laws" means and refers to the laws, statutes, rules, regulations, and procedures of the United States, various States within the United States, and of jurisdictions of other nations in which AML BitCoin and/or AML BitCoin Token is purchased, sold, exchanged, or used that govern, regulate, and relate to preventing money-laundering, terrorism, identity theft, financial crimes, and pertain to know-your-customer laws, and specifically (a) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, aka the USA PATRIOT Act; (b) International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, aka Title III, of the USA PATRIOT Act, and subtitles that deal with International Counter Money Laundering and Related Measures, Bank Secrecy Act Amendments and Related Improvements, and, Currency Crimes and Protection; (c) the Money Laundering Control Act of 1986; (d) provisions of the Fair and Accurate Credit Transactions Act of 2003, also known as FACT Act or FACTA, that pertain to the prevention of identity theft; (e) requirements related to economic and trade sanctions administered and enforced by the Office of Foreign Assets and Controls (OFAC) within the United States

Department of Treasury; (f) the Bank Secrecy Act, aka BSA or the Currency and Foreign Transactions Reporting Act, which requires the reporting of certain transactions to the government; (g) laws pertaining to know-your-customer requirements; and (h) similar laws in other countries.

7. "AML BitCoin Token" refers to a digital token which may be exchanged for an AML BitCoin.

8. "AML BitCoin Token Wallet" refers to the digital wallet used for sending, receiving and mining AML BitCoin Tokens.

9. "amltoken.com" refers to the Website with the URL address of https://amltoken.com, which is owned by NAC.

10. "BGCI" refers to Black Gold Coin International, Inc., a Wyoming corporation, with a principal place of business in Las Vegas, Nevada.

11. "NAC" refers to NAC Foundation, LLC, a limited liability company organized and existing under the laws of the State of Nevada, United States of America, with a principal place of business in Las Vegas, Nevada.

12. "NAC Websites" refers to AMLbitcoin.com, AMLbitcoinwallet.com, AMLtoken.com, and all other websites that may be owned by NAC from time to time. In the event a predecessor coin created by NAC (the Aten Black Gold" coin) is converted to an AML BitCoin, then NAC Websites also refers to Atencoin.com, being the Website with a former URL address of https://www.atencoin.com and Atenwallet.com, being the Website with a former URL address of https://atenwallet.com.

13. "Parties" refers to You and NAC collectively.

14. "Party" refers to NAC or You, as the case may be.

15. "You" and "Your" each refers to you, the person accessing this website and accepting these terms and conditions.

B. You acknowledge, understand, represent, warrant and agree as follows:

1. These Terms and Conditions shall be retroactive to the date of Your original purchase and/or acquisition of AML BitCoin Tokens and/or AML BitCoins and Your execution of a Purchase and Sale Agreement in connection with Your purchase of AML BitCoin Tokens and/or AML BitCoins.

2. You are at least 18 years of age and are of competent mind.

3. You are not located in a country subject to sanctions imposed by laws or regulations of the United States or any governmental agency, department or office of the United States (such as the Office of Foreign Assets Control within the U.S. Department of the Treasury), or executive orders of the President of the United States, or treaties to which the United States is a party, or otherwise imposed by other organizations, such as the United Nations, European Union, any European Union country, the United Kingdom's Department of Treasury, or any other sanctions list recognized and enforced by the United States, such as, without limitation and solely by way of example, the Democratic People's Republic of North Korea and its territories, Iran, and Iraq.

4. Your purchase of AML BitCoin Tokens and AML BitCoins and use of the AML BitCoin Token Wallet and AML BitCoin Wallet complies with applicable law and regulation in Your jurisdiction, including, but not limited to, (a) legal capacity to enter into contracts, (b) relating to purchasing, selling and using digital or cryptocurrencies such as the AML

BitCoin Tokens and AML BitCoins, and exchanges for such, and (d) any governmental or other consents required have been obtained.

5. Information You provided to NAC about Yourself, including, without limitation, passport, driver's license, address, social security number, email address, biometric data, bank account information in connection with verification procedures and Your use of NAC Websites, the AML BitCoin Token Wallet and/or the AML BitCoin Token Wallet, is accurate. Should any such information be inaccurate or change, You will promptly deliver correct information to NAC.

6. In order to obtain an AML BitCoin Wallet and to purchase, sell, exchange, hold, mine, and use the AML BitCoins, You must complete, obtain, and comply with the procedures for and to obtain a certified digital identity profile. This process requires a biometric scan of one of more of Your face, iris, retina, and fingerprint. While at this time, NAC intends to use and rely upon the Digital Identity Trust Network to administer and process the certified digital identity profile, in the future, NAC may rely upon an alternative vendor for the creation, administration and processing of certified digital identity profiles by means of biometric scans.

7. If You are using this website and/or registering for an AML BitCoin Token Wallet and/or an AML BitCoin Wallet on behalf of a legal entity, You represent and warrant that (a) such legal entity is duly organized and validly existing under the applicable laws of the jurisdiction of its organization; (b) and You are duly authorized by such legal entity to act on its behalf.

8. As to entities, only the authorized representative of the entity shall obtain an AML BitCoin Token Wallet and/or the AML BitCoin Wallet and all addresses and credentials pertaining to the AML BitCoin Token Wallet and the AML BitCoin Wallet and transactions in AML BitCoin Tokens and AML BitCoins, including purchases, sales, exchanges, and use in commercial or consumer transactions shall refer to an address identifying the individual representative of the entity.

9. BGCI and NAC are two separate and distinct business entities.

10. You have no right to and will not share or participate in any way with BGCI's revenue, profit, or losses earned in connection with its activities concerning the AML BitCoin and/or AML BitCoin Token.

11. AML BitCoin and/or AML BitCoin Token have no underlying collateral; the AML BitCoin and/or AML BitCoin Token is merely an unsecured cyber currency or digital coin or in the case of the AML BitCoin Token, a digital token for the exchange to an AML BitCoin.

12. AML BitCoin and/or AML BitCoin Token will not be redeemed by BGCI or NAC and You are not relying upon NAC to be a source of liquidity for You or Your purchase of AML BitCoin and/or AML BitCoin Token.

13. Neither AML BitCoins and/or AML BitCoin Tokens nor any agreement related to Your purchase of AML BitCoins and/or AML BitCoin Tokens creates or constitutes a debt of NAC to You. Neither BGCI nor NAC is obligated to pay You any returns or repayment regarding Your purchase of AML BitCoins and/or AML BitCoin Tokens.

14. AML BitCoin is a medium of exchange and not a pooled interest in any business entity or common enterprise or a business venture involving You and BGCI, NAC or its affiliates or subsidiaries.

15. You have not purchased and have no intention of purchasing AML BitCoins and/or AML BitCoin Tokens for investment purposes and You expect no return on investment.

16. AML BitCoins and/or AML BitCoin Tokens are not securities and are not subject to the securities laws of any governmental entity.

17. AML BitCoins and/or AML BitCoin Tokens are intended to be and are solely an Internet-based exchange medium.

18. By purchasing, selling, exchanging, transferring, using or mining AML BitCoins and/or AML BitCoin Tokens, and by using the AML BitCoin Wallet, AML BitCoin Token Wallet, and/or an NAC Website, or obtaining and using technical information and technical support provided by NAC, You are not participating in and not becoming a member or investor in any pooled interest, business entity, common enterprise, or business venture with NAC or any of its or their affiliates. By purchasing AML BitCoins or AML BitCoin Tokens, You have no right to vote on any activity of BGCI, NAC, or any other affiliate or subsidiary of BGCI or NAC.

19. NAC and its affiliates can, without notice, purchase AML BitCoins and/or AML BitCoin Tokens on the secondary market after the initial issuance, and may resell the AML BitCoins and/or AML BitCoin Tokens that they purchased.

20. You shall take full responsibility for Your AML BitCoin Wallet and Your AML BitCoin Token Wallet.

21. NAC will use its best efforts to create a digital currency (or cryptocurrency or cybercurrency) that is compliant with AML Laws.

22. Your purchase of AML BitCoins and/or AML BitCoin Tokens is solely for the purpose of using AML BitCoins and/or AML BitCoin Tokens for Your lawful commercial or personal activities, but not as an investment.

23. You have never, to Your knowledge, been involved in any terrorist or terrorist financing activity; and You shall never intentionally engage in activities that constitute terrorism or financing of terrorists.

24. You shall abide by and conform Your conduct to relevant laws in Your jurisdiction regarding the ownership, purchasing, selling, exchanging, transferring, using or mining AML BitCoins and/or AML BitCoin Tokens, and use of the AML BitCoin Wallet, the AML BitCoin Token Wallet and/or an NAC Website, including, but not limited to, reports to tax authorities.

25. You are not purchasing, selling, exchanging, transferring, using or mining AML BitCoins and/or AML BitCoin Tokens, and/or using the AML BitCoin Wallet, the AML BitCoin Token Wallet, and/or an NAC Website for the purpose of facilitating any illegal or unlawful activities, or in any way in connection with any illegal or unlawful activity.

26. In connection with the purchasing, selling, exchanging, transferring, using or mining AML BitCoins and/or AML BitCoin Tokens, and/or using the AML BitCoin Wallet, the AML BitCoin Token Wallet, and/or an NAC Website, You intend to and will make all reasonable efforts to comply with all laws and regulations of the United States governing currency transmission activity, all State laws governing such, and all laws governing such in Your jurisdiction.

27. The supply of AML BitCoin, AML BitCoin Token and NAC services through the NAC Website are subject to United States and international export controls and economic sanctions requirements.

28. NAC will use its best efforts to monitor all the transactions (purchases, exchanges, sales, mining) of AML BitCoins s in an effort to detect suspicious activities that may violate AML Laws.

29. NAC intends to track AML BitCoin to identifiable persons and business entities and will file suspicious activity or similar reports with relevant governmental agencies in nations where it does business. In filing such reports NAC shall exercise reasonable care and act in good faith based on the information it has and that is provided to it. You agree that notwithstanding NAC's exercise of reasonable care and good faith, or otherwise act in conformity with the standards of applicable law, such reports may be erroneous or contain incomplete or inaccurate information. You acknowledge that generally such reports to governmental agencies that are required to be made are privileged communications, as a result of which, NAC would not be subject to a claim for damages in the event that NAC makes an incorrect or incomplete report having exercised reasonable care and good faith.

30. Your AML BitCoin transactions and their associated IP locations of senders and receivers will be recorded and securely stored in a physical server located in United States of America. Your personal information submitted to an NAC Website shall be securely stored and backed-up in a physical server located in United States of America. Your AML BitCoin transactions and their associated IP locations of senders and receivers will be monitored and analyzed in United States of America with monitoring and detecting software that allows NAC to identify any suspicious activities. Any suspicious activities associated with Your AML BitCoin transactions together with personal information and IP locations of corresponding senders and receivers may, in NAC's sole judgment, be reported to relevant government entities in Your region and/or the Financial Crimes Enforcement Network (FinCEN at http://www.fincen.gov/) in United States of America. NAC's tracking and reporting to appropriate governmental authorities of suspicious activities, includes Your activity in the United States with respect to the AML BitCoin.

31. In the event NAC receives or possesses information that would lead to a reasonable and good faith suspicion, or a basis otherwise in conformity with applicable law, that a transaction in AML BitCoin Tokens and/or AML BitCoins is violating or is about to violate money laundering, anti-terrorist financing, or anti-fraud laws of the United States or of any nation or that the use of AML BitCoins is or is about to be used to facilitate a violation of such laws or a financial crime, or is in violation of a validly issued court order or other valid governmental order, NAC may refuse to process, or may rescind, cancel or reverse, any purchase, sell, exchange, transfer, use or mine of AML BitCoins, and freeze Your AML BitCoin Wallet. In the event Your AML BitCoin Wallet is frozen and You have credible evidence, or evidence otherwise satisfying the standard of applicable law, establishing that You did not knowingly engage in terrorist or criminal activity or the financing of such, and in the event NAC is not ordered otherwise by a court, governmental or law enforcement agency or department, NAC will take all reasonable actions to unfreeze and reinstate Your AML BitCoin Wallet.  (In this regard, You must contact Legal@amlbitcoin.com).

32. By purchasing, selling, exchanging, transferring, using or mining AML BitCoin Tokens and/or AML BitCoins and by using the AML BitCoin Token Wallet and/or AML BitCoin Wallet You are relinquishing rights of privacy relating to NAC's monitoring and reporting of transactions pertaining to You as provided in these Terms and Conditions.

You shall have no right to a claim or cause of action or claim of damages against NAC relating to an invasion of privacy by NAC as a result of NAC's monitoring and reporting of transactions as provided in these Terms and Conditions.

33. You shall take all reasonable measures to not permit or allow access to any person or entity other than You to use Your AML BitCoin Token Wallet, Your AML BitCoin Wallet and/or any NAC Website. You will implement reasonable and appropriate measures designed to secure access to (a) any device associated with the email address associated with Your AML BitCoin Token Wallet, Your AML BitCoin Wallet, NAC Websites, the AML BitCoin Tokens and AML BitCoins, (b) private keys required to access any relevant AML BitCoin Token and AML BitCoin address, and (c) Your username, password and any other login or identifying credentials for the NAC Websites, the AML BitCoin Tokens, AML BitCoins, Your AML BitCoin Token Wallet or Your AML BitCoin Wallet.

34. You shall not use a web crawler or similar technique to access NAC's Websites or to extract data, reverse engineer or disassemble any aspect of NAC's Websites, the AML BitCoin Tokens, AML BitCoins, AML BitCoin Token Wallet or the AML BitCoin Wallet in an effort to access any source code, underlying ideas and concepts, and algorithms. You shall not take any action that imposes an unreasonable or disproportionately large load on NAC's infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data, or information. You shall not transmit or upload any material to an NAC Website that contains viruses, Trojan horses, worms, or any other harmful or deleterious program. You shall not otherwise attempt to gain unauthorized access to the NAC Websites, AML BitCoin Tokens, AML Bitcoins, an AML BitCoin Token Wallet and/or an AML BitCoin Wallet and/or any related computer systems or networks connected with NAC, through password mining or any other means.

35. In the event You suspect a security breach in any of the foregoing You will inform NAC immediately so it can take all required and possible measures to secure Your AML BitCoin Token Wallet, Your AML BitCoin Wallet, the NAC Websites, the AML BitCoin Tokens, AML BitCoins, and related systems as whole. In the event that You are no longer in possession of any device associated with Your AML BitCoin Tokens and AML BitCoins or are not able to provide Your login or identifying credentials to NAC or the NAC Websites, or Your digital identity is unavailable, deleted or compromised, NAC may, in its sole discretion, grant access to Your AML BitCoin Wallet to any person providing additional credentials to NAC. NAC reserves the right to determine the additional credentials required, which may include, without limitation, a sworn, notarized statement of identity.

36. NAC will operate and maintain its computer systems and the NAC Websites in such a manner as a reasonably prudent person in the business of conducting transactions based on a sophisticated computer networking system, and NAC shall exercise due care and good faith, including employing technicians and personnel highly skilled in the operation of such highly sophisticated computer and software based technologies. NAC shall endeavor to employ and utilize the most sophisticated and safest methods of internet and computer security available sufficient to assure that at all times its computer network and NAC Websites provide a safe and secure environment for the conduct of the business anticipated by these Terms and Conditions.

37. In the event of an attack on and NAC Website or computer system, a virus or malicious code in NAC's computer system, notwithstanding NAC's compliance with paragraph 36 above, or in the event NAC is required to suspend, modify, discontinue all or a portion of its services, or terminate its services by a court order or governmental order or direction, as a result of circumstances beyond NAC's control, NAC shall not be liable to You for any damage as a result of such suspension, modification, discontinuance, or termination.

38. It is possible that Your AML BitCoin Token Wallet and/or Your AML BitCoin Wallet may be subject to attempted impersonation and or cyber-attack which could result in the material diminution, theft or transfer of Your AML BitCoin Token Wallet and/or Your AML BitCoin Wallet. So long as NAC has complied with paragraph 36 above, and the circumstances leading to such impersonation or cyber-attack are beyond NAC's control, NAC shall not be liable for any damage caused to You as a result of the use of NAC's computer system or an NAC Website, including direct, indirect, or consequential damages, whether such damage is caused by a hack, data breach, malicious code, computer virus or criminal conduct.

39. Neither NAC, its subsidiaries, affiliates, or licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents will, in regard to the AML BitCoin Tokens, AML BitCoins, Your AML BitCoin Token Wallet, Your AML BitCoin Wallet, or NAC Websites, be liable to You or anyone else for any damages of any kind, including, but not limited to, direct, consequential, incidental, special or indirect damages, including but not limited to loss of profits, trading losses or damages, that result from use or loss of use of the AML BitCoin Tokens, AML BitCoins, Your AML BitCoin Token Wallet, Your AML BitCoin Wallet, or NAC Websites, even if NAC, its subsidiaries, affiliates, licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents has or have been advised of the possibility of such damages or losses, except as otherwise expressly provided in these Terms and Conditions.

40. NAC shall not be liable for any delay or failure to perform any obligation under these Terms and Conditions where the delay or failure results from any cause beyond NAC's reasonable control, including acts of God, labor disputes or other industrial disturbances, electrical, telecommunications, hardware, software or other utility failures, earthquake, storms or other elements of nature, blockages, embargoes, riots, acts or orders of government, acts of terrorism, or war, changes in blockchain technology (broadly construed), or any other force or conditions not within NAC's control.

41. In making Your purchase of AML BitCoins and/or AML BitCoin Tokens You are and have relied solely upon Your own judgment, belief and knowledge as to the nature of the currency and the Cybercoin, cryptocurrency, or digital market and industry and You are not relying on any statements made by NAC, or any of its agents or representatives or on any of its advertising or marketing materials, or any representation or statement made on any NAC Website; and You shall not assert any claim(s) against NAC or any of its agents or representatives based on information on any NAC Website or any modification or change to any NAC Website.

42. You have a substantial and sophisticated level of understanding of the functionality, usage, and storage of cryptographic and digital coins and tokens, as well as blockchain-based software and/or technology.

43. The AML BitCoin Token Wallet, AML BitCoin Wallet, AML BitCoin Token and AML BitCoin are provided "as is". NAC, its subsidiaries, affiliates, licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents make no warranties of any kind, whether express, implied, statutory or otherwise regarding the AML BitCoin Token Wallet, AML BitCoin Wallet, AML BitCoin Token and AML BitCoin, including any warranty that the AML BitCoin Token Wallet, AML BitCoin Wallet, AML BitCoin Token and AML BitCoin will be uninterrupted, error-free or free of harmful components, secure or not otherwise lost or damaged. Except to the extent prohibited by law, NAC, its subsidiaries, affiliates, or licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents disclaim all warranties, including any implied warranties of merchantability, satisfactory quality, fitness for a particular purpose, non- infringement, or quiet enjoyment, and any warranties arising out of any course of dealing or usage of trade.

44. To the fullest extent provided by applicable law, You shall indemnify, defend, and hold harmless NAC, its subsidiaries, affiliates, licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents from and against any and all claims, demands, causes of action, debts or liabilities, including reasonable attorneys' fees (collectively, "Damages") to the extent that any such Damages are based upon or arise out of (a) a misrepresentation by You made in connection with Your purchase of AML BitCoins and/or AML BitCoin Tokens or use of any NAC Website, or (b) Your violation of any law, statute, rule, or regulation of a nation or subdivision thereof having jurisdiction over You.

45. You shall reimburse NAC its subsidiaries, affiliates, licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents, as the case may be, for all reasonable legal fees and expenses incurred in processing and responding to a subpoena, legal order or other legal process relating to You.

46. The permission or privilege to use the amlbitcoin.com website does not necessarily include a right to use any other NAC Website nor the right to an AML BitCoin Token Wallet and an AML BitCoin Wallet. In order to use the amlbitcoin.com website or to acquire an AML BitCoin Wallet, You must be registered, having gone through and submitted to the required verification procedures.

47. NAC retains all right, title and interest in all of its intellectual property, including inventions, discoveries, processes, marks, methods, compositions, formulae, techniques, information, source code, brand names, graphics, user interface design, text, logos, copyrights, moral rights, images, information and data pertaining to the NAC Websites, AML BitCoin Token Wallets, AML BitCoin Wallets, AML BitCoin Tokens, and AML BitCoins or that of NAC's subsidiaries and/or affiliates (hereinafter "NAC's IP") whether or not patentable, copyrightable or protectable in trademark, and any trademarks, copyrights or patents based thereon. You may not use any of NAC's IP for any reason, except with its prior express written consent. You will not modify, publish, transmit, reverse engineer, participate in the transfer or sale, create derivative works, or in any way exploit any of NAC's IP, in whole or in part, found on the NAC Websites or associated products and services, or otherwise. NAC's IP is not for resale. Your use of the NAC's IP does not entitle You to make any unauthorized use of any NAC's IP, and in particular

You will not delete or alter any proprietary rights or attribution notices in any NAC's IP. You will use NAC's IP solely for Your personal use, and will make no other use of NAC's IP without the express written permission of NAC and the copyright, trademark, tradename, and/or patent owner. You agree that You do not acquire any ownership rights in any NAC's IP. We do not grant You any licenses, express or implied, to the intellectual property of NAC except as expressly authorized by these Terms Conditions.

48. You have no claim of ownership or in any of NAC's IP, including, but not limited to, any NAC Website, the AML BitCoin Tokens, AML BitCoins, AML BitCoin Token Wallet, AML BitCoin Wallet, or any other of NAC's IP or that of NAC's affiliates, subsidiaries, and/or licensors, and you shall not assert, claim or file any allegation that you own any copyright, trademark, tradename, and/or patent in any NAC Website, the AML BitCoin Tokens, AML BitCoins, AML BitCoin Token Wallet, AML BitCoin Wallet, or any other of NAC's IP or that of NAC's affiliates, subsidiaries, and/or licensors. You shall never file any action, lawsuit or arbitration in any forum asserting a claim of infringement against NAC, its subsidiaries, affiliates, or licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents, as to any of NAC's IP, including, but not limited to, any NAC Website, the AML BitCoin Tokens, AML BitCoins, AML BitCoin Token Wallet and AML BitCoin Wallet.

49. None of the Terms and Conditions herein shall be deemed waived unless a waiver is in writing and signed by NAC, and in no event, shall there be a waiver solely by reason of a failure to assert or delay in asserting a term or condition.

50. In the event any one or more of these Terms and Conditions, or part thereof, is declared to be void or otherwise unenforceable, the remainder of such term and condition and of these Terms and Conditions shall survive and be deemed modified or amended so as to fulfill the intent of these Terms and Conditions and comply with any applicable law or order of a court.

51. To give notice to NAC under these Terms and Conditions, You must contact NAC by email to Legal@amlbitcoin.com.

52. All communications to be made or given pursuant to these Terms and Conditions shall be in the English language.

53. **Ownership of AML BitCoin Tokens and AML BitCoins by Non-Natural Persons; Non-Transferability and Non-Assignability** As stated above, in order to obtain an AML BitCoin Wallet and to purchase, sell, hold, exchange, and use AML BitCoins, You must obtain a certified digital identity profile, and this process requires a biometric scan of one or more of an individual's face, iris, retina, and fingerprint. Accordingly, only an individual can obtain an AML BitCoin Wallet. While the AML BitCoins and AML BitCoin Tokens can be held in the name of an entity, such as a corporation, limited liability company, partnership or trust, the owner of the AML BitCoin Wallet must be and can only be an individual associated with that entity. Accordingly, an AML BitCoin Wallet cannot be transferred or assigned, unless an individual associated with the transferee independently obtains a certified digital identity profile in accordance with the process that creates a biometric scan of one or more of such individual's face, iris, retina, and fingerprint and complies with all other procedures to obtain an AML BitCoin Wallet.

54. **Changes to these Terms and Conditions.** NAC reserves the right, at its sole discretion, to modify, change, alter or amend any of these Terms and Conditions from time to time

and at any time. Notification of such changes, alterations, modifications or amendments, shall be made via the NAC Website(s) or via email to You (at the email address You provided previously). You shall be responsible for reviewing and shall be bound by such changes, alterations, modifications or amendments to these Terms and Conditions. Your continued use of the NAC Website after the posting or notice by email of such changes, alterations, modifications or amendments shall be deemed Your acceptance and agreement to such changes, alterations, modifications or amendments.

55. **Applicable Law, Jurisdiction and Venue.** These Terms and Conditions, including the representations, warranties, covenants, limitations on liability, and indemnities, contained therein as well as any other written or oral agreements between You and NAC, and any and all claims between the Parties, including their agents, representatives, employees, affiliated entities, trustees, conservators, successors and assigns, related to or arising from these Terms and Conditions, said agreements, whether in contract or tort, and seeking damages or equitable remedies, shall be governed, construed and enforced in accordance with the laws of the State of Nevada, USA and applicable federal law of the United States, without giving effect to Nevada's or the United States' conflicts of laws principles. You agree that only federal courts, state courts, and arbitration forums located in the State of Nevada, United States of America shall have jurisdiction to determine and adjudicate any such matters or disputes, and You agree that such courts shall have jurisdiction over You as well as Your agents, representatives, employees, affiliated entities, trustees, conservators, successors and assigns, and You, and on behalf of each of Your agents, representatives, employees, affiliated entities, trustees, conservators, successors and assigns, waive any objection that such courts or arbitration forums do not have personal jurisdiction over You and them. You agree that venue for the determination or adjudication of any and all matters in controversy or disputes between the Parties, and each of their agents, representatives, employees, affiliated entities, trustees, conservators, successors and assigns, shall be solely and exclusively in Clark County, Nevada, United States of America, and You agree that such venue is intended to be mandatory and not permissive. You agree, on behalf of Yourself and each of Your agents, representatives, employees, affiliated entities, trustees, conservators, successors and assigns, that You and they waive any objection that venue in Clark County, Nevada, United States of America is an inconvenient forum.

56. **Important Warning Concerning Activity in Prohibited Locations** Persons located in certain territories, currently including countries subject to sanctions imposed by laws or regulations of the United States or any governmental agency, department or office of the United States (such as the Office of Foreign Assets Control within the U.S. Department of the Treasury), or executive orders of the President of the United States, or treaties to which the United States is a party, or otherwise imposed by other organizations, such as the United Nations, European Union, any European Union country, the United Kingdom's Department of Treasury, or any other sanctions list recognized and enforced by the United States, such as, without limitation and solely by way of example, the Democratic People's Republic of North Korea and its territories, Iran, and Iraq, are not permitted to purchase, sell, exchange, transfer, use or mine AML BitCoins and/or AML BitCoin Tokens, and/or use the AML BitCoin Wallet, AML BitCoin Token Wallet and/or an NAC Website. This restriction applies to residents and citizens of other nations while

located in a prohibited jurisdiction. The fact that the NAC Website may be accessible in a prohibited jurisdiction, or that the NAC Website allows the use of the official language of a prohibited jurisdiction, shall not be construed as a license to use purchase, sell, exchange, transfer, use or mine AML BitCoins and/or AML BitCoin Tokens, and/or use the AML BitCoin Wallet, AML BitCoin Token Wallet and/or an NAC Website in such prohibited jurisdiction. Any attempt to circumvent this restriction, for example, by using a "vpn", proxy or similar service that masks or manipulates the identification of Your true location, or by otherwise providing false or misleading information regarding citizenship, location, place of residence, or by using the NAC Website through a third party or on behalf of a third party located in a prohibited jurisdiction is a breach of these Terms and Conditions. If NAC has reasonable grounds to suspect that You are located in any of the prohibited jurisdictions, NAC may, without notice, and in accordance with applicable laws, close Your account, deactivate Your AML BitCoin Wallet, and refuse to process, and may rescind, cancel or reverse, any purchase or sale of AML BitCoins and/or AML BitCoin Tokens.

57. **Arbitration and Dispute Resolution; Class Action Waiver**

    1. Except as to claims for injunctive relief requiring immediate restraining orders, all disputes, controversies or claims between You and NAC, its subsidiaries, affiliates, or licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents arising out of or relating to these Terms and Conditions, the purchase, sale or exchange of AML BitCoin Tokens or AML BitCoins, the NAC Websites, Your relationship with NAC, its subsidiaries, affiliates, or licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents, or as to any other matter between You and NAC, its subsidiaries, affiliates, or licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents, including concerning the interpretation of these Terms and Conditions, or any agreement between You and NAC, whether for breach of contract, for a tort, or otherwise, shall be resolved and adjudicated by binding arbitration before ADR Services, Inc. (if available in the venue for adjudication of disputes or before JAMS, Inc. if ADR Services, Inc. is not available in such venue, or if neither is available in the venue for adjudication, then before the American Arbitration Association) and shall be conducted in accordance with the commercial arbitration rules of the such arbitration forum, except as otherwise provided herein. The arbitration shall be conducted in Clark County, Nevada, United States of America. The arbitration shall be conducted by a single arbitrator. The arbitration shall be conducted in the English language and all documents filed, notices, claims responses, counter-claims, counter-responses, briefs, or other papers shall be in the English language. All evidentiary documents in a language other than English shall be translated into the English language and shall be translated by a person certified and authorized under the laws of the State of Nevada. The arbitrator shall be selected in accordance with the rules of the selected arbitration organization.

    2. The arbitration is to be expedited. The arbitration shall be commenced by a demand for arbitration. If a party fails to respond to the demand to arbitrate

within ten (10) business days, the aggrieved party may apply ex parte to the Court in Clark County, Nevada, United States of America for an order to arbitrate, unless the rules of the arbitration forum do not require such an order. An arbitration award may be enforced by applying to a court in Clark County, Nevada, United States of America. The law the State of Nevada shall be applied in any arbitration proceedings, without regard to that jurisdiction's choice-of-law principles and rules. The parties shall not be entitled to discovery in the arbitration and the arbitrator shall have no authority to order any party to submit to discovery with the exception that the Arbitrator may request the parties or their agents to produce such documents as are pertinent and relevant to the dispute. The arbitrator shall have no authority to award punitive, consequential, special, or indirect damages. The cost of the arbitration proceeding and any proceeding in court to confirm or to vacate any arbitration award, as applicable (including, without limitation, reasonable attorneys' fees and costs) shall be borne by the unsuccessful party, as determined by the arbitrator, and shall be awarded as part of the arbitrator's award. The arbitration shall be binding.

3. In the event that the arbitration includes or would include the adjudication of facts, law or claims common to parties not bound by an arbitration provision such that adjudication in the arbitration may result in inconsistent and/or conflicting findings, rulings or orders, or if such adjudication is based on transactions or series of transactions that involve parties who would not be bound by this arbitration provision, the parties hereto agree that the dispute will be adjudicated in a court in the jurisdiction and venue provided elsewhere in these Terms and Conditions, unless such parties agree to participate in the arbitration, so that all necessary parties can be joined to avoid inconsistent and/or conflicting findings, rulings or orders.

4. Prior to initiating an arbitration proceeding, the parties shall make a good faith attempt to resolve the dispute through mediation by providing written notice to the other party of a demand for mediation and the responding party shall have ten (10) business days to respond in writing. No party shall be entitled to recover any fees or costs in arbitration if they have failed to mediate in good faith. The mediator will be selected from the same alternative dispute provider specified above, unless the parties agree in writing to a different mediator.

5. If the provisions for arbitration in these Terms and Conditions are, for any reason, invalidated or deemed unenforceable, then the dispute shall be adjudicated in a federal or state court located in Clark County, Nevada, USA. This includes any dispute concerning the AML BitCoin Tokens, AML BitCoins, NAC Websites, these Terms and Conditions, any agreement between You and NAC, its subsidiaries, affiliates, or licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents, or any other aspect of the relationship between You and NAC, its subsidiaries, affiliates, or licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents. You agree that the forum selection clause contained herein is mandatory and not permissive and You agree not to object to adjudication in Clark County, Nevada on grounds of forum non-conveniens.

6. Waiver of Trial by Jury. THE PARTIES UNDERSTAND AND FULLY AGREE THAT BY AGREEING TO THESE TERMS AND CONDITIONS TO ARBITRATE THEY ARE GIVING UP THEIR CONSTITUTIONAL RIGHT TO HAVE A TRIAL BY JURY, AND ARE GIVING UP THEIR NORMAL RIGHTS OF APPEAL FOLLOWING THE RENDERING OF A DECISION, EXCEPT AS THE FEDERAL ARBITRATION ACT AND APPLICABLE FEDERAL LAW PROVIDE FOR JUDICIAL REVIEW OF ARBITRATION PROCEEDINGS.

7. You HEREBY AGREE to WAIVE YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION. Any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action. If for any reason a claim proceeds in court rather than in arbitration, we each waive any right to a jury trial. If a court or federal regulator with oversight over NAC determines that applicable law precludes enforcement of any of this section's limitations as to a particular claim for relief, then that claim (and only that claim) must be severed from the arbitration and may be brought in court, subject to Your and NAC's right to appeal the court's decision.

58. You acknowledge the following risks and You accept them:

1. Digital coins and tokens, such as AML BitCoin Tokens and AML BitCoin, blockchain technology, and other associated and related technologies are new and relatively untested and to a degree are outside of NAC's exclusive control. Moreover, in some jurisdictions the AML BitCoin Token and AML BitCoin or other digital coins or cryptocurrencies may be considered to be a security, or in the future, may be determined to be a security. NAC makes no warranties or guarantees that the AML BitCoin Token and AML BitCoin are not a security in all jurisdictions. Regulatory bodies around the world are in the process of forming their opinions as to the purchase, sale, and use of digital coins and cryptocurrencies and laws concerning them are being considered in various jurisdictions throughout the world; the process of developing such laws is currently fluid and the laws are not uniform. Likewise, blockchain technologies have been the subject of scrutiny by various governments and regulatory bodies throughout the world. Furthermore, exchanges which enable the exchange of digital coins and cryptocurrencies with other such digital coins or cryptocurrencies or the exchange of such for fiat money, if any, might be subject to regulatory oversight, and such exchanges are currently the subject of reviews by governments and regulatory bodies; and governments and regulatory bodies are currently enacting laws and regulations permitting, prohibiting and regulating such exchanges. Laws and regulations could be enacted that could impede or limit the ability to purchase, sell, exchange, transfer, use or mine AML BitCoins and/or AML BitCoin Tokens, and/or use the AML BitCoin Wallet, the AML BitCoin Token Wallet and/or an NAC Website, and accordingly, the value of the AML BitCoin or AML BitCoin Token could be diminished as a result. You shall bear the legal or financial consequences of AML BitCoin Token and AML BitCoin being considered a security in Your respective jurisdiction. NAC makes no representation or warranty of any kind as to the legality of purchasing, selling,

exchanging, transferring, using or mining AML BitCoins and/or AML BitCoin Tokens, and/or using the AML BitCoin Wallet, AML BitCoin Token Wallet and/or an NAC Website in Your jurisdiction, and by accepting these Terms and Conditions, You agree that You will not purchase, sell, exchange, transfer, use or mine AML BitCoins and/or AML BitCoin Tokens, and use the AML BitCoin Wallet, AML BitCoin Token Wallet and/or an NAC Website in a jurisdiction which prohibits same.

2. Hackers or other groups or organizations may attempt to interfere with Your AML BitCoin Token Wallet, Your AML BitCoin Wallet, the NAC Websites or the availability of AML BitCoin Tokens or AML BitCoins in any number of ways, including without limitation denial of service attacks, Sybil attacks, spoofing, smurfing, malware attacks, or consensus-based attacks.

3. There is a risk that the NAC Websites and AML BitCoin Token and AML BitCoin may unintentionally include weaknesses or bugs in the source code interfering with the use of or causing the loss of AML BitCoin Token and AML BitCoin.

4. Advances in cryptography, or technical advances such as the development of quantum computers, could present risks to cryptocurrencies, which could result in the theft or loss of or loss of use of AML BitCoin Tokens, AML BitCoins, Your AML BitCoin Token Wallet and/or Your AML BitCoin Wallet.

5. As with other decentralized cryptocurrencies, the blockchain is susceptible to mining attacks, including but not limited to double-spend attacks, majority mining power attacks, "selfish-mining" attacks, and race condition attacks. Any successful attacks present a risk to the expected proper execution and/or sequencing of digital coins. Despite the best efforts of NAC, the risk of unknown or novel mining attacks exists. Mining attacks, as described above, may also target other blockchain networks, with which the AML BitCoin Token and AML BitCoin may interact with and consequently the AML BitCoin Token and AML BitCoin may be impacted as a result thereof.

6. While there are currently online services available which enable the possibility of exchange of digital coins and cryptographic coins with other such coins or the exchange of digital coins and cryptographic coins for fiat money, and particularly the exchange of AML BitCoin Tokens and AML BitCoins on such exchanges, NAC makes no warranties and/or guarantees that AML BitCoin Token and AML BitCoin will be listed or made available for exchange with other digital coins and cryptographic coins and/or fiat money in the future, and no warranties or guarantees are given whatsoever with respect to the capacity (volume) of such potential exchanges or the demand for AML BitCoins or AML BitCoin Tokens in the future. Accordingly, NAC does not give any warranties or guarantees regarding any exchange services providers. Furthermore, You may be exposed to fraud and/or failures concerning such exchanges.

7. The value of AML BitCoin Token and AML BitCoin may fluctuate and You may suffer loss in value of the AML BitCoin Tokens or AML BitCoins that You purchase and own.

8. AML BitCoin Token and AML BitCoin are unlike bank accounts or accounts at some other financial institutions, which may be insured by such organizations as

the Federal Deposit Insurance Corporation, and therefore are entirely uninsured. NAC does not offer any indemnity in case of any losses in relation to AML BitCoin Token and AML BitCoin. You assume all risks regarding a loss of Your AML BitCoins or AML BitCoin Tokens.

9. You acknowledge that, given that the transmission of AML BitCoin Tokens and AML BitCoins is entirely dependent on the use of computers, computer software, and Internet connections, malfunctions, delays, failures, disruptions, errors, or distortions may be experienced, and You accept all risks associated therewith and agree that NAC shall have no liability for such malfunctions, delays, failures, disruptions, errors, or distortions.

## C. Safe Harbor Statement/Agreement

NAC Foundation, LLC ("NAC"), a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business and infrastructure in Las Vegas, Nevada, processes information obtained through the registration and validation process for securing an AML BitCoin Token Wallet and AML BitCoin Wallet, and through the amlbitcoin.com, amltoken.com.com and amlbitcoinwallet.com websites in the United States of America. By registering for an AML BitCoin Wallet and purchasing, selling, exchanging, transferring, using or mining AML BitCoins and/or AML BitCoin Tokens, and by using the AML BitCoin Token Wallet and/or AML BitCoin Wallet, a user consents to permit NAC to process and his or her information.

## KYC/AML

NAC prides itself on the integrity and transparency of its business. Resting on a privately-regulated public blockchain, NAC has introduced a personal legal identity-linked credential authentication protocol into the source code of AML BitCoin that permits tracing and tracking of the identities of senders and receivers of the coin when activity with the use of the AML BitCoin indicates suspicious activities in violation of AML laws. AML BitCoin transactions and their associated IP locations of senders and receivers will be monitored and analyzed in United States with monitoring and detecting software that allows NAC to identify suspicious activities. Records of such transactions will be maintained by NAC for six-years (or such other period of time required under applicable law). Suspicious activities associated with AML BitCoin transactions together with personal information and IP locations of corresponding senders and receivers may, in NAC's sole judgment, be reported to relevant government entities. In the event NAC receives or possesses information that would lead to a suspicion that a transaction in AML BitCoins is violating or is about to violate or facilitate a violation of money laundering, anti-terrorist financing, or anti-fraud laws a violation of a validly issued court order or other valid governmental order, NAC may refuse to process, or may rescind, cancel or reverse, any purchase, sell, exchange, transfer, use or mine with and of AML BitCoins and/or AML BitCoin Tokens, and freeze the associated AML BitCoin Wallet.

The purchase, sale, exchange, transfer, use or mining of AML BitCoins and/or AML BitCoin Tokens and/or use of the AML BitCoin Token Wallet and/or AML BitCoin Wallet involves a degree of relinquishment privacy relating to NAC's monitoring and reporting of transactions as stated above.

To obtain an AML BitCoin Wallet and to purchase, sell, exchange, hold, mine and use AML BitCoin Tokens and AML BitCoins, a user must complete, obtain, and comply with the procedures for and to obtain a certified digital identity profile, which includes a biometric scan of one of more of the face iris, retina, and fingerprint, and documents and information such as passport, driver's license, address, social security number, email address, and bank account information. While at this time, NAC intends to use and rely upon the Digital Identity Trust Network to administer and process the certified digital identity profile, in the future, NAC may rely upon an alternative vendor for the creation, administration and processing of certified digital identity profiles by means of biometric scans.

Users located in certain territories, currently including countries subject to sanctions imposed by laws or regulations of the United States or any governmental agency, department or office of the United States (such as the Office of Foreign Assets Control within the U.S. Department of the Treasury), or executive orders of the President of the United States, or treaties to which the United States is a party, or otherwise imposed by other organizations, such as the United Nations, European Union, any European Union country, the United Kingdom's Department of Treasury, or any other sanctions list recognized and enforced by the United States, such as, without limitation and solely by way of example, the Democratic People's Republic of North Korea and its territories, Iran, and Iraq, are not permitted to purchase, sell, exchange, transfer, use or mine AML BitCoins and/or AML BitCoin Tokens, and/or use the AML BitCoin Token Wallet, AML BitCoin Wallet and/or an NAC Website. This restriction applies to residents and citizens of other nations while located in a prohibited jurisdiction. The fact that the NAC Website may be accessible in a prohibited jurisdiction, or that the NAC Website allows the use of the official language of a prohibited jurisdiction, shall not be construed as a license to use purchase, sell, exchange, transfer, use or mine AML BitCoins and/or AML BitCoin Tokens, and/or use the AML BitCoin Wallet, AML BitCoin Token Wallet and/or an NAC Website in such prohibited jurisdiction. If NAC suspects that a user is located in a prohibited jurisdiction, NAC may, without notice, and in accordance with applicable laws, close, suspend and/or deactivate an AML BitCoin Wallet, and/or refuse to process, rescind, and/or deactivate an AML BitCoin Wallet, and/or refuse to process, rescind, cancel or reverse, any purchase, sale, use, exchange and/or mine or any other transaction or use of and/or by and/or with AML BitCoins and/or AML BitCoin Tokens.

Forward-Looking Statements: Statements, other than statements of historical facts, included in NAC's white paper, public statements, press releases, marketing, and/or advertising materials address activities, events or developments that the NAC anticipates will or may occur in the future. These forward-looking statements include such things as regulatory compliance, computer security, the anticipated use of AML BitCoin and/or AML BitCoin Token or other similar matters. These statements are based on certain assumptions and analyses made by NAC in light of its experience and perception of historical trends, current conditions and expected future developments. However, the actual results of the plan for AML BitCoin Tokens and AML

BitCoins might not conform with NAC's expectations due to a number of risks and uncertainties, many of which are beyond NAC's control, including, cybersecurity matters, changes in laws or regulations, secondary market conditions and other risks. Thus, all of the forward-looking statements made in NAC's white paper, public statements, press releases, marketing, and/or advertising materials are qualified by these cautionary statements. There can be no assurance that actual results will conform to NAC's.

**The Distribution of AML BitCoin Tokens to AML Wallet Addresses**

Once users upload AML Wallet Addresses to the Token Sale platform in their account profile page, users are signifying that their AML Wallet Address is correct and that purchased AML BitCoin Tokens are to be sent to the AML Wallet Address listed. If the AML Wallet Address changes for any reason including AML Wallets being accidentally deleted, etc., it is the responsibility of users to delete the incorrect AML Wallet Address and add the correct AML Wallet Address to their Token Sale account profile page as soon as possible.

It is the responsibility of users to ensure that the correct AML Wallet Address is listed in their Token Sale account profile page.

When the NAC Foundation distributes AML BitCoin Tokens from the Token Sale platform to a user's AML Wallet Address and if it turns out that the user deleted the wallet, created another wallet, and forgot to upload the new wallet address to the platform, or a different circumstance in which the incorrect AML Wallet Address was not listed in the platform, then the user's tokens will be lost and the NAC Foundation bears no responsibility.

The above is the reason that the NAC Foundation highly recommends that all users create a wallet backup. In the event that users accidentally delete their wallet or open up a new wallet and do not update the platform with a new AML Wallet Address, users can still recover the coins sent to their old AML Wallet Address, if the wallet backup was kept.

**Other Risks**

The purchase of AML BitCoin Tokens and AML BitCoins involves a high degree of speculation.

Digital coins and tokens, such as AML BitCoin Tokens and AML BitCoin, blockchain technology, and other associated and related technologies are new and relatively untested and to a degree are outside of NAC's exclusive control. Moreover, in some jurisdictions the AML BitCoin Token and AML BitCoin or other digital coins or cryptocurrencies may be considered to be a security, or in the future, may be determined to be a security. NAC makes no warranties or guarantees that the AML BitCoin Token and AML BitCoin are not a security in all jurisdictions. Regulatory bodies around the world, are in the process of forming their opinions as to the purchase, sale, and use of digital coins and cryptocurrencies and laws concerning them are being considered in various jurisdictions throughout the world; the process of developing such laws is currently fluid and the laws are not uniform. Likewise, blockchain technologies have been the

subject of scrutiny by various governments and regulatory bodies throughout the world. Furthermore, exchanges which enable the exchange of digital coins or cryptocurrencies with other such digital coins or cryptocurrencies and/or the exchange of such for fiat money, if any, might be subject to regulatory oversight, and such exchanges are currently the subject of reviews by governments and regulatory bodies; and governments and regulatory bodies are currently enacting laws and regulations permitting, prohibiting and regulating such exchanges. Laws and regulations could be enacted that could impede or limit the ability to purchase, sell, exchange, transfer, use or mine AML BitCoins and/or AML BitCoin Tokens, and/or use the AML BitCoin Wallet, AML BitCoin Token Wallet and/or an NAC Website, and accordingly, the value of the AML BitCoin or AML BitCoin Token could be diminished. NAC makes no representation or warranty of any kind as to the legality of purchasing, selling, exchanging, transferring, using or mining AML BitCoins and/or AML BitCoin Tokens, and/or using the AML BitCoin Wallet, AML BitCoin Token Wallet and/or an NAC Website in a particular user's jurisdiction.

Hackers or other groups or organizations may attempt to interfere with an AML BitCoin Token Wallet, an AML BitCoin Wallet, an NAC Website or the availability of AML BitCoin Tokens or AML BitCoins in any number of ways, including without limitation, by denial-of-service attacks, Sybil attacks, spoofing, smurfing, malware attacks, and/or consensus-based attacks.

There is a risk that an NAC Website and AML BitCoin Token and AML BitCoin may unintentionally include weaknesses or bugs in the source code interfering with the use of or causing the loss of AML BitCoin Token and AML BitCoin.

Advances in cryptography, or technical advances such as the development of quantum computers, could present risks to digital coins and cryptocurrencies, which could result in the theft or loss of or loss of use of AML BitCoin Tokens, AML BitCoins, AML BitCoin Token Wallet and/or an AML BitCoin Wallet.

As with other decentralized cryptocurrencies, the blockchain is susceptible to mining attacks, including but not limited to double-spend attacks, majority mining power attacks, "selfish-mining" attacks, and race condition attacks. Any successful attacks present a risk to the expected proper execution and/or sequencing of digital coins. Despite the best efforts of NAC, the risk of unknown or novel mining attacks exists. Mining attacks, as described above, may also target other blockchain networks with which the AML BitCoin Token and AML BitCoin may interact, and consequently AML BitCoin Tokens and AML BitCoins may be impacted as a result thereof.

While there are currently online services available which enable the possibility of exchange of digital coins and cryptographic coins with other such coins or the exchange of digital coins and cryptographic coins for fiat money, and particularly the exchange of AML BitCoin Tokens and AML BitCoins on such exchanges, NAC makes no warranties and/or guarantees that AML BitCoin Token and AML BitCoin will be listed or made available for exchange with other digital coins and cryptographic coins and/or fiat money in the future. Further, no warranties or guarantees are given whatsoever with respect to the capacity (volume) of such potential exchanges or the demand for AML BitCoins or AML BitCoin Tokens in the future. Accordingly, NAC does not give any warranties or guarantees regarding any exchange services

providers. Furthermore, a user may be exposed to fraud and/or failures concerning such exchanges.

The value of AML BitCoin Token and/or AML BitCoin may fluctuate and a loss may be suffered in value of the AML BitCoin Token and/or AML BitCoin.

AML BitCoin Token and AML BitCoin are unlike bank accounts or accounts at some other financial institutions, which may be insured by such organizations as the Federal Deposit Insurance Corporation, and therefore are entirely uninsured. NAC does not offer any indemnity in case of any losses in relation to AML BitCoin Token and AML BitCoin. The owner of AML BitCoin Tokens and AML Bitcoins assumes the risk of loss.

The transmission of AML BitCoin Tokens and AML BitCoins is entirely dependent on the use of computers, computer software, and Internet connections, malfunctions, delays, failures, disruptions, errors, or distortions may be experienced. NAC shall have no liability for such malfunctions, delays, failures, disruptions, errors, or distortions.

**NAC FOUNDATION, LLC'S REFUND POLICY**

Although we do not provide refunds, where there are extenuating circumstances, NAC may make an exception and provide a refund. Generally, however, where exceptions are made they will be in instances where cryptocurrency was deposited on the platform to purchase AML BitCoin Tokens, but conversion of the cryptocurrency to the AML BitCoin Tokens did not occur. Using Etherium as an example, NAC would refund the full amount of the ETH deposited. Or, if there was a conversion of the cryptocurrency to purchase AML, and a balance of crypto exists after conversion, NAC can refund the balance of cryptocurrency. All refunds will be in US dollars at the rate of exchange of the cryptocurrency on the date of the deposit of the cryptocurrency.

Special consideration may be given to reimburse in digital currency when digital currency was converted to the AML BitCoin Token. To make a special request, one must submit a notarized statement to NAC stating why a refund is requested and acknowledge that the request for the special consideration will be reviewed after the ICO is completed.

In the event that an AML Wallet passphrase is forgotten, a refund will not be granted. It is the responsibility of Token Holders to remember their own passphrase.

Refund requests are only accepted 45 days after the date that tokens were purchased, or currency deposits (all types) were made into accounts, if currency deposits were not converted to tokens.

# EXHIBIT K



**Besides the refund clause in the 'Terms and Conditions', is there any other way to get a refund?**

If anyone on the AML BitCoin team, which includes our technical support staff, has ever told you or anyone purchasing an AML BitCoin Token/AML BitCoin, any of the following listed below, please let us know and you will get an automatic refund and you will also be able to keep all of your coins, pending compliance approval.

- Pooled interest
- Any type of return
- Any type of capital gain
- Any type of interest
- Any type of ownership in the company.
- That the coin had an underlying collateral.

Any of the above mentioned things would be ground for an automatic refund. If you were told anything similar to the above, please email **support@amlbitcoin.com** and provide proof of such statements.

## What is the total supply of coins in real time?

## What is the total supply of coins in real time?

# EXHIBIT L

**NAC Foundation, LLC**
7495 W. Azure Drive
Las Vegas, Nevada 89130

# INVOICE
INV-3298

Bill To:

**Block Bits Capital**
3563 Pierce Street
San Francisco, CA 94123

| | |
|---:|:---|
| Date: | Jan 12, 2018 |
| Payment Terms: | NET 10 |
| Due Date: | Jan 22, 2018 |
| **Balance Due:** | **$ 0** |

| Item | Quantity | Rate | Amount |
|------|----------|------|--------|
| **AML Token Sale deposit to account jdillman@blockbits.capital** | 1 | $ 850,000 | $ 850,000 |

| | |
|---:|:---|
| Total: | $ 850,000 |
| Amount Paid: | $ 850,000 |

Terms:

This invoice can only be paid via BANK WIRE. Credit or Debit Cards are not accepted.

Please note, there are bank wire charges. There is a $14 charge for domestic wires and $17 for international wires.
Please add the amount of the wire charge (international or domestic) to the total amount of your payment.

Please allow approximately five (5) days after your wire is sent for your token account to be credited.

CHASE BANK
ACCOUNT NAME: DAVID █████████████████████
CLIENT TRUST ACCOUNT FOR NAC FOUNDATION

BANK ADDRESS: █████████████████████████
ACCOUNT NUMBER: ███████
ROUTING NUMBER: █████
SWIFT CODE: CHASUS33
BAND IDENTIFIER CODE: CHASUS33XXX

This is an Attorney-Client Trust Account for NAC Foundation, LLC, maintained by David █████████████████
███ A Professional Corporation ("DSA, APC"), pursuant to rules of the State Bar of Nevada. DSA, APC acts as
counsel to NAC Foundation, LLC as to certain legal matters. DSA, APC has no relationship or affiliation of any kind
with ICOBox or any party, connected with the ICO, other than NAC Foundation, LLC

In order for your token account to be CREDITED QUICKER, please fax a copy of this invoice and bank wire
confirmation to 1-877-585-7656.

**NAC Foundation, LLC**
7495 W. Azure Drive
Las Vegas, Nevada 89130

# INVOICE
INV-4199

Bill To:

**Block Bits Capital**
3563 Pierce Street
San Francisco, CAjdillman@blockbits.capiral 94123

| | |
|---|---|
| Date: | Jan 23, 2018 |
| Payment Terms: | NET 10 |
| Due Date: | Feb 2, 2018 |
| **Balance Due:** | **$0** |

| Item | Quantity | Rate | Amount |
|------|----------|------|--------|
| **AML Token Sale deposit to account jdillman@blockbits.capital** | 1 | $150,000 | $150,000 |

| | |
|---|---|
| Total: | $150,000 |
| Amount Paid: | $150,000 |



Terms:

This invoice can only be paid via BANK WIRE. Credit or Debit Cards are not accepted.

Please note, there are bank wire charges. There is a $14 charge for domestic wires and $17 for international wires. Please add the amount of the wire charge (international or domestic) to the total amount of your payment.

Please allow approximately five (5) days after your wire is sent for your token account to be credited.

CHASE BANK
ACCOUNT NAME: DAVID
CLIENT TRUST ACCOUNT FOR NAC FOUNDATION

BANK ADDRESS:
ACCOUNT NUMBER
ROUTING NUMBER:
SWIFT CODE: CHASUS33
BAND IDENTIFIER CODE: CHASUS33XXX

This is an Attorney-Client Trust Account for NAC Foundation, LLC, maintained by David
Inc., A Professional Corporation ("DSA, APC"), pursuant to rules of the State Bar of Nevada. DSA, APC acts as counsel to NAC Foundation, LLC as to certain legal matters. DSA, APC has no relationship or affiliation of any kind with ICOBox or any party, connected with the ICO, other than NAC Foundation, LLC

In order for your token account to be CREDITED QUICKER, please fax a copy of this invoice and bank wire confirmation to 1-877-585-7656.

**NAC Foundation, LLC**
7495 W. Azure Drive
Las Vegas, Nevada 89130

# INVOICE
INV-4345

Bill To:

**Block Bits Capital**
3563 Pierce Street
San Francisco, CAjdillman@blockbits.capiral 94123

| | |
|---|---|
| Date: | Jan 26, 2018 |
| Payment Terms: | NET 10 |
| Due Date: | Feb 5, 2018 |
| **Balance Due:** | **$0** |

| Item | Quantity | Rate | Amount |
|---|---|---|---|
| **AML Token Sale deposit to account jdillman@blockbits.capital** | 1 | $67,500 | $67,500 |

| | |
|---|---|
| Total: | $67,500 |
| Amount Paid: | $67,500 |

Terms:

This invoice can only be paid via BANK WIRE. Credit or Debit Cards are not accepted.

Please note, there are bank wire charges. There is a $14 charge for domestic wires and $17 for international wires. Please add the amount of the wire charge (international or domestic) to the total amount of your payment.

Please allow approximately five (5) days after your wire is sent for your token account to be credited.

CHASE BANK
ACCOUNT NAME: DAVID █████████████
CLIENT TRUST ACCOUNT FOR NAC FOUNDATION

BANK ADDRESS: ███████████████████████
ACCOUNT NUMBER: ████████
ROUTING NUMBER: ██████
SWIFT CODE: CHASUS33
BAND IDENTIFIER CODE: CHASUS33XXX

This is an Attorney-Client Trust Account for NAC Foundation, LLC, maintained by David █████████ Inc., A Professional Corporation ("DSA, APC"), pursuant to rules of the State Bar of Nevada. DSA, APC acts as counsel to NAC Foundation, LLC as to certain legal matters. DSA, APC has no relationship or affiliation of any kind with ICOBox or any party, connected with the ICO, other than NAC Foundation, LLC

In order for your token account to be CREDITED QUICKER, please fax a copy of this invoice and bank wire confirmation to 1-877-585-7656.

**NAC Foundation, LLC**
7495 W. Azure Drive
Las Vegas, Nevada 89130

# INVOICE

INV-4424

Bill To:

**Block Bits Capital**
3563 Pierce Street
San Francisco, CAjdillman@blockbits.capiral 94123

| | |
|---|---|
| Date: | Jan 29, 2018 |
| Payment Terms: | NET 10 |
| Due Date: | Feb 8, 2018 |
| **Balance Due:** | **$0** |

| Item | Quantity | Rate | Amount |
|------|----------|------|--------|
| **AML Token Sale deposit to account jdillman@blockbits.capital** | 1 | $85,000 | $85,000 |

| | |
|---|---|
| Total: | $85,000 |
| Amount Paid: | $85,000 |

Terms:

This invoice can only be paid via BANK WIRE. Credit or Debit Cards are not accepted.

Please note, there are bank wire charges. There is a $14 charge for domestic wires and $17 for international wires. Please add the amount of the wire charge (international or domestic) to the total amount of your payment.

Please allow approximately five (5) days after your wire is sent for your token account to be credited.


CHASE BANK
ACCOUNT NAME: DAVID ██████████████████
CLIENT TRUST ACCOUNT FOR NAC FOUNDATION

BANK ADDRESS: ██████████████████████████
ACCOUNT NUMBER: ████████
ROUTING NUMBER: ████████
SWIFT CODE: CHASUS33
BAND IDENTIFIER CODE: CHASUS33XXX


This is an Attorney-Client Trust Account for NAC Foundation, LLC, maintained by David ██████████████ Inc., A Professional Corporation ("DSA, APC"), pursuant to rules of the State Bar of Nevada. DSA, APC acts as counsel to NAC Foundation, LLC as to certain legal matters. DSA, APC has no relationship or affiliation of any kind with ICOBox or any party, connected with the ICO, other than NAC Foundation, LLC

In order for your token account to be CREDITED QUICKER, please fax a copy of this invoice and bank wire confirmation to 1-877--585-7656.

**NAC Foundation, LLC**
7495 W. Azure Drive
Las Vegas, Nevada 89130



# INVOICE

INV-4660

Bill To:

**Block Bits Capital**
3563 Pierce Street
San Francisco, CAjdillman@blockbits.capiral 94123

| | |
|---|---|
| Date: | Feb 5, 2018 |
| Payment Terms: | NET 10 |
| Due Date: | Feb 15, 2018 |
| **Balance Due:** | **$0** |

| Item | Quantity | Rate | Amount |
|---|---|---|---|
| **AML Token Sale deposit to account jdillman@blockbits.capital** | 1 | $197,000 | $197,000 |

| | |
|---|---|
| Total: | $197,000 |
| Amount Paid: | $197,000 |

Terms:

This invoice can only be paid via BANK WIRE. Credit or Debit Cards are not accepted.

Please note, there are bank wire charges. There is a $14 charge for domestic wires and $17 for international wires. Please add the amount of the wire charge (international or domestic) to the total amount of your payment.

Please allow approximately five (5) days after your wire is sent for your token account to be credited.

CHASE BANK
ACCOUNT NAME: DAVID
CLIENT TRUST ACCOUNT FOR NAC FOUNDATION

BANK ADDRESS:
ACCOUNT NUMBER:
ROUTING NUMBER:
SWIFT CODE: CHASUS33
BAND IDENTIFIER CODE: CHASUS33XXX

This is an Attorney-Client Trust Account for NAC Foundation, LLC, maintained by David
Inc., A Professional Corporation ("DSA, APC"), pursuant to rules of the State Bar of Nevada. DSA, APC acts as counsel to NAC Foundation, LLC as to certain legal matters. DSA, APC has no relationship or affiliation of any kind with ICOBox or any party, connected with the ICO, other than NAC Foundation, LLC

In order for your token account to be CREDITED QUICKER, please fax a copy of this invoice and bank wire confirmation to 1-877--585-7656.

**NAC Foundation, LLC**
7495 W. Azure Drive
Las Vegas, Nevada 89130

# INVOICE

INV-5007

|  |  |
|---|---|
| Date: | Feb 14, 2018 |
| Payment Terms: | NET 10 |
| Due Date: | Feb 24, 2018 |
| **Balance Due:** | **$0.00** |

Bill To:

**Block Bits Capital**
3563 Pierce Street
San Francisco, CAjdillman@blockbits.capiral 94123

| Item | Quantity | Rate | Amount |
|---|---|---|---|
| **AML Token Sale deposit to account jdillman@blockbits.capital** | 1 | $214,500.00 | $214,500.00 |

|  |  |
|---|---|
| Total: | $214,500.00 |
| Amount Paid: | $214,500.00 |

Terms:

This invoice can only be paid via BANK WIRE. Credit or Debit Cards are not accepted.

Please note, there are bank wire charges. There is a $14 charge for domestic wires and $17 for international wires. Please add the amount of the wire charge (international or domestic) to the total amount of your payment.

Please allow approximately five (5) days after your wire is sent for your token account to be credited.


CHASE BANK
ACCOUNT NAME: DAVID ████████████████
CLIENT TRUST ACCOUNT FOR NAC FOUNDATION

BANK ADDRESS: ████████████████████████
ACCOUNT NUMBER: ████████
ROUTING NUMBER: ████
SWIFT CODE: CHASUS33
BAND IDENTIFIER CODE: CHASUS33XXX


This is an Attorney-Client Trust Account for NAC Foundation, LLC, maintained by David ████████████ Inc., A Professional Corporation ("DSA, APC"), pursuant to rules of the State Bar of Nevada. DSA, APC acts as counsel to NAC Foundation, LLC as to certain legal matters. DSA, APC has no relationship or affiliation of any kind with ICOBox or any party, connected with the ICO, other than NAC Foundation, LLC

In order for your token account to be CREDITED QUICKER, please fax a copy of this invoice and bank wire confirmation to 1-877-585-7656.

# EXHIBIT M

Case 3:20-cr-00249-RS Document 148 Filed 05/26/22 Page 100 of 165



**Marcus Andrade** ███████████████

***

## Coins for Sale

***

**Japheth Dillman** ██████████████████          Sun, Jan 14, 2018 at 12:10 AM
To: ████████

Hi Marcus,

Block Bits is putting in an order for $50million worth of AML BitCoin. However, due to the large size of the wire an extra level of KYC scrutiny is being added by the banks. Moreover, the timing of the holiday on Monday 1/15 means that the wire will not be in by the time Phase II ends.

I would kindly ask that you reserve the $1.25 price point for this large purchase of tokens.

To show you that we are serious about the buy, we have gone ahead and sent you an initial wire of $850,000 yesterday (1/12/2018).

Thank you for your consideration.

Sincerely,

--
**Japheth Dillman**
**Managing Partner & Co-Founder**





**Marcus Andrade** ███████████████

## Hello Ben

**Ben Boyer -** ███████████████                                                          Sun, Jun 9, 2019 at 2:40 PM
To: Marcus Andrade ███████████

Marcus,

First off, next time you try to reach me, please leave a voicemail.

Attached is summary of the Blockbits / AML Token offering and the offering entity. This is my only financial agreement with Blockbits. As you can see, they're entitled to 1.5% fee upon sale of the tokens.

I won't share our conversations with Japheth and David but when you asked me about Simple Trading I asked them. David never responded and Japheth said he had heard of the firm but wasn't familiar.

I did not know Blockbits had other suits. Do you have a sense of what they're regarding?

Are you free next week for a call?

Just let me know.

[Quoted text hidden]

---

**2 attachments**

 **Copy-of-AMLBC-2-Pager[1][1].pdf**
163K

 **Company Agreement (Block Bits AML Holdings) v1[1][1].doc**
192K



Block Bits AML Holdings, LLC

Benjamin Boyer Trust
3280 Alpine Road
Portola Valley, CA 94028

**Individual Account Statement***

(PREPARED FROM BOOKS WITHOUT AUDIT)

**Investor Rep:** Benjamin Boyer
**Investment Date:** 1/23 - Ongoing
**Investment Amount:** $150,000 USD and
additional funds in AML BTC

Distribution Statement for the Period Ended: **February 29, 2020**

**Investment:** Block Bits AML Holdings, LLC

| Date | Deposit Amount | Deposit Method | AML BTC Held |
|------|----------------|----------------|--------------|
| 1/23/2018 | $150,000 | Wire | 100,000 |
| 9/4/2018 | 155,216.0137 | AML BTC Transfer | 155,216.0137 |
| 10/26/2018 | 73,153 | Network Transfer | 73,153 |
| Total | | | 328,369.0137 |

*The information contained in this document is for the person named herein. If you are not the intended recipient of this message you must not disseminate, distribute, copy or take any action in reliance on this e-mail or any attachment. Please notify the sender immediately and please delete it from your account.

**Block Bits AML Holdings LLC**
3121 W Hallandale Beach Blvd
Hallandale, FL 33009
dave@blockbits.capital
Prepared by: David Mata

 Block Bits AML Holdings, LLC

Boyer Family Trust
3280 Alpine Road
Portola Valley, CA 94028

**Investor Rep:** Benjamin Boyer
**Investment Date:** 1/12 – 11/03, 2018
**Investment Amount:** $955,000 USD

Distribution Statement for the Period Ended: **February 29, 2020**

## Investment: Block Bits AML Holdings, LLC

| Date | Deposit Amount | Deposit Method | AML BTC Held |
|---|---|---|---|
| 1/12/2018 | $850,000 | Wire | 680,000 |
| 1/25/2018 | $67,500 | Wire | 45,000 |
| 1/29/2018 | $37,500 | Wire | 25,000 |
| 7/31/2018 | 275,186.2484 ABTC | Network Transfer | 275,186.2484 |
| 8/16/2018 | 161,096.5616516 ABTC | Network Transfer | 161,096.5616516 |
| 10/24/2018 | 250,000 | Wallet Deposit | 250,000 |
| 10/25/2018 | 300,000 | Network Transfer | 300,000 |
| 11/03/2018 | 500,000 | Network Transfer | 500,000 |
| Total | | | 2,236,282.8100516 |

*The information contained in this document is for the person named herein. If you are not the intended recipient of this message you must not disseminate, distribute, copy or take any action in reliance on this e-mail or any attachment. Please notify the sender immediately and please delete it from your account.

**Block Bits AML Holdings LLC**
3131 W Hallandale Beach Blvd
Hallandale, FL 33009
dan@blockbits.capital
Prepared by : David Matz



# AML BITCOIN

**Compliant. Fast. Secure.**

## What is Cryptocurrency?

Cryptocurrency plays out publicly not unlike a stock market exchange. Investors watch the market, buy low, sell high, and manage their portfolios (or "wallets", in this case). Cryptocurrency is designed to eventually be a global universal currency, no matter the location, making it a perfect method for governing parties or business deals. The most famous Cryptocurrency, Bitcoin, (during writing on Nov 26, 2017) is currently valued at $7,800 USD per token. The government compliant AML BitCoin is poised to take over Bitcoin's value.

## About AML BitCoin

- U.S. Patriot Act Compliant
- Anti-Money Laundering Compliant
- Know Your Customer Compliant
- Bank Secrecy Act Compliant
- Anti-Theft, Anti-Identity Theft Protocols
- U.S. Office of Foreign Assets Control Compliant
- Compliant with Worldwide Regulatory Requirements
- Monitors, Detects, and Reports Suspicious Activity
- Built-in Databases Prevent Law Enforcement-Known, Unethical Use
- Canadian OSFI List, U.S. FBI's Most Wanted List, European Union Sanctions List, and the OFRAC List

## Why AML BitCoin Is The Best Choice

- Lower Person-to-Person Transaction Fees
- No International Transaction Fees
- Economic or financial instability does not affect the value
- AML BitCoin demand determines price
- Fast Transaction Speed
- Borderless: can travel worldwide
- Identifies sender and receiver
- Ties documents to blockchain using biometrics

## Pricing Structure

- 2.5 million coins already sold in presale at $0.60
- 13.5 million coins are in Public Sale #1 at $1.00
- 20 million coins are in Public Sale #2 at $1.25
- 40 million coins are in Public Sale #3 at $1.50

## Advisors to AML BitCoin

- Angela Knight – Former Secretary of Treasury, U.K.
- Carlos DeLaguardia – Panamanian Ambassador, U.S.
- Catin Vasquez – Board of Directors, Panama Canal and Port Authority
- Jamal Khokhar – Former Ambassador, Brazil
- Raymond Robertson – Former EU Parliament

# WWW.AMLBITCOIN.COM



**AML
BITCOIN**

**Compliant. Fast. Secure.**

## Coming Legislations

- US and EU are looking to regulate cryptocurrency through restricting merchants from accepting non-AML compliant digital currencies
- These regulations would cut off most cryptocurrencies and would restrict non-AML compliant currencies to black market use only
- AML BitCoin is compliant to all regulations that are in consideration
- Current BitCoin value is based on market speculation of future real-world use. Due to upcoming legislation, Investors will perceive future value to be attributed to AML BitCoin

## Current And Upcoming Use of The Coin

- OECD Treaty: Globally accepted payments to foreign tax authorities
- Panama Banks: Banking wires and transfers establishing AML compliance
- Panama Canal: AML BitCoin as payment for ship fees
- Port of San Francisco: Forward-thinking Silicon Valley seeks to integrate digital currency
- Ports of Seattle, LA, Portland, and San Diego: West Coast consortium of ports to possibly support AML BitCoin
- Port of London: The Port of London has entered negotiations
- London Stock Exchange: Interest in accepting cryptocurrency as payments to the stock exchange and in negotiations
- The Royal Bank of England, HSBC, and Sun Trust Bank: Pilot programs to build a case study replacing SWIFT
- Estonia: Licensing the AML Bitcoin technology and pay a transaction fee
- Venezuela: Seeks cryptocurrency for economic stability, evaluating AML Bitcoin

## Block Bits Capital's Offering

- Block Bits Capital purchases the coin on investors behalf & holds the coin in an offline cold storage facility (AKA Encrypted USB keys) in a safe. When investor desires to sell, BBC sells using its institutional accounts on the exchanges. BBC, then, transfers to FIAT currency (dollars) and wires to investor.
- All BBC services for a 1.5% fee at point of sale
- No fee on purchase, only on sale
- BBC provides a secure digital wallet for investors
- www.blockbits.capital



# EXHIBIT N

## PURCHASE AGREEMENT

This Agreement is made by and between NAC Foundation, LLC ('NAC"), Marcus
Andrade ("Andrade") and ʙᴏyᴇʀ ꜰᴀᴍɪʟy ᴛʀᴜꜱᴛ rust ("Coin Purchaser") and is effective as of
October 19, 2018.

### Recitals

A. NAC is engaged in the creation and issuance of virtual coins;

B. NAC has developed and is now upgrading a new coin known as the AML Bitcoin which
includes

software to protect the virtual coins in a secure "wallet";

C. Andrade owns and can make available from his own account AML Tokens than can be
exchanged

for AML Bitcoins; and

D. Coin Purchaser desires to and intends to acquire the AML Bitcoin when it becomes available
in

accordance with the terms of this Agreement by exchanging AML Tokens for AML Bitcoins.

### Agreement

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of
which are acknowledged, Coin Purchaser, Andrade and NAC agree as follows:

### 1. Purchase; Price; Wallet.

(a) Coin Purchaser agrees to purchase and Andrade agrees to sell Two Hundred Fifty Thousand
(250,000) AML Bitcoin Tokens (ABTC) that may and will be exchanged, in accordance with
subsection (e) below, for AML Bitcoins for a purchase price of $0.20 per coin (Twenty cents) for
a total purchase price of Fifty Thousand ($50,000.00) Dollars (the "Purchase Price"), each AML
Token being exchangeable for one AML Bitcoin, i.e., one for one.

(b) Coin Purchaser shall pay the Purchase Price by wire transfer to NAC's designated bank
account

("NAC Bank Account") in U.S. Dollars within 3 days (3) of the execution of this Agreement by
NAC and Coin Purchaser.

(c) Concurrent with Purchaser's execution and delivery of this Agreement, Coin Purchaser, if an

individual, shall deliver to NAC (or its representative) a copy of a government issued
identification (as more particularly described in subparagraph (l) below.

(d) The ABTC will be delivered to and maintained in an electronic "wallet" (being a secure

digital wallet used to store, send, and receive digital currency) maintained by Coin Purchaser or its designee. Coin Purchaser's wallet address into which ABTC shall be delivered is

NAC shall assist Coin Purchaser with needed additional technical guidance to enable Coin Purchaser to obtain and maintain a wallet for the AML Tokens purchased and shall provide all technical support to assist Coin Purchaser in that regard.

(e) Coin Purchaser understands that the AML Bitcoin is in the process of being upgraded to be

compliant with anti-money laundering laws. When that process is completed, Coin Purchaser will be able to convert AML Tokens to AML Bitcoins, on condition that Coin Purchaser is able to successfully complete AML/KYC compliance verification.

(f) Upon the availability of the AML Bitcoin, NAC shall deliver to Coin Purchaser all information,

including technical information, necessary to enable Coin Purchaser to obtain said wallet to store, maintain, exchange and transfer the AML Bitcoins, including the mandatory I.D. Verification; and NAC shall provide all technical support to assist Coin Purchaser in that regard. The technical support personnel shall be highly trained, skilled and competent regarding all technology necessary to maintain, exchange, and trade in digital- or e-commerce, including digital international commerce, cyber currencies and digital coins in general and AML Bitcoins in particular. NAC shall provide on-going technical support available, at a minimum, during the hours that cyber currency and digital coin exchanges are open and available for the conduct of business. NAC understands and acknowledges that Coin Purchaser may not have a high level of technical sophistication sufficient to independently set up a wallet to receive, store, send and receive digital currency without the assistance of and technical support provided by NAC.

(g) Coin Purchaser agrees to provide accurate identification information to NAC in connection with

the creation of the AML Bitcoin wallet. Should any such information be inaccurate, Coin Purchaser will promptly deliver correct information to NAC.

(h) If Coin Purchaser's payment is insufficient to cover the entire Purchase Price for the number of AML Tokens set forth in subparagraph (a) above, NAC shall have no obligation to sell and deliver a lesser number of AML Tokens; and NAC may immediately reverse the transaction, crediting and returning to Coin Purchaser that part of the Purchase Price that was credited to NAC.

(i) Upon the completion of the upgrade of the AML Bitcoin and the delivery of information

necessary to affect an exchange of the AML Tokens for the AML Bitcoins, upon confirmation of AML/KYC compliance, Coin Purchaser and NAC will exchange Coin Purchaser's AML Tokens for the AML Bitcoins on a one to one basis.

(j) If Coin Purchaser does not initiate the exchange of the AML Tokens to the AML Bitcoins within 6 months after the AML Bitcoins become available, NAC may terminate, rescind, and cancel the purchase of AML Tokens or repay to Coin Purchaser the Purchase Price, less the equivalent of a US $25-dollar processing fee. In the event NAC so terminates, rescinds, or cancels, NAC shall notify Coin Purchaser of such termination, rescission, or cancellation within 24 hours. In the event of termination, rescission or cancellation, Coin Purchaser's former account(s) remains subject to the potential for NAC reporting suspicious activities to governmental authorities.

(k) Coin Purchaser hereby agrees to comply with and be bound by all conditions, policies, rules and

regulations on NAC's Website and of all exchanges in which the AML Bitcoin may be offered, transferred, exchanged or sold.

(l) No AML Token may be exchanged for an AML Bitcoin unless Coin Purchaser's legal identity is

confirmed. In the case of an individual this shall require providing a copy of government issued identification that has a photograph of the individual, such as a Driver's License or Passport; in the case of a corporation, limited liability company, or partnership, the verification shall be such a document of the managing member, managing or general partner, or president, in the case of a trust, the verification shall be such a document of the trustee of the trust.

(m) NAC shall operate its computer systems and website and maintain them in such a manner as a

reasonably prudent person in the business of conducing transactions based on a sophisticated computer networking system and shall exercise due care and good faith, including employing technicians and personnel highly skilled in the operation of such a highly sophisticated computer and software based technologies; and NAC shall employ and utilize the most sophisticated and safest methods of internet and computer security available sufficient to assure that at all times its computer network provides a safe and secure environment for the conduct of the business anticipated by this Agreement.

(n) The purchase in this Agreement shall also be governed by the terms and conditions of the

website, "atencoin.com", which terms and conditions are incorporated herein. To the extent of a conflict between the terms and conditions in such website and this Agreement relating to the operation and the technical aspects of conducting transactions on said website, the terms and conditions in said website control. To the extent of a conflict between the terms and conditions on said website and this Agreement pertaining to the purchase of AML Tokens, the AML Bitcoins, the price, NAC's liability, indemnity, Coin Purchaser's representations, and obligations undertaken by NAC to Coin Purchaser, this Agreement controls.

DocuSign Envelope ID: 09A0893F-A927-4B86-9B60-4C95DAFFD11E

## 2. NAC's Right to Cancellation and Rescission.

In the event NAC receives or possesses information

that would lead to a reasonable and good faith suspicion that a transaction in the AML Bitcoin or AML Token is violating or is about to violate money laundering, anti-terrorist financing, or anti-fraud laws of the United States or of any nation or that the use of AML Bitcoins or AML Tokens is or is about to be used to facilitate a violation of such laws or a financial crime, or is in violation of a validly issued court order or other valid governmental order, NAC may refuse to process, or may rescind, cancel or reverse, any purchase or sale of AML Tokens or AML Bitcoins. Such right shall exist even after funds have been debited from Coin Purchaser's account(s). So long as NAC's suspicion was reasonable and in good faith, NAC shall not be obligated to allow Coin Purchaser to reinstate a purchase or AML token exchange or AML Bitcoin transfer order at the same price or on the same terms as the cancelled transaction.

## 3. Representations, Warranties, and Covenants.

a. NAC represents and Coin Purchaser understands, acknowledges and agrees that Black Gold International Inc. (BGCI") is a patent holding company and is not a party to this agreement.

b. NAC represents and Coin Purchaser understands, acknowledges and agrees that Coin Purchaser

has no right to and will not share or participate in any way with BGCI's revenue, profit, or losses earned in connection with its activities concerning the AML Bitcoin.

c. NAC represents and Coin Purchaser understands, acknowledges and agrees AML Bitcoin does not

have any underlying collateral; the AML Bitcoin is merely an unsecured cyber currency or digital coin.

d. NAC represents that it will use its best efforts to create a digital (or cybercurrency) that will be compliant with the laws, statutes, rules, regulations, and procedures of the United States and other jurisdictions in which such currency may be used or exchanged that protect against money-laundering and terrorist financing (hereinafter "AML Laws"), i.e. AML Bitcoin will be AML Compliant.

e. NAC will use its best efforts to monitor all the transactions (purchases, exchanges, sales) of AML

Bitcoins in an effort to detect suspicious activities that may violate AML Laws.

f. NAC and Coin Purchaser acknowledge and agree that the supply of AML Bitcoin and NAC

services through the NAC website are subject to United States and international export controls and economic sanctions requirements.

g. Coin Purchaser understands, acknowledges and agrees that it is not purchasing the AML Bitcoin

through NAC or Andrade for the purpose of facilitating any illegal or unlawful activities, and the AML Bitcoin will not be used for such purpose.

h. Coin Purchaser understands, acknowledges and agrees that it intends to comply with all laws and

regulations of the United States governing currency transmission activity, all State laws governing such, and all laws governing such in Coin Purchaser's jurisdiction.

i. Coin Purchaser understands, acknowledges and agrees that AML Bitcoin will not be redeemed by NAC and Coin Purchaser is not relying upon NAC to be a source of liquidity for Purchaser and Purchaser's AML Bitcoin.

j. Coin Purchaser understands, acknowledges and agrees that AML Bitcoins are mediums of

exchange and not a pooled interest in any business entity or common enterprise or a business venture involving the participation of Coin Purchaser and NAC or its affiliates.

k. Coin Purchaser understands, acknowledges, and agrees that it has not purchased the AML Bitcoins

for investment purposes and expects no return on investment.

l. Coin Purchaser understands, acknowledges, and agrees that AML Bitcoin and the AML Token are

not securities and are not subject to the securities laws of any governmental entity.

m. Coin Purchaser understands, acknowledges, and agrees that AML Bitcoins are intended to be and

are solely an Internet based exchange medium.

n. Coin Purchaser understands, acknowledges and agrees that by purchasing the AML Tokens and exchanging them for AML Bitcoins or by purchasing, selling, exchanging, and transferring AM Bitcoins, and by using the wallet, or obtaining and using technical information and technical support provided by NAC, Coin Purchaser is not participating in and not becoming a member or investor in any pooled interest, business entity, common enterprise, or business venture with NAC, Andrade or any of its or their affiliates.

o. Coin Purchaser understands, acknowledges and agrees that this Agreement does not create or

constitute a debt of NAC to Coin Purchaser and that NAC is not obligated to pay Coin Purchaser,

except as may be otherwise specifically provided in this Agreement.

p. Coin Purchaser understands, acknowledges and agrees that NAC and its affiliates can, without notice, purchase AML Bitcoins or AML Tokens on the secondary market after the initial issuance, and that they can resell the AML Bitcoins or AML Tokens they purchased. NAC represents and agrees that such sales will not be such as to detrimentally harm the market for AML Bitcoins, such that the economic interests of Coin Purchasers will be harmed.

q. NAC is a limited liability company duly organized and existing under the laws of the State of Nevada and NAC has its principal place of business in Las Vegas, Nevada.

r. Coin Purchaser represents that in making the purchase in this Agreement it is relying solely on its own judgment, belief and knowledge as to the nature of the currency and the cyber coin or digital market and industry and Coin Purchaser is not relying on any statements made by Andrade or NAC, made in any NAC advertising or marketing materials, or made on NAC's website; and Coin Purchaser acknowledges and agrees that it shall not assert any claims against Andrade or NAC based on information on the NAC website having been modified, changed or updated.

4. Taxation. NAC shall have no obligation to prepare, provide, or file any financial or transactional

information, tax returns, or information forms to Coin Purchaser in connection with Coin Purchaser's reporting of any income to tax authorities within Coin Purchaser's jurisdiction. Notwithstanding the foregoing, should tax authorities require NAC to provide such information, NAC shall do so.

## 5. Limitations on Liability.

a. NAC intends to track AML Bitcoin to identifiable persons and business entities and, if required by

law, will file suspicious activity or similar reports with relevant governmental agencies in nations where it does business. In filing such reports NAC shall exercise reasonable care and act in good faith based on the information it has and that is provided to it. Coin Purchaser acknowledges that, notwithstanding NAC's exercise of reasonable care and good faith, such reports may be erroneous or contain incomplete or inaccurate information. Coin Purchaser acknowledges that generally such reports to governmental agencies that are required to be made are privileged communications, as a result of which, NAC would not be subject to a claim for damages in the event that NAC makes an incorrect or incomplete report having exercised reasonable care and good faith.

b. In the event, NAC has a reasonable and good faith belief that Coin Purchaser is engaging in

DocuSign Envelope ID: 09A0893F-A927-4B86-9B60-4C95DAFFD11E

conduct in violation of laws, rules, or regulations concerning anti-money laundering, anti-terrorist financing, or anti-financial fraud, NAC may, without liability to Coin Purchaser, suspend or terminate Coin Purchaser's access to the NAC website or services. In that event, NAC shall not be liable to Coin Purchaser or to any third party as a result of such suspension or termination.

c. In the event of an attack on NAC's website or computer system, a virus or malicious code in NAC's computer system, notwithstanding NAC's compliance with paragraph 1(m), or in the event NAC is required to suspend, modify, discontinue all or a portion of its services, or terminate its services by a court order or governmental order or direction, NAC shall not be liable to Coin Purchaser for any damage to Coin Purchaser as a result of such suspension, modification, discontinuance, or termination.

d. Coin Purchaser's AML Bitcoin digital wallet may be subject to attempted impersonation and or cyber-attack which could result in the material diminution, theft or transfer of Coin Purchaser's AML Bitcoin digital wallet. So long as NAC has complied with paragraph 1(m) in this Agreement, NAC shall not be liable for any damage caused to Coin Purchaser as a result of the use of NAC's computer system or website, including direct, indirect, or consequential damages, whether such damage is caused by a hack, data breach, malicious code, computer virus or criminal conduct.

e. Coin Purchaser acknowledges that although NAC intends to provide accurate and timely information on the NAC website, the NAC website (including, without limitation, the content) may not always be entirely accurate, complete, or current and may also include technical inaccuracies or typographical errors. In an effort to continue to provide Coin Purchaser with as complete and accurate information as practicable, information may be changed or updated from time to time without notice, including without limitation information regarding NAC's policies, products and services. Accordingly, Coin Purchaser agrees to verify that the information necessary to conduct transactions in AML Bitcoins is current before relying on information on the NAC website. NAC will not be liable for a transaction though the NAC website if the inability to complete or execute the transaction is based on Coin Purchaser's use of outdated technical information.

6. Indemnity. Coin Purchaser agrees, to the fullest extent provided by applicable law, to indemnify,

defend, and hold harmless NAC, its subsidiaries, directors, officers, employees and agents from and against any and all claims, demands, causes of action, debts or liabilities, including reasonable attorneys' fees (collectively, "Damages") to the extent that any such Damages are based upon or arise out of a misrepresentation by Coin Purchaser under this agreement or Coin Purchaser's violation of any law, statute, rule, or regulation of a nation or subdivision thereof having jurisdiction over Coin Purchaser.

DocuSign Envelope ID: 09A0893F-A927-4B86-9B60-4C95DAFFD11E

7. Succession. Except as otherwise provided in this Agreement, this Agreement shall be binding upon and inure to the benefit of Coin Purchaser, NAC, and their respective heirs, successors and assigns.

8. Assignment. The rights, benefits and obligations of Coin Purchaser under this Agreement and in Coin

Purchaser's AML Bitcoin digital wallet shall not be assignable; except Coin Purchaser may transfer ownership to an entity wholly owned by Coin Purchaser, or from a wholly owned entity to that entity's owner, to a trust in which Coin Purchaser is a trustor, for estate planning purposes, or by (or as a result of intestate or testate succession. Any other purported assignment in violation of this Agreement Section shall be null and void and of no force and effect.

9. Retroactive. This Agreement shall be retroactive to the date of Coin Purchaser's original purchase.

10. Amendment and Modification. To the extent necessary for NAC to comply with laws, statutes,

regulations, and rules pertaining to anti-money laundering ("AML"), anti-terrorist financing, know your customer rules ("KYC"), anti-financial fraud provisions, or to modify any technical aspects of the website to assure a safe and secure and government compliant system to transact transfers or exchanges in AML Bitcoins (or AML Tokens), NAC may, without advance notice to Coin Purchaser, amend and modify the terms and conditions on its website by posting same thereon and/or by sending notice to Coin Purchaser via email, and such amended terms and modified terms and conditions shall be effective at such time.

11. Arbitration. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, including the arbitrability of any controversy or claim, shall be resolved by arbitration in accordance with the Commercial Arbitration Rules and the Optional Rules for Emergency Measures of Protection of the American Arbitration Association ("AAA"). Any provisional remedy which would be available from a court of law shall be available from the arbitrator to the parties to this Agreement pending arbitration. The arbitrator(s) shall be guided by AAA Rules in allowing discovery and all issues regarding compliance with discovery requests shall be decided by the arbitrator(s). The arbitrator(s) may allow additional discovery utilizing Rule 34 of the U.S. Federal Rules of Civil Procedure as a guide. The Federal Arbitration Act shall govern all arbitration proceedings under this Agreement. This Agreement shall in all other respects be governed and interpreted by the internal laws of the State of Nevada United States of America, excluding any conflicts or choice of law rule or principles that might otherwise refer construction or interpretation of this Agreement to the substantive law of another jurisdiction. The arbitration shall be conducted in Clark County, Nevada, United States of America, and such venue shall be considered mandatory and not permissive. The arbitrator must be familiar with the operations of digital currencies. All fees and expenses of the arbitration shall

DocuSign Envelope ID: 09A0893F-A927-4B86-9B60-4C95DAFFD11E

be borne by the parties equally. Each Party shall bear the expense of its own counsel, experts, witnesses, and preparation and presentation of proofs, however, the prevailing Party may, if the arbitrator(s) so determines, be entitled to an award of reasonable attorney's fees and expenses and such party's share of the arbitration fees and expenses. This agreement to arbitrate shall survive the termination and repudiation of this Agreement. Any award rendered in such arbitration shall be final and binding on the parties and may be entered in any court of competent jurisdiction to the extent necessary for the enforcement thereof.

12. Injunctive Relief. Coin Purchaser, Andrade and NAC agree and understand that under certain

circumstances, damages and legal remedies may be insufficient to protect the parties' interests. Accordingly, the parties agree that notwithstanding the arbitration provision in this Agreement, they may pursue claims for injunctive relief in court and outside of the arbitration forum, and in that regard, each party consents to jurisdiction in the courts in Clark County, Nevada and each of the parties agrees that only the federal or state courts in Clark County, Nevada shall have venue over such disputes between the parties seeking injunctive relief.

13. Governing Law. This Agreement and all claims related to or arising from it or arising from the

parties' relationship shall be governed by and construed in accordance with the laws of the State of Nevada and to the extent applicable, the United States, irrespective of Nevada's choice-of-law principles.

14. Interpretation. The recitals to this Agreement are incorporated into and made a part of this

Agreement; titles of paragraphs are for convenience only and are not to be considered a part of this Agreement.

15. Severability. In the event any one or more of the provisions of this Agreement is declared to be void

or otherwise unenforceable, the remainder of this Agreement shall survive and such provision(s) shall be deemed modified or amended so as to fulfill the intent of the parties hereto.

16. Entire Agreement. This Agreement is the final written expression of, and the complete and exclusive

statement of, all the agreements, conditions, promises and covenants between the parties with respect to the purchase contemplated by this Agreement and the use of NAC website, as modified by the terms and conditions thereof. This Agreement supersedes all prior and contemporaneous agreements, representations, and understandings of the parties. Coin Purchaser declares, represents, acknowledges, and warrants that no promise, inducement, understanding, or agreement not expressed in this Agreement or in the website, subject to modifications thereof as set forth elsewhere in this Agreement, has been made to Coin Purchaser.

17. Waiver. None of the terms of this Agreement or any term, right or remedy hereunder shall be deemed waived unless such waiver is in writing and signed by the party to be charged therewith and in no event by reason of any failure to assert or delay in asserting any such term, right or remedy or similar term, right or remedy hereunder.

18. NAC Bank Account. The following is the designated NAC Bank Account information:

NAC Payroll Services, Inc.

Account Number: █████████

Bank: ███████████████

Bank Address: █████████████████████████

Routing Number: ████████████

SWIFT: ██████████

19. Notices. Any and all notices required or permitted under this Agreement shall be in writing and shall be hand-delivered or mailed, courier delivery service, certified mail, return receipt requested, or emailed and addressed to:

If to NAC or Andrade:

via e-mail: legal@amlbitcoin.com

To a street address NAC Foundation, LLC

7495 West Azure Drive, Suite 110 Las Vegas, NV 89130

If to Coin Purchaser:

via email: _____

To a street address:

: Boyer Family Trust Trust % Benjamin Boyer

████████████████████

DocuSign Envelope ID: 09A0893F-A927-4B86-9B60-4C95DAFFD11E

The parties acknowledge their acceptance of this agreement with their signatures below.

NAC FOUNDATION, LLC

DocuSigned by:

_____
6C8D7AAEFE844D9...

Marcus Andrade

COIN PURCHASER

DocuSigned by:

_____
C029688E16A84D0...

Benjamin Boyer

Representative, Boyer Family Trust Trust

DocuSign Envelope ID: 08A0893F-A927-4B86-9B60-4C95DAFFD11E

COIN PURCHASER INFORMATION (and if Coin Purchaser is an entity, then this information shall be provided as to the managing member, managing or general partner, president, or trustee of such entity)

FULL NAME (PRINT): Benjamin Boyer

ADDRESS: ▮▮▮▮▮▮▮▮▮

CITY / STATE: ▮▮▮▮▮▮

DATE OF BIRTH: ▮▮▮▮

CLIENT REP NAME:

PHONE NUMBER: ▮▮▮▮▮▮▮▮

EMAIL ADDRESS: ▮▮▮▮▮▮▮

Additionally, with respect to a Coin Purchaser who is an entity:

If a corporation of limited liability company:

Name: _____ Type of entity: _____

State of Incorporation or creation: _____ Address for mailing:

Employer ID: _____ Number of shareholders, partners, or

members: _____ Identify of all shareholders and members (name,

address, birthdate) (attach additional pages if necessary to list all such information):

_____ _____

_____ If a partnership: Name: _____

Address of the General Partner: _____ Employer ID no., if any:

_____ Number of partners (include all general and limited partner,

if any): _____ Identify all partners (name, address, birthdate) (attach

additional pages if necessary to list all such information): _____

_____

## PURCHASE AGREEMENT

This Agreement is made by and between NAC Foundation, LLC ('NAC"), Marcus Andrade ("Andrade") and Boyer Family Trust ("Coin Purchaser") and is effective as of October 26, 2018.

### Recitals

A. NAC is engaged in the creation and issuance of virtual coins;

B. NAC has developed and is now upgrading a new coin known as the AML Bitcoin which includes

software to protect the virtual coins in a secure "wallet";

C. Andrade owns and can make available from his own account AML Tokens than can be exchanged

for AML Bitcoins; and

D. Coin Purchaser desires to and intends to acquire the AML Bitcoin when it becomes available in

accordance with the terms of this Agreement by exchanging AML Tokens for AML Bitcoins.

### Agreement

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, Coin Purchaser, Andrade and NAC agree as follows:

### 1. Purchase; Price; Wallet.

(a) Coin Purchaser agrees to purchase and Andrade agrees to sell Five Hundred Thousand (500,000) AML Bitcoin Tokens (ABTC) that may and will be exchanged, in accordance with subsection (e) below, for AML Bitcoins for a purchase price of $0.15 per coin (Fifteen cents) for a total purchase price of Seventy-Five Thousand ($75,000.00) Dollars (the "Purchase Price"), each AML Token being exchangeable for one AML Bitcoin, i.e., one for one.

(b) Coin Purchaser shall pay the Purchase Price by wire transfer to NAC's designated bank account

("NAC Bank Account") in U.S. Dollars within 3 days (3) of the execution of this Agreement by NAC and Coin Purchaser.

(c) Concurrent with Purchaser's execution and delivery of this Agreement, Coin Purchaser, if an

individual, shall deliver to NAC (or its representative) a copy of a government issued identification (as more particularly described in subparagraph (l) below.

(d) The ABTC will be delivered to and maintained in an electronic "wallet" (being a secure

digital wallet used to store, send, and receive digital currency) maintained by Coin Purchaser or its designee. Coin Purchaser's wallet address into which ABTC shall be delivered is:

███████████████████████████████ NAC shall assist Coin Purchaser with needed additional technical guidance to enable Coin Purchaser to obtain and maintain a wallet for the AML Tokens purchased and shall provide all technical support to assist Coin Purchaser in that regard.

(e) Coin Purchaser understands that the AML Bitcoin is in the process of being upgraded to be

compliant with anti-money laundering laws. When that process is completed, Coin Purchaser will be able to convert AML Tokens to AML Bitcoins, on condition that Coin Purchaser is able to successfully complete AML/KYC compliance verification.

(f) Upon the availability of the AML Bitcoin, NAC shall deliver to Coin Purchaser all information,

including technical information, necessary to enable Coin Purchaser to obtain said wallet to store, maintain, exchange and transfer the AML Bitcoins, including the mandatory I.D. Verification; and NAC shall provide all technical support to assist Coin Purchaser in that regard. The technical support personnel shall be highly trained, skilled and competent regarding all technology necessary to maintain, exchange, and trade in digital- or e-commerce, including digital international commerce, cyber currencies and digital coins in general and AML Bitcoins in particular. NAC shall provide on-going technical support available, at a minimum, during the hours that cyber currency and digital coin exchanges are open and available for the conduct of business. NAC understands and acknowledges that Coin Purchaser may not have a high level of technical sophistication sufficient to independently set up a wallet to receive, store, send and receive digital currency without the assistance of and technical support provided by NAC.

(g) Coin Purchaser agrees to provide accurate identification information to NAC in connection with

the creation of the AML Bitcoin wallet. Should any such information be inaccurate, Coin Purchaser will promptly deliver correct information to NAC.

(h) If Coin Purchaser's payment is insufficient to cover the entire Purchase Price for the number of AML Tokens set forth in subparagraph (a) above, NAC shall have no obligation to sell and deliver a lesser number of AML Tokens; and NAC may immediately reverse the transaction, crediting and returning to Coin Purchaser that part of the Purchase Price that was credited to NAC.

(i) Upon the completion of the upgrade of the AML Bitcoin and the delivery of information

necessary to affect an exchange of the AML Tokens for the AML Bitcoins, upon confirmation of AML/KYC compliance, Coin Purchaser and NAC will exchange Coin Purchaser's AML Tokens for the AML Bitcoins on a one to one basis.

DocuSign Envelope ID: 987020D5-4084-4A16-A348-26E9509F928C

(j) If Coin Purchaser does not initiate the exchange of the AML Tokens to the AML Bitcoins within 6 months after the AML Bitcoins become available, NAC may terminate, rescind, and cancel the purchase of AML Tokens or repay to Coin Purchaser the Purchase Price, less the equivalent of a US $25-dollar processing fee. In the event NAC so terminates, rescinds, or cancels, NAC shall notify Coin Purchaser of such termination, rescission, or cancellation within 24 hours. In the event of termination, rescission or cancellation, Coin Purchaser's former account(s) remains subject to the potential for NAC reporting suspicious activities to governmental authorities.

(k) Coin Purchaser hereby agrees to comply with and be bound by all conditions, policies, rules and

regulations on NAC's Website and of all exchanges in which the AML Bitcoin may be offered, transferred, exchanged or sold.

(l) No AML Token may be exchanged for an AML Bitcoin unless Coin Purchaser's legal identity is

confirmed. In the case of an individual this shall require providing a copy of government issued identification that has a photograph of the individual, such as a Driver's License or Passport; in the case of a corporation, limited liability company, or partnership, the verification shall be such a document of the managing member, managing or general partner, or president, in the case of a trust, the verification shall be such a document of the trustee of the trust.

(m) NAC shall operate its computer systems and website and maintain them in such a manner as a

reasonably prudent person in the business of conducting transactions based on a sophisticated computer networking system and shall exercise due care and good faith, including employing technicians and personnel highly skilled in the operation of such a highly sophisticated computer and software based technologies; and NAC shall employ and utilize the most sophisticated and safest methods of internet and computer security available sufficient to assure that at all times its computer network provides a safe and secure environment for the conduct of the business anticipated by this Agreement.

(n) The purchase in this Agreement shall also be governed by the terms and conditions of the

website, "atencoin.com", which terms and conditions are incorporated herein. To the extent of a conflict between the terms and conditions in such website and this Agreement relating to the operation and the technical aspects of conducting transactions on said website, the terms and conditions in said website control. To the extent of a conflict between the terms and conditions on said website and this Agreement pertaining to the purchase of AML Tokens, the AML Bitcoins, the price, NAC's liability, indemnity, Coin Purchaser's representations, and obligations undertaken by NAC to Coin Purchaser, this Agreement controls.

DocuSign Envelope ID: 987020D5-4084-4A16-A348-26E9509F928C

**2. NAC's Right to Cancellation and Rescission.**

In the event NAC receives or possesses information

that would lead to a reasonable and good faith suspicion that a transaction in the AML Bitcoin or AML Token is violating or is about to violate money laundering, anti-terrorist financing, or anti-fraud laws of the United States or of any nation or that the use of AML Bitcoins or AML Tokens is or is about to be used to facilitate a violation of such laws or a financial crime, or is in violation of a validly issued court order or other valid governmental order, NAC may refuse to process, or may rescind, cancel or reverse, any purchase or sale of AML Tokens or AML Bitcoins. Such right shall exist even after funds have been debited from Coin Purchaser's account(s). So long as NAC's suspicion was reasonable and in good faith, NAC shall not be obligated to allow Coin Purchaser to reinstate a purchase or AML token exchange or AML Bitcoin transfer order at the same price or on the same terms as the cancelled transaction.

**3. Representations, Warranties, and Covenants.**

a. NAC represents and Coin Purchaser understands, acknowledges and agrees that Black Gold International Inc. (BGCI") is a patent holding company and is not a party to this agreement.

b. NAC represents and Coin Purchaser understands, acknowledges and agrees that Coin Purchaser

has no right to and will not share or participate in any way with BGCI's revenue, profit, or losses earned in connection with its activities concerning the AML Bitcoin.

c. NAC represents and Coin Purchaser understands, acknowledges and agrees AML Bitcoin does not

have any underlying collateral; the AML Bitcoin is merely an unsecured cyber currency or digital coin.

d. NAC represents that it will use its best efforts to create a digital (or cybercurrency) that will be compliant with the laws, statutes, rules, regulations, and procedures of the United States and other jurisdictions in which such currency may be used or exchanged that protect against money-laundering and terrorist financing (hereinafter "AML Laws"), i.e. AML Bitcoin will be AML Compliant.

e. NAC will use its best efforts to monitor all the transactions (purchases, exchanges, sales) of AML

Bitcoins in an effort to detect suspicious activities that may violate AML Laws.

f. NAC and Coin Purchaser acknowledge and agree that the supply of AML Bitcoin and NAC

services through the NAC website are subject to United States and international export controls and economic sanctions requirements.

g. Coin Purchaser understands, acknowledges and agrees that it is not purchasing the AML Bitcoin

through NAC or Andrade for the purpose of facilitating any illegal or unlawful activities, and the AML Bitcoin will not be used for such purpose.

h. Coin Purchaser understands, acknowledges and agrees that it intends to comply with all laws and

regulations of the United States governing currency transmission activity, all State laws governing such, and all laws governing such in Coin Purchaser's jurisdiction.

i. Coin Purchaser understands, acknowledges and agrees that AML Bitcoin will not be redeemed by NAC and Coin Purchaser is not relying upon NAC to be a source of liquidity for Purchaser and Purchaser's AML Bitcoin.

j. Coin Purchaser understands, acknowledges and agrees that AML Bitcoins are mediums of

exchange and not a pooled interest in any business entity or common enterprise or a business venture involving the participation of Coin Purchaser and NAC or its affiliates.

k. Coin Purchaser understands, acknowledges, and agrees that it has not purchased the AML Bitcoins

for investment purposes and expects no return on investment.

l. Coin Purchaser understands, acknowledges, and agrees that AML Bitcoin and the AML Token are

not securities and are not subject to the securities laws of any governmental entity.

m. Coin Purchaser understands, acknowledges, and agrees that AML Bitcoins are intended to be and

are solely an Internet based exchange medium.

n. Coin Purchaser understands, acknowledges and agrees that by purchasing the AML Tokens and exchanging them for AML Bitcoins or by purchasing, selling, exchanging, and transferring AM Bitcoins, and by using the wallet, or obtaining and using technical information and technical support provided by NAC, Coin Purchaser is not participating in and not becoming a member or investor in any pooled interest, business entity, common enterprise, or business venture with NAC, Andrade or any of its or their affiliates.

o. Coin Purchaser understands, acknowledges and agrees that this Agreement does not create or

constitute a debt of NAC to Coin Purchaser and that NAC is not obligated to pay Coin Purchaser,

DocuSign Envelope ID: 987020D5-4084-4A16-A348-26E9509F928C

except as may be otherwise specifically provided in this Agreement.

p. Coin Purchaser understands, acknowledges and agrees that NAC and its affiliates can, without notice, purchase AML Bitcoins or AML Tokens on the secondary market after the initial issuance, and that they can resell the AML Bitcoins or AML Tokens they purchased. NAC represents and agrees that such sales will not be such as to detrimentally harm the market for AML Bitcoins, such that the economic interests of Coin Purchasers will be harmed.

q. NAC is a limited liability company duly organized and existing under the laws of the State of Nevada and NAC has its principal place of business in Las Vegas, Nevada.

r. Coin Purchaser represents that in making the purchase in this Agreement it is relying solely on its own judgment, belief and knowledge as to the nature of the currency and the cyber coin or digital market and industry and Coin Purchaser is not relying on any statements made by Andrade or NAC, made in any NAC advertising or marketing materials, or made on NAC's website; and Coin Purchaser acknowledges and agrees that it shall not assert any claims against Andrade or NAC based on information on the NAC website having been modified, changed or updated.

4. Taxation. NAC shall have no obligation to prepare, provide, or file any financial or transactional

information, tax returns, or information forms to Coin Purchaser in connection with Coin Purchaser's reporting of any income to tax authorities within Coin Purchaser's jurisdiction. Notwithstanding the foregoing, should tax authorities require NAC to provide such information, NAC shall do so.

**5. Limitations on Liability.**

a. NAC intends to track AML Bitcoin to identifiable persons and business entities and, if required by

law, will file suspicious activity or similar reports with relevant governmental agencies in nations where it does business. In filing such reports NAC shall exercise reasonable care and act in good faith based on the information it has and that is provided to it. Coin Purchaser acknowledges that, notwithstanding NAC's exercise of reasonable care and good faith, such reports may be erroneous or contain incomplete or inaccurate information. Coin Purchaser acknowledges that generally such reports to governmental agencies that are required to be made are privileged communications, as a result of which, NAC would not be subject to a claim for damages in the event that NAC makes an incorrect or incomplete report having exercised reasonable care and good faith.

b. In the event, NAC has a reasonable and good faith belief that Coin Purchaser is engaging in

DocuSign Envelope ID: 987020D5-4084-4A16-A348-26E9509F928C

conduct in violation of laws, rules, or regulations concerning anti-money laundering, anti-terrorist financing, or anti-financial fraud, NAC may, without liability to Coin Purchaser, suspend or terminate Coin Purchaser's access to the NAC website or services. In that event, NAC shall not be liable to Coin Purchaser or to any third party as a result of such suspension or termination.

c. In the event of an attack on NAC's website or computer system, a virus or malicious code in

NAC's computer system, notwithstanding NAC's compliance with paragraph 1(m), or in the event NAC is required to suspend, modify, discontinue all or a portion of its services, or terminate its services by a court order or governmental order or direction, NAC shall not be liable to Coin Purchaser for any damage to Coin Purchaser as a result of such suspension, modification, discontinuance, or termination.

d. Coin Purchaser's AML Bitcoin digital wallet may be subject to attempted impersonation and or cyber-attack which could result in the material diminution, theft or transfer of Coin Purchaser's AML Bitcoin digital wallet. So long as NAC has complied with paragraph 1(m) in this Agreement, NAC shall not be liable for any damage caused to Coin Purchaser as a result of the use of NAC's computer system or website, including direct, indirect, or consequential damages, whether such damage is caused by a hack, data breach, malicious code, computer virus or criminal conduct.

e. Coin Purchaser acknowledges that although NAC intends to provide accurate and timely information on the NAC website, the NAC website (including, without limitation, the content) may not always be entirely accurate, complete, or current and may also include technical inaccuracies or typographical errors. In an effort to continue to provide Coin Purchaser with as complete and accurate information as practicable, information may be changed or updated from time to time without notice, including without limitation information regarding NAC's policies, products and services. Accordingly, Coin Purchaser agrees to verify that the information necessary to conduct transactions in AML Bitcoins is current before relying on information on the NAC website. NAC will not be liable for a transaction though the NAC website if the inability to complete or execute the transaction is based on Coin Purchaser's use of outdated technical information.

6. Indemnity. Coin Purchaser agrees, to the fullest extent provided by applicable law, to indemnify,

defend, and hold harmless NAC, its subsidiaries, directors, officers, employees and agents from and against any and all claims, demands, causes of action, debts or liabilities, including reasonable attorneys' fees (collectively, "Damages") to the extent that any such Damages are based upon or arise out of a misrepresentation by Coin Purchaser under this agreement or Coin Purchaser's violation of any law, statute, rule, or regulation of a nation or subdivision thereof having jurisdiction over Coin Purchaser.

DocuSign Envelope ID: 987020D5-4084-4A16-A348-26E9509F928C

7. Succession. Except as otherwise provided in this Agreement, this Agreement shall be binding upon and inure to the benefit of Coin Purchaser, NAC, and their respective heirs, successors and assigns.

8. Assignment. The rights, benefits and obligations of Coin Purchaser under this Agreement and in Coin

Purchaser's AML Bitcoin digital wallet shall not be assignable; except Coin Purchaser may transfer ownership to an entity wholly owned by Coin Purchaser, or from a wholly owned entity to that entity's owner, to a trust in which Coin Purchaser is a trustor, for estate planning purposes, or by (or as a result of intestate or testate succession. Any other purported assignment in violation of this Agreement Section shall be null and void and of no force and effect.

9. Retroactive. This Agreement shall be retroactive to the date of Coin Purchaser's original purchase.

10. Amendment and Modification. To the extent necessary for NAC to comply with laws, statutes,

regulations, and rules pertaining to anti-money laundering ("AML"), anti-terrorist financing, know your customer rules ("KYC"), anti-financial fraud provisions, or to modify any technical aspects of the website to assure a safe and secure and government compliant system to transact transfers or exchanges in AML Bitcoins (or AML Tokens), NAC may, without advance notice to Coin Purchaser, amend and modify the terms and conditions on its website by posting same thereon and/or by sending notice to Coin Purchaser via email, and such amended terms and modified terms and conditions shall be effective at such time.

11. Arbitration. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, including the arbitrability of any controversy or claim, shall be resolved by arbitration in accordance with the Commercial Arbitration Rules and the Optional Rules for Emergency Measures of Protection of the American Arbitration Association ("AAA"). Any provisional remedy which would be available from a court of law shall be available from the arbitrator to the parties to this Agreement pending arbitration. The arbitrator(s) shall be guided by AAA Rules in allowing discovery and all issues regarding compliance with discovery requests shall be decided by the arbitrator(s). The arbitrator(s) may allow additional discovery utilizing Rule 34 of the U.S. Federal Rules of Civil Procedure as a guide. The Federal Arbitration Act shall govern all arbitration proceedings under this Agreement. This Agreement shall in all other respects be governed and interpreted by the internal laws of the State of Nevada United States of America, excluding any conflicts or choice of law rule or principles that might otherwise refer construction or interpretation of this Agreement to the substantive law of another jurisdiction. The arbitration shall be conducted in Clark County, Nevada, United States of America, and such venue shall be considered mandatory and not permissive. The arbitrator must be familiar with the operations of digital currencies. All fees and expenses of the arbitration shall be borne by the

DocuSign Envelope ID: 987020D5-4084-4A16-A348-26E9509F928C

parties equally. Each Party shall bear the expense of its own counsel, experts, witnesses, and preparation and presentation of proofs, however, the prevailing Party may, if the arbitrator(s) so determines, be entitled to an award of reasonable attorney's fees and expenses and such party's share of the arbitration fees and expenses. This agreement to arbitrate shall survive the termination and repudiation of this Agreement. Any award rendered in such arbitration shall be final and binding on the parties and may be entered in any court of competent jurisdiction to the extent necessary for the enforcement thereof.

12. Injunctive Relief. Coin Purchaser, Andrade and NAC agree and understand that under certain

circumstances, damages and legal remedies may be insufficient to protect the parties' interests. Accordingly, the parties agree that notwithstanding the arbitration provision in this Agreement, they may pursue claims for injunctive relief in court and outside of the arbitration forum, and in that regard, each party consents to jurisdiction in the courts in Clark County, Nevada and each of the parties agrees that only the federal or state courts in Clark County, Nevada shall have venue over such disputes between the parties seeking injunctive relief.

13. Governing Law. This Agreement and all claims related to or arising from it or arising from the

parties' relationship shall be governed by and construed in accordance with the laws of the State of Nevada and to the extent applicable, the United States, irrespective of Nevada's choice-of-law principles.

14. Interpretation. The recitals to this Agreement are incorporated into and made a part of this

Agreement; titles of paragraphs are for convenience only and are not to be considered a part of this Agreement.

15. Severability. In the event any one or more of the provisions of this Agreement is declared to be void

or otherwise unenforceable, the remainder of this Agreement shall survive and such provision(s) shall be deemed modified or amended so as to fulfill the intent of the parties hereto.

16. Entire Agreement. This Agreement is the final written expression of, and the complete and exclusive

statement of, all the agreements, conditions, promises and covenants between the parties with respect to the purchase contemplated by this Agreement and the use of NAC website, as modified by the terms and conditions thereof. This Agreement supersedes all prior and contemporaneous agreements, representations, and understandings of the parties. Coin Purchaser declares, represents, acknowledges, and warrants that no promise, inducement, understanding, or agreement not expressed in this Agreement or in the website, subject to modifications thereof as set forth elsewhere in this Agreement, has been made to Coin Purchaser.

17. Waiver. None of the terms of this Agreement or any term, right or remedy hereunder shall be deemed waived unless such waiver is in writing and signed by the party to be charged therewith and in no event by reason of any failure to assert or delay in asserting any such term, right or remedy or similar term, right or remedy hereunder.

18. NAC Bank Account. The following is the designated NAC Bank Account information:

NAC Payroll Services, Inc.

Account Number: ▮▮▮▮▮▮▮

Bank: ▮▮▮▮▮▮▮▮▮▮

Bank Address: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Routing Number: ▮▮▮▮▮▮

SWIFT: ▮▮▮▮▮▮

19. Notices. Any and all notices required or permitted under this Agreement shall be in writing and shall be hand-delivered or mailed, courier delivery service, certified mail, return receipt requested, or emailed and addressed to:

If to NAC or Andrade:

via e-mail: legal@amlbitcoin.com

To a street address NAC Foundation, LLC

7495 West Azure Drive, Suite 110 Las Vegas, NV 89130

If to Coin Purchaser:

via email: ▮▮▮▮▮▮▮▮▮▮▮▮

To a street address:

:    Boyer Family Trust ℅ Benjamin Boyer

▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮

The parties acknowledge their acceptance of this agreement with their signatures below.

NAC FOUNDATION, LLC

*Marcus Andrade*
6C8B7AAEFE844D9

10/29/2018 6:35:36 PM PDT

Marcus Andrade

COIN PURCHASER

C029688E16A84D0

10/27/2018 8:58:30 PM PDT

Benjamin Boyer

Representative, Boyer Family Trust    Trust

DocuSign Envelope ID: 98702DD5-4D64-4A16-A348-26E9609F928C

COIN PURCHASER INFORMATION (and if Coin Purchaser is an entity, then this information shall be provided as to the managing member, managing or general partner, president, or trustee of such entity)

FULL NAME (PRINT): Benjamin Boyer

ADDRESS: ███████████

CITY / STATE: ███████████

DATE OF BIRTH:

CLIENT REP NAME:

PHONE NUMBER:

EMAIL ADDRESS: ███████████

Additionally, with respect to a Coin Purchaser who is an entity:

If a corporation of limited liability company:

Name: _____ Type of entity: _____
State of Incorporation or creation: _____ Address for mailing:
Employer ID: _____ Number of shareholders, partners, or
members: _____ Identify of all shareholders and members (name,
address, birthdate) (attach additional pages if necessary to list all such information):

_____ _____
_____ If a partnership: Name: _____
Address of the General Partner: _____ Employer ID no., if any:
_____ Number of partners (include all general and limited partner, if
any): _____ Identify all partners (name, address, birthdate) (attach
additional pages if necessary to list all such information): _____

_____

# EXHIBIT O



Marcus Andrade

---

## Fwd: NEC Foundation AML information

**AML Adim** <                                                                      Fri, Dec 21, 2018 at 12:02 PM
To: Ben Boyer
Cc: Christopher Ray
Bcc:

Hello Mr. Boyer,

Please note that Mr. Ray is overseeing the checks and balances when it comes to direct sales for the AML Token that were done by NAC and / or Mr. Marcus Andrade when a client representative was actually used.

His job is to make sure that all the information you received from your client representative (David Mata / Blockbits Capital) is indeed true and accurate.

Mr. Ray was only going to ask you about 10 questions so that he can complete the Quality & Assessment Form.

Thank you,

Melanie
AML BitCoin Team

---------- Forwarded message ---------
From: **Christopher Ray**
Date: Fri, Dec 21, 2018 at 11:36 AM
Subject: Fwd: NEC Foundation AML information
To: AML Adim

---------- Forwarded message ---------
From: **Christopher Ray**
Date: Fri, Dec 21, 2018 at 12:19 PM
Subject: NEC Foundation AML information
To:

Mr. Boyer - thank you again for your time earlier. Per your request, please find my contact information below for your or your counsel's review. You may wish to also contact (or have your counsel contact) Marcus Andrade at the NEC Foundation to verify my identity and credentials.

Please note that my firm has been engaged as a third party. We are not direct employees of the NEC Foundation.

--

Christopher Ray, Esq.

This message is intended for the named recipient only. It may contain confidential information or information protected by attorney-client privilege. If you have received this message in error, please notify the sender immediately and destroy this message.

--
Christopher Ray, Esq.

This message is intended for the named recipient only. It may contain confidential information or information protected by attorney-client privilege. If you have received this message in error, please notify the sender immediately and destroy this message.



**Marcus Andrade** ██████████████████

## Aharonoff AML BTC transfer.

**David Mata** ████████████████████                              Wed, Dec 26, 2018 at 12:53 PM
To: Marcus Andrade ◄      ███████████████████

Hi Marcus, we don't actually need to speak today, I just need to see those coins, otherwise Daniel is going to escalate the situation.

Chris did indeed speak with both Japheth and I on Friday, and said that he would notify you of Daniel's responses prior to Friday afternoon. Where did you dig him up? Apparently he was extremely aggressive on the phone with Japheth.

As for Boyer, I wouldn't expect a response from him, he's already sold his coins to Japheth. I'm going to send an email to you and Daniel with questions for Daniel to answer.
D

On Wed, Dec 26, 2018 at 10:49 AM Marcus Andrade ◄    ███████████████████    wrote:

Hello David,

I have been tied up all morning. I will be available around 1 p.m. PST today for a call.

As far as an update, I am waiting on a report from Christopher Ray regarding the Compliance Quality and Assurance form. (The compliance questions he asked everyone and if indeed they were not misled)

I was informed that Chris already spoke to you and Japheth (Blockbits) as well as Daniel. I should be receiving feedback shortly.

You did message me over the weekend stating that Daniel successfully answered all questions and all was well. My question to you is that we haven't received the completed form back so I do not know if that is indeed accurate information. In order to expedite things, did Chris or Daniel tell you that all was good on Daniels responses to the questions Chris asked him?

Also, we haven't heard anything from Ben Boyer. Did he know that Chris was going to contact him?

Please also have Daniel send Chris and myself an email allowing you to take possession of his coins.

Thanks,

Marcus

On Wed, Dec 26, 2018 at 11:45 AM David Mata ◄     ███████████████████     ▸ wrote:
Hi Marcus,
I've been trying to reach you to execute this transfer. Can you please respond today and we can get the test transfer done? It's been far too long of a process, and Daniel now wants to engage counsel. There's no need for that.

I know it's the holidays, but I need to be in possession of those abtc.
D

--
**David Mata**
Managing Director and Co-Founder
Block Bits Capital
████████████████



**Marcus Andrade** ▮▮▮▮▮▮▮▮▮▮

## Hello Ben
14 messages

**Marcus Andrade** ◄ ▮▮▮▮▮▮▮▮▮▮                                Thu, May 30, 2019 at 10:32 AM
To: ▮▮▮▮▮▮▮▮▮▮

Hello Ben,

As you are fully aware of, we tried to reach out to you multiple times last year with no response knowing Blockbits was directing you not to answer our calls.

Since I truly feel you are an unknowingly puppet for Jack Abramoff and a disciple for Japheth and David, I would require you to first write a sworn statement detailing to me what your issues really are.

At that point, I would either arrange a call with you or meet with you in person. If my view of you is completely wrong, you should have no problem providing me with an affidavit about your true issues.

Feel free to provide me with your attorneys contact information and I can have my legal counsel reach out to yours.

When it comes to ABTC, yes we had some road bumps but the project is coming along fine. The public will see that very soon.

Thanks,

Marcus Andrade,

---

**Ben Boyer** ◄ ▮▮▮▮▮▮▮▮▮▮                                Thu, May 30, 2019 at 7:50 PM
To: Marcus Andrade ▮▮▮▮▮▮▮▮▮▮

Marcus,

Thanks for your email. I wasn't aware that you had been trying to contact me -- had I known, I would've reached out earlier. At one point someone claiming to have been hired by the NAC reached out to reverify my AML/KYC info but at the advice from Japheth, I never responded. I assume that's what your referencing?

My questions regarding the project are twofold:

1. Given the fact I have filed a lawsuit against Japheth, I'd like to better understand Japheth's and Blockbit's role in AML Bitcoin. When I invested in the ICO, I did so believing Japheth was the Chief Strategy Officer of the project. In Nov, he told me that his title was only a front to help you raise money in the ICO. What exactly was his role? I have learned that many other representations made to me by Japheth were not accurate and I'd love to hear your perspective on your interactions with him.

2. I'm also interested in getting an update on the project and where things stand with the state of the technology, the financial situation of the company, and any other matters of significance that can give me confidence that the project can still be turned around.



Marcus Andrade ◄ ██████████████████

## Ben Boyer

Marcus Andrade < ██████████ >                                                              Thu, Jan 10, 2019 at 8:43 PM
To: David Mata ██████████████████ , David Mata ██████████████ , Japheth Dillman
██████████████ , Japheth Dillman ██████████████

David,

You have told me on multiple occasions that you and Jaypheth have bought out Ben Boyer from the two contracts that he has with me directly.

Since it is obvious that blockbits misinformed your other client pertaining to ABTC, I have to assume that blockbits did the same thing with Mr. Ben Boyer.

Mr. Boyer is entitled to a full refund from myself pertaining to those two direct purchases if indeed you two made false representations to him like you both did with Daniel Aharanoff.

Since you told me David that Mr. Boyer was bought out by you and Japheth, I need you to provide proof that Mr. Boyer was indeed bought out.

I will not be doing anything more with blockbits capital until the proof has been provided.

Thanks,

Marcus Andrade



**Marcus Andrade**

---

## Here's Aharonoff's CALE form

**David Mata** ▬▬▬▬▬                                      Sat, Dec 8, 2018 at 5:03 PM
To: Marcus Andrade ▬▬▬▬▬

Go read what I wrote in telegram.

On Sat, Dec 8, 2018, 2:57 PM Marcus Andrade ▬▬▬▬▬ wrote:
Remember David, the whole purchase of the Validation and Quality Assessment Form that is a list of questions that Chris will be asking the purchaser, is to make sure that the coins were not sold to them wrong. Where there are no false misrepresentations.

Chris is not the same Chris with DLA. He will not ask anyone about anything else. He will only read the questions to the client and fill in the form.

His only job is for checks and balances. To make sure no facts were misrepresented during the purchase.

Thanks,

Marcus
Marcus

On Sat, Dec 8, 2018 at 4:45 PM Marcus Andrade ▬▬▬▬▬ wrote:

That maybe a compliance issue.

I may have to proceed with a refund.

I will check and revert back to you by Tuesday.

Thank you,

Marcus


Thanks,
Marcus

On Sat, Dec 8, 2018 at 4:13 PM David Mata ▬▬▬▬▬ wrote:
I'll send over Daniel's info.

Ben will not take your call or your attorney's call. If you'd like further info, Japheth would be the person buying his coins and be the person to talk to.

On Sat, Dec 8, 2018, 1:55 PM Marcus Andrade ▬▬▬▬▬ wrote:

Hello David,

Thank you for the completed CALE form.

Please fill one out for Ben Boyer as well since you were also responsible for that sale.

Please send me over the contact information for Ben and for Daniel.

Chris Ray will be contacting them and asking them a few questions to be sure that they were not misled in

---

1 of 2                                                                                      2020-04-07, 12:24 a.m.

# EXHIBIT P

COMPANY AGREEMENT

OF

BLOCK BITS AML HOLDINGS LLC

This Company Agreement ("Agreement") of Block Bits AML Holdings LLC, a Delaware limited liability company (the "Company"), is adopted effective as of January 11, 2018, by and among the undersigned initial Members of such limited liability company for and in consideration of the mutual agreements and provisions herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

## ARTICLE I. - DEFINED TERMS

**Section 1.1**    Definitions.  As used in this Agreement, the following capitalized terms shall, unless the context otherwise requires, have the meanings specified in this Article:

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments: (i) credit to such Capital Account any amounts which such Member is obligated to restore (pursuant to the terms of such Member's promissory note payable to the Company or otherwise) or is deemed to be obligated to restore pursuant to the penultimate sentence of Reg. §§ 1.704-2(g)(1) and 1.704-2(i)(5); and (ii) debit to such Capital Account the amounts specified in Reg. §§ 1.704-1(b)(2)(ii)(d)(4), (d)(5) and (d)(6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Reg. § 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Affiliate" shall mean, when used with respect to a specified person, any person that directly or indirectly controls, is controlled by or is under common control with such specified person.  As used in this definition, the term "control" means possession, directly or indirectly (through one or more intermediaries), of the power to vote five percent (5%) or more of the voting securities of such Person, or direct or cause the direction of management and policies of a person through an ownership of voting securities (or other ownership interests), contract, voting trust or otherwise.

"Bankruptcy" shall mean bankruptcy under the United States Bankruptcy Code or insolvency under any state insolvency act.

"Board of Managers" shall mean the Managers collectively.

"Business Day" shall mean any day other than a Saturday, Sunday and those legal public holidays specified in 5 U.S.C. § 6103(a), as amended from time to time

"Capital Account" shall mean the Capital Account maintained for each Member pursuant to Section 6.4 of this Agreement.

"Capital Contribution" shall mean the total amount of cash or property contributed to the Company by all the Members or any one Member, as the case may be and shall include the Capital Contributions to Invest and listed on Exhibit A hereto.

"Certificate of Formation" shall mean the Certificate of Formation of Block Bits AML Holdings LLC, filed with the Secretary of State of the State of Delaware by which the Company is organized as a Delaware limited liability company pursuant to the Law.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time and any successor statute.

"Company" shall mean Block Bits AML Holdings LLC, a Delaware limited liability company, as such limited liability company may from time to time be constituted.

"Company Property" or "Property" shall mean all interests, investments, properties and rights of any type owned by the Company, whether owned by the Company at the date of its formation or thereafter acquired, including, without limitation, its interest in any Subsidiary (as hereinafter defined).

"Disposition" means any sale, transfer, encumbrance, gift, donation, assignment, pledge, hypothecation, or other disposition, whether voluntary or involuntary, and whether during the lifetime of the person involved or upon or after his or her death, including, but not limited to, any Disposition by operation of law, by court order (including without limitation in connection with termination of a marital relationship), by judicial process, or by foreclosure, levy or attachment.

"General Interest Rate" means a rate per annum equal to the lesser of (a) a varying rate per annum equal to the interest rate publicly reported by the *Wall Street Journal*, from time to time as the prime commercial or similar reference interest rate, with adjustments in that rate to be made on the same date as any change in that rate, and (b) the maximum rate permitted by applicable law.

"Interest" or "Units" shall mean all rights and interests of a Member under this Agreement and the Act, including (i) the right of a Member, expressed in units on Exhibit A, to receive distributions of revenues, allocations of income and loss and distributions of liquidation proceeds under this Agreement, and (ii) all management rights, voting rights or rights to consent.

"Law" shall mean the Delaware Business Organizations Code, as the same may be amended from time to time, and any successor statute.

"Liquidation Process" shall mean a Member must provide written notification to the Manager for request to liquidate Membership Units. Manager will liquidate the Membership Units and provide Member with U.S. Dollars, or equivalent currency. There will be a 1.5% liquidation transaction fee deducted to process all Liquidation requests.

"Super Majority-in-Interest of the Members" shall mean Members having the right to vote more than seventy nine percent (79%) of the total Units in the Company.

"Manager" shall mean the person(s) appointed to the Board of Managers by the Members pursuant to Article X hereof. Japheth Dillman is the initial Manager of the Company. Unless otherwise expressly indicated, the reference to Manager or Managers in this Agreement shall be read "Managers" when more than one Person is serving as Manager, and the reference to Manager or Managers in this Agreement shall be read "Manager" when only one Person is serving as Manager.

"Member" shall mean a Person listed on Exhibit A, as amended from time to time, including any Person who is subsequently admitted to be a Member to the extent of the Interest issued or transferred to such Person.

"Nonrecourse Deductions" has the meaning given to it in Reg. § 1.704-2(b)(1).

"Notification" shall mean a writing containing any information required by this Agreement to be communicated to any Person, which may be personally delivered, sent by

registered or certified mail, postage prepaid, or sent by facsimile transmission promptly confirmed by mail, to such Person, at the last known address of such Person on the Company records. Any such Notification shall be deemed to be given (i) when delivered, in the case of personal delivery, (ii) on the date on which it is deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid, in the case of mail, and (iii) within the first business hour (being 9:00 a.m. to 5:00 p.m., local time for the recipient, on any Business Day) after receipt by the addressee, in the case of facsimile transmission. Any communication containing information sent to any Person other than as required by the foregoing sentences, but which is actually received by such Person, shall constitute Notification as of the date of such receipt for all purposes of this Agreement.

"Partner Minimum Gain" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Reg. § 1.704-2(i).

"Partner Nonrecourse Debt" has the meaning given to it in Reg. § 1.704-2(b)(4), being generally any nonrecourse debt of the Company for which any Member (or related Person within the meaning of Reg. § 1.702-4(b)) bears the economic risk of loss.

"Partner Nonrecourse Deductions" has the meaning given to it in Reg. §§ 1.704-2(i)(1) and (j)(2).

"Partnership Minimum Gain" means that amount determined by first computing, for each Company nonrecourse liability, any gain the Company would realize if it disposed of the Company property subject to such liability for no consideration other than full satisfaction of the liability, and by then aggregating the separately computed gains. For purposes of determining the amount of such gain, the additional rules set forth in Reg. § 1.704-2(d) shall be followed.

"Percentage Interest" shall mean, as to each Member or class of Members, the ratio of the total number of Units held by such Member to the total number of all Units then outstanding.

"Person" shall mean a natural person, partnership, limited partnership, limited liability company, foreign limited liability company, trust, estate, corporation, custodian, trustee, executor, administrator, nominee or entity in a representative capacity, general partnership, joint venture, cooperative or association.

"Subsidiary" shall mean any foreign or domestic limited liability company, corporation, partnership, joint venture, trust or other enterprise of which the Company owns an interest.

## ARTICLE II. - ORGANIZATION

**Section 2.1**    Formation. A Certificate of Formation for the Company was filed with the Secretary of State of the State of Delaware on January 11, 2018.

**Section 2.2**    Name. The name of the Company is "Block Bits AML Holdings LLC".

**Section 2.3**    Assumed Names. The Manager may cause the Company to do business under one or more assumed names. In connection with the use of any such assumed names, the Members shall cause the Company to comply with the Delaware Assumed Business or Professional Name Act § 71.001 et seq, Tex. Bus. & Com. Code § 36.01 et seq., as amended.

**Section 2.4**    Registered Office; Registered Agent; Offices. The registered office of the Company required by the Law to be maintained in the State of Delaware shall be the initial registered office named in the Certificate of Formation or such other office (which need not be a place of business of

the Company) as the Members may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Members may designate from time to time in the manner provided by law. The principal office of the Company in the United States shall be at 3563 Pierce Street, San Francisco, California 75093, or at such place as the Manager may designate from time to time, which need not be in the State of Delaware, and the Company shall maintain records there as required by Section 101.501 of the Law. The Company may have such other offices as the Members may designate from time to time.

**Section 2.5**    No State Law Partnership.  No provision of this Agreement (including, without limitation, the provisions of Article IX) shall be deemed or construed to constitute the Company a partnership (including, without limitation, a limited partnership) or joint venture, or any Member a partner or joint venturer with any other Member, for any purposes other than federal and state tax purposes.

### ARTICLE III. - TERM

The existence of the Company began with the filing of a Certificate of Formation January 11, 2018. The Company shall exist for the duration specified in the Certificate of Formation, unless sooner terminated in accordance with this Agreement.

### ARTICLE IV. - PURPOSE

The purpose of the Company is to transact any and all lawful businesses and engage in any lawful act and/or activities for which limited liability companies may be organized under the Law, and further to engage in any other business or activity that may be incidental, proper, advisable or convenient to accomplish the foregoing purpose and that it is not forbidden by the law of the jurisdiction in which the Company engages in that business.

### ARTICLE V. - MEMBERS

**Section 5.1**    Initial Members.  The names and addresses of the Members of the Company are as set forth on Exhibit A of this Agreement. At the date hereof, there are no other Members of the Company and no other Person has any right to take part in the ownership or management of the Company.

**Section 5.2**    Restrictions on Disposition and Additional Members.  Prior to admission to the Company, a Person must execute an agreement agreeing to be bound by all of the terms and conditions set forth herein, such agreement to be in a form approved by the Board of Managers.

**Section 5.3**    Recognition of Disposition.  A Disposition of Units may not be recognized until: (i) the applicable provisions of this Article are satisfied; (ii) the Board of Managers receive a document executed by both the Disposing and acquiring Persons (or their representative) providing: the notice address of any Person to be admitted to the Company and its agreement to be bound by this Agreement; the Percentage Interests and Capital Contributions of the Disposing and acquiring Persons after the Disposition (the sum of which must equal the pre-Disposition Percentage Interest and Capital Contribution of the Disposing Person) and a representation and warranty that the Disposition was made in accordance with all applicable laws and regulations (including securities laws) (any Disposition and admission complying with this section is effective as of the first day of the calendar month immediately succeeding the month in which the Board of Managers receive notification of Disposition and compliance with this Article); (iii) the Units subject to the Disposition or admission is registered under the Securities Act of 1933, as amended, and any applicable state securities laws, or the Company receives a favorable opinion from its legal counsel (or legal counsel acceptable to it) that the Disposition is exempt from registration under those laws; and (iv) the Company receives a favorable opinion from its legal counsel (or legal counsel acceptable to the Company) that the Disposition will not result in the Company being

taxable as a corporation for federal income tax purposes. Notwithstanding the foregoing, the Board of Managers, however, may waive the requirements of this section.

**Section 5.4** <u>Disposition Expenses</u>. The Disposing and acquiring Persons shall pay or reimburse the Company for all costs incurred in connection with the Disposition or admission (including legal fees incurred in connection with the legal opinions referred to in <u>Section 5.3</u>) within ten (10) days after receipt of the Company's invoice for the amount due; provided, however, the Company may deduct all such costs from the amount payable by the Company. If payment is not made by the date due, the Person owing that amount shall pay interest on the unpaid amount from that date until paid at the General Interest Rate.

## ARTICLE VI. - CAPITAL CONTRIBUTIONS AND INTERESTS

**Section 6.1** <u>Capital Contributions</u>. Each Member shall contribute to the capital of the Company the amount set forth as such Member's Capital Contribution on <u>Exhibit A</u>.

**Section 6.2** <u>Percentage Interests</u>. Upon making the Capital Contribution specified on <u>Exhibit A</u>, each Member shall own the Units set forth opposite such Member's name on <u>Exhibit A</u>.

**Section 6.3** <u>No Further Capital Contributions</u>. No Member shall be obligated to make any Capital Contribution other than that set forth opposite such Member's name on <u>Exhibit A</u>. Without the approval of all the Members, no Member may make any Capital Contributions beyond those specified on <u>Exhibit A</u>.

**Section 6.4** <u>Capital Accounts</u>. A Capital Account shall be maintained for each Member. The Capital Accounts shall be maintained in accordance with applicable U.S. Treasury Department regulations. The Company shall compute on a current basis the Capital Contribution and Capital Account of each Member and their adjusted tax basis in their Interest. The Company shall maintain current and accurate records concerning Members' capital contributions, Capital Accounts and adjusted tax bases and, promptly after the request of any Member, shall make these records available to the Member.

**Section 6.5** <u>Return of Capital Contributions</u>. Except as otherwise provided herein or in a nonwaivable provision of the Law, no Member shall have the right to withdraw from the Company or to withdraw, or receive any return of, his or her Capital Contribution.

**Section 6.6** <u>Interest</u>. No interest shall be paid by the Company on Capital Contributions or on balances in Members' Capital Accounts.

**Section 6.7** <u>Loans From Members</u>. No Member nay make a loan or other advancement of funds to the Company, other than with the unanimous consent of the Members. Loans by a Member to the Company shall not be considered Capital Contributions. If any Member shall advance funds to the Company in excess of the amounts required hereunder to be contributed by him to the capital of the Company, the making of such advances shall not result in any increase in the amount of the Capital Account of such Member. The amounts of any such advances shall be a debt of the Company to such Member and shall be payable or collectible only out of the Company assets in accordance with the terms and conditions upon which such advances are made. The repayment of loans from a Member to the Company upon liquidation shall be subject to the order of priority set forth in Section 13.4 hereof.

## ARTICLE VII. - ALLOCATIONS AND DISTRIBUTIONS

**Section 7.1** <u>Allocations</u>.

A.  Company profits, losses, gain, deduction and credit for each fiscal year shall be allocated among the Members in accordance with their Percentage Interests (the "<u>General Allocation of</u>

Profits and Losses"). Notwithstanding the forgoing, in accordance with Section 704(c) of the Code and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of contribution.

        B.     The losses allocated pursuant to the General Allocation of Profits and Losses shall not exceed the maximum amount of losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any fiscal year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of losses pursuant to the General Allocation of Profits and Losses, the limitation set forth in this Section 7.1(B) shall be applied on a Member-by-Member basis so as to allocate the maximum permissible losses to each Member under Reg. § 1.7041(b)(2)(ii)(d). Notwithstanding the General Allocation of Profits and Losses, the provisions of this Section 7.1(B) (collectively referred to as the "Regulatory Special Allocations") shall be applicable to all Company allocations of profits and losses for each fiscal year in the following order:

        (i)     Minimum Gain Chargeback Allocations. Except as otherwise provided in Reg. § 1.704-2(f), if there is a net decrease in Partnership Minimum Gain during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's share of the net decrease in Partnership Minimum Gain, determined in accordance with Reg. § 1.704-2(g)(2). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Reg. §§ 1.704-2(f)(6) and 1.704-2(j)(2). This Section 7.1(B)(i) is intended to comply with the minimum gain chargeback requirement in Reg. § 1.7042(f) and shall be interpreted consistently therewith.

        (ii)     Partner Nonrecourse Debt Minimum Gain Chargeback Allocations. Except as otherwise provided in Reg. § 1.704-2(i)(4), if there is a net decrease in Partner Minimum Gain attributable to a Partner Nonrecourse Debt during any fiscal year, each Member who has a share of the Partner Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Reg. § 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's share of the net decrease in Partner Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Reg. § 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Reg. §§ 1.704-2(i)(4) and 1.704-2(j)(2). This provision is intended to comply with the minimum gain chargeback requirement in Reg. § 1.7042(i)(4) and shall be interpreted consistently therewith.

        (iii)     Qualified Income Offset Allocations. In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Reg. §§ 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 7.1(B)(iii) shall be made only if and to the extent that any such member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Agreement have been tentatively made as if this Section 7.1(B)(iii) were not in this Agreement. The allocation contained in this Section 7.1(B)(iii) shall be referred to herein as the "Qualified Income Offset Allocation."

        (iv)     Gross Income Allocations. In the event any Member has an Adjusted Capital Account Deficit at the end of any fiscal year which is in excess of the sum of (1) the amount such Member is obligated to restore (pursuant to the terms of such Member's promissory note payable to the

Company or otherwise), and (2) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Reg. §§ 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 7.1(B)(iv) shall be made only if and to the extent that any such Member would have a Capital Account deficit in excess of such sum after all other allocations provided for in this Agreement have been tentatively made as if the Qualified Income Offset Allocations and this Section 7.1(B)(iv) were not in this Agreement.

(v)     Nonrecourse Deductions.  Nonrecourse Deductions for any fiscal year or other periods shall be allocated among the Members in proportion to their respective Percentage Interests.

(vi)     Partner Nonrecourse Deductions.  Any Partner Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Members who bear the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Reg. § 1.704-2(i)(1).

(vii)     Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) or 743(b) of the Code is required, pursuant to Reg. §§ 1.704-1(b)(2)(iv)(m)(2) or (m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of its Percentage Interest, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members in accordance with their Percentage Interests (in the event that Reg. § 1.704-1(b)(2)(iv)(m)(2) applies), or to the Members to whom such distribution was made (in the event that Reg. § 1.704-1(b)(2)(iv)(m)(4) applies).

C.     The Regulatory Special Allocations are intended to comply with certain requirements of the Treasury Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Special Allocations shall be offset either with other Regulatory Special Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 7.1(C).  Therefore, notwithstanding any other provision of this Agreement (other than the Regulatory Special Allocations), the Members shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Special Allocations were not part of this Agreement and all Company items were allocated among the Members in accordance with the General Allocation of Profits and Losses.  In exercising their discretion under this Section 7.1(C), the Members shall take into account future Regulatory Special Allocations under Section 7.1(B)(i) and Section 7.1(B)(ii) that, although not yet made, are likely to offset other Regulatory Special Allocations previously made under Section 7.1(B)(v) and Section 7.1(B)(vi).

**Section 7.2**     Cash Distributions.  The Board of Managers shall, at least quarterly, balance the Company's accounts and distribute to the Members the amount by which cash on hand exceeds the amount necessary to meet the current costs, expenses and liabilities of the Company (including, without limitation, the Mgmt Fee Contributions listed on Exhibit A and a reasonably adequate reserve for working capital and contingencies) ("Net Cash Flow") in accordance with their respective Percentage Interests.  The Company shall not make any distribution to the Members if, immediately after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members with respect to their Interests and liabilities for which the recourse of creditors is limited to specified property of the Company, exceed the fair value of Company Property, except that the fair value of Company Property that is subject to a liability for which recourse of creditors is limited shall be included in the Company assets only to the extent that the fair value of that Company Property exceeds that liability.

**Section 7.3**     Distributions of Other Property.  From time to time, the Board of Managers, upon the affirmative vote of a Super Majority-in-Interest of the Members, also may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with their respective Interests and may be made subject to existing liabilities and obligations. Immediately prior to such distribution, the Capital Accounts of the Members shall be adjusted as provided in Treasury Regulation § 1.704-1(b)(2)(iv)(f).

**Section 7.4**     Distribution to Pay Taxes.  To the extent of available Net Cash Flow, the Managers shall use commercially reasonable efforts to cause the Company to make cash distributions for each taxable year in amounts sufficient to enable each Member to discharge any federal tax liability for such taxable year (excluding penalties) arising as a result of their interest in the Company, determined by assuming the applicability to each Member of the highest combined effective marginal federal income tax rates for any individual or corporation actually obligated to report on any tax returns income derived from the Company. Distributions under this Section 7.4 shall be taken into account in computing subsequent distributions to the Members under Section 7.2 so that the aggregate distributions to each Member under Section 7.2 shall, to the maximum extent possible, be equal to the aggregate distributions that would have been made to the Members under Section 7.2 had there been no distributions pursuant to this Section 7.4. Any distributions under this Section 7.4 shall be treated as an advance against future distributions and shall be taken into account in determining subsequent distributions under Sections 7.2 and 13.4, applicable so that each Member would receive the same aggregate distributions such Member could have received thereunder if this Section 7.4 were not contained in this Agreement. If upon liquidation of the Company a Member had received distributions under this Section 7.4 in excess of what the Member could have received pursuant to Section 13.4, such Member shall be required to immediately repay the Company the difference.  Notwithstanding Section 7.2, in the event there is an allocation of items of taxable income or gain allocated to the Members for a fiscal year that exceed the items of taxable loss, deductions or credit allocated to the Members for such year and cumulatively for all previous years, then to the extent there is cash available for distribution for such year, and to the extent that a Member has a tax liability for such year because of allocations to such Member pursuant to Section 7.1, distributions of cash to the extent available shall be made to such Member in accordance with that Member's Percentage Interest to the extent necessary, as solely determined by the Board of Managers, to pay such income tax liability taking into account the maximum marginal tax rates and such other facts as the Board of Managers deem applicable.

**Section 7.5**     Tax Withholding; Withholding Advances.

A.     *Tax Withholding.* If requested by the Board of Managers, each Member shall, if able to do so, deliver to the Board of Managers:

(i)     an affidavit in form satisfactory to the Board of Managers that the applicable Member (or its members, as the case may be) is not subject to withholding under the provisions of any federal, state, local, foreign or other applicable law;

(ii)     any certificate that the Board of Managers may reasonably request with respect to any such laws; and/or

(iii)     any other form or instrument reasonably requested by the Board of Managers relating to any Member's status under such law.

If a Member fails or is unable to deliver to the Board of Managers the affidavit described in Section 7.5(A) the Board of Managers may withhold amounts from such Member in accordance with Section 7.5(B).

B.     *Withholding Advances.* The Company is hereby authorized at all times to make payments ("Withholding Advances") with respect to each Member in amounts required to

discharge any obligation of the Company (as determined by the Partnership Representative based on the advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "Taxing Authority") with respect to any distribution or allocation by the Company of income or gain to such Member (including payments made pursuant to the BBA and allocable to a Member as determined by the Partnership Representative in its sole discretion) and to withhold the same from distributions to such Member. Any funds withheld from a distribution by reason of this Section 7.5(B) shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement and, at the option of the Board, shall be charged against the Member's Capital Account.

C.    *Repayment of Withholding Advances.* Any Withholding Advance made by the Company to a Taxing Authority on behalf of a Member and not simultaneously withheld from a distribution to that Member shall, with interest thereon accruing from the date of payment at a rate equal to the General Interest Rate:

(i)    be promptly repaid to the Company by the Member on whose behalf the Withholding Advance was made (which repayment by the Member shall not constitute a Capital Contribution, but shall credit the Member's Capital Account if the Board of Managers shall have initially charged the amount of the Withholding Advance to the Capital Account); or

(ii)    with the consent of the Board of Managers, be repaid by reducing the amount of the next succeeding distribution or distributions to be made to such Member (which reduction amount shall be deemed to have been distributed to the Member, but which shall not further reduce the Member's Capital Account if the Board of Managers shall have initially charged the amount of the Withholding Advance to the Capital Account).

Interest shall cease to accrue from the time the Member on whose behalf the Withholding Advance was made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

D.    *Indemnification.* Each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the Member's failure to deduct and withhold tax on amounts distributable or allocable to such Member. The provisions of this Section 7.5(D) and the obligations of a Member pursuant to Section 7.5(D) shall survive the termination, dissolution, liquidation and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Units. The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 7.5(D), including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

E.    *Overwithholding.* Neither the Company nor the Board of Managers shall be liable for any excess taxes withheld in respect of any distribution or allocation of income or gain to a Member. In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

## ARTICLE VIII. - OWNERSHIP OF COMPANY PROPERTY

Company Property shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company Property or any portion thereof. Title to any or all Company Property may be held in the name of the Company or one or more nominees, as the Board of Managers may determine.  All Company Property shall be recorded as the

property of the Company on its books and records, irrespective of the name in which legal title to such Company Property is held.

## ARTICLE IX. - FISCAL MATTERS; BOOKS AND RECORDS

**Section 9.1**    Bank Accounts; Investments.  Capital Contributions, revenues and any other Company funds shall be deposited by the Board of Managers in a bank account established in the name of the Company, or shall be invested by the Board of Managers in furtherance of the purposes of the Company.  No other funds shall be deposited into Company bank accounts or commingled with Company investments.  Funds deposited in the Company's bank accounts may be withdrawn only to be invested in furtherance of the Company's purposes, to pay Company debts or obligations or to be distributed to the Members pursuant to this Agreement.

**Section 9.2**    Records; Right of Inspection.

A.    *Records Required.*  During the term of the Company, the Board of Managers, at the expense of the Company, shall maintain in the Company's principal office in the United States specified in Section 2.4 hereof all records required to be kept pursuant to the Law.

B.    *Right of Inspection.*  On written request stating the purpose, a Member or a permitted assignee of a Member's Interest (an "eligible Person") may examine and copy in person or by the eligible Person's representative, at any reasonable time, for any proper purpose, and at the eligible Person's expense, records required to be maintained under the Law and such other information regarding the business, affairs and financial condition of the Company as is just and reasonable for the eligible Person to examine and copy.  Upon written request by any eligible Person made to the Company at the address of the Company's principal office in the United States specified in Section 2.4 hereof, the Company shall provide to the eligible Person, without charge, true copies of (i) this Agreement and the Certificate of Formation and all amendments or restatements, and (ii) any of the tax returns of the Company described above.

**Section 9.3**    Books and Records of Account.  The Board of Managers, at the expense of the Company, shall maintain for the Company adequate books and records of account that shall be maintained on the method of accounting determined by the Board of Managers and on a basis consistent with appropriate provisions of the Code, containing, among other entries, a Capital Account for each Member.

**Section 9.4**    Tax Returns and Information.  The Members intend for the Company to be treated as partnership for tax purposes.  The Board of Managers shall prepare or cause to be prepared all federal, state and local income and other tax returns that the Company is required to file.  Within the shorter of (i) such period as may be required by applicable law or regulation, or (ii) seventy-five (75) days after the end of each calendar year, the Board of Managers shall send or deliver, or cause to be sent or delivered, to each Person who was a Member at any time during such year such tax information as shall be reasonably necessary for the preparation by such Person of his or her federal income tax return and state income and other tax returns.

**Section 9.5**    Delivery of Financial Statements to Members.  As to each fiscal year of the Company, the Board of Managers shall send, or cause to be sent, to each Member a copy of (i) a balance sheet of the Company as of the end of the fiscal year, (ii) an income statement of the Company for such year, and (iii) a statement showing the revenues distributed by the Company to Members in respect of such year.  Such financial statements shall be delivered by no later than ninety (90) days following the end of the fiscal year to which the statements apply.  Unless a Member requests in writing prior to the end of the fiscal year to which the financial statements apply that the financial statements shall be audited (in which case Section 9.6 below shall apply), such statements need not be audited.

**Section 9.6**     Audits at Request of Member.  Any Member shall have the right to have an audit conducted of the Company books, which audit may be requested with respect to the annual financial statements under Section 9.5 above.  The cost of the audit shall be borne by the Member or Members requesting that the audit be performed or, upon the approval of a Super Majority-in-Interest of the Members, by the Company.  The audit shall be performed by an accounting firm acceptable to the Company and the Members, including the Member requesting the audit.  Not more than one (1) audit shall be required by any or all of the Members for any fiscal year.

**Section 9.7**     Fiscal Year.  The Company's fiscal year shall end on December 31 of each calendar year.

**Section 9.8**     Tax Elections.  The Company shall make such elections for tax purposes as a Super Majority-in-Interest of the Members may deem appropriate and in the best interests of the Members. Neither the Company nor any Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law.

**Section 9.9**     Partnership Representative.

A.     Japheth Dillman is hereby designated the "partnership representative" (the "Partnership Representative") (as defined in Code Section 6223(a)).  The Partnership Representative is hereby authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The Partnership Representative shall have sole authority to act on behalf of the Company in any such examinations and any resulting judicial proceedings, and shall have sole discretion to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any Taxing Authority. The Company and its Members shall be bound by the actions taken by the Partnership Representative.

B.     The Members acknowledge that the Bipartisan Budget Act of 2015, H.R. 1314, P.L. 114-74, 114th Cong. (2015) (the "BBA") potentially makes tax partnerships liable for income taxes attributable to adjustments of partnership items of income, gain, loss, deduction or credit.  The Partnership Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings. Notwithstanding the repeal by the BBA of the unified audit rules contained in Section 6221 through 6234 of the Code, (i) the Partnership Representative shall have substantially the same rights and obligations as required of, or granted to, the Partnership Representative pursuant to this Agreement to the extent such rights and obligations are not in conflict with, or not inapplicable to, the Code (as amended by the BBA) or the Treasury Regulations promulgated thereunder, and (ii) each Member shall have substantially the same rights and obligations as required of, or granted to, such Member pursuant to this Agreement to the extent such rights and obligations are not in conflict with, or not inapplicable to, the Code (as amended by the BBA) or the Treasury Regulations promulgated thereunder.

C.     The Members agree that the Company shall elect out of the application of Section 6221(a) of the Code (as amended by the BBA) for its first fiscal year, and for each fiscal year thereafter, if possible.  If such election out is impossible, the Members further agree that the Company will elect the application of Section 6226 of the Code (as amended by the BBA) for its first fiscal year, in the event that it receives a "notice of final partnership adjustment" that would otherwise permit the Internal Revenue Service to collect from the Company a deficiency of tax, for each relevant year.  The Members covenant to take into account and report to the Internal

Revenue Service any adjustment to their items for the reviewed year as notified to them by the Company in a statement furnished to them pursuant to Section 6226(a) of the Code (as amended by the BBA), in the manner provided in Section 6226(b) of the Code (as amended by the BBA), whether or not any of the Members own any Units in the year of the Company's statement. To the extent that the Partnership Representative does not make an election under Code Section 6221(b) or Code Section 6226 (each as amended by the BBA), the Company shall use commercially reasonable efforts to (i) make any modifications available under Code Section 6225(c)(3), (4), and (5), as amended by the BBA, and (ii) if requested by a Member, provide to such Member information allowing such Member to file an amended federal income tax return, as described in Code Section 6225(c)(2) as amended by the BBA, to the extent such amended return and payment of any related federal income taxes would reduce any taxes payable by the Company. Any Member which fails to report its share of such adjustments on its tax return for its taxable year including the date of the Company's statement as described immediately above shall indemnify and hold harmless the Company against any tax, interest and penalties collected by the Internal Revenue Service from the Company as a result of such Member's failure. The foregoing covenants and indemnification obligation of the Member shall survive indefinitely and shall not terminate, without regard to any transfer of a Member's Units, withdrawal as a Member, or liquidation, dissolution or termination of the Company.

D.      The Company shall reimburse the Partnership Representative for all reasonable expenses incurred by it in connection with any administrative or judicial proceeding with respect to the tax liabilities of the Members.

E.      Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes and any tax deficiency imposed pursuant to Code Section 6226 as amended by the BBA) will be paid by such Member and if required to be paid (and actually paid) by the Company, will be recoverable from such Member as provided in Section 7.5(D).

**Section 9.10**    Indemnity of Partnership Representative. The Company shall, to the fullest extent permitted by law, indemnify and reimburse the Partnership Representative for all expenses (including legal and accounting fees) incurred as Partnership Representative pursuant to this Section in connection with any administrative or judicial proceeding with respect to the tax liability of the Members as long as the Partnership Representative has determined in good faith that its course of conduct was in, or not opposed to, the best interests of the Company. The payment of all such expenses shall be made before any distributions are made to the Members, and shall not be considered a distribution hereunder. The taking of any action and the incurring of any expense by the Partnership Representative in connection with any such proceeding, except to the extent provided herein or required by law, is a matter in the sole discretion of the Partnership Representative and the provisions on limitations of liability of the Partnership Representative and indemnification set forth in Article XIV shall be fully applicable to the Partnership Representative in its capacity as such.

### ARTICLE X. - MANAGEMENT OF THE COMPANY

**Section 10.1**    Managers of the Company.

A.      *Powers of Manager.* The Board of Managers shall be the Persons appointed by a Super Majority-in-Interest of the Members from time to time to serve as the Managers of the Company. The powers of the Company shall be exclusively exercised by and under the exclusive authority of, and the business and affairs of the Company shall be managed under the exclusive direction of, no less than a majority of the Board of Managers at any time there is more than one Manager and at the sole discretion of the Manager at any time there is one Manager. The Board

of Managers shall have the power and authority to do or cause to be done any and all acts deemed by the Board of Managers to be necessary or appropriate to conduct the business of the Company, including the authority to bind the Company in making contracts and incurring obligations in the Company's name in the course of the Company's business, without obtaining the consent of the Members. The Board of Managers shall, subject to the provisions of this Agreement and the availability of cash funds of the Company, use reasonable efforts to implement the Company's then applicable business plan, and, subject to the provisions of this Agreement, shall have all right, power and authority to do so. Without limiting the generality of the foregoing and except as otherwise provided in this Agreement, the power and authority of the Board of Managers shall include, without limitation, the power and authority:

    1.    to employ, retain, consult with and dismiss on behalf of the Company such accountants, attorneys, agents, employees, managers, consultants, engineers, clerical help, and to obtain such other assistance and services as the Manager may determine proper and to pay therefor such remuneration and compensation as the Manager may determine;

    2.    to invest the Capital Contribution to Invest as set forth on Exhibit A of this Agreement into AML BITCOIN;

    3.    to purchase, lease, rent, or otherwise acquire or obtain the use of computers, equipment, software and all other kinds and types of real or personal property that may in any way be determined by the Manager to be necessary, convenient, or advisable in connection with carrying on the business of the Company, and to incur expenses for travel, telephone, facsimile, insurance, and for such other things, whether similar or dissimilar, as may be determined by the Manager to be necessary or appropriate for carrying on and performing the business of the Company;

    4.    to open and close bank accounts, to receive, transfer, and disburse funds, to invest funds and other similar transactions in the normal course of business;

    5.    to procure and maintain in force the insurance coverage, co-insurance and self-insurance as the Manager shall determine to serve as protection for the Company or its assets or against liability for loss and damage that may be occasioned by the activities to be engaged in by the Company;

    6.    to pay, extend, renew, modify, adjust, submit to arbitration or mediation, prosecute, defend, or compromise on behalf of the Company, upon such terms as the Manager may determine and upon such evidence as it may determine sufficient, any obligation, suit, liability, cause of action or claim, including a suit or claim for taxes, in favor of or against the Company;

    7.    to make such classifications, determinations, accounting procedures and allocations as the Manager may determine, having due regard for any relevant generally accepted accounting principles and applicable laws;

    8.    to determine the method of accounting of the Company;

    9.    to take such other actions, to execute and deliver such other documents, and to perform such other acts as may be determined by the Manager to be appropriate to carry out the business and affairs of the Company.

B. *Restrictions on the Authority of the Board of Managers*. The Board of Managers shall have the authority to do any of the following only with the written approval of a Super Majority-in-Interest of the Members:

1. to acquire on behalf of the Company any equipment, facilities and property other than as expressly allowed in Section 10.1(A);

2. to make and enter into such agreements and contracts with such parties and to give such receipts, releases, and discharges with respect to any and all of the foregoing and any matters incident thereto;

3. to purchase or otherwise acquire any real or personal property of any nature;

4. to borrow monies for the business of the Company or draw, make, execute and issue promissory notes and other negotiable or nonnegotiable instruments and evidences of indebtedness; to secure the payment of the sums so borrowed and to mortgage, pledge, or assign in trust all or any part of the property of the Company; to assign any monies owing or to be owing to the Company; and to engage in any other means of financing;

5. to enter into any agreement for the sharing of profits, joint venture, or partnership with any Person, government or agency thereof engaged in any business or transaction in which the Company is authorized to engage, or any business or transaction capable of being conducted, so as to directly or indirectly effect the Company, or that cause the Company to assume obligations;

6. to do or perform any material activity or expenditure which is materially inconsistent with the Company purpose;

7. to enter into any agreement authorizing the merger or consolidation of the Company with any other entity, whether foreign or domestic, or the sale of all or substantially all of its assets;

8. to cause or permit the Company to be converted under state law from a limited liability company to another form of entity;

9. to make the election to change the federal income classification of the Company as a partnership;

10. to approve the withdrawal of a Member from the Company;

11. to approve any transaction or contract between the Company and any of the Members, Managers or officers or between the Company and any other corporation, partnership, association or other organization in which one or more of its Members, Managers or officers are shareholders, partners, members, directors, managers or officers, or have a financial interest;

12. to negotiate the terms of any settlement agreement with the Internal Revenue Service with respect to any tax audit or judicial review;

13. to pay salary or compensation to any Person; and

14. to do any action that would make it impossible to carry on the ordinary business of the Company, including the filing for bankruptcy protection.

C. *Duties and Services of Managers*. The Board of Managers shall comply in all respects with the terms of this Agreement. In the conduct of the business and operations of the Company, the Board of Managers shall (a) use its reasonable good faith efforts to cause the Company (i) to comply with the terms and provisions of all agreements to which the Company is a party or to which its properties are subject, (ii) to comply with all applicable laws to which the Company is subject and (iii) to obtain and maintain all licenses, permits, franchises and other governmental authorizations necessary with respect to the ownership of Company properties and the conduct of the Company's business and operations and (b) attend to other daytoday affairs of the Company.

D. *Reliance by Board of Managers*. Consistent with the Board of Manager's duties and responsibilities as Managers hereunder, the Board of Managers may rely and shall be protected in acting or refraining from acting upon any certificate, instrument, opinion, report, notice, request, consent, order, bond, debenture or other substantially similar third-party paper or document reasonably believed by Manager to be genuine and to have been signed or presented by the proper party or parties. Consistent with the Board of Manager's duties and responsibilities as the Board of Managers hereunder, the Board of Managers may consult with legal counsel, and third-party accountants, appraisers, management consultants, engineers and other consultants and advisers reasonably selected by it. No member of the Board of Managers shall have liability for any action taken or suffered or omitted hereunder in good faith and in reasonable reliance upon, and in accordance with, the opinion of any such persons as to matters within such person's professional or expert competence.

E. *Costs and Expenses*. Subject to the other express provisions of this Agreement, all costs and expenses reasonably incurred in the Company's business shall be paid from Company funds, including costs of preparing Company tax returns, costs of reports to Members, reasonable outside legal costs, interest expense, general and administrative expenses, operating expenses, marketing costs, taxes and other costs and expenses of the Company. In conducting the business and operations of the Company, the Board of Managers may use its own or its Affiliates' personnel (including consultants retained by the Board of Managers or its Affiliates), properties and equipment; provided that any such services, properties or equipment utilized by the Board of Managers on behalf of the Company shall be for such consideration and on such terms and conditions that are no less favorable than those available from unaffiliated third parties and that the Board of Managers determines in good faith to be in the best interests of the Company.

F. *Manager's Compensation*. No member of the Board of Managers shall receive or be entitled to receive any compensation from the Company for his or her service as such. Nothing herein contained shall be construed to preclude a member of the Board of Managers or such member's Affiliates from serving the Company in any other capacity and receiving compensation therefore.

G. *Time Devoted to Company*. Each member of the Board of Managers shall devote such time to Company business as such member deems necessary to manage, supervise and conduct Company business and affairs in an efficient manner; but nothing in this Agreement shall preclude, subject to any approval requirements set forth in this Agreement, the employment of any officer, employee, agent, third party or Affiliate to manage or provide other services with respect to the Company's assets or business as the Board of Managers shall determine.

H. *Liability of Managers*. The Board of Managers shall not be liable for the debts, liabilities, contracts or other obligations of the Company.

I. *Removal of Manager*. Each member of the Board of Managers agrees to serve as a Manager of the Company until such time as the Company has completed its liquidation and termination pursuant to Article XIII, and there shall be no requirement for the annual or other

periodic re-election or re-appointment of the Manager. Each member of the Board of Managers shall serve in such capacity until removed by a Super Majority-in-Interest of the Members.

**Section 10.2**    Officers.

A.    *Appointment of Officers*. The Members and the Board of Managers may appoint one or more individuals to serve as officers of the Company. The Company shall have such officers as the Board of Managers may from time to time determine, which officers may (but need not) include a Chief Executive Officer, President, one or more Vice Presidents (and in case of each such Vice President, with such descriptive title, if any, as the Board of Managers shall deem appropriate), a Secretary, a Treasurer and one or more Assistant Secretaries and Assistant Treasurers. Any two or more offices may be held by the same person.

B.    *Compensation*. The compensation, if any, of all officers of the Company shall be fixed from time to time by the Board of Managers. The Board of Managers may from time to time delegate to the President the authority to fix the compensation of any or all of the other officers of the Company.

C.    *Term of Office; Removal; Filling of Vacancies*. Each officer of the Company shall hold office until his or her successor is chosen and qualified in his or her stead or until his or her earlier death, resignation, retirement, disqualification or removal from office. Any officer designated by the Board of Managers may be removed at any time by the Board of Managers whenever in his or her judgment the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Appointment of an officer shall not of itself create contract rights. If the office of any officer becomes vacant for any reason, the vacancy may be filled by the Board of Managers.

D.    *Limitations on Powers and Duties of Officers*. No officer of the Company shall have the power and authority to cause the Company to take any action that requires the approval of the Members unless the Members have specifically approved such action.

**Section 10.3**    Conflicts of Interest; Outside Activities.

A.    *Conflicts of Interest*. No contract or transaction between the Company and one or more of its Members, a Manager or officers or between the Company and any other corporation, partnership, association, or other organization in which one or more of its Members, a Manager or officers are shareholders, partners, members, directors, managers or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the Member, Manager or officer is present at or participates in the meeting of the Members or the determination of the Manager, as the case may be, that authorizes the contract or transaction, or solely because his, her or their votes are counted for such purpose, if, in addition to any other requirement for approval set forth in this Agreement: (1) the material facts as to the relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Managers, and the Board of Managers in good faith authorizes the contract or transaction; or (2) the material facts as to the relationship or interest and as to the contract or transaction are disclosed or are known to the Members entitled to vote thereon, and the contract or transaction is specifically approved in good faith by the vote of Members holding not less than a Super Majority-in-Interest of the Members; or (3) the contract or transaction is fair as to the Company as of the time it is authorized, approved or ratified by the Board of Managers or the Members. Interested Members may be counted in determining the presence of a quorum at a meeting of the Members that authorizes the contract or transaction.

B.    *Outside Activities*. Subject to the other express provisions of this Agreement and any valid contract, each member of the Board of Managers may engage in and possess interests in

other business ventures of any and every type and description, independently or with others, and neither the Company nor any of its Members shall have any right, title or interest in or to such independent ventures. No such Manager shall have any obligation to offer any such business activity or venture to the Company.

## ARTICLE XI - RIGHTS, POWERS AND OBLIGATIONS OF MEMBERS

**Section 11.1**    Liability to Third Parties. No Member shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

**Section 11.2**    Members of Record; Related Matters. The Company will be entitled to consider the owner of any Interest as set forth in the books and records of the Company as the absolute owner thereof for all purposes. Upon the Disposition of an Interest, neither the Company nor its officers or the Board of Managers will incur any liability for distributions of cash or other property made in good faith to the owner of an Interest in the Company until such time as all the applicable provisions of Section 5.2 have been met and the admission of a new Member has become effective in accordance therewith. The Company may refuse to accept a purported assignment of an Interest until the end of the next succeeding monthly accounting period. In no event will any purported Disposition of any Interest, by operation of law or otherwise, require the Company to account to more than one Person with respect to such Interest subject to the Disposition. In the event of a valid Disposition by a Member, allocations between the assignor and assignee of deductions, credits and income of the Company for federal, state and local income tax purposes shall be based on the portion of the year during which the assignor and assignee each owned such Interest.

**Section 11.3**    Limitations on Members. Other than as specifically provided for in this Agreement and applicable law, no Member shall, solely as a result of its status as such: (a) be permitted to take part in the business or control of the business or affairs of the Company; (b) have any voice in the management or operation of any Company Property; (c) have the authority or power to act as agent for or on behalf of the Company or any other Member, to do any act that would be binding on the Company or any other Member, or to incur any expenditures for or on behalf of the Company, or (d) take any action inconsistent with the actions of the Board of Managers taken in accordance with Section 10.1 of this Agreement.

**Section 11.4**    Confidentiality. Each Member recognizes and acknowledges that the Company's trade secrets and other confidential or proprietary information, as they may exist from time to time, are valuable, special and unique assets of the Company's business. Accordingly, during the term of the Company's existence and for the two years subsequent to the term of the Company's existence or the two years subsequent to the termination of such Member's ownership or control of any Interest in the Company, whichever is later, each Member shall hold in strict confidence and shall not, directly or indirectly, disclose or reveal to any Person, or use for his or her personal benefit or for the benefit of anyone else, any trade secrets, confidential dealings or other confidential or proprietary information of any kind, nature or description (whether or not acquired, learned, obtained or developed by a Member alone or in conjunction with others) belonging to or concerning the Company, or any of its customers or clients or others with whom they now or hereafter have a business relationship, except (i) with the prior written unanimous consent of the Members, (ii) in the course of the proper performance of the Member's duties hereunder or (iii) as required by applicable law or legal process. Each Member confirms (i) that all such information constitutes the exclusive property of the Company and (ii) the survival of the provisions of this Section 11.4 for the period specified above subsequent to the term of the Company's existence or the termination of such Member's ownership or control of any Interest in the Company.

**Section 11.5**    Business Records. Given the competitive environment in which the Company does business, each Member agrees to promptly deliver to the Company, at any time when the Board of Managers so requests, all memoranda, notes, records, drawings, manuals and other documents (and all copies thereof and therefrom) in any way relating to the business or affairs of the Company or any of its

customers and clients, whether made or compiled by such Member or furnished to it by the Company or any of its employees, customers, clients, consultants or agents, which such Member may then possess or have under its control. Each Member confirms that all such memoranda, notes, records, drawings, manuals and other documents (and all copies thereof and therefrom) constitute the exclusive property of the Company. Notwithstanding the foregoing provisions of this Section 11.5 or any other provision of this Agreement, each Member shall be entitled to retain any written materials received by such Member in its capacity as a Member of the Company.

## ARTICLE XII. - MEETINGS OF MEMBERS

**Section 12.1**   Meetings.  Meetings of the Members, for any purpose or purposes, unless otherwise prescribed by the Law, the Certificate of Formation or this Agreement, may be called by the Board of Managers or any Member. Until so called, the Company need not hold any meetings of the Members. Any business may be conducted at a properly called meeting of the Members; provided that inasmuch as the Board of Managers has been vested, pursuant to Section 10.1 of this Agreement, with exclusive power to manage and direct the business and affairs of the Company, the Members shall not be permitted, pursuant to this Article XII or otherwise, to take any action in the place or stead of the Board of Managers or any action that would circumscribe, limit or otherwise adversely affect the power and authority of the Board of Managers, except as otherwise specifically required by applicable law.

**Section 12.2**   Place of Meetings; Chairman.  Meetings of Members shall be held at the principal office of the Company as provided in Section 2.4 above, or at such other places, within or without the State of Delaware, as may from time to time be fixed by the Board of Managers. The Board of Managers shall appoint a Chairman to preside when present at all meetings of the Members. In the absence of such Chairman at any meeting of the Members, the Members present at such meeting shall designate another Member to preside at such meeting.

**Section 12.3**   Notice.  A Notification of all meetings, stating the place, day, and hour of the meeting shall be delivered not less than ten (10) nor more than sixty (60) days before the meeting to each Member entitled to vote.

**Section 12.4**   Waiver of Notice.  Attendance of a Member at a meeting shall constitute a waiver of Notification of the meeting, except where such Member attends for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. Notification of a meeting may also be waived in writing, either before or after the meeting. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be included in the Notification of the meeting but not so included, if the objection is expressly made at the meeting.

**Section 12.5**   Quorum.  A Super Majority-in-Interest of the Members shall constitute a quorum at any meeting of the Members, whether present in person or by proxy. Unless otherwise provided in the Certificate of Formation, the Members represented in person or by proxy at a meeting of Members at which a quorum is not present may adjourn the meeting until such time and to such place as may be determined by a vote of the holders of a majority of the Interests represented in person or by proxy at that meeting. At any such adjourned meeting at which a quorum shall be present or represented, any business may be transacted that might have been transacted at the meeting as originally convened. Unless otherwise provided in the Certificate of Formation, once a quorum is present at a meeting of Members, the Members represented in person or by proxy at the meeting may conduct such business as may be properly brought before the meeting until it is adjourned, and the subsequent withdrawal from the meeting of any Member represented in person or by proxy, or the refusal of any Member represented in person or by proxy to vote, shall not affect the presence of a quorum at the meeting.

**Section 12.6**   Voting.

A. *Voting and Voting Power.* All Members shall be entitled to vote at meetings. Members may vote either in person or by proxy at any meeting. Each Member shall have the number of votes at a meeting equal to such Member's Interest divided by the total Interests of all Members multiplied by one hundred.

B. *Voting.* With respect to any matter other than the sale of all or substantially all of the assets of the Company or a matter for which the affirmative vote of Members owning a specified portion of the Interests is required by the Law, the Certificate of Formation or this Agreement, including, without limitation, Sections 10.1(B), 13.1(B), 15.7(C) and (D) and this Section 12.6(B), the affirmative vote of the holders of a Super Majority-in-Interest of the Members at a meeting at which a quorum is present shall be the act of the Members. A Super Majority-in-Interest of the Members shall be required to approve the sale of all or substantially all of the assets of the Company.

C. *Change in Voting Percentages.* No provision of this Agreement requiring that any action be taken only upon approval, consent, vote or action of Members holding a specified percentage or all of the Interests may be modified, amended or repealed unless such modification, amendment or repeal is approved by Members holding at least such specified percentage of Interests.

**Section 12.7** <u>Voting List</u>. The Company shall make, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting, arranged in alphabetical order, showing the address of, and Interest owned by, each Member, which list, for a period of ten (10) days prior to such meeting, shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the meeting and shall be subject to inspection by any Member during the meeting. Failure to comply with these requirements shall not affect the validity of any action taken at such meeting. The chairman of the meeting shall have the power to adjourn the meeting from time to time, without notice, other than announcement of the time and place of the adjourned meeting. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

**Section 12.8** <u>Action by Written Consent</u>. Any action that may be taken at a meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by Members holding the percentage of Interests required to approve such action under the Law, the Certificate of Formation or this Agreement. Such consent shall have the same force and effect as a vote of the signing Members at a meeting duly called and held pursuant to this Article XII. No prior notice from the signing Members to other Members shall be required in connection with the use of a written consent pursuant to this Section. Any such writing or writings shall be filed with the minutes of proceedings of the Members. A pdf, photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this Section 12.8. Notification of any action taken by means of a written consent of Members shall, however, be sent within a reasonable time after the date of the consent by the Company to all Members who did not sign the written consent.

**Section 12.9** <u>Proxies</u>. A Member may vote either in person or by proxy executed in writing by the Member. A facsimile, telegram, telex, cablegram or similar transmission by the Member, or a photographic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Company, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the chairman of the meeting who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been

appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two (2) or more Persons to act as proxies, unless such instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one (1) is present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify a method for the voting of the Interests that are the subject of such proxy that resolves the disagreement with respect to such issue.

**Section 12.10**   Member Expenses.   Any direct and reasonable costs and expenses incurred by the Members in connection with the business and affairs of the Company, including travel expenses and costs, may be paid or reimbursed by the Company as a Company expense if and only if such payment or reimbursement is approved by the Board of Managers of the Company.   All such requests for reimbursement by the Members shall be accompanied with appropriate written documentation, including the purpose or purposes for the incurrence of such costs and expenses.

## ARTICLE XIII. - DISSOLUTION AND WINDING UP

**Section 13.1**   Events Causing Dissolution.   The Company shall be dissolved upon the first of the following events to occur:

A.   the expiration of the term of duration of the Company, if any, set forth in the Certificate of Formation;

B.   the written consent of Super Majority-in-Interest of the Members at any time to dissolve and wind up the affairs of the Company; or

C.   the occurrence of any other event that requires, under a nonwaivable provision of applicable law, the dissolution of a limited liability company under the Law.

**Section 13.2**   Winding Up.   If the Company is dissolved pursuant to Section 13.1, the Company's affairs shall be wound up as soon as reasonably practicable in the manner set forth below.

A.   *Appointment of Liquidator*.   The winding up of the Company's affairs shall be supervised by a Liquidator, or Liquidators.   The "Liquidators" shall be the Board of Managers or, if a Super Majority-in-Interest of the Members prefer, a liquidator or liquidating committee selected by a Super Majority-in-Interest of the Members.

B.   *Powers of Liquidator*.   In winding up the affairs of the Company, the Liquidator shall have full right and unlimited discretion, for and on behalf of the Company:

1.   to prosecute and defend civil, criminal or administrative suits;

2.   to collect Company assets, including obligations owed to the Company;

3.   to settle and close the Company's business;

4.   to dispose of and convey all Company Property for cash, and in connection therewith to determine the time, manner and terms of any sale or sales of Company Property, having due regard for the activity and condition of the relevant market and general financial and economic conditions,

5.    to pay all reasonable selling costs and other expenses incurred in connection with the winding up out of the proceeds of the disposition of Company Property;

6.    to discharge the Company's known liabilities and, if necessary, to set up, for a period not to exceed two (2) years after the date of dissolution, such cash reserves as the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company;

7.    to distribute any remaining proceeds from the sale of Company Property to the Members;

8.    to prepare, execute, acknowledge and file articles of dissolution under the Law and any other certificates, tax returns or instruments necessary or advisable under any applicable law to effect the winding up and termination of the Company; and

9.    to exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Members under the terms of this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties and functions.  The Liquidator (if not the Members) shall not be liable to the Members and shall, while acting in such capacity on behalf of the Company, be entitled to the indemnification rights set forth in Article XIV hereof.

**Section 13.3**    Compensation of Liquidator.  The Liquidator appointed as provided herein shall be entitled to receive such reasonable compensation for its services as shall be agreed upon by the Liquidator and a Super Majority-in-Interest of the Members.

**Section 13.4**    Distributions from Company.

A.    *Statement of Account.*  The Liquidator shall prepare as promptly as possible a final statement of account showing the status of each Member's Capital Account and the amount that each Member owes to the Company.  The final statement of account shall also reflect all allocations of gain and loss provided in this Agreement.  The Liquidator shall determine the interest of the Company in each of the remaining Company Properties.  The Liquidator shall determine the fair market value of the remaining Company Properties using appraisal techniques that it deems to be appropriate and shall determine the amount of any nonrecourse indebtedness secured by the remaining Company Properties.  Any difference between the fair market value and the basis of Properties as carried on the books of the Company shall be allocated among the Members as though such Properties had been sold or transferred; provided, however, in the case of Company Property having a fair market value less than the nonrecourse indebtedness that it secures, for purposes of determining gain or loss on the sale or transfer of the Property the amount of the nonrecourse indebtedness shall be treated as the amount realized on the sale or transfer.

B.    *Order of Distribution.*  Upon completion of all desired sales of Company Property, and after payment of all selling costs and expenses, the Liquidator shall distribute the proceeds of such sales, and any Company Property that is to be distributed in kind, to the following groups in the following order of priority:

1.    to the extent permitted by law, to satisfy Company liabilities to creditors, including Members who are creditors (other than for past due Company distributions), of the Company, whether by payment or establishment of reserves;

        2.     to satisfy Company obligations to Members to pay past due Company distributions;

        3.     to the Members in accordance with the positive balances in their respective Capital Accounts; and

        4.     to the Members pro rata in accordance with their Percentage Interests.

        C.     *Insufficient Assets.*  The claims of each priority group specified above shall be satisfied in full before satisfying any claims of a lower priority group.  If the assets available for disposition are insufficient to dispose of all of the claims of a priority group, the available assets shall be distributed in proportion to the amounts owed to each creditor or the respective Capital Account balances or Interests of each Member in such group.

        **Section 13.5**   <u>Final Audit</u>.  Within a reasonable time following the completion of the liquidation, the Liquidator shall supply to each of the Members a statement which shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's pro rata portion of distributions pursuant to Section 13.4.

        **Section 13.6**   <u>Deficit Capital Accounts</u>.  In the event any Member has a deficit balance in such Member's Capital Account upon liquidation of the Member's Interest in the Company after making all adjustments thereto, such Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other person for any purpose whatsoever.

**ARTICLE XIV. – EXCULPATION, INDEMNIFICATION AND INSURANCE**

        **Section 14.1**   <u>Exculpation</u>.  Neither the Board of Managers, any Affiliate of any member of the Board of Managers nor any officer of the Company or the Board of Managers, shall be liable, responsible, or accountable in damages or otherwise to the Company or any Member by reason of, or arising from, the operations, business or affairs of, or any action taken or failure to act on behalf of, the Company, except to the extent that any of the foregoing is determined, by a final, non-appealable order of a court of competent jurisdiction (or by any other means approved by a Super Majority-in-Interest of the Members) to have been primarily caused by any act of such person; provided that if the act of any person claiming exculpation shall consist of a conviction or plea of no contest to a felony, then such person shall not be entitled to exculpation unless it is determined, by final, nonappealable order of a court of competent jurisdiction (or by any other means approved by a Super Majority-in-Interest of the Members) that exculpation should be granted in whole or part or that such act was not the primary cause of any of the matters for which exculpation is being sought.   THE MEMBERS RECOGNIZE THAT THIS PROVISION SHALL RELIEVE ANY SUCH PERSON FROM ANY AND ALL LIABILITIES, OBLIGATIONS, DUTIES, CLAIMS, ACCOUNTS AND CAUSES OF ACTION WHATSOEVER EVEN THOUGH CAUSED IN WHOLE OR IN PART BY A PRE-EXISTING DEFECT, THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT), OR STRICT LIABILITY OF SUCH PERSON.

        **Section 14.2**   <u>Indemnification</u>.

        A.     *Indemnitees and Indemnifiable Claims.*  The Company shall indemnify and hold harmless (i) each member of the Board of Managers, (ii) any Member, (iii) any Affiliate of a member of the Board of Managers or any Member, (iv) any officer, director, employee, agent, stockholder, member or partner of the Company, a Member or any of its Affiliates or (v) any Person who is or was serving at the request of the Company as a manager, member, director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another

foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan, or other enterprise (each, an "Indemnitee"), to the fullest extent provided by, and in accordance with the procedures set forth in Sections 101.401 and 101.402 of the Law and Chapter 8 of the Delaware Business Organizations Code ("TBOC") and any other applicable laws; provided, however, that Chapter 8 of the TBOC shall be modified in the following respects as applied to the Company:

      1.      Indemnification of any Person who has satisfied the standard of conduct set forth in Section 8.101 of the TBOC shall be mandatory rather than optional. The determination under Section 8.101 of the TBOC that indemnification shall be made shall also constitute authorization of indemnification under Section 8.103 of the TBOC;

      2.      Advancement of expenses to a Person who has satisfied the requirements of Section 8.104 of the TBOC shall be mandatory rather than optional; and

      3.      Payment or reimbursement of expenses to a Person pursuant to Section 8.106 of the TBOC in connection with his or her appearance as a witness or other participation in a proceeding shall be mandatory rather than optional.

THE MEMBERS RECOGNIZE THAT AN INDEMNITEE SHALL BE ENTITLED TO INDEMNIFICATION FROM ACTS OR OMISSIONS EVEN THOUGH CAUSED IN WHOLE OR IN PART BY A PRE-EXISTING DEFECT, THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT), OR STRICT LIABILITY OF SUCH INDEMNITEE.

      B.      *Insurance and Other Sources of Indemnification*. Subject to Section 8.151 of the TBOC, the Company may purchase and maintain insurance or make other arrangements on behalf of any Person, who is or was a Member, officer, employee, agent or other Person identified in Section 14.2A above, against any liability asserted against or incurred by him or her in such a capacity or arising out of his or her status as such a Person, whether or not the Company would have the power to indemnify such Person against that liability under Section 14.2A or otherwise.

      C.      *Settlements*. Notwithstanding Section 14.2A of this Agreement, the Company shall not be obligated to make any indemnification payment to any Indemnitee in respect of any settlement unless such settlement shall have been approved (i) by the Board of Managers in writing or (ii) by final, nonappealable order of a court of competent jurisdiction (or by any other means approved by a Super Majority-in-Interest of the Members).

      D.      *Source of Funds*. The indemnification provided by this Section 14.2 shall be made and shall be recoverable by the Indemnitee only out of the tangible net assets of the Company and not from the Members.

**Section 14.3**    Entitlement. These indemnification provisions shall inure to each of member of the Board of Managers, the Members, officers, employees and agents of the Company, and to other Persons serving at the request of the Company (as provided in this Article), regardless of whether any such Person ceases to serve as such at any time and whether or not the claim asserted against any such Person is based on matters that antedate the adoption of this Article, and in the event of any such Person's death, shall extend to such Person's legal representatives; but such rights shall not be exclusive of any other rights to which any of the foregoing Persons may be entitled.

## ARTICLE XV. - GENERAL PROVISIONS

**Section 15.1**    Entire Agreement. This Agreement contains the entire agreement among the Members relating to the subject matter hereof and all prior agreements relative hereto that are not contained herein are terminated.

**Section 15.2**     Law Governing.   This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, excluding any conflicts of law rule or principle that might refer the governance or the construction of this Agreement to the law of another jurisdiction. In particular, this Agreement is intended to comply with the requirements of the Law and the Certificate of Formation.  In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the Law or any provision of the Certificate of Formation, the Law and the Certificate of Formation, in that order of priority, will control.

**Section 15.3**     Conference Telephone Meetings.   Meetings of the Members or any committee designated by the Members may be held by means of conference telephone or similar communications equipment so long as all Persons participating in the meeting can hear each other.  Participation in a meeting by means of conference telephone shall constitute presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business thereat on the ground that the meeting is not lawfully called or convened.

**Section 15.4**     Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

**Section 15.5**     Severability.  This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations.  If any provision of this Agreement or the application thereof to any Person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, but the extent of such invalidity or unenforceability does not destroy the basis of the bargain among the Members as expressed herein, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

**Section 15.6**     Headings.  The Article and Section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any Article or Section.

**Section 15.7**     Amendment.

A.      Amendments to this Agreement may be proposed by the Board of Managers or by a Super Majority-in-Interest of the Members.  Any such amendment must be proposed by submitting to all Members in writing the proposed amendment.  Subject to Sections 15.7(B), (C) and (D) below, any such amendment shall be approved only upon (and at the time of receipt of) the affirmative vote or written consent of Members holding at least a Super Majority-in-Interest of the Members.

B.      Notwithstanding the foregoing Section 15.7(A), amendments to this Agreement that are of an inconsequential nature and do not adversely affect any Member, or are necessary to comply with any applicable law or governmental regulation, or are necessary in the opinion of counsel to the Company to ensure that the Company will not be treated as an association taxable as a corporation for United States Federal income tax purposes, or are required or contemplated by this Agreement, may be made by the Board of Managers without the consent of any Member. The Board of Managers shall provide each Member with a copy of any amendment made by the Board of Managers pursuant to this Section.

C.      Notwithstanding Sections 15.7(A) and (B), no amendment that (i) increases the obligation of any Member to make or cease to make Capital Contributions to the Company, (ii) provides for any change in allocations or distributions under Article VII, or (iii) in the opinion of counsel to the Company, would cause the Company to be treated as an association taxable as a

corporation for United States Federal income tax purposes, shall be made without the approval of all Members.

        D.     No provision of this Agreement that establishes a percentage of the Members required to take any action shall be amended, altered, changed, repealed or rescinded in any respect that would have the effect of reducing such voting requirement, unless such is approved by written consent or the affirmative vote of Members holding at least such percentage of Interests then outstanding as the Member voting requirements sought to be reduced. This Section 15.7(D) shall only be amended with the approval of all of the Members.

**Section 15.8**    Construction. Whenever required by the context, as used in this Agreement, the singular number shall include the plural, and vice versa, and the gender of all words used shall include the masculine, feminine and the neuter. Unless expressly stated herein, all references to Articles and Sections refer to articles and sections of this Agreement, and all references to Schedules are to Schedules attached hereto, each of which is made a part hereof for all purposes.

**Section 15.9**    Offset. Whenever the Company is to pay any sum to any Member, any amounts that such Member owes the Company may be deducted from that sum before payment.

**Section 15.10**    Effect of Waiver or Consent. A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute of limitations period has run.

**Section 15.11**    Further Assurances. In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

**Section 15.12**    Waiver of Certain Rights. Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company not otherwise existing under Section 13.1 or for partition of the Property of the Company.

**Section 15.13**    Counterparts and Binding Effect. This Agreement may be executed in one or more counterparts, each of which shall be an original, but all of which taken together shall constitute a single document. This Agreement shall be binding upon each Member upon adoption by the Initial Members as evidenced by their signatures below, regardless of whether any Member has executed the same or any counterpart thereof.

[signatures to follow on next page]

IN WITNESS WHEREOF, the undersigned, being the initial Members of Block Bits AML Holdings LLC, and having read this Agreement, approve this Agreement as evidenced by their respective signatures below, effective as of January 11, 2018.

**MEMBERS:**

_____

**Exhibit A**
TO
COMPANY AGREEMENT
OF
BLOCK BITS AML HOLDINGS LLC

| Name of Member | Date of Contribution | Total USD Contribution | AML Bitcoin Purchased |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |