MICHAEL J. SHEPARD (SBN 91281)
 mshepard@kslaw.com
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: +1 415 318 1200
Facsimile: +1 415 318 1300

KERRIE C. DENT (Admitted *pro hac vice*)
 kdent@kslaw.com
**KING AND SPALDING LLP**
1700 Pennsylvania Avenue, NW, Suite 900
Washington, DC 20006-4707
Telephone: +1 202 626 2394
Facsimile: +1 202 626 3737

CINDY A. DIAMOND (SBN 124995)
 cindy@cadiamond.com
**ATTORNEY AT LAW**
58 West Portal Avenue, #350
San Francisco, CA 94127
Telephone: +1 408 981 6307

Attorneys for Defendant
ROWLAND MARCUS ANDRADE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiffs,<br><br>  v.<br><br>ROWLAND MARCUS ANDRADE,<br><br>    Defendants. | Case No. 3:20-CR-00249-RS-01 (LB)<br><br>**DEFENDANT'S SUPPLEMENTAL REPLY MEMORANDUM IN SUPPORT OF HIS MOTION TO COMPEL DISCOVERY** |

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................... 3

ARGUMENT ............................................................................................................................. 3

    A.    Under The Applicable Standards, Mr. Andrade Is Entitled to the Requested Discovery ........................................................................................ 3

    B.    The Court Should Order the Government to Produce All of Mr. Andrade's Specific Requests ............................................................................ 7

        1.    Non-privileged items from Abramoff's phone should be produced ................................................................................................ 7

        2.    Levin's Devices Should Be Produced Without an Attorney's Eyes Only Provision ............................................................ 9

        3.    The Government Should Be Required to Produce Extraction and Other Information from Erickson's Phone ................. 12

        4.    Documents Relating to the Searches and Seizures of the Devices of Levin, Erickson, and Butina. ............................................ 13

        5.    Any statements of Butina, Levin and Erickson Should Be Produced ................................................................................................ 14

CONCLUSION ....................................................................................................................... 15

**INTRODUCTION**

Stripped of its disparaging remarks,[1] the Government's Supplemental Opposition ("Govt. Supp. Opp." or "docket #158") rests primarily on the government's erroneous view that the only discovery that it can be compelled to produce is that which would "substantially alter the quantum of proof in [the defendant's] favor"[2] – as if only smoking guns are covered by Rule 16 and *Brady*.  Whether or not this may have been the law when *United States v. Marshall*, 532 F.2d 1279, 1284-85 (9th Cir. 1976) was decided, given changes in Rule 16 and subsequent decisions, it is not the law today.  Nor is it a realistic perspective on how defenses are built, especially in cases with an alleged co-schemer who is an experienced fraudster like Jack Abramoff.  In such cases, defenses are often developed from subtler, yet enlightening clues.

To justify discovery, the Ninth Circuit now has a "low threshold" that can be met if, among other things, the requested information will help the preparation of the defense or steer counsel away from lines of defense.  When applied to the rationales provided by Mr. Andrade for his discovery requests, these standards leave no doubt that the Court should order the government to produce the five remaining categories of discovery relating to Butina, Erickson, and Levin.

**ARGUMENT**

**A.    Under The Applicable Standards, Mr. Andrade Is Entitled to the Requested Discovery**

This Court's minute order of March 20 requested "a standalone articulation of the standard that applies," and noted that "the defendant called out the government's reliance on an outdated Rule 16 standard."  The parties did meet and confer on these issues as requested by the Court, but they were unable to reach an agreement.

---

[1] *See, e.g.,* Govt. Supp. Opp Exhibit 158. at 6:21 ("fantastical"); 7:1 ("ludicrous"); 7:6 ("transparently absurd"); 7:7 (plain old "absurd").  The Supplemental Opposition does not explain the difference between regular "absurd" and "transparently absurd."  The government used similar adjectives for ten months to justify its refusal to produce the Butina documents, which when produced turned out to advance a core part of a potential defense.

[2] *Id*. at 2:7.

***Rule 16.*** "The relevant section of Rule 16 is written in categorial terms: Upon the defendant's request, the government must disclose any documents or other objects within its possession, custody or control that are 'material to preparing the defense.' Fed. R. Crim. P. 16(a)(1)(E)(i)." *United States v. Hernandez–Meza*, 720 F.3d 760, 768 (9th Cir. 2013). It is beyond dispute that materiality is a "low threshold," *Id.*, and "not a heavy burden." *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993).

Not acknowledging these principles, the government insists that discovery is limited to information "substantially alter[ing] the quantum of proof in [the defendant's] favor." But the case on which the government relies was decided nearly a half century ago, applies a standard that, at best for the government, is no longer complete, and more recent cases go well beyond its limited definition of materiality. *See United States v. Marshall*, 532 F.2d 1279, 1284-85 (9th Cir. 1976) (interpreting the then-relevant provision, Rule 16(b)).[3] Under Rule 16(b) at that time, a court could Order the government to permit the defendant to inspect and copy documents and other tangible items within the possession, custody, or control of the government, upon a showing of "materiality to the preparation of his defense *and that the request is reasonable*." *Marshall*, 532 F.2d at 1284 (quoting Fed. R. Crim. P, 16(b)).

The *Marshall* Court's interpretation of what the former rule required was based on the component of the rule that instructed the court to judge reasonableness, a component that was removed from Rule 16 when the current rule -- Rule 16(a)(1)(E)(i) -- was implemented. Since *Marshall* was decided and Rule 16 was amended, the materiality standard has been expanded and made easier to satisfy -- and understandably so, given the challenges of proving, as the government would have it, that a document the defense by definition has not yet seen[4] "would

---

[3] *Marshall* not only interpreted a former version of Rule 16 discovery, but also is inapposite because it involved a discovery request that sought to provide the defendant "his only opportunity to effectively impeach the government's main witness" and thus did not involve the question whether the request was material to the preparation of the defendant's case-in-chief. *Marshall,* 532 F.2d at 1284.

[4] Because the defendants often are unable to "know with certainty what information the government has," courts should strongly encourage liberal discovery. *United States v. Jensen*, 608 F.2d 1349, 1357 (10th Cir. 1979).


1  substantially alter the quantum of proof in his favor." *See United States v. Marshall*, 132 F.3d 63,
2  68 (D.C. Cir. 1998).

3   Now, far from being limited to "evidence that must 'enable the accused to substantially
4  alter the quantum of proof in his favor,'" it is sufficient if the requested information is "relevant
5  to the development of a possible defense," (as the government acknowledges elsewhere in its
6  Supplemental Opposition, docket # 158 at 2:3, citing *United States v. Mandel,* 914 F.2d 1215,
7  1219 (9th Cir. 1990)), or if there is a strong indication that the requested information will play an
8  important role in uncovering admissible evidence, aiding witness preparation, corroborating
9  testimony, or assisting impeachment or rebuttal, *Lloyd,* 992 F.2d at 351, or "even if it simply
10 causes a defendant to completely abandon a planned defense and take an entirely different path."
11 *Hernandez–Meza*, 720 F.3d at 768.

12  Express language in *Hernandez-Meza* eviscerates the government's claim that the case
13 does not "directly address[] the standard applicable to requests for discovery under Rule 16."
14 Gov't Supp. Opp., docket # 158 at 2:17.  The *Hernandez-Meza* opinion begins by stating that
15 "we consider a number of questions in this criminal appeal, including the government's
16 discovery obligations under Federal Rule of Criminal Procedure 16." *Hernandez-Meza,* 720 F.3d
17 at 762. It then applies the materiality standard; holds that a document should have been produced
18 to the defense because it was material, and because, had the document been produced, the
19 defendant may have changed his defense; *id.* at 768; and vacates the defendant's conviction. *Id.*
20 at 769.

21  Numerous subsequent Ninth Circuit cases rely on *Hernandez-Meza*, and permit discovery
22 even if the defendant cannot show that the evidence would substantially alter trial proof in their
23 favor. *See, e.g., United States v. Soto-Zuniga*, 837 F.3d 992, 1002-03 (9th Cir. 2016) (holding
24 that district court abused its discretion in denying discovery into the primary purpose of a
25 checkpoint that led to the defendant's arrest because he "should not have [had] to rely solely on
26 the government's word that further discovery [was] unnecessary," and that the district court also
27 abused its discretion in denying discovery of government records of an investigation of a
28

5

different person, which "might" help the defendant identify passengers in his car, who "might then" provide testimony about whether anyone placed drugs in the defendant's car, or "might potentially" help identify potential wrongdoers and "either support or contradict" the defense). *See also United States v. Swenson*, 2013 U.S. Dist. LEXIS 126957 at 5 (D. Idaho 2013) (inculpatory evidence is discoverable because it may alter trial strategy or encourage the defendant to seek a plea deal).

None of the government's post-*Marshall* citations undermine the broader standard applied since *Hernandez-Meza*. Two of the three cases cited by the government were decided before the *Hernandez-Meza* decision, and even they are consistent with its principles.[5] The third, *United States v. Stone*, 2013 U.S. Dist. LEXIS 122066 at 6, 2013 WL 4541513 (E.D. Cal. 2013) – decided just after *Hernandez-Meza* -- confirms the error of the government's continued insistence that the only standard of relevance is that the requested discovery must "substantially alter the quantum of proof in [the defendant's] favor." *Stone* did cite that language, but immediately added to it the much broader language "*or* be relevant to the development of a possible defense" (emphasis added). *Id.*, citing *Mandel*, 914 F.2d at 1219. This also eviscerates the government's attempted rescue of its position by claiming that *Marshall* has not yet been overruled; it confirms that additional ways to satisfy the materiality standard have been tacked on to the language from *Marshall*. As a result, the government's suggestion that *Marshall alone* states the applicable standard for materiality is wrong.

The government concludes by reporting that "mere declarations that desired material is 'material' is insufficient," that "courts must apply some scrutiny in order to avoid immaterial discovery becoming a distraction at trial," and that general descriptions of the information sought

---

[5] *See* Govt. Supp. Opp. at 2:13-16. In *United States v. DeJarnette*, 2011 U.S. Dist. LEXIS 30181, 2011 WL 838898 (N.D. Cal. March 4, 2011), a defense discovery request was granted under the *Marshall* standard when communications between defendant and federal authorities, or between federal and state authorities, might lead to favorable evidence supporting defense related to defendant's scienter in sex-registration case. Quoting both *Marshall* and *Mandel*, *United States v. Alas*, 2009 WL 504687 (D. Ariz. Feb. 27, 2009) demonstrates that the later-established *Hernandez-Meza* standard was not new. "The information that the government must disclose need not be exculpatory; it merely must be material to the preparation of the defense." *Atlas* at LEXIS 16 [records relevant to the state of mind of the defendant ordered disclosed under Rule 16, id. at 20-21].

or conclusory allegations of materiality are insufficient. Docket # 158 at 2:20-22.  After well over 100 pages of briefing and declarations, and at least five hours of meeting-and-conferring, nearly all of which has been devoted to explaining the materiality of the requested information, not to mention considerable effort by the Court to review that mass of information, the best that can be said about the government's assertion is that it must have been misplaced from another brief.

**Brady**.  Mr. Andrade is also entitled to the discovery he seeks based on *Brady*.  There is no dispute that the governing standard is set forth in *Kyles v. Whitley*, 514 U.S. 419, 440 (1995) and that *Brady* should be interpreted liberally on the side of disclosure.[6]

**B.     The Court Should Order the Government to Produce All of Mr. Andrade's Specific Requests**

**1.     Non-privileged items from Abramoff's phone should be produced**

The government's opposition to Mr. Andrade's request for non-privileged items from Abramoff's phone begins by referring to the issue of "*privileged* materials on Abramoff's mobile device," and accusing defense counsel of preferring that the government's privilege filter "be done differently."  Docket # 158 at 4:22-24 (emphasis added).  These characterizations conveniently omit the government's admission that "there are likely numerous communications on Abramoff's phone" that it is not producing, even though they are "*not* privileged."[7]

///

///

---

[6] The Supplemental Opposition does not address Mr. Andrade's citations to *United States v. Lloyd*, 992 F.2d 348, 351(D.C. Cir. 1993) and *United States v. Lov-It Creamery, Inc.*, 704 F. Supp. 1532, 1553 (E.D. Wis. 1989).  In meet-and-confers, the government dismissed these cases merely because they are not binding, but they are consistent with *Soto-Zuniga*, 837 F.3d at 1002-1003: all hold that something that might be helpful defense preparation must be produced.  *See also Amado v. Gonzalez*, 758 F.3d 1119, 1136 (9th Cir. 2014) ("The prosecutor must presume in favor of disclosure, and resolve his doubts about the exculpatory nature of a document in favor of producing it"); *Williams v. Ryan*, 623 F.3d 1258, 1268 (9th Cir. 2010) ("The Supreme Court [in *Kyles*] has explained that a prosecutor who has any doubt about the materiality of a piece of evidence favorable to the defendant should disclose the evidence").

[7] Opposition to Motion to Compel, Dkt. #124 at 10:21-23 (emphasis added).

Currently before the Court is whether it should require the government to produce non-privileged communications between Abramoff and his brother Robert.[8] In its Supplemental Opposition—— without ever exactly coming out and saying so— the government appears to suggest that it can toss out many non-privileged documents with any privileged ones on the ground that none of Abramoff's communications with his brother Robert could possibly be material to preparing the defense. That is incorrect. Although the Supplemental Opposition suggests that Robert Abramoff had only a "tangential relationship to corporate entities related to this case," Docket # 158 at 5:6-7, FBI reports prove the contrary. Among other things:

- Robert "took over Blockchain Entertainment project," serving as a producer rather than an attorney. *See* Exhibit 46 at FBI-302-001747.
- Robert assisted Abramoff's deception by receiving fees intended for Abramoff. *See* Exhibit 47, at 005421-005422; Exhibit 49 at FBI-MAIN-0003898.
- Robert appeared to serve in a management capacity for Landfair Capital (Abramoff's company that he used to collect the money from various fraudulent scheme and also used to pay employees of Mr. Andrade's company). *See* Exhibit 48, at 3778-3780.
- Far from seeing Robert Abramoff as irrelevant, the government has already produced at least four of his personal bank account statements, two of his law firms' banks statements, his IRA account statements, and his credit card statements.

As a result, Robert Abramoff is not "tangential" to corporate entities at the heart of the defense; it is likely that he engaged in many communications that could not have been privileged; and the government has provided defense counsel with no evidence that Robert Abramoff ever served as his brother's lawyer. Rule 16 and *Brady* do not allow the government to withhold information material to the defense on the ground that identifying it would "compel the expenditure of governmental resources in a privilege review," Supplemental Opposition,

---

[8] As set forth in Mr. Andrade's Supplemental Memorandum, on March 8, 2023, the government identified one law firm and two lawyers whose names were searched, and all communications that involved or referenced the names were removed from Abramoff's Cellebrite. The searched terms were "Arent Fox LLP," "Peter Zeidenberg," or "Robert Abramoff." In an effort to compromise and move the discovery process forward, defense counsel proposed that *for now*, and without prejudice to raising the Arent Fox and Zeidenberg issues later, a taint team could be used to review only the messages that contain the search term "Robert Abramoff."

8

Docket # 158 at 5:3-4, or on the ground that it has s produced a large volume of other materials. Docket # 158 at 5:10-12.  The government does not identify any other source of information available to the defense that would duplicate Abramoff's communications with his brother Robert. At a minimum, those communications should be reviewed by a taint team to determine what information must be produced.

**2. Levin's Devices Should Be Produced Without an Attorney's Eyes Only Provision**

Likely fueled by its erroneously narrow view of Rule 16 and *Brady,* the government asserts that "[d]efendant has never articulated how Levin's records *not* involving Abramoff are material." Docket # 158 at 5:24-25, and that it is "mystified by Mr. Andrade's attention to the Butina documents. *Id.* at 4:8.[9]  Mr. Andrade has already explained that a potential defense is that Abramoff rather than Mr. Andrade orchestrated the alleged wrongdoing, and that Abramoff did so to further his own interests that were not aligned with those of Mr. Andrade. Among other things, the Butina documents and other evidence collected to date about Levin lend support to the proposition that Abramoff, with Butina, Erickson, Levin and others, were working to de-regulate cryptocurrency[10]-- the opposite of Mr. Andrade's strategy, which was to make AML Bitcoin the one cryptocurrency that could be compliant with regulations.  To develop this defense, Mr. Andrade needs to learn the motives of Abramoff and those working with him (like Butina, Erickson and Levin) – to know, among other things, what they were doing and why that led them to act in ways contrary to the interests of Mr. Andrade's business.  The Supplemental Opposition briefly flails at suggesting this defense (and the resulting need for discovery) is unsupported or insufficient, but these suggestions go nowhere.

Without offering any different interpretation, let alone support for one, the government suggests that Mr. Andrade has misinterpreted the Butina documents. But even if there were

---

[9] The Supplemental Opposition (docket # 158 at 3:3) also accuses Mr. Andrade of "paint[ing] a misleading picture of . . . the case against [him]," but nowhere supports this accusation by identifying anything in Mr. Andrade's description of the facts that was misleading, let alone provides any support for such an accusation.

[10] *See, e.g*. Ex. 44 at 18 (referencing the "idiotic regulation war"),

9

DEFENDANT'S SUPPLEMENTAL REPLY MEMO      CASE NO. 3:20-CR-00249-RS-01 (LB)
ISO MOTION TO COMPEL DISCOVERY

support for a different reading, differences of interpretation cannot be a basis for withholding discovery. Cf. *United States v. Ruiz*, 59 F.3d 1151 (11th Cir. 1995) (defendant entitled to jury instruction relating to a theory of defense for which there is any foundation in the evidence, and the court is obligated to view the evidence in the light most favorable to the accused).

The government refers to the Butina documents as "20 pages of material, which include a scant 14 lines of handwritten notes." Docket # 158 at 3:26-27, or just a "sales pitch" with "generic marketing . . . nothing more, nothing less, and certainly nothing material to the defense." *Id.* at 4:6-8. They are far more than that. Found in Butina's home, with handwritten notes attributed to Erickson by the government, the 20 pages relate to AML Bitcoin, and the strategies for and uses and value of Mr. Andrade's technology. Exh. 44 at 1, 2-4, and 7-8. Depending on how they are counted, there are 14-16 lines of handwritten notes on the first page relating to a discussion about AML Bitcoin at Abramoff's home, and – omitted in the government's description -- most of the remaining pages are extensively underlined, with additional handwritten notes added. They show at a minimum that Erickson (or whomever wrote the notes) went into depth to understand AML Bitcoin's technology, strategies, and to discuss them – including de-regulation -- with Abramoff, without Mr. Andrade's knowledge. They add to considerable other evidence suggesting that Abramoff using Blockchain Entertainment, the television show about Mr. Andrade's business, Landfair Capital, and other entities, for his schemes about Mr. Andrade's business that were adverse to Mr. Andrade, at the same time that Abramoff was orchestrating the conduct for which Mr. Andrade has been charged.

Levin appears connected to the Abramoff-Erickson-Butina scheme for Mr. Andrade's company through at least the development and funding of the television show. In his proffer interview, Abramoff reluctantly gave the government an indication that he had discussed Mr. Andrade's cryptocurrency business with Levin, *see* Exhibit 11 at 10, and that they had discussed working together to change cryptocurrency policy, *id.*, likely a reference to the deregulation referenced in the Butina documents that was antithetical to Mr. Andrade's plans for the business. Levin was soliciting funding for Abramoff, and with respect to some aspect of Levin's work with

10

Abramoff, Levin asked that his involvement "not be exposed," and asked the same for another person from Eastern Europe who was solicited for funding. Exh. 34 at 8. In mid-July 2018 Abramoff sent Levin an invoice for "cryptocurrency consulting," which the government views as a reference to the "Blockchain Entertainment" television show and the foreign funding discussed by Abramoff and Levin. Exh. 11 at 11. In his proffer, Abramoff claimed that he could not explain the "cryptocurrency" reference on the Landfair invoice sent to Levin, Exh. 34 at 16, and in a previous interview, he falsely claimed not to know how -- or whether -- Erickson knew about AML Bitcoin. Ex. 21 (58:58 – 59:50).

      All of this suggests that Levin will have communications, and not just with Abramoff, that are material to preparing Mr. Andrade's defense. For example, information about the television show supposedly designed to market AML Bitcoin was sent to Levin from Abramoff, Exh. 11 at 12, and evidence suggests that Levin is the link to raising the money for the TV show. Exh. 11 at 10. The Butina documents include material describing the technique of using television as propaganda to sway the public to pressure the government against the institutions of government regulations of cryptocurrency. *Id*. at 18. Levin received a copy of the television show promo reel, and only his device will have a full record of with whom he shared it and why. Levin was also involved with Landfair: Abramoff billed him through that entity (exactly what for is unknown), but after further discussion Abramoff lowered his price and suggested he bill through Blockchain to make it look "cleaner" – which sounds a lot like money laundering.

      Levin's communications -- with others, in addition to with Abramoff -- will help the defense learn, among other things, whether the television show was aimed at gutting the value of Mr. Andrade's company, in favor of Abramoff, Levin, and Levin's connections who were helping to fund the show. If the purpose was to gut the company, the data on the device will also help show why Levin took that course, and regardless of what his purpose was, his device may also have information explaining why Levin was trying to hide the involvement of investors – was it because they were investing in the show to launder money – as well as why Abramoff hid,

11

or tried to diminish, Levin's involvement from the FBI in his proffer, and why he and Abramoff, and others were doing all this behind Mr. Andrade's back.

Getting insight on these questions is material to the preparation of Mr. Andrade's defense.[11] Given that the government had opportunity but offered no answer to Mr. Andrade's reasons why there should be no AEO limitation, the devices should be produced without one.

### 3. The Government Should Be Required to Produce Extraction and Other Information from Erickson's Phone

Mr. Andrade's Supplemental Memorandum demonstrated that the prosecution team has known for many years of Erickson's connection to this case, and that Mr. Andrade was asking about Erickson, but the government apparently destroyed his device anyway. In its Supplemental Opposition, the government did not contest these propositions. It ignores this unquestioned violation of the government's "duty to preserve discoverable evidence." *United States v. Grammatikos,* 633 F.2d 1013, 1019 (2d Cir. 1980). Discovery into how and why this happened, and who is responsible, is necessary to determine if sanctions are appropriate.

Instead of acknowledging and addressing these issues, the government chose to write about the fact that Erickson (like Butina) was convicted of an offense that did not involve AML Bitcoin, and the claim that the FBI investigation of Erickson had nothing to do with cryptocurrency. Neither of these statements tell the Court anything about what was (or is) on his (or Butina's) device, and the facts described above show that Erickson was likely to have communications about Mr. Andrade's business (and about why he was doing what he was doing to Mr. Andrade's business behind his back).

Production of all records that the government has about why it destroyed Erickson's device is made even more important by the shifting statements the government has made about the device. For example, as the government acknowledged in its brief filed on March 22: "The

---

[11] The government's suggestion that any communications between Levin and Abramoff would be on Abramoff's device is inadequate both for the reasons in the text showing that communications between Levin and others are material, but also because the suggestion about the Levin-Abramoff communications themselves is unreliable. For example, there is no assurance that Abramoff did not have additional devices that he had previously discarded, or that he kept in locations not searched by the government.

government previously informed the defense that the extractions themselves were destroyed in March 2022, but further investigation has revealed simply that March 2022 is when the casefile was formally closed. The team has not located any records regarding when those extractions were destroyed."). Docket # 158, Govt. Supp. Opp filed March 22, 2023, at 6:13-16.

Regardless of the nature of his conviction, the circumstances described above suggest that Erickson had communications on his device that are material to preparing Mr. Andrade's defense – communications that apparently are now lost to the defense, due to the fault of the government. The government should not be permitted to withhold any information it has about how and why this happened, who was responsible for it, and why the prosecution team did nothing to stop it.

**4. Documents Relating to the Searches and Seizures of the Devices of Levin, Erickson, and Butina.**

Mr. Andrade described above in the discussion of Levin's devices the reasons why information collected by the government about Butina, Erickson and Levin is material to preparing his defense. Although the defense has explained the materiality of this information to the government in meet-and-confers, the Supplemental Opposition does not respond to those explanations, and instead uses only a narrow lens based on the nature of the offenses the government investigated, without consideration of how whatever it gathered could cast light on the reasons explaining, and nature of, the complicity of Butina, Erickson and Levin in Abramoff's schemes. For example, regardless of what offense the government was investigating, the information it collected and presented as part of affidavits could identify people who may have been investors, reasons to launder funds, potential uses (or misuses) of Mr. Andrade's biometric identification patents, as well exchanges of money that could be, through their timing or their participants, related to Mr. Andrade's companies even if not specifically identified as such.

As with Mr. Andrade's discovery of the Butina documents -- located only after the audio version of Abramoff's interview was reviewed by Mr. Andrade's counsel as there was no

13

DEFENDANT'S SUPPLEMENTAL REPLY MEMO            CASE NO. 3:20-CR-00249-RS-01 (LB)
ISO MOTION TO COMPEL DISCOVERY

reference to them in the report of the interview -- the defense is entitled to inspect this material (and potentially exculpatory) information without reliance on the government's characterization of it. The government has identified no burden to its production of the items requested with respect to Erickson or Levin, nor any privilege or classification issues preventing disclosure of these materials, and the Court should therefore order their production.

As for information relating to Butina, two days before it filed its supplemental opposition, the government provided over 1.7 gigabytes of discovery electronically, and has arranged to send more than 500 gigabytes of additional electronic discovery as soon as it can be copied onto media sufficient to contain it physically. The defense has begun, but (needless to say) has not yet completed, review of the 1.7 gigabytes of discovery. The material reviewed to date includes reports, evidence summaries, and photographs related to the government's seizure of the Butina documents, some of which is helpful to the defense. Although defense counsel is unable to determine with certainty at this time whether the production about the Butina documents is sufficient, the Court could defer ruling on the remaining Butina-related requests until defense counsel completes its inspection of the newly produced, and soon-to-be produced, discovery.

### 5. Any statements of Butina, Levin and Erickson Should Be Produced

Mr. Andrade seeks discovery relevant to his theories of defense, not just information that refers to him or his company AML Bitcoin. As is more fully explained in subparts 2 and 4 above, this requires production of information that might assist in identifying investors, reasons to launder funds, potential uses (or misuses) of Mr. Andrade's biometric identification patents, well exchanges of money that could be, through their timing or their participants, related to Mr. Andrade's companies even if not specifically identified as such, as well as other information helpful in developing or rejecting a defense.

Rather than provide that information, the government merely grants access to specific references to AML Bitcoin or Mr. Andrade. Needless to say, this is a sliver of even the specific terms that would be relevant, such as the television show, Blockchain, Landfair, and specific

14

patents owned by Mr. Andrade, such as his unique biometric identification verification patent.[12] Even more importantly, an approach based on even those expanded terms misses all sorts of information material to the preparation of the defense, such as matters described in the paragraph above.

Without relying on any claim of privilege or confidentiality, the government has rejected Mr. Andrade's discovery request for statements made by Erickson, Butina, or Levin. They have not identified a burden in producing this material. The sliver of an inquiry it made is far from sufficient. The statements requested should be ordered to be produced.

## CONCLUSION

For the reasons set forth above and in all the prior pleadings and exhibits provided to the Court on this matter, and based on upcoming argument, Mr. Andrade respectfully requests that the Court order the government to produce the five categories of requests discussed above.

Respectfully submitted

DATED: March 27, 2023

By: /s/ Michael J. Shepard
MICHAEL J. SHEPARD
KERRIE C. DENT
CINDY A. DIAMOND

Attorneys for Defendant
ROWLAND MARCUS ANDRADE

---

[12] The government's reference to searches for "AML Bitcoin" overlooks the fact that the patent held by Mr. Andrade was applied for and assigned to an entity known as the "Fintech Fund Family Limited Partnership." See Exhibit 44 at 2.