United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 20-cr-00249-RS (LB) |
| Plaintiff, | |
| v. | **DISCOVERY ORDER** |
| | Re: ECF No. 147 |
| ROWLAND MARCUS ANDRADE, | |
| Defendant. | |

**INTRODUCTION**

A grand jury in the Northern District of California charged the defendant Marcus Andrade with wire fraud and money laundering (on promotion and concealment theories). The fraud involved Mr. Andrade's allegedly false statements to induce purchasers to buy tokens for his cryptocurrency AML Bitcoin and his alleged misappropriation of their money.[1] The indictment alleges that a co-schemer worked with Mr. Andrade to promote AML Bitcoin and worked on marketing and public relations for AML Bitcoin.[2] The co-schemer is Jack Abramoff, the lobbyist,

---

[1] Indictment – ECF No. 1 at 4–5 (¶ 9). Citations refer to the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id.* at 3 (¶ 2).

1  who pleaded guilty to conspiracy to commit wire fraud predicated on his public-relations role with

2  AML Bitcoin and his failing to register as a lobbyist in violation of the Lobbying Disclosure Act.[3]

3      Mr. Andrade moved to compel discovery under Federal Rule of Criminal Procedure

4  16(a)(1)(E) and *Brady v. Maryland*, 373 U.S. 83 (1983): (1) documents withheld — as potentially

5  attorney-client privileged — from an already-produced image of Jack Abramoff's phone; (2)

6  images of Alexander Levin's devices (without any AEO designation); (3) extraction and other

7  information from Paul Erickson's phone; (4) documents related to the searches and seizures of the

8  Levin, Erickson, and Marina Butina devices; and (5) any statements of Levinson, Erickson, and

9  Butina.[4] The government resists the discovery on the grounds that (1) Mr. Andrade has no basis to

10 ask the government to redo its privilege review and has not shown that the withheld information is

11 material, (2) the Levin devices are cumulative, (3) the FBI has no extractions from the Erickson

12 devices, which were destroyed, and the Erickson case in any event had nothing to do with

13 cryptocurrency, (4) it will produce information about Butina (but not Levin and Erickson because

14 there is no relevance), and (5) only statements about Mr. Andrade and his company AML Bitcoin

15 are relevant (and only Butina made a statement, which the government produced), and in any

16 event, there are no statements by Levin.[5]

17     The court orders the following: (1) it adopts Mr. Andrade's proposed compromise of starting

18 with Robert Abramoff and orders the government to produce any items that are not privileged (and

19 the court suggests some processes below to mitigate the burden); (2) the government must produce

20 the Levin device without an AEO designation; (3) if the government has the Erickson extractions or

21 information about them, then it must produce them, but given its representation that the case file has

22 been destroyed in this unrelated case on the FBI's normal destruction schedule, the court can order

23 no further relief; (4) limiting productions to references to AML Bitcoin or Mr. Andrade is too

---

[3] Def.'s Mot. to Compel – ECF No. 120 at 6; Plea Agreement, *United States v. Abramoff*, No. 20-cr-00260-RS – ECF No. 14 at 1–2.

[4] Def.'s Suppl. Reply Br. – ECF No. 159 at 4–7 (discovery theories), 7–15 (the remaining disputes). The trial judge referred discovery disputes to the undersigned. Order – ECF No. 98.

[5] Gov't Suppl. Opp'n – ECF No. 158 at 4–7.

United States District Court
Northern District of California

1   narrow and requires a broader production of information; and (5) the same analysis applies to

2   producing the statements.

3   **GOVERNING LAW**

4   **1.  *Brady v. Maryland***

5       In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of

6   evidence favorable to an accused upon request violates due process where the evidence is material

7   either to guilt or to punishment." 373 U.S. 83, 87 (1983); *see Giglio v. United States*, 405 U.S.

8   150, 154 (1972); *Comstock v. Humphries*, 786 F.3d 701, 708 (9th Cir. 2015) (citing *Strickler v.*

9   *Greene*, 527 U.S. 263, 281-82 (1999)). Favorable evidence includes information that would be

10  "advantageous" or would "tend to call the government's case into doubt." *Comstock*, 786 F.3d at

11  708. That the evidence may have minimal value is not relevant to the determination of whether it

12  is favorable. *Id.* (concluding that the state court's finding that a statement's impeachment value

13  was "minimal" was "contrary to" *Brady*).

14      *Brady* also requires disclosure of evidence that could be used to impeach government

15  witnesses, especially where the witness's testimony is an important part of the government's case.

16  *Wearry v. Cain*, 136 S. Ct. 1002, 1004–06 (2016) (*Brady* violation because the undisclosed

17  impeachment evidence was material and the State's evidence was a "house of cards" that relied on

18  witness testimony); *Giglio*, 405 U.S. at 150–51, 154–55; *United States v. Jernigan*, 451 F.3d 1027,

19  1030 (9th Cir. 2006) (to be subject to disclosure under *Brady*, information must be exculpatory or

20  impeaching and must be material to a defendant's guilt or punishment), *rev'd on other grounds*,

21  492 F.3d 1050 (2007).

22      Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to

23  the defense, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449,

24  469–70 (2009). "A reasonable probability does not mean that the defendant 'would more likely than

25  not have received a different verdict with the evidence,' only that the likelihood of a different result

26  is great enough to 'undermine confidence in the outcome of the trial.'" *Smith v. Cain*, 565 U.S. 73,

27  75 (2012) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). Because finding a *Brady* violation

28  requires the appellate court to conclude that disclosure might have affected the outcome of the trial,

United States District Court
Northern District of California

1  a violation occurs only if the withheld evidence is admissible or would have led to admissible

2  evidence. *United States v. Sudikoff*, 36 F. Supp. 2d 1196, 1198 (C.D. Cal. 1999) (citing *Coleman v.*

3  *Calderon*, 150 F.3d 1105, 1117–18 (9th Cir.), *rev'd on other grounds*, 525 U.S. 141 (1998)).

4       Materiality is defined in terms of suppressed evidence considered collectively, not item by item.

5  *Kyles*, 514 U.S. at 436 (1995); *Barker v. Fleming*, 423 F.3d 1085, 1099 (9th Cir. 2005). When there

6  is uncertainty about the materiality of a piece of evidence, "the prudent prosecutor will resolve

7  doubtful questions in favor of disclosure." *United States v. Agurs*, 427 U.S. 97, 108 (1976). Also,

8  whether disclosure would have influenced the outcome of a trial can be determined only after the

9  trial. Only then can the "total effect of all the inculpatory evidence [] be weighed against the

10  presumed effect of the undisclosed *Brady* material." *Sudikoff*, 36 F. Supp. 2d at 1198–99.

11

12  **2.  Rule 16(a)(1)(E)**

13       The government must allow a defendant to "inspect and to copy or photograph books, papers,

14  documents, data, photographs, tangible objects, buildings or places, or copies or portions of these

15  items, if the item is within the government's possession, custody, or control and: (i) the item is

16  material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E).

17       "Materiality is a low threshold; it is satisfied so long as the 'the information [] would have

18  helped' [the defendant] prepare a defense.[] Information is material even if it simply causes a

19  defendant to 'completely abandon' a planned defense and "take an entirely different path.'" "The

20  test is not whether the discovery is admissible at trial, but whether the discovery may assist" a

21  defendant "in formulating a defense, including leading to admissible evidence." *United States v.*

22  *Soto-Zuninga*, 837 F.3d 992, 1002–03 (9th Cir. 2016) (reversing the district court and holding that

23  a defendant was entitled to discovery about the government's drug-smuggling investigation

24  because it "is possible that discovery about the investigation might help" the defendant identify

25  passengers who might have planted drugs in his car).

26       It "behooves the government to interpret the disclosure requirement broadly and turn over

27  whatever evidence it has pertaining to the case." *United States v. Hernandez-Meza*, 720 F.3d 760,

28  768 (9th Cir. 2013) (cleaned up) (in a criminal trial for illegal reentry, the defendant's mother's

United States District Court
Northern District of California

naturalization certificate should have been disclosed under Rule 16(a)(1)(E)(i) as material because an element of the offense of illegal reentry is alienage) (citing *United States v. Doe*, 705 F.3d 1134, 1151 (9th Cir 2013)).

The government's citation to *United States v. Marshall* does not alter this standard.[6]

First, *Hernandez-Meza* is binding authority that rests its standard on the earlier *Doe* case. Other Ninth Circuit decisions apply the standard. *See, e.g.*, *Soto-Zuninga*, 837 F.3d at 1003.

Second, *Marshall* involved an earlier iteration of the Rule and a different context. The discovery issue there was the defendant's request for LAPD reports for six police officers "pertaining to all defendants in certain other cases in which said officers had arrested certain persons during one month after and five months" before the arrests in *Marshall* and where the officers obtained consent to search or claimed that evidence was in plain view. 532 F.2d 1279, 1284 (9th Cir. 1976). Marshall argued that discovery of the reports was "his only opportunity to effectively impeach the government's main witness" (one of the six officers). *Id.* An earlier version of the rule — Rule 16(b) — applied and had a different standard: it required "a showing of materiality to the preparation of the defense and that the request [was] reasonable." *Id.* Citing Fourth and Fifth Circuit cases from 1973 and 1975, the *Marshall* court held that this "requirement of materiality … signifi[ed] that the pre-trial disclosure of the evidence in question must enable the accused to substantially alter the quantum of proof in his favor." *Id.* at 1285. But — in upholding the district court's denial of discovery under the abuse-of discretion standard — the court relied on the "great potential for confusing the issues at trial," an "unduly burdensome task" for the prosecution, and a "fishing expedition" predicated on the "hope that some favorable evidence would turn up." *Id.* It relied on materiality too but characterized the general description of the materials as conclusory and insufficient. *Id.*[7]

---

[6] Gov't Suppl. Opp'n – ECF No. 158 at 2 (citing *Marshall*, 532 F.2d 1279, 1285 (9th Cir. 1976)).

[7] Although the court does not undertake this additional analysis because it is unnecessary, the defendant distinguishes the government's three post-*Marshall* district-court cases: two of the three are consistent with *Hernandez-Meta*'s principles, and the third cites the *Marshall* standard and adds the broader "or be relevant to the development of a possible defense." Def.'s Suppl. Opp'n – ECF No. 159 at 6.

United States District Court
Northern District of California

**ANALYSIS**

Mr. Andrade's defense is that Mr. Abramoff was scheming with others — behind Mr. Andrade's back and without his knowledge or participation — to use Mr. Andrade's company and patented technology for Mr. Abramoff's own purposes. He contends that the discovery will refute the government's accusation that he acted with criminal intent. The discovery involves four persons: Mr. Abramoff (Mr. Andrade's co-schemer who pleaded guilty to wire fraud and failure to register as a lobbyist, *see supra*) and three others — Maria Butina, Alexander Levin, and Paul Erickson — who had relationships with Mr. Abramoff. The government describes Mr. Levin more specifically as Mr. Abramoff's associate and flags that Ms. Butina and Mr. Erickson (who were engaged to each other) were convicted of unrelated federal crimes.[8] Ms. Butina pleaded guilty in December 2018 in the District of Columbia to conspiracy to act in the United States as an agent of a foreign government, Russia. The case had nothing to do with cryptocurrency and involved Ms. Butina's entering the U.S. on an F-1 student visa, establishing relationships with powerful people in U.S. politics to advance Russia's interest, and not disclosing that she was a Russian agent.[9] Mr. Erickson pleaded guilty in November 2019 in the District of South Dakota to wire fraud and money laundering, was sentenced in July 2020, and was pardoned in January 2021 by former President Trump. The case had nothing to do with cryptocurrency and involved his soliciting investors to invest in a real-estate venture involving the construction of single-family homes and misappropriating the funds for personal use.[10]

Mr. Andrade offers more context for his discovery requests based on the government's production on January 4, 2023, of twenty pages of documents that it obtained during a search of Ms. Butina's home.[11] They relate to AML Bitcoin, reference patents, talk about Mr. Andrade and his

---

[8] Def.'s Suppl. Mem. – ECF No. 153 at 5 (Ms. Butina and Mr. Erickson were engaged and commingled their assets), Def.'s Suppl. Reply Br. – ECF No. 159 at 7–15 (the remaining disputes and the persons implicated in them); Gov't Suppl. Opp'n – ECF No. 158 at 3–4 (discussing Mr. Levin's role and the federal charges against Ms. Butina and Mr. Erickson).

[9] Gov't Suppl. Opp'n – ECF No. 158 at 3; Compl. & Aff., No. 1:18-cr-00218-TSC – ECF Nos. 1 & 1-1; Indictment, *id.* – ECF No. 7; Statement of Offense, *id.* – ECF No. 66; Plea Agreement – ECF No. 67.

[10] Gov't Suppl. Opp'n – ECF No. 158 at 4; Indictment, No. 4:19-cr-40015–KES – ECF No. 1; Factual Basis Statement, *id.* – ECF No. 30; Plea Agreement, *id.* – ECF No. 29; Am. J., *id.* – ECF No. 79; Pardon, *id.* – ECF No. 84.

[11] Docs. Found in Butina's House — ECF No. 136-3.

business, discuss promoting the deregulation of cryptocurrency (the opposite of Mr. Andrade's business plan to comply with money-laundering and know-your-customer regulations by using biometric technologies to confirm the identity of persons transacting AML Bitcoin[12]), and contain handwritten notes that the government attributes to Mr. Erickson. Overall, the documents show a discussion between Mr. Abramoff and (presumably) Mr. Erickson about their strategy and Mr. Andrade's business. Mr. Andrade said that he had no knowledge of this discussion and that it adds to other evidence "suggesting that Abramoff [was] using Blockchain Entertainment, the television show about Mr. Andrade's business, Landfair Capital, and other entities, for his schemes about Mr. Andrade's business that were adverse to Mr. Andrade, at the same time that Abramoff was orchestrating the conduct for which Mr. Andrade has been charged."[13]

Mr. Andrade also offers more about Mr. Levin. He "is connected to this scheming by Abramoff, Butina and Erickson" because he participated "in the development and funding of a television show [referenced in the documents found in Ms. Butina's house] controlled by Abramoff, starring Abramoff and Mr. Andrade, and produced by Blockchain Entertainment and Ignition Creatives."[14] Evidence on Mr. Abramoff's cell phone from June 2018 shows that he discussed consulting on a cryptocurrency project with Mr. Levin and sent him a proposal, a contract, and a $750,000 invoice from Landfair Consulting. In July, Mr. Abramoff "re-wrote" some of the consulting contracts and sent a term sheet that referenced a TV show based on a Ukrainian show that would be produced by Blockchain Entertainment.[15] When the FBI asked him about it in February 2020, Mr. Abramoff said that there was no cryptocurrency-consulting project and the invoice may have been related to the TV project or was a combined invoice for the show and the "US PR" effort. He "could not explain why the invoice was labeled as 'cryptocurrency consulting.'" Mr. Abramoff "did have conversations with LEVIN about cryptocurrency."[16] Mr. Andrade cites discovery suggesting that (1) Mr. Abramoff sent

---

[12] Indictment – ECF No. 1 at 3–4 (¶ 6).

[13] Def.'s Suppl. Reply Br. – ECF No. 159 at 10; Def's Suppl. Mem. – ECF No. 153 at 5.

[14] Def's Suppl. Mem. – ECF No. 153 at 5.

[15] Evidence Review, Ex. 11 – ECF No. 119-5 at 10–11.

[16] FBI 302, Ex. 34 – ECF No. 119-5 at 15–16.

information to Mr. Levin about the television show about AML Bitcoin, (2) Mr. Levin is the link to raising money for the show, and (3) he received the promo reel.[17]

The following sections analyze the discovery requests that the parties were unable to resolve on their own: (1) documents withheld as potentially privileged from an already-produced image of Mr. Abramoff's phone; (2) images of Mr. Levin's devices; (3) extraction and other information from Mr. Erickson's phone; (4) documents related to the searches and seizures of the Levin, Erickson, and Butina devices; and (5) any statements to the government by Mr. Levinson, Mr. Erickson, and Ms. Butina.[18]

## 1. Abramoff Documents

The government produced a Cellebrite image of Mr. Abramoff's phone on May 26, 2022. The first page has an imbedded image: "potentially privileged information removed." Mr. Andrade asked for a privilege log but the government has not created a privilege log. The government withheld documents for potential privilege by running a search term for two lawyers and one law firm: Arent Fox LLP, Peter Zeidenberg, and Robert Abramoff. As a compromise, Mr. Andrade proposes a taint-team review of withheld documents that contain the search term "Robert Abramoff." Robert Abramoff is Jack Abramoff's brother, a lawyer, and a movie producer, was connected to Blockchain Entertainment (the company behind the promotional video for the AML Bitcoin TV show), and created NAC Payroll (one of Mr. Andrade's companies), which had funds that were commingled with money from Jack Abramoff's fraudulent activities.[19] Mr. Andrade

---

[17] Def.'s Suppl. Reply Br. – ECF No. 159 at 10–11; Def's Suppl. Mem. – ECF No. 153 at 5–6. The cites to exhibits don't always match up with exhibit numbers or pages. The exhibits were lodged in hard copy with numbered tabs but do not have exhibit numbers, so it was hard to match things up. The first round of sealed documents does not appear on the record (or the court is overlooking the exhibit). The court does not see the public-record exhibits either. The court found cites for all fact points cited before this footnote but could not easily find exhibits for the facts supported by this footnote and so cites the filings. To maintain a record, defense counsel must retain a copy of the lodged exhibits (as parties do with trial exhibits that are not e-filed). The court will return the lodged exhibits at some point.

[18] Def.'s Suppl. Reply Br. – ECF No. 159 at 7–15 (the remaining disputes).

[19] Def's Suppl. Mem. – ECF No. 153 at 6–7; Gov't Opp'n – ECF No. 124 at 10 (the government has not created a privilege log).

United States District Court
Northern District of California

offers specific examples: (1) Robert was a producer on the Blockchain Entertainment project, not an attorney;[20] (2) Jack Abramoff proposed using his brother as a consultant on a shady project;[21] (3) Robert served in a management capacity for Landfair Capital (the company that Jack Abramoff used to collect money from his schemes and used to pay Mr. Andrade's employees); and (4) the government must see that Robert Abramoff is relevant because it has produced statements from four personal bank accounts, two law-firm accounts, his IRA, and his credit cards.[22]

The government responded to this compromise:

> Defendant asks this Court to order the government to, in effect, re-do its privilege filter because Defendant would prefer that it be done differently. Defendant cites to no authority authorizing him to dragoon government resources into conducting supplementary privilege reviews, and the government is not aware of any such authority.

> But more to the point, Defendant's speculation that communications involving attorneys might be material is insufficient to compel their production, let alone to compel the expenditure of government resources in a privilege review. Defendant focuses his attention on Abramoff's brother, but he has no specific reason to believe that any such documents are material. Once again, Defendant merely speculates that because somebody's name appears in a document and because he had some tangential relationship to corporate entities related to this case, the documents in question are therefore material. But the fact that the brother was "involved" in various corporate entities — Defendant fails to specify what he means by "involved" — does not make such documents material. Defendant is simply guessing. Given the volume of material that will be otherwise produced to Defendant, which includes the entire content of Abramoff's phone other than potentially privileged materials, there is no reason to believe uniquely relevant material would be found in such records.[23]

The Ninth Circuit has defined the relevant standard for determining privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

---

[20] Def.'s Suppl. Reply Br. – ECF No. 159 at 8; FBI 302 Ex. 46 – ECF No. 160-1 at 1 (Andrade FBI-302-001747).

[21] FBI 302, Ex. 4 – ECF No. 119-3 (Andrade FBI-302-005421–005422). The document was filed under seal; the court's use of the term "shady" is purposefully vague.

[22] NAC Payroll Docs., Ex. 48 – ECF No. 160-1.

[23] Gov't Suppl. Opp'n – ECF No. 158 at 4–5.

*United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (cleaned up). The attorney-client privilege does not apply to an attorney's communications about business matters (as opposed to legal advice). *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002). "Corporations may not conduct their business affairs in private simply by staffing a transaction with attorneys." *Id.* "[The] party asserting the attorney-client privilege has the burden of establishing the [existence of an attorney-client] relationship and the privileged nature of the communication." *Ruehle*, 583 F.3d at 607. In other words, "[t]he party asserting the privilege bears the burden of proving each essential element" of the attorney-client-privilege test. *Id.* at 608. "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *Id.* at 607.

The government recognizes that "there are likely numerous communications on Abramoff's phone that hit on those terms that are not privileged."[24] Mr. Andrade has made a sufficient showing of materiality under Rule 16. Moreover, prosecutors have "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles*, 514 U.S. at 437. A failure to search for and disclose "exculpatory" information within the meaning of *Brady*, *Giglio*, and their progeny may result in a dismissal of the indictment or other relief, such as a new trial. *See, e.g.*, *Kyles*, 514 U.S. at 421–22 ("Because the net effect of the evidence withheld by the State in this case raises a reasonable probability that its disclosure would have produced a different result, Kyles is entitled to a new trial.").

The court adopts Mr. Andrade's compromise of starting with Robert Abramoff. The government perhaps can mitigate its burden by asking Jack Abramoff to do a privilege review first: after all, the privilege is his. If he does not object to disclosure, then the problem is solved. But given Mr. Andrade's proffer of materiality, the government's taint team must review the documents and produce any that are not privileged. The parties must confer on the need for and form of a privilege log from the government. If Mr. Abramoff asserts privilege, he must submit a privilege log that complies with the court's procedures for privilege logs (set forth in the attached Standing Order).

---

[24] Gov't Opp'n – ECF No. 124 at 10.

## 2. **Levin Devices**

The next discovery issue is that Mr. Andrade asks for the images from Mr. Levin's devices without an AEO designation (and said the government had agreed to produce the images).[25] The government resists the discovery on the grounds the Levin devices — generated by another district in a search warrant there — are cumulative because any communications with Jack Abramoff necessarily are part of the already-disclosed production of content on Mr. Abramoff's devices. (It did not respond to the AEO contention.)[26] Mr. Andrade responds that only Mr. Levin's devices will have a full picture of what Mr. Levin did with the information and provide insight into what he, Mr. Abramoff, and others were doing.[27]

The information may be cumulative in part but Mr. Andrade has articulated a sufficient explanation (summarized at the beginning of the Analysis) about why the information is material. The court orders its production. There is no reason for an AEO designation.

## 3. **Extractions from Erickson Phone**

Mr. Andrade wants extractions from the Erickson phone or, if nothing exists, an explanation. He asked for the information on March 7, 2022, and July 15, 2022, and the government explained on January 25, 2023, that the FBI had destroyed the data on an unspecified date in March 2022 as "part of FBI standard procedure."[28] The government responds that it asked the case agents in the Erickson case to review their files for copies of extractions and "the team has been unable to find any." It clarified that — in contrast to its initial representation that the extractions were destroyed in March 2022 — the FBI closed the case file in March 2022 and "has not located any records regarding when those extractions were destroyed." The government asserts that the information in any event is

---

[25] Def's Suppl. Mem. – ECF No. 153 at 8–9.

[26] Gov't Suppl. Opp'n – ECF No. 158 at 5.

[27] Def.'s Suppl. Reply Br. – ECF No. 159 at 11–12.

[28] Def's Suppl. Mem. – ECF No. 153 at 10–11.

tangential because communications with Jack Abramoff would have been on the Abramoff devices.[29]

The information is material: Mr. Andrade has established a connection between Mr. Abramoff and Mr. Erickson that relates to this case. But there is no relief that the court can order: the information does not exist. For a clear record, if the government has the Erickson extractions or information about them (like the evidence review in this case, cited above, or information about the destruction), it must produce them. As discussed above, the government also has a duty to inquire. *Kyles*, 514 U.S. at 437.

### 4.  Documents Relating to Searches and Seizures of the Levin, Erickson, and Butina Devices

Mr. Andrade asks for FBI 302s, search warrants and affidavits, and other documents related to the search and seizure of the Butina documents (the twenty pages discussed above) and the devices seized from Levin, Erickson, and Butina.[30] The government produced the materials from the Butina case file and contends that the rest is about unrelated investigations.[31]

As described in the previous sections, Mr. Andrade has established a connection to this case surrounding Mr. Abramoff's involvement with Ms. Butina and Messieurs Levin and Erickson, and limiting the production to references to Mr. Andrade and AML Bitcoin is too narrow. Mr. Andrade gives examples (summarized at the beginning of the Analysis) about how a broader range of information is material. It is not just about Mr. Abramoff or Mr. Andrade and AML Bitcoin. It is about the larger context of the business model for cryptocurrency, whether Mr. Abramoff may have been working against Mr. Andrade, and how that affects Mr. Andrade's responsibility and scienter. It is also not a sufficient explanation that the discovery is necessarily duplicative. As described above, it is not. And again, the government has its duty to inquire under *Brady* and cannot delegate its *Brady* obligation to a non-lawyer.

---

[29] Gov't Suppl. Opp'n – ECF No. 158 at 6.

[30] Def.'s Suppl. Reply Br. – ECF No. 159 at 13–14.

[31] Gov't Suppl. Opp'n – ECF No. 158 at 6–7.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    **5.  Statements to the Government by Levin, Erickson, or Butina**

2         Mr. Levin made no statements to the government. The issue then is any statements by Ms.

3    Butina or Mr. Erickson. The government said that it produced the statement made by Ms. Butina

4    that references AML Bitcoin and otherwise, neither person made any statements about AML

5    Bitcoin or Mr. Andrade.[32] The analysis in the last section applies here: limiting production to

6    references to Mr. Andrade and AML Bitcoin is too narrow. That said, information solely about

7    Ms. Butina's work as an undisclosed Russian agent or Mr. Erickson's real-estate scheme is not

8    material to the defense. But given the lack of burden attached to producing 302s,[33] the government

9    might consider whether the utility of producing the statements — however thin the reed that

10   connects the other investigations to this case — outweighs standing on the discovery rule.

11

12                                    **CONCLUSION**

13        The court orders (1) disclosure of non-privileged documents on the image of Jack Abramoff's

14   phone containing the search term "Robert Abramoff," (2) production of the Levin device without

15   an AEO designation, (3) production of the Erickson extractions or any information about them,

16   and (4) production of the information in categories 4 and 5 consistent with this order.

17        The government must serve a copy of this order on Jack Abramoff's counsel and file a proof

18   of service.

19        **IT IS SO ORDERED.**

20        Dated: April 7, 2023

21

22                                    _____
                                      LAUREL BEELER
23                                    United States Magistrate Judges

24

25

26

27   _____
     [32] Gov't Suppl. Opp'n – ECF No. 158 at 7.

28   [33] Def.'s Suppl. Reply Br. – ECF No. 159 at 14–15.

ORDER – No. 20-cr-00249-RS (LB)                    13