Pages 1-36

```
 1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
 2                      SAN FRANCISCO DIVISION

 3

 4   UNITED STATES OF AMERICA,      )  Case No.  20-cr-00249-RS-1
                                    )
 5              Plaintiff,          )  San Francisco, California
                                    )  Thursday, April 6, 2023
 6       vs.                        )
                                    )  ZOOM WEBINAR PROCEEDINGS
 7   ROWLAND MARCUS ANDRADE,        )
                                    )
 8              Defendant.          )
                                    )
 9   _____)

10

11                  TRANSCRIPT OF DISCOVERY HEARING
                    BEFORE THE HONORABLE LAUREL BEELER
12                   UNITED STATES MAGISTRATE JUDGE

13   APPEARANCES:

14   For Plaintiff:            CHRISTIAAN H. HIGHSMITH, ESQ.
                               United States Attorney's Office
15                             450 Golden Gate Avenue, 11th Floor
                               San Francisco, California 94102
16                             (415) 436-7200

17   For Defendant:            MICHAEL J. SHEPARD, ESQ.
                               King and Spalding LLP
18                             50 California Street, Suite 3300
                               San Francisco, California 94111
19                             (415) 318-1221

20                             CINDY ANN DIAMOND, ESQ.
                               Attorney at Law
21                             58 West Portal Avenue, PMB 350
                               San Francisco, California 94127
22                             (415) 661-5297

23
     [Additional Counsel are Listed on the Following Page]
24

25   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
```

2

```
 1   APPEARANCES:  (Cont'd.)

 2   For Defendant:              KERRIE C. DENT, ESQ.
                                 King & Spalding
 3                               1700 Pennsylvania Avenue, NW
                                 Washington, DC 20006
 4                               (202) 626-2394

 5   Transcription Service:      Peggy Schuerger
                                 Ad Hoc Reporting
 6                               2220 Otay Lakes Road, Suite 502-85
                                 Chula Vista, California 91915
 7                               (619) 236-9325

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  SAN FRANCISCO, CALIFORNIA  THURSDAY, APRIL 6, 2023  10:39 A.M.

2                              --oOo--

3          THE CLERK:  Calling Civil -- I'm sorry -- calling

4  Criminal Action 20-249, USA v. Rowland Marcus Andrade.  Counsel,

5  if you could please state your appearances, starting with

6  Plaintiff.

7          MR. HIGHSMITH:  Good morning, Your Honor.  Chris

8  Highsmith for the United States.

9          THE COURT:  All right.

10         MR. SHEPARD:  And good morning, Your Honor.  Mike

11 Shepard, Kerrie Dent, and Cindy Diamond for the Defendant, Mr.

12 Andrade, who is present by Zoom and consents to proceed in that

13 fashion.

14         THE COURT:  Okay.  Great.  So thank you for -- on the

15 plus side, I think you've substantially narrowed your dispute.

16 I'm going to give you a little background, some observations, tell

17 you what I'm thinking.  We can have a constructive conversation.

18         So here's the thing.  I'll just say it's an accident of

19 history that the criminal discovery rules are what they are.  It

20 was an interesting opportunity to back into Rule 16.  Usually we

21 deal with things in a *Brady* context.  A Wisconsin professor sent

22 me some very interesting articles recently.

23         But in December -- when we first got together in

24 December and, you know, I -- you can't see it, but there -- you

25 gave me a good chunk of paper.  It was like this much

1   (demonstrating) paper.  And I did what I do in civil discovery,

2   which is -- and I don't have that many disputes on my civil trial

3   docket; I really don't -- even in the biggest of cases, but you

4   say to people -- which is what I did in December -- "Oh, my Lord,

5   how can you expect me to read all this stuff?  The business model

6   doesn't permit it.  I work really hard already -- you guys know

7   that -- and I can't -- like, aah -- that was essentially --

8   Prioritize for me what comes first.

9         Mr. Weingarten was there in those hearings, and he --

10   you know, he's not here so I can say nice things about him behind

11   his back -- but he's a very thoughtful, nice guy who tries to fix

12   problems.  He's very agreeable and generous generally in his

13   approach to things.  And he was kind of pulling his hair out.  I

14   was not unsympathetic because I felt -- so I -- you know, and I

15   was not unsympathetic to that because I felt constrained by the

16   volume of information that you presented to me.

17         And so then you did reduce your issues -- thank you for

18   doing that.  And finally I just set aside a ridiculous amount of

19   time to go through everything that you guys gave to me.  When I

20   say "ridiculous amount of time," I'm not even going to tell you

21   the hours I spent outlining your case, understanding it,

22   reading -- I tried in my mind -- just to the Government's earlier,

23   you know, "We should know what the Defense is saying under seal.

24   It's really not fair, even though we get that there's case law

25   that supports it.  It's not fair."  But the -- but the reality is

1  that the Defense showed its hand saying why it mattered pretty

2  specifically in the subsequent filings, you know, 153, 158,

3  whatever the numbers are, that are attached on the docket.

4          So I feel like we're all -- so I did read everything,

5  even though I think whoever wrote the paper -- I don't know if it

6  was Ms. Dent -- but said, "You don't have to read everything

7  because we've narrowed it for you.  Now you only have to look at

8  this."  I read everything.  I went through everything.  And I

9  thought about your case pretty deeply.

10          And so I -- you know, before you guys asked for an hour.

11  I'm going to tell you what I think.  I don't need an hour, but I

12  want to let you have the opportunity.  I know your case now.  So

13  I'm going to do a few preliminaries.  Then I'm going to -- then I

14  think we should go through things on an issue -- there are not

15  that many issues, but I'm going to sort of tell you what I think.

16          So I've already said my point number one.  The Defense

17  kind of caved on that, revealing the defense strategy.  I think

18  they pretty much did reveal the defense strategy.  And so they

19  said what they wanted and why they wanted it and they said it

20  pretty specifically.  So I do think in the end, blessedly, a

21  process helps.

22          Two, I will just say CJA counsel.  I said this -- you've

23  heard it because I call Government cases first.  You are a more

24  substantial case.  It took a little bit more time because I was

25  waiting for Pretrial and the other were sort of quick appearances,

1  in person, kind of check in, you know, let's problem solve going
2  forward.  You saw Mr. Valdovinos.  I called that.  I called the
3  short Government cases because I did want to not make CJA counsel
4  wait on a short case.  But you saw what I said in that case.  That
5  was a civil rights case.  What I said, there's a certain amount of
6  deference that attaches to right-minded lawyers who are on our CJA
7  panel.  They're not -- it's a -- it's a panel that has a certain
8  *noblesse oblige* that attaches to it.  People in this district, I
9  don't -- I'm sure you guys appreciate how lucky we are to work in
10  the Northern District of California.  I don't think there's a more
11  interesting or important district in the entire country.

12         On criminal stuff, I have a little bit of a partiality,
13  the EDNY, and SDNY certainly does some interesting cases.  But of
14  all the places to practice law in the entire country, civil or
15  criminal, this is a pretty cool place to be.  We do really
16  important work.  We have great lawyers in this district, great
17  lawyers who come to court and participate on our pane because
18  they're contributing to the practice of law in this district.

19         When I have those days where I feel discouraged by the
20  heaps of work that are piled on me, I think to myself how lucky am
21  I to be here with such lawyers in the district.  I think they get
22  cut a little slack because of that.  That's obligation one.

23         Point -- or point two -- couple other points before I go
24  to the nuts and bolts of the -- of the order.

25         Privilege.  It's not your privilege, Government, so I'm

1   going to say that.  It's -- it's Mr. Abramoff's privilege, so I'll

2   get to that in a second.  I'm just putting in some of my

3   handwritten notes before I -- you know, I've actually written an

4   order, so I -- that doesn't mean I'm not persuadable, but I put in

5   the work to render concrete my thought process.

6        I have also the DOJ Discovery Policy Guidance that I

7   want to remind everybody of.  The Discovery Policy Guidance is

8   broader than the Rules -- on the DOJ website.  It used to be the

9   U.S. Attorney's Manual.  It's called the Criminal Blah Blah Manual

10  now.  I was going to read from it.  I'm not going to -- I'm not

11  going to pull it out now because I'm just saying it.

12       What I -- what I read from that is why do you care so

13  much from the Government's perspective, especially when I say the

14  discovery.  You know, I get burden.  I get the obligations of not

15  spelunking far afield in a case where discovery is confined by

16  Rule 16 and *Brady*.

17       I also want to mention as a preliminary is that you

18  don't -- you don't have a duty to inquire except when it comes to

19  *Brady* where you do have a duty to inquire.  So some of the points

20  that the Defense team has raised, you know, reads in *Brady*.  I do

21  think generally as a proposition, having been there -- I mean,

22  this is my -- who has the time?  And I say this as somebody who

23  has put a bunch of time on your case -- who has the time?  If you

24  -- if you have it, it feels dumb to me to sit on it.  Okay.  So

25  those are my preliminaries.

1          Now I'm going to tell you what I think about -- quickly
2     about the standard.  I don't necessarily need to hear argument
3     about the standard.  I want us to talk concretely about the five
4     issues or whatever that is still in play.  As I said, I already
5     said it.  It reads in *Brady*.  I'm well aware of the 16(a)(1)(E)
6     standard.  I appreciate the Government's citation to *Marshall*
7     (ph).  I don't think it changes the analysis.  *Hernandez-Meza* is
8     binding authority that rests on a standard in the earlier *Doe*
9     case.  Other decisions apply it.  I think that, you know, in the
10    end there's interesting case law.  I think it's -- *Hernandez* says
11    it.   "It behooves the Government to interpret the disclosure
12    broadly and turn over whatever evidence it has pertaining to the
13    cases."
14          So if you really want to tell me about the legal
15    standard, I'll hear it, but I think that *Marshall* is
16    distinguishable really on the facts because, you know -- they're
17    interesting, and I did read all of my Rule 16.  It's been a while.
18    It was applying out-of-circuit authority which has been criticized
19    since.  But more fundamentally on the facts, it really was a
20    fishing expedition for LAPD files, like a month before and five
21    months after the arrest to support a defense that, you know,
22    basically the Government -- that the LAPD basically always had
23    "consent searches," you know.  Oh, yeah, miraculously everybody
24    consents to being searched.
25          And it was a fishing expedition.  And on appeal, in the

1   context of a full record -- which this is not on appeal -- you

2   know, in *Brady* -- *Brady* is backward-looking and so that's why it's

3   such a mistake not to turn over things and not to inquire.

4           So I just think *Marshall's* very distinguishable and it

5   was -- it was a citation to an out-of-district -- an out-of-

6   circuit case to support a conclusion that made great sense in that

7   case, so that's on the standard.

8           Okay.  So if anyone really wants to talk about it, we

9   can talk about it.

10          So then this is -- these are my thoughts.  I'm just

11  going to tell you we can go issue by issue.  But, preliminarily,

12  the Defense made a pretty substantial showing in my view, enough

13  to get me over my general concerns, about some things but not

14  everything.  And so we're going to go issue by issue and I'll just

15  explain to you my thought process.

16          I'm going to start with the Abramoff documents.  I'm

17  going to tell you what I think.  And then I'm going to tell the

18  party that that -- that the tentative goes against to tell you why

19  you think I'm wrong.  And -- and -- and so we'll do it that way.

20          So the Government already provided an image of the

21  phone.  Great.  They did what they're supposed to do.  They had

22  their taint team go through and do a cull of documents that looked

23  like they might be privileged.  The Defense made I think a

24  reasonable showing for all the reasons they articulated about the

25  brother -- that he -- and, look, you know, I'll just leave you

1    with this, too, you know, this is -- you know, the indictment says

2    the co-schemer -- that's Mr. Abramoff -- who's pleaded guilty in

3    a different case.  I read the docket in that case.  I read the

4    docket in the two other people who are implicated in this case.

5    I read the -- you know, I read -- I looked at the docket sheets

6    for all of those and -- and so -- in any event, so -- I get it.

7    So Mr. Abramoff is Co-Schemer 1 or whatever he's called in the

8    indictment.  That's Mr. Abramoff.

9         And so -- and this is his brother, and the -- the

10   Defense, among other things that it said, the Defense calls out,

11   you know, all these different points -- "Produce the image

12   already."  "Produce the other information from bank accounts, law

13   firm accounts, credit cards."  Defense position is, "You know he's

14   important or you wouldn't be giving us all this information.

15   Produce the cell phone image."

16        Government withholds some images as privileged.  The

17   standard -- I'm sure you're all familiar with it, because it's a

18   criminal case rule -- I don't know if I'm pronouncing it correctly

19   -- R-u-e-h-l-e -- is the privilege.  And, you know, normally when

20   privilege comes up, it comes up because the Government's saying,

21   "Hey, you can't withhold things as privileged."  It almost always

22   comes up in a grand jury context.  It doesn't come up in this

23   context.  But the standard, actually civil or criminal -- and that

24   case gets cited in the civil context, too, routinely, which is why

25   I know it -- is the party asserting the privilege has the burden

1   of establishing it.  It's because it impedes the full and free

2   discovery of the truth.  It's strictly construed.  And it's not

3   even the Government's privilege.

4          I thought the Defense proposal of like narrowing it by

5   limiting it to the brother was a great proposal because the

6   reality is the rest of it looks pretty darn privileged.  And so It

7   think that's maybe the genesis of your compromise.

8          But I recognize there's a burden.  The Government said

9   in its brief, you know, "There are likely numerous communications

10  on the phone maybe on terms that are not privileged."  I think

11  that Mr. Andrade's made a sufficient showing of materiality for

12  the reasons they advanced in their papers, and I wrote out

13  laboriously in the Draft Order that I've always constructed.

14         I get it's a burden.  I think the Government can perhaps

15  mitigate its burden by putting it in Mr. Abramoff's direction.  If

16  he challenges stuff withheld -- doesn't challenge -- then there's

17  no burden at all.  If he's like, It's not privileged, then there's

18  no burden at all.  But, if not, the Government has to review the

19  documents and produce any that are not privileged.  And then you

20  can confer on the need for the form of the privilege log.

21         But I also think that because we're bleeding it to

22  *Brady*, the Government has a duty to inquire and it is a mistake --

23  if there's something on there that you've withheld broadly -- the

24  Government said something like, "We're unaware of any authority

25  for using the Government resources for conducting supplemental

1  privilege reviews."

2          No.  I mean, the case law's clear on whose privilege it

3  is -- not the Government's.  Mr. Abramoff's.  And you can't get

4  out of it because it's burdensome.  So that's my tentative on

5  that.

6          So I'll ask Mr. Highsmith because that's a ruling that

7  goes in Mr. Andrade's direction to tell me why you think it's

8  wrong.

9          MR. HIGHSMITH:  Just one -- one thing on -- and then

10  I'll respond, Your Honor?

11          THE COURT:  Yes.

12          MR. HIGHSMITH:  Abramoff -- I think he is interested in

13  intervening to assert his privilege.  I think --

14          THE COURT:  So he can do a privilege log.  I have

15  privilege log procedures in my updated Standing Orders.  If he

16  wants to intervene, great.  How awesome is that?  Produce it to

17  him.  My Standing Order applies -- Elaine, when we file this

18  order, maybe attach my Standing Order.  If he's going to assert

19  privilege, he needs to -- he needs to do the privilege log.  I

20  have a good one, by the way.  I used to do it when I had an old

21  job.  It was when I required a peephole.  And what the Civil

22  Division requires is what the Antitrust Division requires.  My

23  privilege log procedures derive directly from my own practice and,

24  great, he can intervene within a week if he wants to -- we'll put

25  it on the minute order -- and we'll come up with a privilege

1    procedure for him to assert privilege.  Great.  That will really

2    help the Government.  Perfect.

3            MR. HIGHSMITH:  May I just make one other point with

4    regard to that, Your Honor?

5            THE COURT:  Yes.

6            MR. HIGHSMITH:  I think the other thing is is he does

7    not -- he believes -- I don't want me to speak for him.  I'm just

8    kind of fronting this.

9            THE COURT:  Yep.

10           MR. HIGHSMITH:  You know, like family photos, grandkids,

11   stuff like that.

12           THE COURT:  Yeah, yeah, yeah.  That's fine -- personal

13   stuff.  A good privilege log -- everybody knows this -- a good

14   privilege log helps.  Either it's privileged or it's not.  And

15   it's -- it's fine.  Look, if he wants to -- I'm not even opposed

16   to, you know, slight in-camera review after a privilege log is

17   produced, slight.  But I think we can come up with a process.  But

18   I'm going to order that -- that, you know, that we -- it's not the

19   Government's privilege.  I'm very happy, though, if Mr. Abramoff

20   intervenes.  I suggested in my order it's his privilege.  He

21   should review it.  If he has an objection, he should assert it.

22           MR. HIGHSMITH:  Understood, Your Honor.

23           THE COURT:  Okay.  All right.  But I'm going to order

24   the Government -- this is to the Defense -- I'm going to say the

25   taint team has to review it.  You just can't get out of it.

1          All right.  So I assume since that went your way on the

2    Defense side, you don't want to say anything, but you're welcome

3    to if you really want to.

4          MR. SHEPARD:  No.  Thank you, Your Honor.

5          THE COURT:  Okay.  All right.  So the Levin devices.  So

6    I -- again, I -- I did -- I went through all this stuff that you

7    produced to me in the form of your attachments.  You -- the

8    Government had described Mr. Levin more specifically as Mr.

9    Abramoff's associate.  That was one issue.  But the discovery

10   involves essentially four people -- Mr. Abramoff, Ms. Butina, Mr.

11   Levin, Mr. Erickson.  All of them had relationships with Abramoff.

12   The Government describes Mr. Levin more specifically as "his

13   associate."

14         So those -- and then we have the 20 pages.  We have the

15   references in them, which the Defense referenced and which I have

16   summarized is relating to -- sorry -- I've lost my voice now for

17   several weeks.  The reason I had to cancel last Thursday, by the

18   way, is I couldn't even whisper last Thursday; I couldn't talk at

19   all.  And my voice is supported by constant lemon and honey, but

20   I couldn't talk at all last Thursday.

21         So the Defense referenced the documents and what they

22   talk about, and they -- I just have to look at this one thing --

23   sorry.  Okay.  I would say that you see, you know, again the

24   notes.  Presumably it's Mr. Erickson.  I think that's what the

25   Defense posited.  Mr. Andrade said -- and this is what I thought

1   was -- it's -- you know, a thread that goes through this is that

2   the discussions that you see in the record that the Defense

3   proffers is a course of conduct that is different from how Mr.

4   Andrade articulated his business.  You know, actually being able

5   to identify the users, complying with regulatory requirements.  So

6   this thread that goes through the request is that we're looking

7   for information that actually supports that what they're doing

8   without his knowledge is inconsistent with his business model.

9   That is what the discovery is about.

10          And I could see it by reading all the documents.  And so

11  it is very hard, especially looking at the standard -- not

12  *Marshall*, which I've distinguished as being an outlier case.  I

13  mean, I know people cite it, but the practical reality is we

14  almost -- we don't see a lot of discovery orders in criminal

15  cases, for a bunch of reasons -- because we just don't.  We get

16  some *Brady* at the end and you get the *W.R. Grace* and the *Skilling*

17  cases where they say, "Attaboy, Government.  You've cured any

18  issues because you showed your ..." -- well, *W.R. Grace* was not an

19  "Attaboy, Government."  It was like, "You should have done it this

20  way."  *Skilling* was the -- you know, *U.S. v. Skilling* was just the

21  opposite.  The Government team, which was a great team -- I think

22  John Houston, et al. were on that team, and they just gave over

23  all their hot documents with an index and cured any issues that

24  could possibly attend discovery.

25          So I think when you read the proffer that the Defense

1  has made, tethered to concrete documents, that's why I think

2  generally tethering it to just references -- this is an overall

3  observation for the discovery at issue here -- tethering it just

4  to AML Bitcoin and Mr. Andrade is just too narrow.  The fact of it

5  is is that his defense -- and there's nothing secret about it.

6  You said it.  Whatever you said in your papers is what you said,

7  and this is my reading of the evidence, but the thread of

8  everything that you say is this was -- these were undermining.

9  And so that to me is a sufficient articulation of the materiality

10 for Rule 16.

11        And how that goes to the Levin devices, it may be

12 cumulative -- I get it.  The Government led with that.  It may be

13 cumulative, but not necessarily.  Mr. Andrade says -- his counsel

14 says that the devices will have a full picture of what Mr. Levin

15 did with the information and provide insight into what he, Mr.

16 Abramoff, and others were doing.  And I think for the reasons I've

17 articulated is that's the -- that's the import of the request

18 here.

19        Give over the device.  Give over the device.  No AEO.

20 The Government didn't argue AEO.  Then that goes against the

21 Government.  Mr. Highsmith, tell me why I'm wrong.

22        The next one will go your way, by the way -- Erickson --

23 just letting you know so you don't have to feel too bad about it.

24        MR. HIGHSMITH:  Your Honor already spent so much time

25 drafting this order that I don't want to --

1         THE COURT:  Oh, it's okay.  I just -- I didn't mean it

2    as a criticism.  I just wanted to tell you I prepared.

3         MR. HIGHSMITH:  You know, look, Your Honor, the over-

4    arching point is that there's so much irrelevant information and

5    we're concerned about -- we're, frankly, concerned about this

6    Defendant misusing his discovery.  And so that's the -- that's

7    the --

8         THE COURT:  He's got great layers and they're in charge

9    of -- I mean, everybody can be subject to protective orders about

10   -- you can use it in your litigation.  I assume you have one in

11   play.  I probably looked at it somewhere along the way.  And Mr.

12   Andrade -- I don't know how he would misuse the information.  It

13   sure would be a bad mistake for him to do anything nefarious, and

14   I'm sure his lawyers would read him the riot act if he did

15   anything that was untoward because their job is to defend Mr.

16   Andrade and make sure he doesn't stray.

17        And, again, I just put such confidence in the lawyers in

18   this case.  I really do.  I just -- I -- it's such a big deal that

19   people step up and represent on our CJA panel.  That's got to be

20   like in a case -- the *Shifa* (ph) case that I had, the civil rights

21   case, excessive force case, again, former jumpers (ph), lawyers,

22   but same thing; right?  Everybody's a repeat player.  Everybody's

23   honorable.  Everybody does a good job.  We see each other all the

24   time.  I trust the lawyers.  And Mr. Andrade -- I don't have any

25   information to suggest Mr. Andrade's going to misuse it.  You

18

1    never raised the AEO argument anyway in your briefs, I do not
2    believe, in the latest iteration of them, one fifty whatever that
3    we're into.

4        So the fact that it's cumulative, that's the only issue
5    that you really raised.  That was your main argument.  I recognize
6    it probably wasn't you raising it.   It might have been Mr.
7    Weingarten.

8        MR. HIGHSMITH:  We're all the same, Your Honor.

9        THE COURT:  I know.

10       MR. HIGHSMITH:  It doesn't matter.  Okay.  Well, let's
11   move on to our winning point.

12       THE COURT:  Okay.  Okay.  So let's go -- that's fine.
13   So I assume the Defense doesn't need to say anything because that
14   goes your way.

15       All right.   So let's talk about the Erickson
16   extractions.  I mean, this is like -- this is what I call a
17   tempest in a teapot or whatever.  The Government has said that it
18   asked the case agents.  They haven't found anything.  They -- the
19   case -- the Government clarified.  They first said the extractions
20   were destroyed in March, but the FBI closed the case file, hadn't
21   located any information.   The Government seems to me has
22   sufficiently satisfied its duty to inquire, not try to pull the
23   wool over anybody's eyes.  I still have Mr. Weingarten's voice --
24   a creeped voice in my head whenever we ask that together.  He's
25   like, What else -- what else can I do?  And I just -- I just -- I

1  don't think there's any relief I can order, I mean, for a clear

2  record.  I could say,  If you have the extractions, produce them.

3  But the Government said -- because I think you have, according to

4  my earlier observation, I think you've established enough of a

5  materiality to be entitled to them if they exist for the reasons

6  that I just put on the record, but the Government has said, We

7  don't have them.   There's nothing more.   And I'm not going to

8  order a fuller explanation than that.   I don't think that's what

9  *Brady* requires and I don't think that's what Rule 16 requires of

10 me.

11        The honest broker thing has got to cut both ways, right,

12 so I say honest broker on the Defense side, honest broker on the

13 Government side.   All right.   So that from the Defense side, I

14 don't know who's going to speak.   Mr. Shepard's got his mic off.

15 Do you want to say anything about that?

16        MR. SHEPARD:  Briefly, Your Honor.  To take up the point

17 that the Court was talking about very briefly, I do think it would

18 be appropriate for the Court to order that if the Government has

19 any records relating to the destruction of Erickson's phone, that

20 they be ordered to produce it.   If they don't have it, they can

21 say they don't have it.

22        THE COURT:  See, here's what I would say -- I don't mean

23 to interrupt you, but this is what I was thinking, so I just -- it

24 just popped into my headset.  See what you think about this.

25        So one of the documents you gave me was like an evidence

1    review thing that the FBI did in a different device here.  I can't

2    -- it was in connection with one of the 302s that was about I

3    think the Abramoff interview, and the FBI had done an evidence

4    review on it.  And so one thing that I was going to order, because

5    it's a pretty easy thing to do -- I mean, look, I'm mindful of the

6    -- as I said, I read the Erickson and Butina -- I took a look at

7    Pacer and I read the informations.  I read the -- I looked at the

8    docket sheet.  I looked at the plea agreements.  I looked at the

9    statements that were attached to the plea agreements.  Interesting

10   insight in how other districts do things, but you actually look at

11   their -- like commit to our pages in this district.  I don't know

12   -- you know, it was interesting because not everybody does it the

13   way we do it.  But I get the kind of spelunking argument.

14           But I think for all the reasons that I've already

15   articulated, if they had any more information -- so what occurred

16   to me was I was going to order, you know, the extractions or

17   information about them, like the FBI evidence review that we saw.

18   Because it's pretty easy.  Either they have it or not in the -- in

19   the FBI files, and everybody knows how the FBI files are

20   organized.  I know how they're organized, too, but I'm not going

21   to say it on the record or in my order.  I hear you, Mr. Shepard,

22   about wanting the Government to produce an explanation about the

23   destruction, but I don't think so.  I think they just -- if they

24   have extractions or something like the evidence reviewed that

25   summarizes what was on the phones, produce that.  But what's the

1  authority for having me say to the Government, "Okay, if you have

2  something, tell me what happened and why"?  I don't think so, but

3  you tell me why that's wrong.

4        MR. SHEPARD:  Well, the additional points I would make,

5  Your Honor, are these.  First of all, in my experience, the FBI

6  has a record for pretty much everything.

7        THE COURT:  Well, that's why I said that's why I thought

8  the evidence review and calling up that as an example because we

9  have it in this case, right, it's helpful.  The evidence review,

10  by the way, was actually helpful for me like seeing your case, you

11  know, props to the FBI.

12        MR. SHEPARD:  Right.  The -- you know, so they had the

13  phone of somebody who they were prosecuting.

14        THE COURT:  Yep.

15        MR. SHEPARD:  And then they destroyed the phone of

16  somebody who they were prosecuting.  And it would seem to me they

17  would have a record of both of those.  That would just -- they

18  would have -- they would have done an evidence review.  They would

19  have done all those things.

20        THE COURT:  Well, if they have an evidence review, that

21  evidence -- that they will produce.  I've got a written order.  It

22  will say that.  But I'm not going to require the Government to

23  have any sort of explanation or give an explanation.  It's up --

24  the Government has a duty to inquire.  I say that a number of

25  times in my order because of the *Brady* obligation to inquire.

1    You've now raised the issue sufficiently.  I cited *Sokoloff* (ph).

2    Is that the District Judge Pregerson opinion from 1999 or whatever

3    that talks very helpfully about *Brady* being backward-looking but

4    you've got to be forward-looking when you're in the trial court.

5    So I think that you've now, you know, raised a danger-danger *Brady*

6    issue.  The Government has a duty to inquire.  And so it needs to.

7    I do not ascribe -- maybe this makes me a pushover -- do not

8    ascribe bad motive to the FBI.  My experience with them is that

9    they're nothing but meticulous.

10            MR. HIGHSMITH:  No one would accuse you of being a

11   pushover, Your Honor.

12            THE COURT:  Well, I don't know about that but, you know,

13   but -- you know, I think the FBI does a great job.  There it is.

14            So you'll get your evidence, whatever evidence they have

15   about it.  I'll order that.  There's probably nothing, but it's

16   going to be an order nonetheless.  But I'm not going to order

17   further explanation.  I don't see any support for that.

18            MR. SHEPARD:  If I just could --

19            THE COURT:  Okay.

20            MR. SHEPARD:  -- add two sentences about that.

21            THE COURT:  Yeah.

22            MR. SHEPARD:  We do know in this case that the FBI knew

23   the relationship between Erickson and this case, and we were

24   asking for Erickson materials before the document -- we were

25   asking for Erickson materials before the phone was destroyed as

1  best -- as best --

2         THE COURT:  You're going to --

3         MR. SHEPARD:  -- we could --

4         THE COURT:  You're going to try to attack the

5  Government's investigation as being shoddy.  Great.  That's --

6  you've got the record for that.  I don't know that more of a

7  production would actually hurt you or help you -- I don't know --

8  but -- you know, I hear you but the Government has said, The file

9  was destroyed per whatever.  You know, if you can point me to a

10 specific example of a document that might exist, I'm happy to do

11 it, but I think that the evidence of what happened to the device,

12 which is what I'm ordering, what was -- the device extraction if

13 you have it and, if not, any information about the device

14 extraction that you have.  For example, the evidence review that

15 the group cited -- that you guys cited in this case.  Produce it.

16 I mean, if there's something else you learn, you can raise it

17 again, but I just -- and then what is the Government supposed to

18 say?  It's not going to -- the file doesn't exist anymore.  What

19 else is there?  I'm aware of nothing.  I do know exactly how the

20 FBI organizes its files.

21        MR. SHEPARD:  Right.  But --

22        THE COURT:  And -- I know all of it.  They have to ask

23 for *Brady*, "Have you looked in this file?  Have you looked in this

24 file?  Have you looked into this?"  So I understand that.  But I

25 just don't know what else would exist; right?

1    MR. SHEPARD:  I would expect they looked at the phone

2  and I would expect when they destroyed the phone, they made a

3  record of destroying the phone 'cause that's the way the FBI

4  operates.

5    THE COURT:  Yeah.  Okay.  Well, let's -- all right.

6  I'll think about it further, but I don't know.  I'll think about

7  it.  Okay.

8    MR. SHEPARD:  Especially in -- in light of the fact that

9  the cases were related and we were asking about them.

10    THE COURT:  Okay.  All right.  I'll think about it, but

11  I -- I -- okay.

12    Mr. Highsmith, anything that you want to add on this

13  point?  I don't think there's anything else there, so --

14    MR. HIGHSMITH:  I mean, obviously I disagree completely,

15  but I don't think we need to tussle about it.

16    THE COURT:  Okay.  Great.  So I think -- so now we're on

17  to issue four, which is documents related to the searches and

18  seizures of the three devices.  You know, here Government already

19  apparently produced the Butina stuff which the Government should.

20  Contends the rest is about unrelated investigations.  But I

21  already said this -- I already said this in my kind of

22  introductory comments and in the context of Levin and others.

23  Just limiting the production to references to Mr. Andrade and oft

24  the claim is just too narrow.  I've said that already and I said

25  why it's too narrow.

1          Mr. Andrade gave examples to the counsel that I already

2    summarized, about how broader range of information is material.

3    It's about the larger model of this business model for

4    cryptocurrency, whether Mr. Abramoff was working against him and

5    how this affects Mr. Andrade's responsibility and scienter.  And

6    it's not a sufficient explanation that the discovery's necessarily

7    duplicative.  I already described why that wasn't the case in the

8    Levin case.

9          I already said this issue about, you know -- you started

10   to get a little nervous right now. You've got the feel of *Brady*,

11   the echo of *Brady* and the Government's duties to inquire.  And

12   I -- but if there's really nothing related to this case and the

13   Government's satisfied its duty of disclosure by confirming that

14   there's nothing to disclose, then that's fair and there's nothing

15   to disclose.  But a search -- I've described the reach of

16   discovery I think sufficiently and this -- so I think it's already

17   traveled territory, so I think -- now it's like I'm a secret agent

18   of the Russian government and I didn't tell anybody or I've got,

19   you know, some kind of a Ponzi scheme going on in Montana

20   involving real estate where I say I'm doing one thing and I'm

21   really just pocketing the money.

22          And I get it, so that's fine.  But if there's anything

23   in that review, then that should be produced.  If there's nothing

24   and the Government's satisfied its discovery obligation but given

25   the -- given the nexus that the Defense has -- has articulated,

1  the Government's characterization is too narrow, similarly, with

2  the -- the same analysis applies to Butina and Erickson --

3          MR. HIGHSMITH:  Your Honor, may I --

4          THE COURT:  I'm just going to finish -- I'm just going

5  to finish because I think the issues are kind of the same, and

6  then you can address it.

7          It's just too narrow.  And so you can make -- you can

8  make your own calls about the burdens about producing, but I -- a

9  hundred percent I agree with the Government that Ms. Butina's work

10  as an undisclosed Russian agent or Mr. Erickson's real estate

11  schemes are not relevant to this case, hundred percent agree on

12  that point.  The issue is whether there's something about

13  essentially cryptocurrency and Abramoff and schemes.  If there's

14  nothing there, there's nothing there and you don't have anything

15  to produce.  If there's something there, you should produce it.

16  Your articulation of just limiting it to Mr. Andrade and AML

17  Bitcoin is too narrow for my taste.

18          Okay.  So Mr. Highsmith.

19          MR. HIGHSMITH:  I just wanted to distinguish Butina.  I

20  think the Court was talking about Butina; am I correct about that?

21          THE COURT:  I was talking about Butina and I was also

22  talking about Levin and Erickson.  Obviously, Levin didn't make

23  any statements to the Government, but this is about the searches

24  and stuff that was seized with relation to the devices.

25          MR. HIGHSMITH:  Okay.  Okay.  Sorry.

1          THE COURT:  And statements.  And statements for all of

2     them.

3          MR. HIGHSMITH:  I was just talking about the Butina case

4     file.

5          THE COURT:  Okay.

6          MR. HIGHSMITH:  If we had notes.  I don't know if  --

7     were those materials encompassed by what the Court just said or

8     not?

9          THE COURT:  Well, you've already produced the Butina

10    notes; right?  I'm just saying -- my over-arching comment was

11    limiting it to AML Bitcoin and Mr. Andrade is just too narrow.

12    He's described -- he's described his defense which is, They're

13    backdooring me, had their own sets of schemes.  That goes to my

14    scienter.  What they were doing was inconsistent with my business

15    model.  It's not me who's responsible for all that stuff; it's

16    them -- Mr. Abramoff.

17          MR. HIGHSMITH:  Understood.

18          THE COURT:  Not necessarily the others.  And information

19    about that is relevant to my defense, material to my defense --

20    sorry.

21          MR. HIGHSMITH:  Understood.  I was just saying the

22    Butina materials are totally irrelevant to that.  She met Abramoff

23    socially once.

24          THE COURT:  And that's fair.  Like if you've done your

25    duty and there's nothing there as I've described it, then there's

1  nothing there.  I suspect the same may be true for Erickson and

2  Levin.  I'm just broadening the scope of the inquiry somewhat.

3        MR. HIGHSMITH:  Understood.

4        THE COURT:  Okay.  Anything from you, Mr. Shepard?  That

5  went your way.

6        MR. SHEPARD:  It -- I think it went my way, but I just

7  want to --

8        THE COURT:  You're not getting -- it's not -- secret

9  agent land and real estate scheme land isn't relevant.  If there's

10 anything else about crypto, Abramoff, something -- you've heard

11 how I defined it.  I made your defense and I broadened it and I --

12 the backdooring of Mr. Andrade is the -- is the flavor that I'm

13 ascribing to it.  And the Government defined things too narrowly

14 by what they said they did.  But I am skeptical that there's

15 anything else there.

16      For me, if I -- you know, like I approach my life with

17 this in mind:  Who has the time?  But I'm not going to tell

18 like -- who has the time and I would just say, Fine, here it is

19 'cause I don't care.  Protective order.  Tell me if you really

20 want to use it, but I don't have the time.

21      That's what I would do, but I'm not -- that's not the --

22 the Government doesn't have to do it that way.  They have to

23 produce Rule 16 material or *Brady* material.  And if they don't

24 want to do it, they don't want to do it, but they do have a duty

25 to look at it themselves and produce to you what's material as

1  I've defined it and they defined it too narrowly, so I'm skeptical

2  that there's anything there, but I'm ordering the Government -- I

3  will issue an order ordering the Government to produce that.

4          MR. SHEPARD: I appreciate that. There's -- but I think

5  there's a gulf still between what the Court has directed the

6  Government to do, which we appreciate, and what we think the

7  Government should do. And I would like to address that --

8          THE COURT: Okay. Sure. Of course. Of course.

9          MR. SHEPARD: I don't think it's sufficient to say, Go

10  look for cryptocurrency, for example, because, you know, the --

11  the Court appreciates our defense, and I won't repeat it, but to

12  think about it in a little deeper way, for want of a better term,

13  the -- one of the key questions both to exactly understand what

14  Abramoff and these other -- Butina, Erickson, Levin -- were doing

15  and understand why they were doing it, you want to know what else

16  -- what is it that, say, Levin was doing that would explain why he

17  was working with Abramoff and why they were taking these steps

18  with respect to Mr. Andrade's business. And that might mean a

19  whole lot of things that have nothing to do with cryptocurrency.

20  Maybe they needed money for some other purpose. Maybe they needed

21  the technology for some other purpose. So just limiting it to

22  cryptocurrency isn't really gonna capture what they were doing and

23  why they were doing it.

24          THE COURT: Well, I defined it a little bit maybe more

25  broadly than, you know -- I defined it more as that Mr. Abramoff

1    may have been working against Mr. Andrade.

2        MR. SHEPARD:  Right, and -- and -- exactly, and the

3    question is why and what were the motivations for doing that?

4    What were the interests for doing that?  And that shouldn't be

5    limited to just cryptocurrency.  I don't know what they might have

6    been doing.  The evidence suggests they were doing something that

7    was adverse to Mr. Andrade's business and they must have had some

8    reason for doing it.  And whether that reason relates to

9    cryptocurrency or not, --

10       THE COURT:  I get it.  I get it.  I get it.  I will just

11   say evidence about Ms. Butina's undisclosed work as a Russian

12   agent is really -- unless there's impeachment evidence about Mr.

13   Abramoff which Government's already represented that the evidence

14   that they have shows only one meeting.  So there's no -- there's

15   not going to be anything there.  That's Ms. Butina.

16       Mr. Levin, Mr. Erickson, yeah, maybe.  But if the

17   Government investigation for the real estate scheme is just about

18   the real estate scheme and it's got nothing to do with Mr.

19   Abramoff, there's nothing there, nothing, then the Government

20   doesn't have any discovery obligation there 'cause Mr. Erickson is

21   just, you know, his own little schemer in Montana or wherever he

22   was.

23       Mr. Levin, maybe.  So say it -- maybe.  That's a little

24   bit broader.  But at least you're getting your device.  And, you

25   know -- and you know how it is.  You can't possibly get everything

1  you -- you don't want to leave any stone unturned.  I understand.

2  The plus side of getting more information than you have is it

3  gives you a broader -- everybody's got all their stuff on their

4  phone, and -- and I've defined it pretty broadly, so I hear you.

5  I'll think about it.  But, you know, if what the Government says

6  is -- what I think the Government really is saying, they defined

7  it to narrowly -- it's all about this, you know, meetings with

8  powerful people and insinuating themselves into Washington

9  politics and having events and doing all this stuff without

10  disclosing that she's a Russian agent.  Mr. Erickson, the real

11  estate scheme in Montana for goodness sake, right, so he shows up

12  in this case and -- and if all this stuff in that other cases,

13  like these are the lies to the investors, you know, he -- this is

14  what he did, this is the scheme, if that's all there is, which I

15  think that's what the Government's saying, there's no there there

16  and you're not entitled to it.

17          That said, I hear you on the way you've defined your

18  defense, and I would just say for -- and I did say to the

19  Government, you make your own call as to how much work you want to

20  do.  But these things are not relevant and I believe that probably

21  that's all that is there, I would get the case file and look at it

22  if I were on the case myself and I'd make sure that that was

23  correct and -- and it's certainly going to be correct with Ms.

24  Butina.  I'm just going to say it's certainly going to be correct

25  with Ms. Butina.  I don't know about the other two, but that's --

1    okay.  So that's -- those are my thoughts.

2          All right.  Anything else?  If not, we're going to move

3    on to the next case.

4          MR. SHEPARD:  If I could just briefly touch on Butina

5    because, yes, she was a Russian spy.  We don't know what she was

6    doing for Russia and whether that had anything to do with

7    cryptocurrency or not, but what we do know about her is that she

8    and Erickson were a couple.

9          THE COURT:  I knew that.  Yep, saw that.

10          MR. SHEPARD:  She -- you know, these documents were

11    found in her home.  They were, you know, packaged up for review in

12    her home.  And so I don't think it's right to say that the chances

13    that there's any other connection with her and the interests of

14    this case, I just don't -- I think there's enough connection that

15    she has that real serious inquiry is required.  And I guess that

16    gets to the procedural question as to, you know, is this left

17    entirely in the Government's hands.

18          THE COURT:  Well, they're the ones with the discovery

19    obligation; right?  So that's the -- that's the landscape we're

20    stuck with.  It's true of any discovery dispute.

21          MR. SHEPARD:  Well, it is and it isn't.  Of course, the

22    Court has ordered them to produce, for example, Levin's device.

23    So there are things that the Court can do.  And our experience in

24    this case, again recognizing that, as the Court has noticed, these

25    are repeat players who merit respect, but our experience has not

1   been great so far.  And I don't really attribute that to

2   particular AUSAs.

3          THE COURT:  I'm not -- I'm sure it's not malicious, but

4   it's not what you had hoped for.

5          MR. SHEPARD:  Right, and the Court has heard me about

6   this before.  It's not particular AUSAs.  There seem to be a

7   moving cast of them and they're always catching up.  And I -- I

8   think it really goes back to where we were at the start which is

9   whoever has been making these calls, and I expect it's been the

10  FBI agents, they don't appreciate what the standard is.  And so

11  we've had this, you know, nine months of them telling us that the

12  Butina documents weren't relevant.  They didn't -- the only way we

13  learned about those to begin with was because we listened to a

14  recording of an interview.  It didn't show up anyplace else.  We

15  learned about it that way.  We told them we wanted these

16  documents.  We got nine months of, This is all conspiracy theory.

17  We're not giving it to you.  We have to go file a motion.

18         We filed the motion and then they turn them over and it

19  turns out they're, as the Court recognizes, they form a good basis

20  for a defense.  So our, you know -- again, not meaning anything --

21         THE COURT:  Dirtying up Abramoff, however that gets done

22  -- I mean, I'm just gonna say it -- that's your defense, too,

23  right?  You're going to dirty him up.

24         MR. SHEPARD:  Right.  Right.  Right.

25         THE COURT:  I get it.

1          MR. SHEPARD:  So -- so -- and we get this, Okay, we'll

2    do search terms of AML Bitcoin and Andrade that isn't even close.

3    And so --

4          THE COURT:  No.  I agree with that.  I agree with you.

5          MR. SHEPARD:  So the -- so the whole process of where we

6    go from here, therefore, gives me some pause.

7          THE COURT:  Well, let's -- I hear you.  I -- I've

8    written an order that I think is pretty good defining what the

9    scope of the investigation is.  And it is a joke, but -- to Mr.

10   Highsmith, I just think it's -- sometimes the low road is a good

11   road because, you know, who has the time?  But that's not my job

12   to tell you how to do your job.  I just -- I don't have the time,

13   you know.  I don't have the time now.  Fine, Mr. Shepard, here you

14   go.  Bless you.  So that's a different approach.  It's not what

15   I'm ordering.  But it -- because it doesn't matter.  It doesn't

16   matter.  But -- and I really do think, you know, Rule 16 is such

17   a -- the way the criminal discovery -- you guys may or may not

18   know this, but it was originally you were supposed -- it was

19   originally proposed as a uniform standard for civil and criminal

20   discovery and it was kind of a last-minute intervention that

21   criminal rules wound up the way they do.

22          And one of the problems is -- and I don't know that it

23   would necessarily happen here -- you just never know at the end of

24   the day what's going to come out that changes your mind.  I will

25   tell you that I went on some spelunking or expedition myself when

1   I was an AUSA and it was the FBI agent I worked with said, Well,

2   you may not have solved a crime, but you solved a mystery, and so

3   it's -- sometimes things just don't shake out the way you think

4   they're going to because I had this whole theory that was one way.

5   The absence of information was my -- was my case, you know.  Who's

6   sneaking around?  Look at this radio silence.  And so I just -- I

7   will say that it's -- I guess just practically, I think one

8   sometimes needs to approach problem-solving practically.  But I'm

9   not going to order that because that's not what the law requires.

10  It's up to the Government to decide how it wants to manage its

11  burdens.

12          And I will take everybody's arguments under submission

13  and issue an order very shortly, likely today or tomorrow.

14          MR. SHEPARD:  Thank you, Your Honor.

15          THE COURT:  Sure.

16          MR. SHEPARD:  And hopefully that would include whatever

17  activity Erickson, Butina, Levin --

18          THE COURT:  Yep.

19          MR. SHEPARD:  -- were engaged in with Abramoff.

20          THE COURT:  Yeah, yeah, yeah.  So that's -- I'll look at

21  it -- I'll do another read and Abramoff is the big one.  And so,

22  Elaine, can you put on the minute order, because I'm not going to

23  put it in this order because I don't want to clutter it up because

24  it's really tangential, just say, "Court had a discovery hearing

25  and will issue a discovery order."  Mr. -- well, actually it's the

1    Government -- "Mr. Abramoff may intervene if he chooses and must

2    file a privilege log -- must produce a privilege log that comports

3    with the Court's Standing Order" and then attach my Standing Order

4    to the -- to the minute entry.  It just says my privilege log

5    procedures and they're pretty -- they're pretty thorough.  So --

6    and I'll just leave it at that.  I don't really want to touch any

7    of this.  I already suggest that Mr. -- in my order, I've already

8    suggested that if Mr. Abramoff wants to assert privilege, he's

9    entitled to do so.  I think there's a real utility to getting him

10    involved in the process because basically someone's going to do

11    the privilege review and produce a privilege log.  And it doesn't

12    excuse the Government's obligations necessarily, but I think it

13    will probably practically resolve the issue.

14         Okay.  Thanks, everybody.  We're going to go off the

15    record.

16       (Proceedings adjourned at 11:30 a.m.)

17

18         I, Peggy Schuerger, certify that the foregoing is a

19    correct transcript from the official electronic sound recording

20    provided to me of the proceedings in the above-entitled matter.

21
         *Peggy Schuerger*
22    _____          April 13, 2023
      Signature of Approved Transcriber    Date

23    Peggy Schuerger
      *Ad Hoc Reporting*
24    Approved Transcription Provider
      for the U.S. District Court,
25    Northern District of California