MICHAEL J. SHEPARD (SBN 91281)
  mshepard@kslaw.com
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, California 94111
Telephone:     +1 415 318 1221

KERRIE C. DENT (admitted *pro hac vice*)
  kdent@kslaw.com
**KING & SPALDING LLP**
1700 Pennsylvania Avenue, NW, Suite 900
Washington, DC 20006-4707
Telephone:     +1 202 626 2394

CINDY A. DIAMOND (SBN 124995)
  cindy@cadiamond.com
**ATTORNEY AT LAW**
58 West Portal Ave #350
San Francisco, CA 94127
Telephone:     +1 408 981 6307

Attorneys for Defendant
ROWLAND MARCUS ANDRADE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROWLAND MARCUS ANDRADE,<br><br>Defendant. | Case No. 3:2-cr-00249-RS-LBx<br><br>**DEFENDANT ANDRADE'S SUPPLEMENTAL BRIEF IN SUPPORT OF REQUEST FOR LEVIN'S PHONE**<br><br>Date:     October 26, 2023<br>Time:    9:30 a.m.<br>Judge:   Magistrate Laurel Beeler |

1

Defendant Marcus Andrade submits this supplemental brief in support of his request for production of an image of the phone of Alexander Levin. For the court's convenience, this supplemental brief is based on the argument that previously appeared in Mr. Andrade's reply on the issue of Levin's phone in the Joint Status Conference Statement filed on September 15, 2023 (Dkt. #212), but with a few adjustments. It seeks production of Levin's phone — a production that this Court expressly ordered on April 7, 2023 (Dkt. #165) but has still not been made.

The Joint Status Conference Statement revealed that, after multiple rounds of briefing in which it refused a request for Levin's phone based only on a supposed lack of relevance, after an order from this court's April 7, 2023 Order requiring the government to produce Levin's phone, and after months of stonewalling, the government had conjured up a new rationalization for its non-compliance with the Court's April 7 Order. Along with its new rationalization, the government accuses Mr. Andrade of being misleading, but in fact it is the story the government offers to explain its non-compliance – the story that all the previous arguments to the Court were only about four spreadsheets, rather than about an image of Levin's phone – that is demonstrably false. The government's new rationalization is that Levin's phone is not in its *lawful* possession, even though the government has repeatedly conceded that the government *has kept* the phone in its possession. For the reasons set forth below, this is no better an excuse for interfering with Mr. Andrade's access to information material to his defense than the government's previous incorrect assertions.

Although on the merits the government's new "lawful possession" argument does not justify its blocking Mr. Andrade from a device that the court already has found to be material to his defense, the court should not address the new argument on its merits for two reasons. First, the government waived it. This issue was fully briefed – and re-briefed. It was argued – and reargued. In those arguments, there was no question that Mr. Andrade was requesting the entire phone, and the government never argued it could not produce it – only that it was not relevant. The Court ordered its production on April 7. The government never sought reconsideration of the Court's April 7 order; it just stalled and refused to comply. Despite multiple requests and meet-and-confers, it was not until *more than two months after it was ordered to produce the*

*phone,* in a June 9, 2023, email, that the government said that it had produced the extractions from the Levin devices that it was permitted by the Fourth Amendment to have in its possession. No litigant should get to engage in such sandbagging and stonewalling.

    Second, the government has not treated the phone (including the parts of the phone supposedly outside the scope of the warrant by which the government says it obtained the phone) as if it has no right to access it. To the contrary, when access to the entire phone has suited the government's own purposes, it has taken it — without any concern for whether the phone is in its "lawful possession."  For example, as demonstrated in greater detail below, as part of an effort to bolster its failed argument that Levin's phone is irrelevant, the government earlier this year ran three search terms "through the seized devices" and reported that there were no hits.[1] This was not done to help Mr. Andrade, who was already on record objecting to the use of search terms, and this objection was particularly applicable to the search terms the government chose to run (without input from Mr. Andrade), which were so crabbed that they did not even include "Marcus," the most common way Mr. Andrade is addressed and referenced in communications like those on the device.[2]

    If it is a violation of Mr. Levin's rights to view the phone beyond the limits of the warrant, then the government has already violated his rights – when it suited its own needs.  And if, as the government now contends under *United States v. Balwani*, 18-cr-258 EJD, Order, at 9 (N.D. Cal. Apr. 8, 2022) (Dkt. #1393), the government only has lawful possession of extractions of four spreadsheets, why does the government still have the phone at all, over three years after it seized it?[3]  *See, e.g., In re Search of Black iPhone 4,* 27 F. Supp. 3d 7, 80 (D.D.C. 2014) (requiring a revised warrant application to stipulate that nonresponsive seized documents will be returned or destroyed "within a prompt period of time.").  It is only when Mr. Andrade wants his

---

[1]    Email from AUSA R. Weingarten (February 9, 2023) ("I just received word that agents ran the following search terms through the seized devices from Levin: "Andrade,""AML Bitcoin" and "NAC Foundation."  There were no hits on any of those terms.").

[2]    *Id., see also* FBI 302 dated February 9, 2023, written by Andrew Taff in New York City, of the FBI - New York Field Office, Squad C-14 (confirming the three search terms that were run and that they yielded zero hits). This 302 is not-Bates stamped, but it was produced by email from AUSA A. Dawson on February 28, 2023.

[3]    The government concedes that the search warrant that captured Mr. Levin's phone was executed in March 2020. *See* Government's Position, Joint Status Conference, Dkt. #212 at 4:9-10.

own access to the same material that the government searched to advance its own argument that the government claims that no one else can be allowed to look at it, and then makes matters worse by continuing to hold the phone, which renders it impossible for Mr. Andrade to access it as this Court's order allows him to do.

Even if the government is permitted to make its "lawful possession" argument despite its waiver and unclean hands, the argument still fails. Combined with its continued possession of the device, the government is using its "lawful possession" claim to block Mr. Andrade's access to a device that the Court has already found to be material to the preparation of his defense, not to mention blocking access to information that is potentially exculpatory for the reasons set forth in Mr. Andrade's prior briefs. This is impermissible: where the government can take steps to make material information available to the defense, it must do so. *See, e.g., United States v. W.R. Grace,* 401 F. Supp. 2d 1093, 1099-00 (D. Mont. 2005) (requiring the prosecution to take steps to allow access to materials requested by defendant, where HIPPA allows agencies to disclose information to the prosecution if the prosecution subpoenas the information or the information is responsive to a discovery request, and the prosecution seeks a protective order, even though the documents are "of little interest to the prosecution."). As the *W.R. Grace* Court explained, the government's discovery obligations turn on what it "appears able to obtain," at least when, as here, the request is specific and limited and is a "far cry from forcing the prosecution to 'comb the files of every federal agency.'" *Id.* at 1100.[4]

---

[4] Apart from its claim that the government does not lawfully possess the phone it has held for more than three years, the government does not argue that it would be unable to obtain the phone from the United States Attorney's Office for the Southern District of New York, and any such argument would be futile. Needless to say, unlike in *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989), a different United States Attorney's Office is not a different agency; both United States Attorneys report to the same agency official, the Deputy Attorney General, and should be working together to ensure a just result in every case prosecuted by the Department of Justice. Even if Mr. Andrade were nonetheless required to establish that the Southern District of New York has been participating in the investigation of Mr. Andrade, there are ample indications it is doing so, and numerous leads that could produce additional proof. For starters, when Mr. Andrade's prosecutors wanted to contest Mr. Andrade's discovery motion, they worked with FBI Agents in the Southern District of New York to run three exceptionally narrow search terms through Levin's phone – an inquiry that was made and terms that were chosen without consultation with Mr. Andrade – so that the prosecutors could tell this Court that the phone is irrelevant. Even before Mr. Andrade's discovery requests, the agents working on this case conducted interviews for this prosecution jointly with two agents from the FBI's Los Angeles counterintelligence division, inquiring into topics such as Abramoff's hand-written notes relating to his pro-Russia/anti-Ukraine lobbying, and Abramoff's other work with Congressman Rohrabacher and Ukrainian-born oligarch Igor Kolomoisky. *See* FBI-302-0001066-67 (cross-referencing Mr. Andrade's case number). One of those Los Angeles agents later told the Senate Committee on the Judiciary that his inquiries into the "flows of foreign money into U.S. politics," including from Ukraine, were "largely" for the benefit of the

There are various ways the government can ensure that Mr. Andrade can obtain information in its custody that is material to preparing Mr. Andrade's defense and/or evidence exculpating him — and, at a minimum, ways in which the government can cease blocking Mr. Andrade from obtaining that information.  First, if the government is correct in saying that it does not lawfully possess Mr. Levin's phone, and if Mr. Levin or his counsel is within this Court's subpoena power, the government should return what it says it does not lawfully possess to Mr. Levin's counsel, with advance notice to and cooperation with Mr. Andrade, so that Mr. Andrade can serve a subpoena for it on Mr. Levin or his counsel before the phone is returned.[5]  Second, the government has already been ordered to produce the phone; if as the government says it does not lawfully possess it, the government should not keep it but rather should tender the phone to the Court.  The Court can inform Mr. Levin that it has the phone, and the Court can allow him, if the law so requires, the opportunity to object to disclosure to Mr. Andrade if Mr. Levin so chooses.  Third, as the government did with Mr. Abramoff, it can seek consent from Mr. Levin, and then pursue one of the alternatives above if he refuses.

The Court should require the government to comply with its April 7 order, by using one of these procedures, or another one acceptable to Mr. Andrade, within 14 days.  There may be procedures other than those described above that would satisfy any claimed rights, but the one procedure that unquestionably does not do so is the government maintaining possession and using the phone as it desires to suit its own interests, while retaining it in government custody and blocking Mr. Andrade's access to it.  The government cannot be permitted to deprive Mr. Andrade of an opportunity to capture evidence found to be material to the preparation of his defense, and he should not lose out on such evidence simply because another prosecutor in the investigation of a different defendant seized the phone before Mr. Andrade asked for it.

The government's "unlawful possession" argument also fails for an additional, independent reason: even when the government has in its possession unlawfully seized material, the government can still use the material for derivative purposes.  For example, the government

---

Southern District of New York.

[5]   If, in response to the government's offer, Mr. Levin abandons the phone, then there should be no reason the government cannot produce it.

uses illegally seized material to question grand jury witnesses, and to impeach defendants, and both of these uses have won Supreme Court approval. *See, e.g., United States v. Calandra,* 414 U.S. 338, 354 (1974) ("Grand jury questions based on evidence obtained thereby involve no independent governmental invasion of one's person, house, papers, or effects, but rather the usual abridgment of personal privacy common to all grand jury questioning. Questions based on illegally obtained evidence are only a derivative use of the product of a past unlawful search and seizure. They work no new Fourth Amendment wrong."); *United States v. Havens,* 446 U.S. 620, 627-28 (1980) ("[D]efendant's statements made in response to proper cross-examination reasonably suggested by the defendant's direct examination are subject to otherwise proper impeachment by the government, albeit by evidence that has been illegally obtained and that is inadmissible on the government's direct case, or otherwise, as substantive evidence of guilt."); *see also Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) (holding that fruits of an illegal automobile seizure can be used against a passenger). The rationale for allowing Mr. Andrade to use this evidence – giving a criminal defendant access to material that the government possesses, that the defendant cannot otherwise obtain under the Stored Communications Act, and that is likely exculpatory and has been ruled material to the preparation of his defense – is more compelling than the rationales on which the government has successfully relied. *See, e.g., Brady v. Maryland,* 373 U.S. 83, 87-88 (1963) (withholding exculpatory evidence "casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice."). And here, unlike in exclusionary rule cases, no evidence is being used against the victim of the claimed unlawful seizure, and deterrence of police misconduct – the rationale of the exclusionary rule, *see Mapp v. Ohio,* 367 U.S. 643, 656 (1961) – will not be advanced by allowing the government to continue to suppress the evidence. *See United States v. Janis*, 428 U.S. 433, 454, 96 S. Ct. 3021, 3032 (1976) ("If . . . the exclusionary rule does not result in appreciable deterrence, then, clearly, its use . . . is unwarranted.").

///

///

If, despite repeated government representations to the contrary, the Levin phone no longer exists, then unredacted destruction records and other information about its destruction should be provided, along with the search warrant materials relating to the seizure of the phone, (Dkt. #165 at 12), which the government has declined to produce.[6] The government has a "duty to preserve discoverable evidence," *United States v. Grammatikos,* 633 F.2d 1013, 1019 (2d Cir. 1980). When discoverable evidence is missing, the government has a duty to inquire and to report on "what steps it took to identify and locate the requested information" and a duty to provide information about any destruction of evidence; a "bare assertion" that the government has no existing records "is inadequate." *See United States v. Stone*, No. 12-CR-0072 JCC-GSA, 2013 WL 4541513, at *5-9 (E.D. Cal. Aug. 27, 2013), order clarified, No. 12-CR-0072 JCC-GSA, 2013 WL 5969705 (E.D. Cal. Nov. 8, 2013); *see also Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (prosecutor has a "duty to learn of any favorable evidence known to the others acting on the government's behalf.").

Finally, both the government's representation that it never accessed or ran searches through the entire phone, and its claim to have run search terms not on the device but only on a spreadsheet — a gruesome twist of language to begin with — is proven false not just by its own prior statements, but by its own records. Not only did the government tell Mr. Andrade in writing on February 9, 2023, that it had "just received word that agents ran [three] search terms *through the seized devices* from Levin,"[7] but an FBI 302 demonstrates that what the search terms were run against by the FBI in New York City, at the request of the case agents here, was "One (1) 500GB Seagate HDD, s/n Z6E9c66L, containing the master copy of 1B83 (Alexander Levin

---

[6] To avoid wasting the time of the Court and the parties, Mr. Andrade's counsel reached out to the government on September 22, 2023 and requested that it inform Mr. Andrade whether the image of Levin's phone still exists. Mr. Andrade asked that the government produce unredacted destruction reports if the phone image no longer exists. There are additional unanswered questions about Levin's devices. For example, it is not clear why Levin's iPad was seized but never accessed by the government. In addition, Levin used not only a United States phone number, but also a Ukrainian phone number, when he communicated with Abramoff and others. *See* FBI-302-005158 (when summarizing messages on Abramoff's phone, Mr. Andrade's case agents identified 114 messages using Levin's Ukrainian number and 73 messages using the U.S. number). None of the Ukrainian messages summarized in the government's 302 are included in the four spreadsheets of Levin messages produced by the government in response to the Court's April 7 order. Mr. Andrade does not know whether Levin's Ukrainian phone was seized, or whether his seized ipad contained messages using his Ukrainian phone number, or if the government simply did not obtain any of those.

[7] AUSA R. Weingarten email to Mr. Andrade's counsel (Feb. 9, 2023).

iPhone – Serial Number: F2LZDER8N70L – IMEI: 35389910124723).”[8] The government's claim only to have run search terms on a spreadsheet is therefore false.[9]

Especially in light of these facts – all of which were in the government's possession while this issue was argued earlier this year – the government's complaint that Mr. Andrade (and presumably the Court) should have understood that all that was at issue was four Excel spreadsheets of extractions from Mr. Levin's phone is completely untenable. There was no ambiguity that Mr. Andrade was seeking the entire phone, or that the Court ordered the production of that phone: during the hearing on April 6, 2023, the Court twice said to the government "give over the device" (Dkt. #167 at 16),[10] the Court's April 7, 2023 order described Mr. Andrade's request as one for an "image[]" of Levin's phone (Dkt. #165 at 11), and the Court ordered "production of the Levin device" (Dkt. #165 at 13).[11]

The government's view – that Mr. Andrade (and presumably the Court) should have figured out that the government had only extractions because the Fourth Amendment permits the government to seize what is specifically enumerated in the search warrant – wrongly assumes that Mr. Andrade had access to that warrant. To the contrary, when Mr. Andrade inquired about the Levin warrant, the government did not produce it, responding instead, in a June 22 meet-and-confer, that the warrant was "in another investigation" and that it is "irrelevant to Mr. Andrade's case." Worse still, despite the Court having *ordered* the production of the warrant if it is relevant (interpreting relevance broadly to include, *inter alia*, whether Mr. Abramoff was working against

---

[8] FBI 302 dated February 9, 2023, *supra*.

[9] It is true that one of the case agents, Rohan Wynar, searched the extraction from the device for certain terms, but that occurred on March 20, 2023, over a month after the FBI in New York City ran search terms on a copy of Mr. Levin's phone. The FBI 302 explaining what was done on that date, in contrast with the explanation of what was done in New York City earlier, reports that the terms were applied to "Microsoft excel files" described as "extractions of a cell phone belonging to Alexander Levin," which had been "provided to [the] agents by Assistant United States Attorney (AUSA) Rebekah Donaleski from the Southern District of New York." *See* FBI-302-011731.

[10] In response to the Court's next statement, which directed the prosecutor to "tell me why I'm wrong,"Dkt. #167 at 16,the government made no mention of not being in lawful possession of the device or any part of it. Rather, it argued the device was irrelevant and accused the defense of "misusing his discovery." Dkt. #167 at 17.

[11] In addition, Mr. Andrade was not told and did not know of the existence of the four spreadsheets until they were produced for the first time on May 24, long after the arguments, weeks after the Court's April 7 discovery order,and over two months after the case agents received them.

8

1 Mr. Andrade),[12] the government *still* has not produced it – while at the same time telling the
2 Court that Mr. Andrade should be charged with knowledge of it.

Respectfully submitted,

DATED: June 22, 2023                    KING & SPALDING LLP

By: */s/ Michael J. Shepard*
      MICHAEL J. SHEPARD
      KERRIE C. DENT (*Pro Hac Vice*)
      CINDY A. DIAMOND

      Attorneys for Defendant
      ROWLAND MARCUS ANDRADE

---

[12] April 7 Order (Dkt. 165 at 12).