1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3      Before The Honorable Laurel Beeler, Magistrate Judge

4

5  UNITED STATES OF AMERICA,      )
                                  )
6            Plaintiff,           )
                                  )
7  vs.                            )   No. CR 20-00249-RS
                                  )
8  ANDRADE,                       )
                                  )
9            Defendant.           )
   _____)

10

11                               San Francisco, California
                                 Thursday, March 7, 2024
12

13   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
            RECORDING 11:28 - 12:22 = 54 MINUTES
14

15  APPEARANCES:

    For Plaintiff:
16                               United States Attorney's
                                    Office
17                               450 Golden Gate Avenue
                                 San Francisco, California
18                                  94102
                           BY:   CHRISTIAAN H. HIGHSMITH, ESQ.
19                               MATTHEW CHOU, ESQ.

20                               United States Department of
                                    Justice
21                               Antitrust Division
                                 San Francisco Field Office
22                               450 Golden Gate Avenue
                                 Room 10-0101
23                               San Francisco, California
                                    94102
24                         BY:   DAVID J. WARD, ESQ.

25         (APPEARANCES CONTINUED ON THE NEXT PAGE.)

ii

APPEARANCES:   (Cont'd.)

For Defendant:

King & Spalding, LLP
50 California Street
Suite 3300
San Francisco, California
    94111
BY:  MICHAEL J. SHEPARD, ESQ.

King & Spalding, LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
BY:  KERRIE C. DENT, ESQ.

58 West Portal Avenue
Number 350
San Francisco, California
    94127
BY:  CINDY A. DIAMOND, ESQ.

Transcribed by:          Echo Reporting, Inc.
                         Contracted Court Reporter/
                         Transcriber
                         echoreporting@yahoo.com

1

1  <u>Thursday, March 7, 2024</u>                              <u>11:28 a.m.</u>

2                      P-R-O-C-E-E-D-I-N-G-S

3                          --oOo--

4          THE CLERK:  Calling civil (sic) -- I'm sorry,

5  calling criminal action 20-249, USA versus Rowland Marcus

6  Andrade.

7      Counsel, if you could please state your appearances for

8  the record?

9          MR. HIGHSMITH:  Good morning, your Honor.  Chris

10 Highsmith, David Ward, and Matthew Chou on behalf of the

11 United States.

12         THE COURT:  All right.  Good morning.

13         MR. SHEPARD:  Good morning, your Honor.  Michael

14 Shepard and Cindy Diamond for the defendant Rowland Marcus

15 Andrade.  He is present by Zoom, as is our colleague Kerrie

16 Dent.  And, Mr. Andrade consents to proceed in that fashion

17 and appreciates the Court's accommodation.

18         THE COURT:  Great.  And, maybe put on your --

19 okay.  But I don't see -- I think that --

20         THE CLERK:  Well, that's --

21         THE COURT:  So Mr. Andrade can see me.

22         THE CLERK:  Oh, here it is.

23         THE COURT:  I know.  But I can't be in front of

24 the camera and see the people at the same time.  I mean,

25 it's just -- I can't sit in front of my computer and see

2

1  them, and I need to be able to spread out here.  So, I think

2  -- and I don't -- if the cord is not long enough.

3          THE CLERK:  Okay.  Let me see if I can --

4          THE COURT:  So if you just put yourself on camera,

5  then Mr. -- you can --

6          THE CLERK:  I would ask that --

7          THE COURT:  Okay.

8          THE CLERK:  That's my -- that's --

9          THE COURT:  Okay.

10          THE CLERK:  That camera is facing --

11          THE COURT:  Can we ask IT, please, for a longer

12  cord for my camera?  I can't just be behind my computer

13  screen.  I have to have it, like, front and center.

14          THE CLERK:  Okay.

15          THE COURT:  So that's just how it's going to work.

16  Okay.  If that screen were working in the back, then he

17  would have a view back in the courtroom.  So maybe you

18  can --

19          THE CLERK:  I'm working on that.

20          THE COURT:  -- get IT to come up and put that on.

21  Okay.

22      So, let's talk about where we are based on the fact of

23  the reply brief.  Can we just talk through the issues?

24          MR. HIGHSMITH:  Yes, please.  Let's --

25          THE COURT:  So, let's talk through the issues.

3

1 Like, let's use as a frame of reference your reply brief.

2 Okay.  So --

3          MR. SHEPARD:  Okay.  Should I start?

4          THE COURT:  Yeah, you just -- let's just talk

5 through them.

6          MR. SHEPARD:  I guess I would start by saying we

7 come to you in need of help --

8          THE COURT:  I appreciate that.

9          MR. SHEPARD:  -- because we have a case to try in

10 August --

11          THE COURT:  No, I know that, yeah.

12          MR. SHEPARD:  -- despite sometimes more than 10

13 requests for particular items, we're still missing four Rule

14 16 discovery, potentially large volumes of it.  And instead

15 of actually getting the material, we get a lot of

16 unfulfilled promises, shifting contradictory explanations,

17 you know, just in the reply briefs -- in the opposition and

18 reply, for example, they say --

19          THE COURT:  Well, that's what I have in front of

20 me open, the oppositions and reply.

21          MR. SHEPARD:  -- they're willing to produce Mr.

22 Abramoff's Blu-ray disc and the OCNA (phonetic) USB thumb

23 drive.  They also say they've produced them in the past,

24 which is a bit of a head scratcher for me, because they

25 previously rejected our request that they produce them and

4

1   -- you know, and given the chaotic, disorganized, sometimes

2   shuffled Bates number productions that we get, we have said,

3   "Hey, if you think you've produced something, just give us

4   the Bates number.  We'll check for it."  Never provided for

5   this or anything else.

6           THE COURT:  Okay.

7           MR. SHEPARD:  And they say in their opposition,

8   "Don't worry.  As an accommodation to you, we will produce

9   them immediately."

10          THE COURT:  Okay.

11          MR. SHEPARD:  That was three weeks ago.

12          THE COURT:  No, no, I appreciate --

13          MR. SHEPARD:  Three weeks ago.  We don't have

14  them.

15          THE COURT:  All right.  So let's -- here's the

16  thing about me, I dwell in the realm of the particular, not

17  the abstract, and I increasingly -- like, my latest thing

18  I'm saying to people is I just -- everybody's case is the

19  most important case in the world to them, and that's fine.

20  But when we talk with me, we're going to talk in the realm

21  of the particular, we're going to do particular problem

22  solving.

23      And I just -- I can't -- I would appreciate on a going

24  forward basis, we just deal with, like, what's outstanding,

25  when you can do it.  And I don't need the optics, I don't

5

1  need the context, I don't -- and I'm saying this very

2  mildly.  I don't need any invective.  I don't need any of

3  that.  I just dwell in the realm of the particular.

4  Anything else is self-indulgent.  And I don't need it

5  because I don't have the bandwidth for it.  I used to have

6  more bandwidth, and I don't anymore.

7       So that's how we're going to do things going forward.

8  I don't need 25 pages when four pages could have sufficed.

9  And so please don't do it.  I mean, I know that your case is

10 important.  I'll tell you, my uncle was a very successful

11 plaintiff's lawyer, and he always said, "It's not the

12 lawyer's job to care about you."  Luciko (phonetic) once

13 said in the FBA conference -- she said, "If you knew how

14 hard we worked, you wouldn't do this to us."  That's not --

15 that's just not true.

16      So -- but my rules are, I dwell in the realm of the

17 particular.  And I -- next time, I might say, "It's too much

18 for me, take out all the argument, just give me the facts,

19 and we'll deal with it," because I just don't have the

20 bandwidth.  And when you give me stuff like that, I'm not

21 going to do as good a job.  And that also is the point

22 sometimes.  I understand that too.  All is fair in

23 litigation, but I just can't tolerate anything other than

24 the particular.

25      So let's just talk -- and then the other thing from a

6

1  -- like, I -- discovery -- it's very optimistic of you to

2  expect in -- that in the world of government productions,

3  that it's going to look like it does in civil litigation.

4  And it just never does.  And so it just never does.  And I

5  am -- like, I had a trade secrets case yesterday, and boy I

6  was like, please just hire a third-party vendor the way we

7  do it in the civil side, it would be so easy.  And they

8  don't.  So the only tip I have for you is, if you can get a

9  really good paralegal on your case as fast as you can from

10 the beginning and get them started from the get-go, a

11 Merriam (phonetic) Barrows or somebody like that, then your

12 life is exponentially easier.  In the context of a case when

13 the Bureau is involved, they will give you a paralegal if

14 you ask for it.

15      So let's just talk about -- so just the -- that's just

16 the reality.  And so the government's -- I never -- I don't

17 ever doubt your good intentions.  I appreciate that you have

18 an August trial date, and we need to come, you know, with

19 firm plans for getting you things.

20      So just on the issue of the phones -- the Andrade

21 mobile phones, what is at -- what -- from the government's

22 perspective, what's at stake here that hasn't been produced

23 or has been produced?  And if there's more to be produced

24 there, what's the time line for doing it that's reasonable?

25           MR. HIGHSMITH:  So I don't think there's -- so --

7

1  all right.  Let's talk about specifics, and I did not get

2  into it --

3          THE COURT:  And I just like -- I figure that the

4  reply is at least what's left.  You know, we always start

5  out with this --

6          MR. HIGHSMITH:  I actually think mine is more to

7  the point.

8          THE COURT:  I've got your -- I've got it open here

9  too.

10          MR. HIGHSMITH:  I tried to keep mine succinct

11  and --

12          THE COURT:  Yes.  No, no --

13          MR. HIGHSMITH:  -- just to the issues.

14          THE COURT:  Yes.  That's fine.

15          MR. HIGHSMITH:  So I'm looking at mine.

16          THE COURT:  Okay.  That's fine.

17          MR. HIGHSMITH:  All right.  The first phone they

18  asked for, we returned it four years ago.  We'll give them

19  -- if there's an image of it, we'll give them an image that

20  will be duplicative of the phone that we returned four years

21  ago.  If they're asking for more phones, Special Agent

22  Zartman (phonetic), who's here today, returned those phones

23  to Counsel last week or several weeks ago.  To the extent

24  there's images that we have that they don't have, we'll

25  produce them.

8

1      Now, as I said in my brief, this is not civil practice.
2  Everything is not perfect.
3            THE COURT:  No, no.  I know that.
4            MR. HIGHSMITH:  The phone extraction was not
5  perfect.
6            THE COURT:  It's just not -- it's just -- don't
7  worry about it.  Don't worry about it.
8            MR. HIGHSMITH:  And part of the problem is --
9  okay.  I'm not going to get into it.  But sometimes they
10  don't believe -- when I say the extraction was partial --
11            THE COURT:  Welcome to the world of -- yeah.
12            MR. HIGHSMITH:  -- they say, "No, it wasn't."  And
13  I -- there's nothing more I can say other than, "No, the
14  extraction was not perfect."
15            THE COURT:  No, that's -- don't worry about it.  I
16  understand that.  I would just say Mr. Shepard is super on
17  it, and that's just civil litigation.  So you have a civil
18  litigation approach in a criminal case.  It's fine.
19      And I -- the issue here is, it sounds like all phones
20  have been returned.  The only potential issue is whether you
21  have an image.  What is the time frame to look at whether
22  you have an image?  When can you determine that, question
23  one?  And then when can it be produced if it exists?  What
24  does that look like from the agent's perspective?
25            MR. HIGHSMITH:  I think it looks like a couple of

9

1    weeks, and I think we're on it.

2            THE COURT:  Okay.

3            MR. HIGHSMITH:  This is like, A, number one, we're

4    on it, it's going to be a couple of weeks.  I don't think

5    there's an order -- we need an order.

6            THE COURT:  I'm not going to -- all I'm going to

7    do is memorialize it.  If I don't memorialize it, I lose it.

8    And I can't handle the -- it's a one touch rule.  I can't

9    handle 25 pages.  I'm never going to look at your 25 pages

10   ever, ever again.  And so I'm just going to say the

11   government will produce -- government representative will

12   produce in three weeks.

13           MR. SHEPARD:  I mean, the problem is that then

14   they ask communications between the laboratory and the

15   government.  I mean, the communications about -- that's not

16   Rule 16.  That's not -- they want our internal

17   communications about testing the phones.  The problem is

18   that --

19           THE COURT:  So here's what I would say -- I mean,

20   you are -- again, no idea, because I don't know what the

21   communications are.  And it can be fair game in cross

22   examination to attack the integrity of a government

23   investigation.  That's the potential stray into -- and

24   probably there's nothing there, probably your issues are

25   work product or privilege or whatever -- vendor, probably

10

1  there's nothing there -- the agencies, the Bureau.

2            MR. HIGHSMITH:  They're the primary.  There's --

3  the IRS secondary.

4            THE COURT:  Right.

5            MR. HIGHSMITH:  We'll get into that later.

6            THE COURT:  Well -- so you know the way the

7  bureau's files are organized.  They've got -- you know, they

8  just -- they know to look in those different areas to see if

9  there's anything that they need to produce to you.  And the

10 1A files or whatever they're called -- I have the whole --

11 you know, whatever.  And there probably isn't anything

12 there.  You don't have to produce stuff that's not Rule 16

13 and that's not Brady.  I cannot do your discovery ruling for

14 you, but I've identified the potential area where there can

15 be, you know, some issues.

16      So, again, I'm listening to you with -- knowing nothing

17 about your investigation.  If the allegation is, "Well,

18 we've got the phones returned, we've got an image.  It's

19 imperfect.  You said it's imperfect.  Sorry, you can't

20 expect perfection from me," totally fair.  And sometimes

21 there's something relevant to that determination that's in

22 some of the different files where the FBI keeps all of its

23 information organized in different ways for the IRS.  IRS is

24 meticulous, by the way.  Not to say the Bureau isn't, but

25 the IRS is meticulous and also sometimes can be pulled in to

11

1 help with the discovery pieces.

2     But I can't order more than that.  Their Rule 16

3 obligations are their Rule 16 obligations, and I think that

4 that probably is it for the phones.

5         MR. SHEPARD:  Can I address that, your Honor?

6         THE COURT:  Yes.  Yes.

7         MR. SHEPARD:  Mr. Highsmith says, "We've already

8 produced the phone."  The problem is that what they produced

9 was about 300 megabytes.  They produced it two different

10 times.  And it was different from one to the next.  So we

11 don't really know what was produced, what was imaged --

12         THE COURT:  That would be that potential relevance

13 of the extraction files.

14         MR. SHEPARD:  Yes, and --

15         THE COURT:  That can be like a -- it's like a

16 table of contents to what happened.  I'm not saying it's

17 there.  It might not be there.  But the agents should look,

18 because if -- that's the only potential -- it's kind of like

19 documents and devices and evidence, like the Rule 16 stuff

20 in the government's possessions.  Just have the agent look

21 at that.

22         MR. HIGHSMITH:  And we're doing -- we're not --

23 we're doing that.  We're -- the problem -- I don't -- we

24 have 10 things on here.  I don't want to get bogged down.

25         THE COURT:  Yeah, yeah, yeah.  Well, yeah.

12

1          MR. HIGHSMITH:  But the problem is we -- we're

2    doing that.  We're obviously doing that, and we're going to

3    turn it over.  The problem is when we get push back on stuff

4    that is invented.  That's the problem.

5          THE COURT:  But that's just -- I mean, you know --

6    you have my condolences, and it's part of the thing to

7    endure in litigation.  That's just what happens, right?  So

8    it just happens.

9          MR. SHEPARD:  I got so much discovery, I don't

10   need to invent any more.

11         THE COURT:  No, I -- it's a strategy.

12         MR. SHEPARD:  And it's not -- it's not a strategy.

13   I just want what I'm entitled --

14         THE COURT:  I'm not saying that without love.  I'm

15   just saying -- it's the (indiscernible) the government

16   approach.  And the government -- I would just say to the

17   government, "Too bad, you've got to suck it up and deal with

18   it," right?  So it's all fine.  It's all fine.  Sorry.

19   Like, I wish I could do more, but I can't.  And I wish I

20   could help you better, but I can't.

21        So all we can do is, I've told the government what it

22   needs to do.  It knows what it needs to do.  I've not told

23   you.  You know what you need to do.  That's the marginal

24   potential relevance, which is relevant to the extraction

25   issues.  I would say that, again, I -- you know, Diana

13

1  (phonetic) is sitting in the audience, and there's -- there

2  is a fix to this.  The devices have been returned, right?

3  Third-party vendors.

4          MR. SHEPARD:  We have all kinds of inside and

5  outside experts who we used to try to get through this

6  discovery, and they can't fathom -- they can't figure it out

7  either.  It is --

8          THE COURT:  Well then you probably exhausted

9  what's possible, because if your experts can't figure it

10  out, the government's certainly can't --

11          MR. SHEPARD:  No, but --

12          THE COURT:  -- and the government has -- I'm

13  sorry, I don't mean to be rude, but the government --

14          MR. HIGHSMITH:  No, you're corroborating what the

15  government said.  I just told you the government couldn't

16  get into the phones.  And he said, "Well, neither can my

17  experts."

18          MR. SHEPARD:  No, that's not --

19          MR. HIGHSMITH:  Well, there you have it.

20          MR. SHEPARD:  That's not what I said at all.  I

21  said they can't figure out --

22          THE COURT:  But we can't -- particularly, we've

23  dealt with what we can deal with.  I can do nothing more.

24          MR. SHEPARD:  One other --

25          THE COURT:  Okay.  Yes.

14

1        MR. SHEPARD:  point along the line -- same lines.
2  What we got from the opposition about the Motorola G7 was
3  that only a limited portion was imaged, presumably because
4  of technological constraints.  So we don't even know what
5  the supposed problem was.  And that gets to what the Court
6  was asking then --

7        THE COURT:  Well -- I mean, if there's something
8  in the Bureau's or the IRS -- it's going to be the Bureau
9  that sent this stuff off -- that's relevant to what I call
10 the standard Rule 16 documents, et cetera, within the
11 government's possession that kind of gives context to them,
12 the Bureau will look and produce.  That is their obligation,
13 and they will do it.  Other than that, it's not within any
14 -- the government has to do it's <u>Brady</u> obligations.  It
15 knows that it has to review the files personally.  It's all
16 going to be fine.

17     And the reality is -- the practical reality is, this is
18 your forensic landscape from the government's perspective.
19 They don't have to search devices that they seize at all if
20 they don't want to.  They might have to return them to you.
21 They might have to do an image.  They are not charged,
22 although there can be fair cross examination -- as I said,
23 there's authority -- they don't even have to do -- I'm not
24 saying you didn't do a great job on your investigation.  I'm
25 sure you did.  But if they did, that may be an attack on the

15

1 investigation that's useful at trial.  But they don't have

2 to do more than they've done.  And so that's just the

3 reality.

4     So let's move to the next issue.

5         MR. HIGHSMITH:  The next issue is very frustrating

6 for the government, your Honor.  This seems to be indicative

7 of what's happening is we're -- we've got issues that don't

8 make any sense, and we're wasting time on it.  So --

9         THE COURT:  Not particular enough for me.  So

10 let's talk about the particular.

11         MR. HIGHSMITH:  Okay.  So a Trezor wallet is an

12 external -- it's like an external hard drive, right?

13         THE COURT:  Yes.

14         MR. HIGHSMITH:  And -- look, I'm not the world's

15 best tech person.  But it's an external -- it's an external

16 wallet, and it has a private key on it.  The government

17 cannot get into that external hard drive.  There's evidence

18 in the case that I cited in my reply where there's a witness

19 who says Mr. Andrade stored cryptocurrency keys on the

20 Trezor wallet.

21     So that was seized.  It's evidence of proceeds of a

22 crime.  I've told the defense this multiple times, if they

23 want us to figure out what's on the Trezor wallet, give us

24 the password, we'll open it up, and then we can litigate

25 whether it's, you know, properly seized or whether it should

16

1 be forfeited, or whether they have a claim to it.  But we

2 cannot access it because we don't have the password.  The

3 defendant has the password.  We've said this multiple times.

4 I honestly don't know what they've been saying over and over

5 again in their briefing.  It doesn't make sense.

6          THE COURT:  So let me just -- but let me just -- I

7 don't want to cut you off from being able to make your

8 argument, but I'm just going to say something first, and

9 then you can weigh in.  So let's just -- so this is kind of

10 like the equivalent -- so is the only function of the wallet

11 assets?

12          MR. HIGHSMITH:  That's my understanding is that --

13          THE COURT:  So Mr. Shepard is shaking his head no.

14 What other function -- you said it's like an external hard

15 drive, but it's called a wallet.

16          MR. SHEPARD:  It can store transactional data --

17          THE COURT:  Got it.

18          MR. SHEPARD:  -- and that's what we want from it.

19          THE COURT:  So here's the thing.  Again, I -- so

20 they want access to the transactional data, which they think

21 -- they don't want to give you the -- I mean, I'm just going

22 to -- they don't want to give you the passwords, because if

23 there's something bad there, they don't want you to get it.

24 They want to look at it themselves.  I -- and I do recognize

25 that this issue of -- let me just finish my thought, just to

17

1  sort of trace this out.  I'm not saying I'm right.  I'm

2  just, like, thinking it out.

3      Let's say there's transaction data there that's

4  potentially relevant.  And you don't want Mr. Andrade to

5  have access to proceeds, essentially -- proceeds.  So that's

6  fair.  Let me just finish the thought.  And so the issue

7  then becomes access to information that the government is

8  unable to access that may have some exculpatory relevance to

9  the -- let me just finish the -- that you don't want the

10 attorney -- the client himself to be able to get those

11 assets and make nefarious use of them.

12     And so why can't that be done the way you look at

13 source code in IP litigation where it has to be done, you

14 know, like in the attorney -- the -- basically, the attorney

15 controls all access to it.  The client might be able to look

16 -- I'm not saying the client can't look, but the client

17 couldn't manipulate.  And I don't see why this isn't -- if

18 it -- why this isn't a surmountable problem with the

19 equivalent of you can't do AEO really when you're going to

20 trial, but it's the equivalent level production that we give

21 to, you know, source code, for example, which is one of the

22 most protectable things that you've got in litigation -- in

23 patent litigation.  So why can't you produce an image to the

24 attorneys with the protections that prevents nefarious use

25 of it?  Why can't that happen?  Because isn't it Rule 16?

18

1          MR. HIGHSMITH:  Okay.  They haven't made any

2  showing there's transactions on the wallet.

3          THE COURT:  Well, they don't know, because -- I

4  mean, look, here's the practical reality, you know, one --

5  Joe Rosonelli (phonetic) used to say, they -- clients know

6  what they did.  But really, the reality is, people you

7  accuse -- sorry, often are -- who believe in the process,

8  they're criminals.  And so -- and a lawyer can -- does not

9  have to make a showing.  You have to turn over the Rule 16

10 stuff that's in your possession.  They don't have to make a

11 showing of it.  Now, you can't access it, and you have a

12 legitimate concern with access to proceeds.  But why isn't

13 it Rule 16?  Why don't they get it?  And why aren't your

14 interests protected by the equivalent of putting on the

15 lawyers the opportunity to review it in a way that the

16 client cannot independently access it?  That's a solvable

17 problem.

18         MR. SHEPARD:  Yes.  And it is Rule 16 material.

19 And it's not like even I can -- I don't know how to

20 (indiscernible), but it seems like we have an expert -- we

21 have --

22         THE COURT:  But you just couldn't, like -- like,

23 you know, if it happens, that's how it would work.

24         MR. SHEPARD:  Right.

25         THE COURT:  That's the questions that I have, but

19

1   I don't even have my rules in front of me.

2           MR. HIGHSMITH:  You can'T -- it's a -- you can't

3   make an image of it.  It's a hard -- it's like a hard drive.

4           THE COURT:  Really?  You can't make an image of

5   it?  Well then you can do -- yeah.

6           MR. HIGHSMITH:  The purpose is -- it's like --

7   what's -- the best analogy is like --

8           THE COURT:  Then you can do -- then you do the

9   equivalent of a SCIF review.  Not in a SCIF, but it's just

10  -- you set it up.  We do it all the time.  I -- like, all

11  the time, I would have people come sit in an office two

12  doors down from me with their -- I would have a paralegal

13  sitting in the office having a -- maintaining the integrity

14  of the process.  They look at it, and they can look at it.

15  And so that's -- so there is -- you -- this is a

16  surmountable problem that maintains every interest that you

17  have in not allowing, you know, because it would -- because

18  --

19          MR. HIGHSMITH:  So -- but this --

20          THE COURT:  Yeah.

21          MR. HIGHSMITH:  I've never had this scenario,

22  where you basically -- okay.  So he -- let's just --

23          THE COURT:  Half the -- half the -- here -- I'll

24  give you a --

25          MR. HIGHSMITH:  Let's just be -- can I just --

20

 1          THE COURT:  Yeah.  Yeah.  Okay.

 2          MR. HIGHSMITH:  -- can I just engage a little bit?

 3  So he -- he steals money --

 4          THE COURT:  Yes.

 5          MR. HIGHSMITH:  -- right?  He converts it to

 6  crypto, and then he has a -- he has an external wallet where

 7  he stores the key, okay?  And so that external wallet has

 8  the password to his crypto, which is the proceeds of his

 9  crime.  And we can't get into the wallet.  We don't -- we

10  can't access it, because we don't have the password to get

11  in.  So you're saying that the lawyers get to go and look at

12  the wallet that the government has not looked in, which

13  actually his access --

14          THE COURT:  I'm not saying that.  I'm just

15  wondering whether it's Rule 16 and how that factors into it.

16  And then I don't know, like, why can't -- I haven't thought

17  this out well enough, but why can't you -- you know, you can

18  -- technically, I don't know that the password is compelled

19  -- that trying to compel it like the passwords that you do

20  for phones when you compel production -- I'm not so sure

21  it's off limits for you to try to compel the password.

22          MR. HIGHSMITH:  I don't know how we would -- how

23  would we -- well, this is what I said -- I said voluntarily,

24  "Hey, guys, we're happy -- just give us the password, and

25  we'll turn over the entire contents of the hard drive.

21

1          THE COURT:  All right.  So you -- and you cite --

2  I mean, I haven't looked at all the cases you cited.  I do

3  have them in a folder that I'm going to look at.  Did you

4  cite any cases to support your position?

5          MR. HIGHSMITH:  No, because this is totally new.

6          THE COURT:  I'm having a little trouble with

7  whether it's Rule 16 or not.  I'm a little concerned that

8  it's Rule 16.

9          MR. SHEPARD:  It's --

10          THE COURT:  Documents, evidence in the

11  government's possession and control.

12          MR. SHEPARD:  It's something seized --

13          THE COURT:  Yeah.

14          MR. SHEPARD:  -- from the defendant --

15  unquestionably seized from the defendant.  It is right smack

16  in the target of Rule 16.  We're entitled to what -- we're

17  entitled to inspect --

18          MR. HIGHSMITH:  They can look at it anytime.  Come

19  to our office and look at the hard drive that we can't get

20  into.  Come on over.  Anytime you want, you can come look at

21  the hard drive.  That's exactly what happens in analogous

22  cases.

23          MR. SHEPARD:  So we -- that's never been offered

24  to us until now.  I'll take that offer.  We'll send an

25  expert over.  We will have the expert inspect.

22

1      MR. HIGHSMITH:  But you don't get to unlock it.

2      MR. SHEPARD:  Yes, he gets to unlock it, because

3 it's our client's property.

4      MR. HIGHSMITH:  No, it's the property of the

5 government.

6      MR. SHEPARD:  And it was seized from him -- it was

7 seized from him.  And we are entitled to inspect it on the

8 plain face of Rule 16.  So I propose we send an expert over.

9 He's not going to steal the money.  He's going to see if --

10      THE COURT:  It would have to be -- you can manage

11 this through the protective order (indiscernible).

12      MR. HIGHSMITH:  But this isn't -- what I'm

13 offering is not what he wants.  I'm saying your expert can

14 come and take a look at the hard drive.  There will be an

15 FBI agent who's not in the case -- it'll be a separate FBI

16 agent.  They'll sit there.  That's it.  You can look at it.

17 Great.  Just what we can do.  You have the same access to

18 the evidence that we have.

19      THE COURT:  I don't know that that flies under

20 Rule 16.

21      MR. HIGHSMITH:  I don't think it's appropriate for

22 them to be able to kick the FBI agent out of the room.

23      THE COURT:  But what's appropriate is an inquiry.

24 It's what the rules require.  And so you don't have to

25 return it, for sure, when it's, you know, under the -- you

23

1 know, under the seizure doctrine.  I don't think you do.  I
2 mean, you can.  There's a way around things, but you don't
3 have to.  And you can forfeit it, and you can do all of
4 those things.  I'm not sure you can deny access to it under
5 Rule 16.

6          MR. HIGHSMITH:  We're not denying access.

7          THE COURT:  Well, I know, but he will have the
8 password.  The expert can come in.  It could be -- it can --
9 a protective order can be done to address your concern that
10 Mr. Andrade not have any access to it himself.  And then --
11 and that can be done through a protective order 100-percent
12 protecting your interests.  The FBI, they can be there to
13 preserve the integrity of the proceedings walled off from
14 the case, all of that kind of stuff.  It's a surmountable
15 problem.

16     I'm going to look at the Rule 16 issue a little bit
17 more closely.  But unless you can cite me authority that
18 it's not Rule 16 material, under the plain language of Rule
19 16, I think that expert access meets your interests, meets
20 theirs, you see what you get, and then you deal with it
21 after that.

22          MR. HIGHSMITH:  I'm just going to say --

23          THE COURT:  It's not going to hurt anybody.

24          MR. HIGHSMITH:  -- if the expert alters anything
25 in there, then I'm going to charge their expert.  They

24

1 cannot tamper with the evidence in the case.

2      THE COURT: What you're going to do is, you're
3 going to sit down in advance with the agent with expertise.
4 There's so many people in the FBI with huge -- Elvis Chan,
5 for example. Somebody -- whoever that person is down in San
6 Jose, they can tell you how it can be done. And it's going
7 to be okay. If there's an issue there, the expert is not
8 going to tamper with the evidence. The expert is going to
9 sign on to the protective order that has the requirements.
10 And if they violate the protective order, they can be
11 prosecuted for contempt of Court. You don't even have to
12 charge them.

13    So it's going to be okay. It's going to be okay.
14 You're not telling me anything legal, right? So you're
15 saying it doesn't seem appropriate. I'll look at the Rule
16 16 issue, but that's what I think the answer is. Tell me
17 why I'm wrong. I mean, I'm super happy for you to tell me
18 why I'm wrong. But I think I'm right.

19      MR. HIGHSMITH: There's just no circumstance where
20 a defendant gets to go in without -- and see what we can't
21 see. It -- that's --

22      THE COURT: Well, they do it all the time, because
23 they don't always -- you don't always get everything. The
24 issue is Rule 16 and whether --

25      MR. HIGHSMITH: Not in our possession.

25

1        THE COURT:  -- it's evidence that you -- if it's
2   documents that the government has seized, how is that not
3   Rule 16?
4        MR. HIGHSMITH:  It's a hard -- it's physical
5   evidence.
6        THE COURT:  It's physical evidence.  I'll look at
7   the Rule 16.  I -- Rule 16 doesn't delineate between --
8   whatever.  My straight up question is, is it Rule 16?
9   Period, end of story.  And if it is, then I think access
10  needs to be given, and I think your concerns about, you
11  know, nefarious wrongdoing can be addressed by the
12  protective order --
13        MR. HIGHSMITH:  Understood.
14        THE COURT:  -- without tampering -- without
15  hurting the evidentiary value of it.  That's my inclination.
16  I don't want to order it if it's not Rule 16.  It's like --
17  it stands or falls on Rule 16.
18        MR. HIGHSMITH:  I would recommend that the Court
19  order us to meet and confer about procedures that protect
20  the government's interest in the integrity of evidence and
21  not -- and evidence not being tampered with.
22        THE COURT:  Yeah.  And that's totally fair.
23        MR. HIGHSMITH:  And with the defendant's interest
24  in reviewing evidence.
25        THE COURT:  Okay.  We'll -- I'll figure out

26

1 something.  This is a surmountable -- this is a surmountable

2 problem.

3      Next issue.  Only maybe, you know -- I have to

4 entertain myself, if nothing else, otherwise this is too

5 bloody miserable.  Okay.  So next issue, Mr. Highsmith?

6           MR. HIGHSMITH:  Well, it's their --

7           THE COURT:  I guess that's a click on the late

8 notice that I'm talking about.

9           MR. HIGHSMITH:  It's their motion, so --

10           THE COURT:  Okay.  So what do you want to talk

11 about next that's outstanding?

12           MR. SHEPARD:  So the next issue in order, your

13 Honor, is the recordings.  The government says we're asking

14 for recordings that don't exist.  We illustrated in our

15 reply we have at least two that we know of that pretty

16 clearly exist.  We know Mr. Ruzicka (phonetic) was

17 interviewed, and the interview was recorded.  We know that

18 Mr. Boyer (phonetic) had a call with our client scripted for

19 him by the agents.  And we know the agents told Mr. Boyer

20 afterwards that the call was recorded.  We don't have either

21 of those recordings despite requests and --

22           THE COURT:  I 100-percent don't think that the

23 government has withheld anything.  So I just don't want to

24 stay there.  If they don't exist anymore and the government

25 has said that, what else can we do?  And then you attack --

27

1  I mean, it's fair game, attack the shoddiness of the

2  investigation at trial, but I don't think they have to --

3  they can say they looked for them and they can't identify --

4  that they diligently looked everywhere that they could

5  possibly be.  They haven't been able to find any recordings,

6  and they don't have anything to produce.  That's just the

7  end of it.  How you choose to, you know, make hay of that in

8  cross examination, completely fair.  I would let you do it.

9  Judge Walker could let somebody do it, and it worked very

10  well.  And so I just -- there's nothing more I can order.

11         MR. SHEPARD:  Well, I think there is in the sense

12  that even they say they're going to continue to review.  And

13  I think you can tell them.  They need to review this,

14  because it's clear that they --

15         THE COURT:  You're doing a diligent thorough

16  review, correct?

17         MR. HIGHSMITH:  We are -- yes.

18         THE COURT:  I'm sure it's overwhelming.  It's just

19  fine.  That's fine.

20         MR. HIGHSMITH:  We have excellent -- the agents on

21  this case --

22         THE COURT:  I know that they are.

23         MR. HIGHSMITH:  -- work extremely hard.  They are

24  very diligent agents.

25         THE COURT:  I know they are.  I know they are.

28

1  It's the premier law enforcement agency.

2          MR. HIGHSMITH:  Well, yeah.  And these are the

3  premier agents --

4          THE COURT:  Yeah -- no, I know that.

5          MR. HIGHSMITH:  -- in that premier law enforcement

6  agency.

7          THE COURT:  I know that.  I know that.  I know

8  that.  I know that.  They're great.  And I just -- you know,

9  you could use -- everybody could probably use some more tech

10 assistance, but the Bureau in this case is doing a great

11 job.  I have no doubt.  And the IRS on top of it.  So that's

12 fine.  I'll write something, but I -- there's nothing I can

13 do.

14         MR. HIGHSMITH:  Well, I don't think there's a need

15 to write --

16         THE COURT:  There's nothing -- but I'm not going

17 to order anything.  I just have to memorialize what's

18 happened and what we said and reference the transcript.  I

19 just -- that's just the process here.

20     So next issue, Mr. Shepard.

21         MR. SHEPARD:  Next issue is SEC materials.

22         THE COURT:  Okay.

23         MR. SHEPARD:  The SEC work hand in hand with the

24 government in its investigation.

25         THE COURT:  I understand the issues.  Yeah.

29

1          MR. SHEPARD:  The government has repeatedly
2   refused to give us SEC materials.  Now they say, "Okay.
3   We'll look, but we're not going to look for work product
4   materials," which still shows they don't get it, because the
5   case law says they got to look at work product materials,
6   see if there's any Brady and other material in there, and
7   they have to produce it.
8          THE COURT:  Okay.  I'm going to -- I will -- I
9   have extensive research files as you might expect on the
10  issues of parallel investigations.  You know that you have
11  to get the SEC's notes, all of them, and do your Brady
12  review yourself.  You have to ask for the stuff.  You should
13  get SEC's files.  So they have them and just produce them.
14  It doesn't do you any harm.  I know you've produced what
15  you've got.  You do have an obligation to go look on the
16  Brady (indiscernible) stuff.  I know you know that.  The law
17  is clear.  And I don't -- so you tell me anything else that
18  you want to tell me about the SEC materials.  I mean, the
19  SEC materials -- like --
20         MR. HIGHSMITH:  There's not that much -- like,
21  honestly, this is sort of -- there's not a lot of stuff.
22         THE COURT:  Okay.
23         MR. HIGHSMITH:  The crux of the issue is the -- is
24  their work product, and they're not going to turn over their
25  work product.

30

1          THE COURT:  But you have to independently review

2 the work product for <u>Brady</u>.  And so that -- you just have

3 to.  It's just sucks, pardon my French, but an agent can't

4 do it for you.  It's an obligation that can't be delegated.

5 And I know because I've sat there and done it myself, and

6 it's awful, and as a lawyer.

7          MR. HIGHSMITH:  Their internal --

8          THE COURT:  Yeah, you have to review -- you have

9 to review all their notes and everything for <u>Brady</u>.  You

10 have to.  And you have -- it's a personal review that can't

11 be delegated.  You could pull in other lawyers in your

12 office to do it with you.

13          MR. HIGHSMITH:  Well, I'm fine doing it.

14          THE COURT:  Yeah.

15          MR. HIGHSMITH:  I'm just not convinced that's the

16 law, but --

17          THE COURT:  Yeah.  And you're the one who gets to,

18 you know -- and also the SEC will help you.

19          MR. HIGHSMITH:  No, no.  I'm --

20          THE COURT:  They'll tell you why it's work product

21 and --

22          MR. HIGHSMITH:  I'm fine doing -- I'm fine doing

23 that.

24          THE COURT:  Yeah.

25          MR. HIGHSMITH:  I'm just not sure the law is that

1  they get the internal communications.

2          THE COURT:  I looked at it with the -- and you

3  should talk to the -- Bryan (phonetic) or whoever is the

4  person in -- at the general counsel of the FBI.  But I know

5  -- I sat down and went through the same issue with Brenda

6  Atkinson at the time, and we determined that we had to do

7  it.  And we sat in the damn room floors (sic) and did it

8  all.  And I had a bunch of lawyers helping us, and we went

9  through the SEC's investigation.  And the SEC was nice

10 enough to help me by giving me an investigative attorney to

11 kind of help me out with getting the information packaged to

12 me in a way that facilitated review.  But it has to be done.

13 It has to be done.

14     Okay.  Next issue.

15          MR. SHEPARD:  Next issue is Turnberry Solutions.

16          THE COURT:  Okay.

17          MR. SHEPARD:  This is the one --

18          MR. HIGHSMITH:  Oh, this is good.  Let me

19 interrupt.  I got their lawyer on the phone.

20          THE COURT:  Yes.

21          MR. HIGHSMITH:  And he reproduced what was

22 missing.  So we will reproduce what was not produced

23 previously.  So we can move on to F.

24          THE COURT:  Okay.

25          MR. SHEPARD:  If only that had been done several

32

1  years ago.

2          THE COURT:  Well -- you know, it's just not

3  realistic.  I -- you know, everybody's -- I mean, again, I

4  just -- it's just not realistic.  It's just not realistic.

5  The government does -- I mean, I know it's -- it happens,

6  and it happens with plenty of time before trial, but it's

7  just an unrealistic expectation that can never be met, ever,

8  ever.

9      Okay.  Next.

10         MR. SHEPARD:  Next is Abramoff devices.

11         THE COURT:  Okay.

12         MR. SHEPARD:  There are some low hanging fruit

13  here.  The government says they will produce Abramoff's

14  Blu-ray disc and the OCNA USB thumb drive.  They said they

15  would do it immediately.  They still haven't.

16         THE COURT:  Okay.  Mr. Highsmith?

17         MR. HIGHSMITH:  It's ready to go.

18         THE COURT:  Okay.  Next?

19         MR. SHEPARD:  Beyond --

20         THE COURT:  I almost wanted you guys to go in

21  there in my jury room and meet and confer, but then I

22  decided I didn't want to subject you to it.

23         MR. HIGHSMITH:  I just -- I prefer this, your

24  Honor.  So thank you.  Thank you.

25         THE COURT:  Okay.  Next.  I'm trying to just load

33

1  my mail, because I've got meetings that I'm -- hang on a

2  sec.

3      Okay.  Mr. Shepard, yes.

4          MR. SHEPARD:  So beyond that, we have the same

5  issue that the Court has previously dealt with on the Levin

6  device, which is, the government acknowledges that there are

7  Abramoff devices that they have not given to us.  And they

8  say they have not given them to us because they never had a

9  lawful right to maintain possession, custody, or control

10  over --

11          THE COURT:  We've covered this before.  I just

12  can't -- they -- yes, they just can't.  I mean, you can do a

13  third-party subpoena to Abramoff, but I can't -- I can only

14  order the government to produce what is lawfully seized else

15  evade the strictures of the Fourth Amendment.  Yeah.

16          MR. SHEPARD:  I have given you my position on

17  that.

18          THE COURT:  Yes.  Okay.

19          MR. SHEPARD:  I'm not going to argue it again.

20  But what happened with Levin, the same thing that's

21  happening here.  The Belani case, the same case they rely

22  on, it says they can't continue to possess the materials,

23  yet they have continued to possess it while citing Belani

24  for six-and-a-half years.  The effect of that is heads I

25  win, tails you lose.

34

1           THE COURT:  And I understand that, but I -- first
2   of all, it's not Rule 16 in the same kind of way.  Somebody
3   else who has property rights to it could file a Rule 41
4   motion for return of evidence.  I -- it's -- you know, it's
5   not -- the government has turned over what it lawfully has,
6   and it can do no more.  There's just nothing I can order.
7           MR. SHEPARD:  It can follow what <u>Belani</u> says,
8   which is it can no longer possess it.
9           THE COURT:  Well --
10          MR. SHEPARD:  And then it should give them back to
11  Mr. Abramoff where -- in a way that we can then subpoena
12  them from Mr. Abramoff, just as it should be doing with Mr.
13  Levin, but it hasn't done it with Mr. Levin either.  So the
14  result is --
15          THE COURT:  I don't know that you really have
16  standing to make that argument.  So that's the -- you know,
17  the -- I mean, I know you have an interest, but, like,
18  literally thinking about standing in the constitutional
19  sense, I mean, the -- I don't know, I'll look at <u>Belani</u> just
20  to think about it.  It's -- think about the wiretap context
21  where we maintain the recordings.  You know, the government
22  has access.  And what it's able to access, it retains a copy
23  under seal, and it does so for evidentiary reasons.  I don't
24  know absent a Rule 41 motion to return, which Mr. Abramoff
25  have no interest in doing, that there's a -- that there's an

35

1  automatic -- a sua sponte obligation of the government to

2  return information that it seized.  I just don't think it

3  really works that way for a bunch of reasons, including what

4  I'm going to call the Raiders of the Lost Ark movie, one

5  reason of the government warehouse, things lost forever.

6      So that's my reaction to the situation.  And I'll look

7  at Belani, but I don't think that there's anything I can

8  order there.  I'll look at it, but I don't think, you know.

9          MR. SHEPARD:  Yeah, because, otherwise, it's just

10  -- like, the Court has already said --

11          THE COURT:  I understand.

12          MR. SHEPARD:  -- this is Rule 16 material.

13          THE COURT:  The government is -- obligations under

14  Rule 16 and -- have been satisfied with the phone for

15  reasons that are different from the information that it

16  can't access.  So its obligations here are satisfied.  And

17  of that, I am sure.  Okay.  Next.  I know I'm right.

18          MR. SHEPARD:  I mean, you're right that they

19  followed every other line in Belani.  But you are not

20  correct, I believe --

21          THE COURT:  Well, I'll look at Belani.  I said

22  I'll look at it.  I'll just look at that one issue.

23          MR. SHEPARD:  -- because the government should not

24  be allowed to take material that the Court has already

25  recognized.

36

 1          THE COURT:  That is not your interest.  Your

 2  interest is that of Brady and Rule 16, and that's been

 3  satisfied here.

 4          MR. SHEPARD:  Yes.  But the Court has already said

 5  this is Rule 16 material.  The government holds on to it in

 6  a way that we can't get it.

 7          THE COURT:  No, I didn't say that.  I said this --

 8  the government has access to information that has become

 9  Rule 16 information that it possesses lawfully, and it has

10  satisfied its discovery obligations.  That's what I got for

11  this issue.  Please feel free to appeal it if you disagree.

12  I will look at Belani, however, but you have your remedies.

13  It's the best I can do.

14          MR. SHEPARD:  Understood.  We'll move on.

15          THE COURT:  Are you having fun?

16          MR. SHEPARD:  Right.  Right.  Why are you here?

17          THE COURT:  Because it's just like getting an

18  education, right?

19          PRETRIAL SERVICES:  Great lawyers (indiscernible).

20          THE COURT:  Okay.  All right.  Mr. Shepard.

21          MR. SHEPARD:  Okay.

22          THE COURT:  I just thought I would call out

23  (indiscernible) for sitting there through all of this.

24          MR. SHEPARD:  Always good to have --

25          THE COURT:  I did tell Pretrial to come, right?

37

1 So --

2　　　　MR. SHEPARD:  Always good to have comic

3 interludes.

4　　　　THE COURT:  Yes.

5　　　　MR. SHEPARD:  The next item on the list is search

6 warrants, subpoenas, and other materials.  Here's another

7 one where the government said, "There's nothing here."  We

8 pointed out an example in our reply brief, or in our opening

9 brief, they say, "Oh, yes, we'll produce it right away."  We

10 still don't have it.  And that's illustrative of a series of

11 requests that we made for relevant material that they

12 gathered, not subject to <u>Belani</u> or anything like it that we

13 still don't have.

14　　　　THE COURT:  Mr. Highsmith?

15　　　　MR. HIGHSMITH:  So the -- let's focus on the

16 specifics.  My understanding -- and please correct me if I'm

17 wrong -- are that they want materials from Peter Ferrara

18 (phonetic) and David Sammon (phonetic).

19　　　　MR. SHEPARD:  No.

20　　　　MR. HIGHSMITH:  And -- that's what your -- that's

21 what your brief said.

22　　　　MR. SHEPARD:  No --

23　　　　MR. HIGHSMITH:  So please -- just hold on a

24 second.  So we will produce the returns from Mr. Sammon.

25 And we received no materials from Mr. Ferrara.  Obviously,

38

1  we're going to produce all -- this is just sort of repeating
2  before.  Obviously, we're going to produce all Rule 16
3  materials.  We have no interest in not producing those
4  materials.  But if something is not Rule 16, not <u>Brady</u>, not
5  <u>Giglio</u>, not <u>Jencks</u>, there's not an obligation to produce it.
6  It's pretty simple.
7           MR. SHEPARD:  We have been asking for this
8  material for several years.  We have detailed a long list of
9  particular subpoenas, search warrants that we believe we
10 were entitled to.  We laid it out in a series of prior
11 briefs.
12          THE COURT:  I can't go back.  Each brief is a
13 brand new day.  I just can't.  I mean, you know, query -- I
14 mean, seriously?  You know, this is not a realistic business
15 model, right?  This is not a realistic business model.
16     So, the government -- you know, the government has its
17 obligations to produce.  It doesn't have to review all --
18 when it accesses information and has it, it has an
19 obligation to produce it, it has an obligation to look for
20 <u>Brady</u>.  And it says that it will produce -- I mean, one
21 issue is this is the <u>WR Grace</u> issue.  And I completely know
22 how it works, that people are scrambling to do as good a job
23 as they can as fast as they can in anticipation of an August
24 trial date.  I understand the practical realities of all
25 that.  And it's just not -- it's not a great -- and at some

39

1  point, it's all got to be done.  And it's in everybody's

2  interest if it's done 60 days before trial, at minimum.

3      So I just don't know what the process is for you to

4  complete your process.  There's not a lot I can order.  And

5  I know that people are scrambling around trying to do it.  I

6  know that.  I just don't know what we can do here to keep it

7  tidy and organized and out of WR Grace Land, which I'm not

8  going to order stuff.  But you have to -- you have to come

9  up with a proposal.  That's like before when we talked about

10  the three weeks, you know, like, what's realistic?  And then

11  whether -- if it's -- I can't -- you know, I've learned you

12  just can't in some of these cases.  You just have to hue to

13  what's a realistic time frame, because this is not going to

14  work otherwise, because the government doesn't have the

15  extra resources.  Maybe it should.  So I think you get argue

16  about that, but you're never going to get a ruling like that

17  from me.  You're just not.  But I do want to make sure you

18  get all the information in an organized way in a way that

19  actually works.

20      And so I don't know what your thoughts are, Mr.

21  Highsmith, about what's realist (sic) and what your process

22  looks like.

23          MR. HIGHSMITH:  I don't think an order is

24  necessary.  I think the government knows very clearly what

25  its obligations are.  We've been doing this a long time.

*Echo Reporting, Inc.*

40

1        THE COURT:  Well, no, no.

2        MR. HIGHSMITH:  We know exactly what we're

3   obligated to produce.

4        THE COURT:  You know what your obligations are.

5   I'm just saying you stray into WR Grace territory and stuff.

6   I'm not saying like in any bad way.  You just have to be

7   careful with that.

8      So I would just say that I'm going to ask you to talk

9   to the agent and try to come up with a realistic time frame

10  for evaluating that and communicate it to the defense, so

11  you can plan.  And so -- and then if there's a problem with

12  that plan, let's talk about it.

13       MR. SHEPARD:  I mean, the government --

14       THE COURT:  I'm not unsympathetic.  I'm not

15  unsympathetic.

16       MR. SHEPARD:  And it's just that we've been saying

17  these same things for several years.

18       THE COURT:  No, no.  I understand that.

19       MR. SHEPARD:  So hearing that they know their

20  obligations --

21       THE COURT:  No, I understand that.

22       MR. SHEPARD:  -- we still don't have them.

23       THE COURT:  I understand that.  And I'm sure that

24  Mr. Weingarten would say that you're killing him.  That's

25  what he would tell me when he's in court, it's like,

41

1 "They're killing me, Judge." It's not a criticism. It's

2 not a criticism. But it's just that it is -- this is how it

3 goes, and you know that too. And so that's just how it

4 goes. So the government will do that. Just talk to the

5 agent within a week, come back and give the defense an idea

6 of like a time line that you think will work for you. Okay.

7         MR. SHEPARD: Okay. The next item, your Honor. I

8 assume you want me to go to the next --

9         THE COURT: Yes. I mean, we're almost there.

10         MR. SHEPARD: We're almost there, yeah. So two

11 more.

12         THE COURT: Two more, yeah. Or three more, maybe.

13         MR. SHEPARD: Unfortunately, more than two, but --

14         THE COURT: Okay.

15         MR. SHEPARD: Jack Abramoff's criminal wrongdoing.

16 The government treats this request as if it is a Giglio

17 request. It is not a Giglio request. And as the Court

18 knows --

19         THE COURT: No, I understand it's a Rule 16 and

20 Brady request.

21         MR. SHEPARD: Yes, it's a -- it is at the center

22 of the defense. So this is not a premature request. It's a

23 belated production request, and we need it sooner rather

24 than later. And this is -- the whole time we've spent here

25 is illustrative of why, because if the past is any guide, if

42

1 the government gives us this material, it will be scattered,
2 it will be hard to review, it'll be incomplete, we'll have
3 to argue about whether it was complete or not.  The
4 government will promise to give it to us immediately.  We
5 won't get it for a while.  And we need to get that process
6 going.  It's the center of the defense.  It should have
7 already been produced.  It should -- we need whatever
8 informant file there may be for him, his wrongdoing in other
9 cases -- it could be 404(b) evidence -- it's time to get it.
10            THE COURT:  So tell me what you want to tell me
11 about whatever it is that you're doing, what your thoughts
12 are about approaching the Abramoff problem.
13            MR. HIGHSMITH:  It's what I said before.  The
14 government understands its obligations.  There's no need for
15 extra orders.  This is a -- this is a huge lift.  The
16 government is doing it --
17            THE COURT:  Okay.
18            MR. HIGHSMITH:  -- the government is doing it very
19 carefully.
20            THE COURT:  I would do the same thing then.
21 That's what I wanted to hear.  I would just talk, again, to
22 the agent and just try to come up with a realistic proposal.
23            MR. HIGHSMITH:  We're talking every day and --
24            THE COURT:  No, no.  I know you are.  I'm not
25 ordering --

43

1          MR. HIGHSMITH:  -- this is a great team.

2          THE COURT:  It doesn't do me any good to order

3  things that are not achievable.  I would just suggest -- so

4  I'll write out something like, talk to the agents, try to

5  come up with an approach, try to see what's reasonable.  I

6  would just say this -- and, again, I know the agents are

7  probably meticulous -- if they would consider looking, if

8  only for you -- they -- often they have sort of meticulous

9  -- what I call fact work product, not opinion work product

10 that kind of goes with stuff and that you can sometimes be a

11 little bit more flex about producing some of that stuff.

12         MR. HIGHSMITH:  So the problem is, we've gotten

13 push back when we've done that in the past.  The problem is,

14 when we --

15         THE COURT:  I'm not ordering you to do it, yeah.

16         MR. HIGHSMITH:  -- try to do -- when we try to do

17 something, we get attacked for it.  And so it ends up not --

18         THE COURT:  Well, I can't help with that -- yeah,

19 I -- yeah.

20         MR. HIGHSMITH:  I understand.  I'm just giving the

21 Court some context.  That's all.

22         THE COURT:  No, I know.  I understand completely.

23 And I also understand who the agents are working on the

24 case.  And so just consider what the alternatives could be.

25 This is pretty good.  I mean, I know there's -- and, you

44

1  know, you know it too, there's -- you're not -- there are

2  going to be stones left unturned.

3      Okay.  Next.

4          MR. HIGHSMITH:  Fortunately, Mr. Ward gets to come

5  up for this one.

6          THE COURT:  Okay.

7          MR. HIGHSMITH:  I get a little break.

8          THE COURT:  Okay.  So is that 404(b)?

9          MR. SHEPARD:  The government objected to

10 responding to our request.  And it sounds like they're

11 now --

12         THE COURT:  No, it sounds like they're working on

13 it, yeah.  And I'm going to come up with a time line.

14         MR. SHEPARD:  Their answer is not that they object

15 to it, but now they're working on it.

16         THE COURT:  Yes.

17         MR. SHEPARD:  That's an --

18         THE COURT:  Okay.  And we'll get some kind of

19 reasonable process proposed by the Bureau.  I can't -- I

20 won't propose things that they can't do.  Okay.

21     Mr. Ward, what would you like to say?  Is it -- the

22 404(b) is what we're talking about.

23         MR. WARD:  Nothing.

24         THE COURT:  Get me out of here immediately.

25         MR. WARD:  Get me out of here immediately.  Your

45

1  -- the 404(b) request is premature.  Trial is set for August

2  5th.  We're early in March.  The cases that the government

3  cites, no weeks are reasonable.  That's the standard.  This

4  is a white-collar case.  We certainly will be reasonable.

5  It's not reasonable to ask for a 404(b) notice this far

6  ahead of trial when we're still developing our trial

7  strategy.  And I don't see -- the defense makes an ipse

8  dixit request, but cites no authority for why the Court

9  should order that this far in advance --

10         THE COURT:  Yeah, I think -- I mean, I've got the

11  -- I mean, one of these things -- I'm just running out of

12  time, like I have so much to do.  So one of the things in

13  the Rule 404(b) is, I do feel it's like a trial setting

14  thing, just like Jencks, you know, it's a trial setting

15  issue that needs to be worked back from the trial and needs

16  -- like that case management deliberation, I am not inclined

17  to order anything.  It's just a good idea.  I mean, it's --

18  it just would change anyway.  But so -- and so I think the

19  government is right on that piece of it.  And then if you

20  disagree, just like the Jencks-type issues, you know, rattle

21  on that front and get a scheduling order.

22         MR. SHEPARD:  It's -- I mean, it's --

23         THE COURT:  That's not me.  Yeah.

24         MR. SHEPARD:  Three-and-a-half years --

25         THE COURT:  No, I --

46

 1          MR. SHEPARD:  -- since (indiscernible) the case.

 2          THE COURT:  Hey, I --

 3          MR. SHEPARD:  And the notion that they don't know

 4   what they're going to offer --

 5          THE COURT:  Oh, I think --

 6          MR. WARD:  No, that's not right.  I mean it's

 7   not --

 8          THE COURT:  Anyway, you don't -- it's not --

 9          MR. WARD:  -- three-and-a-half years, it's four

10   months from trial.

11          THE COURT:  And also, there's just not going to be

12   that much of a 404(b) case.  And so it's just -- there's not

13   going to be a 404(b) case.  It's silly.  They don't need it,

14   right?

15          MR. SHEPARD:  We will work with the defense on a

16   trial scheduling order --

17          THE COURT:  Yes.

18          MR. SHEPARD:  -- as we get closer.  We will be

19   reasonable.  And certainly, they can come back --

20          THE COURT:  If the government's taste turns on

21   404(b), then they're in trouble.  And it doesn't.  Maybe

22   there'll be something there, but it just doesn't.

23       Okay.  Next.

24          MR. SHEPARD:  So undercover operations.

25          THE COURT:  Okay.

47

1          MR. SHEPARD:  This is -- not to belabor a theme,
2    this is another one where the government says it's given us
3    everything, and we point to specific examples of things they
4    haven't given us.
5          THE COURT:  Well, same issue that you told me that
6    -- of your stuff that you should have, and you don't have
7    it, and you can't find it.  I can't do more than that.
8          MR. SHEPARD:  I don't think it's that they can't
9    find it.  For example, we get explanations like, "Well, it's
10   not in our file, not in our case file."  "Okay.  There are
11   related cases.  Is it in the related case file?"  It's
12   things like that.  And for some of them, they don't even
13   say, "We've looked for it and we can't find it."  They say,
14   "Not obligated to look for it."
15         MR. WARD:  That's not what I said.
16       Number one, they asked for multiple recordings that I
17   said do not exist.  They don't exist.  They don't exist.
18   There is no recording of Shalu (phonetic) Maheshwari
19   (phonetic) relevant to this case.  End of story.  You asked
20   for Joe Ortiz (phonetic).  We will produce that.  We
21   produced the entire UC case file.  They asked for Telegram
22   and Discord chats.  That implies that these chats exist or
23   that we have them in our possession.  We have produced all
24   Telegram and Discord material in our possession.  I don't
25   know what else there is to say.

48

1    THE COURT:  I actually think this just, like,

2  folds into this sort of, like, the Rule 16 <u>Brady</u> type of

3  time line, you know, again, with -- you know, within reason,

4  agents come up with a process -- try to come up with a

5  commitment to get everything to you that can be located and

6  produced by X time, and then problem solve from there if

7  scheduling issues need to be addressed, like the 404(b)

8  notice, like the equivalent of -- which the government

9  doesn't -- isn't going to stand on <u>Jencks</u> in a case like

10  this.  But, you know, in the kind of the typical issues that

11  come up in the gang cases, we have to balance witness safety

12  with the defense need to prepare.  So let's just put it

13  under that.  Let's have a plan going forward.  I'm sure that

14  it's mostly done at this point.  Okay.  And I think -- is

15  there -- the Treasury Department.  Is that it?

16    MR. SHEPARD:  The final envelope.  Yes, we're at

17  the final envelope, the Treasury --

18    THE COURT:  I think Mr. Ward probably needs to

19  (indiscernible) this one too.  Just kidding.  That's just a

20  joke.

21    MR. SHEPARD:  -- the Treasury Department

22  investigation.

23    MR. WARD:  If only.

24    THE COURT:  If only, yeah.

25    MR. SHEPARD:  This is another one.  This -- to me,

49

1 it's -- think back to when we were talking about the SEC.

2 The government says it has produced the responsive documents

3 in our possession, which suggests to me it has not gone to

4 the Treasury Department to get this information.  And, you

5 know, by way of background, the allegation that Mr. Andrade

6 made was that Abramoff used his contacts at Treasury, caused

7 the IRS to do audits of Mr. Andrade as Abramoff threatened

8 he would do if Mr. Andrade did not do what Abramoff wanted.

9      So the question is, what investigation did the Treasury

10 Department do of that.  And since the IRS is one of the

11 agencies involved in this case, we should have access to

12 what the Treasury Department did.  The opposition says,

13 "We'll give you the 59-page complaint referral memo."  We

14 know what that is.  That's essentially the complaint that

15 our client filed as opposed to anything that the Treasury

16 did to investigate it.  And just like they have to deal with

17 the SEC, they should deal with the Treasury and get the rest

18 of it and produce Rule 16 Brady and Giglio material that

19 appears in the rest of the Treasury investigation.

20      THE COURT:  Okay.  I'm thinking about it, but I --

21 the thing that occurs to me is -- you know, there are the

22 two.  There's the law enforcement piece of it that your law

23 enforcement agent attached to the case.  There's always the

24 revenue agent piece of it.  You know, the revenue agents are

25 genius at the IRS, and usually that's to kind of pull into

50

1  Treasury to see what else happened that's relevant to the

2  investigation.  And there's probably not very much there, if

3  anything.

4            MR. WARD:  Okay.  So there's a -- let's read my --

5  let's read my reply brief.

6            THE COURT:  Okay.

7            MR. WARD:  First, the government case team has

8  reached out to Treasury.  So --

9            THE COURT:  Oh, I've got that right here.  Yeah.

10            MR. WARD:  I mean -- so counsel just said the

11  government refuses to reach out to Treasury.  No, we did

12  reach out to Treasury.  There was --

13            MR. SHEPARD:  I said, they didn't ask for anything

14  beyond the complaint.

15            THE COURT:  Well -- actually, that's -- they said

16  they will -- can speak with Treasury to get documents on

17  their file so they can turn over Rule 16 and <u>Brady</u>

18  materials.  And I just -- you know, the revenue agent can

19  probably help you out from the IRS.

20            MR. WARD:  Remember it's a civil rights complaint

21  against the IRS.

22            THE COURT:  No, I know.

23            MR. WARD:  So they're investigating, did the IRS

24  commit a civil rights violation?  Was it the Treasury?  Was

25  it that agent?

51

1          THE COURT:  No, I understand.  But you've already

2   said that you're reaching out to them to see what's there.

3          MR. WARD:  And we are.  Absolutely.

4          THE COURT:  And that's -- we'll do the same, you

5   know.

6          MR. SHEPARD:  And they said they would produce

7   what we already --

8          THE COURT:  Agree.  But they said that they will

9   continue to work with Treasury to get Rule 16 and <u>Brady</u> --

10  the matter is under submission.  Thank you.

11         MR. WARD:  Thank you.

12      (Proceedings adjourned at 12:22 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

52

# CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber
Thursday, March 14, 2024