1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3        Before The Honorable Laurel Beeler, Magistrate Judge

4

5   UNITED STATES OF AMERICA,      )
                                   )
6            Plaintiff,            )
                                   )
7   vs.                           )   No. CR 20-00249-RS
                                   )
8   ROWLAND MARCUS ANDRADE,        )
                                   )
9            Defendant.            )
    _____)

10

11                                 San Francisco, California
                                    Thursday, December 12, 2024
12

13   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
         RECORDING 10:44 - 12:08 = 1 HOUR AND 23 MINUTES
14

15  APPEARANCES:

    For Plaintiff:
16                             United States Attorney's
                                  Office
17                             450 Golden Gate Avenue
                               San Francisco, California
18                                94102
                         BY:   CHRISTIAAN H. HIGHSMITH, ESQ.
19                             MATTHEW CHOU, ESQ.

20                             United States Department of
                                  Justice
21                             Antitrust Division
                               San Francisco Field Office
22                             450 Golden Gate Avenue
                               Room 10-0101
23                             San Francisco, California
                                  94102
24                       BY:   DAVID J. WARD, ESQ.

25          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

ii

1  For Defendant:
2                            King & Spalding, LLP
                             50 California Street
                             Suite 3300
3                            San Francisco, California
                                94111
4                      BY:   MICHAEL J. SHEPARD, ESQ.

5                            King & Spalding, LLP
                             1700 Pennsylvania Avenue, NW
6                            Washington, DC 20006
                       BY:   KERRIE C. DENT, ESQ.
7
                             King & Spalding, LLP
8                            1185 Sixth Ave
                             Thirty-Fourth Floor
9                            New York, New York 10036
                       BY:   DAINEC STEFAN, ESQ.
10
                             58 West Portal Avenue
11                           Number 350
                             San Francisco, California
12                              94127
                       BY:   CINDY A. DIAMOND, ESQ.
13

14  Transcribed by:          Echo Reporting, Inc.
                             Contracted Court Reporter/
15                           Transcriber
                             echoreporting@yahoo.com
16

17

18

19

20

21

22

23

24

25

1

<u>Thursday, December 12, 2024</u>                    <u>10:44 a.m.</u>

2                P-R-O-C-E-E-D-I-N-G-S

3                      --oOo--

4        THE CLERK:  Calling Criminal Action 20-249, USA

5  versus Rowland Marcus Andrade.

6     Counsel, if you could please state your appearances for

7  the record.

8        MR. HIGHSMITH:  Good morning, your Honor.  Chris

9  Highsmith, David Ward, and Matthew Chou for the United

10 States.

11       MR. SHEPARD:  And good morning, your Honor.

12 Michael Shepard and Cindy Diamond present in court on behalf

13 of Mr. Andrade, who is present by Zoom and intends to

14 proceed in that fashion.  Also by Zoom are my colleagues,

15 Kerrie Dent and Dainec Stefan.  As the Court is aware, Mr.

16 Stefan will argue the Abramoff issue, and Ms. Diamond will

17 argue the UCE issue.

18       THE COURT:  Okay.  Great.  Just give me a second

19 to get my notes in order.

20    So, let's see.  So -- all right.  So I guess we'll do

21 the -- so there's the two motions.  One is the Abramoff

22 motion.  You're arguing the Abramoff or the UC?

23       MS. DIAMOND:  I'm arguing the informant motion.

24       THE COURT:  Okay.  So shall we start -- wait.

25       MS. DIAMOND:  Whatever is --

2

1    THE COURT:  So I'll just tell you some
2  preliminaries on the two motions.  I mean -- and I don't --
3  I do want to let your colleague argue, so I'm happy -- just
4  because I'm saying things doesn't mean I don't want to
5  invite argument.  It seemed to me that the Abramoff issue
6  was a lot easier, and we can turn to this, and maybe I'll
7  just tell you some of my thoughts on the informant one, too,
8  just so everybody can be working on it.
9    Abramoff once seemed easier.  I'd already ordered his
10  production, even though I called him "Robert Abramoff."  I
11  don't know where that came from.  There was someone else --
12    MS. DIAMOND:  It's his brother.
13    THE COURT:  I don't know where it came -- anyway,
14  I know who Jack Abramoff is, but, as I re-read my order --
15  and the Government had said that it produced all discovery.
16  You can tell me if I'm getting that wrong, but said you
17  produced it all, and you made that representation, and if
18  you're going to make -- if the Government is going to make
19  that representation to me, I'm going to accept that
20  representation, period, end of story, and the only thing I
21  wanted to remind you of -- but I do want to give your
22  colleague on Zoom an opportunity to argue.
23    But I also just wanted to say -- and I know you know
24  this, but I -- under the Government's control, sometimes,
25  for example, is other files, like SEC, FBI notes.  You've

3

1   got your <u>Brady</u> obligations and all that.  Government is

2   giving the head nod.  It recognizes its obligations.  So I

3   think that pretty much disposed of the Abramoff.  I'm happy

4   to hear why I'm wrong from the defense, just so you have

5   some perk things on the UC, and, again, I'm happy to talk

6   through this, because this is a bit of -- this is why I

7   kicked it.

8        I almost had the hearing on the 8th.  You know, I think

9   I kicked this twice.  Once was right before Thanksgiving,

10  because I got the new motion the day before, and I thought,

11  "Just in the interests of efficiency," but the -- so the UC

12  one was kind of -- was interesting for this reason, just for

13  perk value.  The Government's arguments -- and you'll tell

14  me when we get to the argument that's right.  If we're going

15  to -- if I'm getting this wrong -- but you're basically

16  saying -- under the prongs of the <u>Roviaro</u> inquiry, you

17  haven't shown why you need it.

18       So, with the FBI people, you know, you can get all the

19  stuff you want.  You can do the subpoena.  You can get all

20  the discovery you want.  But then, again, to your point,

21  it's a balancing test, and the big point that you made is,

22  in all of those cases where the Court -- again, this is with

23  the agents.  We'll talk about the civilian employees

24  separately, but this is just for perk value while we address

25  the Abramoff motion, so everybody can be thinking about it.

4

1       There's always been some showing of a Government
2   interest, and I can imagine -- and I -- maybe I got it
3   wrong, and you can point me to where I got it wrong.  I'm
4   not saying what I'm going to do, because I really honestly
5   don't know.  The -- it's always been danger.  You know, it's
6   the MS13 case or -- and there are these people at the FBI
7   who have been deep undercover for a really long time.  I've
8   met some of them before, and, you know, no, you're not going
9   to get their identities, and, no, no, no.
10      I can imagine, in the case of undercover white collar
11  stuff, which I really -- I always thought a white collar
12  case should be done like a gang case or an OCDETF case,
13  where you use all the typical tools of law enforcement to go
14  undercover, do a wire, you know, whatever it is you're going
15  to do.  I think that's a great approach, but there's got to
16  be some Government interest articulated, and then I think it
17  also affects Seeborg, Judge Seeborg, and this idea of, like,
18  is he going to really let agents testify pseudonymously, and
19  are you really going to do that at trial?  So that's point
20  one, and then we can talk about the civilian.
21      So that's just the perk value, stuff that I thought
22  about the UC motion.  So I assume we'll talk about that
23  second.  I already told you what I thought about Abramoff,
24  and, I'm sorry.  Tell me the name of your colleague on the
25  phone.

5

1          UNIDENTIFIED SPEAKER:  Dainec Stefan.

2          THE COURT:  Okay.  Mr. Stefan, if you --

3          UNIDENTIFIED SPEAKER:  He could correct me if I

4   said his last name wrong.

5          THE COURT:  Yes.  Yes.  You can tell me what --

6   why -- if you think I'm wrong on that, first what you're

7   getting that the Government isn't saying that it's already

8   given, what you want the Government hasn't always promised

9   that it's given.  I mean, their papers -- I understand your

10  argument was it wasn't specific enough, but it kind of is

11  now.  But tell me why you think that's wrong.

12         MR. STEFAN (via Zoom):  So, your Honor,

13  (indiscernible) --

14         THE CLERK:  I'm sorry.  Counsel, can you give me

15  one second?

16     (Conferring with the Court.)

17         THE COURT:  Okay.  That's fine.  Yes.  And I don't

18  know if we're able to up the volume, Elaine.

19         THE CLERK:  Yes.

20         THE COURT:  We're just going to double-record on

21  Zoom, just because of the sound issues, and I know the

22  Government is having a little bit of a hard time.  Elaine,

23  I'm really sorry to you, like, say this in court.  We might

24  see if we could get bigger speakers from IT.

25         THE CLERK:  Okay.

6

1          THE COURT:  But you all are probably tired of

2   coming to court and hearing my hybrid complaints, but we'll

3   get it eventually.

4          UNIDENTIFIED SPEAKER:  No, things are improving

5   over the course of this case.

6          THE COURT:  We're doing our best.  I really want

7   to give people the opportunity to not feel they have to

8   come, you know, and be able to do hybrid to save money.  So

9   I'm completely on board with that.  Prefer in person.  It's

10  more fun.  But, okay.  So Elaine is going to up the volume.

11         THE CLERK:  I did.

12         THE COURT:  All right.  Let's try again.

13         MR. STEFAN:  Can you hear me better?

14         THE COURT:  It's a little bit better, yes.  Thank

15  you.  I can hear you fine.

16         MR. STEFAN:  Okay.  I don't know if

17  (Indiscernible.)

18         THE COURT:  Okay.

19         MR. STEFAN:  (Indiscernible.)  With respect to the

20  issue on Abramoff, and whether or not Abramoff is an

21  informant, from the defense's perspective, we're seeking

22  some pretty basic information from the Government, and some

23  of the information under Rule 16.  If Abramoff is an

24  informant, that is information that should be provided to

25  the defense, along with whatever materials exist in his

1  informant file.

2      That could be as an informant in this investigation, or

3  it could be as an informant in another investigation, or

4  related investigation, and we attempted to spare the Court

5  time that we're spending on this hearing right now, and the

6  filing associated with this hearing, by asking the

7  Government some 10 times prior to filing this motion the

8  simple question of whether Abramoff is an informant, and, if

9  so, when we're going to see their discovery related to

10  (indiscernible).

11      (Indiscernible) 10 times previously, and have attempted

12  meet-and-confers, and many discovery requests, and up to

13  this point, up to the point where the defense filed this

14  motion to compel, the Government completely ignored our

15  requests regarding Abramoff's status as an informant, and

16  only now, after filing this motion to compel, did we get the

17  Government's response, which isn't yes or no.  It is that

18  the Government is not aware of the status (indiscernible)

19  and whether they're provided us (indiscernible) discovery.

20      So it's not even so much a matter of specificity.  It's

21  the Government initially claiming ignorance of -- or not

22  claiming ignorance, just really ignoring the defense's

23  request on this matter, and now essentially claiming a

24  certain sort of ignorance, which is "We know nothing more

25  than you might be able to ascertain from the five terabytes

8

1 of data that we've already given you."

2        THE COURT:  So, but can I -- may I ask a question?

3 So, the Government has a duty to inquire -- that's with

4 <u>Brady</u> -- and the Government has already said in court that

5 it understands its obligations extend to co-investigators.

6 This is the classic stuff that comes up in the Government's

7 custody or control, and the Government has said -- so it has

8 said that it has produced everything.

9     I mean, it's done -- it's -- you'll let me know if I'm

10 wrong, but it's done its affirmative work to reach out and

11 identify the scope of discovery for someone who's a

12 cooperator.  The "co-schemer" is I think what you called him

13 in your papers.  They've identified the information they

14 have.

15     They've produced everything that they have from a Rule

16 16 and a <u>Brady</u> perspective, and they understand their

17 obligation is to inquire, and -- and I put this in my little

18 order that I wrote -- and to do things like, if it's

19 implicated -- the classic one in white collar cases is the

20 SEC often has an investigation, and it's the same

21 investigation, or looking for <u>Brady</u> and FBI notes, and the

22 duty to do that into that inquiry personally by the

23 prosecutor, not able to delegate it, and the Government has

24 said it has done those things, and it was very specific in

25 its oppositions.

9

1      I definitely appreciate your point that you said it
2 wasn't that specific until the opposition.  I think you said
3 that in your reply.  But now they've said that, and they've
4 done their affirmative -- they've complied with their
5 affirmative obligation to get information, and so that's it,
6 as far as they know.  What -- that's the case in any
7 Government investigation.  They reach out to the agencies.
8 They have their standard discovery asks that they do.  They
9 do their standard degree of <u>Brady</u>-type questions for the
10 related agencies, and they said they've done that and
11 they've produced everything.  Right?  From the Government?
12          MR. HIGHSMITH:  Yes.
13          THE COURT:  Okay.  So, yes.
14          MR. HIGHSMITH:  Yes, 100 percent.  I have nothing
15 further to add unless you have pointed questions for me.
16          THE COURT:  No, no, no, no, no.  So they've made
17 that representation, and while I think that sort of the
18 utility of your motion is you asked for a clear answer.  You
19 got one in the opposition, ran 10 pages, but that's what you
20 do when people say stuff, and then you have a straight-up
21 "Yes" in court.  I'm not sure that there's anything else
22 that I can order.  Okay.
23          MR. STEFAN:  Can we have the --
24          THE COURT:  I'm sorry.  I didn't mean -- go on.
25          MR. STEFAN:  We don't have the Government

10

1  providing us with specific answer that we requested this

2  entire time.  They've still not answered the question.

3          THE COURT:  Well, I think they have.  I mean, I

4  appreciate the point, but I think they have.  Okay.  Thanks.

5  Okay.  Let's go on to the -- thank you for that.  I'll issue

6  an order shortly, separate.  Let's talk about the UCs.

7          MR. HIGHSMITH:  Your Honor, have we --

8          THE COURT:  Yes.

9          MR. HIGHSMITH:  So their motion, their fourth

10 motion to compel, had two pieces.

11         THE COURT:  Yes.

12         MR. HIGHSMITH:  They had the Abramoff piece.

13 There's a second piece where they want, like, boatloads of

14 stuff not connected to this investigation, and I think we

15 should --

16         THE COURT:  So can we -- can we talk -- let's talk

17 about that.  Okay.  Stick on the line.  All right?  So let's

18 talk about that.

19         MR. HIGHSMITH:  Thank you, your Honor.  I'm going

20 to hand it over to Mr. Ward.

21         THE COURT:  Okay.  That's fine.

22         Okay.  Mr. Ward.

23         MR. WARD:  Thank you, your Honor.  I guess, to the

24 Court's point, what the defense is asking us, as best I can

25 tell, is that we search out among various U.S. Attorney's

11

1   offices, SEC offices, IRS offices, maybe elsewhere, for any

2   subpoenas or search warrants that were issued to a list of

3   32 individuals, and they list them in their footnote.

4        They don't describe what the direct connection is to

5   the case.  Many of them, to the extent the Government can

6   gauge, may have been involved somewhat in some lobbying

7   efforts by Jack Abramoff, but we received this request, and

8   we searched our entire case file for the 32 names of

9   entities and individuals.  We've produced everything that's

10  responsive.

11       For two related cases in this district against David

12  Mata and Japeth Dillman, we did the same.  They're different

13  cases, but it's the same office and the same FBI agents.  We

14  produced that information, but now they are asking us to go

15  even farther and search other various offices.

16       They don't specify what the Plaintiff is supposed to

17  do, but read in -- read it -- seems to be that you need to

18  check and see whether any office has an investigation into

19  any of these individuals or entities, and produce that

20  information, and that's just far beyond the scope of Rule

21  16.  I mean, it has to be things that are possession,

22  custody, or control, or that we at least have, and that's

23  been interpreted as things that we have access to and

24  knowledge of.

25            THE COURT:  Well, I mean, I want to think about

12

1   this for a second, and I need to look at my computer,

2   because my cheat sheet for how information is organized, I

3   can look it up on my computer and somehow it's not in my

4   side pocket of the binder anymore.

5       One of the issues is you've got a cooperator in this

6   case, and then there's the Brady/Giglio piece of it, so it's

7   less than -- so you're shaking your head that he's not a

8   cooperator?

9           UNIDENTIFIED SPEAKER:  No, no.  Well, different

10  issues.  These are different --

11          UNIDENTIFIED SPEAKER:  These 32 --

12          THE COURT:  I would say that the issue is

13  Abramoff, and to the extent it's Abramoff --

14          UNIDENTIFIED SPEAKER:  No, no.  Abramoff --

15          THE COURT:  No, no.  I meant that should be the

16  issue in this case.

17          UNIDENTIFIED SPEAKER:  Yes.

18          THE COURT:  That's what I'm saying.

19          MR. WARD:  So, to Mr. Abramoff specifically, we

20  have --

21          THE COURT:  Yes, that's what I'm trying to say.

22          MR. WARD:  -- produced all of his 302s, all of his

23  plea agreements, all of his statements where -- all of

24  his --

25          THE COURT:  All of his 302s --

13

1          MR. WARD:  -- everything.

2          THE COURT:  -- period, end of story.  Yes, because

3  the FBI has that central repository, and I know how the

4  files are organized, and I know how they keep track of these

5  things.  I know of what I used to call the "desk file" is

6  organized, the 1(e)s (phonetic) and all that kind of stuff,

7  or 1(a)s, or whatever they're called, and I know that.

8      So that's what I was concerned about.  That's what I

9  think has -- how you define the scope of discovery here, and

10  what you're saying, the rest of it, is just so far afield

11  that it doesn't have anything to do with Mr. Andrade or Mr.

12  Abramoff, and everything with Abramoff has been disclosed.

13          MR. WARD:  Everything that we have that has

14  been --

15          THE COURT:  Well --

16          MR. WARD:  Everything, everything, every 302 for

17  Mr. Abramoff has been disclosed, every plea agreement.

18          THE COURT:  Well, so, if there are any

19  investigations, if there are search warrants, if there's any

20  involvement, that's -- about Mr. Abramoff -- that's all been

21  produced, and so what you're left with was -- and so, of

22  course, I just went right to Abramoff's defining the scope

23  of discovery here, and so that's fine.

24      So I didn't mean to cut you off.  Please tell me

25  anything else that you want to tell me, and then we can go

14

1  back to the defense.

2        MR. WARD:  Well, I just think it goes beyond what

3  we're required to produce.  I mean, they mention -- in one

4  instance, they mention "ICO Box (phonetic)," which was an

5  ICO company that did initial public offerings.  Now, they

6  cite to an SEC settlement with ICO Box back in 2019, related

7  to different issues, as far as we can tell, totally

8  unrelated arguments, but they say that not only do we have

9  to produce the information from that file, but we should go

10 back and determine whether the U.S. Attorney's Office in the

11 Central District had an investigation into ICO Box.

12       We don't know that they did.  There were no charges

13 filed.  They seem -- in their motion, they seem to be,

14 "Well, there's a reasonable basis to infer that the U.S.

15 Attorney's Office in the Central District may have

16 investigated ICO Box."  Maybe, but that's a separate

17 investigation we don't have access to and knowledge of.  And

18 so they ask that we go back to them, ask them if they had an

19 investigation into ICO Box, and, if they did, "Can we please

20 have all your subpoenas?"

21       THE COURT:  Could someone just explain like the --

22 like even your understanding?  I'm happy to hear from the

23 defense, too, but what's your understanding of the relevance

24 of ICO Box to this case?

25       MR. WARD:  I think there's minimal reference --

15

1          THE COURT:  But just like --

2          MR. WARD:  I don't --

3          THE COURT:  -- be generous in description.

4    Just --

5          MR. WARD:  I don't understand how anything in the

6    Central District case at all relates to my case.

7          MR. HIGHSMITH:  So -- all right.  So this is a

8    fraud case about a fraudulent crypto -- allegedly fraudulent

9    cryptocurrency.

10          THE COURT:  Yes.

11          MR. HIGHSMITH:  So, with these crypto -- because

12    lots of cryptocurrencies pop up, lots and lots of them.

13          THE COURT:  Right, right.  I'm aware.

14          MR. HIGHSMITH:  They all have these ICOs, these

15    initial coin offerings --

16          THE COURT:  Yes, yes, yes.

17          MR. HIGHSMITH:  -- and we're alleging that's part

18    of the fraud.  Like, they make lies about what their

19    cryptocurrency can do, and then they --

20          THE COURT:  Right, and that's what this case is

21    about.

22          MR. HIGHSMITH:  -- get investment.

23          THE COURT:  Right.

24          MR. HIGHSMITH:  So they use -- Mr. Andrade hires

25    ICO Box, and, so, in our investigation, we -- ICO Box -- we

16

1 investigate ICO Box.  We give them a subpoena, or we look

2 into ICO Box.  Of course we've turned over all that

3 information to them about our investigation.

4      They then say, "Tell us about any investigation

5 anywhere in the entire country involving ICO Box, and turn

6 over everything."  Well, okay.  Maybe, hypothetically

7 speaking, I honestly don't know the answer.  Hypothetically

8 speaking, North Dakota is investigating ICO Box for

9 something totally different.

10          THE COURT:  So, but let me just ask you this

11 question.  Like, on the 302 example, when you were

12 investigating ICO Box, and you get the 302s that the FBI has

13 provided to you that it would have for any investigation

14 that it conducted, and you would have gotten those from the

15 FBI, and then you produced what you got here?

16          MR. HIGHSMITH:  Yes.

17          THE COURT:  Yes.  So that's -- I think that's -- I

18 mean, if there's something, you know, what I would say, from

19 the third-party subpoena -- I was actually looking at that

20 in that camera -- if there's something from a third -- like,

21 the equivalent of a third-party subpoena, like, more

22 information that you identify that might be there, maybe

23 that's -- I still think that stretches way past Rule 16.

24      But just to the extent that the Government has the

25 bureau that it's working with that's producing all of the

17

1 information it has in its files about those entities that

2 are relevant to this investigation, like ICO Box, you got

3 that information, and then, if there -- and that's what the

4 Government has.

5      It's the FBI.  It's the U.S. Attorney's Office, and

6 whatever is there, the FBI has it.  The way it organizes its

7 files, it has the information.  There probably would no be

8 (sic) -- I mean, you know, I suppose you could say,

9 hypothetically, if some place in the country with an agency

10 not involved in this investigation, the IRS -- is the IRS

11 involved in this investigation?  It probably is.

12      But if, you know, there's some other kind of -- you

13 know, if some Treasury thing -- I don't know that,

14 potentially, but it seems that, because the Government is

15 producing everything about this investigation that it's

16 done, and that necessarily gets you all of the reports, the

17 ROIs for the IRS and the 302s for the FBI, you've got it,

18 and they've done -- and then, as far as their duty to

19 inquire, that's this -- you know, that's supposed to be this

20 investigation.

21      So you're getting the Government's larger

22 investigation.  I just don't understand what more I could

23 order that's not -- that's -- I mean, they -- it seems to me

24 the Government has complied with its Rule 16 and Brady

25 obligations in this case, but, again, from -- you tell me on

18

1  the Zoom why you think that's wrong.  I just don't see it.

2  I don't see it.

3           MR. STEFAN:  The Government has represented that

4  it's provided all materials, and, in the process of making

5  those representations, has repeatedly said things that are

6  demonstrably untrue with respect to its agent's

7  understanding of the connections to the individuals in

8  question.

9       So we provided this list within our motion to compel of

10  the various entities and individuals of which were seeking

11  subpoenas and search warrants, and associated information,

12  and the Government's prior responses to our inquiries on

13  this matter have been to say that their agents don't even

14  have familiarity with most of the entities appearing on that

15  list, despite the fact that the agents investigating Mr.

16  Andrade and -- had a role in -- some role in the

17  overwhelming majority of the investigations and interviews

18  related to the people that we listed in that subpoena.

19      So, I mean, that's been a pattern here.  That's been a

20  pattern of the Government just throwing up its hands and

21  saying, "We have no idea what you're talking about," when,

22  in fact, they obviously do know what we're talking about.

23           THE COURT:  I -- you know, that's -- I -- I'm

24  not -- that's not been the Government's representations.

25  Okay.  I appreciate the argument.  I'll have a look at the

19

1   subpoena, but I'll take it under submission.

2       Let's talk about the UC issue.  I mean, I kind of made

3   your argument for you, but tell me what you think I've been

4   saying, and then, I mean, I think it will be interesting for

5   the Government to talk about the Government interest here,

6   and then maybe we'll flip back and talk to the civilian.

7               MS. DIAMOND:  I just have a couple of comments, in

8   light of the Court's (indiscernible) information.

9               THE COURT:  Yes.

10              MS. DIAMOND:  First of all, I do agree we're going

11  to sort of land with the Government doesn't have facts to

12  support testifying -- putting people on the witness stand to

13  explain their pseudonym.  There is a limited exception that

14  the confrontation clause does not get offended when that

15  happens, but it's only when there's harm, and usually

16  physical harm.  So we outlined all our cases in the brief.

17  That's --

18              THE COURT:  I read all the cases, and I --

19              MS. DIAMOND:  That's --

20              THE COURT:  Yes.

21              MS. DIAMOND:  -- the overriding --

22              THE COURT:  I mean, the concern is, you know, to

23  the Government's other point, but it is a balancing test,

24  and it is a limited privilege.

25              MS. DIAMOND:  Correct.

20

1          THE COURT:  That said, I have a hard time seeing

2 what -- the harm with the FBI agents pseudonymously -- there

3 really is no harm, because you get everything, because

4 they're the Government, and the subpoenas and the witnesses

5 and all this stuff you get anyway, and the fact that

6 someone's name is Joe Smith on the stand and something else

7 otherwise I don't think really matters, and there's no real

8 prejudice, because the jury doesn't know it, either.

9          And so -- and that's the -- and then I just then come

10 stump-up against the Roviaro -- it is a balancing test, and

11 they talk about a Government interest, and I'm not sure a

12 Government interest was advanced, but it was more that --

13 and then that makes -- starts to make me feel uncomfortable,

14 because I then start to tread into Judge Seeborg territory.

15          I don't -- you know, I -- and then I always think,

16 what's the Government going to actually do at trial?  Are

17 you really going to have them pseudonymously testify, and do

18 we need a showing closer -- I'm just looking for an exit

19 strategy, because I think you're right on your first

20 arguments, but you tell me.  Let's just talk about the --

21 you want to finish first.  You finish first.  It's your

22 motion.  And then you can -- Mr. Highsmith can answer.

23          MS. DIAMOND:  I just want to tell you where my

24 thinking is on the rest of this stuff.

25          THE COURT:  Yes.

21

1          MS. DIAMOND:  Mr. Highsmith mentioned something

2     about the difference -- maybe your Honor did -- with agents

3     and Government employees.  I want the Court to understand,

4     from Mr. Andrade's perspective, we do not know who is who,

5     you know.  So we have --

6          THE COURT:  Well, I just prefer all Government

7     employees -- I think that whatever -- it would just be the

8     issue of their name, just their identity, that's it, the

9     basic stuff that you normally get when you do -- because, in

10    a normal case -- not that this isn't a normal case, but, in

11    a regular case, with civilians -- or that your informants --

12    you need their names and cell phone numbers and addresses to

13    get your defense -- to find them, and to do your follow-up

14    investigation.

15        The Government's point for all the Government

16    employees, whether they're agents or whether they're

17    employees, is you don't need it.  You've got everything you

18    need, because they're Government.  And so, leaving aside the

19    2(e) (phonetic) issue, which I think you're correct on --

20    that's a different issue -- the Government is basically

21    saying, "If you want them as witnesses, you can subpoena

22    those witnesses.  We have all of our obligations.  The name

23    is irrelevant to your case, because you get everything."

24        And so I was distinguishing -- there's eight in all,

25    seven Government employees and then the one civilian, and

22

1  then the big point that I had is that I -- and this is a

2  judgment call, because it's a trial court judgment call,

3  because it's not really discovery, which is why I sort of,

4  on the Government employees -- it's not discovery, because

5  you get it.  It's really more like a trial issue.

6      I actually did all the work and wrote an order, and

7  read the cases, and said -- and so I think, on the

8  Government employees, a tentative is you're right.  From a

9  discovery perspective, there's nothing more I can order.

10 From a trial perspective, the decision about whether they

11 can testify pseudonymously really is one for Judge Seeborg,

12 because it's his trial.  I write the order with all the

13 standards saying in these cases just what you said in your

14 papers, but that piece of the decision goes to Judge

15 Seeborg.

16     And so that's what I thought about that piece, and then

17 I -- so I literally wrote this order where I, like, take a

18 blank line for writing that conclusion, but I wrote out all

19 the case analysis.  So I think that that serves your

20 interests.  It serves the Government's interests.  We'll see

21 at the end of the day whether the Government does have

22 people testify pseudonymously.  I rather guess they won't,

23 but I don't know what the answer to this --

24             MR. HIGHSMITH:  Can I ask --

25             THE COURT:  Yes.

23

1          MR. HIGHSMITH:  -- for clarification?

2          THE COURT:  Yes.

3          MR. HIGHSMITH:  So I totally agree with the Court.

4 I think the motion is putting the cart before the horse.

5 What usually happens is the Government usually files a

6 motion in all these trials, saying, "We want to sponsor a

7 witness under his UC name," or "We want to sponsor a witness

8 under the civilian confidential informant name," and they do

9 know the difference between the civilians and law

10 enforcement, because we told them.  Everybody knows a UCE is

11 an employee and a CHS is a confidential --

12          THE COURT:  No, no, you did a -- it was very easy.

13          MR. HIGHSMITH:  So I totally agree with the Court

14 that -- but I just want to make sure the Court is denying

15 the motion, because I really don't think they've met their

16 legal standard, and I think that --

17          THE COURT:  I think I will say that there's --

18 well, I want to talk about the last one.

19          MR. HIGHSMITH:  But just before we get there, do

20 you mind if we -- can we just address --

21          THE COURT:  I think I was going to write the -- I

22 was going to write the order something like this, which I

23 think is what you want.  I don't think there's anything I

24 need to order from a discovery standpoint, and the issue

25 about pseudonymously is perhaps premature to be raised with

24

1  the District Court, because I'm not even sure that the

2  Government -- and that may be true for all of these things,

3  but we'll talk about the last one, the civilian person, too.

4  But that needs to be raised with Judge Seeborg under the

5  classic time line before trial, and I don't know when your

6  witness lists are due and all of that kind of stuff.  Once

7  your pre-trial conference -- I sort of lost track of all

8  that.

9           MR. HIGHSMITH:  Yes.  It's the 22nd.

10          MS. DIAMOND:  If I could address that, that point,

11  your Honor?

12          THE COURT:  Yes.

13          MS. DIAMOND:  I do understand the Court's making a

14  distinction between disclosure to us for our pre-trial

15  preparation and the witness getting on the stand and

16  disclosure to the jury.  It isn't even impossible to have

17  disclosure be too honest, under a protective order, and have

18  the witness be testifying under a pseudonym, if a showing is

19  made to Judge Seeborg to justify that for trial, but we are

20  not relying on the fact that we want -- except for one

21  person who -- I filed an addendum on Monday, because

22  Friday --

23          THE COURT:  Yes, that's fine.  I'm fine with it.

24          MS. DIAMOND:  You know, so that's the eighth

25  informant.

25

1          THE COURT:  I just lumped that person in with the

2  employee piece of it, right?

3          MS. DIAMOND:  Yes, yes, because they were

4  designated with the -- at the end.  And I get that, but,

5  with the exception for that person, we do not know who the

6  Government will be calling yet.  We do not know if they're

7  going to be calling the rest of the informants, but each of

8  them have a utility to the defense, and that's what we tried

9  to explain in the part of our motion that was --

10          THE COURT:  I read the "under seal."  Yes.

11          MS. DIAMOND:  -- and not revealed to the

12  Government, and I do understand they have a chance in an in

13  camera hearing, if the Court holds one, to say what the

14  danger is, or why they think balancing tests based on the

15  actual information from the informant mitigates to their way

16  that we don't get to be at (sic).  I understand that.

17          THE COURT:  So, but what does the identity of an

18  FBI employee or agent get you in discovery that you can't

19  get normally?  The only issue is the issue of their name.

20          MS. DIAMOND:  And their documents.

21          THE COURT:  You're entitled to all the Giglio

22  things that -- yes.

23          MS. DIAMOND:  Your Honor, we have not received all

24  of their communications.  We have not received --

25          THE COURT:  That's a discovery issue.

26

1          MS. DIAMOND:  -- all of their -- well, it's all
2   because they're all connected to the informants, whose
3   identity they don't want to give us.  So, if we are entitled
4   to their information, who they are, we're also entitled to
5   know what their involvement in the case is, what was hidden
6   from us, what communications weren't revealed.
7          THE COURT:  But the Government's obligation is to
8   give you all the Rule 16 and all the <u>Brady</u> issues, and I
9   don't think -- my understanding of the case -- I mean, your
10  quarrels have been, along the way, sometimes having to do
11  with what you think the sort of sufficiency of the
12  production is from an organizational standpoint, you know,
13  in a platform where it's -- well, you know, and that's just
14  the Government's -- you know, that's -- I think the
15  Government would be as thrilled as the next person -- you
16  should see the FOIA cases I get, and so the document review
17  platforms that people are using in D.C. that are like a
18  click up from a chisel and a hammer and a stone tablet.
19     So there's been that piece of it, but it doesn't strike
20  me that the Government has been being selective in
21  disclosing what it has obtained, and so -- is that right?
22          MR. HIGHSMITH:  Yes.
23          MS. DIAMOND:  Well --
24          THE COURT:  I mean, but you have.  You're just
25  giving it over, and so that -- so -- and if there are issues

*Echo Reporting, Inc.*

27

1  with, like, a specific thing, "I'm not getting Rule 16

2  discovery for this particular person," or "I have not

3  received a Brady, Giglio, or whatever it is production yet,"

4  I don't see how your knowing an FBI person's true name gets

5  you -- your discovery goes to the Government.  That's the

6  way you get discovery about Government employees.

7      I suppose, if you're really out there gumshoeing it,

8  based on Special Agent Bill Smith's living in, you know,

9  Orinda, to gumshoe it -- I just don't think you're doing

10 that, and so -- because it would be weird, and implicate

11 safety issues, and you just wouldn't do it, and the civilian

12 person I want to talk about.  That might be different.  The

13 interests might be different there.  But I don't see what

14 you get from the Government, when somebody is deep uncover,

15 from a discovery perspective.

16     The issue about the identity itself is discovery, but

17 usually -- I highly doubt, to be perfectly honest with

18 you -- I mean, I don't know.  We'll see what the Government

19 does.  I highly doubt that the Government is going to have

20 them testify pseudonymously.  It doesn't usually happen in

21 my court cases.

22         MS. DIAMOND:  The Government may not want them,

23 your Honor.  We may want them for reasons --

24         THE COURT:  But then it's the same thing.  You get

25 to subpoena them as witnesses, and then the issue -- the

28

1  <u>Roviaro</u> issue becomes the same for you and for Judge

2  Seeborg.  So what I'm here to do is manage discovery.  I can

3  tell you that, personally, I don't think at this moment that

4  balancing inquiry is met from the Government on the

5  Government interests, but it's a little early in the game.

6       So my job right now is to manage discovery to make sure

7  you have everything, and then I don't know what the -- even

8  the -- you know, usually -- and, again, it doesn't come up

9  so much in white collar cases, but, in cases where there

10  really is danger and identities don't get released until 60

11  days before trial, there comes a time point in the

12  Government's decision matrix where it decides which

13  witnesses are going to be, who they're going to call, who

14  you want to subpoena as witnesses on your own, without

15  regard to it, and at that moment, the issue becomes ripe

16  about a pseudonymous -- and then the straight-up question

17  I'm asking you, is there something that you're not getting

18  now that you would get, besides the name, from a discovery

19  standpoint?  I just don't see what utility --

20       MS. DIAMOND:  Yes.

21       THE COURT:  So, leaving aside the civilian -- I

22  want to talk about the civilian separately.

23       MS. DIAMOND:  Okay.  So there are a couple of

24  things, but it's under "under seal" file, so I feel a little

25  comfortable saying it open court, honestly.

29

1          THE COURT:  Well, look at your "under seal" file,

2  and then you can refer -- I have it with me.  I have the

3  short printout.  What I can do is, you can refer to lines --

4          MS. DIAMOND:  I can tell you which --

5          THE COURT:  -- you can refer to lines --

6          MS. DIAMOND:  -- which informant --

7          THE COURT:  -- and I can read it for myself, but

8  just give me a second.

9          MS. DIAMOND:  Sure.  And there's two informants in

10 the -- that this applies to in the written declaration --

11         THE COURT:  Okay.  Just give me a second.  Just

12 give me a second.  I need to make sure --

13         MS. DIAMOND:  -- and there is also a similar

14 issue with the (indiscernible) informant, but I didn't have

15 enough (indiscernible).

16         THE COURT:  Just give me a second.

17         MS. DIAMOND:  Sure.

18         THE COURT:  Just give me -- I need to get

19 myself -- my papers back organized.

20         MR. HIGHSMITH:  Yes.  I'm so sorry, your Honor.

21 May I interject for one second?  Mr. Ward makes an important

22 point.  The FBI uses the following terms, which may be

23 helpful to our discussion:  "undercover employee."  That is

24 an undercover FBI agent who is working undercover.

25         THE COURT:  Right.

30

1          MR. HIGHSMITH:  I use the term.  The FBI uses the
2    term.  It may be helpful for the defense to know the terms
3    "undercover employee."  There is also --
4          THE COURT:  So that's just a UC, and that's an FBI
5    agent.
6          MR. HIGHSMITH:  Thank you.
7          THE COURT:  Yes.
8          MR. HIGHSMITH:  That's a UC.  It's an FBI
9    undercover.  Then you have a civilian, who the FBI calls a
10   "confidential human source."
11         THE COURT:  Right.  There's only one of them here.
12         MR. HIGHSMITH:  There's one of them here.
13         THE COURT:  Yes.
14         MR. HIGHSMITH:  We're not talking about it yet.
15   We'll talk about it at the Court's -- when the Court is
16   ready for that.  But I just -- the term "informant" is --
17   it's inaccurate, and --
18         THE COURT:  No, a hundred percent.  I don't mean
19   to use that term.  All of these people are FBI employees,
20   and that's it.  That's that bucket we're talking about, and
21   so, right.  Yes.
22         MR. HIGHSMITH:  This is very -- see, the thing is,
23   is --
24         THE COURT:  So it's not an informant.  It's an --
25         MR. HIGHSMITH:  -- this comes up in other --

31

1        THE COURT:  -- it's a UC.

2        MR. HIGHSMITH:  -- cases, right, where you've got

3  some civilian who's not identified, and the defense doesn't

4  know the identity of the civilian, and they can't find them,

5  and they can't subpoena them, and they can't get any

6  information about them, because they generated a lead.  This

7  is very different.  This involves an undercover FBI agent.

8        THE COURT:  Yes.

9        MR. HIGHSMITH:  Thank you.

10        THE COURT:  Yes.  That's why I divided them into

11  the two buckets, seven and one, seven and one.  Okay.  So I

12  have the wrong file here.  So now I'm going to look at --

13  I've got your sealed filing, and so what you can do is just

14  direct me --

15        MS. DIAMOND:  I'll refer you to --

16        THE COURT:  -- to like a page and line, and then

17  we can sort of talk it through.

18        MS. DIAMOND:  Okay.  So the discussion that begins

19  on page five, line 22, and specifically in paragraphs 14 and

20  15, which are on page six.  There's some material that was

21  not cognizable or intelligible to us that relates to one of

22  these informants specifically that we haven't gotten.

23        THE COURT:  Well, but -- so this motion, though,

24  is about UCE-7410, and so what you're asking for in this

25  motion is really just the identity.  That's what your motion

32

1 is asking for.

2          MS. DIAMOND:  The identity, the attendant reports,

3 whatever --

4          THE COURT:  But all the reports -- you should be

5 able to have all the reports.

6          MS. DIAMOND:  We -- as to -- sorry.  As to this --

7 again, difficult to --

8          THE COURT:  I don't know.  I understand.  Well,

9 let's -- let me try framing it this way.  I mean, you have a

10 UCE.  All the things that the UCE does are documented in

11 302s or whatever files, and you should be getting all of

12 that as discovery, so whatever the files say that the

13 Government agrees it would -- has or is supposed to produce

14 all of that to you, and then, again, those deficiencies that

15 basically don't have -- you should be able to test that by

16 looking, you know, and if they say they've produced

17 everything, then I -- there's not a lot I can do to order

18 more, and then the -- what does the --

19          MS. DIAMOND:  I do --

20          THE COURT:  Yes.

21          MS. DIAMOND:  I do understand that.  I just want

22 to --

23          THE COURT:  Yes.

24          MS. DIAMOND:  Sorry.  With respect to this

25 informant, if the Court could look, just as the Court

33

1  considers, specifically lines -- on page six, lines 20

2  and -- to 23 are sort of focusing on what we're missing from

3  that.  There's other things, obviously, in the description

4  for that informant.

5            THE COURT:  Okay.

6            MS. DIAMOND:  And I --

7            THE COURT:  So I just don't know why that can't

8  be -- I mean, tell me -- I mean, I -- without telling me

9  again who they were, I don't understand why that issue just

10  couldn't be raised directly -- that seems fairly

11  innocuous -- and why, if there are, like, a list of issues

12  that you have -- I mean, for example, everything that the

13  agent does generally is documented in an accompanying -- in

14  a 302 that accompanies the event that the agent is doing,

15  let's just say, in an undercover capacity.  There's always

16  an accompanying 302.  That accompanying 302 gives you

17  whatever information is in that 302, and there usually is

18  nothing more except for FBI notes, and so --

19            MS. DIAMOND:  And sometimes, your Honor -- if I

20  may?

21            THE COURT:  Yes.

22            MS. DIAMOND:  When the evidence is of the quality

23  that's described here, the notes actually will be meaningful

24  that we don't have.  We just want the chance in the order --

25            THE COURT:  But I don't know what that one -- but

34

1  I don't know how the identity gets you that.  I don't know

2  how your defense strategy is jeopardized in this particular

3  example, for just asking straight-up that this is a problem,

4  and is there something that we could do that's a solution to

5  this problem, to gain more clarity that would be useful for

6  both sides?  Because, in looking at that example --

7          MS. DIAMOND:  Yes, I understand.

8          THE COURT:  -- it seems solvable through the

9  normal ways of solving problems, and I don't know that the

10 UC's identity gets you anything other than --

11         MS. DIAMOND:  Well --

12         THE COURT:  I mean, you know who that person is.

13 They appear at trial as a witness, however they're named,

14 with the ability to cross examine or call them as a witness

15 and show if there are things that are missing, for example,

16 that you talked about in discovery, to cross examine

17 somebody about their not following the rules, or if there's

18 inefficient -- you know, the kind of integrity of the

19 investigation.  It's their cross examination in criminal

20 cases, right?  So, if somebody is sloppy, and they don't

21 document, or -- I had a case.

22     This was a civil case, but I'll give you an example.

23 The San Mateo deputy had in his report the exact opposite of

24 what actually happened, and that was great cross -- and

25 which was documented by -- there was this kind of -- you

35

1  know, it was just -- he was incompetent, is what he was, and

2  then there was forensic evidence that directly contradicted

3  his account in his report, and that came out as great cross

4  examination.  I don't think he was intentional, because what

5  kind of an idiot would contradict a forensic account of what

6  actually happened in an agent's personal digital recording

7  devices, for example?

8      And so I just -- looking at your example here, I think

9  that, if there's a problem there, it's fixable by talking to

10  the Government.  I don't think it gives up defense strategy.

11  I think you're going to have a bunch of different things

12  that -- there are problems you might identify with

13  productions of your discovery, and the Government would be

14  able to talk with you, and I don't see how the identity gets

15  you anything, because you could call that person as a

16  witness to testify about all the issues that you raise.

17          MS. DIAMOND:  Thank you, your Honor.  I appreciate

18  that.  We do believe that there are strategy matters that

19  we're keeping close to the vest.

20          THE COURT:  I get it.  I get it.

21          MS. DIAMOND:  We do believe that the information

22  that we're asking for would be helpful to prepare for cross

23  examination, but I do --

24          THE COURT:  At least you've said in your papers

25  for the first time -- you wrote down your theory of the

36

1  case, which I'm not going to repeat, because I don't want to

2  misquote it, but that was at least one thing.  I mean, your

3  theory of the case is more explicit in this round of papers

4  than it has been previously.

5       MS. DIAMOND:  We're studying on our

6  (indiscernible), your Honor.

7       THE COURT:  Yes, yes, yes.

8       MS. DIAMOND:  So I think --

9       THE COURT:  And I did a public record filing.

10      MS. DIAMOND:  And one more thing on the --

11  sorry -- about two of the other informants.  That same issue

12  that appears with informant request number two appears with

13  request number five, and I would refer the Court to my

14  declaration, page 11, paragraph 26, and that outlines the

15  difficulty that we're having there.

16      THE COURT:  Okay.  Let me look at that.  Yes, it's

17  similar.  Similar.

18      MS. DIAMOND:  And I did not brief it, but I do

19  believe there's a similar issue with the new one.

20      THE COURT:  The new one.

21      MS. DIAMOND:  I could brief it for the Court,

22  actually, if you wanted me --

23      THE COURT:  No.  I think, if it's the same, I

24  accept that representation.

25      MS. DIAMOND:  I took it out from -- some of that

37

1  may be writings, not recordings, but that's where you'll

2  find the information --

3          THE COURT:  Yes, yes, yes.  Let me just look at

4  this.

5          MS. DIAMOND:  -- and I know my colleague, Ms.

6  Dent, wanted to say something.

7          THE COURT:  Okay.  That's fine.

8          MS. DIAMOND:  So, if I could --

9          THE COURT:  Just give me one second to finish

10  reading this paragraph.

11          MS. DIAMOND:  Sure.

12          THE COURT:  So the problem -- so, again, I'm just

13  going to speak as obliquely as I can.  If you want

14  information from somebody that's, you know, an FBI agent, in

15  any normal white collar case or any normal case, right,

16  just -- you know the person's name, case agent.  It's in

17  court, helping produce documents, whatever.

18      You want clarity about something that's in a 302, for

19  example, and so, then, the clarity the Government has -- I

20  mean, again, what normally happens -- it may be different,

21  but what normally happens -- what I used to do for my 302s,

22  I would sit down with a highlighter.  I would read the 302s.

23  I would highlight anything different.  I didn't care if it

24  was Brady.  I didn't care.  I just would highlight it.

25      I would sit down with the FBI, and we would do it

38

1   together.  The FBI lawyer would do it with you

2   (indiscernible) it all got produced, because it's just not

3   worth it.  If there's something else in the notes beyond

4   what's in the 302, it's just not worth it.  You have to do

5   the doc thing.  You have to do the review of the notes

6   yourself.  You do it sitting in the same room with the

7   agent, and they're usually like, "Fine.  Fine.  Produce the

8   notes."  And so you'll get all of that in this case through

9   the normal review.

10      I mean, let me just ask the Government.  Do you agree

11  with that approach, that it's when you have a 302, you're

12  doing your final scrub for Brady, and you have to get the

13  notes, and it's got to be a personal review by one of the

14  lawyers.

15          MR. HIGHSMITH:  I totally agree with the judge.  I

16  of course agree with you.  I just --

17          THE COURT:  Yes.  And -- so that's enough.  So

18  they don't get trust account by having the agent's identity.

19          MS. DIAMOND:  Your Honor, if I just may?

20          THE COURT:  Yes.  Yes.

21          MS. DIAMOND:  In this case -- in fact, it was -- I

22  know it was in the very first motion to compel that was

23  right when I was joining the team, and I didn't write the

24  motion, but there were omissions in the 302 about the

25  co-schemer entirely.  He was entirely omitted out of one of

39

1 the 302s when --

2          THE COURT:  Great cross examination.

3          MS. DIAMOND:  -- when in the recording is how we

4 found it.  So, without the recording --

5          THE COURT:  That's why I said that the U.S.

6 Attorney has to do its review of the notes, similarly for

7 recordings.  If there's stuff in the recording -- and then,

8 again, I personally have a more charitable view of human

9 nature to tell you, with the deputy, what kind of an idiot

10 puts in his report -- some idiot who didn't listen to the --

11 to watch the recording (sic), the actual event.

12     Also, I will say even really great police officers will

13 do it.  I was talking with Chief Brent (phonetic) one time

14 when he was Chief of Oakland, and he said -- he talks about

15 how unreliable memory is, and he said, "I got one a hundred

16 percent wrong," and when he looked at the video recording of

17 an event afterwards, he had it completely flipped.  He was a

18 great chief, great human being, literally an altar boy.

19     And so -- and sometimes people just make mistakes, and

20 you can make hay of it, and that's fair, but then you get

21 that by this -- because that's a great example you gave, and

22 my similar example is the FBI notes, but the Government has

23 agreed that it goes through that process.  And so I think --

24 I mean, I would not personally -- I would not love

25 pseudonymous testimony as the trial judge in a case, but --

40

1          MS. DIAMOND:  Right.

2          THE COURT:  I just wouldn't, unless there were a

3  compelling reason for danger, because of the reasons you

4  advanced.  But here, for the discovery piece of it, there is

5  nothing.  Looking at these examples, all of it are the

6  ordinary examples that attend how the FBI documents its

7  work, how it does its investigations.  Sometimes the work --

8  you know, you just gave an example.  Sometimes the report is

9  incomplete.  We don't, you know -- and because -- and then

10  you see more stuff in the recording.

11      This is why agents should write 302s two days after,

12  within two days, and sometimes they do, and sometimes they

13  don't, and when they do, they're much more complete, and if

14  they don't, there's stuff that's missing, and then you get

15  to make hay of it in cross examination, as a shoddy

16  investigation, or, even better, if there's something

17  exculpatory or relevant to your defense.  But that -- I

18  think that that all happens whether or not you have the

19  agents' names --

20          MS. DIAMOND:  So, just --

21          THE COURT:  -- because, you know, they're not

22  going to --

23          MS. DIAMOND:  Just --

24          THE COURT:  You know, they're not going to enter

25  it.  They're not -- they usually won't get interviewed by

41

1   the defense, right?  But, if you want to ask for it, you can

2   ask for it, anyway.

3           MS. DIAMOND:  And, as I understand it, we have the

4   right to try.  In fact, in some of the circumstances, we

5   have the obligation to try, and if they want to talk to

6   us --

7           THE COURT:  I don't even know what the FBI's rules

8   are, if they -- I think usually they don't just chat with

9   people.  You go through the -- and sometimes they're willing

10  to sit down with you and talk some of the stuff, and

11  sometimes they're not, and usually they're not.

12          MS. DIAMOND:  I --

13          THE COURT:  But, if you expect -- but I'm not

14  aware of the FBI, like, ever -- they work with the

15  Government.  They have a discovery obligation, and their

16  disclosures go all through the Government.  That's how it

17  works, period, end of story.  They might be pleasant to you

18  in the hallway, but they're not going to talk to you about

19  the case.

20          MS. DIAMOND:  So I understand that, your Honor.

21          THE COURT:  You don't want to be a witness in your

22  own case.

23          MS. DIAMOND:  Just to be clear, the categories of

24  things that we can -- we would like the order to include --

25  but we -- I do understand the judge's -- your Honor's

42

1  caution, and that we may not be able to interview anybody.

2  But what we're asking for are names, notes --

3          THE COURT:  Never heard of it, right.

4          MS. DIAMOND:  -- names, notes, reports, and

5  correspondence with other witnesses.

6          THE COURT:  Well, I think that everything -- this

7  motion is really about identity.  That's how it was framed.

8  I read it very carefully.  You were asking for the identity,

9  and that's -- the rest of it is the Government's discovery

10 obligations that they're assured me that they're complying

11 with, Rule 16, <u>Brady</u>, and they've also said that just

12 everything they have they're giving over to you.  So not

13 only they're not playing games with Rule 16, and they're not

14 playing games with <u>Brady</u>, not worth it, but they've gotten

15 it.  There's no reason for them not to turn it over to you.

16 They've understood their affirmative obligations to inquire,

17 to get the information, and to produce it.

18     And so I think I'm very firm on this idea with the

19 employees.  I don't see it from a discovery standpoint.  I

20 think that it (indiscernible), because I don't think

21 identity gets you anything, because the reality is I've

22 never heard of how any FBI -- and I don't think the rules

23 permit.  They just don't.  They don't -- you can't go

24 interview them.  They won't be interviewed.  They -- at

25 best, the best you might ever be able to get is a sit-down

43

1  with the Government and the prosecutors there with the agent

2  or the employee.  They're never, ever, ever going to talk to

3  you outside of the litigation.  That's just not going to

4  happen.

5      I understand the difference with civilians, and the

6  ordinary way that informant issues come up, so let's talk

7  about the last piece of it, which is the civilian informant,

8  Brad, Brad Morgan.

9            MS. DIAMOND:  Seven, eight, nine.

10           THE COURT:  Yes.  So let's hear the

11 Government's -- just to talk me through, what's --

12           MR. HIGHSMITH:  Yes.

13           THE COURT:  Tell me the Government's -- let me

14 just read -- I'm just going to -- what I did is -- because

15 this is how I learn.  I just clap the whole thing out, and I

16 thought that it would be easier for Judge Seeborg if he had

17 one document that just cuts and pastes the stuff in, because

18 my job is to make his job easier, if I can.

19           MR. HIGHSMITH:  So, your Honor, the law says that

20 there's a two-step approach.

21           THE COURT:  Right.

22           MR. HIGHSMITH:  The first step is that we need to

23 determine -- if the Defendant makes a minimum threshold

24 showing that disclosure would bear on at least one defense,

25 then you get to the balancing test.  We need to know -- it's

44

1  got to be more than mere suspicion.  They have to make a

2  threshold showing of how it would be helpful to their

3  defense beyond mere suspicion.

4       So then let's go to -- that's the first step.  The

5  second step is the balancing.  So I'm only focused on the

6  first step, the "helpful to the defense beyond a mere

7  suspicion."  So then I go to what they say will be helpful

8  about Mr. Morgan's identity.  Well, they say, "Giving us Mr.

9  Morgan's true name will help us authenticate recordings of a

10 conversation involving personnel from the British company

11 working on developing Mr. Andrade's patented design for

12 biometric identification software into usable technology."

13      So, again, it's sort of the same point with the UCEs,

14 is we're not there yet.  We're putting the cart before the

15 horse.  If they want to put him on their trial list, go

16 ahead.  The identity changes nothing.  So the identity is

17 not helpful.

18           THE COURT:  So let's look at the second piece of

19 it, because the first piece of it I thought it's just

20 authentication, and if you --

21           MS. DIAMOND:  Your Honor --

22           THE COURT:  I will also let -- I mean, I haven't

23 gotten to the second one, because that's the one I want to

24 talk about, because I have questions still for the

25 Government on that piece.  With authentication, I mean, you

45

1  can get authentication without the actual identity, real

2  identity, right?  You just can.  And so, authentication, but

3  the big piece of it is -- let's talk about a second piece.

4  He may have some knowledge relevant to what information

5  known to him was told to the search warrant's affiants,

6  which is termed relevant to the Franks analysis.

7          MR. HIGHSMITH:  So, again, so I think that's

8  not -- your Honor, the law --

9          THE COURT:  I'm not -- I just want to, like,

10  think.  Just give me a second.

11          MR. HIGHSMITH:  Okay.

12          MS. DIAMOND:  There's also the impeachment factor,

13  your Honor.

14          THE COURT:  Okay.  So, okay.  So what do you want

15  to say on that second case?

16          MR. HIGHSMITH:  May -- I would -- humbly, I would

17  encourage the Court to deny on the Franks.  I don't think

18  they meet their burden.  Franks says -- the law is very

19  clear on Franks, and this Court knows Franks very well:

20          "The Defendant must make specific

21          allegations that indicate the portions

22          of the warrant claims to be false.

23          There must be a contention of deliberate

24          falsehood or reckless disregard for the

25          truth, and the allegations must be

46

1          accompanied by a detailed offer of

2          proof, preferably in the form of

3          affidavits."

4     I cite multiple Ninth Circuit cases to that effect.

5          THE COURT:  Well, let's look at the supplemental

6 submission and I'll just read that with you.  I did read it,

7 but I just want to (indiscernible) it again, because I know

8 it's on page 14, paragraph 34.

9          MR. HIGHSMITH:  This is the "under seal"

10 (indiscernible), your Honor?

11          THE COURT:  Yes, yes.  It's the "under seal"

12 thing.

13          MR. HIGHSMITH:  Understood.

14          THE COURT:  So he's -- so I'm looking at the

15 public record.  This is a tech guy.

16          MS. DIAMOND:  And it's related to the material,

17 your Honor, with --

18          THE COURT:  On the -- I saw that.

19          MS. DIAMOND:  Yes.

20          THE COURT:  Yes.

21          MS. DIAMOND:  So I wanted to again repeat

22 (indiscernible).

23          THE COURT:  So, going back to Ahmed, in your

24 public record filing, you said about Ahmed that Ahmed was

25 quoted in the first search warrants, that the quote was out

47

1  of context, misleading.  This is the <u>Franks</u> issue again.

2  How the warrant's affiants got Ahmed's information is

3  unknown to the defense.  Well, Ahmed is a UC, so the UC

4  would have -- there would be -- again, I don't -- I'm just

5  plain guessing what the documentary record would be, but, in

6  ordinary circumstances, there would be 302s that the UC

7  would write.

8      If there are recordings during the encounter -- this is

9  the tech consultant.  I don't know whether they would have

10  been recorded or not.  I would say maybe not, but there

11  would be whatever forensic record supports that FBI's --

12  like the FBI, and so the reason the case agent gets the

13  302s, writes the affidavit.  Your quarrel is selectively

14  quoting the issues.

15      The Government has the obligations to do the 302s, to

16  do the notes, to look for omitted information.  Then you're

17  right down for Ahmed.  You're back into "interview land,"

18  which is never going to happen, and, by the way, no one

19  remembers trust beyond what's in -- generally, people don't

20  remember beyond what's in their 302 or their notes, because

21  that's their contemporaneous accounting of it, and that's

22  just the way human memory works, the reason the Bureau does

23  the notes and the 302s, or every agent is to preserve as

24  good a record, absent a recording -- and a recording would

25  be another way to do it -- as they can.

48

1      So, again, that's the reality, and the <u>Franks</u> issue

2  with this witness is just -- the name is irrelevant.  And so

3  then you go to the -- this tech consultant.  Again, looking

4  at your public record proffer, the tech person -- I mean, I

5  don't know what information you've got.  It says here:

6              "He personally asked all the questions

7              regarding the tech specifications and

8              architectural details."

9      So they've got somebody that the FBI hires, because

10 they don't have the technical expertise to ask the questions

11 themselves, so then you --

12              MR. HIGHSMITH:  Well --

13              THE COURT:  Well, I'm just making it up.  Maybe

14 they do, maybe they don't.  But they hire --

15              MR. HIGHSMITH:  Let's not impugn the FBI, your

16 Honor.

17              THE COURT:  I'm not trying to impugn the FBI.  And

18 so they hire a tech person.  Like, they hire a tech person,

19 and this tech person goes in to ask the questions.  Okay.

20 Then that is authentication.  I already dealt with

21 authentication, and we could come back.  And so, then, he

22 may have -- so whatever tech stuff he has, again, he's

23 the -- is -- can I -- is this something I can ask?  And if

24 you can't tell me, that's okay.  He's someone the Bureau

25 hired, right?

49

1          MR. HIGHSMITH:  Not hired, because we would have

2    turned over -- if they had paid him, we would have turned it

3    over.  There's plenty of citizens who are just good people,

4    who are --

5          THE COURT:  He'll just, like, agree to be a tech

6    consultant?

7          MR. HIGHSMITH:  He's not a tech consultant.  I

8    think he's a confidential human source.  He's somebody

9    working confidentiality with the FBI.

10          THE COURT:  So he poses as a -- I see.  I see.  I

11    see.  So all the normal employment file stuff, that's given

12    up, if there is one?

13          MR. HIGHSMITH:  All the information about all of

14    these people has been handed -- has been turned over.

15          THE COURT:  Okay.

16          MR. HIGHSMITH:  So maybe it doesn't exist.  Then

17    I'm sorry, if something they want doesn't exist, but --

18          THE COURT:  So, for informants, you've got to turn

19    over the impeachment kind of stuff.  So the person is not

20    getting paid.  The nature of the relationship is relevant to

21    the impeachment issues, Brady, whatever.

22          MR. HIGHSMITH:  They're not even a witness yet.

23          THE COURT:  And so, if there's nothing that's been

24    turned over, there's nothing there, but somewhere, somehow,

25    some documentation of who this person is, and what -- and I

50

1 know it's not in the filing.

2     The reason I'm asking -- it has been produced to the

3 defense.  If it hasn't, it's fair to inquire of it, but,

4 under normal circumstances -- this isn't a normal, like,

5 somebody is working up a drug conviction -- or a drug --

6 trying to avoid a drug -- it's probably not that because, if

7 it were that, it would have been disclosed.

8     So, whatever the basis is, you may already know what

9 this person's relationship is with the FBI, but

10 authentication doesn't get you anything, and then you say,

11 "May have some knowledge relevant to the information.  What

12 he knew was told to the search warrant's affiants.  And

13 that's --

14          MS. DIAMOND:  Your Honor --

15          THE COURT:  And that's -- he can be a witness.

16 You can subpoena him, right?  Because he's basically

17 somebody who's working with the FBI, and is at least

18 adjacent.

19          MR. HIGHSMITH:  They have Brad Morgan and the

20 identifier.

21          THE COURT:  Yes.

22          MR. HIGHSMITH:  So it's the same principle for the

23 undercover employee, your Honor.

24          THE COURT:  Okay.  Right.  I understand.

25          MS. DIAMOND:  Your Honor, we --

51

1          THE COURT:  So you tell me what you think.  Okay.

2          MS. DIAMOND:  Okay.  Well, with respect to Brad

3  Morgan, we do not know his real name.  We do not know how to

4  reach him.  We do not know how to ask for an interview.  We

5  do not know -- I understand the --

6          THE COURT:  Well, the -- yes.

7          MS. DIAMOND:  -- the prosecutor has volunteered to

8  subpoena them, these witnesses, for us -- I get that -- if

9  we need to call them.

10          MR. HIGHSMITH:  Need to --

11          THE COURT:  So let me just ask you this question,

12  because I guess the difference between going to the

13  Government and going on your own -- let's say you get the

14  guy's name and address and phone number, and you want to ask

15  him questions about the stuff, whatever is private and

16  what's mostly in here.  You go knock on his door and say,

17  "Will you agree to talk with me?"  And in any normal defense

18  case, the informant is free to say yes or no.

19          MS. DIAMOND:  Right.

20          THE COURT:  And so what you get to do is you get

21  to knock on his door.

22          MS. DIAMOND:  Ask for an interview, ask to discuss

23  interview questions on --

24          THE COURT:  And ask -- okay.

25          MS. DIAMOND:  -- and subpoena him to be a witness

52

1    at trial.

2              THE COURT:  So that's the only difference here

3    with this --

4              MR. HIGHSMITH:  They can subpoena.  They can do a

5    defense subpoena.  They can put him on their witness list.

6              THE COURT:  Well, so, normally --

7              MS. DIAMOND:  Well, the prosecutor is --

8              THE COURT:  So, normally --

9              MS. DIAMOND:  -- skipping the right to

10   investigate --

11             THE COURT:  So the --

12             MS. DIAMOND:  -- and the case law is very clear

13   that you have a right to try --

14             THE COURT:  Yes.  That's the tricky piece.  I

15   mean, a solution might be -- again, I don't know.  It

16   happens all the time, but you --

17             MS. DIAMOND:  -- to arrange a meeting.

18             THE COURT:  What's that?

19             MS. DIAMOND:  To arrange a meeting for --

20             THE COURT:  So a right to say that they want to --

21   it's what you tell the people, "They want to meet with you

22   to talk about it.  You can say yes.  You can say no.  It's

23   up to you."  And then you can accommodate that request, and

24   pass it on, and agree to do that.

25             MR. HIGHSMITH:  Very happy to do that.  Very happy

53

1  to do that.

2          THE COURT:  Okay.  Let's start with that as a

3  step, and see where it goes, because I think that he's --

4  this person is -- from what I have for the record that's

5  been given to me, he's FBI-adjacent, and so can kind of --

6          MS. DIAMOND:  Yes.

7          THE COURT:  -- it can fall as kind -- like a UC

8  enough that I'll comfortably ask -- put that in as a first

9  step.  See what happens.

10     And you said that your pre-trial conference is the

11  20 --

12          MR. HIGHSMITH:  Second.

13          THE COURT:  -- of January?

14          MR. HIGHSMITH:  Yes.

15          THE COURT:  So you're coming up really close on

16  all of these issues.

17          MS. DIAMOND:  Your Honor, could the Court hear

18  from my colleague, if she has anything to add?

19          THE COURT:  Yes, of course.  Of course.  Yes, yes.

20          MS. DIAMOND:  Thank you so much.

21          THE COURT:  Yes.  I'm just looking at my watch.

22  Not to be impolite, but I'm fine.

23          MS. DENT (via Zoom):  (Indiscernible) to a

24  different issue, the issue of the subpoenas and the search

25  warrants, just to make one quick observation that I want to

54

1  make sure the Court is aware of.

2          MR. HIGHSMITH:  That's a totally different motion.

3          MS. DENT:  But that's the other -- that's the last

4  (indiscernible).

5          THE COURT:  Okay.  Let's finish with this one

6  first.  I think we're finished with this one, and then we

7  can say anything else you want to add on the other one.

8  Okay.  So let's -- I think we're fine with this one.

9          MR. HIGHSMITH:  Are we done with this?  Okay.

10 Thank you, your Honor.

11         THE COURT:  Okay.  So let's go back to search

12 warrants.  Yes.  What did you -- yes.  Thank you.

13         MS. DENT:  So my point on the search warrants is

14 this.  When the Government produced the issue to you today,

15 they went -- I wrote it down, so (indiscernible) they said

16 -- they've asked for (indiscernible) not related to this

17 investigation.  Your Honor, it's in our papers.  The

18 Government knows this.  These people were interviewed by

19 Agent Plade (phonetic) and by Agent Rheinhart (phonetic).

20 Those -- almost everyone --

21         THE COURT:  Then there should be 302s.

22         MS. DENT:  There are 302s.

23         MR. WARD:  If they were interviewed by the case

24 agents in this case, that has been turned over.

25         MS. DENT:  I'm not asking for the 302s again, but

55

1  thank you.

2          MR. WARD:  I mean --

3          MS. DENT:  I'm saying it's not -- we're not asking

4  for search warrants and subpoenas that are unrelated.  They

5  said in response to this request (indiscernible), "Our

6  agents don't even have any idea who these people are," and

7  that's almost a direct quote, your Honor.  They interviewed

8  these people, and their search warrant affidavit to search

9  Jack Abramoff's house lists these entities, and it lists

10 these people.

11         THE COURT:  But the Government has represented

12 that it's turned over all the 302s for all the things that

13 it has, and that includes everything that's listed in the

14 search warrant affidavits, everything.

15         MS. DENT:  But they're saying we searched the

16 file, and that's their words, their case file, and that --

17 and there's nothing --

18         THE COURT:  That's not the way the FBI's files

19 work.  The FBI has, like, document -- 302 repositories.

20 It's not like what the Government, the U.S. Attorney's

21 Office, has its file.  The case agents go through their

22 files, which include the files, all 302s related to, you

23 know, this -- like, all of the stuff that we've been talking

24 about.

25     So, if any of those things that were in the affidavit

56

1  for related investigations, all the stuff that the FBI knows

2  about, which includes, always, a search of its files to

3  identify all the 302s at issue, they've done that.  They've

4  represented in court that they've done that, and there's

5  nothing more for them to do.  They can't do anything more

6  than look at their own repository of information.

7           MS. DENT:  (Indiscernible) the Government and the

8  prosecutors are saying, "We searched our case file."  I

9  believe that.  I'm not questioning whether Mr. Highsmith and

10  Mr. Ward have searched their case file.  That's not a

11  question here.  But their agents, the same two individuals

12  who told them years ago that they'd never even heard of

13  these people, have not done their job, because, if they had,

14  then some of these people -- then prosecutors would know

15  that there are -- there's more there.

16           THE COURT:  Did you want to offer anything from

17  the Government side?

18           MR. WARD:  The representation, as I've said, was

19  made years ago that we didn't know who these people are.

20           THE COURT:  Right.

21           MR. WARD:  Some of them, now we have begun to

22  understand their tangential, at best, connection to the

23  case.  We have searched our case files, the Mata and Dillman

24  case files.  We -- what they are asking for is these 32

25  names, not Jack Abramoff, not Marcus Andrade, but these 32

57

1   names for which they haven't established a true connection

2   to this case, and they're saying, "Any FBI investigation,

3   anywhere in the country, you should produce the subpoenas

4   and the search warrants and the returns that mention to

5   those people, that mention Andrade or AML bitcoin."

6        If there's any investigation related to AML bitcoin,

7   it's done by this office, and we've turned that over.

8   They're asking us to do a sweep of -- for 32 names of

9   entities and people throughout any FBI --

10            THE COURT:  And you're just saying through the

11   lens of Rule 16, "With everything we've identified, we've

12   done the deep sweep, but, if you're asking for us -- and we

13   have the FBI's central repository of 302s with -- like, with

14   witnesses and all of that.  All of those 302s have been

15   produced."

16        So, if there's more information reflected in some of

17   those 302s that they haven't done an independent sweep for,

18   of the things you're aware of you've done -- and so what

19   you're saying -- and I don't know of any precedence for

20   doing this.  The Government's Rule 16 and <u>Brady</u> obligations

21   extend to those involved in the investigation.  It doesn't

22   require going out and coming up with anything, anywhere,

23   anybody has done anything that's relevant to bitcoin

24   generally.

25            MS. DENT:  We never asked them to run around the

58

1 country to every district asking for things.  They know
2 where the information is about the individuals they
3 interviewed and that are on the --
4            THE COURT:  But they told -- they said that every
5 person they've interviewed, they've turned over the 302s.
6 If they talked to anybody --
7            MS. DENT:  (Indiscernible) their agents have not
8 been (indiscernible).
9            THE COURT:  Well, so they said -- but Mr. Ward
10 just said, some years ago, when that statement was made, it
11 may have been true, but it's not true now.
12            MS. DENT:  (Indiscernible.)  He said today on the
13 interviews (indiscernible).  He said, Yes, they're asking
14 for boatloads of stuff that are not connected to this
15 investigation.  It's not two years.  They said it two years
16 ago, but they said it today, and that's why (indiscernible),
17 because they know that's not true, and the Central District
18 is completely involved with the agents out of our case.
19 They've done a lot of the interviews together.  It's -- one
20 of the agents in the Central District even -- because the
21 agent reviewed all of Abramoff's handwritten notes that are
22 a key part of this case --
23            THE COURT:  But everything about Abramoff has been
24 turned over.
25            MR. WARD:  Yes, yes.  The Central District

59

1  agents -- it wasn't the Central District.  It was the CHS in
2  the Central District, working with the FBI.  They reviewed
3  some notes related to Jack Abramoff, related to his
4  Ukrainian lobbying efforts, not Andrade's case, and we went
5  through and found that 302 of the interview set up by the
6  agents of the CDCA of the CHS to review Jack Abramoff, and
7  we turned that over.
8      I mean, we turned that -- that's why they have it,
9  because we turned it over.  I mean, their -- this idea
10 that -- we didn't do the AML bitcoin case with the Central
11 District of New York -- or, excuse me, of California.  I
12 mean, this -- if there was an interview of Abramoff, if
13 there was an interview tied to Abramoff, a 302, we did
14 a (audio glitch).
15          MS. DIAMOND:  But I just want to make sure that --
16          THE COURT:  The court system --
17          MS. DIAMOND:  I just wanted to let Ms. Dent know
18 we can't hear her.  We're trying to fix the audio problem.
19          THE COURT:  Yes.  We might be able to hear her,
20 actually.  It's just, it's our central recording system.
21 All right.  Yes, we're fine.
22          MR. WARD:  I mean, it's okay if I could just --
23 what they're asking for isn't related to Abramoff.  It isn't
24 related to AML bitcoin.  They're saying, for a company,
25 Turnberry Solutions (phonetic), there was a company, ICO

60

1  Box, that you should go --

2          THE COURT:  But you already said ICO Box.  You

3  turned over the stuff that you did, because you --

4          MR. WARD:  We turned over the stuff that we got

5  from Turnberry, that we got from ICO Box.  If some U.S.

6  Attorney's Office in some district somewhere did some

7  separate investigation into ICO Box, related to something

8  else, they --

9          THE COURT:  I don't know how that's Rule 16 or

10 <u>Brady</u>.  I just don't know how it is.  The Government has got

11 its obligation about this investigation.  It gave you a

12 scrub, but it's got an obligation to look for <u>Brady</u>, <u>Giglio</u>

13 impeachment for someone like Abramoff in particular.  They

14 did do a bigger scrub there than they would ordinarily, and

15 then they do as much as they can, make sure they've got

16 everything, because, if these are "liar, liar, pants on

17 fire" in another case, it's going to be relevant to his

18 cooperation here.  And so that happens with the witnesses,

19 and it happens with people in this investigation.

20     The peripheral obligation can be broader, but, at some

21 point, it just -- it would never work as a Rule 16/<u>Brady</u>

22 issue to have to send global discovery requests to all 92

23 U.S. Attorney's Offices and say, "For all of these

24 different, you know, investigations, please turn over your

25 complete investigative file."  I've never seen any basis for

61

1  that in any case file.

2          MS. DENT:  We never asked them to do that, your

3  Honor.

4          THE COURT:  I know, but you're asking for 30.  It

5  doesn't matter if it's all or 30.

6          MS. DENT:  We focused very much on the Central

7  District, just as an example, most of the --

8          MR. WARD:  Well, no.  The list is 32 names of

9  people.  They're saying we need to search everywhere.

10         MS. DENT:  They knew exactly (indiscernible).

11         THE COURT:  (Indiscernible) back and forth to my

12  file.

13         MS. DENT:  (Indiscernible.)  They did interview

14  multiple interviews with (indiscernible) the prosecutors in

15  this case.  It's not -- they're acting like they have no

16  idea (indiscernible).

17         THE COURT:  So the issue here is that the --

18  you're saying that the case agents here participated in

19  joint interviews with the Central District, and as part --

20  let's say that's ACL or whatever, but that information would

21  have been turned over, right?

22         MR. WARD:  Right.  So it was interviews that the

23  Central District did with a confidential human source

24  related to notes that Jack Abramoff wrote about not Andrade,

25  not AML bitcoin, but about Ukrainian lobbying.  So he was

62

1  made available --

2        MS. DIAMOND:  Your Honor, may I --

3        MR. WARD:  Excuse me.  He was made available --

4        THE COURT:  Let the Government finish first,

5  please.

6        MR. WARD:  He was made available to the Central

7  District.  He was -- or the notes were made available.

8        THE COURT:  Now everybody (indiscernible).

9        MR. WARD:  The Central District spoke to the CHS,

10  and we turned that over.  So the idea that we're working

11  together on this case with the Central District just isn't

12  true.  It's not.  It's our case, our case.

13        MS. DIAMOND:  Your Honor, I would like to just

14  remind the Court that the question of whether or not

15  Abramoff's dealings with Ukraine touched on the Levin

16  (phonetic) disclosure that we argued about a couple of years

17  ago -- and the Court ruled in our favor that we should have

18  access to that information.  There are connections.

19        THE COURT:  It's a little different, though, when

20  we have -- well, you're going to say it's the same, that

21  when there's known information, they should have access to

22  it, and, sure, if it's -- you know, we did -- perhaps we're

23  more -- you know, we just turn over the full device.

24  There's been no objection, blah, blah, blah, blah, blah.

25        So we got through this, but let's -- like, let's look

63

1  at your motion again.  Where are the -- this is the fourth

2  motion to compel, just so I've got a record here, and sort

3  of the 30-some entities.  Let's look at that together.  You

4  said it was a footnote.

5          MR. WARD:  Page five of the motion.

6          THE COURT:  Okay.

7          MS. DENT:  We give examples in our papers of the

8  places that we feel (indiscernible.)

9          THE COURT:  Just give me an example, motion line

10 number, reply line number.

11         MS. DENT:  Page eight, line 11.

12         MR. WARD:  Well, is this the motion or the reply?

13         MS. DENT:  The motion.  It's all in our initial

14 motion, examples of --

15         THE COURT:  Page eight?

16         MS. DENT:  Page eight.  Well, actually,

17 (indiscernible) pages are the same as the others..  Page

18 seven, line 11.

19         THE COURT:  Okay.  So ECF eight, page number nine.

20 Okay.

21         MR. WARD:  Wait.  It's ECF -- this is 374?  This

22 is the motion or the reply?

23         THE COURT:  This is the motion.  This is just the

24 Brady standard, the Rule 16 and Brady standard:

25         "The Government could look at a case

64

1              file of a former congressman whose

2              investigation was sometimes

3              cross-referenced with Mr. Andrade's case

4              on the agent's 302 reports."

5        Okay.

6              MS. DENT:  But there are several pages there of

7 examples of the Central District and its ties to

8 (indiscernible), and there are multiple -- it's not just the

9 one interview about the notes -- Abramoff's notes.  There

10 are several other interviews where agents from the Central

11 District are working with our agents on the interviews, and

12 we give some of those examples as well.

13              THE COURT:  So the issue is that, for Rule 16, the

14 Government has an obligation to produce Rule 16 information

15 about this case, even if it's Rule 16 related -- in another

16 related investigation.  The Government has said that it took

17 that example, produced the Rule 16 and Brady information

18 from the other investigation.  It doesn't get you the whole

19 investigation.  It just doesn't.  That's not what Rule 16 or

20 Brady is.  It's just not.

21              MS. DENT:  But, your Honor, what they say in their

22 opposition is "We searched our case file and gave them

23 everything in our (indiscernible) case," as we discovered

24 several times in this case before you, your Honor, that

25 they -- that's not how Rule 16 works.  The prosecutorial

65

1  (indiscernible) sometimes includes the CC or the IRS.  In

2  this case it includes (indiscernible) Central District

3  (indiscernible).

4            THE COURT:  Correct.  It could, and the Government

5  has said that it has reached out for those involved in the

6  investigation and gotten the Rule 16 information, and then,

7  of course, has its <u>Brady</u> obligation to inquire, including

8  about looking at notes, and they've done that.  And so --

9  yes.

10           MS. DENT:  They didn't say that, your Honor.

11           THE COURT:  Well, is that what you've done, Mr.

12 Ward?

13           MS. DENT:  (Indiscernible.)

14           MR. WARD:  I mean, have we asked the Central

15 District for their investigative case file?

16           THE COURT:  Well, no, you don't have to.  You have

17 to, but you've made the request to the agencies for

18 information related to this investigation that overlaps with

19 the other investigation, and you've asked for that material

20 through the agent, and then gotten and produced that

21 information.

22           MR. WARD:  Correct.  We asked the FBI.  They've

23 reviewed it.  To the extent that there was information about

24 a CHS talking to the --

25           THE COURT:  Right.  That's how discovery works --

66

1          MR. WARD:  But that's what -- we produced that.

2          THE COURT:  -- and so you've done that, and then

3 the Brady review of notes or accompanying 302s would be the

4 prosecutor's own obligation.

5          MR. WARD:  That would be --

6          THE COURT:  The FBI gets you the information

7 related to your investigation.  There was some overlap in

8 co-interviews.  That information was obtained and produced.

9 That's what Rule 16 and Brady requires.  It doesn't give

10 you -- the agent is the one who manages discovery.  The

11 agents provide the information to the AUSA.  They have the

12 rules under the guidance of the U.S. Attorney's Office about

13 what their Rule 16 and Brady obligations are.

14     They give it to the U.S. Attorney, who produces it, and

15 if you notice deficiencies, I mean, they're free to say, "We

16 think that this is Rule 16 and you should produce it," but I

17 can't tell whether it's Rule 16 or not.  I have to accept

18 the representations that the Government has produced its

19 Rule 16 and Brady discovery.

20          MR. WARD:  And we have, your Honor.  I mean, just

21 to be clear, though, the -- we have not had the agents go

22 through for all of these 32 names and ask and determine

23 whether there is some notation to those entities in some

24 other district.  Turnberry Solutions, ICO Box, the names of

25 these various Russians, that's not what we've done.

67

1          THE COURT:  I'm just looking back to see where

2 that -- because I just saw where they cross-referenced the

3 case in the docket.  We're almost finished here, a few more

4 minutes, then that's it.  I'm trying to see where you said

5 that the -- you know, it was the 32 or whatever.

6          MR. WARD:  Yes.  It's page -- docket -- document

7 374, page five.

8          THE COURT:  Okay.  Thirty individuals on July 15,

9 2022, and that's Exhibit J, request for -- that's the reply,

10 paragraph -- okay.  So, Mr. Ward, why don't you give me,

11 like, just a representative one.  You have the exhibit in

12 front of you.  Just give me a representative one.

13          MR. WARD:  I don't have the exhibit, but I have

14 the motion.  So they've listed the people.  So Muzin,

15 M-U-Z-I-N, Capital Partners is one of the entities.

16          THE COURT:  Okay.

17          MR. WARD:  So we searched that name through our

18 case file, the investigative case file here.  We searched

19 through the Dillman and Mata case files, but did we do --

20 did we --

21          THE COURT:  No, no, 100 percent, 100 percent.  So,

22 but this is the deal with Rule 16.  <u>Brady</u> is slightly

23 different, affirmative obligation, but Rule 16 is about --

24 the Government has based its entire investigation on stuff

25 in its investigative case file, which it has an obligation.

68

1  It's basically produced it, not relying on Rule 16 -- you

2  can correct me if I'm wrong -- not relying on Rule 16 or

3  Zeng (phonetic), whatever.  We're (sic) just like, "Here it

4  is.  This is everything we have."

5      They've given over its investigative case file,

6  everything that the agents in this investigation have relied

7  on, including the example we had in the Central District,

8  joint interviews of some people, and then including an extra

9  special scrub with Jack Abramoff, because he's a cooperator

10  in the case.  I don't see how Rule 16 requires more.  I just

11  don't see it.

12      Okay.  That's it.  I mean, I appreciate it, but it's

13  not -- the Government doesn't work for you, Mr. -- you want

14  to add something?

15          UNIDENTIFIED SPEAKER:  No, I do not on this.  I

16  just wanted to inquire about -- I think I understand what

17  the Court is saying, completely different subject.

18          THE COURT:  Yes.

19          UNIDENTIFIED SPEAKER:  It has come up a few times.

20  It is -- we say, "Hey.  There's a 'Raiders of the Lost Ark'

21  quantity of paper here," and they make a specific request

22  like Mr. Abramoff's informant files, ability, whatever, or

23  the employment relationship relating to the UC that might --

24          THE COURT:  Yes.  I think you should get the

25  employment relationship.

69

1          UNIDENTIFIED SPEAKER:  And they say, "We've

2    already produced it," and we say, you know --

3          THE COURT:  "Where?"  I think it's -- yes.

4          UNIDENTIFIED SPEAKER:  For all those, both -- for

5    all those items, and we say, "Hey.  We've got the 'Raiders

6    of the Lost Ark' quantity.  Could you tell us where it is

7    that you've produced these items?"  And we get no response.

8    I can't tell if the Court is saying they're not obligated to

9    do so or --

10          THE COURT:  Well, here's -- you tell me what you

11   think about this.  I am very sympathetic, and I -- because

12   it's -- we have a lot of discovery that's produced, and

13   there's case law on this, the Skilling (phonetic) case, for

14   example.  It's not enough for something that's -- you know,

15   we used to see it in the old DEA -- all the recordings where

16   they do 187 recordings, and maybe it was enough when the DEA

17   had recordings, because it was a more finite universe, but,

18   when you get into terabytes of information, you can't comply

19   with your disclosure obligations by just burying things.  So

20   I think that's correct.

21       The issue, though, is what tools do I have to help you?

22   Now, I am not quarreling with anybody here, but the only way

23   to do an investigation is from the very beginning, from the

24   moment you open it up, is to do an index, and Excel

25   spreadsheet, starts to Bates your discovery, and put a

70

1  document description in it, and turn it over.  That's what I
2  did with my cases.  The FBI gave me paralegals to do it.  I
3  started with a paralegal from the beginning.  You might
4  consider that fact work product.
5      I personally would have done -- I personally did my
6  cases that way, because I didn't know how else to do it, and
7  when I got to trial, and I was CaseMapping my case, tagging
8  it with the different issues, that's the way my brain works.
9  That's not how most people do it.  And is it fair for you to
10  ask?  Of course it is.  Should the Government care about
11  identifying things that you're asking for?  Sure, because
12  why wouldn't you want to start -- a good lawyer -- and,
13  like, I don't even know if people use CaseMap anymore.
14  That's what I used.
15      When you think about your case, your elements, what
16  your case is going to be, if you're tagging information
17  that's of interest to you, I definitely want to know where
18  it is, the discovery, because I want to look at it, and as a
19  courtesy, sure.  Can I compel it?  Do you maybe have issues
20  later if they haven't done it?  I haven't limited -- so I am
21  very sympathetic.
22      I also personally would have -- if you developed a very
23  specific issue where the device is one of them, where it's
24  like no burden on anybody to get you the information,
25  because, you know, presumably, you know, the -- I don't know

71

1  what the forward docket looks like in the Eastern District
2  of -- or the Central District of California.  You know, we
3  file our stuff.  We file forward basic things, as a matter
4  of public record.  I don't know how hard it is to identify
5  the case agent who worked on a search warrant, and see if
6  they could rustle you up a courtesy copy of the search
7  warrant affidavit.  I probably would do that, because I
8  don't want my record messed with on appeal.
9       Do I think that's Rule 16?  I don't.  And so you can
10 ask.  They can accommodate, if they want, if it's Rule 16,
11 but sometimes it's not, and then sometimes, when it exists
12 in easily retrievable form, I'm not going to -- the reality
13 is, I haven't stood on the rules to -- when ordering
14 production.  But I just don't think most of the stuff in
15 here is actually Rule 16.  I just don't.
16      Okay.  That's the best I can do.
17           MR. WARD:  Thank you, your Honor.
18           THE COURT:  I'll write some kind of an order.  I'm
19 sympathetic, but the way, you know, it's -- you know, maybe
20 some day the Government will have better -- I mean,
21 they're -- it's really tough.  Not that you should be
22 sympathetic to this, but -- you shouldn't be.  It's not your
23 job to care at all, but to do a good job in a case where you
24 don't know where it's going at the beginning and you come in
25 later, you've got a case that sometimes isn't organized as

72

1  you would like it.  But that's not necessarily a discovery

2  violation.

3       Okay.  Thanks, everybody.

4            ALL:  Thank you, your Honor.

5            THE CLERK:  That concludes today's calendar.

6       (Proceedings adjourned at 12:08 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

73

1                    CERTIFICATE OF TRANSCRIBER

2

3        I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by

6   the U.S. District Court, Northern District of California, of

7   the proceedings taken on the date and time previously stated

8   in the above matter.

9        I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16

17           Echo Reporting, Inc., Transcriber

18                Thursday, January 2, 2025

19

20

21

22

23

24

25