ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

CHRISTIAAN HIGHSMITH (CABN 296282)
DAVID WARD (CABN 239504)
Assistant United States Attorneys

MATTHEW CHOU (CABN 325199)
Special Assistant United States Attorney

      450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
      Telephone: (415) 436-7200
      FAX: (415) 436-7230
      christiann.highsmith@usdoj.gov
      david.ward@usdoj.gov
      matthew.chou2@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>   v.<br><br>ROWLAND MARCUS ANDRADE<br><br>      Defendant. | NO. CR 20-00249 RS<br><br>**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EVID. OF UNCHARGED BAD ACTS**<br><br>Dept.:    Courtroom 3 – 17th Floor<br>Judge:   Hon. Richard Seeborg<br><br>Trial Date:  February 10, 2025<br><br>Pretrial Conf.: January 22, 2025 |

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND....................................................................................1

    A.  AtenCoin & AML Bitcoin .................................................................................1

    B.  Global Algae Royalties, a/k/a Biogreen...........................................................7

III.    LEGAL STANDARD................................................................................................8

    A.  Fed. R. Evid. 404(b)..........................................................................................8

    B.  Inextricably-Intertwined Evidence....................................................................8

IV.     ANALYSIS................................................................................................................9

    A.  The Atencoin Evidence is Inextricably Intertwined with the Charged Fraud Scheme...................9

    B.  The AtenCoin Evidence Shows is Properly Admitted 404(b) Evidence of  Andrade's .................9

    C.   The Biogreen Evidence is Properly Admitted 404(b) Evidence of  Andrade's ...........................12

    D.  The Noticed Evidence Would Not be Improperly Time-Consuming.............................13

    E.  The Probative Value of the Proposed 404(b) Evidence Outweighs its Prejudice.........................13

V.      CONCLUSION.......................................................................................................14

1

2

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

3

*Huddleston v. United States*,
    485 U.S. 681 (1988)................................................................................................ 11, 13

4

*United Staes v. Vacaro*,
    816 F.2d 443 (9th Cir. 1987) ................................................................................... 10, 11

5

*United States v. Arambula-Ruiz*,
    987 F.2d 599 (9th Cir. 1993) ..................................................................................... 8, 13

6

*United States v. Ayers*,
    924 F.2d 1468 (9th Cir. 1991) ........................................................................................ 8

7

*United States v. Bailey*,
    696 F. 3d, 794 (9th Cir. 2012) ....................................................................................... 8

8

*United States v. Cruz-Garcia*,
    344 F.3d 951 (9th Cir. 2003) ..................................................................................... 13, 14

9

*United States v. Hadley*,
    918 F.2d 848 (9th Cir. 1980) ...................................................................................... 8, 12

10

*United States v. Hinton*,
    31 F.3d 817 (9th Cir. 1994) ......................................................................................... 10

11

*United States v. Iverson*,
    162 F.3d 1015 (9th Cir. 1998) ....................................................................................... 12

12

*United States v. Johnson*,
    132 F.3d 1279 (9th Cir.1997) ........................................................................................ 12

13

*United States v. Parker*,
    553 F.3d, 1309 (10th Cir. 2009) ..................................................................................... 9

14

*United States v. Rodriguez*,
    880 F.3d 1151 (9th Cir. 2018) ....................................................................................... 12

15

*United States v. Ross*,
    886 F.2d 264 (9th Cir. 1989) ......................................................................................... 12

16

*United States v. Sanchez*,
    2023 WL 1822562 (D. Idaho 2023)............................................................................... 12

17

*United States v. Sitton*,
    968 F.2d 947 (9th Cir.1992) ........................................................................................... 8

18

*United States v. Smith*,
    282 F.3d 758 (9th Cir.2002) .......................................................................................... 8

19

*United States v. Soliman*,
    813 F.2d 277 (9th Cir. 1987) .......................................................................................... 8

20

*United States v. Spillone*,
    879 F.2d 514 (9th Cir. 1989) ......................................................................................... 12

21

*United States v. Vizcarra-Martinez*,
    66 F.3d 1006 (9th Cir. 1995) .......................................................................................... 9

22

*United States v .Lague*,
    971 F.3d 1032 (9th Cir. 2020) ............................................................................... 8, 11, 13

23

24

**Statutes**

25

18 U.S.C. § 1343 ............................................................................................................ 1

26

18 U.S.C. §  1956(a)(1).................................................................................................. 1

27

28

## I.    INTRODUCTION

Defendant Rowland Marcus Andrade has been charged in an Indictment with one count of Wire Fraud in violation of 18 U.S.C. § 1343, and one count of Money Laundering in violation of 18 U.S.C. § 1956(a)(1).  *Dkt. 1.*  As alleged in the Indictment, Andrade and his co-schemers fraudulently marketed and sold what they claimed was a new a new cryptocurrency, AML Bitcoin.  *Dkt.* 1.  Andrade and his co-schemers represented to potential purchasers that AML Bitcoin had groundbreaking patented security features that would allow it to comply with anti-money laundering and know your customer laws, and falsely stated and implied that they had reached or were about to finalize agreements with government agencies, companies, and other prospective users of the cryptocurrency, and that this widespread adoption would cause the value of AML Bitcoin to soar.  *Dkt. 1* ¶¶ 6, 9.

On September 13, 2024, the government gave notice of its intent to introduce evidence of two earlier investment schemes marketed and sold by Andrade, AtenCoin and Biogreen, both as other acts evidence admissible under Fed. Rule. Evid. 404(b) or as evidence inextricably intertwined with the fraud scheme alleged in the indictment.

On December 27, 2024, defendant Andrade filed a Motion to Exclude evidence of these prior acts.  *Dkt. 425.* Defendant's motion improperly seeks to exclude relevant evidence that is either inextricably intertwined with the charged offenses in this matter, or admissible under Fed. R. Evid. 404(b) to show defendants' knowledge, intent, motive, opportunity, and absence of mistake.  The government respectfully asks the Court to deny defendant's motion.

## II.    FACTUAL BACKGROUND

### A.    AtenCoin & AML Bitcoin

#### 1.    AtenCoin

From 2014 to August 2016, Andrade, through his company the National AtenCoin Foundation ("NAC Foundation"), sold a cryptocurrency called AtenCoin.  According to the NAC's marketing materials, AtenCoin was the predecessor to AML Bitcoin, which he began selling a year later, in 2017.  *Id.* (Andrade "created AML Bitcoin and its predecessor digital currency, the Aten Coin.").

According to a "White Paper," posted on the NAC Foundation and relied on by investors, Andrade claimed that he used his patented technology to develop, first AtenCoin, and then from that,

AML Bitcoin. *Ward Decl* ¶ 1. (White Paper) ("Marcus Andrade invented and granted a license of technology to NAC (patent pending publication . . .) that permits tracing and tracking of the identities of senders and receivers of a cryptocurrency when necessary. Subsequently, using this methodology, NAC developed its first digital currency, the Aten Coin." *Id.*

Like AML Bitcoin, Andrade and his associates claimed that AtenCoin contained the same anti-money laundering and know-your-customer technology, and that this "groundbreaking" technology would leave to widespread adoption of the cryptocurrency. *Ward Decl.* ¶ 1 (White Paper). Andrade claimed that AML Bitcoin was developed using the same patented technology that underly AtenCoin, and that therefore, "AML Bitcoin possesses all the unique properties of Aten Coin, including anti-money laundering, anti-terrorism, and theft resistance." *Id.* As part of the marketing of AML Bitcoin, Andrade encouraged AtenCoin investors to exchange their AtenCoin for AML Bitcoin. *Id.* ("Aten Coin holders may exchange their ATENC units to AML Bitcoin on a ratio of 1:1"). *Id.*

In an email co-schemer Japheth Dillman sent to potential investors, cc'ing Andrade, he described the intertwined nature of the AtenCoin and AML Bitcoin fraud schemes. Similar emails were sent to other investors.

Hi Paul,

Marcus Andrade (cc'ed here), is the CEO and Founder of AML Bitcoin (www.amlbitcoin.com). The coin used to trade at $80 under the name AtenCoin, but they pulled all coins back and have undergone a rebranding. Between us, there are several enormous multi-billion dollar deals being secured with governments for use of this coin. I'll let Marcus share with you the details of some of these deals, but suffice to say Marcus is currently on  whirlwind tour between Central America and Europe literally speaking with Presidents and Prime Ministers of several countries.

The interest by these entities lies in Marcus' patent portfolio that allows him to create AML compliance with cryptocurrency ensuring the AML Bitcoin isn't used by terrorist organizations and nefarious purposes.

I'm reaching out to you to discuss investing in the initial launch of the token, which hits October 1st.

There are literally billions of dollars in deals that are being negotiated right now for the use of the coin, and we expect the price to surge significantly.  In my humble opinion, it would be an incredible boon to your investment funds.

I'm more than happy to have made the introductions!

**Marcus,** Paul is an investor that heavily invests in cryptocurrency and ICOs.

Cheers,

*See Declaration of David Ward in Support of Government's Opposition to Defendant's Motion to Exclude Other Acts Evidence ("Ward Decl.")* ¶ 2 ("Investment into AML Bitcoin" email).

Andrade repeatedly referenced "patents" in his description of the value of both AtenCoin and AML Bitcoin, stating in marketing material that "[m]ultiple aspects of NAC's novel solutions are IP protected, in the form of US and international patent applications & trademarks." *See Ward Decl.* ¶ 6 (NAC Foundation PowerPoint).

In 2017, Andrade, through the NAC Foundation, began pressuring AtenCoin purchasers to trade their AtenCoin (which was then worthless) for AML Bitcoin. *See Ward Decl.* ¶ 6 (NAC Foundation PowerPoint: "ATEN coin trading was brisk, but voluntarily suspended in 2015 when Andrade discovered that third party security vendors failed to provide accurate AML/KYC verification of users."). Andrade claimed that holders of Aten Coin could exchange them for AML Bitcoin, and he claimed that "AML Bitcoin possess all the unique properties of Aten Coin." *Id.*

Government investigators have interviewed AtenCoin purchasers, including some who purchased both AtenCoin and AML Bitcoin tokens. Some will be witnesses at trial. These purchasers describe the investment pitch for AtenCoin as almost identical to AML Bitcoin, and some were later pressured to exchange their AtenCoin for AML Bitcoin.

According to one purchaser, "R.A.", he was contacted by telephone and described how he was persuaded to purchase AtenCoin cryptocurrency coins that he was promised would soon soar in value. *Ward Decl.* ¶ 3 (R.A. Interview 302s). R.A. stated that he was told that AtenCoin's value was that it had built-in anti-money laundering and know-your-customer technology, which made the coins safer than Bitcoin, and would lead to widespread adoption of the cryptocurrency. *Id.* R.A. stated that he initially purchased $15,000 in AtenCoin, and over time invested approximately $120,000. *Id.*

Purchaser R.A. stated that in September 2015, he spoke to defendant Andrade, who told him that "they have thousands of investors," and that they were "currently in negotiations with certain banks to

1    open accounts where the [Aten] coins could be traded in mass by the end of the year," allowing R.A. to

2    easily sell his coins and recoup his investment. *Id.* Andrade claimed that the coins went out with a

3    value of $1 and should be at $4 by the end of the year. *Id.* R.A. stated that his AtenCoin was converted

4    into AML Bitcoin tokens. *Id.* R.A. said that there was never much trading volume for either

5    cryptocurrency, and R.A. was never able to recover any of his investment. *Id.*

6        Two other investors, a couple B.J. and C.J. stated that beginning in 2015, they purchased over

7    $200,000 in Aten coins after being contacted by telephone by an individual, M.D. *Ward Decl.* ¶ 4. B.J.

8    and C.J. were told that AtenCoin was money-laundering resistant cryptocurrency associated with

9    Marcus Andrade. *Id.* Months later, according to C.J. defendant Andrade began calling and asked C.J. to

10   join the company as a business advisor. *Id.* B.J. and C.J. stated that they then invested another

11   $150,000 to $200,000 in the NAC Foundation, and he stated that Andrade told them he wanted them to

12   help take AtenCoin public. *Id.*

13       B.J. and C.J. stated that once they began working with Andrade, they discovered that the

14   technology wasn't ready, and that while they had the patents, they didn't have the parts to put together to

15   finish the technology. *Id.* B.J. and C.J. stated that they were never able to trade (and thus sell) their

16   AtenCoin on any cryptocurrency exchanges. *Id.* B.J. and C.J. stated that they were contacted by

17   Andrade's employees who offered to convert their AtenCoin to AML Bitcoins. *Id.* B.J. and C.J. stated

18   that they were told that the company was "rebranding" AtenCoin as AML Bitcoin and that AML Bitcoin

19   would go live on a cryptocurrency exchange. C.J. and B.J. stated that the rebranded AML Bitcoin

20   "seemed like the same thing as AtenCoin" so they refused to convert their coins. *Id.* They stated that

21   they could never sell their AtenCoin and Andrade never repaid them any money.

22       In 2016, B.J. and C.J. stated that they concluded that Andrade "was a crook" and reported his

23   conduct to the Canadian equivalent to the U.S. Securities and Exchange Commission. *Id.* B.J. and C.J.

24   said that Andrade subsequently sued them, and that while the judge ultimately ruled in their favor, they

25   accrued over $150,000 in legal bills. *Id.*

26       As part of its investigation, the government interviewed an individual, B.D., who stated that he

27   worked for Andrade selling AtenCoin. *Ward Decl.* ¶ 5. B.D. stated that prior to selling AtenCoin for

28   Andrade, he worked for several fraudulent telemarketing schemes, including a foreign currency options

telemarketing scheme for which he was arrested and charged with wire fraud around March 2002. B.D. stated that he pled guilty and cooperated with the government. *Id.* B.D. said that he later managed a "boiler room" of individuals telemarketing what B.D. described as a "fraud scheme selling a private placement stock offering." *Id.* B.D. said he earned 25 – 30% in commissions. *Id.* B.D. estimates that his boiler room raised over $11 million. *Id.* B.D. stated that he was sentenced to 60 months in prison but that his sentence was cut in half to 30 months because of his cooperation. *Id.*

B.D. stated that in 2013 or 2014, he was told by an individual M.D. (who sold B.J. and C.J. their AtenCoin) about an ad looking for "phone pros" to sell something like "crypto hottest deal earn $10K a week." B.D. stated that he began selling AtenCoin through telephone solicitations. *Id.* B.D. stated that he didn't know what cryptocurrencies were at the time, but in the end it didn't matter because, he said, you sell it as greed. *Id.* B.D. stated that after he started, he began speaking to Andrade by phone. *Id.* B.D. stated that Andrade told him that AtenCoin was the only cryptocurrency that was anti-money laundering compliant. *Id.* B.D. stated that he was paid between 30% to 40% of any sales he made in commission. *Id.*

B.D. claimed that Andrade told him that AtenCoin was going to be listed on ANX Pro, which he described as a well-known cryptocurrency exchange in Asia, and that this information brought in a lot of new investors into AtenCoin even though AtenCoin never up being listed on ANX Pro. *Id.*

B.D. said that it seemed that Andrade was simply rebranding AtenCoin as AML Bitcoin. *Id.* B.D. stated that this was a common strategy for sellers in the telemarketing industry, where they roll one investor's investment into another, but the investor is still "on a train going nowhere." *Id.* B.D. stated that he never sold AML Bitcoin.

Just as they did with AtenCoin, Andrade and his co-schemers misrepresented the state of development and viability of the technology that they claimed undergirded AML Bitcoin. Andrade and others misrepresented the timeline of the release of AML Bitcoin, and falsely represented that companies and governments had or would soon begin widespread adoption of AML Bitcoin. *Dkt 1* (Indtictment) ¶ 9a, 9c. Andrade and his co-schemers claimed that the AML Bitcoin tokens they were selling (which contained no KYC or AML technology) could soon be converted into AML Bitcoins, which would soar in value as the technology gained widespread adoption. *Id.* Andrade and his co-

schemers used direct solicitations of investors, along with false and misleading press releases, commissioned "opinion" pieces published in various publications that were merely undisclosed paid-for promotional pieces, the AML Bitcoin website, and posts on social media platforms. *Id.* ¶ 8.

According to the "White Paper" published by Andrade on the NAC website and used to solicit investors that AML Bitcoin "rests on a privately regulated public blockchain that facilitates AML-KYC (anti-money laundering – "know your customer") compliance. *Ward Decl.* ¶ 1 (NAC White Paper). Andrade claimed that "NAC will utilize a biometric identification system to verify owners of wallets that hold the AML Bitcoin." Among the claims was that Andrade held patents or licenses on the AML Bitcoin technology, including some originally held by AtenCoin. *Ward Decl.*¶ 1 (White Paper).

Andrade and his co-schemers made repeated misrepresentations about the scope of adoption and use of the technology. *Id.* ¶ 9(a) – (c). For example, Andrade claimed that the government of Panama and the Panama Canal Authority was poised to begin using AML Bitcoin, and Andrade made false statements claiming that Andrade had met with the governor of California to discuss AML Bitcoin, when in fact Andrade was simply present at a roundtable and had his picture taken with the governor. *Dkt. 1* (Indictment) ¶ 9(c). AML Bitcoin was never discussed, and neither the State of California or any other entity in the U.S. or abroad ever "adopted" or used AML Bitcoin.

Andrade and his co-schemers claimed that AML Bitcoin would soon be listed on multiple cryptocurrency exchanges, that trading volume would soar, and that as prices rose, investors would be able to sell their tokens, recoup their investment and reap outsize profits. In fact, trading volume in AML Bitcoin was tiny, prices never soared, and investors were unable to recover any of their funds.

All of this was part of a scheme that defrauded investors out of millions of dollars. Instead of returning or investing investor monies, Andrade misappropriated much of the funds, including by siphoning off $730,000 to purchase a personal home in his and his spouse's name, and another $220,000 to purchase another property in the name of a company controlled by Andrade. *Dkt. 1* (Indictment) ¶ 9(d).

Among the victims of the scheme was an individual identified as PURCHASER-1 in the Indictment. *Dkt. 1.* PURCHASER-1 stated that he purchased over $1 million in AML Bitcoin shares from the ICO and through private purchases, based on representations on the NAC Foundation website

1  (including the "White Paper"), misleading opinion pieces that (unknown to him) were paid for by

2  Andrade and his co-schemers, and from false representations by Andrade's co-schemers.  *See Ward*

3  *Decl.* ¶ 7.  In 2019, as PURCHASER-1 became worried about his investment, Andrade falsely assured

4  PURCHASER-1 that the AML Bitcoin technology was "coming along fine" and "the public will see that

5  soon." *Id.* But like with other investors, PURCHASER-1 never recovered any funds from his over $1

6  million in purchases of AML Bitcoin. *Id.*  PURCHASER-1 stated that after seeking a return of his

7  investment, he was sued by Andrade in Nevada, but that the case (which was removed to federal court)

8  was dismissed.  *Id.*

9           **B.      Global Algae Royalties, a/k/a Biogreen**

10          The government next seeks to introduce a limited amount of evidence that in 2009 and 2010

11  Andrade used some of the same claims he would use in AML Bitcoin about an investment he was

12  offering in an earlier company, initially called Global Algae Royalties then later re-named Biogreen.

13          According to some Biogreen investors who have been interviewed by the FBI, Andrade claimed

14  that he had developed a patented technology to extract a rare chemical from algae, and that this product

15  was in high demand by drug stores and food companies.  One investor, C.U. stated that he received a

16  phone call from Andrade, who pitched him on investing by buying "units" of Biogreen, claiming that

17  C.U. would begin earning royalties from Biogreen once the algae production began. *Ward Decl.* ¶ 9

18  (C.U. Interview).  C.U. provided a fax letter dated March 7, 2009 from Andrade titled "Letter from the

19  CEO of Global Algae Royalties" signed by "Rowland Andrade." *Ward Decl.* ¶ 10.  The letter stated, in

20  all capital letters: "IF YOU ARE NOT SATISFIED WITH THE ROYALTIES AFTER 2 YEARS, YOU

21  CAN REQUEST TO HAVE YOUR MONEY BACK.  YOUR INVESTMENT WILL BE GLADLY

22  RETURNED, PLUS 6% ANNUAL INTEREST." *Id.*  Investor C.U. stated that he emailed Andrade

23  requesting the return of his signed investment documents.  *Ward Decl.,* ¶ 11.  Investor C.U. stated that

24  he never heard back from Andrade, and never received any royalties or any return on his investment.

25          Another individual, R.M., was interviewed by the FBI, and stated that she worked for Andrade at

26  Biogreen.  *See Ward Decl.,* ¶ 8 (R.M. Interview).   R.M. stated that Biogreen was an alternative energy

27  company that had something to do with algae. *Id.* R.M. stated that Andrade told her he needed investors

28  to get the company going.  R.M. stated she does not think that Biogreen ever developed a product, and

that while investors would call and ask, by the time she left, she didn't think Biogreen had completed their project.  *Id.* R.M. said that Biogreen moved its offices to Andrade's condo when they ran out of money, and that eventually she left with Andrade stopped paying her. *Id.*

## III.    LEGAL STANDARD

### A.    Fed. R. Evid. 404(b)

Rule 404(b) is a "rule of inclusion," and evidence of other acts is admissible "except where it tends to prove only criminal disposition."  *United States v. Ayers*, 924 F.2d 1468, 1472-73 (9th Cir. 1991).  Rule 404(b) provides in part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident…. *Id*.

The Ninth Circuit has set out a four-part test for analyzing the admissibility of 404(b) evidence introduced to show intent.  Evidence is admissible under that test when: (1) the evidence tends to prove a material element of the offense for which the defendant is now charged; (2) the other act is not too remote in time; (3) sufficient proof exists for the jury to find that the defendant committed the other acts, and; (4) in cases where prior act evidence is being introduced to prove intent, the other acts must be sufficiently similar to the charged conduct. *United States v .Lague*, 971 F.3d 1032, 1038 (9th Cir. 2020), *citing United States v. Bailey*, 696 F. 3d, 794, 799 (9th Cir. 2012); *see also United States v. Smith*, 282 F.3d 758, 768 (9th Cir.2002).  The government "has the burden of proving that the evidence meets all of the above requirements." *United States v. Arambula-Ruiz*, 987 F.2d 599, 602 (9th Cir. 1993).  The decision whether to admit Fed. R. Evid. 404(b) evidence is committed to the district court's discretion and is reviewed only for abuse of that discretion.  *United States v. Sitton*, 968 F.2d 947, 958 (9th Cir.1992); *United States v. Hadley*, 918 F.2d 848, 850 (9th Cir. 1980).

### B.    Inextricably-Intertwined Evidence

Other crimes, or "other acts" evidence within the meaning of F.R.E. 404(b) are not subject to a 404(b) analysis if they are inextricably intertwined with the charges offenses and related conduct.

1  *United States v. Soliman*, 813 F.2d 277, 279 (9th Cir. 1987).  Two general categories of other act

2  evidence may be "inextricably intertwined with the charged crimes and thus exempt from the

3  requirements of F.R.E. 404(b); i) acts that constitute a part of the transaction that serves as the basis for

4  the criminal charge; or, ii) evidence that is necessary to permit the prosecutor to offer a coherent and

5  comprehensible story regarding the commission of the crime." *See United States v. Vizcarra-Martinez*,

6  66 F.3d 1006, 1012 (9th Cir. 1995).  As the Tenth Circuit explained in *United States v. Irving*: "intrinsic

7  evidence is that which is 'directly connected to the factual circumstances of the crime and provides

8  contextual or background information to the jury."  665 F.3d 1184, 1213 (10th Cir. 2011), *quoting*

9  *United States v. Parker*, 553 F.3d, 1309, 1313 (10th Cir. 2009).

10 **IV.    ANALYSIS**

11    **A.    The Atencoin Evidence is Inextricably Intertwined with the Charged Fraud Scheme**

12    Atencoin, by defendant's own admission in his marketing materials, was simply the predecessor

13 to AML Bitcoin, and the evidence demonstrates that AML Bitcoin was simply a rebranding of the same

14 investment scheme Andrade used for AtenCoin.  Andrade was using an almost identical sales pitch to

15 sell AtenCoin and AML Bitcoin tokens; namely, that both were AML and KYC compliant, and as such,

16 would be widely adopted by governments and industry.  In both cases, Andrade and his sales associates

17 used promises out outsize returns to lure investors.  AtenCoin investors were given the opportunity and

18 at times had their AtenCoin investments rolled into AML Bitcoin investments.  As such, the AtenCoin

19 investment scheme includes acts that "constitute part of the transaction that serves as the basis for the

20 criminal charge." *Vizcarra-Martinez*, 66 F.3d at 1012.

21    Finally, the government cannot fully and fairly offer a coherent and comprehensible story of the

22 commission of the crime – including how AtenCoin investors became AML Bitcoin investors and

23 eventual victims – without evidence of the earlier, related AtenCoin evidence.

24    **B.    The AtenCoin Evidence Shows is Properly Admitted 404(b) Evidence of Andrade's**
25    **Preparation, Plan, and Knowledge of the AML Bitcoin Fraud**

26    In addition to being inextricably intertwined, the AtenCoin evidence the government seeks to

27 introduce regarding AtenCoin clearly shows Andrade's planning, preparation, and knowledge of the

28 AML Bitcoin fraud. As described above, Andrade used many of the same marketing and sales

techniques with AtenCoin as he did with AML Bitcoin. Andrade and his co-schemers relied on many similar (often identical) misrepresentations. And Andrade even pressured AtenCoin purchasers who couldn't sell their AtenCoin to simply swap them for AML Bitcoin. All of this demonstrates Andrade's planning, preparation, and knowledge of the AML Bitcoin fraud scheme, and as such is properly admissible as 404(b) evidence for these purposes. The AtenCoin evidence satisfies the Ninth Circuit's four-part test for the admission of 404(b) evidence.

### i.    The AtenCoin Evidence Goes to Prove Elements of the Charged Offenses

Evidence of the same or similar *modus operandi* in a prior bad act as to acts charged can be admissible under Rule 404(b) to prove defendant's intent, and to show lack of mistake or accident. *See United States v. Hinton*, 31 F.3d 817, 822-23 (9th Cir. 1994); *United Staes v. Vacaro*, 816 F.2d 443, 452-53 (9th Cir. 1987) ("the evidence was clearly admissible under Rule 404(b) as proof of a plan or scheme or to show *modus operandi*). Here, Andrade employed a nearly identical *modus operandi* in the marketing and sale of AtenCoin and AML Bitcoin, and therefore the AtenCoin evidence goes to show Andrade's knowledge and intent, both elements of the charged offenses.

Andrade, employing the same *modus operandi* in both the sale of AtenCoin and AML Bitcoin, claimed both were revolutionary cryptocurrencies, claimed that both had anti-money laundering and know-your-customer compliant, which would therefore lead to widespread adoption of the currencies, and enormous profits to early investors. Both AtenCoin and AML Bitcoin were sold as cryptocurrency investments that would be listed and traded on exchanges, allowing investors to easily trade or sell their coins and recoup their investments. Both AML Bitcoin and AtenCoin were sold on the false premises that banks, governments, and other institutions were – or would soon be – adopting the coin.

And finally, most AML Bitcoin and AtenCoin purchasers were never able to sell their cryptocurrency or receive any of the investments ban. As Aten coin salesman B.D. said, both AML Bitcoin and AtenCoin purchasers were stuck on an investment train "going nowhere."

### ii.    The AtenCoin Evidence is not to Remote in Time

The evidence demonstrates, and defendant Andrade does not dispute, that Andrade began selling AtenCoin in February 2014, and continued to market and sell it through June 2016. *Dkt. 425* (Def. Motion to Exclude). The evidence establishes that Andrade began selling and marketing AML Bitcoin

1    just over a year later, and that the company launched an initial coin offering for AML Bitcoin in October

2    2017. *Id.* ("Aten coin was last sold over a year prior to the launch of the AML Bitcoin" ICO).   The

3    government's evidence demonstrates that even as Andrade was marketing AML Bitcoin, he was

4    working to exchange investors' AtenCoin (which were then not trading and were virtually worthless)

5    into AML Bitcoin tokens. All of this demonstrates that the AtenCoin evidence is not to remote in time to

6    bar admissibility.

7                    *iii.    Sufficient Proof Exists for a Jury to Link Andrade to the AtenCoin Scheme*

8              For admission of 404(b) evidence, there must be sufficient proof for the jury to find that

9    defendant committed the other act. *Lague*, 971 F.3d at 1038. There is more than sufficient proof for the

10   jury to find that Andrade committed the acts involving AtenCoin alleged as 404(b) prior bad acts – from

11   multiple witnesses who will testify that they bought and held AtenCoin based on representations by

12   Andrade, by witnesses who will testify that they were selling AtenCoin on Andrade's behalf, and by

13   reams of documentary evidence showing that Andrade, through his company the NAC Foundation, sold

14   both Aten coin and AML Bitcoin.  As such, the AtenCoin evidence satisfies the Ninth Circuit's second

15   test for admissibility.  The Ninth Circuit has noted that there is a "low threshold test of sufficiency" of

16   the evidence, and that the government need not prove Rule 404(b) evidence a preponderance of the

17   evidence. *Lague*, 971 F.3d at 1040. Instead, "the government need only lay a factual foundation from

18   which a 'jury could reasonably conclude that [the defendant] committed the allegedly-similar bad acts'

19   and that he possessed the requisite intent in committing those bad acts."  Id., citing *Huddleston v. United*

20   *States*, 485 U.S. 681, 685 (1988)

21                    *iv.    The AtenCoin Scheme is Sufficiently Similar to the AML Bitcoin Scheme*

22             As noted above, AtenCoin was in reality not even a different scheme, it was just an earlier

23   iteration of the AML Bitcoin scheme.  Both were sold as cryptocurrency investments. Both were sold as

24   containing patented and proprietary technology, both were marketed and sold as cryptocurrencies that

25   would soon be listed on exchanges and widely traded, and both were marketed as purchases that would

26   soon soar in value.  Both were marketed through the use of false and misleading pretenses about the

27   potential and current adoption and use of the cryptocurrency.  And in the end, purchasers of AtenCoin

28   were encouraged to simply convert their then worthless AtenCoin for AML Bitcoin.

The similarities between AtenCoin and AML Bitcoin are striking – and more than sufficient for this Court to admit them as relevant and probative 404(b) evidence.

### C.     The Biogreen Evidence is Properly Admitted 404(b) Evidence of Andrade's Preparation, Plan, Knowledge, Intent in the AML Bitcoin Fraud

The evidence the government seeks to introduce regarding Andrade's earlier marketing and sale of Biogreen is admissible 404(b) evidence that shows Andrade's planning, preparation, and knowledge of the AML Bitcoin fraud.  As described above, Andrade used some of the same marketing and sales techniques with Biogreen as he did with AML Bitcoin.  As such, the Biogreen evidence tends to prove a material point - to show Andrade's intent in marketing and selling AML Bitcoin, and that his misstatements and misrepresentations in AML Bitcoin were not mistakes, but merely new iterations of the same fraudulent playbook that Andrade employed in selling Biogreen (and AtenCoin).

The Biogreen scheme occurred over a decade ago, in 2009 and 2010, but it occurred only four years before the AtenCoin scheme, and seven years before the AML Bitcoin scheme.  Acts even over a decade old can be admissible under 404(b) as long as they are sufficiently similar to the charged conduct.  *United States v. Spillone,* 879 F.2d 514, 519 (9th Cir. 1989) ("Depending upon the theory of admissibility and the similarity of the acts ... some remote acts may be extremely probative and relevant."); *United States v. Iverson*, 162 F.3d 1015, 1027 (9th Cir. 1998) ("this court repeatedly has upheld the admission of evidence of prior acts that are more than seven years old.  *See, United States v. Johnson,* 132 F.3d 1279, 1283 (9th Cir.1997) (13 years)); *United States v. Hadley,* 918 F.2d 848, 851 (9th Cir. 1990) (10 years); *United States v. Ross,* 886 F.2d 264, 267 (9th Cir. 1989) (13 years))."

Here, Andrade's conduct in the Biogreen investment scheme is similar enough to allow admissibility.  "The similarity requirement does not require that the prior bad act be precisely the same as the charged act, as long as the prior act was one which would tend to make the existence of the defendant's knowledge more probable than it would be without the evidence." *United States v. Sanchez*, 2023 WL 1822562 *5 (D. Idaho 2023) (quoting *United States v. Rodriguez*, 880 F.3d 1151, 1167 (9th Cir. 2018).

*iii.    Sufficient Proof Exists for a Jury to Link Andrade to the Biogreen Scheme*

Andrade argues that the Biogreen evidence should be excluded because due to the lapse of time, that records are unavailable, and that even one of the key participants in the Biogreen investment scheme, Benito Garza, passed away in 2021.  But as noted above, in the Ninth Circuit there is a "low threshold test of sufficiency" of the evidence and  "the government need only lay a factual foundation from which a 'jury could reasonably conclude that [the defendant] committed the allegedly-similar bad acts' and that he possessed the requisite intent in committing those bad acts." *Lague*, 971 F.3d at 1040, *citing Huddleston v. United States*, 485 U.S. 681, 685 (1988)

**D.    The Noticed Evidence Would Not be Improperly Time-Consuming**

Defendant Andrade claims that admission of the AtenCoin evidence would "balloon" the trial. That is not the case.  The AtenCoin sales occurred just one year prior to the sale of AML Bitcoin, both by Andrade, and both through his company, the NAC Foundation.  Many of the exhibits that will be introduced to discuss AML Bitcoin, also discuss AtenCoin.  Similarly, witnesses who eventually were defrauded through AML Bitcoin were originally AtenCoin purchasers.  The AtenCoin evidence is already inextricably intertwined with the AML Bitcoin case, and it would be necessary regardless to tell a complete story of the AML Bitcoin fraud.  It may add some amount of time to the trial, but given its probative value, is warranted. The government intends to introduce only limited evidence regarding Biogreen, testimony and documents that will not be unduly time-consuming.  Given the relevance of the Biogreen evidence to prove Andrade's intent, knowledge, and absence of mistake in the AML Bitcoin fraud, the limited additional time is warranted.

**E.    The Probative Value of the Proposed 404(b) Evidence Outweighs its Prejudice**

Finally, before admitting 404(b) evidence, the Court must weigh its probative value against the danger of undue prejudice to the defendant.  *See Arambula*, 987 F.2d. at 604.  The AtenCoin evidence has high probative value – it is inextricably-intertwined with the AML Bitcoin fraud scheme – and is necessary for the government to tell a coherent and complete story about the AML Bitcoin fraud.

It is well-established that Rule 403 "excludes only evidence where the prejudice is 'unfair' - that is, based on something *other* than its persuasive weight." *United States v. Cruz-Garcia,* 344 F.3d

951,956 (9th Cir. 2003) (emphasis in original). "Parties always introduce evidence that will do damage to the other side's case; that's the very point of trial.  That evidence may decimate an opponent's case is no ground for its exclusion under 403."  *Id.* Any potential risk of undue prejudice can and should be mitigated through proper limiting jury instructions – not through the wholesale exclusion of highly relevant evidence.

## V.    CONCLUSION

For the reasons stated above, the government respectfully asks the Court to rule that the government's proffered evidence on AtenCoin is inextricably intertwined with the charged offenses and is therefore admissible, and the further, both the AtenCoin and Biogreen evidence are properly-noticed 404(b) evidence and are likewise admissible.


DATED:  January 10, 2025                           Respectfully submitted,

                                                   ISMAIL J. RAMSEY
                                                   United States Attorney


                                                   _/s/  David Ward_____
                                                   CHRISTIAAN HIGHSMITH
                                                   DAVID WARD
                                                   Assistant United States Attorneys


                                                       */s/ Matthew Chou*

                                                   _____
                                                   MATTHEW CHOU
                                                   Special Assistant United States Attorney