1  ISMAIL J. RAMSEY (CABN 189820)
   United States Attorney

2
   MARTHA BOERSCH (CABN 126569)
3  Chief, Criminal Division

4  CHRISTIAAN HIGHSMITH (CABN 296282)
   DAVID WARD (CABN 239504)
5  Assistant United States Attorneys

6  MATTHEW CHOU (CABN 325199)
   Special Assistant United States Attorney
7
        450 Golden Gate Avenue, Box 36055
8       San Francisco, California 94102-3495
        Telephone: (415) 436-7200
9       christiaan.highsmith@usdoj.gov
        david.ward@usdoj.gov
10      matthew.chou2@usdoj.gov

11 Attorneys for United States of America

12

13                    UNITED STATES DISTRICT COURT

14                 NORTHERN DISTRICT OF CALIFORNIA

15                      SAN FRANCISCO DIVISION

16 UNITED STATES OF AMERICA,           )  CASE NO. 3:20-cr-00249-RS
                                       )
17         Plaintiff,                  )  **UNITED STATES' MOTION TO ADMIT**
                                       )  **CO-CONSPIRATOR STATEMENTS**
18      v.                             )
                                       )  Pretrial Conference:  Jan. 22, 2025 | 9:30 a.m.
19 ROWLAND MARCUS ANDRADE,             )  Trial:                Feb. 10, 2025 | 9:00 a.m.
                                       )  Court:                Courtroom 3 | 17th Floor
20         Defendant.                  )  Judge:                Hon. Richard Seeborg
                                       )
21 _____ )

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.   Introduction ................................................................................................................1

II.  Background on the Conspiracy and Its Co-Conspirators ............................................1

    A.   The Conspiracy and Scheme to Advertise and Sell AML Bitcoin ....................1

        1.   Andrade's NAC Foundation, AtenCoin, and AML Bitcoin .....................1

        2.   Andrade Brings on Jack Abramoff to Market and Sell AML Bitcoin By Misleading the Public ..........................................................................2

        3.   Andrade Sold AML Bitcoin "Tokens" But Never Developed an AML Bitcoin Cryptocurrency With the Promised Digital Identity and Biometric Verification Features Built Into its Software ...........................3

        4.   False Statements Regarding AML Bitcoin ...............................................3

        5.   Use of the Funds and Misappropriation by Andrade .............................5

    B.   The Co-Conspirators in the AML Bitcoin Fraud .............................................5

III. Legal Standards ...........................................................................................................6

    A.   Rule 801(d)(2)(E) Has Three Elements and a Preponderance Standard ............6

        1.   Circumstantial evidence is often sufficient to establish a conspiracy ......7

        2.   Only "slight" evidence is needed to connect a declarant to a conspiracy ...8

        3.   An "expansive" set of statements can further a conspiracy ....................8

    B.   The Court Should Admit the Context for Any Co-Conspirator Statement .........9

    C.   The Government Should be Permitted to Offer Co-Conspirator Statements But the Defendant Should Be Precluded From Doing So. ..........................................9

    D.   The Residual Exception Could Independently Admit Proffered Statements .......9

IV.  Argument ...................................................................................................................10

    A.   There Was A Conspiracy to Advertise and Sell AML Bitcoin From At Least June 2017 Through March 2019 ......................................................................10

    B.   Andrade, Abramoff, and Dillman, and Mata All Had Knowledge of, and Participated in, the Conspiracy ......................................................................10

    C.   Proffered Statements Were Made During and In Furtherance of Conspiracy ...11

        1.   The Scheme Leading Up to the October 2017 Initial Coin Offering ......11

            (i)   Generating press coverage, including by secretly ghostwriting and paying for it (a/k/a astroturfing) ...........................................11

|  |  | (ii) | Hiring part-time "public facing" executives to hide Abramoff's and others' involvement ................................................................14 |
|  |  | (iii) | Sales pitches to individual investors .........................................14 |
|  | 2. |  | After the ICO: Selling the Token to Individuals, Exchanges, and the Public ................................................................................................15 |
|  |  | (i) | Published more media, both ghostwritten and under the AML Bitcoin name ...............................................................................16 |
|  |  | (ii) | Pitched investors, including the victim in Count One ................18 |
|  |  | (iii) | Sham commercial for the Super Bowl (Feb. 2018) ....................18 |
|  |  | (iv) | Drafted misleading press release about the Port of San Francisco ....................................................................................19 |
|  |  | (v) | Tried to mollify the Panama Canal Authority ...........................20 |
|  | 3. |  | Damage Control: Lulling Victims and Market Manipulation ...............20 |
|  |  | (i) | Secret plan to buy tokens to prop up price and volume .............20 |
|  |  | (ii) | Dillman and Mata try to lull Aharonoff and Boyer ...................21 |
| V. | Conclusion | | .................................................................................................................23 |

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

In June 2020, a grand jury returned an indictment charging Rowland Marcus Andrade with two counts: (1) wire fraud in violation of 18 U.S.C. § 1343 and 2; and (2) money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i), and 2. Dkt. 1 (Indictment). Andrade's jury trial will begin on February 10, 2025. The United States' case-in-chief will take about 2.5 weeks. At trial, the government intends to introduce the attached statements of co-conspirators Jack Abramoff, Japheth Dillman, and David Mata—including emails, text messages, WhatsApp messages, and documents. *See* Attachment A (List of Co-Conspirator Statements), Attachment B (Excerpt of Co-Conspirator Statements from Dillman via Text Message). All these qualify as non-hearsay co-conspirator statements and should be admitted under Rule 801(d)(2)(E) and/or the residual exception (Rule 807) if necessary.

### II.   BACKGROUND ON THE CONSPIRACY AND ITS CO-CONSPIRATORS

#### A.   The Conspiracy and Scheme to Advertise and Sell AML Bitcoin

The facts below are excerpted largely from the government's concurrently filed motions in limine and Rule 404(b) brief, which also detail Andrade's related AtenCoin schemes. AML Bitcoin flowed from and was inextricably intertwined with those prior schemes. The five sections below chronologically recount the AML Bitcoin scheme.

##### 1.   Andrade's NAC Foundation, AtenCoin, and AML Bitcoin

In February 2014, Andrade founded the National AtenCoin (NAC) Foundation. *Id.* ¶ 5. As the founder and CEO of the NAC Foundation, Andrade claimed to have created Aten Black Gold Coin, a cryptocurrency that would facilitate oil transactions that he later rebranded simply as AtenCoin, which he claimed had identity verification features. Andrade in 2017 rebranded AtenCoin as AML Bitcoin, and Andrade claimed that AML Bitcoin had the same identity verification features built into AtenCoin cryptocurrency's blockchain. Like with AtenCoin, Andrade and his co-schemers claimed AML Bitcoin would soon be widely adopted by businesses and governments, and its price would soar.

From 2014 to August 2016, Andrade and the NAC Foundation sold AtenCoin, raising approximately $2 million from buyers. Andrade employed several boiler-room-type sales people who earned commissions of 30% or more on their sales of AtenCoin.

In 2017, Andrade rebranded AtenCoin and the NAC Foundation launched AML Bitcoin, promising AtenCoin investors that their coins would be converted to AML Bitcoin. Andrade began telling associates and prospective investors that AML Bitcoin would raise funds through an ICO, or initial coin offering. An ICO is a typical type of transaction for new cryptocurrencies. The idea is similar to an initial public offering of stock, although even legitimate ICOs are not regulated and there are no clear rules governing the process or disclosures associated with ICOs. In this case, NAC Foundation held an "ICO" for AML Bitcoin that began in October 2017.

According to the AML Bitcoin "White Paper" dated October 4, 2017, posted on the AML Bitcoin website, AML Bitcoin and AtenCoin both included complete anti-money laundering (also referred to as AML) and know-your-customer (KYC) features by using "biometric technologies" to confirm the identities of participants in transactions. In the White Paper, and in statements about the cryptocurrency, Andrade and others claimed that these compliance and identity-verification features would make AML Bitcoin the dominant, and perhaps the only legal, cryptocurrency.

> ### 2. Andrade Brings on Jack Abramoff to Market and Sell AML Bitcoin By Misleading the Public

In mid-2017, Andrade was introduced to Jack Abramoff, and Andrade retained Abramoff to work on a public relations and marketing campaign for AML Bitcoin. Beginning in about August 2017, Abramoff and Andrade began that media campaign. It involved the placement of what they claimed were "op-eds" in various online publications—but were in fact merely promotional pieces written by writers who had been paid to publish on behalf of AML Bitcoin. Abramoff also drafted press releases that were reviewed and approved by Andrade.

The press releases and fake op-eds often contained exaggerations and false statements implying that AML Bitcoin had business relationships and impending deals with governmental and quasi-governmental entities such as the Panama Canal, the Port of San Francisco, other ports on the West Coast, and London Stock Exchange. In addition, Andrade posted pictures with him and government officials, and claimed he was meeting with them to discuss the adoption of AML Bitcoin. In fact, Andrade was merely engaged in a touch-and-talk scheme in which he would meet briefly with a government or quasi-government entity, in some cases take a photograph with an official connect to that

1   entity, but then spin the meeting through misleading press releases, photographs and public statements to

2   imply that the government entity was seriously considering using AML Bitcoin.

3         **3.    Andrade Sold AML Bitcoin "Tokens" But Never Developed an AML Bitcoin
              Cryptocurrency With the Promised Digital Identity and Biometric
4             Verification Features Built Into its Software**

5         At all times, Andrade and others working with him—such as co-conspirators Jack Abramoff,

6   Japheth Dillman, David Mata—sold what they called AML Bitcoin *tokens* rather than AML Bitcoin

7   itself. The AML Bitcoin "token" was simply a placeholder cryptocurrency modeled on open-source

8   Bitcoin software. From the outside, the token operated like the popularly known Bitcoin, but on its own

9   blockchain. The token had none of the anti-money laundering or know-your-customer features Andrade

10  claimed he was developing. Andrade and his co-schemers represented to investors that the tokens would

11  soon be exchangeable for AML Bitcoin cryptocurrency "coins" with biometric and digital identity

12  verification features built into the software (or blockchain) in the future, usually in about six months.

13  However, even though there was a rudimentary working AML Bitcoin "token," neither it or any AML

14  Bitcoin "coin" contained any of the promised anti-money laundering or security technology that

15  Andrade had claimed he had developed.

16        Andrade hired software developers to assist with AML Bitcoin. The software engineers initially

17  worked only on the token and wallet software. They also did some work on the other features that were

18  supposed to be integrated into the finished AML Bitcoin "coin," but that work was only beginning. The

19  engineers never created or saw a working AML Bitcoin with the promised identification features.

20  Although Andrade and the NAC Foundation had AML Bitcoin tokens with no special identity or

21  biometric verification features, there was never a completed AML Bitcoin cryptocurrency "coin" with

22  the promised and widely marketed biometric and identity verification technology.

23        **4.    False Statements Regarding AML Bitcoin**

24        Throughout 2017 and 2018, Andrade, Abramoff, and others working at Andrade's direction made

25  false statements about the business prospects and technology of AML Bitcoin. Many of the false and

26  misleading representations were made in public statements, including press releases and paid op-ed

27  pieces, and others were made to undercover agents in recorded conversations.

28        From September 2017 through at least April 2018, Andrade, Abramoff, and others working at

Andrade's direction disseminated misleading public statements and press releases indicating that Andrade and AML Bitcoin representatives were in discussions with the Port of San Francisco about the Port adopting AML Bitcoin and its technology. In fact, the Executive Director of the Port of San Francisco had no reason to use AML Bitcoin, no plan to use it, and she told Andrade that the Port would not be using AML Bitcoin.

During approximately the same time period, Andrade and NAC Foundation made false statements, both in press releases and paid op-eds arranged by Abramoff, regarding the prospect that AML Bitcoin would be used by the Panama Canal to collect transit fees, be adopted by the Port of San Francisco and other West Coast ports, and was being considered for use by other governments and private entities.

In September 2017, Andrade traveled to Panama to meet with some private sector entities, in meetings set up by Abramoff and an associate. That trip was used as the basis for a campaign to tout the potential adoption of AML Bitcoin by the Panama Canal. One op-ed, with the headline "A New Digital Currency, AML Bitcoin, Makes Landfall in Panama," stated the Panama Canal was in active negotiations with the NAC Foundation. It also included the false claim that "[Port of San Francisco] officials are considering using this new digital currency in the seaport's passage and docking fees and other payment structures." After a press release, published on November 3, 2017, touted the NAC Foundation's negotiations with the Government of Panama and included false and misleading statements, the Panama Canal Authority contacted the NAC Foundation and demanded a retraction.

In January 2018, the NAC Foundation made public statements claiming that it planned to run an advertisement promoting AML Bitcoin during the 2018 Super Bowl. Then, in a series of press releases, paid articles, and social media posts, the NAC Foundation claimed that the ad was "banned" by NFL executives and rejected by NBC, the network airing the Super Bowl. A video titled "AML Bitcoin: The Banned Super Bowl Commercial That's Sweeping the Globe" was posted on YouTube and other sites. The video was a parody that included an actor portraying North Korean leader Kim Jong Un, and showing the leader frustrated that he could not "hack" or steal AML Bitcoin.

In truth, Abramoff and Andrade knowingly developed a "rejection campaign" and disseminated false claims about the ad being rejected in order to both raise visibility for AML Bitcoin during the ICO,

but also to imply that the NAC Foundation had the financial ability to pay for this advertising time—which costs at least $5 million—in order to support claims that AML Bitcoin had significant financial backing and was an established and successful startup. There was never an intention to pay for or run the ad, and at the time of this commercial campaign, the NAC Foundation had nowhere near enough money in its accounts to pay for a Super Bowl ad on NBC.

### 5.    Use of the Funds and Misappropriation by Andrade

During 2017 and 2018, Andrade and the NAC Foundation raised approximately $4.3 million from purchasers of AML Bitcoin tokens. For example, on January 12, 2018, as part of the fraud scheme, an investor referred to as Purchaser-1 wired the NAC Foundation $730,000 in exchange for AML Bitcoin tokens. While some of the money was spent in apparently legitimate ways, significant amounts of money were spent on the promotion of AML Bitcoin tokens and on transfers to Andrade's personal accounts. During a nine-month period in 2018, approximately $1.5 million in investor money flowed through multiple NAC Foundation bank accounts to Andrade personally. During one financial transaction on March 7, 2018, for example, Andrade obtained a cashier's check for $600,000, which law enforcement directly traced to AML Bitcoin investor funds. Andrade deposited the $600,000 into his personal bank account and later used those funds to buy himself a house. Andrade used additional AML Bitcoin investor funds to purchase himself two vehicles and a second home.

### B.    The Co-Conspirators in the AML Bitcoin Fraud

As Andrade's co-schemers, the indictment lists his National Aten Coin Foundation (the "NAC Foundation"), Co-Schemer A (Jack Abramoff), and then-unnamed associates. Together, Andrade's co-conspirators were those, as well as two others, Japheth Dillman and David Mata:

*Jack Abramoff* was a high-level paid consultant to Andrade and the AML Bitcoin project. Andrade retained Abramoff to work on a public relations and marketing campaign for AML Bitcoin in about June 2017. Unlike other co-conspirators, Abramoff tried to hide his involvement from the public. Abramoff had achieved notoriety in the early 2000s for his guilty pleas and cooperation in political lobbying scandals. Abramoff thus knew that if his role in AML Bitcoin became public, it could hurt the project. In July 2020, Abramoff pled guilty pursuant to a plea agreement in No. 3:20-cr-00260-RS (Dkt. 14) to (1) wire fraud conspiracy for conspiring with Andrade and others to make false and

1    misleading statements about AML Bitcoin; and (2) violating the Lobbying Disclosure Act. Abramoff is

2    expected to testify against Andrade.

3     *Japheth Dillman* was the Chief Strategy Officer (CSO) of AML Bitcoin. While serving as AML

4    Bitcoin's CSO, Dillman also led a cryptocurrency investment fund called Block Bits Capital—a fund

5    which he and David Mata co-founded in June 2017 and which took outside capital. Dillman promoted

6    and sold AML Bitcoin tokens both in his capacity as the project's CSO and the portfolio manager for

7    Block Bits' investors. In short, Block Bits was a marketing and distribution channel for AML Bitcoin.

8    Dillman faces a separate federal criminal case in this District regarding his Block Bits conduct and is

9    thus unavailable to testify at trial.

10     *David Mata* was the co-managing director of Block Bits Capital and co-founded it with Dillman.

11    Mata worked with Dillman to advertise AML Bitcoin tokens to Block Bits investors. And Andrade

12    thought well enough of Mata's work that, by March 2019, Andrade and Mata explored Andrade hiring

13    Mata as AML Bitcoin's CEO. In June 2022, Mata pled guilty pursuant to a plea agreement in No. 3:22-

14    cr-00171-RS (Dkt. 13) to one count of wire fraud. Mata admitted that he and Dillman deceived Block

15    Bits investors, including by secretly diverting some investor funds to the AML Bitcoin ICO. Mata is

16    cooperating in the government's case against Andrade and is expected to testify at trial.

17    **III. LEGAL STANDARDS**

18     Set forth below are the legal standards for (A) admitting co-conspirator statements; (B) admitting

19    the conversational context around a co-conspirator statement; (C) excluding a defendant's effort to admit

20    his own statements, including co-conspirator statements; and (D) the residual exception to hearsay,

21    which would admit any statements the Court finds inadmissible under Rule 801(d)(2)(E).

22      **A. Rule 801(d)(2)(E) Has Three Elements and a Preponderance Standard**

23     Under Rule 801(d)(2)(E), a "statement made by a coconspirator of a party during the course and

24    in furtherance of the conspiracy" is admissible against that party as non-hearsay. *Bourjaily v. United*

25    *States*, 483 U.S. 171, 175 (1987); *United States v. Crespo de Llano*, 838 F.2d 1006, 1017 (9th Cir. 1987).

26    Thus, "the statement of a co-conspirator is admissible against a defendant if the government shows by a

27    preponderance of the evidence that: (1) 'a conspiracy existed at the time the statement was made'; (2)

28    'the defendant had knowledge of, and participated in, the conspiracy'; and (3) 'the statement was made

in furtherance of the conspiracy.'" *United States v. Alahmedalabdaloklah*, 94 F.4th 782, 833–34 (9th Cir. 2024) (quoting *United States v. Bowman*, 215 F.3d 951, 960–61 (9th Cir. 2000)), *cert. denied*, No. 24-125, 2024 WL 5011718 (U.S. Dec. 9, 2024). The preponderance bar for each element of the test is relatively low.

### 1. Circumstantial evidence is often sufficient to establish a conspiracy

First, as to a conspiracy existing, "the question is merely whether there was proof of a sufficient concert of action to show the individuals to have been engaged in a joint venture." *United States v. Chen*, 548 F. Supp. 3d 904, 906 (N.D. Cal. 2021) (quoting *United States v. Layton*, 855 F.2d 1388, 1399 (9th Cir. 1988), *overruled on other grounds as recognized by Guam v. Ignacio*, 10 F.3d 608 (9th Cir. 1993)). And one may infer the existence of such an agreement "from circumstantial evidence, such as the defendant's conduct" or "coordination between conspirators." *United States v. Reed*, 575 F.3d 900, 924 (9th Cir. 2009) (quoting *United States v. Iriarte-Ortega*, 113 F.3d 1022, 1024 (9th Cir.), *opinion amended on denial of reh'g*, 127 F.3d 1200 (9th Cir. 1997)).

Indeed, "[b]ecause most conspiracies are clandestine in nature, the prosecution is seldom able to present direct evidence of the agreement." *Id.* (quoting same). Thus, "[c]ircumstantial evidence is often sufficient to establish the existence of a conspiracy." *United States v. Perez*, 658 F.2d 654, 658 (9th Cir. 1981). And even if there is substantial doubt about the existence of a conspiracy—such that a declarant is even *acquitted* of any conspiracy charge—their statements may still be admissible as co-conspirator statements under the preponderance standard. *See United States v. Peralta*, 941 F.2d 1003, 1006–07 (9th Cir. 1991), *as amended on denial of reh'g* (Oct. 31, 1991).

Similarly, "Rule 801(d)(2)(E) applies to statements made during the course and in furtherance of any enterprise, *whether legal or illegal*, in which the declarant and the defendant jointly participated." *United States v. Siders*, 712 F. App'x 601, 603 (9th Cir. 2017) (emphasis added) (quoting *United States v. Layton*, 855 F.2d 1388, 1399 (9th Cir. 1988), *overruled on other grounds as recognized by Guam v. Ignacio*, 10 F.3d 608 (9th Cir. 1993)). Thus, "[a] coconspirator's statement is admissible upon proof that it was made in furtherance of a conspiracy, notwithstanding the fact that the indictment does not contain a conspiracy count. The question is merely whether there was proof of a sufficient concert of action to show the individuals to have been engaged in a joint venture." *United States v. Manning*, 56 F.3d 1188,

1197 (9th Cir. 1995) (quoting *Layton*, 855 F.2d at 1398); *accord, e.g.*, *United States v. Holland*, 117 F.4th 1352, 1358 (11th Cir. 2024) (collecting cases from nine circuits).

**2.    Only "slight" evidence is needed to connect a declarant to a conspiracy**

"Once the conspiracy has been proven under these standards, only 'slight evidence' is necessary to connect a coconspirator to the conspiracy." *United States v. Perez*, 658 F.2d 654, 658 (9th Cir. 1981); *accord United States v. Crespo de Llano*, 838 F.2d 1006, 1017 (9th Cir. 1987) (same rule for connecting the defendant). This "slight" required connection means that "a defendant need not have known all the conspirators, participated in the conspiracy from its beginning, participated in all its enterprises, or known all its details. A connection to the conspiracy may be inferred from circumstantial evidence." *Reed*, 575 F.3d at 924.

**3.    An "expansive" set of statements can further a conspiracy**

An "expansive" set of statements can further a conspiracy under Rule 801(d)(2)(E). *USA v. Chen*, 548 F. Supp. 3d 904, 908 (N.D. Cal. 2021) (citing *United States v. Nazemian*, 948 F.2d 522 (9th Cir. 1991) and *United States v. Lischewski*, No. 18-CR-00203-EMC-1, 2019 WL 2716614, at *4 (N.D. Cal. June 28, 2019)). These include, for example:

> statements made to induce enlistment or further participation in the group's activities; statements made to prompt further action on the part of conspirators; statements made to reassure members of a conspiracy's continued existence; statements made to allay a co-conspirator's fears; and statements made to keep co-conspirators abreast of an ongoing conspiracy's activities.

*Id.* (quoting *Nazemian*, 948 F.2d at 529). In short, "[w]hen inquiring whether a statement was made 'in furtherance of' a conspiracy, we do not focus on its actual effect in advancing the goals of the conspiracy, but on the declarant's intent in making the statement." *Id.* (quoting *Nazemian*, 948 F.2d at 529).

Furthermore, "[t]he Confrontation Clause does not require the court to make an inquiry into the independent indicia of the reliability of the statement." *Id.* at 906 (citing *Bourjaily*, 483 U.S. at 182). Nor is it "necessary that the statement be made to another member of the conspiracy for it to come under rule 801(d)(2)(E)." *United States v. Williams*, 989 F.2d 1061, 1068 (9th Cir. 1993). For example, statements made by a co-conspirator to a nonmember seeking that non-member's help regarding the conspiracy are

1   admissible as coconspirator statements. *United States v. Zavala-Serra*, 853 F.2d 1512, 1516 (9th Cir.

2   1988); *see also United States v. Taylor*, 802 F.2d 1108, 1117 (9th Cir. 1986) (affirming admission of co-

3   conspirator statements made to non-member undercover agent); *United States v. Echeverry*, 759 F.2d

4   1451, 1457 (9th Cir. 1985) (same).

5       **B.      The Court Should Admit the Context for Any Co-Conspirator Statement**

6       Rule 801 defines hearsay as an out-of-court statement offered to prove the truth of the matter

7   asserted in the statement. So when a co-conspirator makes a statement to someone outside the

8   conspiracy, "it is well settled that admitting evidence of both sides of a conversation is appropriate

9   because statements are not hearsay to the extent they are offered for context.'" *United States v. Collins*,

10  575 F.3d 1069, 1073 (10th Cir. 2009) (alterations omitted) (quoting *United States v. Gajo*, 290 F.3d 922,

11  930 (7th Cir. 2002)); *accord, e.g.*, *United States v. Barragan*, 871 F.3d 689, 705 (9th Cir. 2017)

12  (affirming admission of entire conversation because non-conspirator's statements were "offered only for

13  context" and co-conspirator statements were not hearsay under Rule 801(d)(2)(E)).

14      Separately, "[a] hearsay declaration may be admissible if it is offered, not for the truth of the

15  matter asserted, but to prove that the persons involved in the communication were coconspirators."

16  *United States v. Sanchez-Lopez*, 879 F.2d 541, 554 (9th Cir. 1989) (collecting cases).

17      **C.      The Government Should be Permitted to Offer Co-Conspirator Statements But the
            Defendant Should Be Precluded From Doing So.**

18

19      Rule 801(d)(2)(E), like the other prongs of 801(d)(2), governs statements "offered against an

20  opposing party." So just as the defendant is not permitted to offer his own statements at trial, he is not

21  permitted to offer statements of his co-conspirators. Insofar as the United States was not a member of

22  the conspiracy, those statements and any others by co-conspirators may not be offered against the United

    States. *See United States v. Maliszewski*, 161 F.3d 992, 1011 (6th Cir. 1988).
23

24      **D.      The Residual Exception Could Independently Admit Proffered Statements**

25      Even if a hearsay statement is not admissible under a hearsay exception, Rule 807 admits the

26  statement if it "(1) is supported by sufficient guarantees of trustworthiness . . . ; and (2) is more

27  probative on the point for which it is offered than any other evidence that the proponent can obtain

28  through reasonable efforts." Fed. R. Evid. 807(a). "FRE 807 involves discretion. It exists to provide

judges a 'fair degree of latitude' and 'flexibility' to admit statements that would otherwise be hearsay." *United States v. Bonds*, 608 F.3d 495, 501 (9th Cir. 2010) (quoting *United States v. Valdez–Soto*, 31 F.3d 1467, 1471 (9th Cir. 1994)) (citing, *e.g.*, "*FTC v. Figgie Intern. Inc.*, 994 F.2d 595, 608–09 (9th Cir.1993) (upholding admission under residual exception even where trial court failed adequately to explain reasoning)"). Thus, if the Court disagrees that a proffered statement is neither a co-conspirator statement nor otherwise admissible under a standard hearsay exception, the Court should consider admitting the statement under Rule 807.[1]

## IV.  ARGUMENT

Co-conspirator statements "are usually irreplaceable as substantive evidence." *United States v. Inadi*, 475 U.S. 387, 396 (1986). Indeed, as the proffered statements show, "[e]ven when the declarant takes the stand, [a co-conspirator's] in-court testimony seldom will reproduce a significant portion of the evidentiary value of his statements during the course of the conspiracy." *Id.* at 395. Below, the government addresses Rule 801(d)(2)(E)'s three-part test.

### A.  There Was A Conspiracy to Advertise and Sell AML Bitcoin From At Least June 2017 Through March 2019

The Court may easily dispense with the first two elements of the 801(d)(2)(E) test. There was a conspiracy to advertise and sell AML Bitcoin. Indeed, the indictment returned more than four years ago charged a scheme spanning from at least July 2017 through at least December 2018. In the years since, the government has developed evidence of a fraud conspiracy spanning at least June 2017 through March 2019, to say nothing of Andrade's inextricably intertwined AtenCoin scheme. *See* Sections II, *supra*, and IV-C, *infra*. Indeed, Abramoff pled guilty to conspiring with Andrade as to AML Bitcoin; and Mata has plead guilty to related conduct. Both are cooperating with the government, and their sworn plea agreements and seized records corroborate the existence of a conspiracy by far more than a mere preponderance of the evidence.

### B.  Andrade, Abramoff, and Dillman, and Mata All Had Knowledge of, and Participated in, the Conspiracy

Next, there is more than just "slight" evidence connecting Andrade, Abramoff, Dillman, and

---

[1] This motion and its attachments are intended to satisfy the written notice requirement of Rule 807(b).

Mata to the conspiracy. *See* Section III-A-2, *supra* (Legal Standard). As the proffered agreements show on their face, the co-conspirators worked closely together to write, publish, and speak misrepresentations about AML Bitcoin. Even though "a defendant need not have known all the conspirators, participated in the conspiracy from its beginning, participated in all its enterprises, or known all its details," *Reed*, 575 F.3d at 924, it is apparent that Andrade knew all the conspirators, founded it, personally approved essentially all aspects of it, and knew its details.

### C.    Proffered Statements Were Made During and In Furtherance of Conspiracy

Attachment A to this motion organizes the proffered co-conspirator statements by trial exhibit number, Bates number, approximate date, and summary of the statement. Attachment B excerpts co-conspirator statements by Dillman to victim Ben Boyer, who is identified as Purchaser-1 in the indictment. In all, there are over a hundred possible co-conspirator statements. And at trial, the government will likely elicit or introduce co-conspirator that are not neatly listed on Attachments A or B, but are in the vein of the statements briefed herein.

To structure the Court's evaluation of these many co-conspirator statements, the sections below provide an illustrative chronological summary of proffered statements.

### 1.    The Scheme Leading Up to the October 2017 Initial Coin Offering

Leading up to AML Bitcoin's ICO, the co-conspirators focused on (i) generating press coverage that misrepresented AML Bitcoin's (non-existent) technology and (non-existent) business deals; (ii) hiring public-facing executives while hiding Abramoff's involvement; and (iii) making fraudulent sales pitches to individual investors.

#### (i)    Generating press coverage, including by secretly ghostwriting and paying for it (a/k/a astroturfing)

A key part of the conspiracy was generating press coverage. The co-conspirators primarily did this in two ways. First, they secretly ghostwrote (at least in part) and paid for opinion pieces in high-profile publications, such as the Washington Times. These "astroturfing" efforts started before the October 2017 and continued into 2018. And they resulted in the publication of several articles which contained misrepresentations relied upon by several victims of the charged fraud. Second, the co-conspirators wrote and issued press releases that similarly contained fraudulent misrepresentations.

Jack Abramoff and Japheth Dillman made most of the proffered co-conspirator statements of this press genre. Abramoff and Dillman wrote to (1) other members of the conspiracy (to inform and consult them on draft articles and press releases); and (2) to the op-ed/article authors who received payment in exchange for publishing the ghostwritten articles. Attachment A contains a representative sample of these statements. The statements furthered the co-conspirators' goal of stating, to the public and to victim-investors, that AML Bitcoin had (1) closed major business deals and (2) developed technology enabling cryptocurrency payments compliant with anti-money laundering (AML) and know-your-customer (KYC) laws.

In the months leading up to the October 2017 ICO, co-conspirator statements show payments to the authors and discussion of their draft/published articles. Most of the statements relate to a U.S. News and World Report article (published Sept. 12, 2017), which illustrates how the co-conspirators' press-related statements were during and in furtherance of the conspiracy:

- On August 31, 2017, Abramoff replied to one author (Peter Roff) that "You should be getting a wire shortly . . . can you please send me a W9 with your info, so I can get it to them?" Attachment A (Ex. 244).

- Then, on September 7, Abramoff emailed Roff a draft article—in his words, "the guts of the story." Id. (Ex. 661) The draft contained, among other things, defendant Andrade's biography, and placeholders for quotes from Andrade, Dillman, and others. And the draft asserted that "AML Bitcoin, which will launch publicly on October 1, 2017 and is predicted to soar in value and importance to rival Bitcoin in a very short time. What sets AML Bitcoin apart, as well, is the intense governmental interest in the coin." Id.

- In the September 7 email thread, Roff had asked Abramoff for a couple quotes from Andrade, and Abramoff had agreed. On September 8, as agreed, Abramoff emailed Andrade on September 8 with the draft Abramoff-Roff article. Abramoff asked Andrade not to forward draft with anyone else and to "discuss before sunset." Attachment A (Ex. 171).

- On September 10, Abramoff emailed Roff to relay a revision from Andrade to Andrade's biography in the draft article. Abramoff wrote: "Marcus prefers this: 'Andrade is the software engineer and Texas entrepreneur." Attachment A (Ex. 763).

- On September 11, Abramoff emailed Andrade a revised draft to ask "Please let me know if this is still OK. Peter made some changes." Attachment A (Ex. 142). The draft contains quotes from Andrade, such as his statement that "With AML Bitcoin, digital currency can now engage in mainstream commerce, taking its rightful place among traditional payment options. Id. Co-conspirator Japheth Dillman—identified in the article as a "tech industry insider," is quoted stating, "In the tech industry parlance, Bitcoin is Napster, AML Bitcoin is Spotify." To all this, Andrade replied: "Looks great". Attachment A (Exhibit 142).

- U.S. News and World Report published the article on September 12, 2017, under the headline Cryptocurrency's Future May Be Now. Peter Roff, Contributing Editor for Opinion, is listed as the only author. Attachment A (Exhibit 260).

Other articles were similarly part of the same joint venture. On October 2, 2017, for example, TheStreet published *This New Bitcoin Could Totally Change the Game* under the byline of Chris Versace. Attachment A (Exhibit 70). The article asserted, among other things, that:

> What separates [AML Bitcoin] from the growing pack of other coins is it's compliant with U.S. banking laws, and is powered by patent-pending anti-money-laundering and know-your-customer algorithms that prevent terrorists, criminals and rogue nations from using its digital currency. As one might suspect, its very name -- AML Bitcoin -- refers to its anti-money-laundering properties. This has prompted ports in the United States and Latin America, as well as banks and various governments, to contemplate deploying AML Bitcoin in their payment systems.

In truth, no such technology or pending deals existed. Nor was Chris Versace the main force behind the article. Rather, the co-conspirators partnered with another press person, Brian Darling, to pay for and ghostwrite this article and others. *See, e.g.*, *id.* (Abramoff emailing Darling "great work, Brian!!" in response to Darling forwarding what is purportedly Versace's article); *see also, e.g.*, *id.* (Ex. 775) (Abramoff emails Dillman another article ghostwritten by Darling: Peter J. Ferrara, *A New Digital Currency, AML Bitcoin, Makes Landfall in Panama*, Investor Business Daily (Sept. 20, 2017)).

Indeed, the co-conspirators were so effective at ghostwriting that, farcically, they risked publishing the same story in multiple outlets. At one point in February 2018, for example, Abramoff asked Darling for updates in an email thread titled "For Marcus." Attachment A (Ex. 185).[2] Darling replied: "I am stuck. Ferrara went dark and Versace can't post the same post that Ferrera claims he already submitted to Barrons. Unless if we get Versace to hit business Insider or another financial platform with a totally different post, we can't get one by next week." Darling also informed Abramoff "we can feed [Versace] talking points. He costs 1k/post. What do you want me to so [sic]."

---

[2] And as Brian Darling recently explained in a voluntary interview with the FBI, Abramoff asked Darling to run a promotional media campaign for AML Bitcoin and gave Darling purported facts to amplify. Darling often ghostwrote articles and paid others, such as Ferrara, to publish under their own names. Darling trusted Abramoff and believed he was a reliable source of information. And altogether, Darling was paid less than about $12,000 for all his promotional work. *See, e.g.*, FBI-302-027462 (FBI 302 of Darling Interview on Nov. 14, 2024).

1

2

### (ii)    Hiring part-time "public facing" executives to hide Abramoff's and others' involvement

3    Before the ICO, the co-conspirators also sought to hire and advertise "public facing" executives

4    "for branding purposes and the post-ICO market." Attachment A (Ex. 68). What's more, the co-

5    conspirators sought to conceal the real executives, including Jack Abramoff and another person who

6    allegedly was "limited due to current employment contracts to show to the outside his involvement." *Id.*

7    On September 18, for example, Dillman emailed Andrade, Abramoff, and John Szeder—AML Bitcoin's

8    soon-to-be public-facing Chief Technology Officer (CTO). *Id.* Addressing the whole email to Andrade,

9    Dillman wrote, among other things: "Hi Marcus, as we discussed earlier, it was good for the AML

10   Bitcoin to have a public facing CTO, especially for branding purposes and the post-ICO market." *Id.*

11   And Dillman proposed that Szeder work merely 20 hours per month.

12   Abramoff replied to Dillman privately. To start, Abramoff explained his discomfort with being on

13   the email thread with Szeder. "I thought you were going to just do an email with Marcus and me,"

14   Abramoff explained. Attachment A (Ex. 762). Abramoff did not "want anyone to see my helping out

15   here if not necessary." *Id.* What is more, Abramoff conveyed that Dillman's proposal of 20 hours per

16   month was too *many* for the putative CTO. "[Marcus] said that the most he would need [Szeder] is 10

17   hours/month." *Id.*

18   Szeder accepted the new offer conveyed by Dillman, and Dillman stated he would "put

19   [Abramoff] on BCC in the future for these types of communications." Abramoff concluded this

20   September 18 email thread by asking Dillman to "get [Szeder's] info to Marcus so we can put up [sic]

21   on the site, and can you guys whip out a press release? Please make sure Marcus and I see it before it

22   goes, of course." *Id.*

### (iii)    Sales pitches to individual investors

23   Leading up to the ICO (and after), Mata and Dillman also made direct sales pitches to many

24   investors. These pitches contained myriad misrepresentations. For example, on August 28, 2017, Mata

25   (with Dillman on the thread) emailed two potential investors with the subject line "AML Bitcoins

26   opportunity." Mata misrepresented, among other things, that the AML Bitcoin team "have a deal closed

27   with the Panama Canal that the AML coin will be the sole method of payment once issued. […] Japheth

28

and I are connecting them to the general counsel for the port of san francisco [sic] for a similar deal. [...] some of the investors planning to buy the entire public sale out are suggesting $2 [per AML Bitcoin token]. That's an immediate profit." Attachment A (Ex. 756).

Similarly, on September 25, Dillman sent a series of practically identical emails based on a template he cleared with Andrade and Abramoff. *See* Attachment A (Ex. 765) (template), (Exs. 776–86) (emails to investors). What's more, the emails all CCed Andrade and BCCed Abramoff. And the emails all stated, among other things:

> Hi <<First Name>>,
>
> Marcus Andrade (cc'ed here), is the CEO and Founder of AML Bitcoin (www.amlbitcoin.com). The coin used to trade at $80 under the name AtenCoin,[3] but they pulled all coins back and have undergone a rebranding. Between us, there are several enormous multi-billion dollar deals being secured with governments for use of this coin. […]
>
> The interest by these entities lies in Marcus' patent portfolio that allows him to create AML compliance with cryptocurrency ensuring the AML Bitcoin isn't used by terrorist organizations and nefarious purposes.
>
> I'm reaching out to you to discuss investing in the initial launch of the token, which hits October 1st.
>
> There are literally billions of dollars in deals that are being negotiated right now […].
>
> **Marcus** [emphasis in original], <<First Name>> is an investor that heavily invests in cryptocurrency and ICOs.

Of course, there were never any deals secured with governments, let alone "multi-billion-dollar" ones. Nor did the co-conspirators ever create a cryptocurrency with promised anti-money laundering technology features. These statements furthered the fraudulent scheme.

### 2.    After the ICO: Selling the Token to Individuals, Exchanges, and the Public

After the October 2017 ICO, the co-conspirators (i) published more media; (ii) made sales pitches to investors, including the victim in the indictment; (iii) marketed a purported commercial for the February 2018 Super Bowl; (iv) asked a San Francisco Port Commissioner to approve a misleading press release; and (v) dealt with blowback on misrepresentations regarding a purported deal with the

---

[3] These emails to potential investors repeatedly note that AML Bitcoin was simply a rebrand of AtenCoin. This is but one of many ways in which Andrade intertwined the AtenCoin scheme with the AML Bitcoin scheme, as the government's Rule 404(b) notice and briefings explain.

Panama Canal.

> **(i)     Published more media, both ghostwritten and under the AML Bitcoin name**

The co-conspirators intensified their public relations efforts after the ICO. For one thing, the co-conspirators targeted traditional media with misleading press releases and more ghostwritten articles. They retained a PR agency to create detailed timeline for post-ICO press. But the agency needed guidance from the co-conspirators. Starting around October 9, 2017, it wrote to ask for details on AML Bitcoin's purported deals with "Panama," "West cost port coalition/SF Port Authority," "Estonian Government," and "SunTrust Bank." Attachment A (Exs. 704, 792, 793 (branches of same email thread)). Adding Andrade to the thread, Dillman replied with detailed misrepresentations about each of those four purported deals (*e.g.*, "Panama […] This deal is already in place to begin testing with AML Bitcoin before the end of the year. […] AML Bitcoin will be the accepted currency in the free trade zone in the Canals."). And Dillman emphasized: "I have included Marcus on this email so he can provide other details I'm leaving out that are relevant." *Id.*

Meanwhile, Dillman emailed Andrade and Abramoff privately to highlight the PR timeline. Attachment A (Ex. 792). In response, Andrade forwarded to Dillman a suggestion from Abramoff: "We should push them [that is, the PR agency] to revivify the previous articles, as they had real meat and distinguish us from the other coins." And after a request from Dillman, Abramoff circulated for him and Andrade links to five astroturfed articles covertly placed by the co-conspirators: (1) the aforementioned U.S. News and World Report article; (2) the aforementioned Investors Business Daily article on making "landfall" in Panama; (3) the aforementioned article in TheStreet touting "This New Bitcoin"; (4) a October 3, 2017 Washington Times article about AML Bitcoin[4] and by Peter Ferrera; and (5) an October 5, 2017 article in the Observer by Brian Darling titled *Soccer-Mom-Friendly AML Bitcoin Will Make*

---

[4] *Bitcoin offers a way around economic sanctions: Upgraded cryptography can defeat sanctions evasion* [previous title was "AML Bitcoin strides onto the world stage"], Wash. Times (Oct. 3, 2017), https://www.washingtontimes.com/news/2017/oct/3/bitcoin-offers-a-way-around-economic-sanctions/ (misrepresenting, among other things, that "AML Bitcoin is designed to comply with the anti-money laundering, know-your-customer rules […] AML Bitcoin has already made inroads in so many places where old bitcoin would never be welcome, such as the Port of San Francisco […] AML Bitcoin can operate perfectly well in all financial markets, serving all institutions, even establishment multinational corporations").

*Digital Currencies Mainstream*. Indeed, by February 21, 2018, Darling emailed Abramoff clippings from the many articles they published in traditional media—and Abramoff forwarded those press clips to Andrade on February 23, 2018. Attachment A (Ex. 706, 707).

AML Bitcoin also published content on its own social media accounts. They covered Twitter, Instagram, Reddit, YouTube, Facebook, BitcoinTalk, and more. Andrade had directed Dillman, Mata, and others in writing to "make sure that there are new posts being done to our social media pages." FBI-PHY073483, -073505.[5] As Mata wrote in an October 28, 2017 email to Andrade, Dillman, the PR agency, and others, "At this point, there is a failure where the rubber meets the road. We have great price articles coming out, but at no point have I seen even mention one of AML Bitcoin on key reddit forums. Nothing on LinkedIn. Nothing on Facebook in crypto groups." Attachment A (Ex. 822)

Andrade and his co-conspirators soon filled this gap in social media content. They soon published a wealth of content, which is largely still visible on YouTube, Instagram, Twitter/X, and other platforms today. Some content touted AML Bitcoin's (non-functional) technology. For example, on October 22, 2017, AML Bitcoin's YouTube account posted *What is AML BitCoin?*, a two-minute video asserting that "AML Bitcoin is the first secure AML anti-money-laundering complaint cryptocurrency" and more. *See* Attachment A (Ex. 581), *also available at* https://www.youtube.com/watch?v=cDnO-v8GPWE (last visited Jan. 8, 2025). And other content touted Andrade's (fictional) discussions with public officials about the cryptocurrency's benefits. On April 26, 2018, for instance, AML Bitcoin's Instagram account posted a photo of Andrade with then-Lieutenant Governor Gavin Newsom and wrote: "Marcus Andrade met with the Lieutenant Governor […]today. Some of the topics discussed by the group was AML BitCoin and how it can bring security and compliance to cryoto [sic], fintech, and digital identities." See Attachment A (Ex. 403), *also available at* https://www.instagram.com/p/BiD9KycFdVf/ (last visited Jan. 8, 2025).

---

[5] The content posted by AML Bitcoin's social media accounts is admissible against Andrade regardless of the prong of Rule 801(d)(2) that the Court applies. In addition to ordering a broad social media push, he had personal control over all the accounts (including even employees' email accounts). This is confirmed by Andrade's own posts on those accounts, FBI interviews, and seized evidence—such as a list of passwords all beginning in "MA" saved on Andrade's phone.

1

   **(ii)**  **Pitched investors, including the victim in Count One**

2

   The co-conspirators also continued their sales pitches to possible AML Bitcoin investors. *See,*

3

*e.g.*, Attachment A (Exs. 753, 757, 767). These pitches again made myriad misrepresentations about the

4

state of the technology and business deals. One victimized investor was Ben Boyer, whose $730,000

5

purchase constitutes the specified January 12, 2018 wire transfer in Count One of the Indictment. The

6

co-conspirator statements to Mr. Boyer are legion. Dillman made most of them. He texted, emailed, and

7

spoke with Boyer—and communicated with other co-conspirators *about* Boyer. On December 26, 2017,

8

for instance, Dillman emailed Boyer a "two-pager," a marketing document about AML Bitcoin. *Id.* (Exs.

9

759, 760). The two-pager asserted, among other things, that AML Bitcoin was "Compliant with

10

Worldwide Regulatory Requirements," had "Built-in Databases Prevent Law Enforcement-Known,

11

Unethical Use," and "[t]ied documents to blockchain using biometrics." And in the section titled

12

"Current and Upcoming Use of The Coin," the two-pager repeated misrepresentations made before:

13

"Panama Canal: AML BitCoin as payment for ship fees," "Port of San Francisco: Forward-thinking

14

Silicon Valley seeks to integrate digital currency," and more. *Id.* (Ex. 759).

15

   Attachment B to this filing also reflects excerpted co-conspirator text messages between Dillman

16

and Boyer. The excerpts start in January 2018 and run through November 2018. *See* Attachment B

17

(Ex. 794); *see also* Attachment A (Ex. 722) (Boyer's handwritten annotations on iMessage thread). In

18

January 2018, for example, Dillman lies to Boyer that AML Bitcoin has an ad slot for the February 2018

19

Super Bowl. It is Super Bowl-related statements that this motion addresses next.

20

   **(iii)**  **Sham commercial for the Super Bowl (Feb. 2018)**

21

   Andrade and his co-conspirators publicly misrepresented that the AML Bitcoin had submitted—

22

and was able to afford—a bona fide Super Bowl advertisement, but that NFL and the television network

23

had rejected it. This misrepresentation made AML Bitcoin appear well-resourced and well-connected—

24

and the "victim" of an unfair "rejection." *See, e.g.*, Attachment A (Ex. 549) (Andrade's January 31, 2018

25

open letter to NFL Commissioner Roger Goodell); *id.* (Ex. 430) (June 1, 2018 email from Abramoff to

26

John Bryan). In truth, the Super Bowl ad campaign was a sham. The co-conspirators could not have

27

afforded the multi-million-dollar ad spot; never provided the required paperwork to the TV network;

28

failed to even start the ad application process until just days before the 2018 Super Bowl; and, in any

event, created a purported "ad" that contained content inappropriate for the Super Bowl on its face. *See* Attachment A (Ex. 582) (Super Bowl "ad" downloaded from AML Bitcoin's YouTube account). Thus, as network executives have confirmed in FBI interviews and email productions, AML Bitcoin had failed to even apply—let alone be "rejected."

The co-conspirators sought to conceal this Super Bowl sham. Jack Abramoff's WhatsApp messages are case in point. For instance, on January 17, 2018, John Bryan—an anticipated trial witness leading the production of the Super Bowl "ad" and AML Bitcoin market-making—wrote to Abramoff and others that: "The written proposal will pretend we really are buying a Super Bowl ad because if anybody ever gets this in Discovery or something I don't want to look like we planned to do this... Is that okay?" Abramoff responded: "Probably not the best idea. Maybe you can write it up in a way that says in the event NBC rejects the ad, and this is the plan… If you write it up the other way he may not understand and rejected [sic] out of hand." Attachment A (Ex. 897).

Six days later, Andrade and Abramoff debated whether to even tell Dillman about the ad being a sham. Abramoff told Andrade, "[Dillman] thought you told him that we were doing an ad on [sic] the super bowl, not the rejection ad. I tried to spin it positively but he thought you told him that." Andrade responded, "I did not mention a rejection ad *no one should know that other than you and me and those around us*. It could be looked at negatively if people know that we were going that route." (Emphasis added.) Abramoff replied, "the production guys know it, and he would definitely hear something on set tomorrow." Abramoff and Andrade thus agreed to speak that night before Abramoff got dinner with Dillman. Attachment A (Ex. 900).

### (iv)    Drafted misleading press release about the Port of San Francisco

In April 2018, San Francisco Port Commissioner Leslie Katz arranged a courtesy meeting between Marcus Andrade and the port's Executive Director, Elaine Forbes. Forbes listened to Andrade's presentation on AML Bitcoin. But she knew that it would be a "no go" for the port to adopt cryptocurrency and told Andrade and Katz as much. *See, e.g.*, FBI-302-026923 (FBI 302 of Forbes' Aug. 26, 2024 interview).

Still, Andrade tried to publish a press release that announced the opposite of what happened at the meeting. The draft stated, for example, that the "Port Executive Director, Elaine Forbes […] will be

following up on three possible uses for the Port of this cutting edge technology: First, the implementation of a blockchain-based identification and tracking system […] Second, the ability to migrate the Transportation Worker Identification Credential (TWIC) to the NAC CrossVerify Platform […] Third, the adoption of the CrossVerify platform by Carnival and other major cruise ship operators." Attachment A (Ex. 89). Andrade then circulated the draft to Dillman and Katz for their feedback. Katz shot back, "This is disappointing. It way overstates what transpired […] Please do not do this." *Id.*

### (v)    Tried to mollify the Panama Canal Authority

Meanwhile, the misrepresentations about AML Bitcoin's deals with Panama Canal were also unraveling. In September 2018, Abramoff forwarded to Andrade WhatsApp messages between Abramoff and their Panamanian employee/advisor, as well as related emails from the Panama Canal Authority in which the Authority protested AML Bitcoin's misleading press releases. *See* Attachment A (Ex. 605). In the forwarded messages, Abramoff told the Panamanian advisor to accept publish a press release (which still contains ample misrepresentations) to mollify the Canal Authority. And after Abramoff emphasized to the advisor that Andrade was worried about the Canal rebuking AML Bitcoin publicly, the advisor had an "excellent call" with Andrade. *Id.*

### 3.    Damage Control: Lulling Victims and Market Manipulation

By mid-2018, the co-schemers were engaged in damage control and attempts to conceal the conspiracy. They coordinated (i) a secret plan to buy AML Bitcoin tokens to prop up its price and trading volume; and (ii) to lull victims into not taking legal action or cooperating with the FBI.

### (i)    Secret plan to buy tokens to prop up price and volume

After the ICO, the co-conspirators sought to secretly pump up the perceived price and liquidity of the AML Bitcoin token. Andrade and Abramoff directed this market-making. On May 22, 2018, for example, Abramoff conveyed Andrade's directions to John Bryan (who had also helped produce the Super Bowl "ad"): "OK, I had a chance to review things with Marcus. Here is what he is willing to do. He will sell 500,000 ABTC for $1/token. […] you will have a budget of $250,000 to effect a significant change in the volume and, more importantly, the price of the token. He expects that you will need to use a portion of that for purchasing, but he leaves it to you to do what you need to market properly." Attachment A (Ex. 902). Abramoff then noted, "the token is down to .73. is there anything you guys can

do?" Bryan was blunt: "let me show you what happens ... we buy and then we get shit on ... i will push it up and you can watch it ... OK?" *Id.*

Soon Andrade and Abramoff received a detailed written outline of this plan and tried to limit its dissemination. On June 5, 2018, Bryan emailed Andrade, Abramoff, and several others "the overview of our marketing campaign for tokens"—and referred to a group discussion the day before. Attachment A (Exs. 418, 419). The four-page attachment to his email was titled "Project Sunshine." It proposed a roughly seven-prong plan leading with "**A Proposal to PURCHASE $500,000 OF AML BITCOINS**" to "**Create Awareness, Excitement, and Enthusiasm behind AML Bitcoin project**". *Id.* (Ex. 419) (emphasis in original). The document candidly identified the key problem to be solved: "The real interest in our project is very low, so how do we generate the interest we need to meet our goal of over $20,000,000 of actual buying in the AML Bitcoin project?" *Id.* The proposed marketing solution included, for example: (1) token buybacks; (2) hiring "paid influencers . . . They are professional schillers; (3) "creat[ing] a utility use case for buying the token"—highlighting that, within the company, people knew that there was no actual use to AML Bitcoin even well after the ICO. *Id.*

In response, Abramoff emailed Bryan privately. "Did Marcus know you were sending this out to this full list? Did he request it?," Abramoff asked. *Id.* (Ex. 417). Bryan replied, "Yesterday they all requested that I do that." *Id.* But Abramoff pressed again: "Marcus gave you the list of whom to send it to?" *Id.* Indeed, by about a month later, Andrade referred Abramoff and two others to another version of the "Project Sunshine" document, and instructed: "[…] please look at the proposal. do not share your comments with anyone other than me, Jack [Abramoff] and Richard [Naimer]." *Id.* (Ex. 821).

Meanwhile, co-conspirator David Mata was still defrauding investors for a commission. On October 19, 2018, for example, Mata emailed Andrade an invoice for purchases by two victims (Ahranoff and Boyer). The invoices reflect a 25 percent commission on those sales for Mata. *Id.* (Exs. 601–603).

### (ii)    Dillman and Mata try to lull Aharonoff and Boyer

By May 2018, Ben Boyer was plainly expressing his skepticism about AML Bitcoin, Andrade, and the NAC Foundation to Dillman and Mata. The co-conspirators took a two-step approach to lulling Boyer. First, on the same day Boyer texted his purported ally Dillman that "I think you're being fed lies

by Marcus and NAC," Dillman emailed Andrade: "Please don't contact Ben." Attachment A (Ex. 795).

Second, with the co-conspirators agreeing that Andrade would ignore Boyer's outreach,[6] Dillman and Mata then tried to convince Boyer that AML Bitcoin still had value that they would unlock by supplanting Andrade. In a misdirection, Mata emailed his co-conspirator Dillman on November 23, 2018 and *BCCed* Boyer as if to let him secretly on an arms-length conversation. In this purportedly private email between Mata and Dillman, Mata wrote: "I spent a couple days worth of time with Marcus and one of their attorneys at the NAC foundation […] Long story short, there is an interesting bit of business here and he opened up every company secret of import to me. […] Marcus as well is in a place where here's ready to let someone take over and bring the company back onto its roadmap." Attachment A (Ex. 719). Andrade never relinquished control, of course.

The co-conspirators' campaign to placate Boyer—and to conceal the fraud—escalated after November 29, 2018, when the FBI interviewed Boyer about the AML Bitcoin scheme. Boyer informed Dillman of the FBI's allegations and accused Dillman and Mata of lying to him. Dillman protested that "[e]verything I've stated I repeated directly from Marcus" and promised Boyer a refund from Dillman's personal accounts. Attachment B. But no refund ever materialized.

The co-conspirators analogously deceived Daniel Aharonoff around the same time. In September 2018, Andrade sought to offload some of his own tokens. At this point in the AML Bitcoin project's life, the co-conspirators "want[ed] anything we can get obviously." ANDRADE_DOJ_00035657 (email from Abramoff to Andrade on Sept. 3, 2018 regarding $10,000 purchase). Never mind that just weeks before, the co-conspirators had tried to sell AML Bitcoin to an individual who was in fact an undercover employee (UCE) of the FBI. Recorded conversations with that UCE-7140 are noted on Attachment A at, *e.g.*, Ex. 629–634, 635–643, 644–647. In July 2018, for example, UCE-7140 called Abramoff to explain that he would like more questions answered before buying tokens. Abramoff falsely responded that, because demand for AML Bitcoin has been so strong, he doubted the UCE could buy tokens now even he wanted to. *See id.* (Ex. 647). In truth, demand had flattened and the ICO was never oversubscribed.

---

[6] On May 30, 2019, Andrade misleadingly claimed to Boyer that "As you are fully aware of, we tried to reach out to you multiple times last year with no response knowing Blockbits [*i.e.*, Dillman and Mata] was directing you not to answer our calls." FBI-00052633 (Trial Ex. 789). Naturally, Boyer responded, "I wasn't aware that you had been trying to contact me." *Id.*

1    Dillman and Mata brokered the fall 2018 deal with Aharonoff. But they planned with Andrade to

2    conceal Andrade's reasons for selling and to pump the token's collapsing value. Mata wrote to Andrade

3    and Dillman: "Hi Marcus, Prior to the call tomorrow, I wanted to let you know a couple things. Daniel

4    [Aharonoff] will likely be most focused on why you're willing to sell now. […] He also is watching both

5    the idax and hitbtc pricing. […] I intend to keep the price at 0.000064 or greater, but if you have other

6    people in place to enact a price floor, I'd suggest it." Attachment A (Ex. at 833). Dillman replied to

7    Andrade and Mata: "I told him it was due to family personal issues why the seller was selling. It will

8    look bad fit a [sic] $60 mil ICO to be selling off coin right before a major PR push." *Id.*

9    **V.    CONCLUSION**

10    For the foregoing reasons, the United States moves *in limine* for a preliminary ruling that the

11    proffered co-conspirator statements are admissible pursuant to Fed. R. Evid. 801(d)(2)(E) and/or the

12    residual exception (Rule 807) when offered by the United States.

13

14    DATED: January 10, 2025                    Respectfully submitted,

15                                               ISMAIL J. RAMSEY
16                                               United States Attorney

17    _____
                                                        /s/
18                                               CHRISTIAAN H. HIGHSMITH
                                                 DAVID J. WARD
19                                               Assistant United States Attorneys

20                                               MATTHEW CHOU
                                                 Special Assistant United States Attorney
21

22

23

24

25

26

27

28