ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

CHRISTIAAN HIGHSMITH (CABN 296282)
DAVID WARD (CABN 239504)
Assistant United States Attorneys

MATTHEW CHOU (CABN 325199)
Special Assistant United States Attorney

      450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
      Telephone: (415) 436-7200
      Fax: (415) 436-7230
      christiann.highsmith@usdoj.gov
      david.ward@usdoj.gov
      matthew.chou2@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 20-CR-00249 RS |
| Plaintiff, | **UNITED STATES' MOTION FOR RULE 15 DEPOSITION OF JACK ABRAMOFF** |
| v. | Dept.:     Courtroom 3 – 17th Floor |
| ROWLAND MARCUS ANDRADE, | Judge:     Hon. Richard Seeborg |
| Defendant. | Trial Date:    February 10, 2025 |
| | Pretrial Conf:  January 22, 2025 |

## I.    INTRODUCTION

      The United States respectfully requests that the Court order witness Jack Abramoff's deposition

pursuant to Federal Rule of Criminal Procedure 15.  Abramoff was recently diagnosed with diffuse large

B-cell lymphoma (a type of blood cancer), a life-threatening medical condition.  The cancer is Stage IV,

which means it has metastasized.  Abramoff has begun chemotherapy as part of his treatment regimen,

1    which could last another four to five months.  His treating physician at Johns Hopkins Sidney Kimmel

2    Cancer Center at Sibley Memorial Hospital, Dr. Nina Wagner-Johnston, states that Abramoff has a

3    compromised immune system and that he should not travel for approximately 12 months.[1]

## II.    FACTUAL BACKGROUND

5        Jack Abramoff started working with Defendant Andrade in approximately mid-2017 and was

6    Andrade's primary co-schemer in the alleged scheme to defraud purchasers of AML Bitcoin.  At a

7    meeting with Abramoff, Andrade explained that he was creating a digital currency (a/k/a

8    cryptocurrency) that would be compliant with anti-money laundering (AML) regulations and was

9    looking for a lobbyist.  At the time of the meeting, Andrade's cryptocurrency was called "AtenCoin."

10   Abramoff came to understand that Andrade was renaming his cryptocurrency "AML Bitcoin," and that

11   AtenCoin holders would have their cryptocurrency "coins" converted to AML Bitcoins.  *See* Declaration

12   of AUSA C. Highsmith (Highsmith Decl.), Exhibit 1 (FBI 302 of Abramoff Interview on Nov. 14, 2024)

13   (filed under seal).

14       Andrade wanted Abramoff to design a lobbying and marketing campaign for AML Bitcoin,

15   owned by Andrade's company, the National AtenCoin (NAC) Foundation.  Andrade wanted the U.S.

16   government to recognize his digital currency as the preferred U.S. cryptocurrency because of what he

17   claimed were anti-money laundering and other security features.  Abramoff did not know anything about

18   cryptocurrency, but his son urged him to join Andrade's project because cryptocurrency was exploding

19   in popularity.  *Id.*

20       Soon, Abramoff and Andrade were in constant communication.  *Id.*  They had begun work on the

21   scheme to misrepresent the state of the development of the AML Bitcoin technology, and to overstate

22   and misrepresent the interest by governments, companies, and others in adopting AML Bitcoin.  The

23   scheme was designed to lure purchasers into buying AML Bitcoin tokens, a placeholder cryptocurrency

24   that contained none of Andrade's claimed security features, but that Andrade promised could shortly be

25   exchanged for a working AML Bitcoin.

26       Abramoff and Andrade devised a plan to create false and misleading press about AML Bitcoin

27

28       [1] The government has obtained permission from Abramoff's counsel to file this motion, which contains a discussion of personal medical information, on the public docket.

by paying opinion writers to place editorials in various media platforms. *Id.* Andrade knew everything about Abramoff's marketing strategy for AML Bitcoin, and Andrade knew all that Abramoff was doing for AML Bitcoin because Abramoff constantly communicated with Andrade via WhatsApp. Andrade was the CEO of AML Bitcoin, and Abramoff would Andrade advise about certain aspects of business operations and marketing. But Andrade was the leader of the company and would decline to follow Abramoff's advice when Andrade wanted. *Id.*

As part of this scheme, Abramoff arranged the payment of the opinion piece writers through Andrade. Abramoff had no access to AML Bitcoin's bank accounts. Andrade controlled all the money associated with AML Bitcoin. Abramoff had to ask Andrade for authority to get paid and to spend money for the business because Andrade had control of all AML Bitcoin's finances. Andrade knew that Abramoff was paying writers for opinion editorials, Andrade authorized payment for them, and Andrade ultimately paid for them. Andrade was excited when the articles appeared in the press. *Id.*

With Andrade's authority, Abramoff had his paid writers draft "op-eds" or opinion pieces regarding AML Bitcoin's purported relationships with the Port of San Francisco, the Panama Canal, the British House of Commons, and other governmental and quasi-governmental entities for placement by paid writers in various publications. Abramoff sent Andrade drafts via WhatsApp and Andrade approved Abramoff's work. The articles contained myriad falsehoods and misrepresentations designed to create the impression that he technology behind AML Bitcoin was already created and in place. Abramoff phrased the wording that way because he and Andrade planned to use investor money to build an AML Bitcoin that would eventually have functioning AML and know-your-customer (KYC) features; thus, they exaggerated the existence of the technology in the articles to help raise money from investor to build the product. *Id.*

Andrade constantly demanded that AML Bitcoin get more press. *Id.* Abramoff's and Andrade's solution was to use hyperbolic language to drive interest in AML Bitcoin. The purpose of generating press was to drive sales of AML Bitcoin "tokens." Andrade was actively involved in the press strategy and saw press releases before they went out. One press release, for example, mentioned a "flood" of orders for AML Bitcoin during the later stages of AML Bitcoin initial coin offering (ICO), a period in which AML Bitcoin offered "tokens" to buyers that could be traded for AML Bitcoin at a later date.

1   The statement was false.  The ICO went poorly and there was never a "flood" of orders.   In addition,

2   Abramoff came up with the idea of a Super Bowl rejection campaign, and Andrade supported the idea.

3   *Id.*  Throughout this time, Abramoff and Andrade worked together on the false and misleading

4   representations at the heart of the charged fraud scheme.

5          On September 13, 2018, the FBI executed a federal search warrant at Abramoff's home.  On

6   November 22, 2019, the government filed a criminal complaint against Abramoff.  On or about February

7   25, 2020, Abramoff signed a proffer agreement with the government.  On June 25, 2020, Abramoff was

8   charged via Information with Conspiracy and violating the Lobbying Disclosure Act, in violation of 18

9   U.S.C. §§ 371 & 1606(b), respectively.  *United States v. Abramoff*, 20-cr-260 RS (N.D. Cal.) (Dkt. 1).

10  On July 14, 2020, Abramoff signed a plea agreement admitting that he committed the two felonies

11  charged in the Information and admitting to his criminal conduct in this case.  *Id.* (Dkt. 14).

12         Defendant Andrade was charged with wire fraud and money laundering on June 22, 2020.  Dkt.

13  1.  Trial in this case is set for February 10, 2025.  The government has long anticipated that Abramoff

14  would be a witness at trial.  On November 14, 2024, Abramoff learned that he likely had non-Hodgkin

15  Lymphoma.  *See* Highsmith Decl., Exhibit 2 (filed under seal).  A subsequent scan conducted on

16  November 18, 2024, and reviewed on November 22, 2024, indicated B-cell lymphoma.  *Id.*, Exhibit 3

17  (filed under seal).  On November 25, 2024, a biopsy was collected.  The biopsy was analyzed, and the

18  original diagnosis of B-cell lymphoma remained unchanged.  *Id.*, Exhibit 4 (filed under seal).

19         Shortly after learning about Abramoff's likely cancer diagnosis, undersigned counsel requested

20  medical records from Abramoff's counsel to confirm the diagnosis, treatment, and symptoms.  *Id.* ¶ 5.

21  On December 19, 2024, undersigned counsel for the government received the name of Abramoff's

22  treating oncologist.  *Id.* ¶ 6.  On December 23, 2024, undersigned counsel for the government informed

23  Andrade's defense team of Abramoff's cancer diagnosis and stated that a Rule 15 deposition likely

24  would be appropriate.  *Id.* ¶ 8.

25         On December 25, 2024, undersigned counsel for the government received a letter from

26  Abramoff's counsel signed by Dr. Nina Wagner-Johnston, Professor of Oncology, Director of

27  Hematologic Malignancies, National Capitol Region, Sidney Kimmel Cancer Center at Johns Hopkins

28  University.  *Id.* ¶ 9 & Exhibit 5, L*etter from Dr. Nina Wagner-Johnston to AUSA Highsmith regarding*

*Jack Alan Abramoff*, dated Dec. 24, 2024.  Dr. Wagner Johnston's letter states that:

> Abramoff is under my care at the Johns Hopkins Sidney Kimmel Cancer Center at Sibley Memorial Hospital. Mr. Abramoff is currently being treated for diffuse large B-cell lymphoma (a type of blood cancer) with intravenous chemotherapy, causing profound and sustained immunosuppression.
>
> It is our strong medical recommendation that he avoid crowds and non-medical travel for a minimum of one year (until 01/2026) to prevent infectious diseases that can rapidly evolve into life-threatening conditions.

*Id.*

On December 26, 2024, undersigned government counsel forwarded Dr. Wagner-Johnston's letter to Andrade's legal team and emphasized in the body of the email that a Rule 15 deposition may be necessary given the circumstances.  *Id.* ¶ 9.  Undersigned counsel's goal was and has been to reach a stipulation regarding a Rule 15 deposition given Abramoff's medical condition.

Following numerous and repeated attempts to obtain Abramoff's medical records from multiple sources, on January 5, 2025, Abramoff's counsel emailed undersigned government counsel approximately 55 separate PDF attachments consisting of medical records for Abramoff.  *Id.* ¶¶ 9-10.  On January 7, 2025, undersigned government counsel forwarded the medical records to Andrade's legal team.  *Id.* ¶ 11.  In the email accompanying the medical records, undersigned counsel requested that Andrade's defense team stipulate to a Rule 15 deposition for Abramoff given his medical condition, symptoms, profound and sustained immunosuppression, and oncologist's recommendation.  *Id.* Meanwhile, government counsel continued to seek medical records from the hospital system.  *Id.*

On January 7, 2025, undersigned counsel spoke with a hematology nurse navigator at the Johns Hopkins Sidney Kimmel Cancer Center at Sibley Memorial Hospital regarding Abramoff's chemotherapy treatment schedule.  *Id.* ¶ 12.  The nurse navigator stated that Abramoff is undergoing active treatment for lymphoma, which includes several cycles of chemotherapy treatment.  *Id.*  She further stated that Abramoff received his first cycle of chemotherapy treatment on or about December 11, 12, and 13, 2024, and his second cycle of treatment January 1 and 2, 2025.  *Id.*  She stated that Abramoff is scheduled to receive a third cycle of treatment on January 22 and 23, 2025, and likely would receive a fourth cycle of treatment on or about February 12 and 13, 2025.  *Id.*

On January 9, 2025, the government's trial team conferred with Andrade's trial team.  *Id.* ¶ 13.

The parties discussed stipulating to a Rule 15 deposition. *Id.* Andrade's defense team asserted that they were not necessarily opposed to an in-person Rule 15 deposition in principle but that they needed additional medical and treatment records before agreeing to stipulate to a Rule 15 deposition. *Id.* Undersigned counsel for the government agreed to provide additional medical records as soon as he received them. *Id.*

On January 13, 2025, undersigned counsel for the government received from Abramoff's counsel a status letter regarding Abramoff from Dr. Nina Wagner-Johnston. *Id.*, Exhibit 6, *Letter from Dr. Nina Wagner-Johnston to AUSA Highsmith regarding Jack Alan Abramoff*, dated Jan. 7, 2025. Dr. Wagner-Johnston's letter confirmed that Abramoff is still under her care at the Johns Hopkins Sidney Kimmel Cancer Center at Sibley Memorial Hospital "for treatment of a life threatening medical condition, diffuse large B-cell lymphoma (a type of blood cancer)." Dr. Wagner-Johnston's letter states:

> Mr. Abramoff has begun chemotherapy as part of this treatment regimen. During this period, which could last for another four to five months, he is expected to experience symptoms including weakness, extreme fatigue, nausea, vomiting, and have a compromised immune system. These symptoms will at times prevent Mr. Abramoff from being able to fulfill work-related responsibilities.
>
> We urge you to provide reasonable accommodations for Mr. Abramoff as he focuses on his health during this difficult time.

*Id.* Undersigned government counsel forwarded the letter to Andrade's defense team the same day, January 13, 2025, and asked counsel to stipulate to a Rule 15 deposition. Counsel asked for additional records. *Id.* Despite numerous and repeated efforts, government counsel has not yet received additional medical records. *Id.* As of the filing of this motion, defense counsel have not agreed to stipulate to a Rule 15 deposition. *Id.*

Given the impending trial date, Mr. Abramoff's serious medical condition and ongoing treatment, scheduling requirements, and logistical challenges, the government seeks an order from the Court for a Rule 15 deposition because the parties could not reach a stipulation within a reasonable timeframe.

## III.    LEGAL AUTHORITY

Federal Rule of Criminal Procedure 15 provides in pertinent part that "[a] party may move that a

1   prospective witness be deposed in order to preserve testimony for trial.  The court may grant the motion

2   because of exceptional circumstances and in the interest of justice."  Fed. R. Crim. P. 15(a)(1).  "The

3   district court retains broad discretion in granting a Rule 15(a) motion, and considers the particular

4   circumstances of each case to determine whether the exceptional circumstances requirement has been

5   satisfied."  *United States v. Berger*, 17-cr-00491-RS (N.D. Cal. March 30, 2018) (Dkt. 61, Order

6   Regarding Defense Motions for Witness-Immunity, Rule 15 Deposition, Discovery and Disclosure)

7   (quoting *United States v. Omene*, 143 F.3d 1167, 1170 (9th Cir. 1998) (internal citation and quotation

8   marks omitted)).  "There are no specific prerequisites or factors a district court must consider."  *Id.*  Rule

9   15(a) does not require, for instance, any conclusive showing of "unavailability" or "material testimony."

10  *Id.* (quoting *Omene*, 143 F.3d at 1170).  "Rule 15(a) only requires that the trial court find that due to

11  exceptional circumstances it is in the interest of justice that the testimony of a prospective witness be

12  taken and preserved for possible use at trial."  *Id.* (quoting *Omene*, 143 F.3d at 1170).

13          Courts often equate "exceptional circumstances" and "in the interest of justice" to a showing that

14  the witness is unavailable for trial and has material testimony to offer.  *See United States v. Rodriguez-*

15  *Sifuentes*, 637 F. App'x 1016, 1017 (9th Cir. 2016).  However, the movant need not make a "conclusive

16  showing of 'unavailability' or 'material testimony' before a deposition can be taken in a criminal case."

17  *Omene*, 143 F.3d at 1170; *United States v. Torre-Sanchez*, No. 12-CR-00833-LHK, 2014 WL 4370538,

18  at *3 (N.D. Cal. Sept. 3, 2014).  The Rule "only requires that the trial court find that due to exceptional

19  circumstances it is in the interest of justice that the testimony of a prospective witness be taken and

20  preserved for possible use at trial." *Omene*, 143 F.3d at 1170.

21          Courts may deny a Rule 15 application when the applicant's proffered testimony is vague or

22  irrelevant.  *See, e.g.*, *United States v. Danhong Chen*, No. 19-CR00111-LHK-2, 2020 WL 1322963, at

23  *2 (N.D. Cal. Mar. 20, 2020) (proffered testimony was "vague and conclusory"); *Torre-Sanchez*, 2014

24  WL 4370538 at *3 (applicant "failed sufficiently to articulate how and why [the witness's] testimony"

25  was material).  However, Courts will grant a Rule 15 deposition application when the party

26  demonstrates how the witness's testimony is material and relevant.  *Berger*, 17-cr-00491-RS (N.D. Cal.

27  March 30, 2018) (Dkt. 61, Order); *Omene*, 143 F.3d at 1170.

28  **IV.    ARGUMENT**

Here, exceptional circumstances exist which justify providing a procedural mechanism for securing Abramoff's testimony via deposition under Rule 15.  First, the testimony is clearly relevant.  The government alleges that Abramoff conspired with Andrade to commit the wire fraud scheme charged in the indictment.  And Abramoff has admitted in his plea agreement that he conspired with Andrade to commit the fraud charged in this case.

In fact, Abramoff was Andrade's key co-schemer in the charged indictment.  The government anticipates that Abramoff will testify that he worked closely with Andrade to develop a misleading press campaign that misrepresented potential business deals between AML Bitcoin and various government and quasi-government partners.  Abramoff will also testify that he and Andrade were misrepresenting the state of the AML Bitcoin technology and that they were raising money from investors in order to build the AML Bitcoin technology Andrade and Abramoff told the public was already in place.  Abramoff will also testify about the misleading Super Bowl rejection campaign.  Abramoff's testimony goes to the essence of the charged fraud scheme and is highly material.   Abramoff's testimony is both unique and critical to the government's case.  In some instances, he is the only witness or participant in pieces of the fraud scheme.  He is also deeply involved in the fraud.  His testimony is key for the jury to understand the allegations charged in the indictment.

Second, the unique facts of Abramoff's medical condition establish both that "exceptional circumstances" exist and that "it is in the interest of justice" that his highly material testimony be taken and preserved for possible use at trial.  Abramoff's recent diagnosis of life-threatening cancer, and his current, active treatment schedule constitute exceptional circumstances.  Courts have routinely held that a witness's health conditions may constitute such exceptional circumstances.  *See, e.g.*, *United States v. Prokop*, Case No. 2:09-cr-00022-MMD, 2014 WL 1154164, at *3 (D. Nev. Mar. 20, 2014) (permitting Rule 15 deposition where witness faced "serious health issues" that prevented her from traveling cross-country to the trial).  Abramoff received his cancer diagnosis in November 2024 and began treatment in December 2024.  His treatment is ongoing up to, during, and, potentially, after trial.  The treatment is debilitating.  Abramoff's treating oncologist—a Professor of Oncology and the Director of Lymphoma Drug Development at Johns Hopkins—states: "It is our strong medical recommendation that he avoid crowds and non-medical travel for a minimum of one year (until 01/2026) to prevent infectious diseases

1   that can rapidly evolve into life-threatening conditions." Highsmith Decl., Exhibit 5. She goes on to

2   explain the severe symptoms of treatment—"including weakness, extreme fatigue, nausea, vomiting,

3   and have a compromised immune system." *Id.*, Exhibit 6.

4         Given Abramoff's compromised immune system and the need for treatment, "it is in the interest

5   of justice" to take Abramoff's deposition rather than subjecting him to a cross-country flight,

6   interruption of medical treatment, and risk of serious infection necessitated by in-person trial testimony.

7   Abramoff's testimony is crucial, but the government does not seek to cause him serious physical harm to

8   secure his testimony. Further, the government does not seek to continue the trial date any further.

9   Accordingly, under the unique circumstances here, a Rule 15 deposition rather than trial testimony is

10   appropriate.

11   **V.   LOGISTICAL CONSIDERATIONS**

12         The government proposes a virtual video-taped deposition conducted via video conference with

13   all parties present. The government proposes a fully remote deposition to protect Abramoff and his

14   compromised immune system. An in-person deposition likely would be attended by nearly 10 people,

15   including the witness, witness counsel, defendant, government counsel, defense counsel, witness

16   counsel, videographer, and stenographer. Precedent exists for the deposition to occur via

17   videoconference rather than in-person where the defense does not object. *See United States v. Condron*,

18   Case No. 1:17-cr-10243-IT, 2020 WL 3065354 (D. Mass. Jun. 9, 2020) (permitting government's

19   witness—due to advanced aged and deteriorating health condition—to be deposed from her residence

20   via video conference instead of traveling to the courthouse, and that it could be done over multiple days,

21   hour-by-hour if necessary, although defense did not object); *United States v. Ulysse*, Case No. 21-cr-

22   054, 2022 WL 1271199 (D. Md. Apr. 28, 2022) (permitting Rule 15 depositions of 93 and 90 year old

23   witnesses to occur by videotaped depositions, where one witness was undergoing chemotherapy

24   treatment for cancer, and the other could not travel because of medical reasons).

25         However, the government understands that the Confrontation Clause gives the defendant the

26   right to be personally present at the deposition unless the Court makes "a 'case-specific finding' that (1)

27   the denial of physical confrontation 'is necessary to further an important public policy,' and (2) 'the

28   reliability of the testimony is otherwise assured.'" *United States v. Carter*, 907 F.3d 1199, 1208 (9th Cir.

1    2018) (quoting *Maryland v. Craig*, 497 U.S. 836, 845, 857 (1990)).  The government does not seek a

2    *Carter/Craig* exception from defendant's confrontation right unless Abramoff's condition worsens

3    further.[2]  Therefore, if the defense opposes a fully remote deposition, the government moves this Court

4    for an in-person deposition in Washington, D.C., at a location agreed upon by the parties.

5            Further, the government respectfully proposes that the Court participate in the deposition by

6    Zoom or appropriate video-conference in order to rule in real time on counsel's objections.  The

7    government makes this proposal in order to provide a more streamlined video presentation to the jury at

8    trial and to save significant amount of time and expense presenting the deposition video and transcript to

9    the Court after the deposition for the Court to review the deposition and then rule on objections.  By

10   having the Court present by Zoom, it can rule on objections in real-time, allowing counsel to (if they

11   wish) rephrase or redirect their questions.  More important, absent Court participation, counsel would be

12   entitled to make objections more comprehensive than those in civil practice, and then the witness would

13   answer questions objected to.  *See* Fed. R. Crim. P. 15(e), (g).  Then the Court would have to rule on

14   those objections, and then the government would have to edit the video deposition to remove answers to

15   questions where objections were sustained.  This editing process could take a significant amount of time.

16   Therefore, the government proposes the Court's real time participation.  Other courts have likewise

17   presided over testimony or depositions via video in criminal cases.  *See, e.g.*, *United States v. Nippon*

18   *Paper Indus. Co.*, 17 F. Supp. 2d 38, 43 (D. Mass. 1998) ("rul[ing] on all objections as if the testimony

19   were being conducted before the jury" where the witness was deposed live over video); *United States v.*

20   *Dermen*, No. 2:18-CR-00365-JNP-BCW, 2019 WL 3536616, at *4 (D. Utah Aug. 2, 2019) (magistrate

21   judge presiding over deposition via video).

22   **VI.    CONCLUSION**

23           For the foregoing reasons, the United States respectfully requests that the Court order a Rule 15

24

25           ─────────────────────
26   [2] If medical necessity warrants, the government reserves the right to move for two-way video
     testimony over defendant's objection. Indeed, the Ninth Circuit has recognized it may be "truly
     necessary to forgo physical confrontation at trial due to a witness's medical condition"—such as when
27   "the witness [is] 'terminally ill with cancer and being treated in another state.'" *United States v. Carter*,
     907 F.3d 1199, 1209 (9th Cir. 2018) (original alterations omitted) (quoting *Horn v. Quarterman*, 508
28   F.3d 306, 310, 320 (5th Cir. 2007)).

1   deposition for Jack Abramoff under Fed. R. Crim. P. 15.  The government respectfully requests that, if

2   possible, the Court make an exception to N.D. Cal. Crim. L.R. 47-2(a) and hold a hearing or rule on this

3   motion less than 14 days after filing, given its time-sensitive nature.

4

5   DATED:  January 15, 2025                              Respectfully submitted,

6                                                        United States Attorney

7                                                        _____/s/_____

8                                                        CHRISTIAAN HIGHSMITH
                                                         DAVID J. WARD
9                                                        Assistant United States Attorneys

10                                                       MATTHEW CHOU
11                                                       Special Assistant United States Attorney

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28