MICHAEL J. SHEPARD (SBN 91281)
 *mshepard@kslaw.com*
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone:    +1 415 318 1200

KERRIE C. DENT (Admitted *pro hac vice*)
 *kdent@kslaw.com*
1700 Pennsylvania Avenue, NW, Suite 900
Washington, DC 20006
Telephone:    +1 202 626 2394

CINDY A. DIAMOND
(SBN 124995)
 *cindy@cadiamond.com*
58 West Portal Ave #350
San Francisco, CA 94127
408.981.6307

Attorneys for Defendant
ROWLAND MARCUS ANDRADE

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    vs.<br><br>ROWLAND MARCUS ANDRADE,<br><br>    Defendant. | ANDRADE'S MOTION FOR AN EVIDENTIARY HEARING TO ADDRESS GOVERNMENT MISCONDUCT AND TO SEEK SANCTIONS, INCLUDING POTENTIAL DISMISSAL OF THE INDICTMENT<br><br>No. 3:20-cr-00249-RS<br><br>Judge: Hon. Richard Seeborg<br>Pretrial Conference: January 22, 2024 |

1

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................. 1

II.   FACTUAL BACKGROUND ......................................................................... 2

III.  ARGUMENT ................................................................................................. 17

      A.   The Court Should Hold an Evidentiary Hearing to Determine Whether
           Dismissal of the Indictment is Warranted Based on the Government's
           Misconduct .......................................................................................... 17

      B.   The Government Misconduct Detailed in this Motion Violates Due Process ....... 18

           1.   The Government's Systematic Suppression and Destruction of
                Exculpatory Evidence Relating to Abramoff Is Outrageous and
                Constitutes a Due Process Violation ............................................ 18

           2.   The Government's Deliberate, Repeated Disregard for Mr.
                Andrade's Attorney-Client Privilege is Outrageous and Constitutes
                a Due Process Violation ............................................................. 20

      C.   Even If the Court Does Not Find  a Constitutional Violation, the Court Can
           and Should Exercise its Supervisory Powers to Dismiss the Indictment ......... 21

      D.   If the Court Determines that Dismissal is Unwarranted, Then the Court
           Should Provide the Jury with Adverse Inference Instructions and Should
           Order Other Relief ................................................................................. 23

IV.   CONCLUSION ............................................................................................. 23

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*California v Trombetta*,
    467 U.S. 479 (1984)...........................................................................................19

5

6

*Sanders v. Cullen*,
    873 F.3d 778 (9th Cir. 2017)............................................................................22

7

8

*United States v. Irwin*,
    612 F.2d 1182 (9th Cir. 1980)..........................................................................21

9

10

*United States v. Schell*,
    775 F.2d 559 (4th Cir. 1985)............................................................................20

11

*United States v. Barrera-Moreno*,
    951 F.2d 1089 (9th Cir. 1991)..........................................................................18

12

13

*United States v. Batres-Santolino*,
    521 F.Supp. 744 (N.D. Cal. 1981) ....................................................................21

14

15

*United States v. Blanco*,
    392 F.3d 382 (9th Cir. 2004) ............................................................................19

16

*United States v. Bogart*,
    783 F.2d 1428 (9th Cir. 1986) ............................................................................1

17

18

*United States v. Bundy*,
    968 F.3d 1019 (9th Cir 2020) ...............................................................21, 22, 23

19

20

*United States v. Chapman*,
    524 F.3d 1073 (9th Cir. 2008) ...................................................................2, 21, 22

21

*United States v. Erickson*,
    No. 4:19-RC-40015, Dkt. #66 (D.S.D. July 7, 2020) ......................................11

22

23

*United States v. Fitzgerald*,
    615 F. Supp. 2d 1156 (S.D. Cal. 2009) ............................................................21

24

25

*United States v. Marshank*,
    777 F. Supp. 1507 (N.D. Cal. 1991) ....................................................18, 20, 21

26

*United States v. Quiovers*,
    539 F.2d 744 (D.C. Cir. 1976) .........................................................................23

27

28

*United States v. Sedaghaty*,
    728 F.3d 885 (9th Cir. 2013)............................................................................22

*United States v Sivilla*,
    714 F.3d 1168 (9th Cir. 2013)................................................................................. 23

*United States v. Soberon*,
    929 F.2d 935 (3d Cir. 1991)................................................................................. 18

*United States v. Suarez*,
    2010 WL 4226524 (D.N.J. Oct. 2, 2010)............................................................. 23

**Other Authorities**

 Fifth Amendment ......................................................................................................... 1

Sixth Amendment ......................................................................................................... 18

Fourteenth Amendment................................................................................................. 19

ANDRADE'S MOTION FOR AN EVIDENTIARY
HEARING TO ADDRESS GOVERNMENT MISCONDUCT
            Case Number: 3:20-CR-00249-RS

1    **I.    INTRODUCTION**

2          This motion seeks an evidentiary hearing, sanctions (including potential dismissal of the

3    indictment), and/or other relief, based on government misconduct. The list of misconduct is long.

4    It begins with the systematic suppression of exculpatory evidence relating to twice-convicted

5    felon and cooperating witness Jack Abramoff, about which two witnesses could testify if the

6    Court holds an evidentiary hearing. It includes the government recklessly permitting Abramoff

7    and/or his lawyers to destroy other exculpatory evidence. It includes the intentional destruction by

8    the government of the phone of Paul Erickson, a decades-long friend and colleague of Abramoff

9    on matters found by Judge Beeler to be material to the preparation of the defense. Beyond this

10   substantial collection of evidence that is irretrievably lost, the government was caught attempting

11   to suppress a host of other exculpatory evidence relating to Abramoff's conduct.

12         In addition to crimping the provision of information helpful to Mr. Andrade, the

13   government helped itself to Mr. Andrade's attorney-client privileged information.  It apparently

14   seized, reviewed, and produced privileged information.  And on multiple occasions, it used a

15   cooperating witness to get access to what Mr. Andrade was telling his attorney on the very

16   subjects the government was investigating – and not just to listen, but to direct the specific topics

17   in which the government was interested.

18         Each of the instances or episodes detailed in this motion would be outrageous and, if

19   established at a hearing or based on this filing, could rise to the level of a due process violation.

20   Taken together, they would establish that the government has violated Mr. Andrade's due process

21   rights under the Fifth Amendment. At a minimum, the Court should order an evidentiary hearing

22   to address the government's conduct, give adverse inference instructions to advise the jurors of

23   the government's misconduct and the conclusions the jury may draw from it, and employ other

24   remedies such as disqualification and suppression.

25         Mr. Andrade files this motion and seeks a hearing while recognizing that dismissal of the

26   indictment is an extraordinary remedy. But this is an extraordinary case. The Ninth Circuit has

27   recognized that, in addition to the power to dismiss for due process violations, *United States v.*

28

ANDRADE'S MOTION FOR AN EVIDENTIARY HEARING                    Case Number: 3:20-CR-00249-RS
TO ADDRESS GOVERNMENT MISCONDUCT

1  *Bogart*, 783 F.2d 1428, 1432-33 (9ᵗʰ Cir. 1986),  district court may use its supervisory authority

2  dismiss an indictment when it finds that the prosecution has engaged in "flagrant prosecutorial

3  misconduct." *See United States v. Chapman*, 524 F.3d 1073, 1086 (9ᵗʰ Cir. 2008) (citing cases

4  and finding that dismissal of the indictment was not an abuse of discretion where "the

5  government recklessly violated its discovery obligations and made flagrant misrepresentations to

6  the court.").

7  **II.    FACTUAL BACKGROUND**

8      The misconduct on which this motion is based includes the government's systematic

9  suppression of evidence relating to Jack Abramoff and the government's invasion of Mr.

10  Andrade's attorney-client privilege to gain an unfair advantage at trial.  Details about the

11  government's misconduct and the witnesses Mr. Andrade's counsel expects to call are set forth in

12  more detail in the Declaration of Kerrie C. Dent ("Dent Decl."), and the exhibits attached to the

13  declaration, which are filed under seal in compliance with the protective order in this case.

14      **A.    The Government's Suppression of Abramoff-Related Evidence**

15      A theme of Mr. Andrade's defense is that Jack Abramoff orchestrated the charged

16  wrongdoing, and that Mr. Andrade did not intend to commit fraud.  To the extent that the defense

17  has received discovery relating to Abramoff, it has turned out to have substantial amounts of

18  exculpatory information. Dent Decl. at ¶5.  Any suppression by the government of information

19  relating to Abramoff therefore cuts at the core of Mr. Andrade's defense.

20      In this Motion, Mr. Andrade sets forth the basis for his belief that, if subpoenaed to testify,

21  at least two current or former government insiders, one from the FBI and the other from a

22  different agency, would say that the government intentionally suppressed information about

23  Abramoff's wrongdoing. Corroborating this testimony, defense counsel has caught several

24  instances in which the government attempted to suppress information adverse to Abramoff that is

25  exculpatory for Mr. Andrade. *See* Dent Decl. at ¶5.

26      The first witness, Supervisory Special Agent ("SSA") Johnathan Buma, was an FBI

27  counterintelligence agent for 15 years, including in the Los Angeles Field Office, during the time

28  period when Mr. Andrade's case was investigated and prosecuted. Mr. Andrade's counsel expects

1   that, if the Court holds a hearing on this matter, Buma could testify about the suppression of his

2   investigations and intelligence gathering, the ways the government suppressed information, and

3   the extent to which it related directly to Mr. Andrade's case and to Abramoff.  Buma also likely

4   could testify about Jack Abramoff's participation in serious crimes, evidence of which the

5   government chose to suppress. Dent Decl. at pp. 2-4. The way that Abramoff's participation in

6   such crimes impacted Mr. Andrade's business and the allegations in the indictment is an integral

7   part of Mr. Andrade's defense – a defense that Judge Beeler, repeatedly and over the

8   government's repeated objections, found to be material to the preparation of Mr. Andrade's

9   defense.[1]

10      If the Court holds an evidentiary hearing, the second witness defense counsel would

11  subpoena is a former government employee in a different agency who also has first-hand

12  knowledge of the government's suppression of information about Abramoff and his wrongdoing.

13  Mr. Andrade and his counsel expect that this witness could also testify about the government's

14  suppression of evidence relating to Abramoff and to information about Landfair Capital

15  Consulting, LLC, the company that was used by Abramoff to engage in illegal lobbying and

16  money laundering activities during the relevant time period (as well as to pay AML Bitcoin

17  expenses).  Dent Decl. at ¶8.

18      The testimony provided at the evidentiary hearing would be corroborated by defense

19  counsel's review of  documents and recordings, which also have revealed attempted suppression

20  (some of which appears to have succeeded) about Abramoff and some of this colleagues.  One

21  example is evidence relating to Abramoff that the government found in the apartment of Maria

22  Butina in July 2018.  In an interview of Abramoff, conducted immediately before the FBI's

23  execution of a search warrant at his home on September 13, 2018, one of the then-case agents in

24  Mr. Andrade's case, Agent EQ, described to Abramoff that he had found "a number of things

25  relating to Mr. Andrade's project AML Bitcoin" (including extensive handwritten notes) when

26  the case agents searched Maria Butina's home in D.C. a few months earlier. Dent Decl. at ¶8-9.

27

28

---

[1] Both of these witnesses have had issues with the government, which the Court can explore at a hearing as appropriate.

ANDRADE'S MOTION FOR AN EVIDENTIARY          Case Number: 3:20-CR-00249-RS
HEARING TO ADDRESS GOVERNMENT MISCONDUCT

1    The defense learned of the evidence only after painstakingly listening to a two-hour

2    recording of the Abramoff interview that was among hundreds of recordings in this case: the

3    documents were not referenced in the 302 report the agents wrote up after their interview of

4    Abramoff. The 302 report also omitted much of the information about Landfair Capital

5    Consulting, LLC, that was discussed. Landfair Capital was owned by Abramoff's son, and

6    Abramoff used it repeatedly to pay for and receive payment from his illegal activities, including

7    money laundering. On the recording of the Abramoff interview, the case agents tell Abramoff that

8    Landfair Capital "raised red alerts" and that they had dubbed the Landfair bank account "the

9    money connection." Recording 1D-39 at 57:24 and 1:5:00. Dent Decl. at ¶10.

10    After listening to the recording of the case agents interviewing Abramoff, the defense

11    asked the government to produce the Butina documents referenced by Agent EQ. The

12    government refused, insisting that Butina has "no connection" to AML Bitcoin or the case against

13    Mr. Andrade. It was not until the defense informed the government in an October 14, 2022 letter,

14    that it was planning to file a motion to compel, seeking the Butina documents and a host of other

15    material, that the government agreed to produce the Butina documents.[2] It produced the Butina

16    documents a few months later, on January 4, 2023.  Agent EQ's 302 report summarizing the

17    material seized during search of Butina's residence – prepared four and a half years after they

18    were seized, and only after Mr. Andrade requested them – describes the  Butina Documents as

19    "digitally scanned copies of AML Bitcoin marketing materials, and handwritten notes which

20    appear to be authored by Paul Erickson, taken from a meeting with Jack Abramoff on June 3,

21    2018." Dent Decl. at ¶10.

22    The Butina documents proved to be not only material to Mr. Andrade's defense, but also

23    exculpatory.  The twenty pages found in Butina's residence during the FBI search showed that

24    ───────────────

25    [2] The letter defense counsel wrote to the prosecutors states in part: "The government's position has been
      that you are not aware of any substantive connection between Butina and the case against Mr. Andrade.

26    However, as we discussed during our October 3 call, FBI agents EQ and Agent RW are well aware of the
      connections between Butina and Mr. Andrade's case. In the recording of a conversation with Abramoff at

27    his home on September 13, 2018, Agent EQ states that he found "a number of things" relating to
      Andrade's AML Bitcoin when searching Butina's home and took "extensive notes" on what was found.

28    (Recording ID-39, 58:00-59:00).

ANDRADE'S MOTION FOR AN EVIDENTIARY                    Case Number: 3:20-CR-00249-RS
HEARING TO ADDRESS GOVERNMENT MISCONDUCT

1    Abramoff, without Mr. Andrade's knowledge, was discussing with Erickson (and possibly

2    Butina, who was engaged to Erickson at the time) not only the marketing of Mr. Andrade's

3    business but also the use of Mr. Andrade's technology for other purposes that appear antithetical

4    to their use for Mr. Andrade's businesses. Among other things, the pages include a multi-platform

5    campaign to promote the deregulation of the cryptocurrency industry – the opposite of Mr.

6    Andrade's approach, which was to sell AML Bitcoin as the only cryptocurrency that would be

7    compliant with regulations such as anti-money laundering and "know your customer." The

8    handwritten notes also included references to "Marcus Andrade" and "AML Bitcoin or Die."

9    Dent Decl. at ¶11. *See also* Andrade's Supplemental Memorandum in Support of Motion to

10   Compel Discovery, Dkt. #153 at 5:4-15 (March 15, 2023).

11          In addition to the failed attempt to suppress the Butina documents, the evidence suggests

12   that the FBI also attempted to suppress exculpatory evidence found in Abramoff's iPhone.

13   Defense counsel requested Abramoff's iPhone 5, SVE056536 (1B4), and more than ten additional

14   Abramoff devices, in a letter dated March 3, 2022, and the government produced a Cellebrite file

15   from the iPhone a few months later. But this report was not complete, which the defense learned

16   by reviewing an FBI 302, from which the defense was able to identify hundreds of WhatsApp

17   messages (summarized in the 302) that had not been produced which between Abramoff and

18   Alexander Levin,  whose communications and dealings with Abramoff were found by Judge

19   Beeler to be material to the preparation of Mr. Andrade's defense. Dent Decl. at ¶12. Discovery

20   Order, Dkt. #165 at 7-8 and 11 (April 7, 2023).  The missing messages gleaned from the 302 also

21   included communications between Abramoff and another renowned money launderer, discussing

22   the use of AML Bitcoin, all behind Mr. Andrade's back.

23          When the defense inquired about the data missing from the Cellebrite report, the resulting

24   meet-and-confer provided little insight into why the government failed to produce so many

25   exculpatory documents relating to Levin, Abramoff, and AML Bitcoin. The government's

26   explanation evolved from "Agent RW forgot to include the messages in the Cellebrite file" to "we

27   have not been able to determine exactly which additional communications were not produced" to

28   "we are preparing to produce a complete version of Jack Abramoff's phone." Dent Decl. at ¶14.

5

On March 8, 2023, one of the prosecutors reported that the Cellebrite files for the entire phone were "sitting on the desk," and that the production likely would be made "in the next day or so." Two weeks later, the government made a similar representation to Judge Beeler, but it continued not to make the production until after motions to compel. Discovery Order, Dkt #165 at 11-13 ("Mr. Andrade has established a connection to this case surrounding Mr. Abramoff's involvement with Ms. Butina and Messieurs Levin and Erickson, and limiting the production to references to Mr. Andrade and AML Bitcoin is too narrow."). *See* Andrade's Motion to Compel Production of Abramoff Phone, Dkt. #192 (June 23, 2023), granted on July 13, 2023.

### B.    The Government's Destruction of Exculpatory Evidence

Although the government did eventually produce Abramoff's iPhone, several of Abramoff's other devices were destroyed before the images could be produced to Mr. Andrade. Defense counsel first requested Abramoff devices on March 3, 2022. When many of Abramoff's devices remained unproduced and the defense filed another motion to compel in January, 2024, Dkt. #275 at 18-20, the government took a new position, insisting that, even though it still had possession of the devices (since it seized them in September 2018), it could not "lawfully access" large portions of them.[3] Dent Decl. at ¶19. In response, Judge Beeler ordered the government to return the devices to Abramoff's counsel so that Mr. Andrade could subpoena them. Discovery Order, Dkt. #292 at 3:7-13 (Mar. 17, 2024).

But despite considerable efforts by the defense to coordinate the return of Abramoff's devices so they could be subpoenaed, the result was the destruction of all but one of the remaining devices. The government appears to have made no effort to ensure that the devices were preserved. Dent Decl. at ¶ 20. It ignored a March 18, 2024 email, from the defense ("let us know if you have located a representative for Abramoff to whom you will return his devices, and your expected timing for returning copies of the devices to his counsel"). In response to a follow up email on March 24 (reminding the government to provide its "expected timing for returning Abramoff's devices to him or his counsel" and "the timing as well as to whom the government

---

[3] Gov't Opp. to Third Motion to Compel Discovery, Dkt. # 283 at 8:20-28 (Feb. 15, 2024) (citing United States v. Balwani, 18-cr-258, EJD, Order at 9 (N.D. Cal. Apr. 8, 2022) (Dkt. # 1393).

plans to send the devices"), the government wrote on March 28 that it "anticipate[s] returning the seized Abramoff devices to his counsel by May 3, 2024. You can contact Attorneys [AL] and [RW] at Law Firm WS about Abramoff's devices." Defense counsel wrote to Abramoff's counsel AL the very same day (March 24), copying the government, informing Abramoff's counsel of the Court's March 17 Order, and requesting that AL, Mr. Abramoff, and Law Firm WS "preserve all of the data on any and all of his devices that the government seized from [Abramoff]"). Abramoff's counsel never responded. The government ignored counsel's May 3 email ("let us know immediately when you intend to return Abramoff's devices to his counsel so that we can serve a subpoena for the devices as soon as they are received by AL") and counsel's May 15 email ("let us know when you intend to return Abramoff's devices to Mr. AL"). On June 7, counsel wrote, "You have not responded to our repeated requests that you return Abramoff's devices to his counsel so that we can serve a subpoena for them, and that you let us know when you are doing so. If you do not plan to return the devices to Mr. Abramoff's counsel by the end of next week, please let us know so that we can take the issue to Judge Beeler." The government did not respond, prompting one last email, on June 12 ("let us know whether you plan to return Abramoff's devices to AL this week or if we should take that issue to Judge Beeler"). Instead, the government wrote on June 13, 2024, that it "*has* returned all of the Abramoff devices in its possession to counsel for Mr. Abramoff." Dent Decl. at ¶20.

The day after being informed that Abramoff's devices had been returned to his counsel, defense counsel and the Supervisory Deputy U.S. Marshal notified Abramoff's counsel that a subpoena for the devices would be served by mail. Issuance of the subpoena had already been requested so it could it served when Abramoff received his devices from the government. Nevertheless, and although Abramoff is purportedly cooperating with the government, Abramoff's counsel responded to the subpoena on July 29, 2024, producing one device that included nothing but two drafts of a statement promoting AML Bitcoin, which Abramoff wrote for his friend Representative Dana Rohrabacher to read on the House floor in July 2017. The cover letter accompanying the production stated: "[E]nclosed please find a true and correct copy

ANDRADE'S MOTION FOR AN EVIDENTIARY
HEARING TO ADDRESS GOVERNMENT MISCONDUCT

Case Number: 3:20-CR-00249-RS

1  of the electronic device returned to our client via Law Firm WS . . . *which was the only device in*

2  *our client's possession upon receipt of the Subpoena.*" Dent Decl. at ¶21.

3       A reasonable inference (at least sufficient to trigger further inquiry at a hearing) to be

4  drawn from the government's conduct – its resistance to simply coordinate the return of the

5  Abramoff devices through a simple call or email, and its apparent failure to convince its

6  cooperating witness not to destroy evidence – is that there was information incriminating of

7  Abramoff (and exculpatory of Mr. Andrade) that Abramoff (and the government) did not want

8  Mr. Andrade or this Court to see.  Dent Decl. at ¶22. The Abramoff iPhone that *was* produced

9  (after Mr. Andrade filed a motion and won) has been the best source of exculpatory information

10  in the case, and there is no reason to think that Abramoff's other devices did not also contain

11  exculpatory information. *See* Declaration of Kerrie C. Dent in Support of Motion to Compel

12  Production of Abramoff Phone, Dkt. #192-1 at ¶192-1 (June 23, 2023) ("The incomplete version

13  of the Abramoff phone produced in May 2022 has been a crucial piece of evidence for us as we

14  have been preparing Mr. Andrade's defense, especially because it includes exculpatory evidence

15  and provides a roadmap of the wrongdoing in which Abramoff and his fellow miscreants engaged

16  with Mr. Andrade's company, his cryptocurrency, and his patents. Obtaining the complete

17  Abramoff phone would afford Mr. Andrade the opportunity to identify additional potentially

18  exculpatory evidence and would help Mr. Andrade prepare his defense strategy.").

19       The government also destroyed Paul Erickson's iPhone. Erickson is a long-time friend and

20  associate of Abramoff.  Despite having known of convicted felon Paul Erickson's importance to

21  this case for more than five years, the government destroyed Erickson's iPhone in "March 2022 --

22  despite defense requests, the government has not been more specific about the exact date of

23  destruction).  On a purely mathematical basis, this results in about an 80% chance that it was

24  destroyed *after* the defense made its first request for documents and information relating to

25  Erickson. (March 7, 2022 Letter). Dent Decl. at ¶23.

26       The case agents, Special Agents EQ and RW, were aware of the materiality of Erickson to

27  Mr. Andrade's case because they were present for the search of Butina's home on July 15, 2018,

28  when twenty pages of AML Bitcoin marketing materials and handwritten notes (which the

1   government attributes to Erickson) were discovered and seized. Erickson's notes that

2   accompanied the AML Bitcoin marketing materials included specific references to "Marcus

3   Andrade" and to "Adopt AML Bitcoin platform or die," and the agents conceded on September

4   13, 2018 that the fact that Erickson had put money into Landfair Capital's account (which

5   Abramoff also used for AML Bitcoin) caused "red alerts" for them since that account is the

6   "money connection."[4]  Dent Decl. at ¶24.  A search warrant affidavit signed by Agent RW for

7   Erickson's email account highlighted Erickson's connection to Abramoff's "secret Landfair

8   Capital Consulting account, the same one used for AML Bitcoin.  Consistent with these facts, the

9   Court ruled on April 7, 2023 that "[t]he information [on Erickson's iPhone] is material: Mr.

10  Andrade has established a connection between Mr. Abramoff and Mr. Erickson that relates to this

11  case." Order, Dkt. #165 at 12:3-4.

12         Despite the government's longstanding knowledge of Erickson's importance and

13  materiality, the government destroyed the Cellebrite files from Erickson's phone, reportedly as

14  "part of standard FBI procedure" on an unspecified date in March 2022 – a fact disclosed to the

15  defense, in writing, on January 25, 2023. Dent Decl. at ¶25. The exact date of destruction – still

16  unknown – was of interest to Mr. Andrade because on March 7, 2022, the defense had requested

17  Erickson's statements and documents relating to Abramoff, Mr. Andrade, and AML Bitcoin. Dent

18  Decl. at ¶26. In light of the government's destruction of relevant information, defense counsel

19  wrote to the prosecutors on January 27, 2023, requesting additional information about the

20  destruction of the phone. The defense also asked the Court to compel the production of extraction

21  evidence that was preserved when the government deleted its image of Erickson's phone, or, if

22  that evidence did not exist, information about when and on whose authority the devices and

23  extraction reports were destroyed, and about whether the case agents or anyone else took any

24  steps to preserve the evidence and if not, why not. *See* Dkt. # 153 at 9-11.  Judge Beeler wrote:

25  "The information is material: Mr. Andrade has established a connection between Mr. Abramoff

26  _____

27  [4] A 302 report, dated several months prior to the September 18, 2018 interview and search of Abramoff's home, and authored by Agent RW, reviews some bank activity of Erickson and reflects two payments made by Erickson through the Landfair Capital account.

28

9

and Mr. Erickson that relates to this case. But there is no relief that the court can order: the information does not exist. For a clear record, if the government has the Erickson extractions or information about them (like the evidence review in this case, cited above, or information about the destruction), it must produce them." Order, Dkt. # 165 at 12:3-8 (April 7, 2023). The prosecutors never produced any such data.

Changing its explanation several times, the government has never definitively answered the question of whether or when the Erickson device was destroyed.  Dent Decl. at ¶27.  During a meet-and-confer phone call on March 2, 2023, the prosecutors told defense counsel that they had no information about what day in March 2022 the Erickson phone was destroyed. One of the prosecutors explained that the information was in a database, so he could not send it to the defense, but that he was looking at an entry on the computer that indicated the phone was destroyed in "March 2020."  Counsel asked if the prosecutor could take a screenshot and share it so the defense could better understand what he was looking at, but he declined to do so, and the other prosecutor on the call interrupted and said: "This is ridiculous. I don't have time for this." A few days later, at a March 8, 2023,  meet-and-confer, the government told the defense that it was no longer certain whether the Erickson phone was destroyed or not. Dent Decl. at ¶27.

Two weeks later, in its supplemental opposition to Mr. Andrade's motion to compel discovery, the government claimed that the Erickson phone was not destroyed in March 2022 after all – the March 2022 date was simply the date that the Erickson "casefile was formally closed," and that the government "has not located any records regarding when those extractions were destroyed." Govt Supp. Opp. to MTC, Dkt. #158 at 6:13-18 (March 22, 2023). The government has never explained why "standard FBI procedure" required the phone to be destroyed in March 2022 even though Erickson's case was closed on July 7, 2020, the day after he was sentenced to 7 years in prison for wire fraud and money laundering in connection with schemes to defraud senior citizens. *United States v. Erickson*, No. 4:19-RC-40015, Dkt. #66 (D.S.D. July 7, 2020).[5]  Dent Decl. at ¶28.

---

[5] President Trump pardoned Erickson less than a year a later.

ANDRADE'S MOTION FOR AN EVIDENTIARY                Case Number: 3:20-CR-00249-RS
HEARING TO ADDRESS GOVERNMENT MISCONDUCT

1    The government's explanation of the mysterious disappearance of Erickson's phone took

2    yet another twist after the Court granted Mr. Andrade's motion to compel discovery on April 7,

3    2023, ruling that the phones and other documents relating to Levin, Erickson and Butina are

4    material to Mr. Andrade's defense. Discovery Order, Dkt. #165 (April 7, 2023).  To comply with

5    that Order, the government produced a hard drive of multiple devices seized from Butina and

6    informed defense counsel and the Court that it had now also complied with its obligation to

7    produce Erickson's phone because one of the devices on the Butina hard drive was actually

8    owned by Erickson. The government never disputed that there had been another phone belonging

9    to and used by Erickson. Instead, it refused to say anything more about the subject.  Dent Decl. at

10    ¶29. The government did state a few weeks later that it "has not located any additional

11    information . . . regarding the Erickson phone." Joint Status Report, Dkt. #178 at 7:14-19 (May

12    26, 2023).  This limited response raised more questions than it answered, and never explained

13    what happened to the Erickson phone it told defense counsel it had destroyed.  Nor did it explain

14    how the FBI could destroy that phone without leaving a record, especially for a phone that not

15    only was held to be material to the preparation of the defense in this case but also was a phone

16    belonging to a criminal defendant who was sentenced to seven years in prison for fraud and

17    money laundering. Joint Status Report, Dkt. # 178 at 8:4-16 (May 26, 2023). Dent Decl. at ¶29.

18    **C.    The Government's Invasion of Mr. Andrade's Attorney-Client Privilege**

19    In addition to depriving Mr. Andrade of exculpatory information he should have received,

20    the government gathered for itself from Mr. Andrade information that it should not have

21    possessed – information protected by the attorney-client and related privileges.  Among other

22    things, the government collected and did not segregate or have separate reviewers of privileged

23    information, and it had one of its cooperating witnesses, DM, attend a meeting with Mr.

24    Andrade's lawyer under circumstances in which Mr. Andrade and his lawyer would have

25    reasonably believed that they had a common interest with Cooperator DM – after Mr. Andrade's

26    home had been searched by the FBI.  Not only was the FBI aware of the nature of the meeting,

27    but one of the agents scripted topics about the case for Cooperator DM to ask.

28

ANDRADE'S MOTION FOR AN EVIDENTIARY          Case Number: 3:20-CR-00249-RS
HEARING TO ADDRESS GOVERNMENT MISCONDUCT

Among the nearly 5TB of data produced by the government to the defense are documents that show on their face to be privileged. Dent Decl. at ¶30.  These privileged documents are Government Bates-numbered, which reflects that these documents were seized from Mr. Andrade, and reviewed by those working on the case for the government, apparently without even any review by a taint team.  For example, the productions reflect legal advice from two of Mr. Andrade's key legal advisors – Partners at the law firms DP and at WC – relating to the core allegations against Mr. Andrade, including: emails in February 2018 between Mr. Andrade and his lawyer, JF, regarding SEC regulation of cryptocurrency; a July 9, 2018 legal memorandum from Law Firm DP to Mr. Andrade, with the caption "Privileged & Confidential; Attorney-Client Communication," providing advice on the application of securities laws to AML Bitcoin token sales; a letter from Lawyer JF to Mr. Andrade, dated September 5, 2018, addressing the DP memorandum; and a September 6, 2018 email from Mr. Andrade to his counsel at DP, forwarding JF's analysis of the legal issue. Dent Decl. at ¶30.

Beyond seizing and reviewing privileged materials, the government sought to learn about Mr. Andrade's defenses to the potential charges it was investigating from a very knowledgeable source – Mr. Andrade himself, as he was talking about those topics with one of his lawyers.  This effort may have begun as part of a way to get some information about Mr. Andrade's valuable patents, as discussed below, but it quickly zeroed in on getting information that the target of a criminal investigation would share with his lawyer. The agents had seen the name of Lawyer CP, then a partner at Law Firm DP, on documents seized in their search of Mr. Andrade's residence on September 13, 2018. Dent Decl. at ¶32.

Soon thereafter, on October 3, 2018, David Cooperator DM, who had recently begun cooperating with the government, sent Agent KA several emails containing updates on various ongoing projects for AML Bitcoin.  Mr. Andrade had sent them to Cooperator DM, and asked that Cooperator DM not share them for business confidentiality reasons because they contained confidential updates on various ongoing projects for AML Bitcoin.  Cooperator DM worked with the FBI to set up and record a meeting between Cooperator DM, Mr. Andrade, and Lawyer CP. On October 13, 2018, Cooperator DM texted Agent KA to let her know that he was "planning a

ANDRADE'S MOTION FOR AN EVIDENTIARY
HEARING TO ADDRESS GOVERNMENT MISCONDUCT                    Case Number: 3:20-CR-00249-RS

1  call with Marcus tomorrow to discuss meeting to talk about taking over [Mr. Andrade's company]

2  NAC," and Agent KA replied: "I can send you topics early tomorrow am." Dent Decl. at ¶32.

3        As promised, Agent KA promptly provided Cooperator DM with a long list of topics she

4  wanted Cooperator DM to discuss with Mr. Andrade. The list went well beyond the patents —

5  already relevant to this case — and directly to gathering information about Mr. Andrade's defense

6  to specific allegations that later formed the essence of the indictment of Mr. Andrade. Agent

7  KA's list included more than twenty topics, was essentially an outline of the government's

8  investigation of Andrade from 2018 until his indictment in 2020. It covered, for example, AML

9  Bitcoin's budget for technology, the company's profits, Mr. Andrade's patents, amount raised in

10  the ICO, and the status of ongoing discussions with the Panama Canal, the Port of San Francisco,

11  the London Stock Exchange, and other entities that were considering AML Bitcoin. Dent Decl. at

12  ¶33.

13        On November 5, 2018, Cooperator DM told Agent KA that he and Mr. Andrade would be

14  meeting in Houston, Texas on November 13, 2018 either at Cooperator DM's hotel or at Law

15  Firm DP because "[CP], a lawyer with [Law Firm DP], asked to attend the meeting to . . . provide

16  legal advice." The agents knew that Lawyer CP was one of Mr. Andrade's lawyers at Law Firm

17  DP. Dent Decl. at ¶34.  Other documents suggest that the government may even have known that

18  Lawyer CP and her colleagues at Law Firm DP were representing Mr. Andrade *in connection*

19  *with this investigation.*  For example, documents from Law Firm BN, the firm that took over the

20  representation of Mr. Andrade in 2019, suggested Lawyer CP or others at Law Firm DP had

21  communications with AUSA LF about the return of some of the documents the government

22  seized from Mr. Andrade's Las Vegas office on September 13, 2018. Dent Decl. at ¶35.

23        Knowing that Lawyer CP would be at the meeting, and apparently knowing that she was

24  one of the lawyers representing Mr. Andrade in connection with the government's ongoing

25  investigation, the government sent Cooperator DM into a meeting at Law Firm DP, wired up,

26  with marching orders – in the form of a list of topics from the case agents – to delve into the

27  allegations being investigated by the FBI.  The case agents did this knowing that Mr. Andrade

28  and Lawyer CP would reasonably believe that Mr. Andrade and Cooperator DM had common

1  interests: they were being investigated by the FBI in related cases, both connected to AML

2  Bitcoin, and they had the additional common interest of actively working together to determine

3  the best way forward for NAC Foundation and whether there was a bigger role for Cooperator

4  DM to play.  Dent Decl. at ¶36.

5         Rather than pause to consider what they were doing, the FBI plowed ahead

6  enthusiastically.  Agents KA and RW flew to Houston, where they wired up Cooperator DM with

7  two recording devices on November 13, 2018 and appear to have "live-streamed"[6] and recorded

8  *more than 8 hours of meetings,* including Cooperator DM and Mr. Andrade's drive to Law Firm

9  DP, all-afternoon meetings at the law firm, and dinner conversation that evening. *See* Recordings

10  1D-47 and 1D-48.

11        The full day of recordings covered an array of topics, such as Mr. Andrade's patents, his

12  development of the technology for his cryptocurrency, the best way forward for Mr. Andrade's

13  company. During the meetings with Mr. Andrade and Lawyer CP, Cooperator DM sought

14  information from Mr. Andrade regarding a vast array of issues the government was investigating,

15  many of which it ultimately included in its indictment. For example, *Cooperator DM asked Mr.*

16  *Andrade about the status of negotiations with the Panama Canal FBI-ELSUR003784 at 15:58,*

17  *and he solicited from Mr. Andrade his perspective on the status of the ongoing marketing efforts*

18  *to raise awareness of AML Bitcoin by seeking adoption of AML Bitcoin by the Panama Canal, the*

19  *Port of Dover, and the London Stock Exchange.  Cooperator DM also asked Mr. Andrade about*

20  *the status of his company's marketing efforts with departments of the U.S. government, including*

21  *Homeland Security, Treasury, and the Department of Justice, and he wanted to know whether*

22  *there were "any banks that want to jump" in on the project or any deals with the New York Stock*

23  *Exchange. Cooperator DM also asked questions about the finances of NAC and, after casually*

24  *chatting with Mr. Andrade about his young children and his own difficult upbringing, he said,*

25  *"you've got to tell me about this property you've got down in southern Texas" – a reference to*

26  *Mr. Andrade's purchase of property that the indictment alleges as part of the money laundering*

27  ---

[6] The massive phone records for Cooperator DM's cell phone (FBI-GJ-0007013) show that data being recorded by Cooperator DM on November 13, 2018 was being sent directly to Agent KA in real time.

28

ANDRADE'S MOTION FOR AN EVIDENTIARY                    Case Number: 3:20-CR-00249-RS
HEARING TO ADDRESS GOVERNMENT MISCONDUCT

1   *count.* Recording 1D-47, FBI-ELSUR-003784 at 15:50-57:30. Dent Decl. at ¶39.

2          Despite having been in on the planning, Agent RW appears to have recognized – too late –

3   the error of the FBI's disregard for Mr. Andrade's attorney-client privilege by using cooperating

4   witness Cooperator DM to elicit statements from Mr. Andrade for hours, relating to its criminal

5   investigation of him. This is especially true for the use of Cooperator DM, someone with whom

6   Mr. Andrade and Lawyer CP would have reasonably believed had common interests with Mr.

7   Andrade   In an eight-second recording of Cooperator DM circling back with Agent RW at the

8   end of the evening on November 13, Agent RW asked: "Hmm. Was it really at the attorney's

9   office?  Really? What attorney?" The recording then stops.  Dent Decl. at ¶40.

10         At the same time that Cooperator DM was working with the agents to get privileged

11  information about the views of Mr. Andrade and his lawyer about the facts under investigation,

12  Cooperator DM also was dangling his connection with another lawyer in order to obtain

13  information about Mr. Andrade's patents. Dent Decl. at ¶41. Alleged co-conspirator Japheth

14  Dillman had told the case agents in a September 20, 2018 interview that "Andrade holds three

15  patents on AML Bitcoin related products," two of which have been granted globally, and the FBI

16  had  summarized some of the documents seized from Abramoff's home on September 13, 2018,

17  including a collection of documents found on Abramoff's home office desk relating to Mr.

18  Andrade's patents. The documents of interest to the agents included an email from Mr. Andrade

19  to Abramoff dated August 14, 2018, which identified Lawyer CP, then a Partner at Law Firm DP,

20  as one of the people associated with filings of Mr. Andrade's biometric patent.

21         To find out about the patents, on October 16, 2018 (a few days after the government was

22  speaking with Cooperator DM about getting more information about Mr. Andrade's patents),

23  Cooperator DM introduced Mr. Andrade to Lawyer SM. The introduction was by email, with

24  Cooperator DM telling Lawyer SM that Mr. Andrade had a need for patent litigation/defense

25  lawyers and was "shopping law firms." Dent Decl. at ¶41.  Mr. Andrade, Cooperator DM, and

26  Lawyer SM communicated about Andrade's patent information, and Cooperator DM and Lawyer

27  SM dangled the attorney-client privilege to persuade Mr. Andrade that he could send his entire

28  patent portfolio and underlying documents to Cooperator DM and Lawyer SM and that it would

1   all be protected by the privilege. Mr. Andrade's belief that his interactions were protected were

2   reenforced by the fact that Lawyer SM was using an email address from Law Firm PW, one of

3   Mr. Andrade's trusted law firm that had been handling patent work for him since 2016.  Mr.

4   Andrade sent his confidential patent information to Cooperator DM later that day, in an email

5   marked "CONFIDENTIAL."  Unbeknownst to Mr. Andrade, Cooperator DM then forwarded the

6   patent portfolio to Agent KA.  Although Mr. Andrade also sent the highly confidential patent

7   information to Lawyer SM, no ongoing attorney-client relationship ever resulted.[7] Dent Decl. at

8   ¶41.

9          The government also disregarded Mr. Andrade's attorney-client privilege when Agent EQ

10  questioned Mr. Andrade for nearly forty minutes -- about the source of money for the purchase of

11  his home, his failure to pay taxes, the development of the technology for his cryptocurrency, and

12  much more – *after* Mr. Andrade requested to call his lawyer.  All of this occurred during the

13  FBI's search of his family home. Although Agent EQ told Mr. Andrade at the beginning of the

14  interview that he was free to leave or to make phone calls, he almost immediately began

15  questioning Mr. Andrade about his office situation when Mr. Andrade interrupted and asked,

16  "Can I call my attorney?"  Mr. Andrade informed Agent EQ that he wanted to call his lawyers at

17  Law Firm BN and that he would like his phone back so that he could get the lawyer's phone

18  number from it. Agent EQ then interviewed Mr. Andrade for approximately 38 minutes – grilling

---

19  [7] Lawyer SM also may be able to provide information about a second time that he and Cooperator DM
20  reached out to get Mr. Andrade's patent information under the pretense that the communications were
    protected by the attorney client privilege.  Lawyer SM reached out to Mr. Andrade on March 5, 2020,
21  about a week before the FBI searched Andrade's home and office in Texas. After several emails and calls
    about litigation funding for Mr. Andrade's patent portfolio (which had grown since the men spoke in
22  2018), and with assurances that "[a]ll communications will be treated as privileged," Lawyer SM informed
    Andrade he would be using his hotmail address going forward. Lawyer SM asked Marcus to share his
23  claim charts and other information, and Mr. Andrade said he "would need an engagement agreement"
    before he could share any data. Lawyer SM responded: "Yes that is what I would like to do – be your
24  counsel to get [the] monetization effort going." After a quick call, Lawyer SM asked Mr. Andrade to
    "[p]lease provide any Black Gold Coin patents and patent related documents and *I will treat them as*
25  *attorney-client privileged documents*, not to be shared with anyone outside my team unless and until
    authorized by yourself or your representative." He added: "*Go ahead and send whatever you feel*
26  *comfortable with - it will remain confidential and privileged with me*." Mr. Andrade sent Lawyer SM the
    confidential information, and he put Cooperator DM and Lawyer SM in touch with some of his other
27  lawyers to get them the information they needed to assist with patent litigation funding. Dent Decl. at ¶42.

28

ANDRADE'S MOTION FOR AN EVIDENTIARY                    Case Number: 3:20-CR-00249-RS
HEARING TO ADDRESS GOVERNMENT MISCONDUCT

1  Mr. Andrade about the source of the money he used to purchase his home, his failure to pay his

2  taxes, and other issues directly related to the allegations in the indictment – before Agent RW

3  stepped into the room and asked Mr. Andrade if he had an attorney he wanted to call. *Id.* at 37:55.

4  Mr. Andrade reminded Agent EQ that he had asked at the beginning of the interview if he could

5  have his phone back so he could get his attorney's phone number. *Id.* at 38:13. Agent RW

6  permitted Mr. Andrade to call his lawyer, and Agent EQ finally ended the recording an hour into

7  the conversation, stating: "Marcus Andrade has an attorney so we won't be asking him any more

8  questions. So I'm going to end this recording." Dent Decl. at ¶43.

9  **III.    ARGUMENT**

10  　　　If proven, the facts described in the Motion about the government's suppression and

11  destruction of evidence, and about its invasion and violation of Mr. Andrade's attorney-client

12  privilege, require dismissal of the indictment. The Court can and should order dismissal due to the

13  government's trampling of Mr. Andrade's constitutional rights, or as an exercise of its

14  supervisory powers, or both. In the alternative, the Court should give adverse inference

15  instructions to the jury, disqualify the prosecution team, and suppress certain evidence. At a

16  minimum, the Court should hold an evidentiary hearing on all these issues.

17
18  　　**A.    The Court Should Hold an Evidentiary Hearing to Determine Whether
　　　　　　Dismissal of the Indictment is Warranted Based on the Government's
　　　　　　Misconduct**

19  　　　Mr. Andrade requests an evidentiary hearing on the government's systematic suppression

20  of evidence relating to Jack Abramoff, the government's destruction of exculpatory and

21  potentially exculpatory evidence, and the government's invasion of Mr. Andrade's attorney-client

22  privilege to gain an advantage at trial. An evidentiary hearing is appropriate if there are factual

23  disputes underlying a motion to dismiss the indictment based on outrageous government

24  misconduct that rises to the level of constitutional violations. *United States v. Marshank*, 777 F.

25  Supp. 1507, 1512 (N.D. Cal. 1991) (after an evidentiary hearing to resolve factual disputes, the

26  court "invoke[d] its supervisory power to dismiss the indictment in order to remedy the violation

27  of the defendant's Fifth and Sixth Amendment rights, to preserve judicial integrity, and to deter

28

ANDRADE'S MOTION FOR AN EVIDENTIARY                    Case Number: 3:20-CR-00249-RS
HEARING TO ADDRESS GOVERNMENT MISCONDUCT

1  future government misconduct"); *see also United States v. Soberon,* 929 F.2d 935, 941 (3d Cir.

2  1991) (if district court had "reasonable suspicion" of prosecutorial misconduct, proper course was

3  to hold evidentiary hearing).

4        **B.**      **The Government Misconduct Detailed in this Motion Violates Due Process**

5        It is well-established in the Ninth Circuit that "[a] district court may dismiss an indictment

6  on the ground of outrageous government conduct if the conduct amounts to a due process

7  violation." *United States v. Barrera-Moreno,* 951  F.2d 1089, 1091 (9th Cir. 1991). Each of the

8  episodes detailed in this motion would be outrageous and, if established at a hearing or based on

9  this filing, could rise to the level of a due process violation. Taken together, they should be

10  sufficient to establish that the government has violated Mr. Andrade's due process rights under

11  the Fifth Amendment.

12          **1.**      **The Government's Systematic Suppression and Destruction of**

13                **Exculpatory Evidence Relating to Abramoff Is Outrageous and**
              **Constitutes a Due Process Violation**

14        The government's suppression of evidence relating to Abramoff – evidence that often is

15  exculpatory and shows that Abramoff was engaged in criminal activity that impacted Mr.

16  Andrade's business – has deprived Mr. Andrade of his due process rights by denying him

17  evidence to support his defense.  The government's suppression of Abramoff material is willful,

18  extends to multiple agencies of the United States government, and has deprived Mr. Andrade of

19  any chance of getting a fair trial.

20        The Supreme Court has explained that "[u]nder the Due Process Clause of the Fourteenth

21  Amendment, criminal prosecutions must comport with prevailing notions of fundamental

22  fairness. We have long interpreted this standard of fairness to require that criminal defendants be

23  afforded a meaningful opportunity to present a complete defense." To safeguard that right, the

24  Court has developed "what might loosely be called the area of constitutionally guaranteed access

25  to evidence. Taken together, this group of constitutional privileges delivers exculpatory evidence

26  into the hands of the accused, thereby protecting the innocent from erroneous conviction and

27  ensuring the integrity of our criminal justice system." *California v Trombetta*, 467 U.S. 479, 485

28

ANDRADE'S MOTION FOR AN EVIDENTIARY
HEARING TO ADDRESS GOVERNMENT MISCONDUCT
                             Case Number: 3:20-CR-00249-RS

1  (1984) (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982).

2  Even in cases where the government suppresses only a narrow set of evidence, the

3  government's misconduct can give rise to a constitutional violation. For example, in *United States*

4  *v. Blanco,* 392 F.3d 382 (9th Cir. 2004), the government failed to disclose "highly relevant

5  impeachment material" about a confidential informant and the Court found it "obvious" that the

6  material "should have been turned over to Blanco under *Brady* and *Giglio.*" 392 F.3d at 392. The

7  Ninth Circuit remanded to the district court for further factfinding to determine the full extent of

8  the Brady violations, noting that "[a] range of options will be available to the court, including, at

9  one extreme, dismissal of the indictment for governmental misconduct" *id.* at 395 (citing

10 *Barrera-Moreno*, 951 F.2d at 1091).

11 Here, the suppression of Abramoff-related evidence went far beyond a *Brady* violation: it

12 has been a multi-agency drive to ensure that *Brady* material was never created – a far more

13 nefarious, systematic, and under-the-radar method of stripping Mr. Andrade of his constitutional

14 rights. One of the former government employees whom Mr. Andrade would have testify if the

15 Court holds an evidentiary hearing could talk about suppression of Abramoff material through

16 editing FBI 302 reports or not investigating certain crimes at all.  The other former government

17 employee would testify about how a different government agency suppressed evidence of

18 Abramoff's international money laundering using the Landfair Capital bank account.

19 Adding to the systematic suppression described by these insiders, Mr. Andrade's case

20 agents tried to suppress the AML Bitcoin marketing materials they found when searching the

21 home of Russian political activist Maria Butina, which included Erickson's exculpatory

22 handwritten notes written in one of several meetings Erickson had with Abramoff about AML

23 Bitcoin, and by removing more than one hundred messages from Abramoff's phone before

24 producing it to Mr. Andrade.

25

26

27

28

ANDRADE'S MOTION FOR AN EVIDENTIARY
HEARING TO ADDRESS GOVERNMENT MISCONDUCT          Case Number: 3:20-CR-00249-RS

1

2

      **2.**       **The Government's Deliberate, Repeated Disregard for Mr. Andrade's Attorney-Client Privilege is Outrageous and Constitutes a Due Process Violation**

3

      Government intrusion into the attorney-client privilege relationship rises to the level of

4

being unconstitutional when the intrusion "substantially prejudices" the defendant. *See United*

5

*States v. Marshank*, 777 F. Supp. 1507, 1524 (N.D. Cal. 1991); *U.S. v. Schell*, 775 F.2d 559 (4th

6

Cir. 1985).

7

      This is especially true on the facts of this case, in which the government knew that Mr.

8

Andrade was represented, in which the government knew that his lawyer, Lawyer CP, would be

9

present at the meeting with Cooperator DM to learn from her client and potentially "to provide

10

legal advice,"[8] in which there was "conscious direction" of the script by government case agents

11

setting forth dozens of topics Cooperator DM was to cover (all of which related to the

12

government's investigation of Mr. Andrade), *see id*. at 1522, and in which that direction was

13

designed to "give the prosecution an unfair advantage at trial" (by questioning Mr. Andrade and

14

his counsel about the facts and about his defenses to the accusations under investigation). *See id*.

15

at 1521.[9] As in *Marshank,* "it is simply impossible to excise the taint of the government's

16

constitutional transgressions," which "spreads to all the evidence" obtained against the defendant.

17

*Id.* at 1522. This knowing and deliberate  intrusion into Mr. Andrade's attorney-client relationship

18

with Lawyer CP was specifically designed to learn Mr. Andrade's defenses – something that

19

would "give the prosecution an unfair advantage at trial" – the very type of misconduct the Ninth

20

Circuit has recognized as prejudicial. *U.S. v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980)

21

(prejudice can "result from the prosecution's use of confidential information pertaining to the

22

defense plans and strategy . . .  and from other actions designed to give the prosecution an unfair

23

24

                    

[8] Dent Decl. at ¶34.

25

26

27

28

[9] The government also knew that Mr. Andrade had every reason to believe he had a common interest with Cooperator DM at the time of the meeting, given that Mr. Andrade had already been the subject of a search warrant and an interrogation, arising out of a businesses in which Cooperator DM had participated, and given that they were also planning to discuss Cooperator DM's role in Mr. Andrade's business. Adding to Mr. Andrade's belief that his conversation with Cooperator DM was protected from disclosure, Lawyer CP's firm had Cooperator DM sign an additional non-disclosure agreement that day.

ANDRADE'S MOTION FOR AN EVIDENTIARY
HEARING TO ADDRESS GOVERNMENT MISCONDUCT
            Case Number: 3:20-CR-00249-RS

advantage at trial."). In any event, "where there is surveillance of attorney-client conferences, prejudice must be presumed," *United States v. Orman*, 417 F. Supp. 1126, 1133 (D. Colo. 1976).

### C.    Even If the Court Does Not Find  a Constitutional Violation, the Court Can and Should Exercise its Supervisory Powers to Dismiss the Indictment

Regardless of whether the Court holds a hearing, and even if the Court finds that the government's conduct does not rise to the level of a due process violation, the Court nonetheless should exercise its supervisory power to dismiss the indictment against Mr. Andrade as a sanction for the government's systematic suppression of exculpatory evidence relating to Abramoff and its bulldozing of Mr. Andrade's attorney-client privilege to gain an unfair  advantage. *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir 2020) ("a district court can dismiss an indictment under its supervisory powers even if 'the conduct does not rise to the level of a due process violation.'"); *United States v. Fitzgerald*, 615 F. Supp. 2d 1156, 1158-59 (S.D. Cal. 2009) ("if the conduct does not rise to the level of a due process violation, the court may nonetheless dismiss under its supervisory powers."); *United States v. Chapman,* 524 F.3d 1073, 1084 (9th Cir. 2008). *See*, *e.g.*, *United States v. Marshank*, 777 F. Supp. 1507, 1524 (N.D. Cal. 1991); *United States v. Batres-Santolino*, 521 F.Supp. 744, 750-53 (N.D. Cal. 1981).A district court is permitted to dismiss an indictment under its inherent supervisory powers "to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury." *See United States v. Chapman*, 524 F.3d 1073, 1086 (9th Cir. 2008) (citing cases and finding that dismissal of the indictment was not an abuse of discretion where "the government recklessly violated its discovery obligations and made flagrant misrepresentations to the court.").  To justify dismissal under the Court's supervisory powers, the government's conduct must be 1) flagrant and 2) cause substantial prejudice to the defendant. *Chapman,* 524 F. 3d at 1085 and 1088 (affirming dismissal of an indictment with prejudice because the prosecutor did not abide by his "sworn duty to assure that the defendant has a fair and impartial trial" and his interest in a a particular case is not necessarily to win, but to do justice"); *Fitzgerald*, 615 F. Supp.2d at 1159 (affirming district court's dismissal of the indictment under its supervisory powers where the Government may not

1    have intentionally withheld evidence, but it recklessly disregarded its discovery obligations in

2    failing to produce them); *United States v. Bundy*, 968 F.3d 1019, 1030 and 1041 (9th Cir. 2020)

3    (affirming district court's dismissal of indictment exercising its supervisory powers where "the

4    government fell well short of its obligations to work toward fairly and faithfully dispensing

5    justice rather than simply notching another win."

6         Taken individually, each of the transgressions outlined above would support dismissal of

7    the indictment. The government's suppression of any exculpatory evidence – even on the scale of

8    a *Brady* violation with respect to a particular category of evidence – can warrant dismissal of an

9    indictment for flagrant government misconduct.  *See Chapman*, 524 F.3d 1073. 1089 (9th Cir.

10   2008) (district court did not abuse its discretion in dismissing the indictment based on flagrant

11   *Brady* and *Giglio* violations).

12        Taking all the misconduct together, dismissal should be required.  Where the government

13   commits multiple errors that violate its *Brady* obligations, the Ninth Circuit instructs courts to at

14   least consider the cumulative effect of the errors.  *United States v. Sedaghaty*, 728 F.3d 885, 892-

15   93 (9th Cir. 2013) (citations and internal quotation marks omitted).(noting that the Court is

16   "particularly troubled by the cumulative effect of these errors," and that "[a]lthough each of these

17   issues potentially merits a remand or a new trial on its own, given these multiple, significant

18   errors, a balkanized, issue-by-issue harmless error review is far less effective than analyzing the

19   overall effect of all the errors in the context of the evidence introduced at trial.").  *See also*

20   *Sanders v. Cullen*, 873 F.3d 778, 802 (9th Cir. 2017) (quoting *Kyles v. Whitley*, 514 U.S. 419, 436

21   (1995) (when assessing materiality "suppressed evidence must be considered 'collectively, not

22   item by item.'")).

23        While there will be ample evidence of intent, the Court need not find that the government

24   acted intentionally to demonstrate that its conduct was flagrant.  In *Chapman*, the Court found

25   that the district court did not abuse its discretion in dismissing the indictment based on discovery

26   violations and flagrant misrepresentations to the court without finding it had acted intentionally.

27   The Court explained that "accidental or merely negligent governmental conduct is insufficient to

28   establish flagrant misbehavior," but "reckless disregard for the prosecution's constitutional

obligations" is sufficient. *See also Bundy,* 968 F.3d at 1038 ("the government is wrong to suggest that flagrant misconduct must be intentional or malicious. Although flagrant misconduct cannot be an 'accidental or merely negligent' failure to disclose.").

**D.    If the Court Determines that Dismissal is Unwarranted, Then the Court Should Provide the Jury with Adverse Inference Instructions and Should Order Other Relief**

If for any reason the Court determines that dismissal of the indictment is not warranted in this case, the Court should invoke its broad supervisory power and fashion what it deems to be an appropriate remedy. Mr. Andrade proposes three such remedies.

First, the Court should instruct the jury that the Government has suppressed evidence about Jack Abramoff and his misconduct during the relevant time period of Mr. Andrade's indictment, destroyed evidence that the jury can infer would have been exculpatory, and invaded Mr. Andrade's attorney-client privilege to gain an advantage at trial, and that the jury can draw the following adverse inferences from that conduct;  (1) that the suppressed evidence would have been favorable to the defense; (2) that the destroyed evidence would have been helpful to the defense; (3) that the government unfairly gained an advantage at trial by improperly invading Mr. Andrade's attorney-client privilege; and (4) that any one of these inferences, and all of them together, can provide reasonable doubt about whether Mr. Andrade committed the crimes alleged in the indictment. See *United States  v Sivilla*, 714 F.3d 1168 (9th Cir. 2013); ); *United States v. Quiovers*, 539 F.2d 744 (D.C. Cir. 1976); *United States v. Suarez,* 2010 WL 4226524 (D.N.J. Oct. 2, 2010)*.*

Also, for the invasion of Mr. Andrade's attorney-client privilege, all the prosecutors and case agents who have been working on the case should be disqualified, and any statements elicited from Mr. Andrade after he asked to call his counsel but was prevented from doing so (and the fruit of any such statements) should be suppressed. *See generally Richards v. Jain*, 168 F.Supp. 2d 1195 (W.D. Wash. 2001).

ANDRADE'S MOTION FOR AN EVIDENTIARY
HEARING TO ADDRESS GOVERNMENT MISCONDUCT

Case Number: 3:20-CR-00249-RS

1  **IV.    CONCLUSION**

2          Accordingly, Mr. Andrade respectfully requests that the Court grant this Motion, hold an

3  evidentiary hearing, and enter sanctions (including dismissal and/or adverse inference instructions

4  to the jury) as appropriate.

5

6                                                      Respectfully submitted,

7
   DATED: January 24, 2025                             KING & SPALDING LLP
8
                                              By: */s/ Michael J. Shepard*
9                                                      MICHAEL J. SHEPARD
                                                       KERRIE C. DENT
10                                                     CINDY A. DIAMOND

11                                                     Attorneys for Defendant
                                                       ROWLAND MARCUS ANDRADE
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ANDRADE'S MOTION FOR AN EVIDENTIARY                    Case Number: 3:20-CR-00249-RS
HEARING TO ADDRESS GOVERNMENT MISCONDUCT