```
 1                                    Volume 1

 2                                 Pages 1 - 187

 3                    UNITED STATES DISTRICT COURT

 4                  NORTHERN DISTRICT OF CALIFORNIA

 5    Before The Honorable Richard Seeborg, Judge

 6    UNITED STATES OF AMERICA,        )
                                       )
 7              Plaintiff,             )
                                       )
 8       VS.                           )         NO.  3:20-CR-00249-RS-1
                                       )
 9    ROWLAND MARCUS ANDRADE,          )
                                       )
10              Defendant.             )
      _____)

11
                                      San Francisco, California
12                                    Monday, February 10, 2025

13              TRANSCRIPT OF JURY TRIAL PROCEEDINGS

14    APPEARANCES:

15    For Plaintiff:
                               ISMAIL J. RAMSEY
16                             United States Attorney
                               450 Golden Gate Avenue
17                             San Francisco, California 94102
                          BY:  CHRISTIAAN HIGHSMITH
18                             DAVID J. WARD
                               MATTHEW CHOU
19                             ASSISTANT UNITED STATES ATTORNEYS

20    For Defendant:
                               King and Spalding, LLP
21                             50 California Street, Suite 3300
                               San Francisco, CA 94111
22                        BY:  MICHAEL J. SHEPARD
                               ATTORNEY AT LAW
23
      (Appearances continued on following page.)
24
      REPORTED BY:             Stephen W. Franklin, RMR, CRR, CPE
25                             Official United States Reporter
```

```
 1    APPEARANCES (CONT.'D):

 2    For Defendant:
                              King and Spalding, LLC
 3                            1700 Pennsylvania Avenue, Northwest
                              Washington, DC 20006
 4                      BY:   KERRIE C. DENT
                              ATTORNEY AT LAW
 5
                              King and Spalding, LLC
 6                            1185 6th Avenue, 34th Floor
                              New York, NY 10036
 7                      BY:   DAINEC STEFAN
                              ATTORNEY AT LAW
 8
                              Cindy A. Diamond, Attorney at Law
 9                            58 West Portal Avenue, #350
                              San Francisco, CA 94127
10                      BY:   CINDY A. DIAMOND
                              ATTORNEY AT LAW
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Monday, February 10, 2025 - Volume 1

|                | PAGE | VOL. |
|----------------|------|------|
| Jury Voir Dire | 7    | 1    |

1  **Monday - February 10, 2025**                              **9:02 a.m.**

2                        **P R O C E E D I N G S**

3                              ---o0o---

4      (Defendant present, out of custody.)

5              **THE COURTROOM DEPUTY:**  Please be seated.

6      Calling case 20-CR-249, United States versus Rowland

7   Andrade.  Counsel, please state your appearances.

8              **MR. HIGHSMITH:**  Good morning, Your Honor.  Chris

9   Highsmith for the United States.

10             **THE COURT:**  Good morning.

11             **MR. SHEPARD:**  And good morning, Your Honor.  Michael

12  Shepherd for Mr. Andrade, along with my colleagues Cindy

13  Diamond, Kerrie Dent and Dainec Stefan.  Mr. Andrade is present

14  in court.

15             **THE COURT:**  Good morning.

16      So I just want to make sure we're ready to go.

17             **MR. HIGHSMITH:**  We're ready to go.

18             **THE COURT:**  Okay.  We'll be --

19             **THE COURTROOM DEPUTY:**  They're ready.

20             **THE COURT:**  They're ready?  Okay.  We need the list

21  and get them all down here.

22      So I'll go back to chambers, we'll bring the jury in, and

23  I'll come back and we'll get moving.

24             **MR. HIGHSMITH:**  Can I ask a question, Your Honor?

25             **THE COURT:**  You may.

1          **MR. HIGHSMITH:**  This case has -- there's a second

2    case agent who would like to be at counsel table.  We haven't

3    discussed this before.  He was Rohan Wynar, investigated the

4    case for many years and then moved to Washington and was off

5    the case and is now back in San Francisco.  He is on the

6    defense witness list.  I think he is listed as an as-necessary

7    impeachment witness on the defense list, but I wanted to ask

8    the Court, Mr. Wynar's at the end of his career and would very

9    much like to sit at counsel table for the case.

10         The last factor is that Special Agent Zarbin (phonetic),

11   he's been the case agent for the last couple years.  His wife

12   is due on March 20th.  I don't think that's going to be an

13   issue, but just bringing that to the Court's attention.  It may

14   be another reason to have Special Agent Wynar at the table.

15         **MR. SHEPARD:**  Sorry to be Grinch, but I've never

16   really understood the notion of allowing the case agent, to

17   begin with.  The defendant is the one understandable exception

18   to the rule that nobody who can be a witness should appear in

19   court.

20         **THE COURT:**  As AUSAs we used to need them to do like

21   put exhibit stickers on things.

22         **MR. SHEPARD:**  Yes, I understand.  Although I would

23   never say to the agent that I want him there so he could put

24   exhibit stickers on.  But I mean, so my view is one is enough.

25         **THE COURT:**  Well, let's do this.  I don't have a

1    problem with one case agent being at different times different

2    people.  So you could trade off, but I don't want both of them

3    in here at the same time.

4              **MR. HIGHSMITH:**  Understood.

5              **THE COURT:**  Okay.  All right.  Do you have -- I don't

6    want to spend a lot of time on this, but I did get a motion

7    from the defense this morning about asking for two days'

8    advance notice on the exhibits you're going to use.  Do you

9    have a response?

10             **MR. HIGHSMITH:**  I do, Your Honor.

11        I don't think that's necessary.  We've pared down the

12   exhibit list.  We've cut a couple hundred exhibits, and we've

13   also pared down the larger ones so they're just excerpts.

14        Here's what I propose.  What if we give the defense our

15   exhibits the day before, 24 hours before.  That way if he wants

16   he can object at 8:00 o'clock the next morning and we could

17   take care of that before the jury comes in.  But we can give

18   them our exhibits the day before, 24 hours before.  That seems

19   more reasonable to me.

20             **THE COURT:**  Twenty-four hours?

21             **MR. SHEPARD:**  Well, I appreciate 24 hours.  I would

22   say there's still a lot of exhibits.  They're very voluminous,

23   and, you know, there's no secret at this point, so why -- you

24   know, obviously if something changes dramatically and they need

25   to add something, fine, or subtract, fine, but what's the

JURY VOIR DIRE

1    secret?  Why not two days?

2              **THE COURT:**  Well, because it's a dynamic situation

3    and people are trying to get ready, and they may make some

4    changes.  Twenty-four hours is good enough.  That's what we'll

5    do.

6              **MR. HIGHSMITH:**  Thank you.

7              **THE COURT:**  Okay.

8         (A recess was taken from 9:06 a.m. to 9:24 a.m.)

9         (The venire enters the courtroom.)

10             **THE COURT:**  Please be seated.

11        Good morning, and welcome to the United States District

12   Court for the Northern District of California, San Francisco

13   Division.  I am Chief Judge Richard Seeborg, and I will be

14   presiding over the case for which you've all been summoned.  At

15   the outset, let me thank you very sincerely for responding to

16   your jury summons.  By doing so, you are fulfilling really one

17   of the highest obligations of American citizenship.

18        The role of a juror is fundamental to our country's

19   judicial system.  That system entitles parties to an impartial

20   jury to resolve the factual issues raised in a case.  In order

21   to obtain such a jury, we call persons throughout the area

22   which comprises this federal judicial district, which is known

23   as the Northern District of California.  These persons are

24   selected at random to assure that they represent a fair cross

25   section of the community.  It was this random process that

1    brought you here today.

2        I know when you got a jury summons you didn't say

3    "Halleluiah".  I understand that.  But it really is important

4    that all who are called make every effort to accept the

5    responsibility to serve.  It's only in this way will the

6    litigants in this court receive the trial which is so

7    fundamental to our judicial system.  So your willingness to

8    serve as jurors, it's not only appreciated by the Court and by

9    the parties in this particular case, but it really is necessary

10   in order for our judicial system to work.

11       Keep in mind there may be a day where you need the court

12   system for a case in which you're involved, and you would need

13   your fellow citizens to step forward and to serve as jurors.

14       I'm now going to ask our courtroom deputy, Ms. Corrine

15   Lew, to administer the oath of jury service to all of you.

16       **THE COURTROOM DEPUTY:**  Please stand and raise your

17   right hand.

18       (A venire was duly sworn.)

19       **THE COURTROOM DEPUTY:**  Please be seated.

20       **THE COURT:**  Ladies and gentlemen, the case for which

21   we are selecting a jury today is a criminal case entitled

22   United States of America versus Rowland Marcus Andrade.  We

23   very much appreciate that all of you filled out a questionnaire

24   in advance for us, and that should be very helpful in order to

25   streamline the selection process that we're embarked upon.

1      As I mentioned, this is a criminal case brought by the

2  United States government.  The defendant, Rowland Marcus

3  Andrade, has been charged with wire fraud and money laundering.

4  The government alleges that the defendant participated in a

5  scheme to defraud by making or agreeing with others who were

6  making false and misleading statements about AML Bitcoin, a

7  cryptocurrency he developed.  The government also alleges that

8  the defendant conducted a financial transaction with the

9  proceeds of the fraud scheme in order to conceal or promote the

10  scheme.  Mr. Andrade denies these charges.

11      Now, our best estimate is that the case will be in the

12  hands of the jury for deliberation no later than March 14th,

13  and we hope perhaps even earlier.  Once you have been selected

14  on the jury, each juror will receive a printed schedule, but in

15  the meantime let me just review it with you.

16      Today we will select a jury, a process I hope we can

17  accomplish by this afternoon.  We will then adjourn for the

18  day, and we will reconvene tomorrow, February 11th, and

19  starting that day and each day thereafter during the business

20  week, the trial will run from 8:30 in the morning to 1:30 in

21  the afternoon.  And we'll take two breaks along the way, two

22  breaks at least.  But they'll be short breaks.  We don't take a

23  lunch break, and the notion there is to try to get almost a

24  full trial day in but then give you the opportunity in the

25  afternoon to do the many other things in your life and for the

1  counsel to get ready for the following day and get organized

2  for that.

3      So as we won't be taking a lunch break you'll have some

4  snacks.  I can't tell you they're going to have a lot of

5  variety over time or be the best thing you ever had, but

6  they'll keep us going, I hope.  As I say, that way you'll have

7  the afternoon free for you.

8      That 8:30 to 1:30 schedule will continue throughout the

9  trial until closing arguments, instruction from me, legal

10  instruction, and the tendering of the case to the jury for its

11  deliberations.

12      Once the case is tendered to the jury, after all the

13  evidence has been presented, the lawyers have made their

14  arguments and I have provided the instructions to the jury, I

15  will then ask the jury to set a deliberation schedule within

16  certain parameters.  In other words, at that point -- it's down

17  the line -- but at that point the jury won't be confined to

18  8:30 to 1:30, so you can move with dispatch.  You'll be able to

19  deliberate through the entire day until 4:00 o'clock, when the

20  Court closes until you reach a verdict in the case.

21      So as noted before, the case for which we're selecting a

22  jury today is a criminal case.  The jury in this case will

23  consist of 12 jurors with four additional individuals serving

24  as alternates.  The four alternate jurors will listen to the

25  presentation of the entire case but will not join in the

1    deliberations unless they are required to substitute for one of

2    the 12 jurors in the event a juror is unable to serve further.

3    Of course, it goes without saying, all jury members must be

4    present for all sessions of the trial.

5         Now, before we go further, permit me to introduce to you

6    our court personnel.  As you have already learned, our

7    courtroom deputy is Corinne Lew.  She's always embarrassed in

8    the 15 years we worked together, but I say it every time, she

9    is the best in the business.  She will be in charge of getting

10   the jury situated and well taken care of.

11        Our court reporter today is Mr. Stephen Franklin, and he

12   will be with us at the outset, and then his colleague, Ana Dub,

13   will trade off with him as a court reporter.

14        My law clerks who will be assisting me in this case are

15   Katherine Hong, who is over to my right, and RJ Vogt, who is

16   out there somewhere.  There he is.  They're going to be coming

17   and going, so don't be surprised, because you'll see them

18   coming in and out of the trial.  They help me with this case

19   and all the other many cases that we have on our docket.

20        For those of you who have been called forward, and by that

21   I mean the 36 of you, and we call it in the box, I'm going to

22   be directing some questions to you.  Please raise your hand if

23   any of the people that have just been introduced to you are

24   known to you.

25        Okay.  Now permit me to introduce the individuals who will

1  be presenting this case to you.  First of all, Christian

2  Highsmith for the prosecution.  Mr. Highsmith, can you

3  introduce those who will be working with you.

4          **MR. HIGHSMITH:**  Thank you, Your Honor.

5      Good morning, everyone.  My name's Chris Highsmith.  This

6  is my colleague, David Ward, Matthew Chou.  We work at the

7  United States Attorney's Office here in San Francisco.  Let me

8  also introduce Special Agent Brendan Zarbin with the FBI here

9  in San Francisco.  He's the case agent on the case.  You'll

10  also see Tina Rosenbaum from my office tomorrow.  She will be

11  here in court and for the rest of the trial.  She's the

12  paralegal from our office.

13      Thank you, Your Honor.

14          **THE COURT:**  Again, for the 36 of you that have been

15  called forward, could you raise your hand if you know any of

16  the people that have just been introduced to you.

17      The defendant, Roland Marcus Andrade, will be represented

18  by Michael Shephard of the King & Spalding law firm.

19      Mr. Shepard, could you please introduce the people who

20  will be joining you at counsel table during this trial.

21          **MR. SHEPARD:**  Good morning.  I'm Mike Shephard.  With

22  me are my colleagues, Cindy Diamond, Dainec Stefan, Kerrie

23  Dent.  The other person at counsel table is the defendant,

24  Marcus Andrade.  We'll have a real assistant, Laurie Bardis

25  (phonetic) Callahan, who will be in and out during the trial.

1  We'll have a person helping us with the technology, Ed Jackson,

2  who will also be in and out during the trial.

3          **THE COURT:**  Thank you.

4      For the 36 of you, again, who have been called forward,

5  please raise your hand if you know any of the individuals who

6  have just been introduced.

7      I'm going to now ask Ms. Lew to pass out to you a list of

8  possible witnesses in this case.  It's a long list, and this is

9  not to say to you that all these people are going to

10  necessarily testify, but these are potential witnesses in this

11  case, and again, it's a long list, but what I'm going to ask

12  you to do, the 36 of you that have been called forward, is to

13  review this list, and at the end of that review, when you've

14  all told me you've had a chance to do it, the question is going

15  to be, do you know any of these people.  Some of the names may

16  be fairly common names.  If you don't know but you think you

17  might know, raise your hand and tell us, and then with the

18  assistance of counsel, we'll determine whether or not that is

19  indeed the person.  Oftentimes it's not, but we'll do that.

20      So I'll give you a few moments, because it is a relatively

21  long list, and at a certain point I'll ask if everybody's had a

22  chance to go through it.

23      Okay.  Has everybody had an opportunity to review the

24  list?  Anybody need more time?

25      Okay.  So please raise your hand if you think you know any

1   of the people on this list.  Okay.  We've got two.

2       Sir, on the front row here in the red shirt, who do you

3   think you might know?

4           PROSPECTIVE JUROR:  Two of these names are ringing

5   bells for me.  I can't place them.  Jack Abramoff is a name I

6   know I've heard, but I don't know why, and Chris Ray.  Again, I

7   know his name, and I think that one's going to come to me, but

8   I haven't got it yet.

9           THE COURT:  Okay.  Who can tell us, identify Mr. Ray?

10          MR. HIGHSMITH:  Mr. Ray is a defense witness.  He was

11  a lawyer.  Chris Ray used to be -- it's not the Chris Ray you

12  think.  Chris Ray used to be the head of the FBI, and it's not

13  the head of the FBI.

14          PROSPECTIVE JUROR:  Thank you.  That's it.

15          MR. HIGHSMITH:  I think Chris Ray is a lawyer from

16  Nevada.

17          THE COURT:  So that's probably not the person you've

18  heard.

19          PROSPECTIVE JUROR:  Probably not.

20          THE COURT:  And the other name, Mr. Abramoff, it's a

21  name you're going to hear in this case.  You think you've heard

22  it but you don't know the person, right?

23          PROSPECTIVE JUROR:  I think I've heard it in the news

24  related to some other kind of fraud-related case or something.

25          THE COURT:  Okay.  It's not someone you know?

JURY VOIR DIRE

1      **PROSPECTIVE JUROR:**  It's not someone I know, and I

2  don't know any specifics about it.

3      **THE COURT:**  Okay.  Thank you.

4      The gentleman in the blue.

5      **PROSPECTIVE JUROR:**  Eric Olsen is an individual I

6  went to college with.  I don't know if it's this Eric Olsen,

7  but the name is familiar.

8      **THE COURT:**  Okay.  Who knows anything about

9  Mr. Olsen?

10     **MR. SHEPARD:**  Well, Mr. Olsen is also a lawyer and

11  also in Nevada.

12     **THE COURT:**  Pardon?

13     **MR. SHEPARD:**  Also in Nevada.

14     **THE COURT:**  In Nevada.

15     **PROSPECTIVE JUROR:**  This doesn't sound like that

16  individual.

17     **THE COURT:**  Does not sound like him?

18     **PROSPECTIVE JUROR:**  Does not sound like him.

19     **THE COURT:**  Okay.  Very good.

20     Any other?  Great.  Good.

21     Okay.  As I noted earlier, we very much appreciate each of

22  you filling out the questionnaire, which it is our hope will

23  streamline the jury selection process.  What I'm going to do is

24  I'm going to follow up on some of the information you provided,

25  and we can pass for this purpose a microphone along.  And

JURY VOIR DIRE

```
 1  Ms. Lew, if you can hand that.  This is where, despite the fact
 2  that we're in Silicon Valley and supposedly have the best
 3  technology in the world, don't be surprised the microphone will
 4  probably not work at a certain point.  So just bear with us on
 5  this.
 6      So let me start, is it Mr. Tanner?
 7              PROSPECTIVE JUROR:  Mr. Samples, yes.
 8              THE COURT:  Mr. Samples, okay.  Tanner Samples?
 9              PROSPECTIVE JUROR:  That's right.
10              THE COURT:  Very good.  So let me get your
11  questionnaire.
12      Now, you live in Rohnert Park?
13              PROSPECTIVE JUROR:  Yes.
14              THE COURT:  It's a bit of a schlep.  You think could
15  make it here, you did today, make it here for a schedule that
16  contemplates 8:30 to 1:30?
17              PROSPECTIVE JUROR:  Yes.
18              THE COURT:  Okay.  Now let's see, you are a gig
19  laborer?
20              PROSPECTIVE JUROR:  Yes.
21              THE COURT:  What does that entail?
22              PROSPECTIVE JUROR:  I do production for events, like
23  concerts.
24              THE COURT:  Okay.  And all over the place?  Are you
25  traveling a lot, or ...
```

1    **PROSPECTIVE JUROR:**  I travel sometimes.  Always in

2    north Cal.

3    **THE COURT:**  You apprized us of some medical issues

4    for you.  We do take breaks about every hour, hour and a half.

5    About every hour and a half we'll take a break.  Would that

6    work for you?

7    **PROSPECTIVE JUROR:**  Yes.

8    **THE COURT:**  And let me also use this as an occasion

9    to say to the jury, jurors are permitted, if they want to stand

10   up once you're selected and the trial's underway, you can -- if

11   you want to stretch, stand up, stretch.  The lawyers know that,

12   not to get alarmed.  You can do that, because we want you to be

13   comfortable.  If you need a break, even though we take these

14   scheduled breaks, at any time a juror can raise their hand and

15   say they need a break, and we'll take a break.  So we'll try to

16   accommodate you in that regard.

17       You have told us that you have a friend, a close family

18   friend, that was a magistrate judge.  Is that right?

19   **PROSPECTIVE JUROR:**  That's true.

20   **THE COURT:**  Who is this person?

21   **PROSPECTIVE JUROR:**  Deborah Barnes.

22   **THE COURT:**  Not in our district, then.  It was

23   probably a different district, because that name doesn't ring a

24   bell.

25       Did you talk to Judge Barnes about her work?

1          **PROSPECTIVE JUROR:**  Sometimes.

2          **THE COURT:**  Okay.  Anything about that that you think

3    would affect your ability to be a fair and impartial juror?

4          **PROSPECTIVE JUROR:**  No.

5          **THE COURT:**  Okay.  Now, you answered a question that

6    is going to come up with many of the questionnaires.  This will

7    be the first time.  You're going to get tired of hearing me

8    talk about it, but it is question number 18, which talks about

9    law enforcement witnesses.  There are going to be law

10   enforcement witnesses in this case.  I think some FBI

11   witnesses, perhaps from other agencies.

12         Those witnesses are to be examined, assessed by the jury,

13   like any other witness.  They're not to be given more credit

14   because they're a law enforcement or more suspicion because

15   they're a law enforcement.  It's the job of the jury to listen

16   to the testimony, assess the credibility of the witness and

17   make the determination that they're going to make.

18         So right out of the box, what we want to make sure is

19   people will, even if they have a preconceived idea, would be

20   willing to follow my instruction that I'm telling the jury

21   you've gotta have an open mind.  The witness gets on the stand

22   and you base your conclusions on that witness' testimony and

23   any of the other evidence in the case.  That will be the

24   instruction.

25         Can you follow that instruction?

1          **PROSPECTIVE JUROR:**  No.

2          **THE COURT:**  Okay.  And it's just because you think

3    law enforcement witnesses are more likely to not tell the

4    truth?

5          **PROSPECTIVE JUROR:**  Yes.

6          **THE COURT:**  Okay.  And I will tell you you're not

7    supposed to do that, but you still don't think you could do it?

8          **PROSPECTIVE JUROR:**  Correct.

9          **THE COURT:**  Okay.  I want people to be honest.

10   That's the whole point of this process.

11        The -- another thing that's going to come up for several

12   people, and it comes up with Mr. Samples, many of you indicated

13   on your questionnaire that you have some ideas, opinions about

14   cryptocurrency.  We all have strong opinions about a lot of

15   things, and there's nothing wrong with people having opinions.

16   But this case is not going to be about whether or not you like

17   or don't like cryptocurrency.  What the case is going to be

18   about is the charges the government has brought, and the jury

19   is going to be tasked with determining whether or not the

20   government has proven -- the burden is always on the

21   government -- has proven the charges they brought against the

22   defendant beyond a reasonable doubt.

23        That's what the case is about.  It's not about

24   cryptocurrency.  So, in the sense that you're going to be asked

25   to make some decision on whether or not you think it's a good

1  or a bad thing.  So on that issue could you follow my

2  instructions?

3          **PROSPECTIVE JUROR:**  Yes.

4          **THE COURT:**  Okay.

5      Okay.  Can you pass the microphone over?  And our next

6  potential juror is Mr. Conde.

7          **PROSPECTIVE JUROR:**  Uh-huh.

8          **THE COURT:**  Okay.  Let me just make a note.

9      So let me get your questionnaire.  Mr. Conde, you tell us

10  that you're a program manager with PG&E?

11          **PROSPECTIVE JUROR:**  Correct.

12          **THE COURT:**  And actually there are several other

13  people in the jury pool who work for PG&E, so you may see

14  fellow colleagues here.

15      And what do you do as a program manager?

16          **PROSPECTIVE JUROR:**  Mostly build analytical

17  databases.

18          **THE COURT:**  And are you working in one particular

19  facility?  Virtually?  What do you do?

20          **PROSPECTIVE JUROR:**  I support a team that helps

21  ensure that the roads are possible to get to remote towers.

22          **THE COURT:**  And so -- and you're working in the field

23  or working in a --

24          **PROSPECTIVE JUROR:**  I mostly work from home.

25          **THE COURT:**  From home.

1    Okay.  Now, you answered a question which, like the law

2   enforcement question, I'm going to be bringing up a lot.  And

3   that is question number 21, which is:  Would you be able to

4   follow the instruction that a defendant has the right to remain

5   silent and does not ever need to present any evidence and

6   doesn't need to testify.  That is a core constitutional right

7   in this country.  It is a critical right that all of us share,

8   that if the government charges us with a crime, it is the

9   government's responsibility to prove beyond a reasonable doubt

10   that the person they've charged has committed a crime, and the

11   person that is charged never has to put on any evidence and has

12   a total right to remain silent.

13    So I'm going to be -- and several of you said, well, you

14   know, you're not so sure.  You want to hear from the defendant.

15   And my question is going to be if you now, as you understand,

16   know that I'm going to give the instruction that says you can't

17   hold it against the defendant if a defendant decides not to

18   testify, I need to know whether or not you could follow my

19   instruction.  So we'll start with you on that one, Mr. Conde.

20    **PROSPECTIVE JUROR:**  And your instruction is to what?

21    **THE COURT:**  Not hold -- if a defendant decides not to

22   testify, that defendant is exercising his or her constitutional

23   right, and you cannot hold it against that person, make a

24   negative inference based on the decision not to testify,

25   because it's the right of the defendant not to do it.  It's an

1  important constitutional right.

2         **PROSPECTIVE JUROR:**  Yeah.

3         **THE COURT:**  Can you follow that?

4         **PROSPECTIVE JUROR:**  Yes.

5         **THE COURT:**  Okay.  Now, you have alerted us that you

6  have, on the 14th of February you have a medical appointment.

7         **PROSPECTIVE JUROR:**  Correct.  It could be moved.

8         **THE COURT:**  On Friday the 14th.  We will be in trial

9  I anticipate on that day, but we'll end at 1:30.  Can you

10  accommodate that?

11        **PROSPECTIVE JUROR:**  Yeah, I can move it if necessary.

12        **THE COURT:**  Thank you very much.

13     You've also indicated you've done some investing, it looks

14  like, in crypto, and you have some thoughts about meme coins.

15     Can you effectively follow what I ask of you, which is,

16  you know, there,'s going to be a lot of evidence that involves

17  cryptocurrency, but will you follow my instruction that your

18  decision is not going to be you like or not like

19  cryptocurrency?

20        **PROSPECTIVE JUROR:**  Right.  I feel like I have an

21  understanding of what it is.

22        **THE COURT:**  Right.

23        **PROSPECTIVE JUROR:**  And can smell it when somebody's

24  being fishy with it, so ...

25        **THE COURT:**  Okay.  But you understand this trial is

JURY VOIR DIRE

```
 1  not, at the end of the day do you like crypto or do you not
 2  like crypto?  That's not going to be the question.
 3              PROSPECTIVE JUROR:  Yeah.
 4              THE COURT:  Okay.  Thank you.
 5       Okay.  If you could pass the microphone down to
 6  Ms. Palomares.
 7              PROSPECTIVE JUROR:  Yes, sir.
 8              THE COURT:  Welcome.
 9       So you are -- work at PG&E?
10              PROSPECTIVE JUROR:  Yes.
11              THE COURT:  And you're a workers' comp claims
12  assistant?
13              PROSPECTIVE JUROR:  Yes.
14              THE COURT:  You worked at PG&E for 22 years?
15              PROSPECTIVE JUROR:  Yes.
16              THE COURT:  Wow.  Where do you work?
17              PROSPECTIVE JUROR:  We work now in Oakland.
18              THE COURT:  Okay.
19              PROSPECTIVE JUROR:  From San Francisco to Oakland.
20              THE COURT:  Okay.  And are you working in a -- go
21  ahead.
22              PROSPECTIVE JUROR:  I'm working in the office.  I go
23  to Oakland every day.
24              THE COURT:  Oh, good.  You're like me.  I like coming
25  into the office.
```

1    **PROSPECTIVE JUROR:**  I don't like to work from home.

2    **THE COURT:**  No, you and me both.

3    You indicated that, you know, you have had some back

4    issues.  Another thing I can sympathize with you about.  And

5    you're unable to sit for long periods.  As I indicated before,

6    you will be perfectly entitled, if you're selected as a juror,

7    to get up and stretch in the midst of, you know, lawyers may be

8    asking a witness question.  Doesn't mean you can't stand up and

9    stretch, and we will be taking the breaks.  So do you think

10   that will work?

11   **PROSPECTIVE JUROR:**  That will work.

12   **THE COURT:**  Okay.  Now, again, going back to the

13   question about law enforcement witnesses, you indicated that

14   you might, you know, favor that.  You'd say it might be more

15   likely to believe their testimony because they're law

16   enforcement.  As I say, I'm going to instruct you that when a

17   witness hits the stand, law enforcement or otherwise, you're

18   just to assess that witness like any other, and if they

19   identify themselves as law enforcement, that doesn't, doesn't

20   translate into, I'm gonna give that witness more believability

21   or I'm gonna give that witness less believability just because

22   they're law enforcement.

23   Can you follow my instruction?

24   **PROSPECTIVE JUROR:**  Yes.

25   **THE COURT:**  Thank you.

1    Going back to the question we just went over, the right

2    not to testify.  You had indicated, you know, some preference

3    for hearing from the defendant.  Again, I'm going to, in no

4    uncertain terms, I'm going to tell you if you're a juror that

5    you are not to hold it against the defendant if a defendant

6    decides not to testify.  Can you follow that instruction?

7    **PROSPECTIVE JUROR:**  Yes, I can.

8    **THE COURT:**  Okay.  I alluded to the fact, and I will

9    again many times, that it is the government that has the burden

10    to prove the defendant guilty beyond a reasonable doubt.  And

11    I'll give you, give the jury an instruction about reasonable

12    doubt, but I want to make sure that you're comfortable with the

13    fact that it's the burden of the government, never the burden

14    of the defendant, it's the government's burden to prove this

15    case at the level that I will give you some explanation on how

16    that level works, reasonable doubt.

17    Can you follow that?

18    **PROSPECTIVE JUROR:**  Yes, I can.

19    **THE COURT:**  Okay.  Great.  Thank you.

20    If you could pass the microphone down.  Is it Mr. Villa?

21    **PROSPECTIVE JUROR:**  Yes.

22    **THE COURT:**  Okay.  Let me get your questionnaire.

23    So you have told us that you are an ice cream maker?

24    **PROSPECTIVE JUROR:**  Yes.

25    **THE COURT:**  For Mitchell Ice Creams?

JURY VOIR DIRE

1          **PROSPECTIVE JUROR:**  Yes.

2          **THE COURT:**  Boy, you'll be a very popular juror if

3   you're selected on the jury.

4       And where is that located?

5          **PROSPECTIVE JUROR:**  It's in the city.

6          **THE COURT:**  In San Francisco?

7          **PROSPECTIVE JUROR:**  Yeah, it's in San Francisco.

8          **THE COURT:**  Oh, great.

9       So going to that question about law enforcement that we've

10  been talking about.  You have some skepticism about law

11  enforcement witnesses.  You have now heard me more than you

12  probably like say you're to assess those witnesses like any

13  other.  Could you do that?

14         **PROSPECTIVE JUROR:**  Yeah, I can.

15         **THE COURT:**  Good.  Again, on the issue of the

16  defendant's right, constitutional right not to testify, it's

17  going to be very clearly instructed to the jury that they are

18  not to hold it against the defendant if the defendant decides

19  not to testify.  Can you follow that instruction?

20         **PROSPECTIVE JUROR:**  Yes.

21         **THE COURT:**  Okay.  All right.  There is a question on

22  the questionnaire about the particular cryptocurrency that's

23  going to be discussed in this case, two of them, AML Bitcoin or

24  ATEN Coin, and you indicated that you thought you had heard of

25  those entities.  Could you tell us a little more about that?

1    **PROSPECTIVE JUROR:**  Well, you know, I just heard of

2    like -- I'm not sure if it's the right Bitcoin.  I'm not sure

3    if there are different types of Bitcoin or anything.

4    **THE COURT:**  I see.  You may have heard about it, but

5    you --

6    **PROSPECTIVE JUROR:**  I do know about like the Bitcoin,

7    cryptocurrency, stuff like that, yeah.

8    **THE COURT:**  Now, you're one of the potential jurors,

9    and we've had many others, that have indicated some skepticism

10    about cryptocurrency, and you're perfectly entitled to have

11    views that you have.  Are you comfortable with what I explained

12    at the beginning, that the question in this case is not going

13    to be whether or not you like or dislike, trust or not trust

14    cryptocurrency.  It's going to be about the charges that the

15    government is bringing in this case and whether or not they've

16    proved those charges.

17    So I'm not asking you to change your views or do anything

18    like that, but I want to make sure that you're comfortable with

19    the understanding that this case is not going to be whether or

20    not you think cryptocurrency is good or bad.  You understand?

21    **PROSPECTIVE JUROR:**  Yeah, I do understand that.

22    **THE COURT:**  Okay, thank you.  If you could pass the

23    microphone down to, is it Mr. Altamirano?

24    **PROSPECTIVE JUROR:**  Yes.

25    **THE COURT:**  Did I get close?  Is that right,

1    Altamirano?

2                **PROSPECTIVE JUROR:**  Spot on.

3                **THE COURT:**  So you are a manager for Del Monte

4    Electric?

5                **PROSPECTIVE JUROR:**  Correct.

6                **THE COURT:**  Where is that located?

7                **PROSPECTIVE JUROR:**  In Dublin.

8                **THE COURT:**  Dublin.

9        Okay.  And you live in San Ramon, which is a ways away,

10   but reachable.

11       In particular as a project manager, what kind of projects

12   are you working on?

13               **PROSPECTIVE JUROR:**  Mainly medical facilities.  Also

14   educational.

15               **THE COURT:**  And are you traveling around or in an

16   office building?

17               **PROSPECTIVE JUROR:**  I'd say 90 percent in the office

18   at Dublin.

19               **THE COURT:**  In Dublin.

20       Okay.  Now, you had indicated some skepticism about law

21   enforcement witnesses.  Now having heard our discussion, do you

22   think you could assess a law enforcement witness like any

23   other?

24               **PROSPECTIVE JUROR:**  Yes.

25               **THE COURT:**  Okay.  You had indicated in answer to the

JURY VOIR DIRE

1    question about -- the question was number 24.  It's:  Do you

2    have any religious, political, philosophical or moral views

3    that would make it difficult or inappropriate for you to serve

4    as a juror in a criminal case which requires you to judge a

5    person's guilt, and you indicated that you did.  So can you

6    give me a little more information about that?

7                 **PROSPECTIVE JUROR:**  Just general skepticism.  Just

8    not a very trusting person.

9                 **THE COURT:**  Okay.  Trust but verify sort of thing?

10   Are you the sort of person that even if you have some

11   skepticism going into a process, if evidence is presented to

12   you are you comfortable at the end of that process if it

13   satisfies you to come to a judgment?

14                **PROSPECTIVE JUROR:**  Yeah, absolutely.

15                **THE COURT:**  Okay.  All right.  You had some -- you

16   did some cryptocurrency investing?

17                **PROSPECTIVE JUROR:**  Not really.  I like downloaded an

18   app at one point.

19                **THE COURT:**  Okay.  Now, you had some views about

20   those involved in the crypto business.  Do you think you can

21   focus just on the evidence in this case, come to your

22   conclusions based on that evidence you hear in the courtroom

23   and not some preconceived notion that you may have about that

24   business?

25                **PROSPECTIVE JUROR:**  Yes, I think so.

1    **THE COURT:**  Okay.  Thank you.  Pass on the

2  microphone.

3    Is that Mr. Jaggavarapu?  Thank you.

4    Okay.  Let's see what we have here.  You are an

5  information technology official at Oracle?

6    **PROSPECTIVE JUROR:**  Yes.

7    **THE COURT:**  For six years.  And do you go into the

8  office?

9    **PROSPECTIVE JUROR:**  Yes.

10    **THE COURT:**  Okay.  Is that down in Sunnyvale?

11    **PROSPECTIVE JUROR:**  No, it's in Pleasanton.

12    **THE COURT:**  And you live in Freemont, which is a bit

13  of a distance?

14    **PROSPECTIVE JUROR:**  Yes.

15    **THE COURT:**  We do start at 8:30 in the morning, go to

16  1:30.  Could you make that work?

17    **PROSPECTIVE JUROR:**  Yes.

18    **THE COURT:**  Okay.  Thank you.

19    Going to question number 21, the defendant's right not to

20  testify.  Do you think you can follow my instruction?

21    **PROSPECTIVE JUROR:**  I think so.

22    **THE COURT:**  Okay.  With respect to cryptocurrency,

23  you said you've made a nominal investment.  Did that have any

24  effect on your ability to serve as a juror in a case where

25  there's some discussion about cryptocurrency?

1      **PROSPECTIVE JUROR:**  No, not at all.

2      **THE COURT:**  Okay.  Thank you.  You can pass on the

3  microphone.  Mr. Fluty.

4      **PROSPECTIVE JUROR:**  Yes, sir.

5      **THE COURT:**  All right.  Welcome.

6      So you are at an entity called, if I'm reading it right,

7  SKSS Enterprises?

8      **PROSPECTIVE JUROR:**  Correct.

9      **THE COURT:**  For the last 10 months.  What do they do?

10      **PROSPECTIVE JUROR:**  They are the owners of a

11  franchise store for UPS.

12      **THE COURT:**  For UPS?

13      **PROSPECTIVE JUROR:**  Uh-huh.

14      **THE COURT:**  Do you work in the store?

15      **PROSPECTIVE JUROR:**  Yes, sir.

16      **THE COURT:**  Okay.  And where is that one located?

17      **PROSPECTIVE JUROR:**  Oakland, California.

18      **THE COURT:**  And you're living in Byron, which, remind

19  me where Byron is located?

20      **PROSPECTIVE JUROR:**  Byron is located in between Tracy

21  and Stockton.

22      **THE COURT:**  Wow.  That's a long way.  In fact, I'm

23  not even sure that's in our judicial district.  That could be

24  the Eastern District of California.  That's a long way.

25      **PROSPECTIVE JUROR:**  Hours away.

1      **THE COURT:**  Yes.  8:30 to 1:30, would that be a

2  problem for you?

3      **PROSPECTIVE JUROR:**  It wasn't a problem today, but if

4  I had proper timing, if I was picked I'd be able to make the

5  time no problem.

6      **THE COURT:**  Okay.  Well, I appreciate that very much.

7  Let me ascertain while we're in the process.  Ms. Lew.

8      **THE COURTROOM DEPUTY:**  Yes.

9      **THE COURT:**  Can you ask the jury office whether or

10  not Byron, California, is within our district?

11      **THE COURTROOM DEPUTY:**  I will.

12      **THE COURT:**  I've been at this for a while; I should

13  know every town in our district.

14      Okay.  You had answered the question number 23, which is

15  an interesting one.  The defendant, witnesses or lawyers in

16  this case may be of a different race, color, religious belief,

17  national ancestry, sexual orientation, gender identity, gender

18  or economic circumstances from you.  You will be instructed

19  that you should not be influenced by any of these factors.  Do

20  you believe that you will be influenced by any of these

21  factors?

22      **PROSPECTIVE JUROR:**  No, sir.

23      **THE COURT:**  Okay.  The question, question 25 was:

24  Have you seen, read or heard anything about this case

25  specifically or the allegations in the case, and you indicated

1    that maybe you had.

2            **PROSPECTIVE JUROR:**  Maybe I may have heard about a

3    very similar case in passing, but the finer details are lost on

4    me at the moment.

5            **THE COURT:**  Okay.  How about with respect to the

6    particular crypto, some of the crypto entities that may be

7    discussed, AML Bitcoin or ATEN Coin?

8            **PROSPECTIVE JUROR:**  No, sir.

9            **THE COURT:**  Okay.  Oh, it is; you're in Contra Costa

10   County.  So that is part of our district.

11       Let's go back to just the time involved.  You think you

12   could do it.

13       I might pause and say to the jury, potential jurors, I do

14   really mean it about 8:30 to 1:30, and that's actually for you

15   who get selected, in addition for us, but primarily for you.  I

16   want you to know that you've got a time to start and a time to

17   end, and I'm not going to ask you to -- I'm not going to do

18   what you are probably scared will happen, which is we'll get to

19   1:30 and it will be, oh, you know, can't we just finish this

20   witness in another half hour or something like that.

21       The lawyers know that we're not going to do that, and I

22   make a commitment to you to -- certainly until it's

23   deliberation time, to do the 8:30 to 1:30.

24       At the beginning of the day we really want people to get

25   here so we can get started, because if we start to lose time

JURY VOIR DIRE

1   that prolongs the process.  So that's why I ask those

2   questions.

3        You also had indicated some, you know, preconceived ideas

4   about crypto.  Do you think you can approach this case based on

5   the idea that your verdict is going to be based on the evidence

6   that's presented in this case, not things you've heard outside

7   the courtroom, or not, you know, some ideas, opinions you have,

8   but focused on the evidence and the witnesses presented to you

9   in this case.  Can you do that?

10            **PROSPECTIVE JUROR:**  Yes, sir.

11            **THE COURT:**  Okay.  Thank you.

12        We can pass now the microphone all the way to the front.

13   And we'll go to Ms. Proctor, is it?  Am I right, Ms. Proctor?

14            **PROSPECTIVE JUROR:**  Yes.

15            **THE COURT:**  So, Ms. Proctor, you are working in

16   continuing education of the Bar, the lawyers?

17            **PROSPECTIVE JUROR:**  Yes.

18            **THE COURT:**  And you're the managing editor of a legal

19   news service?

20            **PROSPECTIVE JUROR:**  Yes.

21            **THE COURT:**  Which news service is that one?

22            **PROSPECTIVE JUROR:**  It's the news service of CEB, and

23   a previous job I was a beat reporter covering the Northern

24   District of California and the Ninth Circuit.

25            **THE COURT:**  Really?  So you've been in these

1  courtrooms quite a bit?

2      **PROSPECTIVE JUROR:**  I know this building pretty well,

3  yeah.

4      **THE COURT:**  How many years did you do that?

5      **PROSPECTIVE JUROR:**  I did that for two years, and I

6  left that job about nine years ago.

7      **THE COURT:**  Which news service were you with?

8      **PROSPECTIVE JUROR:**  Courthouse News Service.

9      **THE COURT:**  Okay.  Yeah.  Certainly see your

10 colleagues in the building.

11     That gives you a lot of information about the legal

12 system, and in particular the federal legal system, because

13 you've been here.  Do you think that would impact your ability

14 to be a fair and impartial juror?

15     **PROSPECTIVE JUROR:**  No.

16     **THE COURT:**  Now, you have told us that you had a

17 sister-in-law that worked as a public defender in three of the

18 counties of California.  Do you talk to her about her work?

19     **PROSPECTIVE JUROR:**  Yes.

20     **THE COURT:**  And do you think, you know, that she's

21 obviously doing criminal work if she's a public defender, do

22 you think anything about those discussions would have an impact

23 on your ability to be fair and impartial as a juror in this

24 case?

25     **PROSPECTIVE JUROR:**  No.

JURY VOIR DIRE

```
1              THE COURT:  Now, you indicated that you've got some
2   travel out of the state on March 7th.  When the jury is
3   impaneled, I told you you're going to get a schedule, and what
4   that schedule will show is that on March 6th and 7th the Court
5   is -- we're not going to have jury proceedings during those
6   days.
7              PROSPECTIVE JUROR:  Okay.
8              THE COURT:  So when are you coming back from your
9   travel?
10             PROSPECTIVE JUROR:  Around the 15th.
11             THE COURT:  Okay.  So that's Friday to, what's the
12  following day?
13             PROSPECTIVE JUROR:  I believe it's the following
14  Saturday is the 15th.
15             THE COURT:  So you're out for a week?
16             PROSPECTIVE JUROR:  Yes, Your Honor.
17             THE COURT:  Okay.  All right.  Sure you don't want to
18  change your plans?  It's very interesting to meet you.  You
19  have so much experience.  You want to see one, you know?
20        Okay.  Okay.  Thank you.  If you could pass the microphone
21  along.
22        Ms. Guo?
23             PROSPECTIVE JUROR:  Yes.
24             THE COURT:  Okay.  Ms. Guo, and you are at Peking
25  Handy Craft for about five years, and you're a packaging
```

1  coordinator?

2          **PROSPECTIVE JUROR:**  Yes.

3          **THE COURT:**  What kind of product do they ...

4          **PROSPECTIVE JUROR:**  Bedding.

5          **THE COURT:**  What?

6          **PROSPECTIVE JUROR:**  Bedding, like a quilt or

7  comforter.

8          **THE COURT:**  And where is their facility located?

9          **PROSPECTIVE JUROR:**  The facility?  In South San

10  Francisco.  I work from home.

11          **THE COURT:**  From home, and you live in Alameda?

12          **PROSPECTIVE JUROR:**  Yes.

13          **THE COURT:**  So you indicated in the question about

14  the burden of proof, and that question, just to remind you, is

15  that I will instruct you that the government has the burden to

16  prove guilt beyond a reasonable doubt, and that the defendant

17  is presumed innocent until proven guilty.  And the question was

18  if selected as a juror, would you follow the Judge's

19  instruction without looking to the defendant to prove the

20  defendant's own innocence, and you said maybe.

21      Now that you've heard the discussion we've had thus far,

22  the instruction will be that it's the government's burden to

23  prove guilt beyond a reasonable doubt, and the presumption of

24  innocence remains with the defendant unless and until the

25  government is able to do that.  Can you follow that

1  instruction?

2         **PROSPECTIVE JUROR:**  My counter is I'm not an English

3  speaker, so I don't know if I can fully understand.

4         **THE COURT:**  I see.  Well, you're having no difficulty

5  understanding my questions so far.  Do you think it would be a

6  problem for you if there are exhibits presented, written

7  English?  Can you read and speak English at a certain level of

8  comfort?

9         **PROSPECTIVE JUROR:**  Yes.

10        **THE COURT:**  Okay.  So going back to the reasonable

11  doubt question, do you think you could follow my instruction

12  that it's -- the government's gotta prove its case against the

13  defendant?

14        **PROSPECTIVE JUROR:**  Yes.

15        **THE COURT:**  Okay.  Thank you.  If you could pass the

16  microphone.

17     And is it Mr. Hui?  Okay.  Thank you.  And you are

18  working -- doing restaurant work?

19        **PROSPECTIVE JUROR:**  I'm currently unemployed.  That's

20  what I was doing like in high school.

21        **THE COURT:**  Oh, okay, and that was when you were

22  working in San Ramon in the sushi restaurant?

23        **PROSPECTIVE JUROR:**  Yeah.

24        **THE COURT:**  Okay.  And so right now you're looking

25  for work?

JURY VOIR DIRE

1            PROSPECTIVE JUROR:  Yes.

2        THE COURT:  Okay.  You live in San Ramon?

3            PROSPECTIVE JUROR:  Correct.

4        THE COURT:  Okay.  And any problem with the 8:30

5    schedule?

6            PROSPECTIVE JUROR:  I can manage.

7        THE COURT:  Okay.  Anything so far in our discussion

8    that -- you know I've asked lots of questions about the ability

9    to follow instructions, cryptocurrency and the like.  Anything

10   occur to you that you would want to tell us?

11           PROSPECTIVE JUROR:  I said it in the questionnaire,

12   but besides not knowing a lot of cryptocurrency, not really.

13       THE COURT:  Okay.  Thank you.  You can pass the

14   microphone.

15       All right.  And it's -- is it Ms. Navarra?

16           PROSPECTIVE JUROR:  That's correct.

17       THE COURT:  Okay.  And Ms. Navarra, you live in

18   Concord?

19           PROSPECTIVE JUROR:  Yes.

20       THE COURT:  You work at Kaiser Permanente?

21           PROSPECTIVE JUROR:  Yes.

22       THE COURT:  As an RN?  Oh, great.  Thank you for

23   doing that.

24       Concord is a bit away, could you do an 8:30 to 1:30

25   schedule?

1    **PROSPECTIVE JUROR:**  Maybe.  Because I have a

2    14-year-old.

3        **THE COURT:**  Yes.

4        **PROSPECTIVE JUROR:**  I have to take him to school in

5    the morning.  But my husband is also a nurse, and he works

6    nights, so today I had to tell him to come home early so I'll

7    be here on time.

8        **THE COURT:**  I see.

9        So as this case would go forward, and it would be, as we

10   discussed, a couple weeks, could you make arrangements for your

11   son to come and go and have somebody to take care of him?

12       **PROSPECTIVE JUROR:**  Yeah, I can.

13       **THE COURT:**  You can?  Oh, great.  Well, thank you.

14       Now, you indicated in answer to one of the questions, the

15   one about religious, political, philosophical beliefs, that you

16   have strong religious beliefs.  Do you think you could serve as

17   a juror in the sense that you will be asked to come to a

18   judgment on the guilt or innocence of another person?  Can you

19   do that?

20       **PROSPECTIVE JUROR:**  Yes.

21       **THE COURT:**  You can?

22       Okay.  I know you're -- going back again to your schedule.

23   I know hospitals and RNs are in short supply, and it would be

24   tough to, you know, to serve.  That said, do you think you

25   could make it work with your job?  We talked about your

1  14-year-old, but how about your job?  Can you do it?

2          **PROSPECTIVE JUROR:**  Um, I just have to let them know

3  that I have jury duty.  Actually today's my day off, and I'm

4  working for Tuesday, Wednesday and Thursday.

5          **THE COURT:**  I see.

6      Would it help the 1:30 schedule?  Can you, if you have the

7  afternoon, can you do some work in the afternoon?  Doesn't have

8  to be work.  Maybe other things.  But does that help at all?

9          **PROSPECTIVE JUROR:**  Yes.

10          **THE COURT:**  Okay.  Thank you.  You can pass the

11  microphone along.

12      And this is Ms. Detjencreson?  Is it close?

13          **PROSPECTIVE JUROR:**  Detjencreson, so close.

14          **THE COURT:**  Thank you for bearing with my

15  pronunciation there.

16      And you were in landscaping?

17          **PROSPECTIVE JUROR:**  Yeah, I'm a gardener and

18  landscape designer.

19          **THE COURT:**  Oh, great.

20      And you're working in a particular project?  It says

21  marina motel.

22          **PROSPECTIVE JUROR:**  I do that, too.  That's like my

23  family's business.

24          **THE COURT:**  Oh, I see.

25          **PROSPECTIVE JUROR:**  But I work for a company in San

JURY VOIR DIRE

1    Francisco.

2              **THE COURT:**  Are you out and about in the field?

3              **PROSPECTIVE JUROR:**  Yeah.

4              **THE COURT:**  Now, you live in the city, which is good.

5              **PROSPECTIVE JUROR:**  Uh-huh.

6              **THE COURT:**  You told us that you live with someone

7    who is a law student?

8              **PROSPECTIVE JUROR:**  Yes.

9              **THE COURT:**  And right down the street at UC Law.

10             **PROSPECTIVE JUROR:**  Yes.

11             **THE COURT:**  And do you talk about ...

12             **PROSPECTIVE JUROR:**  For sure.

13             **THE COURT:**  You do?

14        Okay.  Do you think if you were selected as a juror -- and

15   I will tell the jury that they are not to consider anything

16   they hear outside the courtroom.  Certainly not talk to people

17   about the case or anything along those lines, do any research,

18   anything like that.  You're going to be told "do not do that."

19   That's going to be probably very frustrating if you've got

20   somebody in your household that would actually be interested in

21   all of this.

22        Do you think you could follow the instruction that while

23   you're a juror, you can't talk about it?  You can talk about it

24   after you've finished your service.  Do you think you could

25   follow that?

JURY VOIR DIRE

1    **PROSPECTIVE JUROR:**  It would be hard, but, yes, I

2    will follow that.

3    **THE COURT:**  Thanks.

4    You have some law enforcement in your family.  A sheriff,

5    so that's a kind of state law enforcement as opposed to

6    federal.  But you said you could judge law enforcement

7    witnesses like any other.  Is that true?  Is that correct?

8    **PROSPECTIVE JUROR:**  Yes.

9    **THE COURT:**  Okay.  Now, you -- the questions that

10   were about cryptocurrency.  You had, you know, you had some

11   strong views about cryptocurrency, but you ended the written

12   portion that you provided to us that you can keep an open mind

13   about it.

14   **PROSPECTIVE JUROR:**  Yes.

15   **THE COURT:**  And you could make that commitment to me?

16   **PROSPECTIVE JUROR:**  Uh-huh.

17   **THE COURT:**  That's all I can ask.

18   You indicated that you would appreciate the opportunity

19   were you impaneled on the jury to have a notepad.  You could

20   take notes in the jury.  You will get a notepad.

21   **PROSPECTIVE JUROR:**  Okay.

22   **THE COURT:**  I'll give you some instructions about

23   notes and taking notes, but you can use it for taking notes or

24   for doodling.  It's up to you.  So, okay.

25   **PROSPECTIVE JUROR:**  Thank you.

1          **THE COURT:**  All right.  Thanks.

2      If you could pass the microphone along to Ms. Lavigne.  Is

3  that right?

4          **PROSPECTIVE JUROR:**  Lavigne.

5          **THE COURT:**  Lavigne, thank you.

6      So your questionnaire tells us that you work for the

7  federal government.

8          **PROSPECTIVE JUROR:**  I did.

9          **THE COURT:**  You did.  What did you do for the federal

10  government?

11          **PROSPECTIVE JUROR:**  Administrative assistant.

12          **THE COURT:**  For what?

13          **PROSPECTIVE JUROR:**  For the -- well, for -- I worked

14  for the Army and for the Air Force.

15          **THE COURT:**  Oh.  Was that here in this area or

16  somewhere else?

17          **PROSPECTIVE JUROR:**  Sunnyvale.

18          **THE COURT:**  Hmm.  And are you now retired from --

19          **PROSPECTIVE JUROR:**  I'm now retired, yes.

20          **THE COURT:**  Okay.  Was there a law enforcement part

21  of the military, or were you in the other part?

22          **PROSPECTIVE JUROR:**  No, I was in -- we flew

23  satellites.

24          **THE COURT:**  Oh, interesting.

25      On the law enforcement question, you said you might be

1  more likely to believe the testimony of a law enforcement

2  witness.  Not to belabor the point, but you now know what

3  you'll be told if you're a juror.  Can you follow that

4  instruction?

5            PROSPECTIVE JUROR:  Yes, I can.

6            THE COURT:  Okay.  On the question about the

7  defendant's right to testify, you've now heard a great deal

8  about it.  Knowing now that that is a constitutional right that

9  every one of us has and the defendant in this case has, so can

10  you respect that right?

11           PROSPECTIVE JUROR:  Yes, I can.

12           THE COURT:  Okay.  You sound like you'll do it if

13  you're asked, but it's a -- you know, I want to make sure it's

14  sincere, that, you know, it is what you're going to be told.

15           PROSPECTIVE JUROR:  I do understand it's his right.

16           THE COURT:  Okay.  That's good.

17     Okay.  You have some views about people in crypto.  Do you

18  think you can come in with an open mind in this case as a

19  juror, base your verdict on the evidence that's presented in

20  this courtroom and not on any kind of preconceived ideas about

21  this business or any other issues?  Do you think you can do

22  that?

23           PROSPECTIVE JUROR:  Yes.

24           THE COURT:  Okay.  Thank you.  If you could pass the

25  microphone along to Mr. Vestrich-Shade.

JURY VOIR DIRE

1    Is that right?

2            **PROSPECTIVE JUROR:**  Correct.

3            **THE COURT:**  Okay.  And you are coming to us from the

4    city?

5            **PROSPECTIVE JUROR:**  Yes.

6            **THE COURT:**  Makes it easy.

7        And you're at JPMorgan working in financial services?

8            **PROSPECTIVE JUROR:**  Yes, I'm an investment banker.

9            **THE COURT:**  Investment banker.  And how long have you

10   been doing that?

11           **PROSPECTIVE JUROR:**  Eight years for JPMorgan.

12           **THE COURT:**  8:30 to 1:30, could you do that?

13           **PROSPECTIVE JUROR:**  It's very difficult with the

14   schedule, but, yes.  I have to travel for work pretty often,

15   too.

16           **THE COURT:**  Anything you know preplanned for --

17           **PROSPECTIVE JUROR:**  Supposed to be traveling to New

18   York tonight for two days.  Supposed to be in Salt Lake City

19   next week.  Often travel comes up out of state on short notice.

20           **THE COURT:**  Okay.  Knowing that if you are selected

21   as a juror, the travel's gonna obviously have to be

22   rescheduled, can you do that?

23           **PROSPECTIVE JUROR:**  I think it would be difficult

24   with work, but I can -- I mean, I hope that my employer will be

25   respectful.

1      **THE COURT:** I'm hoping JPMorgan will understand.

2  They are customers of this building from time to time.

3      Okay. You are in the financial world, so you have, not

4  surprisingly, views about things like cryptocurrency. Can you

5  put those -- can you put your views aside in the sense, you can

6  keep your views, that's your right, but can you put any

7  preconceived notions about that business aside and focus on

8  what you hear in this courtroom about the evidence in this

9  case, which will involve some aspects of cryptocurrency? Can

10 you do that?

11     **PROSPECTIVE JUROR:** I'm being honest, I think it

12 would be very difficult to separate, Your Honor.

13     **THE COURT:** Okay. And that's because you have -- you

14 have some preconceived notions about those that were involved

15 in the business?

16     **PROSPECTIVE JUROR:** Yeah. I think it's very hard for

17 me to fully separate.

18     **THE COURT:** Okay. You know I'm going to ask the

19 follow-up question. Recognizing that it's hard, do you think

20 you could do it?

21     **PROSPECTIVE JUROR:** I would do my best, yes.

22     **THE COURT:** Okay. Okay. Thank you.

23     Now we'll go all the way to the front here. And so now

24 we've moved to, is it Mr. Salah?

25     **PROSPECTIVE JUROR:** That's correct.

1    **THE COURT:**  All right.  And let me get your

2  questionnaire.

3    You're coming to us from San Bruno?

4    **PROSPECTIVE JUROR:**  Yes.

5    **THE COURT:**  And you're a physician at Palo Alto's

6  Medical Foundation, which used to be where I had my doctor, a

7  fellow named Thomas Whisler.  I don't know if you remember him;

8  he's retired.

9    **PROSPECTIVE JUROR:**  Before my time.  Sorry.

10    **THE COURT:**  It's always bad when your doctor retires.

11  Then you sorta say bad stuff here.

12    So what kind of work do you do as a physician?

13    **PROSPECTIVE JUROR:**  I do palliative care and Hospice

14  medicine.

15    **THE COURT:**  Are you at the facility in Palo Alto?

16    **PROSPECTIVE JUROR:**  No, I work at Mills Peninsula in

17  Burlingame Hospital, and I do a lot of home calls, and our

18  clinic is in San Mateo.

19    **THE COURT:**  I see.  Okay.  So you're moving around in

20  the area quite a bit.

21    **PROSPECTIVE JUROR:**  I'm moving a lot, yeah.

22    **THE COURT:**  8:30 to 1:30, could you make that work?

23    **PROSPECTIVE JUROR:**  I mean, the time, yes.  The

24  prolonged period of time that the trial might go through, it's

25  no inconvenience to me, but to my patients it's more than an

 1  inconvenience.

 2          THE COURT:  Yeah.  Yeah.

 3      Could you do some -- would having 1:30 to the end of the

 4  day help?

 5          PROSPECTIVE JUROR:  No, it's a full-day schedule.

 6          THE COURT:  Okay.  Now, you had indicated about the

 7  law enforcement question, about law enforcement witnesses, that

 8  you have some skepticism about them.  You've now heard what

 9  I'll ask of you.  Do you think you can follow the instruction

10  to treat a law enforcement witness like any other?

11          PROSPECTIVE JUROR:  Honestly, in the recent past my

12  mother was involved in a lawsuit that involved the City's

13  police department and so I have a very hard time saying "yes"

14  to that question.

15          THE COURT:  Would it matter to you at all that the --

16  counsel can correct me if I'm wrong, but it wouldn't be police

17  law enforcement witnesses.  This case will have FBI agents and

18  perhaps some other federal agencies, I don't know, but not

19  police officers.  Would that make a difference?

20          PROSPECTIVE JUROR:  Maybe.  Yeah, I guess that makes

21  a difference.

22          THE COURT:  And circling back to the basic question.

23  Let's say an agent, FBI agent, gets on the stand in this case.

24  Could you look at that witness like any other?  In other words,

25  okay, I don't know anything about this person.  I'm going to

1  judge their testimony based on the testimony and the evidence

2  that's presented.  Not, okay, I don't believe him because he's

3  an agent, or I do believe him because he's an agent.  Can you

4  not do that and just base it on the evidence?

5           PROSPECTIVE JUROR:  I would do my best, yes.

6           THE COURT:  Okay.  Thank you.  You can pass it along.

7      Okay.  So let me go to, is it Mr. Wu?

8           PROSPECTIVE JUROR:  Yes, sir.

9           THE COURT:  All right.  Mr. Wu.  Let me get your

10 questionnaire.  And you are coming from Pleasanton?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Which is a bit of a distance.

13     And you work at Altis Labs as a scientist?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  And what does that involve?  What kind of

16 work are you doing?

17          PROSPECTIVE JUROR:  It's a drug development.  We are

18 the biotech staff, so my job is to deliver the results to, you

19 know, facilitate the program.

20          THE COURT:  Are you working in a laboratory?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Okay.  And where is that one located?

23          PROSPECTIVE JUROR:  Redwood City.

24          THE COURT:  Redwood City.

25     The question that was asked about the burden of proof and

1  the government's burden to prove beyond a reasonable doubt

2  before it would be appropriate to find a guilty verdict, do you

3  think you could follow that?

4          **PROSPECTIVE JUROR:**  Yes.

5          **THE COURT:**  Okay.  8:30 to 1:30, could you make that

6  work?

7          **PROSPECTIVE JUROR:**  I think so.

8          **THE COURT:**  Okay.  Thank you.

9      Let's now go to, is it Ms. Chapman?

10          **PROSPECTIVE JUROR:**  Yes.

11          **THE COURT:**  And Ms. Chapman, you're coming from

12  Petaluma.

13          **PROSPECTIVE JUROR:**  Yes.

14          **THE COURT:**  Which is quite the ways.  Do you think

15  that could work for you?

16          **PROSPECTIVE JUROR:**  Yes.

17          **THE COURT:**  8:30?

18          **PROSPECTIVE JUROR:**  Uh-huh.

19          **THE COURT:**  Thank you.  That's the spirit.  I like

20  that.  You used to work at a company, and this one was an

21  interesting name, Popcornopolis?

22          **PROSPECTIVE JUROR:**  Yes.

23          **THE COURT:**  For 10 years.

24          **PROSPECTIVE JUROR:**  Yes.

25          **THE COURT:**  And you were a director of e-Commerce,

1  right?

2          **PROSPECTIVE JUROR:**  Yes, I was.

3          **THE COURT:**  I can kinda guess, but what did that

4  company do?

5          **PROSPECTIVE JUROR:**  We make gourmet popcorn.

6          **THE COURT:**  There you go.  You and ice cream.  This

7  would be a jury that would be very happy.

8      So you're finished with that work?

9          **PROSPECTIVE JUROR:**  I am.  We sold the company, and

10  so my time there ended.

11          **THE COURT:**  How long ago was the company sold?

12          **PROSPECTIVE JUROR:**  It was sold four years ago, and

13  then part of my job is to do the systems transitions to theirs,

14  so I've been gone for a year and a half now.

15          **THE COURT:**  Okay.  Now, not to be a broken record,

16  but going to question 18 about law enforcement witnesses, you

17  had indicated that you would be more likely to believe their

18  testimony.  Having now heard all the discussion we've had,

19  could you follow my directive, which is they're not -- they're

20  like any other witness?

21          **PROSPECTIVE JUROR:**  Yes, I could.

22          **THE COURT:**  You could?  Okay.

23      Any problems with any of the issues we've gone over thus

24  far about the defendant's right not to testify?

25          **PROSPECTIVE JUROR:**  No.

1          **THE COURT:**  No problem about that?

2          **PROSPECTIVE JUROR:**  No problem.

3          **THE COURT:**  Okay.  Any problems with cryptocurrency?

4          **PROSPECTIVE JUROR:**  No.

5          **THE COURT:**  All right.  All right.  You can pass the

6    microphone along to, is it Ms. Gloria?  And Ms. Gloria, you are

7    an engineer for PG&E?

8          **PROSPECTIVE JUROR:**  Yeah, that's right.

9          **THE COURT:**  There we go.  PG&E is well represented.

10       What kind of engineering do you do for them?

11         **PROSPECTIVE JUROR:**  I do gas storage.

12         **THE COURT:**  And what -- is there a particular

13   facility?

14         **PROSPECTIVE JUROR:**  We do like a gas storage

15   facility.  So there's like two in the area.

16         **THE COURT:**  So are you moving around?

17         **PROSPECTIVE JUROR:**  It like varies.  Sometimes it's

18   home, sometimes it's office, sometimes it's field, yeah.

19         **THE COURT:**  So let's see.  You had also expressed

20   some skepticism about crypto, some aspects of crypto.  Can you

21   come into this trial with an open mind?

22         **PROSPECTIVE JUROR:**  Um, I guess, yeah.  Yes.

23         **THE COURT:**  That would be the "ask".  And so what we

24   need to get a sense of is, you know, are you comfortable doing

25   that.

1    I mean, trials are fascinating.  That's why they have so

2    many TV shows that are trials.  I'm always frustrated when

3    jurors come in and they say, oh, you know, I can't serve.  And

4    I understand they have busy lives.  But then I ask them, do you

5    watch any of those shows about trials?  Oh, yeah, I love those

6    shows.  And it's like, this is the best seat you're going to

7    have.  This is fantastic.

8        Anyway, so you think you could base your judgments on the

9    evidence that is presented in this trial and not bring to the

10   courtroom all sorts of ideas about, well, I'm already -- I've

11   already decided this, that or the other?

12       **PROSPECTIVE JUROR:**  I have, like, pretty strong

13   opinions about it, but, I mean, that's what we're supposed to

14   do, so, yeah.

15       **THE COURT:**  And there's nothing wrong with strong

16   opinions.  I'm not criticizing anyone for having such opinions.

17       Okay.  Anything else you've heard in our discussion so far

18   that you thought, oh, I want to tell him this, that or the

19   other thing?

20       **PROSPECTIVE JUROR:**  I have no comments.

21       **THE COURT:**  Okay.  If you could pass the microphone.

22   And is it Mr. Fetsch?

23       **PROSPECTIVE JUROR:**  Yes, sir.

24       **THE COURT:**  And Mr. Fetsch, you are from Castro

25   Valley.  A bit of a distance.  8:30 to 1:30, does it work?

JURY VOIR DIRE

1    **PROSPECTIVE JUROR:**  Yeah, it's workable.

2    **THE COURT:**  And you're an engineer?

3    **PROSPECTIVE JUROR:**  Yes, sir.

4    **THE COURT:**  With Magnetic Insight.

5    **PROSPECTIVE JUROR:**  Not anymore.

6    **THE COURT:**  Not anymore.  What did they do in your

7    time with them?

8    **PROSPECTIVE JUROR:**  We had a big layoff on the first,

9    so I'm available:  I design machinery, control systems.  That's

10   mostly it.

11   **THE COURT:**  So you're in the in-between period right

12   now?

13   **PROSPECTIVE JUROR:**  Yep.

14   **THE COURT:**  Okay.  Let's see, you had some issues

15   about -- in the answer to the question about different race,

16   color, religious belief, all those questions, and you had some

17   opinions.  Do you think that would get in the way of you being

18   a fair and impartial juror?  In other words, judging witnesses,

19   evidence, through some perspective of, well, I don't believe

20   someone who looks like this, or is like this, or what have you?

21   Would that be a problem for you?

22   **PROSPECTIVE JUROR:**  I don't care what people look

23   like, but I think I was pretty clear in the questionnaire that

24   moral character is everything in the credibility of a witness,

25   and if you've got somebody who has demonstrated moral failings,

 1   they're not credible.  If you've got somebody who clearly has a

 2   mental illness, they're not credible.

 3          THE COURT:  Anything else that we have reviewed that

 4   would cause you to say, oh, I, you know, I have an issue about

 5   this, or that?

 6          PROSPECTIVE JUROR:  I think so.

 7          THE COURT:  Okay.  If you could pass the microphone

 8   down to, is it Mr. Ginn?

 9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  Mr. Ginn, you are from Livermore.  That

11   is also a bit of a distance.  8:30 to 1:30, can you do that?

12          PROSPECTIVE JUROR:  I believe so, yes.

13          THE COURT:  You're also an engineer?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  Lots of engineers.  At Forest Point, what

16   do they do?

17          PROSPECTIVE JUROR:  A number of different things, but

18   broadly speaking, security, software as a service primarily in

19   the security sector.

20          THE COURT:  Are you working in a building or

21   virtually or some combination thereof?

22          PROSPECTIVE JUROR:  Mostly virtually but occasionally

23   go into the office in Campbell.

24          THE COURT:  We've gone over many things so far.

25   Anything jump out at you that you would say, oh, I should tell

JURY VOIR DIRE

1    the Court this?

2            PROSPECTIVE JUROR:  No, sir.

3            THE COURT:  Okay.  Okay.  Thank you.  If you can pass

4    the microphone down, and we are now with Mr. Campbell.

5            PROSPECTIVE JUROR:  Right.

6            THE COURT:  Mr. Campbell, you are coming from Newark.

7    Again, bit of a distance, but could you do 8:30 to 1:30?

8            PROSPECTIVE JUROR:  Yeah, I could do that.

9            THE COURT:  Okay.  And you had in the past been a

10   practice -- you said assistance practice manager at a

11   veterinarian place?

12           PROSPECTIVE JUROR:  Uh-huh, correct.

13           THE COURT:  And you did that for about three years?

14           PROSPECTIVE JUROR:  Uh-huh.

15           THE COURT:  Okay.  And now you're looking for other

16   work?

17           PROSPECTIVE JUROR:  Correct.

18           THE COURT:  Okay.  You had expressed skepticism about

19   law enforcement witnesses, and you have some issues with them.

20   We had a lot of discussion.  Can you say to me that you would

21   look at a law enforcement witness like any other, and you

22   wouldn't build in a decision to believe them or not believe

23   them just based on their being a law enforcement witness?  Do

24   you think you could do that?

25           PROSPECTIVE JUROR:  Yes, I can.

1    **THE COURT:**  Okay.  Is there any -- we have discussed

2   with some of your colleagues here crypto.  Do you think you

3   could be a fair and impartial juror in a case where the crypto

4   industry is involved?

5    **PROSPECTIVE JUROR:**  Yeah, I can do that.

6    **THE COURT:**  Okay.  All right.  You're in the

7   job-seeking process, and you were concerned for understandable

8   reasons about, you know, you want to get interviews and you

9   want to do all that.  Again, the 8:30 to 1:30, do you think for

10   the period of time that we're talking about you could --

11    **PROSPECTIVE JUROR:**  Yeah, with that schedule, I think

12   I can.

13    **THE COURT:**  Okay.  Ms. Brackett.  So let's go over

14   there.

15    So Ms. Brackett, you are coming to us from Walnut Creek?

16    **PROSPECTIVE JUROR:**  Yes.

17    **THE COURT:**  I'm sorry about the, you know, you're all

18   smashed in here.  Once obviously the jury is selected, as I

19   told you, it will be 16 people.  We'll be able to spread it out

20   and accommodate people.

21    You're with Amazon?

22    **PROSPECTIVE JUROR:**  Correct.

23    **THE COURT:**  And you're a sales manager?

24    **PROSPECTIVE JUROR:**  Yes.

25    **THE COURT:**  Do you do that virtually or at an office?

1      **PROSPECTIVE JUROR:**  All over.  My team's located

2  locally, but we cover the South Bay, so we're with customers or

3  in the office.

4      **THE COURT:**  Okay.  You had indicated on the

5  defendant's right not to testify that maybe it would -- you

6  might have a problem with the idea that a defendant didn't take

7  the stand.  Can you follow my instruction now that we've gone

8  over it at great length, that you'll honor the defendant's

9  right to testify if the defendant decided not to testify, and

10  not hold it against the defendant?  Could you do that?

11      **PROSPECTIVE JUROR:**  Yes, sir.

12      **THE COURT:**  Okay.  If you could pass the microphone

13  down.

14      So now we're at Ms. Tai.

15      **PROSPECTIVE JUROR:**  Yes.

16      **THE COURT:**  Okay.  Welcome.

17      Ms. Tai, you are an optometrist?

18      **PROSPECTIVE JUROR:**  Yes, I am.

19      **THE COURT:**  At La Clinica de la Raza.  And where is

20  that located?

21      **PROSPECTIVE JUROR:**  I work at both Concord and

22  Oakland office.

23      **THE COURT:**  And you're living in Moraga?

24      **PROSPECTIVE JUROR:**  That's right.

25      **THE COURT:**  Do you think the 8:30 to 1:30 schedule

1    could work for you?

2             PROSPECTIVE JUROR:  Personally, yes, but our office

3    is really short staffed right now.  If I'm not there, patients

4    got canceled and the office has to be shut down.

5             THE COURT:  Do you have other optometrists working

6    with you?

7             PROSPECTIVE JUROR:  In Oakland, yes, but not the

8    Concord site.  I'm the only doctor there.

9             THE COURT:  You had indicated with respect to the law

10   enforcement witnesses that you'd be likely to believe their

11   testimony based on their being law enforcement witnesses.  Now

12   that we've talked about it, would you be able to follow my

13   instruction that you should treat a law enforcement witness

14   like any other?

15            PROSPECTIVE JUROR:  Yes, I can.

16            THE COURT:  Okay.  You can pass the microphone along.

17       Mr. Carfi?

18            PROSPECTIVE JUROR:  Yes, sir.

19            THE COURT:  Welcome.  You're a Concordian, I guess we

20   call it?

21            PROSPECTIVE JUROR:  Yes.

22            THE COURT:  And you work in a franchise operation?

23            PROSPECTIVE JUROR:  Yes.

24            THE COURT:  What kind of franchise?

25            PROSPECTIVE JUROR:  I'm a franchisee with Burger

1  King.

2           **THE COURT:**  With Burger King.  So you got ice cream,

3  you've got popcorn, you've got Burger King.

4      Okay.  Now, you said you had an out-of-district conference

5  from the 23rd to the 25th?

6           **PROSPECTIVE JUROR:**  Yes, sir.

7           **THE COURT:**  Where is that going to be?

8           **PROSPECTIVE JUROR:**  Palm Springs.

9           **THE COURT:**  Okay.  How critical is it that you attend

10 that conference?

11          **PROSPECTIVE JUROR:**  Not.  I'm on the board of

12 directors for an association, but I'll give my proxy to another

13 board member.

14          **THE COURT:**  Okay.  I know this time of year to say

15 you can't go to Palm Springs is, you know, kind of a not nice

16 thing, but, okay.

17      How about the law enforcement question?  You said you

18 might be more likely to believe law enforcement testimony.

19 Having heard what we've discussed today, do you think you could

20 treat those witnesses like any other?

21          **PROSPECTIVE JUROR:**  My father was career law

22 enforcement.  My degree in college is in criminal justice.

23 Afterwards I went through the police academy and graduated with

24 my academy certificate.  My father-in-law is a career law

25 enforcement.  I went the business path.

JURY VOIR DIRE

1          **THE COURT:**  Right.

2          **PROSPECTIVE JUROR:**  But I generally believe that in

3     court on the stand under oath, that law enforcement tell the

4     truth.

5          **THE COURT:**  Okay.  So then answer for me the

6     question.  I am going to say -- I've said to you, as I've said

7     to all your colleagues, you know, what we expect of the jurors,

8     ask of the jurors, require of the jurors, is that when a

9     witness takes the stand, that witness is only as good as the

10    testimony and credibility they provide from that stand, and

11    what their occupation is from before is not a basis to say,

12    whatever they say I believe them more or I don't believe them

13    more.  I know it's tough, because you have all this law

14    enforcement in your family and your own personal experience.

15         And be honest with me.  If you say, you know, I try, but I

16    think, you know, I know this person is in law enforcement, an

17    FBI agent or what have you, so I'm just gonna believe them.  If

18    that's your answer, I want to know that.

19         **PROSPECTIVE JUROR:**  I believe in evidence, too, but,

20    yeah.  I mean, trust but verifying I guess is, you know.

21         **THE COURT:**  Okay.  Okay.  Thanks.  If you can pass

22    the microphone along.

23         And Mr. Robinson, welcome.

24         So you are with the UC world, and you are chief campus

25    counsel over in Berkley?

JURY VOIR DIRE

 1          **PROSPECTIVE JUROR:**  Yes, Your Honor.

 2          **THE COURT:**  You must be quite busy.  There's a lot of

 3    things going on in UC.

 4       And you're a lawyer?

 5          **PROSPECTIVE JUROR:**  Yes, Your Honor.

 6          **THE COURT:**  Okay.  Did you -- have you practiced in

 7    your legal career in-house in the sense of in academic

 8    institutions?

 9          **PROSPECTIVE JUROR:**  I was in private practice for

10    nine years as a litigator.

11          **THE COURT:**  And which firm were you in?

12          **PROSPECTIVE JUROR:**  Goldfarb & Lipman.  They're now

13    in Oakland.

14          **THE COURT:**  And what kind of work did you do?

15          **PROSPECTIVE JUROR:**  I was doing land use litigation.

16    Primarily I'm in domain litigation for public agencies.

17          **THE COURT:**  Okay.  And your spouse/partner is an

18    attorney?

19          **PROSPECTIVE JUROR:**  Yes, Your Honor.

20          **THE COURT:**  And where is that practice?

21          **PROSPECTIVE JUROR:**  She's self-employed in San

22    Francisco.

23          **THE COURT:**  Solo practitioner?

24          **PROSPECTIVE JUROR:**  Yes, Your Honor.

25          **THE COURT:**  And what kind of legal work does she do?

1    **PROSPECTIVE JUROR:**  She does wills and trusts.  She

2    does some probate litigation.

3    **THE COURT:**  Okay.  And then to compound the life of

4    the law that you lead, you have a, one of your children is a

5    law student.  Where is ...

6    **PROSPECTIVE JUROR:**  He's at UC Law, as well.

7    **THE COURT:**  Right down the street.

8    Okay.  That's a lot of law.

9    **PROSPECTIVE JUROR:**  Yes, Your Honor.

10    **THE COURT:**  Do you think that you can be a fair and

11    impartial juror and not bring preconceptions into the courtroom

12    about what the rulings ought to be and how it all should play

13    out and really look at it with an open mind?

14    **PROSPECTIVE JUROR:**  I understand the obligations of a

15    juror in deciding a case, Your Honor.

16    **THE COURT:**  And you think you can do it?

17    **PROSPECTIVE JUROR:**  Yes, Your Honor.

18    **THE COURT:**  Okay.  And you had -- to add even more to

19    this history, is it your father-in-law is on the superior court

20    or was on the superior court?

21    **PROSPECTIVE JUROR:**  He was.  He's deceased.  Yes, in

22    San Joaquin County.

23    **THE COURT:**  How about the question about law

24    enforcement witnesses?

25    You can treat them like any other witnesses?

 1              **PROSPECTIVE JUROR:**  Yes, Your Honor.

 2              **THE COURT:**  Now, you indicated you think you may have

 3     seen or heard something about this case?

 4              **PROSPECTIVE JUROR:**  I may have.

 5              **THE COURT:**  Is it just sort of a general

 6     recollection?

 7              **PROSPECTIVE JUROR:**  I don't know anything specific

 8     about this case, Your Honor.

 9              **THE COURT:**  Okay.  Would anything that you have seen

10     or heard be a problem for you being a fair and impartial juror?

11              **PROSPECTIVE JUROR:**  No.

12              **THE COURT:**  You have some views about cryptocurrency.

13     You know what my question will be.  Do you think you can focus

14     on the issue of whether or not the government has proven the

15     defendant guilty beyond a reasonable doubt of the charges in

16     this case and not be deciding in your mind the question of

17     whether or not cryptocurrency is good, bad or indifferent?

18              **PROSPECTIVE JUROR:**  Yes, Your Honor.

19              **THE COURT:**  Okay.  Thank you.  If you could pass the

20     microphone along.

21          By the way, I know you are probably thinking when's the

22     break.  Once we get through -- I get through my questions,

23     we'll take a break, and then the attorneys will have an

24     opportunity to do some follow-up questions.

25          Okay.  So now we're at Mr. Cook.  Is that correct?

JURY VOIR DIRE

1          **PROSPECTIVE JUROR:**  Yes, sir.

2          **THE COURT:**  Okay.  Let me just make a ... Mr. Cook,

3  you're coming in from Antioch?

4          **PROSPECTIVE JUROR:**  Yes, sir.

5          **THE COURT:**  Can you do the 8:30 to 1:30?

6          **PROSPECTIVE JUROR:**  Yes, sir.

7          **THE COURT:**  And you're with ABM?

8          **PROSPECTIVE JUROR:**  Yes, sir.

9          **THE COURT:**  And what is ABM?

10         **PROSPECTIVE JUROR:**  It's a building management system

11  for stationary engineers.  You actually have stationary

12  engineers that maintain this building.

13         **THE COURT:**  And you're a stationary engineer?

14         **PROSPECTIVE JUROR:**  Yes, sir.

15         **THE COURT:**  Do you work virtually?

16         **PROSPECTIVE JUROR:**  I work at Bishop Ranch, in San

17  Ramon.

18         **THE COURT:**  Oh, sure.

19      The law enforcement question.  Can you treat a law

20  enforcement witness like any other?

21         **PROSPECTIVE JUROR:**  Yes, sir.

22         **THE COURT:**  The burden of proof, you indicated maybe.

23  Do you think you can follow my instructions that unless and

24  until the government proves a defendant guilty beyond a

25  reasonable doubt, the defendant's innocent?

JURY VOIR DIRE

1    **PROSPECTIVE JUROR:**  Yes, sir.

2    **THE COURT:**  Okay.  You indicated to the question

3    about -- I know it's a bit of a vague question:  Defendants,

4    witnesses, lawyers may be of a different race, color, religious

5    belief, national ancestry, sexual orientation, gender identity,

6    gender economic circumstance from you.  You will be instructed

7    that you should not be influenced by any of these factors.  Do

8    you believe that you will be influenced by these factors, and

9    you said yes.  Can you tell me a little bit more about that?

10    **PROSPECTIVE JUROR:**  Everybody has their own beliefs

11    and religions and backgrounds and whatnot.  It all kind of

12    depends on the person and what's happening and what brought us

13    to that position.

14    **THE COURT:**  Okay.  But what I want to make sure I

15    understand is do you feel so strongly that a person, based on,

16    say, their race or gender or the other factors that were

17    listed, that you would already come to a decision about whether

18    or not to believe them based on that?

19    **PROSPECTIVE JUROR:**  It kinda depends on the person.

20    **THE COURT:**  Okay.

21    **PROSPECTIVE JUROR:**  And how they handle themselves.

22    **THE COURT:**  Okay.  All right.  Thank you.  If you can

23    pass that microphone.

24    And it's Mr. Rabellde?  And Mr. Rabellde, you're living in

25    Pacifica?

1    **PROSPECTIVE JUROR:**  Yes.

2         **THE COURT:**  And you previously worked as a senior

3    claims specialist in the insurance industry, a company called

4    AmTrust North America.

5       What kind of work were you doing there?

6         **PROSPECTIVE JUROR:**  Primarily construction defect

7    litigation, investigation, and I did a little bit of

8    professional liability investigation.

9         **THE COURT:**  So were you working with lawyers?

10        **PROSPECTIVE JUROR:**  All the time.

11        **THE COURT:**  Okay.  Would that present a problem for

12   you being a fair and impartial juror in this case?

13        **PROSPECTIVE JUROR:**  No.

14        **THE COURT:**  You were a police officer in Tampa, you

15   said, but you said you could assess a law enforcement witness

16   like any other.  Is that right?

17        **PROSPECTIVE JUROR:**  Yes, sir.

18        **THE COURT:**  Okay.  8:30 to 1:30, is that doable for

19   you?

20        **PROSPECTIVE JUROR:**  Oh, that's doable, but when you

21   said the trial would move into March, that's a problem, because

22   I have surgery on February 28th.

23        **THE COURT:**  Okay.  We need to know these things.

24      And what day of the week is that, do you know?

25        **PROSPECTIVE JUROR:**  It's a Friday, I believe.

JURY VOIR DIRE

1           **THE COURT:**  Okay.  Will you need to have the morning

2  that morning, or is it in the afternoon, or ...

3           **PROSPECTIVE JUROR:**  It's in the morning, but it kinda

4  goes into the afternoon.

5           **THE COURT:**  Okay.

6           **PROSPECTIVE JUROR:**  Then there's a three-month

7  recovery.

8           **THE COURT:**  Okay.  Well, that's good to know.  And

9  that's Friday the ...

10          **PROSPECTIVE JUROR:**  Twenty-eighth.

11          **THE COURT:**  Twenty-eighth.  Okay.  All righty.  Well,

12  thank you for telling us that.

13      If it's a hip replacement, I just had one and it went

14  really well.  So hopefully that's ...

15          **PROSPECTIVE JUROR:**  No.

16          **THE COURT:**  Okay.  Let's move the microphone over to

17  the final section, and is it Mr. Austin Thomas?

18          **PROSPECTIVE JUROR:**  Yes, sir.

19          **THE COURT:**  Welcome.

20      Mr. Austin Thomas, you are coming to us from Oakland, and

21  you are at Oakland Unified School District.

22          **PROSPECTIVE JUROR:**  Yes.

23          **THE COURT:**  And you're a member of the recruitment

24  team.  So tell me what the recruitment team does at Oakland

25  Unified.

JURY VOIR DIRE

1      **PROSPECTIVE JUROR:**  We recruit all positions in the

2  district.  So teachers and principals, school staff.

3      **THE COURT:**  So you're out there trying to find the

4  teachers?

5      **PROSPECTIVE JUROR:**  Yes, sir.

6      **THE COURT:**  Anything that you've heard so far that

7  you thought to yourself, you know, I should tell the Judge this

8  or I should respond?

9      Okay.  You've done a little crypto investing.  Would that

10  have an effect on your ability to be fair and impartial?

11      **PROSPECTIVE JUROR:**  Not at all.

12      **THE COURT:**  8:30 to 1:30, is that possible?

13      **PROSPECTIVE JUROR:**  It would work.

14      **THE COURT:**  Okay.  Thank you.  If you can pass it

15  along to Mister, and let me try it, Khajehnezhad.

16      **PROSPECTIVE JUROR:**  Very good.

17      **THE COURT:**  Thank you.

18      And you're coming from Walnut Creek?

19      **PROSPECTIVE JUROR:**  Yeah.

20      **THE COURT:**  And you work at Schools First Credit

21  Union?

22      **PROSPECTIVE JUROR:**  Yes.

23      **THE COURT:**  As a credit risk analyst?

24      **PROSPECTIVE JUROR:**  Yes.

25      **THE COURT:**  How about the law enforcement question?

1          **PROSPECTIVE JUROR:**  I can follow the instructions for

2    sure.

3          **THE COURT:**  And the instructions being they're like

4    any other witness.

5          **PROSPECTIVE JUROR:**  Yes.

6          **THE COURT:**  Anything else I should know after what

7    we've discussed?

8          **PROSPECTIVE JUROR:**  No, sir.

9          **THE COURT:**  Okay.  As I may have already asked you,

10   8:30 to 1:30?

11         **PROSPECTIVE JUROR:**  Should work, but I have a kid for

12   pickup and dropoff.  I should try to see, because I pick him up

13   and drop him off, too, at 9:30, 8:30 to 9:00, so ...

14         **THE COURT:**  Oh.

15         **PROSPECTIVE JUROR:**  Yeah.

16         **THE COURT:**  Do you think you could, for the period

17   that this trial is going -- and as I say, or hope is not after

18   March 14th, and hopefully a little somewhat before that, could

19   you get some coverage for that?

20         **PROSPECTIVE JUROR:**  Maybe I can.  Not 100 percent

21   sure, but maybe, yes.

22         **THE COURT:**  How do you think you could -- would be

23   able to find out if the may be is a yes?

24         **PROSPECTIVE JUROR:**  My wife sometimes because she's

25   sometimes working, you know, and she should take off to, you

1   know, drop off the kid.  But if not, I can do that.  I mean ...

2           **THE COURT:**  And the dropoff is at one what time in

3   the morning?

4           **PROSPECTIVE JUROR:**  Dropoff is between 8:30 to 9:00,

5   and pickup is 2:30, but generally I go by 2:00, so ...

6           **THE COURT:**  If you can pass the microphone over.  And

7   we are now at --

8           **PROSPECTIVE JUROR:**  I need to take a break.

9           **THE COURT:**  Yes.  If you want to take a break I was

10  just going to finish this list, but we can take a break now.

11          **PROSPECTIVE JUROR:**  I can't.

12          **THE COURT:**  Okay.  We'll take a break, members of

13  the -- prospective members of the jury.  Try to come back in

14  about 10 minutes.  You don't know much about the case, but even

15  the little you know, don't discuss it amongst yourselves.

16      We'll come back, and come back to exactly the same seat

17  for the 36 that we've called up.

18      (A recess was taken from 10:56 a.m. to 11:09 a.m.)

19          **THE COURT:**  Okay.  We're back on the record.

20      Mr. Tanner had indicated as I was walking out that he

21  wanted to elaborate on an answer that he had given.  So we can

22  get you the microphone.

23          **PROSPECTIVE JUROR:**  It's okay.  I think I can --

24          **THE COURT:**  Oh, project.

25          **PROSPECTIVE JUROR:**  Yeah.  So I just wanted to

 1   elaborate, because although I don't have any negative

 2   polarization, any polarization at all when it comes to

 3   cryptocurrency, as owning and developing it, when it comes to

 4   fraud involving cryptocurrency, I do have a bias from that,

 5   because I was the victim of cryptocurrency fraud because I held

 6   cryptocurrency on~--- with the Institution Block Five, and they

 7   went bankrupt when FTX collapsed.

 8           THE COURT:  I see.

 9           PROSPECTIVE JUROR:  I was part of a class action

10   lawsuit regarding that.

11           THE COURT:  Thank you.  Thank you for clarifying

12   that.

13           PROSPECTIVE JUROR:  Uh-huh.

14           THE COURT:  Let me now go to, is it Mr. Schwab?

15           PROSPECTIVE JUROR:  Correct.

16           THE COURT:  I think I was about to ask some questions

17   of and Mr. Schwab, you're coming from a big distance, Santa

18   Rosa.  Would 8:30 to 1:30 work?

19           PROSPECTIVE JUROR:  Yeah, I can make it work.

20           THE COURT:  Thank you.

21       So you are with the Postal Service?

22           PROSPECTIVE JUROR:  Correct.

23           THE COURT:  And you are one of the folks that is out

24   there helping us and getting communications.  Do you have a set

25   route, or you're going different places?

JURY VOIR DIRE

1          **PROSPECTIVE JUROR:**  Yeah, I'm a regular with a set

2    route.

3          **THE COURT:**  Up in Santa Rosa?

4          **PROSPECTIVE JUROR:**  In Santa Rosa.

5          **THE COURT:**  And you've been doing that for nine

6    years?

7          **PROSPECTIVE JUROR:**  Correct.

8          **THE COURT:**  Okay.  Anything that we've talked about

9    that you think you would want to tell me about, or ...

10          **PROSPECTIVE JUROR:**  The only thing I could think of

11    of relevance is that my wife works for Lighthouse, which is an

12    e-discovery firm.  She works with all sorts of different

13    projects and is often contracted by lawyers to stage data for

14    discovery and all that kinda stuff.  So I don't know if that's

15    relevant at all.

16          **THE COURT:**  Okay.  Do you think that would have any

17    impact on your ability to be fair and impartial?

18          **PROSPECTIVE JUROR:**  No.  She -- other than

19    complaining about her coworkers that's all I know about her

20    work.

21          **THE COURT:**  All right.  On the question, you know,

22    that I've spent a lot of time on about the right, the

23    constitutional right to remain silent, and you said maybe.  Now

24    that you've heard a lot about that, would you be able to follow

25    my instruction that that is the defendant's constitutional

1  right, and if the defendant says, "I'm not testifying," you

2  can't hold that against the defendant.  Can you follow --

3          PROSPECTIVE JUROR:  Yeah, I can follow your

4  instruction.

5          THE COURT:  Okay.  You had some views about

6  cryptocurrency.  Do you think you can approach this with an

7  open mind and judge this case based on the witnesses that are

8  called and the evidence that you get and not build into it some

9  preconceived ideas?

10          PROSPECTIVE JUROR:  I can do that.

11          THE COURT:  Okay.  Thank you.

12      Thank you.  If you could pass the microphone, and it's

13  Mr. Hlaing.  Mr. Hlaing, you're from Daly City?

14          PROSPECTIVE JUROR:  Yeah, I am.

15          THE COURT:  You are with Stanford Healthcare?

16          PROSPECTIVE JUROR:  Yeah, I work for Stanford.

17          THE COURT:  And what do you do for Stanford

18  Healthcare?

19          PROSPECTIVE JUROR:  I'm a CDI lease quality outcome.

20  CDI being clinical documentation integrity.  But I work from

21  home.

22          THE COURT:  You work from home, and you're doing

23  quality control?

24          PROSPECTIVE JUROR:  Not really -- because we are

25  working on documentation.

JURY VOIR DIRE

1      **THE COURT:**  Documentation.

2      **PROSPECTIVE JUROR:**  Yeah.

3      **THE COURT:**  Okay.  And you've done that for eight

4  years?

5      **PROSPECTIVE JUROR:**  I'm sorry?

6      **THE COURT:**  You've done that for eight years?  Eight

7  years you've been at this, your job?  How long have you worked

8  for Stanford?

9      **PROSPECTIVE JUROR:**  I work for Stanford for eight

10  years.

11      **THE COURT:**  Okay.

12      **PROSPECTIVE JUROR:**  Yeah.

13      **THE COURT:**  All right.  Anything that you've heard

14  today that you were thinking to yourself, I want to tell the

15  Judge about this?

16      **PROSPECTIVE JUROR:**  Yeah.  Only thing is my

17  85-year-old, my father-in-law live with us.  So sometime, you

18  know, like emergency.  Last six months we have four times the

19  choking, so we have to call the emergency teams or something.

20  But in case it happens, but if my wife working in San Francisco

21  General, but, you know, with -- actually for me, I work from

22  home, but someone caregiver stay there, but in case of

23  emergency I stay, you know, and taking care of this one.  But

24  this is only it.

25      **THE COURT:**  But he has a caregiver there?

1      **PROSPECTIVE JUROR:**  Yeah, but it's a daytime, you

2  know.

3      **THE COURT:**  Well, 8:30 to 1:30, could you do that?

4      **PROSPECTIVE JUROR:**  Yeah, but it's -- it is every day

5  from today to March?

6      **THE COURT:**  Yes.

7      **PROSPECTIVE JUROR:**  Oh.

8      **THE COURT:**  Yes.

9      **PROSPECTIVE JUROR:**  Yeah, but probably, but, you

10  know, it's very difficult for me to do that.

11      **THE COURT:**  I recognize it could be difficult.

12      **PROSPECTIVE JUROR:**  Yeah.

13      **THE COURT:**  I would need, though, if you are selected

14  as a juror, you would need to be here anytime the court's in

15  session, and we would be -- because we want to get this

16  concluded, we would be going every day, Monday through Friday.

17  There's a holiday, you know, next Monday, so obviously the

18  Court's not in session then.  But, yes, it would be -- a juror

19  couldn't say, well, I really can't come today.  That's not an

20  option.

21      So you think you could do that?

22      **PROSPECTIVE JUROR:**  Yeah, I try my best.  I hope so.

23      **THE COURT:**  Okay.  Well, I need to -- for those who

24  are chosen as jurors, just to make it clear, it's not, we'll

25  try.  It's that's going to be the way it's got to be, because

1  otherwise we -- if one juror couldn't be here, we'd have to

2  stop all proceedings.  So it's a real problem.

3      Okay.  Mr. Gunter.

4          **PROSPECTIVE JUROR:**  Yes, Your Honor.

5          **THE COURT:**  Mr. Gunter, you're living in the city.

6  Let's see, and you are with Target?

7          **PROSPECTIVE JUROR:**  Yes.  I was semiretired and took

8  that job actually because it's strenuous, you know.  It's a

9  good workout.

10         **THE COURT:**  Good, good.  And you work in a particular

11  facility?

12         **PROSPECTIVE JUROR:**  Geary Masonic.

13         **THE COURT:**  I've been there many a time.  I've

14  probably passed by you.  So before that what did you do?

15         **PROSPECTIVE JUROR:**  I had a long sales career.  I was

16  also in management with UPS.  Number of things.

17         **THE COURT:**  Primarily in sales and ...

18         **PROSPECTIVE JUROR:**  The management was a diversion,

19  but, yes, primarily in sales.

20         **THE COURT:**  Okay.  You indicated you think you've

21  heard of AML Bitcoin or ATEN Coin?

22         **PROSPECTIVE JUROR:**  I've definitely heard of Bitcoin,

23  but I've probably heard of AML as one of a list of companies

24  that -- maybe on a website or something.  It's not detailed

25  knowledge.

JURY VOIR DIRE

1     **THE COURT:**  Well, it's sort of obvious, but I'll ask

2     the question anyway.  Anything about the vague things you think

3     you may have heard, would that affect your ability to be fair

4     and impartial in this case?

5     **PROSPECTIVE JUROR:**  I could be fair and impartial.  I

6     might be sarcastic.

7     **THE COURT:**  Well, that's okay.

8     Anything else that we've discussed that you think, oh, I

9     want to tell the Judge about this?

10    **PROSPECTIVE JUROR:**  No, I'll follow your lawful

11    instructions, Your Honor.

12    **THE COURT:**  Thank you.

13    Okay.  Let's go to Mr. Olson.

14    **PROSPECTIVE JUROR:**  Yes.

15    **THE COURT:**  And Mr. Olson, you're living in Richmond?

16    **PROSPECTIVE JUROR:**  Correct.

17    **THE COURT:**  8:30 to 1:30, is that doable for you?

18    **PROSPECTIVE JUROR:**  Yeah, no problem.

19    **THE COURT:**  You work at an entity called Bedrock

20    Ocean Exploration, and you're a survey operations person.  What

21    does that entail?

22    **PROSPECTIVE JUROR:**  To sum it up, just planning and

23    executing when we take our technology out on the water.

24    **THE COURT:**  Oh.  Well, tell us more about that.  What

25    does taking your technology out on the water mean?

JURY VOIR DIRE

1    PROSPECTIVE JUROR:  Sure.

2    We build autonomous underwater vehicles in-house.  So

3    sonar surveys slapped on a robot.  Take it out on a boat, goes

4    in the water, swims around, comes back and we download that,

5    make a map, looking at stuff near home.  And then also I have

6    some upcoming work in New England and the Gulf of Mexico.

7    THE COURT:  Wow.  Interesting stuff.

8    The duration of the case, as I say, our hope and

9    expectation the case would be in the hands of the jury no later

10    than March 14th, perhaps earlier.  Could you make that work?

11    PROSPECTIVE JUROR:  I could, yeah.

12    THE COURT:  Okay.  The law enforcement question, you

13    indicated you might be -- I would be less likely to believe

14    their testimony.  After all the discussion we've had, any

15    reaction to that?  Do you think you could approach those

16    witnesses like any other?

17    PROSPECTIVE JUROR:  I could, yes.

18    THE COURT:  Okay.  Thank you.

19    Mr. Pollak.  I'm sorry you're buried over there.  I

20    apologize.

21    PROSPECTIVE JUROR:  That's okay.

22    THE COURT:  You're in the city.  You work for an

23    entity called Never Forgot Gains?

24    PROSPECTIVE JUROR:  Never Forget Gains.

25    THE COURT:  Never Forget Gains.  And you're an

JURY VOIR DIRE

```
 1   engineer.
 2              PROSPECTIVE JUROR:  Yes.
 3              THE COURT:  So tell us a little bit about what ...
 4              PROSPECTIVE JUROR:  We make and build video games.
 5              THE COURT:  Video games?
 6              PROSPECTIVE JUROR:  Yeah.  Phone, mobile games.
 7   We're an extremely small studio.  There are eight of us, and
 8   I'm the only engineer working on the game that I'm writing, so
 9   ...
10              THE COURT:  What kind of games are these?
11              PROSPECTIVE JUROR:  They're merge games.  I don't
12   know if you've --
13              THE COURT:  Don't know that.
14              THE COURTROOM DEPUTY:  Dragons is the most famous.
15              THE COURT:  Oh, okay.  Oh, I think you got some
16   reaction out of the crowd.
17              PROSPECTIVE JUROR:  Midas Merge, which is -- we all
18   think it's great.
19              THE COURT:  Is it your spouse is an immigration
20   lawyer?
21              PROSPECTIVE JUROR:  Correct.
22              THE COURT:  Do you talk about the work and --
23              PROSPECTIVE JUROR:  Yeah, we talk about stuff at
24   home.
25              THE COURT:  Do you think that would affect your
```

JURY VOIR DIRE

```
 1  ability to be a fair and impartial juror?
 2           PROSPECTIVE JUROR:  No.
 3           THE COURT:  And you also said that both of your
 4  parents are lawyers.
 5           PROSPECTIVE JUROR:  Yes.
 6           THE COURT:  What kind of work do they do?
 7           PROSPECTIVE JUROR:  My mom's retired, and she was
 8  VP/general counsel for Johns Hopkins Medicine, and my dad is
 9  still a real estate lawyer, like in sports teams and stuff like
10  that.
11           THE COURT:  Good, good.
12           PROSPECTIVE JUROR:  City development.
13           THE COURT:  The now well-known law enforcement
14  question.  You had a thoughtful, long answer for us.  To
15  distill it down, do you think you could --
16           PROSPECTIVE JUROR:  Yeah, I would do my best.
17           THE COURT:  -- deal with those witnesses, approach
18  them like any other witness?
19           PROSPECTIVE JUROR:  Yes, I would do my best.
20           THE COURT:  Okay.  Yes.  Thank you.
21      8:30 to 1:30, is that workable?
22           PROSPECTIVE JUROR:  Yeah.
23           THE COURT:  Okay.
24           PROSPECTIVE JUROR:  The length, it's awkward that
25  I'll mostly be doing all of the work that I normally do just in
```

JURY VOIR DIRE

1  the second half of the day, but it's better than it being all

2  day.

3          THE COURT:  Yes.  Okay.  Well, I wish I could say you

4  wouldn't have to do any of the afternoon work.

5          PROSPECTIVE JUROR:  Yeah.

6          THE COURT:  But that is the nature of things.  And

7  that's why I try to do it in the mornings so you can do that,

8  but I know it won't be a relaxing couple weeks if you're on the

9  jury.

10          PROSPECTIVE JUROR:  Yeah, I understand.

11          THE COURT:  Okay.  Ms. Young Han?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  You're from Alameda?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  And you work for Levi Strauss?

16          PROSPECTIVE JUROR:  I do.

17          THE COURT:  But it's in a new job, it looks like,

18  correct?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  And you're a designer?

21          PROSPECTIVE JUROR:  Yeah.

22          THE COURT:  Do you work at Levi Strauss Plaza, or ...

23          PROSPECTIVE JUROR:  I do, at the plaza.

24          THE COURT:  Okay.  How do you like it so far?

25          PROSPECTIVE JUROR:  It's been really good.

1          **THE COURT:**  Good.  Are you going to change the look

2    of all the products for Levi Strauss?

3          **PROSPECTIVE JUROR:**  For 2026, yes.

4          **THE COURT:**  Okay.  2026 we'll be looking for it.

5       The question about the right to remain silent that we've

6    had a lot of discussion about.  Can you follow my instruction

7    that you're not to hold it against a defendant if the defendant

8    exercises his right not to testify?  Can you do that?

9          **PROSPECTIVE JUROR:**  Yes, I can.

10          **THE COURT:**  You said you may have heard of AML,

11    Bitcoin or ATEN Coin?

12          **PROSPECTIVE JUROR:**  Just Bitcoin.

13          **THE COURT:**  Just a general ... okay.  Thank you.  If

14    you could hand the microphone to Ms. Lapedis.

15       And Ms. Lapedis, you're coming from Belmont, long way.

16    What do you think of 8:30 to 1:30?

17          **PROSPECTIVE JUROR:**  It's doable.

18          **THE COURT:**  You are a lawyer?

19          **PROSPECTIVE JUROR:**  Not a practicing lawyer.

20          **THE COURT:**  But you have a law degree?

21          **PROSPECTIVE JUROR:**  I do.  I'm an inactive member of

22    the Bar.

23          **THE COURT:**  Now you work at Cisco?

24          **PROSPECTIVE JUROR:**  Correct.

25          **THE COURT:**  As a program manager?

JURY VOIR DIRE

1    **PROSPECTIVE JUROR:** Yes.

2    **THE COURT:** We had talked -- you had indicated some

3    concerns, again, we talked about before about having to sit in

4    one place for a long time. And as I said before, you know,

5    jurors are completely entitled to stand and stretch and move

6    around anytime they want.

7    **PROSPECTIVE JUROR:** Yes.

8    **THE COURT:** You have to stay within the vicinity of

9    the jury box, but you do have to stand -- you can stand up and

10    stretch.

11    Okay. To the question have you seen, read or heard

12    anything about this case or the allegations in the case, and

13    you said maybe. Can you tell me a little more about that?

14    **PROSPECTIVE JUROR:** Well, I'm a curious person, and

15    when I got the jury -- the first questionnaire, which didn't

16    tell us about the case but just said it would be three and a

17    half weeks, I kind of looked up all the calendars of the Court.

18    About the case.

19    **THE COURT:** You know, those jurors are a real problem

20    for us, those potential jurors. Okay.

21    **PROSPECTIVE JUROR:** But then I just --

22    **THE COURT:** It is what it is.

23    So having done that, did you get very deeply into it?

24    **PROSPECTIVE JUROR:** No, I just looked at Wikipedia

25    and saw a little bit and just went, blah, and that was that.

1              **THE COURT:**  Now, Ms. Lapedis is our case study that

2     those who are selected on the jury, you can't do that.  You

3     can't do that, and I know she won't do it now that she's a

4     juror, if she's a juror.  She knows she can't do that anymore.

5              You can't do any research, and it's very tempting in this

6     day and age.  It's so easy is the problem.  But it really is

7     not something you can do, because the jurors are tasked with

8     really deciding based on what they hear in this courtroom.

9              But, okay, to summarize it all, you saw a little

10    something, kinda know what the name of the case is and all

11    that.  Do you think anything that you saw or read would affect

12    your ability if you are selected to be a fair and impartial

13    juror in this case?

14              **PROSPECTIVE JUROR:**  No.

15              **THE COURT:**  Okay.  I may have already asked you, 8:30

16    to 1:30?

17              **PROSPECTIVE JUROR:**  Right.

18              **THE COURT:**  And that will work?

19              **PROSPECTIVE JUROR:**  Right.

20              **THE COURT:**  Good.

21         Okay.  All right.  Thank you all very much.

22         What I now do is give the counsel an opportunity to ask

23    some questions.  Okay.  So Mr. Highsmith, you're going to ask

24    for the government?

25              **MR. HIGHSMITH:**  Thank you, Your Honor.

1          **THE COURT:**  All right.

2          **MR. HIGHSMITH:**  All right.  Just a couple questions

3     for folks.

4          First off the bat, do any of the jurors or prospective

5     jurors know each other here?

6          Okay.  So what I'm going to do is just ask some general

7     questions of the group, and if you just kinda raise your hand

8     if you've got a yes, I'd appreciate it.  And I might just ask a

9     couple follow-up questions based on that.

10         There's been extensive discussion about folks' views of

11    law enforcement one way or the other, and I don't want to get

12    into any specifics about folks' experiences, but just kinda

13    sitting back and from where you are today, would you be able to

14    give law enforcement officers a fair shake when they come in

15    and testify on the witness stand and be fair and impartial to

16    both sides based on the law enforcement officer's testimony?

17    If anybody has an issue with that, just raise your hand if

18    that's something you can't do.

19         And so you do not have the ability to be fair and

20    impartial when that law enforcement officer testifies?

21         Would you say your name for the record?

22         **PROSPECTIVE JUROR:**  Yes, I'm Tanner Samples, and as I

23    expressed before, I do not believe I could be impartial when it

24    comes to believing a law enforcement officer's testimony.

25         **MR. HIGHSMITH:**  Thank you very much.

1          Is there anybody else who wants to raise their hand to

2     that question?

3          Okay.  Next question is, the FBI, the Department of

4     Justice, the federal government has been in the news a lot

5     recently.  We're out in San Francisco.  This is the United

6     States Attorney's Office in San Francisco, California.  We're

7     working on individual cases out here.  But based on folks'

8     reaction to the news or experiences with the federal government

9     or federal government agencies, does anybody have such strong

10    feelings that they would have a hard time being fair and

11    impartial to both sides in the case?

12         So I see no hands on that question.

13              **PROSPECTIVE JUROR:**  Same juror.

14              **THE COURT:**  If it's the same answer, that's okay.

15              **PROSPECTIVE JUROR:**  Yeah, it's the law enforcement.

16    And like I said, I was the victim of a similar incident.  So,

17    yeah, definitely some issues there.

18         I kinda want to get rid of this microphone.  Thank you.

19              **MR. HIGHSMITH:**  Thank you.  Thank you.

20         Another question is this trial may take some time, and

21    jurors are not going to get paid for their service.  Is there

22    anybody for whom it would create a financial hardship such that

23    you'd be distracted during the case and would have a hard time

24    paying attention to the testimony of both sides because of a

25    financial hardship or distraction?  If that's the case, if

1    you'd please raise your hand.

2          **THE COURT:**  Actually, for the time being we're

3    focused on the 36 people that have come up.  So, go ahead.

4          **MR. HIGHSMITH:**  Sir, if you would start by

5    identifying yourself for the court reporter, that would be

6    helpful.

7          **PROSPECTIVE JUROR:**  Thank you, thank you.  I'm Philip

8    Fluty, and based on my current self-employment status, I'm one

9    of only four station workers at our specific franchise, and if

10   I was unable to achieve my work conditions for my employer, it

11   would create a significant financial burden not just for the

12   employer, but for me, myself.  I currently have a partner that

13   is completely dependent on me.  We have no other family members

14   existing in the state of California, so if I were to not be

15   able to participate in my work, it would create a financial

16   burden not just for me, but for her, as well.

17         **MR. HIGHSMITH:**  Okay.  Thank you.

18        And just quick follow-up on that.

19        Would that financial burden and that difficulty be a

20   distraction for you during the trial?

21         **PROSPECTIVE JUROR:**  Yes, sir.  We are currently

22   paycheck to paycheck at the point.  And something like that

23   would be a significant distraction.

24         **MR. HIGHSMITH:**  Thank you.  Thank you very much.

25        Any other raised hands on that question?

1    There was -- you know, the surveys had questions about the

2    appearance, the race, some of the characteristics of witnesses.

3    Would you be able as a perspective juror to come in and put

4    those feelings aside and be fair and impartial to both sides in

5    the case based on the characteristics of a witness like that?

6    If anybody has any difficulties, would it be difficult, overly

7    difficult?  Please raise your hand.

8        Please, can we pass the microphone up.  And could you

9    start by identifying yourself for the court reporter.

10        **PROSPECTIVE JUROR:**  My name's Walter Fetsch.

11        As stated in the questionnaire, if you bring witnesses who

12    have obvious moral failings or who are mentally ill, they're

13    not credible witnesses and I just can't regard them as such.

14        **MR. HIGHSMITH:**  Understood.  Thank you, sir.

15        Anyone else?  All right.  I see no other hands for that.

16        Could you elaborate on what you mean by moral failure?

17        **PROSPECTIVE JUROR:**  I believe that alternate genders

18    and lifestyles and all of that business is a moral failing.

19        **MR. HIGHSMITH:**  And just to follow up, would you be

20    able to, with those feelings, put them aside and give the

21    witness a fair shake if they came up and testified on the

22    witness stand?

23        **PROSPECTIVE JUROR:**  I think that's highly unlikely.

24        **MR. HIGHSMITH:**  Thank you.

25        **PROSPECTIVE JUROR:**  Just to give you clarity, if you

JURY VOIR DIRE

1    put up a wife beater on the stand, I'm not going to regard him

2    as credible, because he has an obvious moral failing, and it's

3    that same sort of category.

4           MR. HIGHSMITH:  That's all the questions we have,

5    Your Honor.  Thank you.

6           THE COURT:  Very well.  Mr. Shepard.

7           MR. SHEPARD:  Good morning, everyone.  I'm happier

8    questioning witnesses than jurors, so please bear with me.  I'm

9    not -- I don't mean to be picking on anyone if I ask particular

10   questions.  We're just all, all of us here trying to find a

11   group of jurors that would be fair to both sides.

12       I wanted to follow up first on some topics in the

13   questionnaire, and thanks to all of you who took -- y'all went

14   very carefully through it, and there were some things that I

15   just wanted to follow up on.

16       One was a question that addressed hearing evidence that

17   Mr. Andrade might have been involved in other wrongdoing, and I

18   emphasize the word "might," but might have been involved in

19   other wrongdoing and how that might affect your judgment about

20   the charges in this case.  And the Judge will give you some

21   instructions about how to consider other wrongdoing, but some

22   of you had some pretty strong reactions to that, and I just

23   wanted to explore it.

24       And sorry, Mr. Fetsch, you had some strong reactions, and

25   I know you've already had to answer a few questions, but let me

1    just explore that with you, for example, because you were of

2    the view that immoral people never limit themselves to one area

3    of failure, and it sounds like that's a pretty strong opinion

4    that you hold.  Is that right?

5           **PROSPECTIVE JUROR:**  Yes.

6           **THE COURT:**  And so whatever the Judge said to you, it

7    would be hard for you to put that aside and judge Mr. Andrade

8    on the Judge's instructions and the particular charges that

9    have been filed against him.  Am I right about that?

10          **PROSPECTIVE JUROR:**  I guess it depends on what it is

11   you're talking about.  So if --

12          **MR. SHEPARD:**  Understood.

13          **PROSPECTIVE JUROR:**  If you have an individual who has

14   a pattern of dishonesty or a pattern of theft or a pattern of

15   some other significant let's call it bad behavior, it's going

16   to affect any reasonable person's likelihood of believing

17   they're guilty or innocent on another charge or another

18   accusation.

19          **MR. SHEPARD:**  And that feeling that if there was a

20   pattern of dishonesty, that would be hard to set aside in your

21   mind when you are passing judgment on the charges in this case,

22   is that fair?

23          **PROSPECTIVE JUROR:**  It's fair to say it would be

24   impossible to set aside.

25          **MR. SHEPARD:**  Okay.  How many other people feel that

JURY VOIR DIRE

1    way?

2        Let me check my little chart here or you can just help me

3    out by telling me.

4            **PROSPECTIVE JUROR:**  Anthony Schwab.

5            **MR. SHEPARD:**  Mr. Schwab, tell me how strongly you

6    feel about that.

7            **PROSPECTIVE JUROR:**  I feel extremely strongly.  I

8    feel it's very rare that somebody's morals change on certain

9    aspects and not on others.  A person has a pattern of behavior,

10   and when they establish a pattern of doing immoral things, that

11   doesn't just suddenly stop and they become immoral in other

12   parts of their life.

13           **MR. SHEPARD:**  Okay.  Others who feel that way?

14   Anybody else?

15           **PROSPECTIVE JUROR:**  I feel that if there are

16   patterns, that they do seem to follow the person.  Like it's --

17   there's patterns -- like on the TV shows, like on the TV shows

18   there's a pattern of crime, like, or a pattern of whatever.

19   It's -- then it's hard to shake if you see someone going down

20   the wrong path that they might continue to go down that path.

21       Oh, I'm Linda Lavigne.

22           **MR. SHEPARD:**  Yes.  Sorry, I was just going to -- the

23   most important person in the courtroom next to Judge Seeborg is

24   the court reporter, so we all try to please the court reporter.

25   So if you respond to one of my questions, if you could start

JURY VOIR DIRE

1    with your name, that would be great.

2        But before I leave you, Ms. Lavigne, it sounds like you

3    have really strong feelings about that.  Would those be really

4    hard to set aside?

5            **PROSPECTIVE JUROR:**  Yes.  Yes.

6            **MR. SHEPARD:**  Okay.

7            **PROSPECTIVE JUROR:**  I'm Savanna Detjencreson.  I

8    wrote in my testimony I have a really hard time believing

9    someone's moral character after I see immoral acts against

10    women, children and elderly.  I feel like those are very

11    immoral.  Like that is the worst thing that you can do, and if

12    you can do terrible things to those people, then you can do

13    anything.  That's my own opinion.  That's just kind of what I

14    think.

15            **MR. SHEPARD:**  Okay.  Fair enough.

16        If we take the immoral acts to women and young people out

17    of it and just immoral acts more generally, or alleged immoral

18    acts more generally, would you have the same feeling, or would

19    it be different?

20            **PROSPECTIVE JUROR:**  It would be different.  I could

21    keep an open mind.

22            **MR. SHEPARD:**  Other people who feel strongly that,

23    you know, if you're immoral in one, you're immoral across your

24    life?  Others?

25        Not to pick on people, but Mr. Robinson, if I can just ask

1   you.  Thank you, and my apologies.  I think you said good

2   boundaries in one -- or poor boundaries in one area are likely

3   to exhibit in other areas, as well.  Do I -- did I kind of

4   capture your answer correctly?

5           **PROSPECTIVE JUROR:**  Yes, that was how I answered the

6   questionnaire.

7           **MR. SHEPARD:**  And is that something you feel

8   strongly?

9           **PROSPECTIVE JUROR:**  Yes.

10          **MR. SHEPARD:**  And is that something that you could

11  easily set aside if the Judge said to you exactly how you

12  should and shouldn't consider evidence of other accusations of

13  wrongdoing?

14          **PROSPECTIVE JUROR:**  I understand a juror's

15  obligations to follow the Judge's instructions in a case, and I

16  would be able to follow them.

17          **MR. SHEPARD:**  Okay.  Ms. Palomares, if I can come

18  back to you for a moment.

19          **PROSPECTIVE JUROR:**  My name is Corazone Palomares.

20          **MR. SHEPARD:**  I'm sorry?

21          **PROSPECTIVE JUROR:**  My name is Corazone Palomares.

22          **MR. SHEPARD:**  Sorry.  My wife would tell you I'm

23  really bad with names, so I apologize.

24          **PROSPECTIVE JUROR:**  That's okay.

25          **MR. SHEPARD:**  You answered that past behavior will

JURY VOIR DIRE

```
 1    influence my decision-making.

 2              PROSPECTIVE JUROR:  Yes, I did say that.

 3              MR. SHEPARD:  Can you expand on that; explain what

 4    you mean?

 5              PROSPECTIVE JUROR:  Yeah, I forgot about that one,

 6    what I said on that one, but can you please repeat that?  I'm

 7    sorry.

 8              MR. SHEPARD:  Yeah.  You said that past behavior will

 9    influence my decision-making.

10              PROSPECTIVE JUROR:  Yes, that is true.  It means,

11    like, it means that if that person did it already before and I

12    see that it change, you know, like to be a better person, then,

13    you know, I can change the way I look at it.  But if it keeps

14    doing that and it keeps happening, and then I really can't

15    think of, like, that this person will change, because if you

16    did it and you keep doing that again and again, then, you know,

17    I don't believe that this person will change.  But if it happen

18    and then it change the way he used to be before, and like, for,

19    like, couple of years never done anything, then I would say,

20    you know, it will change.

21              MR. SHEPARD:  I understand.  But let's assume for a

22    moment evidence of other accusations of wrongdoing, and you

23    don't get to hear anything about whether there was change or

24    not change.

25              PROSPECTIVE JUROR:  Uh-huh.
```

JURY VOIR DIRE

1          **MR. SHEPARD:**  Would you feel strongly that past

2   behavior is going to influence your decision-making?

3          **PROSPECTIVE JUROR:**  It can and can't be.  It depends.

4          **MR. SHEPARD:**  Okay.  So can you explain to me what it

5   would depend on, apart from, you know, just if you heard

6   evidence of change?

7          **PROSPECTIVE JUROR:**  Yeah, I can change my decision on

8   that.  Yes.

9          **MR. SHEPARD:**  Okay.  Other than change, is there

10  anything else that would matter to you?

11         **PROSPECTIVE JUROR:**  No.

12         **MR. SHEPARD:**  Okay.  So if you didn't hear evidence

13  of change, this would be something that would impact your

14  decision-making?

15         **PROSPECTIVE JUROR:**  Yes.

16         **MR. SHEPARD:**  Yes?  And you feel pretty strongly

17  about that, it seems.

18         **PROSPECTIVE JUROR:**  Yes.

19         **MR. SHEPARD:**  Okay.  Without picking on any more

20  people, I think you all kinda get the idea of what I'm asking

21  about here.  I saw a few heads nodding when people were

22  answering some of my questions.  Are there other people who

23  feel strongly that if there's accusations of other wrongdoing,

24  that that's going to affect their ability to be fair in this

25  case?

1          **THE COURT:**  You have a hand over here.

2          **PROSPECTIVE JUROR:**  I think that if you do something,

3    it's going to make me look at you different.  You will forever

4    be labeled as that.  Like example, domestic violence case X

5    years ago, always look at you as someone who abuses your

6    spouse.  It's hard to take that away, especially if it's going

7    to compound it with more.  You will forever be that.  I believe

8    people could change, but it doesn't change that you did do

9    those actions.  You will forever be that person.

10          **MR. SHEPARD:**  I'm sorry.  To stay on my good side

11    with the court reporter, could you --

12          **PROSPECTIVE JUROR:**  My name is Karen Gloria.  Sorry.

13          **MR. SHEPARD:**  Okay.  And you feel that pretty

14    strongly it would be hard for you to ...

15          **PROSPECTIVE JUROR:**  Yeah, yeah.

16          **MR. SHEPARD:**  Okay.  Who else was nodding?  Others?

17          **PROSPECTIVE JUROR:**  Right.  I was nodding, but

18    counselor, I just want to clarify for you.  I don't need the

19    microphone.  I can project.

20          I was nodding because I understood what Mr. Schwab said.

21          I'm Robert Gunter.  I was nodding because I understood

22    what Mr. Schwab said.  I do not have any problem with that.

23          **MR. SHEPARD:**  I appreciate that.

24          Anybody else?

25          Okay.  Let me move to one of the other questions that I

1    really appreciate all of you taking some time to answer, and

2    that is the question of whether you think someone who's accused

3    of a crime and raises an issue about mental illness is doing so

4    as a means of avoiding responsibility.  And a number of you

5    responded either that that just shouldn't be an excuse for

6    criminal activity, or that too many people are claiming that

7    when accused of criminal activity, and therefore you would be

8    really a hard sell on any claim like that.

9         So who feels like that?

10        **PROSPECTIVE JUROR:**  Jennifer Chapman.  I just feel

11   that a lot of people use that as an excuse, but in context I

12   could put that aside, but you would really have to prove to me

13   that there's some mental illness present, you know, and it's

14   not just a claim of it.  I would want proof of that before I

15   could let that go.

16        **MR. SHEPARD:**  I very much appreciate your saying

17   that.  When you say I have to prove to you something ...

18        **PROSPECTIVE JUROR:**  That the person is not mentally

19   ill.

20        **MR. SHEPARD:**  Yes.

21        **PROSPECTIVE JUROR:**  Or is mentally ill, one way or

22   the other.  I mean, but if they're saying, well, I did this

23   because I'm mentally ill, then I need proof that they are

24   mentally ill, not just, yeah, that he said so.

25        **MR. SHEPARD:**  Okay.  And I don't want to start

1  talking about the evidence, so I'm not going to --

2          PROSPECTIVE JUROR:  Absolutely fine.

3          MR. SHEPARD:  -- get into that with you, but are you

4  suggesting that it would -- you would look to the defense to

5  actually prove the mental illness, as opposed to considering

6  this along with the Judge's other instructions about the

7  government's burden to prove guilt beyond a reasonable doubt?

8          PROSPECTIVE JUROR:  I would have a hard time.  I --

9  yeah.

10         MR. SHEPARD:  You would have a hard time with that?

11         PROSPECTIVE JUROR:  Uh-huh.

12         MR. SHEPARD:  Okay.  I see a hand behind you.

13         PROSPECTIVE JUROR:  I might be wrong in this, but as

14  a jury, aren't we just supposed to determine guilt or

15  innocence?

16         MR. SHEPARD:  I would love to engage in a

17  conversation with you about that.

18         PROSPECTIVE JUROR:  Okay.  Well, my point is I think

19  that's my understanding, I may be wrong.

20         THE COURT:  Well, the job of the jury is at the end

21  of the evidence to consider also my instructions on applying

22  the facts that you find to the law that I give you, and then

23  you will be asked to come to a verdict.

24         PROSPECTIVE JUROR:  Okay.

25         THE COURT:  And the verdict will be guilt or

1    innocence.

2            **PROSPECTIVE JUROR:**  Okay.  Doug Conde is my name.

3        I guess what I'm saying is the mental illness or anything

4    would not come into my frame of reference because we're just

5    trying to look at what the law says, and if they broke the law,

6    they broke the law.  And I think that the mental illness phase

7    should be determined in the penalty.

8            **MR. SHEPARD:**  Okay.  So you --

9            **PROSPECTIVE JUROR:**  My opinion.

10           **MR. SHEPARD:**  You would have a very difficult time

11   considering mental illness as it relates to guilt?

12           **PROSPECTIVE JUROR:**  Correct.

13           **MR. SHEPARD:**  And other people who feel that way?

14           **PROSPECTIVE JUROR:**  I guess I feel the same way

15   that --

16           **THE COURTROOM DEPUTY:**  What's your name, please?

17           **PROSPECTIVE JUROR:**  Matthew Carfi.  Thank you.  That

18   it just doesn't have a bearing, I guess, in my eyes.  It's -- I

19   don't know a better way to say it, but ...

20           **MR. SHEPARD:**  Understood.  You feel strongly about

21   that, it would be hard for you to get past the fact --

22           **PROSPECTIVE JUROR:**  Yeah, I just don't think -- I

23   believe that mental illness is more prominent than we all

24   probably realize, but I don't think it's an excuse to or it

25   condones or it allows someone to break the law or that there

JURY VOIR DIRE

1   should be, you know, repercussions for that regardless,

2   regardless of your mental state.

3          **MR. SHEPARD:**  And that strong feeling would impact

4   your ability to judge Mr. Andrade's guilt or innocence?

5          **PROSPECTIVE JUROR:**  I just, I think that it's not an

6   excuse for committing a -- any crime, I guess.

7          **MR. SHEPARD:**  Okay.  We had some other people raising

8   hands on that.

9          **PROSPECTIVE JUROR:**  Philip Fluty.  And it may just be

10  mainly due to the complexity of the case from what little I was

11  aware of in the e-mail documentation, but if the idea of like a

12  mental illness were to come up in the case, I believe due to

13  the limited information presented to me as a juror, it would

14  impact my judgment due to the innate complexity of the case, so

15  it would impede my ability to be unbiased in this case.

16         **MR. SHEPARD:**  Okay.  Just because you wouldn't be

17  able to learn enough about it, or ...

18         **PROSPECTIVE JUROR:**  Not in the sense of like -- it

19  would be in regards to someone who has -- who is pleading the

20  mental illness would be capable of committing a crime like

21  this.  Like it would be -- it would be something that I would

22  have a hard time believing.

23         **MR. SHEPARD:**  You'd just be -- you'd feel deeply that

24  you'd be really sceptical about any defense like that?

25         **PROSPECTIVE JUROR:**  Yes, sir.

1        **MR. SHEPARD:**  Okay.

2        **PROSPECTIVE JUROR:**  My name's Kevin Cook.

3     You said that it's the government's responsibility to

4  prove that the defendant did something wrong, he is innocent

5  until proven guilty.  But if he's using an excuse that he has a

6  mental illness, wouldn't that be your responsibility to prove

7  that mental illness is actually what it is and it's not just a

8  cop-out?

9        **THE COURT:**  Well, let me just clarify one aspect of

10  this for you, and maybe it will make it easier to understand

11  the question.  When it does come time for me to give

12  instructions to the jury, the government has the burden of

13  establishing all the elements of the crimes charged, and some

14  crimes have an intent element.  The defendant must have

15  intended.  And the government has the burden of proving that

16  the defendant had the intent.

17     When the issue of intent is being considered by the jury,

18  there may be some aspects of that with respect to mental

19  illness.  That's where it may come into play.  The government

20  always has the burden, and if there is an intent element.  So

21  it's not so much mental illness as an excuse.  It's the

22  government has the burden of proving, amongst other elements,

23  that the defendant had the intent to commit the crime.  That's

24  how it comes into play in a criminal case.

25     Go ahead, Mr. Shepard.

1    **MR. SHEPARD:**  Thank you, Your Honor.

2    So understanding that, would you have difficulty because

3    you do not think mental illness is an excuse, would you have

4    difficulty fairly applying the Judge's instruction that the

5    government has to prove intent beyond a reasonable doubt if one

6    of the reasons that is argued that the defendant doesn't have

7    intent is based on some mental illness, would that be hard for

8    you?

9    **PROSPECTIVE JUROR:**  Honestly I think I would.  I

10   spent some time when I was in the army, and you don't just get

11   out of your responsibilities or the things that have to be

12   taken care of because you claim to have a mental illness.  It

13   has to be something that is proven, that that would be the

14   reason why you did do what you did.

15   **MR. SHEPARD:**  When you say you think you would, you

16   mean you think you would have great difficulty following --

17   **PROSPECTIVE JUROR:**  Without proof, that that actually

18   is a true statement.

19   **MR. SHEPARD:**  Other hands?

20   **PROSPECTIVE JUROR:**  I just raised my hand because I

21   wasn't very sure about this part, because the mental illness, I

22   wanted to know about what is exactly that mean.

23   Because for example somebody with general depression, it's

24   not the excuse -- I mean, general depression you could say

25   40 percent, I don't know, 50 percent has that.  So if I can ask

1   is what is mental illness exactly, and how much did that mental

2   illness affect his decision-making when he or she is doing that

3   crime.  So this is what I'm thinking, you know.  If it is -- if

4   it -- he cannot decide when --

5        Thank you.

6        What is the definition, I mean, the mental illness, how we

7   can define it?  I mean, if it is kind of general something,

8   depression or like that, and the person says, I had this mental

9   issue and cannot -- and couldn't decide what I did, it's not

10  excuse for -- it's not excuse.  But if there is a mental, how

11  could I say, there is a significant mental illness based on the

12  Judge telling me this is an instruction this is in law, this

13  kind of illness can affect his decision when he's doing that

14  crime.

15       So it may affect my decision, because the decision-making

16  with that illness could be changed.  I mean, this is what I'm

17  thinking.

18       **MR. SHEPARD:**  Okay.  I don't get to unfortunately

19  answer your questions now, because that is all subject to

20  evidence that may or may not be disputed.  So I'm sorry I

21  can't, but let me just ask you another question to make sure I

22  understand what you said.

23       If the Judge were not to tell you that this illness is an

24  excuse or a defense, would you still be able to consider it, or

25  would the fact that the Judge doesn't give you a specific

1  instruction about that mean that you would think, no, I'm -- I

2  can't take that into account?

3       PROSPECTIVE JUROR:  Maybe I can set it aside, I mean,

4  still I can judge without that information based on my best

5  knowledge.  I mean, yes, I can do that.

6       MR. SHEPARD:  Okay.  Who else?

7       PROSPECTIVE JUROR:  I think I'm -- sorry, Christine

8  Brackett.  I think I'm similar to the other gentleman, that I

9  would expect, depending on the type of mental illness, like

10 either prosecution or defense would try to at least let us know

11 clinically diagnosed, et cetera, rather than someone has a

12 mental illness and just assume that we -- just because you said

13 it, that we have to consider it the same way without having I

14 think someone giving some kind of clinical diagnosis to it or

15 some kind of someone to tell me something so that I understand

16 what the implication is or why it's being brought up at all or

17 what it's -- and what it can cause in terms of outcome.

18      So just tell me that I have to believe that someone has

19 mental illness without understanding any context or application

20 to it is really hard to not to have any bias towards.

21      MR. SHEPARD:  I appreciate that completely.  I

22 appreciate these questions are a bit in the abstract.  That's

23 because we don't want to start --

24      PROSPECTIVE JUROR:  Understood.

25      MR. SHEPARD:  -- getting into the evidence.  So

1 apologies, but I appreciate your explanations.

2   Anyone else?  I think Mr. Fetsch.

3   **PROSPECTIVE JUROR:**  Walter Fetsch again.

4   I don't think I have a great deal to add, but I would just

5 agree that it's -- the evidence of any kind of incompetence

6 would have to be extremely convincing, and given that

7 psychiatry is such a vague and squishy kind of field, I mean,

8 the whole field is very much subjective, it makes proving

9 things very, very difficult.

10   **MR. SHEPARD:**  Okay.  Thank you for that perspective.

11   How many other people think the evidence would have to be

12 evidence of mental illness would have to be extremely

13 convincing before it would make a difference to you?

14   Okay.  Let's start going around with those, if we may.

15   Please.

16   **PROSPECTIVE JUROR:**  (Gloria) Anyone could claim they

17 have a mental illness.  I won't believe it until there's like a

18 professional diagnosis and understand what that mental illness

19 is just because I'm not very well versed on all the illnesses.

20   **MR. SHEPARD:**  Fair enough.

21   I think what was said was the evidence would have to be

22 extremely convincing.  Is that how you feel about it, as well?

23   **PROSPECTIVE JUROR:**  Yeah, because anyone could claim

24 anything, you know.

25   **MR. SHEPARD:**  And you feel pretty strongly about

JURY VOIR DIRE

 1   that?

 2              **PROSPECTIVE JUROR:**  Yes.

 3              **MR. SHEPARD:**  Okay.  I think we had some in the back

 4   there.

 5              **PROSPECTIVE JUROR:**  (Samples) Yeah, to be

 6   transparent, as you know, I have had, like, I've been the

 7   victim of a fraud crime involving cryptocurrency, and due to

 8   that, I don't trust myself to be impartial and follow the

 9   Judge's instructions that intent has to be proven because of

10   the way I feel about what happened to me in the past.  So a

11   different case, maybe, but I don't know if I can really be

12   impartial, regardless of any mental illnesses that may exist in

13   this particular case.

14              **MR. SHEPARD:**  Okay.  Thank you.

15        I think Dr. Salah, is that right?

16              **PROSPECTIVE JUROR:**  Yeah, I think, you know, having

17   treated and seen mental illness frequently, I actually

18   disagree.  I don't think it's that much of a squishy field.  I

19   think it -- although it does depend on subjective assessments,

20   just like with any other field, a clinical diagnosis is a

21   clinical diagnosis, and the way it influences intent and

22   decision-making becomes much more, I guess, for me as a juror,

23   a potential juror, I'd want to see that clinical diagnosis

24   being made before bringing it to the case.

25              **THE COURT:**  Okay.

1          **PROSPECTIVE JUROR:**  Nathan Vestrich-Shade.  We have

2    similar feelings as previously stated.  Would to see the strong

3    evidence to substantiate it.

4          **THE COURT:**  Okay.  Others?

5          **PROSPECTIVE JUROR:**  (Han) Same to what the doctor was

6    saying.  I would need clinical evidence.

7       As someone who was diagnosed with a mental illness myself

8    and have lost a brother due to a clinical diagnosis of

9    depression, so I think that would definitely affect my views.

10         **MR. SHEPARD:**  Thank you for that.  Sorry.

11         **PROSPECTIVE JUROR:**  Anthony Schwab.  I personally

12   have seen too many times where people use mental illness as an

13   excuse for hurting others and either are legitimately mentally

14   ill but not treating it and continue to hurt others or they

15   just use an excuse for being a bad person.

16         **MR. SHEPARD:**  And it seems like you have some pretty

17   powerful feelings about that.  It would be hard for you to set

18   aside?

19         **PROSPECTIVE JUROR:**  Yes.  Been put through the ringer

20   with my brother-in-law.

21         **MR. SHEPARD:**  We'll leave brother-in-laws out, and my

22   apologies.

23       But it sounds like those are really strong feelings based

24   on some intense personal experience that you --

25         **PROSPECTIVE JUROR:**  Yeah.  I'm providing him housing,

1   and it's just a constant excuse and refusal to take his meds

2   and do the right thing and try and go to therapy, and it's just

3   kicking and screaming.

4           **MR. SHEPARD:**  Yeah, those can be very tough.  My

5   sympathies.  But it sounds like you feel that really strongly.

6           **PROSPECTIVE JUROR:**  Oh, yeah.

7           **MR. SHEPARD:**  And it would be hard to set aside.

8           **PROSPECTIVE JUROR:**  I'm trying to make sure that he

9   doesn't do something and that my wife is in an okay place.  So

10  not fun.

11          **THE COURT:**  Okay.  Others?

12          **PROSPECTIVE JUROR:**  Joshua Pollak.

13      I feel like this is a very strange, I don't know, a very

14  strangely asked question.  I think it couldn't just be a simple

15  claim.  Like I'm just assuming there would be evidence.  If

16  there's evidence, that's okay, but I wouldn't just take it on

17  faith that it would absolve someone of intent.  So hopefully

18  that made sense.

19          **MR. SHEPARD:**  No, I agree with you.

20      And again, I apologize, because we're not going to --

21  we're not in a position here to talk about the evidence yet.

22  So that's why the question is phrased the way it is.  But I

23  take your point and I appreciate it.

24      We have one back here.

25          **PROSPECTIVE JUROR:**  Doug Conde again.

1    Just, I have a bit of personal background.  I don't know

2    if -- I won't get into the details, but let's just say that on

3    a daily basis I have to deal with this kind of thing, and

4    either way, the intent in my opinion is -- would be really hard

5    for me to separate out, because in my case dealing with

6    somebody who will repeatedly do this kind of behavior that will

7    affect somebody else, and to that other person, to the person

8    who they're affecting, you know, they don't have a choice in

9    that.  There's no way to say, oh, well, that's just, you know,

10   whatever's going on.

11       You should still be found guilty or innocent, and that

12   person needs to know that they're guilty or innocent.  Again,

13   and I kinda take that to the penalty phase or, you know, the

14   consequence phase of my case, where, regardless of the intent,

15   the consequence needs to be there, and maybe the consequence

16   needs to be dealt with because of the mental illness or

17   whatever, but you still have to call what's right is right and

18   what's wrong is wrong.

19       **MR. SHEPARD:**  Okay.  And so it sounds like you've had

20   some intense personal experience with this for which you have

21   my deepest sympathy.

22       **PROSPECTIVE JUROR:**  On the daily, sir.

23       **MR. SHEPARD:**  And that's going to make it hard for

24   you to consider this sort of evidence in terms of the guilt or

25   innocence, as opposed to punishment.

1    **PROSPECTIVE JUROR:**  Again, I know what the Judge said

2    as far as considering that for the, you know, the intent part

3    of it, but I don't -- maybe it's just my opinion.  I think

4    that, you know, you have to at least call it and say, you're

5    guilty, so ...

6    **MR. SHEPARD:**  Regardless of what the Judge might tell

7    you about intent, you just call it.  You say you're guilty and

8    you deal with that in the punishment part of it.

9    **PROSPECTIVE JUROR:**  Yeah.  You broke the law, you

10   broke the law.

11   **MR. SHEPARD:**  I'm sorry, I didn't hear you.

12   **PROSPECTIVE JUROR:**  I'm sorry.  If you broke the law,

13   you broke the law.

14   **MR. SHEPARD:**  Okay.  Others?

15   **THE COURT:**  We're about at the end of this part of

16   the process, Mr. Shepard, so bring it to a conclusion.

17   **MR. SHEPARD:**  Okay.  If I could move to one other.  I

18   have a couple of other topics.

19   **THE COURT:**  Well, you got one more round, so ...

20   **MR. SHEPARD:**  Let me just ask one general question,

21   and then try to get into one other subject, if I may.

22       A number of people responded not just that they didn't

23   like cryptocurrency, but they thought it was a scam and that

24   people who would sell it were scammers.  How many of you feel

25   that way?

1      (Prospective jurors hands raised.)

2          **MR. STEFAN:**  Okay.

3          **PROSPECTIVE JUROR:**  Karen Gloria.

4      I put in my questionnaire that I believe that people who

5   create cryptocurrencies aren't there to revolutionize the world

6   but to make quick bucks.  You're here to pump and dump.  That's

7   what I put.

8          **MR. SHEPARD:**  And is that something you could put

9   aside, or is that something that you feel really ...

10         **PROSPECTIVE JUROR:**  It's really hard to put aside

11  given everything I've seen regarding new cryptos and stuff.  I

12  play with cryptos, and I see how it goes up and down, and,

13  yeah.

14         **MR. SHEPARD:**  Okay.  How many other people feel that

15  way?

16         **PROSPECTIVE JUROR:**  Brandon Ginn.

17     I've been in and out of techs for a long time now,

18  different communities and all that kind of stuff.  And outside

19  of the major cryptocurrencies, pretty much the only connotation

20  that I see these smaller currencies in is negative and largely

21  just a scam.  Especially with all the news and stuff going on

22  recently, it's hard to see it otherwise.

23         **MR. SHEPARD:**  Okay.  And that would be hard for you

24  to put aside that feeling?

25         **PROSPECTIVE JUROR:**  I would certainly try to do so.

1    **MR. SHEPARD:**  Okay.  But it's sort of a deeply held

2    belief?

3    **PROSPECTIVE JUROR:**  I wouldn't say a strongly seated,

4    but it is definitely held.

5    **MR. SHEPARD:**  Okay.  We had others.

6    **PROSPECTIVE JUROR:**  Nathan Vestrich-Shade.  I think

7    I've stated in the prior questions about this part.  Very hard

8    to set aside.

9    **MR. SHEPARD:**  Okay.

10   **PROSPECTIVE JUROR:**  David Robinson.

11   I don't believe that the creation of new cryptocurrency is

12   a legitimate industry, and it is a strongly held belief.  But I

13   understand what a juror's obligations are, and I'm capable of

14   following the instructions that I receive from the Court as a

15   juror.

16   **MR. SHEPARD:**  Okay.  I think we have one more over

17   here.

18   **PROSPECTIVE JUROR:**  Robert Gunter.  I'm very much in

19   line with what the last gentleman said.  I have a degree in

20   economics, and based on, with that, the amount of risk

21   involved, I don't think cryptocurrency should be legal, but I

22   also understand the Judge's instructions and will follow them.

23   **THE COURT:**  Okay.  Let me see counsel at the side.

24   (The following proceedings were held at Sidebar:)

25   **THE COURT:**  Okay.  Let me start with you.

1          **MR. HIGHSMITH:**  Thank you, Your Honor.

2      I believe number one, Mr. Samples, Tanner Samples, said he

3  can't evaluate the case fairly based on law enforcement.

4          **THE COURT:**  I will grant the for-cause challenge for

5  Mr. Samples.

6          **MR. HIGHSMITH:**  The others, I do not have for-cause

7  on the others.  There's some hardships but they're kind of

8  wobblers.

9          **THE COURT:**  Wobbler?  There's one guy having surgery,

10  so that's not a wobbler.

11          **MR. HIGHSMITH:**  No, he's not a wobbler.

12          **THE COURT:**  And that one is.

13          **THE COURTROOM DEPUTY:**  He was in the well.

14          **THE COURT:**  Mr. Rabellde.

15          **THE COURTROOM DEPUTY:**  Okay.

16          **THE COURT:**  He's got the surgery.

17      Okay.  Mr. Shepard?

18          **MR. SHEPARD:**  We probably could use a moment, or I

19  can let Mr. Stefin start, because it's hard to ask all the

20  questions and keep track.

21          **THE COURT:**  Sure.

22          **MR. SHEPARD:**  So we could let Mr. Stefin, Ms. Dent or

23  Ms. Diamond go.

24          **THE COURT:**  Each one of you is not going to give me

25  for-cause challenges.  I want some lawyer to tell me what the

1    for-cause challenges are.

2            **MR. STEFAN:**  Douglas Conde, who was -- he's two now.

3            **THE COURT:**  Although just for your guidance, people

4    who -- I will strike him for cause, but just the general sort

5    of you gotta prove it is, I think, okay.  Because what they're

6    saying is we're not going to take just somebody saying you've

7    got a mental illness.

8        But Mr. Conde is beyond the pale on that, so I will grant

9    that.

10           **MR. STEFAN:**  Palomares.  She said that in the event

11   she heard any evidence of past behavior, she would expect the

12   person to continue behaving in that way and wouldn't be swayed.

13           **THE COURT:**  The problem with that is to the extent

14   past conduct is admitted by me, they can take it into account.

15   There's nothing wrong with it.  You can't have -- I have to

16   make the determination on whether or not it's being admitted

17   purely to show propensity, which I will not allow.  But if it

18   does come in, if it comes in within the parameters of past

19   conduct, under 404 you can consider it.  That's why it's being

20   admitted into evidence.

21           **MR. STEFAN:**  Understood, Your Honor.  I guess her

22   answers were all in the context --

23           **THE COURT:**  Oh, you can talk, Mr. Shepard.  I didn't

24   say only one person could talk.

25           **MR. SHEPARD:**  But their feelings were all this is

1    propensity.  They're gonna treat it as propensity.  That's the

2    sensitivity of all of this.

3             **THE COURT:**  Well, I understand that point.  It's all

4    on a spectrum.

5        I think in retrospect, frankly, it's a badly -- those

6    questions I don't think were well crafted.  I approved them,

7    but, you know, it's -- your point is a fair one, but at the

8    same time, it is admissible evidence to consider in the

9    appropriate circumstance.  These questions don't make any

10   distinction, which is the problem.  But I agree with you if

11   it's, you know, they did it before, they're gonna do it again,

12   that is something --

13       Now, however, let's get to Mr. Palomares.  I don't think

14   his answer was that way.  So --

15            **MR. STEFAN:**  Her answer?

16            **MR. HIGHSMITH:**  I was just going to say there's no

17   indication she's not going to follow the Judge's ruling.

18   There's absolutely no evidence in the record that she will not

19   follow you.  To the contrary, I think she will follow your

20   instructions, and she's a woman.

21            **THE COURT:**  Yes.  Meaning?

22            **MR. HIGHSMITH:**  She was Miss.  You referred to her as

23   Mister.

24            **THE COURT:**  All right.  I will deny the -- you almost

25   got in a lot of trouble.  Okay.  I'll deny that one.

1    Next.

2         **MR. STEFAN:**  Jorge Villa.  He thinks crypto is a scam

3    and he didn't see himself moving off of that position at all.

4         **MR. HIGHSMITH:**  I think there's absolutely no

5    indication that he will not follow the instructions of the

6    Judge or follow the law.  He was -- his answers were he would

7    follow the Judge, follow the law.

8         **THE COURT:**  Yeah, I'm going to -- I'll deny that one.

9    Okay.  Next?

10        **MR. STEFAN:**  Apologize, Your Honor.  I'm looking

11   through my notes.

12        **THE COURT:**  No, that's okay.  Go ahead.

13        **MR. HIGHSMITH:**  Can I interject for a second just to

14   give you a little extra time, or not?

15        **MR. STEFAN:**  Go ahead.

16        **MR. HIGHSMITH:**  I was just going to say Mr. Fluty had

17   some -- he said he'd be distracted because of the long commute

18   and the financial difficulties, so I would move to excuse him

19   for cause.

20        **THE COURT:**  What's your view on him?

21        **MR. STEFAN:**  I think we're good with Fluty being

22   kicked.

23        **THE COURT:**  All right.  Mr. Fluty is gone.

24   Next?  I believe Ms. Proctor had May 7th to the 14th or

25   something.

JURY VOIR DIRE

1          **MR. HIGHSMITH:**  Excuse her for cause, Your Honor.

2          **THE COURT:**  Yeah, so she can go.

3          **MR. STEFAN:**  So, Your Honor, with respect to

4    number 10, I have Meng Guo.  Oh, nine, sorry.

5          **MR. HIGHSMITH:**  Meng Guo.

6          **THE COURT:**  English problems?

7          **MR. HIGHSMITH:**  Yes.

8          **MR. STEFAN:**  Well, yes.  Understanding that you

9    instructed her on the burden of proof, she didn't really seem

10   to understand what you were saying.

11         **THE COURT:**  Yeah, okay.  Yes, she can go.

12         **THE COURTROOM DEPUTY:**  Okay.

13         **MR. STEFAN:**  Vestrich-Shade.

14         **THE COURTROOM DEPUTY:**  Fourteen.

15         **MR. STEFAN:**  Fourteen.  He works at JPMorgan.  He has

16   a lot of experience in finances and crypto and a very strong

17   opinion that it's all a scam.  When you pressed him whether he

18   could follow your instruction he said he could do his best.

19         **MR. HIGHSMITH:**  I'm also concerned he'll be

20   distracted by the travel schedule and won't be able to pay

21   attention to the Court.

22         **THE COURT:**  Okay.  Vestrich-Shade is gone.

23         **MR. STEFAN:**  Lavigne.  Sorry, I believe that's 13.

24         **THE COURT:**  Yeah.

25         **MR. STEFAN:**  Am I correct?

JURY VOIR DIRE

1      **THE COURT:**  Yeah.

2          **MR. STEFAN:**  She said that she had a very strong

3   feeling about past behavior with respect to the -- that would

4   be hard to set aside.

5          **MR. HIGHSMITH:**  I think strong feelings are okay.

6   The question is whether she can follow the Court, and there's

7   no indication she --

8          **THE COURT:**  I think she kinda crossed the line.  I

9   think she crossed the line.  I'll let her go.

10      Okay.

11          **MR. STEFAN:**  Jennifer Chapman.

12          **THE COURT:**  From Petaluma?

13          **THE COURTROOM DEPUTY:**  Seventeen.

14          **MR. STEFAN:**  Pardon me, Karen Gloria.  I mean,

15   multiple reasons.  Extremely sceptical of cryptocurrency, very

16   difficult for her to set aside, and extremely sceptical of any

17   evidence of mental illness would have to be extremely

18   convincing.  She feels that crypto is a pump and dump and

19   reiterated the answer that she provided in her questionnaire.

20          **MR. HIGHSMITH:**  No indication she wouldn't follow the

21   Judge, follow the law.

22          **THE COURT:**  I think she crossed the line.  She can

23   go.  And I'll save you.  How about Mr. Fetsch?  I assumed --

24          **MR. STEFAN:**  Yes, Mr. Fetsch.

25          **THE COURT:**  -- everybody wants him gone.  Okay.  He's

JURY VOIR DIRE

1    gone.

2            **THE COURTROOM DEPUTY:**  Nineteen, okay.

3            **THE COURT:**  Yes.

4            **MR. HIGHSMITH:**  I'm sorry.  You struck Gloria.

5            **THE COURT:**  And Fetsch.

6            **MR. HIGHSMITH:**  Okay.  Thank you.

7            **MR. STEFAN:**  So Brandon Ginn said that smaller

8    cryptocurrencies are largely scams.  It's very hard for him to

9    see otherwise.

10            **THE COURT:**  Okay.  I'm going to deny that.  I don't

11    think he crossed the line.

12        Okay.  Next?

13            **MR. HIGHSMITH:**  Your Honor, I would -- we would move

14    to strike for cause Cameron Campbell, who wrote in his

15    questionnaire he believed the criminal justice system is

16    corrupt.

17            **THE COURT:**  Well, but he said -- he indicated he'd

18    follow the -- no, I'm not going to strike him.

19            **MR. HIGHSMITH:**  Minzu Wu?  Her English was limited.

20    I think she followed the Court, but she had some limited

21    English.  She was juror number 21 not in the box, but in the

22    box she's 16.  She's juror number 21.

23            **THE COURT:**  I'm just concerned we -- you know, we

24    gotta watch the numbers here.

25        What's your view on Wu?  It's a he, I think.

JURY VOIR DIRE

1          **MR. STEFAN:**  No, we don't want her kicked, Your

2   Honor.

3          **THE COURT:**  All right.  I'm going to leave her on for

4   the time being.

5      Actually, one that I think Mr. Khajehezhad, I'm concerned

6   about this kid dropoff at 9:00 a.m., and he's very kind of over

7   the map on it, but I don't have any confidence that he wouldn't

8   be -- we'd get him on the jury and he'd say, oh, I can't do

9   this.  So I'm inclined to let him go.

10         **MR. STEFAN:**  I apologize, Your Honor.  Which number

11  is that?

12         **THE COURTROOM DEPUTY:**  Twenty-nine.

13         **THE COURT:**  Twenty-nine.

14         **MR. STEFAN:**  I believe on defense side we left off at

15  Ginn.

16         **THE COURT:**  I said no.  I'm going to leave him on.

17         **THE COURTROOM DEPUTY:**  Khajehnezhad.

18         **THE COURT:**  Yeah.

19     Go ahead.

20         **MR. STEFAN:**  Chien Tai, Your Honor.

21         **THE COURT:**  Where is she?

22         **THE COURTROOM DEPUTY:**  Twenty-three in the well.

23         **THE COURT:**  We're back to the beginning?

24         **THE COURTROOM DEPUTY:**  In the well, 23.

25         **THE LAW CLERK:**  In the gallery.

JURY VOIR DIRE

1          **MR. HIGHSMITH:**  She was in the back corner.

2          **MR. STEFAN:**  She said her office would have to shut

3   down if she wasn't there.  She's an optometrist, but she's the

4   only one at her office and would have to shut down.

5          **THE COURT:**  Okay.  Yeah, I think it's ...

6          **THE COURTROOM DEPUTY:**  Twenty-three?

7          **THE COURT:**  Yeah.  We're losing a lot, so it's making

8   me nervous.

9          **MR. STEFAN:**  Matthew Carfi same thing on his

10  inflexibility with respect to mental illness.

11         **THE COURT:**  I'll deny that one.

12         **MR. STEFAN:**  David Robinson had very strong opinions

13  about --

14         **THE COURT:**  He's a good juror.  I want him on there.

15  He's staying on.  The end of every answer is, but I'm going to

16  follow the Judge's instructions.

17         **MR. STEFAN:**  Kevin Cook, he spoke specifically to

18  defense counsel, Mr. Shepard, about having great difficulty and

19  applying the Judge's instructions on the mental illness

20  defense.

21         **THE COURT:**  Yeah, I am going to leave him on.

22     Okay.  I think that's --

23         **MR. STEFAN:**  Pardon me?

24         **THE COURT:**  I think that's it, isn't it?

25         **MR. HIGHSMITH:**  English.  Your Honor, I'm worried

1  about Peter Hlaing's English.

2          **THE COURT:**  Which one is he?

3          **MR. HIGHSMITH:**  He was 31.

4       He had the father-in-law who choked five times.

5          **THE COURT:**  All right.  Yeah, his English is pretty

6  questionable.

7          **THE COURTROOM DEPUTY:**  Thirty-one?

8          **THE COURT:**  Yeah.

9       So what we're going to do is -- pardon?

10          **MR. STEFAN:**  It was a good job for someone with bad

11  English.

12          **MR. SHEPARD:**  I think he may just have not heard the

13  Court.

14          **THE COURT:**  Leave him on.

15          **THE COURTROOM DEPUTY:**  Leave him on?  Okay.

16          **THE COURT:**  Okay.  What I'm going to do, by the way,

17  is call -- put new people in the box, and then we'll take a

18  brief lunch break, like 45 minutes.

19          **THE COURTROOM DEPUTY:**  I have 12.

20          **THE COURT:**  Twelve to strike so far?

21       Okay.  Last go-round.

22          **MR. STEFAN:**  Anthony Schwab, Your Honor.

23          **THE COURT:**  Well, he was pretty out there.

24          **MR. STEFAN:**  Pattern of doing things.  He was really

25  hard on that a lot.  Seen people use mental illness as an

JURY VOIR DIRE

 1   excuse too many times.  Sounds like he has a lot of bias.

 2          **MR. HIGHSMITH:**  I'd like a chance to rehabilitate

 3   him.  I think if we ask him straight up, will you follow the

 4   Judge's instructions, he'll give us an answer on that.

 5          **MR. STEFAN:**  I mean, that would never overcome the

 6   things he's already said.

 7          **THE COURT:**  I sort of had him as a for cause, so

 8   grudgingly go ahead.

 9          **THE COURTROOM DEPUTY:**  Which one was it?

10          **THE COURT:**  Anthony Schwab.

11          **MR. HIGHSMITH:**  That's basically it.

12          **MR. STEFAN:**  Your Honor, Matthew Olson.  Same thing

13   with prior wrongdoing.  Expressed to defense counsel he'd have

14   difficulty saying someone's not --

15          **THE COURT:**  No, he's staying on.

16          **MR. STEFAN:**  Okay.

17          **THE COURT:**  All right.  Can you give me -- let me

18   give the precursor, and then you can do it.  And you'll call

19   the new ones in, right?

20          **THE COURTROOM DEPUTY:**  Yes.

21          **THE COURT:**  And then we'll take the break.

22       (Sidebar conference Concluded.)

23          **THE COURT:**  Thank you very much for your patience,

24   ladies and gentlemen.

25       What's going to happen now is certain jurors issue going

1  to be excused, and then new jurors are going to be called to

2  take the seats of those who have been excused, and at that

3  point we'll take a relatively brief lunch break, and then we'll

4  just go with the new potential jurors, we'll go through the

5  questioning hopefully even more streamlined than we did before.

6      You may be saying to yourself, will this ever end, but we

7  actually are kind of consistent with the schedule and making

8  some progress.  So I'm still hopeful that, you know, by the

9  afternoon we'll have the jury in place.

10     Okay.  So what I'm going to ask Ms. Lew to do is to call

11  out the names of those of you who will be excused.  Once those

12  seats are vacated, she will call the new jurors to take those

13  seats.

14     Ms. Lew.

15         **THE COURTROOM DEPUTY:**  Katherine Proctor, Meng Guo,

16  Linda Lavigne, Nathan Vestrich-Shade, Karen Gloria, Walter

17  Fetsch, Chien Tai, Alijah Rabellde, Milad Khajehnezhad, Anthony

18  Schwab.

19     Scott Hildreth, if you can take a seat in number 1 at the

20  very first.  Thank you.  Number 2 is Mary Bean.  Three is

21  Virginia Lyons.  So the empty seat in the back, please.  Thank

22  you.  Irene Hernandez, the second row in the box, yes.  Thank

23  you.  Stephen Duffy, second row right there, yeah.  George

24  Kelley, in the second row there.

25     Jacquelyn Spano, in the second row next to the gentleman.

1  Adam Kim, the number 18.  Thank you.  Bradley Steinwede.

2  Pamela Henson, in the front row right there.  Yes.  Katherine

3  Dawe?  In the front right there, please.  And then Myisha

4  Childs.  If you could sit in the front right there.

5       That's everybody.

6            THE COURT:  Okay.  Well, welcome to the new

7  prospective jurors.

8       What we're going to do now is we're going to take a lunch

9  break, and we'll resume at 1:15.  And then we'll have some

10  questions for the folks that have just been called forward.

11       Those of you who are waiting patiently in the back of the

12  courtroom that haven't been called yet, I know you want to move

13  it along.  We need you, because we, as you see, we go through

14  the process and jurors' seats become vacant, and we need to

15  call jurors up.  So we need you all here.

16       So for all of those, both called up and those who are

17  waiting patiently, please remember you don't know much about

18  the case, but don't talk about it.  Don't do any research.

19  Don't try to find out anything at all about it.

20       And we'll see you back here at 1:15.

21       For those 36 that are called forward, take exactly the

22  same seats you have now so that we don't get all confused.

23       So we'll see you at 1:15.

24       (The venire exits the courtroom.)

25            THE COURT:  Okay.  We'll see you all at 1:15.

1    (A recess was taken from 12:39 p.m. to 1:21 p.m.)

2        **THE COURT:**  Thank you all for promptly getting back.

3    We can move things along.

4        **THE COURTROOM DEPUTY:**  I need one more juror, Kyle

5    Montville.  If you could sit in the front right next to

6    Ms. Childs right there.  Thank you.  Yes, that's it.

7        **THE COURT:**  Okay.  Welcome to our new perspective

8    jurors.

9    Let me start with you, Mr. Hildreth.  Mr. Hildreth, you're

10   in Alameda?

11       **PROSPECTIVE JUROR:**  I am, Your Honor.

12       **THE COURT:**  And you are a retired college professor?

13       **PROSPECTIVE JUROR:**  Yes, sir.

14       **THE COURT:**  You were at Chabot College?

15       **PROSPECTIVE JUROR:**  I was.

16       **THE COURT:**  What areas did you teach?

17       **PROSPECTIVE JUROR:**  Astrophysics.

18       **THE COURT:**  Astrophysics.

19       **PROSPECTIVE JUROR:**  Lots of fun.

20       **THE COURT:**  That was not my subject in school, so I

21   have to admit I'm not sure I have a clue what exactly you are

22   teaching, but it sounds complicated.

23   So on your form, you indicated to me that, to us, that you

24   have a family member that's in law enforcement in Colorado and

25   a stepsister that's a sitting superior court judge?

1    PROSPECTIVE JUROR:  Yes, sir.

2    THE COURT:  So have you had an opportunity to talk

3    with those individuals about their work and --

4    PROSPECTIVE JUROR:  I have to my sister-in-law, yes.

5    THE COURT:  Okay.

6    PROSPECTIVE JUROR:  The aunt in Colorado, not as

7    much.

8    THE COURT:  Okay.  The conversations that you had

9    with your sister, do you think that would impact your ability

10   to be fair and impartial on a jury here?

11   PROSPECTIVE JUROR:  I don't believe it will impact me

12   at all.  Thank you, Your Honor.

13   THE COURT:  Okay.  With those law enforcement topics,

14   you said you would be more likely to believe the law

15   enforcement witness' testimony.  You've heard at great length

16   that issue being discussed.  Having heard all of that, do you

17   think you could just apply the same scrutiny to a law

18   enforcement witness that you would to any other witness?

19   PROSPECTIVE JUROR:  I do understand that, Your Honor,

20   and I would follow your direction.

21   THE COURT:  Excellent.

22   On the question about burden, you indicated you feel as

23   though there are individuals who are caught and declare

24   themselves not guilty when there really is no doubt they did

25   the deed, and it puts the onus on the prosecution to have to

JURY VOIR DIRE

1  prove they were sane and there weren't valid extenuating

2  circumstances.

3      You do, have heard now many times my emphasizing the

4  burden that's on the government, and just, you know, for a

5  moment as an aside, that's to protect all of us.  I mean, it is

6  to protect us from having to come into court and be charged by

7  governmental authorities and be in a position where we have to

8  prove our innocence.  That's totally contrary to the American

9  system.  So it is really an entrenched concept and one that is

10  critically important that the burden stays on the government.

11      Could you follow that obligation on the government in your

12  deliberations?

13      **PROSPECTIVE JUROR:**  Absolutely, Your Honor.  I have

14  great faith in the system.

15      **THE COURT:**  I appreciate your candor on the right to

16  remain silent.  You say, yes, it is their right.  Would I draw

17  an inference?  I'm afraid I might.

18      It will be drilled into you, as has already been the case,

19  that you can't make an inference.  It's not appropriate.  Will

20  you follow that?

21      **PROSPECTIVE JUROR:**  I will follow that, Your Honor.

22      **THE COURT:**  Okay.  Thank you.

23      The questions about cryptocurrency is -- again, it's not

24  going to be the case that decides whether it's good or bad.

25  Can you focus on the evidence in this case and the conduct and

1  activities that were developed through that evidence for you as

2  the basis for making your decision?

3          **PROSPECTIVE JUROR:**  I can indeed, Your Honor.  As a

4  scientist, that's really what I'm trained to do.

5          **THE COURT:**  There you go.  Okay.  Thank you.

6      Do you have any problem with -- we talked about in the

7  context of mental health issues.  Do you have any problem with

8  the concept that part of the government's burden is if it's a

9  crime that has an element of intent, that the government has to

10  prove that the defendant had that intent.

11          **PROSPECTIVE JUROR:**  I do understand that, Your Honor.

12          **THE COURT:**  All right.  And if there's some evidence

13  regarding mental ability to have that intent, that's something

14  the jury has to consider.  Is that fair?

15          **PROSPECTIVE JUROR:**  That is indeed, yes, sir.

16          **THE COURT:**  Okay.  All right.

17      Thank you.

18      To sort of do a quick summary on what we've already gone

19  over, and not to belabor it, Corinne, did you give our new

20  folks the witness list?

21          **THE COURTROOM DEPUTY:**  They're already sitting there.

22          **THE COURT:**  Did you look at that list?

23      **PROSPECTIVE JUROR:**  Yes, sir; Your Honor, I did.

24      **THE COURT:**  Do you know any of those people?

25      **PROSPECTIVE JUROR:**  There are none.

JURY VOIR DIRE

1     **THE COURT:**  And then we did introductions at the

2  beginning.  Did you know anyone that was introduced?

3     **PROSPECTIVE JUROR:**  I do not, no.

4     **THE COURT:**  Any other questions that I asked or that

5  counsel asked that would have caused you to raise your hand?

6     **PROSPECTIVE JUROR:**  No, sir.

7     **THE COURT:**  Okay.  Thank you very much.

8     Let's move it to Ms. Bean.  Ms. Bean, you're from San

9  Rafael?

10     **PROSPECTIVE JUROR:**  I am.

11     **THE COURT:**  By way of North Dakota.  Very different

12  places.

13     And you are in environmental law?

14     **PROSPECTIVE JUROR:**  Not environmental law.  I did

15  work for an engineering firm termed Law Environmental.  That

16  becomes a little confusing.

17     **THE COURT:**  And you're retired now?

18     **PROSPECTIVE JUROR:**  Correct.

19     **THE COURT:**  Is it your spouse who is a retired police

20  sergeant?

21     **PROSPECTIVE JUROR:**  That's correct.

22     **THE COURT:**  Okay.  Would the fact that you have law

23  enforcement in the family, would that affect your ability to

24  judge a law enforcement witness like any other?

25     **PROSPECTIVE JUROR:**  I think I can judge fairly.

1    **THE COURT:**  Anyone on the witness list that you

2    recognize?

3    **PROSPECTIVE JUROR:**  No, none.

4    **THE COURT:**  Anybody introduced today that you think

5    you know?

6    **PROSPECTIVE JUROR:**  No.

7    **THE COURT:**  No.

8    Any of the questions that were asked -- and I know this

9    is -- a lot of questions were asked, but anything that comes to

10   mind that you'd say, oh, I would have raised my hand for that?

11   **PROSPECTIVE JUROR:**  I don't believe so.

12   **THE COURT:**  Okay.  Thank you.

13   Now we will go to Ms. Lyons.

14   You're coming to us from Kentfield?

15   **PROSPECTIVE JUROR:**  Correct.

16   **THE COURT:**  And you work for a nonprofit?

17   **PROSPECTIVE JUROR:**  Yes.

18   **THE COURT:**  What kind of work does the nonprofit do?

19   **PROSPECTIVE JUROR:**  It does community development

20   work in Richmond.  We build playgrounds and parks.

21   **THE COURT:**  Specifically in Richmond?

22   **PROSPECTIVE JUROR:**  Yes, just in the iron triangle

23   neighborhood of Richmond.

24   **THE COURT:**  And you've been with them for about 20

25   months?

1    **PROSPECTIVE JUROR:**  Yes, two years.

2    **THE COURT:**  The list of witnesses, potential

3    witnesses, did you take a look at that?

4    **PROSPECTIVE JUROR:**  I did, and I don't recognize any

5    names.

6    **THE COURT:**  Did you -- do you happen to know any of

7    the people that were introduced?

8    **PROSPECTIVE JUROR:**  No.

9    **THE COURT:**  The law enforcement question, you

10   indicated I would be more likely to believe their testimony.

11   After all of our discussion today, what's your --

12   **PROSPECTIVE JUROR:**  Yes, I think I can look at them

13   the same way I would look at anybody else.

14   **THE COURT:**  Okay.  You said in answer to the question

15   about have you seen or read or heard anything about this case,

16   specifically or the allegations, and you said perhaps you have.

17   **PROSPECTIVE JUROR:**  No, I don't think so.

18   **THE COURT:**  Okay.  Anything that I asked or counsel

19   asked that would have prompted you to raise your hand, you

20   think?

21   **PROSPECTIVE JUROR:**  No.

22   **THE COURT:**  Okay.  Thank you.

23       Now we go all the way down I think back to Ms. Hernandez.

24   **PROSPECTIVE JUROR:**  Hello.

25   **THE COURT:**  Good afternoon.  Hello.  You're coming

 1  all the way from Napa.

 2          **PROSPECTIVE JUROR:**  Yes.

 3          **THE COURT:**  That's a ways.  And you work -- I

 4  shouldn't indicate this, but you work for the wine that I like

 5  the best, Duckhorn.  Duckhorn Sauvignon blanc is the best.

 6      So could you make it work to come from Napa and be here at

 7  8:30?

 8          **PROSPECTIVE JUROR:**  Yes.

 9          **THE COURT:**  You could?

10          **PROSPECTIVE JUROR:**  Uh-huh.

11          **THE COURT:**  You are to be commended.

12      So what do you at Duckhorn?

13          **PROSPECTIVE JUROR:**  My position is director of

14  quality and laboratory.  I'm the head for chemistry and wine

15  and the quality of the end product.

16          **THE COURT:**  So you are the one responsible for

17  keeping that Sauvignon blanc really good.  That's excellent.

18      Okay.  You've now -- you know, you've heard a little about

19  the nature of the charges that the government has brought.

20  You'd indicated you had some things that perhaps you want to

21  talk to us about.  Now that you know about the type of criminal

22  case this is, do you think you have any problems with that?

23          **PROSPECTIVE JUROR:**  I don't think so.

24          **THE COURT:**  The witness list, did you have a chance

25  to take a look at that?

JURY VOIR DIRE

1      **PROSPECTIVE JUROR:**  Yes, I did.  I don't recognize

2   anyone.

3      **THE COURT:**  Okay.  And how about the people that were

4   introduced?  Anybody that you think you know?

5      **PROSPECTIVE JUROR:**  No.

6      **THE COURT:**  Okay.  You indicated in response to the

7   question about this case you told us about a documentary you

8   had seen.

9      **PROSPECTIVE JUROR:**  I think it was just in a Bitcoin

10  documentary.  I don't think it was this one.

11     **THE COURT:**  Anything else that you would have raised

12  your hand if you had been one of the 36?

13     **PROSPECTIVE JUROR:**  The only one would have been the

14  mental health.  I would like to see a subject matter expert in

15  regards to that part.

16     **THE COURT:**  Okay.

17     **PROSPECTIVE JUROR:**  That's it basically.  And the --

18  you said about the trial dates, there is an international

19  standardization organization audit in May 3, 4 and 5.

20     **THE COURT:**  May?

21     **PROSPECTIVE JUROR:**  Sorry, March 3, 4 and 5.  That

22  would be my only dates that might be critical for me to be --

23     **THE COURT:**  Three, 4 and 5.

24     **PROSPECTIVE JUROR:**  Monday, Tuesday and Wednesday.

25     **THE COURT:**  Well, those will be days that we very

1  likely will be in session.  If you are chosen as a juror, you

2  will need to be here.  So something's gotta give.

3           **PROSPECTIVE JUROR:**  Yeah.

4           **THE COURT:**  What will happen?

5           **PROSPECTIVE JUROR:**  That, I just hired a supervisor

6  to run the laboratory.  She started on the 2nd.  So it might be

7  something that I will have to work hard to train her to be able

8  to answer questions for this audit, just because this audit

9  gives us a certificate that will let us go into markets such as

10 Walmart and Costco, and she will have to be able to answer

11 these questions.

12          **THE COURT:**  That's important.

13          **PROSPECTIVE JUROR:**  Yes, but I think I can be able to

14 do that.

15          **THE COURT:**  And again, you know, we do end at 1:30.

16 I know getting back to Napa is not an easy prospect, so, but

17 there will be a little bit of time where you can at least maybe

18 check in.

19          **PROSPECTIVE JUROR:**  Yes.

20          **THE COURT:**  Well, thank you.

21     Let's send it to Mr. Duffy.  Welcome.  And Mr. Duffy,

22 you're coming from San Anselmo?

23          **PROSPECTIVE JUROR:**  Correct.

24          **THE COURT:**  You are a forester?

25          **PROSPECTIVE JUROR:**  Yes.

1    **THE COURT:**  At the Presidio Trust, is that the

2    Presidio in San Francisco?

3    **PROSPECTIVE JUROR:**  Correct.

4    **THE COURT:**  And I kind of can guess some aspects of

5    your work, but why don't I let you tell us what that entails,

6    being a forester.

7    **PROSPECTIVE JUROR:**  So run the forester program.  So

8    all aspects of arboreal culture, growing, to removing and

9    burning.

10    **THE COURT:**  And there's a lot of flora and fauna in

11    The Presidio.  That's great.

12    So you indicated to us in answer to the question about the

13    right to remain silent and the fact that the defendant has no

14    obligation of any kind to testify, you said, well, you were a

15    little uncomfortable with that.

16    **PROSPECTIVE JUROR:**  That's correct.

17    **THE COURT:**  You've now heard me talk ad nauseam about

18    that issue.  Do you think you could follow my instruction?

19    **PROSPECTIVE JUROR:**  I can.

20    **THE COURT:**  Okay.  The burden of proof.  You also had

21    indicated some concern about that.  And more broadly, that

22    there's some issues that you think in the legal system.

23    Perfectly appropriate opinion.  On the specific question of the

24    burden on the government to prove the defendant guilty beyond a

25    reasonable doubt, that burden always staying with the

JURY VOIR DIRE

1    government, can you apply that standard?

2            **PROSPECTIVE JUROR:**  I can.

3            **THE COURT:**  Okay.  You said maybe you've heard about

4    this matter, I mean, and you had made some reference to Bernie

5    Madoff.  This case does not involve him.  Do you think was it

6    more a general thing, or do you think you've actually heard

7    about this case?

8            **PROSPECTIVE JUROR:**  Yeah, very general, and I don't

9    know that the two are related.

10           **THE COURT:**  You said you think you have heard of a

11   cryptocurrency called AML, Bitcoin or ATEN Coin?

12           **PROSPECTIVE JUROR:**  Yeah, I think I've heard of AML,

13   but again I couldn't be absolutely certain.  I don't really

14   follow Bitcoins, cryptocurrencies.

15           **THE COURT:**  Do you think whatever you may have heard,

16   would that impact your decision to come into this as a fair and

17   neutral juror and base your judgment on the evidence that's

18   presented in this case?

19           **PROSPECTIVE JUROR:**  I don't think so.  There wasn't

20   anything specific.  It just sounded familiar.

21           **THE COURT:**  Okay.  How about the 8:30 to 1:30?

22           **PROSPECTIVE JUROR:**  No problem.

23           **THE COURT:**  Okay.  Thank you.

24       Next is George Kelley.  Mr. Kelley, you're from Antioch?

25           **PROSPECTIVE JUROR:**  Yes.

JURY VOIR DIRE

1      **THE COURT:**  And you are working with Delta View

2  Post-Acute.

3      **PROSPECTIVE JUROR:**  Yes.

4      **THE COURT:**  And you're a certified dietary manager?

5      **PROSPECTIVE JUROR:**  Yes.

6      **THE COURT:**  What's that involve?  Tell us a little

7  about that.

8      **PROSPECTIVE JUROR:**  Well, I work in a 99-bed

9  facility, and it's a rehab facility.  We rehab patients that's

10  come from Kaiser, Sutter, from Medicare, Medicare outpatient.

11  I'm a director of the kitchen, so I have to do dietary

12  assessments on~--- not assessments, but new screening, screening

13  for the residents, and I work up under a registered dietician.

14      **THE COURT:**  I see.  Okay.

15     The 8:30 to 1:30 schedule?

16      **PROSPECTIVE JUROR:**  It's a problem.

17      **THE COURT:**  It's a problem?

18      **PROSPECTIVE JUROR:**  I mean, right now because anytime

19  we're in the window for recertification survey from the State,

20  and they come in anytime.  They usually come on Mondays or

21  Tuesdays, so if they're not there now, I probably won't see

22  them until maybe tomorrow or whatever.  But it's due at any

23  moment, and it's something that I should be present for, so ...

24      **THE COURT:**  And you don't know when that's going to

25  be?

JURY VOIR DIRE

1        **PROSPECTIVE JUROR:**  I don't know when it is.  I can't

2   say when it is.

3        **THE COURT:**  Okay.  Does your facility, what's their

4   view on jury service and paying for jury service?

5        **PROSPECTIVE JUROR:**  No.

6        **THE COURT:**  They don't?

7        **PROSPECTIVE JUROR:**  No.

8        **THE COURT:**  Well, I'm going to remember that if Delta

9   View is in the court.

10       **PROSPECTIVE JUROR:**  Yeah.

11       **THE COURT:**  Okay.

12       **PROSPECTIVE JUROR:**  Some facilities it does, but mine

13  doesn't.

14       **THE COURT:**  Okay.  You have the list of witnesses.

15       **PROSPECTIVE JUROR:**  I seen it.

16       **THE COURT:**  Potential witnesses.  Did any of those

17  people, do you know any of them?

18       **PROSPECTIVE JUROR:**  No, I don't.

19       **THE COURT:**  The people that were introduced to you at

20  the beginning of the case, do you know anybody?

21       **PROSPECTIVE JUROR:**  No, I don't.

22       **THE COURT:**  Okay.  Any questions that I asked or

23  counsel asked you that you would have said, oh, I'm going to

24  raise my hand for that?

25       **PROSPECTIVE JUROR:**  Maybe my trust in the law.

1          **THE COURT:**  Okay.

2          **PROSPECTIVE JUROR:**  Police officers and maybe my

3    trust, I'm lacking a little bit in that business.  I had some

4    bad experiences with the -- with them telling the truth.

5          **THE COURT:**  Would it matter to you if they were, as

6    I've indicated before, the type of law enforcement officers

7    that will be testifying it, won't be police officers.  It will

8    be FBI agents and, I don't know, perhaps other federal agents.

9          **PROSPECTIVE JUROR:**  No, I never had nothing to deal

10   with them before.  Of course, I wouldn't have no problem with

11   them, no.

12         **THE COURT:**  Okay.  But also you wouldn't say just

13   because they're -- would you say just because they're an FBI

14   agent, I'm going to believe them?

15         **PROSPECTIVE JUROR:**  No, no.

16         **THE COURT:**  Okay.  All right.  Anything else?  Any

17   other questions I asked that would cause you to raise your

18   hand?

19         **PROSPECTIVE JUROR:**  (Shakes head.)

20         **THE COURT:**  Okay.  Thank you.

21      Ms. Spano, right next to Mr. Kelley.  You're coming from

22   Redwood City, and you work at Stanford?

23         **PROSPECTIVE JUROR:**  Yes, at the school of medicine.

24         **THE COURT:**  You're a nurse practitioner?

25         **PROSPECTIVE JUROR:**  Yes.

JURY VOIR DIRE

1          **THE COURT:**  And you've been there for 17 years?

2          **PROSPECTIVE JUROR:**  Yes, came from Minnesota.

3          **THE COURT:**  Wow.

4      What kind of schedule do you keep as a nurse practitioner?

5          **PROSPECTIVE JUROR:**  I work 50 hours a week.

6          **THE COURT:**  Fifty?

7          **PROSPECTIVE JUROR:**  Yeah, I work a lot.

8      I wear a couple hats at the university.  I'm a care

9  provider.  I provide care for patients.  And I also do

10  research.  Research is mostly looking at drugs that are going

11  to be submitted for FDA approval and doing those clinical

12  trials and providing oversight and management of those trials.

13  And then I provide care for individuals with cystic fibrosis.

14  Mostly infants that are diagnosed in the screening program in

15  the state of California.

16          **THE COURT:**  Are you at Lucille Packard?

17          **PROSPECTIVE JUROR:**  I actually work for the

18  university, so I'm in an office building, not at the hospital.

19          **THE COURT:**  So the 8:30 to 1:30 calendar?

20          **PROSPECTIVE JUROR:**  I can be here.  I do have to

21  cancel clinics.  So I have to cancel clinics, but I can be

22  here.

23          **THE COURT:**  Well, I appreciate that.

24      Do you have the list of --

25          **PROSPECTIVE JUROR:**  I don't know anybody on the list

1  and I don't know anybody in the room.

2          **THE COURT:**  Okay.  Any of the questions from me or

3  from counsel that you would have been saying to yourself, I'm

4  going to raise my hand?

5          **PROSPECTIVE JUROR:**  I would just support that mental

6  health is a medical diagnosis and should be treated and should

7  not be used as an excuse, and I would look at the evidence

8  presented in this courtroom to make my decision.

9      I do have one disclosure piece that I don't think I put in

10  my form.  My stepson is involved in cryptocurrency, and hence I

11  have some opinions about it.

12          **THE COURT:**  Okay.  What -- by "involved," tell me

13  just a little more.

14          **PROSPECTIVE JUROR:**  He works in the business.  He

15  works in the business.

16          **THE COURT:**  Okay.  Is he involved in a company that

17  sells cryptocurrency or ...

18          **PROSPECTIVE JUROR:**  Yes, and trades.  And there are

19  some things that provide opportunity for dishonesty.  I'll

20  leave it at that.

21          **THE COURT:**  Well, with your -- what you would bring

22  to the courtroom, your views about cryptocurrency, do you think

23  you could be a fair and impartial juror in a case where the

24  cryptocurrency industry may be involved, but the question is

25  going to be whether or not the government has proven the

JURY VOIR DIRE

```
 1   charges against the defendant beyond a reasonable doubt.
 2            PROSPECTIVE JUROR:  Yes.
 3            THE COURT:  It won't be do you like or not like
 4   cryptocurrency.
 5            PROSPECTIVE JUROR:  Yes, I could evaluate what was
 6   presented.
 7            THE COURT:  Okay.
 8            PROSPECTIVE JUROR:  I do have travel at the end of
 9   March, March 17th.
10            THE COURT:  I think that'd be okay.
11            PROSPECTIVE JUROR:  Okay.
12            THE COURT:  You had indicated that you thought you
13   might have heard of AML Bitcoin or ATEN Coin.  Anything
14   specific that you --
15            PROSPECTIVE JUROR:  No, just scrolling through the
16   news, but nothing specific to this case.
17            THE COURT:  Thank you.  Let's go now to Mr. Kim.
18   Mr. Kim's there.
19        Mr. Kim, you live in Richmond?
20            PROSPECTIVE JUROR:  Yes.
21            THE COURT:  And you are a library technician at the
22   Graduate Theological Union?
23            PROSPECTIVE JUROR:  Yes.
24            THE COURT:  You've cone that for three years?
25            PROSPECTIVE JUROR:  Uh-huh.
```

JURY VOIR DIRE

1        **THE COURT:**  The 8:30 to 1:30 schedule, could you make

2   that work?

3        **PROSPECTIVE JUROR:**  Yes.

4        **THE COURT:**  Do you have the list of witnesses?

5        **PROSPECTIVE JUROR:**  Yes, I don't recognize anyone on

6   the list or anyone that was introduced.

7        **THE COURT:**  Any of the questions that either I asked

8   or counsel asked that would prompt you to raise your hand?

9        **PROSPECTIVE JUROR:**  Yeah, two of the questions from

10  the defense counsel, mental health and opinions about

11  cryptocurrency mostly in line with what people have already

12  said about I would like to see an official diagnosis, and

13  having negative feelings towards cryptocurrency.  But I

14  would -- I understand the instruction to set that aside.

15       **THE COURT:**  Okay.  And let me just delve into that a

16  little bit more when you're indicating you understand the

17  instruction.  But what I'm trying to say is that nothing wrong

18  with people having opinions as they come into the courtroom

19  about particular business or what have you, but the whole point

20  of this process is that you come in and you focus on what you

21  hear in this room, and you assess the evidence and you try to

22  say to yourself I'm not going to decide this case based on

23  something I read five years ago about some business or the

24  like.  An inartful question, but will you be able to do that?

25       **PROSPECTIVE JUROR:**  Yes.

1          **THE COURT:**  Any other -- so you've said those two

2  things.  Anything else that comes to mind that you think you

3  have to raise your hand?

4          **PROSPECTIVE JUROR:**  No.

5          **THE COURT:**  Okay.  Thank you.

6     Mr. Steinwede.  Coming to us from Half Moon Bay by way of

7  Sidney, Australia.

8          **PROSPECTIVE JUROR:**  By way of Sidney, Australia, yes.

9          **THE COURT:**  And you work for Lancesoft, Inc.

10         **PROSPECTIVE JUROR:**  Yes.

11         **THE COURT:**  And what does Lancesoft, Inc. do?

12         **PROSPECTIVE JUROR:**  It's a staffing company.

13         **THE COURT:**  Software?

14         **PROSPECTIVE JUROR:**  No, staffing.  We provide

15  contingent labor to most of the Fortune 500 companies.

16         **THE COURT:**  Oh, staffing?

17         **PROSPECTIVE JUROR:**  Uh-huh.

18         **THE COURT:**  Okay.  Are you working virtually or in an

19  office?

20         **PROSPECTIVE JUROR:**  A little of both.  I manage our

21  most profitable account, and I have meetings with those people

22  regularly, which is at their offices, not mine.  And I manage a

23  large team of recruiters.

24         **THE COURT:**  The 8:30 to 1:30 schedule, is that

25  something you can accommodate?

JURY VOIR DIRE

1     **PROSPECTIVE JUROR:**  The time is not an issue.  I

2  neglected to put a trip that I have scheduled from the 7th of

3  March through to the 15th of March on that form.  It's part

4  business and part family.  It's Miami via New York, and it's

5  nonrefundable at this point.

6     **THE COURT:**  And that is from March 7th to ...

7     **PROSPECTIVE JUROR:**  Fifteenth.

8     **THE COURT:**  To the 15th.

9     Okay.  You told me it was back on the East Coast, Miami

10  and New York, you say?

11     **PROSPECTIVE JUROR:**  (Nods head.)

12     **THE COURT:**  Okay.  Did you look at the list of

13  witnesses?

14     **PROSPECTIVE JUROR:**  I did, and I did not recognize

15  any of the names.

16     **THE COURT:**  The people introduced also?

17     **PROSPECTIVE JUROR:**  I've never seen these people

18  before.

19     **THE COURT:**  Anything that you would have raised your

20  hand about?

21     **PROSPECTIVE JUROR:**  Well, the things that I -- are

22  the things that I put in my form.  I -- back in Australia, so

23  20, 30 years ago, I was involved in an arbitration case, and I

24  represented myself.  The other party had an attorney.  I -- it

25  all came down in my favor, and the attorney got very

JURY VOIR DIRE

1    frustrated.  But I was very confident that I did not need

2    anyone to speak on my behalf because I knew what I was talking

3    about, and I feel that if you are honest, then you should not

4    be concerned to speak for yourself.

5            **THE COURT:**  Does that translate for you into a view

6    about the right to remain silent, or ...

7            **PROSPECTIVE JUROR:**  I think it implies guilt when you

8    don't want to.

9            **THE COURT:**  And as you now know well, I'd instruct

10    you, and I really just want your candid response.  If you don't

11    think you could follow the instruction, we want to know that.

12            **PROSPECTIVE JUROR:**  Well, it's always going to come

13    back in my mind like I spoke for myself, why can't he.

14            **THE COURT:**  I see.

15            **PROSPECTIVE JUROR:**  Or that person.

16            **THE COURT:**  Thank you.

17        Let's go next to Ms. Henson.

18        Ms. Henson.  Pittsburgh?

19            **PROSPECTIVE JUROR:**  Yes.

20            **THE COURT:**  And how's 8:30 to 1:30?

21            **PROSPECTIVE JUROR:**  Good.

22            **THE COURT:**  You work in the insurance business?

23            **PROSPECTIVE JUROR:**  Correct.

24            **THE COURT:**  And the company is called AmTrust?

25            **PROSPECTIVE JUROR:**  Yes.

JURY VOIR DIRE

1        **THE COURT:**  Tell us a little about what you do in the

2    work you do.

3        **PROSPECTIVE JUROR:**  I'm a commercial claims adjuster.

4    Mostly handle auto accidents involving, like, 18-wheelers, you

5    know, all the commercials from the trucking industry sand and

6    gravel, all the way down to your small businesses.

7        **THE COURT:**  You work with a lot of lawyers, I

8    suspect?

9        **PROSPECTIVE JUROR:**  I do.

10        **THE COURT:**  Would that experience cause you to have

11    any difficulty you think being a fair and impartial juror here?

12       You said "no"?

13        **PROSPECTIVE JUROR:**  No.

14        **THE COURT:**  Okay.  You have the list of witnesses.

15    Any witnesses, potential witnesses, that you think you might

16    know?

17        **PROSPECTIVE JUROR:**  No, I do not know them.

18        **THE COURT:**  Any of the people that were introduced

19    today, did you know any of them?

20        **PROSPECTIVE JUROR:**  No.

21        **THE COURT:**  In answer to the question about the right

22    to remain silent, your answer was "maybe."  After hearing what

23    we've discussed at great length today, could you follow my

24    instruction that you're not to hold it against the defendant if

25    the defendant elects not to testify?

1      **PROSPECTIVE JUROR:**  Yes.

2          **THE COURT:**  You think you could follow that?

3      **PROSPECTIVE JUROR:**  I can.

4          **THE COURT:**  In response to the question about the

5  burden of proof, I think you were just actually asking for more

6  information.  And you will get the final instructions in this

7  case, I will give an instruction about what the reasonable

8  doubt standard, but we cannot go into that now.  What I can

9  emphasize to you is what I've emphasized henceforth, that the

10 government has that burden.  The government has to prove guilt

11 beyond a reasonable doubt.  The defendant has no burden at all.

12 Doesn't have to present any evidence, doesn't have to testify.

13     Can you accommodate that?

14     **PROSPECTIVE JUROR:**  Yes.

15         **THE COURT:**  You've told us that you know someone

16 who's an investigator, and tell me a bit more about that.

17         **PROSPECTIVE JUROR:**  Well, I -- my daughter is a

18 financial crimes investigator.  She works for a financier for

19 the banking industry.  So she's a risk and financial crimes

20 investigator.  So she does discuss those type of things.

21         **THE COURT:**  Do you think anything about her work and

22 your opportunity to talk with her, would that affect your

23 ability to be a fair and impartial juror, do you think?

24     **PROSPECTIVE JUROR:**  No.

25         **THE COURT:**  And she works for private industry?

JURY VOIR DIRE

1     **PROSPECTIVE JUROR:**  Yes.

2         **THE COURT:**  Any other hand-raising moments you would

3  have had and answered any of the questions that any of us

4  asked?

5     **PROSPECTIVE JUROR:**  No.

6         **THE COURT:**  Thank you.

7     Ms. Dawe?  Ms. Dawe, you are a San Franciscan?

8     **PROSPECTIVE JUROR:**  Yes.

9         **THE COURT:**  And you work for Zone 5 Technologies.

10 You're new there, it looks like.

11    **PROSPECTIVE JUROR:**  Yes.

12        **THE COURT:**  What do they do?

13    **PROSPECTIVE JUROR:**  We're a defense contractor.

14        **THE COURT:**  And you work in HR in that?

15    **PROSPECTIVE JUROR:**  I'm the head of HR.

16        **THE COURT:**  Do you go into the office?

17    **PROSPECTIVE JUROR:**  I'm hybrid remote.  Our office is

18 in San Luis Obispo.

19        **THE COURT:**  8:30 to 1:30, you could do it?

20    **PROSPECTIVE JUROR:**  I could do it.

21        **THE COURT:**  List of witnesses, you know anybody?

22    **PROSPECTIVE JUROR:**  Don't recognize anybody.

23        **THE COURT:**  And the people that were introduced?

24    **PROSPECTIVE JUROR:**  No.

25        **THE COURT:**  You had -- you indicated that you would

1  be perhaps less likely to believe law enforcement testimony.

2  There was some discussion about police officers.  As I

3  indicated, police officers aren't going to be testifying in

4  this trial.  Do you think you could, now having listened at

5  great length to our discussion, do you think you could follow

6  the instruction that witnesses, you don't get any benefit or

7  any detriment just because you're associated with law

8  enforcement?

9          PROSPECTIVE JUROR:  Yes, I can be fair and impartial.

10          THE COURT:  Any other questions that I asked that you

11  thought, oh, I would raise my hand for that?

12          PROSPECTIVE JUROR:  No.

13     I do have travel planned that I didn't put on there.

14          THE COURT:  Tell us about that.

15          PROSPECTIVE JUROR:  I have a trip planned from

16  March 6th to 12th.  It's personal, but, you know, it would be

17  expensive to cancel.

18          THE COURT:  March 6th through 12th.  Do you have

19  nonrefundable tickets?

20          PROSPECTIVE JUROR:  I have a nonrefundable booking,

21  yeah.

22          THE COURT:  And where is this trip to?

23          PROSPECTIVE JUROR:  Tahoe.

24          THE COURT:  Okay.  You said it was March 6th to the

25  12th?

1    **PROSPECTIVE JUROR:**  Correct.  I didn't think the

2  trial was going to go that far, so ...

3    **THE COURT:**  Well, in fairness to you, I think the

4  questionnaire didn't go that far, so not your fault.

5    Thank you.

6    Let's go to Ms. Childs.  Ms. Childs, you're also an

7  Antioch person?

8    **PROSPECTIVE JUROR:**  Yes.

9    **THE COURT:**  8:30 to 1:30?

10    **PROSPECTIVE JUROR:**  Yes, it's fine.

11    **THE COURT:**  You could work?

12    **PROSPECTIVE JUROR:**  Yes.

13    **THE COURT:**  And you work for San Francisco Muni?

14    **PROSPECTIVE JUROR:**  Yes.

15    **THE COURT:**  For 27 years?

16    **PROSPECTIVE JUROR:**  Yes.

17    **THE COURT:**  Fantastic.  Do you have a set -- are you

18  in the field with Muni?

19    **PROSPECTIVE JUROR:**  Yes.

20    **THE COURT:**  Different routes or one specific route?

21    **PROSPECTIVE JUROR:**  No, I don't drive.  I work in

22  finance.

23    **THE COURT:**  In finance?

24    **PROSPECTIVE JUROR:**  Yes.

25    **THE COURT:**  Are you working virtually at all?

1      **PROSPECTIVE JUROR:**  No, I come in every day.

2      **THE COURT:**  Yeah, Muni probably doesn't have a lot of

3  virtual work.

4      **PROSPECTIVE JUROR:**  Right.

5      **THE COURT:**  You have a half sister who is a San

6  Francisco police officer?

7      **PROSPECTIVE JUROR:**  Yes.

8      **THE COURT:**  Do you think having that connection to

9  someone in law enforcement would impact your ability to be a

10  fair and impartial juror?

11      **PROSPECTIVE JUROR:**  No.

12      **THE COURT:**  Did you have a chance to look at the list

13  of witnesses?

14      **PROSPECTIVE JUROR:**  Yes, I did.

15      **THE COURT:**  Do you know any of them?

16      **PROSPECTIVE JUROR:**  No.

17      **THE COURT:**  And anybody that was introduced to you?

18      **PROSPECTIVE JUROR:**  No.

19      **THE COURT:**  The now well known question 21 about the

20  right to remain silent, and you said "maybe."  What's your

21  answer now after all that you've heard?

22      **PROSPECTIVE JUROR:**  I don't have an issue with it.

23      **THE COURT:**  You would be able to follow the

24  instruction?

25      **PROSPECTIVE JUROR:**  Yes.

1        **THE COURT:**  Okay.  How about your skepticism about

2   cryptocurrency?  Do you think you could confine yourself to the

3   evidence in this case that's presented to you, come in with an

4   open mind and be a fair and impartial juror?

5        **PROSPECTIVE JUROR:**  Yes.

6        **THE COURT:**  Thank you.

7       Mr. Montville.  And you're a San Franciscan?

8        **PROSPECTIVE JUROR:**  Yes.

9        **THE COURT:**  You work for Stanford?

10        **PROSPECTIVE JUROR:**  I do.

11        **THE COURT:**  As a web development person?

12        **PROSPECTIVE JUROR:**  That's right.

13        **THE COURT:**  Is that a virtual job?

14        **PROSPECTIVE JUROR:**  Fully remote, yes.

15        **THE COURT:**  Did you look at the list of witnesses?

16        **PROSPECTIVE JUROR:**  I did.

17        **THE COURT:**  And do you know any of them?

18        **PROSPECTIVE JUROR:**  I don't.

19        **THE COURT:**  And how about the people that were

20   introduced?

21        **PROSPECTIVE JUROR:**  No, I don't know anybody.

22        **THE COURT:**  Any of the questions that you were asked

23   would prompt you to raise your hand?

24        **PROSPECTIVE JUROR:**  No.

25        **THE COURT:**  All right.  Mr. Highsmith, fear not,

1   these questions are confined now to the new jurors, so ...

2         **MR. HIGHSMITH:**  Just one quick question, Your Honor.

3     Would sitting for any of the new folks, would sitting on

4   this trial create a financial hardship for you that would be

5   distracting, make it difficult to focus on the case?

6     Would you just elaborate on that, sir?

7         **PROSPECTIVE JUROR:**  (Kelley) Yes, I'm the only one in

8   my household that works.  And I have a mortgage, pay bills.

9   And my job is not paying me to be on jury duty.  So I would

10  lose much-needed finances.

11        **MR. HIGHSMITH:**  Thank you, sir.

12    And would that cause a distraction during the trial for

13  you?

14        **PROSPECTIVE JUROR:**  Yeah, I probably would be in the

15  rush mode to finish, to finish the case.

16        **MR. HIGHSMITH:**  Understood.

17    Thank you, sir.

18    No further questions, Your Honor.

19        **THE COURT:**  All right.  Mr. Shepard.

20        **MR. SHEPARD:**  Mr. Steinwede, do I have that kinda

21  right?

22        **PROSPECTIVE JUROR:**  Yes, very close.  Close enough.

23        **MR. SHEPARD:**  Thank you.  Thanks for giving me a

24  little room.  I appreciate it.

25    You were saying that if you were honest you should not be

1  concerned to speak, and that would always come back in your

2  mind, even if the Judge instructed you that the defendant had a

3  constitutional right not to speak.  And I appreciate you

4  explaining that when you say it's always going to come back

5  into your mind, that means you're going to have difficulty

6  following the Court's instruction?

7        **PROSPECTIVE JUROR:**  I tried to explain it by saying

8  that back in Australia I was in front of arbitration and I

9  spoke for myself.  So my personal experience is that you should

10 not be afraid to speak for yourself, because ... yeah.  I mean,

11 I would do my best not to -- for it not to, but I -- there'd be

12 that concern, yeah.

13       **MR. SHEPARD:**  Okay.  And I appreciate that.

14     Are there other people who feel that way, that even if the

15 Judge tells you the defendant has a constitutional right not to

16 testify, you should not hold it against him if he doesn't, that

17 it would still come back in your mind and be a challenge to

18 disregard?  Anybody else feel that way?

19     Ms. Child, I know you answered "maybe" to that question.

20 You feel okay?  You could put it aside?

21       **PROSPECTIVE JUROR:**  I'm fine, yes.

22       **MR. SHEPARD:**  And Ms. Hanson, I think you had a

23 similar answer in your questionnaire.  Do -- are you with

24 Mr. Steinwede that it's just going to be hard to put it aside?

25       **PROSPECTIVE JUROR:**  No, I don't think so.

1        **MR. SHEPARD:**  You think you can?

2        **PROSPECTIVE JUROR:**  Yes.

3        **MR. SHEPARD:**  Okay.  As before, and I won't repeat

4    myself, because I know you've been listening to us for quite a

5    while, some of you said in the questionnaire you don't regard

6    mental illness as an excuse or defense.  So the question for

7    those of you, and I guess this came up in my notes for

8    Ms. Dave.

9        **PROSPECTIVE JUROR:**  Dawe.

10       **THE COURT:**  Sorry.

11       How open would you be to considering the impact of mental

12   illness on the defendant's intent?  Would you say that's not an

13   excuse and you'd have difficulty considering it?

14       **PROSPECTIVE JUROR:**  I don't think it's an excuse.  I

15   think it can explain behaviors, but I don't think it's an

16   excuse.  I think like 20 percent of the United States is

17   mentally ill at any given moment, so it's not an excuse to

18   break law essentially.

19       **MR. SHEPARD:**  Okay.  But my -- what I was trying to

20   get at inartfully is would you be open to considering it in

21   considering Mr. Andrade's intent, would you give it the full

22   consideration if you're told you should by the Court, or would

23   you always have, to use Mr. Steinwede's phrase, you know, it

24   would always come back in your mind that you don't think it's

25   an excuse?

JURY VOIR DIRE

1    **PROSPECTIVE JUROR:**  Um, I can follow direction and be

2    impartial.  I ... it would -- I don't know.  I don't have

3    enough context, I guess, to firmly say.

4        **MR. SHEPARD:**  Okay.  I'm sorry to harp on it, but I

5    think it would be helpful to know.  Do you feel like it would

6    be a challenge, that it would keep coming back in your mind,

7    and that it would be difficult for you?

8        **PROSPECTIVE JUROR:**  Yes.

9        **MR. SHEPARD:**  Anybody else feel that way about

10   considering mental illness in considering a defendant's intent?

11   Anybody else?

12       **THE COURT:**  We have a raised hand.

13       **PROSPECTIVE JUROR:**  I just, what do you mean by

14   intent?  Sorry.  I might not be understanding that part.  Irene

15   Hernandez.

16       **THE COURT:**  Well, what we will do is at the end of

17   the case, I will give you some instructions on the law, and

18   there will be elements of each of the charged crimes, and in

19   some instances one of the elements that the government must

20   prove is not only that the act occurred, but that the defendant

21   had the intent to commit the act.  And you'll get a full

22   explanation when we get to that point about that.

23       So what I believe Mr. Shepard is asking about is just

24   generally -- well, I'll let him ask the question.  Go ahead.

25       **MR. SHEPARD:**  So with that in mind in terms of how

JURY VOIR DIRE

1    the Court is going to instruct you at the end of the case,

2    would you have difficulty considering a defendant's mental

3    illness on the question of his intent, or would you be thinking

4    that seems just like an excuse to me and I don't think should

5    be an excuse?

6        **PROSPECTIVE JUROR:**  I guess reviewing the evidence

7    and the whole trial will tell us that at the end negotiate.

8    Not negotiating, but speaking and seeing the evidence and the

9    subject matter expert information will give us that answer at

10   the end, I believe.

11       **MR. SHEPARD:**  Well, yeah.  I appreciate your

12   considering the evidence.  That's good.  But I'm just wondering

13   is it going to be weighing on your mind you don't think it's an

14   excuse as you consider the evidence?

15       **PROSPECTIVE JUROR:**  For me it's not an excuse without

16   a professional giving me that information.  That's the only way

17   for me to really understand if it's proved.  There has to be

18   some proof.  Can't just take a person's form of communication

19   as the proof, as an evidence.

20       **MR. SHEPARD:**  Okay.  So without a professional, you

21   wouldn't want to consider it as part of intent?

22       **PROSPECTIVE JUROR:**  Yes.

23       **MR. SHEPARD:**  Okay.  Mr. Duffy, you escaped my

24   clutches on a previous question.  Sorry, but I should have

25   followed up with you as a followed up with a couple of others,

1  because you had said the answer to the questionnaire, if you've

2  done nothing wrong, why would you not defend yourself.  And so

3  I just wanted to inquire, again, taking off from what Mr. -- I

4  was so close the last time -- Steinwede said, is that going to

5  be something that will always come back in your mind on this

6  question, regardless of how the Judge instructs you?

7             **PROSPECTIVE JUROR:**  I don't think so.

8             **MR. SHEPARD:**  So you will be -- you're comfortable

9  you can follow the Judge's instructions?

10            **PROSPECTIVE JUROR:**  Comfortable I can follow them.

11            **MR. SHEPARD:**  Okay.  Mr. Hildreth, in response to the

12  questionnaire, you said that if the defendant claims mental

13  illness or I didn't know it was a crime, you said you believed

14  you would not be able to be fair and impartial, and I think the

15  matter and that defense would be incompatible, and therefore I

16  would be biased.  That's in the context of cryptocurrency.

17      So tell me why you feel that.

18            **PROSPECTIVE JUROR:**  Thank you.

19      I think with the direction that the Judge has already

20  given us this morning, I recognize that when I wrote that

21  response, I probably wasn't thinking in terms of the fairness

22  needed in a trial, and I recognize that as a scientist, I need

23  to use the evidence that you and the prosecution are going to

24  present, and I'll confine my decision to what is presented.

25  And I also, as I said earlier, I have great faith in the system

1    we're in, and I think that the prosecution will understand if

2    they're presenting a case to us, they've gotta give us the

3    evidence if they want us to come to the verdict that they'd

4    like us to see.

5        So if they're unable to do that, then I've gotta find on

6    the basis of the evidence regardless.

7        **MR. SHEPARD:** Okay.  I understand.  I just wanted to

8    get a better feeling for what experiences and thinking as a

9    scientist that caused you to say when it's cryptocurrency and

10   mental illness, you think that you would be biased.

11       **PROSPECTIVE JUROR:** Yes, sir.

12       I had a hard time with that question because for me -- and

13   I'm not at all an expert.  I can tell you how black holes work,

14   but I have no idea about the monetary system.  I thought it was

15   incompatible for somebody, for example, to say they understand

16   how the financial markets work, how to manipulate them or how

17   to use them, whether it's positive or negative, and then

18   somebody saying, gee, I didn't understand how things worked or

19   what the conclusions or the impact would be.

20       To me I thought the former, the case involved seems to

21   imply somebody's going to be pretty sophisticated and figure

22   out what's going on.

23       So that's why I felt difficulty about the claim of

24   somebody not being incompetent and then the charges.

25       So I've thought about it the more I've listened this

1  morning very closely, and I think I can definitely say, fine,

2  I'll just confine myself to the evidence presented by the

3  prosecution and the defense, and I'll just restrict myself to

4  that.

5      MR. SHEPARD:  Okay.  Thank you, Your Honor.

6      THE COURT:  Okay.  Let's see everybody at the side

7  again.

8      (The following proceedings were held at sidebar:)

9      THE COURT:  Okay.

10     MR. HIGHSMITH:  I've got Mr. Steinwede's got the trip

11 from the 7th through the 15th.  I've got Ms. Dawes has the trip

12 from the 6th to the 12th, and Mr. Kelley has a financial

13 hardship and can't focus on the case.  So those are three for

14 cause.

15     THE COURT:  Okay.  I'm inclined to let them go for

16 cause.

17     Any problems with this?

18     MR. SHEPARD:  (Shakes head.)

19     THE COURT:  Okay.  Those three will go.

20     Anybody else?

21     MR. HIGHSMITH:  That's it.

22     MR. STEFAN:  Scott Hildreth, understanding that he

23 provided a lot of follow-up in responses, his answers to the

24 questionnaires were just so indicative of preexisting bias.

25     THE COURT:  Well --

1    **MR. STEFAN:**  And that was only corrected after --

2    **THE COURT:**  He was pretty convincing that --

3    **MR. SHEPARD:**  He admits to being biased.

4    **THE COURT:**  I think he made it quite clear he will do

5    his very best to follow instructions, and I think I'm confident

6    he will do that.

7    Okay.  So those three.

8    Anybody else?

9    **MR. STEFAN:**  Stephen Duffy.

10   **THE COURT:**  Let May find him.  I didn't put anything

11   for him.  What's the issue for Mr. Duffy?

12   **MR. STEFAN:**  So just with respect to his answers

13   on~--- he says he doesn't have much faith in the legal system.

14   If you've done nothing wrong why would you defend yourself.  I

15   understand he looped back on these things, but all of his

16   initial impressions in the questionnaire before being given

17   direct questions from the Court were negative on that.  He

18   doesn't have faith in the system, if you've done something

19   wrong, why would you not defend yourself.  Cryptocurrency is a

20   shady form of ...

21   **MR. HIGHSMITH:**  He was very clear that he would

22   follow your instructions.  He repeatedly said he would follow

23   your instructions.

24   **THE COURT:**  Right.  I think I'm going to deny that

25   for cause.

1    Okay.  I think just three.  Anybody else?

2        **MR. STEFAN:**  No, Your Honor.

3        **THE COURT:**  Thank you.

4    (Sidebar conference concluded.)

5        **THE COURT:**  Okay.  So as we did last time around,

6    you'll see we're getting closer and closer.  I'm going to ask

7    Ms. Lew to indicate which jurors can depart, and the new jurors

8    that can replace them.

9    And I do want to say, I should have said it last time on

10   the last go-around.  If you are someone who's gone into the

11   jury box and then has been excused, you really have done your

12   service by coming and responding to your jury summons.  It's

13   not any kind of judgment on you.  It's that in this process

14   each jury is different, and it's designed to try to get the

15   right complement of jurors for a case.  But you've done your

16   duty by coming here.  You should be very proud of yourself for

17   doing that, and we're very grateful.

18   Okay.  Ms. Lew.

19       **THE COURTROOM DEPUTY:**  George Kelley, Bradley

20   Steinwede and Katherine Dawe.

21       **THE COURT:**  Thank you, the three of you, for

22   answering the summons.

23   Ms. Lew, you can announce the three people to replace

24   them.

25       **THE COURTROOM DEPUTY:**  Weyland Lau, Laurie Hancock,

1    and then Benjamin Milman.

2          **THE COURT:**  Mr. Lau, there you are.  Mr. Lau, you're

3    from South San Francisco?

4          **PROSPECTIVE JUROR:**  Yes, Your Honor.

5          **THE COURT:**  And you had worked with a company called

6    Data Vant?

7          **PROSPECTIVE JUROR:**  Yes, that's correct.

8          **THE COURT:**  What did they do?

9          **PROSPECTIVE JUROR:**  We connected the world's health

10   data like between different companies and stuff so that they

11   can do trials and research.

12         **THE COURT:**  And you did revenue accounting for them?

13         **PROSPECTIVE JUROR:**  Yes.

14         **THE COURT:**  And right now you're in between looking

15   for new work?

16         **PROSPECTIVE JUROR:**  Yeah, I'm five months out of a

17   job, looking for a job right now, yes.

18         **THE COURT:**  8:30 to 1:30, is that a possibility for

19   you?

20         **PROSPECTIVE JUROR:**  Yeah, since I don't have a job

21   right now, there's ... you know.

22         **THE COURT:**  The list of witnesses, can you take a

23   look at it?

24         **PROSPECTIVE JUROR:**  Yeah, I took a look at it.  I

25   don't know anybody, and I don't know anyone here.

JURY VOIR DIRE

1    **THE COURT:**  Very good.

2        You said in your questionnaire that you do have some

3    friends who are on the police department, part of the police

4    department?

5        **PROSPECTIVE JUROR:**  Yeah, my girlfriend's dad was

6    also a policeman that's retired.

7        **THE COURT:**  Having heard everything we've discussed

8    at length today, would you be able to assess a law enforcement

9    witness like any other?  In other words, not give them just the

10   benefit purely because they were a law enforcement officer in

11   terms of who you believe and who you don't believe?

12       **PROSPECTIVE JUROR:**  I think it would be really hard,

13   because they tell me stories and I get very angry about it.

14   Again, I'm just being honest.  Right?

15       **THE COURT:**  That's all we ask.

16       **PROSPECTIVE JUROR:**  Yeah, so I get very angry and

17   frustrated, and I -- like I have this weird thought just like I

18   take into work where I'm jury, judge and executioner.  Sorry

19   for the lack of wording, where I decide, like this is the

20   choice and we should follow it, and I try and convince everyone

21   that's what it is, and that's how I go about life sometimes,

22   like at work and in life.

23       So, yeah, it's really hard to change my mind.  And like I

24   understand, like, you know, the obligation, the orders that you

25   give, but it's like what my girlfriend says.  You hear me but

1   you don't listen to me.

2        **THE COURT:** With respect to the question about the

3   right to remain silent, can you follow my instruction that you

4   can't hold it against the defendant if the defendant elects not

5   to testify?

6        **PROSPECTIVE JUROR:** I know the PC answer is yes, but

7   inside my heart I'm like, probably not, because it's like what

8   the other person has said, like you should be able to say

9   something for yourself to prove that, like, hey, I didn't do

10  it, like, or like some reason why, like, this happened.

11       **THE COURT:** There's no -- and you sort of underline

12  it with your answer.  There's no right answer for the jury.

13       **PROSPECTIVE JUROR:** Yeah.

14       **THE COURT:** What we all want, everyone in this room

15  wants to just know what you are thinking.

16       **PROSPECTIVE JUROR:** Yeah.

17       **THE COURT:** And it doesn't -- you're not -- we're not

18  here to sit in judgment on prospective jurors.  We're here just

19  to try to make sure we have a jury that can follow the

20  instructions and do the work in that fashion.

21       **PROSPECTIVE JUROR:** Yeah, I just feel bad, that's

22  why.

23       **THE COURT:** And you indicated some concern about the

24  burden of proof on the government.  The government has the

25  burden.  You're indicating you have some qualms about that.

1    Could you apply that standard and put the government to its

2    proof?

3              PROSPECTIVE JUROR:  Could you -- sorry, can you

4    simplify the question?

5              THE COURT:  Sure.

6         As we talked about the whole bedrock of a criminal case in

7    the United States is that the government has the burden of

8    proof to prove a defendant's guilt beyond a reasonable doubt,

9    and unless and until the government succeeds in doing that, the

10   defendant remains presumed innocent.  That's our law.

11             PROSPECTIVE JUROR:  Uh-huh.

12             THE COURT:  Can you follow that law?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Anything else -- well, you indicated,

15   like many of the perspective jurors, some preconceived ideas

16   about crypto.

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  Can you put those aside and focus on the

19   evidence in this case and how -- what's presented to you and

20   what the witnesses testify to, rather than bringing in a lot of

21   preconceptions about crypto or anything else?

22             PROSPECTIVE JUROR:  Unlikely, because I traded crypto

23   and I have a friend in a similar case that I did not write

24   about that lost 200,000 in a very identical scam, which I did

25   not -- sorry I, like, left it.  I totally forgot about it.  So

1   that's -- like it's really hard to.

2           THE COURT:  Okay.  Can you pass the microphone to

3   Ms. Hancock.

4       Ms. Hancock, you're coming also from Petaluma.

5           PROSPECTIVE JUROR:  Yes, I am.

6           THE COURT:  Which is a big track, I know that.  The

7   8:30 to 1:30 schedule.

8           PROSPECTIVE JUROR:  I'm available.

9           THE COURT:  You work for Salerno County library, or

10  you did?

11          PROSPECTIVE JUROR:  I did.

12          THE COURT:  You are now retired?

13          PROSPECTIVE JUROR:  I am.

14          THE COURT:  You miss it?

15          PROSPECTIVE JUROR:  Sometimes, yes.

16          THE COURT:  I would think so.

17      And then you, when you did work with the library, you were

18  in charge of three different libraries in the Solano system?

19          PROSPECTIVE JUROR:  Correct.

20          THE COURT:  Did you look at the list of witnesses?

21          PROSPECTIVE JUROR:  I just did, yes.

22          THE COURT:  Anybody that you know, you think you

23  know?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  The people that were introduced to you,

JURY VOIR DIRE

1    do you know anybody that was introduced?

2             **PROSPECTIVE JUROR:**  I don't know anybody.

3             **THE COURT:**  Thinking back on the questions that I

4    asked is directed to whether or not someone would raise their

5    hand, I know there were a lot of questions so it's hard to put

6    them all together, but anything come to mind you thought to

7    yourself, I would have raised my hand on that?

8             **PROSPECTIVE JUROR:**  No.

9             **THE COURT:**  Anything else you think we should know?

10            **PROSPECTIVE JUROR:**  So I was born totally deaf on one

11   side.  And so there's no hearing at all.  I do have one hearing

12   aid.  I believe if you speak into the microphone I'll be fine,

13   but I don't know if I'm allowed to say --

14            **THE COURT:**  You are.

15            **PROSPECTIVE JUROR:**  I am?

16            **THE COURT:**  Absolutely.

17            **PROSPECTIVE JUROR:**  Okay.

18            **THE COURT:**  In fact, in addition to the perfect right

19   that jurors have to stand and stretch, tell me if they need a

20   break, the other thing, and thank you for mentioning this, if

21   you can't hear or you can't see -- because there will be

22   exhibits on those monitors and on the big monitor, if, at any

23   time, you can't hear or see what is going on, raise your hand.

24   Because our job, the counsel and me, is to make sure that you

25   see and hear everything that goes on that's being presented.

1    So you have a perfect right to say, didn't hear it, say it

2    again.

3              **PROSPECTIVE JUROR:**  Thank you.

4              **THE COURT:**  And it will not be rude at all.

5    Very good.  If you could pass the microphone to

6    Mr. Milman.

7    Mr. Milman, you're from Menlo Park?

8              **PROSPECTIVE JUROR:**  That's correct.

9              **THE COURT:**  And you are a software developer?

10             **PROSPECTIVE JUROR:**  Yes, currently unemployed.

11             **THE COURT:**  But you did work in Intuit?

12             **PROSPECTIVE JUROR:**  Yes.

13             **THE COURT:**  How long ago did you leave Intuit?

14             **PROSPECTIVE JUROR:**  I left in 2020 -- it's been a

15    while.  I'll say 2021.

16             **THE COURT:**  Did you look at the list of witnesses?

17             **PROSPECTIVE JUROR:**  Yeah.  I don't recognize anyone,

18    nor anyone else in the room.

19             **THE COURT:**  You expressed some skepticism about

20    crypto.  You have heard a lot of discussion today about what

21    the job of the jury is, to focus on the evidence and not bring

22    into the courtroom some preconceived ideas about the issues

23    that we're going to be discussing.  Can you -- are you

24    comfortable with that?

25             **PROSPECTIVE JUROR:**  Yeah, I can put that aside.  The

1   thing of interest is I'm fairly familiar with the technical

2   underpinnings, including ways that could be used for money

3   laundering.  So I just know how it's used and the functionality

4   under the hood.  Not like the deep math, but the way it works.

5   But again, that's not relevant to my ability to judge the

6   evidence.  Just thought you might want to know.

7         **THE COURT:**  You just happened to be somebody that

8   actually understands some of the technology?

9         **PROSPECTIVE JUROR:**  Yes.

10        **THE COURT:**  Anything that would have caused you to

11  raise your hand if you had been called before?

12        **PROSPECTIVE JUROR:**  On the mental health thing, my

13  mother is a retired psychiatrist.  You know, a 40-year career

14  at Kaiser.  And so I have discussed often mental illness, and

15  also suffer from mental illness myself.  I do believe some

16  people use mental illness as an excuse to avoid taking

17  responsibility, but if someone told me that, I wouldn't assume

18  one way or the other.  I would just look at what's before me.

19        **THE COURT:**  Thank you.

20     Anything else you can think of that I would need to know?

21        **PROSPECTIVE JUROR:**  That's all.

22        **THE COURT:**  All right.  Mr. Highsmith.

23        **MR. HIGHSMITH:**  Just one question for Mr. Milman.

24     Sounds like you've got some specialized knowledge, and so

25  the question is just would you be able to set aside your

1    specialized knowledge of cryptocurrency and related matters and

2    just evaluate the evidence in the courtroom and follow the

3    Judge's instructions on the law?

4            **PROSPECTIVE JUROR:**  Yes.  I have -- it doesn't

5    conceive anything about what people do.

6            **MR. HIGHSMITH:**  Thank you.

7            **THE COURT:**  Mr. Shepard?

8            **MR. SHEPARD:**  I don't have anything, Your Honor.

9            **THE COURT:**  Thank you.

10       Ladies and gentlemen, you now know the drill.  I'm going

11   to the side with counsel, but we will be with you quickly.

12       (The following proceedings were held at sidebar:)

13           **THE COURT:**  Okay.

14           **MR. HIGHSMITH:**  Mr. Lau.

15           **THE COURT:**  Yep.  This will be a fast one.  We're

16   going to let him go.

17           **MR. SHEPARD:**  I was so confident in that I didn't ask

18   him any questions.

19       (Sidebar conference concluded.)

20           **THE COURT:**  Very well.  I'll ask Ms. Lew to tell us

21   who will be replaced.

22           **THE COURTROOM DEPUTY:**  Weyland Lau, you're excused.

23           **THE COURT:**  You can call a new juror to substitute.

24           **THE COURTROOM DEPUTY:**  Elizabeth Haemmel.

25           **THE COURT:**  Welcome, Ms. Haemmel.

 1          You are coming to us from Walnut Creek?

 2              **PROSPECTIVE JUROR:**  Yes.

 3              **THE COURT:**  And first question of course is the 8:30

 4   to 1:30 schedule.  Is that possible for you?

 5              **PROSPECTIVE JUROR:**  It's possible, I put a little

 6   thing in the survey that I have just a little conflict.

 7              **THE COURT:**  Anyone who wants to wear a mask, by the

 8   way, it's perfectly appropriate, but could you pull it down

 9   just when you're answering the question?  Or speak louder,

10   either way.

11          Wait just a second.  Let's get the microphone.

12              **PROSPECTIVE JUROR:**  So there was information I gave

13   you in the second survey about a little bit of conflict.

14              **THE COURT:**  This is the March 7th issue, that you're

15   not available after that?

16              **PROSPECTIVE JUROR:**  Well, that particular day, that

17   second Friday in March.

18              **THE COURT:**  Yes, we won't be in session on that one

19   day.  Is that the issue, or is there a different issue?

20              **PROSPECTIVE JUROR:**  No, I think that's it.

21              **THE COURT:**  No, March 6th and 7th, Thursday and

22   Friday, I have to go to a chief judges meeting in Pasadena that

23   I have to go to every year.  So we're going to not be in

24   session those two days.

25          So you are retired from the Oakland Unified School

JURY VOIR DIRE

1  District?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Did you know we had someone else from the

4  Oakland Unified School District?

5          PROSPECTIVE JUROR:  I noticed that.

6          THE COURT:  You do know each other?

7          PROSPECTIVE JUROR:  (Shakes head.)

8          THE COURT:  It is a large district.

9      And you were a paraprofessional?

10          PROSPECTIVE JUROR:  Right.

11          THE COURT:  Tell us what that entailed.

12          PROSPECTIVE JUROR:  It meant working with special

13  education high school students and helping the teacher, special

14  ed. teacher.

15          THE COURT:  How long ago was it that you retired from

16  that job?

17          PROSPECTIVE JUROR:  November 15th.

18          THE COURT:  Just this last year?

19          PROSPECTIVE JUROR:  Uh-huh.

20          THE COURT:  How are you enjoying retirement?

21          PROSPECTIVE JUROR:  Well, I'm looking for part-time

22  work.  But other than that, yeah, I'm enjoying it.

23          THE COURT:  Good.

24      Did you look at the list of witnesses?

25          PROSPECTIVE JUROR:  Yes.

JURY VOIR DIRE

1          THE COURT:  And do you know any of those people?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  How about the people that were

4    introduced?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Going back, just I want to make sure I

7    understand the conflict.  March 7th, as I said, we will not be

8    in session.  Were you starting a trip, or is that just the day

9    that you're not available?

10          PROSPECTIVE JUROR:  I'm not available that day.

11          THE COURT:  The questions that were asked either by

12    me or by the counsel, any of those questions would you -- would

13    have prompted you to raise your hand?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  Mr. Highsmith?

16          MR. HIGHSMITH:  No further questions, Your Honor.

17          MR. SHEPARD:  Nothing, Your Honor.  Thank you.

18          THE COURT:  All right.  Do you pass for cause other

19    than what's been recorded?

20          MR. HIGHSMITH:  Yes, Your Honor.

21          MR. SHEPARD:  Correct.

22          THE COURT:  Very good.

23       Okay.  So we've reached a new phase of this process,

24    ladies and gentlemen.  Now that we've completed the questioning

25    of the prospective jurors, what the law permits is each side

1    can excuse some jurors from this case.  As I told you before,

2    we're going to ultimately have a jury, 12 jurors and four

3    alternates.  When prospective jurors are excused in this

4    process, it's not because of any personal dislike or distrust,

5    but as I indicated before, it's in order to get a final jury

6    panel that is impartial and that has the kind of balance that

7    the parties feel is appropriate for this case.

8        If you do happen to be one of those excused, please don't

9    consider it any reflection upon you of the quality of your

10   service as a juror.  For example, a person may be challenged

11   and excused because one side or the other believes from the

12   juror's occupation that his or her point of view is unduly

13   represented amongst those occupying the jury box.  The

14   procedure whereby the members of the jury are chosen, it is

15   part of our system of justice, and it has evolved with the

16   purpose of fairness to all sides.

17       You have all done your full duty by being present and your

18   readiness to serve if called.

19       While the attorneys are considering, what happens is they

20   get a form and it goes back and forth.  While they're doing

21   that, what I would ask you to do is to remain more or less

22   where you are.  You know, you can stand up, and it takes a

23   little time for them to do this.

24       Once that process is complete, Ms. Lew will ask all the

25   prospective jurors to go into the audience section, and then

1   she will call forward those who have been chosen to serve on

2   the jury.

3        Those of you who haven't been called yet, we're getting

4   close to the end, but we do still need you to be there because

5   things come up, and sometimes when we think we've got

6   everything in place, there are issues that do require some of

7   you to still serve.  But we're getting close to the end, so

8   thank you very much for hanging in there with us.

9        So with that, I'm going to leave the bench.  The lawyers

10  will be doing their work.  And then once they've completed

11  their work they'll come get me, and we'll close it down for the

12  day.

13       (A recess was taken from 2:37 p.m. to 3:31 p.m.)

14            **THE COURT:**  Thank you.

15       I will now ask Ms. Lew to call forward the names of the

16  individuals chosen to serve as jurors.

17            **THE COURTROOM DEPUTY:**  Juror number 1, Mary Bean.

18            **THE COURT:**  She will also direct you to which seat to

19  take.

20            **THE COURTROOM DEPUTY:**  Yes, the first seat in the

21  back row by the wall.

22       Juror number 2, Gopi Jaggavarapu, you're juror number 2.

23       Number 3 is Virginia Lyons.  In the back row, please.

24       Number 4, Irene Hernandez.

25       Juror number 5 would be Felinafeliza Navarra.

1          Juror number 6, Savanna Detjencreson.

2          Juror number 7, Minzu Wu.  Could you sit in the front row,

3    please.

4          Juror number 8, Jennifer Chapman.  Could you sit next to

5    Mr. Wu, please?  Thank you.

6          Juror number 9, Laurie Hancock.

7          Juror number 10, Brandon Ginn.

8          Juror number 11, Christine Bracket.

9          And juror number 12, Pamela Henson.

10         And then alternate, Jarrett Thomas.  Mr. Thomas, can you

11    sit in the back row.  Thank you.

12         Alternate number 2 is Kyle Montville.

13         Alternate number 3, Ju Young Han.

14         And alternate number 4 is Michelle Lapedis.  Can you both

15    sit in that first bench right there.

16              **THE COURT:**  And we will have cushions for you on the

17    ... going forward, so ...

18         Very well.  I have one more question for each one of you.

19    So let me start with Ms. Bean.  Is there any reason that you

20    would be unable to serve as a juror in this case?

21              **PROSPECTIVE JUROR:**  I don't believe so.

22              **THE COURT:**  And Mr. Jaggavarapu, any reason why you

23    cannot serve as a juror in this case?

24              **PROSPECTIVE JUROR:**  No, I can serve.

25              **THE COURT:**  Ms. Lyons, any reason why you cannot

JURY VOIR DIRE

```
 1  serve as a juror in this case?

 2          PROSPECTIVE JUROR:  No.

 3          THE COURT:  Ms. Hernandez, any reason you cannot

 4  serve as a juror in this case?

 5          PROSPECTIVE JUROR:  No.

 6          THE COURT:  Ms. Navarra, any reason you cannot serve

 7  as a juror in this case?

 8          PROSPECTIVE JUROR:  No.

 9          THE COURT:  Ms. Detjencreson, any reason why you

10  cannot serve as a juror in this case?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  Mr. Wu, any reason why you cannot serve

13  as a juror in this case?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  Ms. Chapman, any reason why you may

16  not -- cannot serve in this case?

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  Ms. Hancock, any reason why you could not

19  serve in this case?

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  Mr. Ginn, any reason why you could not

22  serve in this case?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  Ms. Brackett, any reason why you could

25  not serve in this case?
```

 1          PROSPECTIVE JUROR:  No.

 2          THE COURT:  Ms. Henson, any reason why you cannot

 3  serve in this case?

 4          PROSPECTIVE JUROR:  No.

 5          THE COURT:  And for our alternates, Mr. Thomas, any

 6  reason why you cannot serve on this jury?

 7          PROSPECTIVE JUROR:  No.

 8          THE COURT:  Mr. Montville, any reason why you cannot

 9  serve on this jury?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Ms. Han, any reason why you cannot serve

12  on this jury?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  Ms. Lapedis, any reason why you cannot

15  serve on this jury?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  Very good.

18      Very well.  I'm going to now ask Ms. Lew to administer the

19  oath to the jurors that have been chosen, and if you could

20  please stand.

21          THE COURTROOM DEPUTY:  Please stand and raise your

22  right hand.

23      (The jury was duly impaneled and sworn.)

24          THE COURT:  Other prospective jurors, you are now

25  free.  I think you're now done for today and actually with this

1  courtroom.  Thank you very much for coming to do your jury

2  service.

3        (The venire exits the courtroom.)

4        **THE COURT:**  Members of the jury, what's going to

5  happen now is we're done for the day.  Ms. Lew is going to take

6  you back, get your juror badges, get you acclimated, give you

7  some instructions on coming and going.  An apology right out of

8  the box here.  The jury room, as you will see, is a very tight

9  space.  When they built this building back in the '60s, I don't

10 know where they found the architect, but it's not a good setup.

11 But we have -- there's a room across the hall which we just use

12 sometimes when we have student externs and the like.  You can

13 use that room, as well.  It has bathrooms in it.  So you can

14 move around.  You're not confined in that small space.

15       When we do get to the point of the case being tendered to

16 you and you deliberating, I will in the meantime shop around

17 amongst my colleagues to find a courtroom that isn't being used

18 more like this space so when you get to deliberation you can

19 spread out.  But bear with us on the breaks and things.  The

20 room back there, that's where our snacks will be, for what

21 they're worth, will be back there.

22       Let me give you the instruction that I gave in one similar

23 format the beginning.  As I indicated to you before the trial

24 started, you, as jurors, will decide this case based solely on

25 evidence presented in this courtroom.  This means that after

1    you leave here tonight, today, you must not conduct any

2    independent research about this case, the matters in the case,

3    the legal issues in the case or the individuals or other

4    entities involved in the case.

5        This is important for the same reason that jurors have

6    long been instructed to limit their exposure to traditional

7    forms of media information, such as television and newspapers.

8    If you see something in the media that you think may have

9    something to do with this case, turn it off.  Do not watch it.

10       You must also not communicate with anyone in any way about

11   this case, and you must ignore any information about the case

12   that you might see while browsing the Internet or on social

13   media.  That does mean when you go home tonight in your

14   household you can tell those you live with I've been chosen for

15   jury duty, you know.  I'm going to be serving, and tell them

16   the schedule.  Your employer, you can tell them that.  But

17   beyond that, it is not something that you should be discussing

18   with anyone.

19       In that regard also, I've asked the lawyers, and they know

20   this because they're professionals and are very skilled, that

21   they may cross paths with you in the hallway when you're coming

22   and going, and they are told they are not to have any

23   interaction with you.  So don't think they're being rude.  If

24   you see them and they walk by you, yeah, they can say hello,

25   but they're told that they're not to interact with you at all

1  so they're doing what I told them to do, not being rude in any

2  way to you.

3      So with that I will have you depart for the day.  Ms. Lew

4  will get you all ready to go.  Tomorrow morning what will

5  happen is I have some preliminary instructions to give you to

6  assist you in proceeding into the case, and then we will hear

7  opening statements from the counsel, and then have witnesses,

8  and we'll get going.

9      So thank you all so much.  We'll see you here bright and

10 early tomorrow.  Plan is to get started at 8:30, and we'll go

11 from there.

12     (The jury exits the courtroom.)

13         **THE COURT:**  Okay.  We're out of the presence of the

14 jury.

15     As we talked about, if there are any issues you need to

16 raise with me, plan to be here by 8:00 and we can deal with it.

17     Anything else?

18         **MR. SHEPARD:**  Nothing right now other than tomorrow's

19 witnesses and exhibits.

20         **MR. HIGHSMITH:**  Well, we gave you the exhibits

21 several days -- we gave you the witnesses several days ago.

22 We'll give you the exhibits right when we get back to the

23 office.

24         **MR. SHEPARD:**  Okay.  Thank you.

25         **THE COURT:**  Okay?  All right.  And give me some --

1   tomorrow, not now.  Give me some sense of timing on your

2   openings so that I know when to schedule the breaks.  I don't

3   want to interrupt your flow.  So maybe we'll take a break after

4   the government's opening, and then we'll go with yours.  But I

5   would -- you know, I'm not going to cut you off, but I do want

6   to get a sense of how long you think it's going to be.

7           **MR. WARD:**  We'll probably run about a half an hour,

8   give or take, for the government.

9           **MR. SHEPARD:**  I'm guessing I'll be longer than that,

10  and how much longer will depend on what Mr. Ward says.

11          **THE COURT:**  All right.  So we'll be getting to the

12  witnesses pretty promptly, then.

13          **MR. HIGHSMITH:**  Yes.

14          **THE COURT:**  Thank you.  See you tomorrow.

15      (The evening recess was taken at 3:44 p.m.)

16                      ---o0o---

17              **CERTIFICATE OF REPORTER**

18      I certify that the foregoing is a correct transcript

19  from the record of proceedings in the above-entitled matter.

20  DATE:  Monday, February 10, 2025

21

22

23  _____

24      Stephen W. Franklin, RMR, CRR, CPE
        Official Reporter, U.S. District Court

25