Volume 2

Pages 188 - 339

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

UNITED STATES OF AMERICA,           )
                                     )
            Plaintiff,               )
                                     )
  VS.                                )        NO.  3:20-CR-00249-RS-1
                                     )
ROWLAND MARCUS ANDRADE,              )
                                     )
            Defendant.               )
_____)


                          San Francisco, California
                          Tuesday, February 11, 2025


              __TRANSCRIPT OF JURY TRIAL PROCEEDINGS__


__APPEARANCES:__

For Plaintiff:
                          ISMAIL J. RAMSEY
                          United States Attorney
                          450 Golden Gate Avenue
                          San Francisco, California 94102
                     BY:  **CHRISTIAAN HIGHSMITH**
                          **DAVID J. WARD**
                          **MATTHEW CHOU**
                          **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                          KING AND SPALDING, LLP
                          50 California Street, Suite 3300
                          San Francisco, CA 94111
                     BY:  **MICHAEL J. SHEPARD**
                          **ATTORNEY AT LAW**

(Appearances continued on following page.)

REPORTED BY:              Stephen W. Franklin, RMR, CRR, CPE
                          Official United States Reporter

1   <u>**APPEARANCES (CONT.'D):**</u>

2   For Defendant:

3                            KING AND SPALDING, LLC
                                 1700 Pennsylvania Avenue, Northwest

4                             Washington, DC 20006
                             **BY:  KERRIE C. DENT**

5                             **ATTORNEY AT LAW**

6                             KING AND SPALDING, LLC
                             1185 6th Avenue, 34th Floor

7                             New York, NY 10036
                             **BY:  DAINEC STEFAN**

8                             **ATTORNEY AT LAW**

9                             CINDY A. DIAMOND, ATTORNEY AT LAW
                             58 West Portal Avenue, #350

10                           San Francisco, CA 94127
                           **BY:  CINDY A. DIAMOND**

11                           **ATTORNEY AT LAW**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**I N D E X**</u>

Tuesday, February 11, 2025 - Volume 1

|  | **PAGE** | **VOL.** |
|---|---|---|
| Preliminary Jury Instructions | 191 | 2 |

| **GOVERNMENT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **JODOIN, BRANDI** | | |
| (SWORN) | 253 | 2 |
| Direct Examination by Mr. Chou | 253 | 2 |
| Cross-Examination by Mr. Shepard | 329 | 2 |

<u>**E X H I B I T S**</u>

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 349 | | 260 | 2 |
| 538 | | 267 | 2 |
| 1122 | | 270 | 2 |

1  **Monday - February 10, 2025**                              **8:35 a.m.**

2                        **P R O C E E D I N G S**

3                           ---o0o---

4      (Defendant present, out of custody.)

5          **THE COURT:**  Good morning.

6      Are we ready to bring the jury out?

7          **MR. HIGHSMITH:**  Yes, Your Honor.

8          **MR. SHEPARD:**  (Nods head.)

9          **THE COURT:**  Very well.

10     (The jury enters the courtroom.)

11         **THE COURT:**  Good morning, members of the jury.  Thank

12 you so much for being here on time and really, it's going to

13 help us move along, and we appreciate it very much.

14     Now we're going to have unfortunately some bad weather

15 later in the week, it sounds like.  So keep that in mind for

16 comings and goings.

17     As I indicated to you yesterday, what's going to happen

18 this morning is I'm going to give you some preliminary

19 instructions to help guide your work as jurors in the case, and

20 then we will have opening statements by counsel, and then we'll

21 start the presentation of evidence to you.

22     Jurors, you now are the jury in this case, and I want to

23 take a few minutes to tell you something about your duties as

24 jurors and to give you some preliminary instructions.  At the

25 end of the trial, I will give you more detailed written

**PRELIMINARY JURY INSTRUCTIONS**

1  instructions that will control your deliberations.  When you

2  deliberate it will be your duty to weigh and to evaluate all

3  the evidence received in the case and in that process to decide

4  the facts.  To the facts as you find them, you will apply the

5  law as I give it to you, whether you agree with the law or not.

6  You must decide the case solely on the evidence and the law

7  before you.

8      Perform these duties fairly and impartially.  You should

9  not be influenced by any person's race, color, religious

10  beliefs, national ancestry, sexual orientation, gender

11  identity, gender, or economic circumstances.

12      Also, do not allow yourself to be influenced by personal

13  likes or dislikes, sympathy, prejudice, fear, public opinion or

14  biases, including, upon reflection, unconscious biases.

15  Unconscious biases are stereotypes, attitudes or preferences

16  that people may consciously reject, but may be expressed

17  without conscious awareness, control or intention.  Like

18  conscious bias, unconscious bias can affect how we evaluate

19  information and make decisions.

20      As I mentioned, this is a criminal case brought by the

21  United States government.  The government charges that

22  defendant Rowland Marcus Andrade committed wire fraud and money

23  laundering.  The government alleges that the defendant

24  participated in a scheme to defraud by making or agreeing with

25  others who were making false and misleading statements about

**PRELIMINARY JURY INSTRUCTIONS**

1    AML Bitcoin, a cryptocurrency he developed.

2        The government also alleges that the defendant conducted a

3    financial transaction with the proceeds of the fraud scheme in

4    order to conceal or promote the scheme.

5        The charges against the defendant are contained in an

6    indictment.  The indictment simply describes the charges the

7    government brings against the defendant.  The indictment is not

8    evidence and does not prove anything.

9        The defendant has pleaded not guilty to the charges and is

10   presumed innocent unless and until the government proves the

11   defendant guilty beyond a reasonable doubt.  In addition, the

12   defendant has the right to remain silent and never has to prove

13   innocence or present any evidence.

14       The evidence you are to consider in deciding what the

15   facts are consists of:

16       First, the sworn testimony of any witness;

17       Second, the exhibits that are received in evidence; and

18       Third, any facts to which the parties agree.

19       The following things are not evidence, and you must not

20   consider them as evidence in deciding the facts of this case:

21       First, statements and arguments of the attorneys;

22       Second, questions and objections of the attorneys;

23       Third, testimony that I may instruct you to disregard;

24       Fourth, anything you may see or hear when the Court is not

25   in session, even if what you see or hear is done or said by one

 1   of the parties or by one of the witnesses.

 2        Evidence may be direct or circumstantial.  Direct evidence

 3   is direct proof of a fact, such as testimony by a witness about

 4   what that witness personally saw or heard or did.

 5   Circumstantial evidence is indirect evidence.  That is, it is

 6   proof of one or more facts from which one can find another

 7   fact.  You are to consider both direct and circumstantial

 8   evidence.  Either can be used to prove any fact.  The law makes

 9   no distinction between the weight to be given to either direct

10   or circumstantial evidence.  It is for you to decide how much

11   weight to give to any evidence.

12        There are rules of evidence that control what can be

13   received in evidence.  When a lawyer asks a question or offers

14   an exhibit in evidence and a lawyer on the other side thinks

15   that it is not permitted by the rules of evidence, that lawyer

16   may object.  If I overrule the objection, the question may be

17   answered or the exhibit received.  If I sustain the objection,

18   the question cannot be answered or the exhibit cannot be

19   received.

20        Whenever I sustain an objection to a question, you must

21   ignore the question and must not guess what the answer would

22   have been.

23        Sometimes I may order that evidence be stricken from the

24   record and that you disregard or ignore the evidence.  That

25   means that when you are deciding the case you must not consider

1   the evidence that I told you to disregard.

2       In deciding the facts of this case you may have to decide

3   which testimony to believe and which testimony not to believe.

4   You may believe everything a witness says, or part of it, or

5   none of it.

6       In considering the testimony of any witness, you must take

7   into account:

8       First, the witness' opportunity and ability to see or hear

9   or know the things testified to;

10      Second, the witness' memory;

11      Third, the witness' manner while testifying;

12      Fourth, the witness' interest in the outcome of the case,

13   if any;

14      Fifth, the witness' bias or prejudice, if any;

15      Sixth, whether other evidence contradicted the witness'

16   testimony;

17      Seventh, the reasonableness of the witness' testimony in

18   light of all of the evidence; and

19      Eighth, any other factor that bears on believability.

20      Sometimes a witness may say something that is not

21   consistent with something else he or she said.  Sometimes

22   different witnesses will give different versions of what

23   happened.  People often forget things or make mistakes in what

24   they remember.  Also two people may see the same event but

25   remember it differently.

**PRELIMINARY JURY INSTRUCTIONS**

1    You may consider these differences, but do not decide the

2  testimony is untrue just because it differs from other

3  testimony.  However, if you decide that a witness has

4  deliberately testified untruthfully about something important,

5  you may choose not to believe anything that witness said.  On

6  the other hand, if you think the witness testified untruthfully

7  about some things but told the truth about others, you may

8  accept the part you think is true and ignore the rest.

9    You must avoid bias, conscious or otherwise, based on a

10  witness' race, color, religious belief, national ancestry,

11  sexual orientation, gender identity, gender or economic

12  circumstances in determining the witness' credibility.  The

13  weight of the evidence as to a fact does not necessarily depend

14  on the number of witnesses who testify about it.  What is

15  important is how believable the witnesses are and how much

16  weight you think the testimony deserves.

17    I will now say a few words about your conduct as jurors:

18    First, please keep an open mind throughout the trial, and

19  do not decide what the verdict should be until you and your

20  fellow jurors have completed your deliberations at the end of

21  the case;

22    Second, because you must decide this case based only on

23  the evidence received in the case and on my instructions as to

24  the law that applies, you must not be exposed to any other

25  information about the case or the issues it involves during the

1    course of your jury duty.  Thus, until the end of the case, or

2    unless I tell you otherwise, do not communicate with anyone in

3    any way, and do not let anyone else communicate with you in any

4    way about the merits of the case or anything to do with it.

5    This restriction includes discussing the case in person, in

6    writing, by phone, tablet or computer, or any other means; via

7    e-mail, via text messaging, or any Internet chat room, blog,

8    website or application, including, but not limited to Facebook,

9    YouTube, Twitter, Instagram, LinkedIn, Snapchat, Tiktok or any

10   other form of social media.

11        This restriction also applies to communicating with your

12   fellow jurors until I give you the case for deliberation.  And

13   it applies to communicating with everyone else, including your

14   family members, your employer, the media or press, and the

15   people involved in the trial, although you may notify your

16   family and your employer that you've been seated as a juror in

17   the case and how long you expect the trial to last.  But if you

18   are asked or approached in any way about your jury service or

19   anything about this case, you must respond that you've been

20   ordered not to discuss the matter.  In addition, you will need

21   to report the contact to the Court through Ms. Lew.

22        Because you will receive all the evidence and legal

23   instruction you properly may consider to return a verdict, do

24   not read, watch or listen to any news or media accounts or

25   commentary about the case or anything to do with it.  Do not do

**PRELIMINARY JURY INSTRUCTIONS**

1    any research, such as consulting dictionaries, searching the

2    Internet or using other reference materials, and do not make

3    any investigation or in any other way try to learn about the

4    case on your own.  Do not visit or view any place discussed in

5    this case, and do not use the Internet or any other resource to

6    search for or view any place discussed during the trial.

7         Also, please do not do any research about this case, the

8    law or the people involved, including the parties, the

9    witnesses or the lawyers, until you have been excused as

10   jurors.  If you do happen to read anything or hear anything

11   touching on this case in the media, please turn away and report

12   it to us as soon as possible.

13        These rules do protect each party's right to have this

14   case decided only on the evidence that has been presented here

15   in the court.  Witnesses here in the court take an oath to tell

16   the truth, and the accuracy of their testimony is tested

17   through this trial process.  If you do any research or

18   investigation outside the courtroom or gain any information

19   through improper communications, then your verdict may be

20   influenced by inaccurate, incomplete or misleading information

21   that has not been tested through this trial process.

22        Each of the parties is entitled to a fair trial by an

23   impartial jury, and if you decide the case based on information

24   not presented in the court, you will have denied the parties a

25   fair trial.  Remember you have taken an oath to follow the

1 rules, and it is very important that you do so.  A juror who

2 violates these restrictions jeopardizes the fairness of these

3 proceedings, and a mistrial could result that would require the

4 entire process to start over.  If any juror is exposed to any

5 outside information, please notify us immediately.

6     At the end of the trial you will make your decision based

7 on what you recall of the evidence.  You will not have a

8 written transcript of the trial.  I urge you therefore to pay

9 close attention to the testimony as it is given.

10     If you wish, you may take notes to help you remember the

11 evidence.  If you do take notes, please keep them to yourself

12 until you and your fellow jurors go to the jury room to decide

13 the case.  Do not let note-taking distract you from being

14 attentive.  When you leave the Court for recesses, your notes

15 should be left in the jury room.  No one will read your notes.

16     Whether or not you take notes, you should rely on your own

17 memory of the evidence.  Notes are only to assist your memory.

18 You should not be overly influenced by your notes or those of

19 your fellow jurors.

20     Only the lawyers and I ask questions of the witnesses.  A

21 juror is not permitted to ask questions of the witnesses.  If,

22 however, as we discussed yesterday, you are unable to hear a

23 witness or a lawyer, please raise your hand and we will make

24 sure that that situation is corrected.

25     During the trial I may take up legal matters with the

**PRELIMINARY JURY INSTRUCTIONS**

1  attorneys separately, either by having a conference at the

2  bench, as you saw us do yesterday, when you are present in the

3  courtroom, or by calling a brief recess.  Please understand

4  that while you are waiting -- waiting can be frustrating, I

5  know -- we are working.  The purpose of these conferences is

6  not to keep relevant information from you, but it's to decide

7  how certain evidence is to be treated under the rules of

8  evidence and to avoid confusion and error.

9       Of course, we will do what we can to keep the number and

10  length of these conferences to a minimum.  I may not always

11  grant an attorney's request for a conference.  Do not consider

12  my granting or denying a request for a conference as any

13  indication of my opinion of the case or what your verdict

14  should be.

15       The next phase of the trial will now begin.  First, each

16  side will make an opening statement.  An opening statement is

17  not evidence.  It is simply an outline to help you understand

18  what that party expects the evidence will show.  A party is not

19  required to make an opening statement.  Once the opening

20  statements have been presented, the government will then

21  present evidence, and counsel for the defendant may

22  cross-examine.  Then, if the defendant chooses to offer

23  evidence, counsel for the government may cross-examine.

24       After the evidence has been presented, I will then

25  instruct you on the law that applies to the case.  The

### PRELIMINARY JURY INSTRUCTIONS

1    attorneys will then make their closing arguments.  After that,

2    you will go to the jury room and deliberate on your verdict.

3        So we will now have opening statements; for the

4    government.

5        Mr. Ward.

6        **MR. WARD:**  Thank you, Your Honor.

7        Good morning.

8        Heard a lot about cryptocurrency yesterday.  Judge Seeborg

9    talked about cryptocurrency this morning.  And it's true,

10   cryptocurrency is involved in this case.  But at its heart,

11   this case is about something different.  This case is about

12   greed and it's about deception.  This case is about Marcus

13   Andrade's greed and his misrepresentations he made to feed his

14   greed.

15       The evidence will show that Marcus Andrade used deceit.

16   He used lies, misrepresentations, and he did so to sell over

17   $5 million in a cryptocurrency called anti-money laundering

18   Bitcoin, or AML Bitcoin.

19       The evidence in this case is going to show that he sold

20   AML Bitcoin to thousands of investors, and those investors lost

21   a lot of money.  Some investors lost only a few hundred

22   dollars.  Some investors lost a few thousand dollars, but other

23   investors lost tens of thousands of dollars or hundreds of

24   thousands of dollars.  And you're going to hear from some of

25   those investors at this trial.

1       At the heart of Mr. Andrade's deceptions were two things.

2       One, is that he had developed a working, revolutionary

3   safe and secure cryptocurrency called AML Bitcoin.  And, two,

4   the governments, companies and others were clamoring to use AML

5   Bitcoin.  It was going to be very profitable.  We're going to

6   present to you a lot of evidence that will walk through these

7   deceptions, that will walk through these misrepresentations.

8   Some of them are very specific.

9       Marcus Andrade claimed that the government of Panama and

10  the Panama Canal were going to adopt and use AML Bitcoin as a

11  payment for ships moving through the canal.  Marcus Andrade

12  claimed that the Port of San Francisco and other ports on the

13  west coast were also going to use AML Bitcoin for payment

14  transactions moving through.

15      Marcus Andrade claimed he had a multi-million-dollar

16  marketing and advertising budget, and he was going to spend

17  $5 million on an ad.  It was going to run in the Super Bowl.

18  But he couldn't run that ad because the NFL had rejected the

19  ad; it was too controversial.

20      And ladies and gentlemen, you're going to hear evidence

21  about Marcus Andrade and his co-schemers using a market

22  manipulation scheme, a pump and dump type of scheme, to try to

23  push up the price of AML Bitcoin to make it look like it was

24  worth more than it was.  But in the end, ladies and gentlemen,

25  the evidence will show that it was smoke and mirrors.  The

1  technology didn't work, the business deals were never

2  completed, and, you know, Marcus Andrade's cryptocurrency, AML

3  Bitcoin, it was never what he said it was.

4       As Judge Seeborg mentioned, the government has brought a

5  two-count indictment in this case, and count 1 charges wire

6  fraud.  We allege that Marcus Andrade engaged in what's called

7  a scheme to defraud.  This means that he engaged in a scheme to

8  obtain money or property, and to do so he used false,

9  fraudulent statements, he used false and fraudulent pretenses

10 and representations.  He used half truths, half truths,

11 deceitful statements.  And we will present evidence to you that

12 Marcus Andrade made these misrepresentations, used this deceit

13 in order to obtain this $5 million, over $5 million from

14 investors.

15      Count 1 charges wire fraud, and that just means that a

16 wire was used in furtherance of the fraud.  And we're going to

17 present to you evidence that money from one of the victims was

18 wired from his bank account into a bank account of one of

19 Marcus Andrade's co-schemers.  That's the wiring in furtherance

20 of this scheme to defraud.

21      Count 2 charges money laundering.  We allege that Marcus

22 Andrade took money from investors, concealed it and used it to

23 promote his business and to conceal the source, and then he

24 used the money for his personal expenses, including a house

25 that he bought for him and his wife.

**PRELIMINARY JURY INSTRUCTIONS**

1      These are the charges, and we'll prove these to you at

2  trial.

3      Let me set the stage for you for this case.  And to do

4  that, we have to go back aways.  We have to go back to 2014.

5  This was the early days of cryptocurrency.  Bitcoin had been

6  launched several years earlier.  There were other

7  cryptocurrencies that had been introduced.  Cryptocurrencies

8  were trading.  People were buying and selling, and the prices

9  were going up.

10      Marcus Andrade wanted a piece of it, so he started selling

11  his own cryptocurrency.  Marcus Andrade created a company that

12  he called the National ATEN Coin Foundation, or the NAC

13  Foundation.  It wasn't really a foundation or a nonprofit, it

14  was just a company.  But he used it, and he said his NAC

15  Foundation had created a revolutionary cryptocurrency.  This

16  currency would eventually become AML Bitcoin, but when he first

17  started he called it ATEN Coin.

18      The evidence is going to show that Marcus Andrade and his

19  co-schemers sold over a million dollars of ATEN Coin to

20  investors.  And what is the evidence going to show Marcus

21  Andrade said about ATEN Coin?  It had built-in security

22  features.  It had ante money laundering features built into the

23  cryptocurrency.  It had biometrics.

24      And what about the business prospects for ATEN Coin?  He

25  said there were millions of dollars of deals in the works.

1  Corporations were going to use ATEN Coin.  The oil industry is

2  going to adopt the use of ATEN Coin, going to use it for

3  payments for oil.  It was all going to be very big business.

4  And for those investors who brought ATEN Coin earlier, it could

5  be very profitable.

6      But ladies and gentlemen, the evidence you're going to

7  hear at trial is going to show this was deceptive, this was

8  misleading, and it was false.  And you will hear from investors

9  who bought ATEN Coin, and they will tell you that they were

10 misled and they were deceived, and in the end, they were left

11 with nothing.  After they purchased ATEN Coin, the money was

12 gone.

13     The evidence is going to show, we're going to explain to

14 you how ATEN Coin was sold to investors.  Marcus Andrade sold

15 ATEN Coin directly to investors, but he also used others to

16 do -- sell his ATEN Coin.

17     You're going to hear from at least one of those, a man

18 named Brian Darrow.  Now, Brian Darrow is a convicted felon.

19 He pled guilty to fraud in 2001.  He's admitted to being

20 involved in multiple telephone fraud schemes over the years.

21 And in 2021, he was charged in yet another fraud scheme.  He

22 pled guilty in that case and has a plea agreement, and he's

23 testifying here as part of that plea agreement.

24     Brian Darrow is going to tell you that he was hired to

25 sell ATEN Coin.  He's going to tell you that he sold ATEN Coin

1    for Marcus Andrade, and he's going to say that he used

2    deceptions, many of which were given to him by Marcus Andrade,

3    to sell ATEN Coin.

4        He's going to tell you that for every sale he took

5    30 percent commission or 40 percent commission, and then the

6    rest went to Marcus Andrade.  And you're going to hear, ladies

7    and gentlemen, from victims, people who bought ATEN Coin.  They

8    will testify to Marcus Andrade's statements what he told them.

9    And you will hear that once they bought ATEN Coin, they were

10   left with something that is worthless.

11       Now, you're going to hear testimony that after selling

12   ATEN Coin from 2014 to 2016, 2016, Marcus Andrade stopped

13   selling ATEN Coin.  Told investors, he told others that he had

14   found a security flaw in his coin, that the security features,

15   the technology, there was a flaw, it didn't work and so he was

16   pulling ATEN Coin off the market.  And he did.  His investors

17   didn't get their money back, but he pulled ATEN Coin off the

18   market.  And then a year later, Marcus Andrade was back.

19       In 2017, he relabeled ATEN Coin.  It was the same coin,

20   but he started calling it AML Bitcoin.  And for AML Bitcoin, he

21   started using the same misrepresentations, the same deceit he

22   was using with ATEN Coin.  Let me talk about some of the

23   deceit.  Andrade told investors and potential purchasers that

24   his cryptocurrency had groundbreaking, groundbreaking security

25   and safety features.  They had anti-money laundering technology

1  built into the coin.  They had what's called Know Your

2  Customer, or KYC features, so people who transacted could know

3  who was on the other side of the transaction.

4      Said the currency had biometric identification, the face

5  identification on your iPhone.  But the evidence is going to

6  show that when Marcus Andrade was making these representations

7  and this is what he was telling purchasers, he didn't have

8  this.  It didn't work.  There was no working coin that had this

9  anti-money laundering technology.  There was no biometrics that

10  worked for the coin.  It was just Marcus Andrade's deceptions.

11  It was smoke and mirrors.

12      To sell the technology though, to sell AML Bitcoin you

13  needed more than just the technology.  You needed the deals and

14  you needed the business.  Marcus Andrade told investors that

15  there were a lot of deals in the works, there was a lot of

16  business.

17      As I mentioned, he talked about the Panama Canal.  And

18  Marcus Andrade made representations that the government of

19  Panama and the Panama Canal were going to start adopting AML

20  Bitcoin.  He repeatedly promised investors and told others that

21  he had deals in the works, that he was negotiating with

22  government officials in Panama, high-level officials in the

23  Panama Canal.  He claimed he was meeting with leaders of the

24  Panama Canal, and they were going to adopt the use of the coin.

25  It was going to be big business.

**PRELIMINARY JURY INSTRUCTIONS**

1    But the evidence at trial is going to show that, once

2  again, this was something that didn't exist.

3    You're going to hear testimony from a former Panamanian

4  government official.  He's going to say he was hired by Marcus

5  Andrade as a lobbyist.  He's going to say he was in Panama.  He

6  met with a law firm, had a meeting with the Panama Canal.

7  Marcus Andrade went down, had a couple of meetings.  But in the

8  end there was never any deals.  The Panama Canal was never

9  going to adopt AML Bitcoin.  Never did adopt AML Bitcoin.  The

10 government of Panama never adopted AML Bitcoin.  Something

11 missing.  And he's going to say that Marcus Andrade

12 misrepresented the state of those talks and the state of those

13 development deals.

14   Talk to you about the Port of San Francisco.  Marcus

15 Andrade claimed that the Port of San Francisco was going to

16 start using AML Bitcoin, that he was huddled with the leaders

17 of the port.  He even posted a picture online of him standing

18 with the executive team and leadership of the Port of San

19 Francisco.  But like everything else, Marcus Andrade was trying

20 to make the Port of San Francisco into something that it

21 wasn't.  There was never a deal with the Port of San Francisco.

22 There was no business.  They never started using AML Bitcoin.

23   What you're going to hear from trial is that Marcus

24 Andrade and his co-schemers hired a lawyer, a woman who was a

25 commissioner around the port.  They paid her, named her an

1  adviser to the AML Bitcoin project.  And this woman set up a

2  meeting with the port officials.

3       And you'll hear from the port officials, and they will say

4  they heard Marcus Andrade, they heard what he had to say, but

5  they never adopted the coin.  They were never going to use the

6  coin.  It didn't really work for them, that it wasn't something

7  that could have worked for what the port actually did.  But

8  that's not how Marcus Andrade represented it.  That's not what

9  the evidence is going to show how he presented that.

10      And I told you about a Super Bowl ad, and you're going to

11  see evidence that Marcus Andrade represented that he and his

12  team had made a Super Bowl ad.  It was a controversial Super

13  Bowl ad and that he had attempted to buy a $5 million ad.  But

14  ladies and gentlemen, what you're going to learn is that they

15  made a Super Bowl ad, but it was all part of a scheme to make

16  it appear that the ad had been rejected.

17      You're gonna hear testimony from people from NBC, and

18  they're going to testify that, yes, we saw this ad, but we

19  never rejected it because they never paid for it.

20      The evidence at trial will demonstrate that this was

21  simply an intent to create publicity.  It did two things for

22  Marcus Andrade.  The deception did two things:

23      One, it created a lot of free publicity.  But two, it

24  created the impression to investors that they had $5 million

25  they could spend on a Super Bowl ad.  You will hear about this

**PRELIMINARY JURY INSTRUCTIONS**

1  deception, and you'll hear Marcus Andrade.  You'll see his

2  WhatsApp messages saying, don't tell other people about what

3  we're really doing here.

4      You're going to see that Marcus Andrade used social media,

5  posted pictures of himself with politicians.  Posted a picture

6  with that Gavin Newsom, said he was meeting with Gavin Newsom,

7  discussing AML Bitcoin and the blockchain.  The facts are

8  Marcus Andrade paid to go to a fundraiser.  Went to a

9  fundraiser, he got his picture taken with Gavin Newsom, who was

10  then the lieutenant governor.  He's not huddled with Gavin

11  Newsom discussing the AML Bitcoin and California's use of that

12  technology.

13      Marcus Andrade claimed he had a world-class team of

14  engineers and others working for him.  This was important when

15  he was selling AML Bitcoin to investors, to purchasers.  He

16  needed to present a world-class team.  He wanted it to look

17  like a real cryptocurrency venture.

18      So you're going to hear what he did.  He found a seasoned

19  respectable engineering executive in the bay area, and he paid

20  him $5000.  Asked him to be adviser to the company, and then he

21  put his name and his picture on the website, said this is my

22  chief technology officer.  But like this, like everything else,

23  it was just another instance of Marcus Andrade claiming

24  something he didn't have.

25      You're going to hear from this executive.  He will say he

 1  was paid $5000, but he wasn't chief technology officer.  He

 2  never had an office, never had a salary.  In 2017 he didn't do

 3  anything with the company.  Later he had a few meetings, walked

 4  away.  He'll say that he was never a chief technology officer.

 5  There was nothing there.

 6      And, ladies and gentlemen, you're also going to hear as

 7  part of this scheme, as part of what Marcus Andrade and his

 8  coconspirators were doing, they tried to manipulate the price

 9  of AML Bitcoin.  When Marcus Andrade started selling AML

10  Bitcoin it was put on cryptocurrency exchanges, started trading

11  a little bit.

12      The evidence will show it wasn't doing very well.  Prices

13  weren't going up.  People weren't buying it.  And Marcus

14  Andrade wanted to show volume, he wanted to show price.

15      So you will hear evidence that he and his co-schemers as

16  part of this scheme conspired to manipulate the price, that

17  they engaged in a market manipulation scheme, buy and sell the

18  coin back and forth, to try to push up the price, show that

19  there were more buyers.  They weren't real buyers, they were

20  just trading back and forth trying to push up the price.

21      And ladies and gentlemen, you're also going to hear that

22  despite their best efforts to deceive and mislead, that there

23  was so little volume and so little trading that even the market

24  manipulation scheme didn't work so well.  One of the

25  co-schemers, and you'll see his -- you'll hear his testimony

1  and see his texts.  He called it a catastrophe.

2      Marcus Andrade made these misrepresentations; that was

3  part of it.  But Marcus Andrade also needed to project his

4  misrepresentations.  He needed to get publicity for what he was

5  doing.  He needed investors to see, uh, the deceit.

6      Part of it was he posted on social media, had a Twitter

7  page, Instagram site, had a web page.  He posted on Facebook.

8  You're also going to hear evidence that he hired people in

9  Bitcoin forums to say positive things about AML Bitcoin.  But

10 Marcus Andrade also did something else.

11      Marcus Andrade wanted news articles promoting AML Bitcoin.

12 Wanted the media reporting on AML Bitcoin and how revolutionary

13 it was and its great business deals.  So you're going to hear

14 that he engaged in a scheme to pay writers to write fake news

15 articles about AML Bitcoin.

16      You're going to hear from a witness named Brian Darling.

17 He was a PR person.  And he'll say he was hired by Marcus

18 Andrade and his co schemers, and he was hired to write articles

19 and to pay others to write articles.  He's going to testify

20 that he wrote articles about AML Bitcoin.  Here's what he's

21 going to say.  He will say that he wrote what they told him to

22 write.  He wrote the facts that they gave him.  He didn't do

23 any independent research, didn't do any independent reporting,

24 never checked the facts.  In fact, he didn't really know much

25 of anything about the technology, but he was being paid.  So he

1  wrote what he was told to write, and then he submitted it to

2  news organizations who needed online content, who needed to

3  fill a news hole.

4       Some of these news organizations published those articles.

5  You're going to see some of them.  They didn't check the facts

6  or call it commentary or opinion, and they promoted the deceit

7  that Marcus Andrade was pedaling.

8       In addition to writing his own articles, Brian Darling

9  paid others to write these articles, and it was the same thing.

10 They were fed information, they were told what to write, they

11 were given quotes.  They never checked the facts.  They never

12 did any independent writing or research.  They just wrote what

13 they were told and wrote what they were paid to say.  And then

14 the articles were published online, and then Marcus Andrade

15 took the articles and he posted them on his Twitter page and

16 his website, promoted himself.  Look, the press is talking

17 about AML Bitcoin.

18      Talked about Panama.  AML Bitcoin makes landfall in

19 Panama.  Talked about the Port of San Francisco.  Port of San

20 Francisco's the future of cryptocurrency may be now.  This was

21 just all part of the scheme.  It was a pretty sophisticated

22 scheme.  Marcus Andrade did not act alone.  He had others who

23 helped him.  You'll hear from some of them.

24      Among his co-schemers is a man named Jack Abramoff.  I

25 don't think anyone here has heard of Jack Abramoff, but Jack

**PRELIMINARY JURY INSTRUCTIONS**

1  Abramoff was really a notorious lobbyist in Washington, D.C.

2  He's also a criminal.  You'll hear that he has pled guilty in

3  unrelated fraud schemes.  He had pled guilty.  He went to

4  prison.  Then he got out of prison, and in 2017 he was hired by

5  Marcus Andrade.  He went to work with Marcus Andrade.

6      Marcus Andrade wanted to present to investors that he had

7  lobbyist contacts, that he was lobbying Congress, that Congress

8  and the government was considering the use of a new safer AML

9  Bitcoin.  So he used a disgraced former lobbyist named Jack

10  Abramoff to do it.

11      Jack Abramoff was a willing co-schemer.  He helped with

12  the deceit and the misrepresentations.  The fake news articles,

13  Jack Abramoff helped direct that.  False press releases, Jack

14  Abramoff helped with that.

15      Now, Mr. Abramoff, he's pled guilty in this case.  He's

16  admitted that he engaged in this fraud scheme with Marcus

17  Andrade.  And he will testify, and he will testify that he

18  helped Marcus Andrade develop the fake press articles, that he

19  helped with the market manipulation.  Mr. Abramoff will testify

20  that he was a knowing participant in this fraud scheme and that

21  he did it with Marcus Andrade.

22      But we're here today not just because Marcus Andrade made

23  these false and misleading statements, we're hear because he

24  made these statements to victims, individuals who bought AML

25  Bitcoin tokens.  You will hear from these witnesses.  They will

**PRELIMINARY JURY INSTRUCTIONS**

1  tell you about the money they lost.  They will tell you about

2  being deceived about relying on the misrepresentations.  They

3  will say they believed in the technology, they believed in the

4  business deals.  They're going to tell you they believed Marcus

5  Andrade.

6      And in the end they're going to tell you that all the AML

7  Bitcoin tokens, they were never worth anything.

8      Now, you're going to hear about the money.  You're going

9  to hear that Marcus Andrade took the money.  You're going to

10  hear from a FBI forensic analyst named Theresa Chiu.  She's

11  analyzed the flow of the investor money.  She's going to talk

12  about the money laundering.  She's going to talk about how

13  Marcus Andrade used investor money for himself.

14      You're going to see how he moved it from account to

15  account, from one account to the other.  You're going to see

16  how it ended up, his personal bank account.  And you're going

17  to see how he spent a lot of that money.

18      You're going to see evidence that he bought a $500,000

19  house for himself and his wife.  You're going to see how he

20  bought another $200,000 property.  You're going to hear he paid

21  $60,000 for a Ford F250 for himself and another 69,000 for a

22  Cadillac Escalade for his wife.

23      You're going to hear about thousands of dollars spent on

24  international travel, Marcus Andrade traveling around the

25  world.  And you're going to hear about the fancy meals,

**PRELIMINARY JURY INSTRUCTIONS**

1  Morton's steakhouse.

2     The evidence will show that Marcus Andrade took the money

3  from investors.  He spent a lot of it on himself.  Purchasers

4  who believed that this money was going -- was going to be used

5  to develop AML Bitcoin.  But instead, Marcus Andrade used it

6  for his own enrichment.

7     That's what the government will prove at trial to you over

8  the next coming weeks.

9     I know you met this team before, but let me introduce

10  ourselves once again.  I'm Dave Ward.  This is Chris Highsmith.

11  This is Matthew Chou.  We're prosecutors.  We work for the U.S.

12  Attorney's Office.  Tina Rosenbaum, who you didn't meet

13  yesterday, she is our paralegal, and you'll see a lot of her

14  and she will manage a lot of things throughout the trial.  And

15  special agent Brendan Zarbin is part of the FBI team who

16  investigated this case.  We represent the United States who

17  brought this case.  We have the burden, we have the burden to

18  prove this case, and we embrace that burden.  It is our burden,

19  and we embrace it.

20     So we're going to present to you witness testimony.  We're

21  going to present to you documents.  We'll present to you

22  evidence that will show beyond a reasonable doubt Marcus

23  Andrade engaged in a scheme to defraud when he sold over

24  $5 million in AML Bitcoin through his lies, misrepresentations

25  and deceit, and that he engaged in money laundering when he

<u>**PRELIMINARY JURY INSTRUCTIONS**</u>

1   used a financial transaction to conceal and promote that fraud.

2        And at the end of the case my colleagues and I are going

3   to stand up here, and we're going to ask you to deliberate, and

4   we're going to ask you to return the only verdict that is

5   consistent with the facts in this case, the only verdict that

6   is consistent with the law.  And that's going to be a verdict

7   of guilty on all counts.

8        Thank you.

9            **THE COURT:**  Thank you.

10       Mr. Shepard.

11           **MR. SHEPARD:**  I wonder if we could have two minutes

12   just to get the technology?

13           **THE COURT:**  Sure, sure.  Why don't we make it more

14   like five.

15       We'll go ahead and take a little earlier than usual break

16   so that the defense can get set up.  Remember my admonitions.

17   You're going to hear this a lot from me.

18       Members of the jury, don't discuss this amongst

19   yourselves, with anyone else, and we'll see you back in about

20   five minutes.

21       (A recess was taken from 9:18 a.m. to 9:27 a.m.)

22           **THE COURT:**  Okay.  Bring them out.

23       (The jury enters the courtroom.)

24           **THE COURT:**  The jury is present.

25       Mr. Shepard.

1          **MR. SHEPARD:**  Thank you, Your Honor.

2      Marcus was not a fraudster.  He had a great idea.  He

3   loved his business.  He believed in it.  He believed in its

4   prospects, he believed in its technology, and he believed in

5   his ability to make it work.  He poured all of his energy into

6   making it work.  Put in long hours, did everything he could.

7   So if he wasn't a fraudster, then what?  I think you'll see

8   three themes emerge from the evidence.  The first is that he

9   was someone who was doing his best, which unfortunately wasn't

10  always that good, but he was doing his best and proceeding in

11  good faith.

12      And, second, he was, to use a phrase, "swimming with the

13  sharks."  He was swimming with some very experienced sharks,

14  politely called co-schemers by Mr. Ward, who were pursuing

15  their own separate interests that conflicted with Marcus' and

16  that, at times, undermined his business.  And, third, rather

17  than being a fraudster, if we stick with words that start with

18  "F", he was a lot closer to a fool.

19      With that general introduction that I'll be fleshing out

20  over the next several minutes, let me do a different kind of

21  introduction, which is to remind you who I am and who the rest

22  of my colleagues are and how it's been our privilege to be

23  appointed by the Court to represent Mr. Andrade in this case.

24      My colleagues, Cindy Diamond, Kerry Dent, Dainec Stefan,

25  and that's Mr. Andrade sitting next to Ms. Dent, and that's Ed

1    Jackson at the end of the table, who has the challenging job of

2    helping me with the technology.  My technology skills, as you

3    will see, are very close to zero.  So Ed fortunately has worked

4    with me before, and hopefully he will keep me out of trouble.

5    It's quite a job.

6        Let me talk a little bit more about the three themes I

7    highlighted, and then I want to talk in more detail about what

8    Mr. Ward said to you, starting with proceeding in good faith

9    and doing his best, which sometimes wasn't all that good.  Let

10   me call out a few examples that you'll hear about.

11       First, he was convinced he had great technology, and

12   people confirmed that to him.

13       You'll hear about a guy named George Getz at Morgan

14   Stanley, a big investment bank.  And you'll also hear it

15   confirmed by rosy reports that he would get about business

16   prospects.  I jumped ahead.  So he gets all these good reports.

17   He gets told how good his technology is, and he spent a lot of

18   money and a lot of effort to make sure that what the company

19   was saying was accurate.  And by the way, when Mr. Ward said a

20   lot of times he, referring to Mr. Andrade, said this, said

21   this, said this, you'll see a lot of times it isn't

22   Mr. Andrade.  A lot of times it's Mr. Abramoff who's saying

23   things and, as I say, you'll see he had his own separate

24   interests.

25       So Mr. Andrade, Marcus, took a number of steps to make

 1  sure his company's press releases were accurate.  He had

 2  lawyers reviewing them.  This led to complaints from Abramoff,

 3  who says it's slowing things down, and we shouldn't do this.

 4  And he also took steps to make sure that people who were quoted

 5  in the press releases had signed off on the quotes attributed

 6  to them.  You'll hear that he was misled by Mr. Abramoff, and I

 7  think, I'm not sure Mr. Ward used the name of the Panamanian

 8  official who he referred to, a guy named Carlos De La Guardia.

 9  Carlos De La Guardia and Jack Abramoff told Marcus that Carlos

10  De La Guardia was talking to people at the Panama Canal

11  authority, and that Carlos De La Guardia, who was the person

12  having those conversations, signed off on the press release.

13      You'll see another example of this.  One of the other

14  things Mr. Ward mentioned was the Port of San Francisco.  And

15  you'll see that after a meeting at the Port of San Francisco, a

16  press release was drafted, and Mr. Andrade went to Leslie Katz,

17  who was a port commissioner and said:  Is this okay, is this

18  release okay, is this accurate?  She said, no; he killed it.

19      So he, unlike some of the others involved in this case,

20  Marcus was trying to get it right.  Might not have nailed it

21  each time, but you'll see he was trying to get it right.  And

22  you'll see that sometimes the government would send people to

23  talk to him, to see if he would confirm some of the statements

24  that the, quote, company, through some of the co-schemers, had

25  made and that the government believed to be false.  And we'll

1    show you some examples, at least I think maybe more than one,

2    where the government would send people to Marcus, see if he

3    would say some of these false statements; and he wouldn't.

4        You'll also see he's had various obsessive checks and

5    balances, compliance forms to sign, all kinds of things that

6    were his effort to make sure he was in compliance with the law.

7    Some of those were not terribly effective, but he was working

8    hard to try to make it effective.

9        So on to the second theme, the sharks, the sharks he was

10   dealing with.  These are the people Mr. Ward refers to as

11   co-schemers.  They are, in fact, notorious repeated liars who

12   had their own separate competing interests adverse to Marcus

13   which they frequently pursued behind Marcus' back.

14       Jack Abramoff -- yes, one of the most notorious convicted

15   lobbyists from the early 2000s, he had wonderful connections to

16   the Republican administration, and he tricked, defrauded not

17   only a number of Native American tribes, but also a number of

18   the top government officials in Washington, and he ingratiated

19   himself to Marcus, who was a far easier mark than the people in

20   Washington, D.C, who he had dealt with in the early 2000s and

21   been convicted of various crimes and dealing with them.

22       But he wasn't the only shark Marcus was dealing with.

23   Abramoff brought in a second shark named Japheth Dillman, and

24   Mr. Dillman had a colleague named David Mata.  Him and Abramoff

25   ultimately regretted bringing in Japheth Dillman, and Dillman

1    had his own business that he ran in violation of the rules that

2    Marcus established for his business.  And here you see, just to

3    put people to the names I've identified here, you've got

4    Japheth Dillman indited for wire fraud.

5          **A JUROR:**  Speak up, please.

6          **MR. SHEPARD:**  I'm sorry.  Thank you for reminding me.

7    Please feel free to interrupt and remind me because I love to

8    hear myself talk, but it doesn't do anybody a lot of good if

9    nobody hears me.  So thank you, thank you for interrupting.

10         Japheth Dillman indicted for wire fraud.  Had his own

11   cryptocurrency fund called Block Bits Capital.  And you'll see

12   how his interests were in contradiction to Mr. Andrade's

13   interests, and what he was really interested in was getting as

14   many assets under management, AUM, so that he could sell his

15   business for, he was hoping, billions of dollars.  That was his

16   interests.  It was very different than Marcus' interest.

17         And then he had his colleague, David Mata, who has already

18   pled guilty to a fraud involving Block Bits Capital.  Block

19   Bits Capital had its own separate fraud going on that you'll

20   hear potentially more about.

21         And then the third image that you see there is Jack

22   Abramoff.  As you'll see, he was convicted of several different

23   offenses in the early 2000s.  I've identified a few of them.

24   There was a huge fraud that he committed against Native

25   American tribes, telling them they had to hire him for all

1   kinds of things in order to be able to build casinos, and he

2   also committed a separate bank fraud at the same time.  And

3   I'll talk a little bit more about Abramoff and Brian Darrow and

4   people like that, who are convicted criminals who you're going

5   to hear from during the government's case.

6        But let me for a moment move on to Japheth Dillman, who I

7   mentioned a moment ago, and talk about what he did in this case

8   because he had a very important role in this case.  He lied to

9   Marcus and he cheated Marcus.

10       At a pivotal time in the case, when Marcus was raising

11  money for AML Bitcoin, Dillman told Marcus that he would be

12  buying $50 million-worth of AML Bitcoin.  And that's the

13  e-mail.  We seem to be missing the top of that e-mail, but

14  that's the e-mail that's now on the screen.  There we go.

15  There's the top.  Thank you.  Always keeping me out of trouble.

16  I love it.

17       You'll see January 13th, 2018, Dillman writes to Marcus to

18  say he's putting in $50 million to buy AML Bitcoin tokens.

19  That number, I don't know, it seems, I expect you'll see it was

20  made up.

21       He initially bought $850,000, quite a bit short of

22  50 million, and never bought anything but a tiny fraction of

23  50 million.  And based on the claim that he was buying

24  $50 million, he got a substantial discount on each coin.  Looks

25  like he saved 25 cents on each coin that was then selling for

 1    $1.50.

 2        He had his own separate fund, this fund that he wanted to

 3    build up the assets under management for, and it looks like he

 4    charged his investors a buck 50 and pocketed the difference

 5    that he got by lying to Marcus.  And then he made a story later

 6    on about why he never came up with the remaining money.

 7        And we'll come back to this in a few minutes, but the

 8    timing of that lie is really important because Mr. Ward was

 9    telling you Mr. Andrade bought a house, he bought a car.  The

10    house he bought was after he was told the $50 million was

11    coming in.  So he thought he had a lot more than $50 million

12    that he had earned from his business at that point.  And we'll

13    talk about that more in a minute, but the timing is important

14    in terms of understanding what Marcus was thinking at the time

15    he bought a house.

16        Not only was Dillman lying about how much he was gonna buy

17    from Marcus, Dillman was also violating Marcus' terms.  Marcus

18    took pains to ensure that he was just selling tokens, not an

19    investment.  Mr. Ward referred to investors.  You'll see the

20    evidence as it comes out.  People who bought AML Bitcoin, they

21    bought it through purchase agreements or through terms and

22    conditions, they looked at a white paper.  You'll see all those

23    things said this is not an investment, it's a coin.  You're

24    buying a coin.  It's -- don't look at it as an investment.

25    It's not an investment.  I don't have the exact words right.

1    You'll see them in the terms and conditions and in the purchase

2    agreements.

3         So Dillman did the opposite.  Dillman was advancing the

4    interests of his own fund by saying invest in AML Bitcoin,

5    which is the opposite of what Marcus wanted.  And he was doing

6    that, Dillman was doing that so he could boost his assets under

7    management and sell his investment firm for billions of

8    dollars.

9         And I mentioned this a moment ago, but the timing of all

10   this shows that Marcus was not robbing his business blind.  If

11   you don't understand that $50 million was coming in, maybe you

12   could have that impression.  But when you understand he thought

13   $50 million was coming in, he was not robbing the business

14   blind.  And you'll also learn that he later mortgaged his house

15   and lent money back into the business.

16        And was there anything wrong with buying a house,

17   especially if you had $50 million coming into the business?

18   Marcus had it on good authority that since he was just selling

19   a coin and not selling an investment, he could use the money

20   for whatever purpose he wants.  We'll talk later about how much

21   he was actually putting into building the technology.  But, you

22   know, just like you sell somebody a car, they don't ask you,

23   well, what'd you use the money for.  He was selling a coin, he

24   bought a house.  He had it on good authority he could use the

25   proceeds of the sale of his coin for whatever he wanted.  And

1    at the same time, as you'll see later, he was putting a lot of

2    money into building a coin and building the business.

3        As part of swimming with these sharks, a lot of the

4    information that Marcus received was filtered by Abramoff.

5    Abramoff in many instances controlled and orchestrated what

6    Marcus was able to learn.  He would direct people on the ground

7    to talk to him, and they would talk, Abramoff, Carlos De La

8    Guardia, the guy in Panama, a guy named John Bryan, who dealt

9    with a number of the things that Mr. Ward referred to, and also

10   a guy named Richard Naimer, who had a lot to do with the Port

11   of San Francisco, he had a lot to do with the building of the

12   technology that I'll talk about in a couple minutes.

13       All those people would deal with Abramoff and Abramoff

14   would then decide what of what he learned he was going to share

15   with Marcus.  So a lot of what Marcus learned filtered by Jack

16   Abramoff.  And not only was the input often controlled, so was

17   the output.

18       Sometimes Jack Abramoff had access.  In fact, I think most

19   times Jack Abramoff had access to CEO@AMLBitcoin.com, which you

20   may see presented as if it was Marcus' e-mail, and in some

21   senses it was, but Jack Abramoff had access to it.  And you'll

22   see this particular communication.

23       Steve Stephens is a name that for reasons I don't

24   understand, Jack Abramoff sometimes decided to use, because why

25   call yourself Jack Abramoff all the time.  If you're Jack

 1    Abramoff, you might as well go by Steve Stephens.  So this is

 2    Jack Abramoff getting access to or having access to this

 3    CEO@AMLBitcoin.com account.  And you'll see from time to time

 4    it will be apparent who might have written something, because

 5    Mark -- Jack Abramoff went to law school.  He writes in nicely

 6    phrased lawyer-like phrases.  Marcus does not.

 7         And one of the images that we'll get to is the

 8    communication that he had -- this is it here -- the

 9    communication that he had with Leslie Katz.  Remember, she was

10    the port commissioner who he went to after the meeting with the

11    port to say, hey, here's a draft press release, I want to make

12    sure it's okay with you before we send it out.  And she says,

13    no, it's not okay.  And he responds, my apologies; obviously, I

14    didn't write it.  And he's misspelled the word "write".

15         That's a Marcus-written e-mail.  You'll see many that are

16    from Jack Abramoff, like the press releases that were obviously

17    written by Abramoff and not written by Marcus.

18         I mentioned a moment ago that I would talk about witnesses

19    like Abramoff and this guy Brian Darrow, who Mr. Ward told you

20    was gonna tell you about the sales of ATEN Coin.  One thing the

21    two of those people have in common, they are notorious liars.

22    And the government convicts them and then gives them the

23    opportunity to point the finger at somebody else and gives them

24    a better deal, and then, boom, they go out and do it again.

25    They commit a different crime and they point their finger at

1  somebody else, and the government, you'll see, gives them

2  another really good deal.  And those are the people who are

3  gonna to be a significant part -- certainly not the entire

4  part, but they're going to be a significant part of the

5  government's case.

6      And they have plea agreements.  The plea agreements, they

7  don't get sentenced.  Unlike most defendants that get sentenced

8  shortly after they plead guilty, they have plea agreements, and

9  they wait to get sentenced until after they come in and testify

10  for the government.  And there are these things you'll learn

11  about called the Sentencing Guidelines that guide judges, like

12  Judge Seeborg, in sentencing.  And there's a provision in the

13  Sentencing Guidelines that allows the government to say, give

14  this person a lower sentence or reduce the sentencing guideline

15  range because they offered substantial cooperation.  Only the

16  government gets to make that request.

17      So they hold the sentencing of Abramoff, and they hold the

18  sentencing of Darrow, and if the government, after they see how

19  they testify, says, ah, yes, substantial cooperation in our

20  prosecution, then Abramoff and Darrow can get a lower sentence.

21  And they make a business out of it.  They commit the crime,

22  they do one of those deals that point the finger at somebody,

23  they get out, they think, huh, that wasn't that bad, do it

24  again.  And those are some of the witnesses that the government

25  will be presenting to you.  They will this time be pointing the

1    finger against Marcus.

2         So the third theme I mentioned was there's Marcus swimming

3    with the sharks, and he's not a fraudster.  He's much closer to

4    a fool.  And we spent a lot of time in voir dire talking about

5    this, so you probably know it's coming, and you're probably

6    wondering, okay, how good is this, where'd you come up with

7    this stuff about Marcus being a fool.  And I would say two

8    things:

9         One, yes, we do have an expert with a diagnosis for you;

10   several diagnoses.

11        But, second, you don't have to listen to me or you don't

12   even have to listen to our expert.  Please start by listening

13   to and observing the conduct of those who were working with

14   Marcus every day.  Many of them were plotting to take over his

15   business or at least to keep him from doing anything important

16   relating to that business.  They were doing that to suit their

17   own goals and because they thought this was a valuable

18   business, and they believed in it like Marcus believed it.  But

19   they also saw that Marcus was messing it up because he just

20   wasn't very good at it.  They thought he was incapable of

21   running it.

22        So they would always, all of them, they would sit there,

23   kinda coming up with ways to work around Marcus and take care

24   of things themselves.  And while they were talking about moving

25   him aside or keeping him out of this meeting or keeping him out

**PRELIMINARY JURY INSTRUCTIONS**

1    of that meeting, here are the things that they would say about

2    him:

3         Creates a reality in his mind.  Has a distorted view of

4    reality.  He's living in a different world.

5         This is a quote from Marcus himself:  "If the patent gets

6    approved, we are literally worth a hundred times or more than

7    the richest man on the planet."  Elon Musk worried about this,

8    that Marcus is going to be worth a hundred million times more

9    than he is.

10        Dresses like a clown.  Rambling.  We need to keep him

11   hiding in a box.  No corporate image.  Not refined.

12   Astonishingly bad at presenting himself.

13        I have a character for him already, Grimace.  How many

14   people know Grimace?  Grimace is -- he's featured in McDonald's

15   land commercials.  He's Ronald McDonald's best friend.  He is a

16   large purple rotund being of an indeterminate species, with

17   short arms and legs, known for his slow-witted yet optimistic

18   demeanor.

19        I believe that was Carlos De La Guardia's reference to

20   Marcus.  But there's more.  There's a lot more.  Embarrassing.

21   Not very smart.  Terrible presentation skills.  Incompetent.

22   Moves as fast as a glacier.  Does not know what he's doing.

23   Mind-numbing.  Piece of work.  Out of his depth.  We can --

24   rather than click through the whole slide, let's just put it

25   all up there.  Get them all out there at once.  Idiot.

**PRELIMINARY JURY INSTRUCTIONS**

1  Paranoid.  Sucker.  I mean, these are the people who are

2  working with him all the time.  This is how they see him.  He's

3  not capable in their eyes.  Moron.  Retarded.

4       There's also a reference to Captain Queeg.  I don't know.

5  This is going to be a little almost as old as I am to

6  appreciate Captain Queeg, a literary reference.  I believe it's

7  a 1952 Pulitzer Prize-winning novel called the Caine Mutiny,

8  and Captain Queeg was the captain of a military vessel in war,

9  and his paranoid and other acts led to the executive officer

10  relieving him of his command.  And that was what the book and

11  ultimately movie was about.

12       I think it was Mr. Abramoff or Mr. Naimer who called

13  Marcus Captain Queeg.

14       So we had Marcus examined by a forensic neuropsychologist,

15  a man in Texas where Marcus is from, named Dr. Levi Armstrong,

16  and he will identify and explain for you the mental illnesses

17  that Marcus has that explain why so many of the witnesses who

18  dealt with him said all of these miserable things about him.

19  And Dr. Armstrong will -- I think you'll find him to be very

20  relatable.  And more importantly, his testimony is gonna line

21  up with what the live witnesses say about Marcus, and he'll

22  apply accepted and objective medical diagnoses and principles

23  to explain to you what conditions Marcus has and what you

24  expect, the behavior you expect of somebody who has all those

25  conditions.

<u>**PRELIMINARY JURY INSTRUCTIONS**</u>

1    So Dr. Armstrong tested Marcus, and these are

2  neuropsychological tests.  It's not just like he's sitting on a

3  couch and talking.  These are neuropsychological tests, and he

4  diagnoses Marcus as having autism spectrum disorder, bipolar

5  disorder, obsessive-compulsive disorder, ADHD, which many of

6  you may have heard of, attention deficit hyperactivity

7  disorder.  And he will also talk about Marcus' IQ.

8    He'll explain to you that these conditions have biological

9  components, so that it's not just you should use your will

10  power and control them.  And these conditions, especially when

11  you have these four or more at the same time, they result in

12  cognitive impairment, they result in poor executive functioning

13  and other things that you'll hear about.  And you'll see some

14  of what Dr. Armstrong has diagnosed and some of what he will

15  say.  These were the kinds of things that you would expect to

16  see from a person with these conditions.

17    You'll see these things in the evidence, an inability to

18  understand things as others might.  You'll see that.  You see

19  that in this little graphic.  You'll see it in the evidence.

20    He'll talk about an inability to change view in light of

21  shifting facts.  He just kinda gets hung up on seeing things in

22  a certain way.  And you'll see that also as the evidence comes

23  out.

24    There are bouts of paranoia, which tend to be rather

25  off-putting for the people who he's dealing with at the time.

 1    And more importantly, they impair his ability to get things

 2    done in any effective way.

 3         And of course there are going to be times when he can

 4    appear to be more capable than he actually is, and you'll see

 5    that sometimes.  But you'll see a lot more manifestations as

 6    the trial goes along.  And unfortunately you may hear about

 7    behavior that you may not like.  Especially if he's under

 8    stress he may go off on tangents, he may make accusations, he

 9    may be litigious, he may be difficult.  I think you're gonna

10    see from the evidence that he does this not only if an FBI

11    agent talks to him or if he's arguing with people.  He does it

12    with people he should trust, people who are trying to help him.

13    That's just how he responds given his illnesses.

14         And so we hope you'll consider Dr. Armstrong's testimony

15    and that you'll consider it in light of the substantial

16    corroborating evidence that you'll hear from the people who

17    dealt with Marcus, and that you'll consider it --

18         **THE COURT:**  Could you stop for a moment?  Is it

19    difficulty hearing?

20         **MR. SHEPARD:**  Yeah, I'm sorry.

21         **THE COURT:**  Mr. Shepard, you've gotta really try to

22    keep your voice up.

23         **MR. SHEPARD:**  I'm sorry.  Thank you for raising your

24    hand, and my apologies.

25         We'll ask you to consider Marcus' reduced understanding of

1    what was going on and his reduced ability to adapt and respond

2    to it, along with his other conditions, as you consider whether

3    he was intending to defraud anyone.

4        Marcus is no money launderer, either.  Money laundering

5    starts with unlawful activity, the proceeds of which the

6    defendant intends to hide, which means the government has to

7    prove wire fraud -- that's where the unlawful proceeds come

8    from -- for the reasons I've explained.  And I'll talk about it

9    a little more in addressing the specific Port of San Francisco,

10   Panama Canal kind of things that Mr. Ward touched on.  We don't

11   think they'll prove wire fraud, and therefore they won't prove

12   money laundering.  But even if they did prove wire fraud,

13   Marcus did not intend to hide the proceeds from selling AML

14   Bitcoin.

15       He had no reason to hide those proceeds because remember,

16   he had it on good authority that he was allowed to spend the

17   money that he earned from AML Bitcoin on whatever he wanted.

18       And you'll see there were a number of accounts and

19   transactions that are connected in some way to the purchase of

20   Marcus' house, but all of those accounts and transactions are

21   with his identifying information.  They were local.  They were

22   not in some country where the government might have difficulty

23   subpoenaing them.

24       And one thing you'll see about Marcus from the evidence is

25   that most of what he does is overly complicated.  He has too

1  many bank accounts.  He has too many corporate organizations.

2  He has too many software engineers.  He has too many business

3  forms that aren't really needed.  Most everything he does is

4  overly complicated.  He even has too many lawyers.  Which, as a

5  lawyer I find it somewhat hard to say.  But he has too many

6  lawyers.  And not just the ones here, but the ones he was using

7  when he was working on AML Bitcoin.

8      After I talk about the Port of San Francisco and the Super

9  Bowl and the Panama Canal, I will show you the, what we believe

10  to be the errors in Mr. Ward's other accusations about ATEN

11  Coin and tax returns.  But I'm taking ATEN Coin at the end,

12  because those are not -- Marcus is not charged with doing

13  anything with ATEN Coin.  He's charged with defrauding -- he's

14  not charged with defrauding ATEN Coin investors.  And Judge

15  Seeborg will explain to you why evidence about ATEN Coin is

16  being admitted, and of course you should follow what Judge

17  Seeborg says about why it's being admitted.

18      But keep in mind this is not -- your verdict will not be a

19  referendum on Marcus' life, whether he's a good guy, whether he

20  did other things that were wrong, whether every statement he

21  made was perfect.

22      You'll be asked at the end of the case to determine

23  whether the government has proven beyond a reasonable doubt

24  each and every element of the two charges Mr. Ward identified:

25  Wire fraud involving an intent to cheat and deceive AML Bitcoin

**PRELIMINARY JURY INSTRUCTIONS**

1  purchasers, and money laundering with an intent to hide the

2  proceeds of that activity.  And each of those crimes has some

3  important individual elements that you'll hear about at the end

4  of the case.

5      In any event, as I'll talk about later, ATEN Coin was not

6  a fraud.  He did create the ATEN Coin product.  You'll hear

7  expert testimony about that.  It just wasn't a good enough

8  product.  It needed to be improved.  And rather than abandoning

9  his purchasers, Marcus gave them the opportunity, without

10  paying anything more, to convert their ATEN Coins into AML

11  Bitcoins.

12      So, let's get more into the specifics about what Mr. Ward

13  says Marcus misrepresented.  And before I get into the

14  specifics, so that I don't get run out of the defense lawyers

15  club, I want you to understand we don't have to prove anything.

16  I've already started to tell you a few things we expect to

17  prove, and I'm about to tell you some more, addressing more of

18  what Mr. Ward said.  But keep in mind, as Judge Seeborg has

19  told you, we don't have to show you anything.  You don't have

20  to agree with anything I say.  I'd like to think you will, but

21  you don't have to.

22      It's still the case, whether we say something or we don't,

23  Marcus is innocent until proven guilty, and the government has

24  the burden to do that.  And what they have to prove is that

25  he's guilty beyond a reasonable doubt of the two specific

**PRELIMINARY JURY INSTRUCTIONS**

1  crimes he's charged with, and that means proving each of the

2  elements of those two crimes that Judge Seeborg will describe

3  to you at the end of the case.  None of those elements are

4  technicalities.  They are the things the government must prove

5  beyond a reasonable doubt, every one of them.

6      So let me talk about the specific things that Mr. Ward

7  said Marcus did wrong.

8      First the technology.  AML Bitcoin was not a pump and

9  dump.  Marcus had very valuable patents on the technology for

10  AML Bitcoin.  He worked hard.  He invested a lot of money in

11  making the first AML, anti-money laundering, and KYC, Know Your

12  Customer Compliant Cryptocurrency.  You will see financial

13  records showing the amount of money he spent on the development

14  of his coin.

15      And you will hear from an expert, a guy named Eric Min,

16  who has studied the records that are still available many years

17  later.  Still, it's far from a complete set.  But he's gone

18  back into the code and various other computer techy terms that

19  I'm not good with.  He's gone back into whatever he can go back

20  into and determined that talented developers were working

21  consistently on the technology during the period of time the

22  government says Marcus was engaged in this fraud.

23      And you'll see contemporaneous communications from those

24  working on the technology reporting advances and expected

25  completion dates.  Let me see if we have an example of that.

1        Yes, here's one from July of 2018.  Richard Naimer, as I

2   mentioned, a colleague of Jack Abramoff's, who was in charge of

3   a company that Marcus owned for a while, at least, called Cross

4   Verify.  It was located in London.  Cross Verify was located in

5   London, and it was working on an important piece of the

6   technology.  I'll sorta connect that up for you in a minute.

7   It was working on the key piece of the technology at this point

8   in time, and here it is talking about it's gonna -- this is --

9   the product is developing nicely and on time.  The first

10  version will be completed within six weeks.

11       And here's another example.  My clicker is not moving the

12  needle here.  So in any event, there's another example that

13  comes up a few months later.  It's in September of 2018 where

14  the people in London are reporting not only great business

15  prospects, but they're also reporting on the demo release of

16  System 2.0.  Okay.  That's a little more than six weeks, but

17  that's, as you'll see, kind of the way it works in the

18  technology business.

19       And there it is.  Thank you, Ed.

20       And you'll see they're talking about how this has been

21  engineered as an enterprise production-ready system with

22  standards to match.  Lots of money; lots of people working on

23  the technology.

24       Mr. Ward talked about this Super Bowl ad.  It's a pretty

25  entertaining ad they put together.  It's one of the best things

1   Jack Abramoff did, I think.  Jack Abramoff had the idea for it,

2   and it's pretty funny.  And you'll, I'm sure see it during the

3   course of the trial.  Marcus paid a lot of money to put the ad

4   together.

5        And I heard Mr. Ward suggest that this was a fraud because

6   it made it appear that the company had the money to pay for a

7   Super Bowl ad, when it didn't.  And as Mr. Ward described it,

8   they didn't actually try to get it submitted.  Let me describe

9   for you how that worked from where Marcus was sitting.  First,

10  Marcus was assured he had the money coming in to pay for the

11  ad.

12       This was the Super Bowl in 2018.  So you remember back to

13  Japheth Dillman promising to buy $50 million of AML Bitcoin

14  tokens.  That was in January of 2018.  So Marcus had

15  $50 million coming in.  He had already earned a lot from token

16  sales previous to that.  He had 50 more million coming in, and

17  that would be more than enough to cover a Super Bowl ad and

18  keep paying for the technology and buying a house.

19       And not only was the Dillman money supposedly coming in at

20  the time of the Super Bowl in 2018, but there were many other

21  steps in the works to ensure that the ad would -- could get

22  paid for in other ways, as well.  There -- you'll see on

23  exhibit, I believe it's a government exhibit, it's gonna say

24  that there was a discussion of putting a million dollars in and

25  having someone provide a guarantee with the other 4 million.

 1  The initial cost was 5 million.  You could do -- this proposal

 2  was doing a million dollars cash and then coins, with the value

 3  of the coins guaranteed by a wealthy person.

 4      At the same time Jack Abramoff was soliciting funds for

 5  the ad, and you'll see that he was doing that in a way that

 6  gave great discounts to his friends at Marcus' expense.

 7  Abramoff's friends could make quick bucks at the expense of the

 8  company.  And you will see evidence, I think, that Jack

 9  Abramoff and a man named John Bryan may well have conceived

10  this as a rejection campaign from the start.

11      That is, you know, at some measure it's a clever idea.  As

12  opposed to paying $5 million for a Super Bowl ad, you present

13  the ad, get the ad rejected, and then you try to go viral with

14  it on social media and other places, and you get people to

15  watch your ad, but you saved a bunch of money.  And it appears

16  that Abramoff and John Bryan came up with that idea, but that's

17  certainly not at the beginning was what they shared with Marcus

18  about it, and you'll see in this text or WhatsApp communication

19  between Abramoff and Brian, the written proposal will pretend

20  we are really buying a Super Bowl ad because, and then you'll

21  see -- I started with the top one, if anybody ever gets this in

22  discovery I don't want to look.  And then we get to where

23  Marcus comes in, maybe you can write it up in a way that says

24  in the event NBC rejects the ad, and this is the plan.  If you

25  write it up the other way, he may not understand and reject it

**PRELIMINARY JURY INSTRUCTIONS**

1    out of hand.

2        So they're saying write it up as if we're really trying to

3    do the ad, and then if it gets rejected, we'll run this

4    rejection campaign.  But write it up like we're really trying

5    to do it because otherwise Marcus isn't gonna want it.  Marcus

6    will reject it.  And so that's what they did.

7        Eventually they let Marcus know that it was gonna get

8    rejected, and so he said, yeah, okay, I get it.  Let's not talk

9    about how we expect it to get rejected, but if it's going to

10   get rejected, we submit it and it gets rejected, good.  Let's

11   do it.  But he wasn't out to defraud anybody that way.  He

12   actually had the money.  He wanted NBC and the NFL to run the

13   ad.  And Abramoff and Bryan were controlling how that

14   information came to him.

15       And they do, Abramoff and Bryan and others, do continue

16   efforts to place the ad and fund the ad.  They're doing that

17   pretty much to the end of January, with the Super Bowl I think

18   that year being on February 5th.

19       You'll see there's -- so much for the clicker.  But you'll

20   see -- and we don't need to display it now.  If we can, great.

21   But you'll see in the evidence they're talking, if we can, we

22   can do the NBC deal with the Super Bowl and not the gorilla

23   campaign.  That's another reference to the rejection campaign.

24   That's Abramoff to his buddy, Richard Naimer.  And that's on

25   the 26th of January.

1    They say on the 29th of January, we're still in

2 negotiation as to whether NBC will accept the ad.  Either we'll

3 have the ad on the Super Bowl or we will launch an alt

4 campaign.  And even on January 30th Abramoff is saying they're

5 still trying to get a rejection.

6    And you'll see that while Mr. Ward describes this as

7 Marcus' doing, from his dreaming up the ad to his dealing with

8 John Bryan, this is Abramoff calling the shots.  Marcus is only

9 copied sometimes, and at the end, he ends up very upset, upset

10 at NBC.

11    And one other takeaway from here that's really important.

12 Abramoff and Naimer are joking about how little Marcus really

13 understood about what was going on with the Super Bowl

14 campaign.  Hopefully we can switch over to that one.

15    Yes, this is Naimer and Abramoff.  This is earlier, but it

16 gives you an impression of what they think in terms of Marcus'

17 ability to understand what's actually going on.

18    By the way, as far as he's concerned, you already raised

19 the money for the ad.  This is a little over a month earlier.

20 And Abramoff says, as far as he's concerned, the ad already

21 ran, and we sold a hundred million dollars in the ICO (sic) in

22 40 seconds.  That's Abramoff and Naimer and what they think of

23 Marcus and how well he understands what's happening.  Marcus is

24 a bit of a dreamer in addition to having some cognitive issues.

25    The Panama Canal.  This is the one where Mr. Ward said

1    they lied about dealing with the Panama Canal officials and

2    potentially having a deal with the canal.  To take a step back

3    on this, Panama seems like a pretty good place for something

4    like what Marcus conceived of an anti-money laundering, know

5    your customer kind of cryptocurrency.  You've got ships from

6    all over the world.  There's no common currency.  There's an

7    increased need for anti-money laundering capabilities.  You'll

8    see that spoken about in the evidence, that there is that need

9    in Panama.  Seems like AML Bitcoin would be a good fit.

10       So of course they were interested in seeing if they could

11   get the Panama Canal and other related agencies in Panama to

12   accept AML Bitcoin.

13       And so here again, Abramoff, pulling the strings, Abramoff

14   says he's got a guy in Panama, this guy Carlos De La Guardia.

15   And Carlos I believe used to be the Panamanian ambassador to

16   the United States, so he was a person with gravitas, and

17   Abramoff signed him up to help deal with officials in Panama,

18   and they had a couple of trips to Panama.

19       As with the Super Bowl, Abramoff ran the show using De La

20   Guardia.  De La Guardia generally gave his reports to Abramoff,

21   not to Marcus, at least not until Abramoff vetted what Carlos

22   De Le Guardia was gonna say.  And just like Abramoff and

23   Naimer, just like Abramoff and John Bryan, Carlos De Le Guardia

24   and Abramoff were having a lot of conversations behind Marcus'

25   back.  They were talking about how Marcus didn't get it.

**PRELIMINARY JURY INSTRUCTIONS**

1    Marcus was down there for some meetings with Carlos De Le

2    Guardia, and Abramoff is saying -- I skipped this one.  This is

3    just reflecting that what great prospects the company thought

4    it had in the Panama Canal.  But Marcus didn't get it.  The

5    meetings started, and Abramoff is saying, make sure Marcus

6    understands what went on today better, reflecting that Abramoff

7    had spoken to Marcus about the meetings that Carlos De Le

8    Guardia and Marcus had in Panama, and Abramoff was the -- he

9    doesn't understand what happens.  Carlos, make sure he

10   understands it better.

11   So they're talking about how Marcus didn't get it.

12   They're talking about having -- trying to avoid having Marcus

13   participate in any of the meetings.  Abramoff suggested to De

14   Le Guardia, just tell him he did such a great job that the

15   government wanted to move the follow-through more quickly, and

16   it's best done by you, Carlos, and one of your fellows in

17   Panama.  And Naimer is telling Abramoff, make sure you take the

18   lead, not Marcus.  There was a second trip that Abramoff

19   participates in.  And they're talking about moving Marcus out.

20   Carlos De Le Guardia expresses concern about Marcus and

21   his judgment, and Abramoff says, don't be, we need to move

22   forward.  Richard and I -- that's Richard Naimer.  Richard and

23   I are taking over rapidly.  And you'll see that De Le Guardia

24   and Abramoff wrote up the press release themselves, and

25   frequently they would run it by Marcus, but only with the

1  information that they were giving him.  The information that

2  they were giving him was Carlos De Le Guardia saying he was

3  meeting with Panama Canal officials, he was optimistic that

4  they would get a deal with the Panama Canal.  And you'll see

5  that in the material that gets forwarded to Marcus.

6       And there was a press release that went out that

7  ultimately the Panama Canal authority disagreed with, but that

8  press release was approved by Carlos De Le Guardia before it

9  went out, and Marcus therefore believed it was okay.  And

10  afterwards, Carlos De Le Guardia apologized to Marcus for doing

11  that.

12       What went on at the Port of San Francisco, sort of a

13  similar set of events.  This time it was Richard Naimer who had

14  a significant role.  And there was one meeting in I think

15  September of 2017 and then a second meeting in April of 2018.

16  The meeting in 2017 was Japheth Dillman, Marcus and this woman,

17  Leslie Katz, who was a port commissioner, and who also had --

18  she's a lawyer, and she also had a relationship, a legal

19  relationship with Dillman.  I don't -- may have been

20  representing him and Mata personally and may have been

21  representing their company.  But Leslie Katz was a Dillman

22  connection.  And so the communications with Leslie Katz were

23  facilitated by Dillman.

24       And after Marcus and Dillman and Katz met, Dillman put

25  together a press release, and Jack Abramoff drafted a letter

1    for Leslie Katz to write to the CEO of a local cryptocurrency

2    exchange called UpHold.  This is the press release that Dillman

3    drafted after the September meeting.  It has quotes from Leslie

4    Katz and from Marcus about their meeting.

5         And Dillman reached out to Leslie Katz to see if she would

6    write the letter to the CEO of the cryptocurrency exchange that

7    Abramoff had drafted that referred to very productive meetings,

8    and Dillman reported to Marcus that Katz had said that instead

9    of sending the letter, she had called the CEO and used the

10   draft letter as a script when she called the CEO.  That's what

11   Dillman told Marcus, and that confirmed to Marcus that the

12   letter and its bullish description of the meeting with Katz and

13   the similar press release that Dillman drafted that confirmed

14   for him that the release and the letter were accurate.

15        And later there was some press blowback.  There was some

16   blowback that I think came not from Leslie Katz but from the

17   port staff.  And so they wound up setting up a second meeting

18   with the port staff, as well as Leslie Katz.  Only by now,

19   nobody wanted Marcus to have a big role at any meetings, so

20   Richard Naimer came over from London to make the presentation

21   at the meeting.

22        And so they have a meeting on April 7th, Naimer, Marcus.

23   And I'll mention how much Marcus knows about this pitch in a

24   moment.  But it's Naimer, Marcus, and the port staff and Leslie

25   Katz.  And afterwards, Naimer drafts an internal summary of

1   what happened at the meeting, and he sends it to Marcus, and

2   the summary suggests that the meeting went really, really well.

3        And this is the e-mail he drafted reporting internally,

4   and it's very bullish about the meeting and all of the things

5   that the port is gonna do.  Not necessarily the port itself,

6   but all the things that the port is gonna do that will really

7   help AML Bitcoin.  And based on Naimer's summary -- these are

8   the use cases and the follow-up that the executive director of

9   the port is gonna do.  Based on that summary, Dillman drafts a

10  press release, and Marcus says to Dillman, would you make sure

11  that Katz is okay with the release before it goes out.  Please

12  get Leslie's approval and the port's approval.

13       And Katz openly says "no," and that's when Marcus

14  responded with that e-mail that we showed earlier where he

15  says, "Leslie, I didn't write it," misspelling "write."  "It

16  will not go out."

17       So I think what you'll see in the evidence is that

18  everything that was sent by Naimer, Abramoff and Dillman to

19  Marcus about the port was bullish, and that's not just what

20  they were saying publicly.  They were saying the same things

21  internally to Marcus, that things were going really well.  And

22  that's what he took away from it.

23       And you'll also see that before this meeting, Abramoff and

24  Naimer were communicating.  Naimer was having a meeting with

25  the Port of Dover, in England, another place that would be a

1    good location for AML Bitcoin.  And in preparing for that

2    meeting he wanted to know what the presentation had been the

3    previous fall to the Port of San Francisco, and it appears that

4    he asked Marcus about that, and that Marcus really had no idea

5    what the presentation was.  That was the level at which Marcus

6    understood what was going on.

7         Mr. Ward also mentioned something about I think he called

8    it market manipulation, trying to affect the price of AML

9    Bitcoin on currency exchanges.  You'll see as the evidence

10   plays out, that Marcus had some uncertainty about whether to do

11   that, but ultimately Abramoff, Naimer and Bryan convinced him

12   to do it.  They gave it legitimacy by connecting it to this

13   man, George Getz, who I mentioned earlier, a banker at Morgan

14   Stanley, one of the world's largest and most prestigious

15   investment banks.  They connected the people who were doing it

16   to George Getz.

17        And it's not -- I don't think it will be entirely clear

18   whether anything was done, but if anything was done, it was

19   done on international exchanges.  Which, far from saying there

20   was anything wrong with the sort of market-making and other

21   activity, far from saying there was anything wrong with it, the

22   exchanges would encourage -- these international exchanges

23   encouraged or required trading by those issuing the coins.  And

24   what was being discussed was, in fact, commonly done on

25   international exchanges at the time.

1    I don't know that you'll see any records of any trading

2    actually having occurred in accord with any scheme to

3    manipulate the market.  See if there are any records that show

4    that this trading occurred, or whether this was just some

5    people trying to make some more money off of Marcus.  But in

6    either case, the way it was presented to him, it overcame some

7    of his reluctance, and it seemed like it was legitimate.

8        That brings me to ATEN Coin.  I think the things you'll

9    see about ATEN Coin is that ATEN Coin did, in fact, develop a

10   product.  You'll hear again from Mr. Min, I expect, about that.

11   Marcus was told on a number of occasions in various ways that

12   the product was in development.  He did a lot of good work to

13   develop it.  It initially did have some oil component which did

14   not work out.  That sometimes happens.  It was not a fraud, it

15   just was not a success.

16       And when it did not succeed, Marcus went to the people who

17   had bought ATEN Coin and said you can convert your ATEN Coin to

18   this new coin.  No charge.  You get one of these new coins,

19   tokens, for your old one.

20       And one other thing I would say for you to consider in, in

21   addition to trying to hold my papers, one other thing you

22   should consider as you hear this is a lot of the communications

23   that I've been showing you, some of these back-channeling

24   things that shed a whole lot of light on what was actually

25   going on, we don't have that sort of thing for ATEN Coin,

**PRELIMINARY JURY INSTRUCTIONS**

1  because even though the government investigated it at the time,

2  they did not bring charges.  And so we're now, you know, many

3  years after.  So there will be a lot fewer records about ATEN

4  Coin.  There will be some.  Some people have some.  But there

5  will be a lot fewer records about ATEN Coin than you'll see

6  about AML Bitcoin.

7      So a couple of things to talk about now that you'll be

8  happy to know I'm about at the end.

9      We'll do our best to keep this interesting for you.

10  There's a lot of information.  We'll do our best to be as brief

11  as we can, although that's not always one of my greatest

12  skills, as you're probably figuring out already.  But I'll do

13  my best, and together we'll see the twists and the turns of

14  this case as they unfold.

15      On the defense side I would say we have not been

16  investigating this case for nine and a half years like the

17  government.  We will try to get everything right, but we, and

18  especially me, I'm going to get -- I'm going to make some

19  mistakes, and if I do, please do not hold that against Marcus.

20  My mistakes and the mistakes of my colleagues are not his

21  fault, they're entirely ours.

22      I would also say that I am not Perry Mason, for those of

23  you who are old enough to remember Perry Mason or for those of

24  you who are not, this is not like Law & Order.  Witnesses are

25  not likely to confess on cross-examination.  Jack Abramoff is

1    not suddenly going to become honest.  Instead, you -- we ask

2    you to look for little clues.  Look with us for little clues

3    that witnesses aren't trustworthy or they have biases or they

4    just got ticked off at Marcus or other tells that might impact

5    how you should evaluate their testimony.

6        And I'd like to end by being yet another person who thanks

7    you for your service.  I do that because in many countries, if

8    the government says someone is guilty, that's it, they're

9    guilty.  One of the great things about our country is if the

10   government says Marcus is guilty, we have you.  And so on

11   Marcus' behalf and on behalf of my colleagues I say thank you.

12   We're very grateful for your service because in our view this

13   is a case where the government looked on the surface, saw what

14   it thought was a fraud, didn't understand what was really

15   happening and got it wrong.

16       And that's why we'll ask you at the end of the case to

17   find Marcus not guilty of the charges against him.  Thank you

18   very much for sticking with me.

19       **THE COURT:**  Thank you.

20       All right.  Well, why don't we go ahead and take a short

21   break, maybe about 10 minutes, so we can get organized with the

22   witnesses coming in.

23       Remember my admonitions.  Please do not discuss this

24   amongst yourself, with anyone else.  See you in about 10

25   minutes.

1    (The jury exits the courtroom.)

2        **THE COURT:**  We're out of the presence of the jury.

3    I just had a question.  I was perplexed.  There have been

4    names of witnesses that are going to be on the call as I

5    understand it, and somehow they weren't on our witness list.

6    At least the two experts, Min and Armstrong, are not on this

7    list.  Maybe that was just when we put the list together we

8    missed some things, but I'm just concerned.  Take a look at the

9    witness list.  I assume it's, you know, not likely that they

10    know these people, but the point of the list obviously is to

11    make sure the jury doesn't know any of these people.  So if

12    witnesses are going to start being called that are not on this

13    list, it makes me a little nervous.

14        So could you please look over the list that the jury got,

15    and in addition, if there's anybody beyond Armstrong and Min

16    that you're anticipating calling, I just want to know so we

17    know what the universe is.

18        Okay?

19        **MR. HIGHSMITH:**  Thank you.

20    (A recess was taken from 10:45 a.m. to 11:01 a.m.)

21        **THE COURT:**  Okay.  Bring the jury out.

22    (The jury enters the courtroom.)

23        **THE COURT:**  The jury is present.

24    Mr. Highsmith.

25        **MR. HIGHSMITH:**  Yes, Your Honor.  The United States

1   calls Brandi Jodoin.

2           **THE COURT:**  Please come forward to be sworn.

3           **THE COURTROOM DEPUTY:**  Please raise your right hand.

4                          **BRANDI JODOIN**,

5   called as a witness for the Government, having been duly sworn,

6   testified as follows:

7           **THE COURTROOM DEPUTY:**  Please be seated.  And can you

8   speak clearly into the microphone, and state your name and

9   spell your name, please, your full name.

10          **THE WITNESS:**  My name is Brandi Jodoin, B-r-a-n-d-i,

11  Jodoin, J-o-d-o-i-n.

12                      **DIRECT EXAMINATION**

13  **BY MR. CHOU**

14  **Q.**   Good morning, Ms. Jodoin.

15  **A.**   Good morning.

16  **Q.**   Please tell us a bit about yourself.  Where do you live?

17  **A.**   I currently live in Lynn Dale, Texas, with my husband and

18  our children.

19  **Q.**   And what do you do for a living?

20  **A.**   I homeschool our children.

21  **Q.**   Are you familiar with a cryptocurrency that was called

22  ATEN Coin?

23  **A.**   Yes, I am.

24  **Q.**   How do you spell ATEN Coin?

25  **A.**   A-T-E-N.

JODOIN - DIRECT / CHOU

1  **Q.**   In 2014, did you and your husband purchase ATEN Coins?

2  **A.**   Yes, we did.

3  **Q.**   How much in total did you and your husband purchase?

4  **A.**   That first purchase or in total?

5  **Q.**   In total.

6  **A.**   It was just under $150,000 U.S.

7  **Q.**   And in the years since how much were you able to sell or

8  trade of ATEN Coin?

9  **A.**   None of it.

10 **Q.**   How much investment have you been able to get back side,

11 about 10 years later?

12 **A.**   Zero dollars.

13 **Q.**   How much is your ATEN Coin worth now?

14 **A.**   Nothing.

15 **Q.**   Who played the biggest role in convincing you to invest

16 over a hundred thousand dollars in ATEN Coin?

17 **A.**   Marcus Andrade.

18 **Q.**   Do you see Marcus Andrade in the courtroom today?

19 **A.**   Yes, I do.

20 **Q.**   Could you please identify him by describing where he is in

21 the courtroom and something he's wearing?

22 **A.**   He is on the table, sitting at the table to the left here,

23 he's wearing a black or --

24        **MR. SHEPARD:**  We stipulate.

25        **THE COURT:**  All right.  The record will reflect that

**JODOIN - DIRECT / CHOU**

1    the witness has identified the defendant.

2    **BY MR. CHOU**

3    Q.    In 2015, did you and your husband buy a stake in the NAC

4    Foundation?

5    A.    Yes, we did.

6    Q.    What does NAC stand for for short?

7    A.    The National ATEN Coin Foundation.

8    Q.    How much did you pay for that stake in the National ATEN

9    Coin Foundation?

10   A.    We paid $275,000 U.S.

11   Q.    Who sold you that stake in the NAC foundation?

12   A.    Marcus Andrade did.

13   Q.    What happened to your investment?

14   A.    It's gone.

15   Q.    Let's walk through what happened in roughly chronological

16   order, okay?

17        When did you first learn that Marcus Andrade was behind

18   ATEN Coin?

19   A.    Mid-summer of 2014 my husband received a cold call.

20   Q.    And when did you first hear Marcus Andrade's voice?

21   A.    That would have been December 2014.

22   Q.    When did you first speak with Marcus Andrade?

23   A.    Personally, it would have been later in 2015.  I listened

24   in on conversations with my husband and Marcus, but I

25   personally talked to him in 2015.

1  Q.   And when listening in on these conversations in 2014, what

2  did Mr. Andrade say about ATEN Coin?

3  A.   ATEN Coin was going to be a more maturer version of

4  Bitcoin.  It was going to be AML and KYC-compliant.  It was

5  also going to be part of FinCEN or FinCEN-compliant, and it was

6  going to be able to have a, how do you say, a secure platform

7  where if somebody was doing something illegal it could be

8  locked down, and you could guarantee that it wasn't going to be

9  used for money laundering or to fuel nefarious purposes.

10 Q.   You used a few acronyms there, and I just wanted to unpack

11 those.

12      What does AML stand for?

13 A.   It's anti-money laundering.

14 Q.   And what does KYC?

15 A.   It means know your customer.

16 Q.   And ...

17 A.   I don't know what the acronym for FinCEN means.

18 Q.   Sure.  And what were you told that convinced you and your

19 husband to invest initially?

20 A.   When we, in December, were talking to Marco and then

21 Marcus, they were talking about how Marcus and his partners

22 were --

23          MR. SHEPARD:  Excuse you me, Your Honor.  Could I have

24 a foundation for this conversation?  There seems like multiple

25 people involved and just --

1           **THE COURT:**  Why don't you break it down and tell us

2    which conversation we're talking about.

3           **MR. CHOU:**  Sure, sure, Your Honor.

4    **BY MR. CHOU**

5    **Q.**   Let's focus in on first those phone calls you overheard in

6    2014.  Where were you when you heard those phone calls?

7    **A.**   They were in my husband's office.

8    **Q.**   And why would you have overheard phone calls in your

9    husband's office at home?

10   **A.**   Because he was quite excited about the product and perhaps

11   the investment ability of it.  And so when he was -- when he

12   would take a call, I would come in and just listen to the

13   information so we could make a decision together.

14   **Q.**   And why were you often at home for these calls?

15   **A.**   We have 12 children, and I've homeschooled them all.  So

16   we were home.  I was always home.

17   **Q.**   So during those phone calls what did you overhear

18   Mr. Andrade telling your husband about ATEN Coin?

19   **A.**   The most pivotal conversation is when we were talking

20   about he had explained that they were setting up a agreement

21   between the oil and gas industry in Texas, some individual,

22   speaking to individual members that would tie the ATEN Coin to

23   the profits of the oil derricks or the oil reserves, which

24   would do a couple of different things.  It would give it a

25   foundation.  It would have a security behind it or a commodity

1    behind it.  And then it would also fuel the demand for the

2    coin, coupled with it having a physical asset that it was being

3    used with or would be tied with.  You have this idea of Corey

4    and I very much tried to always be very ethical in our

5    investments, and the idea that you could have something that

6    was a cryptocurrency that had those features was very -- it was

7    very enticing.

8            MR. SHEPARD:  Your Honor, excuse me.  We seem to be

9    mixing conversations and feelings.  I'm happy to ...

10           THE COURT:  Okay.  All right.  Let's go question and

11   answer and make sure that we know what conversation we're

12   talking about, and then if you want to go into what the

13   reaction of the witness is, make it clear that's what you're

14   doing.

15       Go ahead.

16           MR. CHOU:  Yes, Your Honor.

17   BY MR. CHOU

18   Q.   In addition to speaking or overhearing Mr. Andrade speak

19   over the phone in 2014, what else did you do to look into ATEN

20   Coin, if anything?

21   A.   We looked at the NAC website, we went on the Facebook, and

22   we also were sent different Twitter announcements and different

23   coin-based announcement on various coin, cryptocurrency

24   websites.

25   Q.   And you mentioned a few different things there, and I just

```
 1   want to unpack some of them.  When you -- did you go online and

 2   look at content?

 3   A.   Yes, I did.

 4   Q.   Did you look at press releases?

 5   A.   Yes, I did.

 6   Q.   And how did you come across those press releases?

 7   A.   Some of them were through a search about ATEN Coin, some

 8   were given to us.

 9   Q.   I'd like to show you what's been marked as trial

10   exhibit 349.

11        Mrs. Jodoin, do you see the document on the screen in

12   front of you?

13   A.   Yes, I do.

14   Q.   Do you recognize this document?

15   A.   Yes, I do.

16   Q.   And what is it?

17   A.   It is a news release from a coin-based website concerning

18   ATEN Coin.

19   Q.   Did you read this press releases in 2015 when you were

20   deciding whether to invest in ATEN Coin?

21   A.   Yes, we did.

22   Q.   Did this press releases influence your decision to invest?

23   A.   Yes, it did.

24   Q.   Is this exhibit 349 a fair and accurate depiction of the

25   press release you saw at the time?
```

 1    **A.**   Yes, it is.

 2           **MR. CHOU:**  At this time, I would move to admit and

 3    publish this press releases, Your Honor.

 4           **MR. SHEPARD:**  No objections.

 5           **THE COURT:**  349 will be admitted, and you may publish

 6    it.

 7           (Trial Exhibit 349 received in evidence.)

 8    **BY MR. CHOU**

 9    **Q.**   So Mrs. Jodoin, let's start from the top of the press

10    releases and work through a few highlights.  Okay?

11           So first I want to focus in on the header and color there.

12    **A.**   Yes.

13    **Q.**   What does that depict?

14    **A.**   It has a coin on it and then it is a stylized oil derrick

15    or an oil symbol, and then it has ATEN Coin on it.

16           **THE COURT:**  Before you go, seeing that this is our

17    first exhibit showing up on the screen, can all the jurors see

18    the -- does the document come up on the screen and you can see

19    it?

20           **A JUROR:**  Yes.

21           **THE COURT:**  Okay.  Thank you.  Go ahead.

22    **BY MR. CHOU**

23    **Q.**   What is the blue text below ATEN Coin there?

24    **A.**   It says it's the first fully AML/KYC compliant --

25    compliance cryptocurrency.

1  **Q.**    And what about this press release influenced your decision

2  to invest?

3  **A.**    Well, it says that it is the first fully ALM (sic)/KYC

4  compliance, and that means that it's gone through some rigor,

5  correct?  And when you read through it it talks about it has --

6  it's a service member of the American Bank Association, the

7  Counter Financing Tourism.  These are important organizations

8  that give a great deal of credence to the idea that this will

9  do what it said it was going to do.

10  **Q.**    I'd like to zoom in on the bottom two paragraphs starting

11  with "founder of NAC" and then going through "he said."

12  **A.**    Yes.

13  **Q.**    Do you see that okay?

14  **A.**    Yes, I do.  Thank you.

15  **Q.**    And founder of NAC, Marcus Andrade, was that the same

16  Mr. Andrade we were speaking about earlier?

17  **A.**    Yes, it is.

18  **Q.**    When you were reading this quote from Mr. Andrade at the

19  time, what did you understand it to mean?

20  **A.**    It was that this was poised to make a market breakthrough;

21  that it was ready and willing, and we were going to be going

22  through it with it being able to be useable within a matter of

23  months.

24  **Q.**    And this was in May 2015?

25  **A.**    (Nods head.)

1  **Q.**   I'd like to turn to the next page of this press release,

2  please.  And if we could zoom in on the unique features of the

3  ATEN "Black Gold" Coin and through all the bullet points.

4  Thank you so much.

5      Do you remember reading these bullet points, Mrs. Jodoin?

6  **A.**   Yes, I do.

7  **Q.**   What about these bullet points affected your decision to

8  invest?

9  **A.**   The top two, it met the requirements for Corey and I that

10  we always invest in things that are ethical and that will bring

11  some good to whatever community that it's in, and it was very

12  important for us that any type of investment that we currently

13  do is legal in every aspect of it or at least -- or ethical in

14  every aspect.

15      The third bullet point, my husband was a business owner.

16  You need demand for any product that you have.  With tying it

17  to the oil and gas investments, you now had a secondary way to

18  engage interest and for demand, which is always important.  You

19  need multiple streams to develop a business.

20      The last one for us was the usability.  The one for myself

21  was the usability.  The idea that ATEN Coin with ATEN Pay, you

22  now have once again a second stream.  You have ATEN Coin, and

23  then you have a secure way to pay for payment plan -- pardon

24  me, for payment platform.  So you have a double way to increase

25  your investment strategy.

1           **MR. CHOU:**  If we could zoom out, please, and zoom in

2     at the bottom there about National ATEN Coin and the "Black

3     Gold" coin.

4           Perfect.

5     **BY MR. CHOU**

6     **Q.**   So on the first page there was a mention of Warsaw.  Did I

7     get that right?

8     **A.**   Yes.

9     **Q.**   What was your understanding of how come this section is

10    talk about Las Vegas?

11    **A.**   That is where the national -- like the NAC was formed or

12    that's where he had his business he was incorporated in.

13    **Q.**   And did there come a time where you not only went to

14    Warsaw, but also to Las Vegas?

15    **A.**   Yes, there is.

16          **MR. CHOU:**  If we could take this down, please.

17    **BY MR. CHOU**

18    **Q.**   So you looked at a press release or press releases.

19          In addition, did you rely on social media accounts of AML

20    Bitcoin?

21    **A.**   Yes, we did.

22    **Q.**   Excuse me, ATEN Coin?

23    **A.**   Yes, we did.  I went on to the ATEN Coin Facebook, and we

24    also received in communications with Marcus and Marco DiAdamo,

25    we received screenshots of Twitter for updates as we were in

 1  talk.

 2  Q.   You mentioned this name Marco or Marco DiAdamo a couple

 3  times.

 4  A.   Uh-huh.

 5  Q.   Let's just put a pin in that.  Who was Marco DiAdamo?

 6  A.   Marco DiAdamo was the salesperson that was working with

 7  NAC to sell ATEN Coin.  He was later revealed to be the VP of

 8  sales for NAC.

 9  Q.   And who introduced you to Marco DiAdamo?

10  A.   It was a cold call.

11  Q.   And how did you later come to learn that Mr. DiAdamo had a

12  connection with NAC Foundation?

13  A.   He introduced himself as such.

14  Q.   And did you ever attend meetings where DiAdamo and

15  Mr. Andrade were in the same room?

16  A.   Yes.

17  Q.   And could you tell from those interactions what their

18  relationship was, if any?

19  A.   Yes, there was.  It was -- there was a professional

20  relationship, and they were very cordial.  So I would assume

21  there was some type of a friendship there.

22  Q.   So we were talking about social media.

23  A.   Uh-huh.

24  Q.   And what sort of tweets, if any, did you receive?

25  A.   The tweets were along the line of is ATEN Coin, the first

1    of a hundred percent compliance, very similar to kind of the

2    bullet points that you had on that press releases.  There would

3    be one announcing that they were going to go to a

4    cryptocurrency conference, and then there was a big one

5    where -- a big conference coming up in Warsaw, Poland.

6    Q.   And how did you come about seeing those -- that Twitter

7    content?

8    A.   They were sent to us in screenshots or texted to us.  At

9    this time Corey and Marcus were talking, not frequently.

10   Q.   I'd like to show you what's been marked as exhibit 538.

11   A.   Uh-huh.

12   Q.   Mrs. Jodoin, can you see that document okay?

13   A.   I do, thank you.

14   Q.   Do you recognize this document?

15   A.   I do.

16   Q.   What does it depict?

17   A.   It is different Twitter posts.

18   Q.   And does it contain Twitter posts about ATEN Coin that you

19   saw in 2015?

20   A.   They do.  The only difference is is the title is not the

21   same.

22   Q.   Right.  And so --

23   A.   But the content of each one of the Twitters is what we had

24   seen, yes.

25   Q.   So in this particular screenshot, what in particular is

1  different from what you saw back in 2015?

2  **A.**   The logo is different.  The logo was the original logo

3  that was seen on the first document.  And it wasn't AML

4  Blockchain.  It was "ATEN Black Gold" or ATEN Coin."  ATEN Coin

5  was later rolled into AML.

6  **Q.**   And what about the handle for the Twitter posts?

7  **A.**   It would have been an ATEN Coin handle, not an AML.

8  **Q.**   But the dates and content, are those what you saw at the

9  time?

10  **A.**   Yes, they were.

11  **Q.**   And did this Twitter content influence your decision to

12  invest in ATEN Coin?

13  **A.**   Yes, it did.

14  **Q.**   So with the exception of the Twitter profile logo and the

15  Twitter handle, is exhibit 538 a fair and accurate depiction of

16  the tweets you saw at the time?

17  **A.**   Yes, they were.

18      **MR. CHOU:**  At this time, Your Honor, I would move to

19  conditionally admit and publish with later foundation to be

20  laid by FBI Special Agent Kate Ablett.

21      **THE COURT:**  Mr. Shepard?

22      **MR. SHEPARD:**  I'm sorry.  It's going to be admitted

23  conditionally subject to additional foundation?

24      **THE COURT:**  Correct.

25      **MR. SHEPARD:**  Okay.

 1          **THE COURT:**  All right.  It's admitted.

 2          (Trial Exhibit 538 received in evidence.)

 3   **BY MR. CHOU**

 4   **Q.**   So Mrs. Jodoin, do you still see it up on your screen?

 5   **A.**   Yes, I do.

 6   **Q.**   Could you just walk us through some of the tweets that you

 7   saw that you relied on in part?

 8   **A.**   In the top one it said it's in compliance, and then it

 9   lists the different things that ATEN Coin was compliant in.

10   And it didn't say it's going to be, it said is in compliance,

11   which gave a sense that it was a current situation, and the

12   Bank Security Act, the U.S. Patriot Act, the FACT Act.  Those

13   are important safeguards for western society for the world to

14   have proper banking.  To see those type of large government

15   controls, it gave a sense of security that this was exactly

16   what it said it was.

17          And then when you go down, it's just being reiterated over

18   and over again that this is compliant, and it doesn't say these

19   are our plans, it said it is.

20          Also, you see they're going to Dubai on conferences and

21   regulations and compliance.

22          **MR. SHEPARD:**  Your Honor, we are describing an exhibit

23   that the jury can read.  If there's testimony about what she

24   relied on, the Court has said that's permissible, but this is

25   just a description of a document.

 1          **THE COURT:**  Overruled.  Go ahead.

 2    **BY MR. CHOU**

 3    **Q.**    So please go ahead, Mrs. Jodoin.  We were asking you about

 4    what on~-- what sort of tweets, how did this exhibit here

 5    influence your decision-making at the time?

 6    **A.**    It gave a sense that this was very much a mover and shaker

 7    in that it was garnishing or it was getting international

 8    attention.  Which, the more markets you have to an investment,

 9    the more likely it is to be successful.

10          And if you go down, there's the Dubai conference with

11    regulation and compliance, ATEN Black Coin has figured out all

12    the compliance issues.  Well, why wouldn't the banking

13    platforms and the governments be interested in this type of a

14    coin.

15    **Q.**    And you saw these tweets back in 2014 and '15?

16    **A.**    Yes.

17          **MR. CHOU:**  I'd like to take this down, please.

18    **BY MR. CHOU**

19    **Q.**    Did you also review the ATEN Coin website in deciding

20    whether to invest?

21    **A.**    Yes, we did.

22    **Q.**    I'd like to show you exhibit 1122.

23          **MR. CHOU:**  Ms. Rosenbaum, if you could zoom in on the

24    content part of it so it's a little bigger.  Maybe the whole

25    thing.

1  BY MR. CHOU

2  Q.   Mrs. Jodoin, what does this exhibit appear to be?

3  A.   It looks to be like a -- one of the slides off the

4  website.

5  Q.   And do you recognize the content in the middle of the page

6  discussing ATEN Coin?

7  A.   Yes, I do.

8  Q.   At the time, did you rely in part on these representations

9  to decide whether to invest in ATEN Coin?

10      MR. SHEPARD:  I'm sorry.  Has this been admitted, Your

11  Honor?

12      THE COURT:  Not yet.  He hasn't moved to admit it, so

13  the jury hasn't seen it.

14      MR. SHEPARD:  Okay.  Thank you.

15  BY MR. CHOU

16  Q.   Sorry, Mrs. Jodoin.  I was asking whether you recognize

17  the content in the middle of the page.

18  A.   Yes, I do.  This is -- in 2014 some of these information

19  was not present; some of it was.  But in 2015, yes, we were

20  shown all of this information.

21  Q.   And so in 2015, did you see this content on the AML

22  Bitcoin website or the ATEN Coin website?

23  A.   Yes, we did.

24  Q.   And is the content in the middle there a fair and accurate

25  description of the ATEN Coin website in 2015?

1    **A.**    It is.  This format, I am just trying to be clear, this

2    format I believe, with the coloring and anything, this could be

3    taken directly from the website.  We helped reformat once we

4    were working with Marcus.  This is not the same color scheme as

5    the original website.  So I just want to make that ...

6    **Q.**    What about the words?

7    **A.**    Yes.  The words, yes.  As I said, the ATEN Pay on the

8    bottom would not have been in 2014, but everything else was,

9    yes.

10            **MR. CHOU:**  So at this time, I would move to admit and

11    publish this as a representation of the website in 2015.

12            **MR. SHEPARD:**  No objection.

13            **THE COURT:**  1122 will be admitted.

14        (Trial Exhibit 1122 received in evidence.)

15            **MR. CHOU:**  If we could zoom in, please, Ms. Rosenbaum,

16    on the first section there, just those two arrows.  Thank you.

17    **BY MR. CHOU**

18    **Q.**    So there's a couple things mentioned here.  What was your

19    understanding -- or did you see the mention of the U.S. Federal

20    Reserve committee?

21    **A.**    Yes.

22    **Q.**    Did you have an understanding what that was about at the

23    time?

24    **A.**    Yes.  That was after we had already boughten (sic) our

25    coins, most of our coins, and then had been approached to work

1    or to be an adviser.  We were told that ATEN Coin was invited

2    to be a member of the U.S. Federal Reserve Faster Payment

3    Taskforce Committee, and what we were told is the Federal

4    Reserve, seeing the need for cryptocurrency and the ability for

5    money laundering and the nefarious purposes that cryptocurrency

6    could be made, and the idea of having payment platforms so

7    payments could be more easily regulated and used, that ATEN

8    Coin and ATEN Pay had been asked to be a member of this

9    committee so they could work together to develop a system for

10   the Federal Reserve.

11   **Q.**   In the first --

12          **THE COURT:**  Let me make sure that what the witness was

13   saying.  I was told, who told the witness that?

14   **BY MR. CHOU**

15   **Q.**   Mrs. Jodoin, who told you that information?

16   **A.**   Marcus Andrade.

17   **Q.**   That first bullet point there says ATEN Coin started the

18   implementation of monitoring, detecting, dot dot dot, that over

19   a thousand banks use to catch suspicious activity in

20   January 2015.  Did I get that right?

21   **A.**   Yes.

22   **Q.**   During the course of your involvement in the ATEN Coin

23   project did you ever see over a thousand banks use ATEN Coin?

24   **A.**   No, I did not.

25   **Q.**   Did you ever see any banks use ATEN Coin?

1    **A.**    No, I did not.

2           **MR. CHOU:**  We can take this down, please.

3    **BY MR. CHOU**

4    **Q.**    So you reviewed some content online.  Let's discuss what

5    happened next.

6           In the fall of 2015 did you travel to Poland to attend a

7    conference promoting ATEN Coin?

8    **A.**    Yes, we did.

9    **Q.**    Who invited you to that conference?

10   **A.**    Marcus did.

11   **Q.**    And how did he invite you to the conference?

12   **A.**    Prior to that, in late fall, early fall, Marcus and Corey

13   had talked on occasion, and Marcus would ask Corey for building

14   business or concrete business advice.  He had asked Corey to

15   come on as an adviser to the NAC Foundation in an advisory

16   role, and Corey was hesitant due to the fact that they had not

17   personally met.  Marcus had called Corey and was talking about

18   this breakthrough with the conference.  There was bank

19   regulators coming, there was people in law enforcement, there

20   was legislatures there.

21          The reason why we were told that it was going to be held

22   in Poland was because the European union was using Bitcoin or

23   cryptocurrency at a far more sophisticated rate than we were

24   currently in the United States and Canada.  And Marcus invited

25   Corey to come out, Corey and myself, to come to Warsaw.  So we

1  said yes.  An invitation was e-mailed to us, and then we made

2  travel arrangements to go to ...

3  **Q.**  And at this point you had never met Mr. Andrade in person?

4  **A.**  No, we had not.

5  **Q.**  All conversations were either over the phone or overheard

6  on speaker phone?

7  **A.**  That's correct.

8  **Q.**  Who paid for the flights to Warsaw?

9  **A.**  We did.

10  **Q.**  And once you get to Warsaw, in Poland, what did you see at

11  the conference?

12  **A.**  It was held in a very prestigious, an old building.  It

13  was well run.  There was -- we seen Mr. Andrade there and

14  various members of the team.

15      There was people brought in to give talks or to do hold

16  sessions on various pitfalls of cryptocurrency.  And also it

17  was presented how ATEN Coin and ATEN Pay could solve many of

18  these pitfalls.

19  **Q.**  Your impression at the time, was it that there was an

20  impressive number of attendees or not that many attendees?

21  **A.**  I had never been to anything like this before, so it

22  seemed reasonable.  It was~-- the venue was full, but there was

23  approximately a hundred to 150 people there.

24  **Q.**  And months later, months later, did there come a time when

25  you learned that the conference wasn't what you had thought it

1   was?

2   **A.**   Yes.

3   **Q.**   What did you learn?

4   **A.**   When I was talking to Agnieszka Cenzartowicz --

5   **Q.**   Let me stop you there.  We'll talk about Agnieszka

6   Cenzartowicz later.

7   **A.**   Okay.

8   **Q.**   What was -- what did Mr. Andrade tell you about the

9   conference?

10  **A.**   It was presented that this was an opportunity that ATEN

11  Coin and ATEN Pay had been given so much attention, that it was

12  an opportunity to bring together a collaboration between the

13  law enforcement, the regulatory system and the investor, the

14  banking system, to come together and to really kind of

15  synergize on the different problems and how this could be a way

16  to really work through these type of things.

17      Afterwards, we discovered that it was a promotional

18  conference put on by ATEN Coin and ATEN Pay.

19      **MR. SHEPARD:**  Your Honor, objection; lack of

20  foundation.  She says she discovered it.  I'd just like to hear

21  from --

22      **THE COURT:**  All right.  Well, will you go back and

23  provide the foundation for that conclusion.

24      **MR. CHOU:**  Yes.

25  **BY MR. CHOU**

1    Q.    Mrs. Jodoin, when I interrupted you, you were about to

2    tell us about a conversation you had with Agnieszka

3    Cenzartowicz, if I got that right?

4    A.    Yes.

5    Q.    Who was Agnieszka Cenzartowicz?

6    A.    She was a polish marketer who was responsible for

7    organizing and inviting the speakers and arranging for the

8    speakers to come.

9    Q.    And how did you develop the understanding that she was

10   responsible for all that?

11   A.    She admitted it as such as we got to know her and we were

12   working with her.

13   Q.    And did you see her working with Mr. Andrade?

14   A.    Yes.

15   Q.    Where did you see that?

16   A.    In Poland, when we were first there.  And then afterwards

17   when we came onboard, she would work with Marcus, and then I

18   was responsible for working with her to support and develop

19   ATEN Coin.

20   Q.    Were you all on phone calls together?

21   A.    Yes, we were.

22   Q.    Did you send e-mails to her and Andrade on the same

23   thread?

24   A.    Yes, I did.

25   Q.    And so based on those meetings and also your conversations

```
 1   with her, she -- you thought she was an employee of the ATEN

 2   Coin project?

 3   A.   Yes.

 4   Q.   So on the basis of that, what did you learn about the

 5   Warsaw conference?

 6   A.   That it was --

 7        MR. SHEPARD:  Your Honor, objection.  If this is just

 8   to explain what the witness learned and why she did what she

 9   did, I have no objection to it.  But if this is supposed to be

10   some admission of some kind or offered for the truth, there's

11   no basis for that.

12        THE COURT:  So what are you offering this for?

13        MR. CHOU:  It's a 801(d)(2) statement of an employee

14   or agent, Your Honor.  But we could also offer it for the

15   effect on Mrs. Jodoin without necessarily being the truth of

16   the matter.

17        THE COURT:  Well, what are you offering?  Tell me.

18        MR. CHOU:  For the truth, Your Honor.

19        THE COURT:  Well, if you are going that way, you have

20   to establish more than you've established now of some sort of

21   agency relationship.  I don't know who this other person is,

22   and she's not in a position to do that.  So I'm not going to

23   admit it on that basis.

24        So what's your other basis for it?

25        MR. CHOU:  The effect on Mrs. Jodoin and actions she
```

 1  took later in response to learning this.

 2           THE COURT:  All right.  I will allow you to go into

 3  this area on that basis.

 4       And members of the jury, this is going to come up at

 5  various points in the trial.  It's all a little confusing, I

 6  realize, but sometimes statements are offered not for the truth

 7  of the statement.  In other words, it's not being offered to

 8  prove that the statement that was made is true, but it's

 9  important for it just to be admitted so you can understand why

10  this information, having been communicated, why witnesses then

11  react in certain ways.  That's the reason -- that is where we

12  are here.  That is the reason this is being admitted for your

13  consideration.

14       Go ahead.

15  BY MR. CHOU

16  Q.  Jumping ahead briefly in time, Mrs. Jodoin, did there come

17  a time when you began to feel disillusioned with the ATEN Coin

18  project?

19  A.  Yes.

20  Q.  And was one of those reasons for your feeling a

21  disillusionment something you think you learned about at the

22  Warsaw conference?

23  A.  Yes.

24  Q.  And what is it that -- what is it that you learned about

25  this Warsaw conference?

1          **MR. SHEPARD:**  Could I have a foundation?  Objection;

2    lack of foundation.

3          **THE COURT:**  Overruled.

4      You may answer the question.

5    **BY MR. CHOU**

6    **Q.**   The question was, Mrs. Jodoin, what is it that you learned

7    about this Warsaw conference?

8    **A.**   We learned that the Warsaw conference was more a paid

9    venue where they paid the speakers, some of the speakers to

10   come in, and invited other speakers but gave them a very

11   specific topic to talk about rather than it being more a equal

12   footing where you had law enforcement coming together.  It

13   seemed at the beginning it was more of a partnership where this

14   is a legitimate solution, rather than an advertisement or a

15   marketing, where you're trying to put forward that we could ask

16   for this product.

17   **Q.**   So now let's go back in time and talk about what happened

18   at that conference.

19      At that conference, did there come a point where Marcus

20   Andrade asked you and your husband to join the company?

21   **A.**   Yes.

22   **Q.**   And so situate us if you might.  When did he ask you to do

23   that?

24   **A.**   We had listened to the conference, and then after that,

25   Marcus informed us that the -- himself and the rest of the

1  members of the team were going to meet with a man named James

2  Mawhinney, who was from Tandem Capital, and they were going to

3  get together to discuss the final negotiations in an IPO where

4  the NAC Foundation was going to be formed and then taken to an

5  IPO.

6  **Q.**   And then did you and Mr. Andrade end up getting dinner

7  together at any point?

8  **A.**   Yes, we did.

9  **Q.**   Could you tell us a bit more about where this dinner was

10 held?

11 **A.**   It was held in a very nice restaurant in, I believe it was

12 the Intercontinental Hotel, and it was -- there was James

13 Mawhinney -- would you like to know who was there, or just

14 that --

15 **Q.**   Yes, please.  Who was at this dinner, and where were folks

16 seated, roughly speaking?

17 **A.**   And to my recollection, James Mawhinney was more in the

18 middle of the table.  There was approximately 10 or 12 people

19 there.  There was Serge towards one end.  He was introduced to

20 us as a code writer from the Ukraine.  He was also Marcus

21 Andrade's partner.

22     And then Terence Poon, Dr. Terence Poon, who was also --

23 who was introduced to us as a partner of Marcus', and we were

24 told he worked at a university, but he was also a developer.

25     Then there was Agniska, I cannot pronounce her last name.

1  Her husband, Igor.  They were both lawyers, and they were --

2  Aga had been working for -- she went by Aga.  She had been

3  working on the legal side for ATEN Pay and furthering ATEN Coin

4  in Poland.  Agnieszka Cenzartowicz, who was a marketing head

5  help who Marcus had hired.

6  **Q.**    Where were you sitting, and where was -- where was

7  Mr. Andrade sitting, if anywhere?

8  **A.**    Marcus was sitting across my husband and I.

9  **Q.**    At one end of the table?

10  **A.**    Yes.

11  **Q.**    Was this the first time that you had met Mr. Andrade in

12  person?

13  **A.**    That day, yes.  Over that conference, yes.

14  **Q.**    What about your husband, Corey Jodoin?  To your knowledge,

15  had he ever met Mr. Andrade before?

16  **A.**    No, he had not.

17  **Q.**    And so at that dinner at the Intercontinental, what did

18  Mr. Andrade pitch to you?

19  **A.**    He had pitched to Corey that if we had wanted to come

20  onboard and put in an investment of $500,000 U.S., that we

21  would get 5 percent of the NAC Foundation.

22  **Q.**    And what was your response to that?

23  **A.**    He had offered Corey the CEO position, and Corey said he

24  couldn't take the CEO position.  If you're going to take a

25  communicate -- pardon me, a company to an IPO, that's an

1    international company.  Corey did not have the experience for

2    that.  Corey also said I do not think I can come up with

3    $500,000 U.S. dollars.

4        Marcus said that we could -- Corey said I could come down

5    as a COO after -- pardon me, I jumped ahead.  It had been

6    offered at least a couple of times during the next -- like the

7    dinner, the meeting with James Mawhinney, and then he had a

8    meeting.

9    Q.   Let's take it step by step.  What happened at that dinner?

10   A.   Marcus -- it was exciting.  It was this wonderful

11   conference.  And Marcus told Corey, are you ready to come

12   onboard?  We could really use the help.

13   Q.   And so Mr. Andrade offered a CEO position to your husband

14   in exchange for a $500,000 investment?

15   A.   Yes.

16   Q.   And your husband would receive a 5 percent stake in the

17   business?

18       MR. SHEPARD:  Objection; leading.  I don't think

19   that's what she said, either.

20       THE COURT:  Well, make sure you resist leading, but so

21   far overruled because I think it was consistent.

22       Go ahead.

23   BY MR. CHOU

24   Q.   And so Mrs. Jodoin, what did your husband say in response

25   to that CEO offer and the 5 percent?

1   **A.**   He said we could not -- he could not do the CEO.  He was

2   not -- he didn't feel that he was able to handle that position;

3   that we would like to come onboard and help.  We loved the

4   idea.  And that he did not think that we could do $500,000.

5   **Q.**   And what was Mr. Andrade's response to that?

6   **A.**   He said, come onboard.  We can make this work.  Let's -- I

7   want to work with you, Corey.

8   **Q.**   While you were still in Warsaw, did there come another

9   meeting with Mr. Andrade and some of his associates?

10  **A.**   Yes, we did.

11  **Q.**   And what was that next meeting?

12  **A.**   We -- we were invited as future -- as -- pardon me, as

13  coin holders to attend the meeting with the team and James

14  Mawhinney, from Tandem Capitol.

15  **Q.**   And was this meeting also in Warsaw?

16  **A.**   Yes, it was.

17  **Q.**   Could you -- was Mr. Andrade at this meeting?

18  **A.**   Yes, he was.

19  **Q.**   And you've mentioned James Mawhinney.  How did Mr. Andrade

20  introduce this Mr. Mawhinney?

21  **A.**   Marcus introduced him as a fellow from Tandem Capital.  He

22  was very interested in ATEN Coin or NAC, and that he was --

23  worked with a company that took viable small companies and took

24  them to an IPO.

25  **Q.**   So was this meeting held in a conference room, or where

1    was it?

2    A.    Yes, it was.

3    Q.    And what was the -- who delivered the pitch during this

4    meeting?

5    A.    James Mawhinney.

6    Q.    And Mr. Andrade was in the room?

7    A.    Yes, he was.

8    Q.    What was the pitch that Mr. Mawhinney delivered while

9    Mr. Andrade was in the room?

10   A.    James Mawhinney said based on the business plan and the

11   evaluation that Marcus Andrade had given to him of $45 million,

12   and that his own evaluation, that he felt by May of 2000 (sic)

13   and in five months, five to six months, that they could take

14   NAC to an IPO, and there would be an initial offering of a

15   hundred million dollars.

16   Q.    Then after this pitch about an IPO, did Mr. Andrade speak

17   with you and your husband?

18   A.    Yes.  When we were walking out of that meeting, Marcus

19   again said, I really want you to come on as the CEO.  And Corey

20   says, Marcus, I can't do that job.  I don't know how to do that

21   job from an international company.  And he said, I'll help you

22   build the company, I'll help you build it, I can do that.

23        And then the next day, Corey, Marcus and Dr. Poon and I

24   believe Serge were there, and the formal offer was given to

25   Corey.

1   **Q.**    Did the terms of the deal change at all?

2   **A.**    No.

3   **Q.**    Well, did Mr. Andrade offer -- offer your husband the

4   chief executive officer role?

5   **A.**    Yes, he did.  Okay.  I apologize.  I misunderstood the

6   question.

7         That day he was offered the COO position, and for

8   5 percent of NAC, with the understanding we would put in at

9   least $250,000, and more discussions would be made on what we

10  could do for the other portion.

11  **Q.**    You used the acronym COO.  What does COO stand for?

12  **A.**    Chief operating officer.

13  **Q.**    And --

14  **A.**    Sorry.  It was only to be in term as the company was being

15  formed.

16  **Q.**    Did Mr. Andrade also ask you to take a role at the

17  company?

18  **A.**    Yes, he did.

19  **Q.**    And what role was that?

20  **A.**    To the beginning, it was just simply to do housekeeping,

21  organization, working with marketing, developing compliance and

22  corporate structure documents.  And then when we were in Poland

23  again in December, I was offered the chief administrator

24  officer.

25  **Q.**    Let's talk a bit about your work history, your husband and

1  your work history up to this point.

2      Did either you or your husband have any experience in

3  cryptocurrency at the time that that -- Mr. Andrade made that

4  offer?

5  **A.**   I did not.

6  **Q.**   And what experience, if any, did your husband have?

7  **A.**   Corey was an avid watcher.

8  **Q.**   And had you ever served as an executive at a -- at his

9  company?

10 **A.**   I was a director of our personal company.  I handled the

11 parties and the Christmas gifts and that.  But I was

12 predominantly a stay-at-home mom.

13 **Q.**   This meeting in Poland when Mr. Andrade gave this offer,

14 was this the first time that you all had met in person?

15 **A.**   Yes.

16 **Q.**   And how long before that had you started corresponding

17 with him?

18 **A.**   I had perhaps talked to him once myself personally on the

19 phone prior to that.  Corey, it had been about probably

20 December previous was the first time he had talked to Marcus on

21 the phone, and they probably had -- I believe they had I would

22 say between eight and 15 phone conversations.

23 **Q.**   Did you and your husband end up accepting Andrade's offer

24 to work for him at NAC Foundation?

25 **A.**   Yes, we did.

1   Q.   And what about that offer convinced you to join on?

2   A.   It was just a really exciting prospect, the idea that

3   something that could do so much good in the ability to send

4   money back and forth to be able to -- it's exciting.  The

5   technology was suggested to be cutting edge, and the ability to

6   get involved with a situation like that, it's very intriguing.

7   And we felt we couldn't stay with the company once it was

8   established as an international company, but we could work hard

9   and help set up the bones of the company that they could then

10  take forward.

11  Q.   And how were you compensated for the -- for this role that

12  he was asking you to take on?

13  A.   It was just the promise of the shares in the company.

14  Q.   And as part of Mr. Andrade's pitch to have you join his

15  company, did he ask you to buy a stake in it?

16  A.   Yes.

17  Q.   What was the -- what did he say about the structure of

18  that?

19  A.   That once the company was formed and we were finished

20  setting it up, we would receive 5 percent of the soon to be

21  incorporated company.

22  Q.   And leaving aside the investment in ATEN Coin or the

23  purchase of ATEN Coin, how much did the Jodoins put into the

24  NAC Foundation?

25  A.   $275,000 U.S.

1  **Q.**   Was that a large investment for you and your family?

2  **A.**   It was.  It was a huge investment for us.

3  **Q.**   Following your husband's appointment as chief operating

4  officer and your appointment as chief administrative officer,

5  were you asked to help raise money for the NAC Foundation?

6  **A.**   Yes, we do have a -- pardon me.

7  **Q.**   Please go ahead.

8  **A.**   We do have -- we have a document.  Let me try to --

9  **Q.**   Well, I'll ask about that later.  Sorry.

10 **A.**   Okay.  Marcus Andrade asked us -- we had offered, because

11 we could not put in the full 500,000, we asked --

12 **Q.**   Well, we'll just take this piece by piece, if that's okay.

13 Sorry to cut you off.

14 **A.**   Sorry.

15 **Q.**   Who asked you to raise money for the NAC Foundation?

16 **A.**   Marcus Andrade suggested to us, and we had to -- we could

17 host a investment conference where we would invite our family

18 and our friends and other business associates to come together,

19 and any sales of coin could be used to offset the 200 and --

20 the missing $225,000.

21 **Q.**   You mentioned a missing $225,000.  What does that refer

22 to?

23 **A.**   Corey and I did not feel it was right to take the full

24 five percent if we weren't going to put in the full $500,000.

25 On more than three occasions Marcus said, no, I trust you guys.

1    And Corey said, we're happy with two and a half percent.  And

2    then I was like, what can we do instead?  And this was brought

3    up as a solution, that we could have the full 5 percent, and we

4    could work together to have an investment conference and the

5    sales of the coins.

6    Q.    In addition to an investment conference, what else, if

7    anything, did Mr. Andrade ask you to do?

8    A.    It was also going to be a client appreciation.  Because

9    Alberta's main industry is oil and gas, he had a fair number of

10   investments that were in Alberta and BC and some in Canada.  So

11   we were going to invite those previous investors to come and

12   hear the presentation and just touch base with them.

13   Q.    I'm sorry, that was a poorly worded question.

14   A.    I apologize.

15   Q.    In addition to the -- to that Edmonton conference, what

16   else, if anything, did Mr. Andrade ask you to do?

17   A.    Corey was put on the Federal Reserve community.  I was

18   asked to oversee the marketing.  I was also asked to set up the

19   compliance agreements and the corporate structure.  I was also

20   asked to appear on~-- Corey was asked to appear on the Kathy

21   Ireland show with Marcus and Marco, and I was asked to help

22   with the documentation with our existing clients.

23   Q.    Let's take a couple of those examples in turn.

24         So first you mentioned an appearance on the Kathy Ireland

25   show.  Did I get that right?

JODOIN - DIRECT / CHOU

1   **A.**   Yes.

2   **Q.**   Who is Kathy Ireland?

3   **A.**   Well, if you're my age, she was a swimsuit model when we

4   were teenagers, and then she had a business talk show type of

5   TV show.

6   **Q.**   And Mr. Andrade asked your husband to appear with him on

7   the Kathy Ireland show?

8   **A.**   Yes, he did.

9   **Q.**   Could you situate us in time?  When was this happening?

10   **A.**   In November, November 2015.

11   **Q.**   And in November of 2015 did -- was there an employment

12   contract signed with Mr. Andrade?

13   **A.**   No.

14   **Q.**   So how -- how did this invitation or request come about?

15   **A.**   Well, we had -- at this time we're working with Marcus

16   meeting every day by Skype, and we were going through the tasks

17   that he had did, and he explained that they had this

18   opportunity that Kathy Ireland was very discriminatory about

19   the people that she invited onto her show, and it was a great

20   opportunity to showcase ATEN Coin.

21       So Marcus had asked Corey to meet him in LA with Marcus

22   and Marco DiAdamo.

23   **Q.**   And did you fly out to Los Angeles, as well?

24   **A.**   Yes, we did.

25   **Q.**   And did there come a time when Mr. Andrade sent you

 1   talking points for this Kathy Ireland show appearance?

 2   **A.**   Yes.  Each one Marcus, Marco and Corey had questions that

 3   they were given from Marcus, and the answers were there, and

 4   Corey's responsibility was to learn them so he could give the

 5   appropriate answers.

 6   **Q.**   I'd like to show you what's been marked as exhibit 1496,

 7   1496.

 8         Mrs. Jodoin, do you see this document up on the screen?

 9   **A.**   Yes, I do.

10   **Q.**   What is it?

11   **A.**   It is an e-mail from Marcus to my husband, Corey.

12   **Q.**   And in the "to" line, did you also receive this e-mail?

13   **A.**   Yes, I did.

14   **Q.**   And that e-mail address, CBJodoin11@gmail.com, is that

15   your e-mail address?

16   **A.**   Yes, it is.

17   **Q.**   And up at the top it says from Marcus Monex, then there's

18   an e-mail address, MONEX247.  Whose e-mail address is that?

19   **A.**   That's Marcus Andrade's.

20   **Q.**   And out of curiosity, what does MONEX247?  Did he ever

21   tell you what that meant?

22   **A.**   I do not remember, I apologize.

23   **Q.**   And what is this e-mail?

24   **A.**   It's an e-mail forwarded from Marcus.  I mean, from

25   Terence Poon and Marcus to Corey for the answers that Corey was

1  supposed to be giving for the questions that Kathy Ireland was

2  going to be asking.

3  **Q.**  Is this a fair and accurate depiction of the e-mail you

4  received in 2015?

5  **A.**  Yes, it is.

6        **MR. CHOU:**  At this time I'd move to admit and publish

7  this as an opposing party statement.

8        **MR. SHEPARD:**  No objection.

9        **THE COURT:**  1496 will be admitted.

10     (Trial Exhibit 1496 received in evidence.)

11       **MR. CHOU:**  Okay.  So if we could just first,

12  Ms. Rosenbaum, just zoom in chronologically on the first e-mail

13  in the chain, which is the first one at the bottom, please.

14  **BY MR. CHOU**

15  **Q.**  So Mrs. Jodoin, you were forwarded an e-mail thread?

16  **A.**  Correct.

17  **Q.**  What did you understand these Q and As to be referring to,

18  as this e-mail says?

19  **A.**  It was the questions that Marcus had submitted to the

20  Kathy Ireland show, and it was the answers that Marcus and

21  Terence had put together to answer these questions.

22       **MR. CHOU:**  And if we could zoom back out and then zoom

23  in on the top half of the e-mail including the meta data.

24  Perfect.

25  **BY MR. CHOU**

**JODOIN - DIRECT / CHOU**

1  Q.   So then does Mr. Andrade send you an e-mail with a few

2  different attachments?

3  A.   Yes, he did.

4  Q.   We'll just focus in on those two attachments.  What did

5  you understand those first two attachments to be?

6  A.   On the attachments?  They were Corey's answered answers

7  for the Kathy Ireland questions, and they were suggestions for

8  Mark DiAdamo responses, as well.

9  Q.   Sorry, the first two.  So the ...

10  A.   So, that's Marcus' response and then Corey's response to

11  the questions from the Kathy Ireland show.

12  Q.   And the date on this e-mail is November 15.  When was the

13  Kathy Ireland filming, roughly speaking?

14  A.   I think it was the 19th or the 20th.

15        MR. CHOU:  Okay.  If we could take this down.

16  BY MR. CHOU

17  Q.   I'd like to now show you exhibit 1497.  Mrs. Jodoin, do

18  you recognize this document?

19  A.   Yes, I do.

20  Q.   And what is this?

21  A.   It is the answers to the questions from Marcus Andrade.

22  Q.   Is this one of the attachments to the e-mail we just saw?

23  A.   Yes, it is.

24  Q.   Did you understand at the time that these were

25  Mr. Andrade's proposed answers for the Kathy Ireland show?

 1   **A.**   Yes.

 2          **MR. CHOU:**  At this time, I move to admit and publish

 3   this attachment.

 4          **MR. SHEPARD:**  No objection.

 5          **THE COURT:**  1497 will be admitted.

 6      (Trial Exhibit 1497 received in evidence.)

 7          **MR. CHOU:**  I'd like to zoom in on the first Q and A,

 8   please.

 9   **BY MR. CHOU**

10   **Q.**   Mrs. Jodoin, were these the sort of representations and

11   others that Mr. Andrade was making to you about ATEN Coin?

12   **A.**   Yes, they were.

13          **MR. CHOU:**  We can take this down, and if you'd go to

14   the next page, please.  If we could zoom in on, yeah, the Q and

15   A4.  Thank you.

16   **BY MR. CHOU**

17   **Q.**   So I just want to focus in on that first answer from

18   Mr. Andrade, users are not allowed to obtain an ATEN Coin

19   digital wallet address without having their I.D. verified.  Did

20   you have any understanding of what Mr. Andrade meant by that?

21   **A.**   To be KYC and AML compliant, you needed to prove your

22   identity, which was done through a verification program that

23   would either use your driver's license or your passport.  And

24   the hope was that we would be able to do it ourselves.

25          **A JUROR:**  It's not published to the jury?

1          **THE COURT:**  This one I don't think has been admitted
2   yet, is it?
3          **THE COURTROOM DEPUTY:**  No.
4          **MR. CHOU:**  This is the same --
5          **THE COURTROOM DEPUTY:**  1497?
6          **MR. CHOU:**  This is 1497, yes.
7          **THE COURT:**  All right.  You can go ahead and publish
8   it.
9          **THE COURTROOM DEPUTY:**  Sorry.
10          **THE COURT:**  Thank you.
11          **MR. CHOU:**  So sorry.
12  **BY MR. CHOU**
13  **Q.**   So we were looking at the second page of that attachment
14  that was admitted into evidence.  We're on Q and A 4.
15          So at the top it says users are not allowed to obtain a
16  digital wallet address.  Could you explain to us what
17  Mr. Andrade told you about this identity verification with
18  respect to ATEN Coin?
19  **A.**   That to guarantee that it was KYC compliant and AML
20  compliant, you needed to be able to have a way to your
21  identity, which would be done through either third-party
22  verification or a program that they were hoping to have live
23  for -- it was called ATEN Verify.  And it was a way that you
24  could remotely verify persons, either their driver's license or
25  their passport.

1  Q.   And during your time at ATEN Coin, did you ever see a

2  working identity verification?

3  A.   Not one that was developed through ATEN Coin.

4       MR. CHOU:  And we can go ahead and --

5  BY MR. CHOU

6  Q.   Sorry, going to the second paragraph here, it says:  We

7  are in the process of creating a database for government

8  officials and banks to identify any suspicious ATEN Coin

9  transactions.  Did I get that right?

10  A.   Yes.

11  Q.   During your time as chief administrative officer of the

12  NAC Foundation, did you see a database for government officials

13  and banks to identify suspicious transactions?

14  A.   No, we did not.  I did not.

15       MR. CHOU:  We can take this down, please.

16  BY MR. CHOU

17  Q.   I'd like to now show you exhibit 1498, 1498.

18       MR. CHOU:  And if we could -- sorry, just zoom in on

19  the content.

20  BY MR. CHOU

21  Q.   Mrs. Jodoin, do you recognize this document?

22  A.   Yes, I do.

23  Q.   What is it?

24  A.   It is the answers -- the questions and the answers to

25  Corey's questions for Kathy Ireland.

1   **Q.**   And was this an attachment to that e-mail Mr. Andrade sent

2   to you and Corey earlier?

3   **A.**   Yes.

4   **MR. CHOU:**  At this time I'd like to move into evidence

5   and publish the entirety of exhibit 1498, which I believe is

6   two pages, three pages.

7   **MR. SHEPARD:**  No objection.

8   **THE COURT:**  1498 will be admitted.

9   (Trial Exhibit 1498 received in evidence.)

10  **MR. CHOU:**  Okay.  You can zoom out, please,

11  Mrs. Rosenbaum.  And then next page, please.  If you could

12  please zoom in on the second to last paragraph in the -- in Q

13  and A 2.  Sorry.  It starts with "the beauty of the ATEN Coin."

14  Thank you.

15  **BY MR. CHOU**

16  **Q.**   Where did these -- did your husband write these talking

17  points?

18  **A.**   No.

19  **Q.**   Where did these talking points come from?

20  **A.**   Marcus Andrade.

21  **Q.**   And what did Mr. Andrade tell you about the abilities of

22  ATEN Coin that were in effect at the time you invested?

23  **A.**   That it -- that the ATEN Coin had a patent, and that

24  patent would -- and the coin would be completely AML compliant.

25  It could not be stolen, it could not be hacked.

1              **MR. CHOU:**  Go ahead and take this down.

2              **THE COURT:**  Actually, before you do that let me just

3     point out to the jury, we're going to be seeing documents and

4     exhibits in this case, and at the bottom of some of these they

5     have numbers like this one does, and it says confidential on

6     the other side.  That was put on the document to track it for

7     the litigation purposes.  That was not there in the original

8     document.

9          So when you see Bates numbers -- we call it Bates numbers.

10    When you see that on these exhibits that you're gonna see, they

11    were not in the original.

12             **MR. CHOU:**  Ms. Rosenbaum, if you could take this

13    exhibit down, please.

14    **BY MR. CHOU**

15    **Q.**   So the documents we just saw, were those the talking

16    points for the Kathy Ireland interview?

17    **A.**   Yes, they were.

18    **Q.**   Did -- did you ultimately go to Kathy Ireland's studio?

19    **A.**   Yes, we did.

20    **Q.**   What happened next?

21    **A.**   The night before we were at Kathy Ireland's when we were

22    working on these, I brought up to Marcus that there was no

23    legal contract.  There was nothing tying us there, and Corey

24    was hesitant to go on because there's no employee record.  We

25    didn't want in any way for there to be a legal ramification of

1    Corey being on there stating that he represented NAC.  So

2    Sachin, a technical person that was there, helped me

3    develop/design a welcome letter that Marcus signed welcoming

4    Corey onboard, and then we went the next morning very early to

5    the Kathy Ireland show.

6    **Q.**    And once you were in the studio, what happened next?

7    **A.**    Um, after the -- I can't remember if it was before the

8    filming or after the filming.  We had known that there was

9    going to be some cost to it prior to coming there, because we

10   were hoping to -- I mean, it's a great video feed, so we wanted

11   to use that in promotional for ATEN Coin and NAC.

12        When we got there and we were supplying the package, it

13   was made very clear that this was a very pretty info

14   commercial, that it was not -- NAC had not necessarily been

15   headhunted and invited on there as -- as something they wanted

16   to showcase.

17   **Q.**    So let's unpack that a little bit.

18        What was your impression or understanding of the Kathy

19   Ireland show before you got to the studio?

20   **A.**    That Kathy Ireland, the business show was a way to -- that

21   her and her writers, they looked for new and upcoming

22   businesses that were kinda cutting edge and starting that could

23   be -- could use the exposure and were good opportunities.

24   **Q.**    And once you got to the studio either before or after

25   filming, what, if anything, about your understanding changed?

1  **A.**   That we were paying to have this filmed, and how much film

2  or how much time that was on the Kathy Ireland was going to be

3  directly dependent on how much money we paid them.

4  **Q.**   Did Mr. Andrade talk to you about this at the studio?

5  **A.**   Yes, Corey was in the room, so he asked Corey, which

6  package should we go for, partner?  And Corey was reading, they

7  were deciding.  And he said, well, he goes, it's your money

8  that's helping paying for this.

9  **Q.**   Who says it's your money that's helping to pay for this?

10  **A.**   Marcus Andrade did.

11  **Q.**   Was it a surprise to you that Mr. Andrade expected you and

12  your husband to pay for this Kathy Ireland show?

13  **A.**   Well, it was money that was coming out of the money that

14  we had invested, the $275,000.

15  **Q.**   And how much was the -- how much did Mr. Andrade ask you

16  to pay for this commercial?

17  **A.**   I don't remember.  I did not sign it.

18  **Q.**   Let's talk next about this -- earlier did you mention a

19  conference in Alberta?

20  **A.**   Yes.

21  **Q.**   Where is Alberta?

22  **A.**   Alberta is a province in Canada.  It's just above Montana.

23  **Q.**   And did you help hold a conference in Edmonton, Canada, in

24  Alberta?

25  **A.**   Yes, I did.

1  **Q.**    Who paid to put that conference on?

2  **A.**    I did.  My husband and I did.

3  **Q.**    Who asked you to pay for that conference?

4  **A.**    It was -- we offered to pay for it.  We did.  Marcus told

5  us that he could not afford currently to pay for it, and we did

6  offer to pay for it ourselves, because we did feel -- we were

7  extremely grateful that Marcus was still -- he still wanted to

8  give us the 5 percent rather than the two and a half percent.

9  So we did offer to pay for it, with the understanding that it

10  would be reimbursed when NAC was making money and we were given

11  a salary.

12  **Q.**    Did you prepare a -- help prepare a presentation for this

13  conference?

14  **A.**    Yes, we did.

15  **Q.**    And who was invited to this conference?

16  **A.**    The previous investors that had purchased before we came

17  onboard, and our friends, our family members and fellow

18  business associates that Corey had.  There was a few investment

19  brokers that we invited, too, that we had known.

20  **Q.**    What was Marcus Andrade's role, if any, in creating that

21  presentation for the conference?

22  **A.**    Marcus gave us all the information.

23  **Q.**    And --

24  **A.**    And it was used from previous sales -- excuse me.

25  Sales -- what's the word?  You know when you give out

1    information for a sales pitch, like sales material, I guess.

2    And all of the information about NAC or ATEN Coin was given to

3    us by Marcus, and we put it in slides and brought in supporting

4    documentation about banking, but Marcus approved every slide

5    and edited every slide.

6    Q.    You just mentioned Mr. Andrade approving and editing every

7    slide.  What was the process for that?

8    A.    We would put it together, and Yarrick, a banking -- a

9    fellow who worked in banking Poland was working with us, and we

10   would get together and we would decide which slide, what we

11   wanted to put forward.  We'd put the information on it, and it

12   would be sent back to Marcus and he would edit it.  And then

13   when this presentation was completed, then it was given to

14   Marcus, and Terence I believe also overseed it.

15   Q.    Would you all also talk about the contents of marketing

16   materials over Skype?

17   A.    Yes.

18   Q.    Could you explain how those conferences would go?

19   A.    We would meet at a specific time, Marcus, myself, Corey,

20   sometimes Aga Bolinski might perhaps be on, and then we would

21   talk about what -- we would present an idea, is this a good

22   idea?  Marcus, is this something we want to go through?  Marcus

23   would explain why that would not be applicable to ATEN Coin,

24   why that would not be a reasonable venue to go forward.

25   Q.    Was Mr. Andrade, in viewing that content, detail oriented

1    or high level?

2    **A.**    Detailed.

3    **Q.**    And in what way was he detailed?

4    **A.**    It would be slide by slide, sometimes line by line.

5    **Q.**    I'd like to show you what's been marked as exhibit 673.

6          Mrs. Jodoin, are you able to see that okay?

7    **A.**    Yes, I am.   Thank you.

8    **Q.**    Do you recognize the title sheet of this document?

9    **A.**    Yes, I do.

10    **Q.**    And what is this the title sheet of?

11    **A.**    This is the title sheet of the presentation.

12    **Q.**    And this presentation has a few pages, quite a few pages,

13    right?

14    **A.**    Yep.

15    **Q.**    Have you reviewed the entirety of this presentation in

16    preparation for your testimony today?

17    **A.**    Yes, I did.

18    **Q.**    And based on your review of this exhibit 673, what is this

19    entire exhibit?

20    **A.**    This was what we used, what the -- what was used at the

21    conference to encourage coin sales and investments at the

22    Edmonton, Alberta conference.

23    **Q.**    And did Mr. Andrade personally look through and approve

24    every slide?

25    **A.**    Yes, he did.

1  **Q.**  And is exhibit 673 a fair and accurate depiction of the

2  presentation?

3  **A.**  Yes, it is.

4        **MR. CHOU:**  At this time I'd move to admit 673 in its

5  entirety into evidence.

6        **MR. SHEPARD:**  No objection.

7        **THE COURT:**  673 will be admitted.

8        (Trial Exhibit 673 received in evidence.)

9        **MR. CHOU:**  And publish it, please.

10  **BY MR. CHOU**

11  **Q.**  So this is the title page we were talking about earlier.

12  If we could turn to the next page, please.

13        Mrs. Jodoin, what is this agenda slide talking about?

14  **A.**  It was the flow of the evening and the flow of the

15  presentation.  First he was going to talk about the business

16  opportunity of cryptocurrencies and the money made during

17  cryptocurrencies and what it could do to investments or the

18  business world.

19        And then the second is digital currencies and explaining

20  Blockchain.  Many people, I didn't understand Blockchain when

21  we first got involved.

22        And then ATEN Coin is how it's a mature response to

23  Bitcoin, as if Bitcoin was the precursor of it.

24        And then explained about the ATEN Coin group and who they

25  were, the different people that had been affiliated with ATEN

1    Coin or the group team, the core team.

2        And then different strategies to go forward to encourage

3    growth for the investment of ATEN Coin.

4    **Q.**    And before we talk more about ATEN Coin in this

5    presentation, what was your understanding at the time of what

6    cryptocurrency was?

7    **A.**    At the time I understood cryptocurrency is a currency that

8    was formed from the Blockchain, and that it can be used, it has

9    no standard, it has no gold backing, there is no value behind

10    it.  It is simply what it's willing to be traded for.  And that

11    you hold it in wallets, and it's sold against other currencies

12    on coin exchanges.

13    **Q.**    You mentioned the term Blockchain.  What's your

14    understanding at the time of what a Blockchain is?

15    **A.**    Blockchain is a series.  It's information that is

16    permanent and is indissolvable on the Internet, and it's formed

17    by the mining of coins.

18    **Q.**    So let's jump to page 014, please, 14.

19        Mrs. Jodoin, what was this slide?  What did it address at

20    the conference?

21    **A.**    This slide addressed how -- the previous slides in the

22    previous talk had explained the pitfalls of Bitcoin and the

23    problems that banking would encounter with having Bitcoin as

24    exchanged or a currency used in banking.

25        This slide allowed us to showcase how ATEN Coin solved

1  those problems.

2  **Q.**   And was ATEN Coin marketed at this conference as an early

3  project or a mature project?

4  **A.**   It was marketed as the technology was present, and the

5  technology, it had been protected through a patent.  The

6  difficulties going forward were not with the project itself or

7  the coin, it was the verification process, the wallet process.

8  It was.

9  **Q.**   What did Mr. Andrade tell you about what remaining things

10  needed to be done to finish out the project?

11  **A.**   We needed exposure.  We also needed to have a significant

12  coin base, enough people so that you're having a trade, you

13  have enough people who have interest.  So there had to be more

14  information put out there.

15      There was also, we were looking at the intention to ATEN

16  Pay, the payment platform, and ATEN Verify.  We wanted to --

17  Marcus really wanted to have a way to verify our clients that

18  was as unbeatable as the coin was.  He would often say you

19  don't want to have a second party or a third party doing the

20  verification or the payment platform, because the flaws in --

21  the flaws that plague cryptocurrency are in those platforms.

22  **Q.**   What did Mr. Andrade say about the timeline for finishing

23  out the mature digital currency?

24  **A.**   Well, we were going to go -- IPO was supposed to be six

25  months.  When James Mawhinney said, and to go to the IPO you

1  need to have the coin being traded.

2  **Q.**   And when was this Edmonton conference?

3  **A.**   That was in January of 2016.

4  **Q.**   I see.

5        **MR. CHOU:**  If we go to the next slide, please.

6  **BY MR. CHOU**

7  **Q.**   What was the National -- what was your understanding of

8  the National ATEN Coin Foundation?

9  **A.**   The NAC Foundation was what held the patent, and it was

10 the parent company that Marcus owned, and we understood his

11 partners, that then ATEN Pay, ATEN Wallet, ATEN Verify and ATEN

12 Coin came out of.

13 **Q.**   And during your time working as the chief administrative

14 officer of the NAC Foundation, did you ever see a -- did you

15 ever see functioning ATEN Pay?

16 **A.**   No.

17 **Q.**   Did you see a functioning ATEN Wallet?

18 **A.**   There was the ATEN Coin wallet that you had to have to own

19 a coin or a token, but as an ATEN Wallet to be outside of that,

20 no.

21 **Q.**   The slide also discusses tracing identities of senders and

22 receivers, did I get that right?

23 **A.**   Yes.

24 **Q.**   And maintaining liquidity and creating value.  Did I get

25 that right?

1    **A.**    Yes.

2    **Q.**    Did -- in your time at ATEN Coin, what was the tracing and

3    tracking process, if any, for senders and receivers of the ATEN

4    Coin?

5    **A.**    Um, I'm not overly familiar with the technology, technical

6    aspect of it.    I do know that when it came time to get our own

7    clients verified, we could not do it on our own.    We had to

8    have a third party verify it, because there was simply way too

9    much technical difficulty with it, and we had a great deal of

10   difficulty with everybody being able to download and operate

11   and outlaw it.

12   **Q.**    I'd like to turn to page 23 of this slide show.

13        So this slide show depicts something about the Panama

14   Canal; is that right?

15   **A.**    Yes.

16   **Q.**    What did Mr. Andrade tell you about the relationship

17   between ATEN Coin and the Panama Canal?

18   **A.**    Marcus, we were all sitting around talking, and Marcus, we

19   were talking.    One of the -- let me read.

20        One of the things we were trying to achieve was the

21   ability to send money safely and easier.    The Panama Canal got

22   brought up because we were talking about shipping, and Marcus

23   told us that there is a ton of container ships that sit and

24   wait in the Panama Canal, and that it is a huge issue if you're

25   bringing fresh foods because of how long it takes for the

1  currencies to be brought back and forth.

2      The idea was suggested that ATEN Coin and the ATEN Wallet

3  would be a fantastic way to streamline that process.

4  Q.   Who brought up this idea of the Panama Canal?

5  A.   Organically it was brought up in a -- people were throwing

6  out ideas.  Marcus Andrade did have a great deal of information

7  that he told us about the Panama Canal and how it would be a

8  way, it would be a market that we could look forward, we could

9  try to approach.

10 Q.   Did somebody named Carlos De Le Guardia ever attend your

11 meetings about the Panama Canal?

12 A.   No, he did not.

13 Q.   Do you recognize that name?

14 A.   No, I do not.

15 Q.   What about Jack Abramoff?  Was there anybody named Jack

16 Abramoff at these meetings where he discussed the Panama Canal?

17 A.   No.

18 Q.   Do you recognize the name Jack Abramoff in the context of

19 your work at ATEN Coin?

20 A.   I recognize it now.  I did not know who he was then.

21 Q.   I want to turn next to page 24.

22      So was this one of the concluding slides of the

23 presentation?

24 A.   Yes, it was.

25 Q.   What was this slide?  What was Mr. Andrade trying to

1    communicate with this slide?

2    **A.**    That Bitcoin is -- was quite expensive at the time.  It's

3    not now.  We know that's not the case.  At the time, Bitcoin

4    was $390.20 U.S.  ATEN Coin being sold at 2.25 with the

5    expectation that it would perform similarly, was a far more

6    economic and feasible investment purchase.

7             **MR. CHOU:**  We can go ahead and take this down.  Thank

8    you.

9    **BY MR. CHOU**

10   **Q.**    So once you and your husband joined the NAC Foundation,

11   did you begin to see problems with the business and the

12   technology?

13   **A.**    The business, yes, and the technology, as well.

14   **Q.**    So let's start with the technology.

15            Did you ever see an ATEN Coin that had working anti-money

16   laundering features?

17   **A.**    No.

18   **Q.**    Did you have problems downloading ATEN Coins into your own

19   wallet?

20   **A.**    Yes.

21   **Q.**    What other tech problems, if any, did you come across

22   personally?

23   **A.**    We were having difficulty verifying people.  We were using

24   second-party verification companies, and they could not

25   handle -- there was just a lag time.  There was too many -- it

**JODOIN - DIRECT / CHOU**

1  was taking too long to get them to verify.

2      So there was talk of getting, his name was Sachin, I do

3  not know his last name.  He was someone who was a tech in

4  India, and he -- they were trying to get teams together to

5  verify the identities faster.

6  **Q.**  Did you meet any software developers?

7  **A.**  We did in Poland, yes.

8  **Q.**  Who did you -- how many software developers did you meet?

9  **A.**  At the conference we met a fellow named Serge.  I remember

10  him, meeting him, and he was a software developer, a programmer

11  from the Ukraine.

12  **Q.**  As you got more involved in ATEN Coin, did you end up

13  having more meetings with software developers?

14  **A.**  They were talked about.  We were not allowed to be in

15  those meetings.

16  **Q.**  Who didn't allow you to be in the meetings with software

17  developers?

18  **A.**  Marcus.

19  **Q.**  What was his explanation at the time for why he didn't

20  allow you to be in those meetings?

21  **A.**  That wasn't our job.

22  **Q.**  I'm sorry, I didn't mean to speak over you.

23  **A.**  I apologize.  That wasn't our job.

24  **Q.**  You were Mr. Andrade's chief administrative officer at the

25  time?

1   **A.**    That's correct.

2   **Q.**    And your husband was chief operating officer?

3   **A.**    That's correct.

4   **Q.**    You and your husband had invested hundreds of thousands of

5   dollars in Mr. Andrade's business?

6   **A.**    Yes.

7   **Q.**    But he didn't allow you to speak with the software

8   developers?

9   **A.**    There was one time I had --

10          **THE COURT:**  Go ahead.

11          **THE WITNESS:**  There was one time I had approached

12   Serge because I did not understand part -- I can't even

13   remember what it was, and I had reached out to Serge and I had

14   reached out to Terence, and I was informed that I was not to

15   talk to Serge again.

16   **BY MR. CHOU**

17   **Q.**    Did you also try to talk to businesspeople in the company?

18   Others in the company?

19   **A.**    Yes.

20   **Q.**    Was a Jack Abramoff ever involved in ATEN Coin?

21   **A.**    No.

22   **Q.**    Did you know about him at all at the time?

23   **A.**    No.

24   **Q.**    You only learned about him later?

25   **A.**    Yes.

1   **Q.**   And so to your knowledge was he involved in ATEN Coin at

2   all?

3   **A.**   No.

4           **MR. SHEPARD:**  Objection.  That's the third time.

5           **THE COURT:**  Okay.  Move to the next question.

6   **BY MR. CHOU**

7   **Q.**   In addition, Mrs. Jodoin, did you receive any complaints

8   from customers about the technology?

9   **A.**   Yes.

10  **Q.**   Did you speak with Mr. Andrade about those complaints?

11  **A.**   Yes, of course we brought it to Marcus' attention that we

12  were having difficulty verifying the clients, and that they

13  were having difficulty downloading the wallets.

14  **Q.**   What, if anything, did Mr. Andrade say in response to you

15  when you told him about customer complains?

16  **A.**   That it was a new technology, and that it was growing

17  pains, and that we were doing everything we can to correct it.

18  **Q.**   Did you ever get complaints about unpaid bills?

19  **A.**   Yes.

20  **Q.**   Any that you remember specifically?

21  **A.**   There was -- her name was Lisa, I do not remember her last

22  name.  She was from Celeste Marketing.  I believe it was a

23  company out of New York.  She had done some work for Marcus and

24  for us, and she contacted us and said that Marcus had not

25  talked -- responded to her Skypes for over a month.  So we

 1  asked her to send us the bill, and we wired her the money.

 2           MR. SHEPARD:  Objection, Your Honor.  There was --

 3  that was full of hearsay.

 4           THE COURT:  Well, it depends what they're offering it

 5  for.

 6       What are you offering it for?

 7           MR. CHOU:  The steps she took next and what I believe

 8  to be --

 9           THE COURT:  What's the relevance of her next step?

10           MR. CHOU:  Conversations with Mr. Andrade.

11           THE COURT:  All right.  I'll admit it on that basis.

12       Go ahead.

13  BY MR. CHOU

14  Q.  So in response to that customer complaint and leaving

15  aside -- or the bill complaint, leaving aside what you may have

16  been told by another person, did you speak with Mr. Andrade

17  about that complaint?

18  A.  Yes, I did.  We informed him that we had been contacted.

19  Q.  And what did Mr. Andrade say in response to the complaint

20  that, from a marketer that she wasn't paid?

21  A.  He said that it was an oversight and that he would

22  reimburse us for the payment.

23  Q.  And so you ended up paying that marketer out of funds in

24  your own account?

25  A.  Yes.

JODOIN - DIRECT / CHOU

1    Q.    Did Mr. Andrade ever reimburse you for that payment?

2    A.    No.

3    Q.    Did you ask Mr. Andrade to share the company's financials

4    with you?

5    A.    Many, many times.

6    Q.    And could you give us a sense of when and where you would

7    ask him to share the company financials?

8    A.    We asked after we sent the first deposit of $50,000, we

9    asked once we sat -- financials were supposed to be brought to

10   Los Angeles when we went to Kathy Ireland, and we were going to

11   sign, as well as a shareholders or employee contract.  And then

12   after we sent the $225,000, it was -- we were asked.  There was

13   numerous times throughout the time after Corey was given the

14   COO position and I was responsible for administration and

15   trying to streamline some of the payments.

16       We even took a trip to Las Vegas to see the office and the

17   staff, and we were supposed to meet and be given the financials

18   then.

19   Q.    And did Mr. Andrade ever share the company's financials

20   with you?

21   A.    No.

22   Q.    What did he say in response to your requests?

23   A.    Oftentimes it was, we'll get to it, let's work on this

24   right now.  When we were in Las Vegas, we did eat supper with a

25   CPA, and when I asked for the financials then, he told us he

1  couldn't give them to us because he was more than three

2  quarters behind.

3  **Q.**   Let's talk about this trip to Las Vegas, which you just

4  mentioned.  When was this trip to --

5        **THE COURT:**  Before you go into that, I want to take

6  our last break of the day.  How much more do you think you

7  have?

8        **MR. CHOU:**  Probably about 15 minutes on direct, Your

9  Honor.

10        **THE COURT:**  Okay.  Members of the jury, we'll go ahead

11  and take a break.  We've taken a couple of them in addition to

12  the one that we had planned, so why don't we try to get back

13  here in -- well, get back here by a quarter of.

14      Remember my admonitions.  Do not discuss this matter

15  amongst yourselves or with anyone else, and we'll see you at a

16  quarter of.

17      (The jury exits the courtroom.)

18        **THE COURT:**  You can step down for the time being.

19      (A recess was taken from 12:33 p.m. to 12:51 p.m.)

20      (The jury enters the courtroom.)

21        **THE COURT:**  The jury is present.

22      Members of the jury, I know there have been some concerns

23  about the temperature.  It is a little on the chilly side.

24  We're working on it.  We'll try to adjust it better tomorrow.

25  We'll do our best.

1    Okay.  Mr. Chou, you can continue.

2    **BY MR. CHOU**

3    **Q.**  Thank you, Mrs. Jodoin.  We were just talking about access

4    to company financials.  I wanted to now ask you about your

5    visit to the Las Vegas office.  Did you visit the Las Vegas

6    office of the NAC Foundation?

7    **A.**  Yes, I did.

8    **Q.**  And when did you visit the Vegas office of the NAC

9    Foundation?

10   **A.**  It was early January 2015.

11   **Q.**  And why did you decide to go visit the office?

12   **A.**  During conversations with Marcus, myself and Corey, we

13   were talking about the delay in the payments, getting people

14   paid, and just the oversight of putting everything under a

15   company's crypto structure, where you are having very specific

16   ways that you pay a bill, that you pay people.  And oftentimes

17   when there was delays in these type of things, it would be

18   because there was an office breakdown.  So Marcus asked me to

19   go down to Las Vegas, and that I would be responsible for

20   making sure that the office was being run appropriately.

21   **Q.**  And when you got to the Las Vegas office, what did you

22   see?

23   **A.**  It was a rent-a-office, where you had office space shared

24   and an employee that worked for the office company, and they

25   would often be the secretary or bookkeeper of multiple

1    companies.

2         Now, we were stating that at NAC and ATEN Coin were KML

3    and AML -- KYC, pardon me, AML and FinCEN, which means we're

4    bound by the same obligations that a bank has.  Well, if you

5    look at a bank or if you go through a bank, a bank must keep

6    their customer records in a locked facility or a locked file

7    cabinet.  There is -- you have to prove continuity of care with

8    these documents.  They also have to be verified.  All the

9    clients must have proven their identities.

10   **Q.**   So when you got to the office, you were just talking about

11   the KYC process.  What, if anything, did you see that made you

12   think of that AML/KYC process you were describing?

13   **A.**   All of the clients' information was being held on a laptop

14   that was not owned by NAC, it was the office building's laptop,

15   and that person also had other companies' clientele information

16   on there.  There was probably at least 30 to 50 of the clients'

17   files that were on her desk in various states that were not

18   locked away, and when we were pulling certain files, part of

19   the reason why I was pulling certain files is because I was

20   getting information of the previous clients, and they were

21   missing documentation, they were missing -- they did not have

22   the driver's license.  They were not in proper order.

23   **Q.**   You mentioned that the office was a rent-a-office, did I

24   get that right?

25   **A.**   Yes.

1  **Q.**   Was that a surprise to you or what you expected?

2  **A.**   It was a surprise.

3  **Q.**   And why is that?

4  **A.**   Because we assumed that the people working for Marcus were

5  working only for Marcus, and that if you were renting a shared

6  office space, the office space would be only for NAC.

7  **Q.**   And was -- were you surprised in part because your

8  impression of the NAC Foundation was that it was a company

9  headed towards a large IPO?

10        **MR. SHEPARD:**  Leading.

11        **THE COURT:**  That was leading.  Try again.

12 **BY MR. CHOU**

13 **Q.**   Was your impression of the office colored by any

14 representations that Mr. Andrade made to you?

15        **MR. SHEPARD:**  Same objection.

16        **THE COURT:**  Overruled.

17        **THE WITNESS:**  Yes, it was.

18 **BY MR. CHOU**

19 **Q.**   And what were those representations with re' -- that led

20 you to feel a certain way about the office space?

21 **A.**   I was expecting all of the regulatory demands to be not

22 only met, but to be subceded (sic).  This is what we were

23 developing this company.  We were selling this coin for this.

24 They didn't.  They weren't meeting the obligations.  It just

25 was not secure.

1  Q.   Did you have meetings with Mr. Andrade while you were in

2  Las Vegas?

3  A.   Yes, we did.

4  Q.   And could you please describe what happened at those

5  meetings?

6  A.   One we went to with Marcus, and he introduced us to the

7  accountant that was in charge of the financials, and the

8  accountant told us that he could not give us the financials

9  because he was more than three quarters behind.  Marcus at that

10 point said well, that's not his fault, it's my fault, because I

11 haven't yet submitted all of the receipts and the payments.

12      We also then -- Corey and I were quite surprised by that,

13 that there was no chain of command or chain of office for

14 financial payments or put forth.  There was no oversight or

15 guaranteed -- at the company we owned, if you brought in a

16 check, there was a very specific way that check was handled,

17 that it was deposited in a certain way.  Those were not present

18 there.

19 Q.   Did there come a time during your meetings in Vegas where

20 Mr. Andrade said something about his taxes?

21 A.   Yes.

22 Q.   What, if anything, did he say to you?

23 A.   When Marcus Andrade told us that he was behind in his

24 taxes, he was in a little bit of trouble with the IRS, and he

25 asked us if we could use part of our investment to pay his

1  personal taxes.

2  **Q.**   Did there come a time when you began to lose faith in the

3  ATEN Coin project?

4  **A.**   Yes.

5  **Q.**   And what -- what led you to become disillusioned?

6  **A.**   It was -- there was questions raised over the things I

7  just mentioned.  Marcus had give us assurances that that's what

8  we were going to fix, and that was what I was supposed to be

9  doing.  So I had planned to have an audit in February.  We

10  proceeded with the investor weekend.  When the investors got

11  there --

12  **Q.**   If I could stop you there.

13  **A.**   Certainly.

14  **Q.**   Could you remind us what year we're in?

15  **A.**   This is January -- I'm really bad with years.  We started

16  investing in 2014.  It would be January 2016.

17  **Q.**   And you just mentioned a investor weekend.  Was there an

18  investor weekend being held in Las Vegas?

19  **A.**   No, this was -- I apologize.  This was the Edmonton

20  conference that Corey and I were -- had paid for and organized,

21  and when our -- the previous investors came, the previous

22  clients or the older clients came, I noticed that there was

23  some -- in their -- there was -- they were elderly.  They

24  were -- some of them were quite old.  They did not have

25  computers and they did not have their wallets downloaded, nor

1    had they had their identities -- they did not have their

2    identities verified yet.

3    **Q.**    So we were talking about when you began to lose faith in

4    the NAC Foundation.  This began with your time at the Edmonton

5    conference or just before your Las Vegas meeting?

6    **A.**    No, it was after the -- so it's difficult, because you see

7    these things that go wrong and you ask for things to be fixed,

8    and then as times go by they don't get fixed.  Their financials

9    were not being given to us.  We seen the incorrect storage of

10   the client files in Las Vegas that were going to be corrected.

11           Then we came to the conference, and the previous investors

12   showed up and they were -- many of them were considerably older

13   than what I would have thought an investor -- this is a fairly

14   sophisticated investment, having to understand the

15   cryptocurrency, I would say.  You would just have to understand

16   that.  They didn't.

17   **Q.**    And why was it -- why did it stand out to you that these

18   elderly investors didn't have computers in the context of this

19   investment?

20   **A.**    Because how can you have a wallet and safeguard these

21   coins if you don't have a way to download it or to have any way

22   to access them?

23   **Q.**    Did there come a time where, given your disillusionment,

24   you reached out to Mr. Andrade to ask for some sort of refund?

25   **A.**    Yes.  It was following an incident where Marcus came to us

1   and said that there was a problem with a salesperson who was in

2   Florida.  His name was Brian.  After this, we felt that what we

3   thought perhaps were just misspeaks being made were more

4   deliberate in nature, and we went to Marcus and we said, we

5   need the financials and we need an agreement.

6       We still did not have a legal binding agreement that had

7   buyouts, guaranteed shares.  NAC had still not been rolled over

8   into any type of a corporation where any kind of shares were

9   being issued.

10  **Q.**   On the topic of this person named Brian, what did

11  Mr. Andrade tell you about this salesperson, Brian?

12  **A.**   Brian was a salesman who was from Florida, and Marcus told

13  us over Skype that Brian had struck out on his own.  He had

14  taken his client list from ATEN Coin and was selling them a

15  different type of investment.  And one of the things Brian was

16  giving ATEN Coins as a --

17  **Q.**   What did Mr. Andrade do and say that he did in response to

18  Brian striking out?

19  **A.**   He told me, he said, I fixed him.  And I said, what do you

20  mean?  Marcus, what?  He goes, well, I went in and I removed

21  his coins from his wallet.

22  **Q.**   And what is a wallet?

23  **A.**   A wallet is the way that you hold cryptocurrency, and in

24  our case it was supposed to be theft -- it was supposed to be

25  ante theft, and it was AML compliant, and it was supposed to be

 1   such that it could not be stolen from.

 2   **Q.**   And it's an electronic program you would keep on a

 3   computer?

 4   **A.**   Yes.

 5   **Q.**   And so what was your -- what did you say to Mr. Andrade in

 6   response to hearing about that situation?

 7   **A.**   I was horrified and I was very angry.  I said --

 8          **MR. SHEPARD:**  I think the question was what did she

 9   say.

10          **THE WITNESS:**  Okay.

11          **THE COURT:**  Is that your question?

12          **MR. CHOU:**  Yes.

13          **THE COURT:**  All right.  Answer that question.

14          **THE WITNESS:**  I told Marcus that he could not do that.

15   **BY MR. CHOU**

16   **Q.**   And what was his response?

17   **A.**   He told me, Brandi, he said, I can.  I can get in there.

18   He betrayed the company.  And I said, Marcus, you're not

19   supposed to be able to do that.  It's theft.  We market these

20   wallets and these coins on that they are protected, and they're

21   AML.  You -- we simply cannot do that.  And Marcus said he

22   would take it on an advisement.

23          We got off the Skype phone, I called Aga, who was the

24   legal counsel, and then I made a phone call to Marcus

25   personally and reiterated how it wasn't good.

1  Q.   And was that the -- was that a tipping point in what you

2  did next?

3  A.   Yes.

4  Q.   So what did you end up doing next in response to that?

5  A.   Corey and I decided that we needed to have a term paper

6  set, and we needed to literally have a way to guarantee that

7  there would be oversight, both financially, both making

8  decisions, and for us to have our assets protected, and for us

9  to have shares either given to us or a complete refund.

10  Q.   Did Mr. Andrade agree to that?

11  A.   Numerous times he agreed to some type of either a refund

12  or to getting a term paper set up.

13  Q.   And were these communications over what medium?  Phone?

14  In person?

15  A.   They were over Skype, they were over e-mail, and then

16  there were personal phone conversations.

17  Q.   Did you end up getting the refund that Mr. Andrade agreed

18  to?

19  A.   No.

20  Q.   What happened next instead?

21       MR. SHEPARD:  Mr. Andrade agreed to the witness had

22  said refund or an agreement.  The next question was, did you

23  get the refund he agreed to.

24       THE COURT:  Go ahead.

25     So you're starting over again on this?

1          **MR. CHOU:**  Yes, sir.

2          **THE COURT:**  Go ahead.

3   **BY MR. CHOU**

4   **Q.**   Mrs. Jodoin, did Mr. Andrade offer you a -- agree to the

5   refund that you sought from him?

6   **A.**   Yes.

7   **Q.**   And did he ultimately pay you that refund that he agreed

8   to?

9   **A.**   No.

10  **Q.**   What happened next instead?

11  **A.**   He told us that he needed time to get either the finances

12  together or to get together with his partners and to come up

13  with a -- some type of share agreement or employee agreement.

14  He said he needed 30 days.

15  **Q.**   What happened at the end of those 30 days?

16  **A.**   We were served with a civil lawsuit.

17  **Q.**   Where did he -- who served you with the lawsuit?

18  **A.**   Marcus Andrade served both my husband and I with a civil

19  lawsuit.

20  **Q.**   Where were the lawsuits filed?  Which courts?

21  **A.**   The first lawsuit was filed in the federal court, and the

22  second one was filed with the State of Nevada.

23  **Q.**   And did you -- did Mr. Andrade take any other steps to

24  distance you from the NAC Foundation?

25  **A.**   Yes, he did.

**JODOIN - DIRECT / CHOU**

1  **Q.**    What steps were those?

2  **A.**    We woke up in March to a private e-mail from Yarrick, a

3  fellow that was working with Corey in Poland, and he had -- I

4  don't remember if it was -- I believe it was a phone call

5  wanting to know what was going on, because --

6  **Q.**    And what did you do in response to receiving that e-mail?

7  **A.**    We went into our e-mails and contacted, and we had been

8  locked out of NAC.  We had been locked out of ATEN Coin.

9  **Q.**    And did you confront Mr. Andrade about that?

10  **A.**    Yes, we did.

11  **Q.**    What did he say in response?

12  **A.**    He said -- he accused us of moving the goalposts and

13  demanding too much, and he said we're just, until we can get

14  this organized, you're not working for us anymore.

15  **Q.**    So you earlier mentioned you were served with two

16  lawsuits, did I get that right?

17  **A.**    Yes.

18  **Q.**    What was the ultimate disposition of those lawsuits?

19  **A.**    The federal one was dismissed and our legal fees were

20  given back to us, and the second one was also dismissed.

21  **Q.**    Did you ever recover your investment money through those

22  lawsuits?

23  **A.**    No, we did not.

24  **Q.**    At some point did you report your concerns about the NAC

25  Foundation to authorities?

1    **A.**    Yes, we did.

2    **Q.**    And who did you report to?

3    **A.**    The first person we contacted was the AEC, which is the

4    Alberta Exchange Council.  It was like a watch group.  It was

5    officers of the AEC who would ask or answer any questions.  And

6    then afterwards we contacted a securities lawyer in Alberta,

7    and we also contacted the SEC.

8    **Q.**    I want to circle back to your investments.

9    **A.**    Uh-huh.

10   **Q.**    How much did you pay for your shares in the NAC

11   Foundation?

12   **A.**    $275,000 U.S.

13   **Q.**    And how much of your investment did you get back?

14   **A.**    Nothing.

15   **Q.**    And you testified earlier that you bought over a hundred

16   thousand dollars in ATEN Coin?

17   **A.**    Yes.

18   **Q.**    Did you ever try to sell it?

19   **A.**    No, we did not.

20   **Q.**    Was there a time when the NAC Foundation reached out to

21   you about something called AML Bitcoin?

22   **A.**    Yes.

23   **Q.**    And what happened with that?

24   **A.**    It was a -- it was an e-mail to all coin holders, and it

25   was told that ATEN Coin was being re-branded to AML Bitcoin,

1  and that we needed to download a new wallet, and then once we

2  had been verified for that wallet, then they would roll over

3  the tokens in from ATEN Coin into AML Bitcoin.

4  **Q.**  And did you and your husband decide to roll over to AML

5  Bitcoin or not roll over?

6  **A.**  No, we didn't.  We chose not to.

7  **Q.**  And why did you decide not to roll over into AML Bitcoin?

8  **A.**  Because we believed it was unethical, and we simply could

9  not do it.

10  **Q.**  Ultimately were you able to get any of your investment in

11  ATEN Coin back?

12  **A.**  No, we were not.

13  **Q.**  Did you see any proceeds from oil and gas exploration, by

14  the way?

15  **A.**  No, we did not.

16  **Q.**  Did you ever -- in your time with ATEN Coin, did you ever

17  come across someone named Japheth Dillman?

18  **A.**  No.

19  **Q.**  Did you come across anybody named David Mata?

20  **A.**  No.

21  **Q.**  What about Richard Naimer?

22  **A.**  No.

23  **Q.**  And Jack Abramoff?

24  **A.**  No, I did not.

25        **MR. CHOU:**  No further questions.

**JODOIN - CROSS / SHEPARD**

1          **THE COURT:**  Thank you.

2      Mr. Shepard.

3                          <u>**CROSS-EXAMINATION**</u>

4  **BY MR. SHEPARD**

5  **Q.**   Good afternoon.

6  **A.**   Good afternoon.

7  **Q.**   Mr. Andrade was a geek who didn't know what he was doing,

8  right?

9  **A.**   No.

10 **Q.**   Well, you remember you and your husband, Corey, were

11 interviewed by the FBI --

12         **THE COURT:**  Wait just a moment.

13         **MR. SHEPARD:**  Sorry.  You're losing us.  My apologies.

14         **THE COURT:**  Okay.  Before -- when you get organized

15 with your papers, then go to the microphone and ask the

16 question.  Don't do it from there.

17         **MR. SHEPARD:**  I will do that.  My apologies.

18 **BY MR. SHEPARD**

19 **Q.**   You remember you and your husband being interviewed by the

20 FBI in August of 2024?

21 **A.**   Yes.

22 **Q.**   And the two of you were together talking to the FBI, and

23 you were gonna tell them the truth.  Right?

24 **A.**   Yes, correct.

25 **Q.**   And you told them that Mr. Andrade was a geek who didn't

 1  know what he was doing, right?

 2  **A.**    I said that was my impression when we first met, yes.

 3  **Q.**    You said, it became apparent that Andrade was a geek who

 4  didn't know what he was doing.  Right?

 5  **A.**    Can you tell me the context of that?  Because I know there

 6  was more said.

 7  **Q.**    My question to you was, do you remember saying that to the

 8  FBI?

 9  **A.**    Yes, I do.

10  **Q.**    And it was also apparent to you that Mr. Andrade was not a

11  businessman, right?

12  **A.**    Yes.

13  **Q.**    And, in fact, he was like a middle class worker who struck

14  on this big idea, started it to defend the little person, and

15  then he needed somebody to keep him held accountable and do

16  the -- do the housework.  Right?

17  **A.**    Yes.

18  **Q.**    So after you had bought some ATEN Coin and attended the

19  conference in Poland -- and you attended it with your husband,

20  right?

21  **A.**    Yes.

22  **Q.**    And your husband ran a business.

23  **A.**    Yes.

24  **Q.**    He, Mr. Andrade, reached out to you and said, could you

25  help me.  Right?

JODOIN - CROSS / SHEPARD

1    A.    Yes.

2    Q.    And you and your husband said "no."  Right?  And then he

3    asked again, right?

4    A.    Yes.

5    Q.    And eventually you agreed?

6    A.    That's correct.

7    Q.    And you became the chief administrative officer.  Your

8    husband became the chief operating officer.  Right?

9    A.    Yes.

10   Q.    And when did you begin in those roles?

11   A.    In November.

12   Q.    Of 2015?

13   A.    Yes.

14   Q.    You had a number of conversations with the FBI.  Right?

15   A.    Twice.

16   Q.    You met with them in person maybe twice.  Had a number of

17   Zoom and other conversations, correct?

18   A.    How much do you consider numerous?  We met in 2018 with

19   our lawyer, and then we were contacted again in 2024, and we

20   had a single Zoom conversation then.  And then we were

21   subpoenaed, and then we both have met them twice since then.

22   Q.    Do you remember having three conversations with them in

23   2018?

24   A.    Um, there was e-mails, yes.

25   Q.    Conversations.

**JODOIN - CROSS / SHEPARD**

1   **A.**   On the phone?  Most of it was done through our lawyer.  I

2   cannot -- I cannot recall.  I remember the meeting with our

3   lawyer, yes.

4   **Q.**   Okay.  In any event, when you talked to them you tried to

5   be accurate, right?

6   **A.**   That's correct.

7   **Q.**   Represent things fairly, accurately, not leave things out,

8   do your best, right?

9   **A.**   (Nods head.)

10  **Q.**   And you told them in the conversation you had with them

11  last year about your litigation with Mr. Andrade.  Right?

12  **A.**   Yes.

13  **Q.**   And you told them that you won, that the Judge ruled in

14  your favor.  Right?

15  **A.**   I had said -- I used "dismissed" and I used "won".  To me

16  we won.  We didn't have to pay, so we won.

17  **Q.**   In fact, as you mentioned on direct examination, there was

18  a state case and a federal case.  Right?

19  **A.**   That's correct.

20  **Q.**   And in the state case the Judge ruled against you, didn't

21  he?

22  **A.**   Yes, they did.

23  **Q.**   He granted summary judgment in Mr. Andrade's favor and

24  said you were liable to Mr. Andrade; isn't that right?

25  **A.**   Yes, they did.

JODOIN - CROSS / SHEPARD

1  **Q.**  And not only did he say that, but he said on a number of

2  occasions that you had lied, didn't he?

3  **A.**  I don't recall that, no.

4          **MR. SHEPARD:**  May I, Your Honor?

5          **THE COURT:**  You may.

6      You have one for me?

7  **BY MR. SHEPARD**

8  **Q.**  So --

9          **THE COURT:**  Do you want to mark this for

10  identification?  I know you're not admitting it.

11          **MR. SHEPARD:**  Yes, I do want to mark it for

12  identification.  Thank you, Your Honor.

13      Do we know our next number?  Anybody have access to our

14  next number?  We'll say 3000, because I know that won't

15  duplicate.

16          **THE COURT:**  So it's defense 3000.

17          **MR. SHEPARD:**  Defense 3000.

18          **THE COURT:**  It looks like you go up to 3045.

19          **MR. SHEPARD:**  Defense 3046.  We don't really have

20  3000, we just started at a higher number.

21          **THE COURT:**  Okay.  This is defendant's 3046.  Go

22  ahead.

23  **BY MR. SHEPARD**

24  **Q.**  Okay.  And one of the things the Judge said in his

25  findings was that you stated in your counterclaim against

1   Mr. Andrade that you made claims to the Alberta Securities

2   Commission in March of 2016, shortly after being terminated as

3   officers, that you relied on valuations of 140 million, a

4   hundred million and 40 million in paying 275,000 toward

5   a 5 percent stake in the NAC entity.

6        And then the Judge says:  The Jodoins, however, knew this

7   claim of reliance to be false, because any one of those market

8   values could only be reached, quote, with a lot of planning and

9   packaging, in the right way for the investment community, and

10  they, themselves, worked on that planning as officers of NAC.

11       That's what the Judge said, right?

12  **A.**   Where?

13  **Q.**   He said your claim to the Alberta Securities Commission

14  was false.  Right?

15  **A.**   Can you tell me where it is so I can read it for myself?

16  **Q.**   I'm sorry.  It's on~-- that was -- I read paragraph 30 on

17  page 9.

18  **A.**   Thank you.

19  **Q.**   And then paragraph 34, the Judge said that you disputed --

20       **MR. CHOU:**  Objection.  I don't think we have this

21  document.

22       **THE COURT:**  Yeah, I think you've got a different -- I

23  don't have a 34.

24       **THE WITNESS:**  Yeah.

25       **MR. SHEPARD:**  I'm sorry.

1    **MR. CHOU:**  And just for the record, the document that

2    everyone appears to have I don't believe is the one that was

3    referenced during cross-examination.

4        **THE COURT:**  You're going to withdraw it for the

5    moment, I assume 3046, and mark a new one.

6        **MR. SHEPARD:**  Yes, I will.  My apologies.

7        I believe we now have this electronically.  Might we do it

8    that way?

9        **THE COURT:**  Yes, yes.  And are you going to use --

10   rather than withdrawing this, are you going to use this later?

11   Because we'll leave it as 3046, and you can --

12       **MR. SHEPARD:**  If I've given you --

13       **THE COURT:**  -- mark the next one.

14       **MR. SHEPARD:**  Since I've marked it as 3046, we should

15   leave it at 3046.  I don't know that we'll do anything with it.

16       **THE COURT:**  Fine.

17       **MR. SHEPARD:**  We'll mark what I thought I had been

18   given as 3047.

19       **THE COURT:**  Well, let's go ahead.

20   **BY MR. SHEPARD**

21   **Q.**   And I'm sorry, Ms. Jodoin, let me take that back from you,

22   and I'll get you the right document.  It will appear on your

23   screen if, if I can.

24   **A.**   Okay.

25       **MR. SHEPARD:**  Is it okay to project it to the witness?

 1              **THE COURT:**  And to the government, yes.

 2         Okay.  So this is defense exhibit 3047, correct?

 3              **MR. SHEPARD:**  Yes.

 4              **THE COURT:**  All right.  You may proceed.

 5    **BY MR. SHEPARD**

 6    **Q.**  And now I'm moving ahead to page 10, paragraph 34.

 7         You disputed -- this is what the Judge found.  You

 8    disputed in your deposition, specifically telling Tyler Hoff,

 9    an ATEN Coin holder and potential NAC investor, that was a

10    fraud.  However, even if she only told Tyler that the AFC, that

11    would be the Alberta securities commission, concluded that the

12    NAC had violated securities law as she admits, this statement

13    was untrue.  That's what the Judge found, right?

14    **A.**  Yep.

15    **Q.**  Now I'm moving ahead to paragraph 37 on page 11, and it's

16    going to continue on to page 12.  And starting in the middle of

17    that paragraph it says:  Then in an August 27, 2018, interview,

18    Brandi and Corey -- that would be you and your husband, right?

19    **A.**  Yes.

20    **Q.**  -- told two FBI agents that they had been induced to

21    invest in a 5 percent stake in NAC by representations NAC was

22    expected to have an aftermarket value of $140,320,000; and they

23    also provided the FBI with alternative values of 100 million

24    and 40 million.

25         And then they quote from your deposition and from your

1    husband's deposition, and the Judge said:  Jodoins knew this

2    claim of reliance to be false.  Right?

3    **A.**    That's what the Judge said, yes.

4    **Q.**    That is what the Judge said.

5         And then on page 13, paragraph 41, the Judge found:

6    Despite this, Brandi and Corey on August 27, 2018, told the two

7    FBI agents that they had not seen the ATEN Coin function.

8    Jodoins told the FBI and perhaps others that NAC did not employ

9    AML, anti-money laundering, and KYC, know your customer

10   features, in sales of its cryptocurrency, and that they never

11   observed a functional demonstration of ATEN Coin.

12        Based on their deposition testimony, this was false

13   because both had gone through the ATEN Coin I.D. verification

14   process to obtain digital wallets for their owns.

15        That's what the Judge found, right?

16   **A.**    Yes.

17   **Q.**    And then one last one, on page 15, paragraph 42.  This is

18   sort of the end of paragraph 42.  You could read the whole

19   thing if you'd like, but it's kinda long.  So I'm just going to

20   start from the end.  If anybody wants to hear the rest of it,

21   I'm happy to do that.

22        Again, Corey and Brandi both understood the technology and

23   explained it to purchasers.  They also knew of NAC's contract

24   with a company called Jumio to gather information disclosed in

25   government I.D. cards, driver's licenses and passports.  They

1  knew it existed, and they told the government it did not.

2      Isn't that what the Judge found?

3  **A.**  Yes.

4      **THE COURT:**  Are you going to be moving on to another

5  area?

6      **MR. SHEPARD:**  Yes.

7      **THE COURT:**  Okay.  Well, this -- we've reached the

8  1:30 witching hour.

9      So members of the jury, remember my admonitions.  Do not

10  do any research.  Don't look into this matter in any way.

11  Don't discuss it with anybody.  Go home and enjoy other things,

12  and don't think about this case.  But we need to see you

13  promptly at 8:30 tomorrow morning.

14      Have a nice evening.

15      (The jury exits the courtroom.)

16      **THE COURT:**  Okay.  We'll see you --

17      **MR. SHEPARD:**  Your Honor, one question.

18      **THE COURT:**  We are out of the presence of the jury.

19      **MR. SHEPARD:**  Since the witness is on

20  cross-examination, can I ask that she not talk to the

21  government?

22      **THE COURT:**  Right.  At this point she's been tendered

23  for cross, so until that's completed, you're not to discuss the

24  testimony with the witness.

25      We will need you back at 8:30 tomorrow morning.

JODOIN - CROSS / SHEPARD

1          Thank you.

2          (The evening recess was taken at 1:29 p.m.)

3                          ---o0o---

4                  **CERTIFICATE OF REPORTER**

5          I certify that the foregoing is a correct transcript

6     from the record of proceedings in the above-entitled matter.

7     DATE:  Tuesday, February 11, 2025

8

9

10     _____

11     Stephen W. Franklin, RMR, CRR, CPE
       Official Reporter, U.S. District Court

12

13

14

15

16

17

18

19

20

21

22

23

24

25