**Volume 4**

**Pages 505 - 716**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
  VS.                              )          **NO.  3:20-CR-00249-RS-1**
                                   )
ROWLAND MARCUS ANDRADE,            )
                                   )
            Defendant.             )
_____  )
                                   San Francisco, California

                                   Thursday, February 13, 2025


**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                         ISMAIL J. RAMSEY
                         United States Attorney
                         450 Golden Gate Avenue
                         San Francisco, California 94102
                    BY:  **CHRISTIAAN HIGHSMITH**
                         **DAVID J. WARD**
                         **MATTHEW CHOU**
                         **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                         KING AND SPALDING, LLP
                         50 California Street, Suite 3300
                         San Francisco, CA 94111
                    BY:  **MICHAEL J. SHEPARD**
                         **ATTORNEY AT LAW**

(Appearances continued on following page.)

REPORTED BY:             Stephen W. Franklin, RMR, CRR, CPE
                         Official United States Reporter

```
APPEARANCES (CONT.'D):

For Defendant:
                        KING AND SPALDING, LLC
                        1700 Pennsylvania Avenue, Northwest
                        Washington, DC 20006
                   BY:  KERRIE C. DENT
                        ATTORNEY AT LAW

                        KING AND SPALDING, LLC
                        1185 6th Avenue, 34th Floor
                        New York, NY 10036
                   BY:  DAINEC STEFAN
                        ATTORNEY AT LAW

                        CINDY A. DIAMOND, ATTORNEY AT LAW
                        58 West Portal Avenue, #350
                        San Francisco, CA 94127
                   BY:  CINDY A. DIAMOND
                        ATTORNEY AT LAW
```

<u>**I N D E X**</u>

Thursday, February 13 , 2025 - Volume 4

| <u>**GOVERNMENT'S WITNESSES**</u> | <u>**PAGE**</u> | <u>**VOL.**</u> |
|---|---|---|
| **BOYER, BENJAMIN** | | |
| (SWORN) | 525 | 4 |
| Direct Examination by Mr. Highsmith | 525 | 4 |
| Cross-Examination by Mr. Stefan | 581 | 4 |
| Redirect Examination by Mr. Highsmith | 616 | 4 |
| Recross-Examination by Mr. Stefan | 622 | 4 |
| | | |
| **ACUNA, RENE** | | |
| (SWORN) | 623 | 4 |
| Direct Examination by Mr. Highsmith | 623 | 4 |
| Cross-Examination by Mr. Stefan | 640 | 4 |
| Redirect Examination by Mr. Highsmith | 645 | 4 |
| Recross-Examination by Mr. Stefan | 647 | 4 |
| | | |
| **BRUFFEY, SCOTT** | | |
| (SWORN) | 648 | 4 |
| Direct Examination by Mr. Highsmith | 649 | 4 |
| Cross-Examination by Ms. Dent | 669 | 4 |
| Redirect Examination by Mr. Highsmith | 676 | 4 |
| | | |
| **DARLING, BRIAN** | | |
| (SWORN) | 678 | 4 |

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 70 | | 701 | 4 |
| 173 | | 695 | 4 |
| 195 | | 703 | 4 |
| 196 | | 689 | 4 |
| 231 | | 628 | 4 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 236 | | 626 | 4 |
| 241 | | 686 | 4 |
| 381 | | 620 | 4 |
| 506 | | 699 | 4 |
| 602 | | 572 | 4 |
| 626 | | 543 | 4 |
| 666 | | 683 | 4 |
| 727 | | 530 | 4 |
| 728 | | 533 | 4 |
| 731 | | 548 | 4 |
| 733 | | 550 | 4 |
| 734 | | 552 | 4 |
| 740 | | 561 | 4 |
| 852 | | 651 | 4 |
| 869 | | 546 | 4 |
| 875 | | 654 | 4 |
| 1224 | | 557 | 4 |
| 1501-012 and 1501-015 | | 510 | 4 |
| 1502 | | 656 | 4 |
| 1504 | | 658 | 4 |

| | |
|---|---|
| **Thursday - February 13, 2025** | **8:08 a.m.** |

<strong>P R O C E E D I N G S</strong>

---o0o---

(Defendant present, out of custody.)

    **THE COURT:**  Good morning.

    **MR. HIGHSMITH:**  Good morning.

Easy or hard, Your Honor?  Would you like to deal with the easier stuff or harder stuff?

    **THE COURT:**  Start with the easier stuff.

    **MR. HIGHSMITH:**  Okay.  We need to renumber some exhibits from yesterday.  There were two that had one page, and Mr. Ward wants to put on the record what the exhibit is.  It should be --

    **MR. WARD:**  This is exhibit 1501.  It's, I guess, 17 or so pages.  We admitted two yesterday, and the Court admitted them as 1501A and 1501B.

What we'd like to do is have the Court say that they're admitted as 1501-012 and 015 because that exhibit number matches the exhibit number on the document.

    **THE COURT:**  All right.

    **MR. WARD:**  And Mrs. Rosenbaum says that will make her life much easier.

    **THE COURT:**  So 1501, what are the numbers again?

    **MR. WARD:**  1501-012, starting with 1501-012, which is the -- it was the first commission page we looked at.

1          **THE COURT:**  All right.

2          **MR. WARD:**  So we would like that to be admitted as

3    1501-012.  And then 15 was the second commission page we looked

4    at, and we'd like that admitted as 1501-015, and it just needs

5    to be on the record.

6          **THE COURT:**  Do you think it needs to be on the record

7    in front of the jury?

8          **MR. WARD:**  No, just you need to say it so the court

9    reporter has it on the record.

10          **THE COURT:**  All right.

11          **MR. SHEPARD:**  I mean, I objected to both of them.  The

12    Court overruled my objection.  I don't care if --

13          **THE COURT:**  Right.  You're not objecting to the

14    numbering process.

15          **MR. SHEPARD:**  Right.

16          **THE COURT:**  So what was admitted yesterday as 1501A

17    and B, 1501A has now become 1501-012, and 1501B has now become

18    1501-015.

19          **MR. WARD:**  Yes.

20          **THE COURT:**  All right.

21       (Trial Exhibits 1501-012 and 1501-015 received in

22    evidence.)

23          **THE COURT:**  That's the easy one.  What's the next one?

24          **MR. SHEPARD:**  Okay.  We have several.

25       Number one --

1          **THE COURT:**  I was told these were easy when I was

2     lured out here.

3          **MR. SHEPARD:**  I think they're straightforward.

4     They're not like complicated legal issues.

5          **THE COURT:**  Okay.

6          **MR. SHEPARD:**  Number one, the Court had said we should

7     get witnesses at the end of the session.  We got witnesses at

8     the end of the session yesterday.  One was added at 6:00 p.m.

9     He was added to the witness list at the end of January.  He

10    wasn't on the original witness list.  One of his colleagues was

11    on the original witness list.  But the exhibits relating to him

12    raise a few different issues.  They're not -- he and his

13    colleague were not on all the same e-mail chain, so there are

14    different issues.

15         And, you know, once we get these exhibits, and they sent

16    us 70 exhibits, the Court had said 24 hours in advance, they

17    sent us 70 exhibits at 8:36 p.m. last night.  It takes us a

18    while to upload them, get them printed.  So, you know, we don't

19    really have a lot of time to get to them.  There are several

20    leads we need to pursue from the new exhibits relate -- you

21    know, they're -- I'm sure they were in the discovery many --

22    and on the however many, 15, 1600 exhibits that the government

23    identified.  But, you know, in terms of our ability to run them

24    all down, we get the notice before, we don't have time to run

25    it all down.

1          Hopefully he won't get called today, but if he does, we

2    have an issue with that.

3          **THE COURT:**  Well, so what is -- and giving me that

4    history, what is the -- is there a request?  Is there a motion?

5    Is there -- what is there?

6          **MR. SHEPARD:**  The request is, at a minimum, we don't

7    have to cross-examine him until tomorrow.

8          **THE COURT:**  Well, at the speed we're going, we

9    probably won't even get there.

10          **MR. HIGHSMITH:**  Well, here's the deal, Your Honor.  A,

11    we're moving slower than we expected, and we need to cut

12    witnesses in order to make up speed.  So those are just the

13    facts of the trial.  I don't want to quarrel with Mr. Shepard.

14          Second, we sent it to him at 4:00 p.m., not 6:00 p.m, and

15    we're only going to use seven exhibits.

16          **THE COURT:**  Seven?

17          **MR. HIGHSMITH:**  Yes, for those -- for this witness,

18    Mr. Hargreaves.

19          **MR. SHEPARD:**  Mr. Hargreaves was sent to us in an

20    e-mail at 5:59 p.m.  That's when we first learned he would

21    testify tomorrow.

22          **THE COURT:**  Well, I'm not going to get in the -- okay.

23          **MR. HIGHSMITH:**  I'm sorry.  I'm so sorry.

24          **THE COURT:**  Go ahead.

25          **MR. HIGHSMITH:**  Mr. Hargreaves has been -- wants to go

1    on today.  He has some -- he's going to the North Bay at 6:30.

2    He has some very important commitment starting tomorrow and so

3    we're trying to accommodate a commitment starting tomorrow.

4        So I just want to share that with the Court.  So we were

5    planning on calling him first today so that he could go to

6    his --

7            THE COURT:  And he's the one with the documents that

8    they have a problem with?

9            MR. SHEPARD:  Yes.

10           MR. HIGHSMITH:  Correct, Your Honor.

11           THE COURT:  Well, can you readjust?  If he's got some

12   problem tomorrow, maybe you could put him next week.  Why do

13   you have to deal with him today?

14           MR. HIGHSMITH:  I think he's got -- I don't know if he

15   has travel, but I think he's gone for like two weeks or

16   something.  He's going on some --

17           THE COURT:  Who is this man?

18           MR. HIGHSMITH:  It's Hargreaves.  He's a journalist

19   who the defendant hired who had -- yeah, Mr. Chou's witness.

20           MR. CHOU:  Sorry, Your Honor.

21       So Mr. Hargreaves is a PR executive that Mr. Andrade hired

22   for about a, say, two-month period in 2017.  The six or seven

23   documents we're going to go over with him this morning are all

24   either -- they're all to -- Mr. Andrade is on every single

25   thread, and it's either one of Mr. Hargreaves' colleagues

```
 1   sending the e-mail, him sending the e-mail --

 2        Him sending the e-mail.  So it's either Mr. Hargreaves'

 3   colleague sending the e-mail with Mr. Andrade on the thread,

 4   Mr. Dillman sending the e-mail with Mr. Andrade on the thread,

 5   making it a co-conspirator statement, Mr. Andrade himself

 6   sending the e-mail or Mr. Hargreaves sending an e-mail to

 7   Mr. Andrade.  So ...

 8        THE COURT:  The other materials that you sent over,

 9   the 70 or whatever it is?  What else?  I mean, what's in that

10   batch?

11        MR. CHOU:  There was a -- so what we sent over to the

12   defense was a list of all, as we saw it, possible exhibits for

13   the witnesses going on today.  As for Mr. Hargreaves's

14   documents, over the course of preparing last night and meeting

15   with the witness, we narrowed, I don't know, maybe the 20 or so

16   documents of those 70 down to about six or seven.  But there

17   are other documents in there that we disclosed to the defense

18   that are potentially pertaining to other witnesses today.

19        THE COURT:  So they say there's six or seven they're

20   going to use.  What's the problem?

21        MR. SHEPARD:  Two, two problems.

22        Number one, we didn't know there were only six until

23   Mr. Chou just said that.

24        THE COURT:  Well, you know now.  Okay.

25        MR. SHEPARD:  Yes.  But with respect to several of
```

1    them, it's like, okay, here's an e-mail.  There's one, for

2    example, that suggests someone was complaining about not

3    getting their wallet or whatever, and there's no response to

4    that.  We've gotta go find the response.  It's things like that

5    for each of these exhibits.  We're not magicians.  We can't get

6    these at 10:00 o'clock at night after they're downloaded and

7    then run down the leads that need to be run down from it.

8        **MR. CHOU:**  I don't believe that's Mr. Hargreaves's

9    document.

10        **MR. SHEPARD:**  It's one of the documents that went to

11    shift communications.  We isolated the ones --

12        **THE COURT:**  I mean --

13        **MR. SHEPARD:**  I could go through others of them.  It's

14    just --

15        **THE COURT:**  I like to accommodate witnesses' personal

16    situations and all of that, and I'm happy to call people out of

17    order, but if it wasn't a situation where it was a bit of a

18    late disclosure, I would say, okay, the government can just go

19    ahead because of that.  But I'm sorry, I don't know what his

20    commitment is, but he's subpoenaed as a witness, I presume, to

21    this trial, and he's gotta be available:  So I want to give the

22    defense the opportunity to review consistent with our plan.

23        So if you want to go out -- is he here?  You can talk to

24    him and say the big bad judge says, sorry, you know, he's going

25    to be called and subject to being here tomorrow.

 1          **MR. HIGHSMITH:**  Can we start him today, Your Honor?

 2          **THE COURT:**  You can start him.  I mean, that's fine.

 3   Not -- well, meaning at the end of the day.

 4          **MR. HIGHSMITH:**  Yeah.

 5          **THE COURT:**  Oh, sure, sure.  But then they can cross

 6   tomorrow.

 7          **MR. HIGHSMITH:**  Understood.  Understood.

 8          **THE COURT:**  Okay?

 9          **MR. SHEPARD:**  Thank you, Your Honor.

10          **THE COURT:**  You're welcome.

11          **MR. SHEPARD:**  Others, just to get ahead of a few

12   things, one of the other witnesses today is Ben Boyer.  You may

13   recall from the co-conspirator motion that there was one

14   statement that we called out that we didn't think was a

15   co-conspirator statement.  We saw that, there was a bunch of

16   text.  It may be WhatsApp, I forget, Skype, but, you know,

17   text-like communications, and that co-conspirator statement,

18   non-co-conspirator statement, is contained in several of them,

19   and these are sort of group exhibits.

20          **THE COURT:**  Uh-huh.

21          **MR. SHEPARD:**  So it's hard for us to deal with.  We

22   just wanted to call that out in advance because that might take

23   a little time to sort out.

24          **THE COURT:**  And I don't have -- I know when I ruled on

25   the co-conspirator statements there was one that I ruled was

1  not admissible, but the other ones I ruled were admissible.

2          **MR. SHEPARD:**  Yes, correct.

3          **THE COURT:**  So the ones that you're talking about,

4  it's included in the ones that I said were admissible.

5          **MR. SHEPARD:**  Correct.

6          **THE COURT:**  And you're just preserving your objection

7  that there is an aspect of that you maintain should not have

8  been admitted but I went the other way.

9          **MR. SHEPARD:**  No, no.

10          **THE COURT:**  No.

11          **MR. SHEPARD:**  I'm just focused on the fact that they

12  are going to offer an exhibit.

13          **THE COURT:**  Yes.

14          **MR. SHEPARD:**  It might be two exhibits that contain

15  the non-co-conspirator statement that the Court excluded.

16          **THE COURT:**  Oh, the one that I excluded.

17          **MR. SHEPARD:**  Yes.

18          **THE COURT:**  All right.  You want to clear this up from

19  your perspective?

20          **MR. HIGHSMITH:**  Yes, Your Honor.

21      Mr. Boyer, who's going to be a witness this morning, had a

22  very long e-mail exchange with Mr. Dillman, who featured

23  prominently in the defense opening statement.  There's plenty

24  of co-conspirator statements in here that are admissible, the

25  Court ruled are admissible.

1      **THE COURT:**  Okay.

2      **MR. HIGHSMITH:**  And then there's one statement here,

3  and I can hand this up to the Court, where Mr. Dillman says to

4  Mr. Boyer -- they have a long conversation.  There's a lot of

5  context needed to understand it.  And he says every --

6  Mr. Dillman:  Everything I've stated I repeated directly from

7  Marcus.  I have no tools to look inside the company, only

8  access to call him.

9      So I think he's objecting to "everything I said I repeated

10  directly from Marcus," and it's in the context of a long text

11  exchange filled with admissible coconspirator statements, and

12  that's what he's objecting to, and I can pass it up.

13      **MR. SHEPARD:**  And that's the statement the Court

14  excluded.

15      **THE COURT:**  Can't you redact it?

16      **MR. HIGHSMITH:**  Well, I would move to admit it.  I

17  don't~-- the Court needed additional context, and so the

18  additional context now is clear.  It's that whole text

19  exchange.  It's the context, the entire context of that text

20  message exchange.  The witness understands what's happening, so

21  the jury understands what's happening.  So I believe it's

22  admissible for context and to show completeness of the text

23  exchange.

24      **THE COURT:**  I seem to recall my ruling was that this

25  wasn't advancing the scheme or conspiracy, which was the

 1    problem with it coming in as a co-conspirator statement.  So

 2    you're now saying, well, I'm not offering it as a

 3    co-conspirator statement, I'm offering it, as you say, for

 4    context or for how the next message, that kind of thing?

 5             **MR. HIGHSMITH:**  Correct Your Honor.

 6             **THE COURT:**  Well, I'm still not entirely clear on why

 7    you can't just redact it.  I don't know why it's -- I don't --

 8    what context is it giving to anyone?

 9             **MR. HIGHSMITH:**  They're having an extended

10    conversation about the ICO, and he's saying -- he's saying,

11    look, the ICO, you told me they sold out in the ICO.  It's in

12    the middle -- it's smack in the middle of the fraud scheme, and

13    Boyer, one of the investors saying, you told me the ICO sold

14    out, but I'm now learning it didn't sell out, and Dillman is

15    furthering the fraud by saying, hey, everything I heard I heard

16    from Marcus.  And then Boyer comes back with further --

17             **THE COURT:**  But my question is if you excluded this

18    statement, redacted it, I don't think it would be -- I don't

19    think it would be hard to follow the flow of this

20    back-and-forth.  I don't know what it's -- I excluded it.  So

21    now the question is is there some other reason why it needs to

22    be there so the jury can understand this, the admissible

23    co-conspirator statements, and it doesn't seem to me that they

24    need it.  I mean -- so I don't see why you can't redact it.

25             **MR. HIGHSMITH:**  Understood.

```
 1              THE COURT:  Okay.

 2         MR. SHEPARD:  Mr. Stefan, who is dealing with

 3   Mr. Boyer, tells me there may be another one like that.  There

 4   are a couple of these chains of communications.

 5              THE COURT:  Well, it would be that one thing that I

 6   excluded.

 7              MR. SHEPARD:  Yes, same statement.

 8              THE COURT:  Okay.  If it's the same statement --

 9         MR. HIGHSMITH:  I'm not going to introduce it via

10   another exhibit, Your Honor.  I'm not going to sneak it in via

11   another exhibit.

12         MR. SHEPARD:  Okay.  We're just calling out it seems

13   to be in a couple of places.

14              THE COURT:  That sounds like a problem that's not one

15   I have to deal with.

16         MR. SHEPARD:  We will -- we will share what we have

17   identified with the government and we will work it out.

18              THE COURT:  Good.

19         MR. SHEPARD:  Cindy, there was something you wanted to

20   raise.

21         MS. DIAMOND:  Your Honor, we're trying to work this

22   out, but I want to make the Court aware of this because it's a

23   resource issue of the Court's funds.

24       We had tried to work out an agreement with the government

25   before trial that we could have their witnesses be under
```

1  subpoena to us if they were not going to be called by the

2  government.  We have a standby agreement we can provide to them

3  to make it very easy.  The government is not willing to let us

4  do that, although there's a couple of people they've just

5  yesterday and this morning I was told there would be another

6  one, that the government will give us information about where

7  they served these people.

8      I had asked them for location information.  The government

9  represented to me, to us in conversation, that they had all

10  their witnesses under subpoena, and we're trying to find some

11  of them.  We've got an investigator looking for them, we're

12  calling them.  Every afternoon after court, that's the work

13  that partly I am working on.

14      I'm wondering if there is a way that the Court could

15  suggest to the government that they could be more cooperative

16  with us for witnesses that they have under subpoena so we can

17  get those witnesses, a standby agreement to us before they are

18  released.

19      I believe there's one of the witnesses that was on their

20  list, it was on our list.  We've been trying to get him under

21  subpoena, trying to find him.  We have to hire an investigator

22  in a different city through CJA to do that.  Then we have to

23  have them go and see if they'll talk to us and give them the

24  subpoena and the standby agreement because we cannot -- there's

25  no other way for us to accomplish this task, and I'm just

1    asking whether or not the Court could suggest that the

2    government could be a little cooperative with us on that,

3    because we're expending CJA funds to do this.

4            **THE COURT:**  Mr. Highsmith?

5            **MR. HIGHSMITH:**  Okay.  So in the -- we tried to reach

6    a bunch of stipulations and this was within the context of many

7    stipulations.  And so both parties did not agree to those

8    stipulations.  So it's not like -- you know, okay.  That's the

9    back story.

10       I am reluctant to give them the address information,

11   personal identifying information for the witnesses.  We have to

12   cut witnesses to speed the trial up.  And I also am reluctant

13   to tell the witnesses, hey, the defense is going to reach out

14   to them.  I don't want to give them the government's imprimatur

15   of talking to the witnesses.

16       So we're giving them, where we have attorney information,

17   we'll give them the attorney information so they can serve a

18   subpoena on the attorney, and we can talk to the attorney and

19   say make sure this gets served, make sure you accept service.

20   But if it's, give us the address of a witness so your person

21   can go track them down, I have concerns about giving -- handing

22   over personally identifying information for people and then,

23   you know, sort of telling witnesses, giving them the government

24   imprimatur of, hey, you're going to get a defense subpoena.

25       So that's the issue I have.  We -- you know, we're not

1    trying to get in the way of getting them to serve the

2    subpoenas, but it's those issues.

3        **MS. DIAMOND:**  If I may, Your Honor?

4        Our challenge is a little different than the government's.

5    Besides subpoenaing our witnesses, we need information from

6    them to arrange travel through the U.S. Marshals Service, and

7    we need to get details like their Social Security number in

8    order to get them paid for meals and incidentals.

9        **THE COURT:**  I share the government's concern about

10   their reticence about turning over that material, God knows I

11   don't want to spend more CJA funds than we need to.  You know

12   my view on that with respect to this case.  But you're just

13   gonna have to do it on your own.  I mean, they're not obligated

14   to do it, and I understand why there's some concern about

15   giving personal information about witnesses that they may have

16   over to you.  You're gonna have to just figure it out.

17       **MS. DIAMOND:**  Your Honor, without that information, we

18   cannot even transport them here.

19       **THE COURT:**  Well, it's not my problem.  You know, you

20   are the counsel.  You deal with this issue.  And I'm not -- I

21   don't know what your travel arrangements are.  Work on it

22   through CJA.  That's the way it works.  But I'm not going to

23   require all this personal information to be turned over.  Okay?

24       **MS. DIAMOND:**  Thank you for hearing us, Your Honor.

25       **THE COURT:**  You're welcome.

1          **MS. DIAMOND:**  Appreciate that.

2          **MR. HIGHSMITH:**  I'd like to batch a bit some e-mails

3     so that we can move faster on the case.  Do you have a problem

4     with me batch admitting e-mails with Mr. Boyer?

5          **THE COURT:**  What does that mean?

6          **MR. HIGHSMITH:**  That means having him look at five

7     e-mails at once and saying, are these your e-mails?  Yes,

8     they're my e-mails.  Are they a fair and accurate depiction of

9     your five e-mails?  Yes, move to admit and save some time that

10    way?

11         **MR. STEFAN:**  As long as we have adequate time to

12    review the exact e-mails that are being provided given, you

13    know, some of the inclusion of the statements that we've been

14    talking about.

15         **MR. HIGHSMITH:**  Well, I'm not going to -- obviously

16    I'm not going to do the statements.

17         **THE COURT:**  Well, yeah.  But I'm not sure this is

18    going to speed it up any.

19         **MR. HIGHSMITH:**  All right.

20         **THE COURT:**  But if you want to try it, you can go

21    ahead.  But as, you know, Mr. Stefan says, you have the right

22    to review what's being offered, so you can do that.

23         **MR. HIGHSMITH:**  Thank you, Your Honor.

24         **THE COURT:**  Okay.  We're going to bring the jury out.

25         (The jury enters the courtroom.)

1      **THE COURT:**  Good morning, members of the jury.  Thank

2  you again for being prompt and particularly on a nasty day like

3  this.  Not a fun day to commute.

4      So, we can get going.  The government's next witness.

5      **MR. HIGHSMITH:**  Your Honor, the United States calls

6  Benjamin Boyer.

7                      **BENJAMIN BOYER**,

8  called as a witness for the Government, having been duly sworn,

9  testified as follows:

10      **THE COURTROOM DEPUTY:**  Okay.  Please be seated.  And

11  can you state and spell your last name, please.

12      **THE WITNESS:**  First name is Benjamin, last name is

13  Boyer, B-o-y-e-r.

14                    **DIRECT EXAMINATION**

15  **BY MR. HIGHSMITH**

16  **Q.**  Good morning, Mr. Boyer.

17  **A.**  Good morning.

18  **Q.**  What do you do for a living?

19  **A.**  I work in venture capital, and I'm also an entrepreneur.

20  **Q.**  How long have you been a venture capitalist?

21  **A.**  Since 2000.

22  **Q.**  Do you have any specialty in venture capital?

23  **A.**  Yeah, consumer applications, vertical networks.  So

24  software applied to specific industries.

25  **Q.**  When you said vertical, you said vertical-something.

**BOYER - DIRECT / HIGHSMITH**

1  **A.**   Vertical applications.

2  **Q.**   What are vertical applications?

3  **A.**   Yeah.  Those are products that are built to work in a

4  specific industry.  For example, the construction industry

5  would have software that's unique to construction.  I've

6  invested in businesses like that.

7  **Q.**   You said you're also an entrepreneur; is that right?

8  **A.**   That's correct.

9  **Q.**   What do you mean by that?

10 **A.**   I have started a couple of different businesses.  I

11 cofounded the venture capital firm that I work for, and then I

12 also cofounded two venture back startups.

13 **Q.**   And how long have you been an entrepreneur?

14 **A.**   The venture capital firm I cofounded in 2009.  I

15 co-founded my first non-finance business in 2020.  And then

16 last year I cofounded an additional business.

17 **Q.**   Okay.  Did you go to business school?

18 **A.**   I did.

19 **Q.**   Where did you go to business school?

20 **A.**   I went to Stanford.

21 **Q.**   What year did you graduate?

22 **A.**   2004.

23 **Q.**   You familiar with something called AML Bitcoin?

24 **A.**   Yes, I am.

25 **Q.**   How did you first become familiar with AML Bitcoin?

1  **A.**    Back in 2017 I happened to have a flight from California

2  to Florida, and I was sitting next to the chief strategy

3  officer of the company, an individual by the name of Japheth

4  Dillman.

5  **Q.**    And did you learn anything about AML Bitcoin on that

6  flight?

7  **A.**    Yes, I did.  He was quite excited about the project and

8  told me a bunch about what they were working on in the ICO

9  process, and so --

10 **Q.**    Let me stop you right there.

11       What is an ICO?

12 **A.**    ICO is similar to an initial public offering, but the

13 proceeds are being raised for a cryptocurrency as opposed to a

14 business.

15 **Q.**    What's your understanding of what cryptocurrency is?

16 **A.**    Cryptocurrency is a digital form of currency that uses

17 cryptography to transact.

18 **Q.**    And what's cryptography?

19 **A.**    Cryptography is a mechanism to secure transactions.  So

20 when you move money from one source to another, that's in

21 essence a transaction.  It's a mechanism to ensure that that

22 transaction is done correctly, and it's registered typically in

23 a blockchain, which is, for simple purposes, like a ledger.

24 **Q.**    Based on your knowledge, is a blockchain software,

25 computer software?

BOYER - DIRECT / HIGHSMITH

1   **A.**   Is it software?

2   **Q.**   Yeah.

3   **A.**   Yes, it is.

4   **Q.**   On that flight where you were speaking to Mr. Dillman did

5   Mr. Dillman tell you that he had a title with AML Bitcoin?

6   **A.**   Yes, he did.  He referred to himself as the chief strategy

7   officer of AML Bitcoin.

8   **Q.**   Did you -- on that flight did you learn anything else

9   attractive about AML Bitcoin?

10  **A.**   I did.  The story that was described to me was something

11  that I thought was quite interesting.

12       Back in 2017-'18 crypto was still very immature, a very

13  young industry, and what we saw initially with Bitcoin, which

14  at that time was the largest of the block-chains, was use cases

15  that were oftentimes elicit in nature.  So people using --

16  getting, buying Bitcoin, and then using it to transact for

17  drugs, buying weapons in the dark web.  And to me that was

18  something that was gonna limit its ability to become

19  mainstream.

20       What Mr. Dillman described to me was a concept of having a

21  cryptocurrency that required anti-money laundering and "know

22  your customer" capabilities similar to when you go to a bank

23  and you sign up for an account and they do a check to make sure

24  you are someone that's allowed to use the FIAT, the traditional

25  finance banking rails.  That seemed very interesting.

1          He also described the ability to bring biometrics to the

2     blockchain to be able to verify that the person who purports to

3     be making the transaction is, in fact, the person making the

4     transaction.  So --

5     Q.   And let me just stop you there, because you used a word

6     "biometrics".  To your knowledge, what are biometrics?

7     A.   Biometrics are everything from eye readers, fingerprints.

8     It's any sort of security measure that utilizes things that

9     really can't be hacked.  It's your biometrics.  It's your

10    fingerprint.  It's your eye.

11    Q.   So is your biometrics if you take out your cellphone and

12    you put your face to it?

13    A.   That would be biometrics.

14    Q.   And I think you just testified that Mr. Dillman was saying

15    AML Bitcoin would put biometrics on the blockchain.  Do I have

16    that right?

17    A.   That is correct.

18    Q.   At that time when you're having that conversation, and,

19    you know, within the following months, what was your

20    understanding of whether AML Bitcoin actually had those

21    biometrics built into the blockchain?

22    A.   It was my understanding that it was being developed, and

23    they had a patent around the IP to do so, which seemed

24    compelling to me.  But as I was told is the mechanism was being

25    built.

1          MR. HIGHSMITH:  Could we please show the witness, the

2    parties and the Court exhibit 727.

3    BY MR. HIGHSMITH

4    Q.   Is this an e-mail between you and Mr. Dillman?

5    A.   Yes, it is.

6    Q.   All right.  And this is your e-mail account?

7    A.   That is correct.

8    Q.   All right.  Fair and accurate depiction of your e-mail

9    exchange with him?

10   A.   Yes.

11         MR. HIGHSMITH:  Move to admit 727.

12         MR. STEFAN:  No objection.

13         THE COURT:  Exhibit 727 will be admitted.

14    (Trial Exhibit 727 received in evidence.)

15         MR. HIGHSMITH:  Could we publish this to the jury,

16   please?  And then could we also just blow up actually the whole

17   kind of body of the e-mail there.

18   BY MR. HIGHSMITH

19   Q.   So did you follow up with Mr. Dillman after the flight?

20   A.   I did.

21   Q.   And fair to say you were excited about this opportunity?

22   A.   I was.

23   Q.   Fair to say the fact that you had spoken directly with the

24   chief strategy officer of the company was significant to you?

25   A.   Absolutely.

1   Q.   Could you explain, please, why talking directly to the --

2   first of all, help me understand how -- what a chief strategy

3   officer does and sort of how high up they are in a company?

4   A.   Yes.  You know, I've been on probably 20 different boards

5   of businesses, and so I've seen the chief strategy role embody

6   a lot of different things.  But what I would say is it's a very

7   senior position, typically someone that is going to be at the

8   table making critical decisions with the other key executives,

9   like the chief marketing officer, chief sales officer, chief

10  financial officer and obviously the CEO.

11       In most businesses these are people that are being asked

12  to help define what the longterm strategy is of the business,

13  and that is something that will obviously impact all facets of

14  the business, business development, finance and the like.  So

15  it's an incredibly senior position.  It's also an incredibly

16  important position.

17  Q.   All right.  So I think you just said that the chief

18  strategy officer has access and communicates with the CEO.  Is

19  that fair?

20  A.   Yes.

21  Q.   All right.  So in this e-mail in front of you, you say:

22  Just a friendly reminder to introduce me to your lawyer to

23  establish an account.  I hope you and the family are having a

24  great holiday.  And then on Christmas Eve further down in the

25  e-mail you write:  I want to buy $250,000 of AML.  Please let

BOYER - DIRECT / HIGHSMITH

 1    me know how to proceed.

 2        So could you please characterize for the Court your

 3    feelings about AML Bitcoin at the end of December in 2017?

 4    **A.**    I was quite excited about the opportunity.  This e-mail

 5    was sent, I don't remember exactly how many days, but some

 6    period of time after our flight.  I read the white paper on the

 7    project and did some additional work.  And so when I sent this

 8    note, I was quite excited based on what I had read, as well as

 9    based on the conversation with Japheth.

10    **Q.**    Let's pause there.

11        You said you did some additional research?

12    **A.**    Yes.

13    **Q.**    Did you go to AML Bitcoin's website?

14    **A.**    Yes.

15    **Q.**    Describe briefly the additional research you did other

16    than talking to Mr. Dillman.

17    **A.**    At that time the website had a white paper and information

18    about their initial coin offering.  There was also additional

19    information about the executive team.  Japheth was on that part

20    of the website listed as the chief strategy officer, but there

21    was information including brief bios on all of the key

22    executives.

23    **Q.**    We'll talk about the website a little more in a second.

24        Do you see that there's an attachment to this e-mail?

25    **A.**    Yes.

1          MR. HIGHSMITH:  Could we please publish, not to the

2    jury, but to the witness, the Court and the parties,

3    exhibit 728.

4    BY MR. HIGHSMITH

5    Q.   Is this the attachment to the e-mail that Mr. Dillman sent

6    you?

7    A.   Yes, it is.

8          MR. HIGHSMITH:  Move to admit, Your Honor.

9          MR. STEFAN:  No objection.

10         THE COURT:  Exhibit 728 will be admitted.

11        (Trial Exhibit 728 received in evidence.)

12         MR. HIGHSMITH:  Thank you.

13        Could we please publish this to the jury, and just zoom in

14   starting, "what is cryptocurrency," and all the way to the

15   top -- all the way to the bottom, please.

16   BY MR. HIGHSMITH

17   Q.   All right.  So first of all, this document has the AML

18   Bitcoin logo and stamp on it, correct?

19   A.   It does.

20   Q.   And let's just go through this.  Did you review this

21   document in connection with your decision to invest?

22   A.   Yes.

23   Q.   So the last sentence in that first paragraph, what is

24   cryptocurrency, the last sentence reads:  The

25   government-compliant AML Bitcoin is poised to take over

 1    Bitcoin's value.  And then it says Bitcoin was then valued at

 2    about $7800 a token.

 3         What was your understanding of that representation?

 4    A.    Just that there was a very large opportunity for value

 5    creation with this project.

 6    Q.    And then going down to the Why AML Bitcoin Is The Best

 7    Choice, do you see the last bullet point where it says ties

 8    documents to blockchain using biometrics?

 9    A.    I do.

10    Q.    Did that corroborate what Mr. Dillman had told you?

11    A.    It did.

12    Q.    And again, was that a feature that was important to you?

13    A.    It was.

14    Q.    You said before that your understanding was they were

15    working on tying the biometrics to the blockchain.  What was

16    your understanding of how long that would take them?

17    A.    I don't recollect the amount of time specifically, but it

18    didn't sound like it was gonna be, you know, years.  It was

19    just a matter of weeks or months.

20    Q.    Based on your review of the website, your discussion with

21    Mr. Dillman, your independent research, did you have an

22    impression about whether AML Bitcoin had developers working on

23    that specific feature to get the blockchain, the biometrics

24    built onto the blockchain?

25    A.    I had no doubt that they had people working on it, given

1  they were describing it in their offering documentation that

2  that is a feature that they support.

3  **Q.**   Please turn to pricing structure.  Do you see they

4  represented that 2.5 million coins had already been sold in

5  presale at 60 cents.  What did that mean to you?

6  **A.**   So this structure that you see there where you're issuing

7  coins at different prices that increase in value over time,

8  that was very common.  So that is how most ICOs worked.  The

9  presale at 60 cents per coin, two and a half million coins,

10  would imply that the business sold all two and a half million

11  coins at 60 cents and raised, you know, one and a half million

12  dollars or so.

13  **Q.**   And then the next bullet point is 13 and a half million

14  coins are in public sale number 1 at a dollar.  What did you

15  understand that meant?

16  **A.**   Just what it says.  So they would be issuing an additional

17  13 and a half million coins at a dollar.  So to the extent you

18  wanted to purchase in that public sale and the public sales

19  were limited by time.  So there would be a date by which you

20  had to make your investment to get the dollar price versus the

21  $1.25 or the $1.50.  And so the public sale 1 was 13 and a half

22  million units being sold at a dollar each.

23  **Q.**   And so is public sale one the same as the initial coin

24  offering?

25  **A.**   Um, I believe, in my mind I think about this all as part

1  of the initial coin offering.

2  **Q.**   And that initial coin offering is making these -- this

3  product available to the public?

4  **A.**   That's correct.

5  **Q.**   All right.  So third bullet point is 20 million coins are

6  in public sale 2 at $1.25.  Does an initial coin offering often

7  have multiple phases?

8  **A.**   Yes, this was very common.

9  **Q.**   All right.  So just break it down.  Is the idea that phase

10  one is a certain timeframe and there's one price, phase two is

11  a subsequent timeframe at an increased price, and then phase

12  three would be a third timeframe at yet another increased

13  price.  Is that right?

14  **A.**   That's correct.

15  **Q.**   And is that common in ICOs?

16  **A.**   It was, yeah.

17  **Q.**   Why?  What's the thinking behind that?

18  **A.**   It creates increased demand.  You want people to get

19  involved and have each of these sell out such that you can

20  advertise the fact that, you know, the first one was all

21  presold, the second one sold out.  It's really trying to play

22  into scarcity, certainly scarcity at these lower prices.

23       The other thing is, you know, the business obviously needs

24  money to develop things, and so there's a sense of urgency to

25  raise the capital required, which is why it's typically done at

1  more attractive valuations earlier.

2  **Q.**  Jumping ahead a little bit, did you -- was it later

3  represented to you that a large number of coins, many million

4  coins, were sold in the initial coin offering?

5  **A.**  Absolutely.  I believe in the AML Bitcoin Telegram --

6       **MR. STEFAN:**  Objection; foundation.

7  **BY MR. HIGHSMITH**

8  **Q.**  Did you conduct additional research into the state of the

9  initial coin offering?

10  **A.**  I did.  And over time I tracked it based on public

11  announcements from the company.  There was a Telegram AML

12  Bitcoin channel that purported that the business had sold

13  76 million tokens or coins.  That would represent all of the

14  available listed here, which means they would have raised a

15  hundred million dollars.

16  **Q.**  Can we please go to the last page?

17       All right.  So at the bottom of the page, is that the

18  Block Bits Capital logo at the bottom of the page there?

19  **A.**  Yes.

20  **Q.**  Now going up to the top of the page, do you see the

21  representations about coming legislation?

22  **A.**  I do.

23  **Q.**  Based on your research and the materials that you

24  reviewed, did you understand AML Bitcoin to be representing

25  that they were hoping that Congress, U.S. Congress, would pass

1   legislation sort of favoring AML Bitcoin?

2   **A.**   I did, and that was something that Japheth had described.

3   **Q.**   And then moving to the second header, current and upcoming

4   uses of the coin, do you see where they list Panama banks,

5   Panama Canal, Port of San Francisco, ports of Seattle, Los

6   Angeles, Portland and San Diego?  Do you see those

7   representations?

8   **A.**   I do.

9   **Q.**   Based on your research on the AML Bitcoin website, on

10  independent sort of news organizations and research, what was

11  your understanding of kind of the business development pipeline

12  for AML Bitcoin?

13  **A.**   That things were going quite well, and that all of these

14  various projects were at different stages of completion, and

15  there was a number of articles that were out in the press from

16  local and national news that described some of the things that

17  are listed here as being adoptions of the technology.

18  **Q.**   And did that press and these representations about

19  business development influence your decision to invest?

20  **A.**   Absolutely.

21  **Q.**   Why?

22  **A.**   You know, at this point it -- it would have been hard to

23  compete with Bitcoin directly, and really the best way to try

24  to take market share for digital currency away from Bitcoin was

25  to address the issues around KYC and AML to ensure that the

1  right people have access to this digital currency and that the

2  wrong people can't use it for elicit purposes.  And no better

3  way to do that than to get adoption from a lot of large

4  organizations like the ones listed here.

5  **Q.**  Zooming out and moving to the bottom of the document where

6  it says Block Bits Capital's offering, do you see where it says

7  at the first bullet point Block Bits Capital purchases the coin

8  on investors' behalf and holds the coin in an offline cold

9  storage facility?  What did you understand that meant?

10  **A.**  So digital currencies can live within either a hot wallet

11  or a --

12  **Q.**  Let's stop.  What's a hot wallet?

13  **A.**  I'll explain.

14       So a hot wallet is just a digital wallet that is connected

15  to the Internet.  So if you went to Coinbase and you decided

16  you wanted to buy some Bitcoin, you could sign up for an

17  account.  You would download their application, and you could

18  use some U.S. dollars to purchase Bitcoin, buy a fraction of

19  it.  If you leave that Bitcoin in that digital wallet, it's

20  always connected to the Internet and it's potentially hackable

21  if someone ever got access to your log-in credentials.  That's

22  considered a hot wallet.

23       A cold wallet is cryptocurrency that's stored on a storage

24  device, so think like a USB drive, that's not connected to the

25  Internet.  So, so long as that device is not lost, you can't

1    possibly hack it.

2    **Q.**    All right.  And then the next sentence says:  When

3    investor desires to sell, BBC sells using its institutional

4    accounts on the exchanges.

5        So is the idea that if you bought from Block Bits Capital

6    the AML Bitcoin, if you wanted to sell that, Block Bits Capital

7    would sell it for you?

8    **A.**    They would.  And what Japheth described to me is that they

9    had connections through their crypto hedge fund into all of the

10    major marketplaces to trade cryptocurrency, and that they

11    could, via that mechanism, get the best pricing.

12        **MR. HIGHSMITH:**  All right.  Let's show the witness,

13    the Court and the parties exhibit 626, please.

14    **BY MR. HIGHSMITH**

15    **Q.**    Have you seen this before?

16    **A.**    Yes.

17    **Q.**    What is it?

18    **A.**    It's the AML Bitcoin website.

19    **Q.**    All right.  So you see in very small font on the upper

20    right-hand corner is the date, and the date is July 14th, 2018,

21    at 2:23 p.m.  Do you see that?

22    **A.**    Yes.

23    **Q.**    Were you checking the website regularly between

24    December 2017 and throughout 2018?

25    **A.**    Absolutely.

1    Q.   And so you were checking it for any changes and updates;

2    is that right?

3    A.   Correct.

4         MR. HIGHSMITH:  All right.  So I move to admit 626.

5         MR. STEFAN:  I would object to foundation.  The

6    screenshot is taken in July of 2018, a full six months prior to

7    Mr. Boyer's viewing of the website.

8         MR. HIGHSMITH:  Well, he just said he reviewed it

9    regularly.

10   BY MR. HIGHSMITH

11   Q.   And is this a fair and accurate depiction of the website?

12   A.   It is.

13        THE COURT:  He reviewed it after this date though,

14   didn't he?

15   BY MR. HIGHSMITH

16   Q.   Did you review this after this date?

17   A.   I did.

18        THE COURT:  So -- well, can you establish when he

19   reviewed this particular -- the website that we have the

20   screenshot on the monitor, did he look at this particular

21   screenshot?  Can you establish some -- because this is

22   apparently significantly before he starts looking.

23        MR. HIGHSMITH:  Got it.

24        Could you just scroll through?  Could we slowly scroll

25   through the entire screenshot?  This is all from page 2.

1  BY MR. HIGHSMITH

2  **Q.**   Did you see this screenshot in July of 2018?

3  **A.**   I don't remember the exact dates, but I was on that

4  website quite often, often daily.

5  **Q.**   Is this a fair and accurate depiction of the website that

6  you saw?

7  **A.**   Yes.

8  **Q.**   Let's scroll to the next page.

9       Is this next page a fair and accurate depiction of the

10  website that you saw?

11  **A.**   Yes.

12  **Q.**   And could we look at the next page, please.

13       And is this, this page also a fair and accurate depiction

14  of what you saw?

15  **A.**   Yes.

16  **Q.**   Let's scroll to the next page, and let's go all the way

17  down to page 9, please.  Is page 9 a fair and accurate

18  depiction of what you saw?

19  **A.**   Yes.

20  **Q.**   Let's scroll to the end.

21       Okay.  So you started looking at the website in

22  approximately December of 2017; is that right?

23  **A.**   I don't remember the exact date, but it was after I got

24  engaged with Japheth.  That's when I learned about it and

25  started to go on the website, download the white paper, things

1  like that.

2  **Q.**   Okay.  And based on those e-mails, you were e-mailing him,

3  Mr. Dillman, in December 2017?

4  **A.**   Yes.

5  **Q.**   And you testified earlier that you were continually

6  looking at the websites into 2018, through July 2018; is that

7  right?

8  **A.**   Absolutely.

9  **Q.**   And past July 2018?

10  **A.**   Yes.

11  **Q.**   And so this is a fair and accurate depiction of what you

12  saw in mid-2018; is that right?

13  **A.**   Yes.  And the website didn't change a ton for long

14  stretches.  There were obviously news articles and things like

15  that would change, but, you know, the team, the white paper,

16  none of that changed.

17  **Q.**   Okay.

18          **MR. HIGHSMITH:**  Move to admit, Your Honor.

19          **MR. STEFAN:**  No objection.

20          **THE COURT:**  All right.  626 will be admitted.

21      (Trial Exhibit 626 received in evidence.)

22          **MR. HIGHSMITH:**  So let's publish page 1 to the jury,

23  please, and let's look at the banner on the top.

24  **BY MR. HIGHSMITH**

25  **Q.**   You mentioned that you took a look at the white paper, the

1    AML Bitcoin white paper; is that right?

2    **A.**   I did.

3    **Q.**   And there's a link to it at the top of the web page; is

4    that right?

5    **A.**   That's correct.

6    **Q.**   And then if we go over to the far right-hand side, there

7    is a link to AML Bitcoin Talk and Telegram.  What are those two

8    links?

9    **A.**   I didn't spend a lot of time on AML Bitcoin Talk, but that

10   was a social channel for them to communicate with the

11   community.

12       Telegram is a messaging app, and the Telegram allows for

13   businesses to have their own page, and people can subscribe to

14   it and effectively communicate with the community.  I did spend

15   time on Telegram, and that was a mechanism of getting

16   information from AML Bitcoin.

17   **Q.**   Very briefly, what's a white paper?

18   **A.**   A white paper is similar to what a prospectus is for an

19   initial public offering of a stock.  It's a document that

20   describes the cryptocurrency project and how it works, what

21   they're building, who the people around it.  Typically covers

22   information about the ICO process.  And so it's the one

23   document which tries to summarize everything about the project.

24   **Q.**   Okay.  And in that -- do you recall in that white paper,

25   did the white paper represent that biometrics would be built

1    into the blockchain of the product?

2    **A.**    It did.

3    **Q.**    And did the white paper represent that that work was

4    ongoing?

5    **A.**    Uh, yes.

6    **Q.**    Let's take a look, you mentioned Mr. Dillman and his title

7    as CSO.  Can we please turn to page 9 of the website?

8          So is Mr. Dillman listed as chief strategy officer with

9    his photo in the upper right-hand corner?

10    **A.**    He is.

11    **Q.**    And so this is essentially what you looked at shortly

12    after meeting him to confirm he was who he said he was?

13    **A.**    Yes.

14          **MR. HIGHSMITH:**  Okay.  We can take that down.

15    **BY MR. HIGHSMITH**

16    **Q.**    All right.  So based on the research that you did, did you

17    make an investment, a significant investment, in January 2018?

18    **A.**    I did.

19          **MR. HIGHSMITH:**  And then could we please put up

20    exhibit 869 just to the parties, the Court and the witness.

21    **BY MR. HIGHSMITH**

22    **Q.**    Is this basically a LinkedIn sending you Mr. Andrade's

23    profile?

24    **A.**    It is.

25    **Q.**    So did you learn in your research who the founder and CEO

1    of AML Bitcoin was?

2    **A.**    I did.

3    **Q.**    Who is that?

4    **A.**    Marcus Andrade.

5    **Q.**    And did you do some independent research in addition to

6    the website?  Did you look on LinkedIn for Mr. Andrade?

7    **A.**    I did, and unfortunately I didn't have any contacts in

8    common with him at that time other than Japheth Dillman.

9              **MR. HIGHSMITH:**  Move to admit, Your Honor.

10             **MR. STEFAN:**  No objection.

11             **THE COURT:**  869 will be admitted.

12        (Trial Exhibit 869 received in evidence.)

13             **MR. HIGHSMITH:**  Thank you, Your Honor.

14        Can we please publish and zoom in on the top third?

15   BY MR. HIGHSMITH

16   **Q.**    How did Mr. Andrade describe himself on LinkedIn?

17   **A.**    His header says founder and CEO at AML Bitcoin blockchain

18   expert, AML/KYC, big data specialist, private investor.

19   **Q.**    Did that give you an impression about Mr. Andrade's

20   credentials?

21   **A.**    What was described to me by Japheth Dillman was that

22   Mr. Andrade was very early to crypto, was an expert in it.  And

23   when I clicked on his LinkedIn I saw the same characterization.

24   **Q.**    So this corroborated what you heard from Mr. Dillman?

25   **A.**    It did.

1  **Q.**   When you say early to crypto, could you briefly describe

2  what that means?

3  **A.**   You know, I think back to 2000', you know, '17, '18.

4  That's still pretty early to crypto.  But, you know, someone

5  that likely got involved with Bitcoin back in, you know, 2013,

6  '14, '15 is probably the oldest and most sort of early group of

7  people that started to work with it.

8  **Q.**   Did that give you an impression that Mr. Andrade was

9  sophisticated when it came to crypto?

10 **A.**   Absolutely.

11 **Q.**   Can you describe that a little bit?  Why?

12 **A.**   Yeah.  There weren't a lot of people in 2018 that had been

13 working in crypto for a long time.  There were a lot of smart

14 people that started to do work in crypto at that point, but if

15 someone had seen the evolution of Bitcoin from infancy to that

16 point, that domain experience would be something that would be

17 very valuable if you were building a crypto business.

18 **Q.**   So you're a venture capitalist.  You have experience with

19 startups and entrepreneurs, correct?

20 **A.**   That's correct.

21 **Q.**   So is this a reasonable founder profile for a

22 cryptocurrency?

23 **A.**   Yes, it is.

24       **MR. HIGHSMITH:**  Let's show the witness exhibit 731,

25 please.

1    BY MR. HIGHSMITH

2    Q.    Is this your e-mail exchange from December 27th, 2017,

3    with Mr. Dillman?

4    A.    It is.

5            MR. HIGHSMITH:   Move to admit, Your Honor.

6            MR. STEFAN:   No objection.

7            THE COURT:   731 will be admitted.

8        (Trial Exhibit 731 received in evidence.)

9            MR. HIGHSMITH:   Thank you.

10       Can we please publish the top half?

11   BY MR. HIGHSMITH

12   Q.    So this says -- you write to Mr. Dillman on December 27th,

13   2017.  This is after your meeting on the flight, correct?

14   A.    Correct.

15   Q.    And after you've reviewed the Block Bits offering

16   materials, the AML Bitcoin website and other materials,

17   correct?

18   A.    Correct.

19   Q.    And after you read the white paper?

20   A.    That's correct.

21   Q.    At this point fair to say you're excited about AML

22   Bitcoin?

23   A.    I was.

24   Q.    Fair to say you're ready to make a substantial investment?

25   A.    I was.

1  Q.   So please describe to the jury this -- what you're

2  communicating here in this e-mail.

3  A.   It was an e-mail from myself to Japheth on December 27th,

4  and I was confirming my interest in moving forward with an

5  investment, and I was going to be making two separate

6  transactions out of two separate entities for my investment.

7       I also told him I would speak with my partners and

8  parents.  It's worth noting this was a personal investment.

9  This was not an investment for my venture capital firm, which

10 does not have an ability to make an investment in cryptography,

11 the crypto businesses.  And so I let him know that I would

12 check to see if anyone else was interested.

13 Q.   Fair to say that in the next few weeks you became

14 increasingly excited and you decided to buy even more of the

15 AML Bitcoin?

16 A.   That's correct.

17      MR. HIGHSMITH:  Let's please show the witness

18 exhibit 733.

19 BY MR. HIGHSMITH

20 Q.   Did you end up buying a small number of AML Bitcoin tokens

21 directly from the website?

22 A.   I did.

23 Q.   Why did you do that?

24 A.   I wanted to see how the process worked, candidly.  And so

25 I had made purchases through Block Bits, Japheth.  I made later

1   on purchases through a small exchange.  And then this was -- I

2   also made this purchase.

3   **Q.**   Let's stick with the timeline here.

4   **A.**   Okay.

5   **Q.**   So this is January 3rd, 2018, correct?

6   **A.**   Yes.

7   **Q.**   Approximately the time you bought from directly the

8   website?

9   **A.**   Yes.

10          **MR. HIGHSMITH:**  Move to admit, Your Honor.

11          **MR. STEFAN:**  No objection.

12          **THE COURT:**  Exhibit 733 will be admitted.

13      (Trial Exhibit 733 received in evidence.)

14  **BY MR. HIGHSMITH**

15  **Q.**   So is this the e-mail confirming that you downloaded the

16  wallet and that you made your purchase of tokens from the

17  website?

18  **A.**   Yes, it is.

19  **Q.**   Okay.  How did that work for you?

20  **A.**   It worked fine.

21  **Q.**   Did you need to provide any identifying information, like

22  a driver's license or a passport or anything?

23  **A.**   I don't believe so.

24  **Q.**   Okay.  So you downloaded the wallet, and at that point you

25  held a few AML Bitcoin tokens?

1    **A.**    I believe I bought a thousand.

2    **Q.**    Were you buying tokens or coins?

3    **A.**    I believe at that point it was tokens.

4    **Q.**    Please describe the difference between the AML Bitcoin

5    token and the AML Bitcoin coin as you understood it back then.

6    **A.**    Yeah.  As I understood it, the token was the mechanism

7    they were using to raise money.  So they were issuing tokens

8    which could be converted one for one into coins, the actual

9    digital currency, once the blockchain was live.

10   **Q.**    Okay.  And when you say "once the blockchain was live,"

11   was it your impression that the coin would have the biometrics

12   built into its blockchain when it went live?

13   **A.**    Yes.

14   **Q.**    All right.  Let's take a look.  Let's talk about your

15   actual investment.

16          **MR. HIGHSMITH:**  Can we please show the witness

17   exhibit 734, limited to the Court and the witness for now,

18   please.

19   **BY MR. HIGHSMITH**

20   **Q.**    Is this an e-mail between you and Mr. Dillman?

21   **A.**    Yes, it is.

22   **Q.**    And is it dated January 8th, 2018?

23   **A.**    It is.

24   **Q.**    Fair and accurate depiction of your e-mail exchange?

25   **A.**    It is.

1    **MR. HIGHSMITH:**  Move to admit.

2    **MR. STEFAN:**  No objection.

3    **THE COURT:**  Exhibit 734 will be admitted.

4    (Trial Exhibit 734 received in evidence.)

5    **MR. HIGHSMITH:**  Thank you.

6    Can we please publish this to the jury.

7    **BY MR. HIGHSMITH**

8    **Q.**  All right.  So fair to say at this point you want to go

9    ahead and make your significant purchase?

10    **A.**  Yes.

11    **Q.**  All right.  And so I think if we turn to the middle of the

12    page, you write an e-mail saying:  Hi, Japheth, welcome home.

13    And then you say:  Let me know what I need to do to set up an

14    account.  I'd love to fund this week so I don't miss Phase 2

15    pricing.

16    What did you mean I'd love to fund this week so I don't

17    miss Phase 2 pricing?

18    **A.**  As we discussed before, the ICO is being staged at

19    different prices based on different time.  And so what I was

20    referencing was being able to be a part of the second phase of

21    the ICO at a lower price than you would see in Phase 3 or 4.

22    **Q.**  All right.  Do you see Mr. Dillman's response?

23    **MR. HIGHSMITH:**  Can we zoom out on Mr. Dillman's

24    response, please?

25    **BY MR. HIGHSMITH**

1  Q.    So does he then respond to you talking about an SPV?

2  A.    Yes.

3  Q.    Okay.  What's an SPV?

4  A.    Special purpose vehicle.  It's a legal entity in this case

5  that was being created to acquire the AML Bitcoin tokens.

6  Q.    All right.  And so was your understanding you were gonna

7  wire money to Block Bits and then they were going to purchase

8  AML Bitcoin tokens for you?

9  A.    Yes.

10  Q.    And hold it for you?

11  A.    Yes.

12  Q.    And then you say in the second paragraph, or, I'm sorry,

13  Mr. Dillman says that you want to purchase between 750,000 and

14  a million dollars worth of Bitcoin.  Is that approximately

15  accurate on the amount of money you were going to spend?

16  A.    Yes.

17  Q.    In the last paragraph Mr. Dillman says:  Oh, and Ben, fun

18  side note.  The company is purchasing a Super Bowl spot for

19  marketing.  This is after the coin hits the exchanges.

20        What did you understand Mr. Dillman meant by that?

21  A.    Just what he said, that AML Bitcoin was going to be

22  purchasing a Super Bowl ad to get word out about the coin.  I

23  thought that was an incredible, you know, thing.  The reality

24  is that every year, the Super Bowl is either the most watched

25  or among the most watched events globally, and so no better

1    opportunity to get word out about the coin than to do a Super

2    Bowl ad.

3    **Q.**    What's your impression about how much a Super Bowl ad

4    costs?

5    **A.**    For this recent Super Bowl, I read it was $8 million.

6            **MR. STEFAN:**  Objection; foundation.

7            **THE COURT:**  Sustained.

8    BY MR. HIGHSMITH

9    **Q.**    Is your impression that a Super Bowl ad is very expensive?

10   **A.**    It is.

11   **Q.**    And based on that, did you have an impression about the

12   financial condition of AML Bitcoin based on the fact that they

13   were gonna buy a Super Bowl ad?

14   **A.**    Yeah.  My belief was that the ICO process had gone

15   extremely well, and that they were, you know, selling out or

16   close to selling out, and raising, which, again, as mentioned,

17   a hundred million dollars in the offering.

18   **Q.**    So is the financial strength of AML Bitcoin significant to

19   your decision to invest?

20   **A.**    Absolutely.

21   **Q.**    And is the representation that they were going to --

22   thinking about buying a Super Bowl ad significant to your

23   decision to invest?

24   **A.**    Yes, it was.

25   **Q.**    Why?

1    **A.**    I -- for a consumer business, which in essence that's what

2    this is, to be able to articulate what they do and how it works

3    and why you should own it and the most watched event of the

4    year, it felt like an amazing opportunity to grow adoption.

5    **Q.**    If AML Bitcoin was misrepresenting its intention to buy a

6    Super Bowl ad to you and the public, would that have influenced

7    your decision to invest?

8    **A.**    Absolutely.

9    **Q.**    Why?

10   **A.**    If they're misrepresenting, they're fraudulently saying

11   they're going to do it but they're not intending to do it, I

12   would not want to own any AML Bitcoin or any currency for a

13   company that makes a decision like that.

14       Aside from that, yeah, it would mean -- it means that

15   they're making decisions I don't agree with because that is

16   wrong.  But in addition to that they would not have the ability

17   to articulate their value proposition to a wide audience like

18   is suggested.

19   **Q.**    So this is dated January 8th.  Do you subsequently after

20   this fund your purchase through a wire?

21   **A.**    It was after this.

22       **MR. HIGHSMITH:**  Okay.  Your Honor, exhibit 1224 was

23   subject to your motion in limine concerning bank records and

24   the admission of bank records with the 902.11 certificate.  So

25   I'd move to admit exhibit 1224.

1          **MR. STEFAN:**  Your Honor, could we display this

2     exhibit?

3          **THE COURT:**  Can you display it?

4          **MR. STEFAN:**  To the defense.

5          **MR. HIGHSMITH:**  Yeah, absolutely.

6     Can you please display page --

7     **BY MR. HIGHSMITH**

8     **Q.**   Well, let's look first at page 1, and it's the Block Bits

9     Capital Bank statement from the Chase Bank.  Do you see that,

10    Mr. Boyer?

11    **A.**   I do.

12    **Q.**   Okay.  And it's got the bank account number on it; is that

13    right?

14    **A.**   It has an account number and their name and their

15    addresses.

16         **MR. HIGHSMITH:**  Could we please turn to page 5?  We're

17    only going to look at page 5.  All right.  Would you zoom in,

18    please, on the deposits and additions portion.

19    **BY MR. HIGHSMITH**

20    **Q.**   Do you see, Mr. Boyer, it's buried in this confusing bank

21    statement, but do you see for the first entry your name next to

22    a large amount of money?

23    **A.**   I do.

24         **MR. HIGHSMITH:**  All right.  So as I said, I'm moving

25    to admit this.

BOYER - DIRECT / HIGHSMITH

1    THE COURT:  Okay.

2    MR. STEFAN:  No objection.

3    THE COURT:  1224 will be admitted.

4    (Trial Exhibit 1224 received in evidence.)

5    MR. HIGHSMITH:  Thank you, Your Honor.

6  BY MR. HIGHSMITH

7  Q.    Let's very briefly look at page 1, please, and zoom in on

8  the ...

9         Is this a bank account statement?  Does this look like a

10  banking account statement?

11  A.    It's a checking account.

12  Q.    And is it for Block Bits Capital?

13  A.    Yes.

14  Q.    Let's move to page 5, please.

15    MR. HIGHSMITH:  And could we zoom in on deposits and

16  additions to -- we can stop after 1/29.

17  BY MR. HIGHSMITH

18  Q.    All right.  So this is a part of the bank statements that

19  it's hard to read because it's so small, but I'd like you to

20  focus, please, on the deposit for January 12th, 2018.  Do you

21  see that, sir?

22  A.    I do.

23  Q.    Okay.  Do you see that there is a Fedwire credit via

24  Silicon Valley bank ending in the numbers 0399, and then in the

25  third line down it references AML Holdings, and then in the

1    fourth line Benjamin Boyer.

2        Do you see that?

3    **A.**   I do.

4    **Q.**   Is that a depiction of your -- did you wire from your

5    Silicon Valley bank $730,000 on January 12th to a Block Bits

6    Capital account?

7    **A.**   I did.

8    **Q.**   You testified earlier that you were excited and made

9    multiple purchases in January of AML Bitcoin; is that correct?

10   **A.**   That's correct.

11   **Q.**   Could you please look at the second line on January 12th.

12   Is that also a Fedwire credit from your Silicon Valley bank

13   account to Block Bits?

14   **A.**   It is.

15   **Q.**   And is that for an additional $120,000?

16   **A.**   Yes, it is.

17   **Q.**   I'd now like you to look at the entry for January 23rd,

18   2018.  Do you see that?

19   **A.**   I do.

20   **Q.**   Is that yet another wire from your Silicon Valley bank

21   account to the Block Bits Capital bank account for $150,000?

22   **A.**   Yes, it is.

23   **Q.**   And then finally, could you please look at the entry for

24   January 29th at the bottom.  Is that yet another wire, another

25   Fedwire from your Silicon Valley bank account to Block Bits,

1   this time for $37,500?

2   **A.**   Yes, it is.

3   **Q.**   All right.  So fair to say based on you investing over a

4   million dollars at this time, that you were excited about AML

5   Bitcoin?

6   **A.**   Correct.

7             **MR. HIGHSMITH:**  Okay.  Let's take this down, please.

8   **BY MR. HIGHSMITH**

9   **Q.**   So what was your understanding of how many phases the AML

10  Bitcoin, how many phases was the AML Bitcoin ICO?

11  **A.**   I believe it was four, but we had it on one of the charts

12  that you showed earlier.

13  **Q.**   Okay.  And do you recall how many phases you bought in?

14  **A.**   I primarily purchased in the second phase.  I don't

15  recollect if I purchased anything in the third phase.

16  **Q.**   All right.  Let's take a look, just the witness and the

17  parties and the Court, at exhibit 740.

18        All right.  Is this your e-mail exchange with Mr. Dillman?

19  **A.**   It is.

20  **Q.**   And is this dated March 27th, 2018?

21  **A.**   Yes.

22  **Q.**   Is that shortly after the ICO ended?

23  **A.**   It is.

24  **Q.**   And was that an important time for you in your

25  relationship with your investment?

1   **A.**    It was.

2   **Q.**    Why?

3   **A.**    Well, I was told that the project had sold out, and then I

4   found out from Japheth that they were actually 20 percent

5   short.

6   **Q.**    Well, let's now -- let's now look down, further down this

7   message.  And could we please go to the second page.

8        All right.  So do you see there is an e-mail here from AML

9   Bitcoin to you?

10  **A.**    I do.

11  **Q.**    And it's dated March 26, 2018?

12  **A.**    I see it.

13        **MR. STEFAN:**  Your Honor, objection.  He's testifying

14  to the exhibit.  It hasn't been entered, and this is hearsay.

15        **THE COURT:**  740 has not yet been admitted, so ...

16        **MR. HIGHSMITH:**  We'll move to admit it.

17        **THE COURT:**  On that issue.

18        **MR. STEFAN:**  Objection to hearsay with respect to the

19  e-mail sent by Mr. Boyer on March 27th, 2018.

20        **MR. HIGHSMITH:**  Well, it's --

21        Okay.  First of all, let's talk about the first e-mail.

22  March 26th, 2018, is an opposing party statement by AML

23  Bitcoin.  Mr. Boyer is then reacting to it by sending,

24  forwarding an e-mail to Mr. Dillman.  Mr. Dillman then makes a

25  coconspirator statement where he discusses exactly the subject

1    of the opposing party statement.  And Mr. Boyer then

2    communicates his present sense impression of a very important

3    event that was happening, very important to his investment, at

4    that exact moment.  And it also completes the e-mail chain to

5    understand the full context of it.

6              **THE COURT:**  Go ahead.

7              **MR. STEFAN:**  That e-mail at the top of the chain does

8    not represent a present sense impression, and --

9              **THE COURT:**  The present sense impression part is the

10   one that I'm having some pause about.

11             **MR. HIGHSMITH:**  Well, it also explains his actions at

12   that point.  It explains what Mr. Boyer does.  It explains his

13   reaction to the opposing party statement and his reaction to

14   Mr. Dillman.

15             **THE COURT:**  All right.  I'll admit 740.

16        (Trial Exhibit 740 received in evidence.)

17             **MR. HIGHSMITH:**  Could we please publish 740, and let's

18   start on page 2, please.

19   **BY MR. HIGHSMITH**

20   **Q.**   So let's start with AML Bitcoin's e-mail.

21        So on March 26, 2018, did you receive an e-mail from AML

22   Bitcoin?

23   **A.**   I did.

24   **Q.**   All right.  And so if we zoom in on the second paragraph

25   of that AML Bitcoin e-mail at the very bottom.

BOYER - DIRECT / HIGHSMITH

1    So does that AML Bitcoin e-mail say:  During the ICO,

2    60 million tokens were issued?

3    **A.**    It does.

4    **Q.**    The remaining available tokens will be used for mergers,

5    et cetera.  Our team will announce a digital currency

6    exchange -- I'm sorry, I haven't highlighted that.

7        Let's pause on this.  What was your understanding of that

8    statement, 60 million tokens were issued?

9    **A.**    According to their offering documents, they were making

10   available for purchase in the ICO process 76 million tokens.

11   That would have raised a hundred million dollars based on the

12   pricing that was listed in the offering documents.

13       This note came out after the ICO process ended, and they

14   indicated that rather than selling 76 million, they only sold

15   60 million.

16   **Q.**    60 million, if they had sold 60 million, that still would

17   have been raising a significant amount of money, correct?

18   **A.**    It's impossible to say exactly how much unless you know

19   what they sold of each round, but they were probably raising 50

20   to $70 million.

21   **Q.**    That was your understanding based on this e-mail, correct?

22   **A.**    Hundred percent.

23   **Q.**    And your understanding was they were representing millions

24   of dollars in income, tens of millions.

25   **A.**    Tens of millions of dollars.

1    Q.    Okay.  The second sentence says:  The remaining tokens

2    will be used for mergers, et cetera.  What did you understand

3    that meant?

4    A.    I didn't understand exactly what that meant, but

5    oftentimes you will see with companies you issue stock in order

6    to acquire a different business.  Theoretically, you could

7    issue tokens to do the same thing, and that was what I assumed

8    it meant.  But again, I don't know definitively.

9    Q.    Did you have a negative reaction to that sentence?

10   A.    My negative reaction was they intended to raise -- to sell

11   76 million tokens, and they were only able to sell 60.  I was

12   hoping that they would destroy the remainder and just have less

13   tokens available.

14   Q.    Why?

15   A.    It -- the less the number there are out there, the higher

16   the price theoretically should be.  There's -- you know, the

17   value of any cryptocurrency is the aggregate value divided by

18   the number of the cryptocurrency that exists.

19         So for Bitcoin there's 21 million Bitcoin.  For this

20   project it was suggested there would be no more than

21   200 million.  And so my hope was because they couldn't raise

22   it, they would just remove that number from the aggregate.

23   Q.    Let's look at the last sentence at the very bottom of the

24   page.  The last sentence says:  Our team will announce a

25   digital currency exchange list date soon.  We will send you an

1    e-mail with the details once released.

2        What was your understanding of that statement?

3    **A.**    Just what it says, that given the token process, the

4    initial coin process had been completed.  The next step after

5    they've raised the capital is to actually list the digital

6    currency on an exchange where people could buy and sell freely.

7    **Q.**    Why is that important?

8    **A.**    That's the way that you achieve liquidity with an existing

9    investment in cryptocurrency or in an ICO process is when it is

10   listed, it becomes exchanged, the token that you purchased in

11   the ICO can be exchanged one for one for the digital currency,

12   which will trade on an exchange where you could either buy more

13   or sell.  It's important from a liquidity perspective to

14   achieve liquidity on your investment, and it's also important

15   from a capital appreciation perspective.

16   **Q.**    So let's pause on those two terms.

17       Is liquidity getting your money?

18   **A.**    Yeah.  It's being able to sell what you invested in and

19   get dollars back.

20   **Q.**    And you said capital appreciation, is that getting a

21   return on your investment?

22   **A.**    It is.

23   **Q.**    All right.  So fair to say an exchange is important so you

24   can actually get some money back?

25   **A.**    If there was never an ability to put this on an exchange,

1   there would be very limited value in it.

2            MR. HIGHSMITH:  Let's zoom out and look at Mr. Boyer's

3   comments to Mr. Dillman starting "it's disappointing".

4   BY MR. HIGHSMITH

5   Q.   So the same day that you get the e-mail from AML Bitcoin,

6   it looks like 11 minutes later you send an e-mail to

7   Mr. Dillman saying, it's disappointing that they're not

8   destroying the 15 million coins they couldn't sell in the ICO.

9            Is this that essentially we just talked about?

10  A.   Yes.

11  Q.   And you were hoping they'd destroy those coins so there

12  would be fewer coins, and therefore they'd be more valuable?

13  A.   Yes.  So rather than there be 200 million maximum issued

14  coins, there would be 185 million.

15  Q.   Okay.  Let's go to page 1, please.  Could we please -- the

16  document's difficult, but let's focus on the bottom third where

17  it says "from Japheth Dillman," and it's the same day,

18  March 26th, just a half an hour later.

19           So approximately half an hour later that same day, did you

20  get an e-mail from Mr. Dillman?

21  A.   I did.

22  Q.   In his e-mail he says:  We should talk about that comment.

23  Was your understanding he was responding to your e-mail?

24  A.   Yes.

25  Q.   And then he says:  But as an aside, since HitBTC is not

1  acting accordingly to the release contract, Marcus has just

2  paid the fee to list to get the tokens on six more exchanges

3  this week.  It has been completely out of the hands of Marcus

4  and AML Bitcoin.

5       What did you understand at that time he meant there?

6  A.   Just that they were having some sort of issue with HitBTC

7  in terms of listing the cryptocurrency, the AML Bitcoin, and

8  Marcus was responding to that challenge by paying to list the

9  token on additional exchanges.

10 Q.   Okay.  And did you understand whether Marcus was having

11 success or difficulties getting his token listed?

12 A.   With HitBTC specifically it sounds like he was having

13 challenges given the comment:  HitBTC is not acting accordingly

14 to the release contract.

15 Q.   Are you familiar with HitBTC?

16 A.   Vaguely.

17 Q.   It's a cryptocurrency?

18 A.   It's an exchange.

19 Q.   All right.  Let's scroll up just to your response.  You

20 respond about 40 minutes later.  And let's zoom in on that real

21 quick.

22      So you say:  All right, got it, would love to follow up.

23 So this is something important to you that you wanted to

24 discuss with Mr. Dillman?

25 A.   Yes.

1      **MR. HIGHSMITH:**  Let's scroll up to Mr. Boyer's next

2    e-mail and please zoom in on his next e-mail.

3    **BY MR. HIGHSMITH**

4    **Q.**   The next day, March 27th, very early in the morning it

5    looks like, you follow up yet again:

6         By the way, I hope I'm wrong, but the fact Marcus told you

7    they sold out the ICO when they ended up being 20 percent short

8    makes me question everything Marcus is telling you, including

9    these issues with HitBTC.  Again, I hope I'm wrong, but I've

10   got real doubts about his integrity and the stories he's

11   feeding you.

12        What did you mean by that e-mail?

13   **A.**   I had been told multiple times that the ICO had sold out,

14   that all 76 million tokens were sold, and based on the pricing,

15   that implied the business raised a hundred million dollars.

16   This was the very first --

17        **MR. STEFAN:**  Objection; foundation.  By whom and to

18   whom with respect to this impression, where it came from.

19        **THE COURT:**  Overruled.

20        You may continue.

21        **THE WITNESS:**  And this was the very first time that I

22   heard anything to the contrary, and it was an official e-mail

23   from AML Bitcoin explaining the fact that they had sold

24   60 million instead of 76.

25        **MR. STEFAN:**  Objection, misstates the evidence.  The

1    exhibit did not state that.

2            **THE COURT:**  The jury has the exhibit and the witness'

3    testimony.  They're the ones that will make the determination.

4    Overruled.

5    **BY MR. HIGHSMITH**

6    **Q.**   You also --

7    **A.**   I was just going to finish.

8    **Q.**   Please.

9    **A.**   And so my note to Japheth was, I have concerns given I'm

10   being told one thing and I'm also being told something quite

11   different.

12   **Q.**   And then you also make a reference to including these

13   issues with HitBTC.  And then you say, again, I hope I'm wrong,

14   but I have real doubts about his integrity.  What were the

15   issues with HitBTC you were referencing?

16   **A.**   Just that they were having trouble getting it listed.

17   **Q.**   Why did that cause you to question Mr. Andrade's

18   integrity?

19   **A.**   It didn't make sense to me that a project like this that

20   had raised that level of capital would have any issues listing

21   on a small exchange like HitBTC.

22           **MR. HIGHSMITH:**  We can take that down.

23   **BY MR. HIGHSMITH**

24   **Q.**   Okay.  I think we looked at page 1 of the website earlier.

25   Do you remember there was a link to a Telegram channel?

**BOYER - DIRECT / HIGHSMITH**

1   **A.**   I do.

2   **Q.**   Okay.  Were you reviewing that Telegram channel fairly

3   regularly?

4   **A.**   I did.

5   **Q.**   And were you reviewing it during the first half of 2018?

6   **A.**   Sure.

7   **Q.**   And were you reviewing it for information about the ICO?

8   **A.**   I was.

9   **Q.**   And did you learn -- so after this March e-mail, did you

10  learn later through the Telegram channel more information about

11  the ICO and the number of tokens sold?

12  **A.**   Yes.  On the Telegram channel there was an official

13  Telegram release from AML Bitcoin that they had sold 76 million

14  tokens, the entirety of them.

15  **Q.**   What impression did that give you?

16  **A.**   I was confused.  I assumed that they had figured out a way

17  to do, to basically sell the remainder outside of the ICO

18  process.  But it was encouraging for me to hear that they had

19  figured out a way to raise additional capital.

20  **Q.**   Was the Telegram channel an official AML channel link to

21  the website?

22  **A.**   It had their logo and all of the announcements were from

23  the voice of AML Bitcoin.

24  **Q.**   Despite this confusion did you make another investment

25  later in the fall of 2018?

1   **A.**    I did.

2   **Q.**    Why did you do that?

3   **A.**    The situation was brought to me that there was an existing

4   person that was close to AML Bitcoin, an early investor is what

5   I believe it was sort of purported to be, was having liquidity

6   challenges, and there would be an opportunity to purchase AML

7   Bitcoin at an extremely large discount relative to the ICO.

8   **Q.**    And did you have an investment strategy that sort of

9   attracted you to this opportunity?

10  **A.**    Yes.  There's a concept of dollar cost averaging.  When

11  you make investments in cryptocurrency or stocks, anything for

12  that matter, that when you believe in something and you have an

13  opportunity to buy more at a lower price, you can drive down

14  your average cost of capital.

15  **Q.**    And so basically kind of in plain language, are you trying

16  to protect your initial investment by buying more at a cheaper

17  price?

18  **A.**    I don't know that I'm protecting as much.  It certainly

19  would allow me to recoup my investment at a lower valuation.

20  So to the extent the coin doesn't trade as well and I have a

21  bunch of purchases at a much lower price, it will blend down my

22  average and so I can get my money back at a lower amount.  At

23  the same time, if things go well, buying at distressed levels

24  enables you to have high returns.

25  **Q.**    And who did you get this opportunity from?

BOYER - DIRECT / HIGHSMITH

1    **A.**    I was approached by Japheth and I believe his partner,

2    David Mata, at Block Bits, that they had found this pool of

3    coins that were available, again, at a very low price.

4           **MR. HIGHSMITH:**  Can we please show the witness, the

5    Court and the parties exhibit 602.

6    **BY MR. HIGHSMITH**

7    **Q.**    Do you see this is an e-mail that attaches Ben Boyer AML

8    Bitcoin special purchase agreement 2018?

9    **A.**    Yes.

10          **MR. HIGHSMITH:**  Could we scroll to the next page,

11   please.   Sorry.   Could we scroll to the third page and the

12   fourth page.

13   **BY MR. HIGHSMITH**

14   **Q.**    Is this an agreement between Marcus Andrade and the Ben

15   Boyer Family Trust on October 19th, 2018?

16   **A.**    Yes.

17   **Q.**    Have you seen this document before?

18   **A.**    I have.

19   **Q.**    What is this document?

20   **A.**    This was the purchase agreement whereby I purchased

21   250,000 AML Bitcoin at 20 cents per coin.

22          **MR. HIGHSMITH:**  Could we scroll down, please, to the

23   signature page.   And then up one more, please, 14.

24   **BY MR. HIGHSMITH**

25   **Q.**    And is that your signature?

1    **A.**    Um, I think that's ...

2    **Q.**    Under Benjamin Boyer?

3    **A.**    Yes, it's hard to see.

4              **MR. HIGHSMITH:**  Move to admit 602, Your Honor.

5              **MR. STEFAN:**  No objections.

6              **THE COURT:**  Exhibit 602 will be admitted.

7         (Trial Exhibit 602 received in evidence.)

8              **MR. HIGHSMITH:**  Can we publish that last page?  Sorry,

9    page 14, again, with Mr. Boyer's signature.  Thank you.

10   **BY MR. HIGHSMITH**

11   **Q.**    So this is your -- the document that executes you buying

12   additional tokens from Mr. Andrade?

13   **A.**    Correct.

14   **Q.**    Okay.

15   **A.**    Although I didn't know it was from Mr. Andrade.

16   **Q.**    Okay.  What was your understanding?

17   **A.**    It was not a named person, just someone that had been

18   involved with the project early.  The fact that NAC Foundation

19   and Mr. Andrade had acted as the cosigner in my mind just meant

20   it was being facilitated through them.  And so I was not aware

21   that it was in fact Mr. Andrade.

22   **Q.**    Was it concerning to you that it was Mr. Andrade?

23   **A.**    When I found out, it was extremely concerning.  It was an

24   early-stage project.

25   **Q.**    Let me just stop you right there.  Approximately how long

1    after you bought the coins did you learn that you were buying

2    from Mr. Andrade?

3    **A.**    It was -- I don't remember the exact date.  It was

4    sometime after that, but I don't remember exactly when.

5    **Q.**    So not an exact date, but was it a number of weeks?

6    Months?

7    **A.**    What was the date of this?

8         **MR. HIGHSMITH:**  Could we please scroll to page 3 or 4.

9    Down, please.  If we zoom in on the very top of the purchase

10   agreement where it lists October 19th, 2018.

11        **THE WITNESS:**  It was a few weeks later that I learned

12   that it was Mr. Andrade.

13   **BY MR. HIGHSMITH**

14   **Q.**    Why was it important to you that you were buying from

15   Mr. Andrade rather than another early investor?

16   **A.**    The person closest to this project is Mr. Andrade, as the

17   founder and CEO, and if he is willing to sell tokens at 20

18   cents each, he does not believe in the project.  I would never

19   buy a stock in a private company from a founder that's looking

20   to exit, and I certainly wouldn't be buying coins from someone

21   in that same position.  It's a very negative signal to have the

22   people closest to the project want to be selling so early in

23   the project.

24        **MR. HIGHSMITH:**  We can take this down.

25   **BY MR. HIGHSMITH**

1    Q.   We discussed earlier Mr. Dillman being listed on the AML

2    Bitcoin website as the chief strategy officer, correct?

3    A.   Yes.

4    Q.   What happened with Mr. Dillman being listed as the chief

5    strategy officer?

6    A.   What do you mean by that?

7    Q.   Did you learn that there was a development that he was not

8    the chief strategy officer?

9    A.   At a later date he had told me that it was a title alone,

10   and he wasn't actually the chief strategy officer.  That he was

11   sort of a loose adviser.

12   Q.   If you had known that at the time you invested, would that

13   have influenced your decision to invest?

14   A.   I would never have made this investment if I did not

15   believe Japheth Dillman was the chief strategy officer.

16   Q.   If you had known that your investment was transferred to

17   Mr. Andrade's bank accounts and that portions of it were used

18   to buy him a house for nearly a million dollars, would that

19   have influenced your decision to invest?

20   A.   Yes.

21   Q.   How so?

22   A.   I would not have made this investment.

23   Q.   Why?

24   A.   Those dollars should be going to build the blockchain and

25   tying the biometrics to it.  They should not be going to

1   provide an early employer, a founder, with liquidity.  The

2   business was too immature for someone like myself to support

3   that type of use of proceeds.  All of the dollars needed to go

4   into the project, and that is a pretty hard and fast rule when

5   it comes to investing in early-stage technology projects.

6   **Q.**   Were you monitoring a Discord channel that discussed AML

7   Bitcoin?

8   **A.**   Vaguely.

9   **Q.**   Sitting here today, do you recall any of the impressions

10  you got from viewing that Discord channel?

11  **A.**   So Telegram was the primary channel for the company to

12  share information with the community.  Again, that's where I

13  was told that the project had sold 76 million coins, or the

14  full ICO.

15      Over time, because of the delays, because a lot of these

16  BD projects that were discussed in the white paper never came

17  to fruition.

18  **Q.**   Sorry.  You used the word~-- the acronym BD.  Is that

19  business development?

20  **A.**   Business development.  These were the ports, the things

21  that were listed as being organizations that were in the

22  process of adopting AML Bitcoin.

23  **Q.**   So let me just pause there.

24      So you, when you bought, made your initial investment, you

25  reviewed the website, and at that point did you learn about

1  promising business opportunities with specific ports?

2  **A.**    Yes.

3  **Q.**    And did that influence your decision to invest?

4  **A.**    Yes.

5  **Q.**    Okay.  I interrupted you.  Why don't you go back to --

6  **A.**    To Discord.

7         So within the Telegram channel there began to be --

8         **MR. STEFAN:**  Objection, not responsive.

9  **BY MR. HIGHSMITH**

10 **Q.**    Could you please describe the impression you received

11 after reviewing the Discord channel?

12 **A.**    Right.  I was just getting there.

13        So the Discord channel was introduced to people on

14 Telegram.  That was the first time I even knew there was a

15 Discord channel for people to talk about AML Bitcoin.

16        So Discord is another social platform.  I don't believe I

17 had ever used it until I was told on Telegram that there was a

18 group of individuals that were discussing the project.  It

19 became a place where a lot of people that had concerns based on

20 the fact that nothing that was being described to us appeared

21 to actually be happening as it was described to us, but it was

22 a place for people to have that type of conversation.

23 **Q.**    And from your review of the Discord channel, what was the

24 impression you got about the AML Bitcoin project?

25 **A.**    Very concerning allegations around what was going on with

 1   the project and whether or not we were being sold a bill of

 2   goods.

 3   Q.   Did you confront Mr. Dillman about your investment?

 4   A.   I did.  It was I believe in November.

 5   Q.   And was that after the FBI contacted you?

 6   A.   Yes.

 7   Q.   And at that point did you demand from Mr. Dillman your

 8   money back?

 9   A.   I did not initially demand my money back.  I did let him

10   know how angry I was and that if this was all to be true, I'd

11   be pursuing legal remedies.  And it was during that that

12   Mr. Dillman suggested that he would buy my position.

13   Q.   Okay.  Does that also mean he would pay you back?

14   A.   Yes.  He not only offered to pay me back, and all I was

15   looking for was getting my money back, but he was willing to

16   make sure I received a profit on my investment.

17   Q.   Did he ever pay you back?

18   A.   No.

19   Q.   Did you end up having to sue them?

20   A.   I did.

21   Q.   After that process, did you -- did you and Mr. Andrade

22   engage in an e-mail exchange to try to clarify what had

23   happened?

24   A.   Yes, I did.

25   Q.   Did Mr. Andrade's responses make any sense to you?

1  **A.**   They did not.

2  **Q.**   What was the impression you had after learning

3  Mr. Andrade's responses?

4  **A.**   The one thing that was very clear from Mr. Andrade's

5  responses was that --

6           **MR. STEFAN:**  Objection; foundation.

7           **THE COURT:**  Overruled.

8           **THE WITNESS:**  -- was that he was separating himself

9  from Japheth and David, and he made clear the fact that there

10  was something acrimonious between those two people and himself.

11       Beyond that I didn't learn a lot.  There was a bunch of

12  comments made that never made a lot of sense to me.  And again,

13  my interactions with Mr. Andrade were limited to a handful of

14  e-mails and then one phone call.

15  **BY MR. HIGHSMITH**

16  **Q.**   Do you recall Mr. Andrade calling you an unknowing puppet

17  for Jack Abramoff?

18  **A.**   Yes.

19  **Q.**   What was your impression of that e-mail?

20  **A.**   I had no idea what he was talking about.

21  **Q.**   Did he call you a disciple for Japheth?

22  **A.**   Yes.

23  **Q.**   What was your impression of that?

24  **A.**   Only that I was working with Japheth, or, you know,

25  calling me a disciple.  That's not a word I would use to

1   describe someone that has an association with someone, but I

2   don't know entirely what he was thinking.

3   **Q.**   Did you ask Mr. Andrade for clarification about

4   Mr. Dillman's role in AML Bitcoin?

5   **A.**   I did.

6   **Q.**   Did he answer your question?

7   **A.**   No.

8   **Q.**   Did you record a telephone call with the FBI where you

9   called Mr. Andrade?

10   **A.**   Yes.

11   **Q.**   Early in that call did Mr. Andrade say, are you recording

12   this call?

13   **A.**   I don't recollect.

14   **Q.**   Did he make a reference to whether the call was being

15   recorded early on?

16   **A.**   I don't recollect.

17   **Q.**   Did that call, your conversation with Mr. Andrade, make

18   any sense to you?

19   **A.**   It was similar to the e-mails.  It didn't make a lot of

20   sense.

21   **Q.**   Did it provide answers to any of the questions you had?

22   **A.**   No.

23   **Q.**   Did Mr. Andrade sue you?

24   **A.**   He did.  First time I've ever been sued.

25   **Q.**   Where did he sue you?  What state?

**BOYER - DIRECT / HIGHSMITH**

1    **A.**    It was Nevada.

2    **Q.**    What happened with the suit?

3    **A.**    The lawsuit was suggesting that --

4    **Q.**    I didn't ask -- you can add -- I asked what happened with

5    you.

6    **A.**    Okay.

7    **Q.**    So answer the question, and then I'll ask a second

8    question so you can explain.

9    **A.**    All right.

10    **Q.**    Ultimately what happened with the suit?

11    **A.**    I hired a lawyer and it was thrown out.

12    **Q.**    Okay.  Now, in very broad terms what was your

13    understanding of Mr. Andrade's claim against you?

14    **A.**    I'm not a lawyer, so hopefully I understood it the right

15    way, but it was Mr. Andrade fearing that I was going to be

16    bringing litigation against him, and he wanted to preemptively

17    assign all liability to myself and Japheth and exempt him from

18    any of that.

19    **Q.**    And that was dismissed?

20    **A.**    It was.

21    **Q.**    To the best of your knowledge, was the AML Bitcoin project

22    ever completed with the full biometric identification built

23    into the blockchain?

24    **A.**    Never.

25    **Q.**    Did you get a single penny back from your investment?

1   **A.**   I did not.  I sued Japheth.  We had a contract for him to

2   purchase my AML Bitcoin.  I won a judgment against him, and he

3   never paid after I tried to collect.

4   **Q.**   Did you get any money back from Mr. Andrade or AML

5   Bitcoin?

6   **A.**   No, just a lot of legal fees.

7           **MR. HIGHSMITH:**  Nothing further.  Thank you, sir.

8           **THE COURT:**  Mr. Stefan.

9                       <u>CROSS-EXAMINATION</u>

10  **BY MR. STEFAN**

11  **Q.**   Good morning, Mr. Boyer.

12  **A.**   Good morning.

13  **Q.**   You talked on direct a lot about your interactions with

14  Japheth Dillman, right?

15  **A.**   Yes, sir.

16  **Q.**   And you met him on this plane.  I think it was Christmas

17  Eve or maybe the day before?

18  **A.**   It was a little before that.  It was not Christmas Eve,

19  but a little before that.

20  **Q.**   In 2017?

21  **A.**   Yes.

22  **Q.**   And you just happened to have seats like sitting next to

23  each other?

24  **A.**   It was actually my wife, and they started a conversation.

25  And then she said, you need to talk to him.  So we switched

**BOYER - CROSS / STEFAN**

1   seats.

2   **Q.**   And Japheth, he's like a conversational kinda guy?

3   **A.**   He's very affable.   I think he's a very bright person,

4   yes.

5   **Q.**   Pretty easy to get along with?

6   **A.**   Yeah, he's friendly.

7   **Q.**   At least until you know him a little bit better, I

8   suppose?

9   **A.**   Yes.

10  **Q.**   And in the course of that conversation, this is where he

11  broaches AML Bitcoin with you?

12  **A.**   Yes.

13  **Q.**   And his particular role in the company as he purports it

14  to be as the chief strategy officer?

15  **A.**   That's right.

16  **Q.**   And Japheth is a really effective salesman, is that fair

17  to say?

18  **A.**   I'd say that he has that gift.

19  **Q.**   And he really was pumping up this idea of AML Bitcoin that

20  he was selling to you?

21  **A.**   Hundred percent.

22  **Q.**   So in the course of that conversation he got you excited

23  on the plane before you had even arrived to your destination?

24  **A.**   It's a long flight, so we had a lot of time to chat.   But,

25  yes, I was excited by the time we landed.

1  Q.   And by the time you land, you're interested enough to

2  follow up on it and look into it a little bit more?

3  A.   Yes.

4  Q.   And you make a decision on this pretty quickly, as I

5  recall.

6  A.   I did.  I had a employee that worked for me, and that

7  individual was an investor in Block Bits, which is Japheth's

8  hedge fund company, crypto hedge fund.  And I reached out to

9  him, and he was glowing in his description of Japheth.

10      So between the information that Japheth provided me and

11  the information I could read about the ICO, and then this

12  conversation with a former colleague, I got quite excited.

13  Q.   Yeah.  Nate Hennings, right?

14  A.   That's right.

15  Q.   So you had this mutual connection, too, with Japheth, who

16  was vouching for him?

17  A.   That's right.

18  Q.   And after this initial meeting you still keep in touch

19  with Japheth via messages and e-mails and whatnot?

20  A.   Sure.

21  Q.   And Japheth keeps telling you great things about AML

22  Bitcoin?

23  A.   He does.

24  Q.   And at the time that you decide to invest, you decide

25  to -- or at least the terms that Dillman put it, invest in AML

1   Bitcoin, you decided to do that through Japheth's company?

2   **A.**   I invested through Japheth's company, which is the primary

3   mechanism, and those investments were both in the ICO, and then

4   the tokens that I found that I bought from Marcus.  I also

5   bought a thousand, I believe the number was a thousand of the

6   token I think in $1.50 through the AML Bitcoin website.  And

7   then when he did list I had bought some on one of the small

8   exchanges.

9   **Q.**   I appreciate the thoroughness.  And understanding that you

10  did buy over time in a variety of means, the initial investment

11  was made --

12  **A.**   Through Japheth.

13  **Q.**   -- through Japheth?

14  **A.**   Correct.

15          **MR. STEFAN:**  And if we could pull up government

16  exhibit 727.  Oh, pardon me, 728.

17  **BY MR. STEFAN**

18  **Q.**   This document you received from Japheth?

19  **A.**   That's correct.

20  **Q.**   And if we go to page 2 on this document, you see the

21  symbol down there at the bottom right-hand corner of page 2?

22  **A.**   I do.

23  **Q.**   It's the -- you understand that to be the Block Bits

24  Capital logo, if you will?

25  **A.**   Yes.

1    **Q.**    So this was an offering, as far as you knew, from Block

2    Bits Capital for a particular service they were gonna provide

3    with respect to AML Bitcoin?

4    **A.**    Yeah, it's typically called a private placement that they

5    were being utilized as a mechanism to raise dollars via the

6    ICO.

7    **Q.**    So to your knowledge, this was a product made by Block

8    Bits Capital?

9    **A.**    The -- yes.  The private placement was Block Bits Capital,

10    with the intention to buy one asset, which was AML Bitcoin.

11    **Q.**    And the -- Mr. Highsmith went over with you a lot of the

12    representations that appeared on this two-pager, and, again,

13    all of this information came to you via Block Bits?

14    **A.**    It did, but the white paper itself corroborated much of

15    what's on here, as well.

16    **Q.**    Yeah, I heard you indicate that.  I think we'll return to

17    that momentarily with respect to the white paper, but when you

18    received this document, I believe it was what, within a day or

19    two that you made the decision to go ahead and invest?

20    **A.**    It was a few days later, sure.

21         **MR. STEFAN:**  And we can go ahead and zoom in on the

22    bottom of the document, Block Bits Capital's offering.

23    **BY MR. STEFAN**

24    **Q.**    When you made the decisions to go with Block Bits for the

25    purchase, you didn't have to go just through Block Bits, right?

1    **A.**   I could have bought it directly through the website.  I

2    went with Block Bits.

3    **Q.**   At some point you did make at least one purchase through

4    the website?

5    **A.**   That's correct.

6    **Q.**   But with respect to the decision to go through Block Bits,

7    this offering had some sort of incentive for you to choose the

8    Block Bits route, as opposed to the token sale route?

9    **A.**   It was the custody, the cold storage.  The challenge for

10   the cold storage, doing it yourself, is if you have a fire,

11   live in LA, there were a lot of crypto owners that were

12   negatively impacted because the cold wallet was destroyed in

13   the fire.  And so having Block Bits custody the tokens in my

14   behalf was a value to me.

15   **Q.**   And it would be really disappointing for you to know or to

16   learn that there was no cold storage for the tokens that you

17   were purchasing through Block Bits Capital?

18   **A.**   I didn't know that.

19   **Q.**   Would you have been as incentivized to go with Block Bits

20   Capital had you known they weren't going to cold storage?

21   **A.**   No.

22   **Q.**   Okay.  I also want to draw your attention to, you know,

23   just some of the terminology that appears here.  Block Bits

24   Capital purchases, the coin on investors' behalf.  You see that

25   language?

1    **A.**    Yes.

2    **Q.**    And then transfers -- I'm skipping down to the bottom of

3    the first paragraph bullet point, transfers to FIAT currency

4    and wires to investor.  Do you see that language?

5    **A.**    Yes.

6    **Q.**    And then BBC provides a secure digital wallet for

7    investors.  That's the second bullet from the bottom.

8    **A.**    Yes.

9    **Q.**    And you're nodding your head yes?

10   **A.**    Yes.  I'm sorry.

11   **Q.**    No, that's okay.

12        So Block Bits Capital's presentation of this offering to

13   you was as an investment?

14   **A.**    Yes.

15        **MR. STEFAN:**  If we could turn to -- apologies.  One

16   moment.

17        If we could turn to defense exhibit 2783.

18        **THE WITNESS:**  I see it.

19        **MR. HIGHSMITH:**  This was already admitted as a

20   government exhibit.

21        **MR. STEFAN:**  Correct, Mr. Highsmith.  Can you refer me

22   to the exhibit?

23        **MR. HIGHSMITH:**  Yeah, absolutely.

24        **MR. STEFAN:**  Thank you.

25        **MR. HIGHSMITH:**  It's 602.

1          **MR. STEFAN:**  Thank you.

2      And go ahead and ... yes.  And if you could go to page, I

3  think it should be 9.

4      May I have one moment, Your Honor?

5          **THE COURT:**  Yes.  Actually this is probably a good

6  time for us to take our morning break.

7      Members of the jury, remember my admonition.  Don't

8  discuss this amongst yourselves, with anyone else.  We'll come

9  back at 10:15.

10     (The jury exits the courtroom.)

11         **THE WITNESS:**  I can get up?

12         **THE COURT:**  Yes, but why don't you wait until the jury

13  leaves.

14         **THE WITNESS:**  Yes, sorry about that.

15     (A recess was taken from 10:01 a.m. to 10:18 a.m.)

16         **THE COURT:**  Anything before the jury comes out?

17         **MR. SHEPARD:**  Yes.

18     Mr. Ward was kind enough to tell me that given the Court's

19  ruling about Mr. Hargreaves, that the government now wants to

20  add somebody different to testify today who we're also not

21  prepared.

22         **THE COURT:**  Well, is there -- are there -- is it a

23  document thing?

24     The problem here is I want to move this along.

25         **MR. SHEPARD:**  And so do I.

1          **THE COURT:**  And, you know, I'm not going to just -- I

2     want the government to have witnesses ready to go, and so --

3     well, tell me what the government's position is, Mr. Ward.

4          **MR. WARD:**  The witness is Mr. Darling.  We did tell

5     the defense yesterday, we provided them a list of witnesses for

6     today and tomorrow.  Mr. Darling's name was on that list.

7     We've provided them all the 302s for Mr. Darling for some weeks

8     and months ago.  There are a list of exhibits; we haven't given

9     them the list, but they've had all the exhibits for quite some

10    time.  I'm happy to provide them.

11         **THE COURT:**  I want to know the relative importance of

12    this.  Is this a major witness?  What kind of witness is this?

13         **MR. WARD:**  Mr. Darling worked at a PR firm in

14    Washington, and he will testify that he was hired to write

15    articles about AML Bitcoin, and he was given the information by

16    Jack Abramoff about what to write, that he hired other writers,

17    he paid them to write the articles and that they were submitted

18    to Marcus Andrade for his review, and that the articles

19    contained statements that were not verified.

20         **THE COURT:**  Why can't the other guy who has the

21    problem with the scheduling, Hargreaves, why can't you just

22    start him?

23         **MR. WARD:**  Well, we were ready to start --

24         **MR. HIGHSMITH:**  Here's the deal.  We're calling

25    Mr. Boyer, Mr. Acuna and Mr. Bruffey.  Those three folks have

1    been on the list forever.  We expected to call them days ago.

2    I'm sure they're all set.

3            MR. SHEPARD:  We're good.

4            MR. HIGHSMITH:  We would love to move fast.  We don't

5    control how long cross takes.  I would love to call another

6    witness after these three folks.  I had planned for four

7    witnesses a day, but we're a little slower than that.  We

8    wanted Mr. Hargreaves here so that we could accommodate his

9    scheduling; we couldn't.  Next up is Mr. Darling.

10      I'm sorry that they've had a problem with our witnesses.

11   They've been on the list.  They've known about these folks for

12   years.  They've had the exhibits for a long time.  We have

13   tried to accommodate their requests, to give them advance

14   notice of exhibits, to give them advance notice of witnesses.

15   We're trying to move the case.  We're trying not to keep it

16   slow.

17           THE COURT:  At this point it's almost academic because

18   it is moving so slowly I don't think we'll even get to these

19   witnesses.  But, so you have those three.  We're still on the

20   first one.

21           MR. HIGHSMITH:  We're not going to get ...

22           THE COURT:  It's not even going to be an issue because

23   we're moving so slowly.

24           MR. SHEPARD:  I just wanted to alert the Court.  We

25   wanted to move very quickly also.  That's why we asked, and the

 1    Court directed them to give us this advance notice so that we

 2    can get it all together and we would be ready for everybody as

 3    they come in.  We got documents back at the office.  We got all

 4    ...

 5          THE COURT:  Okay.  I'm going to cross the bridge of

 6    the -- if we blissfully get through the three witnesses that

 7    are on the list and they're ready for a fourth, I'm going to

 8    deal with it at that time and we'll figure it out.  But, of

 9    course, I commend you, Mr. Shepard, for wanting to move it

10    along, and you have some control over that in terms of the

11    crosses that we're going to have.

12          MR. SHEPARD:  Well ...

13          THE COURT:  So if there's a pattern of the cross

14    always being longer than the direct, it will cause me some

15    concern.

16      So let's all, you know, row together to get this case

17    moving along.

18          MR. SHEPARD:  Yes.

19          THE COURT:  Excellent.

20          MR. SHEPARD:  We are.

21          THE COURT:  Wonderful.

22          MR. SHEPARD:  And the crosses have not been longer

23    than the direct.

24          THE COURT:  You know, I didn't say they were.  All I

25    said was, I'm just noting that if that phenomena occurs, that

```
 1    is something that would cause me some pause.  I didn't suggest
 2    in any way that it's been too long.
 3         MR. SHEPARD:  But my client has a constitutional right
 4    to cross-examine, and I --
 5         THE COURT:  He does indeed.  Indeed he does.
 6         MR. SHEPARD:  Understood.  Thank you, Your Honor.
 7         THE COURT:  Yes.  And I will protect that right to my
 8    dying day.
 9         MR. SHEPARD:  Thank you, Your Honor.
10         THE COURT:  Very good.
11      Let's bring the jury out.
12      (The jury exits the courtroom.)
13         THE COURT:  Jury is present.
14      You may proceed.
15      MR. STEFAN:  Okay.  Picking up where we left off,
16    could we please display government exhibit 602.
17         Pardon me.  Please remove the display as currently shown.
18    620.
19         THE COURT:  602 is what you wanted, isn't it?
20         MR. STEFAN:  Yes.  Correct, Your Honor.
21         THE COURT:  All right.  It's there.
22         MR. STEFAN:  Thank you.
23      And if you could please zoom in on the language under J
24    through M on that page.
25    BY MR. STEFAN
```

BOYER - CROSS / STEFAN

1   **Q.**   Can you see that all right, Mr. Boyer?

2   **A.**   J?

3   **Q.**   Yes.  So if you start at J, it says:  Coin purchaser

4   understands, acknowledges and agrees that AML Bitcoins are

5   mediums of exchange and not a pooled interest.  You see that?

6   **A.**   I do.

7   **Q.**   And then K says:  Coin purchaser understands, acknowledges

8   and agrees that it has not purchased AML Bitcoins for

9   investment purposes and expects no return on investment.

10      You see that?

11  **A.**   I do.

12  **Q.**   This is a representation which is different from those

13  that were presented to you in the two-pager that Dillman was

14  giving to you.

15  **A.**   Okay.

16  **Q.**   Is that fair to say?

17  **A.**   Yes.  I don't recollect this document, but I believe that

18  there is a difference.  The Block Bits one was suggesting

19  appreciation from an investment.

20          **MR. STEFAN:**  You can go ahead and back out of this

21  exhibit, Ed.  Thank you.

22  **BY MR. STEFAN**

23  **Q.**   And that kind of caveat language didn't exist in the

24  company agreement that you signed with Block Bits Capital

25  either?

1   **A.**    I don't recollect that it did.

2   **Q.**    In fact, the agreement you entered into, the share

3   purchase vehicle, with Block Bits Capital, that was explicitly

4   an investment agreement, right?

5   **A.**    Yes.

6   **Q.**    The idea is you and these other purchasers are gonna group

7   together and purchases will be made out of a common fund, if

8   you will?

9   **A.**    Sure.

10  **Q.**    So this was -- this was rather different than the language

11  that you just saw regarding the coins not being an investment?

12  **A.**    Yes.

13  **Q.**    Throughout the course of -- well, first, I want to talk

14  about your purchases that you made following receiving the

15  two-pager from Dillman in January.  There was first a purchase

16  for 850,000; is that right?

17  **A.**    Sounds right.

18  **Q.**    And then there were multiple purchases after that point

19  for smaller amounts, and the government went over some of those

20  with you?

21      And you're nodding your head yes?

22  **A.**    Yes.

23  **Q.**    There was a purchase for 45,000 tokens on January 25,

24  2018, does that sound about right?

25  **A.**    It sounds about right.  Don't recollect exact dates.

BOYER - CROSS / STEFAN

1  **Q.**  And then for another purchase of 25,000 tokens on

2  January 29th of 2018?

3  **A.**  Certainly could be.

4      **MR. STEFAN:**  Could we display government exhibit 743.

5  Actually, just to the judge and counsel.

6      And I want to go to page 2, please.  And could you give me

7  a zoom on~--- thank you.  Give me a zoom on the top of the page

8  there, the chart that appears at the top.

9  **BY MR. STEFAN**

10 **Q.**  Okay.  Do you see that, Mr. Boyer?

11 **A.**  Yes.

12 **Q.**  Do you recognize this?

13 **A.**  Yes.

14 **Q.**  What is this?

15 **A.**  It's a Excel spreadsheet that I created to keep track of

16 all the purchases I made of AML Bitcoin from the various, you

17 know, mechanisms of acquisition, either through the website,

18 through Japheth or in the open market on an exchange.

19 **Q.**  Thank you.

20     **MR. STEFAN:**  Could we back out of this zoom-in, and

21 then just zoom in on the -- go to the top of the -- sorry.  Go

22 to page 1, please.  And then zoom in on the e-mail that begins

23 on the bottom of the page on Thursday, November 29th, 2018.

24 **BY MR. STEFAN**

25 **Q.**  Okay.  So do you recognize this e-mail?

 1          **MR. HIGHSMITH:**  Your Honor, I'm going to object to

 2   this because it's hearsay, and I don't believe he's impeaching

 3   Mr. Boyer's truthfulness.  So it's not admissible.

 4          **THE COURT:**  Well, he hasn't moved to admit it, has he?

 5          **MR. HIGHSMITH:**  Yeah, but he's not impeaching his

 6   truthfulness right now.

 7          **THE COURT:**  Overruled.  You can proceed.

 8          **MR. STEFAN:**  Thank you, Your Honor.

 9   **BY MR. STEFAN**

10   **Q.**   Do you recognize the chart?

11   **A.**   The chart or the text?

12   **Q.**   The chart and the text, I suppose.  This e-mail.

13   **A.**   I just told you I created the chart.  And, yes, I

14   recognize the text, as well.

15   **Q.**   Okay.  Let's go ahead and go to -- back down to the chart

16   on page 2.  And zoom in on it.

17   **BY MR. STEFAN**

18   **Q.**   I just want to draw your attention to the purchases

19   indicated on the 25th and the -- well, yeah, just the two

20   purchases on the 25th.  You see those?

21   **A.**   I do.

22   **Q.**   Okay.  Does that refresh you on the purchases that you

23   made at that time?

24          **MR. HIGHSMITH:**  Your Honor, I'm going to object.  We

25   covered this with the bank statements.  It's cumulative of the

1    bank statements.  We've already established he made these

2    purchases at this time.

3         THE COURT:  Well, I'm not quite sure why you're asking

4    him to refresh his recollection.  I don't think he's testified

5    he doesn't recall.

6         What are you asking?  What do you want him to testify

7    about?  Putting aside this document, what's the question,

8    whether or not he made purchases at a particular time?  I'm not

9    following it.

10        MR. STEFAN:  I may have put the cart a little bit

11   before the horse, Your Honor.  We can go ahead and remove

12   display of this right now.

13        What I want to ask Mr. Boyer is his recollection of the

14   price of the purchases that he made on~---

15        THE COURT:  Okay.  Why don't you just put this

16   document aside, then if he doesn't remember you can see, does

17   this refresh your recollection.  Okay?

18        MR. STEFAN:  Understood, Your Honor.

19   BY MR. STEFAN

20   Q.   With respect to those purchases that you made on the 25th,

21   do you recall what your price per token was?

22   A.   Could you pull that back up?

23        THE COURT:  We do things in an organized fashion here.

24   You go right ahead.

25        MR. STEFAN:  That's what I meant about putting the

**BOYER - CROSS / STEFAN**

```
 1   cart before the horse, but ...
 2           THE WITNESS:  The purchases on the 25th looks like
 3   $1.50 per token.
 4   BY MR. STEFAN
 5   Q.   Thank you, Mr. Boyer.  Does that refresh you on that?
 6   A.   Yes.
 7   Q.   We can go ahead and back out of that.  Sorry, one second.
 8        And those were purchases that you made through Block Bits
 9   Capital, those ones?
10   A.   Yes.
11           MR. STEFAN:  Okay.  Can we go ahead and back out of
12   that, then?
13   BY MR. STEFAN
14   Q.   So those two purchases that you made at 1.50, would --
15   were you expecting when you transmitted that money to Block
16   Bits Capital that you were getting basically dollars to AML
17   Bitcoin exchange on your purchase?
18   A.   Yes, and the chart captures that.  So it shows a $67,500
19   investment at $1.50 per token, which would be 45,000 tokens.
20   Q.   Did you know that Japheth Dillman and David Mata with
21   Block Bits Capital were actually receiving those tokens for
22   $1.25 each?
23   A.   I did not.
24   Q.   Would you have been comfortable or okay with them buying
25   the tokens at a lower price and then up-selling you at a higher
```

1  price?

2  **A.**    I think my issue would be it was never represented to me

3  that way, and so again, had I understood that early on that I

4  was dealing with a party that was arbitraging my purchases in a

5  nontransparent way, I don't think I would have made those

6  purchases.  The way it was described to me is they would make

7  their money on the back end, that when it was time for me to

8  sell the tokens if I did it through them, they would get a fee

9  for that.

10  **Q.**    Understood.

11      So to be clear, you did not understand that they were --

12  and the term that you used was "arbitrage," that they were

13  arbitraging the sales that they were making or purchases they

14  were making on your behalf?

15  **A.**    Correct.

16  **Q.**    This was a misrepresentation to you as far as you're

17  concerned?

18  **A.**    Yes.

19  **Q.**    Were you aware that at this same time period, Japheth

20  Dillman, David Mata and Block Bits Capital were anticipating,

21  hoping to get acquired by a larger company?

22  **A.**    I did not know that.

23  **Q.**    Were you aware that they were seeking to maximize their

24  assets under management as soon as possible in order to do

25  that?

1   **A.**   Well, I didn't know that they were seeking to be acquired,

2   but virtually every asset manager has an incentive to increase

3   their assets under management, so that part doesn't surprise

4   me.

5   **Q.**   Okay.  So that wouldn't surprise you, but it would be news

6   to you that that was something that was pending for Block Bits

7   Capital?

8   **A.**   I had -- first I've heard of this.

9   **Q.**   Okay.

10          **MR. STEFAN:**  And we can remove this slide, to the

11   extent it's still showing.  Thank you.

12          **THE WITNESS:**  If you ask me prices, please bring it

13   back.

14   **BY MR. STEFAN**

15   **Q.**   I will happily do that for you.

16          You said in direct examination that you never would have

17   purchased AML Bitcoins if Dillman wasn't the CSO or had

18   represented himself as the CSO of the NAC Foundation?

19   **A.**   To me that's fraud, purporting to be someone you're not.

20   And so --

21   **Q.**   I apologize, but just a little nonresponsive.

22          You wouldn't have ever made that purchase?

23   **A.**   I would not have made that purchase.

24   **Q.**   But you made of course that initial purchase and then

25   follow-on purchases with Block Bits Capital?

**BOYER - CROSS / STEFAN**

1    **A.**    Yes.

2    **Q.**    And then subsequent purchases you mentioned on exchanges,

3    and you're nodding your head yes.  And on I believe also

4    through the private sales that we talked about?

5    **A.**    The website?

6    **Q.**    Yes.  And also through the AML Bitcoin website.  And

7    you're nodding your head yes.

8    **A.**    Yes, yes to all of those.

9    **Q.**    And you made those purchases over a period of time where

10   the bad news about AML Bitcoin just keeps piling up from your

11   perspective.

12   **A.**    Well, it wasn't piling up until the end.  When I had the

13   conversation with the FBI individual, I was shocked.

14   **Q.**    Okay.  Well, let me be clear when I say piling up.

15   **A.**    Okay.

16   **Q.**    In the course of the months over which you made these

17   purchases and interacted with Japheth, he told you things about

18   the company?  And you're nodding your head?

19   **A.**    Yes.

20        **MR. HIGHSMITH:**  Your Honor, I'm just going to object

21   to the questioning.  He's basically -- rather than asking a

22   question, he's sort of putting evidence into the record, and

23   then the witness will nod.  So I just ask that the question be

24   phrased properly.

25        **MR. STEFAN:**  Your Honor, if I may?  I'm asking the

```
 1    question and ensuring for the record that the response is
 2    recorded.  I could ask the witness to give a verbal.
 3              THE COURT:  Let's go to the next question.  Go ahead.
 4    Go ahead.  Keep going.
 5              MR. STEFAN:  Yes, Your Honor.
 6    BY MR. STEFAN
 7    Q.   So in this timeframe, Japheth told you things about the
 8    company?
 9    A.   That's correct.
10    Q.   And you expressed concerns to him about things that you
11    were learning through other sources?
12    A.   Yes.
13    Q.   So, say, for instance, after the Super Bowl ad, you
14    expressed concerns to Japheth about negative reception that the
15    Super Bowl ad rejection campaign had received?
16    A.   And I was given an answer that it was not --
17    Q.   Just to be clear, that's a "yes" to my question?
18    A.   That's a "yes".
19    Q.   And same with negative chatter that you were hearing on
20    online forums?
21    A.   Yes.
22    Q.   You reported that to ...
23         Okay.  Sometimes negative things that you may have heard
24    from counterparts or colleagues, just --
25              MR. HIGHSMITH:  Objection.  There's not really a
```

```
 1    question when you start "sometimes" without ...
 2            THE COURT:  Why don't you rephrase that one.
 3    BY MR. STEFAN
 4    Q.   You also received feedback from some colleagues or cohorts
 5    that was negative with respect to AML Bitcoin?
 6            MR. HIGHSMITH:  I don't think he testified he received
 7    feedback from colleagues.  I think he made this investment in
 8    his personal capacity.
 9            THE COURT:  Well, why don't you back up; ask him from
10    whom he received feedback.
11        Go ahead.
12    BY MR. STEFAN
13    Q.   Did you receive negative feedback from any colleagues with
14    respect to AML Bitcoin?
15            THE COURT:  And perhaps "colleagues" is a little
16    confusing.  Who?  Why don't you just ask him from whom he
17    received any feedback?
18            MR. STEFAN:  Thank you, Your Honor.
19    BY MR. STEFAN
20    Q.   From whom did you receive feedback?
21    A.   Yeah.  So when I made the investment, I reached out to
22    people that were involved in the crypto industry that
23    understood the space better than I did, to understand if a
24    cryptocurrency was created that did the things that this one
25    was purported to do in terms of AML and KYC and tying
```

 1   biometrics to the blockchain, would it be valuable.  And I got

 2   a resounding "yes".

 3       I had told people that I had made the investment, and then

 4   along the way, I think some of the negative articles -- there

 5   was an article about whether or not the project actually ever

 6   intended to run the Super Bowl ad, people saw that and started

 7   to share it with me.

 8       So there were people that I had communicated about AML

 9   Bitcoin with that shared with me their concern.

10   **Q.**   Thank you.

11       And my point with the piling up is that you continue --

12           **MR. HIGHSMITH:**  Objection.  It's not about counsel's

13   point.  It's about a question and an answer.

14           **THE COURT:**  Just ask a question.  Okay?

15   **BY MR. STEFAN**

16   **Q.**   Prior to the FBI coming to you in November of 2018, you'd

17   had negative news and feedback regarding AML Bitcoin?

18   **A.**   That is correct.

19   **Q.**   Over the course of that same period you had continued to

20   increase your holdings in AML Bitcoin?

21   **A.**   That is true.

22   **Q.**   This is directly attributable to Japheth Dillman and his

23   communications with you?

24   **A.**   As well as the Telegram channel which AML Bitcoin

25   operated --

1  Q.   But --

2  A.   -- and provided a lot of information about how great

3  things were going, yes.

4  Q.   But absent Japheth Dillman's role as the CSO, or purported

5  role as the CSO, relaying this information, you wouldn't have

6  invested in the first place?

7  A.   Oh, hundred percent.

8  Q.   The point at which Japheth Dillman had told you things

9  that weren't as glowing about the project, that would have

10  impacted your decision-making, as well?

11  A.   Yes.

12  Q.   And so but for Japheth Dillman, you may not have invested

13  in the first place?

14  A.   I wish I was never on that plane with him, but, yes.

15  Q.   And likely wouldn't have continued investing after hearing

16  negative reports?

17  A.   That is correct.

18  Q.   Throughout that entire period you had no communication

19  with Mr. Andrade prior to meeting with the FBI in November of

20  2018?

21  A.   That's correct.

22  Q.   Not CC'd on any e-mails, either?

23  A.   I believe not a single e-mail.  The only communications I

24  had with him were connecting on LinkedIn, and then there were a

25  couple of e-mails that happened after the FBI reached out to

 1  me, and there was one phone call, and I believe that was it.

 2  **Q.**   Dillman was the source of all your information regarding

 3  developments with AML Bitcoin from any kind of insider

 4  perspective?

 5       **MR. HIGHSMITH:**  Objection, Your Honor.  He's already

 6  testified he looked at the website, he looked at the Telegram

 7  channel, he looked at the press.

 8       **MR. STEFAN:**  I --

 9       **THE COURT:**  Overruled.

10       **THE WITNESS:**  That's correct.  I did review all of

11  those different places, and I was --

12  **BY MR. STEFAN**

13  **Q.**   I apologize.

14  **A.**   Okay.

15  **Q.**   Not in response to Mr. Highsmith, but in response to my

16  question.

17       It was from an insider perspective.  Like that was the

18  only information you got.  Dillman was the only person on the

19  NAC team that you were talking to?

20  **A.**   I had no other relationships.  Japheth's partner, David

21  Mata, was also intimately familiar with the project, but he was

22  not listed as a key officer like Japheth.

23  **Q.**   Understood.  So Japheth and Mata gave you representations,

24  but Japheth was the one who was connected?

25  **A.**   He was the primary contact.

1  Q.   And you had no contact with Mr. Andrade?

2  A.   Again, not until after I was approached by the FBI.  I had

3  never had a conversation with Marcus.

4  Q.   And even then, it was some time after you were approached

5  by the FBI, correct?

6  A.   Yes.

7  Q.   By February of 2019, when the FBI talked to you then, you

8  still had not ever communicated with Mr. Andrade?

9  A.   No.

10 Q.   Is it correct that in -- by the time you talked to the FBI

11 in February of 2019 you had not communicated with Mr. Andrade?

12 A.   That's correct.

13 Q.   I believe I got that right.

14      Apart from the connection to Japheth, there were other --

15 your own experience in venture capital had some impact on your

16 perception of the project's progress over time; is that right?

17 A.   Well, I have been an investor for quite a while.  I

18 started in venture capital -- so I believe in some respects,

19 yes, my experience allows me to quickly evaluate opportunities,

20 and I have a pretty decent network to do due diligence.

21 Q.   If I may, Mr. Boyer?

22 A.   You asked for a question.  I was just giving you the

23 answer.

24 Q.   Yes.  I had anticipated it could be answered with a yes or

25 a no, but --

1    **A.**   It's nuanced.

2    **Q.**   Okay.  So nuanced?

3    **A.**   Well, you want an answer --

4          **MR. HIGHSMITH:**  Your Honor.

5          **THE COURT:**  Wait, wait, wait, wait.

6    Let's get a question and an answer, not talking over each

7    other.

8    Question.

9    **BY MR. STEFAN**

10   **Q.**   Specifically your experience in venture capital and your

11   work has resulted in you seeing delays in the delivery of

12   various projects, and that those delays aren't uncommon to you?

13   **A.**   That is correct.

14   **Q.**   So part of your observation with respect to AML Bitcoin

15   was that there is delays, but this isn't uncommon?

16   **A.**   Things always take longer than you anticipate.

17   **Q.**   And that could especially be the case in the development

18   of a technology which is supposed to be groundbreaking?

19   **A.**   It could be.

20   **Q.**   I want to talk about the private sale that Mata and

21   Dillman brokered between you and Mr. Andrade.  At the time that

22   you made that sale you represented here in court today that you

23   did not know that Marcus Andrade personally was on the other

24   side of that?

25   **A.**   I did not.

1  **Q.**   Japheth and Mata represented to you that the person on the

2  other side of that was some other investor or purchaser?

3  **A.**   Someone early to the project is what I believe the way it

4  was framed.

5  **Q.**   A distressed person?

6  **A.**   Needed liquidity.

7  **Q.**   Right.  So they represented to you explicitly that this

8  was not Mr. Andrade?

9       **MR. HIGHSMITH:**  Objection; asked and answered.  I feel

10  like we've covered this already, Your Honor.

11       **THE COURT:**  Overruled.  Go ahead.

12       **THE WITNESS:**  I didn't ask the question if it was

13  Marcus Andrade, and they certainly did not indicate that it was

14  anyone working at the company.  Again, it was purported to be I

15  believe an investor, someone that got in the project early.

16  **BY MR. STEFAN**

17  **Q.**   And at this time, again, you hadn't communicated with

18  Mr. Andrade around the time of the purchases?

19       **MR. HIGHSMITH:**  That one was asked and answered.

20       **THE COURT:**  Sustained.

21  **BY MR. STEFAN**

22  **Q.**   So you don't know what Dillman and Mata told Mr. Andrade

23  about you as the buyer?

24  **A.**   No.

25  **Q.**   You don't know whether they had identified him as the

1    seller?

2    **A.**    I have no idea.

3    **Q.**    I want to turn to government exhibit 740.

4          **MR. STEFAN:**  And go ahead and turn to page 2.  And if

5    you could zoom in on the paragraph at the bottom of that page.

6    **BY MR. STEFAN**

7    **Q.**    So, Mr. Boyer, you represent the e-mail that Mr. Highsmith

8    was discussing with you before about the token sale results?

9    **A.**    Correct.

10   **Q.**    Do you see the language, during the ICO, 60 million tokens

11   were issued?

12   **A.**    I see that.

13   **Q.**    I believe on direct examination you indicated this e-mail

14   told you that 60 million tokens were sold.

15   **A.**    That's how I read it to mean.  I don't know how or why

16   they would issue tokens outside of the ICO.

17   **Q.**    But specifically the language utilized was issued and not

18   sold?

19   **A.**    In this document it was issued, not sold.

20   **Q.**    And with respect to this language it wasn't anything that

21   Marcus ever told you directly, that 60 million tokens were

22   either issued or sold?

23   **A.**    No.

24   **Q.**    Okay.

25   **A.**    One point I will make is in the Telegram channel, which

1    was the AML Bitcoin-sponsored Telegram channel, they used the

2    word "76 million tokens sold," so I did read that.

3    **Q.**    So I want to discuss that, too.

4        **MR. STEFAN:**    We can go ahead and pull out of the

5    government exhibit 740.

6    **BY MR. STEFAN**

7    **Q.**    The Telegram channel, did you happen to screenshot the

8    Telegram channel when you were reviewing it?

9    **A.**    I did.

10    **Q.**    Did you provide that screenshot to the government?

11    **A.**    I did.

12    **Q.**    Okay.  Do you recall when about that screenshot was taken?

13    **A.**    I don't.

14    **Q.**    And do you recall when about you provided that screenshot

15    to the government?

16    **A.**    It was a while after I was first approached by the FBI.

17    It was a thought I -- I had remembered seeing the Telegram

18    channel have the claim that they sold 76 million tokens.  And

19    so I then sent it separately to the FBI.

20        **MR. STEFAN:**    Okay.  Can we pull up government

21    exhibit 626?  And go to the third page.  Sorry, the next page.

22    Fifth page.  Next page.  Next.  And go ahead and zoom in on the

23    chart that's displayed here.

24    **BY MR. STEFAN**

25    **Q.**    I want to bring back attention to one point that you

 1    discussed in direct, which was that there was no biometric

 2    authorization for the wallet that you downloaded for AML

 3    tokens.  Is that right?

 4              **MR. HIGHSMITH:**  Objection.  That was not his testimony

 5    on direct.

 6              **THE COURT:**  Well, he can then correct it.

 7              **THE WITNESS:**  Yeah, I didn't say that.

 8    **BY MR. STEFAN**

 9    **Q.**    Okay.  Did you do biometric verification for AML tokens?

10    **A.**    I never did.

11    **Q.**    Do you observe in this chart that the basic specifications

12    for AML Bitcoin are on the left, and then the specifications

13    for AML token are on the right?

14    **A.**    Yes.

15    **Q.**    And you spoke in direct examination about the difference

16    between a token and a coin?

17    **A.**    Yes.

18    **Q.**    And the understanding that the token is a placeholder?

19    **A.**    It's a mechanism to raise the money, and then you exchange

20    it one for one.

21    **Q.**    And you can observe in this table that biometric

22    identifications is included on the left-hand side as a

23    specification for the completed coin, but it's not included as

24    a specification for the token?

25    **A.**    Correct.

1          **MR. STEFAN:**  Okay.  We can leave government

2   exhibit 626.

3   **BY MR. STEFAN**

4   **Q.**   Following the fallout of the November revelations you had

5   with the FBI, Japheth Dillman tries to buy all of your tokens

6   from you?

7   **A.**   He said he was doing that for all the people that had

8   invested in AML Bitcoin through Block Bits, and that he was

9   going to bring litigation against Marcus on his own.

10  **Q.**   And as you discussed in direct, you ultimately brought

11  litigation against him for failing to perform on his contract

12  to buy your tokens?

13  **A.**   We had a signed asset purchase agreement that was -- that

14  specified the terms that he had offered, and he did not make

15  payment.

16  **Q.**   You also discuss the declaratory judgment that Mr. Andrade

17  sought with respect to you and Block Bits Capital.  With

18  respect to that, the suit that he brought wasn't to get money

19  out of you.

20  **A.**   No, it was to push liability, I believe, away from himself

21  and onto Japheth and myself.

22  **Q.**   Specifically, he was suing Block Bits Capital.  I say

23  suing, seeking declaratory judgment against Block Bits Capital

24  and you, because the purchase contract that you were suing

25  Block Bits Capital over was specifically with Block Bits

1  Capital and not with him?

2  **A.**  Yes.  He -- you're a lawyer and I'm not, and so I don't

3  want to misrepresent it, but that sounds about like my

4  interpretation.

5  **Q.**  He wasn't trying to get any money out of you?

6  **A.**  Well, when you sue someone, you gotta hire a lawyer.  So

7  he got money out of me.  But, no, he wasn't suing for money.

8  **Q.**  Well, he individually didn't get any money out of you in

9  that sense.

10  **A.**  He didn't, but he did force me to spend a lot of money to

11  defend myself.

12  **Q.**  The answer is yes or no.

13  **A.**  I'm answering what happened.

14  **Q.**  So you indicated that you had got your part of that case

15  dismissed.

16  **A.**  Correct.

17  **Q.**  You understand that to be on jurisdiction grounds?

18  **A.**  We went with whatever was the simplest way to make it go

19  away.

20  **Q.**  In this case it was a forum issue?

21  **A.**  I'm not gonna speak to the exact process by which it was

22  dismissed.  I'm not a lawyer.

23  **Q.**  Did you review the opinion -- or not the opinion, but the

24  judgment that the Court entered in that case?

25  **A.**  I did.

1  Q.   Would looking at it refresh your recollection regarding

2  the basis on which the order was made?

3  A.   I'm happy to review it if you would like me to review it.

4  I don't recollect exactly what was said.  And as I said, I'm

5  not a lawyer and definitely don't profess to be one.  When I

6  hired the attorney, he had a way of making this go away as cost

7  effectively as possible.  At this point, I had already lost a

8  lot of money, and I did not want to spend a lot of money

9  defending this, which to me was nonsense.

10          MR. STEFAN:  Your Honor, may I have a moment?

11          THE COURT:  Yes.

12          MR. STEFAN:  Thank you.

13      Just one more matter to address.

14      Can we display exhibit 3106.

15          THE WITNESS:  You're going to have to blow this one

16  way up.  It's very hard for me to read it.

17          MR. STEFAN:  This should only be displayed to counsel

18  and the judge.

19      Thank you.

20  BY MR. STEFAN

21  Q.   Mr. Boyer, did you go on the AML Bitcoin website with some

22  frequency?

23  A.   Yes.

24  Q.   Did you see the "Ask Me Anything" that Marcus did on

25  May 22nd of ...

**BOYER - REDIRECT / HIGHSMITH**

1    **A.**    I don't believe so.

2            **MR. STEFAN:**  Okay.  All right.  Thank you.

3            **THE COURT:**  Mr. Highsmith.

4            **MR. HIGHSMITH:**  Thank you, Your Honor.

5        Just a couple of quick follow-ups.  Could we please

6    display exhibit 1224 and could we please look at page 6?

7        You can publish it to the jury.  It's been admitted.

8                    <u>**REDIRECT EXAMINATION**</u>

9    BY MR. HIGHSMITH

10   **Q.**    Defense counsel asked you several questions about how your

11   money went to Block Bits Capital.  Do you recall that?

12   **A.**    Yes.

13   **Q.**    Asked you several questions about the timing of your money

14   going to Block Bits Capital.  Do you recall that?

15   **A.**    Yes.

16   **Q.**    We covered previously that you transferred or wired money

17   to Block Bits on January 12th, 2018.  Do you recall that?

18   **A.**    Yes.

19   **Q.**    We previously covered how you transferred funds to Block

20   Bits Capital on January 23rd, 2018.  Do you recall that?

21   **A.**    Yes.

22           **MR. HIGHSMITH:**  Please zoom in on the other

23   withdrawals, withdrawals from Block Bits Capital, page 6.

24   BY MR. HIGHSMITH

25   **Q.**    Do you see on the exhibit in front of you that the same

BOYER - REDIRECT / HIGHSMITH

1  day that you wired money to Block Bits Capital, $850,000 was

2  wired out of Block Bits Capital?

3  **A.**    I do see that.

4  **Q.**    Do you know where that money was wired to?

5  **A.**    I believe it was sent to the NAC or AML.

6  **Q.**    Please look at the next line for 1/23/2018.  Is that the

7  same date that you wired money to --

8  **A.**    Yes.

9  **Q.**    -- Block Bits?

10     Do you see that there is another wire or another

11  withdrawal directed, transferred to the same bank account for

12  $150,000?

13  **A.**    I do.

14  **Q.**    Do you know who that was wired to?

15         **MR. STEFAN:**  Objection; foundation.

16         **MR. HIGHSMITH:**  Well, the question is do you know who

17  that was wired to.

18         **THE COURT:**  Well --

19         **THE WITNESS:**  I don't.  I don't know who that was

20  wired to.

21  **BY MR. HIGHSMITH**

22  **Q.**    Counsel asked you several questions about your

23  October 2018 purchase that was directly from Mr. Andrade,

24  correct?

25  **A.**    That's correct.

BOYER - REDIRECT / HIGHSMITH

1  **Q.**   Do you know whether Mr. Andrade paid commissions on that

2  sale?

3  **A.**   I have learned since.

4  **Q.**   But at the time did you know?

5  **A.**   I did not.

6  **Q.**   Did you know that Mr. Andrade paid $12,500 commission for

7  that sale?

8  **A.**   No.

9  **Q.**   If you had known at that time that Mr. Andrade paid a

10  $12,500 commission for that October sale, would that have

11  influenced your decision to invest?

12  **A.**   Hundred percent.

13  **Q.**   Why?

14  **A.**   That's a form of desperation to get out of the position.

15  As I said, having the CEO of a project that's this early

16  looking to sell their stake is indicative of the fact that they

17  don't believe in it or it might not be real.  Additionally,

18  paying on top of that to sell at such distressed levels is

19  further indication that there is really nothing positive going

20  on with the project.

21  **Q.**   Counsel repeatedly asked you about where you got your

22  information about AML from.  Do you recall that?

23  **A.**   I do.

24  **Q.**   In addition to Mr. Dillman, did you receive significant

25  information from the AML website?

**BOYER - REDIRECT / HIGHSMITH**

1  **A.**   Yes.

2  **Q.**   Did you receive information from press releases?

3  **A.**   Yes.

4  **Q.**   Did you receive information from the Telegram channel?

5  **A.**   Yes.

6  **Q.**   Did you also go to Mr. Andrade's LinkedIn page?

7  **A.**   I did.

8  **Q.**   Counsel asked you many questions about whether you had

9  talked personally to the founder and CEO of the company in

10  2018, basically.  You said, "no," correct?

11  **A.**   That's correct.

12       **MR. STEFAN:**  Objection to leading at this point.

13       **THE COURT:**  Well, it is redirect.  Go ahead.

14  **BY MR. HIGHSMITH**

15  **Q.**   And you went to the LinkedIn page, correct?

16  **A.**   Yes.

17       **MR. HIGHSMITH:**  Please display to the witness 381, and

18  just to the parties, the Court and the witness.

19  **BY MR. HIGHSMITH**

20  **Q.**   I think when you looked at the -- when you looked at the

21  LinkedIn page, it did not display the profile photo.  Looking

22  in front of you, is this the profile photo that was attached to

23  the LinkedIn page?

24  **A.**   Yes.

25       **MR. HIGHSMITH:**  Your Honor, I would move to admit

```
 1   exhibit 381.

 2           MR. STEFAN:  No objection.

 3           THE COURT:  381 will be admitted.

 4       (Trial Exhibit 381 received in evidence.)

 5           MR. HIGHSMITH:  Thank you.

 6       Please publish that.

 7   BY MR. HIGHSMITH

 8   Q.  And is that a picture of --

 9           MR. HIGHSMITH:  You can just leave it like this.

10   BY MR. HIGHSMITH

11   Q.  Is this a picture of Mr. Andrade in front of what appears

12   to be a Rolls Royce with his name and the license plate?

13   A.  Yes.

14           MR. HIGHSMITH:  You can take that down.

15   BY MR. HIGHSMITH

16   Q.  Okay.  Counsel asked you repeatedly about your decision to

17   invest and the fact that you relied on information from

18   Mr. Dillman to invest.  Do you recall that?

19   A.  I do.

20   Q.  Did you also decide to invest based on relying on

21   information you got from the AML Bitcoin website, the AML

22   Bitcoin Telegram channel, the AML Bitcoin press releases?

23           MR. STEFAN:  Objection; asked and answered and

24   leading.

25           THE COURT:  Well, that is -- just, yeah.  If you want
```

BOYER - REDIRECT / HIGHSMITH

1   to ask him what he relied on, go ahead.

2   **BY MR. HIGHSMITH**

3   **Q.**   What did you rely on?

4   **A.**   Information that was provided on the AML Bitcoin website,

5   information from Mr. Japheth Dillman, the Telegram channel,

6   press releases.  Those sorts of things.

7           **MR. HIGHSMITH:**  Let's publish exhibit 741 last time,

8   please.  That's not exhibit 740.  740, please.  Take that one

9   down, please.  Please go to page 2.

10      Thank you very much.

11  **BY MR. HIGHSMITH**

12  **Q.**   Counsel asked you follow-up questions about this e-mail

13  communication from AML Bitcoin, correct?

14  **A.**   Correct.

15  **Q.**   I believe counsel asked you to clarify was this a

16  communication from Marcus Andrade.  Do you recall that?

17  **A.**   I do.

18  **Q.**   And I believe there was some insinuation that this -- your

19  information did not come from Mr. Andrade.

20          **MR. STEFAN:**  Objection; argumentative and leading.

21          **THE COURT:**  Yeah.  Why don't you just don't

22  characterize what it was, just ask him whatever question it is

23  you want to ask him.

24  **BY MR. HIGHSMITH**

25  **Q.**   Is Mr. Andrade the founder and CEO of AML Bitcoin?

1    A.    He is.

2    Q.    Therefore, is it your understanding that he is responsible

3    for these announcements that come out?

4    A.    As founder and CEO, you're responsible for anything the

5    company does.

6              MR. HIGHSMITH:  No further questions.

7              MR. STEFAN:  Can we return to exhibit 740?  The top

8    e-mail on the page.  Zoom in.

9                        **RECROSS-EXAMINATION**

10   BY MR. STEFAN

11   Q.    Mr. Boyer, when Dillman told you that Marcus told him that

12   they sold out the ICO, you only have Dillman's representation

13   to go on with respect to whether Marcus told him that or not?

14   A.    I also had the Telegram post, but I don't know the time.

15   So it might have been after this.  I don't recollect.

16        But, yes, I don't know what Marcus told Japheth, which

17   then Japheth told me.

18   Q.    You were relying here strictly on Japheth's

19   representations of what Marcus was telling him?

20   A.    On this e-mail that's all I can speak to.  But as I said,

21   there was a Telegram channel that said they sold 76 million.

22   Q.    Understood.

23        But with respect to this e-mail, as you just indicated --

24   A.    Yes.

25   Q.    -- and with respect to every other communication that

1   Dillman had to you saying, Marcus told me this or Marcus told

2   me that, those were communications that you got strictly from

3   Dillman?

4   **A.**   Anything that he said Marcus said, yes, had to come from

5   Dillman.

6           **MR. STEFAN:**  Okay.   Thank you.

7           **THE WITNESS:**  Yes.

8           **THE COURT:**  You may step down.

9           **THE WITNESS:**  Thanks.

10          **MR. HIGHSMITH:**   The United States calls Dr. Rene

11  Acuna, Your Honor.

12          **THE COURT:**  Please come forward to the witness stand

13  to be sworn.

14          **THE COURTROOM DEPUTY:**  Please raise your right hand.

15                          <u>**RENE ACUNA**</u>,

16  called as a witness for the Government, having been duly sworn,

17  testified as follows:

18          **THE COURTROOM DEPUTY:**  Please be seated.   Can you

19  state your name and spell your last name, please?

20          **THE WITNESS:**  Sure.   Rene Acuna.   Last name is

21  A-c-u-n-a.

22                      <u>**DIRECT EXAMINATION**</u>

23  BY MR. HIGHSMITH

24  **Q.**   Dr. Acuna, what do you do for a living?

25  **A.**   I'm a family practice physician.

1  **Q.**  How long have you been a family practice physician?

2  **A.**  Forty years.

3  **Q.**  Where are you from?

4  **A.**  My residence is in Portland, Texas.  I practice in Sinton,

5  Texas, which is close to Corpus Christi, Texas.

6  **Q.**  Have you ever heard of ATEN "Black Gold" Coin?

7  **A.**  Yes, sir.

8  **Q.**  Who did you hear about it from first?

9  **A.**  From Mr. Brian Darrow.

10  **Q.**  Via phone call?

11  **A.**  Yes.

12  **Q.**  Was it a cold call?

13  **A.**  I'm not sure what you mean by "cold".

14  **Q.**  Did he reach out out of the blue to you?

15  **A.**  I had been involved in a previous investment that he was

16  involved in and he mentioned the ATEN "Black Gold" Coin to me

17  after that.

18  **Q.**  How did that previous investment turn out?

19  **A.**  Not very well.

20  **Q.**  What did you learn about ATEN Coin from Mr. Darrow?

21  **A.**  Well, it was presented as a new Bitcoin that was coming

22  out that had more security involved, that would allow tracking

23  of transactions, which included people that sent money to

24  somebody, and at the other end, people who received it, with

25  the new technology they would be able to track those

ACUNA - DIRECT / HIGHSMITH

1    transactions.

2    **Q.**    Did you eventually buy some of that ATEN Coin?

3    **A.**    Yes, I did.

4    **Q.**    Did you ever see those specialized tracking features built

5    into the coin?

6    **A.**    No, sir.

7    **Q.**    Did you learn about ATEN Coin's connection to the oil

8    industry from Mr. Darrow?

9    **A.**    Yes.

10    **Q.**    What did you learn?

11    **A.**    That there was a particular oil company in north Texas

12    that was willing to take payment in the "Black Gold" Coin for

13    selling their product.

14    **Q.**    To your knowledge did that ever happen?

15    **A.**    Not to my knowledge, no.

16    **Q.**    Any use of ATEN Coin by oil companies?

17    **A.**    Not to my knowledge.

18    **Q.**    All right.  So you ended up buying some ATEN Coin; is that

19    right?

20    **A.**    Yes, sir.

21    **Q.**    Did you have multiple conversations with Mr. Darrow?

22    **A.**    Yes.

23    **Q.**    Did you do any independent research?

24    **A.**    Only what was presented on their website.

25    **Q.**    On whose website?

1  **A.**    On NAC, which was, my understanding was the NAC Foundation

2  was the one that was developing the coin.

3  **Q.**    Based on your review of the website, seemed like a

4  legitimate product; is that correct?

5  **A.**    Yes.

6  **Q.**    Take a look, please, at exhibit 236.

7          **MR. HIGHSMITH:**  Witness, parties and the Court only.

8  If you could just enlarge the top half, please.

9  **BY MR. HIGHSMITH**

10  **Q.**    Is this an e-mail to you on July 23rd, 2014?

11  **A.**    Yes, it was.

12  **Q.**    And is it from ATEN Coin?

13  **A.**    Yes, it is.

14  **Q.**    Is this a fair and accurate depiction of your e-mail?

15  **A.**    Yes.

16          **MR. HIGHSMITH:**  Move to admit 236.

17          **MR. STEFAN:**  No objection.

18          **THE COURT:**  236 will be admitted.

19      (Trial Exhibit 236 received in evidence.)

20          **MR. HIGHSMITH:**  Thank you.

21      Please publish this screen to the jury.

22  **BY MR. HIGHSMITH**

23  **Q.**    All right.  So did you purchase some ATEN Coin in

24  July 2014?

25  **A.**    Yes, sir.

**ACUNA - DIRECT / HIGHSMITH**

1  **Q.**   And did you receive instructions to download a ATEN Coin
2  Wallet?
3  **A.**   I did.
4  **Q.**   And did you do that?
5  **A.**   Yes.
6  **Q.**   Did you have to provide any identification to download the
7  wallet or receive the coins?
8  **A.**   Yes, some generalized information, including a driver's
9  license.
10 **Q.**   Based on your review of the ATEN Coin website, your
11 conversations with Mr. Darrow, what was your understanding
12 about whether the ATEN Coin technology was finalized?
13 **A.**   I was under the understanding that it was in the process
14 of being finalized.  There was no specific date that was given,
15 but there was indication that it would be soon.
16 **Q.**   To the west of your knowledge, were those security
17 features ever put in place and finalized?
18 **A.**   Not to my knowledge.
19 **Q.**   Did you buy additional ATEN Coins after additional calls
20 from Mr. Darrow?
21 **A.**   Yes, sir, I did.
22 **Q.**   Just, did he call you repeatedly?
23 **A.**   There were probably four other instances where I purchased
24 coins, yes, sir.
25 **Q.**   And those were after Mr. Darrow's phone calls?

1    **A.**    Correct.

2    **Q.**    Would he make representations about the price?  Like,

3    would the price either go down or go up after each call?

4    **A.**    With each call there was an incentive that you would get

5    more coins for a similar price that you had paid previously for

6    the original coins.

7              **MR. HIGHSMITH:**  Could we please show Mr. Acuna, the

8    Court and the parties exhibit 231.

9    **BY MR. HIGHSMITH**

10   **Q.**    Are you looking at this purchase agreement in front of

11   you?

12   **A.**    Yes, sir.

13   **Q.**    And do you see at the top it's between you and NAC

14   Foundation?

15   **A.**    Yes, sir.

16   **Q.**    Have you seen this document before?

17   **A.**    Yes, sir.

18   **Q.**    Is this a fair and accurate depiction of your purchase

19   agreement?

20   **A.**    It is.

21             **MR. HIGHSMITH:**  Move to admit, Your Honor.

22             **MR. STEFAN:**  No objection.

23             **THE COURT:**  Exhibit 231 will be admitted.

24             **MR. HIGHSMITH:**  Thank you, Your Honor.

25        (Trial Exhibit 231 received in evidence.)

1    **MR. HIGHSMITH:**  Can we just enlarge the top that shows

2    the date it was purchased?

3    **BY MR. HIGHSMITH**

4    **Q.**   Is this the date when all of your purchases were

5    memorialized?

6    **A.**   Yes, it is.

7    **Q.**   That's August 20th, 2015, correct?

8    **A.**   Correct.

9    **MR. HIGHSMITH:**  Please display page 2, and

10   specifically paragraph 2.

11   **BY MR. HIGHSMITH**

12   **Q.**   So in total, did you buy 525,000 ATEN "Black Gold" Coins

13   for $156 -- $156,250?

14   **A.**   Yes, sir.

15   **Q.**   Was that all of your ATEN Coin purchases in 2014 and 2015?

16   **A.**   It is.

17   **Q.**   Did you plan to earn a return on this investment?

18   **A.**   Yes.  I was hoping to, yes, sir.

19   **Q.**   And how were you planning to earn a return on it?

20   **A.**   Well, during the conversation, it was noted that the coin,

21   when it went up on the market, would initially be sold for a

22   dollar per coin.

23   **Q.**   And is another way of saying market saying it would go up

24   on an exchange?

25   **A.**   That's correct, yes, sir.

1      **MR. HIGHSMITH:**  Can you please go to page 6 of this

2    document, and just the top.  If we could just look at the top

3    third, please.

4    **BY MR. HIGHSMITH**

5    **Q.**   To the best of your knowledge, was this purchase of coins

6    an agreement between you and Marcus Andrade, the founder of the

7    NAC Foundation?

8    **A.**   Yes, it is.

9      **MR. HIGHSMITH:**  We can take that down.

10   **BY MR. HIGHSMITH**

11   **Q.**   You testified a moment ago that you anticipated this would

12   be traded on an exchange opening for a dollar.  Who did you

13   hear that from?

14   **A.**   From Brian Darrow.

15   **Q.**   What did you think ATEN Coin needed to do before it was

16   listed on an exchange?

17   **A.**   I realized that they had to not only finish whatever

18   security -- security parts of the Bitcoin to be finished, but

19   also to comply with all the regulations --

20     **MR. STEFAN:**  Objection.

21     **THE WITNESS:**  -- that were needed to put it on the

22   exchange.

23     **THE COURT:**  What's the objection?

24     **MR. STEFAN:**  Foundation.

25     **THE COURT:**  The objection is what?  Foundation.

1        Mr. Highsmith?

2    **BY MR. HIGHSMITH**

3    **Q.**    Yeah.   The question was:   Where did you get that

4    understanding from?

5    **A.**    From Mr. Darrow.

6    **Q.**    Did you also get it from the website?

7    **A.**    Yes, sir.

8    **Q.**    What was your understanding, based on your review of the

9    website and your conversations with Mr. Darrow, about what the

10   ATEN Coin needed to do in order to get listed on an exchange?

11   **A.**    It needed to finish the programming or whatever was

12   necessary to comply with the built-in securities that were

13   needed in trading the coin.

14   **Q.**    Mr. Darrow called you several times, and you invested with

15   him in ATEN Coin several times, correct?

16   **A.**    Correct.

17   **Q.**    Did you ever say "no" to Mr. Darrow?

18   **A.**    At the very end I did, yes, sir.

19   **Q.**    And was that in approximately 2015?

20   **A.**    Correct.

21   **Q.**    Up to that point had you spoken with Marcus Andrade?

22   **A.**    It was soon, right after my last conversation with Brian

23   Darrow that I spoke with Mr. Andrade.

24   **Q.**    So soon after you said "no" to Mr. Darrow that you were

25   not going to invest any more money, you got a call from

1    Mr. Andrade?

2    **A.**    I did.

3    **Q.**    What did Mr. Andrade say during that call?

4    **A.**    He was also asking to see if I'd be interested in

5    investing more money, and I told him I put in the maximum that

6    I was going to put in.  He asked me how much I had invested,

7    and I explained to him I invested $156,000.  And then he

8    indicated that there was going to be a big meeting where some

9    high-profile people from other countries that were involved in

10   currency in those countries were going to be at, and he wanted

11   to know if I was interested in going.

12   **Q.**    And, sir, did Mr. Andrade indicate where that conference

13   would be held?

14   **A.**    It was going to be held in Poland.

15   **Q.**    Did he -- did he say anything about what you could tell

16   the conference attendees if you went to the conference?

17   **A.**    Well, I told him how much-that I had invested.

18          **MR. STEFAN:**  Objection; leading.

19          **THE WITNESS:**  He indicated, well, why don't you go to

20   the meeting, and you can tell him that you bankrolled the whole

21   project, which I thought was kinda strange.

22   **BY MR. HIGHSMITH**

23   **Q.**    So to be clear, he represented to you, why don't you go to

24   Poland to the conference and tell the attendees you bankrolled

25   the entire project?

ACUNA - DIRECT / HIGHSMITH

1  **A.**   Correct.

2  **Q.**   And your impression was that that was kind of weird?

3  **A.**   Yes, sir.

4  **Q.**   Why?

5  **A.**   Well, I think with a project of this magnitude, $150,000

6  is nothing.

7  **Q.**   What do you mean?

8  **A.**   That it's probably a minimum amount that is needed to

9  complete the project.

10  **Q.**   So what was your impression of the project after he told

11  you that?

12  **A.**   I was a little sceptical, sceptical.

13  **Q.**   Were you concerned that the project might be in trouble if

14  you had financed the whole thing?

15  **A.**   Yes, sir.

16  **Q.**   Did you hear at some point about regulatory authorities in

17  Texas investigating ATEN "Black Gold" Coin?

18  **A.**   Yes, sir.

19  **Q.**   Who'd you hear about that from?

20  **A.**   I -- I heard it through -- I believe that it was on their

21  website, and then there was another part of the website when I

22  kept checking, that they indicated that they had hired somebody

23  to take care of the problem.

24  **Q.**   And when you say "they," do you mean the NAC Foundation?

25  **A.**   Yes, sir.

1  Q.   After you learned about that involvement, were there any

2  changes?  Was there any -- to the product?  Specifically was

3  there any references to the "Black Gold" or the oil after you

4  learned about that?

5  A.   Not that I was made aware of, no, sir.

6  Q.   So was the ATEN Coin, did it cease to exist after this

7  regulatory interaction?

8  A.   Well, the ATEN Black Coin was eventually switched into the

9  AML Bitcoin.  I had a conversation with Mr. Darrow and he

10  indicated that the name change was going to be made to get more

11  of a name -- the name of the coin out there so it would be

12  available to more people.

13  Q.   All right.  Did you have any conversations with

14  Mr. Andrade about the price of the coin?

15  A.   I believe when I had the one conversation with him the

16  dollar amount was also brought up as being the initial offering

17  that was going to take place.

18  Q.   What was the dollar amount he mentioned?

19  A.   One dollar per coin.

20  Q.   And you had bought in at how much per coin?

21  A.   It varied.  It went from initially I think 75 cents per

22  coin down to 25 cents per coin at the very end.

23  Q.   So when you heard a dollar per coin from Mr. Andrade, what

24  was your reaction?

25  A.   Well, that would be a good return on investment.

1    Q.    Did Mr. Andrade represent to you that ATEN Coin would be

2    listed on an exchange?

3    A.    Yes, sir, eventually.

4    Q.    You testified just a few moments ago that ATEN Coin was

5    converted to AML Bitcoin; is that right?

6    A.    Yes, sir.

7    Q.    Walk us through the change from your perspective, please.

8    A.    Well, it was -- it was presented to me again that it was

9    for name recognition, and they --

10         **MR. STEFAN:**  Objection; foundation.

11         **THE WITNESS:**  And they --

12         **THE COURT:**  Overruled.

13         **THE WITNESS:**  And they sent a notice to me and I'm

14   assuming everybody else that we would be able to download the

15   token into a new wallet where it would store the AML Bitcoin.

16   **BY MR. HIGHSMITH**

17   Q.    What was your understanding of -- did you have a choice in

18   the matter?  Could you have said, no, I don't want to convert

19   it over?

20   A.    No, I -- it was something that was going to be done,

21   whether you liked it or not.

22   Q.    To your knowledge, did ATEN Coin trade after that?

23   A.    Not to my knowledge, no, sir.

24   Q.    So to your knowledge, was your impression -- what was your

25   impression about what would happen with your ATEN Coin if you

1  didn't download the new AML wallet?

2  **A.**   You would lose everything.

3  **Q.**   So did you download the new wallet?

4  **A.**   Yes, sir.

5  **Q.**   You had 525,000 ATEN Coins.  How many -- did you get the

6  AML Bitcoin?

7  **A.**   Yes, it was a one-to-one exchange.

8  **Q.**   When you downloaded the wallet did you provide a driver's

9  license, a passport or any other additional personal

10 identifying information?

11 **A.**   No, sir.

12 **Q.**   You testified previously that you researched and reviewed

13 the ATEN Coin website.  Did you review the AML Bitcoin website?

14 **A.**   I did look at the website after the conversion.  I did not

15 see any really significant change in the content.

16 **Q.**   At that point when you downloaded the AML Bitcoin wallet

17 and converted the tokens, what was your understanding about

18 whether the technology was complete?

19 **A.**   That it was pretty much near completion and ready to be

20 traded.

21        **MR. HIGHSMITH:**  I think 1441 has already been admitted

22 into evidence.  Could we please display 1441.

23 **BY MR. HIGHSMITH**

24 **Q.**   When you reviewed the new AML Bitcoin website, do you

25 recall seeing references to deals with the Port of San

1  Francisco?

2  **A.**    Yes, sir.

3  **Q.**    What was your impression about AML Bitcoin based on seeing

4  these publications referencing deals?

5  **A.**    Well, to me that sort of legitified (sic) the coin, that

6  it was going to be used in transactions.

7  **Q.**    To your knowledge was it ever used in business

8  transactions?

9  **A.**    Not to my knowledge, no, sir.

10  **Q.**    If this information about the Port of San Francisco was

11  put out there by somebody paid by AML Bitcoin, would that have

12  influenced your decision to invest?  Would that have impacted

13  your decision to invest in the project?

14  **A.**    It would have, yes, sir.

15  **Q.**    Why is that?

16  **A.**    Well, if -- again, if somebody was going to be using the

17  Bitcoin for transactions, in my mind I saw everything had been

18  completed, and, again, it was going to be ready to be listed on

19  the market or the exchange.

20  **Q.**    Did you hear from Mr. Darrow or Mr. Andrade or anyone else

21  anything about a Super Bowl ad?

22  **A.**    Yes, sir.

23  **Q.**    Who did you hear it from?

24  **A.**    From Brian Darrow.

25  **Q.**    And what did you hear?

1  **A.**   I can't remember what year it was, but a month or two

2  before the Super Bowl, he called and indicated that there was

3  going to be an ad for the Bitcoin and to make sure to watch the

4  halftime show so we could see the ad.

5  **Q.**   What was your reaction at that time when you heard there

6  would be a ad?

7  **A.**   Well, again, to me it sounded like the coin was, again,

8  ready to be put on an exchange and start to be marketed.

9  **Q.**   If that was misleading and they were not actually gonna

10  put an ad on the Super Bowl, would that have influenced your

11  decision to invest?

12  **A.**   It would have.

13  **Q.**   Why?

14  **A.**   Well, if they were saying that it was going to be and

15  there wasn't, then some suspicion would have come in.

16  **Q.**   So you had 525,000 coins, correct?

17  **A.**   Yes, sir.

18  **Q.**   Were you hoping that your coins would trade on an

19  exchange?

20  **A.**   Yes, sir.

21  **Q.**   And did you visit exchanges to see if they could trade?

22  **A.**   I did.

23  **Q.**   What did you see?

24  **A.**   It was listed on a couple exchanges, and it was listed for

25  a dollar at a time, but there was very little activity on

1  the -- in the coin.

2  **Q.**  So did you try to sell your coin on the exchange?

3  **A.**  No, I didn't.

4  **Q.**  Why not?

5  **A.**  Again, because there was no activity.  And I had 525,000

6  coins.  Activity was ranging from a hundred to maybe a thousand

7  coins at a time, and for me to sell a thousand out of 525,000

8  coins was -- you know, I didn't see any sense in doing that.

9  **Q.**  After seeing what was happening on the exchanges, did you

10  think anybody would buy your coin if you sold it?

11  **A.**  No, and that's why I didn't try to sell it.

12  **Q.**  Are you familiar with the term "market manipulation"?

13  **A.**  Yes, sir.

14  **Q.**  You are.

15      What's your understanding of what market manipulation is?

16  **A.**  Well, there may be an individual or an entity that is

17  doing some buying and selling to affect the price of a certain

18  commodity.

19  **Q.**  If you had known that someone affiliated with AML Bitcoin

20  was buying and selling coins -- basically selling coins to

21  himself in an effort to raise the volume and the price, would

22  that have impacted your decision to invest?

23  **A.**  Yes, sir.

24      **MR. STEFAN:**  Objection, assumes facts not in evidence.

25      **THE COURT:**  Overruled.

 1          **THE WITNESS:**  Yes, sir.

 2     **BY MR. HIGHSMITH**

 3     **Q.**   Why?

 4     **A.**   Well, because -- and, in fact, I saw it, where I would

 5     check the coin in the morning and it would be a dollar.  I'd

 6     check it at noon and it would be seven dollars with very little

 7     activity, maybe 200 coins.  And then later at the end of the

 8     day it would be back to a dollar.

 9     **Q.**   You invested more than $156,000; is that right?

10     **A.**   That's correct.

11     **Q.**   Did you get any of that money back?

12     **A.**   No, sir.

13          **THE COURT:**  Mr. Stefan.

14                    **CROSS-EXAMINATION**

15     **BY MR. STEFAN**

16     **Q.**   Good morning, Dr. Acuna.

17     **A.**   Good morning.

18     **Q.**   Okay.  I shouldn't take too long.

19     **A.**   Okay.

20     **Q.**   Just to be clear, at the time that you bought the coin you

21     understood that -- the ATEN Coin -- you understood that the

22     coin was still under development?

23     **A.**   Yes, sir.

24     **Q.**   And it hadn't been finalized yet?

25     **A.**   That's correct.

1    **Q.**   And at the time you bought the coin, you did send in an

2    I.D. scan so that you could get your wallet?

3    **A.**   Correct.

4    **Q.**   And the purchase agreement, I want to return to government

5    exhibit 231, please.

6          **MR. STEFAN:**  Go ahead and zoom in on the four

7    paragraphs at the bottom of this page.

8       Apologize.  The four paragraphs, four paragraphs at the

9    bottom of the page, beginning with "whereas, ATEN "Black Gold"

10   Coin does not have any underlying collateral."  There we go.

11   **BY MR. STEFAN**

12   **Q.**   Okay.  Dr. Acuna, can you see the language on that page

13   saying, Whereas, ATEN "Black Gold" Coin does not have any

14   underlying collateral?

15   **A.**   Yes, sir.

16   **Q.**   Would you understand this or is it fair to say that this

17   indicates that there is nothing backing the ATEN "Black Gold"

18   Coin?

19   **A.**   Yes, sir.

20   **Q.**   So no oil is backing it?

21   **A.**   At -- well, yes, sir.

22   **Q.**   With respect to the following paragraph:  Whereas NAC only

23   guarantees that it will create a digital currency that is AML

24   compliant, that language would reflect your own understanding

25   that the coin was still under development at the time that you

 1   signed this purchase agreement?

 2   **A.**   That's correct.

 3         **MR. STEFAN:**  Can we turn to the next page and zoom in

 4   on paragraphs 11 and 12.

 5   **BY MR. STEFAN**

 6   **Q.**   Mr. Acuna, do you recall having interactions with NAC

 7   staff regarding the establishment of your wallet?

 8   **A.**   I do.

 9   **Q.**   Specifically when you look at the language of this

10   paragraph about how the NAC representative will contact you to

11   schedule a time and date for wallet installation, was a similar

12   procedure followed in your individual case?

13   **A.**   Yes.

14   **Q.**   And in the course of that appointment that you had to

15   establish your wallet, did you provide I.D. verification?

16   **A.**   Yes, I did.

17   **Q.**   How did you do that?

18   **A.**   Through a photo that was sent to them over the computer.

19   **Q.**   Okay.  Did you ever --

20         **MR. STEFAN:**  And you can back out of this portion of

21   the exhibit.

22   **BY MR. STEFAN**

23   **Q.**   Did you ever go through an I.D. verification process

24   strictly on your computer itself?

25   **A.**   Yes, I did.

**ACUNA - CROSS / STEFAN**

1  Q.  Without interaction with some, you know, human employee?

2  A.  Well, there was a human employee at the other end, I'm

3  assuming, but it was all done through the computer.

4  Q.  Okay.  Specifically, I'm referring to the establishment of

5  a wallet by using an online application where you would show

6  your I.D. and show your face.

7  A.  No, sir.

8  Q.  Okay.  So you didn't go through that particular process?

9  A.  No, I didn't.

10  Q.  Your I.D. verification was all performed with I guess

11  physical means, like with another human on the other end?

12  A.  Correct.

13  Q.  Okay.  And you were able to successfully establish a

14  wallet?

15  A.  Yes, sir.

16  Q.  And ATEN Coins were deposited into the wallet?

17  A.  There was a test run where they sent one coin to the

18  wallet, and once I verified that it was received and the

19  balance that was due was sent to the wallet, yes, sir.

20  Q.  And you got the entire balance of the coins you purchased

21  into the wallet?

22  A.  For the amount that was purchased at that time, yes.

23  Q.  Mr. Highsmith talked to you about some of the media that

24  was created around the AML Bitcoin ICO.  Do you recall that?

25  A.  Yes.

1  Q.   Just to be clear, at the time that you purchased your ATEN

2  Coins in 2014 and 2015 --

3  A.   Right.

4  Q.   -- that media hadn't been published yet?

5  A.   That's correct.

6  Q.   This was all subsequent to your actual purchase of the

7  coins?

8  A.   Yes, sir.

9  Q.   You didn't buy any coins during the AML Bitcoin ICO

10  period?

11  A.   No, I did not.

12        MR. STEFAN:  May I have one moment, Your Honor?

13        THE COURT:  Yes.

14        MR. STEFAN:  Can we display exhibit 1441, and scroll

15  down, and down one more, and then highlight the paragraph that

16  begins "that may all change, and soon."

17  BY MR. STEFAN

18  Q.   And --

19        MR. STEFAN:  Yeah, can you back out of this paragraph

20  and highlight the following paragraph?

21  BY MR. STEFAN

22  Q.   Dr. Acuna, I believe you had understood this article to

23  represent that some deal had been struck with the Port of San

24  Francisco; is that right?

25  A.   Not necessarily a deal had been done, but it was in the

1    process of possibly being done.

2    Q.    Specifically if you see the second line in that paragraph,

3    he and port officials are currently in discussions, you would

4    understand this article to represent that there was discussion

5    of the possibility of some sort of project with --

6    A.    Correct.

7    Q.    There was discussion regarding the possibility of a

8    project between AML Bitcoin and the port?

9    A.    That is correct, yes, sir.

10        MR. STEFAN:    I have nothing further for you,

11    Dr. Acuna.    Thank you.

12                    **REDIRECT EXAMINATION**

13    BY MR. HIGHSMITH

14    Q.    Very briefly, Dr. Acuna.    Can we please put up -- I want

15    to talk about the timing of your purchase, because counsel

16    asked you some questions about the contract that you signed in

17    2015.    Do you remember that?

18    A.    Yes, sir.

19        MR. HIGHSMITH:    So can we please display for everybody

20    previously admitted 236.

21    BY MR. HIGHSMITH

22    Q.    All right.    So here you get an e-mail from ATEN Coin,

23    correct?

24    A.    Correct.

25    Q.    It copies someone named Bob Parsons.    Do you see that?

1    **A.**    Yes.

2    **Q.**    Do you know who that is?

3    **A.**    I do not.

4    **Q.**    And then it's July 23rd, 2014.  Do you see that?

5    **A.**    Yes.

6    **Q.**    So this is the time that you made your first purchase of

7    ATEN Coin, correct?

8    **A.**    That is correct, yes, sir.

9    **Q.**    And then I believe you previously testified you made

10    subsequent purchases periodically after getting calls from

11    Mr. Darrow; is that right?

12    **A.**    Yes, sir.

13    **Q.**    And then after you had made all of those purchases, then

14    you signed the purchase agreement on August 20th, 2015; is that

15    right?

16    **A.**    That is correct, yes, sir.

17    **Q.**    So when you invested and you looked at the ATEN Coin

18    website, this was before you had seen this contract, correct?

19    **A.**    That's correct.

20         **MR. STEFAN:**  Objection; leading.

21         **THE COURT:**  Overruled.

22    **BY MR. HIGHSMITH**

23    **Q.**    And so when you went to the ATEN Coin website, did you

24    learn about purported deals with oil companies at the website?

25    **A.**    Yes, I did.

ACUNA - RECROSS / STEFAN

1   Q.   And did any of those deals come to fruition?

2   A.   Not to my knowledge.

3   Q.   If you had known that the purported oil contracts or deals

4   were not real, would you have invested?

5   A.   No, sir.

6   Q.   If you -- moving ahead to the AML Bitcoin section.  If you

7   had known that the AML Bitcoin special security features didn't

8   exist, would that have impacted how you thought about the

9   rollover from ATEN Coin to AML Bitcoin?

10  A.   It would have, yes, sir.

11  Q.   And if you had known that the purported deals with

12  entities like the Port of San Francisco were not real, would

13  that have impacted your decision to invest?

14  A.   Yes, sir.

15          MR. HIGHSMITH:  No further questions.

16          THE COURT:  Do you have anything further?

17          MR. STEFAN:  May I, Your Honor?

18          THE COURT:  Yes, go ahead.

19                    RECROSS-EXAMINATION

20  BY MR. STEFAN

21  Q.   To be clear, the Port of San Francisco articles did not

22  have any impact on your decision to invest, because that

23  decision had already been made?

24  A.   For the initial coins, yes, sir.  But for any purchases

25  afterwards, it would have.

ACUNA - RECROSS / STEFAN

1  Q.   The Port of San Francisco articles were at a timeframe

2  later than the time of the purchase of your coins, all of your

3  ATEN Coins?

4  A.   All of them.

5  Q.   All of them.

6       So it had no impact on your purchase of your ATEN Coins?

7  A.   That would be correct.

8  Q.   Along with the Super Bowl ad, correct?

9  A.   Correct.

10  Q.   And along with any other media that was put out around the

11  time of the AML Bitcoin ICO, right?

12  A.   Correct.

13  Q.   Because you didn't buy in the AML Bitcoin ICO?

14  A.   That's correct.

15          MR. STEFAN:  Thank you, sir.

16          THE COURT:  You may step down.

17          MR. HIGHSMITH:  The United States calls Scott Bruffey.

18          THE COURT:  If you could come to the witness stand and

19  be sworn.

20          THE COURTROOM DEPUTY:  Please raise your right hand.

21                      __Scott Bruffey__,

22  called as a witness for the Government, having been duly sworn,

23  testified as follows:

24          THE COURTROOM DEPUTY:  Please be seated and state your

25  name and spell your last name for the record.

BRUFFEY - DIRECT / HIGHSMITH

1          **THE WITNESS:**  Scott Bruffey, B-r-u-f-f-e-y.

2                      **DIRECT EXAMINATION**

3     BY MR. HIGHSMITH

4     **Q.**   Mr. Bruffey, where are you from?

5     **A.**   Gaithersburg, Maryland.

6     **Q.**   Mr. Bruffey, what do you do for a living?

7     **A.**   I am a, right now, tobacconist and also freelance video

8     tech.

9     **Q.**   Are you familiar with cryptocurrency?

10    **A.**   Yes.

11    **Q.**   What is cryptocurrency to you?

12    **A.**   Cryptocurrency is any decentralized digital currency or

13    asset that is traded through peer-to-peer transactions and

14    protected by cryptography.  Encryption, excuse me.

15    **Q.**   Let me try to understand a couple of those terms.

16          What's encryption?

17    **A.**   Encryption is when something is secured with a password so

18    it's not so readily accessible.

19    **Q.**   Is this conducted using computers and wallets on

20    computers?

21    **A.**   Traditionally, yes.

22    **Q.**   Are you familiar with a cryptocurrency called AML Bitcoin?

23    **A.**   Yes.

24    **Q.**   How did you first become familiar with it?

25    **A.**   A customer came into our store and brought me a newspaper

1    article about the AML coin because he knew that I was heavily

2    into trading cryptocurrency.  So I looked it up and learned

3    about it from there.

4    **Q.**   Do you remember the publication of the article?

5    **A.**   I believe it was the Washington Times.

6           **MR. HIGHSMITH:**  Could we please display for the Court,

7    the witness and the parties exhibit 852.

8    **BY MR. HIGHSMITH**

9    **Q.**   Do you see the article in front of you titled AML Bitcoin

10   Strides Onto The World Stage, Upgraded Cryptography Can Defeat

11   Sanctions Evasion?

12   **A.**   Yes.

13   **Q.**   Do you see it's written by Peter Ferrara, published on

14   Tuesday, October 3rd, 2017?

15   **A.**   Yes.

16   **Q.**   You see at the very top it's the Washington Times?

17   **A.**   Yes.

18          **MR. HIGHSMITH:**  Let's scroll through to the subsequent

19   pages quickly, please, page 2, 3.

20   **BY MR. HIGHSMITH**

21   **Q.**   Is this the article you read when your customer came into

22   your store and brought you an article?

23   **A.**   Yes, that looks familiar.

24   **Q.**   Is this a fair and accurate depiction of the article you

25   read?

1    **A.**    Yes.

2          **MR. HIGHSMITH:**  Move to admit, Your Honor.

3          **MS. DENT:**  No objection, Your Honor.

4          **THE COURT:**  Very well.  852 will be admitted.

5          (Trial Exhibit 852 received in evidence.)

6          **MR. HIGHSMITH:**  Thank you.

7          Let's publish that to the jury, please.

8    **BY MR. HIGHSMITH**

9    **Q.**    All right.  So this is the title, AML Bitcoin Strides Onto

10   The World Stage, written by Peter Ferrara on October 2017.  So

11   is that about when you were first introduced to AML Bitcoin?

12   **A.**    That's correct, yes.

13   **Q.**    Let's go to the second page and focus on the fourth

14   paragraph, please.

15          So this paragraph reads, or it starts:  That is why AML

16   Bitcoin has already made inroads in so many places where old

17   Bitcoin would never be welcome.  Such as the Port of San

18   Francisco, which has already been in discussions with AML

19   Bitcoin officials to enable their use -- to enable use of their

20   new digital currency in the seaport's payment structures.

21          Back when you read this article, what was your reaction to

22   that?

23   **A.**    That this was a very positive development that was

24   hopefully going to help bring cryptocurrency into a more

25   legitimate arena.  Up unto that point it was still wild west.

1    Regulatory, stipulations weren't around.  There was a lot of

2    barricades in keeping cryptocurrency from being accepted into

3    the mainstream.  So if this, in fact, was occurring, this was

4    the game changer.  Anybody who was going to be a part of this

5    was going to be a part of the next wave of development in

6    evolution of cryptocurrency.

7    **Q.**   Did this cause you to be interested and excited about

8    investing in AML Bitcoin?

9    **A.**   Oh, absolutely.

10   **Q.**   Focusing on the next sentence it reads:  That would

11   include payment of seaport passage and docking fees and payment

12   to other institutions and enterprises buying and selling

13   through the seaport.

14       What was your reaction to that when you first read it?

15   **A.**   That not only was it being considered seriously, but that

16   they had already found applications and uses for it that would

17   continue the momentum and tide of acceptability for

18   cryptocurrency in general.

19   **Q.**   Let's focus now on the last paragraph on this page.

20       The last paragraph starts:  The new regulatory-compliant

21   AML Bitcoin is now poised to spread, as well, to other major

22   seaports up and down the west coast from San Diego to Los

23   Angeles-Long Beach, to Oakland, to Seattle.

24       What was your reaction to that at the time?

25   **A.**   You know, just a continuation of optimism.  That this was

**BRUFFEY - DIRECT / HIGHSMITH**

1   very encouraging.  This was implying or actually just stating

2   that the relationships had already started to become

3   established and that this was the beginning of the final

4   acceptability for cryptocurrency.

5   **Q.**   The next sentence starts:  Indeed, the breakthrough is

6   going international.  As AML Bitcoin officials have already

7   been in Panama discussing payments with their digital currency

8   regarding the international trade traversing the Panama Canal.

9         What was your reaction to that statement back in 2017?

10  **A.**   The same thing, continuation of positive momentum.

11  **Q.**   Did this article influence your decision to invest?

12  **A.**   Absolutely.

13  **Q.**   Why?

14  **A.**   Because as I stated, it pretty much laid the framework for

15  the beginning of acceptance for cryptocurrency into traditional

16  financial circles.

17  **Q.**   After you read this article, did you go to the AML Bitcoin

18  website?

19  **A.**   Yes, I did.

20  **Q.**   Did you conduct additional research in AML Bitcoin?

21  **A.**   Yes, I did.

22  **Q.**   What else did you -- what else did you consult when you

23  were doing your research?

24  **A.**   I followed the social media that was being put out by the

25  AML organization, Twitter feeds, Facebook feeds.  I Googled

1    around and found as many different sources and different media

2    outlets that were talking about the technology and talking

3    about the AML Bitcoin, as I could, to try to do due diligence

4    in learning about, as much about this new breakthrough as I

5    could.

6    **Q.**    And based on the articles and your research on the AML

7    Bitcoin website and the AML Bitcoin-sponsored communication

8    channels, did you decide to invest?

9    **A.**    I did.

10          **MR. HIGHSMITH:**  Let's show the witness, the Court and

11   the parties exhibit 875, please.

12   **BY MR. HIGHSMITH**

13   **Q.**    Is this an e-mail to you from NAC Foundation on

14   December 9th, 2017?

15   **A.**    Yes.

16   **Q.**    Is it a fair and accurate depiction of your e-mail?

17   **A.**    Yes, it is.

18          **MR. HIGHSMITH:**  Move to admit 875.

19          **MS. DENT:**  No objection, Your Honor.

20          **THE COURT:**  875 will be admitted.

21        (Trial Exhibit 875 received in evidence.)

22          **MR. HIGHSMITH:**  Can we please publish the top?

23   Perfect.  Thank you.

24   **BY MR. HIGHSMITH**

25   **Q.**    All right.  How much money did you invest in AML Bitcoin

1    after reading the articles and doing the research?

2    **A.**   This primarily was a hundred thousand dollars.

3    **Q.**   And in order to do that, do you recall where you wired the

4    money?

5    **A.**   It was wired to this particular foundation.  I'd have to

6    look at the invoice for the specifics.

7    **Q.**   All right.  Well, you mentioned an invoice.  Did you get

8    an invoice?

9    **A.**   Yes.

10             **MR. HIGHSMITH:**  Could we please take this down and

11   show the witness exhibit 1502, and if we could zoom it in for

12   him, please.

13   **BY MR. HIGHSMITH**

14   **Q.**   Is this the invoice you got?

15   **A.**   Yes, it is.

16   **Q.**   And this is an invoice from NAC Foundation, LLC, 7495 West

17   Azure Drive in Las Vegas?

18   **A.**   Yes.

19   **Q.**   And is this a fair and accurate depiction of the invoice

20   you got?

21   **A.**   Yes, it is.

22             **MR. HIGHSMITH:**  Move to admit.

23             **THE COURT:**  1502.

24             **MS. DENT:**  No objection, Your Honor.

25             **THE COURT:**  1502 will be admitted.

 1            (Trial Exhibit 1502 received in evidence.)

 2            MR. HIGHSMITH:  Thank you, Your Honor.

 3    BY MR. HIGHSMITH

 4    Q.   We're looking at the top.  So this invoice is for your

 5    hundred thousand dollar investment, correct?

 6    A.   Yes.

 7    Q.   Dated December 8th, 2017, shortly after you read the

 8    newspaper article, correct?

 9    A.   Yes.

10            MR. HIGHSMITH:  Can we actually blow up the second

11    half of this page starting with Comerica Bank.  Great.  Thank

12    you very much.

13    BY MR. HIGHSMITH

14    Q.   So did this invoice contain instructions for where you

15    were supposed to wire your money?

16    A.   Yes.

17    Q.   And were you supposed to wire it to the law office of Neil

18    Sunkin?

19    A.   Yes.

20    Q.   A professional corporation client trust account for NAC

21    Foundation?

22    A.   Yes.

23    Q.   And did you wire the money?

24    A.   Yes, I did.

25            MR. HIGHSMITH:  We can take that down.

1  BY MR. HIGHSMITH

2  Q.   Now, after you -- or at the same time you were considering

3  making this big purchase, were you hoping that the product

4  would be listed on an exchange?

5  A.   Absolutely.

6  Q.   Please explain why.

7  A.   Well, the benefit of any investment is to get some sort of

8  return on that investment, and that was my primary interest is

9  that this was such a game changer in the crypto sphere, that

10  anybody that was able to get in on the ground floor would be

11  able to capitalize on its growth once acceptance and adoption

12  started to occur.

13         MR. HIGHSMITH:  All right.  Okay, could we please show

14  the witness only exhibit 1504, and the Court and the parties,

15  as well.  And can we zoom in on the top half of the page, all

16  the text, please.  Thank you very much.

17  BY MR. HIGHSMITH

18  Q.   Is this an e-mail exchange you had with info@AMLBitcoin?

19  A.   Yes.

20  Q.   Spanning December 10th, 2017 to December 16th, 2017?

21  A.   Uh-huh.

22  Q.   Fair and accurate depiction of your e-mail exchange?

23  A.   Yes.

24         MR. HIGHSMITH:  Move to admit.

25         MS. DENT:  No objection.

1      **THE COURT:**  1504 will be admitted.

2          (Trial Exhibit 1504 received in evidence.)

3          **MR. HIGHSMITH:**  Thank you, Your Honor.

4      Can we publish this, please?

5   **BY MR. HIGHSMITH**

6   **Q.**   All right.  So on December 10th you write:  I'm

7   considering a large purchase, and I had a question:  Assuming I

8   decide to sell some of my coins off after the 15th, where would

9   I be able to do so?  Are there any exchanges onboard with

10  handling post-ICO sales?  And if so, which ones?

11         What were you asking there?

12  **A.**   Basically once we get past the initial coin offering,

13  which is what ICO is, what marketplaces and what exchanges are

14  currently in place to handle the -- and process the sales and

15  transactions of this coin.

16  **Q.**   And so that's what you testified about just moments ago,

17  correct?

18  **A.**   Yes.

19  **Q.**   And this is important so you can get a return on your

20  investment, right?

21  **A.**   Exactly.

22  **Q.**   And you were hoping for a return on your investment?

23  **A.**   Certainly.

24  **Q.**   Do you see there a response?

25  **A.**   Yes.

**BRUFFEY - DIRECT / HIGHSMITH**

 1   Q.   They say, six days later, thank you for your message.  You

 2   can purchase the token now at AMLtoken.com.  The token will be

 3   listed on HitBTC exchange on December 25th, 2017.  Christmas.

 4        When the AML Bitcoin becomes available, which we

 5   anticipate will take about six months, then before you can

 6   exchange your AML token to AML Bitcoins, you will have to first

 7   get your certified digital identity.

 8        Do you see that?

 9   A.   Yes.

10   Q.   Let's start with the second sentence:  The token will be

11   listed on HitBTC on Christmas?

12   A.   Uh-huh.

13   Q.   What did you understand that meant?

14   A.   I took that to mean that what I had purchased would be

15   available for trading, even though they had not yet flipped

16   them into the actual coin, that it would be available for

17   manipulation and sales.

18   Q.   All right.  So you got that on December 16th.  So that's

19   about -- it would be available nine days later; is that right?

20   A.   Yes.

21   Q.   Was it?

22   A.   I don't recall seeing it, no.

23   Q.   Were you checking the various exchanges to see if your AML

24   Bitcoin could be traded?

25   A.   Absolutely.

1    **Q.**   And to your knowledge it was not traded on HitBTC?

2    **A.**   Not that I ever found evidence of.

3    **Q.**   Okay.  At least not around that time, correct?

4    **A.**   That -- no.  Yes.

5    **Q.**   Let's turn to the next sentence.  When AML Bitcoin becomes

6    available, which we anticipate will take about six months.

7    Let's stop there.

8        When you made your purchase, did you understand you were

9    buying tokens?

10    **A.**   Yes.

11    **Q.**   And what did you -- explain, please, what you understood

12    you were buying and what would happen with what you were

13    buying.

14    **A.**   The understanding that I had from reading around the edges

15    of the articles was that the underpinning technology for the

16    crypto had been established, but that there were still some

17    pieces left to get it working with exchanges and such.

18    **Q.**   What did you understand would happen with your token in

19    the future?

20    **A.**   That there would be -- everybody would have to have their

21    own specific wallet, which is standard in all cryptocurrency,

22    and that the coins would then be -- the tokens would be

23    converted into coins when that final piece had been established

24    and getting it able to integrate with exchanges.

25    **Q.**   All right.  So your understanding was that you could trade

1  your token for a coin when all the tech was in place?

2  **A.**   Uh-huh.

3  **Q.**   To your knowledge, was all the tech ever in place in the

4  coin?

5  **A.**   I don't know.  I mean, I was assured that it was, but

6  there's a point when the sheep have to trust the shepherd.

7  **Q.**   Well, what do you mean by that?  Was -- the question is:

8  To your knowledge, was the full tech ever in place?

9  **A.**   To my knowledge, yes, based upon what was being offered

10  for sale.  If you're telling me that you're selling me a car,

11  I'm assuming you're going to give me a car.

12  **Q.**   Did you ever see it functioning in place?

13  **A.**   No.

14       **THE COURT:**  This is about the point for our break.

15       **MR. HIGHSMITH:**  Very good, Your Honor.

16       **THE COURT:**  Members of the jury, we're going to take

17  our second break.  Remember my admonition.  Do not discuss this

18  amongst yourselves or with anyone else.  We'll be back in 15

19  minutes.

20       (The jury exits the courtroom.)

21       **THE COURT:**  Okay.  We're out of the presence of the

22  jury.

23       Just so we have an understanding about how we're going to

24  proceed in the final part of this, once -- I don't know what

25  the timing is for completing this witness, but so that there is

BRUFFEY - DIRECT / HIGHSMITH

1  no further back and forth, if there is a witness the

2  government's prepared to call, you can call them, get started,

3  but the defense I will not look to to have to cross-examine.

4  That witness will have to come back tomorrow to be

5  cross-examined.

6          MR. HIGHSMITH:  Understood, Your Honor.  We'll be

7  calling Brian Darling.  We're now moving speedily.

8          THE COURT:  Okay.  And then even if they're done, you

9  don't have to cross-examine them until tomorrow.  We'll just

10  call it a day.

11          MR. SHEPARD:  I appreciate that.  Thank you, Your

12  Honor.

13          THE COURT:  Okay.  All right.

14      (A recess was taken from 12:03 p.m. to 12:17 p.m.)

15          THE COURT:  Okay.  Bring the jury out.

16      (The jury enters the courtroom.)

17          THE COURT:  The jury is present, and Mr. Highsmith,

18  you can proceed.

19          MR. HIGHSMITH:  Thank you, Your Honor.

20  BY MR. HIGHSMITH

21  Q.  All right.  Where we left off, we were discussing your

22  funding, your investment.  We looked at an e-mail exchange

23  between you and AML Bitcoin and it looks like you sent your

24  e-mail before you funded your purchase.  So did the -- did

25  their representation that the coin would soon be listed on an

1    exchange imminently in a matter of days or weeks, was that

2    influential on your decision to invest, or was that important

3    to you?

4    **A.**    Yes, it was.

5    **Q.**    Why is that?

6    **A.**    Well, because it showed that there would be some

7    marketplace that I could actually then start to liquidate the

8    investment once it began to show a return.

9    **Q.**    So in terms of other things you relied on to make your

10   investment, were the representations about impending deals

11   important to your decision to invest?

12   **A.**    Yes.

13   **Q.**    Why is that?

14   **A.**    Because once again, it showed that there was a purpose.

15   An investment that doesn't -- or a currency that doesn't have a

16   use is pointless.  It's worthless.  But by having an

17   already-existing marketplace or purpose for it showed that

18   there was value that we could expect to increase.

19   **Q.**    And then based on your research, your research of the

20   website, your review of the newspaper articles, your review of

21   the social media accounts, what was your understanding about

22   how complete the AML Bitcoin technology was?

23   **A.**    That it was complete.  It was developed.  It was done.  It

24   was ready for release.

25   **Q.**    If, in fact, the AML Bitcoin technology was not

1  substantially complete or was essentially nonexistent, would

2  that have affected your decision to invest?

3  **A.**    Yes.

4  **Q.**    Why?

5  **A.**    Because I was not interested in participating in a

6  startup, I was interested in purchasing a completed product.

7  **Q.**    Can you please just -- why weren't you interested in

8  investing in a startup?

9  **A.**    Because I have no guarantee, without knowing how they're

10 developing it, without knowing more about their team, without

11 knowing what the chances of success are, I'm not ready to just

12 invest blindly in that.  But if the product is completed and

13 it's already been tested and vetted, then, okay, that's a

14 different animal.

15 **Q.**    So you testified earlier that AML Bitcoin was not listed

16 on HitBTC by Christmas.  Did it eventually get listed on some

17 sort of an exchange?

18 **A.**    I remember a couple years later seeing it on a -- an Asian

19 exchange called L-Bank that -- sorry.  No, that's it.

20 **Q.**    What do you recall about the volume of trading?

21 **A.**    That it was very unusual.

22 **Q.**    What does that mean?

23 **A.**    The volume, normally with any kind of trading you begin to

24 see patterns and parameters that are predictable, and this is

25 in any market.  On L-Bank it was very, very, very low,

1  extremely undervalued, like 10th of a penny, and then suddenly

2  it shoots up to $10.  Extremely strange pricing practices.

3  Q.  Did you try to sell your AML Bitcoin and get some return

4  on your investment?

5  A.  Yes.

6  Q.  What happened?

7  A.  Well, I put it on -- I missed that big surge, and when I

8  put some on at a very low offer price and it never sold.

9  Q.  Are you familiar with the term "market manipulation"?

10  A.  Yes.

11  Q.  Or are you familiar with the term "wash trading"?

12  A.  Not that term, but the first, yes.

13  Q.  What's your understanding of what market manipulation is?

14  A.  That's when you have individuals through various means and

15  practices manipulating the marketplace to give the impression

16  that there is more interest or more success than actually is

17  happening.

18  Q.  If you had known at the time you invested that someone

19  affiliated with AML Bitcoin would sell AML Bitcoins to himself,

20  buy and sell Bitcoins to himself in an effort to drive up the

21  volume and the price of the coin, would that have impacted your

22  decision to invest?

23  A.  Certainly.

24  Q.  Why?

25  A.  Because this tells me that there's no real market.  This

1  tells me there's no real value.  This tells me there's

2  manipulation going on that is not exactly trustworthy.

3  **Q.**  So you testified a little bit earlier that you visited the

4  AML Bitcoin website.

5  **A.**  Huh.

6  **Q.**  Is that right?

7  **A.**  Yes.

8  **Q.**  Did you visit it once, or did you visit it repeatedly?

9  **A.**  Repeatedly.

10       **MR. HIGHSMITH:**  This is previously admitted Exhibit

11  626.  Could we please publish that to the jury, and could you

12  please turn to page 2.

13  **BY MR. HIGHSMITH**

14  **Q.**  All right.  Do you see here, is this consistent with the

15  website that you saw?

16  **A.**  Yes.

17  **Q.**  Do you see right in the middle of the page where it says,

18  AML Bitcoin is the world's first AML/KYC/Patriot Act coin

19  that's compliant with biometric identification?  Is that

20  something you saw back in 2017-2018?

21  **A.**  Absolutely.

22  **Q.**  What is biometric identification, if you know?

23  **A.**  Biometric identification is the process where specific

24  facial or biological characteristics of an individual are

25  stored that are difficult, if not impossible, to duplicate.

BRUFFEY - DIRECT / HIGHSMITH

1   **Q.**   So is it your understanding that they were claiming that

2   biometric identification be stored in the blockchain?

3   **A.**   Yes, in some capacity.

4   **Q.**   And so is biometric identification like what I have on my

5   iPhone where my face unlocks the phone?

6   **A.**   Yes, it is.

7   **Q.**   And is it your understanding they were representing that

8   that could be stored on their software?

9   **A.**   Yes.

10  **Q.**   And on their cryptocurrency software?

11  **A.**   Potentially, yes.

12  **Q.**   Did you ever see a final product that had AML Bitcoin

13  cryptocurrency with biometric identifiers built into its

14  blockchain?

15  **A.**   No.

16          **MR. HIGHSMITH:**   Could we please take a look at page 3.

17  At the very bottom of page 3, could we highlight that at the

18  very bottom.

19  **BY MR. HIGHSMITH**

20  **Q.**   So here the website represents AML Bitcoin was created

21  with anti-money laundering, anti-terrorism and theft-resistant

22  properties built into the code of the coin.  Do you see that?

23  **A.**   Yes.

24  **Q.**   Did you understand that to mean that all of those security

25  features were built into its software or its blockchain?

BRUFFEY - DIRECT / HIGHSMITH

1    **A.**    Yes.

2    **Q.**    If you had known when you invested that the ante-theft

3    features were not built into the code of the cryptocurrency,

4    not built into the blockchain, would that have influenced your

5    decision to invest?

6    **A.**    Yes.

7    **Q.**    Why?

8    **A.**    Because that was the entire value.  I mean there are

9    plenty of crypto coins out there that, you know, are just

10   crypto coins.  This one was offering a whole new host of

11   features and advantages that the industry had been crying out

12   for that no one had yet provided and here was the first one

13   providing it.  This is the game changer.  This is what we're

14   waiting for.

15   **Q.**    Did you ever see evidence of the specific anti-money

16   laundering features being built into the code or the blockchain

17   of the cryptocurrency?

18   **A.**    No.

19   **Q.**    Did you ever see evidence that biometric identifiers were

20   built into the blockchain or the code of the AML Bitcoin

21   cryptocurrency?

22   **A.**    No.

23   **Q.**    Did you ever get a single penny of your hundred thousand

24   dollars back?

25   **A.**    No.

BRUFFEY - CROSS / DENT

```
 1          MR. HIGHSMITH:  No further questions.

 2          THE COURT:  Ms. Dent.

 3                    CROSS-EXAMINATION

 4   BY MS. DENT

 5   Q.   Good morning, Mr. Bruffey.

 6   A.   Good morning.

 7   Q.   I guess it might be afternoon by now.

 8        Before you came here to testify today, you had a few

 9   opportunities to speak with various members of the

10   prosecutorial team, right?

11   A.   Uh-huh.

12   Q.   And I believe on December 23rd you spoke with Agent

13   Zartman.  Do you remember that?

14   A.   I do.

15   Q.   And you described yourself as a cryptocurrency enthusiast,

16   right?

17   A.   Yes.

18   Q.   And you said that you have invested in cryptocurrency

19   projects for the past 10 years.

20   A.   Uh-huh.

21   Q.   Is that correct?

22   A.   Yes.

23   Q.   So you're not new to cryptocurrency.  This is something

24   you've been doing kinda like a hobby; is that right?

25   A.   On various levels, yes.
```

BRUFFEY - CROSS / DENT

1    **Q.**    Would you describe yourself as someone who does their

2    homework before they purchase a cryptocurrency?

3    **A.**    Yes.

4    **Q.**    I want to go back to exhibit 1504 that Mr. Highsmith

5    showed you a little while ago.  In that document, what you

6    testified about this document, that you -- that you were told

7    that the token would be listed on HitBTC -- on the HitBTC

8    exchange on December 25th, and you were disappointed that it

9    wasn't.  Do you know why there was a delay?

10   **A.**    I do not.

11   **Q.**    And the token did get listed on HitBTC eventually, didn't

12   it?

13   **A.**    I don't recall if it did.

14   **Q.**    You don't recall that your token got listed on HitBTC?

15   **A.**    I don't recall seeing it, no.

16   **Q.**    Would you have checked something like that?

17   **A.**    Right.  I would have checked it.  I have no record that it

18   was.  If you have a record, I'd love to hear it.

19   **Q.**    Let's go back to your -- well, actually, there's one more

20   thing I want to go through with you on this document.

21        **THE COURT:**  Could you move your microphone a little

22   down?

23        **MS. DENT:**  Sure.

24        **THE COURT:**  Thank you.

25   BY MS. DENT

**BRUFFEY - CROSS / DENT**

1  **Q.**  You mentioned when you were talking about the lack of an

2  exchange, that you never would have invested in a startup.  And

3  when Mr. Highsmith asked you why, you explained that you just

4  don't know the chances of its success?

5  **A.**  Uh-huh.

6  **Q.**  When you invested in AML Bitcoin, how old was that

7  project?

8  **A.**  Um, I would say, based on what I remember, it was within a

9  year of development.

10 **Q.**  I'm sorry?

11 **A.**  Within a year of the development.

12 **Q.**  Right.

13 **A.**  Uh-huh.

14 **Q.**  So it was the -- they were having an ICO, weren't they?

15 **A.**  Yeah.

16 **Q.**  Okay.  And wouldn't you have done some research and found

17 out that it was a new project and that they were just starting

18 up and that they had only been working on the coin for a few

19 months?  I mean, you said you invested in cryptocurrency all

20 the time.

21 **A.**  Yeah, of course.  But that doesn't change the fact that

22 they were promising me things that were finished.  That's the

23 difference.  I don't care if it takes you three months to three

24 years --

25 **Q.**  Okay.  That's --

1        **THE COURT:** Sir, let's not --

2  **BY MS. DENT**

3  **Q.**   Let's not fight about it.

4        **THE COURT:** Wait. Now, ask a new question. Question.

5  **BY MS. DENT**

6  **Q.**   Didn't you say that you would never invest in a startup

7  because you wouldn't know what the chances of the success of

8  the product were?

9  **A.**   If it was a startup and it identified itself as such, yes.

10 But that was not the case here. They identified it as being

11 completed and ready, and that's a huge distinction.

12 **Q.**   Okay. Let's go -- let's talk about that statement for a

13 second.

14 **A.**   Okay.

15 **Q.**   I think after you met with Agent Zartman, a few weeks

16 later you met with members of the prosecutorial team, the

17 prosecutors who are sitting behind me; is that correct?

18 **A.**   Uh-huh. That's correct.

19 **Q.**   And you also told them that you've been interested in

20 cryptocurrency for many years, right?

21 **A.**   Uh-huh.

22 **Q.**   And you said ... I'm sorry. I lost my train of thought.

23       You told them that you learned about cryptocurrency when

24 someone came into the cigar shop where you go and brought you

25 an article.

1    **A.**    Uh-huh.

2    **Q.**    Is that right?

3    **A.**    That's correct.

4    **Q.**    And Mr. Highsmith showed you one version --

5    **A.**    Uh-huh.

6    **Q.**    -- of that article.  There's another version which I'm not

7    even sure exactly what the difference is, but I'm gonna show

8    you the one that's number 3085.

9    **A.**    Okay.

10   **Q.**    And I believe you told the government that this was the --

11   you believe this was the article that you read.  It was in the

12   Washington Times?

13   **A.**    Yes.

14   **Q.**    And you told the prosecutors that you read the article,

15   and it gave you the impression that AML Bitcoin had an existing

16   deal in place with the Port of San Francisco; isn't that

17   correct?

18   **A.**    That they were discussing it, yes.

19   **Q.**    No, that's not what I asked.

20   **A.**    Okay.

21   **Q.**    I said, didn't you tell the prosecutors that you were

22   under the impression that there was an existing deal, and that

23   that's why you purchased AML Bitcoin?

24   **A.**    Oh, okay.  Yes.

25   **Q.**    Okay.  Now, if we can look at the bottom of page 2 of that

1    article going on to the top of page 3, it says:  That is why

2    AML Bitcoin has already made inroads in so many places where

3    old Bitcoin never would have been welcome, such as the Port of

4    San Francisco, which has already been in discussions with AML

5    Bitcoin officials to enable use of their digital currency.

6    **A.**    Uh-huh.

7    **Q.**    You agree that that's what this says?

8    **A.**    Yes.

9    **Q.**    You run a business, correct?

10   **A.**    I'm a sales clerk within a business.  I don't run it or

11   own it.

12   **Q.**    Okay.  But you're in the business world?

13   **A.**    Uh-huh.

14   **Q.**    Wouldn't you agree that having discussions with someone

15   about a project is very different from having a deal in place?

16   **A.**    I would say that it is different, but it still sets a

17   precedent that I thought it was of value, certainly.

18   **Q.**    But it's not the same thing, is it?

19   **A.**    No.

20   **Q.**    In fact, it's very different, isn't it?  It's the

21   difference between having a deal and not having a deal,

22   correct?

23   **A.**    It's different, yes.

24   **Q.**    Thank you.

25         All right.  Let's fast-forward a little bit.

1          When you spoke to Agent Zartman in December you told him

2    that your AML Bitcoin tokens were, in fact, later converted to

3    AML Bitcoins when the project went live.

4    **A.**    Uh-huh.

5    **Q.**    Is that right?

6    **A.**    Yes.

7    **Q.**    And that would have been in 2020?

8    **A.**    Yes.

9    **Q.**    At some point did you have to go through I.D. verification

10   to get your tokens converted to coins?

11   **A.**    As the same you do on every crypto exchange, yes.

12   **Q.**    Okay.  But when Mr. Highsmith asked you if the tech was

13   ever really in place, you said, "no," didn't you?

14   **A.**    Because it wasn't the same thing.  It's not the same

15   thing.  Just because I'm using the identity verification to get

16   this on the account is not the same thing as actually using

17   that token in the real world, processing it.  I never saw it

18   implemented in that capacity at all.  It's a very different

19   thing.

20   **Q.**    Let's look at exhibit 3083.  And do you recognize this as

21   an e-mail exchange that you had with the AML Bitcoin support

22   team?

23   **A.**    Uh-huh.

24   **Q.**    And that was on October 8th, 2020, correct?

25   **A.**    Uh-huh.

1    **Q.**    It looks like you were having some trouble downloading and

2    installing your wallets, and you reached out and asked them for

3    assistance; isn't that right?

4    **A.**    Uh-huh.

5    **Q.**    And they responded with some suggestions and some help?

6    **A.**    Uh-huh.

7    **Q.**    And then you responded.  I'm going to read that, the very

8    last message in the chain, but it's on the top of the document.

9    **A.**    Uh-huh.

10   **Q.**    Your suggestion worked great.  It also helped when I

11   realized that I was trying to load a backup from my old token

12   wallet and not the backup from my coin wallet.

13   **A.**    Uh-huh.

14   **Q.**    Big difference.  Big difference.  You guys are awesome.  I

15   hope your efforts to keep tweaking and growing the coin are

16   going well.

17   **A.**    Uh-huh.

18   **Q.**    That's what you had to say about AML Bitcoin in 2020,

19   correct?

20   **A.**    Sure.

21          **MS. DENT:**  I have no more questions.

22                          <u>**REDIRECT EXAMINATION**</u>

23   BY MR. HIGHSMITH

24   **Q.**    Do you want to clarify your answer?

25   **A.**    Yeah.  Just because you change the color on the paint of

1   the car doesn't mean that you've made a new car or that the car

2   works.  Tweaking is not the same as this thing is done and

3   ready to go.  There's a very big distinction there that I find

4   unfortunate that it wasn't realized.

5           **MR. HIGHSMITH:**  No further questions.

6           **THE COURT:**  Anything further, Ms. Dent?

7           **MS. DENT:**  I have nothing further, Your Honor.

8           **THE COURT:**  Very well; you may step down.

9           **THE WITNESS:**  Thank you.

10          **MR. WARD:**  The United States calls Brian Darling.

11          **THE COURT:**  If you could come forward to the witness

12  stand and be sworn.

13          **MS. DENT:**  Your Honor, I move to admit the two

14  exhibits that I showed the witness.  They were numbered 3083

15  and 3085.

16          **MR. HIGHSMITH:**  Objection; hearsay.

17          **THE COURT:**  I thought you were just using those for

18  impeachment purposes, but ...

19          **MR. HIGHSMITH:**  They can't be admitted on a collateral

20  matter.

21          **THE COURT:**  Yes.

22          **MS. DENT:**  Okay.

23          **THE COURT:**  I'm afraid overruled.

24  \\\

25  \\\

1        <u>**BRIAN DARLING**</u>,

2   called as a witness for the Government, having been duly sworn,

3   testified as follows:

4        **THE COURTROOM DEPUTY:**  Please be seated.  Can you

5   state your name for the record and spell your last name?

6        **THE WITNESS:**  Brian Darling, D-a-r-l-i-n-g.

7   **BY MR. WARD**

8   **Q.**   Good afternoon, Mr. Darling.

9   **A.**   Good afternoon.

10  **Q.**   Mr. Darling, in the fall of 2017 where did you work?

11  **A.**   I worked for a company Liberty --

12       **THE COURT:**  Can you slow down a little?  I didn't hear

13  what you said.  Can you repeat it?

14       **THE WITNESS:**  Liberty Government Affairs.  It's a

15  company I set up myself.

16  **BY MR. WARD**

17  **Q.**   Were you the chief executive of Liberty Government

18  Affairs?

19  **A.**   Yes, I'm the founder and president.

20  **Q.**   What type of company is Liberty Government Affairs?

21  **A.**   My company does government relations, we do public

22  relations and some lobbying.

23  **Q.**   Where are you based?

24  **A.**   We're base said in Washington, D.C.

25  **Q.**   In 2017 were you hired to promote a cryptocurrency called

**BRUFFEY - REDIRECT / HIGHSMITH**

1    AML Bitcoin?

2    **A.**    Yes.

3    **Q.**    Who hired you?

4    **A.**    I worked with Jack Abramoff to work in that project.

5    **Q.**    When Mr. Abramoff approached you about AML Bitcoin, what

6    did he tell you?

7    **A.**    He told me that this was a cryptocurrency that would kind

8    of have improvements on what we see in Bitcoin, so the concern

9    about Bitcoin is that it didn't have a lot of customer laws.

10   It didn't comply with a lot of the know-your-customer laws.  So

11   this was a next step in something that would be compliant with

12   know-your-customer laws and have some -- some technology

13   embedded in the cryptocurrency that would make it more

14   acceptable to government to allow it to exist, because at that

15   time there was a lot of talk about Bitcoin being used by

16   governments and individuals for nefarious purposes.

17   **Q.**    What did Mr. Abramoff want to hire you and your company to

18   do?

19   **A.**    Well, I did public relations and helped talk to third

20   parties to generate op-eds to talk about different issues.

21   **Q.**    When you say you helped to generate op-eds, did you work

22   with writers to write articles that could be published?

23   **A.**    Yes, I worked with writers that I had a relationship with

24   to get op-eds published.

25   **Q.**    Before you began working with AML Bitcoin, did you have

1   conversations with Marcus Andrade?

2   **A.**   No.

3   **Q.**   After you agreed to go to work for AML Bitcoin, did you

4   then have conversations with Mr. Andrade?

5   **A.**   E-mail communications afterwards.  But, no, I didn't have

6   much communication with him at all.

7   **Q.**   When -- before you began working promoting AML Bitcoin,

8   did you have an interest in buying AML Bitcoin?

9   **A.**   Yes.

10  **Q.**   And did you speak to Mr. Andrade about purchasing AML

11  Bitcoin?

12  **A.**   I had e-mail -- I had some information e-mailed to me.  I

13  looked on the website, read up on the website, read up about

14  the cryptocurrency, and I had spoken to Jack Abramoff about

15  buying the cryptocurrency because I was very interested in it.

16  **Q.**   You said that you went on the website.  Was that the AML

17  Bitcoin website?

18  **A.**   Yeah, on the AML Bitcoin website they had a description of

19  the cryptocurrency and how -- how it was going to work, the

20  fact that they had an initial token offering.  They were

21  offering tokens before they were going to be converted in the

22  future to coins that could be traded on exchanges.  And they

23  had a white paper that was very detailed about the technology

24  and how it was KML and know-your-customer compliant, AML

25  compliant.

BRUFFEY - REDIRECT / HIGHSMITH

1    There was something that had all of this embedded

2    technology that would help to make it more acceptable to

3    government officials going forward.

4    **Q.**    Other than the website and the white paper, do you

5    remember looking at anything else and doing any other research

6    before you purchased AML Bitcoin shares?

7    **A.**    I relied quite a bit on the white paper on the website.

8    **Q.**    All right.  And based on what you were told, what did you

9    understand was the state of the security and the anti-money

10   laundering, know-your-customer technology?

11   **A.**    Other than what was on the website, before I -- I'm sorry.

12   After I purchased it, I had to go through a process of going

13   online with an individual that worked for the company.  I held

14   up my license and looked into my computer camera, and that was

15   some of the screening that was done after I purchased the

16   tokens.

17   **Q.**    I see.  You showed a picture of your driver's license --

18   **A.**    Yes.

19   **Q.**    -- and took a picture of it?

20   **A.**    Yeah.

21   **Q.**    And then you submitted that to the company?

22   **A.**    Yes, I did.

23   **Q.**    Was that the NAC Foundation?

24   **A.**    Yes.

25   **Q.**    How much AML Bitcoin did you initially purchase?

1   **A.**   I wired $20,000 to purchase AML Bitcoin tokens on one

2   occasion, and then I sent a subsequent wire after that for I

3   don't remember exactly.  It was either 2500 or $5000 for a

4   second -- on a second wire.

5         **MR. WARD:**  Could we pull up for the witness and the

6   parties exhibit 666.

7   **BY MR. HIGHSMITH**

8   **Q.**   Mr. Darling, did you review this document prior to your

9   testimony here?

10  **A.**   Yes, I did.

11  **Q.**   And the handwritten line on the top, is that your

12  handwriting?

13  **A.**   That is my signature.

14  **Q.**   All right.  And overall, what is this document?

15  **A.**   This was my purchase agreement that I signed and helped

16  fill out.  As you can see, I filled in those numbers on the

17  document.  And that was the agreement prior to me wiring the

18  money to purchase the tokens.

19  **Q.**   When you reviewed this document, is this a fair and

20  accurate representation of the purchase agreement you signed?

21  **A.**   Yes.

22        **MR. WARD:**  At this point, the government would move to

23  admit exhibit 666.

24        **MR. STEFAN:**  No objection, Your Honor.

25        **THE COURT:**  666 will be admitted.

1        (Trial Exhibit 666 received in evidence.)

2            **MR. WARD:**  If we could just blow up the top paragraph.

3   **BY MR. WARD**

4   **Q.**   Is that your handwriting where it says Brian Darling?

5   **A.**   Yes.

6   **Q.**   And it says effective as of August 1st, 2017.

7        Is that when you purchased these $20,000 in the AML

8   Bitcoin?

9   **A.**   Yes.

10           **MR. WARD:**  All right.  We can back out of that,

11  though.

12       Can you do the recitals section, please?  Can we blow that

13  up?

14  **BY MR. WARD**

15  **Q.**   You see the statement where it says, NAC has developed and

16  is now upgrading a new coin known as the AML Bitcoin?

17  **A.**   Yes.

18  **Q.**   Was that your understanding of the state of the technology

19  and what the company was doing?

20  **A.**   Yes.

21           **MR. WARD:**  Let's back out of that, please.  Look at

22  the purchase price real quick if we could.

23  **BY MR. HIGHSMITH**

24  **Q.**   Again, Mr. Darling, that confirms that you bought $20,000

25  of AML Bitcoin tokens at this point?

BRUFFEY - REDIRECT / HIGHSMITH

1   A.   Yes.

2        MR. WARD:   Can we just go to the last page of this

3   document?  Actually up one page.  Well, let's do right here.

4   BY MR. WARD

5   Q.   Is that your name and address and phone number?

6   A.   Yes.

7   Q.   Great.

8        MR. WARD:   Can we go up one page, and could you just

9   highlight the two signature blocks at the bottom.

10  BY MR. WARD

11  Q.   Again, is that your signature, Mr. Darling?

12  A.   Yes.

13  Q.   And when you signed this agreement, who did you understand

14  Marcus Andrade to be?

15  A.   The CEO of the company.

16  Q.   And you'd had some communications with him at this point?

17  A.   Yes.

18  Q.   All right.  You said you purchased an additional

19  $5000-worth of AML Bitcoin.  Do you remember how soon after

20  this purchase agreement you made that purchase?

21  A.   I don't remember the specifics, the exact date, but it was

22  relatively soon after.  Maybe three weeks, about,

23  approximately.

24  Q.   Okay.  And this contract is dated August 1st of 2017.

25  A.   Uh-huh.

**BRUFFEY - REDIRECT / HIGHSMITH**

1  Q.   When you made this purchase was this prior to developing

2  and implementing the press strategy for AML Bitcoin?

3  A.   I believe so.

4  Q.   And this purchase was made before you began commissioning

5  writers to write articles about AML Bitcoin?

6  A.   To the best of my recollection, yes.  It's a long time

7  ago, but I believe so.

8  Q.   Okay.  After you agreed to represent AML Bitcoin and

9  purchase these coins, did you work to generate positive

10 publicity for AML Bitcoin?

11 A.   Yes, I did.

12 Q.   Was part of that strategy, did you pay writers to write

13 articles about AML Bitcoin?

14 A.   I compensated writers for their time and effort, yes.

15 Q.   And when you compensated them for their time and effort,

16 during that time and effort, Mr. Darling, were they writing

17 articles about AML Bitcoin?

18 A.   Yes.

19 Q.   And did you work with these writers to get those articles

20 published on mainstream news organization websites?

21 A.   Yes.

22 Q.   And in mainstream newspapers?

23 A.   Yes.

24 Q.   In addition to hiring and paying writers to write articles

25 about AML Bitcoin, did you also write articles about AML

BRUFFEY - REDIRECT / HIGHSMITH

1    Bitcoin?

2    **A.**    I did.

3    **Q.**    And did you submit those articles to news organizations to

4    have them published?

5    **A.**    Yes, I did.

6    **Q.**    And were they published?

7    **A.**    Yes, they were.

8    **Q.**    I'd like to show you an exhibit marked 241.

9           Mr. Darling, have you seen this document?

10   **A.**    Yes, I have.

11   **Q.**    What is it?

12   **A.**    This is a document I put together that compiled the -- a

13   list of the op-eds that I helped place and publish.

14   **Q.**    Did you put this together during the time that you were

15   working with individuals to compile these articles?

16   **A.**    Yes.

17   **Q.**    Is this an accurate representation of at least some of the

18   articles that you worked on and commissioned?

19   **A.**    Yes.

20          **MR. WARD:**  At this point, the government would move to

21   admit exhibit 241.

22          **MR. STEFAN:**  No objection, Your Honor.

23          **THE COURT:**  241 will be admitted.

24     (Trial Exhibit 241 received in evidence.)

25   **BY MR. WARD**

BRUFFEY - REDIRECT / HIGHSMITH

1   Q.   Mr. Darling, if you would look at this article, let's walk

2   through some of the columns, and we'll start with the second

3   column.  Do you see where it says "author"?

4   A.   Yes.

5   Q.   Is that a list of the authors --

6        MR. WARD:  You can just blow up the whole thing.  I

7   think everyone can see it.

8   BY MR. WARD

9   Q.   The column that says "author," Mr. Darling, are those the

10  writers that you paid to write articles about AML Bitcoin?

11  A.   Yes, and myself, too.

12  Q.   I was gonna point out your name's listed there.  Were

13  those for the articles that you wrote?

14  A.   Yes.

15  Q.   And then the next column is Platform.  What are the

16  entries -- what does platform refer to?

17  A.   Platform was the website that they were placed on.

18  Q.   All right.  And then when it says status, published, does

19  that indicate -- was that a record indicating to you that those

20  articles were, in fact, published?

21  A.   Yes.

22  Q.   And then the column, title of the piece and web link, is

23  that an accurate description of the title of the article and

24  the web link?

25  A.   Yes, it is.

BRUFFEY - REDIRECT / HIGHSMITH

1   Q.   And then the final column, do you see where it says cost?

2   Is that the amount that you paid those individuals to write

3   those articles?

4   A.   Yes.

5   Q.   So, for example, Mr. Darling, if you look at the first

6   row, did you pay a writer named Derek Hunter $500 to write an

7   article called Congress Considering Validating Bitcoin?

8   A.   Yes.

9   Q.   And was that published in the Daily Caller?

10  A.   Yes, it was.

11  Q.   Did you pay a writer by the name Steve Sherman $500 to

12  publish an article called AML Bitcoin Is The Future Of Digital

13  Currency published in Townhall?

14  A.   Yes, I did.

15  Q.   And column five refers to an article that you wrote.  Did

16  you write an article for The Observer entitled Soccer-Mom-

17  Friendly AML Bitcoin Will Make Digital Currencies Mainstream?

18  A.   I did.

19        MR. WARD:  Can we take a look at exhibit 196?

20  BY MR. WARD

21  Q.   Mr. Darling, do you see this article?

22  A.   I do.

23  Q.   Had you reviewed this prior to testifying here today?

24  A.   Yes.

25  Q.   Is this the article you wrote for the Observer about AML

BRUFFEY - REDIRECT / HIGHSMITH

1    Bitcoin?

2    **A.**    It is.

3    **Q.**    Does this document accurately reflect the article that you

4    wrote and had published -- that you wrote?

5    **A.**    Yes, that's it.

6    **Q.**    And was this article, in fact, published in the New York

7    Observer?

8    **A.**    It was.

9          **MR. WARD:**    At this point the government would move to

10    admit exhibit 196.

11          **MR. STEFAN:**    No objection.

12          **THE COURT:**    196 will be admitted.

13    (Trial Exhibit 196 received in evidence.)

14          **MR. WARD:**    Let's just, can we just blow up the bottom

15    three quarters from just above "opinion"?

16    **BY MR. WARD**

17    **Q.**    And Mr. Darling, that "by" line is yours?

18    **A.**    Yes, it is.

19    **Q.**    And it says at the bottom 10/5/2017.  Is that when you

20    remember the article was published?

21    **A.**    Yes.

22          **MR. WARD:**    All right.  If we could go to the second

23    page, please.  Can you blow up the first two paragraphs,

24    please.

25    **BY MR. WARD**

1   Q.   You see the second paragraph, Mr. Darling?

2   A.   Yes.

3   Q.   You wrote:  With the introduction of AML Bitcoin, the

4   first digital currency that incorporates patent-pending

5   anti-money laundering and know-your-customer provisions of

6   America's strict banking laws, soon soccer moms and the rest of

7   us may be able to use digital currencies everywhere.

8        Where did you get the information that AML Bitcoin was the

9   first digital currency that incorporates patent-pending

10  anti-money laundering and know-your-customer provisions?

11  A.   I got some of that information from Jack Abramoff and some

12  of it off the website.

13  Q.   Did you do any independent reporting or research to

14  confirm whether that was true or not?

15  A.   No.

16       MR. WARD:  All right.  Can we pop out of that

17  paragraph, please, and go down to the -- down to the paragraph

18  down at the bottom that starts "she's not alone".

19  BY MR. WARD

20  Q.   You see that sentence where you wrote:  Marcus Andrade,

21  the CEO of NAC Foundation, the creator of AML Bitcoin, has been

22  furiously traveling the world for the past two weeks trying to

23  keep up with governments' requests to meet with him and explore

24  his new AML Bitcoin.

25       When you wrote that, Mr. Darling, where did you get that

1  information?

2  **A.**   That information was provided to me by Jack Abramoff.

3  **Q.**   Did you have any independent confirmation or did you do

4  any independent reporting to confirm whether, in fact, Marcus

5  Andrade was furiously traveling the world?

6  **A.**   No.

7  **Q.**   Did you have any independent confirmation that he was

8  trying to keep up with government requests to meet him and

9  explore his new AML Bitcoin?

10  **A.**   No.

11  **Q.**   Looking at the next paragraph, Mr. Darling, you write:   In

12  Panama, Andrade met with regulatory and financial authorities

13  in urgent and very productive conclaves.

14      Again, where did that information come from?

15  **A.**   That information was provided to me by Jack.

16  **Q.**   Did you have any independent knowledge or understanding

17  that Mr. Andrade was meeting with anyone in Panama --

18  **A.**   No.

19  **Q.**   -- conclaves, productive or not?

20      **MR. WARD:**  All right.  Let's move out of that, please.

21  Can we go to the next page?  Can we look at the next full

22  paragraph there.  No, the one that says "Panama's financial

23  system".

24  **BY MR. WARD**

25  **Q.**   You write, Mr. Darling:  Since Andrade's visit --

1    referring to Panama -- they have been scurrying to find a way

2    to integrate the AML Bitcoin in payment structures for

3    everything from banks to the Panama Canal.

4         Again, where did that information come from?

5    **A.**    That information was provided to me by Jack Abramoff.

6              **MR. WARD:**  All right.  Let's pull out of that

7    paragraph.

8         Can we look at the paragraph that says "moreover"?  That

9    would be the next paragraph.

10   **BY MR. WARD**

11   **Q.**    You write:  Moreover, last week, Andrade joined the

12   European Union Digital Summit in Tallinn, Estonia, where he met

13   with officials from several European nations.

14        Again, where did that information come from?

15   **A.**    That informations was provided to me by Jack Abramoff.

16   **Q.**    Did you do anything or have any independent basis to

17   determine whether that was true or not?

18   **A.**    No.

19   **Q.**    You wrote that he was meeting in meetings including the

20   Croatian Prime Minister, Andre Plenkovic.

21        Again, any information whether that was true or not?

22   **A.**    No.

23   **Q.**    And you write that the individuals at this summit were

24   interested in discussing the possible creation of national

25   digital currencies based on AML Bitcoin's anti-money

1  laundering, know-your-customer-compliant platform.

2      Again, did you have any independent knowledge of whether

3  that was true or not?

4  **A.**   No.

5          **MR. WARD:**  Let's pop back out of that, please.

6      Let's just do one more, the next paragraph, please.

7  **BY MR. WARD**

8  **Q.**   This is in reference to the prior paragraph discussion of

9  the conference in Estonia.  You write:  But the most intriguing

10 news coming from sources at the conference is that Andrade has

11 also been quietly shuttling between Paris and Brussels, likely

12 in intense discussions with the OECD and the EU related to

13 those organizations' interest in exploring AML Bitcoin, and so

14 on.

15     Again, where did that information come from?

16 **A.**   That information was provided to me by Jack Abramoff.

17 **Q.**   When you wrote that the news was coming from sources at

18 the conference, did you have any sources at the conference?

19 **A.**   No.

20         **MR. WARD:**  Okay.  We can back out of that paragraph.

21     One last.  Let's just do the last paragraph here.

22 **BY MR. WARD**

23 **Q.**   You write:  Natko Vlahovic, a former Croatian diplomat and

24 executive director of the Croatian EU's business council

25 speculates that Andrade's communications relate -- with the

 1   OECD relate to a possible role for AML Bitcoin.

 2        Did you speak to Natko Vlahovic?

 3   A.   No, I did not.

 4   Q.   Where did this information come from?

 5   A.   That information was provided to me by Jack.

 6   Q.   And did you -- did Mr. Abramoff tell you that he had

 7   spoken to Mr. Natko Vlahovic?

 8   A.   I don't remember specifically.

 9        **MR. WARD:**  We can back out of this article.

10   **BY MR. WARD**

11   Q.   When you submitted this article to The Observer, were you

12   contacted by an editor or anyone from the Observer?

13   A.   No.

14   Q.   Did anyone contact you to fact-check the article?

15   A.   No.

16   Q.   Did you have any communications with anyone at the

17   Observer?

18   A.   Other than e-mailing the submission in and it getting

19   published, no, I don't remember having any communications other

20   than that.

21   Q.   Did they publish the article just as you'd written it?

22   A.   Yes.

23        **MR. WARD:**  All right.  Can we look at exhibit 706,

24   please.  I'm sorry, can you pull that down?  Can we pull up

25   exhibit 173, please?

BRUFFEY - REDIRECT / HIGHSMITH

 1   BY MR. WARD

 2   Q.   At some point in October of 2017, Mr. Darling, were you

 3   introduced by e-mail to Marcus Andrade?

 4   A.   Yes.

 5   Q.   And did you provide Marcus Andrade a copy of the article

 6   you wrote?

 7   A.   Yes, I did.

 8   Q.   Looking at this e-mail, is that your e-mail address?

 9   A.   I'm sorry?

10   Q.   Is that -- at the top where it says Brian Darling, is that

11   your e-mail address?

12   A.   Yes, it is.

13   Q.   And was this an e-mail from Jack Abramoff to you and

14   Marcus Andrade?

15   A.   Yes.

16   Q.   You've reviewed this e-mail prior to testifying here?

17   A.   I did.

18   Q.   Is it an accurate representation of the exchange?

19   A.   It is.

20           MR. WARD:  Move to admit exhibit 173.

21           MR. STEFAN:  No objection.

22           THE COURT:  173 will be admitted.

23       (Trial Exhibit 173 received in evidence.)

24   BY MR. WARD

25   Q.   Let's look at the top e-mail starting where it says

1  "connecting you guys".  Again, Mr. Darling, that's your e-mail.

2  Do you see to the right of your e-mail where it says Marcus

3  Andrade, CEO@AMLBitcoin?  Did you understand that you were

4  being introduced by e-mail here to Marcus Andrade?

5  **A.**   Yes.

6  **Q.**   This is from Jack Abramoff, and he writes:  Brian will

7  have a link for a piece that he has submitted to New York

8  Observer tonight.  Since I'll be out of commission with the

9  Jewish holiday, Brian will get it to you tomorrow, assuming

10  they move forward, which we hope they will.

11      When Mr. Abramoff says, Brian will get it to you tomorrow,

12  what was he referring to?

13  **A.**   Me e-mailing the link.

14  **Q.**   And was it your understanding that Mr. Andrade was going

15  to review this article before it was published?

16  **A.**   I don't remember him reviewing it.  I --

17          **MR. STEFAN:**  Objection; foundation.

18          **THE COURT:**  Overruled.

19  **BY MR. WARD**

20  **Q.**   Why did -- why was -- why did you understand that Jack

21  Abramoff was asking you to get the article to Marcus Andrade?

22  **A.**   So we could have a link to the article and see that it was

23  published.

24  **Q.**   Okay.  And why did Mr. Andrade want the article published?

25  **A.**   I don't know what he -- I don't know.  Just --

1          **MR. STEFAN:**  Objection; foundation, speculation.

2          **THE COURT:**  That one's sustained.

3  **BY MR. WARD**

4  **Q.**   Do you know why Mr. Andrade and Mr. Abramoff wanted this

5  article published?

6          **MR. STEFAN:**  Same objection, Your Honor.

7          **THE COURT:**  Yeah, sustained.

8  **BY MR. WARD**

9  **Q.**   All right.  Let's step out of this.

10         If you look at the e-mail below.

11         **MR. WARD:**  If you can pull up the whole thing.

12  **BY MR. WARD**

13  **Q.**   Was this the article that you then had published in the

14  New York Observer?

15  **A.**   Yes.

16         **MR. WARD:**  Can we back out of this and go to the

17  second page, please.  Hang on.  Go back up to the first page,

18  please.

19  **BY MR. WARD**

20  **Q.**   The time for the -- this e-mail, the second e-mail, was

21  October 5th at 10:55 a.m.?

22  **A.**   Yes.

23         **MR. WARD:**  All right.  Can we go to the next page and

24  then down to the last page?  Down one more.

25  **BY MR. WARD**

BRUFFEY - REDIRECT / HIGHSMITH

1   Q.   Do you see this response, Mr. Darling?

2   A.   Yes.

3   Q.   When Marcus Andrade says to you, looks great, what's he

4   referring to?

5   A.   The content of the article.

6   Q.   And when he says, post it, what is he referring to?

7   A.   He wants to see it published.

8   Q.   Okay.  And ...

9        Thank you.

10       As part of the press strategy for AML Bitcoin, did you

11  understand that these articles that you wrote would be

12  published on AML Bitcoin's Twitter page?

13  A.   Yes.

14  Q.   And did you see posts of the article you wrote on AML

15  Bitcoin's Twitter page?

16  A.   Yeah, I followed the AML Bitcoin Twitter page.  Saw them

17  there, yes.

18  Q.   All right.  Can we look at exhibit 506?  What is this?

19  A.   That's the AML Bitcoin Twitter handle, and it was a post,

20  and they reposted my op-ed.

21  Q.   You saw this document before you testified here today.  Is

22  this an accurate representation of what you remember being

23  posted?

24  A.   Yes.

25           MR. WARD:  At this point, the government would move to

 1   admit exhibit 506.

 2              **MR. STEFAN:**  No objection.

 3              **THE COURT:**  506 will be admitted.

 4         (Trial Exhibit 506 received in evidence.)

 5   **BY MR. WARD**

 6   **Q.**   And Mr. Darling, the article that's posted by the

 7   @AMLBitcoin Twitter site, is that the article that you wrote?

 8   **A.**   Yes, it is.

 9              **MR. HIGHSMITH:**  Can we publish that one, please?

10              **MR. WARD:**  I'm sorry, has this not been published?

11              **THE COURTROOM DEPUTY:**  Sorry.  That was my fault.

12   **BY MR. WARD**

13   **Q.**   All right.  I'll ask you again, Mr. Darling, is this the

14   article you wrote for The Observer?

15   **A.**   Yes, it is.

16              **MR. WARD:**  We can take that down and move on.

17   **BY MR. WARD**

18   **Q.**   In addition to writing your own articles, Mr. Darling, you

19   testified that you commissioned others to write articles.  Did

20   you commission a writer by the name of Chris Versace to write

21   articles?

22   **A.**   Yes, I did.

23   **Q.**   All right.  And did he, in fact, write articles about AML

24   Bitcoin?

25   **A.**   Yes.

1   Q.   Did he write an article for TheStreet.com?

2   A.   Yes, he did.

3   Q.   Was that an article that you commissioned him to write?

4   A.   Yes.

5        MR. WARD:  Can we look at exhibit 70?  That's

6   exhibit 7.  Seventy.

7   BY MR. WARD

8   Q.   All right.  Looking at the e-mail address, looking at the

9   content at the bottom, is that TheStreet.com article that you

10  had Chris Versace write?

11  A.   Yes.

12       MR. WARD:  Can we pop out of that, please?

13  BY MR. WARD

14  Q.   And then looking at the e-mail address that's the second

15  e-mail box, is that your e-mail address in the "from" line?

16  A.   Yes.

17  Q.   And is that Jack Abramoff sea e-mail in the "to" line?

18  A.   Yes.

19  Q.   And looking at the e-mail at the top, is there a response

20  from Jack Abramoff to you?

21  A.   Yes, he responded, great work, Brian.

22  Q.   All right.  Is this an accurate representation of that

23  communication?

24  A.   Yes.

25       MR. WARD:  All right.  The government would move to

1    admit exhibit 70.

2              MR. STEFAN:  No objection.

3              THE COURT:  Seventy -- exhibit 70 will be admitted.

4        (Trial Exhibit 70 received in evidence.)

5    BY MR. WARD

6    Q.   Okay.  So let's start with the e-mail at the bottom and

7    all of the content of the article.  Again, Mr. Darling, this

8    was the article that you commissioned Chris Versace to write?

9    A.   Yes, it is.

10   Q.   And did you pay him to write this article?

11   A.   Yes, I did.

12   Q.   And did you provide him with the information that he used

13   for this article?

14   A.   Yes, I did.

15   Q.   At least some of the information?

16   A.   Yes.

17   Q.   All right.  Why are you sending a copy of this to Jack

18   Abramoff?

19   A.   Because I was working with Jack to get op-eds placed

20   talking about AML Bitcoin.

21   Q.   All right.  And did he understand that you had writers

22   that you had commissioned to write these articles?

23   A.   Yes.

24   Q.   Did he understand you were paying them?

25   A.   Yes.

BRUFFEY - REDIRECT / HIGHSMITH

1    **Q.**   All right.  Let's back out of this e-mail and then just

2    look at the e-mail chain at the top.  Was that a response from

3    Mr. Abramoff to you?

4    **A.**   Yes.

5    **Q.**   And do you see that Marcus Andrade's CC'd on that e-mail?

6    **A.**   I see that.

7            **MR. WARD:**  Can we take down this article and bring up

8    exhibit 195?

9    **BY MR. WARD**

10   **Q.**   Do you see this article?  You see this document?

11   **A.**   Yes, I do.

12   **Q.**   Is this an article that Chris Versace wrote for

13   Realmoney.TheStreet.com?

14   **A.**   Yes.

15   **Q.**   Was this an article that you commissioned him and paid him

16   to write?

17   **A.**   Yes.

18   **Q.**   Have you reviewed this document prior to testifying here?

19   **A.**   Yes, I have.

20   **Q.**   And is this an accurate representation of the article that

21   you paid Mr. Versace to write?

22   **A.**   Yes, it is.

23           **MR. WARD:**  All right.  I would move to admit

24   exhibit 195.

25           **MR. STEFAN:**  No objection.

1           **THE COURT:**  Exhibit 195 will be admitted.

2      (Trial Exhibit 195 received in evidence.)

3  **BY MR. WARD**

4  **Q.**   Looking at the -- just looking at the first paragraph of

5  this article, if we could.  When Mr. Versace wrote:  A new coin

6  slated to launch at midnight Sunday Hong Kong time called AML

7  Bitcoin is aiming to mainstream what has been considered a wild

8  west-like market for this payment method for goods and

9  services.  The information that Mr. Versace had about AML

10 Bitcoin for this article, where did he get that information?

11 **A.**   He got that from me.

12 **Q.**   Okay.  To your knowledge, did he do any independent

13 research or reporting about AML Bitcoin -- let me finish --

14 about AML Bitcoin for this article?

15 **A.**   I don't believe so.

16          **MR. WARD:**  Okay.  You can come out of that.

17 **BY MR. WARD**

18 **Q.**   In addition to TheStreet.com article, did you commission

19 Mr. Versace to write an article for Forbes?

20 **A.**   Yes.

21          **MR. WARD:**  All right.  Can we look at exhibit 41?

22 This has already been admitted.

23 **BY MR. WARD**

24 **Q.**   You've reviewed this article prior to testifying here?

25 **A.**   Yes.

BRUFFEY - REDIRECT / HIGHSMITH

1  Q.    Is this an accurate representation of the article that you

2  commissioned Chris Versace to write for Forbes?

3  A.    Yes, it is.

4  Q.    And like the other article, where did Mr. Versace get the

5  information about AML Bitcoin in this article?

6  A.    I provided him information is.

7          MR. WARD:   Okay.  Can we go to the second page?  If

8  you can highlight the second paragraph, please.

9  BY MR. WARD

10 Q.    On the line 3, you write:  If the hedge fund and digital

11 coin investor worlds are to be believed, it will quickly rival

12 the original Bitcoin and potentially overtake it.

13       Is that a reference to AML Bitcoin?

14 A.    Yes, it is.

15 Q.    And was that -- the information that Mr. Versace is

16 writing here, that came from you?

17 A.    Yes, it did.

18 Q.    And you did not obtain that information from individuals

19 in the hedge fund and digital investor coin world?

20 A.    That's correct.

21 Q.    Okay.  There is a quote below that from a gentleman by the

22 name of David Mata, and I won't read all of it, but the last

23 sentence says, it's the cryptocurrency equivalent of handing

24 Mark Zuckerberg a check while he sits in his dorm room coding

25 Facebook.  Do you see that?

1    **A.**    Yes.

2    **Q.**    Where did that quote come from?

3    **A.**    I provided that quote to Chris Versace.

4    **Q.**    And did you speak to Mr. Mata before you provided that to

5    him?

6    **A.**    No, that quote was provided to me.

7    **Q.**    By who?

8    **A.**    By Jack Abramoff.

9          **MR. WARD:**  Okay.  Let's back out of that, if we could.

10    Go to the bottom paragraph.  It starts, "with the

11    introduction."

12        You see where Mr. Versace writes:  With the introduction

13    of AML Bitcoin and its likely integration into the payment

14    structures of governments and corporations across the globe,

15    this will all change.

16        Where was that information from?

17    **A.**    That either came from Jack or the website.

18    **BY MR. WARD**

19    **Q.**    All right.  The next sentence says, already, ports in the

20    United States and Latin America, as well as banks and

21    governments throughout the world are in advanced discussions

22    with NAC Foundation, the creator of AML Bitcoin, to deploy AML

23    Bitcoin in their payment systems.

24        Where did that information come from?

25    **A.**    The information about the ports was provided to me by Jack

1    Abramoff.

2    **Q.**    And the same with the Latin America?

3    **A.**    Yes.

4    **Q.**    And again, this wasn't anything that you confirmed

5    independently?

6    **A.**    That's correct.

7            **MR. WARD:**  You can pull out of this.

8    **BY MR. WARD**

9    **Q.**    Did you see this article published on the Forbes.com

10   website?

11   **A.**    Yes.

12   **Q.**    At some point did Forbes pull the article?

13   **A.**    Yes, they did.

14   **Q.**    And how did you learn that Forbes pulled the article?

15   **A.**    I had some communication with Chris it was pulled out.

16   **Q.**    And based on your conversations with Versace, do you know

17   why Forbes pulled the article?

18           **MR. STEFAN:**  Objection; hearsay.

19           **THE COURT:**  Sustained.

20   **BY MR. WARD**

21   **Q.**    After the article was pulled down, did you ever see it on

22   the Forbes website again?

23   **A.**    No.

24   **Q.**    Did you continue to work with Mr. Versace on getting

25   articles published?

BRUFFEY - REDIRECT / HIGHSMITH

1    **A.**    I didn't work with him after that.

2    **Q.**    Okay.  Did you work with a writer named Peter Ferrara to

3    write articles about AML Bitcoin?

4    **A.**    Yes, I did.

5    **Q.**    And like the other writers, did you provide him the

6    information that he used in his articles?

7    **A.**    Yes, I did.

8    **Q.**    And did you pay him to write the articles?

9    **A.**    Yes, I paid him.

10          **MR. WARD:**  Can we look at exhibit 864, please?  This

11    has been admitted.

12    **BY MR. WARD**

13    **Q.**   Mr. Darling, was this an article you paid Peter Ferrara to

14    write for Investor's Business Daily?

15    **A.**    Yes.

16          **MR. WARD:**  All right.  Go to page 2, please, second

17    paragraph.

18    **BY MR. WARD**

19    **Q.**    Dawn came last week to Panama.  As the corn world was

20    buffeted by the market swoon, officials of an entirely

21    different kind of digital currency quietly met with leading

22    government and industry officials in Panama City.

23          **MR. WARD:**  If you can back out of that, please.

24    **BY MR. WARD**

25    **Q.**    Was that a reference to AML Bitcoin?

1  **A.**   Yes.

2          **MR. WARD:**  Ms. Rosenbaum, can we highlight the

3  paragraph that starts "in Panama" and just do the -- that, and

4  those three paragraphs starting with "in Panama"?

5  **BY MR. WARD**

6  **Q.**   Where did you -- where did Mr. Versace get the information

7  that AML Bitcoin founder Marcus Andrade had met with leaders in

8  government and industry, including the banking sector?

9  **A.**   This is a Ferrara piece?

10 **Q.**   A Ferrara piece, yeah, sorry.

11 **A.**   The information I provided to him.

12 **Q.**   All right.  The next paragraph has a quote from a former

13 ambassador Carlos De La Guardia.  Starting with you, did you

14 ever speak to Carlos De La Guardia?

15 **A.**   No.

16 **Q.**   Did you know where that quote that Mr. Ferrara used came

17 from?

18 **A.**   I would have provided it to him.

19          **MR. WARD:**  All right.  Let's back out of this.

20 **BY MR. WARD**

21 **Q.**   I know you've reviewed this article, Mr. Darling.

22 Anywhere in this article does Mr. Ferrara reveal that he's

23 being paid to write this article?

24 **A.**   No.

25 **Q.**   And does anywhere in this article does it reveal that

**BRUFFEY - REDIRECT / HIGHSMITH**

1  the -- he's writing it on behalf of AML Bitcoin?

2  **A.**  No.

3  **Q.**  Going back to that article by Mr. Versace.  Anywhere in

4  that article did Mr. Versace reveal that he was being paid to

5  write that article?

6  **A.**  No.

7  **Q.**  And that AML Bitcoin had a financial interest in that

8  article?

9  **A.**  No.

10  **Q.**  The article that you wrote for The Observer, did you

11  reveal anywhere in the article that that you were acting as a

12  paid promotor of AML Bitcoin?

13  **A.**  No.

14  **Q.**  When you submitted your article to The Observer, did you

15  tell The Observer that you had been paid to write that article?

16  **A.**  No.

17  **Q.**  Okay.  And to your knowledge, if you know, did Mr. Versace

18  or Mr. Ferrara reveal to the news organizations that published

19  their article whether they had been paid for writing those

20  articles?

21  **A.**  I don't believe so.

22  **Q.**  All right.  Did you also work with a writer named Peter

23  Roff?

24  **A.**  Yes.

25  **Q.**  To write articles about AML Bitcoin?

BRUFFEY - REDIRECT / HIGHSMITH

1  **A.**    Yes.

2  **Q.**    Was it the same arrangement with Mr. Roff that you had

3  with Mr. Ferrara and Mr. Versace?

4  **A.**    Yes.

5          **MR. WARD:**  All right.  Can we look at exhibit 1441,

6  which has already been admitted?

7  **BY MR. WARD**

8  **Q.**    You reviewed this article, Mr. Darling?

9  **A.**    Yes.

10 **Q.**    This article is about the Port of San Francisco.  Did you

11 provide Mr. Roff with the information that went into this

12 article?

13 **A.**    Yes.

14 **Q.**    To your knowledge, did he do any independent research to

15 confirm any of the information in this article?

16 **A.**    I don't believe so.

17 **Q.**    And where were you getting the information that you were

18 providing to Mr. Roff for the article?

19 **A.**    My information about the specifics from Jack Abramoff.

20         **MR. WARD:**  All right.  Can we just go down one page,

21 please?  And another.  One more.  Can we highlight this quote

22 right here, "digital currency"?

23 **BY MR. WARD**

24 **Q.**    This is a quote from -- purportedly from Marcus Andrade.

25 Where did this quote come from?

 1   **A.**   That quote was provided to me.

 2          **MR. WARD:**  All right.  If we could back out, please.

 3   Down one more page.  Starting with the quote that says "San

 4   Francisco is a very tech-forward thinking city".

 5   **BY MR. WARD**

 6   **Q.**   Do you recognize that quote?

 7   **A.**   Yes, I do.

 8   **Q.**   And where did that come from?

 9   **A.**   That quote was provided to me.

10   **Q.**   By Jack Abramoff?

11   **A.**   Yes.

12   **Q.**   Did you ever speak to Leslie Katz?

13   **A.**   No.

14          **MR. WARD:**  Okay.  You can back out of this article.

15   **BY MR. WARD**

16   **Q.**   In early 2018, Mr. Darling, were you asked to generate

17   press about an AML Bitcoin ad in the Super Bowl?

18   **A.**   Yes.

19   **Q.**   Were you told -- what were you asked -- well, first, who

20   asked you to generate press about AML Bitcoin in the Super

21   Bowl?

22   **A.**   Jack Abramoff.

23   **Q.**   And what did Jack Abramoff tell you about AML Bitcoin in

24   the Super Bowl?

25   **A.**   Told me that they were putting together an ad.  They were

1  going to a studio and spending money on an ad that they were

2  pulling together that they were gonna submit to see if they

3  could get it running during the Super Bowl.

4  Q.   All right.  And did Mr. Abramoff describe the contents of

5  the ad for you?

6  A.   He described it as the North Korean leader complaining

7  about not being able to hack AML Bitcoin because it was -- it

8  had all these protections in it.  So it was a -- basically

9  showing the North Korean leader just getting all angry and

10  upset saying I can't act with this technology.

11  Q.   It was a humorous ad?

12  A.   Yes, it was intended to be humorous.

13  Q.   And what did Jack Abramoff tell you that AML Bitcoin

14  intended to do with that ad?

15  A.   Submit it to see if they could get it run during the Super

16  Bowl.

17  Q.   And submit it to who?

18  A.   To the network.

19  Q.   All right.  And at a later point did he tell you whether

20  or not they, in fact, had submitted it?

21  A.   My understanding it was submitted and rejected.

22  Q.   And your understanding that it was submitted and rejected

23  comes from Mr. Abramoff?

24  A.   Yes, that's what I was told.

25  Q.   All right.  And did Mr. Abramoff tell you why the -- well,

1  first of all, who did he tell you had rejected the ad?

2  **A.**   I guess it was the network, because the network was the

3  one that was supposed to run it.

4  **Q.**   All right.  Did -- after Mr. Abramoff told you that the

5  network had rejected the ad, what did he ask you to do?

6  **A.**   He asked me to generate a couple op-eds talking about how

7  the NFL and the network rejected the ad because it was so

8  controversial.

9  **Q.**   All right.  And did -- were you able to generate news

10  articles and press about this claim that the NFL and the

11  network had rejected --

12  **A.**   Yeah, not news articles, but I did generate a number of

13  op-eds.

14          **MR. WARD:**  Can we go back and look at exhibit 241?  We

15  can blow up the ...

16  **BY MR. WARD**

17  **Q.**   You can look at line number 7?  Do you see that?

18  **A.**   Yes.

19  **Q.**   Did you commission and pay a writer by the name of Steve

20  Sherman to get an article published called the NFL Has Become A

21  Political Action Committee?

22  **A.**   Yes.

23  **Q.**   Did you, looking at line 8, did you pay a writer by the

24  name of Derek Hunter to write an article called NFL Rejects

25  Super Bowl Ad Because It Mocks Kim Jong-Un?

1  **A.**    Yes.

2  **Q.**    Was that published in the Daily Caller?

3  **A.**    Yes.

4  **Q.**    Next line, same author, Steve Sherman.  Did you commission

5  him to write an article called What Is Wrong With The NFL that

6  was published in Townhall?

7  **A.**    Yes.

8  **Q.**    Same with the next line.  Did you pay Mr. Dan Perkins to

9  write an article, The NFL Is Against Free Speech At The Super

10  Bowl?

11  **A.**    Yes.

12  **Q.**    And then again on line 11, was this another article that

13  you commissioned and had published?

14  **A.**    Yes.

15  **Q.**    The information that all these writers got about the ad

16  and it being rejected by the NFL and the NBC, where did that

17  information come from?

18  **A.**    It came from me.

19  **Q.**    Did you ever confirm with NBC or the NFL whether or not

20  they had rejected the ad?

21  **A.**    No.

22        **MR. WARD:**  It would be a good point to break if we're

23  ready.

24        **THE COURT:**  Okay.  Do you have more?

25        **MR. WARD:**  I have a little more, yeah.

 1          THE COURT:  All right.  Members of the jury, we'll

 2    call it for the day.

 3          Remember my admonition.  Do not discuss this amongst

 4    yourselves, with anyone else.  Don't do any research.  Don't do

 5    anything associated with this case.  Enjoy the wet afternoon,

 6    and we'll see you tomorrow to start at 8:30.

 7          (The jury exits the courtroom.)

 8          THE COURT:  We'll need you back tomorrow.

 9          We're out of the presence of the jury.

10          So we don't have any miscommunications, what is the list

11    for tomorrow?

12          MR. WARD:  Tomorrow we're going to finish up with

13    Mr. Darling.  We're going to go back to David Hargreaves, who

14    was the witness we were going to call today.

15          THE COURT:  Hargreaves?

16          MR. WARD:  Yeah, H-a-r-g-e-a-v-e-s.

17          THE COURT:  Okay.

18          MR. WARD:  From there we're going to do Byron Rhett,

19    R-h-e-t-t.  He's from the Port of San Francisco.  And then from

20    there we will go to Leslie Katz, who was the port commissioner

21    and the lawyer who was featured in the quotes.  And we provided

22    these names to you yesterday, I believe.

23          MR. SHEPARD:  Yes.

24          THE COURT:  Okay.

25          MR. WARD:  So we'll get you the list of the documents.

1    **THE COURT:**  So that's the four?

2    **MR. WARD:**  That's the four.

3    **THE COURT:**  Okay.  I do have civil law and motion at

4    2:30, so could you make sure you clear off the tables?  Because

5    other counsel will need it.

6    All right.  Anything else?

7    **MR. WARD:**  Nothing from the government.

8    **THE COURT:**  Mr. Chou, how do we pronounce your name

9    properly?  Because I've heard it in three or four different

10   iterations.

11   **MR. CHOU:**  Thank you, Your Honor.  It's Chou.  Like

12   C-h-o-w, even though it's not spelled that way.

13   **THE COURT:**  Good to know.  Thank you very much.

14   Okay.  See you tomorrow at 8:30.  Well, I'll see you at

15   8:00 tomorrow.

16   (The evening recess was taken at 1:32 p.m.)

17                    CERTIFICATE OF REPORTER

18   I, Stephen W. Franklin, Registered Merit Reporter, and

19   Certified Realtime Reporter, certify that the foregoing is a

20   correct transcript, to the best of my ability, from the record

21   of proceedings in the above-entitled matter.

22   Dated this 13th day of February, 2025.

23

24   _____

25   Stephen W. Franklin, RMR, CRR