```
                                        Volume 5

                                    Pages 717 - 906

                        UNITED STATES DISTRICT COURT

                        NORTHERN DISTRICT OF CALIFORNIA

            Before The Honorable Richard Seeborg, Judge

            UNITED STATES OF AMERICA,        )
                                             )
                       Plaintiff,            )
                                             )
              VS.                            )       NO.  3:20-CR-00249-RS-1
                                             )
            ROWLAND MARCUS ANDRADE,          )
                                             )
                       Defendant.            )
            _____)
                                        San Francisco, California

                                        Friday, February 14, 2025
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

```
For Plaintiff:
                        PATRICK D. ROBBINS
                        Acting United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California 94102
                BY:  CHRISTIAAN HIGHSMITH
                     DAVID J. WARD
                     MATTHEW CHOU
                     ASSISTANT UNITED STATES ATTORNEYS


For Defendant:
                        KING AND SPALDING, LLP
                   50 California Street, Suite 3300
                   San Francisco, CA 94111
                   BY:  MICHAEL J. SHEPARD
                        ATTORNEY AT LAW


 (Appearances continued on following page.)

REPORTED BY:            Stephen W. Franklin, RMR, CRR, CPE
                        Official United States Reporter
```

```
APPEARANCES (CONT.'D):

For Defendant:
                        KING AND SPALDING, LLC
                        1700 Pennsylvania Avenue, Northwest
                        Washington, DC 20006
                        BY:  KERRIE C. DENT
                        ATTORNEY AT LAW

                        KING AND SPALDING, LLC
                        1185 6th Avenue, 34th Floor
                        New York, NY 10036
                   BY:  DAINEC STEFAN
                        ATTORNEY AT LAW

                        CINDY A. DIAMOND, ATTORNEY AT LAW
                        58 West Portal Avenue, #350
                        San Francisco, CA 94127
                   BY:  CINDY A. DIAMOND
                        ATTORNEY AT LAW
```

# I N D E X

Friday, February 14, 2025 - Volume 5

| **GOVERNMENT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **DARLING, BRIAN (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 733 | 5 |
| Direct Examination by Mr. Ward | 733 | 5 |
| Cross-Examination by Mr. Stefan | 751 | 5 |
| Redirect Examination by Mr. Ward | 770 | 5 |
| Recross-Examination by Mr. Stefan | 773 | 5 |
| | | |
| **HARGREAVES, DAVID** | | |
| (SWORN) | 774 | 5 |
| Direct Examination by Mr. Chou | 774 | 5 |
| Cross-Examination by Mr. Shepard | 810 | 5 |
| Redirect Examination by Mr. Chou | 824 | 5 |
| Recross-Examination by Mr. Shepard | 829 | 5 |
| | | |
| **RHETT, BYRON** | | |
| (SWORN) | 833 | 5 |
| Direct Examination by Mr. Chou | 833 | 5 |
| Cross-Examination by Mr. Shepard | 846 | 5 |
| | | |
| **KATZ, LESLIE** | | |
| (SWORN) | 849 | 5 |
| Direct Examination by Mr. Ward | 849 | 5 |

# E X H I B I T S

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 20 | | 864 | 5 |
| 30 | | 779 | 5 |
| 115 | | 869 | 5 |
| 145 | | 882 | 5 |
| 240 | | 760 | 5 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 405 | | 794 | 5 |
| 461 | | 734 | 5 |
| 488 | | 836 | 5 |
| 489 | | 884 | 5 |
| 549 | | 772 | 5 |
| 587 | | 746 | 5 |
| 706 | | 738 | 5 |
| 707 | | 740 | 5 |
| 792 | | 784 | 5 |
| 864 and 1447 | | 725 | 5 |
| 1144 | | 735 | 5 |
| 1443 | | 790 | 5 |
| 1453 | | 799 | 5 |
| 1467 | | 776 | 5 |
| 2275 | | 814 | 5 |
| 3109 | | 878 | 5 |
| 3112 | | 900 | 5 |

| | |
|---|---|
| 1 | **Friday - February 14, 2025**                          **8:06 a.m.** |

```
 1   Friday - February 14, 2025                          8:06 a.m.

 2                      P R O C E E D I N G S

 3                         ---o0o---

 4        (Defendant present, out of custody.)

 5             THE COURT:  Good morning.

 6             MR. HIGHSMITH:  Good morning.

 7             MR. WARD:  Good morning.

 8             THE COURT:  Two things that I want to talk with you

 9   about.

10        First is there were two exhibits, and it got a bit garbled

11   at the end.  Ms. Dent was using some documents and sought to

12   have them introduced and there was, after the fact, after the

13   witness was on the way out, and it was unclear what the ruling

14   was.  So I wanted to look at it again.  It's exhibit, what,

15   3085?  Is that correct?

16             MS. DENT:  And 3083.

17             THE COURT:  And I have 3085 here, but I don't know if

18   I have 3083.  Do you have 3083?

19             MS. DENT:  I gave them to Corinne.

20             THE COURT:  I've got it.

21        We need to do this contemporaneously because when this

22   happens, that's why things get garbled.  The witness is gone.

23   You know, you need to -- if you want to move up exhibits, move

24   it when you're using it.

25             MS. DENT:  Understood.
```

1              **THE COURT:** But -- so I remember using you this, but

2    you sought to have it introduced.  And Mr. Highsmith, your

3    objection was hearsay?

4              **MR. HIGHSMITH:** Yes.

5              **THE COURT:** All right.  What were you -- tell me why

6    it's not hearsay or why it should be admitted, why were you

7    using it?  Go ahead.

8              **MS. DENT:** Actually, I think it was just being used to

9    impeach the witness.  So, but I think Mr. Ward said that the

10   other version of it was already introduced by them.  Didn't you

11   say the government?  No?

12             **MR. WARD:** No, no, no.  That's the Washington --

13             **MR. HIGHSMITH:** Let's keep the issue separate.

14             **MS. DENT:** Okay.  But ...

15             **THE COURT:** Well, let me do it this way.  What I want

16   to know, let's first start with 3083.  3083 is a e-mail from

17   Mr. Bruffey, and it's something about thank you for having the

18   coin wallet work, or whatever.

19        Are you still seeking to introduce this?

20             **MS. DENT:** Yes, Your Honor.

21             **THE COURT:** Your basis for it why it's not hearsay is?

22             **MS. DENT:** Well, because the witness is saying that,

23   and he's saying that he's very satisfied with his --

24             **THE COURT:** Well, a document will still be -- even if

25   the witness is on the stand, a written document by that witness

can still be hearsay.  The question is -- you could have asked

him about this and then it wouldn't be hearsay because he would

testify to it, but this document is hearsay.

    But are you introducing it -- why is it coming -- why do

you want it to come in?

        **MS. DENT:**  No.  Okay.  We don't need to ...

        **THE COURT:**  Okay.  So you're withdrawing the request

to have this introduced?

        **MS. DENT:**  Yes, Your Honor.

        **THE COURT:**  How about 3085?

        **MS. DENT:**  We'll withdraw that request, as well.

Thanks.

        **THE COURT:**  Well, that makes it simple.

    Okay.  The issue that I need to talk about -- do you have

issues in addition?

        **MR. WARD:**  I have one issue.

        **THE COURT:**  Is it simple?  We can do that one now.

        **MR. WARD:**  I think it's simple, Your Honor.

Hopefully.

        Yesterday when speaking to Mr. Darling I showed him

exhibit 864, which is this Investor's Business Daily article.

        **THE COURT:**  Yeah.

        **MR. WARD:**  And he testified about working with Peter

Ferrara to have it written.  When I brought it up, I said this

exhibit had been admitted, which was only half true.  We did

the exhibit with Dr. Witte, but that was exhibit 1447.  They're

the exact same document.  They've been unfortunately marked

twice, but it's the same document.  I can provide copies to the

Court.

       **THE COURT:**  I think you even -- I thought you said

something about there was only some slight differences when you

were examining.  I remember this came up.  But you're saying

they're identical?

       **MR. WARD:**  I looked at them this morning.  That was

another article slightly different.  Those are identical.

    I would think if the Court would put on the record that

we, and Mr. Shepard I think would stipulate, that 1447 and 1864

are identical, and they would both be admitted, and if we need

to make a comment to the jury when we send them back, you may

see these two exhibits, they are the same.  They may not care

or notice.

       **THE COURT:**  Okay.

       **MR. SHEPARD:**  That's fine.

       **THE COURT:**  All right.  Well, so exhibit 1447 and

exhibit 864 are duplicates.

       **MR. WARD:**  Thank you.

       **THE COURT:**  And if you want me to say something

further to the jury, I don't think we need to.

       **MR. WARD:**  I don't think we need to.  And those will

both be admitted?

1          **THE COURT:**  Yes.

2          (Trial Exhibits 864 and 1447 received in evidence.)

3          **MR. WARD:**  Thank you, Your Honor.

4          **THE COURT:**  And just for my information, the binders

5    that I got are from the defense, and you're -- is this defense

6    binders?  Who gave me the binders?

7          **MS. DENT:**  Yes, Your Honor.

8          **MR. SHEPARD:**  I believe those are ours.

9          **MS. DENT:**  And the government has a copy, as well.  We

10   gave them a copy of what we gave you.

11         **THE COURT:**  And these are ...

12         **MS. DENT:**  Just for today's witnesses.

13         **THE COURT:**  You're going to use them with today's

14   witnesses.

15         All right.  So the issue that I need to talk to you about

16   is a juror.  Ms. Navarro.  As you may remember, she is the

17   nurse, and she, I remember, in the voir dire process she talked

18   about having all sorts of jobs.  And we asked her, you know,

19   that's pretty daunting, do you think you can do it.  I also

20   think she's coming from a long distance.  And she said that she

21   would try or she could.

22         She's now said that she can't do it.  She's exhausted.

23   She can't follow.  She wants to be let go.

24         So that's the situation.  On the one hand it's earlier

25   than I would like to let somebody go.  At the same time, I

1    don't want a juror who says they're physically unable to do

2    their duty.  And I remember I thought her schedule was pretty

3    daunting.

4         So let me start with you, Mr. Shepard.

5              MR. SHEPARD:  I understand the issue.  I guess I would

6    like a brief opportunity to consult with my client about that.

7              THE COURT:  All right.

8              MR. SHEPARD:  And our team.

9         And I should add, I do have an issue or two for the Court,

10   as well, this morning.

11             THE COURT:  Okay.

12             MR. HIGHSMITH:  No objection to releasing her, Your

13   Honor.

14             THE COURT:  Well, why don't you go ahead and consult

15   with Mr. Andrade so we can get this resolved.

16             MR. SHEPARD:  Thank you for the time, Your Honor.  We

17   don't have any objection to letting her go.

18             THE COURT:  So Mr. Jarrett Austin Thomas will be the

19   new juror.  I was just, I will let her go.  I'm not going to

20   make her come back in obviously, and I'm just going to tell the

21   jury that one of your number isn't able to serve further, and

22   Mr. Jarrett Austin Thomas is now moved into the jury, and then

23   we'll go from there.

24             MR. HIGHSMITH:  Understood.

25             THE COURT:  Okay.  Your issues.

1          **MR. SHEPARD:**  Two issues.  One that Mr. Stefan will

2    present.  I think it's more of a hearsay issue in a document.

3        The one I wanted to raise is a rule of completeness issue

4    relating to government proposed exhibit.

5          **THE COURT:**  It hasn't been admitted yet.

6          **MR. SHEPARD:**  It has not been admitted yet, but it

7    will be coming sometime today.

8          **THE COURT:**  All right.

9          **MR. SHEPARD:**  So I wanted raise it now, as opposed to

10   when it comes.

11       This is the government's proposed exhibit.  It's

12   number 89.

13         **MR. HIGHSMITH:**  Which witness?

14         **MR. SHEPARD:**  It's Leslie Katz.

15         **MR. HIGHSMITH:**  Thank you.

16         **MR. SHEPARD:**  So I think -- I'm not sure whether that

17   was, okay, I understand the issue or, okay, I agree with you.

18   But the issue is this is an e-mail chain in which a draft press

19   release is sent at Mr. Andrade's insistence to Ms. Katz, who is

20   the Port of San Francisco commissioner.  It's sent to her

21   before release to see if she's okay with it.  And there's an

22   e-mail chain that results from that, and the government would

23   cut that e-mail chain off I believe with Ms. Katz saying, this

24   is disappointing, it overstates what happened.

25       And the rest of the chain, which is in defense

1    exhibit 3109, is Mr. Andrade saying, I'm sorry, we -- I didn't

2    get it right.  It won't go out.  And seems to me that's like a

3    classic rule of completeness case.

4         **THE COURT:**  Do we have an issue here or not?

5         **MR. WARD:**  That's fine.  No objection.

6         **THE COURT:**  Okay.  The next one?

7    Do you want this back?

8         **MR. SHEPARD:**  I'll take it.

9         **THE COURT:**  All right.  Next issue.

10        **MR. STEFAN:**  We're going to object to hearsay for the

11   government's exhibit 1508.  1508 is related to Brian Darling.

12   The government gave it to us last night.  It's a string of

13   messages between -- well, actually just --

14        **MR. WARD:**  Can I see it?

15        **MR. STEFAN:**  It's just from Darling to seemingly

16   Abramoff, no responses from Abramoff.  So for any effect on the

17   listener purpose, there's no effect to record.

18        And then the second page of the exhibit shows two text

19   interactions between Abramoff and Darling that also don't get

20   at any substantive statements from a coconspirator.

21        So the -- as I understand the final messages on the left

22   here on exhibit 1508, page 2, "nope" and "yep" are from Brian

23   Darling, confirming that the AML Bitcoin post was the reason

24   that Versace was cut from Forbes.

25        **MR. HIGHSMITH:**  The message is that after -- yesterday

```
 1    there was testimony about how Mr. Versace published an article

 2    in Forbes, and then Mr. Darling had testimony about how, you

 3    know, what happened with Mr. Versace after he published that

 4    Forbes article, and he said, I don't know.  And this goes to,

 5    oh, he was cut from Forbes.

 6              MR. STEFAN:  Which shows --

 7              THE COURT:  Is he the author?

 8              MR. HIGHSMITH:  The purported author, the "by line"

 9    author, was cut from Forbes.

10              THE COURT:  Okay.  So what -- run through this.  What

11    are you proposing to do?  What's your question going to be

12    connected to this particular exhibit, so I understand what's

13    coming?

14              MR. WARD:  So Mr. Darling said that he had learned

15    that Versace's post about AML Bitcoin had been rejected by

16    Forbes.

17              THE COURT:  Right.

18              MR. WARD:  And then I asked Mr. Darling, do you know

19    if Mr. Versace did any additional articles for Forbes, and he's

20    like, I don't know.

21         And then in this text, this is part of a text chain

22    between Darling and Abramoff, and Mr. Darling writes:  Versace

23    booted from Forbes because of AML post.

24         So what I would propose to do is show it to him to refresh

25    his recollection as to why he was booted from Forbes, but I
```

1    don't have to introduce it.

2        THE COURT:  Well, you can use any document to see if

3    it refreshes.  If a witness says, I don't remember, the usual

4    drill is to say, well, would anything refresh your recollection

5    or would an e-mail potentially refresh your recollection.  The

6    witness silently reads it, and then the witness either says,

7    yeah, now I remember, or I don't.  I realize it's a bit of an

8    artificial construct sometimes, but the document itself doesn't

9    come into evidence.  And if the answer is, no, I don't

10   remember, it's the last we ever hear of that document.

11       MR. WARD:  That's right, Your Honor.  I'm comfortable

12   with that.  So I'll use it to refresh, but I won't introduce.

13       MR. STEFAN:  Defense's recollection of the transaction

14   that resulted in this objection this morning is a little bit

15   different in that we had a question from the government to the

16   witness regarding why or what his understanding was of why

17   Mr. Versace or if Mr. Versace was booted out of Forbes, and our

18   objection was to foundation and hearsay.  And this document

19   just being an interaction between Abramoff and Darling doesn't

20   get over the issues with hearsay.  I mean, the witness --

21       THE COURT:  Hearsay, it's more he wouldn't have a

22   basis to know one way or the other.

23       MR. STEFAN:  Sure.  And any basis he had would be

24   hearsay, so ...

25       THE COURT:  Right.

1          Actually, I mean it's not a hearsay objection.  They're

2     not seeking to introduce the document.  But it is a foundation.

3          I mean, okay, now I remember that somebody provided me

4     with some hearsay knowledge about this.  Are you -- unless --

5     are you introducing it for the truth of the matter asserted,

6     which is that this guy got dumped by Forbes or is there some

7     other relevance to whether or not he knows or he came to this

8     conclusion that the guy got dumped by Forbes?  Is there some

9     relevance to his understanding of whether or not Forbes didn't

10    want to use him anymore?

11         **MR. WARD:**  I think the relevance is that he understood

12    that he had been booted because of what he had written about

13    AML Bitcoin.

14         **THE COURT:**  Well, but then you really are trying to

15    get in the fact that he was booted by Forbes, which this

16    witness does not have any foundation for.

17         So I agree with the defense.  Don't do this.

18         **MR. WARD:**  Okay.

19         **THE COURT:**  All right.  Okay.  You're going to wear

20    your -- the microphone was working pretty well, so you'll

21    continue to do that?

22         **MR. SHEPARD:**  Yes.  Thank you, Your Honor.

23         **THE COURT:**  Okay.  All right.  So I'll see if they're

24    all here, and we'll get ready, and it will be Mr. Darling.

25         (A recess was taken from 8:24 a.m. to 8:31 a.m.)

```
1              THE COURT:  Okay.  Bring the jury out.

2         (The jury enters the courtroom.)

3              THE COURT:  Good morning, members of the jury.

4         Unfortunately we lost one of your number.  The schedule

5    just couldn't be accommodated.  So our juror was -- Ms. Navarro

6    is not with us and that means that Mr. Austin Thomas, you are

7    now a member of the jury.  So there's an empty seat there.  Our

8    alternates who are not in the box, if one of you wants that

9    seat, or Mr. Austin Thomas can move to that seat.  In other

10   words, it's up to you how you want to position yourself.  So if

11   anybody wants the seat, feel free to take it.  So I don't want

12   to -- you know, first come, first served.  And you can switch

13   off if you decide --

14        I know, Ms. Lapedis, you were having some issues about

15   hearing.  If you want to trade at any time with one of your

16   colleagues, no problem.

17             A JUROR:  Thank you.

18             THE COURT:  All right.  So thank you very much for

19   being here and allowing us to get started on schedule.

20        I believe we were with Mr. Darling on direct.

21        And Mr. Darling, you understand you remain under oath?

22             THE WITNESS:  Yes, sir.

23             THE COURT:  Go ahead, Mr. Ward.

24   \\\

25   \\\
```

DARLING - DIRECT / WARD

1      **BRIAN DARLING**,

2   called as a witness for the Government, having been previously

3   duly sworn, testified further as follows:

4                  **DIRECT EXAMINATION**

5   **BY MR. WARD**

6   **Q.**   Good morning, Mr. Darling.

7   **A.**   Good morning.

8   **Q.**   Yesterday, we were discussing the Super Bowl and the AML

9   Bitcoin.  Do you remember that discussion?

10  **A.**   I do.

11  **Q.**   You testified yesterday that you helped generate articles

12  about the NFL rejection campaign or about the Super Bowl --

13  excuse me -- being rejected by the NFL.  Was part of that

14  strategy to have those articles posted on Twitter and other

15  social media?

16  **A.**   Yes.  The purpose was so people would read them.

17         **MR. WARD:**  Can we bring up an exhibit 461, please.

18  **BY MR. WARD**

19  **Q.**   Mr. Darling, do you see is this?

20  **A.**   Yes.

21  **Q.**   What is it?

22  **A.**   That's a screenshot from the advertisement.

23  **Q.**   Is that an accurate depiction of the social media post you

24  saw at the time?

25  **A.**   Yes, it is.

**DARLING - DIRECT / WARD**

```
 1            MR. WARD:  All right.  Let's move to admit
 2    exhibit 461.
 3            MR. STEFAN:  No objection.
 4            THE COURT:  461 will be admitted.
 5        (Trial Exhibit 461 received in evidence.)
 6    BY MR. WARD
 7    Q.   Mr. Darling, is this a -- is this an Instagram post for
 8    AML Bitcoin?
 9    A.   I think it's a Twitter post; but I'm not sure.
10    Q.   Look at the URL at the top.
11    A.   That's an Instagram.  That is Instagram.
12    Q.   When you look at the picture, briefly describe what the
13    picture shows, please.
14    A.   The picture is a screenshot from the advertisement that
15    they put together.
16    Q.   And is the gentleman -- is the person to the right in the
17    black suit, is that an actor playing Kim Jong-Un?
18    A.   Yes.
19    Q.   And was this the ad that you were told was rejected by the
20    NFL?
21    A.   Yes.
22            MR. WARD:  Let's look at one other exhibit.  Can we go
23    to exhibit 1144, please.
24    BY MR. WARD
25    Q.   What is this, Mr. Darling?
```

1    **A.**    That is the Twitter feed for AML Bitcoin.

2    **Q.**    And is this another ad referencing one of the stories

3    about the NFL rejecting the Super Bowl ad?

4    **A.**    Yes, it's a screenshot from one of the op-eds.

5              **MR. WARD:**  Government would move to admit

6    exhibit 1144.

7              **MR. STEFAN:**  No objection.

8              **THE COURT:**  1144 will be admitted.

9         (Trial Exhibit 1144 received in evidence.)

10   **BY MR. WARD**

11   **Q.**   Mr. Darling, you said this was a Twitter post about the

12   NFL rejecting -- about the rejecting AML Bitcoin's ad.  Who's

13   pictured in the photograph there?

14   **A.**    That's one of the actors in the advertisement.

15   **Q.**    Okay.  Thank you, Mr. Darling.

16        Mr. Darling, when you were working with Mr. Abramoff and

17   Mr. Andrade on the AML Bitcoin campaign, did you have any

18   discussions with Mr. Abramoff about lobbying Congress?

19   **A.**    Not lobbying per se, but educational meetings.

20   **Q.**    And let me be more specific.  Did you have discussions

21   with Mr. Abramoff about meetings with Congress regarding AML

22   Bitcoin?

23   **A.**    Yes.

24   **Q.**    And in general, what -- what was -- what were you and

25   Mr. Abramoff attempting to do with Congress as it relates to

```
 1   AML Bitcoin?
 2   A.   Well, the overall goal was to educate on what it was.  You
 3   know, the existence of this new technology in making members of
 4   Congress understand that there was different types of
 5   cryptocurrency, you know, this being different than Bitcoin per
 6   se, Bitcoin itself because they obviously had different
 7   technologies.
 8   Q.   Was this campaign specifically related to educating
 9   members of Congress about AML Bitcoin as a project, as a
10   product?
11   A.   Yes.
12   Q.   And did you, in fact, meet with any members of Congress?
13   A.   Had a handful of educational meetings, but they didn't
14   really go anywhere.
15   Q.   That was with the members, or staff, or ...
16   A.   Staff.
17   Q.   All right.  And to your knowledge, was there ever any
18   legislation introduced in Congress to --
19   A.   No.
20   Q.   Was there any legislation related -- introduced or passed
21   relating to AML Bitcoin?
22   A.   No.
23   Q.   Okay.  Mr. Darling, at some point did you create a
24   document for Marcus Andrade that collected all the press clips
25   that you had helped generate for AML Bitcoin?
```

**DARLING - DIRECT / WARD**

1   **A.**   Yes, I did.

2   **Q.**   Can I show you what's been marked exhibit 706?

3           **MR. WARD:**   Please just publish this to the witness and

4   the Court and the parties.

5   **BY MR. WARD**

6   **Q.**   Do you see these e-mails?  Mr. Darling, looking at the

7   second e-mail, is that an e-mail from you to Jack Abramoff?

8   **A.**   Yes, it is.

9   **Q.**   And does this reference the attached clips that you

10  helped -- that you put together for Mr. Andrade?

11  **A.**   Yes.

12          **MR. WARD:**   All right.  At this point I'm not going to

13  ... well, we'll go ahead and admit this.  Let's admit

14  exhibit 706.

15          **MR. STEFAN:**   One moment, Your Honor.

16          **THE COURT:**   Yes.

17          **MR. STEFAN:**   Given Abramoff's response to it is the

18  material that would be substantively admitted, I would like --

19  I'm objecting at this point to the admission of that statement

20  as relevant, absent seeing whatever underlying document is

21  attached to the e-mail that was being sent to Abramoff.

22          **MR. WARD:**   The witness his authenticated the document.

23  The statement at the top would be a coconspirator statement,

24  and I'm happy to walk through the attachment with Mr. Darling.

25          **THE COURT:**   All right.  I'll admit it.

1          (Trial Exhibit 706 received in evidence.)

2     BY MR. WARD

3     Q.    Mr. Darling, can you look at exhibit 706, please.  And

4     is -- you write, consider the attached a good display item for

5     Marcus.  What are you referring to there?

6     A.    The attachment which had pictures of the op-eds.

7     Q.    And you write, to have for his meeting.  Why did you write

8     that?

9     A.    I was told that he had a meeting that he wanted to show it

10    off at.

11    Q.    He wanted to show off what specifically?

12    A.    The attachment, which is the op-eds.

13    Q.    Were you told what specific meeting Mr. Andrade was having

14    where he wanted to show these press clips?

15    A.    Not to my recollection.  I don't remember getting any

16    specifics about the meeting.  Just that he was going to a

17    meeting and wanted the clips.

18    Q.    Who told you that?

19    A.    Jack Abramoff.

20          MR. WARD:  Let's move to exhibit 707, and just at this

21    point for the witness and the parties, please.

22    BY MR. WARD

23    Q.    Have you -- did you review this document prior to your

24    testimony today?

25    A.    Yes, I did.

**DARLING - DIRECT / WARD**

1  **Q.**  Is this the attachment that you attached to the e-mail we

2  just reviewed?

3  **A.**  Yes.

4       **MR. WARD:**  Move to admit exhibit 707.

5       **MR. STEFAN:**  Your Honor, we were not provided this

6  exhibit in advance of court; haven't had the opportunity to

7  scroll through and review it.  So we can either do that live or

8  take that up separately, but ...

9       **MR. WARD:**  Happy to review it right now.  We put --

10      **THE COURT:**  Take a look.

11      **MR. WARD:**  -- exhibit number yesterday.

12  (Simultaneous crosstalk.)

13      **THE COURT:**  How long is this attachment?

14      **MR. WARD:**  It's about 10 pages.  It's a member of

15  press clippings.

16      **THE COURT:**  All right.  Go ahead and take a look at

17  the -- well, can we -- are you going to be using this beyond

18  seeking its introduction at this point?

19      **MR. WARD:**  Yes.

20      **THE COURT:**  You're going to be going through the press

21  clippings?

22      **MR. WARD:**  Yes.

23      **THE COURT:**  All right.  Then take a look and review

24  it.

25      And can you scroll through it so I can see it also?

```
1              MR. WARD:  Stop right there on the first page for a
2    second.
3              THE COURT:  Okay.  You can keep going.
4              MR. STEFAN:  No objection.
5              THE COURT:  All right.  Exhibit 707 will be admitted.
6         (Trial Exhibit 707 received in evidence.)
7    BY MR. WARD
8    Q.   Mr. Darling, take a look at the exhibit.  I believe you
9    said this was the document you prepared for Mr. Andrade's
10   meetings?
11   A.   Yes, I created this document.
12             MR. WARD:  Can you go to the second -- can we go to
13   the second page, please.
14   BY MR. WARD
15   Q.   What is this -- document's titled Post List.  What is it?
16   A.   Well, that's a list of the posts that are attached
17   following that initial page with the titles, the dates and the
18   hyperlinks that get you to the actual documents.
19   Q.   Is this a list of at least some of the documents -- excuse
20   me, some of the articles that you paid writers to produce for
21   AML Bitcoin?
22   A.   Yes.
23   Q.   Okay.  Let's go to the next page.
24        Do you see this document, Mr. Darling?  Did you pay Derek
25   Hunter to create the article that's reflected in this image for
```

DARLING - DIRECT / WARD

1   The Daily Caller?

2   **A.**   Yes.

3   **Q.**   And you paid him for that?

4   **A.**   Yes.

5   **Q.**   Let's go to the next page, please.

6        We reviewed this article yesterday.  Is this the article

7   you wrote?

8   **A.**   Yes, it is.

9   **Q.**   Let's go to the next page.

10       We reviewed this article.  Is this the article Chris

11  Versace wrote for you for TheStreet?

12  **A.**   Yes, it is.

13  **Q.**   Next page, please.

14       Did you pay a writer named Steve Sherman to write an

15  article called AML Bitcoin is the future of digital currency

16  that was published in Townhall?

17  **A.**   Yes, I did.

18  **Q.**   All right.  We'll do one more page.

19       Was this an ad that you paid -- excuse me, not an ad.  Was

20  this an article that you paid to have written that was

21  published in The American Spectator?

22  **A.**   Yes.

23  **Q.**   All right.  There are a number of other articles.  You've

24  reviewed this entire document prior to testifying here today?

25  **A.**   Yes.

1    Q.   For each of the articles for which there's the image in

2    that document, are those all articles that you paid to have

3    written about AML Bitcoin?

4    A.   Yes.   There's one link to a video, too.

5    Q.   Okay.   Let's go to that.

6            MR. WARD:   That's page 10, Ms. Rosenbaum.

7    BY MR. WARD

8    Q.   Mr. Darling, what is this a screenshot of?

9    A.   It was an interview with Peter Ferrara.

10   Q.   And which gentleman is Peter Ferrara?

11   A.   He is the individual on the right.

12   Q.   And when you say it was an interview, what media, show,

13   organization was this on?

14   A.   Something called Cheddar.   It's -- at the time, it was a

15   web-based show, and they would just -- you could look on their

16   website and watch video interviews.

17   Q.   And was Mr. Ferrara paid to appear on this show and

18   promote AML Bitcoin?

19   A.   Yeah, I believe so.   And he -- yeah, he went to go travel

20   and did the interview in person, yes.

21           MR. WARD:   You can back out of this.

22   BY MR. WARD

23   Q.   For all of the articles referenced in the document was the

24   information the writers put in their articles, was that

25   information provided by you?

1  **A.**    Yeah.  I mean, obviously they wrote their opinion, too, in

2  the piece about cryptocurrency in general.

3  **Q.**    Let me ask it more specifically.

4      Was the information that they wrote about AML Bitcoin

5  provided by you?

6  **A.**    Yes.

7  **Q.**    And where did you get that information?

8  **A.**    I got it from Jack Abramoff.

9  **Q.**    And as -- in any of those cases, did you work to confirm

10  or verify any of that information?

11  **A.**    No, other than the information that I had from the

12  website, too.

13  **Q.**    And to your knowledge, did any of those writers do any

14  independent research or reporting or writing?

15  **A.**    I don't believe so.

16  **Q.**    Okay.  When did you stop working for Mr. Andrade and

17  Mr. Abramoff on the AML Bitcoin project?

18  **A.**    I don't recall the date, but it was after the Super Bowl

19  ad.

20  **Q.**    All right.  Was it a few weeks or a few months, if you

21  remember?

22  **A.**    Maybe a few weeks.  It was -- that was at a time where I

23  was having technical difficulties, too, with my wallet, so I

24  chose to stop working on the project.

25      **MR. STEFAN:**  Objection, nonresponsive.

1          THE COURT:  Overruled.

2    BY MR. WARD

3    Q.   I'm going to ask you about the technical difficulties in a

4    moment, but first, Mr. Darling, were you paid by Jack Abramoff?

5    Were you paid by anyone for your work promoting AML Bitcoin?

6    A.   I received some compensation, yes.

7    Q.   And who did you receive that money from?

8    A.   I believe Jack was the one that sent me the money, but I

9    don't remember exactly how I received it.

10   Q.   Do you remember approximately how much money you were

11   paid?

12   A.   I don't know, about six or seven thousand, ball-parking

13   it.

14   Q.   Were you satisfied with the amount of money you were paid?

15   A.   No.

16   Q.   Why?

17   A.   It was not the same amount of money that I expended on

18   compensating authors for their time and effort.

19   Q.   And did you ever confront Jack Abramoff about this?

20   A.   No -- well, I had discussions, asked for, you know, to be

21   fully compensated, but at a point I just gave up, and I'd

22   already made a decision not to do any more work for them.

23   Q.   Okay.  You mentioned that you had technical problems.

24   What technical problems were you referring to?

25   A.   Well, initially I had a wallet, and it loaded my tokens.

```
 1   And then we had talked earlier about what had happened when I
 2   reached out to AML Bitcoin saying I had a problem, because none
 3   of them were showing up in my wallet.  That problem was solved,
 4   and --
 5   Q.   Okay.  Sorry.  Let me stop you.  We'll just walk through
 6   step by step.
 7   A.   Uh-huh.
 8   Q.   When you said you were having a problem, are you referring
 9   to the wallet on your computer that held AML Bitcoin tokens?
10   A.   Yes.
11   Q.   Okay.  And what was the problem?
12   A.   They were -- my tokens disappeared.
13   Q.   Okay.  And what did you do when you discovered your tokens
14   had disappeared?
15   A.   If I remember, I called Jack, said, what do you think I
16   should do, and ended up reaching out to AML Bitcoin directly.
17   Q.   And by reaching out, did you call them, or how did you
18   reach out to them?
19   A.   I think I e-mailed.
20   Q.   And did you receive a response?
21   A.   Yeah, I received a response.
22   Q.   And what was the response?
23   A.   It was an e-mail response where they said that they would
24   look at it.
25   Q.   And was the problem then fixed?
```

DARLING - DIRECT / WARD

```
 1    A.    Yes.

 2    Q.    Okay.  Did you later have a conversation by e-mail with

 3    Marcus Andrade about this?

 4    A.    I never had a conversation with him.  I had an e-mail.

 5    Q.    By e-mail.

 6    A.    Yes.

 7    Q.    Sorry.  Did you ...

 8              MR. WARD:  Let's look at exhibit 587, please.  And

 9    please publish this just for the witness and the parties.

10    BY MR. WARD

11    Q.    Mr. Darling, have you seen this document before?

12    A.    Yes.

13    Q.    And looking at the bottom, second page, is this an e-mail

14    from you?

15    A.    Yes, it is.

16    Q.    And is there a response above that?

17    A.    Yes, there is.

18              MR. WARD:  The government would move to admit

19    exhibit 587.

20              MR. STEFAN:  No objection.

21              THE COURT:  587 will be admitted.

22         (Trial Exhibit 587 received in evidence.)

23              MR. WARD:  Let's go to page 2 of this exhibit, if we

24    could.

25              THE COURT:  Yes.
```

DARLING - DIRECT / WARD

```
 1              A JUROR:  Can you stand closer to the microphone,
 2    please?
 3              MR. WARD:  Oh, thank you.
 4    BY MR. WARD
 5    Q.   All right.  Let's go back up to page 1.  And looking at
 6    the bottom part of the e-mail where it says, "on Tuesday,
 7    February 24th."
 8              MR. WARD:  Can we blow that up?
 9    BY MR. WARD
10    Q.   Was this an e-mail from you to Marcus Andrade on
11    February 21st, 2019?
12    A.   Yes.
13    Q.   Okay.  Let's walk through this.
14         You write:  I have purchased many thousands of ABTC
15    tokens.  What are you referring to as ABTC tokens?
16    A.   Those are the AML Bitcoin tokens that I originally
17    purchased.
18    Q.   And the ABTC tokens, how many -- remind us, how much had
19    you originally spent purchasing those tokens?
20    A.   About $25,000.
21    Q.   You next write:  I have received others from the company
22    in consideration of work I performed.
23         Do you remember how many additional tokens you received
24    from the company?
25    A.   I don't remember specifically.
```

1   Q.   Okay.  Looking at the next paragraph, you write:  I can --

2   you say in the last sentence, my wallet is not loading.  And

3   then you write:  I communicated this to Jack Abramoff, as he

4   has been a liaison for many of us with the company and you, and

5   I am told he e-mailed you to seek assistance on the matter.  I

6   am now informed that instead of responding to Jack, you

7   directed his e-mail to your attorneys, who have since

8   communicated with Jack's attorneys.

9        What are you saying here?

10  A.   Yeah.  I was, I was told that attorneys were communicating

11  now.

12           MR. STEFAN:  Objection; foundation.

13           THE COURT:  Overruled.

14  BY MR. WARD

15  Q.   Can you repeat your answer, Mr. Darling?

16  A.   I was told that the attorneys were dealing with this now.

17           MR. WARD:  Can we go to the next page, please.  Can we

18  highlight the first paragraphs and then the signature, Brian

19  Darling?

20  BY MR. WARD

21  Q.   You write:  I am also greatly worried that your response

22  to a technical assistance request is to have your attorneys

23  involved.  This is an ominous sign, as you can imagine, since

24  it hints at severe dysfunction and problems in the project.

25       What were your concerns at this point with AML Bitcoin

1  beyond the technical issues?

2  **A.**   Beyond the technical issues, it had been promised for a

3  long period of time that these tokens would be converted to

4  coins so they could use to go on a exchange and exchange them,

5  sell them or buy more if I wanted to, and that never happened.

6  **Q.**   You next write:  It has been quite some time since the

7  token holders have heard anything about the project.

8       At this time, were you receiving any updates from AML

9  Bitcoin or other information about the state of the project?

10 **A.**   No, and there were no updates on the website either.

11 **Q.**   And when you write, there have been no updates, press

12 releases and no reporting, is that what you're referring to?

13 **A.**   Yeah.  I was receiving no updates at all from any source.

14 **Q.**   Okay.  And then the last sentence you write:  Silence

15 makes us all worry.

16       **MR. WARD:**  You can back out of this.  I don't have a

17 question.

18      And then let's go to the top of this e-mail.

19 **BY MR. WARD**

20 **Q.**   Did you receive a response to your e-mail from Marcus

21 Andrade?

22 **A.**   Yes.

23       **MR. WARD:**  And if we could blow up the top part here.

24 **BY MR. WARD**

25 **Q.**   Was this the response from Mr. Andrade?

DARLING - DIRECT / WARD

1    **A.**    Yes.

2    **Q.**    Did you receive any other response to him about your

3    concerns about the AML Bitcoin project?

4    **A.**    No.

5    **Q.**    Did you receive any response from him about your concern

6    about the lack of updates or communication from AML Bitcoin?

7    **A.**    No.

8    **Q.**    Other than his statement, if you have further questions

9    regarding technical support matters, please direct them to

10   support@AMLBitcoin, did you ever hear anything else from Marcus

11   Andrade about anything related to AML Bitcoin?

12   **A.**    No.

13            **MR. WARD:**   All right.   You can take this down.

14   **BY MR. WARD**

15   **Q.**    Mr. Darling, were you ever able to sell or trade or

16   otherwise monetize any of your AML Bitcoin tokens?

17   **A.**    No, and my wallet completely failed.

18   **Q.**    And did you ever get any of the money that you put into

19   the AML Bitcoin project back?

20   **A.**    No.

21   **Q.**    Mr. Darling, if you had known that the AML Bitcoin did not

22   have the technical capabilities that you were told it had,

23   would that have influenced whether you -- your decision as to

24   whether to purchase AML Bitcoin?

25   **A.**    Yes.   I wouldn't have bought any of them.

DARLING - CROSS / STEFAN

1    **Q.**   And if AML Bitcoin didn't have the development deals and

2    business deals you were told, would that have influenced your

3    decision as to whether to purchase AML Bitcoin?

4    **A.**   Yes.

5          **MR. WARD:**  Nothing further.  Thank you.

6          **THE COURT:**  Mr. Stefan.

7                    <u>**CROSS-EXAMINATION**</u>

8    **BY MR. STEFAN**

9    **Q.**   Good morning, Mr. Darling.

10   **A.**   Good morning.

11   **Q.**   With respect to your initial involvement in the AML

12   Bitcoin project, your interactions were with Jack Abramoff?

13   **A.**   Yes.

14   **Q.**   You've only interacted with Mr. Andrade in person once in

15   your life?

16   **A.**   Yes.

17   **Q.**   And that was exchanging of like a brief greeting in a

18   hotel lobby?

19   **A.**   That's correct.

20   **Q.**   Nothing more substantive than that?

21   **A.**   That's the only in-person meeting I had with him, yes.

22   **Q.**   And only had a couple of phone calls ever; is that

23   correct?

24   **A.**   Yes.

25   **Q.**   And you purchased the tokens, AML Bitcoin tokens, well

DARLING - CROSS / STEFAN

1  before meeting or speaking with Mr. Andrade; is that correct?

2  **A.**   Yes.

3  **Q.**   All the initial information that you got on the AML

4  Bitcoin project came from Jack Abramoff or the AML Bitcoin

5  website; is that right?

6  **A.**   The white paper and Jack, correct.

7  **Q.**   And before your purchase -- you didn't review your

8  purchase of the AML Bitcoin tokens in August of 2017 --

9  **A.**   Uh-huh.

10  **Q.**   -- you didn't review the website in-depth?

11  **A.**   I read the white paper.  That was pretty detailed.

12  **Q.**   That's nonresponsive to my question.

13       You didn't read the website in-depth?

14  **A.**   I don't understand your question.  I read the website.

15  **Q.**   Did you read the website in-depth?

16  **A.**   I read the website.  I don't know what you mean by

17  "in-depth."

18  **Q.**   You did not read the website in depth, did you?

19          **MR. WARD:**  Objection; asked and answered.

20          **THE WITNESS:**  I don't know what that means.

21          **THE COURT:**  Sustained.

22  **BY MR. STEFAN**

23  **Q.**   Your review of the website was brief, is that accurate?

24          **MR. WARD:**  Objection, misstates the witness'

25  testimony.

 1              THE COURT:  Overruled.  You may answer that question.

 2              THE WITNESS:  I mean, I read the white paper.  That

 3    took a while to read through, and that was on the website --

 4              MR. STEFAN:  Nonresponsive, Your Honor.

 5              THE COURT:  Don't interrupt the witness.  You can make

 6    your objection, but let the witness finish what they're saying.

 7         Finish your answer.

 8              THE WITNESS:  Yeah, I mean, I read the white paper

 9    from the website, and that did take a while to get through.

10    BY MR. SHEPARD

11    Q.   The white paper didn't detail business --

12              THE COURT:  Don't talk over each other.  Okay?  Repeat

13    your question.

14    BY MR. STEFAN

15    Q.   The white paper didn't detail business development deals

16    and progress for AML Bitcoin?

17    A.   That's correct.

18    Q.   When you bought, you did not even know who was developing

19    AML Bitcoin?

20    A.   What do you mean by who was developing?  It was the NAC

21    company.

22    Q.   But you didn't know who, what individuals were behind the

23    project?

24    A.   No, I didn't know anything other than what I read in the

25    white paper on the website and was told to me by Jack.

1    Q.    So the answer to my question is "yes," you did not know

2    who was developing the AML Bitcoin project?

3    A.    That's correct, yes.

4    Q.    And you spoke with nobody at the company other than Jack

5    Abramoff?

6    A.    Well, when I got my wallet set up I did speak to somebody,

7    but that's when I was purchasing it, yes.

8    Q.    So the answer to my question is prior to purchasing the

9    AML Bitcoin tokens, you had not spoken with anybody at the

10    company?  And that's correct?

11    A.    Yes.

12    Q.    Apart from Jack Abramoff.  Right?

13    A.    Yes.

14    Q.    And your friendship with Jack stretched back before his

15    first set of convictions in 2006?

16    A.    I met him.  That I would say we're friends, we developed a

17    friendship after that.

18    Q.    You've known him since before the 2006 convictions, then?

19    A.    I met him, yes.

20    Q.    And subsequently you've developed a friendship with him?

21    A.    Yes.

22    Q.    And as the government covered repeatedly with you in

23    direct examination, Jack Abramoff was the person you interacted

24    with when writing articles for the AML Bitcoin project?

25    A.    Yes.

**DARLING - CROSS / STEFAN**

1  Q.   He was the person who gave you the information for the

2  articles, correct?

3  A.   That's correct, yeah.

4  Q.   And he was the person who paid you for the articles, to

5  your recollection; is that correct?

6  A.   Yes.

7  Q.   Mr. Andrade never personally gave you any information for

8  the articles?

9  A.   I don't remember him giving me any information for the

10  articles.

11  Q.   Mr. Ward pointed you to particular claims in these

12  articles related to business deals, say in Panama, right?

13  A.   Yes.

14  Q.   Or Estonia?

15  A.   Yes.

16  Q.   You never had any communications with Mr. Andrade

17  regarding what he was doing in Panama, correct?

18  A.   That is correct.

19  Q.   Or what he was doing in Estonia?

20  A.   That's true.

21  Q.   In fact, you can't recall ever getting any information

22  from Mr. Andrade for the articles?

23  A.   That's right.

24  Q.   On direct you called these articles op-eds.  Right?

25  A.   Yes.

**DARLING - CROSS / STEFAN**

1  Q.    These, to you, were opinion pieces?

2  A.    Yes.

3  Q.    You had some familiarity with writing these sorts of

4  pieces in your own work in lobbying, correct?

5  A.    In public relations, yes.

6  Q.    And to this day, you still will write articles for clients

7  who pay you?

8  A.    I get hired by clients and I do op-eds, amongst other

9  things.

10  Q.    So the answer to my question is "yes"?

11  A.    Yeah.

12  Q.    The work that you were doing for Mr. Abramoff in this

13  regard was similar to work that you'd previously done for other

14  clients?

15  A.    That's correct.

16  Q.    Farming out articles for publication with the various

17  outlets?

18  A.    Yes.

19  Q.    And in the context of these opinion pieces it's common to

20  provide quotes to the piece writer from the client?

21  A.    Yes.    That does happen, yes.

22  Q.    And just to be clear, if you have someone who's

23  contracting with you or you're paying to write an article on

24  behalf of the client, you could relay them a quote from the

25  client, who's given it to you?

DARLING - CROSS / STEFAN

 1   **A.**   Yes.

 2   **Q.**   You were briefly asked about the work that you attempted

 3   to do with congresspeople regarding AML Bitcoin, right?

 4   **A.**   Yes.

 5   **Q.**   As part of your work you did speak with Congressman Rand

 6   Paul?

 7   **A.**   I spoke with his staff.

 8   **Q.**   Okay.  Just his staff, not him individually?

 9   **A.**   I don't remember a specific conversation with him about

10   this.

11   **Q.**   How about Congressman Walter Jones?

12   **A.**   I was in a meeting with the late Congressman Walter Jones,

13   yes.

14   **Q.**   And you broached AML Bitcoin with him in that meeting?

15   **A.**   We had a discussion about cryptocurrency in general, and

16   AML Bitcoin did come up.

17   **Q.**   And you viewed your work in raising AML Bitcoin in that

18   discussion with him as part of your work that you were doing

19   with Mr. Abramoff regarding the AML Bitcoin project?

20   **A.**   Yes.  These were educational meetings, yes.

21   **Q.**   Educational meetings that could potentially develop into

22   some sort of meaningful legislative development for the benefit

23   of Mr. Abramoff and the benefit of your client?

24   **A.**   At that point it was just educational meetings to raise

25   the issue so that they had an understanding of what AML Bitcoin

1  was, you know, just because they -- these members didn't know

2  much about cryptocurrency in general.

3  **Q.**    And that was done with a view towards potentially

4  advancing further discussions or advancements for AML Bitcoin?

5  **A.**    These were educational meetings.  I was not lobbying on

6  this.

7  **Q.**    Just educating Congress people regarding the AML Bitcoin

8  project?

9  **A.**    Yes.

10  **Q.**    That you were advocating or were through your various

11  article writers a spokesman for --

12  **A.**    Yes.

13  **Q.**    -- these op-ed pieces?

14  **A.**    Yeah, sure.

15  **Q.**    Okay.  Apart from the $20,000-worth of AML Bitcoin that

16  you purchased in August 2017, you later received additional

17  coins; is that right?

18  **A.**    Yeah, I purchased additional coins and received additional

19  coins, that's correct.

20  **Q.**    Okay.  I believe you subsequently purchased an additional

21  $5000-worth of coins, or thereabouts, about a month after, or a

22  month, or a month or two after your initial purchase; is that

23  correct?

24  **A.**    Yes.

25  **Q.**    And your initial purchase being August of 2017.  So we're

**DARLING - CROSS / STEFAN**

 1  talking about the September timeframe of 2017 that you made

 2  that second purchase?

 3  **A.**    It's a long time ago, but that's what I remember, yes.

 4  **Q.**    And then you received additional distributions of tokens

 5  from AML Bitcoin for your services that you were providing Jack

 6  Abramoff?

 7  **A.**    Yes.

 8  **Q.**    Another 50,000 tokens?

 9  **A.**    I don't remember how many.

10         **MR. STEFAN:**  Could we please see government

11  exhibit 240.

12         **THE COURTROOM DEPUTY:**  Witness only?

13         **MR. STEFAN:**  Witness only, yes.

14      And go ahead and zoom in on the chart, please.

15         **MR. WARD:**  Your Honor, the Government's going to

16  object.  240 has not been admitted.

17         **THE COURT:**  He's not showing it to the jury yet.

18         **MR. WARD:**  Oh, right.  Okay.

19  **BY MR. STEFAN**

20  **Q.**    Mr. Darling, do you recognize this chart?

21  **A.**    Yes.

22  **Q.**    And how do you recognize it?

23  **A.**    It looks like something I created.

24  **Q.**    Yes, you created this chart --

25         **MR. STEFAN:**  Sorry, can we zoom back in on the chart?

DARLING - CROSS / STEFAN

1   BY MR. STEFAN

2   Q.   Is this chart a representation of the tokens that you

3   received from Jack Abramoff and AML Bitcoin project, and which

4   you then distributed to various other individuals who were

5   working for you at the time?

6   A.   Yes.

7   Q.   And to the best of your knowledge and belief when you made

8   this chart, the numbers that you placed into it were accurate?

9   A.   Yes.

10        MR. STEFAN:  Defense moves to admit what's been marked

11   as -- well, defense moves to admit government exhibit 240.

12        MR. WARD:  No objection.

13        THE COURT:  240 will be admitted.

14    (Trial Exhibit 240 received in evidence.)

15   BY MR. STEFAN

16   Q.   Mr. Darling, in this --

17        MR. STEFAN:  Can we publish to the jury, please?

18   BY MR. STEFAN

19   Q.   This chart shows that you received another 50,000 tokens

20   in October and -- well, 25,000 tokens in October of 2017,

21   correct?

22   A.   Yes.

23   Q.   And then another 25,000 tokens in December of 2017,

24   correct?

25   A.   Yes.

DARLING - CROSS / STEFAN

1    Q.    And then you made distributions to the individuals listed

2    below your name on this chart, Beau Rothschild, Brian Darling,

3    Chase Kroll, Chris Versace, Derek Hunter and Christian Josi?

4    A.    Josi.

5    Q.    Josi, thank you.

6          Subsequent to that distribution that you received,

7    correct?

8    A.    Yes.

9    Q.    You provided these tokens to the authors as, looks like

10   gifts or compensation; is that correct?

11   A.    Yes.

12   Q.    Basically to incentivize them in their work writing

13   articles for you?

14   A.    Yes.

15   Q.    And the remaining tokens would have been tokens that you

16   kept yourself?

17   A.    Yes.

18          MR. STEFAN:    We can go ahead and leave this exhibit.

19   BY MR. STEFAN

20   Q.    The Super Bowl ad that the government addressed with you,

21   that was a project between January and February of 2018; is

22   that right?

23   A.    Yes.

24   Q.    Beyond having your authors create content related to the

25   rejection campaign, you also assisted Mr. Abramoff in writing a

**DARLING - CROSS / STEFAN**

1  letter that would be delivered to the NFL commissioner Roger

2  Goodell, correct?

3  **A.**   He asked me to look over a letter and help him with it,

4  yes.

5  **Q.**   That letter essentially expressed disappointment regarding

6  the NFL's position on the ad in so many terms?

7  **A.**   Yes.

8  **Q.**   And you had a role in getting that letter to an Eli

9  Zimmerman, gentleman in New York who is also a connection with

10  Jack Abramoff.  You sent that to Mr. Zimmerman?

11  **A.**   I don't remember, but I guess I did if you're saying that.

12  I don't remember sending that.  Again, it's a long time ago.

13  I'm doing my best to remember all this.

14  **Q.**   Understood.

15       You know who Eli Zimmerman is?

16  **A.**   No.

17  **Q.**   You told the government that you were paid six or $7000

18  for your work with Jack Abramoff; is that right?

19  **A.**   Yes, that's to the best of my recollection.  I don't

20  remember specifically how much.

21  **Q.**   You remember that in a conversation with the F -- do you

22  remember having a conversation with the FBI on November 14th of

23  2024?

24  **A.**   Yes.

25  **Q.**   And do you remember your ballpark figure for the number

**DARLING - CROSS / STEFAN**

1  that time was about double what you're offering today at six or

2  $7000?

3  **A.**   I don't -- the number on my chart is bigger.  That's what

4  I expended.  It's a different amount that I received than what

5  I expended.  That's what I remember.

6  **Q.**   Well, you told the FBI on November 14th, 2024, that you

7  were paid less than $12,000 for all the promotional work that

8  you did.

9  **A.**   Right.  That's not inconsistent.

10  **Q.**   The approximate number is just double the six to $7000

11  that you offer today, the approximation you offered them at

12  that point?

13  **A.**   Was what?  Can you repeat the question?  I don't

14  understand it.

15  **Q.**   The approximation you offered them at that point was that

16  you had been paid less than $12,000.

17  **A.**   Right.  That's right.

18  **Q.**   Your approximation today is that you were paid somewhere

19  from six to $7000?

20  **A.**   That's less than 12,000.

21  **Q.**   The answer to my question is "yes"?

22  **A.**   I don't -- can you repeat it?  Maybe I'm losing the ... I

23  missed the question.  My apologies.  Can you just ask me again?

24  **Q.**   Yes.  The approximation that you offered the FBI on

25  November 14th, 2024, was that you were paid less than $12,000,

**DARLING - CROSS / STEFAN**

 1  correct?

 2  **A.**   Yes, that's less than 12,000, right.

 3  **Q.**   The approximation you offered today is that you were paid

 4  between six to $7000; is that correct?

 5  **A.**   That's less than 12,000, yes.

 6  **Q.**   Okay.  So the answer to my question is "yes"?

 7  **A.**   Yeah.  That's what I remember, yes.

 8          **MR. STEFAN:**  May I have a moment, Your Honor?

 9          **THE COURT:**  Yes.

10  **BY MR. STEFAN**

11  **Q.**   Mr. Darling, just one more line of questioning here.

12      With respect to the e-mail that you sent to Mr. Andrade in

13  February of 2019, the government showed you that e-mail moments

14  ago.  Do you recall that?

15  **A.**   Yes.

16  **Q.**   When you sent that e-mail, were you still in communication

17  with Mr. Jack Abramoff?

18  **A.**   I believe so.

19  **Q.**   You were still friends with him?

20  **A.**   Yeah.

21  **Q.**   Does that continue to this day?

22  **A.**   I haven't talked to him in a while, but if I -- after this

23  is all over, if I run into him I'd still consider him a friend,

24  yes.

25  **Q.**   Okay.  When was your last communication with him?

**DARLING - CROSS / STEFAN**

1   **A.**   I can't remember.  It was a couple years ago.

2   **Q.**   Was your communication with him in February 2019 still

3   fairly consistent?

4   **A.**   Um, yeah.  Yes.

5   **Q.**   On a weekly basis?

6   **A.**   No.  I talk to him every maybe once every two months just

7   to say hello.

8   **Q.**   Prior to sending that e-mail to Marcus in February 2019,

9   you had communicated with Mr. Abramoff regarding the issues

10  that you were having with the wallet?

11  **A.**   Yes, yes, I did.

12  **Q.**   And Mr. Abramoff encouraged you to reach out to Marcus and

13  raise your complaints with him?

14  **A.**   Yes, he did.

15  **Q.**   He wanted you to apply some pressure to Mr. Andrade to I

16  guess address whatever technical issues that you were having?

17  **A.**   Yes.

18  **Q.**   And address the issues that you were raising with respect

19  to Mr. Andrade's use of attorneys in responding to you?

20  **A.**   Sure, yes.

21  **Q.**   Mr. Abramoff at that time was pursuing, or do you have

22  knowledge that Mr. Abramoff at that time was pursuing a

23  potential buyout of Mr. Andrade's patent portfolio?

24  **A.**   I didn't know much about what was going on other than my

25  wallet crashed, and I wanted to get it fixed.

DARLING - CROSS / STEFAN

```
 1   Q.   Well, when you say you didn't know much about what was

 2   going on, Mr. Abramoff had communicated to you regarding his

 3   desire that you contact Mr. Andrade --

 4   A.   Yes.

 5   Q.   -- about --

 6   A.   Yes.

 7            THE COURT:  Wait for the question.

 8            THE WITNESS:  I'm sorry.

 9   BY MR. STEFAN

10   Q.   About the wallet issue?

11   A.   Yes.

12   Q.   And that you address with Mr. Andrade his use of attorneys

13   in responding to potential issues, correct?

14   A.   Yes.

15   Q.   Mr. Abramoff specifically wanted you to raise that with

16   him?

17   A.   Yes.

18   Q.   And to raise issues about your concerns with the veracity

19   of the project, correct?

20   A.   He encouraged me, and I agreed with him, yes.

21   Q.   And Mr. Abramoff, as you know, was deeply involved in the

22   AML Bitcoin project and with Mr. Andrade.

23   A.   That's correct, yes.

24   Q.   So you knew at that time when you made those statements to

25   Mr. Andrade at Mr. Abramoff's behest, that Mr. Abramoff had
```

1  some interest in you relaying those problems that he was

2  expressing to Mr. Andrade?

3  **A.**    Sure.

4  **Q.**    And specifically, Mr. Abramoff was at the time attempting

5  to perform an acquisition or a sale of Mr. Andrade's patent

6  portfolio.  You had knowledge of that?

7          **MR. WARD:**  Objection; lack of foundation, lack of

8  knowledge.

9          **THE COURT:**  Overruled.  You may answer the question.

10         **THE WITNESS:**  No, I understood that he had an interest

11  over a period of time in having, you know, more of an equity

12  interest in it, but I didn't know the details of it.

13  **BY MR. STEFAN**

14  **Q.**    Okay.  So he had an interest in a period of time in having

15  more of an equity interest in Mr. Andrade's patent portfolio,

16  correct?

17  **A.**    I don't know what -- patent portfolio ... I mean, the

18  company.

19  **Q.**    Okay.

20  **A.**    I don't know if you're valuing the patent portfolio or the

21  actual AML Bitcoin, so ...

22  **Q.**    He wanted additional equity in the company?

23  **A.**    That's my understanding is he wanted to -- yes, he did

24  want to have more of an interest in the company.  Yes.

25  **Q.**    Or, in Mr. Andrade's interests generally?

**DARLING - CROSS / STEFAN**

1    A.   I don't know that.

2    Q.   Regardless, you understood that part of the motivation he

3    had in asking you to send that e-mail to Mr. Andrade was to get

4    Mr. Andrade to come to the table and increase Mr. Abramoff's

5    equity in Mr. Andrade's endeavors?

6    A.   That wasn't my motivation.  I wanted to get my wallet

7    fixed.

8    Q.   I'm not speaking to your motivation.  I'm speaking to what

9    Mr. Abramoff relayed to you with respect to his purpose in

10   asking you to --

11   A.   He never told me to put the --

12   Q.   I haven't finished my --

13        THE COURT:  Don't argue.  Ask your question and answer

14   the question.

15        Ask a question.

16   BY MR. STEFAN

17   Q.   You knew that he had this interest --

18   A.   Yes.

19   Q.   -- and equity in Mr. Andrade's projects?

20   A.   Yes.

21   Q.   You knew that the purpose of your e-mail was, in part, to

22   further his interest in getting that equity?

23   A.   I didn't --

24        MR. WARD:  Objection, misstates the testimony.

25        THE WITNESS:  I didn't have --

DARLING - CROSS / STEFAN

```
 1          THE COURT:  Okay.  Can you repeat the question?  I
 2   think you're trodding ground you've already covered, but ask
 3   the question.
 4   BY MR. STEFAN
 5   Q.   You knew that Mr. Andrade's request of you to send this
 6   e-mail --
 7   A.   Mr. Abramoff's.
 8   Q.   Pardon me, yes.  That Mr. Abramoff's request to you to
 9   send this e-mail was grounded at least partially in his
10   interest in bringing Mr. Andrade to the table on getting
11   Abramoff equity?
12   A.   If that's true I didn't really care.  I just wanted to
13   communicate and get my situation resolved.  So if he asked me
14   to mention attorneys, I was okay with it.
15   Q.   He prompted you to send that language in your e-mail
16   regarding attorneys to Mr. Andrade?
17   A.   Help me to put together an e-mail so I can get my
18   situation resolved.
19   Q.   So he did help you craft that e-mail, actually?
20   A.   He didn't help me.  I asked him how I should reach out,
21   what I should --
22   Q.   And he advised you --
23          THE COURT:  Hold on.  Don't argue.  Don't talk over
24   each other.
25          Ask a question.
```

DARLING - REDIRECT / WARD

1    BY MR. STEFAN

2    **Q.**   He advised you regarding the content of that e-mail?

3    **A.**   Yes.

4          **MR. STEFAN:**  I don't have further questions.

5                    <u>REDIRECT EXAMINATION</u>

6    BY MR. WARD

7    **Q.**   Mr. Darling, counsel asked you about whether you had

8    interacted with Mr. Andrade.  Did you send Mr. Andrade copies

9    of the articles that you wrote?

10   **A.**   Yes.

11   **Q.**   And did you send him copies of the articles that you had

12   paid other individuals to write?

13   **A.**   Yes.

14   **Q.**   Counsel asked you about other work you did in providing

15   quotes for other opinion pieces.  For the quotes that you

16   provided the writers for the AML Bitcoin pieces, the quotes

17   from individuals, did you ever talk to those individuals?

18   **A.**   No.

19   **Q.**   Did you have any information as to whether those quotes

20   were real or made up?

21   **A.**   No.

22   **Q.**   Counsel asked you about speaking with congressional staff.

23   Again, beyond the meetings, was there anything else that you

24   did with Congress furthering anything related to AML Bitcoin?

25   **A.**   No.

1      **MR. WARD:**  Can we bring up exhibit 240?  This has been

2   admitted.  If we could blow up this.

3   **BY MR. WARD**

4   **Q.**  Mr. Darling, you were asked about this chart.  Were these

5   AML Bitcoin tokens that you provided to the writers who wrote

6   about AML Bitcoin?

7   **A.**  Yes.

8   **Q.**  And was that part of their compensation for writing about

9   AML Bitcoin?

10  **A.**  Yes.

11  **Q.**  And the articles that they wrote, did, to your knowledge,

12  did any of them disclose that when they were writing about it

13  they had a financial stake in AML Bitcoin?

14  **A.**  Not to my knowledge.

15  **Q.**  You were asked questions about a letter that you helped

16  Mr. Abramoff draft.  What was the letter?

17  **A.**  It was a letter complaining about the rejection.

18  **Q.**  And the -- you drafted the letter.  Who was it drafted to?

19  **A.**  I don't -- it was directed to the NFL.  I don't remember.

20      **MR. WARD:**  Could we pull up exhibit 549.

21      **THE COURTROOM DEPUTY:**  Is that admitted?

22      **MR. WARD:**  No; just for the witnesses and the parties.

23  **BY MR. WARD**

24  **Q.**  Can you take a look at that, Mr. Darling?

25  **A.**  Yes.

DARLING - REDIRECT / WARD

1  Q.    Is this the letter that you helped draft?

2  A.    I did help with this.

3          MR. WARD:  Move to admit exhibit 549.

4  A.    No objections.

5          THE COURT:  549 will be admitted.

6      (Trial Exhibit 549 received in evidence.)

7          MR. WARD:  Can we do the top part down to the first

8  paragraph?  If we could get the logo.

9  BY MR. WARD

10 Q.    And was this -- it says, Dear Mr. Goodell.  Who's

11 Mr. Goodell?

12 A.    Roger Goodell is a commissioner of the NFL.

13 Q.    The letter references that the NFL will not accept our

14 television ad, North Korea can't steal AML Bitcoin.

15      Was that the ad that you understood they had created and

16 submitted to the NFL?

17 A.    Yes.

18 BY MR. WARD

19 Q.    All right.  We can pull out of this.

20      Can we look at the third paragraph here, "an ad taking Kim

21 Jong-Un?"

22      The last clause says:  The AML Bitcoin has been designed

23 with features that prevent his army from stealing it.

24      Was that something you wrote?

25 A.    I helped edit, and there was a lot of back and forth, so I

1    don't remember if I wrote that or not.

2            MR. WARD:  Okay.  We can pull out of that.

3        And then finally let's just look at the signature block.

4    BY MR. WARD

5    Q.    Did you write the letter in the name of Marcus Andrade?

6    A.    I didn't have the final cut of the letter, so ...

7            MR. WARD:  Thank you, Mr. Darling.  Nothing further.

8            THE COURT:  Anything further?

9                        RECROSS-EXAMINATION

10   BY MR. STEFAN

11   Q.    Mr. Andrade's name was on that letter, right?

12   A.    Yes.

13   Q.    But to your knowledge, you and Jack were the ones who

14   wrote and edited it?

15   A.    Yeah.  Once I sent it back to Jack, I don't know what

16   happened to it.

17   Q.    Understood.

18        So to your knowledge, this was a letter provided to you by

19   Jack?

20   A.    Yes.

21   Q.    For your edits?

22   A.    Yes.

23   Q.    And provided back to Mr. Andrade?

24   A.    Yes.

25            MR. STEFAN:  Thank you.

HARGREAVES - DIRECT / CHOU

```
 1            THE COURT:  You may step down.

 2            MR. CHOU:  The United States calls David Hargreaves.

 3            THE COURT:  If you could come forward to the stand to

 4    be sworn.

 5            THE COURTROOM DEPUTY:  Please raise your right hand.

 6                        DAVID HARGREAVES,

 7    called as a witness for the Government, having been duly sworn,

 8    testified as follows:

 9            THE COURTROOM DEPUTY:  Please be seated.

10        Can you state and spell your last name, please?  And speak

11    into the mic.

12            THE WITNESS:  David Hargreaves, H-A-R-G-R-E-A-V-E-S.

13                        DIRECT EXAMINATION

14    BY MR. CHOU

15    Q.   Good morning, Mr. Hargreaves?

16    A.   Good morning.

17    Q.   Mr. Hargreaves, what is your professional background in

18    public relations or PR?

19    A.   Yeah, probably about 30 years.  I had an agency in the UK,

20    and we worked for people like Apple, Facebook, Virgin.  Then I

21    moved over to the U.S. and ran offices for a international PR

22    group here and for five, 10 years.

23    Q.   And what was the name of that international PR group that

24    you mentioned?

25    A.   The public company was called Next 15 Communications,
```

1    Quoted On The UK Stock Market, and the specific brand that I

2    worked for was Bite Communications.

3    **Q.**    Back in 2017 and 2018 did you also work at a public

4    relations firm called Shift Communications?

5    **A.**    I did.  I worked for them after I worked for Bite.

6    **Q.**    What is Shift Communications?

7    **A.**    Shift Communications is a marketing communications group.

8    It did largely public relations, also digital marketing,

9    working in the consumer technology and healthcare fields.

10   **Q.**    What was your role at Shift Communications?

11   **A.**    I was managing director of the San Francisco office.

12   **Q.**    In October 2017, did Marcus Andrade hire Shift

13   Communications?

14   **A.**    He did, yes.

15   **Q.**    How long did Andrade's business relationship with Shift

16   Communications last roughly speaking?

17   **A.**    I can't remember exactly, but probably, I don't know,

18   three, four, five months, something like that.

19   **Q.**    Let's start from the beginning and work forward in time.

20   Okay?

21       In October 2017 what did Marcus Andrade say about why he

22   wanted to hire Shift Communications?

23   **A.**    He had a new Bitcoin, AML Bitcoin, that he was looking to

24   do what's called an ICO, initial coin offering, which is

25   basically raising money for a new coin.

1          MR. CHOU:  I'd like to show exhibit 1467 just to the

2    witness, the parties and the Court.

3    BY MR. CHOU

4    Q.   Mr. Hargreaves, can you see that okay?

5    A.   I can, yeah.

6    Q.   And in the "to" line is that CEO@AMLBitcoin.com, is that

7    an e-mail that you used to communicate with Mr. Andrade?

8    A.   It is, yeah.

9    Q.   And the e-mail below that in the CC line,

10   AMLBitcoin@shiftcomm.com, what is that?

11   A.   That was an alias that we set up for all of our clients.

12   I was on the alias along with all of the team members of any

13   given client team.  So this particular instance there were five

14   people including me on that team.

15   Q.   So you received all e-mails sent to that shiftcomm alias?

16   A.   I did, yes.

17   Q.   Is this a fair and accurate depiction of an e-mail that

18   you received at the time?

19   A.   It is, yeah.

20          MR. CHOU:  Government moves to admit exhibit 1467.

21          MR. SHEPARD:  No objection.

22          THE COURT:  1467 will be admitted.

23       (Trial Exhibit 1467 received in evidence.)

24   BY MR. CHOU

25   Q.   So Mr. Hargreaves, just looking at that first line there

**HARGREAVES - DIRECT / CHOU**

1    you write -- or, sorry, your colleague, Kris Kitto, who's that?

2    A.    Kris Kitto was -- he was the account director on the team.

3    So every team had a account lead because ultimately I was

4    involved in accounts, but I couldn't be close on the day-to-day

5    running of the client -- my account directors.

6    Q.    Did you lead the shift communications team as to

7    Mr. Andrade and AML Bitcoin?

8    A.    I did, yeah.

9    Q.    And were you responsible for the bulk of communications

10   with the client?

11   A.    I was, yeah.

12   Q.    In this case who was the client?

13   A.    The client was AML Bitcoin of which Marcus Andrade was the

14   CEO.

15   Q.    Up at the top do you see where Mr. Kitto says:  Thanks so

16   much for your time today in explaining the ICO process to us

17   and helping fill in other details?

18   A.    I do.

19   Q.    Is the ICO process what you just testified to a few

20   moments ago, the initial coin offering for AML Bitcoin?

21   A.    Correct.

22   Q.    And then basically your team tees up next steps for this

23   press campaign?

24   A.    Yeah.

25   Q.    And I want to point out that in the CC line and also at

1    the bottom there's a mention of somebody named Japheth or

2    Japheth Dillman.  Do you see that?

3    A.   Correct.  I do.

4    Q.   What was your understanding of who Japheth Dillman was in

5    relation to AML Bitcoin?

6    A.   His exact role wasn't a hundred percent clear to me, but

7    for all intents and purpose, he was our sort of main link

8    person to the client, AML Bitcoin, which was Marcus Andrade.

9    So he was somebody that I would sort of liaise with, but

10   ultimately, you know, the information came from Marcus Andrade.

11   Q.   So from your perspective, who called the shots on the AML

12   Bitcoin project?  Was it Marcus Andrade, Japheth Dillman or

13   someone else?

14   A.   Marcus Andrade.

15   Q.   So this is an October 4th, 2017, e-mail?

16   A.   Correct.

17        MR. CHOU:  Go ahead and take this down.

18   BY MR. CHOU

19   Q.   What did Mr. Andrade want you to do for AML Bitcoin?

20   A.   He wanted us to publicize AML Bitcoin as the first

21   AML-compliant Bitcoin ever.

22   Q.   And you mentioned the acronym AML.  Would you just mind

23   explaining what AML stood for to your understanding?

24   A.   Yeah, it's my understanding, and I wasn't aware of the

25   term before, you know, being introduced to AML Bitcoin, but

**HARGREAVES - DIRECT / CHOU**

1   anti-money laundering Bitcoin, and it was sort of a more secure

2   Bitcoin, which also involved biometrics, I think.

3           **MR. CHOU:**  I'd like to show the witness, the parties

4   and the Court exhibit 30.

5   **BY MR. CHOU**

6   **Q.**  And Mr. Hargreaves, you received this e-mail directly in

7   the CC line?

8   **A.**  I did, yes.

9   **Q.**  Did you review this e-mail in preparation for your

10  testimony today?

11  **A.**  I did, yeah.

12  **Q.**  Is this a fair and accurate depiction of an e-mail you

13  received from Mr. Dillman, which included Mr. Andrade, yourself

14  and the shiftcomm team?

15  **A.**  It is, yeah.

16          **MR. CHOU:**  Move to admit exhibit 30.

17          **MR. SHEPARD:**  No objection.

18          **THE COURT:**  Exhibit 30 will be admitted.

19      (Trial Exhibit 30 received in evidence.)

20  **BY MR. CHOU**

21  **Q.**  So in this document here, the top of the document is the

22  most recent e-mail in the chain?

23  **A.**  Yes.

24  **Q.**  And then the bottom would be the oldest chronologically

25  speaking?

1   **A.**   Correct.

2   **Q.**   So let's start with the first e-mail in the chain, which

3   is --

4           **MR. WARD:**   If we could please zoom in from "on Wed,"

5   Wednesday, October 4th, 2017, through the bottom of the

6   content.

7   **BY MR. CHOU**

8   **Q.**   Can you see this okay, Mr. Hargreaves?

9   **A.**   I can, yeah.

10  **Q.**   Do you see where Mr. Andrade says, can you get this PR to

11  your team to fix it up a bit?  Also, I need his e-mail address

12  so that I can put him in touch with HitBTC, thanks, Marcus?

13  **A.**   I see that, yeah.

14  **Q.**   Who did you understand in the context of this e-mail

15  thread who "his" was referring to?

16  **A.**   Yeah, "his" in this e-mail is me.

17  **Q.**   Okay.  And then I'd like to just focus in briefly on

18  the -- on the press releases itself.  So if we can go to the

19  next page, please.

20          **MR. WARD:**   Just the content of the draft.  Thanks.

21  **BY MR. CHOU**

22  **Q.**   Did Shift Communications have any role, to your knowledge,

23  in writing any of the content in this draft press release?

24  **A.**   No, this was provided to us and as per the introduction at

25  the beginning of this e-mail, he said could we fix it up a bit.

1  Q.   Okay.  And so, for example, the quote at the top from

2  Mr. Andrade, Shift Communications didn't write that?

3  A.   No.

4       MR. CHOU:  Okay.  We can zoom out of this, and then

5  back to the first page, please:  And if we could please zoom

6  in, Ms. Rosenbaum, on Mr. Dillman's response to Mr. Andrade.

7  It's on Wednesday, 4th, 2017, 9:06 p.m.

8       No, above that, please.  Mr. Dillman's response.

9  BY MR. CHOU

10 Q.   Mr. Hargreaves, can you see that okay?

11 A.   I can, yes.

12 Q.   Do you see where Mr. Dillman responds to Mr. Andrade, yes,

13 sir, CC'd as David Hargreaves, as well as the e-mail that

14 forwards to our entire team at Shift, and then it says David,

15 see below?

16 A.   Yes.

17 Q.   So was Mr. Dillman basically looping you into this thread,

18 including what we just saw?

19 A.   Yeah.

20       MR. CHOU:  All right.  Zoom out of this, please.

21 BY MR. CHOU

22 Q.   I want to return to what Mr. Andrade just forwarded to

23 you, or rather what Mr. Dillman forwarded you from Mr. Andrade.

24       MR. CHOU:  Can we zoom in on the quote at the bottom

25 of the page that starts with, "for months we had been

HARGREAVES - DIRECT / CHOU

1   inundated?"

2   **BY MR. CHOU**

3   Q.   When you read that quote, what did you understand the AML

4   Bitcoin project to be trying to communicate?

5   A.   That it was a new type of Bitcoin that there was a huge

6   amount of market demand for.

7        **MR. CHOU:**  Okay.  Zoom out of that, please.  And then

8   if we go back to the second page.  If we could zoom in with the

9   paragraph that starts, "it is not only the digital currency

10  world."

11  **BY MR. CHOU**

12  Q.   Do you see where it says:  With a front page article that

13  has official Washington abuzz, the Washington-Times, EMBED

14  LINK, today revealed that a number of policy leaders see the

15  AML Bitcoin as a solution not merely to the problem of

16  terrorist and criminal elements, and then it goes on?

17  A.   Yeah, I see that, yeah.

18  Q.   What did you understand Mr. Andrade wanted to communicate

19  with this draft press releases based on that?

20  A.   That the AML Bitcoin had been picked up as a story by a

21  highly reputable media outlet.

22       **MR. CHOU:**  We can come out of this, please, and go

23  back to the first page.  And then just quickly touching on, if

24  we could highlight basically the first half of the page

25  starting with the metadata going down to Mr. Andrade's

**HARGREAVES - DIRECT / CHOU**

1  signature saying the shiftcomm e-mail is bouncing.

2  **BY MR. CHOU**

3  Q.   And so is this is basically the last, most recent e-mail

4  in this thread?

5  A.   Yeah.

6       **MR. CHOU:**  Okay.  We can take this down, please.

7  **BY MR. CHOU**

8  Q.   After receiving that e-mail, did you develop a PR plan for

9  the ICO?

10 A.   We did, yeah.  And that was led by Kris Kitto.

11 Q.   I'd like to show exhibit 792.  And Mr. Hargreaves, again,

12 in the CC line, is that the shiftcomm address that you received

13 e-mails from?

14 A.   It is, yeah.

15 Q.   And this is an e-mail from Japheth Dillman to your

16 colleague, Chris Kitto and to Marcus Andrade?

17 A.   Yes.

18      **MR. CHOU:**  And if we could scroll to the following

19 page.

20 **BY MR. CHOU**

21 Q.   This is all a thread that's responding to an e-mail that

22 Mr. Kitto sent?

23 A.   Yeah.

24      **MR. CHOU:**  Move to admit exhibit 792, and if we could

25 go back up to the first page, please.

 1              MR. SHEPARD:  No objection.

 2              THE COURT:  792 will be admitted.

 3         (Trial Exhibit 792 received in evidence.)

 4    BY MR. CHOU

 5    Q.   Okay.  So Mr. Hargreaves, like before, chronologically

 6    speaking, oldest e-mail is at the bottom?

 7    A.   Yeah.

 8    Q.   So let's start from there.

 9              MR. CHOU:  So I'd like to zoom in on the October 9th

10    e-mail that starts with, "you'll find an updated timeline on

11    our initial PR push."

12    BY MR. CHOU

13    Q.   What was your team communicating to Mr. Andrade and

14    Mr. Dillman with this e-mail?

15    A.   Just communicating a sequence of activities in sort of

16    chronological order that we would use to, you know, tell the

17    story of AML Bitcoin as an emerging company.

18              MR. CHOU:  And if we could zoom out, please, and turn

19    to the next page.

20              THE WITNESS:  And in particular the ICO, I should say,

21    yeah.

22              MR. CHOU:  And if we could please zoom in on~--- yeah,

23    sure, we can just show the top half of the timeline.

24    BY MR. CHOU

25    Q.   And was this the -- was this the timeline of things you

HARGREAVES - DIRECT / CHOU

1  were hoping -- shift was hoping to do after the ICO or in

2  connection with the ICO?

3  **A.**    Exactly.  Showing sort of the momentum of hiring people,

4  hiring board members.  I think there's an article "bylined"

5  article, an article authored by a third party.

6  **Q.**    Do you see on the very last part of the zoomed in part

7  here says TBD:  Deals announcements?

8  **A.**    I do, yeah.

9        **MR. CHOU:**    So we'll zoom out, and if we could please

10  highlight the section titled Deals Announcements.  Thank you.

11  **BY MR. CHOU**

12  **Q.**    So this section mentions four different potential deals,

13  right?

14  **A.**    Correct.

15  **Q.**    Where did you learn about these four deals, potential

16  deals, mentioned here?  Panama, SF Port Authority, Estonian

17  government, and Suntrust Bank?

18  **A.**    From my briefing with AML Bitcoin, yeah.

19  **Q.**    And below that there was requests from Shift

20  Communications?

21  **A.**    Correct.  Yeah, we were just trying to get the information

22  in order to write a press releases about those particular

23  deals.  So what was the deal worth and what were the benefits

24  to Panama using AML Bitcoin versus other, you know, payment

25  mechanisms, why did they choose AML Bitcoin, but probably most

1    importantly, you know, what was the commitment and when would

2    the contract be signed, and what was the timeline for the

3    rollout of the currency.

4    **Q.**    And why did you need that information?

5    **A.**    Because in order to communicate and sell a story to a

6    reputable journalist you have to provide some real tangible,

7    you know, facts about a particular deal.  A journalist can't

8    write a story about a company without that information.

9    Otherwise, it's, you know, Company A has a conversation with

10    Company B.  What the New York Times or the reps or media outlet

11    needs to write is company signs X million dollars with Company

12    Y to roll out Bitcoin in January 2026, whatever it may be.

13              **MR. CHOU:**  Can we zoom out of this, please?  And if we

14    flip to the first page, which is the response to these

15    requests.  If we could please zoom in on just the metadata plus

16    through 4.  The metadata, as well, please.

17    **BY MR. CHOU**

18    **Q.**    So Mr. Hargreaves, what did you understand this e-mail

19    from Mr. Dillman to be?

20    **A.**    Sorry, can you repeat the question?

21    **Q.**    What did you understand this e-mail from Mr. Dillman to

22    be?

23    **A.**    It was a briefing on the deals that were mentioned in the,

24    you know, previous e-mail.  It was an e-mail briefing us on the

25    details of those deals and hopefully answering the questions

**HARGREAVES - DIRECT / CHOU**

1    that we'd asked.

2    **Q.**   And I'd like to focus in on paragraph 2 and paragraph 4.

3         So in paragraph 2, do you see where the e-mail states,

4    this deal is already in place to begin testing with AML Bitcoin

5    before the end of the year?

6    **A.**   I do, yeah.

7    **Q.**   Do you see also where it states, AML Bitcoin was their

8    only choice for digital currency because of its AML compliance?

9    **A.**   I do.

10   **Q.**   When you read this, what was your impression of the -- of

11   the AML Bitcoin project and the state of its business

12   development?

13   **A.**   That it was already receiving traction among, you know,

14   big customers or potential customers, and the deals had been

15   signed.

16        **MR. CHOU:**  If we could zoom out, please, and focus in

17   on paragraph 4, please.

18   **BY MR. CHOU**

19   **Q.**   Do you see where it says, this project is far longer -- it

20   says, this process is far longer, and it goes on.  AML Bitcoin

21   is the only one that has compliance, so it will win the bid?

22   **A.**   I see that, yeah.

23   **Q.**   When you read that, what was your understanding of the

24   state of the AML Bitcoin project with respect to west coast

25   ports like the Port of San Francisco?

**HARGREAVES - DIRECT / CHOU**

1    **A.**    That it was option one of one.

2    **Q.**    And I want to point -- direct your attention to the line

3    below this as paragraph 4.  Do you see where it says, I have

4    included Marcus on this e-mail so he can provide other details

5    I'm leaving out that are relevant?

6    **A.**    I do see that, yeah.

7    **Q.**    What was your understanding of why Mr. Andrade would need

8    to be on this e-mail thread, given that you were speaking a lot

9    with Mr. Dillman?

10            **MR. SHEPARD:**  Objection; calls for speculation.

11            **THE COURT:**  Wait a minute.  You're asking why

12    Mr. Dillman put Mr. Andrade on the e-mail list?

13            **MR. CHOU:**  My question is what Mr. Hargreaves'

14    understanding was of why Mr. Andrade would need to be on this

15    e-mail thread with respect to Shift.

16            **THE COURT:**  You can at least ask the foundation, did

17    anyone tell him?  What would be the basis of his knowledge?

18    You've got some foundation as to why he would know.

19            **MR. CHOU:**  Understood, Your Honor.

20    BY MR. CHOU

21    **Q.**    So Mr. Hargreaves, what was Mr. Andrade's role in your

22    work with AML Bitcoin?

23    **A.**    I mean, he was, you know, clearly the source of the most

24    important information, and my reading of that e-mail is that

25    Japheth has given as much information as he can give, but the

1   details on that west coast ports deal don't include some of the

2   answers to the questions that we'd asked previously.  So

3   Japheth is, you know, maybe speculating that Marcus has those

4   answers.

5           MR. CHOU:  Zoom out, please.  And I just want to zoom

6   in on the section that starts with "note from Marcus," and then

7   just down to the bottom of the page.

8   BY MR. CHOU

9   Q.   And do you see where it says, "note from Marcus," followed

10  by a colon?

11  A.   I do.

12  Q.   Do you see where it says, we are in discussions with them

13  to require that all payments to the tax authorities worldwide

14  be in AML Bitcoin, and then it goes on?

15  A.   I see that, yeah.

16  Q.   When you read that, what was your impression of the state

17  of AML Bitcoin's business development with OECD countries?

18  A.   I mean, extensive and impressive.

19          MR. CHOU:  Okay.  We'll zoom out, please, and we can

20  take this exhibit down.

21  BY MR. CHOU

22  Q.   So Mr. Hargreaves, based on your contacts with AML Bitcoin

23  folks, did Shift Communications put out some press releases

24  regarding AML Bitcoin?

25  A.   I'm sure we did put out some press releases.  I can't

1    remember the specifics of exactly which press releases we put

2    out and which we didn't.

3         MR. CHOU:  I'd like to show the witness, the Court and

4    the parties exhibit 1443, and if we could zoom in on the part

5    that says, "PRNewswire".  And if we could also go to the -- I

6    believe it's page 3, please and if you could zoom in on the

7    part that says, "Shift Communications."  And if we go back up

8    to the top.  Thank you, Ms. Rosenbaum.

9    BY MR. CHOU

10   Q.   Mr. Hargreaves, is this one of the press releases that

11   your Shift Communications team helped put out for AML Bitcoin?

12   A.   It is, yeah.

13   Q.   And I'll just let you look.

14        MR. WARD:  If you could scroll through to 2, 3 and 4

15   just so that he sees the whole document.  Oh, that's perfect.

16   BY MR. CHOU

17   Q.   Mr. Hargreaves, is this a fair and accurate depiction of

18   the press releases that your team put together?

19   A.   I mean, as far as I recollect, yeah.

20        MR. CHOU:  Okay.  Move to admit exhibit 1443.

21        MR. SHEPARD:  No objection.

22        THE COURT:  1443 will be admitted.

23        (Trial Exhibit 1443 received in evidence.)

24   BY MR. CHOU

25   Q.   And I just want to first zoom in on the first paragraph

**HARGREAVES - DIRECT / CHOU**

1    here starting with Las Vegas.  And the date on this is

2    October 16, 2017?

3    **A.**    It is.

4    **Q.**    Was this a press releases in connection with AML Bitcoin's

5    initial coin offering?

6    **A.**    It is, yeah.

7    **Q.**    And why -- what's your understanding of why the AML

8    Bitcoin folks wanted to announce that AML Bitcoin is accepting

9    every form of currency?

10    **A.**    Because it shows market adoption or market acceptance, I

11    should say.

12        **MR. CHOU:**  If we could zoom out, please.  And could we

13    please zoom in on the fourth paragraph that starts with, "the

14    Foundation created."

15    **BY MR. CHOU**

16    **Q.**    Do you see where it says, the Foundation created AML

17    Bitcoin with anti-money laundering, anti-terrorism and

18    antitheft properties built into the coin's code?

19    **A.**    I see that, yeah.

20    **Q.**    Based on that, what was your understanding at the time of

21    the state of the AML Bitcoin technology?

22    **A.**    That it was, I guess pioneering is probably the right

23    word, and there was technology.  I know patents had been spoken

24    about.  So, yeah, there was intellectual property that was part

25    of the Bitcoin that was, you know, clearly differentiator.

1    Differentiated it from other Bitcoin.

2            **MR. CHOU:**  If we could go to the second page, please.

3    If we could zoom in on the first paragraph starting with,

4    "Foundation CEO."

5    **BY MR. CHOU**

6    **Q.**   Who provided this quote to Shift Communications?

7    **A.**   In terms of, I mean, AML Bitcoin, who it was, often when

8    we write press releases we will write a quote and attribute it

9    to a spokesperson based on the information that we've been

10   given by that person, and then they would be asked to approve

11   that quote.

12   **Q.**   So the quote that says, the first U.S. Bank to run a trial

13   of AML Bitcoin -- is poised to run a file for interbank

14   transfers, an advancement that will save millions of dollars in

15   exchange fees.  Do you see that?

16   **A.**   I do.

17   **Q.**   In your ordinary practice at Shift Communications you

18   would run that quote by the person who was attributed to?

19   **A.**   Hundred percent.

20           **MR. CHOU:**  Let's take that down, and if we could --

21   let's see here.  We can take this exhibit down, please.

22           **THE COURT:**  Would this be a good time for the break?

23           **MR. CHOU:**  Yes, Your Honor.

24           **THE COURT:**  All right.  Members of the jury, we'll

25   take our morning break.

1          Remember my admonition.  Do not discuss this amongst

2    yourselves or with anyone else, and we'll see you in 15

3    minutes.

4          (The jury exits the courtroom.)

5          (A recess was taken from 10:01 a.m. to 10:16 a.m.)

6          **THE COURT:**  Okay.  We're going to bring the jury out.

7          (The jury enters the courtroom.)

8          **THE COURT:**  The jury is present.

9          Mr. Chou, you may continue.

10   **BY MR. CHOU**

11   **Q.**   So Mr. Hargreaves, we just looked at a couple different

12   press releases, right?

13   **A.**   Yes.

14   **Q.**   Did Mr. Andrade ask you to publish other press releases,

15   too?

16   **A.**   I'm not sure.  I'm sure he did.  I can't give you the

17   specifics.

18          **MR. CHOU:**  I'd like to pull up exhibit 405 for the

19   witness, the parties and the Court.

20   **BY MR. CHOU**

21   **Q.**   And exhibit 405 here, is it an e-mail from Mr. Andrade to

22   you?

23   **A.**   It is, yes.

24   **Q.**   Have you reviewed this e-mail thread, it's a couple pages,

25   in preparation for your testimony here today?

HARGREAVES - DIRECT / CHOU

 1   A.   Yes, it's one that I've seen before, I think.

 2           MR. CHOU:  Scroll down to the second page and last

 3   page, as well.  All the way to the top.

 4   BY MR. CHOU

 5   Q.   Mr. Hargreaves, is this a fair and accurate depiction of

 6   an e-mail that you received from Mr. Andrade?

 7   A.   It is, yeah.

 8           MR. CHOU:  Move to admit exhibit 405.

 9           MR. SHEPARD:  No objection.

10           THE COURT:  405 will be admitted.

11       (Trial Exhibit 405 received in evidence.)

12   BY MR. CHOU

13   Q.   Mr. Hargreaves, let's turn to the first e-mail in this

14   thread.  So that's on page 2, please.

15           MR. CHOU:  If we could zoom in on the top?  It says

16   "on Sun," Sunday, November 5th, and then go all the way down to

17   include the content that Mr. Andrade forwards.

18   BY MR. CHOU

19   Q.   Up at the top do you see where Mr. Andrade writes, here is

20   PR 1, Japheth?

21   A.   I do.

22   Q.   What's your understanding of what PR 1 refers to?

23   A.   I mean, my assumption is it's press release number 1.

24   Q.   Okay.  Do you see where he forwards text below that?

25   A.   Yeah.

**HARGREAVES - DIRECT / CHOU**

1  Q.   This content below, upon your review of it, did Shift

2  Communications draft any of this content?

3  A.   I mean, it's unlikely.  I don't think so.  It's been

4  forwarded to us, so my assumption is no.

5  Q.   And I'd like to just focus in on the first paragraph

6  starting with "NAC Foundation, the Creator."

7       Do you see where it says, AML Bitcoin announced today that

8  it has been in extensive discussions with the governmental and

9  private sector authorities in Panama to integrate the AML

10 Bitcoin?

11 A.   I do.

12 Q.   Did you have any independent understanding of Panamanian

13 negotiations or did you receive this content from Mr. Andrade?

14 A.   Yeah, this was not written by Shift Communications because

15 we wouldn't have written a press releases that is about

16 discussions.

17 Q.   Okay.

18        MR. CHOU:  And take this down, or zoom out, please.

19 And then if we could zoom in on the two paragraphs that begin

20 with De La Guardia, and then in addition to Minister Roy.

21 BY MR. CHOU

22 Q.   Do you see how in that first paragraph it says that Mr. De

23 La Guardia has been in discussion with Roberto Roy, the

24 president of the board of directors and minister of the Panama

25 Canal, and then below that there's another mention of Minister

HARGREAVES - DIRECT / CHOU

1    Roy?

2    **A.**    I see that, yeah.

3            **MR. CHOU:**    Okay.    We can zoom out of this.

4    **BY MR. CHOU**

5    **Q.**    And then at the top of the page here, I want to zoom in on

6    those three lines starting with, "please someone give me a

7    status report."

8        Was this Mr. Andrade's e-mail to you and the team?

9    **A.**    It was, yeah.

10    **Q.**    And if we could go back to the first page.

11            **MR. CHOU:**    If we could zoom in on the metadata there

12    just to confirm on the e-mail we just talked about, metadata at

13    the bottom.    Thank you.

14    **BY MR. CHOU**

15    **Q.**    So this is an e-mail from -- you know, we just talked

16    about it was an e-mail from Mr. Andrade to Mr. Dillman, and

17    CC'ing you?

18    **A.**    Correct.

19    **Q.**    What's the date on that e-mail?

20    **A.**    November the 6th, 2017.

21    **Q.**    Okay.    So was that about a month after you started your

22    engagement with --

23    **A.**    Yeah.

24    **Q.**    -- Mr. Andrade?

25        I'm sorry, I didn't quite catch your answer.

HARGREAVES - DIRECT / CHOU

 1   A.    Yes, yeah.

 2         MR. CHOU:  Zoom out, please.

 3   BY MR. CHOU

 4   Q.    And so in response to his request to Mr. Dillman and you

 5   for an update, what is -- what did you reply?

 6         MR. CHOU:  Zoom in on November 6th, please, that

 7   e-mail.

 8   BY MR. CHOU

 9   Q.    What did you understand -- what were you trying to

10   communicate to Mr. Andrade?

11   A.    Yeah.  So what I was trying to communicate here is the

12   press release that we had been given isn't a press release that

13   we felt would be picked up by any journalist because it was a

14   press releases saying Company -- you know, AML Bitcoin is

15   having discussions with, you know, a third-party organization.

16   That in its own right wouldn't be -- is not a story that a

17   reputable media source could pick up.

18         However, what I was suggesting here is in a world where,

19   you know, anyone can publish information, that AML Bitcoin, we

20   should publish it on its own website so that at least, you

21   know, we've got some information out there in the public domain

22   that when we're talking to journalists, we could at least say,

23   you know, go and check it out on the AML Bitcoin website.  It's

24   not something that a journalist would write a story about, but

25   at least then a journalist could see that information and then

 1    for a journalist to write a story, they're going to want to do

 2    their own sourcing of that content.

 3        So maybe they would then call up Panama and see if what

 4    was being written was true and that they could write a story in

 5    their media about it -- whether it's an online publication or

 6    newspaper or whatever, yeah.

 7            **MR. CHOU:**  If we could zoom out, please, and then

 8    focus in on Mr. Andrade's response to Mr. Hargreaves' e-mail.

 9    **BY MR. CHOU**

10    **Q.**   So is it fair to say that Mr. Andrade has many questions

11    in response to your suggestion that he just put his content on

12    the website?

13    **A.**   Yeah.  He wants a third-party media outlet to pick it up,

14    so he's asking, can I guarantee that journalists can pick it

15    up, and clearly the answer is "no".

16    **Q.**   Do you see where he writes, I think it's in the third and

17    fourth line, our objective is to get this information out, not

18    just to one place but to many places, I need this information

19    to be seen worldwide, not yesterday, but today?

20    **A.**   I see that, yeah.

21    **Q.**   And then does Mr. Andrade insist on a response from you

22    today?

23    **A.**   He does.  He says he needs a reply today.

24    **Q.**   And then at the bottom it says -- you see the at symbol

25    Japheth, please call me?

1    A.    Yeah.

2    Q.    In response to receiving this e-mail do you and

3    Mr. Andrade have a conversation?

4    A.    We have a follow-up conversation, yes.

5          MR. CHOU:  We can take this down, please.

6          I'd like to show the Court, the witness and the parties

7    exhibit 1453.

8    BY MR. CHOU

9    Q.    Mr. Hargreaves, is this an e-mail from you later that same

10   day to Mr. Andrade and CC'ing Mr. Dillman?

11   A.    It is.  It's off the back of our conversation, yeah.

12   Q.    And have you reviewed this exhibit 1453 in preparation for

13   your testimony today?

14   A.    I have, yes.

15   Q.    Is this a fair and accurate description of an e-mail you

16   sent to Mr. Andrade?

17   A.    It is, yeah.

18         MR. CHOU:  Move to admit 1453.

19         MR. SHEPARD:  No objection.

20         THE COURT:  1453 will be admitted.

21         (Trial Exhibit 1453 received in evidence.)

22   BY MR. CHOU

23   Q.    Mr. Hargreaves, we were just talking about how this was

24   sent on November 7th.  I'd like to zoom in on starting with "Hi

25   Marcus," and then the first couple lines, it was good to talk

1    earlier, that sentence.

2        So was this e-mail basically in response to a conversation

3    you had with Mr. Andrade?

4    **A.**   It is, yeah.

5    **Q.**   And what did you mean by -- what were you trying to

6    communicate with the line, I have tried to lay it all out

7    there?

8    **A.**   I was just trying to, in a polite way, explain why what

9    was being asked of us wasn't going to be possible without

10   making some changes.

11        **MR. CHOU:**  And if we could zoom out and highlight the

12   paragraph starting with the header, "what we need to be

13   successful."  Just the paragraph, what we need to be

14   successful.

15   **BY MR. CHOU**

16   **Q.**   Do you see where you write, I'd be lying if I say we have

17   been surprised at journalists' total skepticism towards what

18   AML Bitcoin is doing?

19   **A.**   I see that.

20   **Q.**   Why did you say that you'd be lying if you said you were

21   surprised?

22   **A.**   Because there wasn't a -- there wasn't a whole bunch of

23   substance to it.  I mean, I'd be lying if I said ... yeah, I

24   guess that's what I'm saying.  Yeah, I guess that's one thing.

25        **MR. CHOU:**  Then if we could zoom out of that and then

1    zoom in on the paragraph that's headered, "your

2    news/deals/announcements?"

3              THE WITNESS:  We could just go back to that previous?

4    BY MR. CHOU

5    Q.    Sure.  If we could go back to --

6    A.    So I think I was generally, I was surprised.  I thought

7    the story that had been told to us of like this innovative new

8    AML Bitcoin that was clearly doing something that nobody else

9    had done, before we went into the assignment, I thought that

10   would be of interest to journalists, and through our

11   conversations with journalists, they weren't picking it up for

12   whatever reason, which we can go into.

13             MR. CHOU:  Okay.  Zoom out, please.  And then if we

14   could zoom in on "your news/deals/announcements."

15   BY MR. CHOU

16   Q.    So do you see where you write, how many times you have

17   seen a story saying, quote, Company X, that you've never heard

18   of, has had discussions with Organization Y?  A reputable

19   journalist can't write that story.

20         Did I get that right?

21   A.    You did.

22   Q.    What were you trying to communicate with Mr. Andrade with

23   that line in the context of your conversation?

24   A.    So bear in mind we had been sent a press release from

25   Mr. Andrade that was essentially saying that, you know, they

1  were having discussions with various different companies.  He

2  was asking us why journalists weren't picking up the story and

3  asking if we could guarantee if the journalists could run with

4  that story.

5      And so I'm responding, saying, well, a journalist will

6  never write that story because there's actually no news there.

7  All we're saying is Company X is having a conversation with a

8  company.  How many times have you seen that on the front page

9  of the New York Times?

10      MR. CHOU:  Can we scroll to the second page, please,

11  and could we please zoom in on, starting from the top, top

12  line, all the way through "a quote from Roberto Roy or

13  permission for us to refer."

14  BY MR. CHOU

15  Q.   So Mr. Hargreaves, in this section here are you offering

16  Mr. Andrade some suggestions for how he might get press from

17  reputable journalists?

18  A.   I am.  So I was trying to make the point that if we can't

19  talk about AML Bitcoin having signed specific contracts with

20  these organizations, maybe we should take a different tack and

21  get those organizations to talk about the importance of an AML

22  compliant currency, rather than necessarily committing that

23  they're going to be going with AML Bitcoin.  It's really, you

24  know, getting those companies to make a case for a new type of

25  Bitcoin that is AML compliant.

1       So to do that they don't have to say we've signed a

2  contract with AML Bitcoin, but it's them saying, yes, we can

3  see a role in our business and the efficiencies and the money

4  savings for an AML Bitcoin type, building a category rather

5  than specifically about AML Bitcoin itself.

6  **Q.**   The section that says, the important points that we

7  include are, I just want to direct your attention to that.  The

8  second bullet point there, or dash, is a quote from Roberto Roy

9  or permission for us to refer a journalist to him.  Do you see

10 that?

11 **A.**   I do.

12 **Q.**   Is why did you ask Mr. Andrade for a quote from Roberto

13 Roy or for permission to us to refer journalists to him?

14 **A.**   Because as I remember from the previous e-mail, I think

15 Roberto Roy was involved with the Panama port authorities.  So

16 if we could get permission from Roberto Roy to talk to a

17 journalist, a journalist will be able to source the story that,

18 yes, there is a role for a cryptocurrency like AML Bitcoin that

19 was AML compliant, so it would get a third-party endorsement,

20 rather than there just being AML Bitcoin that says there's a

21 need for AML Bitcoin.

22 **Q.**   In response to your request to him did Mr. Andrade ever

23 refer you to the Minister of Panama Canal Affairs, Roberto Roy?

24 **A.**   He didn't, no.

25       **MR. CHOU:**  If we could zoom out and go back to the

1    first page.  Or actually if we could scroll down to the third

2    page so the jury sees the whole document, and then just back up

3    to the first, please.

4    **BY MR. CHOU**

5    **Q.**   So is it fair to say from this e-mail that -- or is it

6    fair to say that at the time you were having difficulty with

7    getting journalists to pick up the AML Bitcoin story

8    organically?

9    **A.**   Correct.

10   **Q.**   Did you ever consider just offering to pay the journalist

11   a few thousand dollars?

12   **A.**   No, it doesn't work like that.

13   **Q.**   And why didn't you consider doing that?

14   **A.**   Because it's -- it would be unethical.  I don't know if

15   it's illegal, but it would certainly -- yeah, I would never do

16   that, or any organization I work for.

17        **MR. CHOU:**  Okay.  We can take this down.

18   **BY MR. CHOU**

19   **Q.**   Mr. Hargreaves, let's talk about bills or billing for a

20   minute.

21        To the best of your recollection, how much did Shift

22   Communications invoice Mr. Andrade for his work or for its work

23   ballpark?

24   **A.**   I think it was about $15,000 a month.

25   **Q.**   And did Mr. Andrade pay his bill?

HARGREAVES - DIRECT / CHOU

1   **A.**   He -- I don't know if he ever paid it.  I know we had a

2   lot of issues with payment.

3   **Q.**   And would reviewing correspondence from Mr. Andrade help

4   refresh your recollection about the specifics of the billing

5   situation?

6   **A.**   Yeah.

7        **MR. CHOU:**  I would like to show the witness a document

8   that's been Bates stamped FPI-PHY-074627.  We could mark it I

9   guess 5002 for identification.

10       **THE COURT:**  Very well.

11       **MR. SHEPARD:**  Have I seen this?  Is this one of the

12  exhibits you listed for today?

13       **MR. CHOU:**  No, but I'm just using it to refresh.

14       **MR. SHEPARD:**  Okay.  Thank you.

15  **BY MR. CHOU**

16  **Q.**   So, sir, if you could just read this silently to yourself.

17  It's a two-page e-mail thread.  And then look up whenever

18  you're ready.

19  **A.**   Okay.

20  **Q.**   You can put the document aside, please.

21       So, sir, what -- what were your interactions like with

22  Mr. Andrade with respect to his company's payment of bills or

23  lack thereof?

24  **A.**   I mean, sort of antagonistic, at best, I guess.

25  **Q.**   And did Mr. Andrade fully pay his bills to Shift

**HARGREAVES - DIRECT / CHOU**

1  Communications?

2  **A.**   Not as far as I'm aware.  I don't know.  I can't remember

3  if Shift Communications ended up writing off a bad debt or if

4  some of it was paid, or ... I'm pretty sure all of it wasn't

5  paid.

6  **Q.**   But to the best of your recollection as the managing

7  director on the project?

8  **A.**   Yeah.

9  **Q.**   Did you ultimately fire Mr. Andrade as a client?

10  **A.**   Yes.  I mean, yes.  We couldn't work for him.

11  **Q.**   And based on your -- how long did you say you've worked in

12  public relations?

13  **A.**   I don't know, 30-plus years, yeah.

14  **Q.**   Based on your 30-plus years working in public relations,

15  how common or uncommon is it to dismiss someone as your client?

16  **A.**   Very rare.

17  **Q.**   How many times have you had to do it in your career?

18  **A.**   Once, twice, yeah.

19  **Q.**   Mr. Hargreaves, over the couple months Mr. Andrade worked

20  with Shift Communications did you exchange several e-mails with

21  Mr. Andrade?

22  **A.**   Sorry, repeat the question.

23  **Q.**   And you can put the document aside.

24      Over the couple months Mr. Andrade worked with Shift

25  Communications did you exchange several e-mails with

HARGREAVES - DIRECT / CHOU

1    Mr. Andrade?

2    **A.**    Yeah, I did.

3    **Q.**    You did.

4         And did you speak with him a few times over the phone?

5    **A.**    I did.

6    **Q.**    Based on all your interactions with Mr. Andrade, how would

7    you characterize his demeanor?

8    **A.**    Forceful.  Slightly --

9              **MR. SHEPARD:**  Objection.

10             **THE WITNESS:**  -- aggressive, as you can see from that

11   e-mail.

12   **BY MR. CHOU**

13   **Q.**    Was he somebody who knew what he wanted or was he taking

14   direction from somebody else?

15   **A.**    No, but he knew what he wanted.

16             **MR. SHEPARD:**  Objection.

17             **THE COURT:**  Sustained, sustained.  Not specific enough

18   a question.

19   **BY MR. CHOU**

20   **Q.**    When Mr. Andrade told you about what he wanted for the AML

21   Bitcoin project did he ever say that somebody else wanted those

22   things done?

23   **A.**    Sorry, can you repeat the question?

24   **Q.**    When Mr. Andrade was giving you direction on the AML

25   Bitcoin project --

1    **A.**    Yeah.

2    **Q.**    -- did he ever say that he was doing it at the behest of

3    somebody else?

4    **A.**    No.

5    **Q.**    Over your 30-year career, Mr. Hargreaves, have you worked

6    with many executives and clients?

7    **A.**    Lots, yeah.

8    **Q.**    Relatively speaking, how forceful was Mr. Andrade in your

9    experience in communicating his requests?

10    **A.**    I mean, on a scale of zero to 10?  10.

11    **Q.**    And how about on a percentile basis?

12    **A.**    Top five.

13    **Q.**    Based on all your interactions with Mr. Andrade, what was

14    your understanding of his role at AML Bitcoin?

15    **A.**    I mean, he was the head of it.

16        **MR. SHEPARD:**  Objection, this is just speculation.

17        **THE COURT:**  It's what his impressions were, and that's

18    not speculation.  He can testify --

19        **MR. SHEPARD:**  But his --

20        **THE COURT:**  Overruled.  Overruled.

21    BY MR. CHOU

22    **Q.**    I'll ask the question again, Mr. Hargreaves.

23    **A.**    Yeah, I'm sorry.

24    **Q.**    Based on all your interactions with Mr. Andrade, what was

25    your understanding of his role at AML Bitcoin?

1    **A.**    He was the head of AML Bitcoin as the CEO.  He was the,

2    you know, the source of -- yeah, the buck stopped with him.

3    **Q.**    And while at Shift Communications did you interact with

4    Japheth Dillman as well?

5    **A.**    I did.

6    **Q.**    Based on your interactions with Japheth Dillman what was

7    your understanding of Mr. Dillman's role at AML Bitcoin?

8    **A.**    I never fully had a clear understanding.  I sort of

9    recollect that he was an investor of some sort.  I also knew he

10   had multiple other, you know, irons in fires.  But, you know,

11   for our purposes and it's not unusual -- so when we're working

12   with a startup, it's not unusual for us to work with, you know,

13   somebody else on the team to get information to help us be

14   successful.  So he was a conduit for information for Shift

15   Communications to get information out of AML Bitcoin.

16       But ultimately we knew that Japheth had to go to Marcus,

17   as we've seen in a few different e-mails, to get, you know,

18   more detail that Japheth didn't have.

19       **MR. SHEPARD:**  Objection to what Mr. Dillman was

20   thinking about what he had to do before he got -- that's just

21   pure speculation.

22       **THE COURT:**  I'll sustain that and strike that part of

23   the answer.

24   **BY MR. CHOU**

25   **Q.**    By chance, Mr. Hargreaves, did you ever interact with

HARGREAVES - CROSS / SHEPARD

1  somebody named Jack Abramoff in the course of your work with

2  AML Bitcoin?

3  **A.**   It doesn't ring a bell.

4  **Q.**   If, while at Shift, you had received conflicting

5  directions from Mr. Dillman on the one hand and Marcus Andrade

6  on the other, who would you have listened to?

7  **A.**   Marcus, because he was the CEO, and he would be the one

8  who pays the bills.

9         **MR. CHOU:**  One moment, Your Honor.

10        Nothing further.

11        **THE COURT:**  Mr. Shepard.

12                        <u>**CROSS-EXAMINATION**</u>

13  **BY MR. SHEPARD**

14  **Q.**   Good morning.

15  **A.**   Good morning.

16  **Q.**   I gotta start by saying I love the accent.  Do you mind if

17  I ask it it's Australian?

18  **A.**   It's English but we're friends with Australia.

19  **Q.**   It's great.  I loved it.

20        So Mr. Andrade came to you for public relations help,

21  right?

22  **A.**   Correct.

23  **Q.**   A lot of companies need help getting known, correct?

24  **A.**   Correct.

25  **Q.**   That's why companies like Shift are in business, right?

HARGREAVES - CROSS / SHEPARD

1   **A.**   Correct.

2   **Q.**   Did Marcus come to you through Dillman?  Was Dillman your

3   connection?

4   **A.**   I think -- I don't think he -- I think the original

5   connection was somebody called David Mata.

6   **Q.**   Mata, ah.  Mr. Mata and Mr. Dillman are partners.  Did you

7   know that?

8   **A.**   I didn't know that.

9   **Q.**   Okay.  And in addition to coming to you for help around

10  the same time you knew that Mr. Andrade was also adding a

11  lawyer to help with PR, right?

12  **A.**   I wasn't aware.  I was aware of a company called ICO Box

13  that were focused on the highly specialist Bitcoin media.

14  **Q.**   Okay.  Just to stick with ICO Box for a second, and then

15  I'll come back to the lawyer.  ICO Box was the company that was

16  running the ICO for AML Bitcoin, right?

17  **A.**   I'm not aware of that.

18  **Q.**   Okay.

19  **A.**   I thought they were doing PR.

20  **Q.**   Had you been involved in any ICOs before?

21  **A.**   No.

22        **MR. SHEPARD:**  Okay.  Coming back to my question about

23  the lawyer, can we put up just for the Court, the witness and

24  the exhibit (sic) defense exhibit number 2275, or did we

25  re-number it?

1           This is defense exhibit 3313, which is just the first

2      e-mail from the exhibit number I mentioned.

3           **THE COURT:**  You already gave it to me.  I have a

4      binder.  Thank you.

5           **MR. SHEPARD:**  Okay.  May I show it to the witness?

6           **THE COURT:**  Yes, you may.

7      **BY MR. SHEPARD**

8      **Q.**   If you'd take a look at that, does that refresh your

9      recollection?  I think you'll see you're copied on it.  And

10     does that refresh your recollection?

11     **A.**   I don't specifically remember this e-mail, but I'm clearly

12     on it.

13     **Q.**   Okay.  And does it refresh your recollection that

14     Mr. Andrade introduced a lawyer into the public relations

15     process and wanted communications to go through the lawyer?

16     **A.**   It doesn't refresh my memory of that, no.

17     **Q.**   But you did receive this e-mail on October 22nd, 2017,

18     correct?

19     **A.**   I did, yes.

20          **MR. SHEPARD:**  Okay.  I offer it, Your Honor.

21          **MR. CHOU:**  Objection; hearsay.  801(d)(2)(A), it does

22     not include Mr. Andrade's statements.

23          **MR. SHEPARD:**  It's not hearsay, Your Honor.  It's an

24     act.  It's an event.  There's no -- we're not offering anything

25     for its truth here.  We're offering the fact that he asked

1    people it to run his press through a lawyer.

2          MR. CHOU:  Seems like --

3          THE COURT:  All right.  If it's not to prove that

4    fact, what's the relevance of it?

5          MR. SHEPARD:  Well, it is offered to prove that he ran

6    communications through a lawyer, but that's not -- it's not

7    offered for the truth, it's an event.  It's telling people run

8    through the lawyer.  Like it's telling someone --

9          THE COURT:  All right.  Okay.  I understand.  All

10   right.  I will admit it.  Are you admitting the whole thing?

11         MR. SHEPARD:  No, that's what I did.  And I'm sorry,

12   you have the prior version.  In order to address whatever

13   concern the Court might have about the longer version, I

14   substituted just the first one.

15         THE COURT:  One page?

16         MR. SHEPARD:  Yes.  It should be --

17         THE COURT:  2275-1?

18         MR. SHEPARD:  And it should -- it even has a little

19   more than I think it should.  It should just be the first

20   e-mail on exhibit 3313.

21         THE COURT:  All right.

22         MR. SHEPARD:  That's all that should go into evidence.

23         MR. CHOU:  Your Honor, would the Court consider

24   offering a limiting instruction as to the --

25         THE COURT:  Yes, yes.

1         As we have discussed before, I know it's a very sort of

2    difficult concept in some ways, but this particular document,

3    exhibit 2275, is not offered for the truth of these statements

4    that are contained in this, but it's offered so you can

5    understand what witnesses did in response to receiving

6    information and the like.  So that's why this is in here, not

7    to prove that the statements in this exhibit are true.

8         Okay.  Go ahead.

9         (Trial Exhibit 2275 received in evidence.)

10            **MR. SHEPARD:**  Thank you, Your Honor.

11       Can we put up government exhibit 405.

12   **BY MR. SHEPARD**

13   **Q.**   And this is a subject that -- an exhibit that the

14   government asked you a number of questions about.  Do you

15   recall?

16   **A.**   I do.

17   **Q.**   And it had attached to it a proposed press release.  That

18   would be on the next page, if we could go to there.  And you

19   said it was unlikely you wrote it, correct?

20   **A.**   Unlikely that Shift Communications wrote it.

21   **Q.**   Yeah, correct.  Any -- not just you, anybody at Shift

22   Communications.

23   **A.**   Yeah.

24   **Q.**   Right.

25        Were you told that it was written by Jack Abramoff and

HARGREAVES - CROSS / SHEPARD

1    Carlos De La Guardia?

2    **A.**    I can't recall.

3    **Q.**    Might have been, just don't remember?

4    **A.**    I can't recall, yeah.

5    **Q.**    Okay.  And you don't know what discussions Mr. De La

6    Guardia had with people in Panama before this draft of a press

7    releases was sent to you, correct?

8    **A.**    No.

9    **Q.**    And you don't recall what -- you don't have any

10   information about what Mr. De La Guardia told Mr. Abramoff

11   before this exhibit was sent to you?

12   **A.**    Not that I recall.

13   **Q.**    And you were also asked a lot about exhibit 792.

14           **MR. SHEPARD:**  Could we get that one on the screen,

15   please?

16   **BY MR. SHEPARD**

17   **Q.**    And my recollection is you got this from Japheth Dillman,

18   correct?

19   **A.**    That's what it says in the e-mail, yeah.

20   **Q.**    And you did not get any similar e-mails from Mr. Andrade

21   laying out the status of negotiations with various people,

22   correct?

23   **A.**    So you're saying that I didn't get them?  I don't know.

24   **Q.**    I'm asking if you did.

25   **A.**    I can't remember.

HARGREAVES - CROSS / SHEPARD

1   Q.   Okay.

2   A.   I don't recall getting specific answers to the questions

3   that we posed from Mr. Andrade.

4   Q.   Right.  And Mr. -- I think you, when you were asked

5   questions by Mr. Chou you looked at a particular line toward

6   the bottom, I have included Marcus on this e-mail so he can

7   provide other details I'm leaving out that are relevant?  Do

8   you recall Mr. Chou highlighting that for you?

9   A.   I remember that, yeah.

10  Q.   And you don't recall getting anything further from Marcus

11  on that, correct?

12  A.   I don't recall, no.

13  Q.   And when you were asked questions about this document and

14  your understanding of this document, the questions and answers

15  made it sound like you thought that there were a bunch of deals

16  that were already done, but that wasn't so.  Right?

17  A.   On the previous page of this e-mail, which was the

18  follow-up to a briefing, then there were four companies names

19  under the section which was Deals.

20  Q.   Right.

21  A.   My assumption is that these are the deals that ...

22  Q.   Okay.  And I think that's what's being shown now, the four

23  names, the Estonia, Panama, Suntrust Bank and West Coast ports?

24  A.   I was referring to the e-mail from I think it was Kris

25  Kitto, but those four companies, as well.

1    Q.   Okay.  But you knew, you spoke to Mr. Andrade, and you

2    knew that none of the deals were signed, correct?

3          MR. CHOU:  Objection, assumes facts not in evidence.

4    Also hearsay.

5          THE COURT:  Well, the question is what did he learn

6    from Mr. Andrade.  He can testify to that.

7          THE WITNESS:  I mean I learned that there were deals

8    in discussion.  I don't think, I don't believe -- I certainly

9    never saw any evidence that deals were signed, but the

10   conversations were happening, which I think is reflected in

11   this e-mail.

12   BY MR. SHEPARD

13   Q.   Right.  Conversations were happening, but no deals were

14   signed.  That's what you understood, correct?

15   A.   That's what I understood.

16          MR. SHEPARD:  If you would put exhibit 30 up for me.

17   BY MR. SHEPARD

18   Q.   This was another attachment that had a press release,

19   right?  The press release starts at the bottom of the first

20   page?

21   A.   Yeah.

22   Q.   And we looked at the press release already.  We don't need

23   to look at it again unless you would like to, to refresh your

24   recollection.  I just have one or two questions about it.

25          You don't know who initially drafted it, right?

HARGREAVES - CROSS / SHEPARD

1   **A.**   No, I don't.

2   **Q.**   It wasn't you or somebody else at Shift?

3   **A.**   Not that I remember, no.

4   **Q.**   And you don't know what it was based on, correct?

5   **A.**   Correct.

6   **Q.**   Based on the conversations that you had and what you had

7   seen, you thought the company was having some very impressive

8   conversations with various entities, right?

9   **A.**   Sounded -- sounded good.

10  **Q.**   And it also seemed, as I understood what you were saying,

11  that the company wasn't using those conversations as

12  effectively as it should have.  Right?

13  **A.**   When you say "the company," are you referring to AML

14  Bitcoin?  Can you rephrase the question?

15  **Q.**   Sure, sure.

16  **A.**   I guess my question is effective at what?

17  **Q.**   Effective at getting their story out.  You thought that

18  they could have used those conversations more effectively to

19  get their story out?

20  **A.**   No.

21  **Q.**   Well --

22  **A.**   It could be -- because what I was saying before is having

23  conversations, you can't get a story to the media about having

24  conversations.  So it's not like they were being ineffective.

25  It was something that was mission impossible.

1  Q.   Right.  You thought they needed to do a little bit more --

2  A.   Sign a deal, yeah.

3  Q.   Even -- well, let's look at exhibit 1453, if we may.

4  Sorry, not 1452, but 1453.  And this is already in evidence.

5       MR. SHEPARD:  And if you can go to the bottom

6  paragraph and just blow up the first few sentences there.

7  First -- yeah, that's great.  Thank you.

8  BY MR. SHEPARD

9  Q.   You were saying you're having a lot of conversations which

10 are incredibly impressive, but you ultimately say you need

11 either a deal signed or a third-party organization to speak on

12 your behalf.  Right?

13 A.   Correct.  That's what I wrote, yeah.

14 Q.   Okay.  And you gave some examples of that starting on the

15 last line of the first page and running -- let's take the first

16 two lines and the next three quotations there on the top of

17 page 2.  If we can look at that.

18      MR. SHEPARD:  Sorry to make it hard to bridge two

19 pages.  So can we get that line on~-- from page 1 onto the top

20 there, "if we take the Panama story?"  Excellent.  Thank you.

21 BY MR. SHEPARD

22 Q.   Starting there at the bottom of the first page you said,

23 if we take the Panama story, I had a quick conversation with

24 Japheth.  That's Mr. Dillman, right?  And tried to come up with

25 some angles that would turn it into more than just Company X

**HARGREAVES - CROSS / SHEPARD**

1   had discussions with Company Y.  And we don't need to belabor

2   these but one example that you had would be a story that would

3   be Panamanian industries are in discussions to adopt

4   alternative currencies, including AML-compliant

5   cryptocurrencies, as a way to move away from cash?

6   **A.**   That's what I wrote.

7   **Q.**   That would be an example of the way they could have done

8   it better, right?

9   **A.**   It's taking a different tack, yeah.  It's solving the

10  problem of how you get a story out into the media by taking a

11  position, taking a stance, which is more about the adoption of

12  a new type of -- of a new category, rather than specifically

13  signing a deal with AML Bitcoin.

14  **Q.**   So you wanted them to take a different tack that you

15  thought would be more effective at getting their story out?

16  **A.**   Correct.

17  **Q.**   And --

18  **A.**   In the absence of what we were currently getting, correct.

19  **Q.**   Right.  You would have preferred they would have actually

20  had a deal to talk about?

21  **A.**   Correct.

22  **Q.**   But in the absence of that, you had a --

23  **A.**   Try something else.  A different way.  A less good way,

24  but a different way.

25  **Q.**   Less good than having a deal?

1  **A.**    Yeah, because it would be promoting the category rather

2  than promoting the capabilities and credibility of AML Bitcoin

3  per se.

4  **Q.**    So it was less good than having an actual deal but better

5  than what they were actually doing, in your opinion?

6  **A.**    Correct.

7  **Q.**    Yes?

8  **A.**    Correct.

9  **Q.**    And ultimately Marcus wound up having a billing dispute

10  with you, and so you were never able to follow up on that

11  suggestion, correct?

12  **A.**    I can't remember the sequence of when we stopped working

13  and whether these suggestions ever got any traction.

14  **Q.**    Okay.  You don't remember exactly the sequence, but before

15  anything else happened, there was a billing dispute and the way

16  you described it you fired Mr. Andrade and his company, his

17  clients, correct?

18  **A.**    What I'm saying, I don't know the exact sequence.  So

19  you're characterizing it as I make this -- we make this

20  suggestion and then the billing and then the dispute about

21  billing happened immediately afterwards.  I don't know if we

22  spent a month trying to execute what I've outlined here.

23  **Q.**    Okay.  But you don't have any recollection of getting

24  further requests or taking further action on your suggestions.

25  Right?

**HARGREAVES - CROSS / SHEPARD**

1  **A.**   No.  And I know we asked for, you know, information

2  numerous times and we didn't get anything back.  So, yeah, it

3  had run its course.

4  **Q.**   And Mr. Andrade was questioning your bills?

5  **A.**   Correct.  We saw that e-mail earlier, yeah.

6  **Q.**   And Mr. Andrade did not ask you to pay any journalists,

7  right?

8  **A.**   I don't recall.

9  **Q.**   You don't recall him doing that, right?

10  **A.**   Sorry, there were a lot of negatives in there.  Did we --

11  can you repeat the question?  Rephrase the question, please.

12  **Q.**   Well, you had said on direct examination you don't pay

13  journalists.

14  **A.**   Correct.

15  **Q.**   And I'm asking in that context.  He didn't ask you to do

16  that, did he?

17  **A.**   No.

18  **Q.**   And without in any way questioning that you don't pay

19  journalists, I get that completely, there is some money that

20  sometimes is spread around.  You do pay, like, PR Newswire to

21  get articles out, correct?

22  **A.**   That's a distribution service, yeah.

23  **Q.**   So money does flow sometimes, but you as a PR firm would

24  not pay journalists?

25  **A.**   So there's things like PR Newswire, which is a mechanism

1    to get news out to journalists and all journalists watch the

2    wires and pick up news, et cetera.  You also have advertorials,

3    which are, you know, they're made to look like advertorial, but

4    they're essentially paid space.

5    **Q.**    Right.  That goes on in the industry also?

6    **A.**    That goes on in the industry, but not among reputable

7    media.

8    **Q.**    I'm sorry, I didn't hear that.

9    **A.**    So the New York Times you can't pay for editorial.

10   **Q.**    Right.  Understood.

11          You -- well, let me just start that in a different way.

12          You said a number of things about the way Marcus presented

13   to you, and there were a number of unusual things about the way

14   he presented to you, correct?  You ordinarily deal with the

15   person in charge of business development or marketing, as

16   opposed to the CEO, correct?

17   **A.**    Not necessarily.  We worked for a lot of -- we worked for

18   a lot of startups as well as big companies.

19   **Q.**    You recall talking to Mr. Chou and FBI Special Agent

20   Winart on February 12th, earlier this week?

21   **A.**    Yeah.

22   **Q.**    And you told them that usually you would not work directly

23   with CEO, but instead work with someone involved with

24   marketing, or "bisdev," correct?

25   **A.**    Because the majority of our clients were bigger clients,

1    yes.

2    **Q.**    That was typically how it was done?

3    **A.**    Depending on the size.  If it's a startup with just the

4    founder CEO and no employees, then obviously we would work with

5    the CEO.

6    **Q.**    Okay.  But you didn't give that qualification to Mr. Chou

7    and Special Agent Winart earlier this week, correct?

8    **A.**    No, but it's probably implicit.

9            **MR. SHEPARD:**  If I may just have a moment.

10    Thank you, Your Honor.  Nothing further.

11            **THE COURT:**  Anything further?

12                        <u>**REDIRECT EXAMINATION**</u>

13    **BY MR. CHOU**

14    **Q.**  Mr. Hargreaves, just a few brief questions.

15            **MR. CHOU:**  If we could first pull up exhibit 792

16    again.  And it's in evidence, so we can go ahead and publish

17    it.

18    **BY MR. CHOU**

19    **Q.**  I just want to ask you about each of the paragraphs here.

20            **MR. CHOU:**  So if we could first zoom in on the Estonia

21    paragraph.

22    **BY MR. CHOU**

23    **Q.**  And to situate us, this is the -- is this the e-mail that

24    Mr. Dillman sent to Mr. Andrade and you in response to Shift's

25    questions about AML Bitcoin's deals?

1    **A.**    Correct.

2    **Q.**    And do you see on the first sentence here it says,

3    Estonia:  Deal will be inked with an MOU in a couple of weeks?

4         What was the impression you had reading that sentence

5    about the state of a deal with Estonia?

6    **A.**    That it was imminent subject to a memorandum of

7    understanding.

8         **MR. CHOU:**  Let's turn to the second paragraph of with

9    respect to Panama, please.  If we could zoom in on that.

10   **BY MR. CHOU**

11   **Q.**    And looking at the, sorry, the middle of that block of

12   text, do you see where it says, this deal is already in place

13   to begin testing with AML Bitcoin before the end of the year;

14   AML Bitcoin was their only choice for digital currency because

15   of its AML compliance?  Did I get that right?

16   **A.**    Correct.

17   **Q.**    What was your impression about the state of the deal, if

18   any, with the Panama authorities when reading that message?

19   **A.**    I mean, it's a huge system.  If it's replacing the SWIFT

20   system, which is what this says, then it's a huge endorsement

21   for AML Bitcoin, if they signed that deal.

22   **Q.**    And what's your understanding of what the SWIFT system is?

23   **A.**    It's the interbank payment system.

24        **MR. CHOU:**  Could we scroll down to third bullet point

25   here, Suntrust Bank.

HARGREAVES - REDIRECT / CHOU

1    BY MR. CHOU

2    Q.   Do you see where it says, same discussion as Panamanian

3    banks, same timeline, perhaps a bit earlier, November

4    hopefully?

5    A.   I see that.

6    Q.   When you read that what was your impression of the state

7    of a business deal, if any, with Suntrust Bank?

8    A.   Again, if a -- you know, if a major bank adopts, you know,

9    this solution instead of SWIFT, it's a huge deal.

10            MR. CHOU:   And lastly, I'd like to highlight paragraph

11   number 4, please.

12   BY MR. CHOU

13   Q.   Do you see where it says, AML Bitcoin is the only one that

14   has compliance, so it will win the bid?

15   A.   I do.

16   Q.   What was your impression about the state of a business

17   deal, if any, with the San Francisco port when you read that

18   message on October 10th?

19   A.   That it was a, you know, virtual certainty.  If there's

20   only one company in the running, then there's only one company

21   that's going to get it.

22            MR. CHOU:   We can take this exhibit down, please.

23   BY MR. CHOU

24   Q.   Mr. Hargreaves, earlier do you remember how defense

25   counsel asked you about whether you ever offered to pay some

**HARGREAVES - REDIRECT / CHOU**

1  journalists a few thousand bucks to run the piece?

2  **A.**   I do.

3  **Q.**   And do you remember talking about how there were something

4  called advertorials?

5  **A.**   Yeah.

6  **Q.**   Could you just explain for us what an advertorial is at a

7  high level?

8  **A.**   Yeah, an advertorial is a -- so if you think of a

9  magazine, you essentially take out a page of advertising, and

10  then the company can write a article.  You know, they can say

11  whatever they want, because essentially they've bought, they've

12  bought the page of advertising.  It's designed to trick the

13  reader into thinking it's not paid for.  So it's positioning it

14  as editorial.  You know, sort of the less reputable the media

15  outlet is, the less it probably looks like an advert.

16  **Q.**   In your experience in 30 years in public relations, do

17  these advertorials usually disclose somewhere, you know, paid

18  media, something like that?

19  **A.**   They do.

20  **Q.**   And you mentioned that these advertorials don't really run

21  in reputable media?  Did I get that right?

22  **A.**   Correct.  They look much more like adverts than reputable

23  media.

24  **Q.**   Would it surprise you if, let's say, Forbes ran something

25  like an advertorial?

**HARGREAVES - REDIRECT / CHOU**

1  **A.**   It would surprise me if they ran an advertorial that

2  didn't look like an advert full of writing, if that makes

3  sense.

4  **Q.**   And that's because of -- what's the basis for that

5  knowledge with respect to Forbes?

6  **A.**   Just, I mean, editorial standards.  I think there is a, or

7  there certainly was a part of Forbes online where a company

8  could pay to have like a "by" lined article.  Again, it

9  looked -- it was made clear that the company paid for that

10  space, and that's the important distinction.

11  **Q.**   Last couple questions, Mr. Hargreaves.

12      Earlier do you remember how counsel asked you about an

13  e-mail thread with supposedly an attorney on it?

14  **A.**   I do.

15  **Q.**   Did you ever talk -- to the best of your recollection, did

16  you ever speak with an attorney named Neil Sunkin?

17  **A.**   Not to the best of my recollection.

18  **Q.**   To the best of my recollection, did you ever speak with

19  any of Mr. Andrade's attorneys?

20  **A.**   No.

21  **Q.**   Similarly do you remember earlier when we were asking you

22  questions about a Jack Abramoff?

23  **A.**   I can't quite remember the context, but ...

24  **Q.**   Do you know Jack Abramoff?

25  **A.**   No.

1          MR. CHOU:  One moment.

2      Nothing further, Your Honor.

3          THE COURT:  Mr. Shepard, anything?

4          MR. SHEPARD:  Very, very briefly, Your Honor.

5                    <u>RECROSS-EXAMINATION</u>

6  BY MR. SHEPARD

7  Q.   You don't know Mr. Abramoff, and you don't know what

8  communications he was having with people at AML Bitcoin,

9  correct?

10 A.   Not from my recollection, no.

11 Q.   Just wanted to ask you one more question following up from

12 exhibit 792.

13         MR. SHEPARD:  Could we put that very briefly back on

14 the screen?

15 BY MR. SHEPARD

16 Q.   Mr. Chou asked you about it on redirect.  And you can see

17 it's dated October 10th?

18 A.   I can, yeah.

19 Q.   Correct?

20         MR. SHEPARD:  And then if we could put up

21 exhibit 1468.

22 BY MR. SHEPARD

23 Q.   1468 is dated October 20, so 10 days later.  Right?

24 A.   Yeah.

25 Q.   And you said, and this is in the third bullet point under

HARGREAVES - RECROSS / SHEPARD

 1    number 1, "credibility," we realize none of the deals are

 2    signed?

 3            MR. CHOU:  Objection; hearsay.

 4            THE COURT:  What?

 5            MR. CHOU:  Objection; hearsay.

 6            MR. SHEPARD:  This document's in evidence.

 7            THE COURT:  Go ahead.  Yes, overruled.

 8    BY MR. SHEPARD

 9    Q.   That's what you wrote, we realize none of the deals are

10    signed, correct?

11    A.   The previous exhibit talks about AML having discussions

12    with Suntrust, having, like, moving towards memorandum of

13    understanding, so ...

14            MR. CHOU:  Your Honor this is not in evidence.

15            THE COURT:  It's not in evidence?

16            MR. CHOU:  No, sir.

17            THE COURT:  Well, that's a different proposition,

18    then.

19            MR. SHEPARD:  Okay.  Well --

20            THE COURT:  First of all, it should be taken down from

21    the screen.

22            MR. SHEPARD:  I apologize.  I thought it was.

23            THE COURTROOM DEPUTY:  I didn't show it to the jury.

24            THE COURT:  Thank you.  Good.

25            MR. SHEPARD:  I apologize, then.

1      This is government exhibit 1468.  I offer it.

2           MR. CHOU:  Objection, Your Honor, hearsay once more.

3           THE COURT:  Sustained.

4  BY MR. SHEPARD

5  Q.   This is an e-mail that you sent to Mr. Andrade on

6  October 20, 2017, correct?

7  A.   Correct.

8  Q.   And you were informing him about the conversations that

9  you had had and what you had learned, correct?

10  A.   I was explaining some of the challenges that we were

11  facing in telling the story.

12  Q.   Okay.  Based on the conversations you had had and what you

13  had learned, correct?

14  A.   Correct.

15  Q.   And you were reporting it as accurately as you could,

16  correct?

17  A.   Correct.

18  Q.   And you were doing that so that you would inform

19  Mr. Andrade and Mr. Dillman of what they needed to do, correct?

20  A.   Correct.

21           MR. SHEPARD:  Okay.  At this point, Your Honor, at a

22  minimum --

23           THE COURT:  Why are you hung up on the document?  Why

24  don't you ask him --

25           MR. SHEPARD:  I will.

1          THE COURT:  -- if he can recall what he said to Mr. --

2          MR. SHEPARD:  I'm going to do that.

3          THE COURT:  Then you don't need the document unless he

4    can't remember, and then you show him the document.

5          MR. SHEPARD:  Well, I think the document also is

6    helpful as context based on what he has previously said and

7    what the government has accused Mr. Andrade with.

8          THE COURT:  Why don't you start with asking him what

9    he recalls on~---

10         MR. SHEPARD:  Yes.

11         THE COURT:  -- this issue, and then we'll deal with

12   the document.  Okay?

13         MR. SHEPARD:  Fair enough, Your Honor.  Thank you.

14   BY MR. SHEPARD

15   Q.   You knew on October 20, 2017, that none of the deals were

16   signed.  Right?

17   A.   Correct; that's what I'd been told.

18   Q.   That's what you had been told by Mr. Andrade, among

19   others, correct?

20   A.   That e-mail was from Japheth, but AML Bitcoin, yeah.

21   Q.   And you had also spoken with Mr. Andrade prior to writing

22   this e-mail, correct?

23   A.   Uh, I can't remember the sequencing, but probably, yeah.

24         THE COURT:  You may step down.

25         MR. SHEPARD:  Nothing further.  Thank you, Your Honor.

 1          **THE COURT:**  Thank you.  You may step down.

 2          **MR. CHOU:**  Your Honor, the United States calls Byron

 3    Rhett.

 4          **THE COURT:**  If you could come forward, please, to the

 5    stand and be sworn.

 6          **THE COURTROOM DEPUTY:**  Raise your right happened,

 7    please.

 8                          **BYRON RHETT**,

 9    called as a witness for the Government, having been duly sworn,

10    testified as follows:

11          **THE COURTROOM DEPUTY:**  Thank you.

12       Can you state your name and spell your last name once

13    you're seated.

14          **THE WITNESS:**  My name is Byron Rhett, R-h-e-t-t.

15                      **DIRECT EXAMINATION**

16    BY MR. CHOU

17    **Q.**   Good morning, Mr. Rhett.

18    **A.**   Good morning.

19    **Q.**   Did you work at the Port of San Francisco?

20    **A.**   Yes.

21    **Q.**   How long did you work there, sir?

22    **A.**   About 21 years.

23    **Q.**   And what were your roles at the port?

24    **A.**   I was deputy director for planning and development, and I

25    was chief operating officer.

1   **Q.**   You mentioned chief operating officer.  Were you COO by

2   2018?

3   **A.**   Yes, I think so.

4   **Q.**   And as chief operating officer of San Francisco port, how

5   large of an operation did you manage?

6   **A.**   Well, the port is roughly seven and a half miles of

7   waterfront, so I managed all of the departments at the port

8   that mainly focused on the development and reuse of that

9   property.

10  **Q.**   And as COO, were you a member of what's called the senior

11  leadership team?

12  **A.**   Yes.

13  **Q.**   What is the port's senior leadership team?

14  **A.**   It's primarily all of the deputy directors and the

15  executive director, but the deputy directors are over finance

16  or engineering, that team that led all of the various

17  departments and staff related to that.  There are roughly 250

18  staff at the port.

19  **Q.**   Did the senior leadership team at the port work closely

20  together?

21  **A.**   Yes, yes.  We met weekly, usually Monday morning, to focus

22  on what we were trying to accomplish that week.  Usually

23  prepare for the regular port commission meetings, as well.

24  **Q.**   Have you heard of a cryptocurrency called AML Bitcoin?

25  **A.**   Um, I actually don't remember that.  I'm not familiar with

1  it.  I think I attended one meeting related to that.

2  **Q.**  Were you chief operating officer at the time of that one

3  meeting?

4  **A.**  Yes.

5          **MR. CHOU:**  And I'd like to show the witness, the Court

6  and the parties exhibit 488, 4-8-8.

7      If we could please zoom in on just the center content,

8  including that whole tweet, yeah.

9  **BY MR. CHOU**

10 **Q.**  So Mr. Rhett, do you recognize yourself in this photo?

11 **A.**  Yes.

12 **Q.**  And is this a photo of a meeting that you attended?

13 **A.**  Yes, it is.

14 **Q.**  Was it that cryptocurrency meeting that you referred to?

15 **A.**  Right.

16 **Q.**  Is this a -- is this photo a fair and accurate photo of

17 the meeting that took place?

18 **A.**  Uh, yes.  I mean, that's all the participants of the

19 meeting.

20 **Q.**  These were all the participants?

21 **A.**  That's my memory, yes.

22          **MR. CHOU:**  At this time, I move to admit and publish

23 exhibit 488.

24          **MR. SHEPARD:**  No objection.

25          **THE COURT:**  488 will be admitted.

1          (Trial Exhibit 488 received in evidence.)

2     **BY MR. CHOU**

3     **Q.**   So Mr. Rhett, just directing our attention back to the

4     photograph here, could you please go from left to right and

5     tell us if you know the names of each person and who they were

6     with respect to the meeting?

7     **A.**   Let's see.  Well, I'm having a senior moment here

8     forgetting the name of my commissioner on the left.  I retired

9     about five years ago and I haven't focused on port issues since

10    then.

11         But -- so second to the left is Elaine Forbes, who was the

12    executive director at the time.  Ken Tashain is fourth from the

13    left.  He was over security and reported directly to me in that

14    position.  Then I'm to his right in the photograph.

15         The other folks, third from the left and the far right,

16    were in the meeting, but I have to admit I don't remember their

17    names.  The only time I met them was in that meeting.

18    **Q.**   And you, just to circle back to how you started off, the

19    person all the way over to the left, is that -- the woman

20    wearing orange, she is a San Francisco port commissioner?

21    **A.**   Yes.

22    **Q.**   But her name is just escaping you right now?

23    **A.**   Yeah, I'm just forgetting.

24    **Q.**   How did this meeting come about?

25    **A.**   I actually don't know or don't remember.  I was asked to

1   attend the meeting by the executive director, and there was no

2   preparation.  I didn't get anything, any advanced information

3   about the -- about the meeting and -- that I can recollect.  So

4   I just, what I learned about the reason for the meeting I

5   learned in the meeting.

6   **Q.**   Would it help refresh your recollection if I showed you

7   some notes from that meeting?

8   **A.**   Sure.

9          **MR. CHOU:**  I'd like to at this time mark for

10  identification as 5003 FBI-302-017968.

11      May I approach, Your Honor?

12          **THE COURT:**  You may.

13          **MR. CHOU:**  It's two-sided, sir.

14  **BY MR. CHOU**

15  **Q.**   And, sir, if you could just read this silently to yourself

16  and just let me know when you're -- look up when you're done.

17  **A.**   Okay.

18  **Q.**   Mr. Rhett, does reading over this document refresh your

19  recollection about who the woman is over on the left?

20  **A.**   Um, yeah.  I'm still forgetting her name.  It will come to

21  me.  But I -- this reminds me.  Oh, I see right there at the

22  top.  It's Leslie Katz.

23  **Q.**   And, sir, does this -- reading this over refresh your

24  recollection about how this meeting came about?

25  **A.**   It reminds me of what was discussed in the meeting.  I

1    assume that it's not common for commissioners to sit in

2    meetings, so I assume that this came about from a discussion

3    between the executive director and the commissioner.

4    **Q.**    Are you familiar with the term "courtesy meeting"?

5    **A.**    Yes.

6    **Q.**    What is a courtesy meeting?

7    **A.**    It's usually at the request of some entity, developer,

8    consultant, or often representatives of other cities or

9    countries that have an interest.  We have a lot -- we had a lot

10   of interactions with ports from other cities in the U.S. and in

11   other countries, and they often, when they were traveling and

12   doing research, they asked for meetings with staff.

13       And so that type of meeting with very little preparation

14   often.  It's what I would call a courtesy meeting.

15   **Q.**   And --

16       **THE COURT:**  Mr. Chou, before you go further, a lot of

17   titles have been used, executive director, commissioner.  Can

18   you just go through with this witness foundationally the

19   positions in this entity?

20       **MR. CHOU:**  Of course, Your Honor.

21   **BY MR. CHOU**

22   **Q.**   So Mr. Rhett, would you just mind explaining what is the

23   executive director of the port?

24   **A.**    So the executive director is appointed by the mayor and

25   leads the 250-staff team that is the Port of San Francisco.

1    The Port of San Francisco is a city department.  Even though

2    we're managing state lands and all of the lands that are under

3    our jurisdiction are controlled by the port in trust from the

4    State, but the department is a city department where all the

5    staff are city employees, and the director is selected and

6    appointed by the -- by the mayor.

7         And so, and then related to the further question related

8    to the Commission, there is a commission that makes all of the

9    business decisions for the port.  Staff works and reports to

10   the Commission.  The Commission meets on a regular basis in

11   public hearings and gives actual direction to the -- to staff.

12        So I was -- especially when I was playing development

13   director, I was negotiating longterm leases, ferry billing,

14   exploratory, those kinds of -- Mission Rock, those kinds of

15   developments.

16        Almost all of the land that the port manages is through

17   longterm leases, not sale.  And so we were negotiating longterm

18   leases usually up to 75 years, and the actual authorization to

19   enter in a lease -- into a lease has to be approved by the port

20   commission.  And so we met regularly with the port commission

21   to get final direction.  They would pass a resolution which

22   would allow us to enter into contracts whether it was for

23   services or for the lease and rarely the sale of land.

24             THE COURT:  Are they elected officials, the

25   commissioners?

1    **THE WITNESS:** No. They're appointed by the mayor.

2    They're not elected officials.

3    **THE COURT:** Thank you.

4    BY MR. CHOU

5    **Q.** And you, sir, as chief operating officer, were you

6    elected? Appointed? Hired? Something else?

7    **A.** Same as the -- so I was hired, selected by the executive

8    director, with confirmation by the port commission.

9    **Q.** So in this photo do you remember meeting anybody named

10    Jack Abramoff at this meeting?

11    **A.** I actually don't remember the names of the two people that

12    I met with there. I was introduced to them at the meeting.

13    **Q.** Uh-huh. Do you -- and only if you recall, do you happen

14    to remember meeting anybody named Japheth Dillman?

15    **MR. CHOU:** Oh, I'm sorry. Could we publish this,

16    please?

17    BY MR. CHOU

18    **Q.** Did you meet anyone named Japheth Dillman?

19    **A.** This is so long ago, I just don't remember the names of

20    the people I met with.

21    **Q.** Let's talk about first when this meeting took place. When

22    did this meeting take place roughly?

23    **A.** Well, according to my notes here, it was April 27th. It

24    was April of 2018.

25    **Q.** And earlier you mentioned or you testified that reviewing

1    the notes refreshed your recollection as to what happened at

2    the meeting.  Based on the best of your recollection, what

3    happened at the meeting?

4    **A.**    Well, I went into the meeting, my focus even as a chief

5    operating officer, was related to development mainly.  So the

6    departments that I oversaw were real estate, that was property

7    management, development, longterm leases, planning, that was

8    responsible for the master plan.

9    **Q.**    Sir, sorry.  If I could just jump in there.  Apologize for

10   interrupting.

11       I just was asking what happened at the meeting with these

12   AML Bitcoin folks.

13   **A.**    Yeah, that was sort of background to say my focus on the

14   meeting was on~--- I assume that the meeting was related to

15   development-type issues, and I went into the meeting sort of

16   focused on are these folks looking for some sort of transaction

17   with the port that would trigger my focus.

18       So mainly I learned -- I heard a lot about Bitcoin and

19   issues that I don't usually work with, so my notes were

20   initially about the questions, the issues that were being

21   raised in the meeting and the questions I had about them.

22   **Q.**    How long was the meeting?

23   **A.**    Gee, I think 45 minutes.

24   **Q.**    And who did most of the talking during the presentation?

25   **A.**    The two gentlemen.  Sort of they had a PowerPoint

1    presentation, and they did most of the talking.

2    **Q.**    When you say the two gentlemen, could you just remind us

3    which two you're talking about in the photo?

4    **A.**    The gentleman who's third from the left and then the

5    gentleman who's on the extreme right of the photograph.

6    **Q.**    And while you were sitting in this, let's say, 45-minute

7    meeting, what was going through your mind?  What was your

8    reaction to it?

9    **A.**    How does this relate to what I do?

10   **Q.**    Pardon?

11   **A.**    How does this, these issues around Bitcoin relate to the

12   work that I do.  And I was trying to, one, understand Bitcoin,

13   which I had had no experience with.  And then the other was

14   related -- I'm trying to understand how it related to what I

15   did.  And then you can see in my note there's one reference to

16   does AML replace TWIC.  And so that was sort of the connection

17   for me.  TWIC cards, and I'm forgetting what those letters

18   stand for, but it related to security clearance for any of our

19   secure facilities like Pier 80, where, at the time we were

20   exporting Teslas, and you needed to get federal clearance to be

21   able to go to those facilities.

22        And so there was some reference to AML as some sort of

23   replacement for the TWIC process, and that's probably why Ken

24   Tashian was at the meeting because he was over security for the

25   port, and all employees that required TWIC cards worked with

1    Ken to get that clearance.

2    **Q.**   Sir, you can place the notes aside at this point.   Thank

3    you.

4    **A.**   Okay.

5    **Q.**   Did you take detailed notes at this meeting?

6    **A.**   No.   What you see on this page is just little notes that I

7    was taking as reminders to myself of, it's just a habit I had.

8          And then pretty early or somewhere in the process of the

9    meeting I sorta realized that this wasn't something that was

10   really a focus for me, that this is really kind of a courtesy

11   meeting, and I stopped taking notes at that point.

12   **Q.**   If the meeting would have led to follow-up steps by you,

13   what actions would you have taken during the meeting?

14   **A.**   I would have actually talked about what those follow-up

15   steps would be; how we, my group or the group of the

16   departments that I was responsible for, how we would be

17   involved with the folks who were there for the presentation,

18   what the follow-up might be, contact information, you know, who

19   on my staff would be following up with them and exactly what

20   they would be doing.

21   **Q.**   And would you have taken more detailed notes and had them

22   transcribed?

23   **A.**   Yes.

24   **Q.**   Let's talk about this photo here.   How did this photograph

25   come about?

1    **A.**    My memory was that it was the request -- at the request of

2    the two gentlemen that were making the presentation.

3    **Q.**    And does anything about the photo or the fact of this

4    photo stand out to you?

5    **A.**    Yes, it's unusual in any kind -- it's unusual in meetings

6    that I'm participating in that we would take a photograph at

7    the end of the meeting.  Usually if that does happen, it's

8    usually one of the courtesy meetings that involves sister ports

9    or other ports or other development entities that are having

10    the exchange, often related to folks coming from other

11    countries who are asking questions and we're sharing

12    information about how we do business versus how they do

13    business.

14    **Q.**    And in the course of your career at the port, did you --

15    had you ever taken a photo before with a perspective vendor?

16    **A.**    I couldn't remember one ever doing that before.  I can't

17    remember, using your term "vendor," asking for a photograph,

18    and I don't remember in all the years that I worked with the

19    port ever doing that.

20    **Q.**    Earlier we talked about the senior leadership team.  Do

21    you remember that?

22    **A.**    Yes.

23    **Q.**    Did they meet every week?

24    **A.**    Yes.  As I said, regular meeting would be Monday, usually

25    either Monday morning or Monday afternoon senior staff would

RHETT - DIRECT / CHOU

1    meet.

2    **Q.**    Did the port leader -- did the port's senior leadership

3    team ever discuss adopting AML Bitcoin at the meetings you

4    attended?

5    **A.**    Not at any meeting that I attended.

6    **Q.**    And when did you stop serving as COO?

7    **A.**    September 2020.

8    **Q.**    Okay.  So you were chief operating officer from at least

9    2018 through September 2020?

10   **A.**    Yes.

11   **Q.**    To your knowledge, did the senior leadership team ever

12   engage in contract negotiations with AML Bitcoin?

13   **A.**    Not that I'm aware of.  And usually there's some sort of

14   public or competitive process for any contract that we enter

15   into, and I'm not aware that we ever put out a solicitation for

16   any kind of services related to this.

17   **Q.**    As chief operating officer and a member of the senior

18   leadership team, would you have been informed if the port had

19   put out a solicitation for cryptocurrency?

20   **A.**    Yeah, all solicitations would have been discussed at a

21   senior staff meeting, or I would have discussed it.  I met

22   regularly.  I had a formal meeting every two weeks with the

23   executive director.  It would have come up either in the

24   regular Monday meeting or in my one-on-one meeting, or I had

25   meetings with the department heads.  I met regularly with

 1  the -- with the deputy director over finance, and it would have

 2  come up in that.

 3  **Q.**   Is it fair to say a lot of touch points and meetings?

 4  **A.**   Yes.

 5  **Q.**   Did the port's senior leadership team ever discuss

 6  adopting any cryptocurrency?

 7  **A.**   Not that I'm aware of.  Not in any of those meetings that

 8  I referenced nor any informal meeting that I ever had with the

 9  CFO or the CEO.

10  **Q.**   To the best of your knowledge, did the Port of San

11  Francisco ever adopt AML Bitcoin as a cryptocurrency?

12  **A.**   Uh, not to my knowledge.  And since we are -- we are --

13  they are, I was, a city department, that kind of -- something

14  like that would have been led by the City and through the mayor

15  anyway.  That's not something that we would likely be able to

16  do independent of that.  But I'm not aware of that happening.

17          **MR. CHOU:**  One moment, please.

18      Nothing further, Your Honor.  We can take the exhibit

19  down.

20                    **CROSS-EXAMINATION**

21  **BY MR. SHEPARD**

22  **Q.**   Mr. Rhett, nice to meet you.  Thank you for coming.

23      You don't remember much about this meeting, right?

24  **A.**   No, not much beyond the notes in front of me.

25  **Q.**   Okay.  And your recollection is it was set up by

1    Commissioner Katz?

2    **A.**    I didn't have direction or connection with Commissioner

3    Katz in setting up this meeting.  My invitation came from the

4    executive director.

5    **Q.**    Okay.  So you don't -- you don't know what went on with

6    the deputy director that caused the meeting to get set up?

7    **A.**    With the commissioner?

8    **Q.**    Correct.

9    **A.**    No, no.  I don't -- it might have been discussed in a

10   meeting.  I was -- it was so long ago, I don't remember that.

11   **Q.**    Okay.  And you said as far as you were concerned this was

12   a courtesy meeting?

13   **A.**    Yes, because I wasn't given any information in advance of

14   the meeting.  There was no prep.  There were no reports that I

15   reviewed.

16       So, and then how the meeting went, I would call it a

17   courtesy meeting.

18   **Q.**    Yeah.  But you didn't say to the people who came, we're

19   just meeting with you as a courtesy, we're not really, you

20   know, taking notes or anything, right?  You didn't share that

21   with the people who came?

22   **A.**    No, no, I didn't.

23   **Q.**    And you didn't tell them, I'm only taking a few notes,

24   because this really isn't of interest to me, correct?

25   **A.**    That's not what I said, but I didn't share anything like

1    that with them, and the -- as I said, the meeting was at

2    invitation from the director, so effectively it was her

3    meeting, and so I was there at her request.

4    **Q.**   And did you know that one of the people who attended

5    actually was from a foreign country?

6    **A.**   I don't remember where they were from.  So I may have

7    learned that in the meeting, but I don't remember that.  It's

8    not reflected in my notes, and so I assume it wasn't -- if I

9    did hear it, I assume I didn't understand it to be significant.

10   **Q.**   Okay.  And do you know who took the photo, exhibit 448

11   that the government showed you?  Do you know who took it?

12   **A.**   I don't.  I assume it was maybe someone on the director's

13   staff, but --

14   **Q.**   You don't know?

15   **A.**   But I don't know.

16        **MR. SHEPARD:**  Okay.  I don't have anything further.

17   Thank you.

18        **THE COURT:**  Very well.

19        **MR. CHOU:**  Nothing further, Your Honor.

20        **THE COURT:**  Very well.  You may step down.  Thank you.

21        **MR. WARD:**  Government calls Leslie Katz.

22        Your Honor, my apologies.  Ms. Katz is in the building.

23   She's on 18.  I think maybe she went to the wrong floor.  She

24   can be here in two minutes.  We can take a break or we can wait

25   for her.

 1          **THE COURT:**  Why don't we go ahead and take our break.

 2      Members of the jury, remember my admonition.  Don't

 3  discuss this amongst yourselves, with anyone else, and we'll be

 4  back here in 15 minutes.

 5      (The jury exits the courtroom.)

 6      (A recess was taken from 11:44 a.m. to 12:02 p.m.)

 7          **THE COURT:**  Okay.  Shall we bring the jury out?

 8          **MR. WARD:**  We're ready.  Thank you, Your Honor.

 9      (The jury enters the courtroom.)

10          **MR. CHOU:**  Your Honor, if I could approach and remove

11  the notes?

12          **THE COURT:**  Sure.

13          **MR. CHOU:**  Thank you.

14          **THE COURT:**  Jury is present.

15      Mr. Ward.

16          **MR. WARD:**  The government calls Leslie Katz.

17          **THE COURT:**  Very well.

18                          **LESLIE KATZ**,

19  called as a witness for the Government, having been duly sworn,

20  testified as follows:

21          **THE COURTROOM DEPUTY:**  Please be seated.

22      Can you state your name and spell your last name, please.

23          **THE WITNESS:**  Sure.  Leslie Katz, K-A-T-Z.

24                       **DIRECT EXAMINATION**

25  **BY MR. WARD**

**KATZ - DIRECT / WARD**

1    **Q.**    Good afternoon, Ms. Katz.  What do you do for a living?

2    **A.**    I'm an attorney.

3    **Q.**    Did you used to be a port commissioner for the Port of San

4    Francisco?

5    **A.**    Yes.

6    **Q.**    When did you first become a port commissioner?

7    **A.**    In 2011.

8    **Q.**    And how long did you serve?

9    **A.**    Until 2018.

10   **Q.**    How did you get the position as a port commissioner?

11   **A.**    Initially former Mayor Gavin Newsom nominated me for the

12   position that carried over into former Mayor Ed Lee's term, who

13   submitted my name, and it was approved by the board of

14   supervisors to serve on the port commission.

15   **Q.**    I see.

16         How many port commissioners are there?

17   **A.**    Five.

18   **Q.**    Are they all appointed by the mayor and then confirmed?

19   **A.**    Yes.

20   **Q.**    Generally, what does the port commission do?

21   **A.**    It's much like sort of a board of directors for a company

22   in that they oversee the executive director of the port and the

23   staff and determine broadly policy issues, that sort of thing.

24   **Q.**    When you served as a port commissioner, was that a

25   full-time position?

1   **A.**   No, not at all.

2   **Q.**   And while you were serving as a port commissioner, were

3   you also a practicing attorney?

4   **A.**   Yes.

5   **Q.**   Okay.  Do you know an individual named Japheth Dillman?

6   **A.**   Yes, I do.

7   **Q.**   How did you meet Mr. Dillman?

8   **A.**   Initially, I met Mr. Dillman when we both were

9   participants in a business trip put on by the Bay Area Council

10  to China and we were both participants on that trip.

11  **Q.**   I see.  And following that meeting, or following that

12  trip, excuse me, did you and your firm then represent

13  Mr. Dillman and his firm, Block Bits Capital?

14  **A.**   Yes.

15  **Q.**   And when in time did you first meet Mr. Dillman?

16  **A.**   I think probably in the 2016, twenty, early 2017

17  timeframe.

18  **Q.**   Okay.  And did you represent him shortly thereafter and

19  through the 2017-2018 timeframe?

20  **A.**   Yes.

21  **Q.**   Okay.  Are you familiar with a cryptocurrency called AML

22  Bitcoin?

23  **A.**   Yes, I am.

24  **Q.**   And how did you first hear of AML Bitcoin?

25  **A.**   Initially, Mr. Dillman told me about it and explained to

```
 1  me what it was and then introduced me to its founder, Marcus

 2  Andrade.

 3  Q.   What did you understand Mr. Dillman's role was at AML

 4  Bitcoin?

 5  A.   He was business development, potentially some fundraising.

 6  Q.   Okay.  You said that he introduced you to Marcus Andrade?

 7  A.   Yes.

 8  Q.   Following -- how did he -- how did that interaction come

 9  about?

10  A.   I had been doing work in the blockchain space, and he

11  thought I would be interested to find out more about AML

12  Bitcoin and what they were doing, and it was an interesting

13  project in time.

14  Q.   And then following that introduction, did you meet with

15  Mr. Andrade?

16  A.   Yes.

17  Q.   And setting ourselves in the timeframe, was this around

18  the fall of 2017?

19  A.   Yes, that would be about right.

20  Q.   Do you remember in that timeframe approximately how many

21  meetings you had with Marcus Andrade?

22  A.   I don't remember exactly.  Probably maybe two.  Two or so.

23  Q.   And were those meetings in person or by phone, or maybe

24  one was one way and one is the other.  What do you remember?

25       A JUROR:  Speak up, please.
```

1          **MR. WARD:**  Sorry.  Let me repeat the question.

2    **BY MR. WARD**

3    **Q.**   When you met with Mr. Andrade were those meetings in

4    person or by telephone?

5    **A.**   In person.

6    **Q.**   Okay.  Did you discuss AML Bitcoin during those meetings?

7    **A.**   Yes, and he showed me the capabilities and what it, you

8    know, was supposed to be able to do.

9    **Q.**   I want to ask you about those meetings.  What did

10   Mr. Andrade tell you, describe to you as the technology

11   underlying AML Bitcoin?

12   **A.**   So at the time the Holy Grails was figuring out how to

13   make tokens or coins block -- anti-money laundering, Know Your

14   Customer compliant, because there were concerns about the usage

15   of different tokens and being used without any kind of

16   identifiers of the user.  So AML Bitcoin was able to embed bio

17   identifiers that were related to those that purchased or that

18   were going to purchase the tokens so that they would have been

19   compliant with the anti-money laundering and Know Your Customer

20   requirements.

21   **Q.**   What did you understand by biometrics?

22   **A.**   Facial recognition, potentially eyeballs, fingerprints,

23   that would match up to other identification, you know, physical

24   identification, passports, that sort of thing.

25   **Q.**   And when you understood these biometric features, did you

1    understand them similar to the face technology we have on an

2    iPhone now or thumbprint technology?

3    **A.**    I think somewhat similar to that.

4    **Q.**    It uses the eye or the face or the thumb, something bio?

5    **A.**    Correct.

6    **Q.**    Okay.  When Mr. Andrade told you they were embedded, what

7    did you mean by that -- what did he -- what did you understand

8    that to mean?

9    **A.**    I'm not a technology person, but it was basically a step

10    that would make sure that there was added security attached to

11    whoever purchased or who possessed these tokens.

12    **Q.**    Was it your understanding that that biometric was embedded

13    in the AML Bitcoin itself?

14    **A.**    Correct; that in order to make that purchase, they had to

15    have passed certain requirements and identification.

16    **Q.**    And what did Mr. Andrade tell you is the state of the

17    technology, of his technology?

18    **A.**    That he had the technology and that they were getting

19    ready to roll it out.

20    **Q.**    Did you and Mr. Andrade discuss anything about potential

21    business deals that AML Bitcoin had or had in the works?

22    **A.**    And I can't recall whether it was directly from

23    Mr. Andrade, or Mr. Dillman or both, but I think a discussion

24    did take place that the Panama -- that they were working with

25    the Panama Canal to utilize AML Bitcoin down there, as well.

1    Can't remember if there were any opportunities with

2    England.  At the time they had a member of their board or

3    advisory board who had been in the financial services space in

4    London.  I don't know what was -- I don't recall if there were

5    any business dealings there, but definitely regarding the

6    Panama Canal.

7    **Q.**  And what was your understanding of the business deals they

8    had or had in the works with the Panama Canal?

9    **A.**  That AML Bitcoin could be utilized with respect to trade,

10   ships coming through, workers on the ships, that sort of thing.

11   **Q.**  Okay.  And did they tell you the state of those deals,

12   whether -- did they tell you what the state of those deals

13   were?

14   **A.**  I don't recall exactly, but my general understanding was

15   that they were in -- yeah, had reached an agreement with the

16   Panama Canal.

17   **Q.**  Okay.  Now, you said you had a couple of meetings with

18   Mr. Andrade in 2017.  Just to clarify, was Mr. Dillman at any

19   of those meetings?

20   **A.**  I think he would have been in all of them.  Often my

21   former firm would let our clients use our conference rooms for

22   meetings if they weren't being -- if they weren't otherwise

23   being in use.  So he would -- Mr. Dillman would often request

24   to use our conference room.

25   **Q.**  Anyone else, do you remember, being at any of those

1  meetings?

2  **A.**   Those meetings, I don't think so.

3  **Q.**   Okay.  You said those meetings were in the fall of 2017.

4  Other than those meetings, do you remember any other meetings

5  with Mr. Andrade during that timeframe?

6  **A.**   In that timeframe I don't recall.  I don't think so.

7  **Q.**   And in that timeframe around the time you had these

8  meetings with Mr. Andrade, did you set up any meetings with him

9  between him and anyone at the Port of San Francisco?

10 **A.**   Yes.  I was asked if we could set up a meeting with the

11 port, which I was able to do with the port's executive

12 director, the deputy executive director and one other person

13 who I don't recall.  We had a meeting, and it was to share with

14 the port at that time, really giving them an understanding, or

15 the port staff, a bit of an education on blockchain.  That was

16 the purpose of the meeting, to explain to them what blockchain

17 technology was, what it was capable of, and then to share with

18 them a little bit about what AML Bitcoin was capable of doing.

19 **Q.**   Now, are you referring to the meeting in April of 2018?

20 **A.**   Yes.

21 **Q.**   All right.  Prior to that meeting, in 2017, in that

22 timeframe, were there any meetings with the port?

23 **A.**   No.

24 **Q.**   During that timeframe were there any meetings that you

25 helped arrange between Mr. Andrade and his team with any other

1  ports?

2  **A.**    No.

3  **Q.**    Not the Port of Long Beach or Seattle or Los Angeles?

4  **A.**    No.

5  **Q.**    Are you aware of any meetings that they had with any other

6  port?

7  **A.**    No, I'm not aware of any.

8  **Q.**    Okay.  You testified that as a -- well, you didn't

9  testify.

10      As a port commissioner, did the Port Commission meet on a

11  regular basis?

12  **A.**    Yes.

13  **Q.**    All right.  Do you -- was there a meeting of the Port

14  Commission in or around September of 2017?

15  **A.**    Yes.

16  **Q.**    And at that meeting do you -- did you make a request of

17  the staff regarding AML-compliant cryptocurrency?

18  **A.**    Yes.

19  **Q.**    And what was that request?

20  **A.**    Just for them to start looking into it, to, you know -- at

21  that point there was a lot of chatter everywhere about the use

22  of cryptocurrencies, and it made sense to see if there would be

23  some opportunity for the port to utilize cryptocurrency in

24  their operations.  So I made a request for them to explore

25  AML-compliant cryptocurrencies.

**KATZ - DIRECT / WARD**

1  **Q.**    And what happens normally when you make a request like

2  that to the staff?

3  **A.**    Other than the staff rolling their eyes at another

4  request?  The staff would then take the request and in theory

5  they would then at least do some research and follow up on the

6  request for them to explore whatever was being requested.

7  **Q.**    On this specific request did you receive any follow-up

8  reports from the staff?

9  **A.**    No, I didn't.

10  **Q.**    Do you recall any meetings or discussions with the port

11  staff?

12  **A.**    No.

13  **Q.**    What do you think happened with the request?

14  **A.**    It was probably not assigned to anybody to do and just

15  sort of fell through the cracks.

16  **Q.**    And did you ever raise the issue again or resubmit the

17  request?

18  **A.**    I did not.

19  **Q.**    Okay.  I want to show you a newspaper -- an exhibit,

20  exhibit 1441.

21        Ms. Katz, are you now familiar with this article?

22  **A.**    No.

23  **Q.**    Are you familiar with it from your meetings with the

24  government?

25  **A.**    I'm sorry?

1  **Q.**   Are you familiar with it now?

2  **A.**   Now I am, yes.

3       **MR. WARD:**  Exhibit 1441 is admitted, and let's publish

4  to the jury.

5  **BY MR. WARD**

6  **Q.**   This article, Ms. Katz, I asked you if you were familiar

7  with it.  At the time in 2017 were you familiar with this

8  article?  Did you see this article?

9  **A.**   No, I don't think so.

10 **Q.**   There's a writer by the name of Peter Roff.  Do you see

11 his name on the article?

12 **A.**   Yes.

13 **Q.**   Do you recall talking to him in 2017?

14 **A.**   No, I don't.

15      **MR. WARD:**  Let's go to the next page, and let's go

16 down one more page.

17     Can you blow up the paragraph that says, "that may all

18 change soon?"

19 **BY MR. WARD**

20 **Q.**   Ms. Katz, this article was written in September of 2017.

21 It says:  The Port of San Francisco, like many international

22 ports, is considering using digital currencies in its payment

23 structures because it sees them as the wave of the future.

24 Thanks to Marcus Andrade who met with the port's leaders in

25 early September, it may soon be able to.

1    Ms. Katz, to your knowledge, did Marcus Andrade meet with

2    the port's leaders in early September?

3    **A.**    Other than meeting with me, no.

4    **Q.**    If there were meetings with the port's leaders, would

5    you -- would you have been aware of them, given your

6    relationship with Mr. Andrade and Mr. Dillman?

7    **A.**    I assume so.

8            **MR. WARD:**  All right.  Let's move out of this.

9            Can we go down one page, please?  Can we highlight the

10   quote that says "San Francisco is a very tech-forward looking

11   city?"

12   **BY MR. WARD**

13   **Q.**    Do you see this quote, Ms. Katz?

14   **A.**    Yes.

15   **Q.**    Did you provide this quote to Mr. Roff, the writer of this

16   article?

17   **A.**    I did not provide it to him.  He might have taken it from

18   the Port Commission meeting where I asked the staff to look at

19   it, but I did not give the quote to him.

20   **Q.**    And did you give anyone permission to use your name and

21   create a quote for you for a newspaper article?

22   **A.**    No, not that I recall.

23   **Q.**    Would you be allowed to do that as a port commissioner?

24   **A.**    We had a press secretary that handled press operations for

25   the port, and usually anything stating port position would have

1   gone through her.  Rene, and I'm sorry, I've forgotten her last

2   name.

3           MR. WARD:  Okay.  We can pop out of this quote and we

4   can take this exhibit down.

5       If we could pull up exhibit 852.

6   BY MR. WARD

7   Q.  Ms. Katz, have you seen this article?

8   A.  Yes.

9   Q.  When did you first see it?

10  A.  Fairly recently.

11          MR. WARD:  All right.  This has been admitted.  We can

12  publish exhibit 852.

13  BY MR. WARD

14  Q.  Ms. Katz, if you'd look at the "by" line.  Again, the "by"

15  line there is Peter Ferrara and the date is Tuesday,

16  October 3rd.  Do you recall speaking with a reporter named

17  Peter Ferrara in October 2017?

18  A.  No, I don't.

19          MR. WARD:  If we could then go to the next page,

20  please.  Can we highlight the paragraph that starts, this is

21  why -- or "that is why?"

22  BY MR. WARD

23  Q.  The article says, this is why AML Bitcoin has already made

24  inroads in so many places where old Bitcoin would never be

25  welcome, such as the Port of San Francisco, which has already

1    been in discussions with AML Bitcoin officials to enable the

2    use of their new digital currency.

3        Again, in October 2017, Ms. Katz, were there any

4    discussions between AML Bitcoin and the Port of San Francisco?

5    **A.**   Other than just sharing about AML with me, no other

6    discussions with board officials.

7    **Q.**   And to your knowledge, was there any discussion about

8    using AML Bitcoin in the seaport's payment structure, such as

9    payment of seaport passage and docking fees?

10   **A.**   No.

11   **Q.**   Is that something that AML Bitcoin or a Bitcoin could be

12   used to do?

13   **A.**   In theory it would have been possible at that time, but it

14   would have taken a lot of steps for both the city and county

15   and the Port of San Francisco to agree to adopt the use of

16   cryptocurrencies, which hadn't taken place at that point.

17   **Q.**   Was the port using any cryptocurrency at the time?

18   **A.**   No.

19   **Q.**   You said it would have taken a lot of steps.  Would that

20   have included steps outside the Port of San Francisco, for

21   example, with the City of San Francisco?

22   **A.**   Right.  Yes, probably through the city attorney's office.

23   **Q.**   Okay.

24       **MR. WARD:**  If we could pull out of this, please, and

25   go down to the --

KATZ - DIRECT / WARD

1    BY MR. WARD

2    Q.   I can just ask you, at this time, you weren't aware of any

3    discussions with any other ports regarding AML Bitcoin?

4    A.   Other than Panama, no.

5            MR. WARD:  All right.  Can we go to the next page?

6    Okay.  And we can pull that down.

7    BY MR. WARD

8    Q.   At some point later in 2017 were you asked to be an

9    adviser to AML Bitcoin?

10   A.   I think so, yes.

11           MR. WARD:  Can we pull up exhibit 20 just for the

12   witness and the parties, please.

13   BY MR. WARD

14   Q.   You see this document, Ms. Katz?

15   A.   Yes.

16   Q.   Is that your e-mail account at your law firm?

17   A.   Yes, it is.

18   Q.   And is that Japheth Dillman's e-mail account?

19   A.   One of them, yes.

20   Q.   And does that appear to be on the "to" line Marcus

21   Andrade's e-mail account?

22   A.   Yes.

23   Q.   Have you reviewed this e-mail prior to testifying here

24   today?

25   A.   Yes.

1  Q.   Is this an e-mail from Japheth Dillman to you?

2  A.   Yes, it was.

3  Q.   And does the e-mail in the document you see here

4  accurately reflect that e-mail?

5  A.   I'm sorry?

6  Q.   Does the document accurately reflect ...

7  A.   It appears to.

8       MR. WARD:  At this point the government would move to

9  admit exhibit 20.

10      MR. SHEPARD:  No objection.

11      THE COURT:  Exhibit 20 will be admitted.

12  (Trial Exhibit 20 received in evidence.)

13      MR. WARD:  Okay.  If we could blow up the "to/from"

14  header and then the first paragraph under, "Hi, Leslie."

15 BY MR. WARD

16 Q.   In December of 2020, did Mr. Dillman ask you to be an

17 adviser to AML Bitcoin?

18 A.   Seems so, yes.

19 Q.   Did he describe to you what your role would be as an

20 adviser to AML Bitcoin?

21 A.   Other than what's here in this e-mail, I don't recall.

22 Q.   It says, I just spoke with Marcus and he's excited to

23 extend to you an invitation.  What did you understand that to

24 mean?

25 A.   That I would be approached by Marcus at some point to

**KATZ - DIRECT / WARD**

1    serve essentially as an adviser to the company.

2    **Q.**    He writes, I also shared with him a list below of

3    potential introductions.

4          **MR. WARD:**  Can we highlight that and all the

5    introductions?

6    **BY MR. WARD**

7    **Q.**    What is Mr. Dillman asking you to do in regards to this

8    list?

9    **A.**    It would appear to be setting up meetings or introductions

10   to educate the various entities or individuals on there about

11   the capabilities.

12         **MR. WARD:**  Okay.  Let's back out of this.  And can we

13   just highlight the last paragraph here.

14   **BY MR. WARD**

15   **Q.**    Mr. Dillman writes, Marcus would like to immediately gift

16   to you 5000 tokens with the possibility of earning more in the

17   future based on how many of these deals come to fruition.

18        What did you understand that offer to be?

19   **A.**    Again, I don't recall at the time, but it looks like this

20   is, you know, typically an adviser to companies gets

21   compensated, you know, back in those days more often with

22   tokens, as opposed to with any other kind of compensation or

23   equity.

24   **Q.**    Was he offering to compensate you in return in part for

25   helping to introduce his company to the public officials listed

 1  above?

 2  **A.**   Yes.

 3  **Q.**   Okay.  He writes in the final paragraph, finally, I recall

 4  you wished to not be publicly listed on AML Bitcoin's site and

 5  materials, that your role would be behind the scenes to help

 6  avoid the appearance of any conflict of interest.

 7        What did he mean by that?

 8  **A.**   Not exactly sure.  I think my guess it would be that

 9  because I was representing other companies in the blockchain

10  space, I would assume, concerns of favoring one over another

11  potentially.

12  **Q.**   Did you accept the offer to become an adviser of AML

13  Bitcoin at this point?

14  **A.**   No.

15  **Q.**   Why not?

16  **A.**   I don't think it went anywhere.  I didn't see -- I don't

17  recall seeing anything further on this.  I never received the

18  5000 tokens, and I don't think I would have set it up based on

19  a compensation based on performance like that.

20  **Q.**   I'm sorry, say that last part?

21  **A.**   And I don't think I would have done compensation based on

22  a current reduction basis like that.

23        **MR. WARD:**  Okay.  If we could pull out of that.

24  **BY MR. WARD**

25  **Q.**   Even though you didn't become an adviser, did you, in

1    fact, introduce Marcus Andrade and the AML team to any of those

2    public officials?

3    **A.**    Indirectly I introduced Mr. Dillman to Speaker Emeritus

4    Pelosi.  She had an annual luncheon that Mr. Dillman, a

5    fundraising luncheon that he attended with me, and he went up

6    and introduced himself to her, independent of me.

7    **Q.**    I've asked you this before, but it says here ports of

8    Oakland, Long Beach.  After this e-mail or at any time, did you

9    introduce Marcus Andrade to anyone at any other port?

10    **A.**    Not that I recall.

11    **Q.**    Okay.

12        **MR. WARD:**  We could back out of this.

13    **BY MR. WARD**

14    **Q.**    This e-mail is in December of 2017.

15        In March of 2018 did you learn about an article that was

16    written by a news organization called Port Strategy?

17    **A.**    I'm sorry?

18    **Q.**    Port Strategy?

19    **A.**    Are you asking when I learned about it?

20    **Q.**    Are you -- were you aware at the time that Port Strategy

21    had written an article?

22    **A.**    No, I was not.

23        **MR. WARD:**  Okay.  Let me pull up exhibit 382.  This

24    has not been admitted.

25    **BY MR. WARD**

**KATZ - DIRECT / WARD**

1  **Q.**   Looking at this document now, does this refresh your

2  recollection as to whether you recall a Port Strategy article

3  in March of 2018?

4  **A.**   I've seen it since, so I apologize, I don't recall if I'd

5  seen it at the time.

6  **Q.**   Okay.

7        **MR. WARD:**  Can we back out of this document, please?

8        Can we pull up exhibit 115?

9  **BY MR. WARD**

10  **Q.**   Do you see this document?

11        **MR. WARD:**  This has not been published.  Just for the

12  witness.

13  **BY MR. WARD**

14  **Q.**   Is that an e-mail from Marcus Andrade to you?

15  **A.**   Yes.

16        **MR. WARD:**  Can we back out of this page and look at

17  page 2?

18  **BY MR. WARD**

19  **Q.**   Is that an accurate representation of the communication

20  from Marcus Andrade in March of 2018?

21        **MR. WARD:**  You can back out of this now.

22        **THE WITNESS:**  I'm sorry?

23        **MR. WARD:**  You can go back to page 1.

24  **BY MR. WARD**

25  **Q.**   Is this a communication from Marcus Andrade to you?

KATZ - DIRECT / WARD

```
 1   A.   Yes.
 2         MR. WARD:  At this point, the government would move to
 3   admit exhibit 115.
 4         MR. SHEPARD:  No objection.
 5         THE COURT:  115 will be admitted.
 6     (Trial Exhibit 115 received in evidence.)
 7   BY MR. WARD
 8   Q.   Ms. Katz, let's look at the first paragraph.
 9         MR. WARD:  Yeah, "hello, Leslie," and below that.
10         THE WITNESS:  Yeah.
11   BY MR. WARD
12   Q.   Marcus Andrade writes, we are putting our 12-month
13   strategy together, which includes either purchasing or doing a
14   reverse merger with a California bank.
15        What did you understand him to be saying when he wrote
16   that?
17   A.   That, again, this was what a lot of the blockchain-related
18   companies were looking to do to see if they could -- they were
19   having trouble with the traditional banking options, and so
20   many were looking at whether it would be viable to purchase a
21   bank.  So it was not uncommon for companies to look at doing
22   that.
23   Q.   And prior to this had you had any discussions with Marcus
24   Andrade about his plans to purchase a California bank?
25   A.   Not that I recall.
```

1  Q.  Or to do a reverse merger with a California bank?

2  A.  Not that I recall.

3  Q.  And --

4  A.  It's possible Mr. Dillman might have mentioned something

5  along those lines, but I don't recall that.

6  Q.  And do you recall any subsequent conversations, or just do

7  you recall any subsequent discussions with Mr. Andrade about

8  purchasing or doing a reverse merger with a California bank?

9  A.  No.

10  Q.  To your knowledge, did that ever happen?

11  A.  Not to my knowledge.

12       MR. WARD:  Okay.  Let's pull that out.

13       If you could go down to the paragraph that says,

14  "unfortunately".

15  BY MR. WARD

16  Q.  He writes, unfortunately, the article that was recently

17  written suggests that the AML Bitcoin team are liars, and that

18  will cause some serious red flags in what we are trying to

19  accomplish, not only with the stock exchanges, regular digital

20  currency trading platforms, but with the possible acquisition/

21  merger with a California bank.

22       Do you know what he's referring to here?

23  A.  I'm assuming some language that indicated that things were

24  not proceeding as represented in the article or represented to

25  the author of the article.

1    Q.    And you're referring to the port strategy article?

2    A.    Right.  The U.S. -- it looks like it's the U.S. News

3    article.

4         MR. WARD:  Okay.  Let's pull out from here.

5    BY MR. WARD

6    Q.    Going up to the second paragraph, let me highlight that

7    for you.

8         When he says, I am concerned with the misunderstanding of

9    the article that came out about AML Bitcoin and the Port of San

10   Francisco that is titled, "Port Worry of Bitcoin Bubble."  You

11   see that?

12   A.    Yes.

13   Q.    That in fact refers to the Port Strategy article, correct?

14   A.    Correct.

15   Q.    You had referenced the U.S. News article, but is it your

16   understanding now that this is the Port Strategy article?

17   A.    Got it.

18        MR. WARD:  Okay.  Can you pull out of this?

19        Going down, if you could highlight the paragraph at the

20   bottom, "I would really appreciate," and then just all the way

21   to the bottom.

22   BY MR. WARD

23   Q.    Mr. Andrade asks, if possible, can you contact the port

24   magazine and have them amend the article?  What did you

25   understand Mr. Andrade was asking you to do?

KATZ - DIRECT / WARD

 1   **A.**   Looking at it now, I assume that he wanted me to reach out

 2   to whoever wrote the article and try to get it corrected or

 3   changed.

 4   **Q.**   And did you, in fact, reach out to Port Strategy and ask

 5   them to amend or change the article?

 6   **A.**   No.

 7           **MR. WARD:**  Okay.  We can pull out of this exhibit and

 8   let's pull up exhibit 382 again.  This has not been admitted.

 9   **BY MR. WARD**

10   **Q.**   Do you see this document?

11   **A.**   Yes.

12           **MR. WARD:**  All right.  Can we go to the second page of

13   this, please?  If we could highlight the paragraph that starts,

14   "one port".

15   **BY MR. WARD**

16   **Q.**   You see that quote?

17   **A.**   Yes.

18   **Q.**   Does this refresh your recollection as to whether you ever

19   spoke to anyone at Port Strategy?

20   **A.**   It's possible that I did.  I don't recall, but that would

21   have been essentially an accurate statement of what transpired

22   with the follow-up, the request that was made to the commission

23   staff to just look at it generally.

24   **Q.**   You're quoted in this article as saying, we are looking at

25   crypto generally and are not considering any specific product.

1    Is that an accurate statement?

2    **A.**    That would have been correct based on my request of the

3    staff.  Not sure if they followed up on it, though, as we said

4    earlier.

5    **Q.**    Right.  Okay.

6         **MR. WARD:**  We can pull out of that and pull that down.

7    **BY MR. WARD**

8    **Q.**    You started to talk about this a bit ago, but in April 28,

9    did you set up a meeting between Marcus Andrade and his team at

10   AML Bitcoin with yourself and the leadership of the port?

11   **A.**    Yes, I did.

12        **MR. WARD:**  Okay.  Can we pull up exhibit 488 which was

13   already admitted?

14   **BY MR. WARD**

15   **Q.**    Ms. Katz, is this a photograph of that meeting?

16   **A.**    Yes, it is.

17   **Q.**    Okay.  What was the purpose of the meeting?

18   **A.**    It was set up to help educate port leadership on

19   blockchain, that that was one of the things that Mr. Andrade

20   and his team had offered to provide an education of the

21   technical issues behind blockchain, what it was, what it was

22   capable of.  And then they would talk, you know, generally

23   about AML Bitcoin, and, you know, if I recall, probably what

24   they were doing with the Port of Panama.

25   **Q.**    All right.  And who requested that the meeting be set up?

KATZ - DIRECT / WARD

```
 1  A.   I assume either -- requested of me?

 2  Q.   Who requested of you that the meeting be set up?

 3  A.   Either Mr. Dillman or Mr. Andrade.  I don't recall

 4  specifically.

 5  Q.   And how long was the meeting?

 6  A.   It would have been probably 30 minutes to an hour.  No

 7  more than an hour.

 8  Q.   Okay.

 9  A.   That's typically what meetings were capped at.

10  Q.   Following the meeting were there any subsequent meetings

11  with the port?

12  A.   No, not after that meeting.

13  Q.   To your knowledge, were there any follow-up discussions

14  between yourself and anyone at the port about AML Bitcoin?

15  A.   No.

16  Q.   And --

17  A.   Actually, I take that back.  There may have been internal

18  meetings at the port that I wasn't aware of amongst the other

19  participants there, but I didn't hear anything further about

20  any meetings.

21  Q.   And did you set up any follow-up meetings?

22  A.   No.

23  Q.   And did the port ask you for any additional information on

24  AML Bitcoin?

25  A.   No.
```

KATZ - DIRECT / WARD

1  Q.   Was there any discussion of the port using AML Bitcoin in

2  any of its businesses following this meeting?

3  A.   Actually on the contrary.  The port basically at that

4  meeting said they wouldn't have been the likely users of the

5  technology, that it might be something useful for the folks at

6  Homeland Security or what was referred to as TWIC, T-W-I-C, and

7  I can't remember the acronyms.  And also it was Ports of

8  America, the operators -- I'm sorry, cruise Ships of America,

9  whatever the operator of the cruise terminal.

10 Q.   You said that at the meeting -- was it told to AML Bitcoin

11 and folks at the meeting that AML Bitcoin would not be of

12 interest or use by the port?

13 A.   It didn't seem likely that these others were more likely

14 the entities that would be in a better position to explore it

15 or look at it.

16 Q.   What would be the reason why the port would not be

17 interested in using a cryptocurrency?

18 A.   It wasn't so much not being interested in using a

19 cryptocurrency, but just the applications that were available

20 certainly through AML Bitcoin and the security measures they

21 were articulating would have been more appropriate for other

22 entities that the port wasn't overseeing or wouldn't have been

23 involved with.

24 Q.   So in your view, the technology they were pitching, the

25 product they have wasn't something that the port could use in

**KATZ - DIRECT / WARD**

1    its business and operations?

2    **A.**    That was generally expressed at the meeting, that the

3    other entities would be more fruitful avenues for them to

4    pursue, and I guess it was probably discussed at some point --

5    the port primarily operated as a landlord for all the different

6    businesses all along the waterfront.  So in the role as

7    landlord, they might have been able to accept at some point

8    cryptocurrency payments instead of a FIAT or dollars.

9        But in terms of the security provided through AML Bitcoin,

10    they were referred -- the AML Bitcoin team was referred to -- I

11    apologize.  I can't remember the name of the entity that ran --

12    that operates the cruise terminal and sort of runs the

13    functions tied to the security measures for the cruise ships.

14    They handle all of those operations directly with the cruise

15    operators and with TWIC out of Homeland Security.

16    **Q.**    To your knowledge, were -- did you help them set up any

17    meetings with those entities?

18    **A.**    No, I did not.

19    **Q.**    And to your knowledge, did they have any meetings with

20    TWIC or any of these other entities?

21    **A.**    Not to my knowledge.

22    **Q.**    All right:  At some point do you recall seeing a press

23    releases that was put together by AML Bitcoin about the meeting

24    at the port?

25    **A.**    Yes.

KATZ - DIRECT / WARD

```
 1              MR. WARD:  All right.  Can we pull up 3109.
 2    BY MR. WARD
 3    Q.   All right.  Why don't I have you take a look at that.  Can
 4    you look at that first page, please.
 5              MR. WARD:  And you don't need to blow it up.  It's
 6    okay.  And then we can look at the second page, please.  And
 7    then let's go to the third page.
 8    BY MR. WARD
 9    Q.   Looking at the e-mail at the bottom, is that your e-mail
10    address on the "to" line?
11    A.   Yes.
12              MR. WARD:  And then let's go to the next page, please.
13    BY MR. WARD
14    Q.   And then do you see that e-mail from you to Mr. Dillman
15    and Mr. Andrade?
16    A.   Yes.
17    Q.   Have you reviewed this e-mail prior to your testimony here
18    today?
19    A.   Yes, I have.
20    Q.   Is this the draft press release you were sent in the
21    subsequent e-mail exchange?
22    A.   Yes, it is.
23              MR. WARD:  All right.  The government moves to admit
24    exhibit 3109.
25              THE COURT:  What's the number again?  3109?
```

 1           MR. SHEPARD:  No objection to defense 3109.

 2           THE COURT:  It's a defense exhibit.  Okay.

 3   Exhibit 3109 will be admitted.

 4       (Trial Exhibit 3109 received in evidence.)

 5           MR. WARD:  Okay.  So let's go back up to the second

 6   page.  I'm sorry, go up to the first page.

 7   BY MR. WARD

 8   Q.   Was this the draft press releases that you were sent?

 9   A.   I don't recall.  I don't see my e-mail on this.

10   Q.   Well, let's go back to the third page, then.  It's all

11   part of the same chain.

12       Do you see the e-mail where it says, "is this a or they

13   are pushing out you're okay with this?"

14       And then do you see your response, "no"?

15   A.   That was my polite response.

16   Q.   Is that in -- when Mr. Dillman says very eloquently "this

17   is a or they are pushing out, you okay with this?"  When he

18   says, "you okay with this," what is he referring to?

19   A.   I guess the draft of the press release.

20   Q.   Okay.  And when you say "no," what --

21   A.   I was not okay with it.

22   Q.   So you were not okay with the draft press release?

23   A.   Correct.

24           MR. WARD:  All right.  Let's go back up and go to the

25   next page.  Down one more.  And down one more.  And could we

KATZ - DIRECT / WARD

1  highlight this e-mail here?  That's right.  It starts, "Leslie

2  Katz."

3  **BY MR. WARD**

4  **Q.**   When you wrote, this is disappointing, it way overstates

5  what's transpired, invites a retraction from the port and will

6  ensure they do not take steps to help with TWIC, what are you

7  referring to?

8  **A.**   So during the meeting after executive director Elaine

9  Forbes had indicated it didn't make sense necessarily for the

10  port to go any further with this, but that this might be a

11  technology that TWIC could utilize themselves, and she I think

12  had offered to make an introduction there.

13      But that was what transpired out of the meeting, that the

14  port had never agreed to go any further officially as the Port

15  of San Francisco on these items.

16  **Q.**   When you write in the last sentence, if this goes out, you

17  will do more harm, as the port should/would issue a

18  correction/clarification, what are you referring to there?

19  **A.**   That the port would have had to have issued a statement

20  saying this was not correct, and it was inaccurate, and that it

21  was improper.

22      **MR. WARD:**  Can we pull out of this and go back up to

23  the first page?  Can we highlight the first three paragraphs of

24  this?

25  **BY MR. WARD**

1   Q.   The first paragraph says, the NAC Foundation recently

2   concluded a highly successful meeting with officials from the

3   Port of San Francisco at the port's headquarters.

4        Is that accurate in your view?

5   A.   It's a little hyperbole in terms of -- but it was a

6   productive meeting in that information was shared.

7             MR. WARD:   Okay.  Can we back out of this, please?

8        If we could go to the bottom three paragraphs.

9   BY MR. WARD

10  Q.   The article talks about the implementation of block-based

11  identification and tracking systems for passengers and cargoes

12  which would greatly benefit the California Association of

13  Ports.

14       Is that a separate entity from the Port of San Francisco?

15  A.   Yes, it is.  It's the association of all of the ports in

16  the state of California.

17  Q.   And are you aware of any meetings between -- did you help

18  arrange any meetings between AML Bitcoin and anyone at CAPA?

19  A.   No, other than Elaine Forbes was the Port of San

20  Francisco's representative to CAPA.

21  Q.   Okay.  And this talks about TWIC. the transportation

22  worker identification credential.  Are you aware of any

23  meetings between AML Bitcoin and TWIC?

24  A.   I'm not aware of any, no.

25  Q.   Third paragraph talks about the adoption of the

KATZ - DIRECT / WARD

1    CrossVerify platform by Carnival and other major cruise ship

2    operators.

3         Again, would those be adoptions that would be separate

4    from anything the port would do?

5    **A.**    Yes.

6    **Q.**    And can the port tell Carnival and other major cruise ship

7    lines what sort of payment systems to use?

8    **A.**    No.

9    **Q.**    Were there any meetings set up to your knowledge with

10   Carnival or anyone else, any of the other major cruise ship

11   operators?

12   **A.**    Not to my knowledge.

13        **MR. WARD:**  All right.  If we could back out of this.

14   If we could go down to the last page.  Up one more, I guess.

15   **BY MR. WARD**

16   **Q.**    Can you look at the e-mail at the bottom?  You see that

17   e-mail from Mr. Andrade?

18   **A.**    Yes.

19   **Q.**    He says:  My apologies.  Obviously I didn't write it.

20   Also, there's no way I would allow anything to go out without

21   your prior approval or that of the port.  It will not go out.

22        But was -- Mr. Andrade was at the meeting with the port?

23   **A.**    Yes.

24   **Q.**    So it would be -- was it your understanding that he would

25   have known what happened and what didn't happen at that

```
 1   meeting?
 2           MR. SHEPARD:  Objection, Your Honor.  Her
 3   understanding doesn't matter.
 4           THE COURT:  Sustained.
 5           MR. WARD:  We can pull out of that.  That's fine.
 6   BY MR. WARD
 7   Q.   Did you invite Mr. Andrade to a campaign event at your law
 8   firm with then -- Lieutenant Governor Gavin Newsom?
 9   A.   Yes, I did.
10           MR. WARD:  Can we pull up exhibit 145, please.
11   BY MR. WARD
12   Q.   Looking at this document, is this the invitation that you
13   sent out for that fundraiser?
14   A.   Yes, it is.
15   Q.   Is this an accurate representation of that?
16   A.   Yes, it is.
17           MR. WARD:  Move to admit exhibit 145?
18           MR. SHEPARD:  No objection.
19           THE COURT:  145 will be admitted.
20       (Trial Exhibit 145 received in evidence.)
21   BY MR. WARD
22   Q.   Just in general, what kind of event is this?
23   A.   So we hosted -- I was hosting with an attorney from
24   another firm, a Mike Kahn, a small fundraiser for then
25   candidate for governor Gavin Newsom.  It was probably 10 or 15
```

KATZ - DIRECT / WARD

```
 1  people in my office.

 2  Q.   You anticipated my next question.  Where was the

 3  fundraiser held?

 4  A.   At our offices in one of our conference rooms.

 5  Q.   And how much was the suggested contribution?

 6  A.   It ranged from $2500 up to people writing or raising up to

 7  the maximum permissible of $29,200.

 8  Q.   You mentioned it was at your law firm.  Approximately how

 9  many people were present?

10  A.   As I recall, somewhere between probably is 12 to 20.

11  Q.   Okay.  Do you recall how long the meeting or the

12  fundraising event was?

13  A.   Looks like it was about an hour and 15 minutes.

14  Q.   What happened at this event?

15  A.   We were seated at -- as it says, it was a roundtable.  So

16  we were seated around a conference table.  Now-Governor Newsom

17  gave us a campaign pitch and talked about the issues he wanted

18  to work on and then had Q and A with the other participants

19  that were there that day.

20  Q.   Okay.  Great.

21       MR. WARD:  Can we take that down and take up -- put up

22  exhibit 489.

23  BY MR. WARD

24  Q.   You see that image, Ms. Katz?

25       MR. WARD:  This has not been admitted yet.
```

```
 1              THE WITNESS:  Yes.
 2    BY MR. WARD
 3    Q.   The colorful pictures in the background, do you recognize
 4    those?
 5    A.   I do.  Those are the original photos from the old
 6    nightclub in San Francisco.
 7    Q.   Where were the pictures?
 8    A.   They were on the back of the main conference room at the
 9    Greenberg Traurig offices.
10    Q.   All right.  Is this a picture from that fundraiser?
11    A.   It appears to be, yes.
12              MR. WARD:  All right.  Move to admit exhibit 489.
13              MR. SHEPARD:  No objection.
14              THE COURT:  489 will be admitted.
15         (Trial Exhibit 489 received in evidence.)
16    BY MR. WARD
17    Q.   The e-mail that -- this is a Twitter post.  It says, AML
18    Bitcoin founder and CEO, Marcus Andrade, met with Gavin Newsom,
19    lieutenant governor of California, along with others today.
20    Does that reference anything about it being a fundraiser?
21    A.   No.
22    Q.   It says, some topics discussed by the group was Bitcoin
23    and how it could bring security and compliance to
24    crypto/fintech/digital entities and reducing poverty.
25         Do you recall that discussion about reducing poverty and
```

1   using AML Bitcoin?

2   **A.**    I don't recall reducing poverty.  It was a broad

3   discussion about blockchain, maintaining blockchain in

4   California.  And I think all of the attendees, if they spoke,

5   would have introduced themselves and what their business was.

6   **Q.**    You said it was a broad conversation.  Was it based on

7   blockchain generally or specific companies?

8   **A.**    More blockchain generally, although participants probably

9   would have shared what they were working on.

10  **Q.**    Are there any limitations at a political fundraiser about

11  promoting a specific company?

12  **A.**    Yes.  Try to avoid anything that would make it look like

13  the recipient was receiving money in order to act on specific

14  requests of the donors.  Donations are to be kept separate from

15  specific actions and proceedings.

16  **Q.**    So that it wouldn't appear to be a quid pro quo?

17  **A.**    Exactly.

18  **Q.**    And is your memory of the event that everyone from you to

19  Lieutenant Governor Newsom would have been aware of that?

20  **A.**    Certainly --

21          **MR. SHEPARD:**  Objection.

22          **THE WITNESS:**  -- I was aware of it.

23          **THE COURT:**  Wait.

24      You can ask what she knows, not anybody else.

25  **BY MR. WARD**

**KATZ - DIRECT / WARD**

1  Q.   Were you aware of the rules about discussing business with

2  a specific company at a political fundraiser?

3  A.   Yes, I was aware of those rules, and I would have assumed

4  that --

5          **MR. SHEPARD:**  Objection.

6          **THE COURT:**  Just wait for the next question.

7  BY MR. WARD

8  Q.   And do you recall any specific discussions of California

9  adopting AML Bitcoin?

10  A.   No.

11  Q.   Okay.  Great.

12      Did you receive any follow-up from Gavin Newsom or anyone

13  about using AML Bitcoin for crypto/fintech/digital identities

14  or even reducing poverty?

15  A.   No, no follow-up.

16  Q.   Thank you.

17  A.   Actually, I'm sorry.  The extent of the follow-up was when

18  he became governor he created a broad task force to look at

19  blockchain and cryptocurrency generally, but nothing specific

20  to any company.

21          **MR. WARD:**  You can take this down.

22  BY MR. WARD

23  Q.   You mentioned that the fundraiser cost $2500 to attend as

24  an individual.  Did you receive a payment from Marcus Andrade

25  for that -- to attend?

KATZ - DIRECT / WARD

```
 1   A.   I would not have received the payment.  It would have been

 2   made to the gubinatorial campaign.

 3   Q.   All right.  Did you subsequently learn about that payment?

 4   A.   Yes.

 5            MR. SHEPARD:  Foundation.

 6   BY MR. WARD

 7   Q.   Were you contacted by someone from the governor's campaign

 8   about Mr. Andrade's donation check?

 9   A.   Yes.  As I recall, they said it --

10            MR. SHEPARD:  Objection; hearsay.

11            THE COURT:  Well, okay.  Now you can ask the next

12   question.

13   BY MR. WARD

14   Q.   And what did you learn about Mr. Andrade's check for the

15   fundraiser?

16   A.   I was advise that it --

17            MR. SHEPARD:  Objection.

18            THE COURT:  Overruled.  Go ahead.

19   BY MR. WARD

20   Q.   Go ahead.

21   A.   I was advised that it hadn't cleared and could I reach out

22   to Mr. Andrade.

23   Q.   The check bounced?

24   A.   Yes.

25   Q.   Did you reach out to Mr. Andrade?
```

1   **A.**   I'm assuming I did, but I don't recall all the details.

2   **Q.**   Do you recall whether you actually got the money?

3   **A.**   I have no recollection.

4       I'm sorry, I take that back.  I think it did eventually,

5   it did go through.  I just don't recall, because there was no

6   further follow-up.

7   **Q.**   At the time when you learned that his check had bounced,

8   did that raise any questions in your mind about the viability

9   of his company?

10  **A.**   No.

11  **Q.**   Did it raise any questions in your mind about his ethics?

12  **A.**   You know, oftentimes -- you know, I didn't think about it

13  at the time, no.

14  **Q.**   All right.

15      Ms. Katz, did you ever purchase any AML Bitcoin tokens?

16  **A.**   Yes, I did.

17  **Q.**   How many did you purchase?

18  **A.**   About $500-worth.

19  **Q.**   And when was that?

20  **A.**   Fairly early on.  Probably in 2017, I would guess.

21  **Q.**   In addition to your purchase, did your now significant

22  other, did she also purchase AML Bitcoin tokens?

23  **A.**   Yes, she did.

24  **Q.**   And when was that?

25  **A.**   Probably about the same time.

KATZ - DIRECT / WARD

1    **Q.**    Do you recall approximately how -- how much she purchased?

2    **A.**    I think it was about $40,000-worth.

3    **Q.**    Okay.  And for -- what did you learn about AML Bitcoin?

4    What made you decide to purchase the tokens?

5    **A.**    A variety of things.

6        AML Bitcoin was not a client, so I could purchase tokens.

7    It was a good opportunity to -- for me to go through the

8    process of purchasing tokens that would be converted in an ICO,

9    and it seemed like an interesting and good opportunity, so I

10    wanted to participate.

11    **Q.**    Were you ever able to trade your tokens on the -- any

12    cryptocurrency exchange?

13    **A.**    No.

14    **Q.**    And were you ever able to sell any of the tokens?

15    **A.**    No.

16    **Q.**    And your partner, now spouse, I believe, was she ever able

17    to trade or sell any of her tokens?

18    **A.**    Not that I'm aware of.

19    **Q.**    Have either of you received any of the money you put into

20    AML Bitcoin back?

21    **A.**    No.

22        **MR. WARD:**  One moment, please.

23        Thank you, Ms. Katz.

24        **THE COURT:**  Mr. Shepard.

25    **BY MR. WARD**

1   Q.   Good afternoon, Ms. Katz.  Nice to meet you.

2   A.   Nice to meet you, too.

3   Q.   I asked Nancy Clarence, who was representing you at the

4   time, if I could talk to you, and you politely declined.  Yes?

5   A.   That's correct.

6   Q.   You said you met with Marcus a couple of times in 2017 in

7   the fall, right?

8   A.   Yes.

9   Q.   And your connection to him was Japheth Dillman who was a

10  client of yours at the time, correct?

11  A.   Correct.

12  Q.   When you met with Mr. Andrade you formed an impression of

13  him, right?

14  A.   Yes.

15  Q.   That he was a putz, right?

16  A.   I don't recall if I said that or formed that.

17  Q.   Okay.  Well, do you remember -- maybe it's up there.

18       Do you remember talking to the FBI in January of last

19  year?  So a little over a year ago?

20  A.   Yes.

21  Q.   And you spoke to the agents for a while, they were taking

22  notes, and I'm sure you tried your best to be accurate, right?

23  A.   Yes.

24  Q.   And when you spoke to them you told them that you thought

25  Marcus was a putz, didn't you?

KATZ - DIRECT / WARD

```
 1   A.    I guess that would be accurate.  That was -- you'd asked
 2   if that was my first impression of him.
 3   Q.    I'm sorry.  But that was your impression?
 4   A.    Eventually, yes.
 5   Q.    And that you were underwhelmed by him, correct?
 6   A.    That would be correct.
 7   Q.    That he did not seem like a solid executive to you,
 8   correct?
 9   A.    Correct.
10   Q.    The one thing that you thought he had right was that his
11   patents really existed, right?
12   A.    Correct.
13   Q.    And were those meetings in the fall the only times you met
14   with Mr. Andrade in person?
15   A.    I don't recall the specific times.  I -- there were, you
16   know, several meetings.  I just don't remember exactly the
17   timeframe.
18   Q.    Okay.  Well, you do remember at some point in time
19   probably discussing the possibility of proposing the AML
20   Bitcoin technology to the Port of San Francisco?
21   A.    Yes.
22   Q.    And at the time that you were discussing that possibility,
23   you were a commissioner of the port, right?
24   A.    Correct.
25   Q.    And you did --
```

KATZ - DIRECT / WARD

1    **A.**    I'm sorry.  Correcting, proposing versus introducing the

2    technology to the port.

3    **Q.**    Well, you remember in that same conversation you had with

4    the FBI in January of last year you said that you probably

5    discussed the possibility of proposing the AML Bitcoin

6    technology to the port, didn't you?

7    **A.**    Proposing, introducing, yes, that would ... generally.

8    **Q.**    Well, they're two different things.  You used the word

9    "proposing," correct?

10   **A.**    Sure.

11   **Q.**    And you thought there may be opportunities for the port to

12   use the cryptocurrency as a means of payment, correct?

13   **A.**    I had thought that might be possible, yes.

14   **Q.**    And that's one of the reasons why you, as you explained on

15   direct examination, you brought it up at a meeting of the port

16   in September of 2017, around the time you were meeting with Mr.

17   Andrade and Mr. Dillman, correct?

18   **A.**    To look at whether the port could utilize

19   cryptocurrencies.  There was also a competitor out there, I

20   think it was called Squbic.

21   **Q.**    Okay.  And if I recall, neither Squbic nor AML Bitcoin was

22   mentioned in your report, I guess it's called, in the board

23   minutes?

24   **A.**    Request.  No, it wasn't.

25   **Q.**    And after those meetings in the fall were you in

**KATZ - DIRECT / WARD**

1    communication then with Mr. Dillman?

2    **A.**    Yes.

3    **Q.**    And did he in the fall, after the conversations that you

4    had with Mr. Andrade and Mr. Dillman, did Mr. Dillman ever talk

5    to you about a press release at that time?

6    **A.**    Um, I don't recall.  The only press release I remember was

7    the one after the meeting with the port staff.

8    **Q.**    Okay.  And that's the one that was just a draft press

9    release that never went out, right?

10    **A.**    Correct.

11    **Q.**    Did Mr. Dillman ever -- and I'm now going back to the time

12    in the fall of 2017.  Did Mr. Dillman send you a draft letter

13    and ask you to send it to the CEO of a company called UpHold?

14    **A.**    I don't recall.

15    **Q.**    Might have happened; might not?

16    **A.**    I don't recall ever sending a letter, but he might have

17    asked me -- he might have sent one to me.

18    **Q.**    Okay.  And did you ever tell Mr. Dillman that you called

19    the CEO of UpHold using a draft letter that Mr. Dillman had

20    sent you as a script?

21    **A.**    I don't recall.

22    **Q.**    Is it possible or just ...

23    **A.**    I have no recollection.  I guess anything's possible, but

24    I don't recall.

25    **Q.**    So if Mr. Dillman was telling other people that you had

1    used his language and called the CEO of UpHold, it sounds like

2    you would be saying Mr. Dillman wasn't being truthful.

3    **A.**    I don't recall.  I don't recall making the phone call.

4    **Q.**    Okay.  You just don't recall making the phone call.  You

5    don't remember whether Mr. Dillman asked you or anything like

6    that?

7    **A.**    I may have been asked, but I don't recall, and I don't

8    think I would have followed up, but I don't know.

9    **Q.**    I want to move forward in time now to the spring of 2018

10   and the lead-up to the meeting that occurred in late April with

11   the port staff.

12   **A.**    Sure.

13   **Q.**    And you were the person who helped set up that meeting

14   with Elaine Forbes, the executive director of the port,

15   correct?

16   **A.**    Yes.

17   **Q.**    And the way that was set up is that Mr. Dillman sent you

18   an e-mail introducing you to a guy named Richard Naimer,

19   correct?

20   **A.**    That sounds correct.

21   **Q.**    And he told you that -- and by the way, did you know who

22   Naimer was?

23   **A.**    Not at that point.

24   **Q.**    Did you hear he had something to do with Israeli

25   Intelligence?

1    **A.**    I heard that, yes.

2    **Q.**    Do you know whether that's true?

3    **A.**    I have no idea.

4    **Q.**    And did you know that Mr. Naimer had a relationship with

5    Jack Abramoff?

6    **A.**    I did not know that.

7    **Q.**    In any event, Mr. Dillman introduced you to -- by e-mail

8    to Mr. Naimer and then told you that Mr. Naimer had a

9    compelling presentation and wanted to visit San Francisco and

10    talk to the port staff about it.  Correct?

11    **A.**    That's correct.

12    **Q.**    And the compelling presentation would relate to providing

13    digital identities, among other things, to vehicles coming to

14    the port?

15    **A.**    That was part of it, and it was also to do the full

16    introduction of blockchain and blockchain technologies.

17    **Q.**    Okay.  And in particular in the context of AML Bitcoin,

18    right?

19    **A.**    I had asked that they do the overview, as well, some

20    discussion of AML Bitcoin, but to provide the education,

21    because the staff had no idea about blockchain at that point.

22    **Q.**    Understood.  But obviously you understood their interest

23    was --

24    **A.**    Of course, yes.

25    **Q.**    -- to tell AML Bitcoin, right?

1    **A.**    Sure.  Well, not necessarily sell it.  To explain what

2    they were capable of doing.

3    **Q.**    And to see if the port would be interested in using it,

4    correct?

5    **A.**    Yes.

6    **Q.**    And ultimately Mr. Namer joined that e-mail conversation

7    and mentioned that he had had some conversations with the Port

8    of Dover?  Remember that?

9    **A.**    I think that may have been what I was referencing earlier,

10    that I thought there might have been discussions with other

11    ports near England or in England.

12    **Q.**    Okay.  And after all that you set up a meeting with the

13    port staff --

14    **A.**    Correct.

15    **Q.**    -- through Elaine Forbes?

16    **A.**    Correct.  She chose who would be present at the meeting.

17    **Q.**    And during that meeting was there a discussion of possible

18    use cases for ports on the west coast?

19    **A.**    Generally, yes.

20    **Q.**    And did that include possible implementation of a

21    blockchain-based identification and tracking system for

22    passengers and cargo which may be adopted by the California

23    Association of Ports?

24    **A.**    That I don't recall, and I don't think it would have been

25    specific to CAPA.  That's the acronym for the California

1    Association of Ports.  Elaine might have mentioned it, that

2    that would be a step that they could take to go to, but none of

3    us were authorized to speak for CAPA specifically.

4    **Q.**    Understood.  But leaving, just for a moment leaving the

5    specific reference to CAPA out of it, do you recall a

6    discussion about possible implementation of a blockchain-based

7    identification and tracking system for passengers and cargo?

8    **A.**    "Implementation" is probably a little too strong a word.

9    I think it was more of a discussion of capabilities and how it

10   could be used.

11   **Q.**    Okay.  And how about transferring of the -- the acronym

12   TWIC -- Transportation Worker Identification Credential, to a

13   CrossVerify.  That was the part of the AML Bitcoin-related

14   entities that Mr. Naimer was associated with.

15       Do you recall a discussion of transferring of the

16   transportation worker identification credential to the

17   CrossVerify platform?

18   **A.**    Not transferring, no.  It was -- it might be something

19   that TWIC would be interested or could take a look at using,

20   but there was no discussion of transferring it to them or any

21   specifics.

22   **Q.**    So that was just a potential use that was one of the

23   things that was discussed at the meeting?

24   **A.**    Correct.

25   **Q.**    And then last topic of discussion, do you recall any

1    discussion about the adoption of the CrossVerify platform by

2    Carnival and other major cruise ship operators that can be

3    integratable, if that's a word, with immigration and security

4    authorities?

5    A.   Again, not a discussion of adoption.  It would have been a

6    discussion that this could be presented to them.  Again, we

7    couldn't -- the port couldn't speak for adoption by Carnival,

8    but that it may be something that they'd be -- might have been

9    more interested in.

10   Q.   And I think what I understood was communicated in addition

11   to discussion of those topics, what I understand was

12   communicated, seems like the Port of San Francisco actually

13   doesn't have a lot of ports left, and it's mostly a landlord

14   and therefore wouldn't be part of these various use cases.

15   A.   Primarily that's correct.  The cruise ship terminal was

16   operated by another entity.  That would be one usage.  There

17   was a very small cargo terminal, and that would have probably

18   related more to TWIC.

19   Q.   Okay.  And after the meeting didn't you ask Elaine Forbes

20   to introduce company personnel, AML Bitcoin company personnel,

21   to the Port of Oakland and to San Francisco Metro?

22   A.   After the meeting?

23   Q.   Yes.

24   A.   Not that I recall.  It might have come up in the meeting

25   of options available there.  I don't recall the specific

1    request after the meeting to do that.

2    **Q.**    And do you recall calling her a second time on that

3    subject?

4    **A.**    No.  That topic would have come up during the meeting.

5    She's the one that raised the concept of -- it was Metro Ports

6    that I was trying to remember that operates the cruise ship

7    terminal.

8    **Q.**    You think you may have asked her that during the meeting

9    as opposed to after?

10   **A.**    I wouldn't have asked her that.  It might have come up as

11   an option and she might have volunteered that she could do

12   those introductions.

13   **Q.**    Okay.  Do you recall participating in at least one meeting

14   with Mr. Dillman?  I guess "meeting" isn't the right word.

15       Do you recall participating in at least one program with

16   Mr. Dillman in which he was, for want of a better word,

17   pitching AML Bitcoin?

18   **A.**    Yes.

19   **Q.**    Okay.  And was there one or more than one such program?

20   **A.**    I recall just one that was held at our Palo Alto offices

21   sponsored by another organization, and they had panelists, and

22   Mr. Dillman was one of the panelists.

23   **Q.**    And you were one of the panelists also?

24   **A.**    Correct.

25           **MR. SHEPARD:**  Can we call up exhibit 3112 and show it

1  just to the witness and the Court.

2  **BY MR. WARD**

3  **Q.**  So I've put in front of you a, I don't know what I would

4  call it, maybe a flier, a program announcement entitled -- for

5  January 16, I believe January 16, 2018, entitled Silicon Valley

6  Blockchain and ICO Investors.  Do you see that?

7  **A.**  I do.

8  **Q.**  Is that the flier for the program that you and Mr. Dillman

9  participated in?

10 **A.**  I assume so.  It looks like it.

11 **Q.**  Okay.  Do you need to page through any more of it, or can

12 I give you a hard copy?  Would that be easier for you to look

13 at?

14 **A.**  Sure, that would be fine.

15 **Q.**  Okay.  Does that refresh your recollection that this is,

16 in fact, the flier for the program?

17 **A.**  Yes.

18        **MR. SHEPARD:**  I offer it, Your Honor, as exhibit 3112.

19        **MR. WARD:**  No objection.

20        **THE COURT:**  3112 will be admitted.

21     (Trial Exhibit 3112 received in evidence.)

22        **MR. SHEPARD:**  And if we go to the second page, please,

23 Ed.

24 **BY MR. WARD**

25 **Q.**  You can see nice photos of you and Mr. Dillman.  You may

1   see it more clearly on the screen there.  Your choice

2   obviously, but for me it's easier to see on the screen, and it

3   can get blown up that way.

4        So under Mr. Dillman it says he's gonna speak about how

5   AML Bitcoin, as the world's first AML/KYC/Patriot Act coin, can

6   work with banks worldwide.  Right?

7   A.   Yes, that's what it says.

8   Q.   Okay.  And did he, in fact, speak about that?

9   A.   As I recall, yes.

10           MR. SHEPARD:  And, Ed, if you can scroll down so we

11  can see the other participants in this program.

12  BY MR. WARD

13  Q.   There's you and there's one of your shareholder colleagues

14  at the Greenberg Traurig firm.

15  A.   Maria Sendra.

16  Q.   Maria Sendra.

17       And I believe that consists of the entirety of the people

18  who are presenting, right?

19  A.   I'm not sure.  I thought there might have been one or two

20  others that spoke that evening.

21  Q.   Okay.  But there was no Marcus Andrade, correct?

22  A.   Correct.

23  Q.   He wasn't -- he wasn't a presenter, correct?

24  A.   I don't think he was even there.

25  Q.   And he -- not only was he not there he wasn't even

```
 1   invited, correct?
 2   A.    I didn't put the event on, so I don't know if he was
 3   invited.
 4         MR. SHEPARD:  If we can go back to exhibit 3109, which
 5   I believe in evidence.
 6   BY MR. WARD
 7   Q.    This is the draft press release that ultimately was sent
 8   to you.
 9         MR. SHEPARD:  I'm sorry, Ed.  I've gotten a little
10   ahead of you.  I'm looking for -- there you go.  Thank you.
11   BY MR. WARD
12   Q.    So this is, to put it back in your mind, the draft press
13   release, and you said it wasn't accurate; Marcus said it won't
14   go out.
15         Do you know who drafted the press release?
16   A.    No idea.
17   Q.    Do you know how it was prepared?
18   A.    No idea.
19   Q.    When you met -- you had some meetings with the government
20   before you came on the witness stand?
21   A.    I'm sorry?
22   Q.    You met with the government before you came on the witness
23   stand, correct?  With the prosecutors, the FBI agents?
24   A.    Yes.  The meeting you referenced earlier?
25   Q.    No, I was --
```

1    **A.**    Oh, yes.

2    **Q.**    In addition to the --

3    **A.**    Yes.

4    **Q.**    -- time you talked to the FBI, I guess there are times,

5    you also, you know, as all lawyers do if they can, they want to

6    talk to you before they put you on the witness stand?

7    **A.**    Yes.

8    **Q.**    They go over what they're going to ask you, and you talk

9    about how you might answer.  Correct?

10   **A.**    Yes.

11   **Q.**    And when you had that meeting did they show you the

12   entirety of what's now government exhibit 3109?  Did they

13   include the part where Mr. Andrade said, I won't send it out?

14   **A.**    I don't recall.  I -- I don't know.

15        **MR. SHEPARD:**  Okay.  I think we can take down defense

16   exhibit 3109.

17        We can now turn to government exhibit 115.

18        Okay.  The screen isn't rolled up far enough to see it's

19   government exhibit 115 at the bottom, but I have a similar copy

20   that -- there we go.  Thank you.

21   **BY MR. STEFAN**

22   **Q.**    And this, you addressed this a little bit on~--- when the

23   government was asking you questions, but you did recall --

24   sorry.  Let me ask it differently.

25        You did speak to a reporter once about an article relating

1    to AML Bitcoin, correct?

2    **A.**    Yes, in 2018 or 2019.

3    **Q.**    And the -- but the name of the reporter who you remember

4    speaking to it might have been Peter Roff?

5            **MR. WARD:**  Objection, misstates the testimony.

6            **THE COURT:**  You can answer if you recall.

7            **THE WITNESS:**  I don't think that's who it was, no.

8    **BY MR. WARD**

9    **Q.**    Do you recall when you spoke to the FBI in the last couple

10    of weeks telling them that the reporter you spoke to might be

11    Peter Roff?  Might have been Peter Roff?

12    **A.**    I didn't recall the name.  I might have said it could have

13    been him, but it was somebody I thought out of England that

14    wrote specifically for port publications.

15            **THE COURT:**  We've now reached 1:30, so I assume you

16    have some more.

17            **MR. SHEPARD:**  I do.  I was trying to, but ...

18            **THE COURT:**  I appreciate that but I'm afraid you have

19    to return Tuesday morning at 8:30.

20            Remember, members of the jury, my admonition.  This is a

21    long weekend, so I have to redouble my efforts to remind you

22    that you should put this case out of your mind.  Do not discuss

23    it with anyone.  Don't do any research.  Really nothing

24    connected with this case.  Enjoy the weekend.  Stay healthy.

25    We really need you all, obviously and so, do healthy things.

1    Don't do anything unhealthy this three-day weekend, and we

2    will see you Tuesday, 8:30.  Thank you so much.  Have a

3    wonderful three-day weekend.

4        (The jury exits the courtroom.)

5        THE COURT:  Okay.  We'll see you all bright and early

6    Tuesday morning.

7        MR. WARD:  Thank you, Your Honor.

8        MR. SHEPARD:  Thank you.

9        THE COURT:  All right.  And do we have the list for --

10   I know it's more than 24 hours, but do we know who Tuesday is

11   going to be?

12       MR. HIGHSMITH:  Yes.  It's going to be Melanie Cowan,

13   Bernadette Tran -- I mean, Melissa Foteh is also on the list

14   scheduled for Tuesday.  She's the --

15       THE COURT:  That's creating some mirth.  What's that

16   all about?

17       MR. HIGHSMITH:  We talked about her before.  She's the

18   one filed a motion in limine saying she can't talk about her

19   self-diagnosed Post-Traumatic Stress Disorder.  She said lots

20   of bad stuff about us, lots of bad stuff about them.

21       THE COURT:  Equal opportunity bad stuff.

22       MR. HIGHSMITH:  Lot of bad stuff.  There's a chance we

23   get to Evan Carlson, as well, on Tuesday.  So those are the

24   four we've got on for Tuesday, Your Honor.

25       MR. SHEPARD:  I was chuckling only because of the

KATZ - DIRECT / WARD

1  phrasing that Mr. Highsmith used, which is she's on the list,

2  as opposed to we're really gonna put her on the stand.  So it

3  will be interesting to see.

4        THE COURT:  She may or may not be on the stand, or

5  you've decided you're putting her on?

6        MR. WARD:  She may or may not be.

7        THE COURT:  We'll deal with it Tuesday.  Have a nice

8  three-day weekend.

9        (The evening recess was taken at 1:32 p.m.)

10                          ---o0o---

11                  **CERTIFICATE OF REPORTER**

12        I certify that the foregoing is a correct transcript

13  from the record of proceedings in the above-entitled matter.

14  DATE:  Friday, February 14, 2025

15

16

17  _____

18  Stephen W. Franklin, RMR, CRR, CPE
    Official Reporter, U.S. District Court

19

20

21

22

23

24

25