# Deloitte.

Deloitte Corporate Financial LLC
30 Rockefeller Plaza
New York, NY 10112
USA
Tel.: +1 212-436-2495

February 28, 2020

**PRIVATE AND CONFIDENTIAL**

Marcus Andrade
Chief Executive Officer
Black Gold Coin, Inc.
1621 Central Avenue
Cheyenne, WY 82001

Dear Mr. Andrade:

This letter, effective as of the commencement of the services described herein, confirms the engagement of Deloitte Corporate Finance LLC ("DCF") by Black Gold Coin, Inc. ("Client"), to provide advisory services to Client related to a potential transaction (this "Engagement") more fully described below.

**Services to be Rendered**

In connection with this Engagement, DCF will be available to provide the following corporate finance advisory services (the "Services"):

*Phase I: Value Assessment*

- Provide consultation to Client in connection with potential valuation scenarios for the patent portfolio set forth in Appendix B (collectively, the "Patent Portfolio") related to "Biometrics on Blockchain".

- Consultation around valuation methodologies to be considered by Client in connection with a potential Transaction (as defined below).

- Discuss potential uses for the Patent Portfolio and obtain an understanding of (i) the markets and market participants relevant to a potential Transaction, and (ii) Client specified jurisdictional coverage of intellectual property rights associated with the Patent Portfolio, each to the extent relevant to a value assessment of the Patent Portfolio in connection with a potential Transaction.

- Prepare assessment of potential valuation ranges[1] for, and potential buyers of, the Patent Portfolio (the "Phase I Deliverable") for consideration by Client in connection with Client's assessment of the desirability of a potential Transaction.

*Phase II: Marketing and Transaction Services*

In addition, in connection with this Engagement, as requested by Client, DCF will provide the following advisory services to Client in connection with potential sale of the Patent Portfolio:

---

[1] Assessments of potential valuation ranges will be calculated various standard methodologies (including but not limited to, the income (discounted cash flow), cost and market methodologies).

EX2232-001

Black Gold Coin, Inc.
Page 2

- Assist in drafting certain marketing materials ("Marketing Materials") that describe the Patent Portfolio. Client and DCF expect that the Marketing Materials will include an anonymized teaser as well as a confidential information memorandum or similar document.

- Assist in identifying parties that meet Client's specifications that may have an interest in a Transaction, approach identified parties that have been approved by management of the Client ("Management" and such approved parties, "approved parties") with respect to their potential interest in a Transaction, and comment on the financial and strategic appeal of approved parties.

- Deliver Marketing Materials, on behalf of Client, to those approved parties who have indicated a level of interest in a Transaction ("interested parties"). Assist with the coordination of the due diligence process with interested parties (including by assisting with the execution of non-disclosure agreements between Client and such parties) and facilitate Management presentations with selected interested parties.

- Assist in the analysis of potential structures of a potential Transaction, provide consultation to Client in connection with structuring alternatives of a Transaction, assist in analyzing estimates of potential value of the Patent Portfolio, and advise Client in connection with negotiation of the financial elements of a Transaction (including by reading and providing business comments on certain Transaction documents prepared by Client's or counterparty's legal counsel).

In connection with providing the Services above, DCF will coordinate with Client's legal counsel as appropriate.

**Professional Fees**

In consideration of DCF's services to be rendered, Client agrees to pay DCF as follows:

*Phase I*

- A cash fee of $75,000 (the "Phase I Fee") due upon DCF's delivery of the Phase I Deliverable. Any paid Phase I Fee will be credited against any Transaction Success Fee (as defined below).

*Phase II*

- A cash fee ("Transaction Success Fee") upon the close of any Transaction, equal to 15% of the Aggregate Consideration (as defined below). It is hereby agreed that any Transaction Success Fee will not be less than $1,000,000 (the "Minimum Fee"). The Minimum Fee shall, in all cases, be due in full upon the closing of the Transaction.

"**Transaction**" means any transaction or series of transactions involving the sale or disposition of an interest in all or a portion of the Patent Portfolio (through any method or means including, sale of assets, sale of equity interests, merger or other business combination or arrangement).

"**Aggregate Consideration**" means the total consideration paid or received and to be paid or received (which shall be deemed to include amounts paid to client from escrow at the time of such payment), directly or indirectly, regardless of how allocated or the form of consideration, to or by Client, Client's affiliates or any of their respective equity holders or those with the rights to acquire equity (collectively, "Equityholders"), or to any third party in connection with a Transaction, including: (i) cash; (ii) equity securities (including but not limited to common stock, preferred stock, warrants, options, stock appreciation rights, in each case whether or not vested or issued), equity interests, carried interests, "roll-over" equity, retained equity interests, and equity reinvestment, in each case, in Client, its successor or buyer or any of their respective affiliates; (iii) straight or convertible debt instruments; (iv) above market management retention or consulting agreements entered into in connection with the Transaction; (v) payments to be made in installments or otherwise deferred, including amounts held in escrow; and (vi) other consideration exchanged between the parties or their respective equityholders, in connection with the Transaction.

Black Gold Coin, Inc.
Page 3

If any portion of the Aggregate Consideration is to be paid at a date or dates past the closing date of the Transaction (e.g., earn-outs, lease agreements, royalty payments, licensing fees, etc.) ("Deferred Consideration"), whether or not paid on a contingent basis, Client shall pay the applicable portion of the Transaction Success Fee in respect of such Deferred Consideration ("Deferred Success Fee") as and when such Deferred Consideration is paid or received unless a change in law, rule or regulation, or another circumstance, arises that would result in the payment of the Deferred Success Fee in such a manner being illegal or in conflict with independence or professional rules. In such a situation and upon the request of DCF, the parties shall negotiate an equitable solution to payment, if any, of the Deferred Success Fee, on the closing date of the Transaction.

### Expenses

The Transaction Success Fee is not inclusive of expenses incurred by DCF related to this Engagement. Whether or not a Transaction is proposed or completed, Client shall reimburse DCF for all reasonable out of pocket expenses incurred in connection with this Phase II of this Engagement. These expenses will be billed no more frequently than on a monthly basis. Invoices for reimbursable expenses are payable on receipt. Without Client's consent, DCF's aggregate reimbursable expenses hereunder will not exceed $30,000 and DCF will request Client approval(s) via email before any reimbursable travel expenses are incurred. For Client's budgeting purposes, it is anticipated that reimbursable expenses will not exceed more than $5,000.00 in a single month period and DCF will endeavor to notify Client if it anticipates reimbursable expenses in a given month will exceed $5,000.00.

### General Business Terms

The General Business Terms attached hereto as Appendix A are hereby incorporated by reference herein. Capitalized terms have the meanings assigned in this letter or the attached General Business Terms.

*****************************************



EX2232-003

Black Gold Coin, Inc.
Page 4

As we have discussed, in order to accommodate your timing requirements, this letter is being provided in advance of DCF's completion of all of its engagement acceptance procedures. Accordingly, we shall have the right to terminate this Engagement in the event we do not complete such procedures or are not satisfied with the results of such procedures. Client hereby acknowledges such right and releases DCF, its affiliates and related entities from any claims, liabilities, or expenses in any way relating to or in connection with the exercise of such right.

We appreciate the opportunity to provide you with our professional services. If this letter meets with your approval please sign a copy of this letter and return it to us. If you have any further questions or comments, please feel free to contact John Hudson at 404-631-2837.

Very truly yours,

Deloitte Corporate Finance LLC

By:   Phil Colaco
      Managing Director


Accepted and agreed to by Client:

Company Name: Black Gold Coin, Inc.

By: Marcus Andrade

Signature: _____

Firm's Tax Identification Number: 47-2256343

Title: CEO

Date: 3-2-2020

Black Gold Coin, Inc.
Page 5

## APPENDIX A

## GENERAL BUSINESS TERMS

1. **Payment of Invoices**. Client will compensate Deloitte Corporate Finance LLC ("DCF") under the terms of the engagement letter to which these terms are attached (the "Engagement Letter") for the Services performed and expenses incurred, through the term or effective date of termination of this Engagement. DCF invoices are due upon receipt. If payment is not received within thirty (30) days of receipt of an invoice (i) such invoice shall accrue a late charge equal to the lesser of (a) the rate stated in New York Civil Practice Law and Rules Section 5004 or (b) the highest rate allowable by law, in each case compounded monthly to the extent allowable by law and (ii) DCF may also suspend or terminate the Services. Client shall be responsible for any taxes imposed on the Services or on this Engagement (such as value added or other similar taxes), other than taxes imposed by employment withholding for DCF's personnel or on DCF's income or property.

2. **Term**.

    a. This Engagement shall terminate on the date that is six (6) months after the date of the execution of the Engagement Letter (such date, the "Sunset Date"), provided that this Engagement shall not terminate on the Sunset Date if DCF, with Client's direction or consent, is still or was still performing the Services during the two weeks prior to, the Sunset Date. either DCF or Client may terminate this Engagement, with or without cause, by giving thirty (30) days prior written notice to the other party. In the event of a termination for cause, the breaching party shall have the right to cure the breach within the notice period. DCF may terminate this Engagement upon written notice to Client if DCF determines that performance of any part of the Services would be in conflict with law (including applicable federal or state securities laws or related rules and the Financial Industry Regulatory Authority's ("FINRA") Bylaws or rules) or independence or professional rules. This Engagement shall only be deemed completed upon either the consummation of a Transaction or termination of this Engagement by either DCF or Client in accordance with this Section 2. In the event that a Transaction is consummated or an agreement to enter into a Transaction is executed within 12 months after termination of this Engagement with a party (or any of its affiliate, portfolio companies or funds managed by it or its affiliates) identified to Client by DCF, contacted by, or in contact with DCF or with which Client was in contact during the term of DCF's engagement, DCF shall be paid the entire amount of the Transaction Success Fee as set forth in the Engagement Letter.

    b. In the event of a termination of this Engagement, upon Client's written request, DCF shall provide Client with a list of parties identified, contacted by, or in contact with DCF, during the term this Engagement, with respect to a potential Transaction. Client may offer objection to the assertion that a party was identified, contacted by, or in contact with DCF, during the term this Engagement, with respect to a potential Transaction within ten days of its receipt of DCF's list provided pursuant to the preceding sentence. If DCF and Client disagree as to whether any party is subject to DCF being paid its post-termination Transaction Success Fee as stated in Appendix A, Section 2.a of this Engagement, then such dispute shall be subject to the dispute resolution requirements of Section 18 of this Agreement, provided that before filing of any such lawsuit, DCF and Client shall enter a mediation agreement with a mutually-agreed mediator familiar with the sale of intellectual property and seek to mediate and resolve such dispute on mutually agreed terms. Further, if a disputed with party covered by Appendix A, Section 2.a of this Engagement within the 12 month post-Engagement termination period stated in of Appendix A, Section 2.a of this Engagement, Client shall establish a third party escrow account for the deposit of the disputed claimed Transaction Success Fee, until such time as the dispute is resolved by agreement or litigation. If Client deposits the disputed claimed Transaction Success Fee in such an escrow account, the provisions of Appendix A, Section 1 of this Engagement (including late fees) and pre-judgment interest under New York Civil Practice Law and Rules or

Black Gold Coin, Inc.
Page 6

similar statutes or rules of other states shall not apply for such time period during which the disputed claimed Transaction Success Fee has been held in escrow. DCF may not seek injunctive relief seeking to enjoin the closing of any Transaction based on a claim for post-Engagement termination claimed Transaction Success Fee. DCF may seek injunctive relief before a Transaction has closed requiring that Client pay claimed Transaction Success Fee at the closing of such Transaction into an escrow account for claims related to disputed post-Engagement termination claimed Transaction Success Fee as described above.

3. **Exclusivity**. Client agrees that DCF shall be Client's sole and exclusive financial advisor in connection with any Transaction. Client shall (i) concurrent with the execution and delivery of the Engagement Letter, identify to DCF all potential counterparties or buyers who have been in contact with Client with respect to a Transaction prior to DCF's Engagement; and (ii) promptly upon receipt of an inquiry, identify to DCF all potential counterparties or buyers who make inquiries to Client with respect to a Transaction during the term of DCF's Engagement. Except as otherwise mutually agreed in writing, Client shall not initiate discussions regarding a Transaction with any potential counterparty or buyer, except through DCF.

4. **Ownership of DCF Property**. To the extent that DCF utilizes any of its property (whether tangible or intangible) in connection with Engagement and may, in connection with the performance of the Services, use, create, modify, or acquire rights in, works of authorship, materials, information, and other intellectual property (collectively the "DCF IP"), such property shall remain the property of DCF, and Client shall not acquire any right or interest in such property. DCF shall have ownership (including copyright ownership) and all rights to use and disclose its ideas, concepts, know-how, methods, techniques, processes and skills, and adaptations thereof in conducting its business, and Client shall not assert or cause to be asserted against DCF or its personnel any prohibition or restraint from so doing. Upon full payment to DCF hereunder with respect to the applicable phase of the Services, and subject to the terms and conditions contained herein, (i) the tangible items specified as deliverables or work product in the Engagement Letter shall become the property of Client, and (ii) DCF hereby grants Client a royalty-free, fully paid-up, worldwide, nonexclusive license to use the DCF IP contained in such deliverables in connection with the use of such deliverables. Except for the foregoing license grant, DCF or its licensors retain all rights in and to all DCF IP. Client may provide the deliverables to other third parties acceptable to us, provided that prior to such disclosure (1) DCF consents in writing to disclosure to such third party; (2) Client has executed an authorization agreement relating to access by such third party in form and substance acceptable to DCF; and (3) such third party has executed an agreement relating to such access in form and substance acceptable to DCF. Client acknowledges and agrees that it and such third party shall be solely responsible for the determination of whether and what information is provided by Client to such third party and DCF shall have no responsibility therefor.

5. **Limitation on Warranties.** This is a services engagement. DCF warrants that it shall perform the Services in good faith and with due professional care. **DCF DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

6. **Limitation on Damages and Indemnification.**

    a. DCF and its subcontractors, and their respective personnel, shall not be liable to Client for any claims, liabilities, or expenses relating to this Engagement or any Transaction or potential Transaction ("Claims") for an aggregate amount in excess of the fees paid by Client to DCF pursuant to this Engagement related to the applicable Transaction, except to the extent resulting from the recklessness, bad faith or intentional misconduct of DCF or its subcontractors. In no event shall DCF or its subcontractors, or their respective personnel, be liable to Client for any loss of use, data, goodwill, revenues or profits (whether or not deemed to constitute a direct Claim), or any consequential, special, indirect, incidental, punitive, or exemplary loss, damage, or expense relating to this Engagement, any Transaction or potential Transaction.

    b. Client shall indemnify and hold harmless DCF and its subcontractors, and their respective personnel, from

Black Gold Coin, Inc.
Page 7

    all Claims attributable to claims of third parties, except to the extent resulting from the recklessness, bad faith or intentional misconduct of DCF or its subcontractors.

c. Promptly after the receipt by DCF, its subcontractors, or their respective personnel (each, an "indemnified party"), of notice of any Claims for which indemnification is sought (an "Indemnity Claim"), the indemnified party shall give notice thereof to Client; provided that the failure to give such notice shall not affect the indemnified party's rights to indemnification hereunder unless and to the extent such failure shall materially prejudice Client's ability to defend such Indemnity Claim. Client shall have the right to assume the defense of any such Indemnity Claim at its expense, provided that the selection of counsel is approved by the indemnified party (which approval will not be unreasonably withheld). Notwithstanding any election of Client to assume the defense of any Indemnity Claim, the indemnified party shall have the right to participate in (but not control) the defense of the Indemnity Claim defended by Client hereunder and to employ separate counsel in connection with such Indemnity Claim. The fees and expenses of such separate counsel shall be at the indemnified party's expense, provided that Client shall advance and bear the expense of such separate counsel if (i) in the opinion of counsel to the indemnified party, use of the counsel chosen by Client could reasonably be expected to give rise to a conflict of interest; (ii) Client shall have failed to employ counsel reasonably satisfactory to the indemnified party within a reasonable time after notice of the institution of any such Indemnity Claim; (iii) Client or the counsel selected by Client shall have failed to vigorously and zealously defend the indemnified party in such Indemnity Claim and to keep the indemnified party informed of all material aspects and developments of such defense; or (iv) Client shall have authorized the indemnified party to employ separate counsel at Client's expense.

d. Client shall not settle, compromise, facilitate or participate in any such settlement or compromise, or permit a default or consent to the entry of any judgment in, any claim, suit, action, proceeding, investigation or inquiry related to this Engagement or any transaction or potential transaction (each, an "Action"), including, without limitation, any Action in which indemnification may be sought hereunder (whether or not an indemnified party is an actual or potential party to such Action), without the prior written consent of such indemnified party, if any, and DCF, unless such settlement, compromise or consent to the entry of judgment (i) involves only the payment of money damages by Client, (ii) does not include any admission of or statement regarding (including any allocation to DCF of) wrongdoing, fault, culpability or failure to act by or on behalf of DCF, its subcontractors or their respective personnel, or any other relief, and (iii) includes a complete and unconditional release of DCF, its subcontractors and their respective personnel of all Claims.

e. Client will compensate DCF for any time and expenses (including, without limitation, reasonable legal fees and expenses) that DCF may incur in considering or responding to discovery requests or other requests for documents or information, or in participating as a witness or otherwise in any legal, regulatory, or other proceedings (including, without limitation, those unrelated to the matters that are the subject of this Engagement Letter) as a result of DCF's performance of the Services.

f. In circumstances where any limitation on damages or indemnification provision hereunder is unenforceable or unavailable for any reason Client shall contribute to any Claims in such proportion that reflects the relative benefits to Client, on the one hand, and to DCF, on the other hand (whether or not a transaction is consummated) arising out of this Engagement. For purposes of this Section, the relative benefits to Client and DCF arising out of this Engagement shall be deemed to be in the same proportion as the total value received or contemplated to be received by Client as a result of or in connection with the Transaction contemplated by this Engagement bears to the fees actually paid to DCF by Client hereunder. If the allocation provided in the two immediately preceding sentences is unenforceable or unavailable for any reason, Client shall contribute to such Claims, as is appropriate to reflect not only the relative benefits received or contemplated to be received, as provided above, but also the relative fault that DCF's conduct bears to all other conduct giving rise to such Claims.

7. **Client Responsibilities; Management Representations and Cooperation; Compliance with Securities**

Black Gold Coin, Inc.
Page 8

Laws.

a. **Access and Cooperation.** DCF's performance is dependent upon, among other things, the cooperation of the Client which includes providing DCF with timely access to data, information and personnel of Client. With respect to the data and information provided by Client to DCF or its subcontractors for the performance of the Services, Client shall have all rights required to provide such data and information, and shall do so only in accordance with applicable law and with any procedures agreed upon in writing. If DCF is provided access to or use of Client's facilities outside of the United States for the purpose of performing the Services, such facilities may not be dedicated solely for DCF's use and DCF will not be deemed a tenant of Client with respect to such facilities.

b. **Client Responsibilities.** Client shall be solely responsible for, among other things, the performance of its personnel and agents and the accuracy and completeness of all data (except data and information obtained from third parties) and information provided to DCF for purposes of the performance of the Services. Without limiting the foregoing, Client shall be solely responsible for the following in connection with the Services: (i) any historical or prospective financial statements, including financial projections or models, and the support thereof by appropriate and reasonable assumptions related to Client or the Patent Portfolio; (ii) any representations about its plans, forecasts, projections and expectations and for disclosure of significant information that might affect the ultimate realization of these plans, forecasts, projections and expectations; (iii) the accuracy and completeness of responses to due diligence requests related to the Patent Portfolio from potential counterparties or buyers and DCF; (iv) all approvals and decisions regarding the preparation, negotiation, review, and execution of all documentation with respect to any transaction (Client acknowledges that DCF cannot commit Client to the terms of any transaction, or consummate any transaction on behalf of Client, and that Client, through its management, shall make all decisions that commit Client with respect to any transaction); (v) determination of the price range with which negotiations shall occur with respect to any transaction, as well as the ultimate price to be accepted and all other terms in connection with any transaction; (vi) making all management decisions and performing all management functions in connection with the Services and the deliverables, including evaluating the adequacy and results of the Services, accepting responsibility for the results of the Services and designating a competent member of management to oversee the Services; and (vii) compliance with all applicable federal and state laws and related rules (including any applicable securities laws or rules). DCF's performance is dependent upon, among other things, the timely and effective satisfaction of Client's responsibilities hereunder and timely decisions and approvals of Client in connection with the Services. DCF shall be entitled to rely on all decisions and approvals of Client.

c. **Limitations with respect to DCF Services.** DCF will be acting solely as a financial advisor to Client in connection with this Engagement. Client agrees that DCF is not being engaged to provide, nor shall it be providing or be responsible for providing, legal, tax or accounting advice, or any financial or tax due diligence services. DCF will not be preparing or interpreting any legal documents. Client will engage knowledgeable and experienced transaction legal counsel to advise Client in connection with a Transaction. It is expressly understood that with respect to the Services, DCF's reports, recommendations, analyses, conclusions and other documents, if any, whether written or oral, do not, in whole or in part, constitute a fairness or solvency opinion or feasibility determination and the Services will be consultative in nature and will not result in the determination of a specific value by DCF. Additionally, DCF will not perform any review, audit or other attestation procedures, with respect to historical or prospective financial information, as defined by the American Institute of Certified Public Accountants, the Public Company Accounting Oversight Board or any other regulatory entity, and will not issue any opinion or report or provide any other form of assurance with respect to any financial information in connection with the Services. DCF will not be distributing securities or acting as an agent with respect to the placement of any securities for the benefit of Client or its affiliates. DCF's performance of due diligence is solely intended for its own benefit, including in connection with its own risk management and regulatory compliance requirements. DCF's due diligence does not relieve Client of its responsibilities in connection with its representations, warranties, and other obligations under this Engagement Letter or in connection with any Transaction (including, if applicable, any securities offering) entered into by or for the benefit of Client

EX2232-008

Black Gold Coin, Inc.
Page 9

or its affiliates. DCF shall have no responsibility for the achievability of any forecasted results.

d. **Confidentiality Agreements**. DCF may, if requested by Client, and for the benefit of Client, enter into a confidentiality agreement on behalf of Client with a third party. DCF would enter into such an agreement solely as an accommodation to Client, in order to avoid disclosing the identity of Client to a third party. Client understands and agrees that the obligations set forth in such confidentiality agreement shall be the responsibility of Client and not of DCF, that DCF will not have any obligation to enforce any such confidentiality agreement, that DCF will attempt to assign its rights and obligations under any such confidentiality agreement to Client, and that DCF will have no liability in connection with any such confidentiality agreement or the failure to effectuate an assignment of such confidentiality agreement.

e. **Third Party Service Providers**. DCF may use third party service providers for purposes of storage and retention of any information or documents provided by or on behalf of Client or created by DCF or its subcontractors in connection with this Engagement in a manner consistent with the confidentiality provisions hereof. In connection with such storage and retention services, the third party providers may, subject to confidentiality restrictions, access such information or documents relating to their assisting DCF with its record keeping obligations. The costs of such third party providers for purposes of storage and retention of any information or documents shall be deemed to be DCF overhead and are not Expenses that may be charged to the Engagement and are not payable by Client.

f. **Marketing Materials**. Prior to any distribution of the Marketing Materials to any potential buyer or any other third party, DCF shall provide the Marketing Materials to Client who shall provide a final approval of the Marketing Materials, including any amendments or supplements, to Client's knowledgeable and experienced transaction legal counsel for its review. Client agrees that any information related to Client or the Patent Portfolio contained in the Marketing Materials will be true, complete and accurate in all material respects and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Client will notify DCF in writing (i) if the Marketing Materials are no longer true, complete and accurate in all material respects, and (ii) of any event that would require amending, updating, or supplementing the Marketing Materials. Accordingly, once the final draft of the Marketing Materials has been prepared, Client will confirm the accuracy and completeness of the Marketing Materials in writing and will approve the Marketing Materials for distribution to prospective buyers and counterparties approved by Client. Client shall not distribute the Marketing Materials, including any amendments or supplements, to any potential buyer or other third party without the prior written concurrence of DCF.

g. **Information Provided to DCF**. Client acknowledges and agrees as follows:

(i) All statements and information that Client furnishes or causes to be furnished to DCF (except data and information obtained from third parties) in connection with this Engagement, including any provided prior to the execution hereof, (the "Information") will be true, complete and accurate in all material respects (other than Management's projections, which will be prepared in good faith and based upon assumptions which, in light of the circumstances in which they are made, are reasonable) and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;

(ii) The documents and records supporting the Information are true, accurate, complete, and evidence actual facts and circumstances they purport to represent;

(iii) DCF may rely, without independent verification, upon the fairness, completeness and accuracy of the Information and on other information available from generally recognized public sources and does not assume any responsibility for the accuracy or completeness of such information;

EX2232-009

Black Gold Coin, Inc.
Page 10

    (iv) Client will notify DCF promptly in writing of any material adverse change, or development that can reasonably be expected to lead to a material adverse change, in the business, properties, operations, or financial condition of Client; and

    (v) Client will promptly provide DCF with copies of any and all (i) communications between Client and any governmental or regulatory authority, which pertain to, or could potentially affect, the Patent Portfolio or a Transaction , and (ii) threatened or actual legal proceedings, in each case, which pertain to, or could potentially affect, the Patent Portfolio or a Transaction during the Term of this Engagement.

  h. **U. S. Patriot Act**. To help the United States government fight the funding of terrorism and money laundering activities, United States federal law requires DCF to obtain, verify and record information that identifies each entity or natural person with which it becomes engaged. For example, DCF hereby notifies Client that pursuant to the requirements of the USA PATRIOT ACT (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), DCF is required to obtain, verify and record information that identifies Client, its directors, officers and shareholders which information includes the name, address and tax identification number of Client and other information that will allow DCF to identify Client in accordance with the Patriot Act. In that connection, DCF may also request corporate formation documents, or other forms of identification, to verify information provided. Client agrees that, in order to assist the government in its efforts to fight the funding of terrorism and money laundering activities, Client shall provide DCF with any and all information as DCF may reasonably request that pertains to (i) Client and its affiliates, and (ii) any entity that is a source of funds or assets in connection with the potential transaction, as applicable. In connection with the foregoing, Client further agrees that DCF may provide any such information to a third party, subject to confidentiality restrictions, in order that such third party may assist DCF in verifying the background of Client, its affiliates and the source of such funds or assets.

  i. **Business Continuity Plan**. A written summary of DCF's Business Continuity Plan may be obtained by writing to: Deloitte Corporate Finance LLC, 111 South Wacker Drive, Suite 1600, Chicago, IL 60606, Attention: Compliance Department. A copy of the Business Continuity Plan is also posted on DCF's website.

  j. DCF is a registered broker-dealer and a member of FINRA and the Securities Investor Protection Corporation.

8. **Force Majeure**. Neither party shall be liable for any delays or nonperformance resulting from circumstances or causes beyond its reasonable control, including, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order, or requirement of any governmental agency or authority.

9. **Limitation on Actions**. No action, regardless of form, relating to this Engagement, may be brought by either party more than one year after the cause of action has accrued, except that an action for non-payment may be brought by a party not later than one year following the due date of the last payment owing to the party bringing such action.

10. **Independent Contractor**. Each party hereto is an independent contractor and neither party is, nor shall be considered to be, nor purport to act as, the other's agent, partner, fiduciary, joint venturer, or representative.

11. **Confidentiality**. To the extent that, in connection with this Engagement DCF comes into possession of any confidential information of Client, including any such information provided prior to the execution hereof, DCF will not disclose such information to any third party without Client's consent, using at least the same degree of care as it employs in maintaining in confidence its own confidential information of a similar nature, but in no event less than a reasonable degree of care. Client hereby consents to DCF disclosing such information: (i) as expressly permitted in the Engagement Letter, (ii) to contractors providing administrative, infrastructure and other support services to the receiving party and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors

EX2232-010

Black Gold Coin, Inc.
Page 11

and subcontractors have agreed to be bound by confidentiality obligations similar to those in this Section 11, (iii) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation or a potential or actual fee dispute pertaining hereto, or (iv) to the extent such information (a) is or becomes publicly available other than as the result of a disclosure by DCF in breach hereof, (b) becomes available to DCF on a nonconfidential basis from a source that DCF believes is not prohibited from disclosing such information to DCF, (c) is already known by DCF without an obligation of confidentiality with respect thereto, or (d) is developed by DCF independently of any disclosures made to DCF hereunder.

12. **Communications, Internal Use; Public References**.

   a. The nature of the Services will necessitate prompt communication to Client of our findings and recommendations that result from the Services, as they are performed. Therefore, it will not be possible for all of our communications to be in the form of written reports. Accordingly, any spreadsheets, information, documents, or other communications, whether in writing or otherwise, created by DCF for delivery to Client, should be considered by Client in the context of the nature of the Services that we have agreed to provide.

   b. Client agrees that: (i) any advice or recommendations, written or oral, provided by DCF in connection with the Services are exclusively for the management of Client and may not be disclosed to any third party or circulated or referred to publicly without DCF's prior written consent, except to Client's transaction legal counsel, acting strictly in an advisory capacity to Client in connection with such Transaction (provided that such counsel does not further circulate, disclose, or refer to such advice or recommendations); (ii) it will not refer, generically, by name or otherwise to DCF or its related entities or the Services in any written materials relating to any potential or actual transaction, including in any publicly filed documents, without DCF's prior written consent for each requested use or reference; and (iii) in no event will it make any oral statements to any party that might reasonably be construed as a recommendation by DCF regarding a potential transaction.

   c. Upon completion of a Transaction, Client agrees that DCF may describe the Services, reproduce the logo of Client and state that DCF has acted as financial advisor to Client in connection with the Transaction as follows: (i) within proposals and other directed marketing efforts and (ii) in announcements in such print and/or electronic publication media as DCF may choose (including website posting).

13. **Other Relationships**. It is understood that one or more of DCF, its affiliates or related entities may be engaged to provide (i) services to other parties in connection with the Transaction or related transactions, or (ii) audit, tax, consulting or other services to, and may have other business relationships with, other parties involved in, or considering, the Transaction or related transactions or their respective affiliates. If such an engagement by DCF, its affiliates or its related entities is being performed or were to be undertaken, the engagement team providing the Services would be separate from any engagement team providing services to any such other parties. Confidential information of Client will not, without Client's prior permission, be disclosed to any such other parties. Similarly, DCF and its personnel will have no responsibility to Client (a) relating to such services or other relationships, or (b) to use or disclose information, including the identity of any such other parties that DCF, its affiliates or its related entities possess by reason of their services for such other parties, whether or not such information might be considered material to Client. DCF believes that the relationships described above will not impair the objectivity of DCF and its personnel in the performance of the Services. However, DCF is bringing the possibility of these relationships to Client's attention to avoid any misunderstanding.

14. **Survival and Interpretation**. All provisions which are intended by their nature to survive performance of the Services shall survive such performance, or the expiration or termination of this Engagement. No affiliated or related entity of DCF or such entity's personnel, shall have any liability hereunder to Client and Client will not bring any action against any such affiliated or related entity in connection with this Engagement. Without limiting the foregoing, such affiliated and related entities are intended third-party beneficiaries of these terms

Black Gold Coin, Inc.
Page 12

and may in their own right enforce such terms. **Each of the provisions of these terms shall apply to the fullest extent of the law, whether in contract, statute, tort (such as negligence), or otherwise notwithstanding the failure of the essential purpose of any remedy.** Any references in these terms or in the Engagement Letter to the term "including" shall be deemed to be followed by "without limitation".

15. **Assignment and Subcontracting.** Except as provided below, neither party may assign any of its rights or obligations arising out of or related to the Engagement Letter or the Services (including interests or Claims), without the prior written consent of the other party. Client hereby consents to DCF subcontracting any portion of the Services to any affiliate or related entity, whether located within or outside of the United States. Services performed hereunder by DCF's subcontractors shall be invoiced as professional fees on the same basis as Services performed by DCF personnel unless otherwise agreed.

16. **Waiver of Jury Trial.** THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO THIS ENGAGEMENT.

17. **Entire Agreement, Amendment, and Notices.** These terms, and the Engagement Letter including attachments, constitute the entire agreement between the parties with respect to this Engagement; supersede all other oral and written representations, understandings, or agreements relating to this Engagement; apply to information or estimates, if any, provided prior to the effective date. In making its determination to proceed with the Engagement, neither party has relied on any representations of the other party except as expressly set forth in these terms, and the Engagement Letter including attachments. These terms, and the Engagement Letter including attachments, may not be amended except by a written agreement signed by the parties. In the event of any conflict, or ambiguity between these terms and the Engagement Letter, these terms shall control. All notices hereunder shall be (a) in writing, (b) delivered to the representatives of the parties at the addresses first set forth in the Engagement Letter, unless changed by either party by notice to the other party, and (c) effective upon receipt.

18. **Governing Law, Jurisdiction and Venue, and Severability.** These terms, the Engagement Letter, including attachments and all matters relating to this Engagement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof). Any action based on or arising out of this Engagement or the Services shall be brought and maintained exclusively in any state or federal court in each case located in New York County, the State of New York. Each of the parties hereby expressly and irrevocably submits to the jurisdiction of such courts for the purposes of any such action and expressly and irrevocably waives, to the fullest extent permitted by law, any objection which it may have or hereafter may have to the laying of venue of any such action brought in any such court and any claim that any such action has been brought in an inconvenient forum. If any provision of these terms or the Engagement Letter is found by a court of competent jurisdiction unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

Black Gold Coin, Inc.
Page 13

## Appendix B – Patent Portfolio

EX2232-013

Black Gold Coin, Inc.
Page 14

| Country | Application Number | UM / Patent No. | Date Issued |
|---|---|---|---|
| ARIPO | AP/P/2018/010735 | | |
| Australia | AU2016400090A1 | AU2016400090B2 | 11/8/2018 |
| Australia | 2018100477 | 2018100477 | 4/26/2018 |
| Australia | AU2016400090B2 | | |
| Australia | AU2018236721A1 | AU2018236721B2 | 1/24/2019 |
| Australia | AU2018236722A1 | AU2018236722B2 | 11/14/2019 |
| Australia | AU2018236723A1 | AU2018236723B2 | 11/28/2019 |
| Australia | AU2018236747A1 | AU2018236747B2 | 11/14/2019 |
| Bahrain | 173/2018 | | |
| Barbados | 2001/1931 | | |
| Belarus | 20180438 | * | |
| Belize | To be assigned. | | |
| Brazil | BR 11 2018 070088 6 | | |
| Brazil | BR 11 2018 070093 2 | | |
| Brazil | BR 11 2018 070095 9 | | |
| Brazil | BR 11 2018 070096 7 | | |
| Brazil | BR 11 2018 070091 6 | * | |
| Canada | 3,006,587 | | |
| Chile | 2018-02724 | | |
| China | 201680081706.2 | | |
| China | 201811133009.4 | | |
| China | 201811131873.0 | | |
| China | 201811131854.8 | | |
| China | 201811131215.1 | | |
| Colombia | NC2018/0011415 | | 11/5/2019 |
| Costa Rica | 2018-514 | | |
| Croatia | P20181711 | | |
| Cuba | 2018-0116 | | |
| Denmark | 201870697 | | |
| Ecuador | SENADI-2018-79192 | | |
| Egypt | PCT 1507/2018 | | |
| El Salvador | 20180024144 | | |
| Europe | 16897290.9 | | |
| Europe | 18206524.3 | | |
| Europe | 18206522.7 | | |
| Europe | 18206482.4 | | |
| Europe | 18206477.4 | | |
| Europe | 18206468.3 | | |
| Estonia | 0028/18PC | | |
| Eurasian | 201891901.00 | * | |
| Finland | 20185901.00 | | |
| Georgia | 14885/1 | | |
| Germany | 202016008584.1 | 202016008584 | 8/23/2018 |
| Germany | 112016006077.7 | | |
| Germany | TBD | | |
| Germany | 202016008689.9 | DE202016008689U1 | 1/16/2019 |
| Germany | 20 2018106351.0 | | |
| Germany | 202016008687.2 | DE202016008687U1 | 1/16/2019 |
| Germany | 202016008688.0 | DE202016008688U1 | 1/16/2019 |
| Germany | 202016008686.4 | DE202016008686U1 | 1/16/2019 |
| Guatemala | A2018-000169 | | |
| Honduras | 1969/2018 | | |
| Hong Kong | 19123548.00 | | |
| Hungary | US1624776 | | |
| India | 201817022527 | | |
| India | 201717033995 | | |
| India | 201917020721 | | |
| Indonesia | P00201807824 | | |
| Israel | 261839 | IL261839A | 3/31/2019 |
| Israel | 263109 | IL263109A | 5/30/2019 |
| Israel | 264078 | IL264078A | 9/26/2019 |
| Israel | 264079 | IL264079A | 9/26/2019 |
| Israel | 265284 | | |
| Japan | 2018-143775 | | |
| Japan | 2018-600050 | JP3220620U | 3/28/2019 |
| Japan | 2018-199420 | | |
| Japan | 2018-199421 | | |
| Japan | 2018-199422 | | |
| Japan | 2018-199423 | | |

EX2232-014

Black Gold Coin, Inc.
Page 15

| Country | Application Number | UM / Patent No. | Date Issued |
|---|---|---|---|
| Kazakhstan | PCT/US2016/024776 | 34076 | 12/23/2019 |
| Korea | 10-2018-7030963 | KR101990761B1 | 6/18/2019 |
| Korea | 10-2018-7033150 | KR101990762B1 | 6/18/2019 |
| Korea | 10-2018-7033161 | KR101990763B1 | 6/18/2019 |
| Korea | 10-2018-7033177 | | |
| Korea | 10-2018-7035609 | | |
| Kuwait | PCT110/2018 | | |
| Kyrgyzstan | 20180088 | * | |
| Libya | N/A | | |
| Macedonia (Yugoslav) | MK/P/2018/000770 | | |
| Malaysia | PI 2018703095 | | |
| Mexico | MX/a/2018/010163 | | |
| Mexico | MX/a/2018/011933 | | |
| Mexico | MX/a/2018/011927 | | |
| Mexico | MX/u/2018/000561 | | |
| Mongolia | 6301 | | |
| Morocco | 43326 | 43326 | 5/31/2019 |
| New Zealand | 744540 | NZ744540A | 12/20/2019 |
| Nigeria | F/P/2018/000313 | | |
| Norway | 20181053 | NO343876B1 | |
| OAPI | 1201800202 | 18670 | |
| OAPI | 1201800376 | | |
| OAPI | 1201800378 | | |
| OAPI | 1201800379 | | |
| OAPI | 1201800377 | | |
| Oman | OM/P/2018/0288 | | |
| Panama | 92216-01 | | |
| Panama | 92216-05 | | |
| Panama | 92216-02 | | |
| Panama | 92216-03 | | |
| Panama | 92216-04 | | |
| PCT | PCT/US16/024776 | | |
| Philippines | 1-2018-502087 | | |
| Poland | P-427232 | | |
| Portugal | 2017171733 | | |
| Qatar | QA/201809/0410 | | |
| Russia | 2018120742 | RU2667801C | 9/24/2018 |
| Saudi Arabia | 518392296 | | |
| Serbia | P-2018/1135 | | |
| Seychelles | PCT/US2016/024776 | | 11/2/2018 |
| Singapore | 11201804658S | | |
| South Africa | 2018/05308 | | |
| Spain | 201890049 | ES2692871B2 | 12/27/2019 |
| Sweden | 1851298-8 | | |
| Switzerland | 01182/18 | | |
| Tajikistan | 02.1/004 | | 8/28/2019 |
| Thailand | 1801005103 | | |
| Turkey | 2018/11939 | | |
| Turkmenistan | 18/I01551 | | |
| UK | 1808833.6 | GB2561107B | 10/30/2019 |
| UK | 1815740.4 | | |
| UK | 1815742.0 | | |
| UK | 1815754.5 | | |
| UK | 1815756.0 | | |
| UK | 1913409.7 | | |
| Ukraine | a2018 10340 | | |
| United Arab Emirates | P6000987/2018 | | |
| US | 16/529,356 | | |
| US | 15/083,241 | 9985964 | 5/29/2018 |
| US | 15/966,320 | 10116657 | 10/30/2018 |
| US | 16/103,666 | 10182051 | 1/15/2019 |
| US | 16/107,126 | 10298571 | 5/21/2019 |
| US | 16/138,359 | 10389713 | 8/20/2019 |
| US | 16/138,454 | 10298572 | 5/21/2019 |
| US | 15/978,004 | | |
| US | PCT/US18/33027 | | |
| US | 16/138,781 | | |
| Uzbekhistan | IAP20180485 | | |
| Vietnam | 1-2018-03911 | | |

\* Notice of allowance received from respective patent offices, awaiting issuance of patent.

