

**Whitaker Chalk**
Swindle & Schwartz PLLC

301 Commerce Street, Suite 3500
Fort Worth, Texas 76102

Phone: 817.878.0500
Fax:   817.878.0501

September 26, 2017

Colin Luce
Senior Vice President
Global Business Development
Uphold, Inc.
301 Battery Street
7th Floor
San Francisco, CA 94111
Via e-mail: colin@uphold.com

    Re:    AML Bitcoin

Dear Mr. Luce:

You have asked for a letter on whether AML Bitcoin would be a security.

The AML Bitcoin Terms and Conditions include the following statements:

- You have no right to and will not share or participate in any way with BGCI's revenue, profit, or losses earned in connection with its activities concerning the AML BitCoin and/or AML Token.

- AML BitCoin and/or AML Token have no underlying collateral; the AML BitCoin and/or AML Token is merely an unsecured cyber currency or digital coin or in the case of the AML Token, a digital token for the exchange to an AML BitCoin.

- AML BitCoin and/or AML Token will not be redeemed by BGCI (Black Gold Coin International, Inc.) or NAC (NAC Foundation, LLC) and You are not relying upon NAC to be a source of liquidity for You or Your purchase of AML BitCoin and/or AML Token.

- Neither AML BitCoins and/or AML Tokens nor any agreement related to Your purchase of AML BitCoins and/or AML Tokens creates or constitutes a debt of NAC to You. Neither BGCI nor NAC is obligated to pay You any returns or repayment regarding Your purchase of AML BitCoins and/or AML Tokens.

- AML BitCoin is a medium of exchange and not a pooled interest in any business entity or common enterprise or a business venture involving You and BGCI, NAC or its affiliates or subsidiaries.

- You have not purchased and have no intention of purchasing AML BitCoins and/or

Colin Luce
Senior Vice President
Global Business Development
Uphold, Inc.
September 26, 2017
Page 2

AML Tokens for investment purposes and You expect no return on investment.

- AML BitCoins and/or AML Tokens are not securities and are not subject to the securities laws of any governmental entity.

- AML BitCoins and/or AML Tokens are intended to be and are solely an Internet-based exchange medium.

- By purchasing, selling, exchanging, transferring, using or mining AML BitCoins and/or AML Tokens, and by using the AML BitCoin Wallet and/or an NAC Website, or obtaining and using technical information and technical support provided by NAC, You are not participating in and not becoming a member or investor in any pooled interest, business entity, common enterprise, or business venture with NAC or any of its or their affiliates. By purchasing AML BitCoins or AML Tokens, You have no right to vote on any activity of BGCI, NAC, or any other affiliate or subsidiary of BGCI or NAC.

- You shall take full responsibility for Your AML BitCoin Wallet.

- NAC will use its best efforts to create a digital currency (or cryptocurrency or cybercurrency) that is compliant with AML Laws.

- Your purchase of AML BitCoins and/or AML Tokens is solely for the purpose of using AML BitCoins and/or AML Tokens for Your lawful commercial or personal activities, but not as an investment.

## Is AML BitCoin a Security?

AML BitCoin is planned to be a utility cryptocurrency payment system. Like other utility currencies, AML Bitcoin can be subject to speculation. NAC Foundation will indirectly administer AML BitCoin's anti-money laundering compliance, including digital identification, and contract with transaction settlement platforms, but does not plan to affect pricing through these activities.

Colin Luce
Senior Vice President
Global Business Development
Uphold, Inc.
September 26, 2017
Page 3

**Background**

U.S. Securities and Exchange Commission ("SEC") regulatory actions have, to date, focused on Bitcoin and The Dao. Reviews by the SEC's Divisions of Corporation Finance and enforcement actions by the SEC's Division of Enforcement relating to Bitcoins have focused on intermediary business entities intending to invest in or trade Bitcoins,[1] but not actual Bitcoins.

On 25 July 2017, the U.S. SEC announced a SEC issues investigative report concluding The DAO tokens, a digital asset, were securities.[2] The DAO is an Ethereum-based token that were offered by a German blockchain startup named Slock.it. The Slock.it sold the The DAO tokens to investors to collect money to fund certain projects. The DAO token holders can vote on which projects should be funded. Finally, certain portions of the profits from those projects will be given to the The DAO token holders as a return for their investments. The SEC concluded that The DAO is a security because the fortunes of the investors (i.e., the The DAO token holders) are directly tied with those of the promoters (i.e., Slock.it), the interest in business enterprises means that it is a pooled investment vehicle and the success of the pooled investment vehicle derives from the material efforts of those other than The Dao token holders.

Treating AML BitCoin transactions as securities transactions under U.S. law would impose considerable regulatory burdens on AML BitCoin transactions. As a matter of background, U.S. securities regulation does not regulate the investment instrument, it regulates the transaction relating to the instrument. If the transaction involves a security, all transactions relating to the instrument must either be registered with the SEC or exempt from registration. If a securities instrument is sold once pursuant to a registration statement, it does not become "free-trading." Instead all subsequent transactions in that instrument must also be either registered with the SEC or subject to an available securities exemption.[3]

---

[1] See e.g. *Securities and Exchange Commission v. Trendon T. Shavers and Bitcoin Savings and Trust,* Civil Action No. Civil Action No. 4:13-CV-416, E.D. Texas Sherman Division (SEC Litigation Release No. 23090, September 22, 2014); *Bats BZX Exchange, Inc.; Order Disapproving a Proposed Rule Change, as Modified by Amendments No. 1 and 2, to BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, to List and Trade Shares Issued by the Winklevoss Bitcoin Trust,* SEC Release No. 34-80206, March 10, 2017).
[2] "*Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The Dao,*" SEC Release No. 34-81207 (July 25, 2017), (found at https://www.sec.gov/litigation/investreport/34-81207.pdf).
[3] *SEC v. Cavanaugh,* 155 F.3d 129, 133 (2d Cir. 1988),

Colin Luce
Senior Vice President
Global Business Development
Uphold, Inc.
September 26, 2017
Page 4

Also, securities registration exemptions treat original issuances of securities differently from secondary sales by sellers who are not affiliated with the issuer. SEC Regulation D is the primary securities exemption for original issuances[4] and generally requires purchasers to be "Accredited Investors", that is individuals who have $200,000 in annual income ($300,000 in annual income with spouse") or $1 million in assets outside the home equity for the primary residence.[5] Secondary transactions by issuer non-affiliates after a purchase from an issuer will generally be subject to one-year holding periods under SEC Rule 144.[6] If a transaction involves a seller who is not the issuer or its affiliates, an underwriter (that is a securities holder who acquired the securities directly from the issuer or its affiliates) or a securities dealer, then secondary transactions will generally be exempt from U.S. securities registration requirements under Section 4(a)(1) of the Securities Act of 1933.[7] Further, states can regulate secondary transactions. Many U.S. states have securities exemptions for limited secondary transactions exemptions.[8]

Further, those being compensated for selling securities in U.S. transactions need to be registered to sell securities as a broker or dealer.[9] Those being compensated by U.S. clients for advising on the purchase or sale of securities are required to be registered as investment advisers under U.S. federal or state law.[10] Moreover, a business entity whose shares or units are sold to U.S. subscribers and whose business is to own securities of other issuers may be an "investment company," thus imposing a system of complex regulation under the Investment Company Act of 1940.[11] Finally, operators of facilities that provide for the purchase, sale and settlement of trades in securities sold or settled in the U.S. must register as exchanges or otherwise be exempt.[12]

---

[4] 17 CFR §§500-508.
[5] 17 CFR §502.
[6] 17 CFR §144.
[7] 15 U.S.C. §77d(a).
[8] See e.g. 7 Tx. Admin. Code. 139.14.
[9] 15 U.S.C. §78o(a).
[10] 15 U.S.C. §80b-3.
[11] 15 U.S.C. §80a-1 et seq.
[12] "Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The Dao," SEC Release No. 34-81207 (July 25, 2017), pp. 16-17 (found at https://www.sec.gov/litigation/investreport/34-81207.pdf ).

Colin Luce
Senior Vice President
Global Business Development
Uphold, Inc.
September 26, 2017
Page 5

Finally, all these U.S. securities transactions, whether exempt or not, are subject to the anti-fraud provisions of federal and state securities law.[13] This means that the sellers have the obligation to disclose all material facts and cannot misrepresent information about the security.

### AML BitCoin and the definition of "Security"

The question is whether a AML Bitcoin transaction is a securities transaction under U.S. state and federal law.

Bitcoin is a "decentralized peer-to-peer payment network that is powered by its users with no central authority or middlemen"[14]

> The Bitcoin network is sharing a public ledger called the "block chain." This ledger contains every transaction ever processed, allowing a user's computer to verify the validity of each transaction. The authenticity of each transaction is protected by digital signatures corresponding to the sending addresses, allowing all users to have full control over sending Bitcoins from their own Bitcoin addresses. In addition, anyone can process transactions using the computing power of specialized hardware and earn a reward in Bitcoins for this service. This is often called "mining". [15]

AML BitCoin is planned to function similarly. AML BitCoin is intended to have a public ledger as an open/transparent blockchain. For the public ledger, the authenticity of each transaction will be protected by digital signatures corresponding to the sending addresses, allowing users to have control over sending AML BitCoins from their own AML BitCoin addresses (subject to AML compliance, including digital identification). Further, participants can process transactions using the computing power of specialized hardware to be awarded AML BitCoins for such services.

AML BitCoin involves no obligation by BGCI or NAC to pay any sum to anyone. AML BitCoin holders receive no promise to pay, no interest, no participation in profits,

---

[13] See e.g. 15 U.S.C. §77q(a); 15 U.S.C. §78j; 17 CFR §240.10b-5.
[14] What is Bitcoin? Bitcoin.org FAQs, https://bitcoin.org/en/faq#what-is-bitcoin (visited August 31, 2017).
[15] How does Bitcoin Work? Bitcoin.org FAQs, https://bitcoin.org/en/faq#what-is-bitcoin (visited August 31, 2017).

Colin Luce
Senior Vice President
Global Business Development
Uphold, Inc.
September 26, 2017
Page 6

no distributions, no dividends and no redemptions. The fortunes of AML BitCoin holders will not be tied to BGCI, NAC or any other party. The AML BitCoin holders will be responsible for their own success or failure if they choose to speculate in AML BitCoin. These holders will decide the timing, pricing and quantity of their buy and sell transactions in AML BitCoin – they are in charge of generating any returns to themselves.

**AML BitCoin is not stock**

The definition of a "security" under federal and state law includes stock. The US Supreme Court has held that stock's characteristics include: (1) the right to receive dividends contingent upon the apportionment of profits; (2) negotiability; (3) can be pledged or hypothecated; (4) conferring voting rights in proportion to shares owned; (5) can appreciate in value.[16] AML BitCoin provides no right to receive dividends or any right to participate in the profits of an enterprise. The AML BitCoin also does not confer voting rights. AML BitCoin is negotiable and can appreciate in value through speculative trading, and such trading will rely entirely on the expertise of the AML BitCoin's holder. Under certain conditions complying with the Uniform Commercial Code, it might be possible to hypothecate AML BitCoin. But, in the end, Bitcoin is not stock.

Likewise, AML BitCoin's additional features do not cause AML BitCoin to be stock. AML BitCoin's anti-money laundering compliance, including digital identification, may enable easier transaction settlements, but should not affect pricing. AML BitCoin also is not stock.

**AML BitCoin is not a debt security**

U.S. Courts use the *Reves* "family resemblance" test to determine whether a debt instrument is a security.[17] First, U.S. Courts will look at whether the instrument is among the items that are deemed to not be a security, such as a consumer note issued in consumer finance. Then, Courts will look at a four factor balancing test.

> First, we examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it. If the seller's purpose is to raise money for the general use of a business enterprise or to finance

---

[16] *Landreth Timber Co., v Landreth*, 471 U.S. 681, 686 (1985).
[17] *Reves v. Ernst & Young*, 494 US 56, 62-63 (1990).

Colin Luce
Senior Vice President
Global Business Development
Uphold, Inc.
September 26, 2017
Page 7

substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security." . . . . Second, we examine the "plan of distribution" of the instrument, . . . , to determine whether it is an instrument in which there is "common trading for speculation or investment," . . . Third, we examine the reasonable expectations of the investing public: The Court will consider instruments to be "securities" on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not "securities" as used in that transaction. . . . Finally, we examine whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary.[18]

AML BitCoin purchasers are not seeking to finance substantial investments in business enterprises as they will not be paid any return by the AML BitCoin sellers. Instead they will receive a utility virtual currency – AML BitCoin. AML BitCoin does not pay a return on investment in the form of interest or otherwise. Indeed, debt securities include a promise to pay in return for the retirement of the debt security. AML BitCoin has no promise to pay. Any return on investment would come from speculative trading **by the AML BitCoin holder**. AML BitCoin will have a broad distribution and common trading for speculation. Since AML BitCoin will be a utility virtual currency with no promise to repay, it is not like other debt instruments treated as securities. Finally, AML BitCoin is intended to be subject to an anti-money laundering alternative regulatory regime, but such regulation is not meant to be for the protection of AML BitCoin purchasers and sellers – the AML regulatory system is just intended to seek to prevent AML BitCoin from being used for unlawful purposes. Accordingly, there is no alternative regulatory regime providing protection to purchasers and sellers. Consequently, a balancing of the *Reves* factors shows that AML BitCoin is not a debt security as two of the four balancing factors are not satisfied. In particular, any anticipated returns would come from the AML BitCoin purchaser's trading prowess, not any efforts by an issuer or other

---

[18] *Reves* at 62-63.

Colin Luce
Senior Vice President
Global Business Development
Uphold, Inc.
September 26, 2017
Page 8

third parties or the payment of on interest or a fixed return. Plus, the issuer has no obligation to pay to retire the instrument as it would with a debt instrument.

**AML BitCoin is not an investment contracts.**

U.S. Courts use the *Howey* Test to determine whether an instrument is an "investment contract" as defined by federal and state securities laws. According to the US Supreme Court:

> the basic test for distinguishing the transaction from other commercial dealings is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others. . . . This test, in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security. The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. By profits, the Court has meant either capital appreciation resulting from the development of the initial investment, . . . or a participation in earnings resulting from the use of investors' funds, . . . . In such cases, the investor is "attracted solely by the prospects of a return" on his investment. . . . By contrast, when a purchaser is motivated by a desire to use or consume the item purchased. . . . -- the securities laws do not apply.[19]

First, AML BitCoin will be purchased for money, including other virtual currencies. But, it is not quite an "investment" as the issuer will have no conditional or unconditional obligation to pay. AML BitCoin are instruments that can be purchased for speculation (like baseball cards,[20] tulips,[21] etc.) or as currency for payment for goods and services. AML BitCoin will not pay a return on investment in the form of interest, dividends or distributions. Any return on AML BitCoin purchased in the initial coin offering or mined will not relate to the operation of any business by someone other than the purchaser or

---

[19] *United Housing Foundation, Inc. v. Forman*, 421 US 837, 852-853 (1975)/
[20] See *"The Baseball-Card Bubble"* The Economist, December 17, 2014 found at https://www.economist.com/news/christmas-specials/21636506-how-childrens-hobby-turned-classic-financial-mania-baseball-card-bubble
[21] See https://en.wikipedia.org/wiki/Tulip_mania

Colin Luce
Senior Vice President
Global Business Development
Uphold, Inc.
September 26, 2017
Page 9

derive from the operation of any other security. In that sense, AML BitCoin is not an investment.

Second, AML BitCoin does not relate to a "common enterprise." Various courts recognize three types of common enterprise when applying the investment contract test.

Horizontal commonality (adopted in the First, Third, Sixth and Seventh Circuit Courts of Appeals) relates to a pooling of assets or funds "from multiple investors so that all share in the profits and risks of the enterprise."[22] AML BitCoin does not involve the pooling of assets or funds for the sharing of profits and risks of an enterprise. It is just a medium of financial exchange.[23] While the initial coin offering does result in the pooling of purchaser funds, it does not result in the sharing of profits and risks. The AML BitCoin holder may use the AML BitCoin to purchase goods and services, exchange for other currencies (both virtual and fiat) or to speculate based on his or her own judgment. For secondary transactions, each owner of AML BitCoins will be buying and selling them separately and the purchase or sale of one AML BitCoin will not be contractually connected the purchase or sale of another AML BitCoin. If a seller has no ongoing obligation to act for the benefit of the participants in the pooled investment vehicle, there is no horizontal commonality.[24]

---

[22] *Milnarik v. M-S Commodities, Inc.*, 457 F.2d 274 (7th Cir. 1972), cert. denied 409 U.S. 887, *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96, 99-102 (7th Cir. 1977); *Curran v. Merrill Lynch*, 622 F.2d 216, 221-225 (6th Cir. 1980, aff'd on other grounds 456 U.S. 353 (1982); *Salcer v. Merrill Lynch*, 682 F.2d 459 (3d Cir. 1982); *Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001 (6th Cir. 1984); *Secon Service Systems v. St. Joseph Bank & Trust*, 855 F.2d 406, 411 (7th Cir. 1988); *Deckebach v. La Vida Charters, Inc. of Florida*, 867 F.2d 278, 281-284 (6th Cir. 1989); *Newmyer v. Philatelic Leasing, Ltd.*, 888 F.3d 385, 395-397 (6th Cir. 1989) cert. denied sub nom., *Trager, Glass & Co., v. Newmyer*, 495 U.S. 930, *Wals v. Fox Hills Development Corp.*, 24 F.3d 1016 (7th Cir. 1995); *SEC v. Lauer*, 52 F.3d 667 (7th Cir. 1995), *SEC v. SG Ltd.*, 265 F.3d 42, 49 (1st Cir. 2001).

[23] This is to be distinguished from business entities that use pooled funds to purchase Bitcoins – which have drawn SEC scrutiny. See *Securities and Exchange Commission v. Trendon T. Shavers and Bitcoin Savings and Trust*, Civil Action No. Civil Action No. 4:13-CV-416, E.D. Texas Sherman Division (SEC Litigation Release No. 23090, September 22, 2014); *Bats BZX Exchange, Inc.; Order Disapproving a Proposed Rule Change, as Modified by Amendments No. 1 and 2, to BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, to List and Trade Shares Issued by the Winklevoss Bitcoin Trust*, SEC Release No. 34-80206, March 10, 2017).

[24] "(T)o satisfy the "common enterprise" element of Howey, plaintiffs must be able to show that funds were pooled and that the fortunes of each investor in the pool were tied to the success of the overall venture." *Rolo v. City Investing Co. Liquidating Trust*, 845 F. Supp. 182, 236 (D.N.J. 1993).

Colin Luce
Senior Vice President
Global Business Development
Uphold, Inc.
September 26, 2017
Page 10

The protocols for AML compliance (including digital identification) do not directly impact the pooling of purchaser funds or the running of an enterprise that will pay a return on investment.

The Fifth and Eleventh Circuit Courts of Appeals have adopted "broad vertical commonality" which requires that the fortunes of all the investors depend on the promoter's expertise, whether or not the investment is pooled with other investments.[25] AML BitCoin has an administrator that will merely engage in AML compliance activities, including digital identifications - not generating returns on investment to be paid to AML BitCoin holders. Mined AML BitCoin should be viewed similarly.

The Ninth Circuit has adopted "strict vertical commonality." The common enterprise may be found where the "fortunes of the investor are interwoven with and dependent on the efforts and success of those seeking the investment or third parties."[26] AML BitCoin will generate no return on investment through dividends, distributions, royalties or interest payments. There is no enterprise depending on efforts of others for its success. Any economic return will only relate to speculative trading or mining by the Bitcoin or AML BitCoin holder (thus depending on the success of the purchaser), not the operation of any enterprise.

Third, the investment contract test requires an expectation of profits. "Profits" means either capital appreciation resulting from the development of the initial investment, . . . or a participation in earnings resulting from the use of investors' funds, . . . . In such cases, the investor is "attracted solely by the prospects of a return" on his investment."[27] Moreover, "profit may be derived from the income yield by an investment as well as from capital appreciation."[28] The profit expected may be either fixed, as with interest, or variable.[29] With AML BitCoin, no return on investment from development of BGCI or NAC, participation in earnings, or fixed payments should be expected and any return will only derive from speculative market demand for AML BitCoin with the

---

[25] *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 478-479 (5th Cir. 1974); *SEC v. Continental Commodities Corp.*, 497 F. 2d 516, 520-523 (5th Cir. 1974); *Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d 187, 193 (5th Cir. 1979), modified on other grounds, 611 F.2d 105 (5th Cir. 1980); *Villeneuve v. Advanced Business Concepts Corp*, 698 F.2d 1121, 1124 (11th Cir. 1983), aff'd en banc, 730 F.2d 1403 (11th Cir. 1984).
[26] *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 n.7 (9th Cir. 1973), cert. denied 414 U.S. 821.
[27] *United Housing Foundation, Inc.* at 853.
[28] *United Housing Foundation, Inc.* at 855.
[29] *SEC v. Edwards*, 540 U.S. 389 (2004).

Colin Luce
Senior Vice President
Global Business Development
Uphold, Inc.
September 26, 2017
Page 11

decision as to whether, when and at what price to buy and sell being <u>within the discretion of the purchaser</u>, not NAC, BGCI or another third party. Alternatively returns could be generated with AML BitCoin mining, but those speculative actions would be in the control of the miner, not any third party.

Fourth, the investment contract test states that the anticipated return on investment comes from the efforts of others which are "undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."[30] For AML BitCoin, any return on investment would solely depend on AML BitCoin mining by the purchaser or others and the purchaser's or miner's trading prowess in surfing a speculative wave. AML BitCoin purchasers will not rely on others. AML BitCoin's efforts to comply with anti-money laundering laws should have no impact on returns on investment.

A comparison to The Dao is illuminating. The DAO involved participants pooling funds, voting on investments and distribution of profits. The SEC found that it was a security. AML Bitcoin, a utility coin, has no participants pooling funds and participating in that pool, voting on actions by the pooled investment vehicle or distribution of profits by the issuer.

**Accordingly, the purchase or sale of AML BitCoin does not appear to involve the purchase or sale of securities under US federal securities laws.**

I can be reached at (817) 878-0547 or jfahy@whitakerchalk.com.

Sincerely,

/s/ John R. Fahy

John R. Fahy
Whitaker Chalk Swindle & Schwartz PLLC

cc:    Marcus Andrade

---

[30] *SEC v. Glenn W. Turner Enterprises, Inc.* at 482.