**Volume 16**

**Pages 2453 - 2664**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,           )
                                )
   VS.                           )   **NO.  3:20-CR-00249 RS**
                                )
ROWLAND MARCUS ANDRADE,          )
                                )
            Defendant.           )
_____ )

San Francisco, California
Tuesday, March 4, 2025

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                        PATRICK D. ROBBINS
                        ACTING UNITED STATES ATTORNEY
                        450 Golden Gate Avenue
                        San Francisco, California 94102
                 **BY:  CHRISTIAAN HIGHSMITH**
                      **DAVID J. WARD**
                      **MATTHEW CHOU**
                      **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                        KING & SPALDING, LLP
                        50 California Street, Suite 3300
                        San Francisco, California 94111
                 **BY:  MICHAEL J. SHEPARD, ATTORNEY AT LAW**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

 1   **APPEARANCES:** (CONTINUED)

 2   For Defendant:
                            KING & SPALDING, LLC
 3                          1700 Pennsylvania Avenue, NW
                            Washington, D.C. 20006
 4                 BY:  **KERRIE C. DENT, ATTORNEY AT LAW**

 5                          KING & SPALDING, LLC
                            1185 Avenue of the Americas, 34th Floor
 6                          New York, New York 10036
                   BY:  **DAINEC P. STEFAN, ATTORNEY AT LAW**

 7

 8                          LAW OFFICES OF CINDY A. DIAMOND
                            58 West Portal Avenue, Suite 350
 9                          San Francisco, California 94127
                   BY:  **CINDY A. DIAMOND, ATTORNEY AT LAW**

10

11   Also Present:          **Special Agent Brendon Zartman**
                            **Tina Rosenbaum, Paralegal**
12                          **Ed Jackson, Trial Technician**

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                **I N D E X**

2

3     Tuesday, March 4, 2025 - Volume 16

4
                                                    **PAGE   VOL.**
5
      Charging Conference                           2639   16
6

7

8     **DEFENDANT'S WITNESSES**                        **PAGE   VOL.**

9     **MIN, ERIK**
       (SWORN)                                       2471   16
10    Direct Examination by Mr. Stefan               2471   16
      Cross-Examination by Mr. Chou                  2533   16
11    Redirect Examination by Mr. Stefan             2591   16
      Recross-Examination by Mr. Chou                2615   16
12

13    **ARMSTRONG, PSY.D., LEVI**
       (SWORN)                                       2617   16
14    Direct Examination by Ms. Diamond              2617   16

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

```
 1   Tuesday - March 4, 2025                              8:10 a.m.

 2                       P R O C E E D I N G S

 3                         ---o0o---

 4             (Defendant present, out of custody.)

 5        (Proceedings were heard out of the presence of the jury.)

 6        THE COURT:  Good morning.

 7        ALL:  Good morning.

 8        THE COURT:  Okay.  I'm told there was more paper

 9   flying yesterday, so bring me up to speed.

10        I didn't -- I spoke briefly with my folks, but I haven't

11   had a chance to review whatever -- I had a chance to review

12   what was filed for the 2 o'clock hour, but not what was filed

13   thereafter.  So I understand there are motions by

14   the Government.

15        MR. HIGHSMITH:  Yes, Your Honor.  We'll start with

16   Mr. Chou.

17        MR. CHOU:  Yes, Your Honor.  So this is referring to

18   Docket 602.  Yesterday around 4:07 p.m., the Defense disclosed

19   another piece of documentation, an 18-page Word doc with

20   biometric logos and photos and the like as a basis --

21        THE COURT:  Can you hand it up?  I haven't seen this.

22        MR. CHOU:  Oh.  Yes, Your Honor.  This is a

23   black-and-white version, but there's a color version attached

24   to the motion, Your Honor.

25        THE COURT:  Okay.
```

PROCEEDINGS

1      **MR. CHOU:**  And the Defense notified the Government

2   that they may use this as part of Mr. Min's testimony, and sure

3   enough, at 9:02 p.m., they sent updated demonstratives or,

4   rather, what they will move to be in evidence as exhibits, a

5   number of new slides.  And one of them, on page -- there's no

6   page numbers, but roughly in the middle of the demonstrative

7   set is a snapshot from this new Word document that was

8   disclosed yesterday at 4 o'clock.

9      So the Government's position is that this is highly

10  prejudicial.  It's an unauthenticated Word document that

11  appears to be authored by Mr. Andrade himself, based on the

12  unauthenticated Word metadata, and we just don't have time to

13  respond to this.

14      **THE COURT:**  And you're moving both with respect to

15  this demonstrative, you said, and -- aren't they both

16  demonstratives?

17      **MR. CHOU:**  Well, in addition, not to mix the issues,

18  Your Honor, the Defense has notified us they plan to move the

19  vast majority of their slides into evidence as exhibits rather

20  than just demonstratives.

21      We'd, of course, oppose that across-the-board as well.

22  You can't use an expert as a backdoor to get in otherwise

23  inadmissible evidence.

24      **THE COURT:**  Right.

25      **MR. CHOU:**  But leaving that aside, we would move to

 1  exclude wholesale any reliance on this late-disclosed document,

 2  which would necessarily include the demonstrative or exhibit

 3  that's based on that -- on that doc.

 4        **THE COURT:**  All right.  Mr. Stefan?

 5        **MR. STEFAN:**  So, first, with respect to the document,

 6  like Mr. Chou mentioned, it's, I think, 18 pages, but we're not

 7  attempting to introduce the entirety of that document.  The

 8  piece that we're introducing -- and if we could pass this up.

 9  The piece that we're introducing is just on this page, which

10  is -- and I can grab you a separate copy, if you want.

11        **MR. CHOU:**  No, I got it.  Thanks.

12        **MR. STEFAN:**  Okay.  It's on page 22 of what's been

13  marked as 3395.  This is just a snippet of the Word document in

14  question, two snippets really, the date at the top and then the

15  deployed private IPs at the bottom.

16      And this is just essentially introduced because these

17  deployed private IPs associated with this document on this date

18  are found within the source code that Mr. --

19        **THE COURT:**  Where is this thing coming from?  What is

20  this?  What is it?  I mean, I don't --

21        **MR. STEFAN:**  Well, I mean --

22        **THE COURT:**  Documents -- you're talking about why

23  you'd like to have this in there.  That's lovely.  What I don't

24  understand is I'm being handed documents that appear to have

25  been -- I don't know what they are.  What are they?

PROCEEDINGS

1          **MR. STEFAN:**  So the document that Mr. Chou provided to

2     you, which is what was given to the Government last night, is

3     an overview, a CrossVerify overview of this piece of technology

4     that was made by Terence Poon and by -- well, at least edited

5     by Terence Poon and certainly, yeah, worked on by Mr. Andrade

6     as well from 2017.  And it essentially just accounts for the

7     CrossVerify project.

8          This was --

9          **THE COURT:**  What is -- you're calling an expert

10    witness.  What is this?  Is this something he is purporting to

11    rely upon?  Is this --

12         **MR. STEFAN:**  This is a document -- yes, Your Honor.

13    This is a document that he is relying upon in part for his

14    testimony.  And when I say "in part" --

15         **THE COURT:**  Then why wasn't it turned over long ago

16    when he was designated?  What are you doing?  What are you

17    doing?  The night before, a new document -- I mean, we've had

18    fights about exhibits that are to be used that otherwise were

19    produced and they get designated late and we have a kerfuffle

20    about that, but this is stuff they've never seen.  What is --

21         **MR. STEFAN:**  Well --

22         **THE COURT:**  Why is it coming across the transom at

23    this point in time?

24         **MR. STEFAN:**  To be clear, Your Honor, they have seen

25    it.  I put on their desk --

PROCEEDINGS

 1          **THE COURT:**  When?

 2          **MR. STEFAN:**  -- this morning a copy -- one of the many

 3    versions of this document that they've seized over time from

 4    Mr. Andrade and which bear Government Bate stamps.

 5          **THE COURT:**  Which one?  Which one of these was seized?

 6          **MR. STEFAN:**  Well, the one there in your right hand,

 7    Your Honor.  If you look down at the bottom left side of it,

 8    you know, it bears a --

 9          **THE COURT:**  Bates stamp.

10          **MR. STEFAN:**  -- a Bates stamp.

11          **THE COURT:**  Okay.  So is this -- let me go back to

12    Mr. Chou.

13       Is this a document the Government's had for a while?

14          **MR. CHOU:**  Well, Your Honor, that's the first time

15    I've heard of that Bates stamp.  I'm sure if we went back and

16    checked our massive database, perhaps it would appear somewhere

17    in there.

18       But the ultimate truth of the matter is, this was never

19    noticed as a basis for Mr. Min's opinion until 4:07 p.m. last

20    night.  We've had no ability to vet its authenticity.  It

21    raises the same sort of issues that the Government raised with

22    respect to the 16.5 million lines of source code dumped on us

23    about two and a half weeks before trial.

24       I mean, in our view, this is just a repeat practice by

25    this particular Defense expert, or at least the Defense with

1    respect to this expert, and it raises many concerns about the

2    reliability and admissibility of his testimony.

3        **MR. STEFAN:**  I mean, the Government could speak to

4    this, but Ms. Chiu's disclosures, or at least demonstratives,

5    were amended multiple times prior to her introduction,

6    including the day before her presentation.

7        And this document in particular, again, has been in

8    the Government's possession for some time.  We wouldn't

9    normally have --

10        **THE COURT:**  This document is one, not this one.  Has

11    this been in their possession for a long time?

12        **MR. STEFAN:**  No, Your Honor.  Many -- many parts of

13    it --

14        **THE COURT:**  Be precise about it, then.  Don't start

15    making sweeping statements.

16        Maybe one has been in their possession.  This one nobody

17    is suggesting was in there possession.

18        **MR. STEFAN:**  Correct, Your Honor.  The -- correct.

19    This is --

20        **THE COURT:**  So this one's out.  I mean, this is -- I

21    don't know what's going on here.  I mean, this is not the way

22    things are supposed to be done.  And there are significant

23    teams of lawyers on both sides in this case, and I don't

24    understand why we are in this position.

25        Yes.  Go ahead.

1      **MR. STEFAN:** Your Honor, we -- last night -- we

2  previously provided to the Government a demonstrative for

3  Mr. Min. And, yes, some of the material within what we

4  provided the Government yesterday wasn't within the original

5  provision, but I believe that the original provision was

6  actually probably something like double the length of what we

7  gave them yesterday.

8      We significantly revised what we provided them because of

9  the Court's ruling yesterday limiting Mr. Min's testimony to

10  those areas that are strictly related to the 2017-2018 time

11  frame. So we went back and --

12      **THE COURT:** Okay. So is it your representation to me

13  that is -- and, again, which one are we talking about?

14      You are representing to me that one of these documents

15  reflects adjustments that were made because of some rulings

16  with respect to what was permissible and what wasn't.

17      Those things do happen, and I'll accept representations

18  from counsel, but be careful that that is true. Because if

19  you're telling me that, it will affect how I come out, and it

20  better be right.

21      So, very simple question. We're talking now about

22  Exhibit 3395. Are the changes in 3395 just adjustments based

23  on the ruling that I gave with respect to the fact that in --

24  we're not going to be able -- you're not going to be able to go

25  into 2020 and whether or not the technology would ultimately

PROCEEDINGS

```
 1   have worked?  Is that why there are changes in this document,
 2   or are there more than that?
 3           MR. STEFAN:  The primary reason for the changes --
 4           THE COURT:  Not the primary reason, Counsel.
 5       You are standing here as counsel in this case.  I'm asking
 6   you a very simple question, and you better tell me the truth.
 7           MR. STEFAN:  I --
 8           THE COURT:  Is the truth that the only changes in this
 9   document were the result of the order that I gave with respect
10   to the timing?  That's what I want to know.
11           MR. STEFAN:  That would not be the case.
12           THE COURT:  All right.
13           MR. STEFAN:  I have --
14           THE COURT:  This cannot be used.  It may not be used.
15   It's excluded.
16       Okay.
17           MR. STEFAN:  Your Honor?
18           THE COURT:  What?
19           MR. STEFAN:  May the Defense use it as a demonstrative
20   exhibit only for --
21           THE COURT:  Yes.
22           MR. STEFAN:  -- the Court?
23           THE COURT:  You may use demonstrative exhibits.  They
24   should be turned over.  They should be shared.  But I will
25   allow you to use this purely as a demonstrative, and you're not
```

 1    going to admit it into evidence.

 2            **MR. STEFAN:**  Understood, Your Honor.

 3            **THE COURT:**  Now, with respect to this one --

 4            **MR. STEFAN:**  Again, to be clear, Your Honor, we're not

 5    attempting to admit that into evidence.  We provided this to

 6    the Government yesterday as another basis on which Mr. Min,

 7    you know, was informed regarding his opinions here today.  And

 8    with what comes as presentation to the jury in the

 9    demonstrative, it's that one page that we showed to you.

10            **THE COURT:**  That's not being admitted into evidence.

11        You can use these documents as demonstratives, point

12    them -- if I otherwise allow the area of examination, but

13    you're not -- none of these are being admitted into evidence.

14            **MR. CHOU:**  Your Honor, may the Government request a

15    further remedy?

16            **THE COURT:**  What's the further remedy?

17            **MR. CHOU:**  As I understand it, and as counsel has

18    confirmed, the basis of Mr. Min's opinion is going to depend in

19    part, he's going to opine on this document that was disclosed

20    last night at 4 o'clock; and it includes, on this particular

21    demonstrative now, statements from Nigel Quantick,

22    IP addresses, a date from November 2017.

23        The Government's request is that that particular opinion

24    and this demonstrative be excluded in its entirety.

25            **THE COURT:**  What is his opinion in particular?

PROCEEDINGS

1           **MR. CHOU:**  Well, it's hard for the Government to

2    fathom because we just received this last night at 4 o'clock;

3    but at a minimum, Mr. Min will be talking about this slide,

4    which includes a discussion of --

5           **THE COURT:**  What opinion is Min going to offer with

6    respect to this page?

7           **MR. STEFAN:**  With respect to that page, the

8    IP addresses listed there correspond with IP addresses which

9    are provided for the blockchain integration of the CrossVerify

10   product around the same time frame, 2017-2018, that we would

11   expect those entries to have been made into the database.

12      So essentially --

13          **THE COURT:**  That's a fact statement.  What is his

14   opinion?  What is it that -- what's the relevance of that item

15   to his opinion, and what is the opinion?

16          **MR. STEFAN:**  That the CrossVerify product was in

17   development and was integrated with the blockchain in

18   2017-2018.

19          **THE COURT:**  And he will testify that he relied on this

20   information to support the notion that it was in development?

21          **MR. STEFAN:**  In part.  It corroborates his opinion

22   that it was in development.

23      Your Honor, I --

24          **THE COURT:**  The expert -- okay.  All right.

25      Okay.  Well, he can testify that amongst the things he's

1    relying upon is this, although it should have been -- if

2    it's simply a demonstrative, it's one thing.  If it's a piece

3    of material that he's relying upon for his opinion, it should

4    have gone over to them before.

5             MR. STEFAN:  Yes, understood, Your Honor.  When

6    the Court issued its --

7             THE COURT:  This has nothing to do with the thing that

8    I talked -- that you said was the basis for adjustments.  That

9    has to do with 2020.  This doesn't have anything to do with

10   that; right?

11            MR. STEFAN:  I mean, overall, that would be correct.

12            THE COURT:  Overall, that would be correct.  Counsel,

13   come on.  I'm asking you simple questions, and you ought to be

14   giving me straightforward, simple answers, not dissembling

15   about what's going on here.  Understood?

16            MR. STEFAN:  Understood.

17            THE COURT:  Okay.  So this has absolutely nothing to

18   do with the rulings that I gave yesterday about 2020.

19        So why wasn't that provided to the Government if it was

20   going to be a basis for Mr. Min's expert testimony?

21            MR. STEFAN:  It was not identified until yesterday.

22   The only --

23            THE COURT:  Why, is my question.  Why?  Inadvertence?

24   What was it?  You're working hard?  I mean, I understand all

25   that but --

PROCEEDINGS

```
 1          MR. STEFAN:  It was an -- it was an oversight,
 2   Your Honor.  I mean --
 3          THE COURT:  Okay.  Well, you should have told me that
 4   right at the beginning instead of this, "Oh, no, we've
 5   refashioned this to accommodate Your Honor's ruling," which is
 6   not apparently what happened.
 7          MR. STEFAN:  Well, to be clear, Your Honor, that is
 8   what happened, at least in part, and with respect to the
 9   demonstrative in particular.
10      I am in very clear conscience about the representations
11   I've made to the Court today about all the documents we've
12   presented to you.
13          THE COURT:  All right.  Go through again with me,
14   Mr. Chou, what it is the Government's requesting.
15          MR. CHOU:  The Government's requesting, at a minimum,
16   that we strike this slide and prevent Mr. Min from opining or
17   otherwise testifying about --
18          THE COURT:  And your reason for that is what?
19          MR. CHOU:  And the reason for that is that we were not
20   notified that this was a basis or a foundation for Mr. Min's
21   testimony until last night -- or last afternoon at 4:07 p.m.;
22   and under Rule 16 and the Court's orders, that is a very late
23   expert disclosure.
24          THE COURT:  Okay.  You're not using that page.  Okay?
25          MR. STEFAN:  Yes, Your Honor.
```

PROCEEDINGS

1          **THE COURT:**  Good.

2          **MR. CHOU:**  Thank you.

3          **THE COURT:**  Anything else?

4          **MR. HIGHSMITH:**  Yes.  The Defense wants to call

5    special agents to impeach the testimony of Government

6    witnesses, and I think that should be excluded.  I think it's

7    not a -- it's not permissible.  It's not -- it's cumulative.

8    It's collateral.  It should be prevented.

9          **THE COURT:**  What's the issue that they want to --

10          **MR. HIGHSMITH:**  I was informed -- they want me to

11    stipulate -- they wanted me to stipulate that -- I'm not sure

12    because I didn't get a draft stipulation; but they want me to

13    stipulate that, if called, an agent would say that one of

14    the Government witnesses told that agent something.  So what

15    they want to do -- I have not stipulated to that for various

16    reasons.  But what they want to do is call those agents to say,

17    "In the past, that Government witness told me X; but on the

18    stand, they said they didn't remember."

19       So numerous times --

20          **THE COURT:**  Well, you should have impeached the

21    witness when the witness was on the stand.  I'm not going to

22    let you call an extrinsic witness to impeach somebody that's

23    already testified.

24          **MR. SHEPARD:**  Your Honor, I'll submit you a

25    Ninth Circuit case on this.

1      If the witness is asked "Didn't you tell the FBI X" and

2  the witness either says "No, I didn't," which is maybe one or

3  two of these but mostly they are "I don't recall," if the

4  witness says either "I didn't tell the FBI that" or "I don't

5  recall whether I told the FBI that," the Ninth Circuit says --

6          **THE COURT:**  I'll read the --

7          **MR. SHEPARD:**  -- we are entitled to prove that --

8          **THE COURT:**  -- opinion because that sounds to me like

9  you're trying to impeach with extrinsic evidence, which is not

10  generally allowed.

11      So if you've got some Ninth Circuit case, I will of course

12  follow what the Ninth Circuit says; but sometimes when people

13  say they have a Ninth Circuit case and I look at it, it doesn't

14  exactly stand for --

15          **MR. SHEPARD:**  Fair enough.

16          **THE COURT:**  -- the proposition that they are saying it

17  does, but I will take a look at it.

18          **MR. SHEPARD:**  Okay.  We will submit the case to you.

19          **THE COURT:**  Okay.

20          **MR. HIGHSMITH:**  In my view, that's also collateral;

21  therefore, prohibited, because the -- helpfully, they provided

22  me with a list of the statements, which was very helpful.  But

23  my position is these are all collateral issues; therefore, out;

24  and also cumulative because we also have definitively in their

25  testimony "I don't remember."

1          THE COURT:  When is this -- so when are these -- if

2    they were to be called, when would they be called?

3          MR. SHEPARD:  Whenever we get this resolved.  We

4    can -- we have plenty of witnesses, I expect, for today.

5          THE COURT:  Okay.  So I can look at this Ninth Circuit

6    opinion at the end of the trial day?

7          MR. SHEPARD:  I expect so, yes.  It's always hard to

8    predict.  We're hoping to get through our witnesses today, but

9    it's hard to predict.  I would -- my best expectation for

10   the Court is that we will consume the day with Mr. Min and

11   Dr. Armstrong.

12         THE COURT:  Okay.  With respect to this case you want

13   me to see, at this stage just give me the case.

14         MR. SHEPARD:  Yes.

15         THE COURT:  I mean, I don't need a brief.  I don't --

16         MR. SHEPARD:  Understood.

17         THE COURT:  And give it to the Government.

18         MR. SHEPARD:  Yes.

19         THE COURT:  If they've got a Ninth Circuit case, they

20   can give me that one.  So...

21         MR. SHEPARD:  We'll do that.

22         THE COURT:  Okay.

23                    (Recess taken at 8:29 a.m.)

24              (Proceedings resumed at 8:37 a.m.)

25       (Proceedings were heard out of the presence of the jury.)

1          THE COURT:  Okay?

2      (Proceedings were heard in the presence of the jury.)

3          THE COURT:  The jury is present.

4      Defense will call?

5          MR. STEFAN:  The defense calls Mr. Erik Min.

6          THE COURT:  All right.  If you could come forward,

7  please, to the stand to be sworn.

8    (Witness enters the courtroom and steps forward to be sworn.)

9                          **ERIK MIN,**

10  called as a witness for the Defendant, having been duly sworn,

11  testified as follows:

12          THE WITNESS:  I do.

13          THE COURTROOM DEPUTY:  Please be seated.

14      Can you state your name and spell your last name, please.

15          THE WITNESS:  Yes.  It's Erik Min, M-i-n; Erik,

16  E-r-i-k.

17                    **DIRECT EXAMINATION**

18  BY MR. STEFAN:

19  **Q.**  Good morning, Mr. Min.

20  **A.**  Good morning.

21  **Q.**  I want to first have you introduce yourself a bit.

22      What is your occupation, Mr. Min?

23  **A.**  Yes.  I'm a senior director within FTI Consulting's

24  blockchain and digital assets practice.

25  **Q.**  And what do you do in your role with -- as an expert with

1   FTI?

2   **A.**   Yes.  I work in a digital forensics capacity.  I perform

3   investigations into disputes with regards to cryptocurrencies

4   and blockchain investigation analysis, an assortment of

5   different type of investigations.

6   **Q.**   Apart from investigations, do you do other work with FTI?

7   **A.**   Yes, I do.  I work in an advisory capacity, you know, for

8   blockchain native and crypto native companies, performing an

9   assortment of different types of technical operational

10  assessments for those companies, you know, reviewing protocols,

11  procedures, looking at their source code, you know,

12  understanding their footprint, and limiting their risk.

13  **Q.**   Just generally, what does the work of someone in your

14  capacity entail when it comes to blockchain cryptocurrency and

15  analysis of source code?

16  **A.**   Yeah.  So, you know, we would obviously want to obtain the

17  relevant information, you know, from the sources of the code,

18  analyze them, review them, look for aspects of metadata, look

19  for aspects of the code itself, look at the functions and

20  features within the applications in the source code to

21  formulate an opinion, essentially.

22  **Q.**   How long have you been doing this kind of work?

23  **A.**   For digital forensics, generally speaking, over 20 years

24  my career, I've been performing that type of investigation.

25          You know, specifically within the blockchain and

1    cryptocurrency space, six years.

2    **Q.**    And what is your company FTI Consulting?

3    **A.**    Yeah.  FTI Consulting is a global consultancy firm.

4    You know, we're publicly traded.  Offices in over 30 countries.

5    Our segments vary from our technology segment, which hosts

6    our blockchain digital assets practice.  You know, our

7    corporate finance group performs forensic accounting from our

8    forensic litigation consulting practice.  You know, various

9    different segments covering multiple aspects of businesses.

10   **Q.**    So is the advisory group that you're a part of just a

11   portion of FTI's work?

12   **A.**    Yes.

13   **Q.**    What are some of FTI's clients?  Who does FTI serve?

14   **A.**    Banks, internal investigations, you know, crypto natives,

15   some of the largest exchanges in the cryptocurrency space as

16   well.  Excuse me.  It varies, yes.

17   **Q.**    And I'm sorry, but you've used the term "crypto natives" a

18   couple of times.  I just want to ask you what that is.

19   **A.**    Yeah.  A crypto native would fall into the aspect of what

20   Mr. Andrade's project with the AML BitCoin application was

21   looking to accomplish, you know, being a crypto native company,

22   servicing the industry, you know, applying some sort of, you

23   know, application to better the industry.

24   **Q.**    I want to talk about your education and background a

25   little bit.

**MIN - DIRECT / STEFAN**

1    Do you have a -- what's your educational background?

2    Could you describe it?

3    **A.**    Yeah.   I have a Bachelor's of Science from Virginia

4    Tech -- Virginia Polytechnic Institute and State University.

5    **Q.**    Do you have any certifications that are relevant to your

6    work in digital forensics?

7    **A.**    Yes, I do.

8    **Q.**    Can you describe some of those?

9    **A.**    Yes.   I have the -- from the Blockchain Council, I'm a

10   certified Bitcoin expert, a certified blockchain developer, and

11   a certified blockchain expert.

12   **Q.**    What was generally entailed in getting those

13   certifications?

14   **A.**    For those specifically, we had, you know, a course of

15   training, usually taking several days to complete the training,

16   additional study, of which then conducting an examination to

17   obtain the certification and credential.

18       I also have several, you know, additional

19   forensic-specific certifications.   I have the TRM Certified

20   Investigator, which is a digital asset tracing tool for

21   blockchain analytics.

22       In addition to the TRM Certified Investigator, I have the

23   Crystal Research and Investigation certification.   I also have

24   the EnCase Certified Examiner.

25   **Q.**    What is EnCase?

**MIN - DIRECT / STEFAN**

 1  **A.**   EnCase is a leading digital forensics tool for performing

 2  forensic analysis.

 3  **Q.**   How did you get that certification?

 4  **A.**   Yes.  That certification is a lengthy, you know, study

 5  period to learn the different aspects of, you know, evidence

 6  handling, forensic analysis of various data sources, of which,

 7  upon taking the test, which was quite extensive, you know, you

 8  obtain the certification.  And that's a three-year renewal

 9  process.  I have held that certification since 2012.  To

10  continue to renew, it requires, you know, continuing

11  professional education credits, CPEs.

12  **Q.**   You talked about how you'd been at FTI for six years,

13  I believe?

14  **A.**   Yes.

15  **Q.**   Prior to working with FTI, can you describe your

16  employment history?

17  **A.**   Yes.  Prior to FTI, I was with Grant Thornton, which is an

18  audit -- tax audit and advisory firm, similar to the Big Four.

19  They're actually Number 5 on the list of audit firms, audit and

20  accounting firms.  I was with them from twenty- -- 2015 to

21  2019 -- sorry, it's been a bit for that one -- performing an

22  assortment of digital forensic investigation, e-discovery

23  services with Grant Thornton.

24       Prior to that, I was with Granite Legal Systems from 2012

25  to 2015, similar capacity:  digital forensics, forensic

**MIN - DIRECT / STEFAN**

 1  collection, e-discovery services.

 2       Prior to Granite Legal, I was with HSSK Forensics with --

 3  you know, from the time period of 2009 to 2015, I believe.

 4  Yeah.

 5  **Q.**  What kind of work were you doing with those firms?  Was it

 6  similar to what you're doing with FTI now?

 7  **A.**  Yes.  More so in the digital forensic capacity.

 8  **Q.**  Are you part of any professional associations associated

 9  with your practice as well?

10  **A.**  Yes.  Association of Certified Fraud Examiners and the

11  Global Blockchain Association.

12  **Q.**  And during the course of your career, about how many

13  investigations have you participated in or consulted on as a

14  digital forensics expert?

15  **A.**  Yeah.  Over the course of my 20-year career, I'd say,

16  you know, in the ballpark of 4- to 500 investigations.

17  **Q.**  And about how many of those investigations were specific

18  to blockchain and cryptocurrency?

19  **A.**  Yeah.  I'd ballpark that around 80 over the course of the

20  last six years.

21  **Q.**  Have you ever been previously qualified in court to

22  testify as a digital forensics expert?

23  **A.**  Yes, I have.

24  **Q.**  How many times?

25  **A.**  Once.

**MIN - DIRECT / STEFAN**

1   Q.   Apart from testimony in court, have you provided forensic

2   reports or affidavits, materials for use in litigation?

3   A.   Yes, I have.

4   Q.   How many times do you think you've done that?

5   A.   Twice for expert reports.  Various affidavits, I can't

6   recall off the top of my head, but, yeah, over the course of my

7   career, many affidavits.

8         MR. STEFAN:  Your Honor, at this time the defense

9   moves to enter -- have recognized Mr. Min as an expert in

10  digital forensics, blockchain, and cryptocurrency.

11         MR. CHOU:  Reserving objection at this time.

12         THE COURT:  Do you wish to voir dire at this point?

13         MR. CHOU:  Not at this point, Your Honor.

14         THE COURT:  All right.  Well, I will so designate the

15  witness.

16     Go ahead.

17         MR. STEFAN:  Thank you, Your Honor.

18     Can we show just to the witness Exhibit 3395.

19  Q.   Do you recognize what I've shown to you?

20  A.   Yes, I do.

21  Q.   Is this the first page of a demonstrative that you

22  prepared for your testimony today?

23  A.   Yes, I did.

24  Q.   Do the contents of the demonstrative generally reflect the

25  material that you reviewed in preparation for your testimony?

**MIN - DIRECT / STEFAN**

1    **A.**    Yes.

2    **Q.**    And the opinions and findings that you have made with

3    respect to your review of the evidence in this case?

4    **A.**    Yes.

5    **Q.**    Is it a fair and accurate summary of those findings and

6    opinions and the material that you reviewed?

7    **A.**    Yeah.  Yes, it is.

8         **MR. STEFAN:**  Your Honor, the Government -- or, pardon

9    me -- the defense would seek to publish Exhibit 3395 as a

10   demonstrative exhibit to the jury or seek to enter 3395 as a

11   demonstrative exhibit.

12        **MR. CHOU:**  No objection except for that one slide.

13        **MR. STEFAN:**  Yes, Your Honor.

14        **THE COURT:**  You may use the -- you may use the

15   document as a demonstrative so the jury can look at it as

16   you're inquiring.

17        **MR. STEFAN:**  Thank you, Your Honor.

18        Let's go ahead and please publish Slide 1.

19   **Q.**    So, Mr. Min, I want to start with the overall findings

20   that you made with respect to the review that you performed in

21   this case.

22        Did you perform a review of the source code for Aten Coin

23   and the AML BitCoin projects, specifically with AML BitCoin,

24   the material related to CrossVerify?

25   **A.**    Yes, I did.

**MIN - DIRECT / STEFAN**

1  **Q.**    Did you form opinions regarding them to a reasonable

2  degree of certainty?

3  **A.**    Yes, I did.

4  **Q.**    And what was your overall finding with respect to the

5  Aten Coin project that you reviewed?

6  **A.**    Yeah.  With regards to Aten Coin, you know, a complex

7  project, an abundant amount of source code associated with the

8  project, very detailed information, you know, specific to the

9  project and how to manage the development process.  You know,

10 specific aspects to how to develop the code itself were

11 prevalent.

12     The application appeared to be -- at least the portions of

13 the application were complete and in need of essential,

14 you know, building to compile the total application.

15 **Q.**    Did it appear to be a functional product that relied on

16 third-party ID verification software?

17 **A.**    Yes, it did.

18 **Q.**    With respect to the AML BitCoin or CrossVerify product,

19 what findings did you make with respect to the progress in its

20 development over the 2017 and 2018 time frame?

21 **A.**    Yes.  It was apparent that there was quite a bit of

22 development and testing that occurred across that time period

23 of 2015 to 2017.

24 **Q.**    And with respect to the final state of that CrossVerify

25 product, what's your opinion regarding its capacity to get

1  integrated into a preexisting cryptocurrency in the 2017-2018

2  time frame?

3  **A.**    Yes.  It was there as far as the ability to get it

4  integrated and functional.

5  **Q.**    I want to turn, then, to how you reached each one of these

6  findings; but first, I want to talk about cryptocurrency and

7  blockchain more generally.

8       What do we mean by the term "blockchain"?

9  **A.**    Yes.  Blockchain is a decentralized ledger technology for

10  purposes of recording transactions.

11  **Q.**    How does a blockchain work?

12  **A.**    Essentially, the decentralized ledger will record a

13  transaction that is validated, you know, by validators on the

14  blockchain, you know, for purposes of validating that

15  transaction, of which then it is recorded to the blockchain in

16  an immutable fashion, you know, for purpose of record.

17  **Q.**    Could you try to put in more layperson terms what a

18  decentralized -- pardon me.  I already forget the term that you

19  used.  Decentralized ledger --

20  **A.**    Correct.

21  **Q.**    -- I believe you said.

22  **A.**    Yeah.  Decentralized in that it's -- there's no central

23  body governing the blockchain and how it's recording.

24       It would be a situation where you would have numerous

25  nodes or, you know, essentially, you know, operators of the

1    blockchain that are responsible for maintaining that copy.  And

2    those validators and those nodes, essentially, are in the

3    purposes of confirming that everyone has the exact same copy.

4    But none of them have the overall control, and, you know, they

5    are leveraged across those nodes, you know, to manage and

6    protect and secure the blockchain.

7    **Q.**    What are some of the benefits of this technology?

8    **A.**    Yeah.  As mentioned, decentralization for governance.

9    You know, the transparency of the transaction.  It's immutable,

10   meaning it cannot be changed from the record.  The overall

11   transactions are visible, you know, through the blockchain

12   explorers for visibility for audit purposes and review.

13   **Q.**    What is a cryptocurrency?

14   **A.**    Yeah.  A cryptocurrency would be a digital asset, a token

15   that is essentially transacted on the blockchain.

16          **THE COURT:**  You really do need to slow down.

17          **THE WITNESS:**  Yes, sir.  It is very complex.  I do

18   apologize.

19        The -- a cryptocurrency is the digital asset that will be

20   transacted on a blockchain and stored those transactions.  So

21   when you conduct a transaction, if it be, you know, an actual

22   currency for purposes of making a purchase of something, say a

23   pizza or other services, that actual transaction would be

24   recorded.

25        There's other aspects to blockchain technologies in the

**MIN - DIRECT / STEFAN**

1    form of supply chain management.  You could use those

2    applications to validate aspects of, say, that same pizza.

3    You know, hey, the pizza was made at the restaurant.  Confirm

4    this aspect.  It then is validated to the next step, of which

5    then that aspect would be the delivery driver picks up the

6    pizza.  And it's to continue to be recorded throughout the

7    process and validated.

8    **Q.**    Is the idea, then, that anyone can go back and look to see

9    how the process played out?

10   **A.**    Yes, sir.

11   **Q.**    When you -- how does a person possess a cryptocurrency?

12   **A.**    Yeah.  The possession is really through the private keys

13   of --

14   **Q.**    Slow down a little bit, if you would.

15   **A.**    Sure.

16        The possession would be through the private keys of the

17   wallet that is transacting the cryptocurrencies.  So you would

18   need a wallet for the purposes of holding the cryptocurrency

19   keys and managing those assets for purposes of transacting

20   those assets.

21   **Q.**    And how would the person holding it in the wallet then

22   transact using the blockchain?

23   **A.**    Right.  By authenticating through their wallet.  You would

24   take -- you would then have access to those private keys and

25   have the control to then perform those transactions, you know,

**MIN - DIRECT / STEFAN**

1    through the wallet functions:  send, receive, et cetera.

2    Right?

3    **Q.**   How many cryptocurrencies are there?

4    **A.**   Thousands.

5    **Q.**   And at a thousand-foot level, what do you need to put

6    together to make a cryptocurrency?

7    **A.**   Yeah.  You would need the overall technology of the

8    blockchain.  You would need, you know, a wallet application for

9    purposes of managing those assets.  You would need an

10   ID verification process, you know, to confirm the holder of

11   those assets, to perform the transactions, essentially, yes.

12   **Q.**   I want to turn to the Aten Coin project first.  Did you

13   perform an analysis of the Aten Coin cryptocurrency?

14   **A.**   Yes, I did.

15   **Q.**   I want to talk about what materials you relied upon for

16   your analysis.

17       What materials were the basis for your conclusions in this

18   case?

19   **A.**   Yeah.  For the Aten Coin project, an assortment of copies

20   of the Aten Coin source code were provided for review and

21   analysis, of which, you know, reviewed those.  You know, they

22   contained, you know, the various source code, the different

23   aspects of the documentation that was prevalent within the

24   repositories to perform the analysis.

25   **Q.**   I want to talk about the primary copies or sets of source

1    code that informed your investigation.

2        Were there some primary ones that informed your

3    investigation?

4    A.   Yes, there were.

5    Q.   Which are you referring to?

6    A.   There was one particular, the Aten Coin -- Aten Black Gold

7    Coin multisig wallet.  I believe it was dated in April of

8    2020 -- 2015.  Excuse me.

9    Q.   And what was the format of that file?

10   A.   It was in a zip format.

11   Q.   What did you understand the origin of the zip file to be?

12   A.   It was originated from an email from a developer,

13   Terence Poon, of which it was sent to another one of the

14   development teams -- team members in 2015.

15   Q.   Who did you understand Terence Poon to be?

16   A.   A developer on the project.

17   Q.   On the Aten Coin project?

18   A.   Yes, sir.

19   Q.   And how did you receive that source code?

20   A.   King & Spalding gave me access to the code.

21   Q.   When you reviewed the metadata for the source code or the

22   files containing the source code, what did that reflect?

23   A.   Date-modified timestamps of 2015.

24   Q.   And what does "date-modified timestamp" mean?

25   A.   Yeah.  Date modified would be a metadata timestamp that's

1    associated with a file, a folder to show the last time it had

2    been changed.  An effective change, not an access point, but

3    essentially changed of the document.

4    **Q.**    What did that timestamp of 2015 indicate to you with

5    respect to the zip file that you reviewed with the Aten Coin

6    source code?

7    **A.**    Yeah.  With the source code being last modified written

8    within the 2015 time period, that the code had been, you know,

9    modified and edited within 2015.

10   **Q.**    Was there another zip file that you also relied on?

11   **A.**    Yes, there was.

12   **Q.**    And what did you understand the origin of that zip file to

13   be?

14   **A.**    Yeah.  That zip file was provided to King & Spalding

15   shortly after a conversation that I was a part of with the

16   King & Spalding team, with the developer, Terence Poon, of

17   which following that conversation in January of 2025, it was

18   essentially provided to King & Spalding and then shared with

19   me.

20   **Q.**    And by "King & Spalding," I assume you're referring to

21   myself and my fellow cohorts at defense counsel table?

22   **A.**    Yes, that's right.

23   **Q.**    Did you review the date-modified information with respect

24   to that zip file as well?

25   **A.**    Yes, I did.

**MIN - DIRECT / STEFAN**

1   **Q.**   And what did that information reflect?

2   **A.**   Again, last modified, last written time stamps of 2015.

3   **Q.**   And did that indicate to you that this was source code

4   originally created or at least zipped up into that format in

5   the 2015 time frame that it was dated?

6   **A.**   Yes, that's correct.

7   **Q.**   Those sets of source codes on which you relied, did you

8   view them as a reliable basis on which to form your opinions?

9   **A.**   Yes.

10  **Q.**   And was that material that was given to you and you relied

11  on, is that the kind of material typically relied on by digital

12  forensics experts and cryptocurrency and blockchain experts in

13  performing their analysis?

14  **A.**   Yes.  Yes, it is.

15  **Q.**   And is the manner that you received and verified the

16  source of the information for those zip files consistent with

17  the standards in your field as well?

18  **A.**   Yes.

19  **Q.**   You mentioned that you had a conversation with

20  Terence Poon.  Was there any other developer you spoke with?

21  **A.**   Yes.  Sergey Petkevich.

22  **Q.**   Did your conversation with them actually form a basis for

23  your opinions as presented here?

24  **A.**   No, unfortunately, it did not.

25  **Q.**   Oh, why is that?

1   **A.**   It was a short conversation.  It was very high level.  It

2   did not get into the technical specifications that I would have

3   preferred to have in that conversation.

4   **Q.**   Were there difficulties in obtaining conversations with

5   the software developers who worked on this project previously?

6   **A.**   Yes.

7   **Q.**   I want to talk then about what you -- what you did

8   discover with respect to the Aten Coin source code that you

9   reviewed.

10       First, based on your review of the source code, what is

11  your perspective on whether the Aten Coin was a working product

12  in the 2014-2015 time frame from which the source code -- the

13  source code derived?

14  **A.**   Yeah.  The various aspects and packages were there.  Very

15  much, you know, it was -- you know, each of those were working,

16  you know, functional applications.

17  **Q.**   So the applications that you reviewed for the Aten Coin

18  source code appeared to be functional?

19  **A.**   Yes.

20  **Q.**   Just overall, understanding that Aten Coin was a

21  cryptocurrency, could you describe the features that you

22  observed regarding the Aten Coin?

23  **A.**   Yes.  Aten Coin, you know, had an aspect of ID -- user

24  identification and verification.  It would take, you know, KYC

25  information, for instance, for the user, which "know your

1    customer" is what KYC would stand for with this regard.  And it

2    would take that and perform a validation of that KYC

3    information against a third-party software vendor for

4    confirming that identity.

5    **Q.**    Did it have a wallet application?

6    **A.**    Yes, it did.

7    **Q.**    And could you describe any features specific to that

8    wallet application?

9    **A.**    Yes.  The wallet, obviously, being a cryptocurrency, it

10   operated on a blockchain for purposes of recording

11   transactions.  It had, you know, log-in capabilities, that ID

12   verification aspect discussed with the third-party vendor, of

13   which all of that's integrated onto the blockchain.

14   **Q.**    And when you speak of the blockchain, what kind of

15   blockchain did the Aten Coin have?

16   **A.**    It was a forked copy of the Bitcoin blockchain.

17   **Q.**    Can you describe to the jury what that means, "forked copy

18   of the Bitcoin blockchain"?

19   **A.**    Right.  A forked copy would be, you know, taking the

20   Bitcoin blockchain application code, which is open source, and

21   taking that copy, making that your base for the code that you

22   would then develop your application.

23        So in this case, the team took Bitcoin core, stored that

24   within their Git repositories, and then began making their

25   changes to that code to effectively make it their own version

1   with their own functions and features, you know, that they're

2   including, the biometric functions -- excuse me -- the

3   ID verification process.

4   **Q.**   Is the Bitcoin core an open-source material?

5   **A.**   Yes, Bitcoin's an open source.

6   **Q.**   Can you describe to the jury what that means?

7   **A.**   Yeah.  Open source is an aspect of the development

8   ecosystem.  Right?  So contributing to the environment,

9   contributing to code, bettering the code, making it openly

10  available to educated, you know, developers for the purposes of

11  refining the code, using it for their own purposes, you know,

12  building excellent and wonderful, you know, new projects.

13  **Q.**   So is an open-source code something that is available to

14  anyone to use?

15  **A.**   Yes, sir.

16  **Q.**   Okay.  How common is it for cryptocurrencies to be made by

17  forking the Bitcoin blockchain?

18  **A.**   Regularly.  Very common.

19  **Q.**   I believe you briefly touched on this already, but with

20  respect to the wallet, did you identify something called an

21  identity-linked credential that was specific to the Aten Coin

22  wallet?

23  **A.**   Yes, I did.  ILCA for short.

24  **Q.**   Can you describe --

25  **A.**   ILCA, I-L-C-A.

**MIN - DIRECT / STEFAN**

1    **Q.**    I apologize.  I interrupted you.

2         Can you describe to the jury what that feature was?

3    **A.**    Yes.  The ILCA for short, identity-linked credential

4    authentication was a purpose of validating a user's identity.

5         In performing that, you would, you know, perform the

6    validation through this third-party, you know, software, the

7    ID verification vendor, of which once the validation is

8    confirmed, the Aten Coin gateway would confirm a security

9    token, this credential, of which that credential, you know,

10   once validated, would essentially give the gateway the ability

11   to effectively co-sign a transaction in a sort of multisig

12   function capability.

13   **Q.**    Would you describe this, then, as a multisignature wallet,

14   the Aten Coin wallet?

15   **A.**    Yes.

16   **Q.**    You used the term "gateway" a couple times.  I just want

17   to see if you can provide to the jury any clarity on what you

18   were referring to --

19   **A.**    Yeah.

20   **Q.**    -- with respect to the gateway.

21   **A.**    Yes.  By "gateway" here in this context, I'm referring to

22   what the Aten Coin project was referring to the Aten Coin

23   gateway.  Essentially, it's, you know, the overarching sort of

24   brain, so to speak, of the Aten Coin project, you know, which

25   it's managing the different functions; it's integrating the

1    different aspects of the wallet, which is where the user is

2    interacting with this.  It's communicating those ID aspects,

3    identity verification aspects.  It's communicating with the

4    third-party servers that are doing the ID verification itself.

5    It's interacting and making that verification for purposes of

6    validating those transactions.

7    **Q.**    And you indicated your view showed some use of third-party

8    ID verification softwares?

9    **A.**    Yes.

10   **Q.**    Can you expand on what you observed with respect to that?

11   **A.**    Yeah.  Within the code was found a third-party vendor

12   called Mii Card -- M-i-i, Card, C-a-r-d -- and that application

13   was the third-party tool that would perform the ID verification

14   process.

15   **Q.**    I want to talk about some of the challenges that you faced

16   in reviewing the Aten Coin material.

17       What challenges were presented to you in your review?

18   **A.**    Yeah.  Aten Coin specifically did not have any of the

19   commit history that you would expect to be available from a

20   Git repository data pool.

21   **Q.**    So I'll go ahead and pause you right there.

22       You mentioned commit history and a GitHub repository data

23   pool.  Can you describe what you were referring to?

24   **A.**    Yeah.  So Git is a -- is a -- is essentially an

25   application that programmers and development teams will utilize

1  to manage the development of their applications, their code

2  development.  Essentially, it's change management for software.

3      And when you're leveraging a Git repository, the

4  developers will pull down a local copy from, you know, the

5  centralized, let's just call it, cloud that is Git.  In this

6  case, it's Bitbucket is the -- is the tooling that is

7  supporting the Git repository.  There's multiple ones.  There's

8  GitHub as well.  That's another version.  But, in this case,

9  Bitbucket is what I'll be referring to.  And, you know, with

10  this Bitbucket, Git repositories will manage the overall

11  development and workflow.

12      So in the example where a developer pulls down the data

13  for, you know, the source code to perform their review and

14  analysis and make changes, say they wanted to add a feature,

15  they'll make their changes, of which then they'll push those --

16  that code change to Git -- in this case, Bitbucket -- for

17  purposes of recording that change.

18      The developer's metadata as far as that developer's name,

19  the timestamp of when that commit was generated and recorded

20  will be registered there.

21      The developers also have the ability to leave a message,

22  you know, to drop a note, essentially, to, you know, give an

23  indication of what it was that was performed.

24  **Q.**  So that's a whole lot of information that you're

25  indicating was not present with respect to the Aten Coin

1    material that you reviewed?

2    **A.**    That's correct.

3    **Q.**    Would you have an understanding of why that is?

4    **A.**    I would say it's a ten-year-old project.  You know, being

5    the source code that I reviewed had timestamps from 2015 of

6    their changes, I would say it's -- it's common to have any sort

7    of, you know, version-control issues with something that old.

8    If you didn't have access to the specific Git repository that

9    was maintaining that source code, you wouldn't be able to

10    easily just extract it out as a clone copy to provide, say, to

11    me in this case.

12        So if you had static files saved on, say, an external hard

13    drive somewhere or on your workstation, your laptop, and that's

14    just what you have, then that essentially is what could be

15    provided.  And that's what looks to be the case in the

16    instances of these two files, the zip files that I received to

17    review.

18    **Q.**    In that they were essentially -- they weren't from the

19    original -- well, I don't know.  Just go ahead and describe

20    what you mean by that.

21    **A.**    Yeah.

22    **Q.**    What was the case with the two files?

23    **A.**    It wasn't in a direct export from Git, and Bitbucket

24    specifically for the AML BitCoin project, but, you know, native

25    files stored locally.

1    Q.    How did that affect your ability to analyze the data?

2    A.    Well, with the commit history, you would love to see that

3    to actually tell when development had occurred.  As I

4    mentioned, Git is essentially change management for software.

5         So if you're seeing development over time, you would want

6    to review the Git history -- the commit history -- excuse me --

7    to review the changes, see what was done, see the exact changes

8    that occurred, the time when those occurred, and any of those

9    notes that I mentioned to give an indication to what was being

10   performed and the purposes thereof.

11   Q.    Were there other difficulties that the lapse of time from

12   2014, 2015 to your present review, were there other

13   difficulties associated with that?

14   A.    Yes.  I'd say in addition to the time period, you know,

15   there was a technical aspect that would be of issue with the

16   overall time that had passed.  You know, for instance,

17   you know, you're constantly getting a -- you know, Apple wants

18   you to update your phone.  Right?  There's always an update

19   that is being occurred.  So if you're talking about ten years

20   of updates that occurred to, say, a mobile device that you're

21   using, you would need to stay up-to-date and current.

22        So there's many, many, many versions that would have

23   changed over time.  And the versions that we have are from

24   2015.  So if you were thinking of a project that continued to

25   run from 2015 to current, there would be reasonably, you know,

**MIN - DIRECT / STEFAN**

1   a fair amount of versions that you would have in place.

2       There's also the overall, you know, hardware aspect in

3   addition to the software that is problematic in reviewing code

4   this old.  You know, our MacBooks our Windows computers,

5   you know, they're modern; they're up-to-date.  You're dealing

6   with a software that was essentially built on preexisting

7   versions of those pieces of hardware and software.

8   **Q.**   So are there difficulties trying to run 2014 or 2015

9   source code or software on equipment that's ten years newer

10  than that?

11  **A.**   Yes, there is.

12  **Q.**   Could you describe that with respect to your work on

13  Aten Coin?

14  **A.**   Right.  So, I mean, there's nothing I can really do about

15  getting a Windows computer, a Mac computer that's, you know,

16  that -- presumably, you could find an old, you know, version of

17  it and blow it back; and that's essentially what we had to do

18  in some cases, you know, for reviewing the aspects of the code,

19  spinning up aspects of the code.  You have the version control

20  as far as -- so the software that was utilized for the purposes

21  of development.

22      In addition to, you know, the aspects of running it

23  itself, you're using different software development tools that

24  essentially are outdated.  So to get them to work in the state

25  that they were at the time, you would want to actually have to

1    implement those versions for the purposes of the analysis.

2          **MR. STEFAN:**  Could we show Slide 2, please, or the

3    next slide of the demonstrative.

4          Next, please.

5    **Q.**    What is -- what is being displayed here?

6    **A.**    Yeah.  These were the various, you know, pieces of

7    software that were found to be utilized at the time of

8    development for the code itself.

9    **Q.**    And why have you listed these here?  What does this

10   illustrate?

11   **A.**    It illustrates the dated nature of the code utilized.

12   You know, it's 2025, and we're talking about code here that was

13   released well over ten years ago.

14   **Q.**    What kind of difficulties does the use of this old

15   development software pose for you when trying to get the

16   software up and running in the current era?

17   **A.**    Yeah.  Rebuilding it in a form that we can actually

18   compile the code to, you know, generate the executables and

19   actually run the software; and that is, you know, the

20   AML BitCoin Wallet -- sorry -- the Aten Coin wallet.

21   **Q.**    How do you think your situation would have changed had you

22   been performing this review in 2016 or 2017 as opposed to 2024

23   and 2025?

24   **A.**    Well, the discussed in the hardware and the software,

25   you know, version issues would be alleviated.  You'd have

1    access to those versions.  You know, for instance, the ones

2    here on the screen would be relatively current, not

3    out-of-date, and we'd have access to those in a ready fashion.

4        We'd also have access, you know, to the development team

5    for purposes of asking questions, having sessions to review the

6    code, understand the architecture of the code, get into,

7    you know, the back end and understand all those different

8    functions and what they're doing.

9    **Q.**    Okay.  Despite those limitations, were you able to perform

10   an effective review of the source code for Aten Coin?

11   **A.**    Yes.

12   **Q.**    And overall, what did your review of the source code tell

13   you about the Aten Coin project developers, the people working

14   on the software?

15   **A.**    Yeah.  The development team was quite sophisticated, very

16   well organized.  They took good care to make sure that they

17   documented the aspects of how they wanted the project run and

18   how the commit analysis would be -- sorry -- the commit history

19   would be recorded, how the code would be reviewed, changed,

20   et cetera, for purposes of making those commits to the -- to

21   the ultimate, you know, Git repository for change management.

22   **Q.**    What kind of source code was used in this development?

23   **A.**    C++.

24   **Q.**    What does that tell you about the project?

25   **A.**    Yeah.  C++ is a sophisticated programming language.  It's

1    not for the average user.  You need education and training to

2    actually perform, you know, the actual coding functions.  It's

3    not necessarily a run-of-the-mill code base you just get

4    started with.

5         **MR. STEFAN:**  Can we please show the next piece of the

6    demonstrative.

7    **Q.**   What are we looking at here, Mr. Min?

8    **A.**   This is a nice note from the development team, likely the

9    leadership of the team -- the development team, indicating

10   exactly how they want the code developed.

11        Obviously, I don't need to read it to you; but

12   essentially, you know, taking the different aspects from,

13   you know, the actual Git repository, performing those edits,

14   and how they want those commits submitted to the Git repository

15   and how they are ultimately reviewed, you know, to the extent

16   that, you know, it's a well-documented plan and direction to

17   the development team for purposes of making edits to the code.

18        **MR. STEFAN:**  And can we advance to the next piece of

19   the demonstrative, please.

20   **Q.**   What is reflected here?

21   **A.**   Yeah.  Another good example of good instruction, you know,

22   within the code files that we found in the supporting

23   documentation for the code.  This is a read me QT file, which

24   would indicate the aspects of developing the front end of the

25   application.  So the user face that you see; so, in this case

1    of the wallet application, the flow of what it looks like, the

2    things that make, you know, the user enjoy the product.  Right?

3    It doesn't have the intricacies of the back end.  This is more

4    focused on the user experience and the UI, meaning the user

5    interface.

6              **MR. STEFAN:**  And we can advance to the next piece of

7    the demonstrative.

8    **Q.**   Is this another example of instructions being provided by

9    the developers to people using the source code?

10   **A.**   Yes, it is.  You can see from the notation of Aten Black

11   Gold Coin, the QT indicates, obviously, more of the same,

12   you know, front-end UI development.

13   **Q.**   Were you able to utilize the instructions provided to you

14   within the source code to some effect?

15   **A.**   Yes, I did.  Yeah, we did, in fact, use these for purposes

16   of building the application and spinning it up to run.

17   **Q.**   And when you say "the application," what exactly did you

18   spin up to run?

19   **A.**   The wallet application, the Black Gold Coin -- Aten Black

20   Gold Coin wallet.

21   **Q.**   I want to talk about what you saw with respect to that

22   wallet.

23        Did the wallet that you Git spun up, did it have the

24   relevant portions of a cryptocurrency wallet that you would

25   expect?

MIN - DIRECT / STEFAN

1    **A.**    Yes, it did.

2    **Q.**    What are you referring to specifically?

3    **A.**    Yeah.  It had the functionality to log into the wallet,

4    you know, performing the ID verification aspects.

5          Once validated through obtaining that credential, as

6    mentioned before with the ILCA credential, you could then

7    perform transactions.

8          You had the ability to be vetted for AML compliance, which

9    is anti-money laundering, to spell it out for you -- excuse

10    me -- and essentially perform those transactions.  And you

11    could send assets to anyone you liked if you had, you know,

12    their cryptocurrency address.

13          **MR. STEFAN:**  Can we advance to the next slide of the

14    demonstrative, please.

15    **Q.**    What is depicted here?

16    **A.**    Yeah.  This is the Aten Black Gold Coin wallet that I

17    managed to spin up.  The -- you can see the functionality.

18    You know, it looks like most other wallets in the case that you

19    have an overarching dashboard, you know, the different aspects,

20    which we'll get into in further examples.

21          But, yeah, the neat and interesting one that I want to

22    call out here for this one is in the left slide under the file,

23    it has the aspect you sign a message, which is a neat feature

24    for cryptocurrency wallets, to where if you send a transaction,

25    you know -- to use an example that we've carried here, if I

1    wanted to send, you know, cryptocurrency, Aten Coins to someone

2    for supply -- you know, delivering me a pizza, I could say on

3    there, you know, "Thanks for the pizza.  You know, enjoy the

4    tip."  Right?

5        So it's a situation where this function here allows you to

6    sign, you know, actually interact yourself with the blockchain,

7    in addition to the transaction that you're conducting, to write

8    a note and have it stored on the blockchain.

9    **Q.**   All right. we can advance to the next slide of the

10   demonstrative.

11   **A.**   So let's stay on the left side again, the help window.  I

12   mean, expected with any software, you would want to have a help

13   window.  That essentially gives you the ability to, you know,

14   learn about the specific versioning of the software, understand

15   what the application is and does.  If you have, you know,

16   errors or come across issues with the code, you can submit a

17   debug, you know, function to report a bug or a problem, as it's

18   called, you know, within the, you know, coding space --

19   application space.

20   **Q.**   And how about, on the right-hand side, there's an option

21   to encrypt the wallet.  Would that be something that you'd

22   expect of a cryptocurrency wallet?

23   **A.**   Yes, I would.  Yeah.  Encryption is important for

24   cryptography in general.  And essentially, this would help

25   secure your wallet and assure that only your -- only you would

 1    have access to that wallet.

 2            **MR. STEFAN:**  We can advance to the next demonstrative

 3    slide, please.

 4            **THE WITNESS:**  So this is a good example here as far as

 5    on the left pane, we have receive.  Here, it's just showing,

 6    you know, the ability to -- you know, to receive, you know,

 7    currency.

 8        You know, with any wallet, you would want to be able to

 9    send and receive tokens.  So with a receipt, you would --

10    excuse me -- generate an address from your wallet that's unique

11    to your cryptocurrency wallet.  It would then populate within a

12    further below item in your address book.  You would share that

13    address with, you know, the pizza driver -- well, actually,

14    that's for receipts.  Excuse me.

15        So if you wanted to send someone assets, you would

16    provide -- apologies.

17        If you wanted to receive assets, you would provide one of

18    your receiving addresses, of which then, you know, the sender

19    on the other end would then put your address into the form

20    within the wallet and essentially send you whatever the amount

21    of currency was that they wanted to send you.

22            **MR. STEFAN:**  I think we can advance to Slide 10,

23    please.  And zoom in on the information on the right-hand side

24    in the "Pay to," "Label," and "Amount."

25    **Q.**   Is this what you were referring to?  I know it's pretty

 1    fuzzy in this screenshot.

 2    **A.**    Yeah, it is.  So "Pay to" would be that address that

 3    you're going to send assets to.  The "Label" would be a

 4    notation that you would include within, you know, your wallet

 5    application.  This would not necessarily be stored to the

 6    blockchain itself.  However, in the example of the pizza, this

 7    would be, "Hey, pizza for Friday night for the kids."  Right?

 8    So you can make a note so you can understand, if you ever

 9    wanted to look back at your transactions, to understand what it

10    is that you had done before.

11        You see this commonly in most traditional financial

12    institutions through Fiat banking as well.

13    **Q.**    And then, finally, Slide 11.

14    **A.**    Yeah.  So this is just the UI interface to show -- I mean,

15    as you can see, this wallet is out of sync, as you can see on

16    the left.  You know, being an application from 2015, the

17    blockchain itself is not live.  So, essentially, we could

18    not -- I could not sync that application, you know, to the

19    blockchain.  So that's why it shows out of sync.

20        If the application was -- the blockchain was live and we

21    had synced it to that blockchain, then I would have been able

22    to see that I was synced and I was ready to confirm

23    transactions on the blockchain.  Essentially, you need to be

24    able to have a synced version of the blockchain to be able to

25    conduct those transactions and see those transactions in a

1    clear state.

2    **Q.**    To be clear, how did you come to have all of these

3    screenshots?

4    **A.**    Sure, which, as discussed, it's a really complicated

5    process of obtaining, you know, prior versions of the software

6    to utilize.  We took -- I took the Linux -- a prior version of

7    Linux from 2015 to make an image, of which -- I'll try to keep

8    this high level so it's not too complicated for you-all -- but

9    take that operating system in Linux and then use compilers to

10    generate the executable for -- from 2015 using dated, old

11    versions from 2015 to do that; you know, using the same

12    instructions that, you know, were provided that you saw before

13    about how to build these packages; and essentially compile that

14    into an executable and then spin up the application to get to

15    this point of review.

16    **Q.**    So, essentially, you built this application out using the

17    source code that was provided to you?

18    **A.**    Yeah, using the source code.  And the notations were very

19    helpful in getting to this point.

20        **MR. STEFAN:**    I want to advance to the next slide,

21    please.

22    **Q.**    And discuss what we are viewing here.  First, this green

23    and colored text on the black background, what is this?

24    **A.**    Yeah.  It looks like a copyright notation for 2014 Aten

25    Black -- Aten Coin Developers.

MIN - DIRECT / STEFAN

1  **Q.**  And then just generally, this screenshot that we're

2  viewing, what is it a screenshot of, just broadly speaking?

3  **A.**  Sure.

4  **Q.**  The text on the page --

5  **A.**  Yeah.  The -- sorry.  Go ahead.  Sorry.

6  **Q.**  No.  Go ahead.

7  **A.**  I was going to say, the HTPPS gateways at the bottom,

8  Gateway 1 and Gateway 2 for atenblackgoldcoin.org/API, those

9  are gateway servers for making the connection between,

10  you know, the actual wallet functions to that of the

11  third-party verification service, ID verification service.

12  **Q.**  So I guess, what would the function of these gateways be

13  when a user is using their wallet or using the Aten Coin

14  blockchain?

15  **A.**  Yeah.  You would need to be able to connect to them.  So

16  this allows that communication of information between the

17  wallet application and the gateway servers, and, you know, the

18  Aten Coin gateway, as is mentioned before.  So communication

19  between the two.  This is essentially the connection, the road

20  to get from one point to the other.

21  **Q.**  Did you observe evidence of blockchain integration for the

22  Aten Coin?

23  **A.**  Yes, I did.

24       **MR. STEFAN:**  Could we advance to the next slide,

25  Slide 13.

**MIN - DIRECT / STEFAN**

1    **Q.**    What is depicted here?  What does this inform you of?

2    **A.**    Yeah.  This is code, source code from the Aten Black Gold

3    Coin multisig repository reviewed.  These are, you know, C++

4    files indicating the aspect of an RPC call, which is a remote

5    procedure call.  That is for the purpose of making those

6    connections to the blockchain for transmitting information back

7    and forth.

8    **Q.**    Would this indicate to you that there was blockchain

9    integration?

10    **A.**    Yes.

11    **Q.**    Did you also -- I believe you spoke to it.  Did you

12    observe evidence that Aten Coin was utilizing third-party

13    ID verification services?

14    **A.**    Yes.

15    **Q.**    What was --

16        **MR. STEFAN:**  You know, let's advance to Slide 14,

17    actually.

18    **Q.**    What was the evidence that you saw of the integration of

19    third-party ID verification services?

20    **A.**    Yeah.  As you'll see on line 21, the miicard_verification.

21    That's M-i-i Card, underscore, verification.  Yeah.  Within

22    there, you see the aggregation of the account holder's first

23    name, last name, which is then communicated to the Mii Card

24    third-party tool to perform that ID check.

25        And then go to the next slide.

1    **Q.**    Yeah, we can go to the next slide.

2    **A.**    And of which you'll see in line 36 "data_image Base

3    Code 64" -- "Base64.encode."  That would be an indication of a

4    selfie.  Base64 would be an image, as notated, data_image.

5    **Q.**    What did you understand Mii Card to be?

6    **A.**    An ID verification service.

7    **Q.**    Is this a third-party service?

8    **A.**    Yes, sir.

9    **Q.**    And what was your understanding of how that interacted

10    with the Aten Coin wallets and blockchain?

11    **A.**    So through those HTTP gateways, Mii Card would communicate

12    with the Aten Coin gateway to transmit that information back

13    and forth.  So you would take a selfie.  You would validate --

14    that image would be validated against the information that

15    Mii Card is holding to confirm the identity, which then it

16    would return, you know, the approval, you know, the yes

17    function to -- to advance that aspect to confirm the identity.

18         **MR. STEFAN:**  Let's advance to Slide 15.  Or, pardon

19    me.  We are at Slide 15.  That's fine.

20    **Q.**    Okay.  So just overall, with respect to Aten Coin, based

21    on your review, did it appear to have been a working product in

22    the 2014-2015 time frame?

23    **A.**    Yes.

24    **Q.**    And was it integrated with the blockchain?

25    **A.**    Yes.

1    **Q.**    Did it have a multisignature wallet?

2    **A.**    Yes.

3    **Q.**    And did it appear to include ID verification of users?

4    **A.**    Yes, it did.

5    **Q.**    And so I want to turn now to the AML BitCoin and

6    CrossVerify products.

7        Did you perform a review of source code related to those

8    products as well?

9    **A.**    Yes, I did.

10    **Q.**    Generally, what was the AML BitCoin product intended to

11    be?

12    **A.**    Yeah.  AML BitCoin was intended to be a product for a

13    cryptocurrency that would leverage a wallet that would perform

14    an ID verification process, you know, utilizing biometric

15    functions to validate the identity of the user is who should be

16    in control of that wallet.

17    **Q.**    With respect to the AML BitCoin, what was the relationship

18    between that and a software called CrossVerify?

19    **A.**    Yeah.  CrossFire -- CrossVerify was the actual application

20    that would perform that ID verification and biometric function.

21    **Q.**    Who, to your understanding, was responsible for the

22    development of the CrossVerify technology or the administration

23    of its development?

24    **A.**    Yeah.  The Aten Coin team.

25          **MR. CHOU:**  Objection.  Hearsay.  Foundation.

1    **THE COURT:**  Overruled.

2    **BY MR. STEFAN:**

3    **Q.**   Pardon?

4    **A.**   The Aten Coin development team.

5        Sorry.  Apologies.  AML Bitcoin development team.

6        We shifted gears now.  Excuse me.  Apologies.

7    **Q.**   That's okay.

8        So I want to focus your testimony on the CrossVerify

9    product.  What was the intended purpose of CrossVerify?

10   **A.**   To validate the user's identity.

11   **Q.**   And what evidence did you review for your analysis of the

12   CrossVerify product?

13   **A.**   Yeah.  Various source code files, database entries, the --

14   the aspects that you would see that were available, were relied

15   upon to understand the components and how they functioned,

16   you know, for the purposes of the AML BitCoin Wallet.

17   **Q.**   And just specifically, where did those sources come from?

18   **A.**   The Bitbucket Git repositories provided for review.

19   **Q.**   And I believe you previously described what a Bitbucket

20   repository is; right?

21   **A.**   Yes.  It's a Git repository.

22   **Q.**   How many repositories from the Bitbucket did you rely upon

23   for CrossVerify?

24   **A.**   I believe it was three.

25   **Q.**   And that's out of a total of how many repositories that

1    existed?

2    **A.**    Over 50.  I think it was 58.

3    **Q.**    So I want to talk about that briefly.

4        Was the CrossVerify portion of your review just a part of

5    the total sum of evidence that you reviewed?

6    **A.**    Yes.  There was quite a bit to review across all the

7    repositories.

8    **Q.**    About how much data was in the total Bitbucket repository

9    that you reviewed?

10   **A.**    Nearly 16 1/2 million lines of code.

11   **Q.**    Apart from the 16 1/2 million lines of code for the

12   Bitbucket repositories, was there other information associated

13   with AML BitCoin and CrossVerify that was available for your

14   review?

15   **A.**    I'm sorry.  Repeat the question.

16   **Q.**    Apart from the Bitbucket repository, were there other

17   sources of potential evidence for Cross- -- CrossVerify and

18   AML BitCoin products?

19   **A.**    Yes, there was.

20   **Q.**    What are you referring to?

21   **A.**    AWS, Amazon Web Services.

22   **Q.**    Were you able to review all of the material on AWS?

23   **A.**    No, I was not.

24   **Q.**    Why is that?

25   **A.**    Yeah.  Once -- it was a process to gain access to the

1  accounts.  In discussions with the defendant, Mr. Andrade, we

2  attempted to gain access to it.

3  **Q.**  I'm sorry.  I don't want to get too deep into discussions

4  you may have had with Mr. Andrade.

5      Just generally, were you unable to use the server keys to

6  open the accounts?

7  **A.**  No, I could not.

8  **Q.**  Was your understanding, with respect to that, that the

9  subscription had expired for the accounts?

10  **A.**  That's correct.

11  **Q.**  And did you speak with any developers regarding the

12  AML BitCoin and CrossVerify products?

13  **A.**  Yeah.  The same meeting with Terence Poon and Sergey

14  Petkevich.

15  **Q.**  Was that a basis for reaching of your conclusions today?

16  **A.**  No, it was not.

17  **Q.**  Same reasons you provided before?  Just a short,

18  high-level conversation?

19  **A.**  Yes, that's correct.

20      Excuse me.

21  **Q.**  How did you get the access to the Bitbucket repository

22  that you used to analyze the CrossVerify evidence?

23  **A.**  Yes.  Through working with the King & Spalding team,

24  Mr. Andrade provided his credentials to the Bitbucket accounts,

25  of which were shared with me, which gave me access to review

1  the account.

2  **Q.**   Did provision by Mr. Andrade of the access to the account

3  cause you any sort of concerns about the veracity of the

4  material in that account?

5  **A.**   No, it did not.

6  **Q.**   Why wouldn't it cause you any concerns?

7  **A.**   Because it's a Bitbucket, you know, Git repository.  Its

8  purpose is to track changes to the repository.  If changes were

9  made, the account would notate that.

10 **Q.**   Would this make it quite difficult to change any files in

11 the account without creating an entry that would alert you --

12 **A.**   That's correct.

13 **Q.**   -- to that fact?

14 **A.**   Yeah.

15 **Q.**   Is it fair to say that the Bitbucket repositories cannot

16 be easily manipulated?

17 **A.**   Yes, that's correct.

18 **Q.**   And are the Bitbucket repositories that you reviewed in

19 this case of a type that are commonly relied upon in analysis

20 of experts in a similar position to you?

21 **A.**   Yes.

22 **Q.**   I want to talk about what was in the Git -- Bitbucket

23 repositories for CrossVerify.

24      What did you review in those repositories with respect to

25 the CrossVerify product?

 1    **A.**    Yeah.  The code that was associated with the CrossVerify

 2    product, associated documentation and logging, more

 3    importantly, some of the databases associated with the

 4    CrossVerify application specifically.  Yeah, that's -- that's

 5    essentially in a nutshell what it was, yeah.  Apologies.

 6    **Q.**    That's all right.

 7          How would you characterize the quality of the source code

 8    that you reviewed for the CrossVerify product?

 9    **A.**    Loosely documented; no real, you know, architecture

10    detailed; no clear instruction, as previously, you know,

11    articulated within the Aten Coin project, for instance.

12    Essentially, just, you know, the aspects of the code and no

13    real clear map of how to get from Point A to Point B.

14    **Q.**    Did this pose difficulty for you in your -- in your

15    analysis?

16    **A.**    It did.

17    **Q.**    What did this speak to you regarding the overall

18    management of the development for CrossVerify?

19    **A.**    I'd say that it was poorly managed, you know; no real, you

20    know, control in various aspects of the code; not very clearly

21    articulated for purposes of guidance to the development team.

22    **Q.**    Did you observe involvement of different development teams

23    on the product over the course of different time periods?

24    **A.**    Yes, I did.  At least two.

25    **Q.**    What is your understanding of how that can affect the

1    development of a code?

2    **A.**    Yeah.  It's just with any given team, if you pick up a

3    project, you're working with existing code; you're making that

4    your own; you're making your own changes as you see fit.  And

5    as you change to an additional team, it's the same situation.

6    **Q.**    Are you familiar with the NuGen company or team?

7    **A.**    Yes.

8    **Q.**    And with the -- another team, the DTN or London team with

9    respect to this --

10    **A.**    Yes.

11    **Q.**    -- development?

12    Did it appear to you that there were issues in the

13    interactions between those two teams with respect to the

14    development?

15    **A.**    Yes, there was.

16    **Q.**    I want to talk about what you saw in the Bitbucket

17    repository and, specifically, any limitations that you had in

18    reviewing those materials.

19    What limitations, if any, did you encounter?

20    **A.**    Yes.  The -- in review of the Bitbucket repository for

21    Git, the commit history began in the end of 2018.  In review of

22    the commits and the lines of code that were committed, it's

23    clear that there was an abundant amount of work that had

24    occurred at that point.

25    Well, prior to that point, as having that much code and

1    that much development, you know, to continue at the tail end of

2    2018 into 2019, it would be indicative of a considerable amount

3    of work performed prior to that that you would have expected to

4    see within the Git repository which was not available, which

5    would lead me to believe that there would have been an

6    additional Git repository containing code that was being

7    managed by that separate -- that separate Git repository.

8    Q.    Okay.  I want to kind of go back over just a little bit

9    what you just said.

10        You mentioned the commits; right?

11   A.    Yes.

12   Q.    And just to reiterate, the commits are people making

13   changes or adding code to the repository, and that gets

14   recorded; is that right?

15   A.    Yes, the development team.

16   Q.    So with respect to the Bitbucket repository, what's the

17   first commit that you observed in the repositories?

18   A.    One that occurred in 2018.

19   Q.    And do you recall the month?

20   A.    It was in November.

21   Q.    You're indicating you believe that there was actually

22   development reflected in those commits that was performed prior

23   to that date; right?

24   A.    Yes.

25   Q.    And so with respect to those initial commits that were

1    made in November, say, or December, what is it about those

2    commits that indicate to you that there was development prior

3    to those commitment points?

4    **A.**    Yeah.    Just the abundant volume of data within the lines

5    of code that were committed thereafter would imply that you had

6    additional components of that Git repository.    There's

7    databases, you know, specifically, you know, that reference

8    information and testing that occurred as early as 2017.

9        So with that, I mean, you can safely form a conclusion

10   that, you know, there would have had to have been some sort of

11   development process in place to record that activity and those

12   changes.    So seeing, you know, these various observed

13   timestamps throughout the code files themselves, along with

14   those database entries, you would expect to have seen

15   additional work that just wasn't there.

16   **Q.**    And I believe you stated that with respect to that, this

17   told you something about the existence of a prior GitHub or

18   Bitbucket or some other repository.

19       Can you just rearticulate what it was that indicated to

20   you that some prior repository had existed?

21   **A.**    The volume.    Yeah, the volume of code.    The -- you would

22   have expected -- if this was a brand-new project, you would

23   expect to see a gradual increase in the amount of commits in

24   the line -- in the aspects of how much code was committed to

25   the repository.    It just wasn't seen here.

1          It was very much a hard -- a whole lot of commit -- a

2     whole lot of data all of a sudden, which does not support,

3     you know, the current standings of that being the only

4     repository.

5     **Q.**    When you say "a whole lot of data all of a sudden," can

6     you quantify that?

7     **A.**    I think the first month or so was easy.  You know, a

8     million commits -- excuse me -- a million lines of commits --

9     apologies -- a million lines of code changes across, I believe

10    it was, ten commits between November and December.

11    **Q.**    Would that be an abnormal number of code changes, given

12    the number of commits and the time period?

13    **A.**    Yes.

14    **Q.**    Apart from that, you had mentioned indication within the

15    data itself that the development had been occurring prior to

16    the commitment point in November of 2018.  What was it in the

17    data that indicated that to you?

18    **A.**    Predominantly, a database associated with the CrossVerify

19    application.  There's two, essentially, that were heavy within,

20    you know, the actual line items of data where a recorded

21    timestamp was as early as April of 2017.

22    **Q.**    About how many timestamps did you observe that were

23    prior -- that were prior to November of 2018?

24    **A.**    Yeah.  It was over 4,000 -- 40,000.

25    **Q.**    40,000?

1  **A.**  40,000, yes, correct.  Over 40,000 line items, you know,

2  within those databases.

3  **Q.**  Based on those entries, were you able to kind of come up

4  with an understanding of the timeline of the development of the

5  CrossVerify project between 2017 and 2018?

6  **A.**  Yes.  With the database timestamps being a great indicator

7  to testing of the application and its functionality, you also

8  had numerous observed timestamps within the source code itself.

9  You know, as noted before, as you see with code, you have the

10  ability to drop notes for yourself.  Developers on the project

11  would regularly send a note or provide a note within the code

12  indicating what they were doing and the time frame that they

13  had done it.

14  **Q.**  Was there evidence within the code that you reviewed that

15  the CrossVerify product had gone through testing?

16  **A.**  Yes.

17  **Q.**  What was it that indicated that to you?

18  **A.**  Yeah.  The same database, you know, showed a considerable

19  amount of testing specific to the biometric function for

20  CrossVerify, which leveraged the biometric functionality of a

21  facial recognition score as well as an iris recognition score.

22  **Q.**  I want to talk about some of the specific timestamps that

23  you observed within the evidence that informed your opinion.

24       **MR. STEFAN:**  Can we advance to the next slide.

25  **Q.**  What is it that's depicted here?

1   **A.**   Yeah.  These are various code files found within the

2   AML BitCoin Bitbucket repository reflecting observed time -- it

3   that shows the observed timestamp that was seen, some of these

4   being programmatic functions created by the applications that

5   were developing the software -- I'm sorry -- developing the

6   code.

7   **Q.**   I'm sorry.  I'm just going to pause you for one second.

8   **A.**   Sure.

9   **Q.**   What's a programmatic function?

10  **A.**   Yeah.  So through the software development, you know,

11  application, you would have something that occurred.  You know,

12  you'd do a change.  You'd do something that ultimately triggers

13  the software to generate a timestamp.

14  **Q.**   In other words, these would be automated timestamps within

15  the source code that you --

16  **A.**   Yes.

17  **Q.**   -- reviewed?

18      I apologize.  I interrupted you.

19      So these timestamps would be programmatic, you indicated?

20  **A.**   Yes.

21  **Q.**   What did this -- what did these timestamps tell you about

22  the development of the technology in this time frame?

23  **A.**   Yeah.  The timestamps reflect that, you know, the

24  development team was busy and active across the project.  You

25  have timestamps that are reflecting, I believe, as early as --

1  I believe it was April of twenty- -- sorry -- yeah, April of

2  2017, carrying through, I believe, May of 2018.

3      So a considerable amount of time, well over, you know, a

4  year essentially, of development activity had occurred just by

5  looking at these files alone.

6      **MR. STEFAN:**  Can we move to the next slide, Slide 18.

7  **Q.**   What did these images -- or what did these portions of the

8  source code tell you about the development of the project?

9  **A.**   Yeah.  These are specific to the CrossVerify demo

10  repository within the Bitbucket Git repositories.  These are

11  notes from the development team adding aspects of what they

12  were doing, what they wanted to communicate as far as record

13  within the code files themselves.

14      As you can see, we have activity as early as March of

15  2017.  We have aspects, you know, as late as April of 2018 in

16  this case at the bottom here.

17      **MR. STEFAN:**  Can we advance to the next slide.

18  **Q.**   And what does this chart indicate to you?

19  **A.**   Yeah.  As noted in the top, you see [as read]:

20          "Crossverify-demo/CrossVerifyControllerDB.sql."

21      This is a SQL database of which records activity,

22  you know, being conducted by the application.

23      With regard to this table, this is a -- the users table

24  within that database.  And what we have here are counts of when

25  users were created within that database.  If you look at the

1    time period, you've got roughly 30-ish or so entries in May of

2    2017, then a large spike in June of 2017, which would indicate

3    that that's likely a significant amount of testing.

4         So the development team is reviewing the aspects of what

5    the application is doing, how it's recording information in

6    these databases, all of which is important to the overall

7    process.  You need to, you know, take it for a test drive.  And

8    that's what the June timestamp there is indicating, is a high

9    volume.  Nearly 10,000 entries were recorded in that table for

10   users being created within the table itself.  Continued process

11   of testing, you know, more at a -- probably likely a more

12   average pace throughout July of 2017 to May of 2018.

13        **MR. STEFAN:**  I should have done this earlier.  Can we

14   zoom in on the CrossVerify --

15   **Q.**   Well, actually, I'll just draw your attention to up there

16   in the top left corner [as read]:

17            "Crossverify-demo/CrossVerifyControllerDB.sql."

18        What is being shown here in each of these slides?

19   **A.**   Yeah, the CrossVerify demo is reflective of the Bitbucket

20   repository itself for that aspect of the repo- -- the

21   repository.  Excuse me.  And the database is the underlying

22   database file that stores this information that's depicted in

23   the visual.

24   **Q.**   So essentially, this is a file path, right --

25   **A.**   Correct.

1    **Q.**    -- that is shown?

2    **A.**    Yes.

3    **Q.**    Okay.  So material that you accessed within the source

4    code, this is the path for that material?

5    **A.**    Yes, sir.

6          **MR. STEFAN:**  We can advance to the next slide.

7    **Q.**    Is this essentially more information indicating further

8    testing that you were referring to?

9    **A.**    Yes.  Yes.  Here we have, you know, the company

10   invitations table, as you can see in the very top.  That is the

11   table within the database in the next line [as read]:

12          "crossverify-demo/CrossVerifyDB.sql."

13   Again, these are counts of company invitations, so sending

14   out invitations to join the project, join the wallet and

15   configure an account through the AML BitCoin, you know,

16   verification process.  So these are reflective of those

17   invitations.

18   And as you can see, we have a fair amount of activity and

19   testing in April; you know, a considerable amount in June of

20   2017, well over 5,000 or so; and continued testing throughout

21   the year into May of 2018.

22   **Q.**    In the course of your review, did you observe evidence

23   that the CrossVerify product was integrated with the

24   blockchain?

25   **A.**    Yes, I did.

1    **MR. STEFAN:** Can we advance to the next slide, please.

2  **Q.** What is it that this source code excerpt shows you about

3  blockchain integration?

4  **A.** Yeah. Here you have, you know, a configuration for

5  blockchain notes for, you know, what's called a database dump

6  of data from a database, the results of that database, and

7  what's found to the blockchain for purposes of recording that

8  information to the blockchain.

9    So what you have here on the left, as you can see --

10  actually, it's probably better to call out where it says

11  [as read]:

12        "COPY public.blockchain_nodes."

13    That, there, is indicating what we have here.

14    And then the next section of "(id, ip, port)" would be the

15  underlying fields that are relevant within this entry.

16    And what we have are the IDs on the lower entry where 13,

17  14, 15, 16, 17 would be those IDs; and then these numbers here

18  to the right of those respective numbers are the IP addresses

19  for the blockchain nodes themselves.

20    **MR. STEFAN:** Your Honor, may I have a brief moment?

21    **THE COURT:** You may.

22            (Pause in proceedings.)

23    **MR. STEFAN:** Okay. We can advance to the next slide,

24  please.

25  **Q.** And what is it that's relayed to you in this demonstrative

1   about the verification logs?

2   **A.**   Yes.  So the name here is highlighted in orange.  You have

3   "verification_logs."  That would be the underlying table within

4   the database.  And this is the creation of that table.

5       So what you have for the table "verification_logs" would

6   be the fields.  You know, think about an Excel file in a way.

7   The various fields and columns that you have within that Excel,

8   which in this case is a database, you have the ID; a user ID

9   that's specific to, you know, the individual user being

10  onboarded; the face score for the facial recognition process;

11  the iris score for the iris recognition process; the results of

12  those tests; and the underlying metadata for, you know, those

13  scores and when they were recorded to the database.

14  **Q.**   Was this evidence to you that the CrossVerify product was

15  working on integration of biometric verification with

16  blockchain?

17  **A.**   Yes, it does.

18       **MR. STEFAN:**  Can we please advance to the next slide.

19  **Q.**   What does this slide depict?

20  **A.**   The results of that same database schema being configured

21  and set up, of which you can see -- I like to call out for

22  where it says "COPY public.verification_logs," for that table,

23  and to the right of that you have the relevant fields.

24       It's a little bit difficult to read.  It's not as clean as

25  a nice Excel file.  But you have ID, again user ID, face score,

1    iris score, result, created at, and updated at, so the same

2    fields discussed in the prior.

3        In the creation of the table, we have the underlying data

4    for that table, what appears to be a significant amount of

5    testing of the application of where you can see within the data

6    itself are lines 1 through 19.  In the example here in the

7    demonstrative, you have, in the first line -- actually, let's

8    go to one that actually shows some -- line 10.

9        So line 10 has user -- ID is 10; user ID, a value of 142.

10   So, say, John Doe is associated with user ID 142.  Then you

11   have that user ID's -- that user, John Doe, in this example's

12   face score, after performing the facial recognition aspect

13   through the CrossVerify platform.  That score will be -- result

14   here.  Then you have the same with the iris score and the

15   results.

16       So in this case, we have the face score with the values,

17   and then, essentially, we don't have one for the iris score in

18   this case, but we do have a value of success listed as a

19   successful authentication of the biometric data.

20       The resulting timestamps would indicate when the file

21   was -- sorry -- the entry was created and updated, which,

22   you know, by looking at the metadata timestamps, they are the

23   same time.  So that would be the first entry.

24       **MR. STEFAN:**  Your Honor, I'm informed that we could

25   use a break at this time if that would be acceptable to

**MIN - DIRECT / STEFAN**

 1  the Court.

 2      **THE COURT:**  Okay.  Members of the jury, we'll take our

 3  morning break.  Remember my admonitions.  Do not discuss this

 4  amongst yourselves or with anyone else.

 5      And we'll come back in 15 minutes.

 6              (Recess taken at 10:01 a.m.)

 7           (Proceedings resumed at 10:23 a.m.)

 8      (Proceedings were heard in the presence of the jury.)

 9      **THE COURT:**  The jury is present.

10  You may proceed.

11      **MR. STEFAN:**  Thank you, Your Honor.

12  **Q.**  Okay.  Mr. Min, when we left off, you were explaining this

13  verification log to the jury.

14      Does this -- what does this verification log tell you

15  about the -- what work CrossVerify was doing in the field of

16  biometric identification and integration with the blockchain?

17  **A.**  Yeah.  The tabled schema reflects the face score and the

18  iris score field, of which in the database you have results of

19  that scoring evident.

20      You know, as I mentioned with line 10, you do have a

21  facial score for the purposes of testing, presumably, of which

22  that entry was created in April of -- April 27th of 2017,

23  1500 hours, and the net modified time is the exact same

24  timestamp.  So that would indicate it's the first entry for

25  that user.

1   Q.   Did you observe evidence that CrossVerify had the ability

2   to also collect and store KYC data?

3   A.   Yes, that's correct.

4        MR. STEFAN:  Can we advance to the next slide, please.

5   Q.   What is depicted in this slide?

6   A.   Well, this slide would be, as you can see from the --

7   excuse me -- the file pathing up at the top, "c_2.0_android,"

8   that would be the actual Bitbucket repository -- Git repository

9   that this file was taken from.  As you can see, so that would

10  be specific to an Android mobile device application.

11       You know, with that, you have the different entries within

12  the view here.  This would be aspects of configuring an image,

13  which as you can see, "android:layout."  A little bit below you

14  see the face aspect for, you know, the configuration of that

15  view of -- of the facial aspect of taking that picture.

16       And the record here indicates that that occurred in

17  March -- March 7th of 2018 at 16:33 hours.

18  Q.   Would this indicate to you that there was work on the

19  Android application for the CrossVerify software in March of

20  2018?

21  A.   Yes, it would.

22       MR. STEFAN:  And we can pause display of the

23  demonstrative for the moment.

24  Q.   Mr. Min, what do all these 2017 to 2018 timestamps tell

25  you about what information was missing from the Bitbucket

1    repository that you got for AML BitCoin and CrossVerify?

2    **A.**    I'm sorry.  Rephrase the question.

3    **Q.**    What do all these timestamps within the database tell you

4    about what may have been missing from the Bitbucket repository

5    that you received?

6    **A.**    Yes.  The database entries reflect a considerable amount

7    of testing of the application and recording of those entries

8    within the database.

9         With that, you would have expected to see the correlating

10   aspects of developing the code.  For instance, in line 10 where

11   we have a facial recognition portion, you don't have the iris

12   score; yet you get a success.

13        So the development process would be inherently to fix this

14   bug, of which you would make a change.  So you would have

15   expected to see a change around April of 2017, around the time

16   period of that entry being created to fix that issue.

17   All right?

18        And that would have been recorded within the

19   Git repository, and it would have had a commit.  There would

20   have been a clear edit to the code that would have been visible

21   within the Git repository reflecting, you know, who performed

22   that change, when it was performed, and exactly what was

23   changed in that line of code.

24   **Q.**    So do you expect on that basis, then, for there to have

25   been at some point a GitHub or Bitbucket or some other

1  repository that contained this information we're referring to

2  from 2017 to 2018?

3  **A.**    Yes, sir.

4  **Q.**    Was any such GitHub or Bitbucket available to you for

5  review?

6  **A.**    No, sir.

7  **Q.**    Overall, based on your review of the CrossVerify material,

8  do you have an opinion regarding whether it would have been

9  possible to integrate the CrossVerify technology you observed

10  with a preexisting cryptocurrency source code?

11  **A.**    Yes.

12  **Q.**    What is your opinion on that?

13  **A.**    Yeah.  The aspects of the code for CrossVerify indicate

14  that they had a working application or at least somewhat

15  functional, close to being, you know, complete in development.

16        You know, with that completion, in integration with the

17  wallet application itself, you would expect to see a

18  functioning application that has those components, you know,

19  combining the aspects of the CrossVerify aspect to validate a

20  user, you know.

21        And taking a step back, the wallet application, verifying

22  a user to authenticate to the platform, the wallet, that is, of

23  which, as I mentioned, the CrossVerify component to confirm

24  that biometric function for purposes of anti-money laundering

25  techniques to confirm that identity is whom it's intended to

1  be, of which then you would integrate with the blockchain,

2  you know, for the purposes of recording those transactions for

3  immutability across the decentralized ledger that is

4  blockchain.

5  **Q.**  Do you have an estimation or could you provide an

6  estimation of how much time you think it would take for a

7  development team with the adequate resources to integrate the

8  CrossVerify technology you observed in the source code with a

9  preexisting cryptocurrency?

10     **MR. CHOU:**  Objection.  Vague, time period, from which

11  point counsel is referring to.

12     **THE COURT:**  Can you clarify your question.

13  **BY MR. STEFAN:**

14  **Q.**  With respect to the CrossVerify technology, did you

15  generally form an opinion about the status of its completion,

16  given the total source code that you reviewed?

17     **MR. CHOU:**  Objection.  Prior court order on this

18  issue.

19     **MR. STEFAN:**  I'm -- Your Honor, I'm referring

20  specifically to the CrossVerify technology.

21     **THE COURT:**  I understand.

22     You can testify as to what state it was, what the

23  technology was.

24     We're talking about twenty- -- what period of time?

25     **MR. STEFAN:**  2017 to 2018.

 1              THE COURT:  2017 to 2018.

 2              THE WITNESS:  Yes, sir.

 3         In my opinion, you know, within six to eight months, with

 4    a qualified development team, you could take the CrossVerify --

 5              THE COURT:  It's not what you're expecting will

 6    happen.  It's what was the state of it at the time.  How

 7    complete was it?

 8              THE WITNESS:  Yes.  CrossVerify was near complete.

 9              THE COURT:  All right.

10    BY MR. STEFAN:

11    Q.   And given that, how -- what is an estimation of how long

12    it would take to integrate that technology with a preexisting

13    cryptocurrency?

14    A.   Yes.  To complete and integrate, six to eight months would

15    be an estimate.

16    Q.   And overall, what's your opinion regarding the progress of

17    work on the CrossVerify product between 2017 and 2018?

18    A.   I'm sorry.  Would you mind rephrasing the question?

19    Q.   How would you characterize the development progress on the

20    CrossVerify technology between 2017 and 2018?

21    A.   Consistent.  You see, you know, active testing.  You see,

22    you know, code to support the application and its overall

23    integration at some point to the overall application of

24    AML BitCoin Wallet.

25    Q.   Did the developers writing the code appear to know what

1    they were doing?

2    **A.**    They did, yeah.  The code is sufficient.  It's a sound

3    piece of code.  It looks to be something that would work with

4    the right amount of work and effort.

5    **Q.**    You spoke earlier about issues with management and the

6    project.  Do you distinguish between those issues and the

7    actual quality of the source code that you reviewed?

8    **A.**    Not terribly so.  I mean, it's a situation, I think, of,

9    you know, you have these varying capacities of different teams

10   working on this.  You know, it obviously is going to contribute

11   to the effectiveness of the overall project and the success.

12        You know, the code is there.  It's not very clear, though,

13   as far as the documentation, the overall architecture and how

14   everything is supposed to work.  So it's -- it's a bit vague as

15   far as how sound the code is; but it does appear that with that

16   amount of work, as I mentioned, roughly six to eight months,

17   that it would be an effective product that could be easily

18   integrated.

19            **MR. STEFAN:**  Your Honor, may I have a moment?

20            **THE COURT:**  Yes.

21                    (Pause in proceedings.)

22            **MR. STEFAN:**  Thank you, Mr. Min.  I don't have any

23   further questions.

24            **THE COURT:**  Mr. Chou?

25            **MR. CHOU:**  Your Honor, just as the defense had a break

1    to meet with their rebuttal witness as to Theresa Chiu, we

2    would ask -- the Government would ask for a short break to meet

3    with its rebuttal witness.

4         **THE COURT:**  Okay.  Well, we just had a break, but

5    we'll -- how long are you requesting?

6         **MR. CHOU:**  Would 15 minutes be fair, Your Honor?

7         **THE COURT:**  Okay.  We're going to do a double 15, but

8    then we're going to hang in there for the rest of it.

9         So remember my admonitions not to discuss this amongst

10   yourselves or with anyone else.

11        And I'll see you in 15 minutes.

12                    (Recess taken at 10:35 a.m.)

13                 (Proceedings resumed at 10:54 a.m.)

14        (Proceedings were heard in the presence of the jury.)

15        **THE COURT:**  The jury is present.

16        Mr. Chou, cross-examination.

17                    **CROSS-EXAMINATION**

18   **BY MR. CHOU:**

19   **Q.**   Good morning, Mr. Min.

20   **A.**   Good morning.

21   **Q.**   I want to start with something that the defense didn't

22   elicit from you on direct examination.

23        You're not testifying here for free; correct?

24   **A.**   No, I'm not.

25   **Q.**   And you bill hundreds of dollars an hour for your work in

1  this case; correct?

2  **A.**   I do.

3  **Q.**   Billing about $250 an hour?

4  **A.**   That is correct.

5  **Q.**   And that $250 an hour included the time you spent

6  analyzing the source code?

7  **A.**   Yes.

8  **Q.**   Travel?

9  **A.**   No.

10  **Q.**   Travel's reimbursed?

11  **A.**   It is.

12  **Q.**   What about rehearsing your testimony?  Is that billable?

13  **A.**   Yes.

14  **Q.**   Practicing for this cross-examination?

15  **A.**   Yes.

16  **Q.**   And testifying right now, is that part of your $250 an

17  hour rate?

18  **A.**   Yes.

19  **Q.**   So since this morning, you've billed about $750 to this

20  case?

21  **A.**   I have to check the time, but sounds about right.

22  **Q.**   Okay.  And so all together, how much have you personally

23  billed to this matter?

24  **A.**   I have to check the invoices.  I don't have those at hand.

25  I didn't do an analysis of the overall time spent to date on

**MIN - CROSS / CHOU**

1   the source code at this point.

2   **Q.**   You're not sure how much time you've spent analyzing the

3   code?

4   **A.**   I mean, as an estimate, around a hundred hours.

5   **Q.**   And that's you personally or FTI as a whole?

6   **A.**   As a team, yes, FTI as a whole.

7   **Q.**   FTI as a whole.

8        And how much do you think by the end of this case, just an

9   estimate, FTI as a whole will bill for this case?

10  **A.**   Without looking at it and performing an estimate off the

11  cuff, I'd say 120 hours.

12  **Q.**   Okay.  So let's just say if we call it a hundred hours at

13  $250 an hour, that's about $25,000, give or take?

14  **A.**   Sounds like a fair estimate.

15  **Q.**   And of those hours, personally, how much have you

16  personally billed to the case as opposed to your FTI

17  colleagues?

18  **A.**   Roughly 50 percent or so.  40 to 50 percent, I'd say.

19  **Q.**   Okay.  So you've put in about 45 hours, and your

20  colleagues who aren't here in the Court today put in about 55?

21  **A.**   That'd be accurate.

22  **Q.**   And is their rate also $250 an hour?

23  **A.**   Yes, they're listed at 250 an hour.

24  **Q.**   You work at a company called FTI Consulting; correct?

25  **A.**   Yes.

1    **Q.**    And they're a consulting firm?

2    **A.**    Yes.

3    **Q.**    They provide these sort of expert witness services to

4    people and companies who want to hire FTI; correct?

5    **A.**    Yes.  They hire us as experts.

6    **Q.**    And in this case, the defendant, through their law firm

7    King & Spalding, retained you; is that right?

8    **A.**    Yes.

9    **Q.**    And King & Spalding is a major international law firm.

10    Fair to say?

11    **A.**    Yes.

12    **Q.**    They're a major -- major client and source of revenue for

13    FTI Consulting; correct?

14    **A.**    Yes, they are.

15    **Q.**    And fair to say the relationship between FTI Consulting

16    and King & Spalding is important to King & Spalding -- or,

17    excuse me -- important to FTI Consulting?

18    **A.**    On behalf of FTI, yes.

19    **Q.**    Mr. Min, you have a LinkedIn profile; correct?

20    **A.**    I do.

21    **Q.**    And on that profile, you wrote that you enjoy playing

22    utility infielder and enjoy grabbing whatever glove is needed

23    to play and win; correct?

24    **A.**    Yes.

25    **Q.**    Let's talk about your qualifications.

**MIN - CROSS / CHOU**

1          Earlier you testified about a number of certifications and

2   your education.  Do you remember that?

3   **A.**   Yes.

4   **Q.**   Do you have any professional certifications in source code

5   review or software development?

6   **A.**   I do not.

7   **Q.**   No certifications in source code review or software

8   development?

9   **A.**   I mean, other than my Blockchain Council, blockchain

10  developer certification.

11  **Q.**   Right.  And let's talk about that.

12          So this is the certified blockchain developer

13  certification you mentioned?

14  **A.**   Yes.

15  **Q.**   And that required only 15 hours of training; correct?

16  **A.**   With the course training, specifically, roughly, two,

17  three days, I believe, and then additional study in preparation

18  for the examination.

19  **Q.**   Right.  It's a 15-hour course duration as advertised

20  online.  Is that fair to say?

21  **A.**   That sounds about right.

22  **Q.**   It's $299; right?

23  **A.**   Yes.

24  **Q.**   And it's a self-paced access mode course?

25  **A.**   Yes.

**MIN - CROSS / CHOU**

1  Q.   And what programming languages, if any, were discussed in

2  this 15-hour online course?

3  A.   Solidity, different aspects of Ethereum, programming

4  languages for blockchain development.

5  Q.   So Solidity?

6  A.   As primary, yes.

7  Q.   Any other languages?

8  A.   It touched on other aspects of C++, JSON-type aspects for

9  SQL, Visual Studio.  They're all reviewed at some level,

10  degree.

11  Q.   When you say "touched on" this in this 15-hour course, how

12  much time was spent on C++?

13  A.   I don't recall offhand.

14  Q.   Okay.  Did you -- did you write any lines of code in C++?

15  A.   I did not.

16  Q.   And Solidity, as you just testified, that's for an

17  entirely different cryptocurrency called Ethereum; correct?

18  A.   It is.

19  Q.   That's different from what Bitcoin core is written in;

20  correct?

21  A.   Correct.

22  Q.   That's written in C++; correct?

23  A.   Yes.

24  Q.   And then Ruby on Rails, or Ruby, did you ever work with

25  that?

**MIN - CROSS / CHOU**

1   **A.**   In what capacity?

2   **Q.**   With respect to the AML BitCoin and Aten Coin code here --

3   or, rather, to take a step back, in that 15-hour course, did

4   you study the programming language Ruby?

5   **A.**   I did not.

6   **Q.**   And that's, in fact, what much of the code in the

7   AML BitCoin and Aten Coin code base is written in; correct?

8   **A.**   For AML BitCoin, yes.

9   **Q.**   So is it your testimony, then, that your education in

10  software development and source code review is largely based on

11  a 15-hour online course?

12  **A.**   No.

13  **Q.**   Could you please elaborate?

14  **A.**   The volume of casework that I've performed over the

15  duration of my career provided on-the-job training through the

16  extensive amount of work performed in conducting those

17  investigations in support of various expert projects for

18  additional experts within my practice and firm.

19  **Q.**   Understood.

20       Let's talk about your educational background.  Okay?  So

21  you have a C.V. and a LinkedIn profile; correct?

22  **A.**   Yes.

23  **Q.**   And there you list a bachelor's degree you obtained from

24  Virginia Tech; correct?

25  **A.**   Yes.

**MIN - CROSS / CHOU**

1  Q.   And you earlier discussed it was a Bachelor's of Science;

2  right?

3  A.   Yes.

4  Q.   But today counsel didn't ask you what that degree was in;

5  correct?

6  A.   No.

7  Q.   And your LinkedIn profile doesn't state what the degree is

8  in; correct?

9  A.   I don't believe it does.

10  Q.   And your résumé that was provided to the Government as

11  part of your expert disclosures also doesn't say what you

12  studied; correct?

13  A.   I don't believe it does, no.

14  Q.   You studied psychology; correct?

15  A.   Psychology, sociology, criminology.

16  Q.   Okay.  Let's talk about your publications or

17  presentations.

18       Have you authored any publications in the past ten years?

19  A.   I have not.

20  Q.   And earlier counsel asked you about your prior trial

21  testimony.  Do you remember that?

22  A.   Yes.

23  Q.   Within the last four years, you've testified at trial

24  once?

25  A.   Yes.

MIN - CROSS / CHOU

1    Q.    And in the course of your entire career, that was your one

2    trial testimony?

3    A.    Yes.

4    Q.    That was a divorce case in the state of Indiana; right?

5    A.    Yes.

6    Q.    And you didn't testify to source code analysis in that

7    divorce case; correct?

8    A.    No, but there was the aspect of the Ethereum blockchain in

9    that specific case which involved a fork of the blockchain, and

10   reviewing that aspect of the fork and confirming the

11   disposition of assets was a key part of the testimony and

12   ultimate decision.

13   Q.    Right.  In that family law case, you did tracing.  You

14   tried to track where Ethereum went through the Ethereum

15   blockchain; correct?

16   A.    Yes.

17   Q.    And that's separate from analyzing source code for Bitcoin

18   and forks of Bitcoin; correct?

19   A.    Though there was an aspect of understanding a fork in the

20   Ethereum code.

21   Q.    Let's talk about deposition testimony.

22        Have you testified in a deposition at all in the last

23   four years?

24   A.    No.

25   Q.    Have you ever been deposed?

**MIN - CROSS / CHOU**

1   **A.**   Not deposed.

2   **Q.**   So fair to say this is your first time ever testifying

3   about source code review and analysis?

4   **A.**   To what capacity?  Can you elaborate?

5   **Q.**   Well, have you ever testified in court about source code

6   review and analysis?

7   **A.**   No.

8   **Q.**   And, Mr. Min, you wrote on your LinkedIn profile that you

9   are a battle-tested investigator and expert witness; correct?

10  **A.**   Yes.

11  **Q.**   Let's talk about your work history.

12      You've been a consultant your whole career, as listed on

13  your résumé; correct?

14  **A.**   Yes.

15  **Q.**   And fair to say that before you joined FTI Consulting,

16  your jobs were primarily focused on information security and

17  project management?

18  **A.**   No.

19  **Q.**   What am I missing there?

20  **A.**   Digital forensics, investigations, e-discovery support, as

21  well as cybersecurity, proactive on that end, as well, as far

22  as incident response as well.

23  **Q.**   Okay.  And you've never been employed as a software

24  developer; correct?

25  **A.**   Correct.

MIN - CROSS / CHOU

1    Q.    I want to talk about your expert disclosure, which you

2    approved and filed in this case.

3         The second sentence of that disclosure in the

4    qualifications section, you write over 20 -- that you have over

5    20 years of investigative and advisory experience across

6    cryptocurrency, blockchain technologies, intellectual property

7    theft, fraud, and other digital forensic-based work.

8         Did I get that -- get that right?

9    A.    Yes.

10   Q.    Mr. Min, would you say you have over 20 years of

11   experience in cryptocurrency work?

12   A.    No.

13   Q.    Over 20 years of experience in blockchain technologies?

14   A.    No.

15   Q.    And the qualifications you listed in your disclosure do

16   not include computer science; correct?

17   A.    That's correct.

18   Q.    Programming is not mentioned in that disclosure; correct?

19   A.    Correct.

20   Q.    And, Mr. Min, you've never published code on GitHub

21   before; correct?

22   A.    No.

23   Q.    Have you ever written working programs in the programming

24   language C++?

25   A.    No.

MIN - CROSS / CHOU

1  Q.  Have you ever written working programs in the programming

2  language Ruby?

3  A.  No.

4  Q.  Have you ever written any programming -- excuse me.

5      Have you ever written any computer program from scratch?

6  A.  No.  I'm not a developer.

7  Q.  And the code we're viewing today, those are written in C++

8  and Ruby; correct?

9  A.  Yes.

10 Q.  So your disclosure mentions, quote, "FTI's analysis"

11 several times; correct?

12 A.  Yes.

13 Q.  How many other people helped you on your analysis to which

14 you're testifying under oath today?

15 A.  Two.

16 Q.  But the jury won't hear from them; correct?

17 A.  Correct.

18 Q.  What portion of the analysis was conducted by you

19 personally?

20 A.  Review of the code with the team, individual analysis

21 myself, reviewing files, commits.

22 Q.  Let's talk about the code that you reviewed.

23     Mr. Min, how did you obtain the Bitbucket repositories and

24 other source code you reviewed in this case?

25 A.  Directly from Bitbucket, the Bitbucket account.

**MIN - CROSS / CHOU**

1  Q.   And that log-in information was provided to you by the

2  defense team?

3  A.   Correct.

4  Q.   And so in the course of your work for this case, did you

5  depend on the defense team to send you what to review?

6  A.   Yes.

7  Q.   And you reviewed what they and Mr. Andrade told you to

8  review; correct?

9  A.   Yes.

10 Q.   And they provided you with what Mr. Andrade claimed was

11 his source code; correct?

12        **MR. STEFAN:**  Objection.   Foundation.

13        **THE COURT:**  Overruled.

14 BY MR. CHOU:

15 Q.   And they provided you with what Mr. Andrade claimed was

16 his source code; correct?

17 A.   Yes.

18 Q.   When in time, when did the defense team first share with

19 you what Marcus Andrade claims is his source code?

20 A.   With regards to Bitbucket -- oh, God, this case has been

21 ongoing for quite some time.   I'd say that was in 2023, early

22 2023.

23 Q.   Early 2023?

24 A.   I think that's correct, yes.

25 Q.   And then you said that's with respect to Bitbucket.   Were

 1  there disclosures of other sets of data --

 2  **A.**    Yes.

 3  **Q.**    -- at a later date?

 4  **A.**    Yeah.  The Aten Coin.

 5  **Q.**    And when was that first disclosed to you?

 6  **A.**    I believe November of last year.

 7  **Q.**    So November of 2024?

 8  **A.**    Correct.

 9  **Q.**    Would it surprise you if the defense team never disclosed

10  that data to the Government until January 22nd, 2025?

11         **MR. STEFAN:**  Objection.  Relevance.

12         **THE COURT:**  What is the relevance of this witness

13  testifying to that?

14         **MR. CHOU:**  Well, Your Honor, it goes to the lack of

15  basis for his testimony, and also the defense explored this

16  same sort of topic in their cross-examination of --

17         **THE COURT:**  You can examine about the timing of when

18  the witness received things, but the question was would it

19  surprise him.  I think you need to rephrase that question.

20         **MR. CHOU:**  Understood, Your Honor.

21  **Q.**    So, Mr. Min, you just testified that you received the code

22  from the defense team either in early 2023 or November 2024.

23  Did I get that right?

24  **A.**    Yes.

25  **Q.**    Did you know that in June of 2019, the federal grand jury

MIN - CROSS / CHOU

```
 1   in this courthouse demanded that the NAC Foundation provide all
 2   records relating to AML BitCoin software development, including
 3   source code?
 4          MR. STEFAN:  Objection.  Relevance.
 5          THE COURT:  Overruled.
 6   BY MR. CHOU:
 7   Q.   I can ask the question again if --
 8   A.   Please.
 9   Q.   Did you know that in June of 2019, the federal grand jury
10   in this courthouse demanded that the NAC Foundation provide,
11   quote, "all records relating to AML BitCoin software
12   development," end quote, including source code?
13   A.   No.
14   Q.   You didn't know that?
15   A.   I did not.
16   Q.   But Marcus Andrade failed to provide any source code to
17   the grand jury; right?
18   A.   Unaware.
19          MR. STEFAN:  Objection.  Foundation.  Speculation.
20          THE COURT:  Overruled.
21          MR. STEFAN:  And --
22          THE COURT:  Overruled.
23   BY MR. CHOU:
24   Q.   But Marcus Andrade failed to provide any source code to
25   the grand jury; correct?
```

**MIN - CROSS / CHOU**

1   **A.**   Unaware of that.

2   **Q.**   You're not sure one way or another?

3   **A.**   I wouldn't know.

4   **Q.**   You just trusted what the defense team was giving you when

5   you were hired by them; correct?

6          **MR. STEFAN:**  Objection.  It's argumentative.

7          **THE COURT:**  Overruled.

8   **BY MR. CHOU:**

9   **Q.**   Sorry.  I'll ask the question.

10         You just relied on what the defense team gave you to

11  analyze; correct?

12  **A.**   The code that was provided was what I had to review.

13  **Q.**   Mr. Min, your analysis assumes that the source code you've

14  received is authentic; correct?

15  **A.**   Yes.

16  **Q.**   It assumes that -- and I'm sorry.

17         Before getting there, we had just talked about code you

18  received in 2023 and 2024.  That's several years after the FBI

19  executed search warrants on Mr. Andrade; correct?

20  **A.**   To my understanding, yes.

21  **Q.**   And so the source code you got, you relied on the defense;

22  correct?

23  **A.**   Yes.

24  **Q.**   And you're assuming that what Mr. Andrade is giving you

25  really was the source code at the time; correct?

MIN - CROSS / CHOU

1    **A.**    Yes.

2    **Q.**    And you're assuming that the code hasn't been edited

3    before it came to you; correct?

4    **A.**    Yes.

5    **Q.**    That there's been no changes to the plain text timestamps;

6    correct?

7    **A.**    Yes.

8    **Q.**    And that there hasn't been any new code added after the

9    fact before you saw it; correct?

10   **A.**    Yes.

11   **Q.**    And do you remember testifying on direct that in late

12   2018, you saw commits, quote, "a whole lot of data all of a

13   sudden"?

14   **A.**    Yes.

15   **Q.**    And was the date of that November 2018?

16   **A.**    Yes.

17   **Q.**    Are you --

18   **A.**    Or December.  December was when the first lines of code

19   were committed.

20   **Q.**    November or December --

21   **A.**    Majority, yeah.

22   **Q.**    -- 2018?

23   **A.**    Yeah.  That's where the large volume discussed was

24   committed, was in December.

25   **Q.**    And are you aware whether or not the FBI executed a search

1   warrant on Mr. Andrade's offices on September 13th, 2018?

2   **A.**   No.

3   **Q.**   And are you aware whether or not Melanie Cowan testified

4   that in October or November of that year, Mr. Andrade directed

5   her to start changing online media posts?

6   **A.**   Unaware.

7   **Q.**   So you don't know for certain that the source code you

8   reviewed is authentic; correct?

9   **A.**   To the basis of the project and the code, it appeared to

10  be authentic.  It was told to be authentic.  I had no reason to

11  believe that it was not authentic.

12  **Q.**   Sure.

13       So let's talk a bit about the source code.  But before we

14  do, just a couple of threshold sort of scene-setting questions.

15       Mr. Min, in all my questions today about the code, I want

16  to direct our attention to just what the code appeared to be on

17  or before October 2018.  Okay?

18  **A.**   Okay.

19  **Q.**   And I don't intend to ask you whether or not the code

20  worked sometime in the distant future, like 2020 or '21.  Okay?

21  **A.**   Okay.

22  **Q.**   So, Mr. Min, your disclosure says that you reviewed source

23  code from over 70 repositories and databases.  Is that

24  accurate?

25  **A.**   Yes.

MIN - CROSS / CHOU

1   Q.   And on direct, you testified to something called commit

2   history.  Did I get that right?

3   A.   Yes.

4   Q.   And could you just remind us what commit history is?

5   A.   Yes.  Commit history is associated with a Git application

6   for code management to commit lines of code that have been

7   changed and track those changes to the code, including,

8   you know, the developer that performed the code changes as well

9   as the timestamp they were performed.

10  Q.   So at a high level, commit history tracks when code is

11  edited; correct?

12  A.   Yes.

13  Q.   And it's -- is it machine generated, like a

14  machine-generated log?

15  A.   Yes.

16  Q.   In the format that you received them, most of those

17  repositories lack this commit history of changes; right?

18  A.   Yes.

19  Q.   And instead of machine-generated commit history, you

20  mostly received source code stored in text files; right?

21  A.   Can you elaborate to the specific repository we're

22  referring?  Because we have AML BitCoin and then we have

23  Aten Coin.  So I want to make sure I'm clear to what I'm

24  speaking to.

25  Q.   Sure.  Why don't we first discuss Aten Coin.

**MIN - CROSS / CHOU**

1          So instead of machine-generated commit history, what did

2     you receive there?

3     **A.**    Yeah.  The source code, you know, had the structure of a

4     Git repository, the same folder structuring, you know, the

5     aspects that you would expect to see from a Git export, though

6     in the Aten Coin case, we did not have the commit history

7     included with the deliverable.

8     **Q.**    So in the Aten Coin case, you did not have the commit

9     history.  What about for the AML BitCoin repositories?

10    **A.**    Those did have commit history.

11    **Q.**    How many of them had commit history?

12    **A.**    I don't recall offhand exactly how many of the --

13    **Q.**    Okay.

14    **A.**    -- 58 that actually had data.

15    **Q.**    Right.  They actually had data, but that's a separate

16    issue from whether there was a log of when changes were pushed

17    to the code; correct?

18    **A.**    I'm sorry.  Rephrase the question again.  Repeat the

19    question.  Excuse me.

20    **Q.**    Your testimony on cross, if I just heard it correctly, was

21    that 58 repositories had data in them; right?

22    **A.**    Yes.

23    **Q.**    But that's a different sort of thing than stating whether

24    or not there were -- there was commit history for those 58;

25    correct?

MIN - CROSS / CHOU

1   **A.**    Yes.

2   **Q.**    And so for the files that did not have commit history,

3   that was stored in, like, a text format.  Is that fair to say?

4   **A.**    What repository?

5   **Q.**    Let's just set aside the ones that had commit history.

6   Let's just talk about the ones that didn't.

7   **A.**    So Aten Coin, just to clarify?

8   **Q.**    Sure.

9   **A.**    Okay.  So --

10  **Q.**    And also, as I understand it, some AML BitCoin ones too;

11  correct?

12  **A.**    Now that I know you're speaking to both, if you don't mind

13  asking -- rephrasing the question or repeat the question,

14  please.

15  **Q.**    Is it your testimony here today, Mr. Min, that every

16  single AML BitCoin repository had commit history?

17  **A.**    No.

18  **Q.**    Okay.  So I am just asking you, just to get us on the same

19  page, about repositories across Aten Coin and AML BitCoin that

20  didn't have commit history.  Are we on the same page?

21  **A.**    Yes.

22  **Q.**    So for those, those are stored in what's essentially a

23  text file; correct?

24  **A.**    Documentation within the folder structure, text files,

25  source code files.  There's an assortment of different types of

1  documentation that are stored within either a Git repository or

2  an export of the code from a Git repository.

3  **Q.**   And when we're talking about source code, that's

4  ordinarily written in a plain text format; right?

5  **A.**   Yes.

6  **Q.**   And anyone can easily edit a text file; right?

7  **A.**   A text file, yes.

8  **Q.**   They can change the dates in that text file?

9  **A.**   Yes.

10 **Q.**   They can input whatever they want into that text file?

11 **A.**   Theoretically, yes.

12 **Q.**   Let's talk about the volume of code that you and the FTI

13 team reviewed.

14      Mr. Min, in your disclosure, you state that nearly

15 16.5 million lines of code were committed and used for

16 development in the remaining AML BitCoin repositories; is that

17 correct?

18 **A.**   Yes.

19 **Q.**   You know, 16.5 million lines of code sounds like a lot.

20 How did you arrive at that number?

21 **A.**   Through the actual commits for those codes and what was

22 actually committed.

23 **Q.**   And is it your opinion, Mr. Min, that the developers of

24 AML BitCoin created those nearly 16.5 million lines of code

25 themselves?

**MIN - CROSS / CHOU**

1    **A.**    They committed them, yes.

2    **Q.**    Okay.  They committed them, but I just want to be precise

3    here about our wording.

4    When somebody commits something, they can grab that code

5    from anywhere; right?

6    **A.**    Yes.

7    **Q.**    And so out of that 16.5 million lines of code, how many

8    lines of code are actually written by developers of

9    AML BitCoin?

10   **A.**    I didn't perform that analysis.

11   **Q.**    Did you analyze or identify any third-party source code in

12   the AML BitCoin data?

13   **A.**    With regards to -- I'm not sure I understand the question.

14   **Q.**    In the 16.5 million lines of code that you say you

15   reviewed, did you identify any code that was written by people

16   unaffiliated with AML BitCoin altogether?

17   **A.**    The source of AML BitCoin being a fork?  Right?  Well,

18   Aten Coin -- excuse me -- being a fork of the Bitcoin

19   blockchain, yes, with that capacity of you need a starting

20   point.

21   **Q.**    And, Mr. Min, can you please explain for us what a comment

22   is in source code?

23   **A.**    A comment would be a notation for a specific line of code

24   or, you know, leaving a comment by a developer within the code

25   itself.  There's various aspects of how you can do that, either

1  through commit history; you can leave a message through leaving

2  a note within an underlying file or source code file.  You can

3  do it that way as well.

4  Q.   And, Mr. Min, when one runs a program, the comments don't

5  do anything while the program is running; correct?

6  A.   No, they do not.

7  Q.   Out of the nearly 16.5 million lines of code, how many

8  were just comments?

9  A.   I'm not sure I understand the question.

10  Q.   So earlier you stated in your disclosure that there were

11  nearly 16.5 million lines of code in this AML BitCoin database

12  you reviewed; correct?

13  A.   Yes.

14  Q.   How many lines of those were comments, like comment lines

15  that don't run when you run the code?

16  A.   I wouldn't know.  I did not perform that review.

17  Q.   You did not perform that review.

18       And in addition to comments, does computer source code

19  sometimes contain blank lines?

20  A.   It can.

21  Q.   Were there blank lines in this source code?

22  A.   There's some here and there, yes.

23  Q.   But you didn't tally those up either; right?

24  A.   No.

25  Q.   Let's talk about the -- some of your opinions regarding

**MIN - CROSS / CHOU**

1    the code.

2         Mr. Min, in your disclosure and I think on direct, you

3    testified or you stated that the quality and sophisticated

4    nature of the source code reviewed by FTI is reflective of at

5    least 18 to 24 months' worth of work by qualified and

6    intelligent developers.  Did I get that right?

7    **A.**   Yes.

8    **Q.**   But then you testified on direct that you had a number of

9    technical issues with your analysis; correct?

10   **A.**   Yes.

11   **Q.**   And you had difficulties getting things to run; correct?

12   **A.**   Yes.

13   **Q.**   And, again, you did not personally review all of the

14   source code; right?

15   **A.**   Not directly, but with -- you know, through a review

16   process with my team that was assisting on the analysis, all

17   aspects were reviewed together.

18   **Q.**   And as we discussed earlier, your formal training with

19   respect to C++ and Ruby is zero; correct?

20   **A.**   Formal training.  But on-the-job training, I've reviewed

21   many times those code bases.

22   **Q.**   And you testified that you don't know how much of

23   AML BitCoin source code was written by third parties; correct?

24   **A.**   Correct.

25   **Q.**   Prior to this case with Marcus Andrade, Mr. Min, have you

1    ever offered an expert opinion regarding the time required to

2    develop source code you analyzed?

3    **A.**    No, I have not.

4    **Q.**    And prior to this case, have you ever offered an expert

5    opinion regarding the qualifications of some other software

6    developer based on your analysis of that developer's source

7    code?

8    **A.**    Not formally.

9    **Q.**    And you opined that the work was performed by qualified

10    and intelligent developers.  Did I get that right?

11    **A.**    Yes.

12    **Q.**    Prior to this case, have you ever offered an expert

13    opinion regarding the intelligence of a software developer

14    based on your analysis of that person's source code?

15    **A.**    Not formally.

16    **Q.**    You testified on direct a number of things about

17    Aten Coin.  Do you recall that?

18    **A.**    Yes.

19    **Q.**    And I want to talk about some of the conversations that

20    you said you had with developers.

21        You spoke with an individual named Terence Poon; correct?

22    **A.**    Yes.

23    **Q.**    He's an individual based in Mainland China?

24    **A.**    I don't know his -- his place of domicile, where he

25    resides, no.

1  Q.   Okay.  Was -- how was this conversation conducted?  Over

2  the phone or in person?

3  A.   Correct, teleconferencing.

4  Q.   Teleconferencing.

5       And then you also spoke with one other developer, someone

6  named Sergey?

7  A.   Yes.

8  Q.   What was their last name?

9  A.   Pardon the pronunciation, but Petkevich.

10 Q.   Petkevich.  Okay.

11      Did you speak with any other people who said that they

12 were developers of either Aten Coin or AML BitCoin?

13 A.   No.

14 Q.   And you testified on direct that after your conversations

15 with Terence Poon and Sergey Petkevich -- Petkevich, you did

16 not rely on those conversations for your opinions today; right?

17 A.   That's correct.

18 Q.   So why didn't you rely on conversations by the people who

19 said they developed this code?

20 A.   Yeah.  Frankly, the request for the call was primarily to

21 speak with Sergey, as he was understandably a primary developer

22 on the project.  Terence Poon was brought in to assist on the

23 conversation.  And, personally, in my opinion, Terence took

24 over the conversation.  It was very one-sided, and he kept it

25 very high level as far as architecture, and didn't really get

1  the opportunity to ask questions.

2      So it was very limited as far as what we were able to

3  learn in a very short time period, of which, you know, we had a

4  window of time with him and no opportunity for follow-up due to

5  schedules, is my understanding.

6  **Q.**  And so you mentioned it was a very short time period.

7  When did these conversations take place?

8  **A.**  January 6th, I believe, of 2025.

9  **Q.**  Oh.  So a few weeks ago or --

10 **A.**  Two months, yeah.

11 **Q.**  And was that the only time you ever spoke with those

12 developers, or were there other conversations too?

13 **A.**  That was the only time.

14 **Q.**  And did you ever request follow-up?

15 **A.**  I did.

16 **Q.**  And did that happen?

17 **A.**  It did not.

18 **Q.**  You also testified on direct that you weren't able to

19 access a lot of materials, including ones stored on Amazon

20 servers.  Did I get that right?

21 **A.**  Yes.

22 **Q.**  And yet despite all this, you testified on direct that in

23 your expert opinion, Aten Coin was a working product during the

24 relevant time period; correct?

25 **A.**  Yes.

1    Q.    Let me posit to you a hypothetical.  If Aten Coin was a

2    working product, would an Aten Coin user be able to submit a

3    cartoon photograph of Homer Simpson to be an approved user by

4    Aten Coin?

5    A.    I'm not sure I'm following.  Can you explain the context

6    for the question --

7    Q.    Sure.

8    A.    -- in regards to AWS?

9    Q.    Well, this is leaving aside AWS.

10   A.    Okay.

11   Q.    So we're talking about Aten Coin.

12         Your opinion on direct was that Aten Coin, in your expert

13   opinion, was a working product before October 2018 --

14   A.    Understood.  Thank you.

15   Q.    -- correct?

16   A.    Yes.

17   Q.    Yes.  And you also mentioned on direct, you opined that

18   you saw some biometric features for Aten Coin; correct?

19   A.    Yes.

20   Q.    Purported third-party verification?

21   A.    Yes.

22   Q.    And so, hypothetically, if somebody submitted a photo of

23   Homer -- are you familiar with Homer Simpson, the --

24   A.    I am, yes.

25   Q.    Okay.  If somebody submitted a photo of Homer Simpson to

1    Aten Coin and tried to get verified under that name and they

2    were, in fact, verified, in your expert opinion, would that be

3    a working -- a working Aten Coin product?

4    **A.**    If a cartoon character -- so I understand your question,

5    if a cartoon character image was submitted acting as an

6    individual --

7    **Q.**    Named Homer Simpson.

8    **A.**    -- by the name of Homer Simpson --

9         (Simultaneous speaking.  Stenographer interrupts for

10   clarification of the record.)

11        **THE WITNESS:**  -- by an individual, a real person named

12   Homer Simpson?

13   **BY MR. CHOU:**

14   **Q.**    Correct.

15   **A.**    I don't know the specifics as far as the recognition

16   capabilities.  I would presume no.

17   **Q.**    Right.  And, Mr. Min, you talked about Aten Coin, which is

18   a cryptocurrency; right?  And -- right?

19   **A.**    Yes.

20   **Q.**    And you showed images of what appears to be the Aten Coin

21   wallet; correct?

22   **A.**    Yes.

23   **Q.**    Did you ever review any transactions on an Aten Coin

24   blockchain?

25   **A.**    Let me think.  As far as the -- pardon.  For Aten Coin,

MIN - CROSS / CHOU

1   no.

2   **Q.**   And earlier you testified on direct that you have

3   experience in cryptocurrency tracing; correct?

4   **A.**   Yes.

5   **Q.**   In fact, your only prior testimony was in a family court

6   case about Ethereum tracing?

7   **A.**   Yes.

8   **Q.**   And yet in this case, you did not see any transactions on

9   an Aten Coin blockchain; correct?

10  **A.**   Correct.

11  **Q.**   You testified that you spoke with two developers, Terence

12  Poon and Sergey Petkevich; correct?

13  **A.**   Yes.

14  **Q.**   Did you speak with any people who bought Aten Coin?

15  **A.**   No.

16  **Q.**   Did you speak with any people who bought AML BitCoin

17  tokens?

18  **A.**   No.

19  **Q.**   Did you speak with any office workers who either worked on

20  the Aten Coin project or the AML BitCoin project?

21  **A.**   No.

22  **Q.**   And did you review any financial records about how money

23  was spent on these -- on the development of these projects?

24  **A.**   No.  Not part of my investigation.  My investigation was

25  specific to the Aten Coin and AML BitCoin projects.

**MIN - CROSS / CHOU**

1    **Q.**   Understood.

2         Mr. Min, you testified earlier that the first commit you

3    identified in the AML BitCoin repositories was from either

4    November or December of 2018 --

5    **A.**   Yes.

6    **Q.**   -- is that right?

7         Is it November or is it December?

8    **A.**   Both.

9    **Q.**   Both.

10        Okay.  Which repository exactly contains that

11   November 2018 commit?

12   **A.**   I believe it was AML Bit.

13   **Q.**   AML Bit.  Okay.

14        Would it surprise you if a computer scientist looked

15   through the code that you produced and there isn't a single

16   repository with commits from November 2018?

17   **A.**   I'm sorry?

18   **Q.**   Would it surprise you if another computer scientist or,

19   rather, a computer scientist looked through the AML BitCoin

20   code and didn't find a single repository with that date you

21   just mentioned?

22   **A.**   It would.

23   **Q.**   Okay.  And you relied on others to provide you that

24   November 2018 date; correct?

25   **A.**   Yes.

1    Q.   So let's pause for a second on this November 2018 or

2    December 2018 date.  This was the first date that you claim

3    there were changes to the AML BitCoin code; correct?  Or

4    commits, rather.

5    A.   Yes.

6    Q.   And you don't know when the FBI first executed search

7    warrants on Marcus Andrade's office and Jack Abramoff's house?

8    A.   No, sir.

9    Q.   And you don't know when Marcus Andrade first told Melanie

10   Cowan to start editing AML BitCoin social media posts from past

11   tense to future tense?

12   A.   No, sir.

13   Q.   And do you know that November 2018 is just two months

14   after the FBI first went public with this investigation into

15   Marcus Andrade?

16   A.   No, sir.

17   Q.   You didn't know that until sitting here just now?

18   A.   I'd read the article.  So, yes, actually, I had.

19   Q.   Okay.

20   A.   I'd researched it.

21   Q.   Did you know whether or not developer Evan Carlsen

22   testified that in November of 2018, he was working on Stage 1

23   of AML BitCoin, reviewing Aten Coin?

24   A.   I can't recall specifically what Mr. Carlsen testified to.

25   I was made aware of an interview quite some time ago.  I don't

1    recall offhand what the details were, though.

2    **Q.**    And, in fact, he testified that there was no AML BitCoin

3    at that point in November 2018; correct?

4          **MR. STEFAN:**  Objection.   Foundation.

5          **THE COURT:**  Overruled.

6    **BY MR. CHOU:**

7    **Q.**    Mr. Min, do you know whether or not Mr. Carlsen testified

8    that, quote, "no AML BitCoin at that point," end quote, in

9    reference to November 2018?

10   **A.**    As I mentioned, I don't recall the specifics of his

11   interview or which testimony you're specifically referring to.

12   **Q.**    But November 2018, sir, is when you say Marcus Andrade

13   first created the AML BitCoin Bitbucket; correct?

14   **A.**    Yes.   It was the first commit that occurred within that

15   AML BitCoin Bitbucket repository.

16   **Q.**    Right.   You don't see any commits before that date?

17   **A.**    Correct.

18   **Q.**    And commits, as we discussed earlier, that's ordinarily

19   the way that developers track the timing of changes to code;

20   correct?

21   **A.**    Yes, sir.

22   **Q.**    I want to turn to some of your opinions.

23          So earlier counsel asked you about your first opinion on

24   this demonstrative, which is that Aten Coin appears to have

25   been a complete functional product that relied on third-party

1    software for ID verification.  Do you remember that?

2    **A.**    Yes.

3    **Q.**    And you testified in response on direct that portions

4    appeared to be working; correct?

5    **A.**    Yes.

6    **Q.**    Excuse me.  Mr. Min, I'd like to, at this time, show you

7    some of your demonstratives and then code that you produced as

8    part of your disclosures in reference to those demonstratives.

9    Okay?

10   **A.**    Sure.

11          **MR. CHOU:**  So if we could please show the Court,

12   parties, and the witness Exhibit -- what's been marked as

13   Government demonstrative or Exhibit 6000.

14   **Q.**    Mr. Min, can you see that okay?

15   **A.**    Yes, I can.

16   **Q.**    And this is one of your demonstratives that you walked

17   through earlier on direct; correct?

18   **A.**    Yes, sir.

19          **MR. CHOU:**  And if we could scroll on to the next page.

20   **Q.**    This here, you see the black lines and then what appears

21   to be this code.  Is this code that was produced by you in your

22   disclosure materials?

23   **A.**    I don't recall offhand, but if it's a source to that

24   specific database, then, yes.

25          **MR. CHOU:**  So if we could please scroll back up to the

1    first page, please.

2        And the Government moves to publish this, but not admit it

3    pursuant to Federal Rule of Evidence 107.

4        **THE COURT:**  You may.

5    **BY MR. CHOU:**

6    **Q.**  All right.  Are you able to see this okay, Mr. Min?

7    **A.**  Yes.

8    **Q.**  And so, Mr. Min, did you create this chart?

9    **A.**  One of my colleagues did.

10   **Q.**  One of your colleagues did.

11       Okay.  And the vertical axis, the labels jump from 1 to 10

12   to 100 and so on; right?

13   **A.**  Yes.

14   **Q.**  Is that because there were a lot of users created in

15   June 2017 but far fewer in the other time periods?

16   **A.**  No.  The design was meant to reflect as accurately as

17   possible the actual user counts, you know, for the respective

18   time periods.  With the large amount in 2017 of June, we had to

19   account for the 10 -- 10,000 lines.

20   **Q.**  That was a poorly --

21   **A.**  Or, excuse me.  The 10,000 --

22   **Q.**  Go ahead.

23   **A.**  The 10,000 entries.

24   **Q.**  And that was a poorly phrased question.

25       More just, if the vertical axis was a linear one that

**MIN - CROSS / CHOU**

1  didn't multiply, the bars would be different scale; right?

2  **A.**  I'm not sure I'm following.  Can you rephrase?

3  **Q.**  So you're familiar with the vertical --

4  **A.**  Yes.

5  **Q.**  -- axis in this chart?

6  **A.**  Mm-hmm.

7  **Q.**  And do you see how it goes from 1 user to 10 and then to

8  100 and then to 1,000 and then 10,000?

9  **A.**  Correct.

10  **Q.**  That's like an exponential scale; right?

11  **A.**  Yes.

12  **Q.**  And so the height of the blue bars is a little squished;

13  correct?

14  **A.**  Yes.

15  **Q.**  And can we please take a look at the horizontal axis here

16  where the dates are shown.  Over on the right side, do you see

17  where the third bar from the right and the second bar from the

18  right it says "2017-12" and "2018-04"?

19  **A.**  Yes.

20  **Q.**  Do those represent December 2017 and April 2018?

21  **A.**  Respectively, yes.

22  **Q.**  There's a four-month gap there; right?

23  **A.**  Yes.

24  **Q.**  And there's no gaps elsewhere in this horizontal chart,

25  similar time gaps?

1    **A.**   Correct, that's right.

2    **Q.**   And is that because there was no activity in those three

3    to four months that are omitted?

4    **A.**   That's accurate.

5    **Q.**   Did you omit those months from your chart so that it

6    looked like there was consistent development activity over

7    time?

8    **A.**   No.  No.  We reported on the data itself and what actually

9    had values, and that explains the timestamps.

10   **Q.**   And, Mr. Min, did you personally review the data used to

11   create this users chart?

12   **A.**   I don't recall offhand specifically, but I did review the

13   analysis and the resulting chart with my colleague.

14   **Q.**   Okay.  The chart you relied on to create this -- or,

15   sorry -- the data you relied on to create this chart is just

16   fake data, isn't it?

17   **A.**   Fake data?  Can you elaborate?

18          **MR. CHOU:**  If we can scroll down to the next

19   demonstrative, please.

20   **Q.**   So earlier you mentioned that this appears to be source

21   code or data taken from your 16.5 million lines of code that

22   you turned over to the Government; correct?

23   **A.**   Yes.

24   **Q.**   And, Mr. Min, is this part of the data you used to create

25   the chart or that your team used to create the chart that we

1  were just looking at?

2  **A.**   Yes.

3  **Q.**   And do you see the names and email addresses that look

4  like -- that comprise the various rows here?

5  **A.**   Yes.

6  **Q.**   Do these look like real users of the system to you?

7  **A.**   Yeah.  This -- I see your point.  These are -- you know,

8  appear to be test data, which is a common practice in

9  developing any source code and any application.  You have to

10 test it thoroughly, and obviously, you don't have a large

11 population of test subjects to just openly give their

12 information to provide, so you would essentially create a test

13 subject here in this case to have data for the purposes of

14 testing the overall functionality of the application.

15 **Q.**   So, for example, the first row here in this demonstrative,

16 it says "Donald Tramp J." or "Donald J. Tramp."  That's an

17 example of a test user?

18 **A.**   I would believe so.

19 **Q.**   So would you agree, then, that the users in your

20 demonstrative, the ones that we just saw on the previous slide,

21 those are not real users?

22 **A.**   Yeah.  I testified to that, those are, in fact, test data.

23        **MR. CHOU:**  Let's scroll down to the next page, please,

24 of this Government demonstrative.

25 **Q.**   So, Mr. Min, you testified on direct about some timestamps

1    you saw in the AML BitCoin source code; correct?

2    A.    Yes.

3    Q.    And this table here reflected some timestamps that you

4    said were as early as 2017; correct?

5    A.    Yes.

6    Q.    In your experience conducting digital forensic

7    investigations, is it standard practice to rely on dates and

8    times typed into a text file that any human could alter?

9    A.    Well, for the sake of understanding the complexities of

10   the source code, the underlying data, and what's occurring,

11   this applies.

12   Q.    Okay.  But earlier we discussed that much of the source

13   code you reviewed was in a text format; right?

14   A.    These are essentially -- with aside of the SQL database,

15   the majority of these are text files.

16   Q.    And so the timestamps that are represented on your

17   demonstrative here, those were pasted from text files into this

18   chart; correct?

19   A.    Correct.

20   Q.    And so those text files could have been easily modified

21   by, say, opening them in Windows Notepad and doing some edits?

22   A.    In the way that they're created, you've got programmatic

23   applications creating those timestamps.  You've got an

24   assortment of different, you know, manual creations of these

25   notes as listed, you know, by -- you know, created by

**MIN - CROSS / CHOU**

1    Athanasios Moutsioul.

2         I'll give you a second to spell that one.

3         You know those are all aspects, yes, that they

4    theoretically could be modified in a -- via a text file edit.

5    **Q.**   So at the end of the day, you don't know whether or not

6    the text files were edited; correct?

7    **A.**   I find it highly unlikely that these would have been

8    modified; but to answer the question, no.  No.

9    **Q.**   And did you analyze whether the timestamps in these files

10   had been manipulated?

11   **A.**   With regards to a timestamp?  The only thing I could tell

12   was that the files themselves had been created or last written

13   in the 2019 time period.

14   **Q.**   Okay.  So based on your analysis, the files were last

15   created or modified in 2019.  Did I get that right?

16   **A.**   Yeah, based on the commit history and -- excuse me.

17        From the files being generated from the Bitbucket

18   repository that was created at the tail end of 2018, and

19   continued development in 2019, those files would inherently,

20   just by the metadata of them, be a 2019 timestamp.

21   **Q.**   Got it.  But the text that your team copy/pasted out of

22   those files, some of it's from '17, for example?

23   **A.**   Yes.

24   **Q.**   So let's look at the first two entries on this -- on your

25   demonstrative here.

**MIN - CROSS / CHOU**

1      You cite something that ends with Gradle Wrapper

2 properties.  Do you see those top two --

3 **A.**   Yes.

4 **Q.**   -- rows?

5      And then the timestamps you provide are August 2017 and

6 May 2018.  Did I get that right?

7 **A.**   Yes.

8 **Q.**   And then the little hash in front of the time, is that

9 basically indicating it's a comment, like a text comment?

10 **A.**   It's a -- that's a programmatic timestamp.

11 **Q.**   Okay.  And then over on the left in those rows, you see

12 how it begins with the word "Corda"?

13 **A.**   Yes.

14 **Q.**   Corda is software that's publicly available online on a

15 website called GitHub; right?

16 **A.**   Yes.

17 **Q.**   And so it's -- but it's your opinion that these represent

18 AML BitCoin development activity?

19 **A.**   Yes.

20 **Q.**   Mr. Min, these log files from 2017 were created by

21 third-party software developers and copied into AML BitCoin

22 source code, weren't they?

23 **A.**   I did not review to that extent.

24      **MR. CHOU:**  Well, let's scroll to the next

25 demonstrative, please -- or, rather, just the next page.

1    **Q.**    So do you see how on the left, does that appear to be code

2    that you or your team reviewed and that you disclosed to

3    the Government?

4    **A.**    (Witness examines document.)  I believe so.

5    **Q.**    And do you see that same text on the left, it's a hash

6    symbol, "Friday August 25th 12:50:39 BST 2017"?

7    **A.**    I do.

8    **Q.**    Did you know that if you go to that URL on the right,

9    github.com/corda, that you can actually pull that same

10   timestamp from just the Internet?

11   **A.**    I didn't perform that review.

12   **Q.**    You didn't perform that review.

13        To your knowledge, did your -- did the two members of your

14   team perform that review, or was that out of scope?

15   **A.**    I did not -- we did not review it.

16   **Q.**    You did not review it.

17        Okay.  Let's look at the other log files from 2017.

18            **MR. CHOU:**  If we could scroll back up, please.

19   **Q.**    So do you see how at the bottom two rows here in your

20   demonstrative, it's social/app/tmp/debug.log and then there's

21   an error.log?

22   **A.**    Yes, sir.

23   **Q.**    And the timestamp provide there is December 19, 2017?

24   **A.**    I see that.

25   **Q.**    Mr. Min, have you heard of a software application online

1    called mooSocial?

2    **A.**    No.

3              **MR. CHOU:**  If we could scroll a couple slides down to

4    DX Min 5.

5    **Q.**    So on the left, does that appear to be code that either

6    you or your team reviewed and then produced to the Government?

7    **A.**    This is sourcing from my disclosure?  To confirm, I

8    don't -- I mean, I've seen a lot of code, so it's difficult to

9    confirm; but if that was in my disclosure, then, yes.

10   **Q.**    Okay.  But sitting here today, you're not sure when you're

11   looking at code that was referenced in your demonstrative?

12   **A.**    This -- this code was not in my demonstrative.

13   **Q.**    Well, so earlier, when we were looking at the

14   demonstrative, do you see that timestamp 2017-12-19 03:43:30?

15   **A.**    Yes.

16   **Q.**    And do you see how -- at least what I'm offering to you is

17   code you provided to us, do you see that same timestamp to the

18   left?

19   **A.**    I do.

20   **Q.**    Did you know that if you go to that mooSocial.com website

21   linked on the right, that you can pull code with that same

22   timestamp?

23   **A.**    I did not.

24   **Q.**    Did you know that it's a -- it appears to be a one-for-one

25   match of just publicly available source code?

1    **A.**   It likely was an open source project and added to the

2    project, would be the explanation I could think of at this

3    point; but, no, I did not.  I wasn't aware of it.

4             **MR. CHOU:**  If we could please scroll to the next

5    demonstrative page, please.

6    **Q.**   And, Mr. Min, have you ever -- Mr. Min, have you ever been

7    onto this mooSocial website before?

8    **A.**   No.

9    **Q.**   Do you know whether or not it's a social networking

10   program?

11   **A.**   I hadn't used it.

12   **Q.**   Okay.  And do you see where it says "No coding skill

13   required"?

14   **A.**   I do.

15            **MR. CHOU:**  We can scroll down.

16   **Q.**   So, Mr. Min, do you recall your demonstrative that looked

17   like this?

18   **A.**   Yes.

19   **Q.**   And you testified on direct that these were developer

20   notes with observed timestamps for CrossVerify or something to

21   that effect?

22   **A.**   Yes.

23   **Q.**   And do you see at the -- in the middle of the page here,

24   there's a date referenced of 21 March 2018?

25   **A.**   I see it.

1  Q.   And there's another -- there's also another line below

2  that, same thing.

3       Did you look at the contents of this file beyond just the

4  date and the comment that followed that's excerpted here?

5  A.   Over the time -- duration of the investigation, I did.  I

6  don't recall exactly what it was.

7  Q.   Okay.  And what did you do to validate that these files

8  are authentic, by the way?

9  A.   As far as validating them?

10  Q.   Correct.

11  A.   Reviewed the metadata, the timestamps, you know, reviewed

12  the content there within.

13  Q.   Okay.  And so you opened a text file, you saw a timestamp,

14  and then put that into your demonstrative?

15  A.   Yes.

16  Q.   Other comments in this same file suggest that the software

17  didn't actually work; correct?

18  A.   I don't recall.

19       MR. CHOU:  Well, let's move to the next slide.  This

20  has been marked as DX Min 08.

21  Q.   So do you see how up at the top there, we have those same

22  21 March 2018 dates in the code, and then there's that excerpt

23  from the code you produced in that snapshot to the left?

24  A.   So the top is mine, the middle is --

25  Q.   The left is the code you produced to us, and we're just

MIN - CROSS / CHOU

1   magnifying --

2   **A.**   I see.

3   **Q.**   -- to show that it's the -- it's the same code.

4   **A.**   Yep, I see it.

5   **Q.**   And so earlier, your demonstrative, you know, took

6   snapshots of code -- right? -- particular lines?

7   **A.**   Mm-hmm.

8   **Q.**   But then if you scroll down just a -- I don't know --

9   probably about 15 lines below that snapshot, there was -- there

10  were further comments in that code; correct?

11  **A.**   Yes.

12  **Q.**   And you see where the comment stated in the code you

13  produced, something along the lines of an IP address "Not used

14  at all," exclamation point, exclamation point, question mark,

15  question mark, exclamation point, exclamation point?

16  **A.**   Yes.

17  **Q.**   And do you see where below that in that same excerpt

18  there's a couple of numbered comments?  The first one states

19  "Not able to get company registered," period?

20  **A.**   Yes.

21  **Q.**   And do you see the second number, it says "Not able to go

22  beyond this stage and get CVID"?  Do you see that?

23  **A.**   Yes.

24  **Q.**   What's your understanding of what CVID is?

25  **A.**   CrossVerify identification.

**MIN - CROSS / CHOU**

 1   **Q.**   So not able to go beyond this stage and get CrossVerify

 2   identification?

 3   **A.**   Yes.

 4   **Q.**   And, Mr. Min, is it your opinion that the CrossVerify code

 5   is substantially close or -- to fully functional?

 6   **A.**   Yes.

 7          **MR. CHOU:**  If we could turn to the next demonstrative,

 8   please.

 9          So -- oh, sorry.  One moment.  Actually, we can take this

10   down, please.

11          Just give me one second.

12                      (Pause in proceedings.)

13   **BY MR. CHOU:**

14   **Q.**   So, Mr. Min, just one more demonstrative and then just

15   some --

16   **A.**   Yes.

17          **MR. CHOU:**  So if we could, please, if the defense

18   wouldn't mind pulling up Mr. Min's demonstrative, which

19   I believe was marked as Exhibit 3395, at page 23.

20          Thank you very much.

21   **Q.**   So, Mr. Min, do you remember testifying about this

22   demonstrative here?

23   **A.**   Yes.

24   **Q.**   And this reflects CrossVerify code related to biometric

25   data verification; correct?

1    **A.**    For the database, yes.

2    **Q.**    And then you testified on direct about a face score and

3    iris score; correct?

4    **A.**    Yes.

5    **Q.**    And then on the --

6          **MR. CHOU:**  If we could scroll to the next page,

7    please, onto 24, if that's okay.

8    **Q.**    And then, Mr. Min, you relied on entries in this table to

9    describe, in your opinion, how CrossVerify was doing biometric

10   verification; correct?

11   **A.**    Yes, sir, I did.

12   **Q.**    And, again, up at the top, do you see in that first line,

13   starting with the blue copy on the left and in the middle, it

14   says "face_score" and "iris_score"?

15   **A.**    Yes, sir.

16   **Q.**    Mr. Min, did you analyze the source code associated with

17   those variables, face score and iris score?

18   **A.**    Not specifically.

19   **Q.**    Okay.  Do you know if your team looked at it, or you're

20   not sure right now?

21   **A.**    I'm not sure.

22   **Q.**    The source code that's referenced in your disclosure for

23   face score and iris score is based on publicly available source

24   code for drawing googly eyes; correct?

25   **A.**    I don't know.  I didn't review it.

**MIN - CROSS / CHOU**

1    Q.   Mr. Min, do you know what I mean when I say "googly eyes"?

2    A.   I assume you mean the -- actually, no.

3    Q.   But the CrossVerify source code references, quote, "googly

4    eyes graphic," end quote, and, quote, "googly face tracker";

5    correct?

6    A.   Again, I didn't review it.

7    Q.   So you didn't research whether the CrossVerify biometric

8    source code is, in fact, based on publicly available googly

9    eyes code?

10   A.   No.

11   Q.   Mr. Min, would you consider -- well, so, first of all,

12   let's just talk about googly eyes for a second.

13        Are you familiar with the concept of, like, a filter when

14   you're using Snapchat or some sort of video application?

15   A.   Yes.

16   Q.   And are you familiar with how some applications will draw,

17   like -- I don't know -- exaggerated features on one's face?

18   A.   Yes.

19   Q.   And have you seen those little sticky eyes you can put

20   onto objects where the eyes sort of like roll around?

21   A.   Yes.

22   Q.   And so you don't know whether or not the code referenced

23   by CrossVerify here is, in fact, substantially based on an

24   application that draws googly eyes on somebody's face; right?

25   A.   Yeah.   No.   I would imagine that it was open source and

1  leveraged for the project, of which the continued development

2  early in the project would have used source code that was

3  publicly available through the open-source project --

4  **Q.**  Right.

5  **A.**  -- of which, as done with Aten Coin for using the Bitcoin

6  blockchain, leveraged that to build upon.

7      And, you know, essentially, that's what I think you have

8  here, is that they utilized that, as you called it googly-eyed,

9  you know, source code to develop their aspects therein.

10 **Q.**  Well, in fact, Mr. Min, the code that you disclosed to us

11 from CrossVerify references, quote, "googly eyes graphic" and

12 "googly face tracker"; correct?

13 **A.**  I don't recall.

14 **Q.**  You don't recall.  Okay.

15     And you haven't checked GitHub, for example, to see where

16 you can download that code; correct?

17 **A.**  Googly eyes?  No.

18 **Q.**  The same code, correct.

19 **A.**  No.

20     **MR. CHOU:**  We could take down this defense exhibit,

21 please, or demonstrative.

22     And if we could please swap over to Government control of

23 the monitors.

24 **Q.**  So, Mr. Min, from your code review, you couldn't see

25 whether Aten Coin was a hundred percent anti-money laundering

1    compliant in 2014, could you?

2    **A.**    No.

3         **MR. CHOU:**  Could we please publish what's been

4    admitted into evidence as Exhibit 1087.

5    And could we please first highlight the metadata.

6    **Q.**    Mr. Min, have you ever reviewed this email dated

7    November 6, 2014?

8    **A.**    No.

9         **MR. CHOU:**  If we could zoom out.

10    And then if we could zoom in on the second paragraph below

11    Point 2.

12    **Q.**    Do you see where Mr. Andrade wrote in November of 2014

13    that Aten Coin is the first digital currency that is a hundred

14    percent anti-money laundering compliant?

15    **A.**    (Witness examines document.)  I do.

16         **MR. CHOU:**  If we could take this exhibit down.

17    **Q.**    Mr. Min, I want to direct your attention to May of 2015.

18    In May of 2015, in your opinion, Aten Coin was not

19    entirely complete; correct?

20    **A.**    May of 2015?

21    **Q.**    Yeah, May of 2015.

22    **A.**    Yeah.  Portions of the application were complete, yes.

23    **Q.**    Portions.  But what about the whole thing?  Is your expert

24    opinion that the entire thing was correct or just -- was

25    complete or just parts of it?

1    **A.**    Parts of it.  You wouldn't be able to tell based on the

2    status of the code to build all of the relevant packages.  With

3    enough resources and time, I would be able to confirm that, but

4    we would not be able to do so.

5         **MR. CHOU:**  Could we please pull up what's been marked

6    as Government Exhibit 349, which has been admitted into

7    evidence and can be published.

8    **Q.**    Mr. Min, have you ever reviewed this document before?

9    **A.**    I don't recall the document.

10        **MR. CHOU:**  And could we please zoom in on the date,

11   which is in the first line of the first paragraph.

12        Sorry, no.  The date of the press release, but this is

13   fine too.

14   **Q.**    You see where the date that appears in this document is

15   May 25th, 2015?

16   **A.**    I do.

17        **MR. CHOU:**  And then could we please zoom in on the

18   last paragraph, the quote that's attributed to Marcus Andrade.

19   **Q.**    Mr. Min, do you see where this quote states [as read]:

20           "We set our bar very high and feel that our

21        goals have not only been met for the Aten Black Gold

22        Coin but exceeded"?

23   **A.**    I do.

24        **MR. CHOU:**  We could take this exhibit down, please.

25   **Q.**    Mr. Min, I want to direct your attention to January of

1    2016, your opinions as to the code in that time period.

2    All right?

3    **A.**    January 2016?

4    **Q.**    January 2016.

5    **A.**    Thank you.

6    **Q.**    At that point in time, did you see any integration of

7    Aten Coin into businesses?

8    **A.**    I don't recall January 2016 specifically.

9    **Q.**    Did you -- did you see any integration of Aten Coin as

10   some sort of daily payment service?

11   **A.**    No.

12   **Q.**    And, in fact, earlier you testified on cross that you

13   didn't see any Aten Coin blockchain transactions in the code

14   that you were able to review; right?

15   **A.**    Correct.

16        **MR. CHOU:**    I'd like to please pull up what's been

17   marked as Exhibit 673, which is admitted and in evidence.

18        If we can please jump to page 14 and publish page 14.

19   **Q.**    So do you see how up at the top it says "Aten Coin, The

20   Mature Digital Currency"?

21   **A.**    Yes.

22        **MR. CHOU:**    And if we could please zoom in on the

23   third-from-the-bottom bullet point starting with "Integration

24   into business."

25   **Q.**    Do you see where this slide states [as read]:

1              "Aten Coin has attained key to success factors"?

2      And then there's a number of bullet points.  One of them

3  is [as read]:

4              "Integration into business that facilitates

5          market liquidity."

6  A.    Yes.

7              MR. CHOU:  And zoom out.

8      Then if we can zoom in on the last bullet point there.

9  Q.    Do you see where this slide states that [as read]:

10             "Aten Coin has attained acceptance as a daily

11         payment service through the use of Aten Pay

12         Services"?

13 A.    Yeah.  Yeah.  These are all aspects of what I would have

14 expected to see as far as the vision of the application and

15 where they wanted to take it and ultimately be.

16 Q.    Mm-hmm.

17     And from your review of the code, in January 2016,

18 Aten Coin wasn't entirely complete; correct?

19 A.    As testified to, aspects of the code were complete, but

20 not the actual full application.

21 Q.    Excuse me.  My question was:  In your expert opinion, as

22 of January 2016, Aten Coin was not entirely complete; correct?

23 A.    Based on my findings, no.

24             MR. CHOU:  If we could take this exhibit down, please.

25 Q.    I want to switch gears to AML BitCoin, Mr. Min.

1          During the October 2017 initial coin offering, AML BitCoin

2     wasn't completed; correct?

3     **A.**   Of what -- repeat the question.

4     **Q.**   During -- in October of 2017 -- are you with me so far?

5     **A.**   Yes.

6     **Q.**   In October of 2017, based on your review, AML BitCoin did

7     not appear completed; correct?

8     **A.**   I wouldn't know.  Based on the repositories reviewed, as

9     far as the status of the completion of the tool, the aspects

10    that were reviewed with regards to the actual application had

11    aspects that did appear functional.

12    **Q.**   But I want to circle back to the first part of your answer

13    there.  You said you wouldn't know?

14    **A.**   I said that in regards -- I wasn't quite following.  So

15    apologies.  So on October of 2017, if I know?  I'm sorry.

16    **Q.**   I want to -- sorry.  I'll ask the question again.

17         I want to direct your attention to your opinion as to what

18    the -- whether or not the code functioned -- AML BitCoin code

19    functioned in October of 2017.  With me so far?

20    **A.**   Yes.

21    **Q.**   During -- or in October 2017, in your opinion, AML BitCoin

22    wasn't entirely completed; correct?

23    **A.**   Correct.

24    **Q.**   And I just want to direct your attention to a few months

25    after that, so October 2017 and then January 2018.

1          In January 2018, AML BitCoin wasn't completed; correct?

2     **A.**    I wouldn't know, no.

3     **Q.**    And why wouldn't you know?

4     **A.**    I didn't have the findings to understand that.

5     **Q.**    Okay.  And do you know whether or not AML BitCoin's

6     initial coin offering was in October 2017?

7     **A.**    I believe that's when it was, yes.

8     **Q.**    And do you know whether or not Mr. Andrade sold

9     AML BitCoin to Ben Boyer in January 2018?

10    **A.**    Unaware of that.

11    **Q.**    Lastly, Mr. Min, I want to direct your attention to May,

12    May of 2018.

13         In May of 2018, AML BitCoin wasn't entirely completed;

14    correct?

15    **A.**    Portions of the application were complete.  In building it

16    out with the right team, in my opinion, it could have been

17    complete; but, no, it was not complete.

18    **Q.**    Okay.  So just to make sure I got it right there, in your

19    opinion, it could have been complete but it wasn't complete;

20    correct?

21    **A.**    Yeah.  Based on the data and code that was provided,

22    there's no way to really tell, to be able to spin it up

23    completely with the amount of resources and time they've given.

24         **MR. CHOU:**  Can I please just lastly pull up

25    Exhibit 901, which has been admitted into evidence.

1          And can we please zoom in on the first four messages

2     between these two individuals.

3     **Q.**   So, Mr. Min, have you reviewed text messages or WhatsApp

4     messages between Jack Abramoff and Marcus Andrade as part of

5     your analysis?

6     **A.**   No, sir.

7     **Q.**   And do you see how the timestamp, as it appears on this

8     document, is May 7th, 2018, or thereabouts?

9     **A.**   I do.

10    **Q.**   And do you see where somebody with the name of

11    Jack Abramoff writes [as read]:

12          "Our price is dropping rather rapidly.  Any

13          ideas?"

14    **A.**   I do.

15    **Q.**   And do you say where somebody with Mr. Andrade's name

16    writes at the bottom [as read]:

17          "As soon as market making kicks in, we'll be

18          good to go"?

19    **A.**   I do.

20          **MR. CHOU:**  We can take this exhibit down.

21          **MR. STEFAN:**  Your Honor, I'd object to the entire line

22    of questioning and move to strike his testimony regarding those

23    matters.

24          **THE COURT:**  Why would this witness -- what was the

25    reason for examining this witness about those documents?

1          MR. CHOU:  To establish, Your Honor, that his basis

2    for his opinion does not include the vast majority of admitted

3    evidence in this case.

4          THE COURT:  I'm going to grant the motion.  I don't

5    think that's the proper use of this witness.

6          MR. CHOU:  Understood.

7       One moment, Your Honor.

8          THE COURT:  Yes.

9                         (Pause in proceedings.)

10         MR. CHOU:  Nothing further, Your Honor.

11      Thank you, Mr. Min.

12         THE WITNESS:  Thank you.

13                        (Pause in proceedings.)

14         THE WITNESS:  Oh, excuse me.

15         THE COURT:  You're not done.

16         THE WITNESS:  Oh, sorry.  Excuse me.

17                     <u>REDIRECT EXAMINATION</u>

18   BY MR. STEFAN:

19   Q.   Hello, Mr. Min.

20   A.   Hi.

21   Q.   I want to talk first about your engagement with

22   Mr. Andrade's defense team in this case.

23      Are you familiar with the Criminal Justice Act Funding

24   Program?

25   A.   Criminal, yeah, Justice Association, I believe, yes.

```
 1            MR. CHOU:  Objection.  Relevance.
 2            THE COURT:  Well, you opened the door by talking about
 3   King & Spalding and other issues of the like.  So, overruled.
 4       Go ahead.
 5   BY MR. STEFAN:
 6   Q.   So you can answer my question.  Do you have some
 7   familiarity with what I was referring to, Criminal Justice --
 8   A.   Yes.
 9   Q.   -- the funding program?
10   A.   Yes, sir.
11   Q.   Just explain to the jury what that is.
12   A.   Yes.  Through the process of determining, you know, the
13   analysis and what needs to be reviewed, a series of discussions
14   would occur to formulate the plan of what's needed with
15   review --
16   Q.   Okay.  Sorry.  Sorry, Mr. Min.  I'm going to redirect you
17   a little bit.
18       How would you be funded in this case?  How were you paid?
19   A.   The CJA.
20   Q.   The CJA, this is -- it's a system in place established by
21   U.S. federal law -- right? -- that --
22            MR. CHOU:  Objection, Your Honor.
23            THE COURT:  Just if he knows how the funding works,
24   you can ask him; but don't give him a lecture about the
25   funding.  If he knows, fine; if he doesn't, that's it.
```

1           **MR. CHOU:**  The Government asks that the witness be

2     allowed to finish his answer to the prior question.

3           **THE COURT:**  Well, let's start with a new question.

4     **BY MR. STEFAN:**

5     **Q.**   So the CJA, what is this funding source?

6     **A.**   My understanding is it's Criminal Justice Association, the

7     CJA.

8     **Q.**   And where -- how are these funds -- what makes someone

9     eligible for these funds?

10    **A.**   I believe classifying the individuals as an expert in,

11    you know, their applicable team.

12    **Q.**   More specifically, the --

13          **THE COURT:**  I don't know if this witness is the

14    witness to ask these questions.  You can try one more, but I

15    don't think he's getting your point here, but go ahead.

16    **BY MR. STEFAN:**

17    **Q.**   When you were doing work on this case, were you paid your

18    normal rate?

19    **A.**   No.

20    **Q.**   About how much of a cut, as a percentage, did you take off

21    your normal rate?

22    **A.**   At least 75 percent.

23    **Q.**   75 percent off of what you normally charge?

24    **A.**   Excuse me.  Bad math.  Yeah, my normal rate is roughly 810

25    an hour.

**MIN - REDIRECT / STEFAN**

1  **Q.**   And how much were you paid on this case?  I think you said

2  250?

3  **A.**   250 an hour.

4  **Q.**   So why did you -- what was your understanding of why you

5  could only collect $250 an hour on this case?

6  **A.**   As it was funded through the CJA.

7  **Q.**   Okay.  And the CJA is a program for indigent clients, is

8  that correct, people who can't afford, you know, normal

9  representations?

10  **A.**   Yes.

11  **Q.**   Do you understand that to be the case?

12  **A.**   Yes, I do.

13  **Q.**   Is that the reason that you were taking this reduced rate,

14  was that you were doing the work on behalf of a firm

15  representing an indigent client?

16  **A.**   Yes.

17  **Q.**   Is FTI short of work?

18  **A.**   No.

19  **Q.**   Did FTI feel a desperate need to take this case and work

20  on behalf of King & Spalding's defense of Mr. Andrade?

21  **A.**   Yeah.  FTI regularly takes pro bono cases even.

22  **Q.**   So in this case, what was the motivation on your part for

23  participating in this representation --

24        **MR. CHOU:**  Objection.  Relevance.  Motivation.

25        **THE COURT:**  Overruled.

1    Go ahead.

2         **THE WITNESS:**  Do you mind repeating the question,

3    please?

4    **BY MR. STEFAN:**

5    **Q.**   Why participate with King & Spalding in representing

6    Mr. Andrade on a case where you're making, well, $600 an hour

7    less than you normally would?

8    **A.**   Yeah.  My understanding, it's an application that was a

9    great idea.  It was a great function.  It would absolutely

10   benefit the cryptocurrency industry.  It seemed to be that the

11   initial review, that the aspects were there as far as the

12   development.  You know, as far as the ability to essentially

13   help in this case, I felt a duty to do so.

14   **Q.**   You talked about how you worked with a team of other

15   people on this case; is that right?

16   **A.**   Yes, sir.

17   **Q.**   And about -- a little bit about your own background and

18   your role at FTI.  Is your role at FTI as a programmer?

19   **A.**   No, it's not.

20   **Q.**   Have you ever had that kind of role?

21   **A.**   No, I have not.

22   **Q.**   What is your role specifically as a director?

23   **A.**   Forensic investigation.

24   **Q.**   And can you describe the kind of duties or

25   responsibilities you'd have in that role?

**A.**    Yeah.  Managing our clients, coordinating the aspects for

a given investigation and analysis, figuring out the

determining -- the aspects that needed to be to prove specific

aspects of the case, working with my team of investigators who

range from various aspects of experience and background as

experts in the space, and leveraging them to essentially be

available to support the matter.

**Q.**    When it comes to the nitty-gritty of analyzing source code

and getting to the bottom of programming issues, what are you

doing in those circumstances?

**A.**    Yeah.  I'm working with my team of very experienced

developers, developers that have worked in the space for over

20 years.  You know, they're very, very good at what they do.

They understand the ins and outs of the code.  They work with

me as, you know, the investigator and testifying expert to

opine to those, you know, aspects learned through the

investigation and analysis and sit here today in front of the

jury.

**Q.**    What kind of work have you done specific to blockchain or

cryptocurrency outside of investigative work like what you did

in this particular case?

**A.**    Yes.  Routinely perform technical and operational-type

assessments in an advisory capacity for, you know -- for

cryptocurrency native, you know, companies.  You know, various

clients include, you know, exchange companies, manage custody,

**MIN - REDIRECT / STEFAN**

1  wallet custody companies, to essentially look at their overall

2  protocols, procedures, their operations, review those with

3  them, essentially a -- sort of a cybersecurity audit for

4  blockchain.

5  **Q.**   About how many companies do you think you've performed

6  this kind of work for?

7  **A.**   In an advisory capacity, I'd say 20.

8  **Q.**   Is FTI cheap?

9  **A.**   No.

10  **Q.**   Have you had return clients out of these companies?  Have

11  companies come back to you --

12  **A.**   Absolutely.

13  **Q.**   -- repeatedly for your work?

14  **A.**   Yeah.  Within our segment, in our specific blockchain

15  digital access practice, as well as across the firm, to any

16  various capacity that an expert opinion or investigation is

17  needed or advisory capacity work as well.

18  **Q.**   You'd mentioned on cross-examination that you had two

19  other people working with you on this team for the AML BitCoin

20  review and Aten Coin review; is that right?

21  **A.**   Yes.

22  **Q.**   Who are those people?

23  **A.**   Yeah.  One is Sam Davies.  He's out of our London office.

24  And Anup Gupta was a contractor that worked within our

25  practice.

1  **Q.**   What does Sam Davies do?

2  **A.**   Sorry?

3  **Q.**   What does Sam Davies do?

4  **A.**   He's a managing director.

5  **Q.**   And can you describe his role and particularly his skill

6  sets when it comes to --

7  **A.**   Correct.

8  **Q.**   -- the work that he was doing in this case?

9  **A.**   Yeah.  He's a programmer at heart.  He's been working

10  with, you know, development for software over the course of his

11  career.  He's got an extensive background experience set.  He's

12  prior Big Four, performing advisory capacity for source code

13  and different types of applications and making them better,

14  essentially.

15  **Q.**   Sorry.  What's Big Four?

16  **A.**   The accounting firms:  Deloitte, KPMG, and the likes.

17  **Q.**   Okay.  And the second individual you mentioned?

18  **A.**   Yeah.  Anup.

19  **Q.**   Yes.  Can you --

20  **A.**   Yeah.  Anup's a programmer, a blockchain-specific

21  programmer.  He -- we were consulting with that firm on a

22  series of different investigations as well as an advisory

23  capacity, writing source code for their projects, and we

24  utilized Anup's, you know, expertise to assist in the

25  investigation.

1    Q.   When you were forming your opinions in this case, did you

2    rely in part on the work of your colleagues on this team?

3    A.   Absolutely.

4    Q.   Have you considered the -- well, do you have a history of

5    working with them?

6    A.   I do.

7    Q.   And have you been satisfied with their performance in

8    previous cases?

9    A.   Absolutely.

10   Q.   Has that been relied on by clients, paying clients, of

11   FTI?

12   A.   Yes.

13   Q.   You said you billed about a hundred hours maybe to this

14   point on this case.

15   A.   Yeah.  I believe so, yeah.

16   Q.   So at $600 a loss per hour, what are you looking at in the

17   damages department for your participation in this case?

18            MR. CHOU:  Objection.  Misstates the testimony.  Loss.

19            THE COURT:  Sustained.

20   BY MR. STEFAN:

21   Q.   Have you taken a significant reduction in the amount of

22   proceeds that you would normally bring to FTI in participating

23   in this case?

24   A.   Yes, sir.

25   Q.   I want to talk about the issues that Mr. Chou raised with

1    respect to the timestamps in the Git Bucket -- pardon me -- the

2    Bitbucket repository that you reviewed.

3         **THE COURT:**  Actually, before you go into that, we had

4    a couple of breaks, so I don't want to have a long break, but I

5    do think I'll give you one more before we get all the way to

6    1:30.

7         So let's take a break now, and let's try to keep it to

8    about ten minutes.  Remember my admonitions.  Don't discuss

9    this amongst yourselves or with anyone else.

10        And we'll see you shortly.

11                    (Recess taken at 12:20 p.m.)

12                (Proceedings resumed at 12:33 p.m.)

13        (Proceedings were heard in the presence of the jury.)

14        **THE COURT:**  The jury is present.

15        Mr. Stefan, you may proceed.

16   **BY MR. STEFAN:**

17   **Q.**   Mr. Min, I was turning to the timestamps that went --

18   Mr. Chou went over with you before.

19        Mr. Chou went over with you maybe -- I don't know -- ten

20   of the timestamps, total, that you discussed in your direct

21   examination --

22   **A.**   Yes.

23   **Q.**   -- right?

24        This is of the 40,000 or more than 40,000 timestamps that

25   you saw in the Bitbucket repository; right?

1    **A.**    Yes.  Within the database, yeah.

2    **Q.**    40,000 that were dated between 2017 and 2018?

3    **A.**    That is correct.

4    **Q.**    And you said that it would be highly unlikely, in your

5    view, that all of these would be fabricated or made up; right?

6    **A.**    Yes.

7    **Q.**    I mean, why would that be the case?

8    **A.**    Yeah.  You know, in that specific demonstrative, the table

9    that had the various timestamps, you have an assortment of

10    different formats for a date and a time.  The database as well,

11    specifically the CrossVerifyDB.sql database, has its own

12    unique, you know, timestamp format.

13         The amount of effort to go through that process to update

14    all these different aspects, you would take a considerable

15    amount of time to formulate that.  The -- the Gradle Wrapper

16    are programmatic functions to update those timestamps.

17    You know, with those, you would have to update it every time,

18    you know, to continue to have it to be that specific one.

19         So, for instance, if, you know, let's say January 1 of

20    2017 an update had occurred and then, after that, say in, you

21    know, June of 2017, someone made an edit to it manually, the

22    update would have -- from the Gradle Wrapper would have changed

23    it as well.

24    **Q.**    So, I mean, you have an issue with the programmatic times

25    being what the programmatic times are; right?

**MIN - REDIRECT / STEFAN**

```
 1   A.    Yes.

 2   Q.    Would you then have to basically amend them every single

 3   time you made an amendment anywhere else in the --

 4   A.    Right.

 5   Q.    -- in the timestamps?

 6   A.    Yeah.  For any of those programmatic ones, you'd have to

 7   do it every time.

 8   Q.    About how many of those programmatic ones existed within

 9   the times stamps you reviewed?

10   A.    There's quite a few.  I don't remember exactly the number,

11   but there were quite a few.

12   Q.    Some number of the total of the 40,000?

13   A.    Right.

14   Q.    And with respect -- sorry.  Were you --

15   A.    No.

16   Q.    With respect to the amount of work involved, what would be

17   required of an individual to go and make these sorts of

18   amendments?  And, more importantly, how could it be done

19   without being detected?

20   A.    Yeah.  You'd have to have a sophisticated programming,

21   you know, capability to do that in a way that would be

22   automated.  You've got various files throughout the

23   repositories as well that you'd have to locate.  So you would

24   have to search and find those specifically for, say, a time

25   frame, for an example, in 2019, and then account for any
```

1  various aspects of that timestamp format and essentially have

2  it programmatically change it.

3  **Q.**   Did you observe any evidence within the GitHub -- pardon

4  me -- the Bitbucket repository that you reviewed that

5  timestamps in that repository had been edited?

6  **A.**   Yeah.   No, I had not.   I would expect to see an error or

7  something that would be off across the board, and it just

8  seemed very odd that, you know, it's very specific population

9  of files, you know, and not a broader sense.   If you were going

10  to make that change, why wouldn't you just change, you know,

11  multiple repositories, multiple timestamps, you know, to better

12  your overall position?

13  **Q.**   You also spoke to getting the GitHub repository access in

14  this case from King & Spalding.

15  **A.**   I did.

16  **Q.**   Which got the access from Mr. Andrade?

17  **A.**   Correct.

18  **Q.**   Is it possible, to your knowledge, to edit entries in a

19  GitHub repository or a Bitbucket repository without being

20  detected?

21  **A.**   No.

22  **Q.**   Is it just out of the question in that case?

23  **A.**   Yeah.   The metadata would show so, and then the actual

24  account associated with the change would have been tracked.

25  **Q.**   Did you have any reason to question the commit data that

1    was provided to you in the Bitbucket repository that was handed

2    by Mr. -- well, by King & Spalding access to you?

3    **A.**    No, sir.

4    **Q.**    With respect to the first commits that appeared in late

5    2018, these were commits of millions of lines of code; is that

6    right?

7    **A.**    Yes.

8    **Q.**    Too large, too many lines of code to reasonably be

9    included in the number of commits that were provided -- the

10   number of commits that they were uploaded in?

11   **A.**    Yeah, correct.

12   **Q.**    Do people change repository sources sometimes?

13   **A.**    With regard to?

14   **Q.**    Like move from a GitHub to a Bitbucket, say.

15   **A.**    Yeah, absolutely.  Yeah, it's a common practice.  I mean,

16   even just the nature of the development process, you wouldn't

17   edit files within the Git repository.  You would take them down

18   local, make your edits, and then you would push them back up to

19   the commits.

20        In addition, if you've got multiple, you know, teams

21   engaged on the project, say you have Team 1 that's working on

22   this aspect for, say, the biometric function and then,

23   you know, they are essentially taken off the project and

24   replaced, you know, they would have their own account as well.

25   So you would have a change from account to account for

 1  respective teams even.

 2  **Q.**   Is it possible that in that process, commit history could

 3  be lost in transferring from some repository to another?

 4  **A.**   Yes.  I think we've seen that as far as Aten Coin

 5  specifically, that that has occurred.

 6  **Q.**   And do you think that you see that specifically with

 7  regard to the Bitbucket repository commits that start in

 8  November of 2018 -- or December of 2018, that we've lost

 9  history before that --

10  **A.**   Yes.

11  **Q.**   -- in the process of a transfer of a prior repository into

12  the Bitbucket repository?

13  **A.**   Correct.

14  **Q.**   I want to talk about some of the information that could

15  potentially have been lost within that transfer.

16      Are you familiar with the fact that Mr. Andrade had a team

17  in London working on the CrossVerify project?

18  **A.**   Yes.

19  **Q.**   Did you know that Evan Carlsen was one of the people --

20  Mr. Chou mentioned him on cross-examination -- Evan Carlsen was

21  one of the people that Mr. Andrade had hired to work with him

22  on the AML BitCoin project?

23  **A.**   Yeah.

24  **Q.**   Did you know that the CrossVerify team in London comprised

25  of about six or seven people?

**MIN - REDIRECT / STEFAN**

1    **A.**    I don't know the exact number, but I know that he had a

2    team.

3    **Q.**    And did you know that in the fall of 2018, Evan Carlsen

4    visited the CrossVerify team in London?

5    **A.**    I'm unaware.

6            **MR. CHOU:**  Objection.  Leading.

7            **THE COURT:**  On redirect, you can -- and it's an expert

8    witness.  He can do some leading.

9        Go ahead.

10    **BY MR. STEFAN:**

11    **Q.**    Did you know that Evan Carlsen visited that team in

12    London?

13    **A.**    I don't recall.

14    **Q.**    Along with a gentleman named Hung Tran?

15    **A.**    Yes, that name ring- -- is familiar.

16    **Q.**    Did you know that Hung Tran also visited the CrossVerify

17    team in London with Mr. Evan Carlsen?

18    **A.**    I don't know specifically, yeah.

19    **Q.**    That's okay.

20        Are you aware that at that time, Evan Carlsen expressed

21    that he was very pleased with the CrossVerify product?

22    **A.**    I do recall that.

23    **Q.**    And with the progress of the CrossVerify team in London?

24    **A.**    Yes.

25    **Q.**    And that was in the fall of 2018?

MIN - REDIRECT / STEFAN

```
 1   A.   Yes.
 2            MR. CHOU:  Objection.  Foundation.  The witness wasn't
 3   here for Mr. Carlsen's testimony.
 4            THE COURT:  Overruled.
 5        Go ahead.
 6   BY MR. STEFAN:
 7   Q.   You're not aware of how much of the code that you have
 8   available to you from that London team?
 9   A.   I do not.
10   Q.   And it appears based on the history of the GitHub -- or
11   the Bitbucket repository, that information is missing; right?
12   A.   Yes.
13   Q.   Particularly that information that was developed between
14   2017 and 2018 --
15   A.   Yes, sir.
16   Q.   -- by these six or seven developers in London?
17        And the material that Evan Carlsen was impressed by, it's
18   possible that that wasn't in the information that was relayed
19   to you and your team?
20   A.   Correct.
21   Q.   And are you familiar -- I think you did testify that
22   you're familiar with this NuGen team as well.
23   A.   Yes.
24   Q.   And this was a team in India; right?
25   A.   Yes.
```

1  Q.   You saw some of the information related to their work in

2  the repository that you got timestamps from; right?

3  A.   Yes.

4  Q.   However, that repository isn't complete when it comes to

5  what you would expect to see from a full Bitbucket repository

6  download of the 2017 and 2018 timestamped information; is that

7  right?

8  A.   Yes, that's right.

9  Q.   You can't speak to the total sum of all the work that they

10  performed in the 2017-2018 time period?

11  A.   No, sir.

12  Q.   Or know how much Mr. Andrade paid them to perform that

13  work?

14  A.   No, sir.

15  Q.   Did you know that it was many thousands and thousands of

16  dollars that he paid that NuGen team?

17  A.   I do recall an email mentioning something about paying the

18  team, acquiring a budget; but that's -- I don't have specifics.

19  But, yeah, it was a considerable amount of money, if I recall

20  correctly.

21  Q.   Are you aware that the CrossVerify team visited the

22  United States at some point in the development process and

23  actually showed a demo of what they were working on?

24  A.   Yes.

25          MR. STEFAN:  And I want to see if we can display

MIN - REDIRECT / STEFAN

1    Exhibit 3202, please.

2        Ed, if you can pull that up and please go to the -- go to

3    the second page.

4        Zoom in on the -- the paragraph beginning with "The

5    product is developing nicely and on time."

6        Is this being displayed to the jury?

7            MR. CHOU:  Objection, Your Honor.  I think this is the

8    unredacted version of this exhibit.

9            THE COURT:  It better not be.

10       Don't use a document -- first of all, let's take it down

11   from the jury's view.

12           THE COURTROOM DEPUTY:  I didn't.

13           MR. STEFAN:  Apologies, Your Honor.

14       Can I just see the first page for the judge and the

15   parties only.

16           THE COURT:  Right.  And just going forward, this is

17   not the vehicle to just put up all sorts of exhibits in this

18   case and just ask this witness.  I mean, he's an expert

19   witness.  He's not a fact witness.  So let's not just review

20   every fact in this case and ask him if he knows it.

21           MR. STEFAN:  Understood, Your Honor.

22   Q.  Were you aware that in October of 2018, Mr. Richard Naimer

23   informed Mr. Marcus Andrade that the product -- CrossVerify

24   product was developing nicely and was on time?

25           MR. CHOU:  Hearsay.  Outside the scope.

1          **THE COURT:**  I'll allow it.

2      Go ahead, if you knew.

3          **THE WITNESS:**  Yes.

4          **MR. STEFAN:**  All right.  Can we show, please, the

5   Defense Demonstrative Slide 1.

6   **Q.**   I want to talk about some of the findings -- return to the

7   findings that you made in the course of your review in this

8   case and some of the things that Mr. Chou said about them.

9          With respect to the Aten Coin software, you previously

10  testified that it appears to have been a complete functional

11  product that relied on third-party software for ID

12  verification; right?

13  **A.**   Yes.

14  **Q.**   You weren't able to actually review the third-party

15  software for its veracity; right?

16  **A.**   Right.

17  **Q.**   You couldn't run tests on the third-party software to

18  speak to how good that piece of the product was?

19  **A.**   Correct.

20  **Q.**   That wasn't Mr. Andrade's product?

21  **A.**   That's correct.

22  **Q.**   It was connected to his product?

23  **A.**   Yes.

24  **Q.**   So if Homer Simpson was verified by a third-party ID

25  verification service, that says nothing about what Mr. Andrade

1    did with the Aten Coin source code; is that right?

2    **A.**    Yes.

3    **Q.**    And just specifically the Aten Coin, when we're talking

4    about a complete functional product, on direct examination you

5    talked about some of the things that cryptocurrency that would

6    function would have; right?

7    **A.**    Yes.

8    **Q.**    And correct me if I'm wrong, but you've got to have a

9    blockchain; right?

10   **A.**    Yes.

11   **Q.**    And wallet?

12   **A.**    Yes.

13   **Q.**    And basically an ability for that wallet to actually

14   interact with the blockchain?

15   **A.**    Yes.

16   **Q.**    And in the case of Aten Coin, it had all of these features

17   as far as you could tell based on the source code that you

18   reviewed?

19   **A.**    Yes.

20   **Q.**    And you were able to get at least one of those features,

21   the wallet application, up and running despite a ten-year gap

22   in time since it was originally made?

23   **A.**    Yes, sir.

24   **Q.**    You did that using the source code that Mr. Andrade's team

25   had created?

1    **A.**    Yes, sir.

2    **Q.**    And you saw specific evidence that the third-party ID

3    verification services were integrated with that source code?

4    **A.**    Yes, sir.

5    **Q.**    With respect to the AML BitCoin, correct me if I'm wrong,

6    but you did not testify today that the AML BitCoin product was

7    a complete product in the time frame that you had reviewed?

8    **A.**    I'm sorry.  Repeat the question.

9    **Q.**    You didn't testify that the AML BitCoin was a complete

10   product in the time that you reviewed or that it was finished;

11   right?

12   **A.**    Correct.

13   **Q.**    You spoke to, instead, consistent work by intelligent

14   developers working on the CrossVerify and AML BitCoin projects

15   throughout 2017-2018?

16   **A.**    Yes.  Correct.

17   **Q.**    That is spoken to, in your view, by the quantity of the

18   source code that was generated; is that right?

19   **A.**    Yes, sir.

20   **Q.**    I think you had said some 16.5 million lines of code?

21   **A.**    Yes, sir.

22   **Q.**    You're not aware of how many of those code lines were

23   blank off the top of your head?

24   **A.**    No.

25   **Q.**    I mean, how many, based on your experience or your review,

1    could you even estimate may have been blank out of those?

2            **THE COURT:**  You can do some leading, but not at the

3    level you're just doing it.  So...

4            **MR. STEFAN:**  Understood, Your Honor.

5    **Q.**    Were most of the lines blank?

6    **A.**    No.

7    **Q.**    And when you spoke to intelligent people working on the

8    project, why?  Why do you have that impression based on the

9    code that you reviewed?

10   **A.**    I'm sorry.  The question?

11   **Q.**    Why did you have the impression that intelligent people

12   worked on this product from the code that you reviewed?

13   **A.**    Yeah.  In review of the code -- excuse me -- with respect

14   to Aten Coin particularly, you had extremely well-documented

15   aspects of the project, and we were able to spin this code up

16   as discussed.

17        The Aten Black Gold Coin wallet is over ten years old, and

18   using their specific instruction, I was able to spin that

19   portion of the application up to see all the functionality that

20   I'd shown through my demonstratives.

21        The integration of that ID verification aspect for

22   Aten Coin specifically is extremely, you know, sophisticated.

23   You know, the code base is sophisticated.  The integration of

24   blockchain is a whole 'nother component that is not a simple

25   endeavor, and to pull that off in the way that appears that

1    they have done is extremely telling.

2    **Q.**   And, finally, with respect to CrossVerify, the state of

3    the product, as you saw it, was such that it could be

4    integrated with a preexisting cryptocurrency in a matter of a

5    few months?

6    **A.**   Yes.

7    **Q.**   Mr. Chou had indicated in direct examination that,

8    you know, you're working for an international law firm King &

9    Spalding; right?

10    **A.**   Yes, sir.

11    **Q.**   Did your relationship or the fact that you were working

12    with King & Spalding have any impact at all on your testimony

13    today?

14    **A.**   No.

15    **Q.**   Did that -- did that slant your opinion because you were

16    working with King & Spalding at a $600 discount per hour?

17    **A.**   No.

18            **MR. STEFAN:**  May I have a moment, Your Honor?

19            **THE COURT:**  Yes.

20                        (Pause in proceedings.)

21            **MR. STEFAN:**  Thank you.

22        I don't have further questions, Mr. Min.

23            **THE COURT:**  Very brief, Mr. Chou.

24    \\\

25    \\\

1                    <u>RECROSS-EXAMINATION</u>

2   **BY MR. CHOU:**

3   **Q.**   Very briefly, Mr. Min.

4   **A.**   Yes, sir.

5   **Q.**   You testified on redirect that you thought that

6   AML BitCoin and Aten Coin was a good idea.  Did I get that

7   right?

8   **A.**   Yeah.  Yes, sir.

9   **Q.**   And you're also billing $250 an hour to the work in this

10  case; correct?

11  **A.**   Yes.

12  **Q.**   You also stated on redirect that based on what you

13  reviewed and what you were told, that you believed in the

14  AML BitCoin/Aten Coin project.  Did I get that right?

15  **A.**   That I believed -- I didn't catch the question.

16  **Q.**   You testified on redirect that based on what you reviewed

17  and what you were told by the defense team, that you

18  believed --

19          **MR. STEFAN:**  Objection.

20  **BY MR. CHOU:**

21  **Q.**   -- in the project.

22          **MR. STEFAN:**  Misstates what he stated on redirect.  He

23  didn't say anything about the defense team informing him.

24          **THE COURT:**  Okay.  Overruled.

25      Just answer the question.

PROCEEDINGS

1  BY MR. CHOU:

2  **Q.**   Mr. Min, did you testify on redirect that you believed in

3  the AML BitCoin/Aten Coin project?

4  **A.**   Yeah.  The purpose of these coins and these wallets in

5  decreasing the potential of anti-money laundering is a

6  significant task.  You know, cryptocurrencies have gotten a bad

7  rap.  Yes, there are rampant fraud that takes place by cyber

8  criminals, for instance.

9       Being able to leverage, you know, an application like

10  AML BitCoin that is taking the extra step to validate a user to

11  confirm that transaction is something that is intended,

12  you know, by the owner of those currencies is absolutely

13  necessary for the purposes of getting cryptocurrency -- you

14  know, this blemish on its overall reputation removed and moving

15  into a new era that is completely open and secure.

16  **Q.**   The people who invested in Mr. Andrade's project believed

17  in it too, didn't they?

18  **A.**   I don't know --

19       **MR. CHOU:**  Nothing further.

20       **THE WITNESS:**  -- what the question is.

21       **THE COURT:**  Very well.  You may step down.

22       **THE WITNESS:**  Thank you.

23            (Witness excused.)

24       **MS. DIAMOND:**  The defense will call Dr. Levi Armstrong

25  to the stand.

ARMSTRONG - DIRECT / DIAMOND

```
 1    (Witness enters the courtroom and steps forward to be sworn.)
 2           THE COURT:  If you could come forward, please, and
 3    take the stand.
 4           MS. DIAMOND:  Sit right up there.  Get yourself
 5    settled.  You'll be sworn in.
 6           THE COURTROOM DEPUTY:  Please raise your right hand.
 7                    LEVI ARMSTRONG, Psy.D.,
 8    called as a witness for the Defendant, having been duly sworn,
 9    testified as follows:
10           THE WITNESS:  Yes, I do.
11           THE COURTROOM DEPUTY:  Can you state your name and
12    spell your last name?
13           THE WITNESS:  Dr. Levi Armstrong.  My last name is
14    A-r-m-s-t-r-o-n-g.
15                       DIRECT EXAMINATION
16    BY MS. DIAMOND:
17    Q.   Thank you.
18         Dr. Armstrong, I'm going to ask you when you speak, to
19    speak directly into the microphone.  They're good microphones.
20    They won't give you a lot of feedback.  And that way, the jury
21    will be able to hear you clearly.
22         Could you please tell the jury what you do for a living?
23    What is your profession?
24    A.   So I am a clinical neuropsychologist where I have been in
25    private practice now for ten years and primarily focusing on
```

**ARMSTRONG - DIRECT / DIAMOND**

1    the biological bases of behavior and the assessment of that.

2    **Q.**    Did you have any special education as part of your

3    training in your profession?

4    **A.**    So in order to be a neuropsychologist, you have to have

5    first a bachelor's degree; and then part of my training -- and

6    not all training -- but after my bachelor's, I have a master's

7    degree in psychology and a Psy.D, or a doctorate, of clinical

8    psychology, which is the equivalent to Ph.D. in psychology.

9    And that's --

10    **Q.**    And where -- if I may, where did you receive your degrees?

11    If you just tell the jury.

12    **A.**    Sure.  So my bachelor's was from Texas A&M University in

13    College Station; and then the master's was through the

14    University of the Rockies, which then was also where I earned

15    my doctorate in neuropsych or clinical psych.

16    **Q.**    After you received your doctorate, did you do any other

17    special training in your field to help your work in

18    neuropsychology?

19    **A.**    I did.

20    **Q.**    Could you tell the jury, please?

21    **A.**    So after my doctorate, I had to complete a two-year

22    postdoctoral residency, or sometimes called a fellowship, under

23    the supervision of a board-certified neuropsychologist; and,

24    thankfully, he was from Tyler, Texas, which is not too far from

25    my hometown in Paris, Texas.

**ARMSTRONG - DIRECT / DIAMOND**

1          But after my two-year residency, I -- I don't know how I

2    did it because I've got a 10 and a 7-year-old, but I went back

3    to school and earned my postdoctoral master's in clinical

4    psychopharmacology, which is essentially very similar in

5    curriculum to the first couple of years of med school.

6          It allows, with that degree and passing of a couple of

7    tests and some other things, allows me to prescribe in certain

8    states.  In Texas, I -- it's not -- we don't have that scope of

9    practice.  And so I earned that primarily because, as a

10   neuropsychologist, we deal so much with, you know, the biology,

11   it just -- I learned along the way that without having that

12   training in the whole system of the body, it was -- it

13   didn't -- it didn't make much sense to only know about the

14   brain because the whole body's connected.

15   **Q.**   Did you do hours of supervised work prior to getting your

16   Ph.D. as part of the curriculum or the regime to get your --

17   forgive me.  I said Ph.D.  You said it was a Psy.D.  That's

18   P-s-y, dot, D; is that correct?

19   **A.**   That's correct.

20   **Q.**   Did you do any sort of practice hours or practicum hours,

21   hours of counseling, hours of work under supervision; and if

22   so, how many?

23   **A.**   For the master's and the doctorate combined ended up being

24   right around 2,000 hours of supervised practicum unpaid, and I

25   always -- yeah.

**ARMSTRONG - DIRECT / DIAMOND**

1    And then 2,000-hour predoctoral internship that -- that's

2  whenever my wife and I moved back down to Texas, to Dallas to

3  do that, and that was -- and then I graduated after that.

4  **Q.**   So that was 4,000 hours prior to receiving your doctorate?

5  **A.**   Correct.

6  **Q.**   And then after receiving your doctorate, did you then do

7  some additional amount of hours, either as part of your

8  clinical psychopharmacology degree or to otherwise further your

9  training?

10  **A.**   Sure.  So in the state of Texas, in order to be licensed

11  as a psychologist, you have to have an additional 2,000 hours,

12  after your doctorate, of supervised experience.  In order to

13  call yourself a neuropsychologist, though, you've got to have

14  an additional year on top of that.  So it was a total of

15  4,000 hours after my doctorate of supervised experience.

16  **Q.**   And are you currently in private clinical practice?

17  **A.**   I am, yes.

18  **Q.**   And besides your clinical practice, do you currently do

19  forensic work?

20  **A.**   I do.

21  **Q.**   Could you explain to the jury the difference, please?

22  **A.**   Sure.  So clinical neuropsychology is the application of

23  our expertise for the -- for, ultimately, the purpose of

24  differential diagnosis so that we can identify the best course

25  of treatment.

**ARMSTRONG - DIRECT / DIAMOND**

1    And neuropsychologists are often referred to by

2    specialists.  I get referred patients a lot from neurology and

3    from psychiatry when there's a complicated question of a

4    diagnosis, where they're not sure exactly what diagnostically

5    we're looking at.

6    And so I'll get a referral, allowing me to administer

7    various tests and use my training and expertise, where they

8    don't have that training and expertise, and kind of team up

9    with them, giving them my insights and ideas about what I think

10   is going on diagnostically.

11   **Q.**   So just to paraphrase, lesser-trained psychologists

12   sometimes will consult with you because your training is

13   greater than theirs to help them figure out what's going on

14   with the mind or the brain of one of their patients?

15   **A.**   Sure.

16   **Q.**   Did I get that right?  If not --

17   **A.**   I would say lesser trained in the sense of differently

18   trained.  Like clinical psychologists will refer to

19   neuropsychologists mainly because they don't have the

20   brain-behavior relationship training or education.  And most of

21   them will do testing, but they aren't ethically allowed to

22   administer neuropsych tests or at least interpret them in the

23   same way that we can from a biological standpoint, yeah.

24   **Q.**   In addition to doing forensic work for other practicing

25   clinicians, have you done forensic work for attorneys or courts

ARMSTRONG - DIRECT / DIAMOND

1    before today?

2    **A.**    I have.  And the only reason why I'm kind of smiling on

3    that is because I didn't become a neuropsychologist to be a

4    forensic neuropsychologist.  I was informed along the way that

5    because of our specialty, we end up here frequently.

6        And with the training that I had, one of my previous

7    mentors, who passed away not long ago, became a forensic

8    neuropsychologist specifically; and so I began getting that

9    experience in grad school, knowing that that was going to be

10   coming my way at some point.  And, lo and behold, since being

11   in practice over ten years, it just started happening.

12       And then from there, obviously, the two years of my

13   postdoc was supervised by that same mentor, by the way, who was

14   a forensic neuropsychologist, gave me experience there.  But

15   it's about 10 percent of my practice.

16   **Q.**    And when you've appeared before in courts as a

17   professional forensic witness, have you appeared before working

18   for the defendant in a case?

19   **A.**    Can you restate that again?  I'm not sure.

20   **Q.**    Sure.

21       Has a criminal defense team ever hired you before today to

22   work as a forensic expert?

23   **A.**    Yes.

24   **Q.**    And has the prosecution ever hired you before?

25   **A.**    No.

ARMSTRONG - DIRECT / DIAMOND

1   **Q.**   Have courts ever hired you to work as an expert on behalf

2   of a court or a judge?

3   **A.**   Yes.

4   **Q.**   Could you tell the jury a little bit about what that work

5   entails?

6   **A.**   Sure.  So in those cases, because where I practice is kind

7   of on the border of rural versus the suburban sprawl of Dallas

8   and in the rural areas there aren't very many specialists like

9   that do what we do, and there's been a few referrals directly

10  from the Court or the judge as a court-appointed expert for

11  various cases related to either questions of diagnosis that the

12  judge became aware of, it was just very obvious; or, you know,

13  one side or the other had a question on diagnostics that seemed

14  to kind of be a nowhere -- no man's land between neurology and

15  psychology, and they learned that there's an actual

16  subspecialty called neuropsychology.

17  **Q.**   And, finally, turning in your experience to teaching, do

18  you have teaching experience?  And if so, could you please

19  describe it to the jury?

20  **A.**   I do.  I have right at ten years of teaching as a full

21  professor at a private Christian university in Dallas -- the

22  Dallas area called Amberton University where I teach grad-level

23  future prospective counselors diagnostics, psychiatric

24  diagnostics, using the DSM-5, which is the gold standard

25  diagnostic manual.

ARMSTRONG - DIRECT / DIAMOND

1    And I teach -- they allowed me to create two courses

2    there, and I created the adult and geriatric psychopathology

3    and treatment course and then the child and adolescent child

4    psychology and treatment course.

5    And then with those two classes, I've got, like, a

6    rotating -- I teach three classes every semester, and I've got

7    one that rotates through, it's either lifespan development,

8    counseling assessment, advanced counseling skills, and teaching

9    on topics of neurodevelopment.  Psychopharm is a big one these

10   days for counselors.  So, yeah.

11        MS. DIAMOND:  Thank you.

12   Your Honor, I would offer Dr. Armstrong as a clinical and

13   forensic neuropsychological expert.

14        MR. HIGHSMITH:  No opposition.

15        THE COURT:  All right.  The witness will be so

16   designated.

17   BY MS. DIAMOND:

18   Q.   Dr. Armstrong, have you met my client, Marcus Andrade?

19   A.   I have.

20   Q.   What were the circumstances that you met -- under which

21   you met my client?

22   A.   I conducted a comprehensive neuropsychological evaluation

23   of him.

24   Q.   As part of your preparation for your testimony today, did

25   you prepare some materials that may help the jury understand

ARMSTRONG - DIRECT / DIAMOND

 1    what we're about to talk about?

 2    **A.**   I did.

 3           **MS. DIAMOND:**  Mr. Jackson, if we could display for the

 4    witness, the Court, and counsel, please, Exhibit 3394.

 5    **Q.**   And, Dr. Armstrong, I'd like you to take a look at the

 6    first page; and as you request, if necessary, we can scroll

 7    through the pages for you.  Just when you've done that, let me

 8    know if this looks familiar.

 9    **A.**   (Witness examines document.)  Yes, I'm familiar with this.

10    This is the first page of the slides that I created.

11           **MS. DIAMOND:**  Thank you.

12           Your Honor, request permission to use this as a

13    demonstrative exhibit.  We are not asking to admit it, but just

14    to assist the jury.

15           **THE COURT:**  You may.

16           **MS. DIAMOND:**  Mr. Jackson, could you please display

17    page 1 for the jury.  Thank you.

18    **Q.**   Dr. Armstrong, what is a neuropsychological evaluation?

19    **A.**   That's a great question.  One of the best ways of

20    describing it is one of the most comprehensive ways to assess

21    someone from a psychological and neurobiological standpoint.

22    The reason why I say "the most comprehensive" is because it

23    encompasses both a clinical psychological evaluation in

24    addition to the administration of several more tests that

25    specifically measure different parts of the brain and different

ARMSTRONG - DIRECT / DIAMOND

1    networks in the brain.

2         In general, neuropsychological evaluation includes usually

3    about between 45 minutes and an hour-and-a-half diagnostic

4    clinical interview.  And really what that is, is where I meet

5    with the patient, walking through what their chief complaints

6    might be.  And what that means is why they're there, what

7    difficulties they have in life, walking through their history,

8    their medical history, and so forth.

9         And then during that time, I'm also observing them.  And,

10   you know, it's not that I'm not analyzing them, you know, like

11   my family might be worried about when I go back home; but I'm

12   observing their behaviors and putting it kind of all together

13   where after that interview, I've started formulating a

14   hypothesis of different diagnoses that might be present.

15        And based on that hypothesis, I'm going to use what's

16   called a fixed flexible approach to my test battery.  And

17   that's a real specific term in my field that means we've got an

18   outline plan of tests that we give to everybody where we remain

19   flexible to be able to add to those tests or take away from

20   those tests.

21        You know, the reality is, is managed care has changed more

22   about medicine, in my field anyway, probably more so than even

23   theory has at times; and so I think one of the best responses

24   we've had as a profession in my area is the ability to be more

25   flexible like that, because it used to be 12-something hours

ARMSTRONG - DIRECT / DIAMOND

1    for every single person that came through.  And it didn't

2    matter if you had dyslexia or severe traumatic brain injury,

3    you got just 12 hours of battery of tests.

4    **Q.**   And is that the former method or the fixed flexible

5    method?

6    **A.**   That's the former method.

7          So the fixed flexible method is obviously a more efficient

8    way of doing it but still captures the same things that those

9    long batteries would capture; and using updated norms, that we

10   can -- we have ways of analyzing test data that you don't have

11   to have all 12 hours like that anymore.

12         And so anyway, with the evaluation, after we administer

13   those tests and score them, the next part there -- and it's not

14   always in this order but -- is reviewing collateral records or

15   input whenever it's available.  Ideally, the more records, the

16   better; but when evaluating an adult, it's a challenge often to

17   get, you know, records from preschool.  Some disorders,

18   diagnoses, those things are more or less important; but

19   ideally, we are also incorporating some records.

20   **Q.**   And are you familiar with the part of Texas where

21   Mr. Andrade came from?

22   **A.**   I'm familiar.  I didn't grow up in that area, but I am

23   familiar with the rural nature of Texas because we would often

24   go on vacations down there on the coast of the beautiful ocean

25   of Texas down there.  That's not true.  I'm sorry.  But we

1    would go on vacation down there, and so I am aware of the

2    culture and the educational, you know, upbringing that we all

3    had during that time.

4    **Q.**    When Mr. Andrade would have been a schoolchild in

5    elementary school in Texas, to your knowledge, would there have

6    been counselors and awareness among the educators such that he

7    might have -- records might have been kept of any symptoms of

8    any neurological disorder, to your knowledge?

9    **A.**    At his age, just knowing what I know about Texas, I would

10   not have a lot of --

11          **MR. HIGHSMITH:**    Your Honor, I'm going to object just

12   because there's not -- there's insufficient foundation.    It

13   seems like he's going down a road where he doesn't really have

14   foundation to answer this.

15       If they want to delve into his understanding of Texas

16   20 years ago, fine, but to just spout off opinions without a

17   basis --

18          **THE COURT:**    Okay.    I got it.

19       Yeah, I don't think -- anecdotal stuff about Texas, you

20   need to -- if this is where you're going, you need to have a

21   bit more foundation.

22          **MS. DIAMOND:**    No problem.    Thank you, Your Honor.

23   **Q.**    Did you receive any school records related to Mr. Andrade

24   to review?

25   **A.**    I did not.

ARMSTRONG - DIRECT / DIAMOND

1   Q.   Did you see -- did you receive some medical records of

2   Mr. Andrade's to review?

3   A.   I did.

4   Q.   Did they include psychiatric records or treatment?

5   A.   A few, but not a lot.

6   Q.   Was there treatment for anything more severe than reported

7   anxiety or incidence of depression?

8   A.   No.

9   Q.   Did you have any other independent collateral information

10  or, rather, collateral information, something other than your

11  diagnostic interview, your behavioral observations, and your

12  battery of tests that you used in forming any opinion that you

13  have formed about Marcus?

14  A.   Yes, I did.

15  Q.   What was that?

16  A.   I had his spouse complete an objective measure of her

17  perspective of his executive functioning.  I know that was --

18  yeah.

19  Q.   And is there a name for that test?

20  A.   It's the Behavior Rating Inventory of Executive

21  Functioning adult form.

22  Q.   And is a spouse an ordinary collateral source that is used

23  in your line -- in your profession during the course of

24  conducting your comprehensive neuro- -- sorry --

25  neuropsychological evaluation?

ARMSTRONG - DIRECT / DIAMOND

1   **A.**    Yes.

2   **Q.**    Were you able to reach a diagnosis or diagnoses about

3   Marcus after your evaluation?

4   **A.**    I was.

5   **Q.**    And when did this evaluation take place?

6   **A.**    I believe in July of last year.

7   **Q.**    Thank you.

8   **A.**    Mm-hmm.

9   **Q.**    Could you please tell the jury the components of your

10  diagnosis, just if you have found any conditions, disorders, or

11  illnesses that he suffers from?

12  **A.**    The results from my evaluation and my observations of him,

13  in my opinion, were most consistent with autism spectrum

14  disorder, Level 1 severity, which is the high functioning side

15  of autism.

16       I also diagnosed ADHD combined presentation, where what

17  that means is it is a -- we have three subtypes of ADHD, and

18  it's both a hyperactive, impulsive, and inattentive type.

19       I also diagnosed obsessive-compulsive disorder and I

20  diagnosed bipolar disorder.

21  **Q.**    And are these the conditions that are displayed for the

22  jury at this time?  Is that consistent?

23  **A.**    Yes, ma'am.

24  **Q.**    Is another word for autism or another way of describing

25  autism spectrum disorder ASD?

ARMSTRONG - DIRECT / DIAMOND

 1   **A.**    Yes.

 2   **Q.**    Is that the shorthand?

 3   **A.**    That's the acronym; that's correct.

 4   **Q.**    And in order to make these diagnoses, you reviewed a

 5   number of testing results; is that right?

 6   **A.**    Mm-hmm.

 7   **Q.**    Were some of Mr. Andrade's results considered by you to be

 8   exceptionally low?

 9   **A.**    Yes.

10   **Q.**    What were the areas of his scores that you saw patterns of

11   scoring that you deemed to be exceptionally low?

12   **A.**    Primarily in the brain functioning domains of attention

13   and executive functioning.  And when I say "executive

14   functioning," just to clarify, that includes mental flexibility

15   and social cognition.  And I can explain that further, if

16   needed.

17   **Q.**    Let's start with mental flexibility.  What does that term

18   refer to?

19   **A.**    Mental flexibility is the ability to stop thinking a

20   thought and fluidly switch to another thought and then stop

21   that and fluidly switch back.  It's the ability to be

22   interrupted and be able to redirect yourself back to whatever

23   task was at hand.

24          It's also an aspect of working memory, which is how much

25   information can you keep in mind at one given time without

ARMSTRONG - DIRECT / DIAMOND

1  forgetting it.  So if I wrote -- if I told you my cell phone

2  number, you had to memorize it to go write it down, how long

3  can you keep that in mind before you start to forget it?

4  That's an aspect of it.

5  **Q.**  And you described something that you called social

6  cognition.  Are you talking about how someone does at a party

7  or at a social?  Do a little more work than that in that

8  phrase.

9  **A.**  Right.  No, not that type of socializing.  Social

10  cognition is social skills.  And social skill development -- or

11  if we're talking about a kid, we would talk about whether or

12  not they met -- they have met their social

13  milestones -- right? -- their social skill milestones.

14     And social cognition is the ability to take perspective or

15  imagine what others are thinking, it's the ability to

16  accurately read non-verbal communication in others, and it's

17  the ability to imagine a perspective other than your own.

18  **Q.**  Does social cognition include the ability to communicate

19  in writing with other people?

20  **A.**  Does it -- I'm sorry.  Does it include that?

21  **Q.**  Does it include the ability to cognize or understand

22  written communications with other people?

23  **A.**  I just want to make sure I'm getting your question right.

24  So does having social cognition allow you to do that?  Is that

25  what you're asking me?

ARMSTRONG - DIRECT / DIAMOND

1    Q.    Are skills related to communication with other people part

2    of the umbrella of social cognition?

3    A.    Yes.   That's under -- the ability to read between the

4    lines, you know, both metaphorically and, I guess, practically,

5    where understanding written communication is an aspect of

6    social cognition and imagining what that person is trying to

7    communicate, yep.

8    Q.    And did your results give you any findings significant

9    about Mr. Andrade's long-term memory?

10    A.    They did, and he scored in the exceptionally low category

11    on short-term, which is the learning side of memory, and

12    long-term recall and, specifically, for verbal information.

13    Q.    And same question with respect to intelligence findings.

14    Where did you find his intelligence on the comparative scores

15    of other people?

16    A.    Sure.   So I administered the gold standard, legally

17    accepted across everywhere Wechsler Adult Intelligence Scale,

18    Fourth Edition, and it's a battery of more than ten tests, but

19    the ten tests that you give are how we derive one's

20    intelligence or IQ.   And I gave all ten of those subtests and

21    was able to obtain an IQ of him.

22    Q.    And have you heard of the bell curve with respect to

23    describing IQ?

24    A.    I have.

25    Q.    Could you describe what that is to the jury?

**ARMSTRONG - DIRECT / DIAMOND**

1  **A.**   So the bell curve, or the normal distribution, is that if

2  we were to line up the intelligence of a population from lowest

3  to highest, it would pile up in the middle, meaning that the

4  probability of you just randomly picking out somebody with a

5  really, really low score or a really, really high score is

6  really low on the ends of the bell curve; whereas in the

7  middle, if we were just randomly choosing from a population, we

8  are more likely going to get scores that are close to the

9  average.  Right?

10 **Q.**   And where on that bell curve idea did Mr. Andrade's scores

11 fall with respect to intelligence?

12 **A.**   At the 16th percentile.

13 **Q.**   And is that in the middle of the bell curve or where would

14 you place it?

15 **A.**   It is in the low average range, technically, and a -- it's

16 on the very low end of what we would classify as a normal IQ.

17 **Q.**   And when you're looking at scores and viewing patterns in

18 the scores, what is the comparative person that you're using to

19 establish the norm to see whether or not there's an abnormal

20 result here?  Who are you comparing the results to?

21 **A.**   And that's -- and that's what I believe the most about our

22 tests, and that's the power of our tests, is that I'm comparing

23 all of his raw scores on all the tests that I give to normative

24 samples of men his same age and years of education who have no

25 history of any diagnosis, no medical history whatsoever.

ARMSTRONG - DIRECT / DIAMOND

1    So we're trying to get a representative selection of men

2    just like him so that I can take his score and know where he

3    stands in relation to that average or the normal range.

4    Q.   Now, while you were evaluating Marcus and you conducted a

5    diagnostic interview, prior to that, had you given him any sort

6    of questionnaire?

7    A.   I did.  So I gave him my typical patient, intake patient,

8    questionnaire that I think I was telling you I developed about

9    ten years ago when I first started out that includes a whole

10   bunch of questions about from childhood and early development

11   all the way through vocational history and things like that.

12   And I get patients that are always complaining about how

13   long it is, but it's very comprehensive.  And it's generic in

14   the sense that it allows me to gather information efficiently

15   across a wide range of domains like developmental history,

16   academic history, and so forth.

17   Q.   Do you usually review that questionnaire before you begin

18   your diagnostic clinical evaluation?

19   A.   Yes.

20   Q.   And in Mr. Andrade's case, did you, prior to the

21   completion of your interview, your diagnostic interview with

22   him, form a working hypothesis?

23   A.   I did.

24   Q.   What was that hypothesis?

25   A.   I have done this long enough to know that when a patient

PROCEEDINGS

```
1   completes that questionnaire and reports early childhood

2   speech/language delays, fine motor coordination delays, and

3   even episodes of mutism, that there's a high probability I'm

4   looking at something neurodevelopmental from a diagnostic

5   standpoint because we're talking about developmental delays,

6   which we know that developmental delays are almost always

7   present with neurodevelopmental disorders.

8        MS. DIAMOND:  Your Honor, I think this is a good

9   stopping point in Dr. Armstrong's testimony.  We're two minutes

10  shy of 1:30.

11       THE COURT:  Yes, yes.

12    Okay.  Members of the jury, remember my admonitions.  Do

13  not discuss this amongst yourselves, with anyone else.  Don't

14  do any research.  Nothing about the case.

15    We'll see you tomorrow at 8:30.

16  (Proceedings were heard out of the presence of the jury.)

17       THE COURT:  We're out of the presence of the jury.

18  We'll see you-all at 3:30.

19              (Recess taken at 1:29 p.m.)

20            (Proceedings resumed at 3:36 p.m.)

21    (Proceedings were heard out of the presence of the jury.)

22       THE COURT:  Okay.  So before we delve into the jury

23  instructions or the verdict form, let me give you the upshot of

24  what I was requested to do with respect to the impeachment

25  issues.
```

PROCEEDINGS

1    Thank you for the Ninth Circuit information, and then my

2    diligent folks jumped into it to an even greater degree.

3    I'm not going to go through all of Rule 613 and where it

4    goes.  To make a long story short, I do think that there is --

5    contrary to my initial reaction about you can't impeach with

6    extrinsic information, I think that -- while that concept does

7    play itself out, I think 613 does contemplate you can in the

8    appropriate situation.

9    If a witness, however, says, "I don't" -- "I don't

10   remember, but I probably said it," if there's no pushback,

11   I think that's a problem with respect to any intent to try to

12   impeach.

13   And I also think it can't be about a collateral issue.

14   Whether or not I said the statement is a collateral issue to

15   me.  It's got to be some underlying issue that is being -- that

16   is subject to the impeachment.

17   All of that said, this is what I think you can do.  There

18   are three of these trial testimony brackets, events that

19   I think you can call an FBI agent to impeach.

20   The first one involves Mr. Szeder, S-z-e-d-e-r, and it's

21   at pages 1357 and 1358.  It's the back-and-forth with respect

22   to the white paper, although I thought that was a pretty close

23   call, but I'll let the defense call an agent for purposes of

24   establishing what was said in the 302.

25   Okay.  The second one, which is of more consequence

1   probably, is page 1832, which is Mr. Abramoff and the

2   discussion about Morgan & Morgan.  So you can call an FBI agent

3   to impeach about that.

4       And the third one is involving Mr. Carlsen, and that's at

5   page 1278 to 1279, and that's the million dollars spent on

6   development.

7       Those are the three.

8           MR. SHEPARD:  Okay.  Thank you, Your Honor.

9       Can we, for the record, just mark that?  And the "that" is

10  what we gave the Court as our list of --

11          THE COURT:  Do you have a -- I marked this up.  Do you

12  have one that's not marked?

13          MR. SHEPARD:  I'm sure we do somewhere.

14          THE COURT:  Yes, it can go into the record.

15      I don't know -- Corrine, can they just file something like

16  this?

17          THE COURTROOM DEPUTY:  It would have to have the case

18  name and number.

19          THE COURT:  Can you put the case name and number on it

20  and then you can file it?

21          MR. SHEPARD:  Yes.  We will do that.  Thank you.

22          THE COURT:  All right.  I mean, you may want to take

23  those three out of this because I'm letting you do those three.

24  And I don't know if that's one FBI agent or more.

25          MR. HIGHSMITH:  I don't either.

CHARGING CONFERENCE

1    **THE COURT:**  Okay.

2    **MR. SHEPARD:**  We have a list somewhere.

3    Unfortunately, Ms. Dent is chasing down something she forgot

4    upstairs.

5    **MR. HIGHSMITH:**  We'll figure it out quickly.

6    **THE COURT:**  All right.

7    **MR. HIGHSMITH:**  This is not hard.

8    **THE COURT:**  Okay.  So let's talk now.  Let me first

9    ask you about the verdict form.

10    **MR. SHEPARD:**  I -- let me grab that one.  I came with

11    the instructions first.

12    I did -- I did have one issue with the verdict form,

13    although I expect it's more of just preserving the record

14    because it's something that the Court did not accept in our

15    jury instruction argument; and that is, the verdict form for

16    Count -- or the way the verdict form reads for Count Two, it

17    does not require unanimity on the basis of conviction.  And

18    I think we had made an argument about that in the jury

19    instructions.  The Court didn't accept our argument.  I just

20    want to preserve that argument for the verdict form.

21    **THE COURT:**  Okay.  Fair enough.

22    Beyond that?

23    **MR. SHEPARD:**  No, I have nothing.

24    **THE COURT:**  All right.  And I will tell them -- when I

25    get to those instructions at the end of the case, I'm going to

```
 1   tell them to -- I mean, the way you've got this verdict form,
 2   you've got a blank, and then you've got guilty/not guilty.
 3   Shall we say, "Please circle the applicable one"?  Or do you
 4   want them to write it in?  This is your recommendation.
 5            MR. HIGHSMITH:  Oh.  Usually, they just check the
 6   correct box.  Well, they should write it in.
 7            THE COURT:  So I will tell them to write -- those are
 8   your two choices:  guilty/not guilty.  Write your choice --
 9            MR. HIGHSMITH:  Correct.
10            THE COURT:  -- in on the underline.
11            MR. HIGHSMITH:  Correct.
12            THE COURT:  Okay.
13            MR. HIGHSMITH:  Please.
14            THE COURT:  All right.  There are only two, but
15   ordinarily, I would put -- because I'm a big believer in leave
16   nothing to doubt, make it as literal as possible, I would
17   sometimes after 1 say, "Go to Answer Number 2."  But with only
18   two, if they came back and they didn't answer one, I'd just
19   send them back.  So it's all right.
20       Okay.  And you want the statutory reference in there and
21   the -- okay.
22            MR. HIGHSMITH:  You know, to be honest, six of one,
23   half dozen of another.
24            THE COURT:  I don't care.  I'll leave it in there.
25   That's what you want.
```

1      Okay.  So turning to the instructions, why don't we do

2 like what we did when we went over the jurors for hardship, and

3 tell me the first one that somebody wants to say something

4 about, or I also recognize that there are instructions that you

5 have proposed that are not included in here.

6      As I said yesterday, you can memorialize your objection

7 any way you want.  I think, frankly -- I think you probably

8 have preserved it by virtue of having a different set, but far

9 be it from me to suggest how you want to preserve your

10 objections.  So if you want to preserve your objections, feel

11 free.  But why don't we go through these first, and then if you

12 want to say, "By the way, we object that you didn't give

13 these," that's fine with me.

14      Okay.  Who's got -- what's the first one?  And, again,

15 just to remind everybody, I'm going to take out everything but

16 a number once we get to the final version.  So, for example,

17 6.1, Duties of Jury, it will simply have 1 and then the

18 instruction and it won't have the footer obviously.  So...

19           **MR. HIGHSMITH:**  Understood.

20           **MR. SHEPARD:**  My first one is 3.3.

21           **THE COURT:**  Okay.  Do you have anything before 3.3?

22           **MR. HIGHSMITH:**  No.

23           **THE COURT:**  All right.  Let me find 3.3.  Let me get

24 it first.

25           **MR. SHEPARD:**  My objection to that is just the listing

1  of, I think, everything in 404(b) as a potential justification.

2  I think the -- the way the sentence reads, it's like you can

3  consider this for pretty much anything.  And so I object to

4  having all those different terms in the second sentence.

5  I think it should be much more focused.

6       **THE COURT:**  So you want -- first of all, do you want

7  this instruction in there?  Does somebody want it?

8       **MR. SHEPARD:**  Well, I mean, the way it's currently

9  written, probably not.  So the question is:  Can it be more

10  limited?  Otherwise, I think there are other instructions that

11  are better than this.

12       **THE COURT:**  I mean, I, frankly, thought this was an

13  instruction that was one the defense usually wants because it's

14  essentially saying you can't convict him for anything other

15  than the acts charged; but if you don't want it --

16       **MR. SHEPARD:**  I think there is a separate instruction

17  that says what the Court just said --

18       **THE COURT:**  All right.

19       **MR. SHEPARD:**  -- namely, that you can't convict him

20  for something other than the crime charged.

21       And so the way this is currently written, I don't think it

22  adds --

23       **THE COURT:**  Well, I also didn't quite know which

24  crimes, wrongs, or acts.  I'm not sure what -- I mean, there's

25  been evidence about maybe wrongs or acts.  There's no criminal

1    conviction that's come into evidence, is there?

2        **MR. SHEPARD:**  Right.  I mean, the -- it's Aten Coin

3    and the failure to file taxes.

4        **THE COURT:**  Failure to file tax returns, that's right.

5        **MR. HIGHSMITH:**  We'd get rid of "crimes."

6        **THE COURT:**  Well, do we need it at all?  I mean, I

7    don't know what -- if we really --

8        **MR. HIGHSMITH:**  Our position is we want it because

9    I think it captures the Aten Coin and it captures the late

10   filing of the taxes.  And it's the model instruction.  So we do

11   not want to modify the language too much because this is the

12   model instruction.

13       **THE COURT:**  Well, you want it -- how -- my

14   impression -- my understanding from Mr. Shepard is he wants to

15   take out "crimes."  Or you don't want to take out "crimes"?

16       I mean, there is evidence, now that you've reminded me, of

17   the tax.  I mean, Aten Coin -- Aten Coin didn't result in

18   criminal charges.  It was just an investigation; right?

19       **MR. HIGHSMITH:**  Correct.

20       **THE COURT:**  So -- and while the failure to file a tax

21   return may be actionable, he didn't get charged with it.  So

22   I think "crimes" sort of connotes convictions.

23       **MR. HIGHSMITH:**  We're fine taking out "crimes."

24   Absolutely fine striking the word "crimes."  We do think it's

25   appropriate because there is the other wrongs or acts not

 1    charged, but we're fine taking out "crimes."

 2         **THE COURT:**  Okay.

 3         **MR. SHEPARD:**  Even with that, I object to it for the

 4    reasons stated.

 5         **THE COURT:**  Let me just look at the commentary on this

 6    one.

 7         Well, as I'm looking at the instruction, it has brackets

 8    around all of the "You may consider this evidence only for its

 9    bearing, if any, on the question of the defendant's" and then

10    it's got bracketed "intent, motive, opportunity, preparation,

11    plan, knowledge, identity, absence of mistake, absence of

12    accident, and for no other purpose."

13         Are all of those applicable?

14         **MR. HIGHSMITH:**  No.  Intent -- I think all of them

15    actually are at issue.  The tax returns and the Aten Coin

16    conduct goes to intent.  It goes to opportunity.

17         Preparation because it rolls right into the AML BitCoin.

18         The plan, it rolls -- the Aten Coin rolls right into the

19    AML BitCoin.

20         Knowledge, if he's done Aten Coin once, he then goes to do

21    substantially similar conduct the second time; therefore, that

22    goes to knowledge.

23         It goes to the absence of mistake.  Doing this the second

24    time is not a mistake.  He had done it once before.  It was not

25    an accident.  He had done it once before.

1          **THE COURT:**  How about motive?

2          **MR. HIGHSMITH:**  That's the only one.  I think they do

3     not go to motive.  I think "motive" should be stricken.

4          **THE COURT:**  Okay.

5     All right.  Well, Mr. Shepard has preserved his objection.

6     I will -- I will include it, and it's going to read [as read]:

7               "You have heard evidence that the defendant

8          committed other wrongs or acts not charged here.  You

9          may consider this evidence only for its bearing, if

10         any, on the question of defendant's intent,

11         opportunity, preparation, plan, knowledge, absence of

12         mistake, and absence of accident and for no other

13         purpose."

14     Okay.  3.8 and 3.9 were sort of confusing to me because

15     3.8 is kind of the general impeachment thing and then 3.9 is

16     the one that -- well, 3.9, I guess, is talking about plea

17     agreements and that kind of thing.

18     So what's going to be filled in on here?

19         **MR. SHEPARD:**  So the way we parsed that, and we spent

20     a fair amount of time trying to figure out what was 3.8 and

21     what was 3.9 also, but this is what we would propose for 3.8

22     [as read]:

23               "You have heard evidence that" -- and I'm going

24         to skip the name for a second because I've got a

25         list -- "You have heard evidence that a witness" and

1          then "testified contrary to at least one statement

2          the witness made to the FBI and/or testified contrary

3          to at least one prior written statement the witness

4          had made."

5          I think those are both accepted forms of impeachment.

6     Those were both means of impeachment that we used for the

7     following witnesses:  John Szeder --

8          Am I too fast for you?  Sorry.

9              MR. HIGHSMITH:  No, no.  It's okay.

10         What was the last thing you said?  At least one prior

11    written statement and then you had --

12             MR. SHEPARD:  "Prior written statement the witness had

13    made."

14             MR. HIGHSMITH:  Okay.  Thank you.

15             MR. SHEPARD:  And our list would be John Szeder,

16    S-z-e-d-e-r; Evan Carlsen, C-a-r-l-s-e-n; Melanie Cowan,

17    C-o-w-a-n; John Bryan, B-r-y-a-n; Brian Darrow, D-a-r-r-o-w;

18    Jack Abramoff; Bernadette Cowan-Tran, same Cowan spelling,

19    C-o-w-a-n and then dash T-r-a-n; Brandi -- I never pronounce

20    her name right -- Jodoin or Jodoin.  Those are -- and I'm

21    sorry.  Carlos De La Guardia.

22             THE OFFICIAL REPORTER:  And you don't spell Jodoin?

23             MR. SHEPARD:  Sorry.  I was on a roll there.

24    J-o-d-o-i-n.

25             THE COURT:  Well, other than Szeder, Carlsen, and

1    Abramoff, who we just talked about in terms of impeachment and

2    FBI 302s, I don't remember any of the other witnesses -- I

3    mean, again, this may go back to what is impeachment.  If you

4    said -- if they say "I don't recall" and you give them the 302

5    and they say "Well, I still don't remember it, but I have no

6    reason to believe I didn't give this statement," I don't think

7    they're really being impeached.

8         MR. SHEPARD:  Well, the ones who -- leaving aside the

9    particular impeachment the Court has already dealt with, these

10   are people who said something contrary to their testimony to

11   the FBI and, when impeached, they said, "Yeah, I did say that

12   to the FBI."

13        THE COURT:  Well, okay.

14        MR. SHEPARD:  So they were impeached.  They were shown

15   to have testified falsely, and I believe that's what 3.8 is

16   about.

17        MR. HIGHSMITH:  Well, the commentary says that 3.8 is

18   specifically about a witness's character for truthfulness and

19   impeachment by evidence of a criminal conviction.  So --

20        THE COURT:  Let me go there and see.  I've never given

21   this instruction in the way that it's just been described, but

22   let's see.

23        MR. HIGHSMITH:  I think one of -- there are

24   potentially several issues.  One issue is that the comment does

25   not capture the circumstance where a witness says, "I may have

 1   said that, but I don't recall."  That is outside the gambit of

 2   the comment to this instruction.

 3         MR. SHEPARD:  That's not this list.  This list, as

 4   I believe we constructed it, was "You testified differently

 5   than what you had previously said, either in writing or to the

 6   FBI."

 7         THE COURT:  Well, I have -- I've never given this

 8   instruction in the way you're suggesting it should be given.

 9   I've never been asked to give it in that way.

10         MR. SHEPARD:  There's always a first time.

11         THE COURT:  But I'm not saying absolutely no.  I mean,

12   there have been a lot of witnesses that testified, and a lot of

13   them -- I'm a little uncomfortable singling out a whole list of

14   people when the supposed impeachment is, you know, that they --

15   the example of somebody saying "I don't remember, but I have no

16   reason to disbelieve it," I would not include somebody like

17   that on the list because they're not saying any -- they're not

18   contradicting themselves.  They're just saying "I don't

19   remember, but I agree, that sounds right."  I wouldn't include

20   any of those people on this list.  And if that's all it is, I

21   don't think that that's correct.

22       Yes, sir?

23         MR. HIGHSMITH:  No, I agree with the Court.  The

24   commentary talks about 608 and 609.  This is not -- how counsel

25   is describing it is different, I think, than how the rule

1  contemplates it.  We don't have evidence about their character

2  for truthfulness or untruthfulness or impeachment with criminal

3  convictions.

4     **THE COURT:**  Well, let me go back and look at that one

5  because that -- I just -- I haven't seen it used in this

6  fashion.  So give me your list.

7     **MR. SHEPARD:**  I will give you the list.  And I heard

8  what the Court said about my list.  I will double-check my list

9  based on what the Court just said --

10     **THE COURT:**  Okay.

11     **MR. SHEPARD:**  -- to make sure I'm in compliance.

12     But here is my list in the meantime.

13     **THE COURT:**  Okay.

14     **MR. SHEPARD:**  It's John Szeder, S-z-e-d-e-r; Evan

15  Carlsen, C-a-r-l-s-e-n; Melanie Cowan, C-o-w-a-n; John Bryan,

16  B-r-y-a-n; Brian Darrow, D-a-r-r-o-w; Jack Abramoff; Bernadette

17  Cowan-Tran; and Brandi Jodoin, J-o-d-o-i-n; and, finally,

18  Carlos De La Guardia, D-e, space, as you remember, L-a, space,

19  Guardia, G-u-a-r-d-i-a.

20     **THE COURT:**  Okay.  I'll go back and look at that; and

21  if I do not include it in the way you've requested,

22  Mr. Shepard, you've preserved your objection.

23     **MR. SHEPARD:**  Thank you.

24     **THE COURT:**  3.9, this will pertain to Abramoff --

25     **MR. SHEPARD:**  Abramoff and Darrow, I believe.

1              **THE COURT:**  -- and Darrow.

2              **MR. HIGHSMITH:**  That's it, Abramoff and Darrow.

3              **THE COURT:**  Okay.  And have you filled in the blanks

4    or brackets for me?

5              **MR. SHEPARD:**  Well, I'll give you what I would

6    propose, and then I will give you the more strict

7    interpretation in the instruction.

8         I would say Abramoff and Brian committed crimes and

9    reached favorable plea deals with the Government to testify,

10   and I think that captures the essence of it.

11        The -- I don't think the form actually captures it, but it

12   seems like Mr. Darrow would fall into the first subpart of the

13   form, received benefits, compensation, favored treatment from

14   the Government in connection with this case in the sense that

15   my recollection is he was not forced to plead guilty in

16   connection with what he did with Aten Coin.  He instead pled

17   guilty to something -- one of his many other crimes.

18        Mr. Abramoff would fall into the third bucket because he

19   did plead guilty to a crime arising out of the same events for

20   which the defendant is on trial.

21        But I find those categorizations to be -- to not really

22   capture because Darrow could have been charged with and pled

23   guilty relating to Aten Coin.  They just chose to charge him

24   with something else instead.  So that's why I had trouble with

25   the categories and preferred the language that I proposed.

1      **MR. HIGHSMITH:**  So, obviously, we would stick to the

2  model instruction.  Abramoff fits all three buckets, so we

3  would do the Abramoff language to say, starting with Bucket 1,

4  "received benefits from the Government in connection with the

5  case."  The benefit would be continuing his sentencing.

6      He also admitted to being an accomplice to the crime

7  charged or a co-schemer, so Abramoff fits into the second

8  bucket.  And then, of course, Abramoff fits into the third

9  bucket.

10      So for Abramoff I would follow the model and include all

11  three buckets.

12      **THE COURT:**  We're talking about separate instructions

13  for each person rather than trying to lump them into a --

14      **MR. HIGHSMITH:**  I think that's right because they are

15  differently situated.

16      For Mr. Darrow, what I would do is I would use Bucket 1

17  and I would use Bucket 3.

18      **THE COURT:**  Did Darrow plead guilty to a crime arising

19  out of the same events?

20      **MR. HIGHSMITH:**  It was the same investigation.  It

21  was -- Darrow's involved in Aten Coin.  He learns about

22  Aten Coin and he goes, "Oh, that's an amazing scheme.  I can do

23  that myself."  So then he goes off and he does something called

24  Javacoin where he uses Mr. Andrade's Aten Coin model to commit

25  his own fraud scheme.  He is charged and pled guilty to his

1    Javacoin fraud scheme.

2        So it's arising out of this investigation, it's somewhat

3    arising out of this case, but it is not the four corners of

4    this case.

5        **THE COURT:**  Well, okay.  Putting aside for a moment

6    what Mr. Shepard is recommending, pleaded guilty to a crime

7    arising out of the same investigation for which the defendant

8    is on trial?

9        **MR. HIGHSMITH:**  Yes.

10       **THE COURT:**  Okay.  Now, did you -- I'm not sure I

11   followed all of the changes you wanted on this, but what's your

12   view of -- I know you say you prefer the pattern instruction.

13   Run this by me again what you think is --

14       **MR. SHEPARD:**  I was proposing something more simple

15   [as read]:

16           "You have heard testimony from Jack Abramoff and

17       Brian Darrow who committed crimes and reached

18       favorable plea deals with the Government to testify."

19       **THE COURT:**  And then it would go on [as read]:

20           "For this reason, in evaluating the testimony of

21       the two of them, you should consider the extent to

22       which each" --

23       **MR. SHEPARD:**  I would actually pick up one line above

24   that [as read]:

25           "The guilty plea is not evidence against the

1          defendant, and you may consider it only in

2          determining this witness's believability," and then,

3          "for these reasons in evaluating the testimony," as

4          the Court suggested.

5                 THE COURT:  Well, if there were separate instructions

6     for both Darrow and Abramoff but they were effectively the same

7     thing, just two separate instructions, doesn't that sort of

8     simplified approach take care of this?

9                 MR. HIGHSMITH:  It simplifies it, but it doesn't --

10    (a) it's not the model.  It doesn't follow the model.

11                THE COURT:  I like the model, but that doesn't mean we

12    always give the model.

13                MR. HIGHSMITH:  Obviously, we don't agree with the

14    term "favorable," "a favorable plea deal."  I mean, this is --

15                THE COURT:  I understand.

16                MR. HIGHSMITH:  The plea deal is to tell the truth and

17    to fully cooperate.

18                THE COURT:  Well, if you took out "favorable"?

19                MR. HIGHSMITH:  Yes, we would agree to it.

20                THE COURT:  So --

21                MR. HIGHSMITH:  Again, we like the model.

22    The Government's always hesitant to deviate from the model,

23    Your Honor.

24                MR. SHEPARD:  Well, I would say as to the word

25    "favorable," that the model has "favored treatment."  I didn't

1    just concoct that.  I mean, I -- so I do have a problem with

2    taking that out.  It does come from the model.

3         **MR. HIGHSMITH:**  And then, of course, from the model,

4    we think the language in Bucket 3, "pleaded guilty to a crime

5    arising out of the same investigation for which the defendant

6    is on trial," is important language.

7         **THE COURT:**  Well, do this for me:  Each side submit to

8    me their proposal for 3.9.  Tell me if you want a joint

9    instruction or separate instructions for Abramoff and Darrow,

10   and then I will look at them and decide.

11        **MR. HIGHSMITH:**  Understood.

12        **THE COURT:**  Okay.  3.14 is -- can we merge the four

13   experts into this one instruction?

14        **MR. HIGHSMITH:**  Yes, Your Honor.  The only question is

15   Dr. Amanda Gregory, who's the Government's rebuttal.  So we'd

16   have to -- if we end up calling her in rebuttal, we'd have to

17   slot that in.

18        **THE COURT:**  Okay.  And -- all right.

19        **MR. HIGHSMITH:**  We're going to see how Mr. Armstrong

20   finishes up.

21        **THE COURT:**  Okay.  So it's three or four.

22        **MR. HIGHSMITH:**  Yes.

23        **THE COURT:**  The bottom line is, we can use the same

24   instruction, just add that expert in if that expert testifies.

25        **MR. SHEPARD:**  I think it's actually four or five, but

1    yes.

2              THE COURT:  Who -- so we've got --

3              MR. SHEPARD:  We've got Ms. Chiu and Carfora from

4    the Government, Min and Armstrong --

5              THE COURT:  Okay.  Right.

6              MR. SHEPARD:  -- and then potentially Gregory.

7              THE COURT:  Gotcha.  Gotcha.

8         Can you just remind me of -- somebody submit the list of

9    names for me?

10             MR. HIGHSMITH:  Yes.

11             THE COURT:  Okay.  6.9 is pretty straightforward.

12        3.16, we've had both charts and summaries in evidence and

13   used as demonstratives, so we would have both.

14        Well, what's the next one anybody has?

15             MR. HIGHSMITH:  He'll probably pop up first.

16             THE COURT:  Okay.  Mr. Shepard?

17             MR. SHEPARD:  My next one is wire fraud --

18             THE COURT:  Okay.  So you're --

19             MR. SHEPARD:  -- 15.35.

20        Oh, it seems like I skipped one.

21             MR. STEFAN:  Your Honor, just that defense preserves

22   its objections as provided in the joint filing regarding

23   deliberate ignorance.

24             MR. SHEPARD:  Oh, yeah.  Sorry.  I meant to --

25             THE COURT:  Well, I'm going to let you kind of do a

 1  global preservation of objections once we get through the -- is

 2  that -- that's one that I omitted or I left in and you want

 3  out.

 4          **MR. SHEPARD:**  You left it in.

 5          **THE COURT:**  So when we get to that, you can tell me

 6  you want it out.

 7          **MR. SHEPARD:**  Yes.

 8          **THE COURT:**  Because we haven't gotten there yet.

 9          **MR. STEFAN:**  Pardon me, Your Honor.  I jumped the gun.

10          **THE COURT:**  Okay.  All right.  So --

11          **MR. SHEPARD:**  So --

12          **THE COURT:**  So the first one that you want to talk

13  about is wire fraud?

14          **MR. SHEPARD:**  Yes.

15          **THE COURT:**  And do you, Mr. Highsmith, have anything

16  before wire fraud?

17          **MR. HIGHSMITH:**  No, Your Honor.

18          **THE COURT:**  Okay.  Wire fraud.  Go ahead, Mr. Shepard.

19          **MR. SHEPARD:**  I have two pieces relating to 15.35.

20  One Mr. Stefan is the expert in but I'll get started, and the

21  other relates to the Court included "good faith" language,

22  which we appreciate, but did not include, from the typical good

23  faith instruction, the language that the defendant does not

24  have to prove his good faith, which I think is very important

25  on burden of proof.  And so we would ask the Court to add that

1    sentence.

2          **THE COURT:**  Just so that it's clear on the record, I

3    didn't include it because I think it is covered in the overall

4    burden instruction and reasonable doubt, and so I don't think

5    it's necessary to underscore it as an additional burden issue.

6          So I heard you, you preserved the evidence, but I'm

7    leaving it out.

8          **MR. SHEPARD:**  Okay.  Thank you, Your Honor.

9          The other issue is another thing that I think will fall

10   into the category of preservation, and that is that we had

11   submitted some additional unanimity language.  And this is

12   because, I mean, back when I was a prosecutor, there were

13   various terms in statutes like "materiality" in 18 U.S.C. 1001,

14   that the Court would just instruct the jury this is material.

15         And there have now been many United States Supreme Court

16   decisions in different contexts, not relating to a wire fraud

17   charge but in different contexts, that say, "If the words are

18   in the statute, they've got to be pled and they've got to be

19   proven.  Beyond a reasonable doubt, the jury has to find them."

20   And so that was our -- we had an objection along those lines to

21   the wire fraud instruction.

22         And it comes up even more clearly for us in the money

23   laundering instruction.  In the money laundering instruction, I

24   know there are Ninth Circuit cases that do not accept our

25   argument, but they're old.  They haven't been rethought in

 1   light of the Supreme Court precedent.

 2          MR. HIGHSMITH:  We'd like to stick with the

 3   instructions, which tag closely to the model.

 4          THE COURT:  When did the Circuit last opine on that --

 5          MR. HIGHSMITH:  I don't know the answer.

 6          THE COURT:  -- unanimity issue?

 7          MR. HIGHSMITH:  I do not know.

 8          MR. CHOU:  Well, Your Honor, the wire fraud

 9   instruction was recently amended to reflect the *Milheiser*

10   decision from the Ninth Circuit.  So I think this is a -- this

11   is an instruction that's not sitting moribund or anything like

12   that.

13          THE COURT:  Okay.  Well, you've preserved your

14   objections on that.

15          MR. SHEPARD:  Yeah.  It's a little more poignant in

16   the next one where there's this language about specified

17   unlawful activity, which we think needs to be pled and proven

18   beyond a reasonable doubt, but it's basically the same

19   principle.

20          THE COURT:  Okay.

21          MR. HIGHSMITH:  And, again, we would like to keep the

22   current version because it follows the model instruction.

23          THE COURT:  Next.

24          MR. SHEPARD:  The next one I have is, as Mr. Stefan

25   was anticipating, the deliberate ignorance instruction, which

1  we object to.  We think it would be particularly confusing in

2  this case because part of the defense in this case is, I would

3  call it innate ignorance or unintelligent ignorance as opposed

4  to deliberate ignorance, and I don't want the jury to be

5  confused by how to address that evidence.

6      **MR. HIGHSMITH:**  I actually think that shows why this

7  is an important instruction.  There's been a lot of testimony

8  elicited by the defense about what Mr. Dillman did, obviously

9  what Mr. Abramoff did, what other people did.  And the

10  defendant is the founder and CEO.  He's the one in charge of

11  this entire enterprise.  So to be able to hide behind the

12  actions of other people and say -- I don't know what "innate

13  ignorance" means, but this seems actually particularly

14  appropriate in this case.

15      **THE COURT:**  I mean, when you say "innate ignorance,"

16  it sort of plays into the -- isn't that really related to your

17  diminished capacity argument in a sense?

18      **MR. SHEPARD:**  I prefer to think of it more as a lack

19  of intent to defraud argument; but, yes, it is related.

20  However the Court wants to view that argument, it is related to

21  that argument.

22      **THE COURT:**  And I'm going to give that diminished

23  capacity instruction.

24      So okay.  Well, you've preserved that issue.

25      Okay.  So what I'm looking for from you is some further

1    input on the three-point -- the impeaching stuff.

2            MR. HIGHSMITH:  Understood.

3            THE COURT:  You were going to give me some different

4    versions, and I'm going to work on that.  Okay?

5        Let's see.  Okay.  Anything else?

6            MR. HIGHSMITH:  I'm just pausing on whether

7    the Government needs to object to the diminished capacity

8    instruction, Your Honor, but I'll -- I'm not going to.

9            THE COURT:  So tomorrow, Dr. Armstrong is still on the

10   stand.  And then who's after him?

11           MR. SHEPARD:  I think we will want to address in the

12   morning Mr. Andrade's decision on whether he is going to

13   testify.  I think we should do that in the morning.

14           THE COURT:  You'll be ready at 8:00?  We can do that

15   at 8:00?

16           MR. SHEPARD:  Yes.  To the extent I am in charge of

17   it, yes.

18           THE COURT:  Well, one way or the other, we'll get an

19   answer at 8:00.

20           MR. SHEPARD:  Yes, we'll be here.  We'll address it.

21           THE COURT:  Okay.

22           MR. SHEPARD:  And -- and then we may call Raul Torres

23   and --

24           THE COURT:  Who's that person?

25           MR. SHEPARD:  He's another one of Mr. Andrade's

**CHARGING CONFERENCE**

 1    accountants.

 2        And we then also have to deal with the remaining documents

 3    that the Court has now allowed us to admit that have not been

 4    published.

 5        We have -- over the weekend, we sent some additional

 6    documents to the Government that we are asking for a

 7    stipulation to authenticity and, if they have other objections,

 8    to let us know.  We have not heard back on those.  Those are

 9    also on the list.

10        Then we will either be able to reach a stipulation on the

11    three completion of impeachment items that the Court identified

12    earlier this afternoon, and I expect that's the end of the

13    case.  It will certainly get us through tomorrow at the rate

14    we're going.

15        **THE COURT:**  Where did things -- where were things left

16    with respect to the whole battle about the purchase agreements

17    and did -- was there anything left on that?  There was some --

18    I remember you preserved some issue and we were going to talk

19    about it, and then I've lost track of where that went.

20        **MR. SHEPARD:**  I believe -- and one of my colleagues

21    can correct me if I'm wrong.  I believe that you ruled on that

22    as part of the three-part it's not hearsay argument --

23        **THE COURT:**  Right.

24        **MR. SHEPARD:**  -- that we filed on Sunday night.

25        **THE COURT:**  So that's been resolved.

1          **MR. SHEPARD:**  I believe it has been resolved.

2          **THE COURT:**  And because I ruled that way, I don't

3    think the Government needs a separate instruction about it is

4    not -- the whatchamacallit.  Why do I keep forgetting the name

5    of the case?

6          **MR. HIGHSMITH:**  Oh, *Lindsay*.

7          **THE COURT:**  *Lindsay*.  Thank you.

8       You don't need a *Lindsay* instruction --

9          **MR. HIGHSMITH:**  Understood.

10         **THE COURT:**  -- because of how I ruled.

11         **MR. HIGHSMITH:**  Okay.

12         **THE COURT:**  All right?

13         **MR. HIGHSMITH:**  We're just pausing on closing

14   arguments, but I think we'll wait till next week for that.

15         **THE COURT:**  So if we finish tomorrow, we get into your

16   rebuttal, you're going to call whoever your Mr. Min equivalent?

17         **MR. HIGHSMITH:**  We're not going to call Mr. Min

18   equivalent.

19         **THE COURT:**  Are you going to have any rebuttal case?

20         **MR. HIGHSMITH:**  We may have Dr. Gregory, the rebuttal

21   to Armstrong; and we have Ethan Quinn.  We're going to recall

22   Agent Ethan Quinn to address several of the arguments they

23   made, but very briefly.  He's going to introduce two documents,

24   two or three.

25         **THE COURT:**  So we could finish tomorrow?

1          **MR. HIGHSMITH:**  I think so.  I think we're -- if

2   Mr. Torres seems like he'll be very short, Dr. Armstrong is

3   almost done, I think we could finish tomorrow.

4          **THE COURT:**  Okay.  So that means we could have closing

5   arguments on Monday.  And the reason I'm asking is I want to

6   tell the jury -- excuse me.  If we are able to conclude

7   tomorrow, I want to ask them to clear -- I want them to go from

8   8:30 to 4:00 because I don't know how long your closings are,

9   but I don't want to spread them over two days, and then also

10  let them get started.

11         So if that's -- that's what I'm going to do if we finish.

12  I'm going to tell them that, that I want them here for the full

13  thing.  And that does mean, then, we need to finalize these

14  instructions hopefully tomorrow because I'm -- you know, I'm

15  going to be away.

16         **MR. HIGHSMITH:**  Understood.

17         **THE COURT:**  That does, of course -- I mean, I guess we

18  find out at 8:00 tomorrow with respect to Mr. Andrade.

19         **MR. SHEPARD:**  We'll see how tomorrow goes.

20         **THE COURT:**  Keep me in suspense.  All right.  But, I

21  mean, that would change the calendar, obviously.

22         **MR. HIGHSMITH:**  Understood.

23         **THE COURT:**  Okay.  Well, you kept your word.  You're

24  ahead of the game.  I think the jury fortunately -- I'm glad we

25  told them -- their current expectation is they're going through

1    all of next week, so I think we're in good shape however it

2    shakes out.  So, okay.

3            **MR. HIGHSMITH:**  Thank you.

4            **MR. SHEPARD:**  Thank you, Your Honor.

5            **THE COURT:**  Nothing else?  I can't believe it.

6            **MR. SHEPARD:**  We'll work on it.  We'll work on it.

7            **THE COURT:**  Don't work too hard, Mr. Shepard.  Take a

8    break.  Watch some TV.

9                    (Proceedings adjourned at 4:20 p.m.)

10                        ---o0o---

11

12                    <u>**CERTIFICATE OF REPORTER**</u>

13        I certify that the foregoing is a correct transcript

14    from the record of proceedings in the above-entitled matter.

15

16    DATE:  Wednesday, March 5, 2025

17

18

19

20                    _Ana Dub_

21        _____

22            Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

23            CSR No. 7445, Official United States Reporter

24

25