**Volume 18**

**Pages 2846 - 2942**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )
  VS.                           )    **NO.  3:20-CR-00249 RS**
                                )
ROWLAND MARCUS ANDRADE,         )
                                )
          Defendant.            )
_____)

San Francisco, California
Monday, March 10, 2025


**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    PATRICK D. ROBBINS
                    ACTING UNITED STATES ATTORNEY
                    450 Golden Gate Avenue
                    San Francisco, California 94102
               BY:  **CHRISTIAAN HIGHSMITH**
                    **DAVID J. WARD**
                    **MATTHEW CHOU**
                    **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                    KING & SPALDING, LLP
                    50 California Street, Suite 3300
                    San Francisco, California 94111
               BY:  **MICHAEL J. SHEPARD, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

```
 1   APPEARANCES: (CONTINUED)

 2   For Defendant:
                              KING & SPALDING, LLC
 3                            1700 Pennsylvania Avenue, NW
                              Washington, D.C. 20006
 4                    BY:     KERRIE C. DENT, ATTORNEY AT LAW

 5                            KING & SPALDING, LLC
                              1185 Avenue of the Americas, 34th Floor
 6                            New York, New York 10036
                      BY:     DAINEC P. STEFAN, ATTORNEY AT LAW
 7

 8                            LAW OFFICES OF CINDY A. DIAMOND
                              58 West Portal Avenue, Suite 350
 9                            San Francisco, California 94127
                      BY:     CINDY A. DIAMOND, ATTORNEY AT LAW
10

11   Also Present:           Special Agent Brendon Zartman
                             Tina Rosenbaum, Paralegal
12                           Ed Jackson, Trial Technician

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          **I N D E X**

2

3     Monday, March 10, 2025 - Volume 18

4

5

6                                                   **PAGE**    **VOL.**

7     Government Rests                               2941      18

8

9     **GOVERNMENT'S WITNESSES**                     **PAGE**    **VOL.**

10    **GREGORY, AMANDA  (RECALLED IN REBUTTAL)**
      (PREVIOUSLY SWORN)                             2853      18
11    Direct Examination resumed by Mr. Highsmith    2853      18
      Cross-Examination by Ms. Diamond              2873      18
12    Redirect Examination by Mr. Highsmith         2930      18
      Recross-Examination by Ms. Diamond            2936      18
13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1    **Monday - March 10, 2025**                                    **8:09 a.m.**

2                        **P R O C E E D I N G S**

3                              ---o0o---

4              (Defendant present, out of custody.)

5        (Proceedings were heard out of the presence of the jury.)

6              **THE COURT:**  Good morning.

7              **MR. HIGHSMITH:**  Good morning, Your Honor.

8        I have two issues for the Court.

9              **THE COURT:**  Okay.

10             **MR. HIGHSMITH:**  The first issue is that we have a

11   stipulation that we've entered into that we'd like to read into

12   the record.

13             **THE COURT:**  Okay.

14             **MR. HIGHSMITH:**  I'll hand it up to the Court.

15        But by way of background, Special Agent Quinn testified

16   that he did not know about receiving, pursuant to

17   the Government subpoena, any source code from Mr. Andrade; and

18   the Government asked that on direct, the defense crossed on it,

19   and the Government redirected on it.  We also asked Dr. --

20   Mr. Min a question about not receiving source code.

21        The defense, I don't think they knew about it either, but

22   they found on Saturday that some source code had been produced.

23   It appears to be some Aten Coin source code from 2015.

24        But we would like to correct the record with this

25   stipulation.  It's clear the parties are stipulating that

**PROCEEDINGS**

1  Special Agent Quinn did not know about that source code, but we

2  want to make clear that it was -- some source code was

3  produced, 13,000 pages of it.

4       **THE COURT:**  Okay.  When do you want to read this?

5       **MR. HIGHSMITH:**  I was just going to read it first

6  thing.

7       **THE COURT:**  Okay.

8       **MR. HIGHSMITH:**  Just start the day with that, finish

9  with Dr. Gregory, and rest.

10      **THE COURT:**  Okay.

11      **MR. HIGHSMITH:**  Second -- thank you so much.

12    The second item is we'd like to amend the money laundering

13  jury instruction.  We do not intend to argue promotion money

14  laundering.  We only intend to argue concealment money

15  laundering.  So we're proposing to cut out the "promotion"

16  language and just have the "concealment" language for the sake

17  of simplicity.

18      **THE COURT:**  Is this a --

19      **MR. HIGHSMITH:**  It's a redline and then a clean

20  version.

21      **THE COURT:**  I see.  Okay.

22      **MR. STEFAN:**  Your Honor, understanding it's fairly

23  straightforward, we haven't really had a chance to go over this

24  yet or consider it on the defense side.  The Government

25  provided this to us just this morning.  So if we could have a

1    little bit of time to confer on it.

2        **THE COURT:**  I suppose.  It's favorable to you that

3    they're omitting this, I think.

4        **MR. STEFAN:**  In theory, Your Honor, yes.

5        **THE COURT:**  Okay.  Well, I'll take it.  And then if

6    there's something -- it's going to be finalized this afternoon,

7    and then I'm going to send a final version to each side so you

8    can use it in your closing.  So you need to tell me if you have

9    a problem with this before noon.

10       **MR. STEFAN:**  Understood.

11       **THE COURT:**  Okay.

12       **MR. HIGHSMITH:**  That's it, Your Honor.  Thank you.

13       **THE COURT:**  Okay.  Thank you.

14                    (Recess taken at 8:12 a.m.)

15                    (Proceedings resumed at 8:31 a.m.)

16       (Proceedings were heard out of the presence of the jury.)

17       **THE COURT:**  Are you ready?

18       (Proceedings were heard in the presence of the jury.)

19       **THE COURT:**  Welcome, members of the jury.  Hopefully,

20   you had a good extended couple of days.  Thank you so much for

21   being prompt.

22       Okay.  Before we recall the witness who was on the stand,

23   you had a stipulation you wanted to read, Mr. Highsmith?

24       **MR. HIGHSMITH:**  Yes, please, Your Honor.

25       All right.  So I'm going to read a stipulation into the

**PROCEEDINGS**

1    record between the parties, similar to the stipulation that was

2    read into the record earlier in the trial.

3        Special Agent Ethan Quinn testified on direct examination

4    that a grand jury subpoena was issued to Mr. Andrade's company,

5    the NAC Foundation, to produce source code for AML BitCoin and

6    Aten Coin; and when asked if any of that source code was

7    produced pursuant to that grand jury subpoena, he stated,

8    quote, "Not to my knowledge," end quote.

9        During cross-examination, Special Agent Quinn reiterated

10   that, quote, "We received a response to the subpoena.  I don't

11   believe it included the source code," end quote.

12       On redirect, when asked, quote, "Did you ever during the

13   investigation receive that source code," end quote, Special

14   Agent Quinn, again, stated, quote, "I have not seen any source

15   code," end quote.

16       During the trial testimony of Mr. Andrade's digital

17   forensics expert, Mr. Erik Min, the Government, over defense

18   objection, inquired as to Mr. Min's knowledge that Mr. Andrade,

19   quote, "failed to provide any source code to the grand jury,"

20   end quote, about which Mr. Quinn stated he was, quote, "unaware

21   of that," end quote.

22       Over the weekend of March 8th, 2025, defense counsel was

23   able to confirm that Mr. Andrade's counsel at the time produced

24   more than 13,000 pages of source code to the Government

25   approximately five years ago in March 2020 in response to the

 1   grand jury subpoena about which Agent Quinn testified.

 2        Defense counsel so informed the Government.

 3   The Government agrees that 13,000 pages of source code was

 4   produced as described in this stipulation, and Agent Quinn

 5   reiterates that he has not seen the produced code.

 6        **THE COURT:**  Thank you.

 7        Ready to call or recall?

 8        **MR. HIGHSMITH:**  Yes, Your Honor.

 9    (Witness enters the courtroom and steps forward to be sworn.)

10        **THE COURT:**  Could you come forward, please.

11                        **AMANDA GREGORY**,

12   called as a witness for the Government, having been previously

13   duly sworn, testified further as follows:

14        **THE COURT:**  Dr. Gregory, you understand you remain

15   under oath?

16        **THE WITNESS:**  I do.

17        **THE COURT:**  Mr. Highsmith.

18        **MR. HIGHSMITH:**  Thank you, Your Honor.

19                 **DIRECT EXAMINATION**  (resumed)

20   BY MR. HIGHSMITH:

21   **Q.**   Dr. Gregory, when we left off on Wednesday of last week,

22   you testified about your professional experience and training.

23   Do you remember that?

24   **A.**   I do.

25   **Q.**   And you testified that you have a master's degree and a

 1  Ph.D. in clinical psychology; is that right?

 2  **A.**    Correct.

 3  **Q.**    And I believe you testified that you have a Ph.D.

 4  specialization in neuropsychology; is that right?

 5  **A.**    Yes.

 6  **Q.**    And you have over 20 years of clinical --

 7          **MS. DIAMOND:**  Objection.  Asked and answered.

 8          **THE COURT:**  Well, he's bringing the jury back up to

 9  speed with what happened last week.

10      You may proceed.

11          **MR. HIGHSMITH:**  Thank you, Your Honor.

12  **Q.**    And you have over 20 years of clinical experience in

13  forensic and clinical neuropsychology; is that right?

14  **A.**    I do.

15  **Q.**    And on Wednesday, a little bit more -- almost a week ago,

16  you testified about your teaching experience, your research

17  experience, your publications, and your conference

18  presentations; is that right?

19  **A.**    I believe so, yes.

20  **Q.**    Approximately, just ballpark, how many forensic and

21  clinical neuropsychological evaluations have you conducted in

22  your career?

23  **A.**    I've conducted approximately 1800 psychological and

24  neuropsychological evaluations.  Of those, 1100, approximately,

25  were clinical and 700 forensic.

GREGORY - DIRECT / HIGHSMITH

1   **Q.**   And you've testified as an expert witness in court on

2   numerous occasions prior to today; correct?

3   **A.**   Yes.

4   **Q.**   Have you testified as a prosecution expert witness before?

5   **A.**   I have.

6   **Q.**   Have you testified as a defense expert witness before?

7   **A.**   I have.

8   **Q.**   Have you testified as a court-appointed forensic

9   evaluator?

10  **A.**   I've testified in cases where I was court appointed, yes.

11  **Q.**   What's more common for you?  To testify as a prosecution

12  expert witness or to testify as a defense expert witness?

13  **A.**   I've testified more frequently for the defense.

14  **Q.**   Let's talk about your compensation.  What's your hourly

15  rate?

16  **A.**   $400.

17  **Q.**   And you bill for your testimony today?

18  **A.**   Yes.

19  **Q.**   And you bill for reviewing Mr. Andrade's medical records?

20  **A.**   Yes.

21  **Q.**   And you bill for interviewing Mr. Andrade?

22  **A.**   I do.

23  **Q.**   And you bill for preparing your findings?

24  **A.**   Yes.

25  **Q.**   Approximately how many hours have you worked on this case

GREGORY - DIRECT / HIGHSMITH

 1    to date?

 2    **A.**    Approximately 40 to 50.

 3    **Q.**    At sort of a high level, what is the purpose of your

 4    testimony today?

 5    **A.**    The purpose of my testimony was to evaluate and comment on

 6    Dr. Armstrong's diagnoses and his interpretation of the test

 7    data.

 8    **Q.**    And when you say "interpretation of the test data," are

 9    you talking about Mr. Andrade's test data that Mr. Armstrong

10    compiled?

11    **A.**    Yes.

12    **Q.**    Could you please cover briefly what tests and analysis you

13    conducted as part of formulating your opinions in this case?

14    **A.**    So I evaluated Mr. Andrade on January the 21st of this

15    year.  I met with him -- well, I evaluated him for

16    approximately six hours.  I conducted psychological testing,

17    and I also conducted neuropsychological or cognitive testing,

18    and my evaluation was essentially a replication of

19    Dr. Armstrong's but using different tests, for the most part.

20        And the reason to use different tests is to try to prevent

21    what are called practice effects.  So if you give the same test

22    to somebody within a year, research has shown that people can

23    do better on those tests than if you give alternate versions of

24    the tests or completely different tests.

25    **Q.**    Please describe for the jury what records you reviewed in

**GREGORY - DIRECT / HIGHSMITH**

1    connection with your evaluation and analysis.

2    **A.**    I reviewed Mr. Andrade's VA medical records, about

3    approximately 1550 pages or so.

4    **Q.**    And did you essentially review the same material that

5    Dr. Armstrong reviewed?

6    **A.**    I did.

7    **Q.**    Let's now proceed to some of Dr. Armstrong's diagnoses and

8    your opinions about those diagnoses.

9         And you were here in court for Dr. Armstrong's trial

10    testimony as well; correct?

11    **A.**    Yes.

12    **Q.**    All right.  Let's first discuss the autism spectrum

13    disorder diagnosis.

14         Dr. Gregory, have you formed an opinion about

15    Dr. Armstrong's diagnosis of Mr. Andrade with autism spectrum

16    disorder?

17    **A.**    I have.

18    **Q.**    What is your opinion?

19    **A.**    My opinion is that Dr. Armstrong did not have sufficient

20    information to make such a diagnosis.  In order to diagnose

21    autism spectrum disorder, which is a developmental disorder,

22    you have to have information on whether the symptoms were

23    present during the developmental period; and for an autism

24    spectrum disorder, those symptoms are typically present in the

25    first couple of years but definitely before the school age.

1    **Q.**    In your opinion, did Dr. Armstrong gain sufficient

2    information from collateral sources of information necessary

3    for a diagnosis?

4    **A.**    No.

5    **Q.**    Could you describe some of the collateral sources of

6    information that, in your opinion, he should have relied on?

7    **A.**    Typically, people will ask for or review medical records

8    from childhood, school records that might reference behavior.

9    If those are not available, then at the very least trying to

10    talk to a family member that can speak to the person's

11    functioning during the developmental period.

12    **Q.**    Given the lack of information about the developmental

13    period, do you have an opinion about whether or not

14    Dr. Armstrong administered sufficient tests for evaluating an

15    adult with no prior autism spectrum disorder diagnosis?

16    **A.**    He did not.

17    **Q.**    Could you explain your findings and the basis for that

18    opinion, please.

19    **A.**    So when there is an absence of information on the

20    developmental history, it's particularly important to

21    administer tests that look at symptoms of autism spectrum

22    disorder.  Dr. Armstrong didn't administer any of those tests.

23        There are several that are available.  There are the

24    Autism Diagnostic Observation Schedule, the symptom -- the

25    Social Responsiveness Scale, the Autism Diagnostic Interview so

**GREGORY - DIRECT / HIGHSMITH**

1   that at least you can get a sense of the current symptoms.  And

2   also there are questions about developmental history in those

3   tests as well.

4   **Q.**   Now, you were here for Dr. Armstrong's testimony about the

5   test he administered where he showed Mr. Andrade a series of

6   faces and asked him to name the emotions associated with those

7   faces.  Do you recall that testimony?

8   **A.**   Yes.

9   **Q.**   Is that a test that is sufficient for a diagnosis of

10  autism?

11  **A.**   It's a test that people often give when looking at autism,

12  but it is not sufficient, solely based on that result, to give

13  a diagnosis of autism.

14  **Q.**   Dr. Gregory, do you know what the DSM-5-TR is?

15  **A.**   Yes.

16  **Q.**   What is it?

17  **A.**   The DSM-5-TR is the latest version of the manual that

18  psychiatrists and psychologists use to make diagnoses.  So it

19  has diagnostic criteria for all of the mental health diagnoses.

20  **Q.**   Dr. Gregory, have you formed an opinion about whether

21  Mr. Andrade meets the DSM-5-TR diagnostic criteria for autism

22  spectrum disorder?

23       **MS. DIAMOND:**  Objection.  No foundation.  This witness

24  did not conduct a comprehensive neurological/psychological

25  evaluation.

1          **THE COURT:**  Overruled.  You can cover these things on

2    cross-examination.

3        Proceed.

4          **THE WITNESS:**  Sorry.  Could you ask the question

5    again?

6    **BY MR. HIGHSMITH:**

7    **Q.**   Absolutely.

8        Dr. Gregory, have you formed an opinion about whether

9    Mr. Andrade meets the DSM-5-TR diagnostic criteria for autism

10   spectrum disorder?

11   **A.**   Yes.

12   **Q.**   What is your opinion?

13   **A.**   So my opinion, just based on the limited available

14   information, is that he does not exhibit some of the

15   characteristics that are -- need to be present for a diagnosis

16   of autism spectrum disorder.

17       So specifically, his interpersonal behavior with me, his

18   non-verbal behavior was essentially within normal limits.  And

19   for a diagnosis of autism spectrum disorder, a person is

20   supposed to show deficits in their non-verbal social

21   communication.  So, for example, when I met him, he got up.  He

22   made good eye contact.  He shook my hand.  Throughout the

23   evaluation, he made emotional expressions on his face.  So his

24   non-verbals were essentially within normal limits.

25   **Q.**   Did you, in conducting your evaluation regarding autism

1  spectrum disorder, consider a factor including an interest in

2  peers or an interest in initiating social contact or an

3  interest in making friends, that kind of thing?

4  **A.**    Yes, based on the limited information available.

5  **Q.**    And did you formulate an opinion about that category of

6  information with regards to Mr. Andrade?

7  **A.**    So Mr. Andrade did show some difficulties in social

8  relationships that date back to childhood, based on the limited

9  information he could provide.  These seemed to be more related

10  to anxiety in that he was bullied as a child for being

11  overweight; and he did actually want to have friends, which is

12  often not the case with autism spectrum disorder.  So it seemed

13  like it was more related to his circumstances rather than an

14  autism spectrum disorder.

15  **Q.**    And did you also make conclusions and formulate opinions

16  about Mr. Andrade exhibiting the severity of restricted

17  patterns of behavior, interests, activities that would be

18  necessary to diagnose autism spectrum disorder?

19  **A.**    So, again, just based on the interview information and not

20  a more comprehensive evaluation, he was not reporting a history

21  of repetitive motor behaviors that people often show as

22  children.  So that can include hand flapping, walking on

23  tiptoes, rocking.

24      He was not reporting restricted patterns of behavior in

25  terms of like overfocus on a particular interest.  He was

1    denying having any of the hyper- or hypo-sensory sensitivities

2    that are typically associated with autism.  So he was generally

3    denying those restricted patterns of behavior.

4    **Q.**    Moving on now to IQ test results, do you recall

5    Dr. Armstrong's testimony about his IQ testing of Mr. Andrade?

6    **A.**    I do.

7    **Q.**    And do you have an opinion about Mr. Andrade's IQ test

8    results?

9    **A.**    Mr. Andrade's IQ test results are composed of several

10   different subtests; and across my testing and Dr. Armstrong's

11   testing, the subtest scores generally ranged from low-average

12   to average, so grossly within the normal range.

13   **Q.**    So just to pause on that, Mr. Andrade's IQ testing scores

14   were essentially within the normal range; is that accurate?

15   **A.**    Yes.

16   **Q.**    Do you have an opinion about the accuracy of

17   Dr. Armstrong's IQ testing?

18   **A.**    In Dr. Armstrong's IQ testing, there was one particular

19   subtest on my testing in which he did much -- he did somewhat

20   better.  So on my testing, on the test of verbal reasoning, he

21   performed in the average range; and on Dr. Armstrong's testing,

22   he performed in the low-average range.

23          Dr. Armstrong appears to have underscored, in a minor way,

24   on his testing which artificially deflated the score slightly.

25   **Q.**    Let's talk a little -- let's pause on the differences in

1  testing.

2      Could you -- do you have an opinion about the likelihood

3  of underscoring versus the likelihood of overscoring or, put

4  differently, the difficulty of underscoring versus the

5  difficulty of overscoring on a test such as an IQ test?

6  **A.**    There are far more factors that can contribute to somebody

7  underscoring on testing.  It's extremely rare for people to

8  overscore.  So generally you can't overscore your potential on

9  an IQ test, but you can underscore either by distractibility,

10  lack of effort, sometimes anxiety.

11  **Q.**    So does that lead you to an opinion about whose test

12  results are more accurate, yours or Dr. Armstrong's?

13  **A.**    Mr. Andrade reported on -- I asked him if he felt more

14  anxious with my testing or Dr. Armstrong's testing, and he said

15  he felt much more calm during my testing.  So based on the

16  effects of anxiety, my opinion is that he probably performed

17  closer to his potential on my testing.

18  **Q.**    I'd like to ask you briefly about the verbal reasoning

19  test because there was some testimony from Dr. Armstrong about

20  that.

21      Do you have an opinion about the test results --

22  Mr. Andrade's test results on his verbal reasoning assessment?

23  **A.**    Yes.  That was what I referred to.  So on my testing, he

24  performed in the average range for verbal reasoning.  In

25  Dr. Armstrong's testing, it was in the low-average range.

1    Q.    Let's turn to the bipolar disorder diagnosis for a second.

2         Regarding Dr. Armstrong's diagnosis of Mr. Andrade with

3    unspecified bipolar disorder, do you have an opinion about

4    Mr. Andrade's mood symptoms?

5    A.    Mr. Andrade reported to me that he had not experienced

6    significant mood symptoms, which can either be irritability or

7    a more grandiose elevated mood.  He reported that he had not

8    ever experienced those for a week, which is the length of time

9    that needs to be present for a manic episode.  He did report

10   some irritability that lasted at least four days.

11        This is in the context of the psychological testing

12   results also showing that he had a tendency to overreport

13   symptoms.  So that also has to be considered.

14   Q.    I'll follow-up on the overreporting of symptoms -- well,

15   let's pause on that.

16        Could you please explain the significance of overreporting

17   of symptoms?

18   A.    So overreporting symptoms, you can get information that's

19   not accurate in terms of making a diagnosis.

20        Part of the reason that we administer psychological

21   testing is that they have validity scales that can help us

22   understand whether somebody's overreporting, underreporting,

23   not really paying attention, and all of those things can affect

24   the validity.

25   Q.    Did the -- did your observation of Mr. Andrade

1  overreporting symptoms cause you to formulate or influence your

2  opinion about Dr. Armstrong's findings?

3  **A.**    Dr. Armstrong didn't appear to take into account some of

4  the psychological testing results that suggested some

5  malingering or overreporting of symptoms.  He sort of took

6  other elements and made the diagnosis.

7      When somebody is showing a pattern of overreporting, it's

8  important to have collateral information.  So that can be

9  medical records or talking to other people to try and verify

10 the information that they're reporting.

11 **Q.**    And those -- that collateral information, those additional

12 records were not provided; is that correct?

13 **A.**    There were the collateral information from the VA records

14 and within those records, it referenced an anxiety disorder but

15 not any of the other disorders.

16 **Q.**    Let's talk about the severity of the mood symptoms and the

17 unspecified bipolar.

18     Did you render an opinion or did you formulate an opinion

19 about the severity of Mr. Andrade's bipolar diagnosis?

20 **A.**    If the symptoms are present, then it's more of a mild

21 range disorder.  So he's never been hospitalized and, again, he

22 wasn't reporting symptoms that lasted at least a week.

23 **Q.**    You sort of touched on this before, but I want to ask this

24 question in a clearer way.

25     Based on your evaluation of the records and your testing,

1  was it difficult to make a diagnostic determination of bipolar

2  disorder for Mr. Andrade?

3  **A.**   It was difficult to make a diagnostic determination with

4  many of the mental illness symptoms because of his approach to

5  the psychological testing.  So the psychological testing, as I

6  mentioned, tended to show his approach was more of an

7  overreporting or exaggerating of symptoms, and so then it's

8  difficult to make a determination on the accuracy of his

9  symptom report.

10  **Q.**   Let's -- let's -- let me pause just one -- for one

11  question on the symptom of irritability.

12      Do you have an opinion about whether that's a common

13  symptom for folks or a unique and particularly debilitating

14  symptom?

15  **A.**   Irritability is fairly common in a lot of people.  When it

16  persists consistently for several days, up to a week, that's

17  when it can actually be associated with mania; but in addition

18  to that, you also have to have several other symptoms.

19      Mr. Andrade was not reporting that he had experienced

20  persistent irritability for at least a week.  He did say

21  perhaps for like four days or so.

22  **Q.**   I'd like to turn to the ADHD diagnosis.  What is ADHD?

23  **A.**   ADHD -- you can have ADHD inattentive type where you're

24  basically showing six of nine inattention symptoms, you can

25  have a diagnosis of attention-deficit/hyperactivity disorder

1  combined presentation where there's both inattention and

2  impulsivity and hyperactivity, or you can have ADHD impulsive

3  hyperactive type where you just have those symptoms.

4  **Q.**  And do you have an opinion about whether Mr. Andrade has

5  ADHD?

6  **A.**  Based on my assessment, which included some psychological

7  testing where the results were valid, he was presenting with

8  mild inattention and more prevalent impulsivity symptoms

9  consistent with a diagnosis of ADHD.

10  **Q.**  Dr. Gregory, do millions of Americans have ADHD?

11  **A.**  Yes.

12  **Q.**  In your opinion, do people with ADHD understand the

13  consequences of their actions?

14  **A.**  Yes.

15  **Q.**  In your opinion, does Mr. Andrade have mild ADHD?

16  **A.**  He was reporting mild symptoms of inattention, and he was

17  reporting more serious symptoms of impulsivity.

18  **Q.**  Do you recall Dr. Armstrong's testimony regarding

19  Mr. Andrade's mental flexibility?

20  **A.**  I do.

21  **Q.**  I'm going to ask you a couple questions about your mental

22  flexibility findings and your analysis of Dr. Armstrong's

23  findings.

24      First, is mental flexibility related to executive

25  function?

1   **A.**   Yes.  Mental flexibility is one of the executive

2   functions.

3   **Q.**   And could you explain the relationship, please.

4   **A.**   So mental flexibility is an executive function where it

5   looks at your ability to switch tasks, to change course if

6   you've got -- if you're approaching a problem and it's

7   unsuccessful, but it's basically a flexibility in your thinking

8   when addressing situations.

9   **Q.**   And did you formulate an opinion about Mr. Andrade's

10  mental flexibility?

11  **A.**   Yes.

12  **Q.**   And what is that?

13  **A.**   So on my testing, Mr. Andrade's mental flexibility

14  generally fell in the low-average to average range, including

15  on one of the tests, I gave an alternate version of the test on

16  which he performed poorly for Dr. Armstrong; and on my testing,

17  he performed in the average range on that test.

18  **Q.**   So is that essentially within the normal range for mental

19  flexibility?

20  **A.**   Yes.

21  **Q.**   Could you describe in a little bit more detail the

22  characteristics of mental flexibility?  Is it sort of the

23  inability to course correct?  What is mental flexibility in

24  your profession?

25  **A.**   So in the testing that I administered, there's one test

1    where you basically have to figure out how to solve the

2    problem; and the only feedback that you get is whether your

3    last answer was right or wrong, and so you have to use that

4    information to change your response to try and figure out the

5    correct response.  Mr. Andrade performed in the average range

6    on all of the metrics of that test.

7    **Q.**    So were you able to analyze and formulate an opinion about

8    Mr. Andrade's ability to change his responses in an adaptive

9    way?

10   **A.**    Yes.  So on my testing in particular, that test, he was

11   able to use the information, which was corrective feedback, and

12   then change his response to give a correct response.

13   **Q.**    And did you evaluate and test whether or not Mr. Andrade

14   was able to correct his way of responding to challenges, or

15   respond to challenges and correct his actions?

16   **A.**    Yes.  He was able to do that.

17   **Q.**    Dr. Gregory, do you know what malingering is?

18   **A.**    I do.

19   **Q.**    What is malingering?

20   **A.**    Malingering is where a person exaggerates or grossly

21   exaggerates or fakes symptoms for some kind of secondary gain.

22   So it could be, in a civil legal case, somebody fakes their

23   symptoms in the hope of getting a more lucrative financial

24   award; and in criminal cases, it could be so that the person

25   has mitigating factors in their case.

**GREGORY - DIRECT / HIGHSMITH**

1  Q.    Did both you and Dr. Armstrong assess for malingering?

2  A.    Yes.  Myself and Dr. Armstrong gave tests that included

3  scales that looked at malingering.

4  Q.    And so you were present for Dr. Armstrong's testimony

5  regarding his malingering score; correct?

6  A.    Yes.

7  Q.    And do you recall that he -- that Mr. Andrade with Mr. --

8  with Dr. Armstrong had a raw value of 84 for malingering?  Do

9  you recall that?

10 A.    Yes.  Dr. Armstrong, on his testing, it was a T-score of

11 84.  T-scores have an average of 50 and a standard deviation of

12 10 points.  Anything that's above two standard deviations, so

13 above 70, is considered high.

14 Q.    So stepping back for a second, what is the significance of

15 Dr. Armstrong's malingering score of 84 for Mr. Andrade?

16 A.    It strongly suggests that there was some overreporting of

17 symptoms.

18 Q.    And you just testified that you also -- your testing also

19 generated a malingering score; is that correct?

20 A.    Yes.

21 Q.    What was the malingering score your testing generated?

22 A.    The T-score on my testing was a 98.  So that was

23 significantly above average.

24 Q.    Is that multiple standard deviations above average?

25 A.    Yes.  It's nearly five standard deviations above the

1    average.

2    **Q.**    Could you just situate us, please, in terms of how unique

3    such a raw score is.

4    **A.**    It's highly unusual.

5    **Q.**    Okay.  And, again, why is that malingering index score

6    significant in your testing?

7    **A.**    Because it makes it difficult to interpret the other

8    results or other reports of symptoms when he's reporting a lot

9    of symptoms.  If somebody with a score like that is reporting

10    an absence of symptoms on certain tests or certain questions,

11    then you can still be confident in the absence of symptoms

12    because of that tendency to overreport; but if they're

13    reporting a presence of symptoms, it's hard to trust that

14    information based on that malingering scale score.

15    **Q.**    I'd like to turn now to the fourth and final diagnosis,

16    obsessive-compulsive disorder.

17        Dr. Gregory, have you formed an opinion about whether

18    Dr. Armstrong's diagnosis of Mr. Andrade with OCD was correct?

19    **A.**    Yes.

20    **Q.**    And what is your opinion?

21    **A.**    My opinion is that Mr. Andrade does not exhibit OCD.

22    **Q.**    What is the basis for your opinion?

23    **A.**    I asked Mr. Andrade about the symptoms of

24    obsessive-compulsive disorder, including obsessive thinking and

25    compulsive behavior to try and eliminate those obsessions.  He

1  was not reporting symptoms at a severity level that would

2  warrant that diagnosis.

3  **Q.**   Let's talk about Dr. Armstrong's test results.

4       In your analysis and in your opinion, did Dr. Armstrong's

5  test results demonstrate that Mr. Andrade has OCD?

6  **A.**   On Dr. Armstrong's test results, even in the context of

7  overreporting on several other symptoms, Mr. Andrade's score on

8  the obsessive-compulsive disorder scale was low.  So he was not

9  reporting significant symptoms on that scale.

10 **Q.**   And so just to be clear, what does it mean to report -- to

11 score low on the obsessive-compulsive scale?

12 **A.**   It means an absence of symptoms.

13 **Q.**   Dr. Gregory, in your opinion, did Dr. Armstrong appear to

14 pick and choose among certain test results?

15 **A.**   Dr. Armstrong did make a big deal of one particular test

16 result on the executive functioning, where Mr. Andrade did

17 perform in the extremely low range; but there were three other

18 tests that looked at mental flexibility that he did not really

19 discuss as much; and on those tests, he performed in the

20 average, low-average range.

21 **Q.**   Dr. Gregory, in your opinion, following your evaluation of

22 Mr. Andrade and your analysis of his tests, does Mr. Andrade

23 understand the consequences of his actions?

24 **A.**   There was nothing in my test results to suggest that he

25 does not understand the consequences of his actions.

GREGORY - CROSS / DIAMOND

1          **MR. HIGHSMITH:**  Nothing further, Your Honor.

2     Thank you.

3          **THE COURT:**  Very well.

4       Ms. Diamond.

5          **MS. DIAMOND:**  Just one moment, Your Honor.

6                    (Pause in proceedings.)

7                    <u>**CROSS-EXAMINATION**</u>

8     BY MS. DIAMOND:

9     **Q.**   Good morning, Dr. Gregory.

10    **A.**   Good morning.

11    **Q.**   I want to ask you -- excuse me.  I want to ask you just a

12    couple of things about the experience and training that you

13    went through when we -- before the long weekend that the jury

14    had, hopefully, enjoyed.

15        You mentioned that you didn't prescribe medication.

16    That's not within your credentials; correct?

17    **A.**   I didn't mention it, but I do not prescribe medication.

18    **Q.**   You mentioned that Dr. -- sorry.

19        It's ordinary for a neuropsychologist not to provide

20    medication; is that right?

21    **A.**   Correct.

22    **Q.**   It's not a requirement of your job to do so; correct?

23    **A.**   Correct.

24    **Q.**   It's not a requirement of Dr. Armstrong's job to do so; is

25    that right?

**GREGORY - CROSS / DIAMOND**

1   **A.**   As a neuropsychologist, no.

2   **Q.**   And you yourself did not receive a master's in

3   psychopharmacology; correct?

4   **A.**   Correct.

5   **Q.**   You mentioned that you did some work with the psychiatry

6   and law department at UCSF.  And psychiatry is a medical

7   doctor's specialty in things related to the brain; is that

8   correct?

9   **A.**   Yes.

10  **Q.**   Psychiatrists are medical doctors; is that right?

11  **A.**   Correct.

12  **Q.**   They have medical degrees, where they can prescribe

13  medication; is that right?

14  **A.**   Yes.

15  **Q.**   Your work with the psychiatry and law department did not

16  involve learning psychiatry; is that correct?

17  **A.**   Correct, yeah.  It was more learning about forensic cases.

18  So we looked at landmark cases, how to do particular forensic

19  assessments, because it was with the forensic psychiatry and

20  the law program.

21  **Q.**   So forensics would be the subspecialty, in either

22  psychiatry or psychology, where you would be able to break

23  down -- evaluate something, not for treatment, but for purposes

24  of -- whoever your client is, whoever hired you to do the

25  evaluation, for someone outside of the person to understand

GREGORY - CROSS / DIAMOND

1  what's going on with that person either psychiatrically or

2  psychologically; is that correct?

3  **A.**   Essentially.  It's also involved in answering particular

4  legal questions quite often.

5  **Q.**   Such as we're doing now; correct?  You're -- I'm asking

6  questions, Mr. Highsmith asked you questions, and you're

7  answering them; is that right?

8  **A.**   Yes.  I was actually thinking more about specific

9  questions like with assessing somebody's competency to stand

10  trial.  But, yes, on a more micro level, I am answering legal

11  questions right now.

12  **Q.**   There's a subpart of your training in the psychology and

13  law department about giving testimony, isn't there?  A little

14  bit.

15  **A.**   I'm trying to recall if I remember that part of the

16  training.  I'm sure that was part of that, yes.

17  **Q.**   There was a portion in Mr. Highsmith's examination of

18  Dr. Armstrong where he read a bit about a printed -- some

19  printed summary of data relating to the PAI test; isn't that

20  right?

21  **A.**   Yes.

22  **Q.**   And that's the Personality Assessment Inventory; is that

23  what the "I" stands for?

24  **A.**   Correct.

25  **Q.**   Okay.  And that is a test that's considered a test -- a

**GREGORY - CROSS / DIAMOND**

1   symptoms test; is that right?

2   **A.**    Symptoms and personality.

3   **Q.**    And there's something related to that test that in your

4   profession you refer to as the infrequency scale; is that

5   correct?

6   **A.**    Yes.

7   **Q.**    And it was in the infrequency scale questions that were

8   noted in Dr. Armstrong's report as having some results that

9   could be attributed to a number of things, including

10   malingering; is that right?

11   **A.**    Yes.  I think technically, on the infrequency scale, it

12   says overreporting but, yes.

13   **Q.**    And that particular report was authored by the lead

14   psychologist and the committee of advisors who prepared the

15   test; is that right?  The testing materials; is that correct?

16   **A.**    It's a computer-generated report that looks at what's

17   associated with particular scale elevations of an examinee and,

18   yes, by the original test authors, I assume.

19   **Q.**    So that if one were to purchase the full version -- when a

20   practitioner such as yourself were to purchase the license to

21   use the full version of that test, part of what comes along

22   with the raw score data is a suggested interpretation of the

23   data that's available through a printout; is that right?

24   **A.**    Yes.

25   **Q.**    And that is what Mr. Highsmith quoted from when he

1    confronted Dr. Armstrong about the possibility of there being

2    malingering in symptoms; correct?

3    **A.**    Correct.

4    **Q.**    And you yourself used that report -- excuse me.

5         You yourself gave Mr. Andrade the PAI as well; correct?

6    **A.**    I did.

7    **Q.**    And this was authored by the same people that authored the

8    software and the test that Dr. Armstrong used; correct?

9    **A.**    Yes.

10    **Q.**    You used the truncated, shorter version; is that right?

11    **A.**    No.

12    **Q.**    Okay.  Did you have a lengthy printout as well on your

13    data?

14    **A.**    I did not because the test results on mine were invalid.

15    So there was no interpretation included because it was invalid.

16    **Q.**    And the test results -- just one moment.

17         Your test results printed out a little, couple paragraphs

18    describing what the validity of the test results were; is that

19    right?

20    **A.**    Yes.

21    **Q.**    And do you have those results here today to refer to if we

22    needed to refresh your memory?

23    **A.**    I do.

24    **Q.**    Okay.  So in your test, what your printed test results

25    indicated was that the respondent's score on the INF scale --

1    is that the infrequency scale?

2    **A.**    It is.

3    **Q.**    -- exceeds the cutoff for profile validity, suggesting

4    problems attending to or interpreting item content in response

5    to PAI items; correct?

6    **A.**    That's part of it, yes.

7    **Q.**    And it also says that there are several potential reasons

8    for this failure to attend, including reading difficulties,

9    careless or random responding, marked confusion, or

10    idiosyncratic item interpretation or failure to follow test

11    instructions; is that right?

12    **A.**    Yes.

13    **Q.**    And this test, your results then said that there is no

14    clinical interpretation because these results, due to the

15    factors listed, are considered to be invalid; correct?

16    **A.**    The results are considered to be invalid, not due to all

17    of those factors.  Those are factors to consider.

18        There are also other validity scales that can help you

19    evaluate what was actually going on for the person.  So there's

20    a scale that looks at the consistency of responses to similar

21    questions; and if the person is responding in a consistent

22    manner, that suggests that they were paying attention and that

23    they can understand the questions.

24        Mr. Andrade's scale score on that scale was low,

25    indicating that he was very consistent in his responses, so I

**GREGORY - CROSS / DIAMOND**

1  could rule out that as an issue.

2  **Q.**    Was -- were those symptoms part of the PAI test?

3  **A.**    Yes.

4  **Q.**    So you used the PAI test to interpret the PAI test?

5  **A.**    I used the validity scores to interpret what was going on

6  to make his test invalid.

7  **Q.**    So despite the test authors themselves saying, "This test

8  doesn't work, he doesn't understand idioms, he might have

9  reading confusion," you still continued to rely on the

10  interpretation of that test?

11  **A.**    I did not rely on the clinical scale interpretation, but I

12  looked at all of the validity scales to see what was the reason

13  for the invalid test.

14  **Q.**    Didn't Dr. Armstrong's PAI, in the lengthy description

15  that was given that he didn't author, didn't that test also

16  explain that there are several potential reasons for scores in

17  this range, including confusion, reading difficulties, random

18  responding, idiosyncratic of interpretation of individual

19  items, or failure to follow test instructions?

20  **A.**    There are, but it's important to look at all the validity

21  scales to find out what's going on.  And when there are more

22  than one scale that suggests malingering or overreporting

23  negative symptoms or psychopathology, it's a fair assumption

24  that that's what's driving the high scale scores versus

25  confusion.

1    The scales that look at confusion or somebody not really

2  understanding the questions, as I said, the consistency scale,

3  those were all in a range which would suggest that the person

4  was -- that he was understanding the test.

5  **Q.**   So despite the fact that the test itself said to you there

6  may be reading confusion or confusion about understanding the

7  instructions, or idiosync- -- I can't say the word right, but

8  understanding the subtext of what he's reading, understanding

9  it in context, your conclusion is that those factors were not

10  at play, or is your conclusion that those factors could have

11  been at play?

12  **A.**   My conclusion is that those factors were not at play based

13  on my interpretation of the other validity scales, which

14  suggested there was not confusion or reading problems.

15  **Q.**   The other validity scales within the PAI itself?

16  **A.**   Correct.

17  **Q.**   So were you trained, in the PAI, that if you see that

18  there are indications, that there are the other cluster of

19  reasons why there may be problems with using the PAI, that you

20  are not to continue using the PAI, that you are to stop?

21  **A.**   I'm trained to not use the clinical interpretation, but I

22  am trained to look at the validity scales to try and understand

23  why the test's invalid.

24  **Q.**   And in your opinion, none of the other factors that your

25  own printout indicated were probable reasons for the invalidity

**GREGORY - CROSS / DIAMOND**

1    were meaningful?

2    **A.**    I ruled out the confusion and reading problems based on

3    the fact that he was consistent in his responses to similar

4    questions.  He may have given some idiosyncratic responses that

5    elevated his scale on the infrequency scale.  It's basically a

6    scale that looks at people -- whether people endorse highly

7    unusual behaviors.

8        But I also looked at the other validity scales where he

9    was not presenting himself overly positively, but he was

10   definitely presenting a lot of symptoms on two of the other

11   validity scales to a degree that was very high.

12   **Q.**    And this is all still part of the PAI test?

13   **A.**    Yes.

14   **Q.**    You also gave the CAT.A test -- the CAT-A; is that right?

15   **A.**    I did.

16   **Q.**    And that test also measures self-reported attention and

17   cognitive problems; correct?

18   **A.**    That is a scale that's specific to symptoms of ADHD.

19   **Q.**    And on that test, you did not diagnose that Mr. Andrade

20   was malingering; is that right?

21   **A.**    Mr. Andrade was forthcoming on that test, yes.

22   **Q.**    He scored in the normal range as far as the validity goes

23   on that test; correct?

24   **A.**    Yes.  He did report to me that his -- the accuracy of his

25   childhood symptom report was not what he would hope because he

**GREGORY - CROSS / DIAMOND**

1    didn't have great memory of his childhood symptoms.  But on the

2    validity scales, he was being forthcoming; he was being

3    accurate.

4    **Q.**    And you took note, didn't you, that he did not have a

5    great deal of memory from his childhood according to his

6    self-report to you --

7    **A.**    Yes.

8    **Q.**    -- is that right?

9         And, in your opinion, that was one of the reasons why you

10   found it difficult to make an ASD diagnosis; is that correct?

11   **A.**    Yes.

12   **Q.**    Of the neuropsychological evaluations that you have given,

13   how many of them were given to children compared to adults?

14   **A.**    I have probably given about 70 percent adult and

15   30 percent child or adolescent evaluations.

16   **Q.**    And was -- were most of your neuropsychological

17   evaluations given during your time working in hospital, or were

18   most of them given in private practice?

19   **A.**    I've probably given more in a hospital setting, but I've

20   given at least 800 outside of a hospital setting.

21   **Q.**    In a hospital setting, did you have time and cause to

22   treat people with autism?

23   **A.**    I worked on treatment teams working with people with

24   autism, yes.

25   **Q.**    So it may not be the cause of the hospitalization, but

GREGORY - CROSS / DIAMOND

1    there were some times when there was a person hospitalized who

2    had autism at a level that the attending might have called you

3    in to attend to that person while they were in the hospital for

4    something else?  Is that possible?  Is that one of the

5    circumstances?

6    **A.**    Usually when somebody comes in with autism, that's like

7    the primary issue.  I don't recall if there was a time when

8    somebody came in with a different issue and then autism was a

9    secondary issue.

10   **Q.**    So the in-hospital people that you treated with ASD were

11   people who required some sort of hospitalization or assistance;

12   is that correct?

13   **A.**    Some of them, yes.

14   **Q.**    Were some of them high functioning?

15   **A.**    Yes.

16   **Q.**    And were most of them more acute than high functioning?

17   **A.**    The hospital setting I was in with children and

18   adolescents, generally the children went to school; they

19   participated in group.  So it was more sort of the milder end

20   of autism spectrum disorder.

21   **Q.**    That was for children.  What about for adults?

22   **A.**    Most of the adults I've seen probably had moderate or mild

23   autism spectrum disorder.

24   **Q.**    You gave more validity tests than just the one embedded in

25   the PAI test; correct?

1   **A.**   Yes.  So on --

2   **Q.**   Thank you.

3   **A.**   Sorry.

4   **Q.**   Mr. Andrade was given a test called Test of Memory and

5   Malingering, shortened by TOMM; is that right?

6   **A.**   Yes.

7   **Q.**   And in that test, that showed that Mr. Andrade was trying;

8   correct?

9   **A.**   Yes.

10  **Q.**   Showed that he was giving effort; correct?

11  **A.**   Yes.

12  **Q.**   That he was not malingering; is that right?

13  **A.**   On the cognitive testing, correct.

14  **Q.**   On the TOMM, that -- it did not show that he was

15  malingering; correct?

16  **A.**   Yes.  The TOMM is a test that looks at somebody's

17  performance validity on cognitive testing.  It's not related to

18  their psychological functioning.

19  **Q.**   And Mr. Andrade himself -- sorry.

20      Dr. Armstrong also used validity tests throughout his

21  testing regime; correct?

22  **A.**   Yes.

23  **Q.**   He used some standalone tests; correct?

24  **A.**   Yes.

25  **Q.**   He used some embedded tests; correct?

1    **A.**    Correct.

2    **Q.**    Generally speaking, embedded tests are a little more

3    reliable; is that right?

4    **A.**    Generally speaking, the standalone tests are more

5    reliable.

6    **Q.**    In your opinion, the standalone tests are better than the

7    embedded tests; is that what you're saying?

8    **A.**    Yes.

9    **Q.**    Yes or no.  Thank you.

10   **A.**    Because they're solely designed for that purpose.

11   **Q.**    You gave a test called the California Verbal Learning

12   Test, CVLT; correct?

13   **A.**    Yes.

14   **Q.**    And that test involved a pattern where you would read

15   words aloud.  16 words, is that what was used?

16   **A.**    Yes.

17   **Q.**    And the subject was requested to repeat the words in any

18   form -- sorry -- in any order that they can remember them, but

19   to repeat as many as the person could remember; is that right?

20   **A.**    Yes, over --

21   **Q.**    And then the test is repeated, where the subject -- where

22   the practitioner repeats the same list to the subject; correct?

23   **A.**    A total of five times, yes.

24   **Q.**    So the second time, they repeat the list, and the subject

25   is asked again to say back what they remember; is that right?

GREGORY - CROSS / DIAMOND

1    **A.**    Yes.

2    **Q.**    And then that goes on for five times, and each time the

3    subject's progress in remembering and learning is noted;

4    correct?

5    **A.**    Yes.

6    **Q.**    And in Mr. Andrade's case, the first time he was able to

7    repeat six words; is that right?

8    **A.**    I don't remember the specific number.

9    **Q.**    Do you have your data in front of you to review?

10   **A.**    Yes.

11   **Q.**    If you would, please.  Thank you.

12   **A.**    (Witness examines document.)

13   **Q.**    And I'm going to revise my question, Doctor.

14        He remembered five words on the first test?  That's my

15   question.  Is that correct?

16   **A.**    I don't have the actual number of words.  I just have the

17   score for the number of words that he recalled.

18   **Q.**    So the score doesn't relate to the number of words?

19   **A.**    The score does relate to the number of words, but I don't

20   know, from looking at that score, what the number of words was.

21   **Q.**    Okay.  So the first score he received was five; correct?

22   **A.**    Yeah, the first score he had was a scale score of five.

23   **Q.**    The second score he had went up.  It was an eight;

24   correct?

25   **A.**    Yes.

**GREGORY - CROSS / DIAMOND**

1  **Q.**   Then the third score he had went down, and he achieved a

2  six; is that correct?

3  **A.**   Correct.

4  **Q.**   The next score he achieved was a seven; correct?

5  **A.**   Yes.

6  **Q.**   And the final score he achieved was a seven; is that

7  correct?

8  **A.**   Yes.

9  **Q.**   Dr. Armstrong didn't give that exact test, but he gave a

10 similar test called the RBANS; is that right?

11 **A.**   Yes.  Within the RBANS, there is a list-learning test.

12 **Q.**   And these tests are designed to measure verbal learning;

13 correct?

14 **A.**   Yes.

15 **Q.**   That's more than just knowing what a word means; correct?

16 **A.**   It's the ability to remember the word list.

17 **Q.**   And to remember the word list when prompted in between

18 testing your memory; correct?

19 **A.**   It's a test of your verbal memory for a word list, yes.

20 **Q.**   And on Dr. Armstrong's test of a similar function, a

21 different test, he scored less than 1 percent; is that right?

22 **A.**   I do not recall that off the top of my head.

23 **Q.**   Do you have Dr. Armstrong's test data before you?

24 **A.**   Yes.

25 **Q.**   If you could check.  Thank you.

1   **A.**   (Witness examines document.)

2   **Q.**   So my question is:  On Dr. Armstrong's test, he scored in

3   the ninth percentile; is that right?  I'm sorry.  The first

4   percentile -- less than the first percentile?

5   **A.**   It looks like his immediate recall was less than the first

6   percentile and then delayed recall was low-average.

7   **Q.**   And on your test for his immediate recall, he scored in

8   the ninth percentile; correct?

9   **A.**   Yes.  His total list learning was in the ninth percentile,

10  which is low-average.

11  **Q.**   So what that means, outside of numbers, is that if there's

12  a hundred people who take this test, 91 of them are going to do

13  better than Mr. Andrade on this particular day; correct?

14  **A.**   On that particular metric of the test, yes.

15  **Q.**   These tests measure probabilities; correct?  Probabilities

16  of behavior?

17  **A.**   They measure somebody's cognitive abilities compared to

18  other people in a similar age range.

19  **Q.**   According to either test, being in the one percentile or

20  the ninth percentile, you would agree that both scores are

21  significantly improbable in the normal population; is that

22  right?

23  **A.**   The first percentile is extremely low and improbable.  The

24  ninth percentile is low-average.

25  **Q.**   Correct.  But it's still improbable; is that right?

1    **A.**    It's still grossly within the normal range if it falls in

2    the low-average range, so I wouldn't describe it as improbable.

3    **Q.**    So 9 percent, to you, is not an improbable number?

4              **MR. HIGHSMITH:**  Objection.  Asked and answered.

5              **THE COURT:**  Overruled.

6              **THE WITNESS:**  The ninth percentile still falls within

7    the low-average range.  The first percentile is highly unusual.

8    The ninth percentile is still a relatively low score, but it

9    falls within the low-average range of the population.

10   **BY MS. DIAMOND:**

11   **Q.**    You've answered the average range a number of times.  Have

12   you answered my improbability question?

13   **A.**    There's a probability that if he's in a room with a

14   hundred people, then 91 of them will do better.  So that's the

15   best way I can answer that question.

16   **Q.**    And that's better on both the short-term and long-term

17   verbal memory; correct?

18   **A.**    I gave other tests of verbal memory where he was solidly

19   in the low-average range for immediate recall and delayed

20   recall.

21   **Q.**    Yes.  And I was asking you whether the Cat-A was

22   measuring -- designed to measure short-term and long-term

23   verbal memory.

24   **A.**    You mean the CVLT?  You said the --

25   **Q.**    I do mean the CVLT.  Thank you.  It's a little bit of

**GREGORY - CROSS / DIAMOND**

1    alphabet gibberish, I think, for all of us laypeople.

2         But the test that we've been talking about, that does

3    pertain to short-term and long-term verbal memory; correct?

4    **A.**    Yes.

5    **Q.**    You gave Mr. Andrade an intelligence test, an IQ test,

6    that's known as the WASI-II; is that correct?

7    **A.**    Yes.

8    **Q.**    And the WASI-II is considered an abbreviated scale of

9    intelligence test; is that correct?

10   **A.**    Yes.

11   **Q.**    And the more full, complete test for intelligence would be

12   something called the WAIS-IV; is that right?

13   **A.**    Yes.

14   **Q.**    The "W" in both of those tests refers to a person's name

15   that was one of the authors of the test; is that correct?

16   **A.**    Correct.

17   **Q.**    And in Dr. Armstrong's test, he found Marcus to be in the

18   16th percentile of intelligence; is that right?

19   **A.**    (Witness examines document.)  Yes.

20   **Q.**    And in your test, you found that he was in the 27th

21   percentile; is that correct?

22   **A.**    (Witness examines document.)  Yes.

23   **Q.**    The 27th percentile is just two notches up from the

24   beginning of the average range, isn't it?

25   **A.**    Yes.  It's in the low end of the average range.

GREGORY - CROSS / DIAMOND

1    Q.    The average goes all the way from the 25th percentile to

2    the 75th percentile; correct?

3    A.    Yes.

4    Q.    So Mr. Andrade's IQ, according to you, was 91; is that

5    right?

6    A.    Yes.

7    Q.    And that's six points higher than what Dr. Andrade --

8    sorry -- Dr. Armstrong found that Marcus had an 85 IQ; is that

9    right?

10   A.    Yes.

11   Q.    Isn't it true that the WAIS-IV test, Dr. Armstrong's full

12   and complete test, is considered more accurate?

13   A.    It's a more comprehensive measure of the abilities that

14   make up IQ, yes.

15   Q.    And it has, in itself, built-in validity measures;

16   correct?

17   A.    It has one, yes.

18   Q.    And the WASI-II, the test that you gave, does not have

19   embedded validity measures; correct?

20   A.    It does not.

21   Q.    And the literature for the WASI-II indicates that the

22   WAIS -- sorry -- that the WASI-II should not be used in

23   isolation for diagnosis or classification; correct?

24   A.    Correct.

25   Q.    It's not the favored IQ test; correct?

**GREGORY - CROSS / DIAMOND**

1  **A.**   It's a favored IQ test when the full IQ test has been

2  recently given.  So the reason I administered that test was

3  because the full test had been given within the last

4  six months.  So I gave the WASI-II and then I gave other

5  subtests that looked at different metrics that were evaluated

6  by the more comprehensive test.

7  **Q.**   Doesn't the manual for the WASI-II say that the WASI-II

8  should not be used for legal/judicial or quasi-legal purposes?

9  **A.**   Solely, yes.

10 **Q.**   There was nothing in Dr. Armstrong's test, his intell- --

11 the intelligence test that indicates that those results were

12 invalid; correct?

13 **A.**   Correct.  Well, actually, in his test results, no; but his

14 scoring, as I mentioned previously, he seemed to miss some

15 elements where Mr. Andrade could have scored higher.

16 **Q.**   Were some of those scores within that test subjective, to

17 be supplied by the practitioner?

18 **A.**   There are pretty specific guidelines as to how to score

19 it, but there is some subjectivity.

20 **Q.**   And in some of those subjective interpretations, you

21 disagree with Dr. Armstrong; correct?

22 **A.**   That might have been one of them, but there were two that

23 were clearly this requires further evaluation and one where he

24 had underscored it and it wasn't subjective.

25 **Q.**   In your intelligence test, did you give the subparts on

1   information?

2   **A.**   That is not a subtest that can be repeated within a year.

3   **Q.**   That test refers to verbal comprehension; correct?

4   **A.**   It looks at a person's general knowledge and long-term

5   memory, but it's part of the verbal comprehension scale.

6   **Q.**   There were other tests in the intelligence battery that

7   Dr. Armstrong gave, including the visual puzzles test, the

8   digit span test, the coding test, and the symbol search test

9   that you did not give; correct?

10  **A.**   I did not.   I gave alternative tests to look at those

11  abilities.

12  **Q.**   You also gave Marcus a test called the -- I'm not going to

13  try to say it.   D-KEFS; is that correct?

14  **A.**   I gave subtests from the D-KEFS, yes.

15  **Q.**   One of the tests that you gave was a trail-making test; is

16  that correct?

17  **A.**   Yes.

18  **Q.**   Was that adjusted for Mr. Andrade's education level?

19  **A.**   The norms for that test do not take into account education

20  level.

21  **Q.**   The tests, however, could be adjusted to take into account

22  the subject's age, gender, and education level; correct?

23  **A.**   It's actually just the person's age that's taken into

24  account.

25  **Q.**   So you were not aware that the test could be adjusted for

**GREGORY - CROSS / DIAMOND**

1    education level?

2    **A.**    It's not the standard way of scoring it.

3    **Q.**    Were you aware that the test could be adjusted for

4    education level?

5    **A.**    The D-KEFS, I've never used the education adjustment if

6    there's one available.

7    **Q.**    So you don't know whether or not it could be adjusted for

8    education level?

9    **A.**    I know some of the subtests for the D-KEFS can.  I'm

10    not -- I can't remember specifically if it's a trail-making

11    test.

12    **Q.**    So there are some subtests that could be adjusted for the

13    education level, but that is not a technique that you employ in

14    your neuropsychological evaluations?

15    **A.**    Yes, and it's not a technique that's employed when I was

16    working at UCSF or at hospitals either.

17    **Q.**    And Mr. Andrade has completed a little bit of post-high

18    school education; correct?

19    **A.**    He describes perhaps a year of an associate's degree.

20    **Q.**    And that he obtained a high school diploma; correct?

21    **A.**    Yes.

22    **Q.**    He, in fact, attended, at some point in his high school, a

23    special education program; correct?  An alternative high

24    school, if you will?

25    **A.**    Yes.  It was unclear if it was due to learning

1    difficulties or, the way he said it, he was falling behind, so

2    he went to a plus program which helped him graduate.

3    **Q.**    So he had extra assistance in order to get his high school

4    diploma?

5    **A.**    Yes.

6    **Q.**    And in general, would you agree that if you give a test

7    concerning both visual and verbal skills like the D-KEFS does,

8    that the test results might report a little higher to someone

9    with a full high school diploma and a little bit of post-high

10    school schooling compared to someone who doesn't have a high

11    school diploma?  Correct?

12    **A.**    Sorry.  Can you say that question again?

13    **Q.**    Yes.  I think.

14        You would say, just generally, that if you're giving a

15    test not adjusted for education, so it's taking the norm of the

16    population, which may or may not have a high school diploma,

17    they may or may not be an adult that -- a person who has a high

18    school diploma, especially in verbal skills, if the test is

19    testing verbal skills, they might test a little higher than a

20    person -- than if the test is set for a normal person, not

21    adjusted for education?

22    **A.**    Somebody with a higher level of education, you might

23    expect them to score higher on the test but not always.

24    **Q.**    And in general, Mr. Andrade -- Marcus's scores were a

25    little bit better with visual and spatial understanding than

**GREGORY - CROSS / DIAMOND**

1  verbal understanding; is that correct?

2  **A.**   (Witness examines document.)  A little bit, yes.

3  **Q.**   And the verbal fluency part of the D-KEFS test in part

4  helps measure mental flexibility; is that correct?

5  **A.**   There is a metric for that, yes.

6  **Q.**   And scoring low may mean that the subject might take a

7  little longer to tell an anecdote; is that right?  Is that one

8  of the features?

9  **A.**   I don't know that there's been any research on that.  I

10  would think that would be more associated with processing

11  speed, but you could say, yes, they might have more difficulty

12  finding particular words quickly.

13  **Q.**   Right.  They might get stuck if they don't know the right

14  word or they might even substitute the wrong word; correct?

15  **A.**   I don't know about Mr. Andrade but somebody could.

16  **Q.**   And your results showed -- your results showed that on

17  verbal fluency, Marcus had scores in the first, second, fifth,

18  and ninth percentile; correct?

19  **A.**   Yes.

20  **Q.**   And the ninth percentile being the best that he did, what

21  that means, again, a hundred people in a room, Mr. Andrade --

22  there's 91 of them that are better at verbal fluency than

23  Marcus; correct?

24  **A.**   Yes.

25  **Q.**   You also gave a social cognition battery of tests to

**GREGORY - CROSS / DIAMOND**

1  Marcus; correct?

2  **A.**   I gave one test that looked at his affect, his emotion

3  naming, not a battery of tests.

4  **Q.**   And was this the same test, the social cognition test,

5  that Dr. Armstrong gave?

6  **A.**   It was.

7  **Q.**   And Dr. Armstrong determined that Marcus was in the first

8  percentile of social cognition; correct?

9  **A.**   Of affect naming, yes.

10  **Q.**   And that includes tests that relate to understanding

11  someone's body language?

12  **A.**   No.

13  **Q.**   Just facial expressions?

14  **A.**   Yes.

15  **Q.**   This test -- and -- did the test relate at all to body

16  language?

17  **A.**   It's a test where there are pictures of people making

18  different facial emotions -- so anger, fear, neutral

19  expression, disgust, happiness -- and the person has a list of

20  those emotions, and then you look at the picture of the person

21  making the facial expression and decide which one they're

22  making.

23  **Q.**   Your test also determined that Marcus had -- was in the

24  first percentile on that test; correct?

25  **A.**   Yes.

1    Q.    So if -- that would mean, if Marcus is sitting with a

2    group of people, he doesn't necessarily interpret their facial

3    expressions the way the person who's having the emotion means?

4         That's a poorly worded question.  Do you want me to say it

5    again?  I can say it in different words.

6    A.    Sure.

7    Q.    Okay.  In ordinary conversation, isn't it true that most

8    of us, typical people, will have an understanding if they're

9    communicating well by looking at the face of the person they're

10   talking to; isn't that right?

11   A.    In general, yes.

12   Q.    And that's one of the things that this test registered

13   Marcus as being particularly low at, extremely low; correct?

14   A.    He did perform in the extremely low range.  On my testing,

15   I think there was also some distractibility and impulsivity

16   that played a role; but, yes, he had a low score on this test.

17   Q.    Distractibility being one characteristic of ADHD; correct?

18   A.    Yes.

19   Q.    And impulsivity is also a characteristic of ADHD; correct?

20   A.    Yes.

21   Q.    And ADHD does cause some sorts of cognitive impairment;

22   correct?

23   A.    People with ADHD can score low on that test, yes.

24   Q.    And stepping away from the tests, they have -- they can

25   have a little bit of interference with understanding what's

**GREGORY - CROSS / DIAMOND**

1  going on with them when they're particularly interested or

2  inattentive, either one; correct?

3  **A.**   Sorry.  What do you mean?

4  **Q.**   Sorry.  The "interested" is, if they're interested in

5  something and the conversation isn't about what they're

6  interested in.

7  **A.**   I could say they have problems with distractibility,

8  inattention, and sometimes with impulse control.

9  **Q.**   And that can sometimes make someone not understand what's

10  going on.  Even if they're having a conversation, they may not

11  understand all of the things that are being said if their

12  attention is drawn elsewhere; correct?

13  **A.**   They may miss some details, yes.

14  **Q.**   And the same thing with missing details, that's another

15  common thing with people with ADHD in their ordinary life;

16  correct?

17  **A.**   Sorry.  Are you saying they miss details sometimes in

18  their ordinary --

19  **Q.**   Yes.

20  **A.**   Yes.

21  **Q.**   And those are parts of executive functioning skills;

22  correct?

23  **A.**   They're more attention skills.

24  **Q.**   And does executive functioning require attending to what's

25  needed and planning for the future?

GREGORY - CROSS / DIAMOND

1    **A.**    Planning and -- planning is an executive functioning -- an

2    executive function.

3    **Q.**    Does a significant amount of ADHD interfere with the

4    ability to plan and execute?

5        Let's put it this way:  It can interfere, can't it?

6    **A.**    It can, yes.

7            **MS. DIAMOND:**  One moment, Your Honor.

8                    (Pause in proceedings.)

9    **BY MS. DIAMOND:**

10   **Q.**    Just taking you back to the verbal fluency tests that were

11   part of the D-KEFS, that's the set of tests we talked about

12   before we talked about the social cognition tests, despite the

13   difference in your results and Dr. Armstrong's results, in your

14   results, you did find that Mr. Andrade was low, correct,

15   particularly low?

16   **A.**    On verbal fluency?

17   **Q.**    Yes.

18   **A.**    Yes.

19   **Q.**    And you used one category in your test data called

20   borderline low.  Do you remember that?

21   **A.**    Yes.

22   **Q.**    And isn't it true that the protocol has changed, and it

23   used to be called borderline low, but now the preferred term is

24   exceptionally low?  Is that right?

25   **A.**    For those scores, no.

1   **Q.**   Would those scores be considered low-average?

2   **A.**   I use the descriptor that's in the test manual, and the

3   test manual uses the term "borderline."

4   **Q.**   What's the date of that test manual?

5   **A.**   I don't recall.

6   **Q.**   Does it predate 2020?

7   **A.**   Yes, I think so.

8   **Q.**   Did you know -- have you licensed or purchased the updated

9   test?

10  **A.**   I have the most updated version.

11                  (Pause in proceedings.)

12          **MS. DIAMOND:**  Sorry, Your Honor.  Just a moment.

13                  (Pause in proceedings.)

14  **BY MS. DIAMOND:**

15  **Q.**   Now, you were unable to make a diagnosis of autism

16  spectrum disorder; correct?

17  **A.**   Correct.

18  **Q.**   And you indicated, both in the document that you supplied

19  to counsel before trial started and here in your testimony with

20  the jury, that there was limited information available to you

21  to make the diagnosis; correct?

22  **A.**   Yes.

23  **Q.**   You are used to having some sort of school records in

24  order to make a diagnosis; is that right?

25  **A.**   School records or collateral reports from people who know

1    the information.

2    **Q.**   And that's more readily available now, in the 2020s, than

3    it was in the 1980s; correct?

4    **A.**   It's more readily available in younger people, yes.

5    **Q.**   In schools in modern times, more counselors and teachers

6    are aware of neurotypical -- sorry -- atypical diagnoses like

7    ASD, and they're more likely to note symptoms in school records

8    than they were in the 1980s; is that correct?

9    **A.**   They're more aware.  I don't know that they're more likely

10   to note it in records unless somebody's made the diagnosis

11   who's qualified.

12   **Q.**   Isn't it true that when an adult who's fully living

13   independently and apparently a functional adult is tested for

14   ASD, that it's perfectly acceptable to use the self-reports of

15   the individual as consideration in an ASD diagnosis?

16   **A.**   That's a component but it's not sufficient.

17   **Q.**   It is a factor that makes the diagnoses more valid and

18   reliable than an evaluation that relied only on a clinical

19   interview; correct?

20   **A.**   I'm sorry.  I think you're saying two different things

21   there, so I don't understand the question --

22   **Q.**   Okay.

23   **A.**   -- related to the prior question.

24   **Q.**   Isn't it true that the DSM-5 says that when possible,

25   self-reports from a patient may help make a diagnosis of ASD

 1    more valid and reliable?  That, in other words, it could be one

 2    of the sources of information available to the practitioner?

 3    **A.**    Yes, it could be one of the sources.

 4    **Q.**    Sometimes it's completely not available, a self-report;

 5    correct?

 6    **A.**    If the person's non-verbal, correct.

 7    **Q.**    So a person might be non-verbal because they're a young

 8    child, for instance?  That's one reason; right?

 9    **A.**    An extremely young child, yes, or they might have more

10    severe symptoms, and they're non-verbal for that reason.

11    **Q.**    Right.  So a high-functioning autistic person isn't

12    usually a person who's non-verbal; correct?

13    **A.**    Correct.

14    **Q.**    But there are some people who suffer from ASD whose

15    conditions are so severe that they're not able to live

16    independently; right?

17    **A.**    Yes.

18    **Q.**    They're not able to conduct a normal conversation;

19    correct?

20    **A.**    Correct.

21    **Q.**    They may or may not have the vocabulary to do it; correct?

22    **A.**    Correct.

23    **Q.**    They may or may not have the ability to engage socially?

24    And I don't mean for fun.  I mean interpersonally.  Correct?

25    **A.**    Correct.

**GREGORY - CROSS / DIAMOND**

1   Q.   Some people with high-functioning autism can't meet

2   another person's eyes; is that right?

3   A.   With high-functioning autism?

4   Q.   No.  I'm sorry.  Some person with ASD.

5   A.   Yes.

6   Q.   On some scales of ASD, people are ill enough, impaired

7   enough that making eye contact is extremely difficult, if

8   possible at all; is that right?

9   A.   Correct.

10  Q.   And Mr. Andrade did not present with that feature;

11  correct?

12  A.   He did not.

13  Q.   He -- you actually noted that he looked you in the eye and

14  shook your hand when you met him; correct?

15  A.   Yes.

16  Q.   And that was one of the factors that you considered to

17  show that Mr. Andrade did not meet the classic requirements, in

18  your view, for an ASD diagnosis; is that right?

19  A.   Based on the limited information available, yes.

20  Q.   So, in other words, if -- Mr. Andrade walked in and didn't

21  physically exhibit a sign that, upon meeting him, gave you an

22  indication that he might have ASD; correct?  He greeted you

23  more directly than that?

24  A.   He did not present like a person with autism spectrum

25  disorder when I first met him, correct.

1  **Q.**   Isn't it true that the DSM explains that individuals with

2  lower levels of impairment from ASD may be better able to

3  function independently than people with higher levels of ASD?

4  **A.**   Yes.

5  **Q.**   And even if those individuals are living independently,

6  they still may remain socially naive and vulnerable?

7  **A.**   Yes.  If they have mild autism, they can still have some

8  of those factors.

9  **Q.**   Now, as part of the material that you used to review to

10  criticize or critique Dr. Armstrong's evaluation, you had

11  access to his questionnaire of Marcus; correct?

12  **A.**   I did.

13  **Q.**   And you yourself used a questionnaire as well?

14  **A.**   I did.

15                      (Pause in proceedings.)

16        **MS. DIAMOND:**  Sorry, Your Honor.  I'm trying to open a

17  document.  One moment.  Technical problems.

18        Okay.

19  **Q.**   So one of the things that Dr. Armstrong's questionnaire

20  talked about were questions that would be considered a

21  self-report of symptoms; is that right?

22  **A.**   Yes.

23  **Q.**   And another thing that Dr. Armstrong's report talked about

24  was a little bit about the patient's family history of mental

25  illness; correct?

GREGORY - CROSS / DIAMOND

1    **A.**    Yes.

2    **Q.**    Mr. Andrade indicated to Dr. Armstrong that his hopes to

3    be answered by the evaluation he attended with Dr. Armstrong

4    were for diagnosis and treatment; isn't that right?

5    **A.**    I vaguely recall that, yes.

6    **Q.**    Do you have his questionnaire with you?

7    **A.**    I have it in my computer.

8    **Q.**    Thank you.

9           **MS. DIAMOND:**    Perhaps for the witness only and

10    the Court and counsel, not for the jury, Mr. Jackson, could you

11    please display Exhibit 3405.    3405 for the witness and

12    the Court and counsel only.

13        One moment, Your Honor.

14           **THE COURT:**    How much more do you have?

15           **MS. DIAMOND:**    I have a bit more.    Should we take our

16    break and resume?

17           **THE COURT:**    We'll take our break.

18        Members of the jury, remember my admonitions, do not

19    discuss this amongst yourselves or with anyone else.

20        And we'll see you in 15 minutes.

21                 (Recess taken at 9:58 a.m.)

22              (Proceedings resumed at 10:18 a.m.)

23        (Proceedings were heard out of the presence of the jury.)

24           **THE COURT:**    All right.    We're bringing the jury out.

25        (Proceedings were heard in the presence of the jury.)

1          **THE COURT:**  The jury is present.

2      You may proceed.

3          **MS. DIAMOND:**  Thank you.

4  **Q.**  Dr. Gregory, before the break, I was turning your

5  attention to the questionnaire that Dr. Armstrong used in his

6  evaluation as a precursor to his diagnostic interview; correct?

7      Doing a diagnostic interview is a standard part of a

8  comprehensive neurological psycho -- sorry, I always stumble --

9  comprehensive neuropsychological evaluation.  One of the

10  components is a clinical interview.  That's pretty standard;

11  correct?

12  **A.**  Yes.

13  **Q.**  And you included an interview as well in your evaluation?

14  **A.**  I did.

15  **Q.**  Okay.  And you looked at Dr. Armstrong's questionnaire

16  because he provided that to you; correct?

17  **A.**  Yes.

18  **Q.**  And when Mr. Andrade was asked what are his hopes for the

19  evaluation, he indicated that --

20          **MR. HIGHSMITH:**  Objection, Your Honor.  Inadmissible

21  hearsay, the defendant's statements.

22          **MS. DIAMOND:**  It's part of her basis testimony,

23  Your Honor.

24          **THE COURT:**  Well, you've first got to elicit what she

25  based her testimony on, the foundation.

GREGORY - CROSS / DIAMOND

```
 1   BY MS. DIAMOND:
 2   Q.   You did -- as part of your review of Dr. Armstrong's
 3   evaluation, you reviewed all the material that he provided to
 4   you; correct?
 5   A.   Yes.
 6   Q.   So within the material that he provided to you were the
 7   questionnaire filled out by Marcus; correct?
 8   A.   Yes.
 9   Q.   So that was one of the things that you looked at to form
10   your opinion that Dr. Armstrong was wrong; correct?
11   A.   It was one of the pieces of information that I looked at
12   within my evaluation, yes.
13   Q.   Great.
14        So in that evaluation that my client filled out, he
15   indicated that he hoped that the evaluation with
16   Dr. Armstrong --
17            MR. HIGHSMITH:  Objection.
18            THE COURT:  Yes, you can't just do that.  Ask her what
19   the basis -- what she relied on, what the basis of her -- don't
20   start just stating what the questionnaire said.
21   BY MS. DIAMOND:
22   Q.   There was material in Dr. Armstrong's questionnaire that
23   helped you to determine whether or not his process was, in your
24   opinion, a good process or a bad process; correct?
25   A.   He administered a questionnaire that's fairly standard for
```

**GREGORY - CROSS / DIAMOND**

1  a neuropsych evaluation, and that was one of the components

2  that I looked at.

3  **Q.**   It was his particular take on a standard questionnaire;

4  correct?

5  **A.**   Yes.

6  **Q.**   He devised this questionnaire from a number of various

7  questionnaires used for this purpose, according to his

8  testimony; correct?

9  **A.**   I actually don't recall that, but it's possible.

10  **Q.**   And you used a different questionnaire but for a similar

11  purpose, to gather some background information from the

12  subject; correct?

13  **A.**   I did.

14  **Q.**   And in -- and did you compare the material between the two

15  questionnaires?

16  **A.**   I -- I reviewed the information from both questionnaires

17  and I asked follow-up questions.

18  **Q.**   And some of the information in Mr. Andrade's questionnaire

19  you took at face value; correct?

20  **A.**   Yes.  His -- like his educational level.

21  **Q.**   And the fact that he was discharged honorably from the

22  military; correct?

23  **A.**   Yes.  I mean, I think I understood that he was in the

24  military and he may have put that there was an honorable

25  discharge, but I didn't have anything to confirm that.

GREGORY - CROSS / DIAMOND

1    Q.    He self-reported that to you?

2    A.    Yes.

3    Q.    And he self-reported also to both you and Dr. Armstrong

4    that he had delayed speech/language problems when he was a

5    child; correct?

6    A.    Yes.  I inquired further about those problems, and it was

7    basically an articulation difficulty.  So difficulty rolling

8    his Rs rather than a delay in learning to talk.

9    Q.    He also explained to you that he had difficulty with the

10   onset --

11          MR. HIGHSMITH:  Objection, Your Honor.

12          THE COURT:  She can ask questions about this -- what

13   was disclosed in his questionnaire.  What she can't do is just

14   read statements out of the questionnaire.

15          Proceed.

16   BY MS. DIAMOND:

17   Q.    He disclosed to you that he had difficulty in childhood

18   with fine motor skills as well, didn't he?

19   A.    I know that's in Dr. Armstrong's.  I don't recall if that

20   was in my questionnaire.

21   Q.    Delay in development of fine motor skills is one of the

22   hallmarks of ASD, isn't it?

23   A.    It's a non-specific finding.  It's actually associated

24   with ADHD as well.

25   Q.    So that's a "yes"; right?

**GREGORY - CROSS / DIAMOND**

1    **A.**    That's a no.

2    **Q.**    It's not associated with ASD?

3    **A.**    It's associated with ASD and ADHD and some other issues,

4    so it's not specific to ASD.

5    **Q.**    Okay.  But it's included in the things that might alert a

6    practitioner to the presence of ASD; correct?

7    **A.**    It might alert a practitioner to the presence of some mild

8    developmental issues, but fine motor coordination is not one of

9    the diagnostic criteria for ASD.

10    **Q.**    Mr. Andrade indicated that, as a child, he had

11    psychological problems; correct?

12    **A.**    I don't recall the specifics of that.

13    **Q.**    The question is:  Did he indicate that he had

14    psychological problems as a child?  Yes or no.

15    **A.**    He indicated that he had some psychiatric treatment as a

16    child, yes.

17    **Q.**    And some of that psychiatric treatment was in a

18    residential hospital called Bayview; correct?

19    **A.**    Yes.

20    **Q.**    That's a hospital in Texas that treated, when Mr. Andrade

21    was a child, developmentally disabled children; correct?

22    **A.**    I don't know the nature of the treatment, but I know it

23    was at a residential treatment program.

24    **Q.**    And you didn't do anything to contact the hospital;

25    correct?

**GREGORY - CROSS / DIAMOND**

1    **A.**   I did not.

2    **Q.**   Mr. Andrade reported to you that as a child, he had

3    clumsiness; correct?

4    **A.**   Yes.

5    **Q.**   He had problems socializing; correct?

6    **A.**   Yes.

7    **Q.**   He had speech problems; correct?

8    **A.**   Yes.  The R rolling that I noted.

9    **Q.**   And that he had psychological and behavioral problems;

10   correct?

11   **A.**   Yes.

12   **Q.**   Mr. Andrade also told you that while his mother was

13   pregnant, she took Haldol; is that right?

14   **A.**   He said that she had taken Haldol in -- in her life, but

15   he couldn't say specifically whether she'd taken it when she

16   was pregnant with him.

17   **Q.**   You discussed the fact that Mr. Andrade's mother suffered

18   from schizophrenia and/or bipolar disorder; correct?

19   **A.**   Yes.

20   **Q.**   And there is a familial -- sorry.

21       For -- for bipolar disorder, is it true that there is both

22   a genetic or hereditary factor and an environmental factor

23   that's thought to be related to the onset of bipolar disorder?

24   **A.**   Yes.

25   **Q.**   And isn't it true also that in autism there is considered

1    to be a genetic and a -- sorry -- a hereditary and

2    environmental component?

3    **A.**    Yes.

4    **Q.**    Mr. Andrade shared with you that his memory of being

5    hospitalized as a child involved his having mutism; is that

6    right?

7    **A.**    Yes.

8    **Q.**    What's mute -- what is mutism?

9    **A.**    So selective mutism is where somebody chooses not to

10   respond verbally in certain situations.

11   **Q.**    He basically just stopped talking; right?

12   **A.**    Yes.

13   **Q.**    And they couldn't make him talk, and at some point a

14   practitioner suggested hospitalization would help him; correct?

15   **A.**    I'm assuming, yes, seeing as he ended up at the hospital.

16   **Q.**    This isn't a normal factor with a child that experiences

17   speech delays; correct?

18   **A.**    Sorry.  Could you repeat that?

19   **Q.**    This is not a normal occurrence in all children that

20   experience a delay in onset of speech?

21   **A.**    Correct.

22   **Q.**    Didn't Mr. Andrade also reveal to you that one of his

23   sisters has experienced mutism as well?

24   **A.**    He indicated that she has developmental delays.  I don't

25   recall him saying mutism.

GREGORY - CROSS / DIAMOND

1  Q.   Do you recall that he described that she was living in a

2  hospital, a mental health and mental rehabilitation hospital,

3  for the last 20 years?

4  A.   Yes, and I recall he indicated that she had had

5  developmental issues from birth.

6  Q.   And Mr. Andrade and his siblings were raised by a mother

7  who, besides having herself schizophrenia and being treated --

8  sorry.  It's a long question.

9       Mr. Andrade related to you that his mother, in his memory,

10  was hospitalized several times for her mental disorder;

11  correct?

12  A.   Yes.

13  Q.   And Mr. Andrade's mother herself had experienced trauma as

14  a young child when she witnessed Marcus's grandfather shoot his

15  grandmother in the head; correct?

16  A.   Correct.

17  Q.   And this had a great effect on the impression that Marcus

18  had about his mother; correct?

19  A.   Which part?

20  Q.   He didn't like her at first, and then he grew to

21  understand that she may have been ill and he forgave her?

22  A.   Yes.

23  Q.   Mr. Andrade's father left home while he was a young age;

24  correct?

25  A.   Correct.

1    Q.   Mr. Andrade's understanding was that his father left

2    because of the mental health issues in the household; is that

3    right?

4    A.   That was one of the factors he mentioned, yes.

5    Q.   You learned, during your interview with Mr. Andrade, that

6    his older brother has a child with autism; correct?

7    A.   Yes.

8    Q.   And you learned that his sister, the one who isn't

9    hospitalized with an intellectual developmental disorder, also

10   had a child with autism; correct?

11   A.   He mentioned that one of his sisters had a child with

12   autism, but I don't know which sister.

13   Q.   And he was forthright with you about his own feelings of

14   anxiety and depression; correct?

15   A.   He described some anxiety and depression, yes.

16   Q.   And he did describe to you that he had to enroll in speech

17   therapy classes.  We talked about the Rs, but he did have

18   speech therapy as a child; correct?

19   A.   Yes.

20   Q.   And despite receiving some medication for anxiety or

21   depression, you didn't see records from his current medical

22   provider at the VA, anything that indicated, at the time that

23   he met with you, that he was undergoing psychiatric or

24   psychological treatment; correct?

25   A.   I did not see any records that indicated that.  He did say

1    he'd recently started meeting -- or recently started taking

2    Prozac, an antidepressant medication, about a month before I

3    saw him.

4    **Q.**    And you saw him about six months after Dr. Armstrong saw

5    him; correct?

6    **A.**    Yes.

7    **Q.**    And he reported similar highlights of his family history

8    to Dr. Armstrong as well as to you; correct?

9    **A.**    I did not see a lot of the information that he told me in

10    Dr. Armstrong's notes and records.

11    **Q.**    Did you see note that he had received assistance for

12    speech delay?

13    **A.**    Yes.

14    **Q.**    Did you see note that he had been treated at a hospital in

15    Texas for mutism, residentially, as a child?

16    **A.**    Yes.

17    **Q.**    Did you see a note that his mother had schizophrenia and

18    had been treated for that for most of Mr. Andrade's memory?

19    **A.**    I didn't see any reference to her treatment but the

20    diagnosis, yes.

21            **MS. DIAMOND:**  I need just a minute, Your Honor, if I

22    may.

23                        (Pause in proceedings.)

24    **BY MS. DIAMOND:**

25    **Q.**    When you were conducting your interview and your tests of

1    Mr. Andrade, you took notes along with recording the test

2    results; correct?

3    **A.**    Yes.

4    **Q.**    And at times you noted in your notes the duration of a

5    test, how long it took him; is that right?

6    **A.**    Yes.

7    **Q.**    And at times you noted that Mr. Andrade -- something about

8    his speech pattern or descriptions to you to help you remember

9    your impressions while you wrote down what he was telling you;

10   correct?

11   **A.**    Yes.

12   **Q.**    One of the things that you wrote down during your

13   diagnostic interview of Mr. Andrade is that he seemed to be

14   distractible; correct?

15   **A.**    Yes.

16   **Q.**    That was based on circumstances; correct?

17   **A.**    Yes.

18   **Q.**    When a topic drew his attention, he would talk about it a

19   lot; correct?

20   **A.**    He would sometimes kind of veer off topic rather than

21   being drawn to a topic; he would include details that were

22   perhaps peripheral.

23   **Q.**    And peripheral to your evaluation; correct?

24   **A.**    Yes.

25   **Q.**    And what you did is what psychologists call redirection;

GREGORY - CROSS / DIAMOND

1    correct?

2    **A.**    Sometimes yes, and sometimes no.

3    **Q.**    Sometimes you would try to steer him back to the topic at

4    hand so he didn't talk about whatever was foremost in his mind

5    so he could pay attention to the question; correct?

6    **A.**    Yes.

7    **Q.**    I mentioned Haldol and I forgot to follow up with that

8    question.

9         What is the significance if Mr. Andrade's mother had taken

10    Haldol during pregnancy, which we do not know?  He reported he

11    did not know.  He just knew she took that drug.  What is the

12    significance of Haldol with respect to autism, if any, in your

13    knowledge?

14         **MR. HIGHSMITH:**  I'm going to object on the

15    speculation -- she's calling for speculation because she does

16    not know whether he took it or not.

17         **THE COURT:**  Well, it is speculative, but I'll allow

18    the witness to answer the question.

19         Go ahead.

20         **THE WITNESS:**  With respect to autism, I don't know any

21    association.

22    **BY MS. DIAMOND:**

23    **Q.**    You're not aware that there's literature that indicates

24    that a pregnant person taking Haldol might be a contributing

25    factor to an autistic -- a child with autism?

1  **A.**    I'm not; and if it is, it's one of the more minor

2  contributors.

3  **Q.**    I thought you said you were not aware of it.

4  **A.**    Most of the research suggests like genetic and

5  environmental issues, with a preponderance of it being genetic,

6  so that's why I'm talking about it being a lesser factor.

7  **Q.**    Because a substance that a mother takes while pregnant

8  would be environmental to the fetus; correct?

9  **A.**    Correct.

10  **Q.**    Same thing as living in a toxic environment is an

11  environmental factor about possibly contributing to, say, a

12  respiratory disease, for instance?

13  **A.**    Yes.

14  **Q.**    And you did learn that Mr. Andrade's father, his natural

15  father, passed -- or sorry -- left when he was young; correct?

16  **A.**    Yes.

17  **Q.**    And his mother passed away in 2013; is that right?

18  **A.**    I think it was 2015.

19                    (Pause in proceedings.)

20        **MS. DIAMOND:**  Sorry, Your Honor.  Just reviewing

21  really quick.

22                    (Pause in proceedings.)

23  **BY MS. DIAMOND:**

24  **Q.**    Repeatedly in your conversation with Mr. Andrade, you

25  noticed that he was appearing to be anxious; is that right?

**GREGORY - CROSS / DIAMOND**

1   **A.**   At times he was anxious, yes.

2   **Q.**   And he indicated to you readily that he felt anxious at

3   times and stressful; correct?

4   **A.**   Yes.  I mean, he said that he had some anxiety, but that

5   he was far less anxious during my evaluation than the prior

6   evaluation.

7   **Q.**   He liked your manner with him; is that right?

8   **A.**   I'm sorry?

9   **Q.**   Did it appear to you that he liked your manner with him?

10  **A.**   I don't know.

11  **Q.**   Do you generally have a soft and welcoming approach with

12  your patients?

13  **A.**   I try to make people feel comfortable, yes.

14  **Q.**   And you do that whether or not you're evaluating them for

15  a forensic purpose or whether or not you're treating them in a

16  clinical setting; correct?

17  **A.**   Yes.  It somewhat depends on who I'm evaluating but, yes.

18  **Q.**   And you did that with Mr. Andrade?  You tried to make him

19  feel as comfortable as possible; correct?

20  **A.**   Yes.

21  **Q.**   Because you knew that if he was anxious or also

22  distracted, it might throw some results off?

23  **A.**   I mean, you want to create the best environment for the

24  person to give their best performance.  Those are elements of

25  it, but that wasn't the conscious decision about, you know,

**GREGORY - CROSS / DIAMOND**

1   trying to create a pleasant environment.

2   **Q.**   It wasn't a social setting?  You weren't trying to make

3   them feel happy to be there?  That's fair to say; correct?

4   **A.**   Yes.

5   **Q.**   But you also weren't presenting as an antagonistic person

6   intentionally; correct?

7   **A.**   No.

8   **Q.**   You did tell Mr. Andrade that you worked for

9   the Government; right?

10   **A.**   Yes.  I repeated that before -- at the beginning of the

11   evaluation and after lunch.

12   **Q.**   So in the middle of your evaluation, you had a -- sorry.

13   During your evaluation, you had a conversation; correct?

14   An interview?

15   **A.**   Yes.

16   **Q.**   And after the interview, you conducted some tests?

17   **A.**   Right.

18   **Q.**   And did you take a break before or after the tests, your

19   break for lunch?

20   **A.**   After some tests and before others.

21   **Q.**   And in the middle of that, when you came back from lunch,

22   you had some conversation; correct?

23   **A.**   Interview, yes.

24   **Q.**   So you split your interview up into several different

25   times during your testing procedure?

**GREGORY - CROSS / DIAMOND**

1   **A.**   Yes.  He was filling out the questionnaire at different

2   times, and then I would follow up on some of his answers.

3   **Q.**   And you did that also at the end of his interview, didn't

4   you -- I'm sorry -- at the end of his testing procedure as

5   well; correct?

6   **A.**   Yes.

7   **Q.**   Mr. Andrade was aware that he didn't -- as a person with

8   whatever conditions he had, he had no special powers; correct?

9   He was not under a delusion or a delirium to that degree;

10  correct?

11  **A.**   Correct.

12  **Q.**   He did explain to you that he's much more comfortable with

13  technology than people; isn't that right?

14  **A.**   I don't recall him saying than with people, but he did say

15  that he enjoys technology.

16  **Q.**   He felt the future was bright because of technological

17  advances; correct?  He was hopeful?

18  **A.**   Yes.

19  **Q.**   And he described himself as a bit of an idealist; right?

20  **A.**   I don't recall that part.

21  **Q.**   Do you recall him thinking -- him articulating to you that

22  he could do what Zuckerberg could do?

23  **A.**   I do recall him saying that, and then he sort of followed

24  it up with, "Why not?"

25  **Q.**   And in your clinical opinion as a psychologist, to you

**GREGORY - CROSS / DIAMOND**

1    this sounded a bit grandiose; correct?

2    **A.**    Yes.

3    **Q.**    And you considered whether or not he had a slightly bit --

4    a slight mood elevation on the day that you evaluated him as a

5    result; correct?

6    **A.**    Yes.

7    **Q.**    Grandiosity is a symptom of bipolar disorder, isn't it?

8    **A.**    It is and it's also a symptom of like personality

9    disorders as well.

10    **Q.**    Mr. Andrade brought up his mother's mental health

11    struggles many times during his conversation with you, didn't

12    he?

13    **A.**    He brought it up on more than one occasion.

14    **Q.**    He also told you that as a child -- as a child, he wanted

15    close friends; correct?

16    **A.**    Yes.

17    **Q.**    But that he did not have many friends; isn't that right?

18    **A.**    Yes.

19    **Q.**    He told you, when he said that he wished that he could

20    have had friends, that he never felt like he fit in; right?

21    **A.**    That was one of the parts too.  He also said he didn't

22    feel comfortable bringing friends home because of his mother's

23    mental health issues.

24    **Q.**    And that he expressed his wish that he had had friends?

25    **A.**    Yes.

**GREGORY - CROSS / DIAMOND**

1  Q.  And that he said that other kids made fun of him; correct?

2  A.  Yes.

3  Q.  Now, you are aware that you are -- as we've established,

4  that you can consider things that an articulate subject says

5  about their own personal history in thinking about whether or

6  not there's an ASD diagnosis; correct?

7  A.  Yes.  That's a factor to consider.

8  Q.  And Dr. Armstrong, in addition to considering his

9  self-reporting and his self-presenting, also gave a

10  questionnaire to Marcus's wife; correct?

11  A.  Yes.  The questionnaire was on his current executive

12  functioning, so it had nothing to do with his developmental

13  history and wasn't specific to autism.

14  Q.  Correct.  But how someone performs on executive

15  functioning is a factor that neuropsychologists consider in

16  determining whether objective tests indicate the presence of

17  ASD; correct?

18  A.  Executive dysfunction is an associated feature of ASD as

19  well as ADHD and many other issues.  So it's really not

20  specific to ASD.

21  Q.  Right.  And my question wasn't if it was specific to ASD

22  alone.  My question is:  Is it a factor to consider for a

23  neuropsychologist?  It is a factor, isn't it?

24  A.  It's factor to consider for a neuropsychologist; but in

25  terms of the diagnostic criteria for ASD, it is not related to

**GREGORY - CROSS / DIAMOND**

1  those.

2  **Q.**   And did you make use of the diagnostic questionnaire that

3  Dr. Armstrong gave to Marcus's wife, or did you just ignore it

4  completely because it didn't talk about his childhood?

5  **A.**   No.  I reviewed that questionnaire.

6  **Q.**   Okay.  And did you promulgate any questionnaires to anyone

7  in Marcus's life?

8  **A.**   I did not.

9  **Q.**   You did not reach out and ask to give a questionnaire,

10 say, to his stepfather, did you?

11 **A.**   No.  I was trying to replicate, as much as possible, the

12 evaluation that was given.  Excuse me.  There are very few

13 collateral questionnaires to give.  One of the ones that is

14 available is the one that Dr. Armstrong gave, so I reviewed

15 that, which was valid.

16 **Q.**   And you didn't promulgate any questionnaires to any of

17 Marcus's business associates?

18 **A.**   No.

19 **Q.**   So, in essence -- let me ask you this:  Did you ask

20 the Government to get his school records for you?

21 **A.**   I asked if there were additional medical records and

22 school records available.

23 **Q.**   Did you ask them to subpoena them for you?

24 **A.**   I did not.

25 **Q.**   Do you have any reason to believe that from the school

 1    that Marcus went to, which he told you the name of, that that
 2    school -- the school records from the early '80s to early '90s,
 3    that those records still exist?
 4    **A.**    I'm sorry.  Can you ask that again?
 5    **Q.**    Do you have any reason to believe whether or not the
 6    records -- the school that Mr. Andrade attended in elementary
 7    school -- I'm going to stop myself.
 8         Mr. Andrade was born in 1978; is that correct?
 9    **A.**    Yes.
10    **Q.**    So he would have been a small child in the early '80s and
11    then in elementary school through most of the '80s; correct?
12    **A.**    Yes.
13    **Q.**    Did you investigate whether or not -- you personally
14    investigate whether or not his school still existed and had
15    records available?
16    **A.**    Personally, no.
17    **Q.**    Did you do anything to continue or complete comprehensive
18    neuropsychological evaluation of Mr. Andrade besides the things
19    that you have testified here?  Meaning, use your own
20    questionnaire, review Dr. Armstrong's test materials, records,
21    results, give your own tests, and have a conversation with
22    Marcus?
23    **A.**    Sorry.  Is the question did I do anything beyond that?
24    **Q.**    Yes.
25    **A.**    Not that I recall.

1   **Q.**   And at the end of your conversation -- sorry.

2       At the end of your evaluation with my client, were you

3   continuing your diagnostic evaluation of him when you had

4   conversation after your testing regime was complete?

5   **A.**   I asked him some further diagnostic questions at the end

6   of the day, yes.

7   **Q.**   And was he forthcoming with you?

8   **A.**   I mean, he answered the questions; but as I said, in the

9   context of the prior testing, there's a suggestion of a

10  tendency to overreport.

11  **Q.**   When he was having conversations with you in the end of

12  your conver- -- at the end, after the diagnostic tests were

13  completed, did you still have to redirect him if he was --

14  sorry -- did you have to redirect him at any point in that

15  conversation?

16  **A.**   I had to redirect him a few times during the day.  I don't

17  recall exactly when it was.

18  **Q.**   It was sort of a feature of the way he talked; right?  He

19  would go off on something that he found interesting and if it

20  was not your topic, you would have to bring him back to center;

21  right?

22  **A.**   That happened a few times, yes.

23  **Q.**   Is it your opinion that without childhood medical records

24  or school records or a present adult who did not have mental

25  illness to report on symptoms, that an ASD diagnosis cannot be

**GREGORY - CROSS / DIAMOND**

1  made ever?

2  **A.**   No.

3  **Q.**   In this situation, you didn't have those things, however,

4  and is that what you referred to when you said you had limited

5  information?

6  **A.**   Yes.  So I think when somebody has severe autism spectrum

7  disorder, the symptoms are quite prominent and obvious.

8      When somebody might have more mild, you need additional

9  information to know if it was present in the developmental

10  period.

11  **Q.**   So for someone with a high functioning level of autism

12  spectrum disorder, as Dr. Armstrong indicates Marcus has, it's

13  a much more subtle thing to be able to diagnose such a person

14  as an adult; correct?

15  **A.**   It's a less obvious thing, yes.

16  **Q.**   They may have, in fact, learned behaviors, such as, when

17  you meet a new person, shake their hand; correct?

18  **A.**   They can, yes.

19  **Q.**   And so Mr. Andrade's doing that with you didn't indicate a

20  significant fact one way or the other diagnostically; correct?

21  **A.**   It was a factor to consider.  You know, it might be that

22  the person learned it, but I don't know if it was absent

23  previously, which is why I need early information.

24      But I also looked at his repetitive -- or his history of

25  repetitive behaviors or need for structure, and he was not

GREGORY - CROSS / DIAMOND

1    reporting any of those issues that are associated with autism

2    either.

3    Q.    When Mr. Andrade met with you and met your eye and shook

4    hands with you, that is behavior that you would not expect

5    someone with a significant amount of autism spectrum

6    disorder -- someone on a higher level, that would be a

7    difficult act for them; correct?

8            THE COURT:  Haven't we -- we've covered this quite a

9    bit now, so let's move on.

10   BY MS. DIAMOND:

11   Q.    If someone knew that they were trying to be diagnosed as

12   autism, intentionally trying to fool you, would greeting you

13   with eye contact and a handshake be a step towards fooling you

14   or a step away from fooling you?

15   A.    Away.

16   Q.    Thank you.

17           MS. DIAMOND:  May I have a moment, Your Honor?

18           THE COURT:  Yes.

19                   (Pause in proceedings.)

20           MS. DIAMOND:  Thank you, Your Honor.

21       Thank you, Dr. Gregory.  We have no further questions at

22   this time.

23           THE WITNESS:  Thank you.

24           THE COURT:  Mr. Highsmith.

25

1      <u>**REDIRECT EXAMINATION**</u>

2   **BY MR. HIGHSMITH:**

3   **Q.**   All right.  I'm going to try to keep this short.  Very --

4   couple quick follow-up questions.

5       Let's start with the intelligence tests.  Lots of

6   questions about the intelligence tests.  Do you remember that?

7   **A.**   Yes.

8   **Q.**   All right.  Questions both about your assessment and

9   Dr. Armstrong's assessment.  Do you recall that?

10  **A.**   I do.

11  **Q.**   Okay.  So on your -- you have a copy of your test in front

12  of you?

13  **A.**   Yes.

14  **Q.**   So just following up on the questions on cross-examination

15  about intelligence test results, could you turn to the page

16  that says "Neuropsychological Assessment Results Summary"?

17  **A.**   I have.

18  **Q.**   Okay.  So if we look at an intellectual abilities range

19  for block design, vocabulary, matrix reasoning, similarities,

20  verbal comprehension index, perceptual reasoning index, and

21  full-scale IQ, for all of those entries, what is the range for

22  Mr. Andrade?

23  **A.**   Average.

24  **Q.**   Turning to Dr. Armstrong's test results, lots -- there

25  were lots of questions on cross-examination about the

GREGORY - REDIRECT / HIGHSMITH

1    intelligence test results.

2        Looking just at Dr. Armstrong's test results, not the PAI

3    but his test results themselves, do you recall what his test

4    results were for academics and specifically word reading,

5    spelling, and math comprehension?

6    **A.**    Average.

7    **Q.**    For -- again, focusing on Dr. Armstrong's specific

8    results, do you recall what the score was for intelligence,

9    looking at the subtest for vocabulary, information, block

10    design, matrix reasoning, visual puzzles, and coding?

11    **A.**    Those subtests of the IQ test were all average.

12    **Q.**    Okay.  So let's turn now to malingering.  There was quite

13    a few questions on cross-examination about malingering, and I'd

14    like to follow up and clarify the record.

15        I think you testified that Mr. Andrade had high

16    malingering scores on both your test and on Dr. Armstrong's

17    test; is that accurate?

18    **A.**    Yes.

19    **Q.**    Did the high -- did his high malingering scores cause you

20    concerns about the validity of the test results?

21    **A.**    They did.

22    **Q.**    Okay.  Let's pause on malingering.

23        In simple laymen's terms, what is malingering?

24    **A.**    So malingering is faking or grossly exaggerating some kind

25    of symptom or problem in order to get some kind of reward or

1   secondary gain.

2   **Q.**   On cross-examination, you were asked many questions about

3   percentiles.  Do you remember that?

4   **A.**   I do.

5   **Q.**   Okay.  You were also asked questions about if you put a

6   hundred people in a room, where would the subject line up in

7   those -- that line of a hundred people.  Do you recall that?

8   **A.**   I do.

9   **Q.**   Okay.  So on your test, is it accurate that Mr. Andrade

10  scored four to five standard deviations above the norm for

11  malingering?

12          **MS. DIAMOND:**  Objection.  Vague as to which test.

13          **THE COURT:**  Overruled.

14          **THE WITNESS:**  Sorry.  On the Personality Assessment

15  Inventory, which was a psychological test I administered, on

16  the malingering scale, he scored a 98.  The mean is 50.

17  Standard deviation is 10 points.  So it's nearly five standard

18  deviations above the mean.

19  **BY MR. HIGHSMITH:**

20  **Q.**   I'm not good at math, but nearly five standard deviations

21  above the mean, does that put him in approximately the

22  99.99 percentile for malingering?

23  **A.**   It's above the 99th percentile, yes.

24  **Q.**   So to use the framing that Defense used for some of their

25  percentile questions, if you put a thousand people in a room,

1 approximately where would Mr. Andrade stand in terms of ranking

2 him for malingering?

3 **A.**    Maybe one or two people might score higher.

4 **Q.**    So near the top of a thousand people?

5 **A.**    Yes.

6 **Q.**    All right.  Just to clarify, there were lots of questions

7 in cross-examination about specific tests, one test, your

8 findings from that.

9      To be clear, you conducted multiple tests; is that right?

10 **A.**    I did.

11 **Q.**    And your results are based on your analysis and

12 compilation of conducting a wide battery of tests in reaching

13 your conclusions; is that right?

14 **A.**    Yes.

15 **Q.**    So you're not selectively relying on one test to draw a

16 conclusion; is that correct?

17 **A.**    Right.  I look at the whole battery of tests.

18 **Q.**    All right.  So to pause on your findings, in your opinion,

19 Dr. Armstrong's diagnosis of autism spectrum disorder is

20 incorrect; is that right?

21 **A.**    Correct.

22 **Q.**    All right.  When you reviewed more than 1500 pages of VA

23 medical records for Mr. Andrade, did you see a diagnosis of

24 autism spectrum disorder in those records?

25 **A.**    No.

GREGORY - REDIRECT / HIGHSMITH

1   Q.   When you reviewed more than 1500 pages of VA medical

2   records for Mr. Andrade, did you see a diagnosis for bipolar

3   disorder in those records?

4   A.   No.

5   Q.   When you reviewed more than 1500 pages of VA medical

6   records for obsessive-compulsive disorder, did you see any

7   diagnosis for obsessive-compulsive disorder?

8   A.   I did not.

9   Q.   On cross-examination, you were asked several questions

10  about reviewing a certain set of records and not reaching out

11  to get additional records.

12       Was your review based on trying to conduct a similar

13  review to Dr. Armstrong's, sort of a -- like an equivalent

14  review that Dr. Armstrong conducted?

15  A.   Yes.  I asked for all the records that Dr. Armstrong had

16  reviewed, and I also inquired whether there are any additional

17  up-to-date psych records or school records.

18  Q.   So if you had reviewed a whole set of material that

19  Dr. Armstrong did not review, it would have been difficult to

20  make an apples-to-apples comparison; is that correct?

21  A.   Yes.

22  Q.   Okay.  On cross-examination, you were asked some questions

23  about ADHD, and one of the questions was:  Is a symptom of ADHD

24  missing some details in your ordinary life?  And I think you

25  answered "Yes."

GREGORY - REDIRECT / HIGHSMITH

1          Doesn't everyone miss some details in their ordinary life?

2   **A.**   Yes.  And I think people with ADHD perhaps do it a little

3   bit more.

4   **Q.**   Was it part of your analysis and Dr. Armstrong's analysis

5   that Mr. Andrade obtained money from thousands of investors?

6   **A.**   That was not part of our evaluations.

7   **Q.**   Was it part of your analysis and evaluation and that of

8   Dr. Armstrong that Mr. Andrade supervised, hired, and directed

9   numerous employees who were working under him?

10  **A.**   No.

11  **Q.**   Was it part of your and Dr. Armstrong's analysis that

12  Mr. Andrade traveled around the world promoting his business?

13          **MS. DIAMOND:**  Your Honor, objection.  Request sidebar.

14  We covered this on Dr. Armstrong's --

15          **THE COURT:**  Overruled.

16          **THE WITNESS:**  No, I was not provided with that

17  information.

18  **BY MR. HIGHSMITH:**

19  **Q.**   Was it part of your and Dr. Armstrong's analysis that

20  Mr. Andrade brought in millions of dollars in investments from

21  thousands of investors?

22          **MS. DIAMOND:**  Same objection, Your Honor.

23          **THE COURT:**  Overruled.

24          **THE WITNESS:**  No.

25  \\\

1  BY MR. HIGHSMITH:

2  Q.    And was it part of your and Dr. Armstrong's analysis that

3  Mr. Andrade ran multiple cryptocurrency companies over many

4  years?

5  A.    That was not information I was provided with.

6  Q.    So that factor did not factor into your analysis; correct?

7  A.    Correct.

8  Q.    So you did not -- in the VA medical records, there was no

9  autism spectrum disorder diagnosis, no bipolar disorder

10  diagnosis, no obsessive-compulsive diagnosis; correct?

11  A.    Correct.

12  Q.    So based on your analysis, the first time Mr. Andrade was

13  ever diagnosed with these mental health issues was from a paid

14  Defense expert just months before his criminal trial?

15  A.    Yes.

16        MR. HIGHSMITH:  No further questions.

17        MS. DIAMOND:  Thank you.

18                      **RECROSS-EXAMINATION**

19  BY MS. DIAMOND:

20  Q.    When you were talking about the 98 percent T-score, you

21  were talking about the results that were printed out by the PAI

22  test; isn't that right?

23  A.    Those results are in that report, yes.

24  Q.    And in that report, that was talking about a caution to

25  you, the practitioner, that the results of the tests were

1    invalid; correct?

2    **A.**   They were invalid based on the validity scales, including

3    that scale.

4    **Q.**   They were invalid for several reasons, as we read the

5    printed material that was provided by you as the results you

6    received from the author of the test, that possible reasons for

7    the invalidity did not include the word "malingering"; isn't

8    that true?

9    **A.**   In that printout, it says "overreporting"; but then when

10   you look at all of the validity scales, one of them is the

11   malingering scale --

12   **Q.**   I'm sorry.  I asked the question about the printed

13   material that you were given by the authors of the test when

14   the test was completed.

15       It listed a number of things, including the inability to

16   understand innuendo and not follow directions, the inability to

17   understand the directions, all -- it didn't list malingering;

18   isn't that right?

19   **A.**   It didn't say anything about innuendo.  It didn't say

20   malingering in the written part, yes.

21   **Q.**   So after the test results said, "These are not valid,

22   disregard this test," you looked at the results and you found a

23   number that corresponded with malingering and told

24   Mr. Highsmith about it; correct?

25   **A.**   It's standard practice to look at all of the validity

**GREGORY - RECROSS / DIAMOND**

1  scales when there's some question of validity.  The malingering

2  scale is one of the validity scales.

3  **Q.**  Your PAI test gave no question of validity.  They said it

4  wasn't valid, this test doesn't work; right?

5  **A.**  It said it was invalid, which is a question of validity.

6  **Q.**  You did not make a formal diagnosis of malingering;

7  correct?

8  **A.**  Correct.

9  **Q.**  There is such a diagnosis in the DSM, and you did not find

10  that Marcus met those elements; correct?

11  **A.**  I have tended to refer to it as overreporting versus

12  malingering, but I was asked about that scale.

13  **Q.**  But you did not diagnose him as malingering according to

14  the DSM-5-TR; correct?

15  **A.**  I did not.

16  **Q.**  The PAI test is a test that talks about symptoms as

17  reported by the subject; correct?

18  **A.**  Yes.

19  **Q.**  And isn't being unaware of how a subject presents or even

20  how a subject's own emotions feel part of the condition of

21  autism spectrum disorder?

22  **A.**  Sorry.  You started asking about the test, and then you

23  asked about -- the question is --

24  **Q.**  The test itself refers to a subject's awareness of

25  symptoms in relation to the way the words of the questions are

**GREGORY - RECROSS / DIAMOND**

1    worded; right?

2    **A.**    It's based on the person's self-report of symptoms, yes.

3    **Q.**    Have you read any literature that says that the WAIS-II,

4    the abbreviated intelligence test that you used, is superior to

5    the more complete WAIS-IV test administered by Dr. Armstrong?

6    **A.**    No.

7    **Q.**    You were able to diagnose, despite not knowing the

8    particular level that Mr. Armstrong -- I'm sorry -- that

9    Mr. Andrade -- that Marcus has bipolar disorder.  He's

10   exhibiting symptoms of bipolar disorder; correct?

11   **A.**    I'm sorry.  Can you repeat that question?

12   **Q.**    Yes.

13        You diagnosed Marcus as having bipolar disorder; correct?

14   **A.**    I observed symptoms consistent with a bipolar disorder.

15   **Q.**    So in your professional opinion, it seems that he has some

16   form of bipolar disorder, although I know that you're quick to

17   agree he was not, in your knowledge, hospitalized for it, and

18   so you don't really know the severity; correct?

19   **A.**    Yes.  He has some mood symptoms of both depression and

20   some bipolar symptoms, but they're mild.

21   **Q.**    And you were able to diagnose Mr. Andrade with having

22   attention deficit disorder; correct?

23   **A.**    Yes.

24   **Q.**    When you looked through the VA medical records of Marcus,

25   these were records that were given to Dr. Armstrong six months

GREGORY - RECROSS / DIAMOND

1    earlier; correct?

2    **A.**    I'm not quite sure when he received them, but he was given

3    them earlier than me.

4    **Q.**    You received the same records that Dr. Armstrong received

5    when he conducted his evaluation in July of 2024; is that

6    right?

7    **A.**    Yes.

8    **Q.**    There wasn't an updated version given to you; is that

9    correct?

10    **A.**    No.

11    **Q.**    And in the evaluation -- in the VA records, on redirect

12    you indicated that there was no evaluation or diagnosis of

13    autism spectrum disorder; is that right?

14    **A.**    Yes.

15    **Q.**    You did not see any neuropsychological evaluation noted in

16    the VA records, did you?

17    **A.**    No.

18    **Q.**    There were some complaints relating to psychiatric

19    conditions, such as depression or anxiety; correct?

20    **A.**    Mainly anxiety, yes.

21    **Q.**    And yet there was no comprehensive

22    neurological/psychological evaluation contained within his

23    medical records; is that right?

24    **A.**    Correct.

25    **Q.**    Thank you.

 1          **MS. DIAMOND:**  Nothing further.  Thank you.

 2          **THE COURT:**  You may step down.

 3          **THE WITNESS:**  Thank you.

 4                          (Witness excused.)

 5          **MR. HIGHSMITH:**  Nothing further.

 6          **THE COURT:**  So the Government rests?

 7          **MR. HIGHSMITH:**  The Government rests, Your Honor.

 8  Thank you.

 9          **THE COURT:**  Very well.

10      So, members of the jury, we have reached the end of the

11  evidence in this case.  It's been completed, and the next phase

12  is going to be my providing you with instructions on the law

13  for you to -- you may step down.

14          **THE WITNESS:**  Sorry.  Can I go out this way or do I --

15          **THE COURT:**  No.  Why don't you just go out this way.

16          **THE WITNESS:**  I didn't want to walk in front of you.

17          **THE COURT:**  I will be giving you instructions on the

18  law, and then you can use those and should use those to find

19  the facts as you find them.  That's your task.  Then we're

20  going to have closing arguments from counsel, I'll give you

21  some final instructions, and then the case will be yours for

22  deliberation.

23      As we talked about last week, my request to you is that

24  you clear your calendar because tomorrow we will go from

25  8:30 to 4:00; and you will have the case, and then it's up to

1    you.

2        So with that, we're almost at the end, so bear with me.

3    Remember, don't do any research, don't do anything associated

4    with this case.  Don't talk about it with anybody.  You're

5    almost at the point where you will get to talk about it amongst

6    yourselves, but not yet.

7        So we're ending early, but that's because the evidence is

8    concluded.  So we'll see you tomorrow at 8:30.

9    (Proceedings were heard out of the presence of the jury.)

10        **THE COURT:**  We're out of the presence of the jury.

11    The instruction that the Government wanted to amend?

12                    (Pause in proceedings.)

13        **MR. STEFAN:**  Yeah.  No objection to the removal,

14    Your Honor.

15        **THE COURT:**  Okay.  We'll go ahead and make that

16    change.

17        My expectation is that midafternoon -- by midafternoon

18    we'll get you the final set of -- you know, I'm not changing

19    anything except for the change that was just requested, but

20    we'll, nonetheless, give you a final set in the event that you

21    want to use them in your closing arguments.

22        **MR. HIGHSMITH:**  Thank you.

23        **THE COURT:**  All right.  See you later.

24        **MR. HIGHSMITH:**  Thank you, Your Honor.

25                (Proceedings adjourned at 11:12 a.m.)

**<u>CERTIFICATE OF REPORTER</u>**

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Monday, March 10, 2025


                    *Ana Dub*

_____

    Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

    CSR No. 7445, Official United States Reporter