CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

CHRISTIAAN HIGHSMITH (CABN 296282)
DAVID J. WARD (CABN 239504)
Assistant United States Attorney

MATTHEW CHOU (CABN 325199)
Special Assistant United States Attorney

      450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
      Telephone: (415) 436-7200
      Fax: (415) 436-7230
      christiaan.highsmith@usdoj.gov
      david.ward@usdoj.gov
      matthew.chou@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 20-CR-00249 RS |
| Plaintiff, | **UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR NEW TRIAL AND FOR JUDGMENT OF ACQUITTAL** |
| v. | |
| ROWLAND MARCUS ANDRADE, | Hearing Date: June 24, 2025, 9:30 a.m. |
| Defendant. | Judge:    Hon. Richard Seeborg |

# **TABLE OF CONTENTS**

I.  Defendant Andrade is Not Entitled to a New Trial Under Fed. R. Crim. P. 33 ............................1

    A.  The Money Laundering Instruction Did Not Need to Specify the "Financial Transaction" ...........................................................................................2

    B.  The Good Faith Instruction Was More Than Andrade Was Entitled To as Is ...........................................................................................................................3

    C.  Andrade Was Not Entitled to a Multiple Conspiracies Instruction .......................5

II.  Defendant Andrade is Not Entitled to a New Trial Under *Napue v. Illinois* ................................10

    A.  The Trial Record Does Not Support Andrade's *Napue* Claim ...........................11

    B.  Andrade Cannot Meet His Burden of Establishing a *Napue* Violation ................12

        1.  Andrade Has Not Shown the Government Knew Any Testimony Was False ....................................................................................13

        2.  Andrade Has Not Shown That Exhibit 805 Was Material ........................13

    C.  Andrade's Discovery Claims Do Not Warrant a New Trial .................................15

III.  Defendant Andrade is Not Entitled to A Judgment of Acquittal Under Rule 29 ........................16

    A.  Standard Governing Rule 29 Motions ....................................................................16

    B.  The Court's Hearsay Rulings Were Correct .........................................................17

        1.  Terms and Conditions from the AML Bitcoin Website............................18

        2.  Excerpts of Andrade's Recorded Conversation with Undercover Agent (Rule of Completeness)................................................19

        3.  Abramoff's Alleged Separate Scheme and Marina Butina Documents ................................................................................................21

        4.  WhatsApp Messages on the Panama Ship Registry and Maritime Authority ...................................................................................22

        5.  WhatsApp Messages on the Super Bowl ..................................................23

        6.  Redactions of Weekly Management Update Emails to Andrade............23

        7.  Witnesses Had Personal Knowledge and Were Not "Incompetent"..........................................................................................24

        8.  The Court Properly Excluded Testimony on Software Development That Took Place After 2018 ................................................27

        9.  The Court Properly Admitted Rule 404(b) and Inextricably Intertwined Evidence ............................................................................28

10.  The Admission of Evidence of NAC Foundation Finance and
     Andrade's Spending Was Not Unfairly Prejudicial ...................................31

11.  The Court Did Not Improperly Limit Impeachment of
     Government Witnesses ...................................................................................31

     (i)   The Court Did Not Improperly Limit Impeachment
           Allowed by Fed. R. Evid. 806 ...........................................................31

     (ii)  The Court Did Not Improperly Limit Impeachment
           Under Fed. R. Evid. 613 ...................................................................33

IV.  The Court Did Not Err In Denying Andrade's Continuance and Other Motions .........................35

V.   Conclusion ...........................................................................................................37

# **TABLE OF AUTHORITIES**

**Federal Cases**

*East v. Scott,* 55 F.3d 996 (5th Cir. 1995) ............................................................... 10

*Echo Acceptance Corp. v. Household Retail Servs., Inc.*, 267 F.3d 1068 (10th Cir. 2001) ................... 18

*Est. of Suskovich v. Anthem Health Plans Of Virginia, Inc.*, 553 F.3d 559 (7th Cir. 2009) ................... 24

*Morris v. Slappy*, 461 U.S. 1 (1983) .................................................................. 35

*Napue v. Illinois*, 360 U.S. 264 (1959) ................................................................ 10

*Panah v. Chappell*, 935 F.3d 657 (9th Cir. 2019) ....................................................... 10

*United States v. A. Lanoy Alston, D.M.D. P.C.*, 974 F.2d 1206 (9th Cir. 1992) ...................... 1

*United States v. Alarcon-Simi*, 300 F.3d 1172 (9th Cir. 2002) ........................................ 16

*United States v. Anguiano*, 873 F.2d 1314 (9th Cir. 1989)............................................. 5, 7

*United States v. Arambula-Ruiz*, 987 F.2d 599 (9th Cir. 1993) ........................................ 29

*United States v. Ayers*, 924 F.2d 1468 (9th Cir. 1991) ............................................... 28

*United States v. Bailey*, 696 F. 3d (9th Cir. 2012) ................................................... 29

*United States v. Brandon*, 17 F.3d 409 (1st Cir. 1994) ............................................... 9, 10

*United States v. Brodie*, 403 F.3d 123 (3d Cir. 2005) ................................................ 16, 17

*United States v. Camacho*, 555 F.3d 695 (8th Cir. 2009) .............................................. 2

*United States v. Cherer*, 513 F.3d 1150 (9th Cir. 2008) .............................................. 28

*United States v. Del Toro–Barboza*, 673 F.3d 1136 (9th Cir. 2012) .................................... 2

*United States v. Dorsey*, 418 F.3d 1038 (9th Cir. 2005) .............................................. 19

*United States v. DuShane*, 623 Fed. App'x 332 (9th Cir. 2015) ....................................... 3

*United States v. Fernandez*, 388 F.3d 1199 (9th Cir. 2004) ........................................... 8

*United States v. Ghazaleh*, 58 F.3d 240 (6th Cir. 1995) .............................................. 8, 9

*United States v. Giampa*, 758 F.2d 928–35 (3d Cir.1985) ............................................. 16, 17

*United States v. Gianandrea*, 38 Fed. App'x 434 (9th Cir. 2002) ..................................... 4

*United States v. Hadley*, 918 F.2d 848 (9th Cir. 1980) ............................................... 29, 31

*United States v. Hall*, 181 F.3d 1057–62 (9th Cir. 1999) ............................................. 35

*United States v. Hardeman*, No. CR 10-0859 RS, 2011 WL 13143992 (N.D. Cal. Oct. 7, 2011) .......... 24

iv

*United States v. Hickey*, 917 F.2d 901 (6th Cir. 1990) ............................................... 24, 25, 26

*United States v. Higa*, 55 F.3d 448 (9th Cir. 1995) ....................................................... 33

*United States v. Hilliard*, 851 F.3d 768 (7th Cir. 2017) ............................................... 25

*United States v. Irving*, 665 F.3d 1184 (10th Cir. 2011) ............................................... 29

*United States v. Kellington*, 217 F.3d 1084 (9th Cir. 2000) ......................................... 2

*United States v. Lacerda*, 958 F.3d 196 (3d Cir. 2020) ................................................ 27

*United States v. Lague*, 971 F.3d 1032 (9th Cir. 2020) ................................................ 29

*United States v. Laykin*, 886 F.2d 1534 (9th Cir. 1989) ............................................... 3

*United States v. Lindell*, 766 Fed. App'x 525 (9th Cir. Apr. 1, 2019) ......................... 7

*United States v. Little*, 2012 WL 2563796 (N.D. Cal. June 28, 2012) ......................... 31

*United States v. Lopez*, 4 F.4th 706 (9th Cir. 2021) ..................................................... 20

*United States v. Martin*, 228 F.3d 1 (1st Cir. 2000) ................................................. 14, 16

*United States v. Mena-Robles*, 4 F.3d 1026 (9th Cir. 1993) ....................................... 9

*United States v. Miller,* 953 F.3d 1095 (9th Cir. 2020) ............................................... 1

*United States v. Moe*, 781 F.3d 1120 (9th Cir. 2015) ............................................... 5, 7

*United States v. Molinaro*, 11 F.3d 853 (9th Cir. 1993) ............................................. 28

*United States v. Ocegueda-Ruiz*, 663 Fed. App'x 560 (9th Cir. 2016) ....................... 5, 7, 8

*United States v. Ortega*, 203 F.3d 675 (9th Cir. 2000) ............................................... 18

*United States v. Pang*, 362 F.3d 1187 (9th Cir. 2004) ............................................... 19

*United States v. Parker*, 553 F.3d (10th Cir. 2009) ................................................. 29, 30

*United States v. Pimentel*, 654 F.2d 538 (9th Cir. 1981) ............................................. 2

*United States v. Renzi*, 769 F.3d. 731 (9th Cir. 2014) ............................................... 10, 12, 13

*United States v. Reyes-Alvarado*, 963 F.2d 1184 (9th Cir. 1992) ............................... 16

*United States v. Saada*, 212 F.3d 210 (3d Cir. 2000) ................................................. 31

*United States v. Salmonese*, 352 F.3d 608 (2d Cir. 2003) ......................................... 16

*United States v. Sayakhom*, 186 F.3d 928 (9th Cir.) ................................................. 3, 18

*United States v. Scarfo*, 711 F. Supp. 1315 (E.D. Pa. 1989) ..................................... 10, 11

*United States v. Shipsey*, 363 F.3d 962 (9th Cir. 2004) ............................................. 3-4

*United States v. Singh*, 924 F.3d 1030 (9th Cir. 2019) ................................................................ 9

*United States v. Sitton*, 968 F.2d 947 (9th Cir.1992) ......................................................... 29, 31

*United States v. Smith*, 282 F.3d 758 (9th Cir.2002) ................................................................ 29

*United States v. Soliman*, 813 F.2d 277 (9th Cir. 1987) ......................................................... 29

*United States v. Vizcarra-Martinez*, 66 F.3d 1006 (9th Cir. 1995) ....................................... 29

*United States v. Walker*, 25 F.3d 540 (7th Cir. 1994) ............................................................. 9

*United States v. Weaver*, 860 F.3d 90–96 (2d Cir. 2017) ................................................ 18-19

*United States v. White*, 116 F.3d 903 (D.C. Cir. 1997) ........................................................ 31

**Federal Statutes**

18 U.S.C. § 3771 .......................................................................................................................... 35

**Federal Rules**

Fed. R. Crim. P. 16 ...................................................................................................................... 16

Fed. R. Crim. P. 29 ........................................................................................... 1, 9, 13-14, 15, 16

Fed. R. Crim. P. 12 ...................................................................................................................... 15

Fed. R. Crim. P. 29 ...................................................................................................................... 17

Fed. R. Crim. P. 33 ................................................................................................................ 1, 15

Fed. R. Evid. 106 ................................................................................................................... 20, 21

Fed. R. Evid. 401 ......................................................................................................................... 32

Fed. R. Evid. 403 ........................................................................................... 17, 19, 20, 23, 24

Fed. R. Evid. 404 ................................................................................................................... 28, 29

Fed. R. Evid. 601 ......................................................................................................................... 24

Fed. R. Evid. 602 ................................................................................................................... 24, 25

Fed. R. Evid. 608 ................................................................................................................... 31, 32

Fed. R. Evid. 613 ........................................................................................................... 32, 33, 34

Fed. R. Evid. 701 ......................................................................................................................... 25

Fed. R. Evid. 801 ................................................................................................................... 22, 31

Fed. R. Evid. 806 ................................................................................................................... 31, 32

**<u>Other Authorities</u>**

Wright & Miller, 27 Fed. Prac. & Proc. Evid. § 6027 (2d ed.)....................................................... 25

Wright & Miller, 30B Fed. Prac. & Proc. Evid. § 6717 (2025 ed.) ........................................... 22

The United States submits this opposition to defendant's motion for acquittal on all counts under Rule 29 of the Federal Rules of Criminal Procedure, and for a new trial under Fed. R. Crim. P. 33, and for a new trial under *Napue v. Illinois*. Dkts. 645 & 656 ("Def. Mot."). The motion should be denied.

## I.    Defendant Andrade is Not Entitled to a New Trial Under Fed. R. Crim. P. 33

Defendant Andrade raises three challenges to the jury instructions, all which are without merit. A motion for a new trial under Rule 33 may be granted for failure to give proper jury instructions. However, an instructional error does not automatically warrant a new trial: the defendant must show that the error affects substantial rights. *See United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020) ("an error in misdescribing or omitting an element of the offense in a jury instruction is harmless if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error'"). *See also United States v. Thongsy*, 577 F.3d 1036, 1043 (9th Cir. 2009), quoting *Neder v. United States*, 527 U.S. 1, 18 (1999).

The Ninth Circuit has made clear that when applying this standard, a court should consider "the jury instructions and the trial record as a whole." *United States v. Espino*, 892 F.3d 1048, 1053 (9th Cir. 2018). Where the evidence actually presented at trial and "other language in the jury instructions" assures the court that the jury could not have based its verdict on the erroneous language in the instruction, the Ninth Circuit has found the error to be harmless. *Miller*, 953 F.3d at 1103; *see also Espino*, 892 F.3d at 1053; *United States v. Perez*, 116 F.3d 840, 847 (9th Cir. 1997) ("Even though an element of the offense is not specifically mentioned [in the jury instructions], it remains possible the jury made the necessary finding.").

In considering a motion for a new trial under Rule 33, the district court may weigh the evidence itself and judge the credibility of witnesses. *United States v. A. Lanoy Alston, D.M.D. P.C.*, 974 F.2d 1206, 1211 (9th Cir. 1992). Nonetheless, the defendant "bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that there has been a "serious miscarriage of justice." *Id.* If the court concludes that, "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by

another jury." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000) (quotation marks and citations omitted). The Ninth Circuit has held that such motions are generally disfavored and should only be granted in "exceptional" cases. *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981); *United States v. Del Toro–Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012); *United States v. Camacho*, 555 F.3d 695, 705 (8th Cir. 2009).

### A. The Money Laundering Instruction Did Not Need to Specify the "Financial Transaction"

Andrade argues that the jury instruction on money laundering allowed the jury to convict Andrade for unindicted conduct. *See* Dkt. 645 at 12–15. The Court's instruction—which properly tracked the Ninth Circuit model, No. 18.4—did no such thing. The Court properly rejected the jury instruction that Andrade had proposed.

Andrade's argument flows from two false premises: (1) the jury instruction should have specified that unlawful proceeds were proceeds of "the wire fraud charged *in Count One*," rather than wire fraud more generally; and (2) the jury instruction should have specified that the "financial transaction" was the $600,000 cashier's check from Fintech Fund Family LP. Controlling precedent defeats both premises, as briefed at length previously. *See* Joint Proposed Jury Instructions, Dkt. 480 at 51–53 (government and defense cross-objections to proposed money laundering instruction). Indeed, the defense candidly conceded this at the time. Andrade began his jury instruction briefing by "acknowledg[ing] that the caselaw in the Ninth Circuit does not mandate that the government prove the predicate offense of 'specified unlawful activity" (SUA), and the bulk of caselaw in other circuits comports with this approach to money laundering." *Id.* at 53.[1]

The government will not repeat that briefing here. Rather, the government offers yet more authority confirming the Court's money laundering instruction was correct. To start, Andrade is wrong that the Court should have deviated from the model instruction to specify a financial transaction (here,

---

[1] If the defense purports to argue that its objections in the Joint Proposed Jury Instructions are somehow distinct from its objections in the instant Motion for a New Trial, the defense has forfeited any objections made for the first time now. Indeed, any novel objections at the final charge conference, let alone now, were weeks out of time and—as the Court found—"waived." Dkt. 645 n.3 at 13 (quoting Court transcript from the charge conference).

the $600,000 cashier's check from Fintech Fund Family LP). The Ninth Circuit has no such requirement. Rather, for decades, the Ninth Circuit-approved jury instruction has referred only to "a financial transaction." *See, e.g.*, Ninth Circuit Model Jury Instruction No. 18.4 (revised May 2023); *United States v. Sayakhom*, 186 F.3d 928, 940 (9th Cir.), *amended*, 197 F.3d 959 (9th Cir. 1999) (approving of similar model instruction to affirm conviction on seven money laundering counts).

Andrade is also wrong that the jury instruction should have specified the date "on or about" the charged transaction occurred. Again, the Ninth Circuit has never required this. *See, e.g.*, Ninth Circuit Model Jury Instruction No. 18.4; *Sayakhom*, 186 F.3d at 940. This is for good reason. Time is not a material element of money laundering. *See United States v. Laykin*, 886 F.2d 1534, 1543 (9th Cir. 1989) ("Time is a material element of an offense only if made so by statute.").

In any event, the only money laundering evidence introduced at trial—and the sole focus of the government's jury addresses on the money laundering charge—was the very transaction Andrade insists should have been expressly detailed in the jury instruction – the purchase of a $600,000 cashier's check by Andrade using funds raised from investors that Andrade then used to purchase a personal residence. Thus, any variance from the indictment or supposed error would have been harmless. *See, e.g.*, *United States v. DuShane*, 623 Fed. App'x 332, 333 (9th Cir. 2015) (holding immaterial the omission of charged date from jury instructions given the evidence introduced at trial). In sum, the Court correctly instructed the jury on money laundering as charged in Count Two of the indictment.

### B.    The Good Faith Instruction Was More Than Andrade Was Entitled To as Is

Next, Andrade argues that, as to wire fraud, the Court should have given verbatim the "good faith instruction" he had requested. *See* Dkt. 645 at 16. He ignores that (1) the Court already afforded him a more defense-friendly jury instruction than the Ninth Circuit has recommended; and that (2) the main authority which he cites is an inapposite bankruptcy fraud case.

To start, the Ninth Circuit's Model Jury Instruction for wire fraud does not mention good faith at all. *See* Ninth Circuit Model Criminal Jury Instruction No. 15.35 (revised March 2025). That is because "[o]ur case law is well settled that a criminal defendant has 'no right' to *any* good faith instruction when the jury has been adequately instructed with regard to the intent required to be found guilty of the crime charged, notwithstanding the normal rules governing 'theory of defense' requests." *United States v.*

1   *Shipsey*, 363 F.3d 962, 967 (9th Cir. 2004) (emphasis in original), *as amended* (May 12, 2004). In short,

2   the Court could have properly declined to give *any* instruction on the good faith defense. *See* Dkt. 480 at

3   46–47 (collecting cases). But the Court instead obliged Andrade. The Court instructed the jury that "If

4   the defendant acted in good faith, then he lacked the intent to defraud required to prove the offense of

5   wire fraud as charged in Count One. The defendant acted in good faith if, at the time, he honestly

6   believed in the truth of the representations or promises that the government has charged as being false or

7   fraudulent." Dkt. 612 (Final Jury Instructions), at 22

8        Unsatisfied, Andrade now claims that the Court committed "critical error" by omitting his

9   requested language that "[t]he defendant does not have to prove his good faith. Rather, the government

10   must prove beyond a reasonable doubt that the defendant acted with intent to defraud." Dkt. 645 at 16.

11   But he criticizes a distinction without a difference. The Court correctly instructed the jury that good faith

12   negates an element of wire fraud—and that "the government has the burden of proving every element of

13   the charges beyond a reasonable doubt." Dkt. 612 at 3. The Court thus gave Andrade's requested

14   instruction in interchangeable words. Accepting Andrade's argument would mean that district courts

15   "critically err" whenever they read the Ninth Circuit's model jury instruction on wire fraud, or even a

16   more defendant-friendly version of the same. Nothing requires this absurd result.

17        What's more, as the defense candidly concedes, "Ninth Circuit cases have decided that it is not

18   an abuse of discretion to decline to give good faith instructions that place the burden of disproving good

19   faith on the government." Dkt. 645 at 17. The non-precedential case on which the defense relies, *United*

20   *States v. Gianandrea*, 38 Fed. App'x 434, 436 (9th Cir. 2002), is not to the contrary. *See* Dkt. 645 at 16–

21   17 (defense brief). *Gianandrea* was different from Andrade's case in at least three major respects.

22        *Gianandrea* was (1) a bankruptcy fraud case (2) in which the trial court "omitted a crucial

23   statement contained in the model instructions" and (3) presented the good faith defense not as part of

24   one of the elements, but as a confusing "separate defense" in a "separate set of instructions."

25   *Gianandrea*, 38 Fed. App'x at 436 & n.1. Here, by contrast, the Court presided over a wire fraud and

26   money laundering case, read the Ninth Circuit model instruction on wire fraud, and supplemented it with

27   a defense-friendly instruction that explained how good faith would necessarily negate the intent element

28   of wire fraud. In sum, the Court did not err in reading a version of Andrade's requested good faith

1    instruction.

2    ### C.    Andrade Was Not Entitled to a Multiple Conspiracies Instruction

3    Andrade argues that he was entitled to a multiple schemes jury instruction, and that the Court's

4    failure to give his requested instruction was reversible error. Andrade is wrong. Neither the evidentiary

5    record nor the case law Andrade relies on, which addresses the multiple conspiracy instruction, support

6    him.[2]

7    Andrade was the sole defendant at trial. "The fact that [Andrade] was tried alone tends to negate

8    the risks that would be present if the proof showed multiple conspiracies." *United States v. Ocegueda-*

9    *Ruiz*, 663 Fed. App'x 560, 561 (9th Cir. 2016) ("The risks associated with multiple conspiracies are

10   generally absent where a defendant is tried alone.") (citing *United States v. Anguiano*, 873 F.2d 1314,

11   1318 (9th Cir. 1989)). The caselaw Andrade relies on makes clear that a multiple conspiracy instruction

12   is not necessary when the government goes to trial against a single defendant on a single wire fraud

13   charge. *See, e.g.*, *Anguiano*, 873 F.2d at 1318; *Ocegueda-Ruiz*, 663 Fed. App'x at 561. The multiple

14   conspiracy instruction "is needed in order to mitigate the problem of transference or spillover of guilt

15   from one co-defendant to another." *United States v. Moe*, 781 F.3d 1120, 1127 (9th Cir. 2015) (internal

16   citation and quotation omitted). "In contrast, a multiple conspiracy instruction is not required when a

17   defendant stands trial alone because there is no problem of spillover." *Id.* (internal citation and quotation

18   omitted).

19   Here, the evidence at trial was concentrated solely on the single fraud scheme charged in the

20   indictment against the single defendant, Andrade. The government introduced no evidence of Andrade's

21   potential involvement in a separate scheme or conspiracy, and there was no co-defendant on trial with

22   Andrade that would present a risk of spillover of guilt from one co-defendant to another. The

23   government's evidence at trial of Andrade's involvement in the charged fraud scheme was

24   overwhelming. It established that Andrade and others working at his direction made false statements to

25   the public and potential purchasers of AML Bitcoin about the development and viability of the AML

26   Bitcoin technology and about potential business deals with governmental and private sector entities.

27   _____

28   [2] Andrade's brief refers to a multiple conspiracies instruction, and he cites caselaw for a multiple conspiracies instruction, but he sought a multiple schemes instruction. Dkt. 480, at 44:8-11.

1   There was no risk the jury could reasonably have concluded that Andrade was involved in a separate

2   fraud scheme (or conspiracy) unrelated to the single fraud scheme charged in the indictment, and there

3   was no risk that the jury would convict Andrade based on spillover evidence from a separate, uncharged

4   conspiracy.

5       A parade of government witnesses over a nearly five-week trial established that Andrade led the

6   AML Bitcoin fraud scheme. Among other witnesses and evidence, Ben Boyer, Jack Abramoff, and the

7   AML Bitcoin website established that Japheth Dillman worked under Andrade as AML Bitcoin's Chief

8   Strategy Officer ("CSO") to sell AML Bitcoin tokens. The evidence established that Andrade and

9   Dillman, who was Andrade's CSO and one of his many AML Bitcoin salesmen, were working toward

10  the common purpose of selling AML Bitcoin tokens and that Andrade benefitted directly from

11  Dillman's sales. Indeed, Dillman parroted Andrade's claims about AML Bitcoin in order to sell Boyer

12  on AML Bitcoin.  Tr. 527-547. And Boyer purchased AML Bitcoin tokens based on his conversation

13  with Dillman and based on Boyer's independent research into the AML Bitcoin website and white paper

14  that corroborated what Boyer learned from Dillman. Tr. 523, 534, 537, 538, 540-545, 548. In fact, Boyer

15  first made a small purchase of AML Bitcoin tokens directly from the website. Tr. 549. Boyer also relied

16  in part on Andrade's false press campaign and Dillman's claims that AML Bitcoin would be purchasing

17  an advertisement in the February 2018 Super Bowl. Tr. 538, 554-555. Andrade specifically misled

18  Dillman into thinking that AML Bitcoin would be buying a Super Bowl ad when in fact Andrade was

19  running a Super Bowl rejection campaign. Tr. 1704-1710; Ex. 900. And Boyer testified that he was

20  buying into AML Bitcoin's initial coin offering ("ICO")—an effort led by Andrade—with the January

21  12, 2018, purchase of $730,000 worth of AML Bitcoin. Tr. 532, 535, 536, 552.

22      The evidence at trial was overwhelming that Andrade led the AML Bitcoin fraud scheme and

23  that he caused the wires to be used to perpetuate the AML Bitcoin fraud. Andrade brought Dillman into

24  the AML Bitcoin fraud scheme as CSO, supplied him with information about the AML Bitcoin project,

25  empowered him to sell AML Bitcoin tokens, and benefitted immediately and directly from Dillman's

26  sales efforts. This evidence establishes beyond a reasonable doubt that Andrade caused Boyer's January

27  12, 2018, wire to purchase $730,000 of AML Bitcoin tokens. In addition, Theresa Chiu's tracing

28  analysis shows that the very same day that Boyer wired $730,000 to Dillman to purchase the AML

Bitcoin tokens as part of the ICO, Dillman wired Boyer's full $730,000 to his boss, AML Bitcoin CEO Marcus Andrade.  Tr. 1969. And the evidence at trial established that Andrade used Boyer's $730,000 toward vehicle and real estate purchases for Andrade's direct benefit. Tr. 1963-1969.

Further, the Court's jury instructions made clear that the jury was required "only to determine whether the defendant is guilty or not guilty of the charges in the indictment." Jury Instr. 15, Dkt. 612, at 17. The jury instructions clearly informed the jury that "[t]he defendant is not on trial for any conduct or offense not charged in the indictment." *Id.*; *see United States v. Lindell*, 766 Fed. App'x 525, 529 (9th Cir. Apr. 1, 2019) (rejecting defense challenge to jury instructions, which correctly required "jury to find the conduct charged in the indictment before it may convict") (quoting *United States v. Ward*, 747 F.3d 1184, 1191 (9th Cir. 2014)).

Andrade's argument that Dillman was involved in a separate scheme that he hid from Andrade does not support Andrade's request for a multiple conspiracies or schemes instruction. There was no "problem of transference or spillover of guilt from one co-defendant to another." *Moe*, 781 at 1127. Dillman was not on trial. *See Ocegueda-Ruiz*, 663 Fed. App'x at 561; *Anguiano*, 873 F.2d at 1318. The government did not introduce evidence of a separate criminal scheme by Dillman. The evidence at trial established that Andrade hired Dillman to be AML Bitcoin's Chief Strategy Officer and that Andrade wanted and expected Dillman—and many other AML Bitcoin employees—to sell AML Bitcoin tokens for Andrade's benefit. Indeed, Dillman transferred all the proceeds of Boyer's token purchases to Andrade, who used the money to buy vehicles and real estate for himself.

Andrade's claim that Jack Abramoff's purported money laundering warranted a multiple conspiracy instruction is similarly misplaced. As discussed in detail above, Andrade was the sole defendant at trial on one wire fraud count alleging one fraud scheme. As such, the risks associated with multiple conspiracies were absent. *See Ocegueda-Ruiz*, 663 Fed. App'x at 561; *Anguiano*, 873 F.2d at 1318. Further, the proof at trial clearly showed only a single scheme or conspiracy—the AML Bitcoin scheme. Andrade claims that he introduced, via cross-examination, evidence of Abramoff's involvement in separate money laundering schemes involving a Ukrainian billionaire and Angolan associates. But this has little to no basis in the record. Further, there was little evidence—and the government made no claims whatsoever—that Andrade was involved in these purported money laundering activities. In fact,

Andrade does not argue in his discussion of Abramoff's purported separate scheme that the jury could have convicted Andrade based on evidence—introduced via cross-examination—of Abramoff's purported money laundering.

Given the evidentiary record at trial, there was no risk that the "jury could reasonably interpret the evidence presented at trial to show separate conspiracies," and there was no risk that Andrade could "be convicted on the basis of acts committed by those in a conspiracy of which he was not a part." Dkt. 645, at 8 (quoting *United States v. Ocegueda-Ruiz*, 663 Fed. App'x 560, 561 (9th Cir. Oct. 17, 2016)). Because there was no foundation in the evidence for such an instruction, a multiple conspiracy—or multiple schemes—instruction was not required or appropriate. *See United States v. Fernandez*, 388 F.3d 1199, 1247 (9th Cir. 2004) (explaining that multiple conspiracy instruction is required only if the defendants' theory of the charged conspiracy or conspiracies "is supported by law and has some foundation in the evidence") (quoting *United States v. Anguiano,* 873 F.2d 1314, 1317 (9th Cir. 1989)).[3]

Andrade's request for a multiple scheme or multiple conspiracy instruction is not supported by the evidentiary record or the law. As caselaw cited by Andrade himself makes clear: "A district court is not required to give a multiple conspiracy instruction where only one conspiracy is alleged and proved." *United States v. Ghazaleh*, 58 F.3d 240, 244 (6th Cir. 1995) (internal citation and quotation omitted). Here, the government alleged one scheme in the indictment and proved one scheme at trial—the AML Bitcoin fraud scheme. Nearly five weeks of testimony from a parade of government witnesses established the existence of that one scheme and that Andrade led the scheme to sell AML Bitcoin tokens based on misstatements and falsehoods disseminated or approved by Andrade about the state of the AML Bitcoin technology and potential business deals with public and private sector partners. In short, the evidence at trial showed that Andrade and two co-schemers not on trial—Dillman and Abramoff—were "acting in furtherance of one overarching plan"—the AML Bitcoin fraud scheme. *Id.*

---

[3] "[E]ven if the evidence would have supported such an instruction, the failure to give it is error only if the instructions as a whole, considered in the context of the entire trial, did not fairly and adequately cover the issues," including that theory. *Fernandez*, 388 F.3d at 1247 (quoting *Anguiano*, 873 F.2d at 1317). In addition, Andrade would have invited any prejudice from any error because he opposed the government's request that the jury see the indictment, which would have helped cure any concern that the jury was considering uncharged schemes. *See* Joint Proposed Jury Instructions, Dkt. 480 at 43; Feb. 26, 2025 Tr. 1997:2–1998:25 (defense declines to show the jury the indictment).

at 245. And the evidence showed that Andrade—along with Dillman and Abramoff—"agreed to participate in what [Andrade] knew to be a collective venture directed toward a common goal"— namely, selling AML Bitcoin tokens based on material misstatements and misrepresentations for Andrade's own profit and for the profit his co-schemers Dillman and Abramoff. *Ghazaleh*, 58 F.3d at 245; *see, e.g.*, Ex. 932-001 (text from Andrade to Abramoff: "the 50M for the intellectual property means YOU AND ME").

Despite Andrade's claims, the evidence at trial does not support the existence of multiple schemes or Andrade's involvement in multiple schemes. Andrade does nothing more than argue that testimony he elicited on cross-examination suggests that Dillman and Abramoff were working on entirely separate schemes without Andrade's knowledge that were detrimental to Andrade. Def. Mot. at 8-13. Andrade's claim is not supported by the evidence, nor is it the basis for a multiple schemes instruction. *See United States v. Singh*, 924 F.3d 1030, 1054 (9th Cir. 2019) (affirming trial court's decision to provide single conspiracy instruction, setting forth the test for whether a single conspiracy or multiple conspiracies had been proven, and concluding that the evidence established an "overall agreement"); *United States v. Walker*, 25 F.3d 540, 547 (7th Cir. 1994) (affirming trial court's denial of multiple conspiracy instruction because there was "little to suggest the existence of two or more separate conspiracies, and it is not error to refuse a multiple conspiracy instruction where the evidence does not warrant such an instruction") (internal citation omitted); *United States v. Mena-Robles*, 4 F.3d 1026, 1033 (9th Cir. 1993) (affirming trial court's denial of Rule 29 motions and defense argument of a variance between single charged conspiracy and evidence at trial).

Even if the evidentiary record could somehow be construed as introducing multiple schemes to the jury—and it cannot—the Court should deny Andrade's motion for acquittal or a new trial because any purported failure did not affect Andrade's substantial rights. The main concern with alleged multiple conspiracies is that the jury would be "misled into attributing guilt to a particular defendant based on evidence presented against others who were involved in a different and separate conspiratorial scheme." *United States v. Brandon*, 17 F.3d 409, 450 (1st Cir. 1994) (declining to reverse trial court's refusal to give multiple conspiracy instruction because there was no risk of evidentiary spillover from one defendant to another) (internal citations omitted). In this case, there was no risk of "evidentiary spillover

1  resulting from trying defendants *en masse* for distinct and separate offenses committed by others"

2  because Andrade was tried alone, on a single fraud count, supported by the Court's instruction that the

3  jury must find the charged fraud. *Id.* (internal citation omitted). And any minimal evidence of separate

4  schemes by Dillman or Abramoff could not spill over to Andrade because, as Andrade himself argues,

5  Dillman and Abramoff hid those purported schemes from Andrade. Further, it was the defense—not the

6  government—that attempted to introduce evidence of separate schemes by Dillman and Abramoff.

7  Andrade himself does not claim spillover of evidence from Dillman and Abramoff to Andrade.

8  Accordingly, the Court should deny Andrade's request for a new trial or acquittal.

9  **II.    Defendant Andrade is Not Entitled to a New Trial Under *Napue v. Illinois***

10         Andrade claims that the government violated the proscriptions of *Napue v. Illinois*, 360 U.S. 264

11  (1959), against knowingly introducing or not correcting false testimony when the government

12  introduced Exhibit 805 through the testimony of one of the case agents. Exhibit 805 was a photograph,

13  seized from Andrade's phone, of a piece of paper containing a list of social media accounts used by

14  Andrade and the NAC Foundation, along with user names and passwords beginning with the initials

15  "MA." *See* Dkt. 645, at 13-19.

16         In *Napue*, the Supreme Court reversed a defendant's conviction, holding that a prosecutor's

17  failure to correct testimony he knew to be false violated a defendant's right to due process. To prevail

18  under *Napue*, a defendant must show (1) that [the witness's] testimony was false, (2) that the testimony

19  was material, meaning there is a reasonable likelihood that the false testimony could have affected the

20  judgment of the jury; and (3) that the prosecution knew that the testimony was false. *United States v.*

21  *Renzi*, 769 F.3d. 731, 751 (9th Cir. 2014); *citing United States v. Houston*, 648 F.3d 806, 814 (9th Cir.

22  2011); *see also East v. Scott*, 55 F.3d 996, 1005 (5th Cir. 1995). *Napue* can be triggered by false or

23  misleading testimony, if "the testimony, taken as a whole, gives the jury a false impression." *Panah v.*

24  *Chappell*, 935 F.3d 657, 664 (9th Cir. 2019), *quoting Alcorta v. Texas*, 355 U.S. 28, 31 (1957).

25         The burden of establishing false testimony is on the defendant. *See United States v.*

26  *Scarfo*, 711 F. Supp. 1315, 1322 (E.D. Pa. 1989). Andrade cannot establish any of the elements required

27  for reversal under *Napue*. His motion for a new trial on these grounds should be denied.

28  //

**A.     The Trial Record Does Not Support Andrade's *Napue* Claim**

Andrade was charged and convicted of orchestrating a scheme to defraud that included myriad false statements and misrepresentations about AML Bitcoin, a cryptocurrency he developed and sold to investors. Dkt. 1 (Indictment). These misrepresentations included false statements to potential investors, false documents, false and misleading press releases, and false and misleading posts on Twitter, Instagram, and other social media sites.

At trial, FBI Special Agent Quinn testified that agents seized Andrade's cell phone during a search warrant executed in March 2020. Tr. 3174. Agent Quinn testified as to a number of items searched on the phone, including photographs. Tr. 2185-2190. Agent Quinn testified that among those photographs was an image of what appeared to be a photograph of a piece of paper. Tr. 2190. That was Exhibit 805, and it was admitted without objection. *Id.* Agent Quinn testified that Exhibit 805 appears to be a list of accounts, email accounts, Twitter accounts, and so forth, as well as the username, abbreviated "UN," and then the password with those accounts. *Id.* Agent Quinn was asked what the first two letters of each of the passwords was, and he replied "M and A" (which are Marcus Andrade's initials). *Id.* That was the full extent of Agent Quinn's testimony regarding Exhibit 805.

Wholly separate from Exhibit 805, however, there was extensive evidence introduced at trial that defendant Andrade was aware of and in many cases controlled and directed what was posted on the NAC Foundation's social media sites, including Twitter and Instagram.

Brian Darling, a Washington-based public relations executive, testified that he wrote and commissioned "press" articles for Andrade and Abramoff that were designed to falsely and misleadingly present the view that independent journalists were reporting favorable news about AML Bitcoin, when in fact, they were simply being paid to repeat the lies and misleading statements Andrade and Abramoff were feeding them about AML Bitcoin. Tr. 694-696. During his testimony, Exhibit 173 was admitted, an email chain in which a copy of one of the false and misleading articles was sent to Andrade, and Andrade replied "post it." Tr. 698. Darling was then asked, "did you understand that these articles you wrote would be published on AML Bitcoin's Twitter page?" *Id.* Darling responded, yes, and testified that he subsequently saw the false and misleading articles posted on AML Bitcoin's Twitter page. *Id.*
//

Bernadette Tran, one of Andrade's office assistants, testified that Andrade oversaw the promotion of AML Bitcoin through social media, including Instagram, Twitter and Telegram, among other platforms. Tr. 895. Tran said explicitly that, "he [Andrade] had to approve everything that went out. So everything, we'd probably, like, send him a version, and then he would say yes or no and then we would post it." Tr. 895.

Melanie Cowan, another marketing employee for Andrade, testified that while working at the NAC Foundation, she reviewed the updates to the Twitter posts with Andrade. Tr. 1051 (Q: "And was it your practice to review the updates to the Twitter post with Marcus Andrade before they went up?" A: "When I was with Republic One, it was with Melissa [Foteh] and then with Marcus, yes."). Cowan also testified that when she would edit documents for the website, she would need to get approval for those from Andrade. Tr. 1056 (Q: "When you would edit documents for the website, did you need to get approval for those?" A: "Yes." Q: "And did that come from Marcus Andrade?" A: "Yes.")

Melissa Foteh, a marketing manager for Andrade during the conspiracy period, testified that Andrade instructed her to post various comments and statements online under accounts created in false names. Tr. 1133 (Q: "Ms. Foteh, does that refresh your recollection that Marcus Andrade asked you to have the tech support team post various things online under false accounts." A: "I believe – I believe so. Yeah.").

Jack Abramoff, one of Andrade's co-conspirators, testified to Exhibit 555 (admitted without objection), an email from Abramoff to Foteh stating that Andrade wanted a letter to NFL Commissioner Roger Goodell containing false and misleading representations posted on the NAC Foundation website, and that after Andrade directed that the letter be posted, it was in fact put on the AML Bitcoin website. Tr. 1902 (Q: "Are you communicating that Mr. Andrade wants this letter up on the website?" A: "Yes." Q: "And he also wants an explanation up on the website?" A: "Yes." Q: "Is the explanation put up on the website true and correct?" A: "No.").

## B.    Andrade Cannot Meet His Burden of Establishing a *Napue* Violation

To meet his burden of establishing a violation of *Napue* requiring reversal or a new trial, a defendant must first establish that the witness's testimony was actually false. *Renzi*, 769 F.3d. at 751. Agent Quinn's testimony was not false. He testified truthfully that Andrade's cell phone was seized in

2020, that it was reviewed, and that a photograph of what appeared to be a list of social media sites, user names, and passwords was on that image. Exhibit 805 was an image of that list.

Andrade admits, because he must, that none of Quinn's testimony was actually false. Rather, Andrade argues that "while Quinn's testimony may have been literally true, its sole purpose was to suggest falsely that Mr. Andrade controlled the social media accounts when the misrepresentations alleged by the government were made." Dkt. 645 (Def. Mot.), pg. 17. As an initial matter, the overwhelming evidence at trial was that in fact Andrade did control the social media accounts when the misrepresentations alleged by the government were made. Andrade presented no evidence at trial, and presents none here, to dispute that. Andrade complains that the purpose of introducing Exhibit 805 was in support of the government's claims that Andrade controlled the NAC Foundation's social media accounts in 2017 and 2018. There is nothing improper in asking the jury to draw that conclusion from Exhibit 805. The defendant was certainly able to argue to the contrary. That he failed to do so, or that the jury did not credit his arguments, is not a violation of *Napue*. Agent Quinn's testimony was neither false nor misleading; defendant fails to meet the first prong of the *Napue* analysis.

### 1.    Andrade Has Not Shown the Government Knew Any Testimony Was False

Because Agent Quinn's testimony was not actually false or misleading, Andrade cannot show that the government knew or should have known that it was false. The government accurately elicited testimony that Exhibit 805 was seized from Andrade's phone in 2020, eliciting no additional testimony beyond what was in the document. Andrade presents no evidence that the government did know it was false. Defendant fails to meet his burden to establish the second prong of the *Napue* analysis.

### 2.    Andrade Has Not Shown That Exhibit 805 Was Material

Even assuming, for arguments sake, that the testimony was actually false, Andrade must show that the testimony was material, meaning that there was "a reasonable likelihood that the false testimony could have affected the judgment of the jury." *Renzi*, 769 F.3d. at 751. At trial, five percipient witnesses (Darling, Foteh, Tran, Cowan, and Abramoff) all testified explicitly that Andrade either controlled access to the social media sites, reviewed and approved postings to those sites, and was aware of and at times directing the posting of false and fraudulent statements on the social media accounts during the time period of the scheme. Multiple documents introduced at trial corroborated this testimony. Andrade

presented no evidence, and raises no evidence in his motion, to contradict this. Andrade claims that
Foteh was "an utterly unreliable witness" but in ruling on a post-trial motion for a new trial under Rule
29, the Court must also credit both direct and circumstantial evidence without evaluating or speculating
on the weight the jury might give it. *United States v. Martin*, 228 F.3d 1, 10 (1st Cir. 2000). Andrade
claims that the testimony of Tran and Cowan cannot be relied upon because they did not deal directly
with Andrade until July 2018 (Tran) or August 2018 (Cowan). Dkt. 645 (Def. Mot.), at 14.  But the
charged scheme period did not end until October 2018, and included misrepresentations made during the
time Tran and Cowan both testified that Andrade controlled the social media sites. Other witnesses and
documents also allowed the jury to conclude that Andrade controlled or directed posts to the social
media sites during the scheme period.

Moreover, Andrade was convicted of orchestrating a scheme to defraud that included myriad
other misrepresentations in addition to what was posted on social media. These included directing and
overseeing the creation of false and misleading "news" articles, false and misleading statements on the
NAC Foundation website, emails to potential investors containing false and misleading statements,
misrepresentations made by co-conspirators Abramoff and Dillman, the deceptive manipulation of the
trading of the AML Bitcoin token, dozens of false and misleading representations made by Andrade
himself and captured in recorded interviews with an undercover FBI agent, and false and misleading
representations Andrade made directly to the FBI when he was interviewed during the search of his
home in 2020.

Given all of this, Andrade cannot meet his burden of establishing that even if Exhibit 805 created
a misleading impression, that this could have led to "a reasonable likelihood" that the testimony could
have affected the judgment of the jury. Andrade fails to meet his burden of establishing that any
testimony, even if assumed false, was material.

In a footnote, defendant claims that the admission of Exhibit 805 "does not appear to be the
government's only violation of *Napue*," citing to the testimony of witness Ben Boyer, who said he gave
the FBI a screenshot that was not introduced into evidence, and Ethan Quinn, who mistakenly testified
that Andrade had produced no source code (in fact Andrade produced a small amount as part of an email
produced to the government). But Andrade provides no evidence that the government knowingly

1   solicited false testimony, that the government knew any testimony was false, and that the testimony

2   would have been material regardless. As such he fails in properly asserting a *Napue* claim.

3        **C.     Andrade's Discovery Claims Do Not Warrant a New Trial**

4        Finally, Andrade inserts a 26-line footnote into his argument that attempts, misleadingly, to

5   rehash discovery issues that were litigated for two years before Judge Beeler. Dkt. 645 at 15 n.19. All of

6   these issues were resolved prior to trial. *See* Dkt. 165 (Discovery Order – 4/7/2023); Dkt. 170

7   (Discovery Order 4/18/2023);Dkt. 179 (Discovery Order 5/27/2023); Dkt. 213 (Discovery Order

8   9/21/2023); Dkt. 235 (Discovery Order 11/5/2023); Dkt. 250 (Discovery Order 2/3/2023); Dkt. 256

9   (Discovery Order 12/16/2023); Dkt. 292 (Order 3/17/2024); Dkt. 309 (Discovery Order 5/10/2024); Dkt.

10  352 (Discovery Order 8/1/2024); Dkt. 359 (Discovery Order 9/15/2024); Dkt. 413 (Order Denying

11  Fourth Motion to Compel Discovery).

12       Andrade provides no argument or legal support for a claim that any of these issues or decisions,

13  long ago litigated and decided, now support a new trial under *Napue,* or Rule 29 or Rule 33. In fact,

14  there is none, as all of the discovery disputes, including those regarding Andrade's cell phone, were

15  argued and resolved before trial, as they are required to be. *See* Fed. R. Crim. P. 12(b)(3) (discovery

16  motions must be made before trial). Andrade claims that he did not receive Andrade's seized cell phone

17  that contained the image that was Exhibit 805, or what they claim was a privileged communication

18  attached to the image (of which the prosecution team was not aware). This is just not true. In fact, the

19  government returned Andrade's entire phone—with everything on it—to him in 2020. *See* Dkt. 283

20  (United States' Opposition to Andrade's Third Motion to Compel, Decl. of Christiaan Highsmith,

21  Exhibit 1 – Property Release/Return Receipt). The government also provided Andrade with

22  unminimized, pre-taint versions of phone, even though they were merely "duplicative of the [] phone

23  previously returned to counsel." *Id.* Additionally, Exhibit 805 was produced to Andrade in discovery in

24  July 2022 (Bates-labeled FBI-00119775) and it was listed on the government's Exhibit List filed on

25  January 15, 2025, almost a month before trial. *See* Dkt. 465-1.

26       Andrade cannot complain that he did not have all of the evidence obtained from his phone, was

27  not produced Exhibit 805 in discovery, and was not told explicitly a month before trial that the image

28  could be used as an exhibit. Andrade's claim in his motion that the government concealed material facts

1    from is disingenuous, and a misrepresentation of the facts.

2        The discovery claims Andrade raises here were the same one he raised repeatedly before the

3    magistrate. All of them were resolved, and there is no legal basis to relitigate them here. As the Court

4    correctly noted during trial when counsel for Andrade complained about another discovery issue, those

5    issues were not to be relitigated at trial. *See* Tr. 13 – 2058 (The Court: "Rule 16 is done. We have done

6    that issue. You litigated up one side and down the other in front of Judge Beeler. . . . we're not going to

7    have a trial about whether or not the Government did or did not comply with Rule 16. That's something

8    you should litigate before.").

9        Defendant is not entitled to a new trial based on unfounded allegations of discovery violations.

10   **III.    Defendant Andrade is Not Entitled to A Judgment of Acquittal Under Rule 29**

11       **A.    Standard Governing Rule 29 Motions**

12       It is well-established that, when considering a motion for acquittal under Rule 29, the Court

13   views the evidence in the light most favorable to the government and draws all reasonable inferences in

14   the government's favor. "[T]he relevant question is whether, after viewing the evidence in the light most

15   favorable to the prosecution, any rational trier of fact could have found the essential elements of the

16   crime beyond a reasonable doubt." *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002)

17   (internal quotation omitted); *see also United States v. Salmonese*, 352 F.3d 608, 618 (2d Cir. 2003) (that

18   inferences favorable to the defendant could also be drawn from the evidence is of no import because

19   "the task of choosing among permissible competing inferences is for the jury, not a reviewing court").

20       The Court may not view the government's evidence in isolation but must examine that evidence

21   as a whole. *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005). Circumstantial evidence and

22   reasonable inferences drawn from that evidence are sufficient to sustain a conviction. *United States v.*

23   *Reyes-Alvarado,* 963 F.2d 1184, 1188 (9th Cir. 1992). The Court must also credit both direct and

24   circumstantial evidence without evaluating or speculating on the weight the jury might give it. *United*

25   *States v. Martin*, 228 F.3d 1, 10 (1st Cir. 2000).

26       In ruling on a Rule 29 motion, the Court does not intrude on "the exclusive function of the jury

27   to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences

28   from proven facts." *Alarcon-Simi*, 300 F.3d at 1176 (*quoting United States v. Rojas*, 554 F.2d 938, 943

1    (9th Cir. 1977)). Thus, the Court may not weigh the evidence, substitute its opinion for that of the jury,

2    or make credibility determinations. *United States v. Giampa,* 758 F.2d 928, 934–35 (3d Cir.1985). The

3    Court's approach at this stage is to determine whether the government adduced evidence sufficient to

4    sustain a conviction. *Id.* Indeed, "[a] finding of insufficiency should be 'confined to cases where the

5    prosecution's failure is clear.' Courts must be ever vigilant in the context of Fed. R. Crim. P. 29 not to

6    usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting

7    its judgment for that of the jury." *Brodie*, 403 F.3d at 133 (citations omitted).

8           **B.       The Court's Hearsay Rulings Were Correct**

9           In his first set of evidentiary challenges, Andrade claims that the Court "erroneously excluded

10   exculpatory evidence based largely on erroneous application of hearsay rules." Dkt. 645 at 29. He cites a

11   wide range of purportedly exculpatory and excluded evidence that fall into six buckets: (1) particular

12   versions of the terms and conditions provided on Andrade's website to AML Bitcoin investors; (2) some

13   excerpts of Andrade's recorded conversation with undercover FBI agent Bryant Ling; (3) some

14   documents pertaining to Jack Abramoff's alleged separate scheme; (4) some WhatsApp messages

15   between Abramoff and Carlos De La Guardia about Panama's ship registry and the Panama Maritime

16   Authority; (5) messages between Abramoff and an out-of-court declarant named Moshe Lapin about the

17   Super Bowl; and (6) redacted parts of the email updates Andrade received from CrossVerify employees

18   in London. *See id.* at 29–38.

19          These evidentiary challenges essentially relitigate the hearsay issues the Court and parties had

20   analyzed at length. *See, e.g.*, Dkt. 584 (Def. Mot. to Admit CrossVerify Email, Ex. 3202), Dkt. 585

21   (government motion conceding that Andrade may offer an out-of-court statement he received if it

22   arguably provided a good faith basis for his actions and cleared evidentiary hurdles related to nested

23   hearsay, authenticity, victim-blaming, and Rule 403 balancing), Dkt. 597 (government motion on

24   hearsay objections to CrossVerify email updates and terms & conditions contracts), Dkt. 601 (order

25   granting in part and denying in part Dkt. 597), 604 (government motion to exclude more terms &

26   conditions and other documents).

27          The Court's rulings were correct. And even if the Court had erroneously excluded some of

28   Andrade's proffered hearsay evidence, any error would have been harmless. The government and the

17

1    Court both recognized that Andrade was entitled to present effect-on-the-listener evidence that could

2    support his good faith, *see, e.g.*, Dkts. 585, 601, and he admitted many exhibits to this effect.

3    Nevertheless, the government addresses below the six buckets of excluded evidence that Andrade cites.

### 1. Terms and Conditions from the AML Bitcoin website

5    Andrade argues that he should have been allowed to admit several versions of his website's

6    Terms & Conditions (T&Cs) on two grounds: (1) "the fact that Mr. Andrade made these disclosures . . .

7    was important evidence establishing his good faith"; and (2) the T&Cs "were not hearsay; rather they

8    were legal documents governing the underlying relationship between Mr. Andrade and the AML Bitcoin

9    purchasers." Both grounds are baseless.

10    First, it is black-letter law that a defendant cannot introduce as evidence his own self-serving

11    hearsay without subjecting himself to cross-examination on the same. Such a tactic is "precisely what

12    the hearsay rule forbids." *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000) (quoting *United

13    States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988)). Yet Andrade sought to do just this. He

14    proffered his T&Cs—which, consistent with the evidence, Andrade concedes he made and caused to be

15    posted on his AML Bitcoin website—to show his purported good faith toward his investors. The T&Cs

16    were thus inadmissible. *See, e.g.*, *United States v. Sayakhom*, 186 F.3d 928, 937 (9th Cir.), *amended*,

17    197 F.3d 959 (9th Cir. 1999) (holding inadmissible an audio recording of defendant speaking, which she

18    had offered to show her good faith state of mind).

19    Second, the T&Cs were not admissible under the narrow hearsay exception for legal documents

20    or so-called "verbal acts." "The verbal acts doctrine applies only where the out-of-court statement

21    actually 'affects the legal rights of the parties,' or where "legal consequences flow from the fact that the

22    words were said."' Thus, it is not enough to simply characterize a statement as an offer. Only 'utterances

23    by the parties constituting the offer and acceptance *which brought the contract into being*' qualify as

24    verbal acts." *Echo Acceptance Corp. v. Household Retail Servs., Inc.*, 267 F.3d 1068, 1087 (10th Cir.

25    2001) (emphasis in original and original ellipsis omitted) (first quoting *U.S. v. Pungitore*, 965 F.Supp.

26    666, 673 n. 1 (E.D. Pa. 1997), and then quoting McCormick on Evidence § 249 (5th ed. 1999)). Here, it

27    is doubtful, if not impossible, that Andrade brought any contract into being by burying various

28    unconscionable disclaimers into the fine print of click-wrapped T&Cs that—assuming investors even

saw them—promoted fraud. *See also United States v. Weaver*, 860 F.3d 90, 95–96 (2d Cir. 2017) ("Fraudsters may not escape criminal liability for lies told to induce gullible victims to make worthless investments by inducing them to sign a contract containing disclaimers of reliance.").

The authorities Andrade cites in fact confirm his evidentiary overreach. *See* Dkt. 645 at 32. In *United States v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004), for example, Ninth Circuit affirmed the government's admission of bank checks and money transfer forms as legally operative "verbal acts." *See Pang*, 362 F.3d at 1192. The admission of these terse bank instruments is hardly comparable to the admission of several prolix and self-serving T&Cs drafted personally by the defendant. And *United States v. Dorsey*, 418 F.3d 1038, 1044 (9th Cir. 2005), *abrogated by Arizona v. Gant*, 556 U.S. 332 (2009) is even further afield. There, the Ninth Circuit affirmed testimony in a suppression hearing about a law enforcement officer's hearsay statement to show that arresting officers acted in good faith. *See id.* This ruling has little applicability to a defendant offering his own out-of-court statements at trial, all while evading the scrutiny of cross-examination.

In any event, any error resulting from the exclusion of some T&Cs would be harmless. The Court permissively allowed Andrade to introduce at least one version of the T&C and to direct the jury's attention to its disclaimers during witness testimony. *See, e.g.*, Dkt. 645 at 32 n.30 (defense noting that "[t]he Court admitted an earlier version of the Terms & Conditions that did not have volume making language, Ex. 2471, before excluding subsequent versions"). The other T&Cs posed a danger of at least undue delay, wasting time, and cumulative evidence. *See* Fed. R. Evid. 403.

### 2.    Excerpts of Andrade's Recorded Conversation with Undercover Agent (Rule of Completeness)

Andrade next relitigates the rule of completeness's application to his recorded conversation with an undercover FBI agent, Bryant Ling. *See* Dkt. 645 at 33–34. Mr. Ling testified at trial and was available for thorough cross-examination. Andrade argues that, on cross-examination, he should have been able to admit portions of the recording about AML Bitcoin technology and investment. *Id.*

The Court employed a careful process for assessing the defense's proffered recordings in the context of trial. First, the government briefed this issue two days before Ling took the stand. *See* Dkt. 590 (government's Feb. 25, 2025 motion to preclude defense introduction of hearsay recordings). Next,

19

the Court heard defense proffers on completeness and reviewed transcripts of recording excerpts that the defense sought to admit on cross-examination. *See, e.g.*, Feb. 27, 2025 Tr. 2148:3–2151:14 (Court's review of transcript for excerpt of Skype call). And ultimately, the Court allowed the defense to elicit some hearsay statements but not others. *See, e.g.*, *id.* at 2126:8–2130:1 (allowing, over government objection, questions eliciting Andrade's and Abramoff's hearsay), 2133:11–2134:10 (allowing, over government objection, questions eliciting Andrade's hearsay on biometric technology and "Homer Simpson" incident).

Andrade has failed, even now, to explain with specificity how his proffered excerpts were necessary to correct a misleading distortion. As briefed before, *see* Dkt. 590 at 2, "the rule of completeness does not compel the admission of inadmissible hearsay evidence simply because such evidence is relevant to the case." *United States v. Lopez*, 4 F.4th 706, 715 (9th Cir. 2021). The rule of completeness applies only if the government "introduce[es] misleading excerpts," requiring the opposing party to "correct[] a distortion created by an opposing party's misleading proffer." *Id.* In other words, the rule "applies only to the *narrow* circumstances in which a party has created a misimpression about the statement . . . . The mere fact that a statement is probative and contradicts a statement offered by the opponent is not enough to justify completion." Fed. R. Evid. 106 advisory committee notes to 2023 amendment (emphasis added).

Andrade appears to argue that the excluded excerpts could have showed that (1) Andrade was supposedly forthcoming about his technology not being complete; (2) he told Mr. Ling that AML Bitcoin was not an investment; and (3) Andrade was mentally disabled. *See* Dkt. 645 at 34. But it is unclear how the defense's proffered clips would be necessary to correct any misimpression. The selected Ling recordings were not misleading, whether viewed standing alone or especially in the context of all the evidence and argument spanning the five-week trial. First, as to Andrade's statements about technology, the evidence and argument showed that Andrade sold a token, which unlike the AML Bitcoin itself, was a placeholder lacking AML technology. The government also stressed that Andrade often said that the technology was not yet complete—but would be done soon. Second, as to Andrade's statements about investment, the defense was allowed to admit Andrade's T&Cs that contained disclaimers about AML Bitcoin's value as an investment. And third, as to alleged mental disability, the

1   jury heard many more minutes of Andrade's recordings (during SSA Quinn's testimony) and testimony

2   from two expert witnesses on Andrade's mental state.

3          In short, the Ling recording did not fit the "narrow circumstances" to apply the rule of

4   completeness. Fed. R. Evid. 106 advisory committee notes to 2023 amendment.

5             **3.**     **Abramoff's alleged separate scheme and Marina Butina documents**

6          The Court did not, as Andrade claims, improperly limit Andrade's proffered documentary

7   evidence about Abramoff's involvement in a purported money laundering scheme involving a Ukrainian

8   billionaire. Selectively citing a portion of the trial transcript, Andrade claims that the Court issued a

9   blanket ruling excluding documentary evidence regarding Abramoff's purported money laundering.

10  Def. Mot. at 25 (quoting Tr. 1838:2-6: "You've asked him a question. He answered the question. So

11  then why are you introducing a document which, frankly, the offer is it's just going to say the same –

12  there's no basis for the document to come into evidence."). A complete reading of the transcript shows

13  that the Court correctly excluded specific documents offered by the defense as inadmissible hearsay. Tr.

14  1838:16. The trial transcript in no way supports Andrade's contention that the Court issued a blanket

15  ruling precluding Andrade from introducing relevant evidence of Abramoff's purported money

16  laundering. Tr. 1838.

17         The only specific exhibits Andrade refers to in his motion were properly excluded by the Court.

18  For example, Andrade implies that Exhibit 3307 should have been admitted because it was relevant, but

19  he fails to address the fact that the Court excluded Exhibit 3307 on hearsay grounds. Tr. 1838:16.

20  Further, Exhibit 3307 does not relate to Abramoff's purported money laundering; it relates to the Super

21  Bowl rejection campaign. Exhibit 3307; Tr. 1834-1838. Next, Andrade cites a portion of the trial

22  transcript where defense counsel cross-examined Abramoff using Exhibit 3261. Def. Mot. at 25 & n.25

23  (citing Tr. 1841:5 & Exhibit 3261). But Andrade never sought to admit Exhibit 3261. *See* Tr. 1841-

24  1843. Andrade cannot credibly claim the Court excluded Exhibit 3261 when he never sought to admit it.

25  Further, defense counsel quoted extensively from Exhibit 3261 while cross examining Abramoff, and

26  the content of Exhibit 3261 was presented to the jury through witness testimony. *See* Tr. 1841-1843.

27  Regardless, Exhibit 3261 is inadmissible hearsay, which Andrade completely fails to address. Likewise,

28  Andrade never sought to admit Exhibit 3262, and he does not address any potential hearsay issues

1    regarding Exhibit 3262. Andrade cannot claim the Court improperly excluded Exhibit 3262 when he

2    never sought to admit it.  *See* Tr. 1858:25 to 1861:7.

3        Next, Andrade argues that the Court should have admitted handwritten notes seized from Maria

4    Butina's residence. But Andrade never sought to admit the handwritten notes, which he erroneously

5    characterizes as Abramoff's rather than Paul Erickson's handwritten notes. At trial, defense counsel

6    simply sought to cross-examine FBI Special Agent Ethan Quinn about the FBI's search warrant at Maria

7    Butina's residence; counsel never sought to introduce the seized notes. *See* Tr. 2283:11-2284:8. Andrade

8    cannot claim that the Court improperly excluded the handwritten notes when he never sought to

9    introduce them. Regardless, the handwritten notes were irrelevant and inadmissible hearsay.

10        Nor did the Court improperly exclude documents showing Abramoff's involvement in Andrade's

11    real estate purchases. Andrade claims that the Court improperly excluded Exhibit 2934, but Andrade

12    never sought to admit it. Tr. 1867:17-1868:19. Even if Andrade could have admitted Exhibit 2934 over a

13    hearsay objection, the exclusion of documents showing Abramoff's involvement in Andrade's real

14    estate purchases cannot support acquittal or a new trial, particularly where Andrade fails to make any

15    showing of relevance.

16        **4.    WhatsApp messages on the Panama ship registry and Maritime Authority**

17        Regarding evidence on Panama, Andrade complains that although he was allowed cross-examine

18    Abramoff and Carlos De La Guardia at length, the Court excluded hearsay text messages about the

19    topics of those cross examination. Specifically, Andrade argues he should have been allowed to admit

20    text messages between Abramoff and De La Guardia about AML Bitcoin's usefulness for Panama's ship

21    registry and the Panama Maritime Authority. *See* Dkt. 645 at 36–37.

22        Evidence 101 forecloses Andrade's argument. Unless a hearsay exception applies, hearsay is

23    inadmissible even when the hearsay declarant is in-court and testifying. *E.g.*, Wright & Miller, 30B Fed.

24    Prac. & Proc. Evid. § 6717 (2025 ed.) ("Rule 801(c)(1) extends the federal hearsay definition to capture

25    a testifying witness' own prior statements."). Andrade fails to cite any hearsay exception. *See* Dkt. 645

26    at 37. The Court correctly excluded the hearsay text messages, especially given that the Court allowed

27    cross-examination on the same topics.

28        In any event, the Panama ship registry and Panama Maritime Authority were sideshows distinct

1    from the Panama *Canal* and the Panama *Canal* Authority. The Canal was the crux of Andrade's

2    Panama-related misrepresentations and the focus of the government's Panama-related case. The

3    exclusion of ship registry and Maritime Authority evidence cannot support a new trial or acquittal.

###    5.    WhatsApp messages on the Super Bowl

5        Andrade's arguments about Super Bowl evidence mirrors those he makes about Panama

6    evidence. He complains that he should have been allowed to admit written communications between

7    Abramoff and an out-of-court declarant, Moshe Lapin. *See* Dkt. 645 at 37. Again, the Rules of Evidence

8    foreclose Andrade's argument. No hearsay exception applies to these out-of-court writings between

9    Abramoff and Lapin, and indeed, Andrade fails to cite any exception.

###    6.    Redactions of Weekly Management Update Emails to Andrade

11        Andrade's last hearsay-related challenge (Def. Mot., at Section IV-A) pertains to redactions of

12    emails Andrade received from out-of-court declarants about CrossVerify. The Court admitted several of

13    these so-called "Weekly Management Updates" after adopting redactions proposed by the defense. *See*

14    Order on Defense Motions in Limine Regarding Admission of Reports et al., Dkt. 601 at 2

15    ("Recognizing the court's concerns about "the variety of statements in the Updates," Defendant offers to

16    redact most of the information in the proposed exhibits. *See* Def. Br., Dkt. No. 597, at 3 n.3. If accepted,

17    this would mean that the exhibits feature only (1) identifying information (e.g., date, recipient, and

18    relevant heading) and (2) "a full representation of the specific topic described [in Defendant's brief]."

19    *Id.* With this understanding in mind, the motion is granted and part and denied in part.").

20        Andrade has arguably waived any objection to the redactions, given that he himself offered the

21    redactions after supplemental briefing on hearsay issues. *See* Dkt. 597 at 3 n.3 ("Although the entirety of

22    the Updates are relevant and non-hearsay (mostly providing updates on business prospects), *if the Court*

23    *prefers, Mr. Andrade will redact* all information from the Updates except for the identifying information

24    . . . ." (emphasis added)). Still, even if Andrade has not waived the argument he makes now, Rule 403

25    supports the redactions. As a general matter, and as briefed before the Court's final rulings on the

26    Weekly Management Updates, "the Court has 'great leeway' to exclude evidence under Rule 403. And

27    courts regularly exclude evidence that—though probative of a defendant's purported good faith—pose a

28    danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or

1  needlessly presenting cumulative evidence." Dkt. 585 at 5 (first quoting *United States v. Pendleton*, 884

2  F.2d 1396, at *2 (9th Cir. 1989) (unpublished), then quoting Fed. R. Evid. 403)).

3      If left unredacted, the Weekly Management Updates posed a substantial danger of all the dangers

4  listed in Rule 403. As to confusing the issues, for example, the Updates contained various technical

5  terminology from non-testifying out-of-court declarants about topics only tangentially related to the case

6  at hand. *See* Dkt. 645 at 38 (citing, *e.g.*, alleged memorandum of understanding with the owner of

7  Corda, which provides a crypto development platform in exchange for a fee). And as for cumulative

8  evidence, for example, the jury already had before it several Updates that showed that Andrade had

9  received updates from CrossVerify management that purported to show some business or technological

10  development. Given all this, the Court did not err by adopting the defense's own proposed redactions in

11  admitting the Weekly Management Updates.

12  **7.  Witnesses Had Personal Knowledge and Were Not "Incompetent"**

13      In addition to challenging the Court's hearsay rulings, Andrade argues that the Court admitted

14  "incompetent evidence"—that is, the testimony of witnesses who purportedly lacked personal

15  knowledge. *See* Dkt. 645 at 39–41. Andrade exaggerates the bar for excluding testimony on grounds of

16  incompetence or personal knowledge, and ignores the substantial foundation laid over the five-week

17  trial.

18      To start, lack of personal knowledge or competence is rarely grounds to exclude testimony.

19  "Rule 601 of the Federal Rules of Evidence presumes that *every* person is competent to testify as a

20  witness." *United States v. Hardeman*, No. CR 10-0859 RS, 2011 WL 13143992, at *3 (N.D. Cal. Oct. 7,

21  2011) (emphasis in original); *accord, e.g.*, *Est. of Suskovich v. Anthem Health Plans of Virginia, Inc.*,

22  553 F.3d 559, 570 (7th Cir. 2009) (collecting cases holding that "Federal Rule of Evidence 601 []

23  creates a broad presumption of competency"). And under Rule 602, the proponent of testimony need

24  only introduce evidence "sufficient to support a finding that the witness has personal knowledge," and

25  "[e]vidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid.

26  602. "[P]ersonal knowledge is not an absolute but may consist of what the witness thinks he knows from

27  personal perception." *Id.* at Advisory Committee Note on Proposed Rule (citing 2 Wigmore § 650).

28      Put simply, "the threshold of Rule 602"—of personal knowledge—"is low." *United States v.*

24

1   *Hickey*, 917 F.2d 901, 904 (6th Cir. 1990). "The judge should allow the testimony to go to the jury

2   unless the judge concludes the foundation for personal knowledge is so weak that the testimony will be a

3   waste of time. On the other hand, if the judge decides that there is enough evidence of personal

4   knowledge that *a reasonable juror could give some weight to the testimony*, Rule 602 is satisfied."

5   Wright & Miller, 27 Fed. Prac. & Proc. Evid. § 6027 (2d ed.); *see, e.g.*, *United States v. Hilliard*, 851

6   F.3d 768, 780 (7th Cir. 2017) ("a witness need not have had 'personal interaction' with a defendant in

7   order to provide appropriate Rule 701 testimony . . . 'the knowledge required by Rule 602 is not

8   absolute or unlimited knowledge'") (quoting *United States v. Mendiola*, 707 F.3d 735, 741 (7th Cir.

9   2013))); *United States v. Whittemore*, 776 F.3d 1074, 1082 (9th Cir. 2015) ("Personal knowledge

10  includes opinions and inferences grounded in observations and experience.") (quoting *Great Am.*

11  *Assurance Co. v. Liberty Surplus Ins. Corp.*, 669 F. Supp. 2d 1084, 1089 (N.D. Cal. 2009))).

12          In *United States v. Hickey*, for example, the trial court allowed the testimony of a drug addict

13  whom the district court characterized as a "loose cannon"—and who testified inconsistently while

14  claiming "lack of memory" and "uncertainty as to details." 917 F.2d at 903. On appeal, the Sixth Circuit

15  rejected the *Hickey* defendant's attack on the addict's personal knowledge and affirmed the admissibility

16  of his testimony. The standard for admission, the court of appeals stressed, was low. "Despite the fact

17  that [the addict's] testimony may have been, in large part, unbelievable to some and in spite of the

18  possibility that his perception was sometimes impaired, *a reasonable or rational juror could believe* that

19  [the addict] and the other prosecution witnesses perceived the course of events to which they testified."

20  *Hickey*, 917 F.2d at 905 (emphasis added).

21          Andrade's case is much easier than *Hickey*. Andrade attacks most the personal knowledge of

22  Abramoff and victim Boyer, *see* Dkt. 645 at 29–31, but both witnesses had ample personal knowledge

23  underlying their testimony. A "rational juror" could have believed them. *Hickey*, 917 F.2d at 905.

24          As to Abramoff, Andrade complains that Abramoff lacked foundation to testify as two topics.

25  First, Abramoff purportedly lacked foundation to testify that the AML Bitcoin project did not "have the

26  money it would take to get an ad placed on the Super Bowl." Feb. 24, 2025 Tr. 1706:4–11. But Andrade

27  ignores the evidence at trial that (1) Abramoff was Andrade's main co-conspirator privy to information

28  that Andrade hid even from his Chief Strategy Officer, Japheth Dillman (such as the fact that the

1    purported Super Bowl ad was a rejection campaign); (2) Abramoff had experience in media relations

2    and worked with Andrade and John Bryan on the Super Bowl ad; (3) the common-sense fact that the

3    Super Bowl ad would have cost millions of dollars; and (4) WhatsApp messages between Abramoff and

4    Andrade showing that the AML Bitcoin project was not merely short on funds, but a "disaster." *See,*

5    *e.g.*, *id.* at 1698:18 (Ex. 926 WhatsApp thread); 1704:23–1705:10 (Abramoff's contacts in the

6    entertainment world, including Bryan).

7        Second, Abramoff purportedly lacked foundation to testify about Bryan's market-making

8    activities. But this argument ignores evidence showing that (1) Abramoff and Bryan had a relatively

9    close and longstanding relationship and that (2) as to market manipulation specifically, Bryan texted

10   Abramoff to keep him apprised of the market manipulation—and Abramoff, rather than express

11   surprise, confusion, or ignorance, urged Bryan to stop reporting the market manipulation in writing. *See,*

12   *e.g.*, Feb. 21, 2025 Tr. 1524:12–1548:8 (Bryan testimony on market making plans sent to Abramoff;

13   WhatsApp message threads between Bryan and Abramoff on the market manipulation). Thus, a

14   "reasonable juror could give some weight to the testimony" from Abramoff on AML Bitcoin's finances

15   and Bryan's market manipulation. Wright & Miller, *supra*, § 6027.

16       As for victim investor Boyer, Andrade complains that Boyer testified that "[Boyer] had been told

17   multiple times that the ICO had sold out, that all 76 million tokens were sold." *See* Dkt. 645 at 41

18   (quoting Feb. 13, 2025 Tr. 567). But Andrade ignores that (1) Boyer had at that point already testified at

19   length and introduced documentary evidence of his many conversations about AML Bitcoin and his

20   reliance on those conversations; and that (2) Boyer's testimony about "76 million tokens" was grounded

21   in his reaction to receiving an email (Exhibit 740) that stated far fewer tokens (60 million) had been

22   issued. *See, e.g.*, Feb. 13, 2025 Tr. 562:1–565:10 (testimony on why token issuance and sale was

23   significant to Boyer given his background as a professional investor). So a "reasonable juror could give

24   some weight to the testimony" of Boyer as well. Wright & Miller, *supra*, § 6027.

25       Andrade's other foundation arguments are conclusory and can be similarly rejected out of hand.

26   *See* Dkt. 645 at 41 (defense string cite attacking the testimony of Brandi Jodoin, Bryan Darrow, Carlos

27   De La Guardia, and FBI SSA Ethan Quinn). In brief: Mrs. Jodoin of course had foundation to testify

28   what she learned about the Warsaw conference, because she spoke with Andrade, invested in his

company, and went to the conference. Mr. Darrow had foundation to testify about what he understood about Aten Coin technology, because he spoke with Andrade about Aten Coin and sold that cryptocurrency to investors (including some who testified at trial). Mr. De La Guardia, a former Panamanian official, had foundation to testify about the purpose of Panama-related press releases that he helped draft and approve. And SSA Quinn, a case agent, had foundation to testify to the simple point that he learned in his investigation that Mark D'Adamo was a Canadian who had worked with Andrade. *See, e.g.*, *United States v. Lacerda*, 958 F.3d 196, 211 (3d Cir. 2020) (holding that the government may call a law enforcement officer who "may testify about all matters within his personal knowledge from the investigation"). All told, Andrade's foundation objections are meritless and, in any event, fall far short of warranting a new trial or judgment of acquittal.

### 8.   The Court Properly Excluded Testimony on Software Development That Took Place After 2018

Andrade argues that his expert witness on Aten Coin and CrossVerify code, Erik Min, should have been allowed to testify about software development of CrossVerify and/or AML Bitcoin that allegedly took place after 2018. *See* Dkt. 645 at 42–43. The Court had excluded Mr. Min from opining about Andrade's work in 2019, *see* Mar. 3, 2025 Tr. 2447–2452:5, because the charged wire fraud scheme period ended "on or about October 2018," Dkt 1 at 6, and his charged misrepresentations took place before then. Andrade argues that, because several witnesses testified that they never saw AML Bitcoin's promised technology completed, he should have been allowed to introduce Min's opinion that the technology was substantially completed sometime after 2018. That continued work "reflects his good faith," Andrade claims. Dkt. 645 at 43.

Andrade conflates good faith with efforts to deliver on already-broken promises. The evidence at trial showed that Andrade repeatedly promised that the AML Bitcoin technology was substantially complete *well before* 2019. *See, e.g.*, Feb. 13, 2025 Tr. 663:19–664:14 (testimony of victim Scott Bruffey). And yet, even as late as *November 2018*, Andrade was starting AML Bitcoin development from scratch. *See, e.g.*, Feb. 19, 2025 Tr. 1264:15–23, 1269:12–12:70:3 (CTO Evan Carlsen's testimony on November 2018 timeframe and missing AML and KYC features). Thus, as the jury found, Andrade's lied about the completion timeline of his technology. What Andrade claimed was already done in 2017

1    and 2018 had, in truth, barely even started.

2         Andrade's development of AML Bitcoin in 2019 is therefore irrelevant and calls for jury

3    nullification. Just as it is no defense for a fraud defendant to attempt repayment after being caught, it is

4    no defense to try to deliver on technological promises after repeatedly breaking them. *See, e.g.*, Order on

5    Motions in Limine, Dkt. 497 at 4 ("A defendant's belief that the victims of the fraud will be paid in the

6    future or will sustain no economic loss is no defense to the crime." (quoting *United States v. Molinaro*,

7    11 F.3d 853, 863 (9th Cir. 1993))); Mar. 3, 2025 Tr. 2433:21–25 (The Court: "The focus here is, even

8    from the proffers that the defense has made, what Mr. Andrade knew or his understandings in the period

9    of time in which the alleged misrepresentations were made. Whether or not years later it would have

10   worked or not worked is not relevant.").

11        Likewise, it is no defense to start building a promised product only after being caught. Recall

12   that the FBI went overt with its investigation in September 2018 by executing search warrants on

13   Andrade's office and Abramoff's home. And within weeks of learning of the federal criminal

14   investigation, Andrade directed that Mr. Carlsen begin work on software development and that Melanie

15   Cowan and Bernadette Tran edit AML Bitcoin's preexisting social media posts to remove Andrade's

16   past-tense boasts about completed technology. *See, e.g.*, Feb. 18, 2025 Tr. 1056:8:–1059:21 (Ms.

17   Cowan's testimony). Accordingly, the Court properly limited Min's expert testimony to source code

18   development predating 2019.

19              **9.    The Court Properly Admitted Rule 404(b) and Inextricably Intertwined
                        Evidence**

20

21        Defendant Andrade next claims that the Court erred in allowing the admission of evidence of

22   Andrade's development, marketing and sale of "AtenCoin" a predecessor cryptocurrency to AML

23   Bitcoin as both inextricably-intertwined with the charged fraud scheme, or otherwise admissible as

24   404(b) evidence. *See* Dkt. 493 (Order Granting in Part and Denying in Part Defendant's Motion In

25   Limine to Exclude Allegations of Uncharged Bad Acts). The Court's ruling was correct; defendant's

26   motion for a new trial on these grounds should be denied.

27        Rule 404(b) is a "rule of inclusion," and evidence of other acts is admissible "except where it

28   tends to prove only criminal disposition." *United States v. Ayers*, 924 F.2d 1468, 1472-73 (9th Cir.

1   1991); *accord, e.g.*, *United States v. Cherer*, 513 F.3d 1150, 1157 (9th Cir. 2008). The Ninth Circuit has

2   set out a four-part test for analyzing the admissibility of 404(b) evidence introduced to show intent: (1)

3   the evidence tends to prove a material element of the offense for which the defendant is now charged;

4   (2) the other act is not to remote in time; (3) sufficient proof exists for the jury to find that the defendant

5   committed the other acts, and; (4) in cases where prior act evidence is being introduced to prove intent,

6   the other acts must be sufficiently similar to the charged conduct. *United States v. Lague*, 971 F.3d 1032,

7   1038 (9th Cir. 2020), *citing United States v. Bailey*, 696 F. 3d, 794, 799 (9th Cir. 2012); *see also United*

8   *States v. Smith*, 282 F.3d 758, 768 (9th Cir.2002). The government "has the burden of proving that the

9   evidence meets all of the above requirements." *United States v. Arambula-Ruiz*, 987 F.2d 599, 602 (9th

10  Cir. 1993). The decision whether to admit Fed. R. Evid. 404(b) evidence is committed to the district

11  court's discretion and is reviewed only for abuse of that discretion. *United States v. Sitton*, 968 F.2d 947,

12  958 (9th Cir.1992); *United States v. Hadley*, 918 F.2d 848, 850 (9th Cir. 1980).

13          Other crimes, or "other acts" evidence within the meaning of Rule 404(b) are not subject to a

14  404(b) analysis if they are inextricably intertwined with the charges offenses and related conduct.

15  *United States v. Soliman*, 813 F.2d 277, 279 (9th Cir. 1987). Two general categories of other act

16  evidence may be "inextricably intertwined with the charged crimes and thus exempt from the

17  requirements of Rule 404(b); i) acts that constitute a part of the transaction that serves as the basis for

18  the criminal charge; or, ii) evidence that is necessary to permit the prosecutor to offer a coherent and

19  comprehensible story regarding the commission of the crime." *See United States v. Vizcarra-Martinez*,

20  66 F.3d 1006, 1012 (9th Cir. 1995). As the Tenth Circuit explained in *United States v. Irving*: "intrinsic

21  evidence is that which is 'directly connected to the factual circumstances of the crime and provides

22  contextual or background information to the jury." 665 F.3d 1184, 1213 (10th Cir. 2011), *quoting*

23  *United States v. Parker*, 553 F.3d, 1309, 1313 (10th Cir. 2009).

24          As the evidence introduced at trial amply demonstrated, AtenCoin was the predecessor to AML

25  Bitcoin, and that Andrade's fraudulent investment for AML Bitcoin was simply a rebranding and

26  continuation of the false and misleading representations Andrade had made about AtenCoin, and as such

27  was both inextricably intertwined the charged fraud scheme and meets the Ninth Circuit's four-part test

28  for admissibility.

1        Andrade employee Bernadette Tran testified that AML Bitcoin "was a rebrand of Aten Coin."

2  *See* Tr. 949. Tran further testified that she helped Aten Coin investors convert their Aten Coins to AML

3  Bitcoin. Tr. 954. Victim Brandi Jodoin, who purchased Aten Coin, testified that Aten Coin "was being

4  rebranded to AML Bitcoin." Tr. 327. Documents introduced at trial demonstrated that Andrade used the

5  same false and misleading representations to sell AML Bitcoin as he did with Aten Coin. For example,

6  in a 2014 email, Andrade emails a press release stating that Aten Coin "is the first digital currency that is

7  100% anti-money laundering compliant." *See* Ex. 1087.

8        These were the same fraudulent misrepresentation he used with AML Bitcoin. Witnesses

9  testified that they were attempting to build the AML Bitcoin technology from old, incomplete and non-

10  working Aten Coin technology. Evan Carlson, who was hired briefly as Andrade's Chief Technology

11  Officer, testified that it was his plan to build AML Bitcoin by starting with a review of the Aten Coin

12  software. Tr. 1306. And like AML Bitcoin, the jury heard evidence—via testimony and documents—

13  that Andrade falsely represented to Aten Coin investors that he had millions in contracts or potential

14  contracts for the coin. *See* Ex. 1088 (Andrade email to Poon: "We already have over $9 million dollars

15  per year worth of potential contracts."). And finally, the undisputed evidence at trial was that investors

16  put over $2 million into Aten Coin, all of which they lost.

17        The Court was correct in its ruling admitting Aten Coin evidence as inextricably-intertwined

18  with the AML Bitcoin fraud because Andrade used the same company, the same or similar sales tactics,

19  the same representations regarding the technology, and preying on the same victims. *See* Dkt. 493

20  (Order Granting in Part and Denying in Part Defendant's Motion In Limine to Exclude Allegations of

21  Uncharged Bad Acts). The Court correctly held that "AtenCoin is inextricably intertwined with AML

22  Bitcoin and is admissible on those grounds." *Id.*

23        The Court also correctly ruled that AtenCoin evidence was properly admitted as 404(b) evidence.

24  First, it proves a material point as to Andrade's planning, preparation and knowledge of the AML

25  Bitcoin fraud, making similar misrepresentations about both, and attempting to "roll" AtenCoin

26  investors into buying AML Bitcoin. *Id.* This evidence showed Andrade employing the same *modus*

27  *operandi* in both schemes, further demonstrating AtenCoin's materiality to the AML Bitcoin fraud.

28  Finally, the AtenCoin scheme (2014 to 2016) directly preceded the AML Bitcoin scheme (2017-2018),

demonstrating that they were not too remote in time.

The district court has discretion to admit 404(b), and that discretion is reviewed only for abuse of that discretion. *United States v. Sitton*, 968 F.2d 947, 958 (9th Cir.1992); *United States v. Hadley*, 918 F.2d 848, 850 (9th Cir. 1980). The Court was well within its reasoned discretion in admitting evidence of Andrade's fraudulent marketing and sale of Aten Coin.

### 10. The Admission of Evidence of NAC Foundation Finance and Andrade's Spending Was Not Unfairly Prejudicial

Andrade argues that the jury was presented with unfairly prejudicial evidence of Andrade's personal spending, including the fact that "he stiffed a large percentage of his employees" and that "he partied a lot and went to strip clubs." Dkt. 645 (New Trial Motion). In fact, the evidence elicited from former NAC Foundation employees was that Andrade was spending money raised from investors on personal expenses, including parties and strip clubs, and that as a result, the company was at times unable to pay bills, including payroll, lighting bills, the phone bill, and even office rent. Tr. 967-968. As the Court held during trial, that testimony was highly relevant in allowing the jury to assess Andrade's intent – was he legitimately developing a working AML Bitoin, or, as evidenced by his excessive personal spending – was his intent to deceive and cheat his investors.

### 11. The Court Did Not Improperly Limit Impeachment of Government Witnesses

Andrade claims that the Court erroneously limited impeachment of government witnesses under Rules 806 and 613. *See* Dkt. 645 at 44. Specifically, he protests that (1) the Court excluded the testimony of Christine Lee, who would have testified about an entirely separate scheme in which Japheth Dillman defrauded her; and (2) the Court excluded evidence of alleged prior inconsistent statements. Both arguments are meritless.

#### (i) The Court Did Not Improperly Limit Impeachment Allowed by Fed. R. Evid. 806.

Andrade claims that the Court should have permitted him to call Christine Lee to impeach Japheth Dillman, who was not a witness at trial but whose statements were admitted as government evidence via Fed. R. Evid. 801(d)(2)(E). This issue has already been briefed by the parties and ruled on

by the Court. Dkts. 598 (Motion in Limine to Permit Testimony to Impeach Japheth Dillman as Permitted by Federal Rule of Evidence 806), 600 (Government Opposition), 601 (Court Order Denying Motion in Limine). The Court properly excluded Ms. Lee's testimony and related documents as extrinsic evidence under Fed. R. Evid. 608(b). Dkt. 601, at 7-8 (quoting *Bonin v. Calderon*, 59 F.3d 815, 829 (9th Cir. 1995); *United States v. Saada*, 212 F.3d 210, 221 (3d Cir. 2000); *United States v. White*, 116 F.3d 903, 920 (D.C. Cir. 1997); *United States v. Little*, 2012 WL 2563796, at \*4 (N.D. Cal. June 28, 2012)). Furthermore, as the government previously argued, Rule 403 offered an independent ground to exclude evidence pertaining to Ms. Lee. *See* Dkt. 600 at 8; *see also Shayota*, 784 F. App'x at 990 (bypassing the circuit split on Rule 608(b) by affirming the exclusion of extrinsic impeachment evidence under Rule 403).

Even if the Court improperly excluded Ms. Lee's testimony—and it did not—the error was not prejudicial and would not warrant a new trial or acquittal. Impeaching Dillman with Ms. Lee's testimony would not have undermined in any meaningful way the jury's conclusion that Andrade executed and led the AML Bitcoin fraud scheme and that he caused Ben Boyer's January 12, 2018, wire in furtherance of the fraud scheme. The evidentiary record is clear that Andrade owned, operated, and controlled the AML Bitcoin project. He hired Dillman to sell AML Bitcoin tokens, he supplied information about AML Bitcoin that Dillman used to sell tokens, Boyer bought the tokens relying on information provided and controlled by Andrade, and when Ben Boyer bought AML Bitcoin tokens the proceeds flowed directly to Andrade. The evidence was overwhelming that Andrade caused Boyer's wire in furtherance of the AML Bitcoin fraud scheme. Tr. 523, 534, 537, 538, 540-545, 548.

Similarly, the Court properly excluded Exhibit 3184. Andrade claims that the Court erroneously excluded Exhibit 3184 and further impeachment of Dillman via government witness John Szeder. But the Court's earlier order, Dkt. 601, established that Exhibit 3184 was inadmissible under Fed. R. Evid. 608(b), and the Court properly ruled that Fed. R. Evid. 806 did not permit admission of Exhibit 3184. Tr. 1350:24-1351:2, Tr. 1351:22-1352:2. Further, Exhibit 3184 was inadmissible under both Fed. R. Evid. 401 and 403. Questioning Szeder about Dillman's autotrader was also irrelevant and had the potential to confuse the issues cause undue delay, and waste time. Tr. 1350:5-10 ("You do seem to be going off on a tangent…."), Tr. 1352:1-2 ("I don't think the jury will … have a clue what you're talking

32

1    about."), Tr. 1353 ("This seems to be a compete tangent.").

2    And even if the Court improperly excluded Exhibit 3184, any error was not prejudicial and

3    would not warrant a new trial or acquittal. Dillman's autotrader was a completely separate endeavor, and

4    Andrade was not involved with it. Testimony about Dillman's autotrader and related investments would

5    not undermine the fact that Boyer bought AML Bitcoin tokens from Dillman based on his review of the

6    Andrade-controlled AML Bitcoin website and white paper, press reports that Andrade approved, and

7    false information about an AML Bitcoin Super Bowl ad that Andrade disseminated and then hid the

8    truth from Dillman that he was actually running a rejection campaign.

9              (ii)    **The Court Did Not Improperly Limit Impeachment Under Fed. R.
                       Evid. 613**

10

11    Nor is a new trial or acquittal warranted, as Andrade contends, based on the Court's limitation of

12    impeachment based on prior inconsistent statements under Fed. R. Evid. 613. The Court properly ruled

13    that under Rule 613, Andrade could introduce law enforcement testimony to impeach prior government

14    witnesses provided Andrade's extrinsic evidence was not about a collateral issue and the witnesses did

15    not admit to the challenged testimony. Tr. 2637:3-16. Under this framework, the Court permitted

16    Andrade to call law enforcement witnesses to impeach three topics and excluded impeachment on seven

17    collateral topics.[4] Tr. 2637:17-2638:7.

18    The Court did not err in excluding collateral extrinsic evidence. "The district court has broad

19    discretion over whether to admit extrinsic evidence to rebut a witness' direct testimony, particularly on a

20    matter collateral to the case." *United States v. Higa*, 55 F.3d 448, 452 (9th Cir. 1995) (internal citation

21    omitted). "The general test of whether evidence is collateral is: Could the fact, as to which error is

22    predicated, have been shown in evidence for any purpose independently of the contradiction?" *Id.*

23    (internal citation and quotation omitted). This determination is to "be left largely in the control of the

24    trial court." *Id.* (internal citation and quotation omitted). And the trial court has "broad discretion." *Id.*

25    (internal citation and quotation omitted).

26

27    ───────────────
      [4] The Court permitted impeachment evidence on the following: (1) to impeach John Szeder's
      testimony regarding the white paper; (2) to impeach Jack Abramoff's testimony about Morgan &

28    Morgan; and (3) to impeach Evan Carlsen about money spent on development of AML Bitcoin.  Tr.
      2637:17-2638:7.

33

The Court correctly exercised its broad discretion in excluding extrinsic evidence of collateral topics. And the Court correctly excluded extrinsic evidence where there was no prior inconsistent statement. Broadly, Andrade states that the Court precluded him from impeaching Abramoff. Def. Mot., at 40:7. But this mischaracterizes the record. The defense cross-examination of Abramoff lasted longer than the direct examination. The defense had wide latitude to impeach Abramoff and did so repeatedly. A review of the trial transcript covering Abramoff establishes that the jury could not have been left with the wrong impression of Abramoff's truthfulness based on the Court's exclusion of a small number of extrinsic statements on collateral topics.

Andrade's specific challenges to the Court's seven exclusions fail because they do not satisfy Rule 613 or are collateral and therefore were properly excluded by the Court under its broad discretion. For example, the Court properly excluded extrinsic impeachment evidence of Abramoff calling Andrade "an idiot." There was no inconsistent statement. Abramoff testified, "I don't recall calling him an idiot, but I certainly may have called him an idiot." Tr. 1757:16-17. And Abramoff admitted to calling Andrade "a dunce who came up with a great idea." Tr. 1757:22-24.[5] Similarly, the Court correctly excluded collateral extrinsic evidence to impeach Abramoff's testimony about hearing that Aten Coin had been valued as high as $80, Tr. 1767-1768;[6] Abramoff's testimony about more money being spent on technology than marketing, Tr. 1822:4-10;[7] Abramoff's testimony about Dillman preparing his own marketing material and Andrade having his lawyers review it, Tr. 1862:16-21;[8] Carlsen's testimony about Andrade not being a good businessman, Tr. 1278:6-8;[9] Carlsen's testimony about Andrade

---

[5] Additional testimony reinforced that Abramoff called Andrade "an idiot." Tr. 1758:3-4 (Q. "And you often called Marcus an idiot; right?" A. "I don't know how many times I used that word.").

[6] Based on a review of the transcript section cited by Andrade, Def. Mot. at 40 & n.57, it is unclear what specific testimony the defense was seeking to impeach.

[7] See Tr. 1822:4- (Q. "Do you remember telling the FBI … that you were under the impression that more money was spent on AML Bitcoin technology than on marketing?" A. "I don't recall making the statement, but it makes sense in terms of what I was thinking about the project….").

[8] See Tr. 1862:16-21 (Q. "you remember telling this person who was working undercover for the FBI … that Dillman prepared his own marketing material and Marcus made him have AML BitCoin lawyers review them?" A. "I'm not denying it, but I don't recall it.").

[9] See Tr. 1278:6-8 (Q. "you told the FBI last year that Marcus was not a good businessman, didn't you?" A. "I may have.").

34

1  spending $1 million on development, Tr. 1279;[10] and Carlsen's testimony about Richard Naimer going

2  quiet, Tr. 1280:17-23.

3         Finally, the Court correctly excluded extrinsic impeachment evidence raised in Andrade's

4  misconduct motion. Def. Mot., at 40 n.58. The proposed witnesses in Andrade's misconduct motion

5  were collateral to the case; irrelevant to the trial; and presented significant risk of confusing the issues,

6  misleading the jury, causing undue delay, and wasting time.  *See* Dkt. 535 (order denying misconduct

7  motion).

8  **IV.    The Court Did Not Err In Denying Andrade's Continuance and Other Motions**

9         In the fifth part of his motion, Andrade argues that the Court should have granted his request for

10 yet another continuance in a case that began in June 2020. *See* Dkt. 645 at 51–52. Echoing extensively

11 litigated prior motions, Andrade claims that he needed more time to prepare for trial after the

12 government produced to the defense—about 3.5 weeks before the start of trial and more than a month

13 before the start of the defense case—accounting records obtained from Karl Ruzicka, an accountant

14 retained by Andrade for Aten Coin and AML Bitcoin. *See id.*; Dkts. 511 (original defense mot. On Jan.

15 29, 2025), 523 (amended def. mot.), 534 (govt. response), 538 (def. reply), 541 (order denying def.

16 mots.). Put simply, Andrade relitigates Ruzicka.

17        The Court's correctly denied Andrade's motion for another continuance for the reasons stated in

18 its detailed written order. *See* Dkt. 541. Additional authorities and developments at trial only confirmed

19 that a continuance was unwarranted. As to additional authorities, the Supreme Court has stressed that

20 "[t]rial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their

21 problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and

22 this burden counsels against continuances except for *compelling* reasons." *Morris v. Slappy*, 461 U.S. 1,

23 11 (1983) (emphasis added) (affirming denial of a continuance following substitution of counsel six

24 days before trial when original counsel fell ill). And the Crime Victims' Rights Act and Speedy Trial

25 Act further militated against delay. *See* 18 U.S.C. § 3771(a) (victims' rights to "proceedings free from

26 unreasonable delay" and "timely restitution"); *United States v. Hall*, 181 F.3d 1057, 1061–62 (9th Cir.

27

28 _____
   [10] *See* Tr. 1279:1-7 (Q. "you told the FBI … that Mr. Andrade probably spent about a million
   dollars on overall development, correct?" A. "If that's what I said then, that's what I said.").

1   1999) (discussing the "public's strong interest in the timely administration of justice"). Against this

2   weight of authority, Andrade failed to present any compelling reason to delay trial on conduct

3   practically a decade old.

4          Developments at trial then cured any prejudice to Andrade several times over. To start, recall

5   that Andrade claimed that Mr. Ruzicka's accounting documents were necessary for the cross-

6   examination of FBI accountant Theresa Chiu and the proffered testimony of defense accountant Kathy

7   Johnson (who ultimately did not even testify). *See, e.g.*, Dkt. 538 ¶¶ 3, 5. In response, the government

8   *sua sponte* (1) volunteered Ms. Chiu for recall, *see* Feb. 27, 2025 Tr. 2057:01–5; and (2) declined to

9   object to lengthy and improper cross-examination about the scope of Ms. Chiu's expert disclosures and

10  whether she had reviewed Ruzicka's documents, *see id.* at 2057:6–2060:14 (the Court's disapproving of

11  the defense's cross of Ms. Chiu but correctly noting that the government did not object).

12         Then, in the defense case, the defense admitted the testimony of Karl Ruzicka himself. *See* Feb.

13  28, 2025 Tr. 2329:17–2369:10 (Ruzicka testimony). Through Mr. Ruzicka, the defense elicited

14  testimony on accounting records that Ruzicka maintained for Andrade—and the Court permissively

15  admitted several defense exhibits over the government's objections. *See, e.g.*, *id.* at 2346:12–17 (The

16  Court: "Well, there's a danger the jury will be confused because I have been confused. . . . I will admit

17  these documents on the proffer that you have made . . . .").

18         And by the time the defense rested on March 5, 2025, Andrade had received Mr. Ruzicka's

19  documents from the government more than six weeks prior. Yet the defense did not recall FBI

20  accountant Chiu, call defense accountant Johnson, or otherwise argue that Andrade needed more time to

21  present some Ruzicka-related document. In short, the trial itself confirmed that no prejudice resulted

22  from the government's January 2025 production of Ruzicka documents to the defense.

23         In his motion here, Andrade declares that when subpoenaed, Ruzicka ordered him not to tell

24  Andrade that they had seized his physical and electronic files." Diamond Decl. ¶ 7, Dkt 645-2 at 4.

25  Counsel is mistaken. The government did not obtain a non-disclosure order for the subpoena addressed

26  to Mr. Ruzicka, nor serve him with anything purporting to be a non-disclosure order. The government

27  merely provided Mr. Ruzicka with standard cover letters which asked that subpoena recipients not

28  disclose the investigation.

1    Regardless, as explained herein, the timing of the government's Ruzicka production does not

2    warrant the drastic relief Andrade seeks, a new trial or judgment of acquittal.

3    **V.    Conclusion**

4    For the foregoing reasons, the United States respectfully asks the Court to deny defendant's

5    motion for a new trial and for judgment of acquittal in its entirety.

6

7    DATED:  June 11, 2025                                        Respectfully submitted,

8                                                                 CRAIG H. MISSAKIAN
                                                                 United States Attorney
9

10                                                               _____/s/_____
                                                                 CHRISTIAAN HIGHSMITH
11                                                               DAVID J. WARD
                                                                 Assistant United States Attorneys
12
                                                                 MATTHEW CHOU
13                                                               Special Assistant United States Attorney

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

37