MICHAEL J. SHEPARD (SBN 91281)
  mshepard@kslaw.com
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, California 94111
Telephone:    +1 415 318 1221

DAINEC P. STEFAN (Admitted *pro hac vice*)
  dstefan@kslaw.com
1185 Avenue of the Americas, 34th Floor
New York, New York 10036
Telephone:    +1 212 556 2291

CINDY A. DIAMOND (SBN 124995)
  cindy@cadiamond.com
**ATTORNEY AT LAW**
58 West Portal Ave #350
San Francisco, CA 94127
Telephone:    +1 408 981 6307

Attorneys for Defendant
ROWLAND MARCUS ANDRADE

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>        v.<br><br>ROWLAND MARCUS ANDRADE,<br><br>                Defendant. | Case No. 3:20-cr-00249-RS<br><br>**REPLY TO UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR NEW TRIAL AND FOR JUDGMENT OF ACQUITTAL**<br><br>Judge: Hon. Richard Seeborg, Chief Judge<br>Hearing: June 24, 2025 |

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.   MR. ANDRADE IS ENTITLED TO A NEW TRIAL BECAUSE THE
      COURT MADE CRITICAL ERRORS IN INSTRUCTING THE JURY..............1

      A.   The Court's Instructions Allowed the Jury to Convict Mr. Andrade
           of Money Laundering (Count Two) for Conduct Other than that
           Charged by the Grand Jury ........................................................................1

      B.   The Court Did Not Properly Instruct the Jury About Good Faith ..............4

      C.   Mr. Andrade Is Entitled to a New Trial and a Judgment of
           Acquittal Because the Court Refused to Give a Multiple
           Conspiracies Instruction, Despite Evidence that the Lone Charged
           Wire Did Not Further the Scheme ..............................................................6

III.  MR. ANDRADE IS ENTITLED TO A NEW TRIAL UNDER *NAPUE V.
      ILLINOIS* BECAUSE THE GOVERNMENT PRESENTED
      TESTIMONY THAT IT KNEW OR SHOULD HAVE KNOWN WAS
      MISLEADING.........................................................................................................8

IV.   THE COURT'S EVIDENTIARY RULINGS DEPRIVED MR.
      ANDRADE OF A FAIR TRIAL ........................................................................12

      A.   The Court Erroneously Excluded Exculpatory Evidence Based
           Largely on Incorrect Application of Hearsay Rules .................................12

      B.   The Court Admitted, Over Defense Objections, Incompetent
           Evidence Offered by the Government ........................................................19

      C.   The Court Placed Date Restrictions on Evidence in the Defense
           Case After Permitting the Government to Present Evidence
           Regardless of Dates...................................................................................21

      D.   The Court Erroneously Admitted Rule 404(b) Evidence and Other
           Unfairly Prejudicial Evidence...................................................................23

      E.1.  The Court Erred in Limiting Impeachment Allowed by Rule 806 ...........25

      E.2.  The Court Erred in Limiting Impeachment Based on Prior
            Inconsistent Statements Under Rule 613 ..................................................26

V.    THE COURT PREJUDICED MR. ANDRADE AND VIOLATED HIS
      CONSTITUTIONAL RIGHTS BY DENYING HIS MOTION FOR A
      CONTINUANCE, MOTION FOR AN EVIDENTIARY HEARING ON
      THE GOVERNMENT'S OUTRAGEOUS CONDUCT, AND OTHER
      MOTIONS ..........................................................................................................27

CONCLUSION...........................................................................................................30

i

Reply to United States' Opposition to Defendant's                Case Number: 3:20-cr-00249-RS
Motion for New Trial and for Judgment of Acquittal

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Velazquez-Fontanez*,
  6 F.4th 205 (1st Cir. 2021) .................................................................................8

*Carter v. Kentucky*,
  450 U.S. 288 (1981).........................................................................................4

*Dickey v. Davis*,
  69 F.4th 624 (9th Cir. 2023) .............................................................................9

*Echo Acceptance Corp. v. Household Retail Services, Inc.*,
  267 F.3d 1068 (10th Cir. 2001) ..................................................................13, 14

*Hayes v. Brown*,
  399 F.3d 972 (9th Cir. 2005) .............................................................................9

*Joshua David Mellberg LLC v. Will*,
  386 F.Supp.3d 1098 (D. Ariz. 2019) ................................................................20

*Kalasho v. BMW of N. Am., LLC*,
  520 F. Supp. 3d 1288 (S.D. Cal. 2021).............................................................13

*Michaelson v United States*,
  335 U.S. 469 (1948).........................................................................................23

*Notaro v. United States*,
  363 F.2d 169 (9th Cir. 1966) .............................................................................6

*Onset Fin., Inc. v. Future Legends LLC*,
  2024 WL 4953424 (D. Utah Dec. 3, 2024), *appeal dismissed*, No. 24-4120
  (10th Cir. Jan. 16, 2025) .................................................................................20

*Panah v. Chappell*,
  935 F.3d 657 (9th Cir. 2019) .............................................................................8

*United States v. Asher*,
  910 F.3d 854 (6th Cir. 2018) ...........................................................................23

*United States v. Brandon*,
  17 F.3d 409 (1st Cir. 1994)................................................................................8

*United States v. Bullcalf*,
  563 Fed. App'x 535 (9th Cir. 2014) .................................................................26

ii

Reply to United States' Opposition to Defendant's                    Case Number:  3:20-cr-00249-RS
Motion for New Trial and for Judgment of Acquittal

*United States v. Charley,*
   1 F.4th 637 (9th Cir. 2021) ............................................................................23

*United States v. Cruz-Garcia,*
   344 F.3d 951,956 (9th Cir. 2003) ................................................................13

*United States v. DuShane,*
   623 F. App'x 332 (9th Cir. 2015) ..............................................................3, 4

*United States v. Fernandez,*
   839 F.2d 639 (9th Cir. 1988) .......................................................................14

*United States v. Freeman,*
   514 F.2d 1184 (10th Cir. 1975) ...................................................................16

*United States v. Gianandrea,*
   38 F. App'x 434 (9th Cir. 2002) ...........................................................4, 5, 6

*United States v. Hickey,*
   917 F.2d 901 (6th Cir. 1990) .......................................................................19

*United States v. Higa,*
   55 F.3d 448 (9th Cir. 1995) .........................................................................16

*United States v. Hilliard,*
   851 F.3d 768 (7th Cir. 2017) .......................................................................19

*United States v. Holmes,*
   129 F.4th 636 (9th Cir. 2025) ........................................................................8

*United States v. Johnson,*
   459 F.3d 990 (9th Cir. 2006) .........................................................................7

*United States v Lacerda,*
   958 F.3d 196 (3d Cir. 2020)........................................................................21

*United States v. Laykin,*
   886 F.2d 1534 (9th Cir. 1989) .......................................................................4

*United States v. Martin,*
   228 F.3d 1 (1st Cir. 2000)............................................................................11

*United States v. Mc Bride,*
   862 F.2d 1316 (8th Cir. 1988) .......................................................................2

*United States v. Ortega,*
   203 F.3d 675 (9th Cir. 2000) .......................................................................14

*United States v. Sayakhom*,
    186 F.3d 928 (9th Cir.), *as amended*, 197 F.3d 959 (Dec. 1, 1999) .........................................14

*United States v. Seijo*,
    514 F.2d 1357 (2d Cir. 1975) ...................................................................................................11

*United States v. Vizcarra-Martinez*,
    66 F.3d 1006 (9th Cir. 1995), *as amended on denial of reh'g* (Sept. 21, 1995) ....................23

*United States v. Wallace*,
    848 F.2d 1464 (9th Cir. 1988) ..................................................................................................27

*United States v. Warren*,
    984 F.2d 325 (9th Cir. 1993) ......................................................................................................1

*United States v. Weaver*,
    860 F.3d 90 (2d Cir. 2017) ........................................................................................................15

*United States v. Whittemore*,
    776 F.3d 1074 (9th Cir. 2015) ..................................................................................................19

*United States v. Williams*,
    668 F.2d 1064 (9th Cir.) ...........................................................................................................26

*Walter v. Transidyne General. Corp.*,
    697 F. 2d 130 (6th Cir. 1983) ...................................................................................................18

**Other Authorities**

2A Federal Practice and Procedure § 485 (4th ed.) ...........................................................................2

Fed. R. Evid. 16 .............................................................................................................................27

Fed. R. Evid. 33 ..........................................................................................................................2, 9

Fed. R. Evid. 102 ...........................................................................................................................24

Fed. R. Evid. 403 ...............................................................................................................13, 23, 25

Fed. R. Evid. 404(b) .......................................................................................................................23

Fed. R. Evid. 608 ...........................................................................................................................24

Fed. R. Evid. 613 .....................................................................................................................16, 26

Fed. R. Evid. 801(c) .......................................................................................................................16

Fed. R. Evid. 806 ...........................................................................................................................24

Reply to United States' Opposition to Defendant's          Case Number:  3:20-cr-00249-RS
Motion for New Trial and for Judgment of Acquittal

27 Wright & Miller, Federal Practice & Procedure § 6026 (2d ed.) ...........................................19

Reply to United States' Opposition to Defendant's                    Case Number:  3:20-cr-00249-RS
Motion for New Trial and for Judgment of Acquittal

Defendant Rowland Marcus Andrade files this Reply to the United States' Opposition to Defendant's Motion for New Trial and for Judgment of Acquittal.

## I.    INTRODUCTION

Faced with the challenge of defending the dozens of prejudicial errors it generated, the government's opposition repeatedly swings and misses.  It does not dare to acknowledge, let alone explain away, that the Count Two instruction it insisted the Court give "destroy[ed] the defendant's substantial right to be tried only on charges presented in an indictment."  It dances far around the proof that, at a minimum, it should have known that its Exhibit 805 (and its argument about it) was misleading, and it offers no declaration that it did not know it was misleading the jury, let alone that it should not have so known.  In attempting to defend the errors for which it was responsible, it has no choice but to take positions that conflict with what it previously argued.  It attempts to dismiss dozens of errors as harmless, without recognizing their significance or bothering to confront the cumulative impact caused by the one-way flood of errors.  For these and other reasons, a fresh look at the trial demonstrates that the interests of justice require a new one.

## II.    MR. ANDRADE IS ENTITLED TO A NEW TRIAL BECAUSE THE COURT MADE CRITICAL ERRORS IN INSTRUCTING THE JURY

### A.  The Court's Instructions Allowed the Jury to Convict Mr. Andrade of Money Laundering (Count Two) for Conduct Other than that Charged by the Grand Jury

The Opposition devotes over 500 words to addressing the jury instruction on Count Two but never mentions the Fifth Amendment requirement that Mr. Andrade can be convicted only on the charge approved by the grand jury, or that the failure to ensure that this Fifth Amendment requirement is met typically requires reversal.  *See* Government's Opposition (Dkt. 682); Opening Brief (Dkt. 656) 3:12-5:1. Instead, it repeatedly seeks refuge in the fact that the instruction tracked the Ninth Circuit model, Dkt. 682, 2:9-10; 3:2-5; 3:7-8, without ever pausing to acknowledge that both the Model Instructions themselves and the Ninth Circuit's decisions flatly reject the notion that tracking the model means the instruction is proper.  *See United States*

1   *v. Warren*, 984 F.2d 325, 327 n.3 (9th Cir. 1993) (reversing conviction, explaining that "[u]se of

2   a model jury instruction does not preclude a finding of error"); 9th Cir. Manual Model Criminal

3   Jury Instructions, *Introduction* (2025) ("As the title states, these instructions are only models. . . .

4   [T]hey have been neither adopted nor approved by the Ninth Circuit. . . . They also must be

5   carefully reviewed, with additional legal research and analysis performed when needed, before

6   being used in any specific case, and they should be tailored or modified when appropriate."). As

7   Wright & Miller explain, "[t]hough these pattern instructions can be extremely helpful to a judge

8   in preparing his charge, they are, as those who have prepared the patterns would be the first to

9   insist, no substitute for careful thinking and preparation of the charge by the judge himself."  2A

10  Federal Practice and Procedure § 485 (4th ed.) (footnote omitted).

11      Also wrong is the government's claim that this Court can grant a new trial only in

12  "exceptional" cases. Dkt. 682, 2:2-5.  While that standard may sometimes be offered, in light of

13  the discretion on new trial motions granted to the district court, for what is required for *the Court

14  of Appeals to reverse* the denial of a new trial motion, it is not the standard the district court

15  applies in deciding the motion in the first instance.  Rule 33 directs this Court to grant a new trial

16  "in the interests of justice," and that standard "requires the district court to balance the alleged

17  errors against the record as a whole and evaluate the fairness of the trial."  *United States v. Mc

18  Bride*, 862 F.2d 1316, 1319 (8th Cir. 1988) (quotation marks omitted) (affirming grant of new

19  trial).  Even that standard is too high a bar for instructions that leave doubt as to the

20  circumstances under which the crime can be found to have been committed, which is per se

21  reversible error.  *See* Opening Brief at 4:5-5:1.

22      No better are the few remaining claims in the opposition.  It correctly notes that Mr.

23  Andrade initially raised two issues with the instruction,[1] and devotes many words to the first of

24  _____

25  [1] Mr. Andrade's Opening Brief set forth how he preserved this issue during the trial, and not just
    in this motion as note 2 of the Opposition inscrutably suggests.  Even worse for the government,

26  having been presented again with this issue when the defense sought to fix this error before the
    instructions were given, having refused to discuss it with the defense, and instead having

27

28

those issues (and to the existence of adverse law on that first issue, as Mr. Andrade

acknowledged), without noting that Mr. Andrade's new trial motion briefs the second issue only.

As for that issue, the most the government can say is that "the only money laundering evidence

introduced at trial and the sole focus of the government's jury addresses on the money

laundering charge . . . was the very transaction Andrade insists should have been expressly

detailed in the jury instruction," Dkt. 682, 3:11-13, and cites *United States v. DuShane*, 623 F.

App'x 332, 333 (9th Cir. 2015), to suggest that as a result the omission from the instruction is

immaterial.

This argument is a collection of non-starters.  First, the representation that the only

money laundering evidence introduced at trial was the transaction charged in the indictment is

false, and embarrassingly so.  Mr. Andrade's Opening Brief referenced at least ten transactions

the government connected to the purchase of the $600,000 cashier's check.  Dkt. 656, 2:9-12;

n.2.  The Opposition makes no effort to address these facts in any way.[2]

Second, even if it were true that the government's argument was limited to the cashier's

check among the many other pieces of evidence presented by the government about the series of

financial transactions and efforts to hide the use of funds to purchase his house — and it

unquestionably was not[3] — the Opening Brief established that as a matter of law, whatever

---

responded that the issue was preserved, the government cannot be heard to argue the contrary.
Dkt. 656, 2:21-3:1; n.3.

[2] There are many more such facts. For example, the government added to the likely confusion
when it focused most of its money laundering expert's testimony on two extraneous uncharged
checks, Tr. 2042:23-20448; 2044:9-25, and then lumped all the cashier's checks together to
discuss their purported significance as evidence of concealment while failing to meaningfully
distinguish the charged check.  Tr. 2045:4-2046:24.

[3] *See, e.g.,* Tr. 215:9-216:6 (government opening explains that the jurors will "hear from a FBI
forensic analyst named Theresa Chiu," who has "analyzed the flow of the investor money," and
will "talk about the money laundering" and  "about how Marcus Andrade used investor money
for himself," mentioning "how he moved it from account to account, from one account to the
other," and "how it ended up, in his personal bank account.," and how he spent a lot of that
money. . . that he bought a $500,000 house for himself and his wife . . . bought another $200,000

happened during the trial is no substitute for a proper jury instruction, *see Carter v. Kentucky*, 450 U.S. 288, 304 (1981); Dkt. 656, 5; n.5, and the government did not respond to that point either. *DuShane* confirms the government's error; in that case, unlike this one, "the *only* evidence introduced at trial" fit with the date that was omitted from the instructions. 623 F. App'x at 333 (emphasis added).[4]

### B. The Court Did Not Properly Instruct the Jury About Good Faith

As in *United States v. Gianandrea*, 38 F. App'x 434, 436 (9th Cir. 2002), this Court's omission of burden of proof from the good faith instruction "likely left confusion in the jury's mind as to where the burden of proof lay with respect to the good faith defense, and how high that burden was," and the omission "may have caused the jury to convict [the defendant] where it might not have done so had it known that the government had to disprove good faith beyond a reasonable doubt." (emphasis omitted). The government's efforts to distinguish *Gianandrea* merely underscore why this Court should have followed it. The government states that

---

property . . . paid $60,000 for a Ford F-250 for himself and another 69,000 for a Cadillac Escalade for his wife"); Tr. 3028:14-3029:2 (government closing, referring to the March 7, $600k check, adds that Mr. Andrade "then took that physical check and, on the same day, went to a different bank with that check and deposited it," adds further that "[i]t went from Fintech to Woodforest," and that "[r]ather than transferring the funds in the normal, traceable, easy way of electronic funds and not having to walk around with a check that's basically $600,000 you could lose, he did it this way because he knew and he wanted — he attempted to hide the AML BitCoin investor proceeds").

[4] Because the instructions failed to specify the one transaction charged in the indictment, it does not matter whether the instructions also failed to specify the date of that transaction. However, the government's argument that the date does not matter is nonsense. If the date did not matter, there would have been no need for an on or about instruction, but without objection from the government, the Court gave an "on or about" instruction addressed to the date in Count Two. Tr. 2960:12-20. The case cited by the government, Dkt. 656, 3:9, says nothing about whether the date in a money laundering charge "is a material element," and the case from which that line is derived, *United States v. Laykin*, 886 F.2d 1534, 1543 (9th Cir. 1989), merely held that March or April was reasonably near May and that proof that a crime occurred reasonably near the date charged in the indictment is sufficient unless time is a material element of the offense or the actual date implicates the statute of limitations or comes after the indictment.

*Gianandrea* was a bankruptcy fraud case, but never offers even a hint of a reason why that flavor of fraud should have different instructions than the wire fraud flavor.  Remarkably, it then insists that in *Gianandrea* the trial court "omitted a crucial statement contained in the model instructions," Dkt. 682, 4:22-23, without mentioning that the statement the *Gianandrea* court criticized the district court for omitting was *even stronger for the defense* than the statement Mr. Andrade requested and this Court omitted: "The omitted portion explained that the government retained the burden of *disproving* the good faith defense raised by the defendant."  38 F. App'x at 436.  Nearly as lame is the government's last supposed distinction: just like in this case, the *Gianandrea* court was critical of the fact that the good faith defense was not presented as an element, but rather was presented separately.[5]  Just as *Gianandrea* recognized, there was no reason whatsoever to create any confusion on this critical issue.

Splitting a sentence in half, the government quotes Mr. Andrade's acknowledgement that some Ninth Circuit cases have found it not to be an abuse of discretion to refuse instructions like the one Mr. Andrade proposed, but the government could not bear to note — and then leaves unaddressed — the rest of Mr. Andrade's sentence, which explained that those cases included other language that went further in the direction that Mr. Andrade requested than this Court's instruction did.  Dkt. 656, 7:11-14 (two cases instructing the jury that "if the evidence leaves you with a reasonable doubt whether the defendant entertained such good faith, you must then find that defendant not guilty").  The result is that this Court's instruction not only disregards *Gianandrea*, but also is an outlier even in the Ninth Circuit in not expressly reducing confusion

---

[5] The government's discussion of *Gianandrea* inserts the word "confusing" before "separate defense," but the *Gianandrea* court never said that the language used to describe good faith was confusing as the government's phrasing suggests; rather it said, as is the case here, that presenting good faith separately, and not as part of the elements,  left the question of burden of proof of good faith confusing. It is unclear whether the *Gianandrea* court told the jury, as this Court did, that if the defendant acted in good faith then he lacked the intent to defraud required to prove the offense of wire fraud, but this Court's instruction still omitted describing which party had the burden to prove "if the defendant acted in good faith," which is what *Gianandrea* found to be so critically confusing as to require reversal.

about the burden of proof relating to good faith, without resort to other instructions.

No case appears to have approved the instruction given by the court, especially in light of the confusion identified by *Gianandrea*.  It is no answer to say, as the government does, that the Court did Mr. Andrade a favor because it did not need to give a good faith instruction at all. Dkt. 682, 4:8-16.  First, as there was ample basis for a good faith defense in the record, this Court was required to give a good faith instruction, based on the cases cited in Mr. Andrade's Opening Brief to which the government did not respond.  *See* Dkt. 656, 5:4-17.  Second, even if the Court was not obligated to give a good faith instruction, once it chose to give one, it needed to unambiguously set forth the governing burden of proof.  *See Gianandrea*, 38 F. App'x at 436; *see generally Notaro v. United States*, 363 F.2d 169, 175 (9th Cir. 1966) (explaining that "[t]he desire of a careful judge to avoid language which to him may seem unnecessarily repetitive should yield to the paramount requirement that the jury in a criminal case be guided by instructions framed in language which is unmistakably clear," and reversing conviction when one paragraph of entrapment instructions stated burden of proof and another did not).

### C.  Mr. Andrade Is Entitled to a New Trial and a Judgment of Acquittal Because the Court Refused to Give a Multiple Conspiracies Instruction, Despite Evidence that the Lone Charged Wire Did Not Further the Scheme

The Opposition dances around Mr. Andrade's argument that the Court erred in not giving a multiple conspiracy instruction.  It repeatedly claims, based on its own evidence, that Mr. Andrade led a conspiracy that included Dillman, *see, e.g.*, Dkt. 682, 6:5-21, but offers only the repetition of a few conclusory words[6] about the all the evidence presented by Mr. Andrade establishing that Dillman and others were actually undermining the central tenets of Mr.

---

[6] *See, e.g.*, Dkt. 682, 9:11 ("not supported by the evidence"); 7:26-27 (same); 8:13-14 (same); 9:21-22.

Andrade's business (including in connection with the wire in Count One),[7] as well as cheating him — all while hiding this activity from him. Dkt. 656, 9:18-11:4. It similarly bypasses the proof that Abramoff was using Mr. Andrade's company for money laundering and, like Dillman, was doing so in ways that undermined Mr. Andrade's business, such as successfully encouraging the AML Bitcoin ICO before it was ready. Dkt. 656, 11:5-21. It ignores the law establishing the low bar of evidence — easily exceeded by Mr. Andrade's unrebutted evidence — that is sufficient to justify a jury instruction proposed by the defense. Dkt. 656, 8:15-9:5; *United States v. Johnson*, 459 F.3d 990, 993 (9th Cir. 2006) ("[T]he defendant is entitled to his proposed instruction even if his evidence is weak, insufficient, inconsistent, or of doubtful credibility. In assessing the evidence, we will leave credibility determinations to the jury.") (quotation marks omitted).

Instead, it asserts that multiple conspiracy instructions can only be used for spillover prejudice in multiple defendant cases. But the instruction is by no means limited to multiple defendant cases, Dkt. 656, 9:1-5, and is in fact what the model instructions recommend "when the indictment charges a single conspiracy but the evidence establishes two or more possible conspiracies." 9th Cir. Manual Model Criminal Jury Instructions 11.3 cmt. (citing *United States v. Perry*, 550 F.2d 524, 533 (9th Cir. 1977)). The instruction would have satisfied the Court's obligation to instruct on a defense theory with some support in the evidence;[8] would have helped the jury determine whether, in light of the evidence that Dillman, Mata and Abramoff were dedicated to their own interests adverse to Mr. Andrade's interests, the government was

---

[7] In fact, as Mr. Andrade's opening brief argued and the government did not dispute, the evidence suggested that Mr. Andrade would not have taken the money from Dillman following Boyer's purchase of tokens through Dillman's investment fund had the existence of the fund and its policies not been hidden from him. *See* Dkt. 656, 10:13-15.

[8] The Opposition suggests in a footnote that the Court should consider the need for the instruction in light of the instructions as a whole, but identifies no other instruction that the Court gave that helped the jury address what to do "when an indictment charges a single conspiracy but the evidence establishes two or more conspiracies." 9th Cir. Manual Model Criminal Jury Instructions 11.3 cmt.

correct that they were "acting in furtherance of *one* overarching plan;" Dkt. 682, 8:23 (emphasis added); and, perhaps most importantly, would have helped the jury determine whether the wire in Count One was in furtherance of a *separate scheme* that Dillman ran for his own benefit and Marcus's detriment.  *See also United States v. Brandon*, 17 F.3d 409, 449 (1st Cir. 1994) (trial court should grant a defendant's request for a multiple conspiracy instruction if, "on the evidence adduced at trial, a reasonable jury could find more than one such illicit agreement, or could find an agreement different from the one charged." (quotation marks omitted), *abrogation on other grounds recognized by United States v. Velazquez-Fontanez*, 6 F.4th 205 (1st Cir. 2021)).

### III.    MR. ANDRADE IS ENTITLED TO A NEW TRIAL UNDER *NAPUE V. ILLINOIS* BECAUSE THE GOVERNMENT PRESENTED TESTIMONY THAT IT KNEW OR SHOULD HAVE KNOWN WAS MISLEADING

Unable to bring itself to acknowledge that, as Mr. Andrade's Opening Brief contended, *see* Dkt. 656, 13:15-16; 15:9; 17 n.22, a *Napue* violation can be based on what the government should have known, *see Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019); *United States v. Holmes*, 129 F.4th 636, 662-63 (9th Cir. 2025) ("[t]o establish a *Napue* violation, a defendant must show . . . that the government knew or should have known [the testimony] was false . . ." (quoting *United States v. Renzi*, 759 F.3d 731, 751 (9th Cir. 2014)), the government makes no effort to deny that it should have known that Special Agent Quinn's testimony and its presentation of Exhibit 805 was, at a minimum, misleading, and makes no effort to respond (under oath or not) to the facts collected in Mr. Andrade's brief demonstrating that it must have known. Dkt. 656, 15:11-17:6.[9]  With brief exceptions, it also ignores the settled law that *Napue* violations include misleading testimony as well as false testimony. *Compare e.g.*, Dkt. 682,

---

[9] Instead, the government merely asserts — falsely — that "Andrade presents no evidence that the government did know it was false," *e.g.*, Dkt. 682, 13:19-20 — a non-sequitur given that Mr. Andrade's contention was that the testimony (and argument) was misleading, not false, and inaccurate for the reasons in the opening brief cited above.  The government not having denied that it knew the testimony was misleading, the Court should conclude that it knew.  If not, the Court at a minimum should hold a hearing.

1   10:18; 12:26-27; 14:23, *with* Dkt. 656, 10:22-24.

2       Barely pausing to address its misleading uses of the evidence identified in Mr. Andrade's

3   Opening Brief, *e.g.*, Dkt. 656, 13:17-14:5, 14:13-15, 18 n.23, the government makes a half-

4   hearted misfire at declaring the testimony not to be misleading: it merely asserts that there was

5   "nothing improper in asking the jury to draw that conclusion [that because Mr. Andrade

6   controlled the social media accounts in 2020, he also did so in 2017 and 2018] from

7   Exhibit 805." Dkt. 682, 13:11-12. This justification based on an inference is wrong twice. It is

8   wrong because the government never asked the jury to infer that because Mr. Andrade controlled

9   the social media accounts in 2020, he must have done so in earlier years; rather, its presentation

10  suggested that Exhibit 805 itself proved that he controlled the social media accounts when it

11  mattered. It is even more wrong because the inference proffered in the Opposition is false, and

12  the government knew it, for the reasons presented in Mr. Andrade's Opening Brief: the evidence

13  was not just that the passwords were on the phone in 2020 (which might allow an inference

14  about earlier years), it was that the passwords had *just been added to the phone in 2020* and that

15  *the accounts had previously been controlled by others. See* Dkt. 656, 15:11-17:1.

16       Leaving this false excuse behind, the Opposition devotes the bulk of its argument to a

17  claim that the misleading testimony was not material. Materiality is easily met, *see Hayes v.*

18  *Brown,* 399 F.3d 972, 978 (9th Cir. 2005) (en banc) (materiality standard met even though falsity

19  went only to credibility of witness who already had been subject to extensive impeachment, and

20  noting impact of needed correction), and is considerably less demanding than the standard for

21  *Brady* claims, *Dickey v. Davis,* 69 F.4th 624, 637 (9th Cir. 2023) (materiality threshold lower

22  because *Napue* cases involve a corruption of the truth-seeking function of the trial process) – and

23  should be lower still under Rule 33's "interests of justice" standard.

24       Exhibit 805 was material on this or any other standard. Much of the government's

25

26

27

28

favorite evidence was from social media accounts,[10] with the origin of the posts, and who created or posted it, never explained.[11]  The Opposition lists five witnesses it claimed established that Mr. Andrade controlled access to the social media sites, reviewed and approved postings, and was aware of them, during the time period of the charges.  Dkt. 682, 13:24-28.  This list merely underscores the government's need for Exhibit 805.

*Darling.*  While testimony about Darling's article writers does not speak to control over social media posts, the Opposition overstates that evidence.  It asserts that writers "were simply being paid to repeat the lies and misleading statements that *Andrade and* Abramoff were feeding them," Dkt. 682, 11:22-23 (citing Tr. 694-96 (emphasis added)), but those transcript portions do not attribute any of the facts in the articles to Mr. Andrade and instead attribute them to Abramoff.  Tr. 578:12-14; 691:2; 692:5; 692:15; 693:16; 705:25-706:1; 710:19; 711:19-22; 712:22-24; 743:8; 751:11-13; 755:7-10; 755:21-23. No better is the government's reliance on Mr. Andrade saying "post it" about one of the articles Abramoff had arranged: it does not address control over social media accounts, or the treatment of materials not coming through Abramoff, on whom Mr. Andrade relied, and there was no evidence that either Abramoff or Darling controlled social media posts or could do anything to act on what Mr. Andrade said.

*Tran and Cowan.*  The Opposition relies extensively on Tran and Cowan, and dismisses Mr. Andrade's contention that they did not deal with Mr. Andrade directly — and therefore added nothing to what and how posts were made on Twitter — until July 2018 (Tran) or August 2018 (Cowan), Dkt. 656, n.18 — with the observation that the charged scheme did not end until October 2018.  Dkt. 682, 14:4-7.  But regardless of when the charged scheme ended, *every social media post the government introduced pre-dates Tran and Cowan working directly with Marcus,*

---

[10]  The government repeatedly cited social media posts in closing argument and attributed all of them to Mr. Andrade. Tr. 3012:17-24; 2972:23-2973:2; 2982:13-15, 2983:6-9; 3004:8-11; 3008:17-18; 3019:3-6; 3131:17-20; 3137:4-7.

[11]  As the Court is aware, the government offered evidence beyond what was posted on social media, but Mr. Andrade responded with evidence of his good faith as to each of those claims. Dkt. 656, 14:16-15:8; n.19.  The Opposition did not respond.

Reply to United States' Opposition to Defendant's                                    Case Number:  3:20-cr-00249-RS
Motion for New Trial and for Judgment of Acquittal

with the last one dated May 26, 2018.  Ex. 439.  Put differently, far from helping the government, the timing of Tran's and Cowan's knowledge of social media postings is exculpatory, because it shows that when Mr. Andrade was, according to them, in control of social media, no misrepresentations were made.  What the government needed to show was control of social media before Tran and Cowan worked directly for Marcus, which they, by definition, could not establish.

*Foteh.*  The government does not — nor could it — dispute that Foteh was "utterly unreliable," and instead suggests that the Court should ignore her lack of reliability and decide materiality as if one of the looniest witnesses ever to set foot in the courtroom were Pope Leo. Dkt. 682, 14:1-4.  This nonsense is in no way supported by the only case cited, *United States v. Martin*, 228 F.3d 1, 10 (1st Cir. 2000), which deals with challenges to the sufficiency of the evidence, rather than the nuanced materiality standard for *Napue* violations.  *See, e.g., United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir. 1975) (test "'is whether there was a significant chance that this added item, developed by skilled counsel . . . could have induced a reasonable doubt in the minds of enough of the jurors to avoid a conviction." (quotation omitted).

*Abramoff.*  That the government relies on both Foteh and Abramoff speaks volumes about the weakness of its position.  While this brief could be filled with Abramoff's falsities on the stand[12] or his history of fraud and lies, the supposed support he gives to the government about social media posts can be dismissed on other grounds as well.  His email to Foteh attributing to Mr. Andrade the desire to post the letter to the NFL Commissioner on the AML Bitcoin website does not address social media, and the evidence established that he hid information from Mr. Andrade about the Super Bowl, which casts further doubt on the reliability of his statement to Foteh (and the notion that Mr. Andrade was in control).  Tr. 1901:20-1902:18 (Ex. 555, email to Foteh about Letter to NFL).  In light of the weakness of these witnesses, it is no surprise that the

---

[12] *See, e.g.*, Tr. 1861:4-16 (forgetting about the billion-dollar Angola deal); 1832:12-20 (claiming the Super Bowl ad was a rejection campaign from the start, when the documentary evidence and testimony from John Bryan proved otherwise)

Reply to United States' Opposition to Defendant's          Case Number:  3:20-cr-00249-RS
Motion for New Trial and for Judgment of Acquittal

government in closing on social media highlighted Exhibit 805.  Tr. 3012:17-24.

In response to the suggestion in the Opening Brief that the Court should consider the government's other conduct in assessing the *Napue* violation, the opposition makes matters worse by dismissing Quinn's other misleading testimony — that he never saw any source code — with the report that Mr. Andrade had produced only "a small amount" of code. Dkt. 682, 14:27.  The "small amount" was *13,000 pages.*  Tr. 2850:2-3; 2852:22-2853:1.  In addition, the government's failure to correct Boyer's false statement remains unexplained; instead, the government merely says there is no evidence they knew of the falsity, without addressing the obvious question: when Boyer claimed he sent the FBI a screenshot corroborating an important piece of his testimony, didn't they check to see if they had it and could introduce it, either immediately, or later, among the dozens they offered through Quinn?  That inference, along with the unrebutted evidence the government at a minimum should have known that Exhibit 805 was misleading, constitutes stronger evidence than what the government offered in its Opposition; anything more could not be gathered without subpoenas and a hearing.[13]

## IV.    THE COURT'S EVIDENTIARY RULINGS DEPRIVED MR. ANDRADE OF A FAIR TRIAL

### A.  The Court Erroneously Excluded Exculpatory Evidence Based Largely on Incorrect Application of Hearsay Rules

*Terms & Conditions*. In its closing argument, the government insisted that Mr. Andrade hid his market making.  Tr. 3009:22-3010:11.  This was false: Mr. Andrade disclosed what John Bryan — the witness responsible for any activity — testified he was doing. *See* Tr. 1578:2-5;

---

[13]  The government erroneously suggests that Mr. Andrade reargued a discovery issue relating to the device from which Exhibit 805 was obtained, but the issue impacted Mr. Andrade's ability to fully understand the misleading nature of the government's use of the exhibit.  Dkt. 656, 18:10-12; 18:20-19:2.  The government writes as if this issue was decided against Mr. Andrade, but in fact Judge Beeler ordered the government to produce the requested materials over its objection. *Id.* at 15, n.19, and the government was never able to give a coherent explanation of why it was unable to do so. *Id.*

Terms & Conditions, Exs. 2473 and 2474). That Mr. Andrade made that disclosure was a fact that was neither hearsay nor cumulative, and, especially given the false accusation repeated in the government's closing, was critical to his defense. It was therefore error for the Court to have excluded, based on the government's objection, Exhibits 2472, 2473, and 2474, three versions of the Terms & Conditions provided to purchasers on the AML Bitcoin website, in which that disclosure was made.[14]

The lengths to which the government has to go to defend its deception of the jury about market making is underscored by its claim that the excluded exhibits were "a danger," cumulative and properly excluded under its newly expansive interpretation of Rule 403 — an interpretation that was 180 degrees different from the interpretation of that same rule that it successfully urged on the Court when the government was presenting far more prejudicial evidence in its own case.[15] It contends that Exhibits 2472, 2473, and 2474 "posed a danger of at least undue delay, wasting time, and cumulative evidence," Dkt. 682, 26:14-19, even though admitting them would have consumed no more time than objecting to them, and they were far from a waste of time because they, unlike the version in Exhibit 2471 that was from an earlier time period, contained the disclosure that refuted the government's accusation.

As the Court recognized in admitting Exhibit 3150, contracts are not hearsay to begin with, *see, e.g., Kalasho v. BMW of N. Am., LLC*, 520 F. Supp. 3d 1288, 1293-94 (S.D. Cal. 2021)

---

[14] The Court admitted into evidence one set of Terms & Conditions during the testimony of Port Commissioner Leslie Katz, Ex. 3150, overruling a hearsay objection from the government. Tr. 931:11-25.

[15] When arguing for the inclusion of evidence like AtenCoin that it wanted the Court to admit, – the government wrote: "It is well-established that Rule 403 "excludes only evidence where the prejudice is 'unfair' - that is, based on something other than its persuasive weight." *United States v. Cruz-Garcia*, 344 F.3d 951,956 (9th Cir. 2003) (emphasis in original). Despite the lack of proof of much of what the government promised about AtenCoin, and a mass of unduly prejudicial testimony about purchasers losing money, the government insisted that the risk of even that much prejudice could not be remedied "through the wholesale exclusion of highly relevant evidence." USA's Opposition to Andrade's Motion to Exclude Evidence of Uncharged Bad Acts, Dkt. 441 at 16:26-17:5 (emphasis added).

(overruling plaintiff's hearsay objection because a lease agreement is "a legally operative document that defines the rights and liabilities of the parties in this case" (quoting *Stuart v. UNUM Life Ins. Co.*, 217 F.3d 1145, 1154 (9th Cir. 2000)). The government offers *Echo Acceptance Corp. v. Household Retail Services, Inc.*, 267 F.3d 1068, 1087 (10th Cir. 2001) to suggest the contrary, but that case merely held that the district court did not abuse its discretion in excluding a contract offer that the court found did not "affect[] the legal right[] of the parties" or supply the context or completeness that was the basis for the offer of the evidence. *Id.* at 1087-88 (quotation marks omitted). *Echo* is a far cry from this case, in which the contract proves a fact — that Mr. Andrade made a disclosure — that refutes what the government told the jury, when it accused Mr. Andrade of hiding what he in fact disclosed.

Even worse is the government's claim that the Terms & Conditions can be excluded as "self-serving" hearsay because they were "drafted personally by the defendant." Dkt. 682, 26:4-14. This fails both as a matter of law and as a matter of fact. The only law the government cites is not cases addressing contract language that has independent significance, but rather is cases excluding statements made by defendants to law enforcement officers after their arrest, and the like.[16] The government cites nothing to support its factual assertion that the Terms & Conditions were drafted personally by Mr. Andrade, and the record suggests the contrary. Tr. 2377-78 (lawyer John Fahy describes his role in drafting the T&Cs). Instead, the government's argument rests on a supposed admission that it invents out of wholecloth — that "Andrade concedes he

---

[16] *See United States v. Ortega*, 203 F.3d 675, 681-82 (9th Cir. 2000) (district court did not abuse its discretion when it limited defendant in drug trafficking case from eliciting testimony on cross-examination of a law enforcement officer regarding defendant's self-serving statements to him that the firearms found in the residence belonged to his cousin, that the methamphetamine was given to him by his cousin, and that he had no knowledge of the methamphetamine found in the garage); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988) (per curiam) (affirming district court decision that bank robbery defendant was not permitted to elicit a post-arrest statement defendant had made to the FBI Agent in which defendant denied committing the robbery); *United States v. Sayakhom*, 186 F.3d 928, 937 (9th Cir.), *as amended*, 197 F.3d 959 (Dec. 1, 1999) (holding inadmissible an audio recording of defendant speaking, which she had offered to show her good faith state of mind).

---

made [the Terms & Conditions] and caused [them] to be posted on his AML Bitcoin website—to show his purported good faith." Dkt. 682, 18:14-15. No citation is offered for this supposed concession, and there is none. To be sure, Mr. Andrade offered the Terms & Conditions *at trial* to show his good faith (among other things), but he never conceded (or suggested in any way) that his purpose at the time was to show his good faith, or that he had any purpose other than accepting what lawyers drafted to record the terms on which he was offering his cryptocurrency.[17]

*Good Faith*. Unable to rebut Mr. Andrade's argument that as evidence of his good faith he should have been able to elicit statements he made to an undercover agent that showed that Mr. Andrade was telling potential purchasers the truth about the state of his technology, Dkt. 656, 23:10-11 n.33, the government avoids that issue entirely in favor of arguing that these statements were not eligible for admission under the rule of completeness—an argument nowhere made in Mr. Andrade's post-trial motion. *See* Dkt. 682, 19:20-20:17. To make matters worse, it dismisses the importance of the excluded evidence with a false claim: that "the government also stressed that Andrade often said that the technology was not complete—but would be done soon." Dkt. 682, 20:25-26. The Opposition offers no citation for this claim, and in fact the government repeatedly told the jury the contrary.[18] The government successfully kept

---

[17] Equally unpersuasive is the government's citation to *United States v. Weaver*, 860 F.3d 90 (2d Cir. 2017) (per curiam), to accompany its otherwise unsupported assertion that the language in the T&C was an "unconscionable disclaimer" in "fine print." Dkt. 682, 18-19. Even if that mattered, *Weaver* says nothing about the market making language in the T&C constituting an unconscionable disclaimer. At best for the government, *Weaver* says only that disclaimers *of reliance* are not themselves a defense to fraud, but Mr. Andrade has never so claimed; rather, he offered a contract, prepared with eminent counsel, as evidence that supported his good faith and that rebutted a false claim by the government.

[18] Tr. 3000:10-13 (government closing that "why did people put millions of dollars into AML BitCoin? Because they thought because Marcus Andrade lied and represented that they had a completed product"); Tr. 3004:12-13 (government closing that " Marcus Andrade wanted people to understand, that the technology was complete, it was ready to go"); Tr. 3019:3-5 (government closing that "[r]emember, that content, the social media posts you saw, those were written in the past and present tense about a half-baked product that supposedly complete . . ."); Tr. 2975:24-

1    out of evidence another important piece of exculpatory evidence, and took advantage of this

2    erroneous exclusion by using it as a license to make false statements in closing argument.

3        *Abramoff's Separate and Destructive Schemes*. The Opposition offers two responses to

4    the limitations placed on proof of Abramoff's separate and destructive schemes.  First, it

5    suggests that the documents identified in Mr. Andrade's Opening Brief are "inadmissible

6    hearsay, which Andrade completely fails to address."  Dkt. 682, 21:27-28.  This is flat wrong.

7    Mr. Andrade's Opening Brief explained that the documents were not mere impeachment, but

8    rather were substantive evidence that Abramoff was engaged in a separate scheme, Dkt. 656,

9    25:6-13, and the opposition did not respond.  Take Exhibit 3262, for example.  Dkt. 656, 24 n.35.

10   It describes a plan, and its evidentiary value is in the existence of the plan (here that Abramoff

11   was planning to use AML Bitcoin to launder money); a description of a plan does not contain

12   factual statements offered for their truth.  *See generally* Fed. R. Evid. 801(c) advisory committee

13   note ("If the significance of an offered statement lies solely in the fact that it was made, no issue

14   is raised as to the truth of anything asserted, and the statement is not hearsay").[19]  In any event,

15   even if a document were only impeaching, that does not make it inadmissible, *see United States*

16   *v. Higa*, 55 F.3d 448, 452 (9th Cir. 1995) ("Rule 613(b) contains no bar, beyond foundation

17   _____

18   2976:4 (government closing that "You heard from Evan Carlsen, who said that in late 2018,
     more than a year after the initial coin offering, more than a year after Marcus Andrade repeatedly

19   lied that he had a completed product and millions of dollars in business deals, Evan Carlsen was
     building out this technology from scratch"); Tr. 2977:16-20 (government closing that "he found

20   that there was no evidence anywhere of a complete anti-money laundering compliant
     cryptocurrency with biometric identification built into the blockchain, what Marcus Andrade had

21   sold and lied about time and again in '14, '15, '16, '17, and '18").

22   [19]Or, if wrongly deemed hearsay, it would still be admissible as evidence of Abramoff's state of
     mind.  *See United States v. Freeman*, 514 F.2d 1184, 1190 (10th Cir. 1975).  And take the

23   government's example of Exhibit 3261 (Abramoff receiving a report that Ukrainian billionaire
     friend needed help with money), Dkt. 682, 21:27-28, which was admissible regardless of its truth

24   because Abramoff's receipt of that report was used to show why he pushed Mr. Andrade to
     initiate the ICO for AML Bitcoin before it was ready.  *See* Tr. 1843 (showing that soon after the

25   communication in Exhibit 3261, Abramoff reconnected with Mr. Andrade, and reported that he
     was approached by one of his friends in the New York finance world who is very bullish on this

26   and wanted Abramoff to get involved, but Abramoff claimed he should do it only with Mr.

27   Andrade).

28

requirements, to extrinsic evidence of prior inconsistent statements"), especially when the issue is not collateral, like Exhibit 3262.[20]

Next, the Opposition suggests that the Court did not issue a blanket ruling prohibiting the use of such documents; it does so by selecting one of the Court's many directions to defense counsel not to offer documents, and attempting to pass it off as a proper exclusion of hearsay. Dkt. 682, 21:6-16. This is wrong twice. First, the document at issue, Exhibit 3307, like all the others, was not hearsay: it was Abramoff setting forth the then-current plan of having Naimer call Mr. Andrade, close the deal to get funding from Lapin, and then proceed with the Super Bowl advertisement and not a rejection campaign – important substantive evidence (as well as impeachment) that Abramoff was planning to run the Super Bowl advertisement.

In addition, the Opposition is wrong in denying that the Court on that occasion did not unequivocally declare that counsel could not offer a document on cross examination if the witness admitted to its contents (that the Court also erroneously considered the document to be hearsay does not undermine that declaration), and more importantly, the Opposition ignores that the Court made this same declaration repeatedly, and also repeatedly directed counsel that documents were inadmissible, leaving counsel the choice of defying the Court or not moving beyond the identification of the documents.[21]

---

[20] Ex. 3262 demonstrated Abramoff's plan to exploit Mr. Andrade's technology and company for his own devious ends and therefore was far from collateral. *Higa*, 55 F.3d at 452 ("The general test of whether evidence is collateral is: Could the fact, as to which error is predicated, have been shown in evidence for any purpose independently of the contradiction?") (quotation marks omitted).

[21] *See, e.g.,* Tr. 1824:24 -1825:5 ("you've established the relevant fact you wanted to establish. You don't need these reports in evidence. So, sustained."); 1826:23-1827:2 ("You've established the fact that he's on the — that he too was receiving these reports. . . . I don't think these documents come in. So I'll sustain the objection."); 1836:3-1836:25 ("Yeah. Again, you're using this document, Mr. Shepard, to impeach the witness. He has now acknowledged what you asked. Why do you need the document?); 1836:7-1837:1) (after counsel responds that "the document is an event, . . . [that reflects] Mr. Abramoff's effort to raise money," the Court answers "And he just admitted that he did. So why do you need the document . . . . *I don't know why we keep going over this.*"*)* (emphasis added)); Tr. 1837:2-5); ("*Move to the next issue. You*

---

1    The opposition is also wrong in claiming that defense counsel "never sought to

2  introduce" the Butina documents.  Dkt. 682. 29:5-9.  When defense counsel sought to introduce

3  the documents by asking Special Agent Quinn about the AML Bitcoin marketing materials he

4  seized from Butina's apartment, the Court cut off the questioning to ask "Where are you going

5  with this?  Where is this going?"  Tr. 2283:11-2284:22.  And when defense counsel explained

6  that "on this occasion, Agent Quinn and the FBI seized documents related directly to AML

7  BitCoin from Maria Butina's apartment," the Court abruptly ended the line of questioning,

8  stating, "This is not an area — you know this is not an area to go into.  Next question."

9  Tr. 2283:22-2284:8.  Contrary to the Opposition's claim that counsel never sought to introduce

10  these documents, counsel sought to introduce them, and the Court excluded them before defense

11  counsel could even make the offer.[22]

12    Also wrong is the Opposition's claim that "[r]egardless, the handwritten notes were

13  irrelevant and inadmissible hearsay."  Dkt. 682, 22:9.  The Butina documents are not statements

14  of fact, but they shed light on a whole separate scheme in which Abramoff was involved, using

15  AML Bitcoin to cover his tracks.[23]  The exclusion of the documents was therefore erroneous and

16  _____

17  *don't admit the document.*  So, sustained.  Next." (emphasis added)); Tr. 1838:2-25 ("So you
don't need a document for this purpose.  You've asked him a question.  He answered the

18  question.  *So then why are you introducing a document* which, frankly, the offer is it's just going
to say the same — there's no basis for the document to come into evidence.") (emphasis added));

19  1838:14 ("that's your problem.  You are not — *there is no basis for these documents* which are
otherwise hearsay.  You don't have a basis for them.  *Listen, that's my ruling.  Let's move on.*

20  (emphasis added)).

21  [22] Even if the Court had not expressly excluded them, the issue would have been preserved.

22  Where a formal offer of proof is not made, but the substance of the excluded evidence is
apparent from the context within which the questions were asked, lack of a formal offer of proof

23  does not bar consideration on appeal.  *See Walter v. Transidyne General. Corp.*, 697 F. 2d 130,
134 (6th Cir. 1983) (record showed the parties and trial judge knew what testimony counsel was

24  about to elicit, so that the court was aware of, and the transcript disclosed, the general nature of
the excluded evidence).

25  [23] In an April 7, 2023 Order, Judge Beeler described the Butina documents, noting among other

26  things that "[t]hey show a discussion between Mr. Abramoff and (presumably) Mr. Erickson about
their strategy and Mr. Andrade's business." . . .  [and] discuss promoting the deregulation of

27

28

prejudicial.

As described in Mr. Andrade's Opening Brief, the result of the government's egging the Court on to erroneous hearsay rulings, and the Court's repeated admonitions to counsel, was a one-sided admission of documents that produced an uneven mass of evidence, which benefitted the government in closing, as the jurors confirmed after trial.  Opening Brief at 21:9-13.

## B.  The Court Admitted, Over Defense Objections, Incompetent Evidence Offered by the Government

The government was allowed to admit important testimony that lacked foundation.  In response, the government presents part of the applicable standard — nowhere does it acknowledge that witnesses are not "permitted to speculate," 27 Wright & Miller, Federal Practice & Procedure § 6026 (2d ed.) — and cites three cases that primarily address what witnesses were thinking themselves or events they saw.[24]

None of these cases are remotely similar to Abramoff testifying about whether NAC — about which the government made a point of eliciting on multiple occasions that it shared its

---

cryptocurrency (the opposite of Mr. Andrade's business plan to comply with money-laundering and know-your-customer regulations by using biometric technologies to confirm the identity of persons transacting AML Bitcoin). . ."  Discovery Order, Dkt. 165, 6-7 (Apr. 7, 2023).

[24] *United States v. Hickey*, 917 F.2d 901, 904-05 (6th Cir. 1990), Dkt. 682, 25:1-4, dealt with the challenged testimony of a drug addict, about whom the court determined that "a reasonable or rational juror could believe that [he] and the other prosecution witnesses perceived the course of events to which they testified."  *United States v. Whittemore*, 776 F.3d 1074, 1082-83 (9th Cir. 2015), Dkt. 682, 25:9-11, addressed questions about what the witness would have done herself in a hypothetical scenario, questions to which the door had been opened by the defense on cross examination.  And in *United States v. Hilliard,* 851 F.3d 768, 780 (7th Cir. 2017), Dkt. 682, 25:5-8, after defense counsel asked a law enforcement officer broadly about his observations, including "any facts, any evidence" of uncharged drug dealing on his client's part, in follow-up defense counsel asked if the officer had seen the defendant "drive anywhere else to make a delivery of heroin" to other customers, to which the officer responded: "I believe we followed him on occasion where we did meet him and we believed he was doing a transaction but we weren't able to identify anybody involved." 851 F.3d at 778 (quotation marks omitted).

financial information with no one[25] — had sufficient funds to pay for a Super Bowl advertisement, and about what market making activities Bryan engaged in.  Unlike what an officer personally observed in *Hilliard*, or what a witness herself would have done in *Whittemore*, or what a drug addict saw in *Hickey*, neither of the topics at issue in this motion are subject to casual observation or are based on the witness's own mindset, and necessarily require some additional basis for believing that the witnesses had sufficient personal knowledge to opine on something outside their own ability to observe.

That Abramoff may have actively participated in and influenced aspects of the NAC Foundation does not determine his ability to speak to company finances. *See Joshua David Mellberg LLC v. Will*, 386 F.Supp.3d 1098, 1104 (D. Ariz. 2019) (Company's part-time CFO was not permitted to testify about company finances as a lay witness due to lack of personal knowledge); *Onset Fin., Inc. v. Future Legends LLC*, 2024 WL 4953424, at *5-6 (D. Utah Dec. 3, 2024) (CFO permitted to testify about company financial records so long as he reviewed them and they were admissible), *appeal dismissed*, No. 24-4120 (10th Cir. Jan. 16, 2025).

The closest the opposition comes to offering a basis for Abramoff's speculation about finances (despite apparently not seeing any records, and being, according to his testimony, merely a consultant to the company)[26] is a reference to a What'sApp message in which Abramoff had earlier speculated about the company's financial position.  Dkt. 682, 26:3-4; Ex. 926.  That he had previously speculated provides no grounds to believe he had a sufficient basis to do so as required by the Rules of Evidence, especially when his prior speculation was, on its face, rhetorical, and was directed to a much broader issue — whether the ICO would generate

---

[25] *See* Tr. 314:3-21, 314:23-315:2, 321:3-10, 321:23-322:5; 988:7-10; 1007:9-18.

[26] Tr. 1891:18-1892:18 (Following leading questions from prosecutor, Abramoff described himself as "the employee or the consultant," for Mr. Andrade); Tr. 2980:9-12 (referring to Abramoff as a lobbyist Mr. Andrade hired).

1  enough funds for the "project" as a whole, Ex. 926, which according to Abramoff would require

2  much more money than a Super Bowl advertisement.[27]

3      Worse still is Abramoff's speculation about Bryan's market making activity.  Here the

4  Opposition merely notes that Abramoff knew Bryan well and was communicating with him,

5  Dkt. 682, 26:7-10, which at best suggests that if Abramoff had any knowledge, it would be based

6  on inadmissible hearsay.

7      Mr. Andrade's challenge to the testimony of Ben Boyer is even more fundamental.  The

8  question by whom he was "told multiple times that the ICO had sold out, and that all 76 million

9  tokens had been sold," Tr. 567:13-20, is critical to assessing whether Mr. Andrade was

10 responsible for such statements, and to providing the defense with the ability to test whether

11 Boyer was correct.  This testing was important, because Boyer's claim to have seen one such

12 statement on a Telegram channel proved to be false, given that he claimed to have taken a

13 screenshot of it, and to have given that screenshot to the FBI, Tr. 611:7-19, but the FBI never

14 produced it or presented it to the jury.  When Mr. Andrade objected for lack of foundation, the

15 Court should have required the witness to say who told him.[28]  It was error not to have done so.

16

17 **C.  The Court Placed Date Restrictions on Evidence in the Defense Case After
       Permitting the Government to Present Evidence Regardless of Dates**

18     The government repeatedly introduced evidence that Mr. Andrade never completed his

19 technology and thereby opened the door to proof that this was false.  It never even tries to

20

21 [27] The other bases for this speculation offered in the opposition are illusory.  That Abramoff may

22 have been privy to information about who was aware of his media strategy, or that he had
   experience in media relations, or that he was working on preparing the Super Bowl

23 advertisement, Dkt. 682, 25:27-26:3), says nothing about his level of knowledge of what was in
   the company's allegedly secretive bank accounts or financial records, and whether there was

24 enough to pay for the advertisement.

25 [28] The same reasoning applies to the Jodoin testimony challenged at Dkt. 656 31:10-11.  The
   notion that a case agent can testify about anything he learned in his investigation, Dkt. 682, 27:5-

26 7, defies the rules of evidence and constitutional rights of confrontation, and *United States v
   Lacerda*, 958 F.3d 196, 211 (3d Cir. 2020), did not rewrite those rules or the constitution,

27 especially since in that case no objection to the testimony had been made.

28

respond, to this contention, and the defense's proof that the government's evidence was false

should have been admitted on this basis alone.  The opposition instead attempts to justify its

objection to this proof by saying that the defense evidence should not be admissible to prove

good faith because it relates to a time period after the indictment., but the government whiffs on

this issue too.  As Mr. Andrade explained and the government never refutes, "acts both prior and

subsequent to the indictment period may be probative of the defendant's state of mind."  Dkt.

656, 32:19-21.

　　　　All the government can do is engage in an exercise of ignoring wide swaths of evidence

in order to state that prior to the fall of 2018, Mr. Andrade had "barely started" work on the

AML Bitcoin technology.  Dkt. 682, 27:27-28:1.  Even if such a fact could somehow close the

door the government opened and preclude Mr. Andrade from rebutting what the government

repeatedly presented, the government's assertion is false.  That Evan Carlsen did not find the

prior work satisfactory and said he needed to start working on the coin from scratch does not

suggest that the prior work was not performed.  To the contrary, a collection of exhibits and

percipient witnesses demonstrated that Mr. Andrade had been working consistently on the

project for a substantial period of time before the fall of 2018, and had been told that the

biometric identification pieces would soon be completed.  *See, e.g.*, Exs. 3302 (July 2018), 2333

(July 2018), 2334 (Sept. 2018) (updates showed work and expected completion by the London

team); Tr. 1414:17-1415:7 (hired the Newgen team to build the coin prior to the AML Bitcoin

ICO); 1305:12-21 (had another software company in India, Chetu, working on the coin *prior* to

Carlsen's hiring); 1399:6-16, 1414:17-1415:2 (hired software developer Hung Tran to be project

manager for Newgen team in September 2017 when it seemed their work was lackluster, and

then to develop the AML Bitcoin token); 1409:2-23; 1410:11-15 (Tran visited the London team

in the summer of 2018 with the mission of determining whether they were reliable and capable of delivering the CrossVerify product).[29]

In addition to this percipient witness testimony, defense expert Erik Min testified that substantial work had been done on the project in 2017 and 2018.[30]  Even one of the government's experts, Theresa Chiu, conceded that substantial funds were spent on software development in the period ending in October, 2018.[31]  As a result, the government has no excuse for its objections to the presentation of evidence showing that Mr. Andrade continued to work on the project until it was completed in 2020.

### D.  The Court Erroneously Admitted Rule 404(b) Evidence and Other Unfairly Prejudicial Evidence

Steering far away from responding to the showing in Mr. Andrade's Opening Brief that the government did not prove that AtenCoin was a fraud, and that the government did not live up to multiple representations it made to this Court in winning the right to present AtenCoin evidence, the argument in the Opposition instead focuses on the claim that AtenCoin was inextricably intertwined with AML Bitcoin.  Even if that were enough to provide some

---

[29] The government's notion that Mr. Andrade suddenly started working in the fall of 2018 because that is when the government searched his Las Vegas office was a failure of proof: the evidence was that Mr. Andrade was rarely in Las Vegas, Tr. 2356:2, and was not present at the search, Tr. 2205:1-3l; those who were present were likely told not to mention the search to Mr. Andrade, Tr. 2206:6-13, and Karl Ruzicka understood he was not supposed to tell Mr. Andrade of government inquiries made to him.  Tr. 2358:6-15.  No witness testified that Mr. Andrade was aware of the search.  *See* Tr. 2206:21-24.

[30] Tr. 2519:23-2520:2; 2514:20-2525:7 2528:24-2529:3; Tr. 2518:24-2520:5, Demonstrative Slide 17; Tr. 2520:9-2520:16, Demonstrative Slides 18-19; Tr. 2523:25-2525:23, Demonstrative Slides 23-24.  Mr. Min testified to the appearance of 40,000 time stamps in the code database dated prior to November, 2018.  Tr. 2517:22-2518:2.

[31] Tr. 1983:20-21; 1987:20-1988:4; Ex. 1520-004 (From July 2017 to October 2018, Mr. Andrade spent at least $1.1 million on software development for just the CrossVerify team, another $0.3 million on software, and $1.1 million in employee and contractor wages).

justification for admitting some AtenCoin evidence,[32] that justification is insufficient under both Rules 403 and 404(b) to license the flood of prejudicial victim evidence, including crying, that resulted. *See United States v. Charley*, 1 F.4th 637, 647 (9th Cir. 2021) ("the use of such evidence must be narrowly circumscribed and limited" (quoting *United States v. Bailleaux*, 685 F.2d 1105, 1109 (9th Cir. 1982)); *Michaelson v United States*, 335 U.S. 469, 475-76 (1948) (noting that prior wrongdoing "is said to weigh too much with the jury and to overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge"); *United States v. Asher*, 910 F.3d 854, 863 (6th Cir. 2018) ("When jurors hear that a defendant has on earlier occasions committed essentially the same crime as that for which he is on trial, the information unquestionably has a powerful and prejudicial impact" (quoting *United States v. Jenkins*, 593 F.3d 480, 486 (6th Cir. 2010)); Dkt. 532, 40:17-43:3.

This flood of prejudicial evidence was especially unfair given the unrebutted weakness of the proof that AtenCoin was a fraud in the first place. The only fact for which the government offered considerable evidence regarding AtenCoin was that some purchasers lost money and that they were very upset about it, and the government offered far more victim evidence about AtenCoin than it did about AML Bitcoin. Many of the facts the government promised to prove about AtenCoin — such as that Mr. Andrade filed frivolous litigation against the Jodoins, and that Mr. Andrade used the "same boiler-room type salespeople" — were shown to be false. Nonetheless, after consuming days of testimony about the AtenCoin non-fraud, the government turns around and seeks to justify the exclusion of the prejudice-free but exculpatory Terms & Conditions — which would have taken a few seconds to admit — on the grounds of undue delay. Dkt. 682, 19:18-19.

---

[32] It does not, because the government's version of AML Bitcoin could easily have been told without it, and by no means would have been incoherent or incomprehensible without it. *See United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012-13 (9th Cir. 1995), *as amended on denial of reh'g* (Sept. 21, 1995). It also does not because AtenCoin and AML Bitcoin were not a single *transaction,* as is required. *Id.* at 1012.

Even apart from all the other evidentiary errors identified by Mr. Andrade in his Opening Brief, this flood of undue but needless and unjustified prejudice meaningfully altered the trial. And yet the government did not stop there, adding, for example, the claim — based on no adequate foundation — that Mr. Andrade stiffed then-Lieutenant Governor Newsom. No effort is made in the Opposition to justify this baseless and unfairly prejudicial testimony, and there is no such justification. *See also* Dkt. 656, 34:5-9 (discussing impact on Carlos De La Guardia).

### E.1. The Court Erred in Limiting Impeachment Allowed by Rule 806

The opposition adds nothing to the government's prior arguments about the intersection between Rules 608 and 806, leaving little to add here about that issue other than to note that the opposition ignores the impact of Rule 102, that its argument renders Rule 806 a nullity where the only reasonable means of "inquiring into" specific instances of conduct for an absent declarant is through extrinsic evidence, and that it offers no answer to the additional arguments in the Dkt. 656 for why the Second Circuit's decision in *Friedman* is the right approach.

Denying Mr. Andrade the opportunity to impeach Dillman was devastating to his defense, and the opposition underscores that point rather than rebuts it. According to the Opposition, the record is clear that Mr. Andrade controlled AML Bitcoin and hired Dillman, that he gave Dillman information that Dillman used to sell AML Bitcoin to Boyer (triggering the wire in Count One) and that Boyer bought the tokens in reliance. Dkt. 682, 32:15-20. In other words, the opposition claims to have offered evidence suggesting that Dillman was acting in a way that furthered the conspiracy charged by the government. But that report completely bypasses the evidence that Dillman was cheating Mr. Andrade, and that Dillman was undermining a central tenet of Mr. Andrade's business by using AML Bitcoin to sell investments in Dillman's business, BlockBits Capital, (so Dillman could make billions), while hiding that fact from Mr. Andrade because he knew Mr. Andrade would not stand for it .[33] *See* Dkt. 656,

---

[33] Abramoff testified that Mr. Andrade was angry at Dillman for sending out materials without prior approval. Tr. 1882:17-19.

9:18-11:4. This is why the jury needed information to consider whether Dillman was the kind of person who would lie to his friends and business partners — a question important to a consideration of whether Dillman was part of the same conspiracy as Mr. Andrade — rather than just treating Dillman as a co-conspirator for whose conduct and statements Mr. Andrade was liable by operation of law.

Returning to its born-again-at-the-start-of-the-defense-case interpretation of Rule 403, the government claims that impeaching Dillman would be "irrelevant and had the potential to confuse the issues, cause undue delay[,] and waste time." Dkt. 682, 32:26-27. But it offers no reason to suggest that impeachment of Dillman would have done any of those things. For example, that the Autotrader developed by BlockBits Capital was a separate endeavor does not matter because impeachment is allowed for other acts, and BlockBits Capital's Autotrader conduct would not have been contested by the government, which indicted Dillman for fraud related to the Autotrader. That impeachment would have shown him cheating his investment partners, just as Christine Lee would have shown him cheating a close friend—far from a tangent in considering whether he was cheating Mr. Andrade and conspiring against him (or at least was not conspiring with him).

### E.2. The Court Erred in Limiting Impeachment Based on Prior Inconsistent Statements Under Rule 613

The opposition's proffered justifications of the limitations on Mr. Andrade's efforts to impeach witnesses under Rule 613 are long on generalities, short on specific justifications, and devoid of any reference to contrary Ninth Circuit law. For example, it claims that various equivocal statements by Abramoff about whether he made prior statements are not inconsistent and therefore not proposer for extrinsic evidence, *e.g.*, Dkt. 682, 34:11-12, without once mentioning the contrary decision in *United States v. Bullcalf*, 563 Fed. App'x 535 (9th Cir. 2014); *see also* Dkt. 656, 39:7-18.

1     Exacerbating its avoidance, the opposition declares, without citation or explanation, that

2  "the court correctly excluded collateral extrinsic evidence to impeach Abramoff's testimony

3  about hearing that AtenCoin had been valued as high as $80." Dkt. 682, 34:14-16 & n.55. This

4  is nonsense. There is nothing collateral about this statement. Although not described in the

5  opposition, Abramoff's trial testimony — in contrast to his prior statement that was the subject

6  of impeachment — attributed this false $80 statement *to Mr. Andrade*. As a result, this

7  testimony was a serious accusation of a fraud against the defendant. It was therefore critically

8  important to allow impeachment to show the falsity of the accusation, and the fact that the false

9  testimony was uttered by an alleged co-schemer made the impeachment even more justified. *See*

10  *United States v. Williams*, 668 F.2d 1064, 1070 (9th Cir.), *as corrected* (Feb. 8, 1982).

11     As it does with all the other errors it encouraged, the government attempts to pass this

12  error off as harmless. But the fact that there were so many of these errors that this brief cannot

13  emphasize the significance of each of them should not diminish their individual import or numb

14  the court to them, Many of these errors went to critical elements of the defense or major

15  challenges to the credibility of government witnesses, and the opposition never grapples with the

16  case law emphasizing the serious risks of cumulative error, of which this case is a poster child.

17  *See United States v. Wallace*, 848 F.2d 1464, 1475 (9th Cir. 1988) (though errors looked at

18  separately may not rise to the level of reversible error, their cumulative effect may nevertheless

19  be so prejudicial that reversal is warranted.).

20

21  **V.    THE COURT PREJUDICED MR. ANDRADE AND VIOLATED HIS
        CONSTITUTIONAL RIGHTS BY DENYING HIS MOTION FOR A**
22      **CONTINUANCE, MOTION FOR AN EVIDENTIARY HEARING ON THE
        GOVERNMENT'S OUTRAGEOUS CONDUCT, AND OTHER MOTIONS**
23

24     The errors created by the government by failing to deliver core Rule 16 discovery and

25  Brady material to the defense for nearly five years after its seizure were not cured at trial, as

26  asserted in the government's Opposition. Neither the government's offer of witness Chiu for

27

28

recall nor their claimed restraint in objecting to trial testimony,[34] nor Ruzicka's testimony itself, Dkt. 682, 36:7-12, could alleviate the harm that flowed to the defense from not having Mr. Andrade's business's accounting records (and other records to which they would have led) at the outset.

The government's Opposition did not address the fundamental flaws that flowed from its late-discovery, most notably, that the defense was unable to pursue additional discovery that would have enabled the defense to use Ruzicka's data productively.  Ruzicka's work relied in part on data provided to him by the bookkeeping firm Office Squad. *See* Tr. 2331:18-22.  Office Squad's data was not provided to defense counsel.  Office Squad data's relationship to Ruzicka's accounting files was not discovered until the in limine motions were underway. Defense forensic accountants could not access all of Ruzicka's backup material, even if they had time to do so, which they did not.  *See* Diamond Declaration, Dkt. 656-2, 5-6 ¶¶ 10-12.  Disclosure of the Ruzicka material came too late to have time to seek discovery of the Office Squad data that was likely also seized in the February 2020 search of the Las Vegas office, and which was similarly not disclosed to the defense after indictment in June 2020.  Diamond Declaration, Dkt. 656-2 at 6 ¶ 12.

In addition, the government's opposition is written as though defense counsel had nothing else to do pretrial (or during trial) and could have devoted all of their time to the Ruzicka materials they received a few weeks before trial. In addition to grappling with more than 5 TB of data, speaking with witnesses, and preparing motions in limine, defense counsel was reviewing the more than 1500 exhibits the government included on its exhibit list, only 130 of which they

---

[34]  Both offers are illusory as they relate to the issues in this motion. Contrary to its characterization in the Opposition, the offer relating to Chiu was triggered by the belated production of her support schedules, not by anything relating to Ruzicka.  Tr. 2056:24-2057-4. And there was nothing wrong with the defense's question to Chiu, to confirm that she had not reviewed the Ruzicka materials, which produced the surprising answer that she *had* reviewed the Ruzicka material, to which she added that she had not used them in her analysis.  Tr. 1992:22-23. Contrary to the Opposition, this question to Chiu was not discussed, let alone disapproved of, Tr. 2057:6-2060:14.

offered at trial.  During trial, there was even less time to think about reviewing the government's belated data dump of accounting records because, in addition to preparing witnesses and getting ready for trial each day, other government misconduct resulted in multiple goose chases, such as locating the evidence that Mr. Andrade had produced source code Agent Quinn denied ever seeing, determining whether Boyer provided a screen shot to the FBI as he testified, and beginning to look into the fast one described above that the government pulled with Exhibit 805.

Instead of defending its failure to disclose in a timely manner the defense accounting records about subject matter covered in its case-in-chief, the government's Opposition blames defense counsel for framing the instructions given to Mr. Andrade's CPA from the Criminal Investigation division of the IRS, Ex. 3338, as an "order" rather than a request.  Dkt. 682, 43:25-28.  But the letter from the IRS advised against disclosure in language suggesting such activity could be viewed as a crime, stating that "disclosure of the subpoena and to any third parties may impede or obstruct the investigation, asking him "not to disclose the existence of the subpoena or the nature of your response to it for the indefinite future."  *See* Ex. 3389; Tr. 2358:2-15.  Ruzicka reasonably believed that he had been instructed by the IRS to keep the fact of the seizure from his client.  *Id*.  Consequently, Mr. Andrade — who had never looked at the raw-data, receipts, communications, spreadsheets, and other accounting records prepared and relied upon by Ruzicka for two of Mr. Andrade's companies — had no idea the nature or amount of his financial data could have been available to his defense counsel because it had been in the possession of  IRS agents since 2020.

The Ruzicka documents were directly relevant to the issues in the case: the *Brady* error is evident.  Ruzicka's failing memory prevented his live testimony from sufficiently curing the original error.  Since not even a short, thirty-day continuance was granted, nor was the government's use of the second-hand financial data it presented curtailed or restricted, the Court's error in denying the in limine motion deprived Mr. Andrade of a fair trial.

## CONCLUSION

For the reasons stated above, Mr. Andrade requests a judgment of acquittal and/or a new trial.

Respectfully submitted,

DATED: June 18, 2025                             KING & SPALDING LLP

By: */s/ Michael J. Shepard*
MICHAEL J. SHEPARDDAINEC P.
STEFAN
CINDY A. DIAMOND

Attorneys for Defendant
ROWLAND MARCUS ANDRADE