CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

CHRISTIAAN HIGHSMITH (CABN 296282)
DAVID WARD (CABN 239504)
Assistant United States Attorneys

MATTHEW CHOU (CABN 325199)
Special Assistant United States Attorney

       450 Golden Gate Avenue, Box 36055
       San Francisco, California 94102-3495
       Telephone: (415) 436-7200
       FAX: (415) 436-7230
       christiaan.highsmith@usdoj.gov
       david.ward@usdoj.gov
       matthew.chou@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. 20-CR-00249 RS |
|      Plaintiff, | ) UNITED STATES' SENTENCING MEMORANDUM |
|   v. | ) Dept.: Courtroom 3 – 17th Floor |
| ROWLAND MARCUS ANDRADE, | ) Date: July 29, 2025 |
|      Defendant. | ) Time: 9:30 a.m. |

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................................. 1

II.   RELEVANT OFFENSE CONDUCT ................................................................. 2

    A.    Andrade's Scheme, as Proven at Trial, Started with AtenCoin ............... 3

    B.    Andrade's AtenCoin Scheme Morphed Into AML Bitcoin ...................... 4

    C.    Andrade's Misleading Press Strategy Amplified the AML Bitcoin Scheme.................... 5

    D.    Andrade Approved the Misleading Super Bowl Rejection Campaign................. 9

    E.    Andrade Misled Investors About When AML Bitcoin Tokens Will be Listed on an Exchange and Then Funds Market Manipulation.................... 9

    F.    Andrade Pocketed $2.1 Million in Investor Funds ................................. 10

    G.    Andrade Tried to Cover Up His Criminal Conduct ............................... 10

III.  GUIDELINES CALCULATION ...................................................................... 12

    A.    Andrade's Loss Exceeded $9,500,000 .................................................. 12

    B.    Andrade's Offense Involved Far More Than 10 Victims ...................... 16

    C.    The "Outside the United States" or "Sophisticated Means" Enhancement Applies.................... 16

    D.    Andrade Was Convicted of Money Laundering Under 18 U.S.C. § 1956.................... 17

    E.    Andrade Was a Leader and Organizer of the Offense............................ 17

    F.    The Enhancement for Obstruction of Justice Is Warranted .................. 17

IV.   SENTENCING RECOMMENDATION ........................................................... 18

    A.    The Nature and Circumstances of Andrade's Offense........................... 18

    B.    Andrade's History and Characteristics.................................................. 20

    C.    The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense.................... 21

    D.    The Need to Afford Adequate Deterrence .............................................. 22

    E.    The Need to Protect the Public From Future Crimes By Andrade ......... 23

    F.    The Need to Avoid Unwarranted Sentencing Disparities ..................... 23

V.    RESTITUTION .................................................................................................. 25

VI.   ANDRADE SHOULD FORFEIT PROCEEDS OF HIS CRIMES ................ 26

VII.  CONCLUSION .................................................................................................. 27

## <u>TABLE OF AUTHORITIES</u>

**<u>Federal Cases</u>**

*United States v. Booth*,
    309 F.3d 566 (9th Cir. 2002) ............................................................................. 11, 14

*United States v. Carty*,
    520 F.3d 984 (9th Cir. 2008) ...................................................................................... 16

*Gall v. United States*,
    552 U.S. 38 (2007) ....................................................................................................... 16

*United States v. George*,
    949 F.3d 1181 (9th Cir. 2020) ................................................................................... 14

*United States v. Goffer*,
    721 F.3d 113 (2nd Cir. 2013) .................................................................................... 20

*United States v. Laurienti*,
    611 F.3d 530 (9th Cir. 2010) ..................................................................................... 12

*United States v. Lawrence*,
    189 F.3d 838 (9th Cir. 1999) ......................................................................... 11, 13, 14

*United States v. Musgrave*,
    761 F.3d 602 (6th Cir. 2014) ..................................................................................... 20

*United States v. Ressam*,
    679 F.3d 1069 (9th Cir. 2012) (en banc) ................................................................. 16

*United States v. Zolp*,
    479 F.3d 715 (9th Cir. 2007) ..................................................................................... 12

**<u>Federal Statutes</u>**

18 U.S.C. § 1028A ............................................................................................................. 22

18 U.S.C. § 1956, § 2S1.1 ........................................................................................... 10, 15

18 U.S.C. § 3553 ..................................................................................................... 16, 17, 21

18 U.S.C. § 3663A ............................................................................................................ 23

18 U.S.C. § 3664 ......................................................................................................... 23, 24

**<u>Sentencing Guidelines</u>**

U.S.S.G. § 1B1.3 ..................................................................................................... 11, 13, 14

U.S.S.G. § 2B1.1 ..................................................................................... 10, 11, 12, 14, 15

U.S.S.G. § 2S1.1 ......................................................................................................... 15, 22

U.S.S.G. § 3B1.1 ........................................................................................................... 10, 15

U.S.S.G. § 3C1.1 ........................................................................................................... 10, 16

## I.    INTRODUCTION

Marcus Andrade was convicted at trial of orchestrating a multi-million-dollar cryptocurrency fraud scheme and laundering the proceeds to spend for his personal benefit. Through lies, deceit, and misrepresentation, he defrauded thousands of investors out of more than $10 million. He laundered the proceeds of his scheme through multiple bank accounts, and he lived off the proceeds, purchasing multiple homes, expensive automobiles, and bank-rolling international travel, all with investors' money. He promoted his AML Bitcoin fraud scheme throughout North and Central America and Europe. He led numerous companies, employees, and advisors. When his scheme began to unravel, he obstructed justice by destroying evidence, suing victims with their own money, and witness tampering. Yet despite a jury verdict on all counts, Andrade refuses to accept responsibility for his criminal conduct.  He continues to blame his co-conspirators, his investor-victims, and law enforcement. Post-conviction, he continues to spread misinformation on the internet and through public press releases, accusing the FBI of misconduct. Finally, he has not been forthright with Court about his financial circumstances, claiming only $75 and $730 in his bank accounts when recent statements show that between December 2024 and May 2025 over $91,000 was deposited into those accounts.

As set forth in more detail below, the United States recommends that the Court sentence Andrade to 210 months in prison, a sentence at the low end of the applicable Guidelines range. The Court should also enter a restitution order of $4,597,205.88 to the victims of Andrade's fraud, a forfeiture money judgment in the amount of $10,474,609, as well as a special assessment of $200.

The United States agrees with Probation that Andrade's Total Offense Level is 37, and his Criminal History Category I, and he thus faces an advisory Guidelines range of 210 to 262 months in prison. However, the United States strongly disagrees with Probation's sentencing recommendation of just 84 months in prison, a downward variance of 126 months (60% below the bottom of the Guidelines range). Such a significant downward variance is not appropriate given Andrade's extensive criminal conduct, his leadership role in the offense, the huge losses and financial hardship he caused, his obstruction of justice, and his failure to accept responsibility for his crimes.

## II.    RELEVANT OFFENSE CONDUCT

Through lies, deceit, and misrepresentations, Andrade sold investors on what he proclaimed to be a groundbreaking new digital currency, AML Bitcoin. According to Andrade's fraudulent sales pitch, AML Bitcoin was anti-money laundering (AML) and know-your-customer (KYC) compliant, had biometric identification built into its blockchain, and he and his company had signed or were about to sign significant business deals with government and private sector entities throughout North America, Panama, and Europe. In truth, Andrade never had a working AML Bitcoin cryptocurrency with digital identity verification built into its blockchain. AML Bitcoin's purported AML/KYC compliance was a sham. And AML Bitcoin had no business deals with government and private sector entities. Yet Andrade spent years peddling these falsehoods, amplifying his lies and misrepresentations about AML Bitcoin through a highly sophisticated and deeply deceitful press and social media campaign.

And Andrade's fraudulent conduct started well before AML Bitcoin. Time and again, he posed as a sophisticated executive to sell purportedly mature technologies that, in truth, never existed. In 2009 and 2010, he concocted the "Biogreen" scheme. *See* U.S. Opp'n to Def. 404(b) Mot., Dkt. 441 at 10–11. He falsely claimed that he had developed a patented technology to extract a rare chemical from algae, that this this product was in high demand by drug stores and food companies. *See id.* As with AtenCoin and AML Bitcoin, Andrade lulled investors with promises of a solid product and refunds if profits failed to materialize. There was no Biogreen and investors lost their money.

By 2014, Andrade was onto his next scheme—the cryptocurrency fraud the government proved at trial. While the charges relate to AML Bitcoin, as the Court found, this fraud was inextricably intertwined with an earlier iteration, AML Bitcoin's predecessor, AtenCoin. Nearly identical to what he would falsely claim with AML Bitcoin, Andrade pitched investors on AtenCoin, claiming it had specialized security features and was AML and KYC compliant, and would soon be widely adopted (and profitable). But AtenCoin never materialized, and rather than telling AtenCoin investors the truth—that he had not developed functional specialized security features or closed any business deals—Andrade doubled down. He rebranded AtenCoin as AML Bitcoin and continued his fraudulent misrepresentations.  Andrade even hired notorious convicted former lobbyist Jack Abramoff to run a deceitful press campaign to market AML Bitcoin's promise as an investment, amplified that press

1  campaign on the AML Bitcoin website, which Andrade himself controlled, and pushed an Initial Coin

2  Offering ("ICO") to raise millions of dollars, which Andrade used to buy multiple houses and luxury

3  vehicles, and to fund his international travel. In the end, none of the promises materialized, and AML

4  Bitcoin and AtenCoin investors lost over $10 million.

5  **A.  Andrade's Scheme, as Proven at Trial, Started with AtenCoin**

6  Andrade's digital currency scheme started in 2014. That year, he incorporated the National Aten

7  Coin ("NAC") Foundation LLC. Andrade's NAC Foundation (which was not a true foundation, but

8  rather a for-profit company) controlled his digital currency projects, which started with Aten Black Gold

9  Coin and morphed into AtenCoin and then AML Bitcoin. From the beginning, Andrade used a boiler

10 room playbook and con man tactics to solicit investors. For example, one investor-victim recalled that

11 Andrade offered AtenCoin as "a one-time opportunity[,] and I had to act right then." Victim Impact

12 Statement Questionnaire Responses (Exhibit 1, filed under seal), *Victim Impact Statement of R.B.*

13 Andrade's deception and defrauding of two investor victims, Brandi J. and Corey J. illustrate his

14 scheme[1]. Andrade cold-called Corey J. and pitched him and his wife Brandi J. to purchase AtenCoin. Tr.

15 255. They initially invested $150,000 in AtenCoin and increased their investment, eventually putting

16 over $400,000 into AtenCoin and the Foundation. They lost their entire investment.

17 Andrade frequently emphasized the success of Bitcoin and played on his investors' emotions

18 about having missed out on Bitcoin's initial success. One investor reported that he was thinking about

19 buying Bitcoin, but Andrade convinced him to buy Aten "Black Gold" Coin instead. *See Victim Impact*

20 *Statement of S.W.D.* Initially, Andrade claimed that his digital currency would be tied to the profits of oil

21 derricks or oil reserves. Tr. 258; Ex. 349.

22 Andrade also emphasized to investors that AtenCoin would be AML and KYC compliant and a

23 more mature version of Bitcoin. Tr. 256. Andrade furthered the scheme by hiring "phone pros"—

24 salesmen who cold-called potential investors and earned a 30% commission on sales. The salesmen

25 knew nothing about digital currency or its underlying technology; they simply sold investors on

26 AtenCoin using talking points Andrade provided. Tr. 449. Andrade increased the sales commission

27

28
_____
[1] Brandi J. testified at trial.

1   when he was pressed for money. Tr. 441, 447, 460. According to Brian Darrow, a convicted felon and

2   one of Andrade's "phone pros," after they hooked an investor, Darrow would continue calling and

3   slowly bleed the investor over time.

4       Andrade personally worked with Darrow to extract funds from investors. In 2015, after

5   repeatedly investing in AtenCoin through Darrow, victim-investor Dr. Rene A. finally said no to

6   Darrow[2]. Almost immediately, Andrade called Dr. A. and tried to induce him to invest even more

7   money by inviting Rene A. to attend the AtenCoin conference in Poland and tell the attendees that he

8   had bankrolled the entire conference. Tr. 632. In their calls with investors, Darrow and Andrade claimed

9   that AtenCoin had specialized security features. Tr. 389. These claims about specialized security

10  features were amplified on AtenCoin's website. Tr. 626. But investors never saw those security features

11  in action. Tr. 389, 625, 627.

12      After the Texas Railroad Commission demanded that Aten Black Gold Coin stopped claiming

13  that it was linked to oil, Andrade pivoted. He dropped the "Black Gold" name from the coin and falsely

14  claimed that AtenCoin had specialized security features that made it anti-money laundering and know-

15  your-customer compliant. Tr. 456. That was false. Tr. 1264. But Andrade continued to bleed his

16  investors. For example, Andrade locked in investors Brandi and and Corey J. by inviting them to attend

17  an AtenCoin conference in Poland. There, Andrade asked the two to work for his company the NAC

18  Foundation to induce them to invest an additional $275,000. Tr. 281, 283, 284. Andrade then convinced

19  them to hold an AtenCoin sales conference in Edmonton, Canada, at their expense. Tr. 302. Throughout

20  these events, Andrade furthered false claims that AtenCoin had working identify verification and

21  AML/KYC features. Even now, Andrade claims that AtenCoin was a "functional coin." PSR ¶ 9 fn. 5.

22  In truth, AtenCoin never had working identity verification or AML/KYC features, was never adopted by

23  any businesses, and was never profitable. Tr. 295, 309, 625, 1393, 1264. Like AML Bitcoin AtenCoin

24  was a fraud, and investors lost approximately $2.1 million.

25  **B.    Andrade's AtenCoin Scheme Morphed Into AML Bitcoin**

26      When AtenCoin failed, Andrade doubled down on his lies to investors. Rather than telling them

27

28
_____
[2] Victim Rene A. testified at trial.

the truth—that AtenCoin had no meaningful AML/KYC compliance features and no working identity verification—Andrade simply rebranded AtenCoin as something new, AML Bitcoin. He emailed investors and informed them that AtenCoin "was morphing into something called AML Bitcoin." Tr. 389. As with Aten Coin, Andrade promoted AML Bitcoin as a revolutionary cryptocurrency that would include a mechanism to verify the identity of the participants in each transfer, using biometrics and other means to identify and track the participants.

In truth, however, Andrade never had a complete cryptocurrency that used biometric means to identify and track AML Bitcoin holders. Instead, Andrade hired one developer, Hung Tran, to build an AML Bitcoin "token" with no specialized security features and a "wallet" for holding tokens. Tr. 1400. Tran completed the token in approximately October or November 2017. Andrade sold the token to investors and promised that investors could trade the token for completed AML Bitcoin, which would have biometric identification and other security features built into its blockchain. Andrade's messaging to the public was purposefully misleading. AML Bitcoin made clear to some investors that AML Bitcoin only selling tokens, but the website and press materials indicated to the public that the fully functional AML Bitcoin was either complete or substantially complete. In fact, there was no AML Bitcoin cryptocurrency with AML/KYC features and biometric identification built into its blockchain. Tr. 1401.

### C.    Andrade's Misleading Press Strategy Amplified the AML Bitcoin Scheme

In mid-2017, Andrade hired co-schemer Jack Abramoff to drive a false and misleading press strategy designed to deceptively promote AML Bitcoin in advance of its October 2017 ICO. Andrade approved the overall press strategy, including individual press pieces and all the misstatements contained in them. PSR ¶ 15. Broadly, the press strategy propagated two fundamental misstatements: (1) that AML Bitcoin was a functional AML/KYC compliant cryptocurrency with biometric identification built into its blockchain, and (2) that AML Bitcoin had signed or was about to sign business deals with government and private sector entities around the world. In support of this strategy, Andrade traveled to, among other places, Panama, San Francisco, the United Kingdom, and Estonia. And he sought photo ops with prominent politicians to contrive an image of success for himself and AML Bitcoin.

To maximize the promotion of the misstatements, with Andrade's approval, Abramoff paid his contacts to write articles that appeared to be legitimate news stories but were in truth simply paid pieces

touting and amplifying the false and misleading claims that Andrade and Abramoff were making in order to sell AML Bitcoin. At trial, victims testified that the misstatements placed by Abramoff and Andrade in prominent media, for example, *U.S. News & World Report*, *The Washington Times*, *Forbes*, Observer.com, and *Investor's Business Daily* influenced their decision to invest in AML Bitcoin.

Andrade amplified the misleading press through AML Bitcoin's social media accounts and its website. His employees testified that Andrade had to approve all press releases posted on the AML Bitcoin website and that Andrade had to approve all online content. Andrade manipulated popular support for AML Bitcoin by buying good will. He influenced online chat groups by giving extra tokens to participants who publicly supported AML Bitcoin. *See Victim Impact Statement of C.J.* Likewise, a Telegram group provided updates, acting "like customer support, promising everything will be fine." *Victim Impact Statement of A.D.* But when a participant warned that AML Bitcoin was likely a scam, "they banned me from the group." *Id.*

The press and social media campaign misleadingly exaggerated potential deals for AML Bitcoin that, like many of the most beguiling frauds, contained a sliver of truth. Andrade hired advisors in different geographical areas and then traveled to them in an attempt to meet with representatives of various entities. During his visits, Andrade would meet with an official—often a short or informal meeting—but then approve misleading press coverage implying that the meeting had been successful and an entity in the country was on the verge of partnering with AML Bitcoin. Tr. 1162. As co-schemer Jack Abramoff put it: "The key is PR and photo ops for stories." Tr. 1167. Andrade's misleading statements about purported deals with the Port of San Francisco and the Panama Canal played a prominent role in the misleading press strategy.

### 1.    Port of San Francisco

In September 2017, Andrade and AML Bitcoin's Chief Strategy Officer, Japheth Dillman, met with a lawyer who served as a Port of San Francisco Commissioner. They had a preliminary discussion about whether it would be possible for the Port to utilize AML-compliant cryptocurrencies in their operations. PSR ¶ 22. Andrade and others then met with Port officials, but the Port never followed up on this discussion and never considered utilizing AML Bitcoin, which did not exist as a functioning cryptocurrency at that time. Nonetheless, Andrade approved a spate of misleading articles—placed and

paid for with AML Bitcoin funds—proclaiming that AML Bitcoin was in negotiations with the Port of San Francisco about adopting a functioning AML Bitcoin.

On September 12, 2017, *U.S. News & World Report* published an article falsely claiming that the Port of San Francisco was considering adopting AML Bitcoin in its payment structures. PSR ¶ 22. AML Bitcoin's website and social media accounts propagated this message. On September 27, 2017, *Forbes* published "Building a Better Bitcoin." The article misleadingly proclaimed, "ports in the United States and Latin America, as well as banks and governments throughout the world, are in advanced discussions with NAC Foundation, the creator of AML Bitcoin, to deploy AML Bitcoin in their payment systems." On October 3, 2017, the *Washington Times* published an article implying that AML Bitcoin was a complete product with security features in place and was engaged in negotiations with the Port of San Francisco, who was considering adopting AML Bitcoin in its payment structures. PSR ¶ 23. The articles were all designed to drive interest in AML Bitcoin's October 2017 ICO.

### 2.    Panama Canal

Andrade hired Carlos De La Guardia, a friend of Abramoff's, to serve as AML Bitcoin's advisor in Panama. De La Guardia's job was to get meetings for AML Bitcoin with his contacts in Panama so that AML Bitcoin could generate promotional press releases to generate publicity necessary to garner investment. Per De La Guardia: "Marcus wants/needs enough material to send out press releases to the media and create/increase expectations." Tr. 1170. De La Guardia set up two meetings for Andrade in September 2017 in Panama, one at a law firm and one with the Panama Maritime Authority (PMA). The law firm expressed interest in a follow-up meeting to discuss AML Bitcoin further. Tr. 1174. The PMA representatives were not interested in AML Bitcoin. Tr. 1176. Andrade understood that the PMA meeting had gone badly. Tr. 1178. Andrade never with representatives from the Panama Canal, and he complained about it to De La Guardia. Tr. 1178.

Nevertheless, Andrade approved—and amplified via social media—several articles that misled the public with claims that AML Bitcoin was engaged in promising business negotiations with government entities in Panama. On the heels of his trip to Panama, *Investor's Business Daily* published "A New Digital Currency, AML Bitcoin, Makes Landfall in Panama." Placed and sourced by Abramoff, the article misleadingly implied that AML Bitcoin was a mature product and that AML Bitcoin

executives were in active discussions with the government of Panama, whose representatives were

considering adopting AML Bitcoin. The article stated: "We expected to raise interest, but never

expected the unbounded enthusiasm we encountered. Our discussions with leading banks will lead to

tremendous opportunities for our digital currency, both in Panama and throughout the world." This was

profoundly misleading. Tr. 1186-87. The article also proclaimed that AML Bitcoin representatives had

"commenced groundbreaking discussions with the [PMA]," another misleading statement because the

PMA had no interest in AML Bitcoin.

On October 5, 2017, the *Observer.com* published another article placed and sourced by

Abramoff, "Soccer Mom-Friendly AML Bitcoin Will Make Digital Currencies Mainstream." The article

implied that AML Bitcoin was a functioning product with specialized AML and KYC security features.

PSR ¶ 24. And it proclaimed that Andrade "has been furiously traveling the world for the past few

weeks, trying to keep up with governments' requests to meet him and explore his new AML Bitcoin as a

solution to the difficulties confronting cryptocurrency." *Id.* This was not true. The false article also

claimed that Andrade had been in Tallinn, Estonia; Paris; and Brussels meeting with government

officials interested in exploring AML Bitcoin, all of which was untrue. PSR ¶¶ 24, 25. The article

misleadingly asserted: "In Panama, Andrade met with regulatory and financial authorities in urgent and

very productive conclaves… Since Andrade's visit, they have been scurrying to find a way to integrate

the AML Bitcoin in payment structure for everything from banks to the Panama Canal…" PSR ¶ 24.

Andrade and De La Guardia never met with Panama Canal representatives; yet on November 8,

2017, in order to drive interest in the ICO, AML Bitcoin issued a press release claiming that the

company had been in extensive discussions with governmental and private sector authorities in Panama,

including with representatives of the Panama Canal. Ex. 1457; Ex. 518. The same day, AML Bitcoin

tweeted a link to the misleading press release under the headline "Creator of AML Bitcoin on Track to

Partner with Panama Canal." Ex. 518. Both the tweet and the press release were false and misleading.

Tr. 1198. Panama Canal representatives "were furious." Tr. 1198. De La Guardia spoke with Canal

representatives, and he communicated his conversation to Andrade. Tr. 1203. Nonetheless, on

November 10, 2017, AML Bitcoin issued another Tweet: "Creator of AML BitCoin on Track to Partner

with Panama Canal." Ex. 517. Andrade continued releasing more misleading tweets. Even after De La

1    Guardia wrote a memo to Andrade emphasizing that no meetings were scheduled with the Panama

2    Canal Authority or the Bank of Pana, AML Bitcoin issued a tweet proclaiming: "AML Bitcoin

3    Negotiating with Panamanian Government." Tr. 1211-12; Ex. 515.

4        **D.    Andrade Approved the Misleading Super Bowl Rejection Campaign**

5        Andrade also misled the public—and his own employees—by claiming that AML Bitcoin would

6    be running an advertisement in the February 2018 Super Bowl. PSR ¶ 36. In fact, AML Bitcoin could

7    not afford a Super Bowl ad, which would have cost about $10 million. Andrade instead intended to run a

8    Super Bowl rejection campaign falsely proclaiming that the NFL and NBC had rejected their ad because

9    it was too controversial. Tr. 1705-06. Even the rejection campaign was misleading: neither the NFL nor

10   NBC ever rejected AML Bitcoin's ad. Tr. 1712. Nonetheless, Andrade directed Abramoff that "no one

11   should know [about the rejection campaign] other than you and me and those around us" because "[i]t

12   could be looked at negatively if people know that we are going that route." *Id.*; Tr. 1710; EX 900.

13   Underscoring that Andrade knew that his lies about a Super Bowl ad were wrong, he tried to hide them

14   even from his Chief Strategy Officer Japheth Dillman.

15       Yet Andrade continues, even now, to deceptively assert that this rejection campaign was initially

16   "hidden from Mr. Andrade based on the correct belief that he would not have approved it." PSR ¶ 36, fn.

17   15. This is simply more deception given the evidence introduced at trial.

18       Andrade's Super Bowl lies led investors to believe that AML Bitcoin was not only well-

19   capitalized, but also about to achieve adoption by some of the millions of people who watch the Super

20   Bowl. Victim Ben B., for example, heard that AML Bitcoin was going to run an ad in the Super Bowl,

21   and that information influenced his decision to invest. PSR ¶ 35.

22       **E.    Andrade Misled Investors About When AML Bitcoin Tokens Will be Listed on an
             Exchange and Then Funds Market Manipulation**

23

24       In the midst of the ICO, Andrade misled the public to believe that they would be able to sell their

25   tokens and earn some return on their investment by having the tokens listed on a cryptocurrency

26   exchange. PSR ¶ 26. Andrade said publicly that the token would be listed as early as December 25,

27   2017, on the HitBTC exchange. *Id.* When he missed that release date, Andrade continued promising that

28   the token would be listed on an exchange imminently. *Id.* But the token was not listed on any exchange

1    until May 9, 2018, and then only on a small Mongolian exchange called IDAX. It was not until several

2    months later that AML Bitcoin tokens were listed on another exchange, HitBTC. *Id.*

3        After the token was listed on an exchange, its price was stagnant and volume so low that there

4    was no real market for it. So Andrade paid a marketing executive, John Bryan, to engage in market

5    manipulation—buying and selling tokens with himself—to increase the volume and price of the token.

6    With Andrade's approval and direction, Bryan sold tokens to himself on the exchange without

7    disclosing to the public that he was simply trading with himself rather than buying from other sellers on

8    the open market. Bryan's trading gave the impression of sales volume and at times increased the price of

9    the token. If investors had known that AML Bitcoin was supporting an individual who was selling to

10   himself to drive up the price and volume of the token, that would have influenced their decision to invest

11   in AML Bitcoin. One investor characterized such trading as "manipulation" and "not exactly

12   trustworthy." PSR ¶ 27. From July 2017 through October 2018, AML Bitcoin investors lost

13   approximately $8,374,609. PSR ¶ 45.

14       **F.    Andrade Pocketed $2.1 Million in Investor Funds**

15       While Andrade spent some investor money to fund AML Bitcoin business expenses, he

16   personally pocketed approximately $2.1 million between July 2017 and October 2018. PSR ¶ 40.

17   Andrade used investor money to buy himself two properties, including his residence and a second

18   property. *Id.* In addition, Andrade bought himself a $80,000 Ford 250 pickup truck and a Cadillac

19   Escalade SUV with investor funds. *Id.* Andrade concealed these transactions by funneling investor funds

20   through numerous accounts, some held in nominee or business names, and by purchasing a cashier's

21   check to conceal the transfer $600,000 in investor money into his personal bank account. PSR ¶ 42.

22       **G.    Andrade Tried to Cover Up His Criminal Conduct**

23       After the FBI's investigation became overt, Andrade began taking steps to cover up his criminal

24   conduct. A month or two after the FBI's September 2018 search of Andrade's Las Vegas offices, he told

25   his employees that AML Bitcoin's previous misleading social media posts—the posts during the ICO

26   period—were not "in compliance," and he instructed his employees to edit the posts so that they were

27   not misleading. PSR ¶ 43. For example, some posts read "AML Bitcoin is the World's First AML/KYC

28   Compliant [Cryptocurrency]." *Id.* But AML Bitcoin did not have a functioning cryptocurrency, so

1  Andrade instructed his employees to change the wording to the future tense to indicate that AML

2  Bitcoin "will be" the world's first AML/KYC compliant cryptocurrency. *Id.*

3      Software developer Evan Carlsen testified that as of May 2018, in terms of an AML Bitcoin

4  cryptocurrency there was "nothing existing." Tr. 1261. Carlsen estimated that building an AML Bitcoin

5  product would require at least six developers working 6-12 months and more than $1 million in funding,

6  meaning that there could be no working product until 2019. Tr. 1261-62. In November 2018, Andrade

7  hired just one person, Carlsen, to start building the AML Bitcoin cryptocurrency that Andrade had been

8  claiming existed in the press and on social media for nearly a year. Tr. 1269. In early 2019, after only

9  three months, Carlsen stopped working for AML Bitcoin because Andrade was not paying him.

10 Tr. 1273. There was no functioning AML Bitcoin cryptocurrency. Tr. 1274.

11     In 2020, well after the FBI's investigation was public, Andrade tried to tamper with potential

12 witnesses. Andrade texted and then called his former Panama advisor, De La Guardia. Andrade asked

13 De La Guardia to reach out to members of the PMA and ask them to confirm the press releases and

14 quotes AML Bitcoin had issued regarding promising business deals with the Panamanian government.

15 Tr. 1217-18. Andrade asked De La Guardia to persuade the PMA members to say (falsely) that the

16 quotes in the press releases were correct. PSR ¶ 44. De La Guardia told Andrade: "that's not true." Tr.

17 1218. The quotes and the press release were not correct—they were misleading. Andrade was asking De

18 La Guardia to get the PMA members to lie and say that in fact the PMA did have an interest in AML

19 Bitcoin. De La Guardia asked Andrade to put his request in writing a text message, but Andrade did not

20 comply. Tr. 1219.

21     Meanwhile, even in 2020, years after Andrade claimed he had created a working AML/KYC

22 compliant cryptocurrency, AML Bitcoin refused to be honest with investors. One investor said that in

23 approximately June 2020, "I was put through some of the most tiring and confusing times of my life

24 trying to communicate with the AML Bitcoin support team." *Victim Impact Statement of W.E.W.*

25 "[T]hey had me email back and forth from Dec 21 2017 to June 28 2020 in order for me to try and

26 receive my tokens. It was a constant rollercoaster of anxiety, excitement, guilt, hope, shame, anger,

27 depression as they continued to give me false hope only to be continually let down but then filled with

28 hope over and over again in order to get my tokens [and] they led me to believe it was my fault that I

1   never got my tokens." *Id.*

2       Nearly 300 victims provided loss amounts or victim impact statements recounting the anger,

3   shame, and disappoint they felt being defrauded, and the financial and personal impact Andrade's

4   scheme had on them and their family.  Victim Impact Statement Questionnaire Responses (Exhibit 1,

5   filed under seal).

## III.   GUIDELINES CALCULATION

7       The government agrees with the Guidelines' calculation set forth by U.S. Probation in the final

8   PSR. PSR ¶¶ 56-64. The calculation for the fraud and money laundering grouping, which determines

9   defendant Andrade's Sentencing Guideline range, is set forth below:

| | |
|---|---|
| Base Offense Level, §§ 2S1.1 & 2B1.1(a)(1): | 7 |
| Loss exceeding $9.5 million, § 2B1.1(b)(1)(K): | +20 |
| 10 or more victims, § 2B1.1(b)(2)(i): | +2 |
| Sophisticated Means, § 2B1.1(b)(10)(B) & (C): | +2 |
| Convicted under 18 U.S.C. § 1956, § 2S1.1(b)(2)(B): | +2 |
| Adjustment for Role in the Offense, § 3B1.1(c): | +2 |
| Obstruction of Justice, § 3C1.1: | +2 |
| Total Offense Level: | 37 |

15       Andrade falls within Criminal History Category I. Thus, for Total Offense Level 37, he faces a

16   Guidelines range of 210-262 months' imprisonment. The government agrees that the PSR accurately

17   calculates the Adjusted Offense Level. Andrade objects to the application of certain Guidelines

18   calculations. The government thus addresses them in turn.

### A.   Andrade's Loss Exceeded $9,500,000

20       At trial, testimony and exhibits established that Andrade was responsible for approximately

21   $10,474,609 in loss. EX 1520; Tr. 1958-59 (adding just under $2.9 million in cryptocurrency

22   investments to $7.6 million invested via bank deposits).

23       Under the Guidelines, loss "is the greater of actual or intended loss." U.S.S.G. § 2B1.1(b) app.

24   note 3(A). "Actual loss" means "the reasonably foreseeable pecuniary harm that resulted from the

25   offense." *Id.* note 3(a)(i). "'[R]easonably foreseeable pecuniary harm' means pecuniary harm [i.e., harm

26   that is monetary or otherwise readily measurable in money] that the defendant knew or, under the

27   circumstances, reasonably should have known, was a potential result of the offense." *Id.* notes 3(A)(iii)

28   & (iv).

The Guidelines direct that the defendant must be held responsible for "all harm that resulted from [his] acts or omissions…." *Id.* § 1B1.3(a)(3). The Guidelines further state: "Relying on the entire range of conduct, regardless of the number of counts that are alleged or on which a conviction is obtained, appears to be the most reasonable approach to writing workable guidelines for [fraud] offenses." *Id.* § *1B1.3 Background*. Therefore, sentencing courts "take into account the entire loss inflicted by the common scheme." *United States v. Booth*, 309 F.3d 566, 575 (9th Cir. 2002) (affirming sentence based on entire loss rather than just loss resulting from counts of conviction); *see also* U.S.S.G. § 1B1.3(a)(2) (directing courts to consider "all acts and omissions ... that were part of the same course of conduct or common scheme or plan as the offense of conviction" when determining the appropriate sentence); *United States v. Lawrence*, 189 F.3d 838, 844 (9th Cir. 1999) (quoting earlier version of § 1B1.3). "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable sentencing range." U.S.S.G. § 1B1.3 Background; *see also Lawrence*, 189 F.3d at 844-45. The acts must merely be "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." *Lawrence*, 189 F.3d at 844; *see also* U.S.S.G. § 1B1.3 Cmt. 5(B)(i). "The cumulative loss produced by a common scheme or course of conduct should be used in determining the offense level, regardless of the number of counts of conviction." *Lawrence*, 189 F.3d at 844 (citing *United States v. Fine*, 975 F.2d 596, 599-600 (9th Cir. 1992) ("[C]onduct which was part of the scheme is counted, even though the defendant was not convicted of crimes based upon the related conduct.")).

"The guidelines do not present a single universal method for loss calculation under § 2B1.1…." *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007). The Court "need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1(b), App. Note 3(C). In estimating loss, the Guidelines direct the Court to consider "the cost to the victim of replacing [the unlawfully taken] property," "[t]he approximate number of victims," and "reduction that resulted from the offense in the value of equity securities or other corporate assets." *Id.* "The court need not make its loss calculation with absolute precision; rather, it need only make a reasonable estimate of the loss based on the available information." *Zolp*, 479 F.3d at 719 (citing U.S.S.G. § 2B1.1(b), App. Note 3(A), 3(B), and 3(C)). Investors' net loss is a reasonable estimate of loss for an investment fraud where the underlying

company is essentially worthless. *See United States v. Laurienti*, 611 F.3d 530, 558 (9th Cir. 2010) ("If the underlying company was worthless or practically worthless, it is reasonable to use the total investment cost as the actual loss.") (discussing *United States v. Zolp*, 479 F.3d 715, 717-19 (9th Cir. 2007)). As the Guidelines and caselaw make clear, a reasonable estimate of loss is all that is required; the Court need not tie a specific misstatement to each investors' investment to calculate the defendant's loss. *Id.* at 557 (rejecting defense argument that of the 100 victims in the case loss could only come from the losses of the 30 victims investigated by the government). Put differently, for a given investor-victim, "it is the net loss … that truly accounts for the actual loss to the victim as a result of the scheme to defraud." *Id.* (citing *United States v. Orton*, 73 F.3d 331, 334 (11th Cir. 1996) ("holding that, in calculating loss from a Ponzi scheme, the district court correctly calculated the net loss to the losing victims").

Here, Andrade was convicted of wire fraud relating to the AML Bitcoin fraud scheme. Victim-investors Ben B., Dr. Michael W., and Scott B. testified at length about the misrepresentations that induced their investments into AML Bitcoin. Victim Ben B. invested more than $1.8 million. *See Victim Impact Statement of Ben B.*; Tr. 558, 573. He lost his entire investment. Tr. 581. Victim Michael W. purchased approximately $50,000 worth of AML Bitcoin tokens and made a $70,000 investment in CrossVerify with Andrade. Tr. 391, 409. He lost his entire investment. Tr. 423. Victim Scott B. invested $100,000. Tr. 655. He lost his entire investment. Tr. 668. This trial testimony established that AML Bitcoin investors lost their entire investment.  FBI Forensic Accountant Theresa Chiu corroborated this investor testimony with her analysis of Andrade's bank records.

Accountant Chiu examined bank records for approximately twenty bank accounts controlled by Andrade or held for his benefit or the benefit of his companies and created a summary chart of those voluminous bank records. Ex. 1517; Ex. 1520; Tr. 1941-44. Using bank records and Andrade's investors lists, Accountant Chiu traced and tallied investor funds deposited into Andrade's and his business's bank accounts. Ex. 1520; Tr. 1944-46. Andrade's bank records established that during the pre-Initial Coin Offering ("ICO") and ICO periods, July 2017 through October 2018, investor-victims invested approximately $5.5 million in AML Bitcoin. Ex. 1520-002. In addition, Accountant Chiu examined two black binders seized from the NAC Foundation containing approximately 200-pages listing the details of

investments in AML Bitcoin purchased via cryptocurrency. Tr. 1956. Using the blended average price of each respective cryptocurrency from October 2017 through February 2018, Accountant Chiu determined that investors paid approximately $2,874,609 worth of the cryptocurrencies Bitcoin, Ethereum, Litecoin, and Bitcoin Cash to invest in AML Bitcoin. Tr. 1958; Ex. 1520-005. Investors never received a return on their investment in AML Bitcoin. Accordingly, based on Andrade's bank records, investors lost a total of $8,374,609 by investing in AML Bitcoin.

In addition, Andrade's total loss amount includes the $2.1 million investors lost by investing in AtenCoin. The evidence regarding AtenCoin was "inextricably intertwined" with the AML Bitcoin fraud. *Order on Mot. in Limine, Dkt. 493, at 3*. The evidence at trial established that Andrade's AtenCoin project was part of the entire range of Andrade's conduct and part of a common scheme with his AML Bitcoin project. Andrade's AtenCoin and AML Bitcoin projects were "substantially connected to each other" by multiple factors, including, common victims (such as victim Michael W.), a common purpose (to induce investment in Andrade's cryptocurrency projects), and similar modus operandi (selling investors in an AML and KYC compliant cryptocurrency). *See Lawrence*, 189 F.3d at 844; *see also* U.S.S.G. § 1B1.3 Cmt. 5(B)(i). (citing *United States v. Fine*, 975 F.2d 596, 599-600 (9th Cir. 1992) ("[C]onduct which was part of the scheme is counted, even though the defendant was not convicted of crimes based upon the related conduct.")).

Andrade hooked victims—such as Michael W. and Rene A—by inducing them to invest in AtenCoin based on misrepresentations, morphed AtenCoin into AML Bitcoin, and induced AtenCoin investors to invest in the new AML Bitcoin project. Numerous Aten Coin investors had their AtenCoin investments rolled into AML Bitcoin investments and therefore lost their Aten Coin investment as part of the AML Bitcoin fraud scheme. Aten Coin and AML Bitcoin were not, as Andrade claims, separate ventures. Order, Dkt. 493, at 4. They were part of a common cryptocurrency scheme. Therefore, Andrade is accountable for both the AML Bitcoin and the AtenCoin investment losses, which total $10,474,609. *See* U.S.S.G. §§ 1B1.3(a)(2) & 1B1.3 Background; *Booth*, 309 F.3d at 575; *Lawrence*, 189 F.3d at 844 ("The cumulative loss produced by a common scheme or course of conduct should be used in determining the offense level, regardless of the number of counts of conviction.")

**B.      Andrade's Offense Involved Far More Than 10 Victims**

The PSR correctly applies a two-level enhancement because Andrade's offense involved 10 or more victims. PSR ¶ 56; U.S.S.G. § 2B1.1(b)(2)(A)(i). For purposes of Section 2B1.1, "victim" means "any person who sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1 app. note 1. As with loss, estimating the number of victims does not require absolute precision, and the Court may make a reasonable estimate based on available information. *See United States v. George*, 949 F.3d 1181, 1186 (9th Cir. 2020) ("It [is] 'sufficient for the government to produce evidence for enough of the [victims] to allow the sentencing court reasonably to infer a pattern." (quoting *United States v. Pham*, 545 F.3d 712, 720 n.3 (9th Cir. 2008) (alteration in original))).

Evidence introduced at trial established that more than 4,000 people, if not many more, invested in AML Bitcoin. Approximalely 290 victims submitted victim impact statements. Numerous victims testified at trial. Under any measure, more than 10 individuals sustained a loss as a result of Andrade's fraud.

**C.      The "Outside the United States" or "Sophisticated Means" Enhancement Applies**

The PSR correctly applied a two-level enhancement because "a substantial part of a fraudulent scheme was committed from outside the United States" or "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10)(B), (C).

First, a substantial part of Andrade's fraud scheme was committed from outside the U.S. *Id.* § 2B1.1(b)(10)(B). Andrade traveled to Panama, the U.K., Estonia, Poland, and other parts of Europe spreading falsehoods and misstatements about AtenCoin and AML Bitcoin. And Andrade amplified his international engagements via press releases, social media, and his website. Bank records and victim impact statements show that Andrade induced victims from around the world to invest in his scheme. The victim impact spreadsheet alone shows victim-investors from 33 states, the U.S. Virgin Islands, Canada, the Philippines, Wales, England, Australia, Ireland, Israel, Czech Republic (Czechia), the Netherlands, South Korea, New Zealand, Cyprus, and Slovenia.

Second, the two-level enhancement is warranted because Andrade used "sophisticated means" to carry out his fraud scheme. U.S.S.G. § 2B1.1(b)(10)(C). Andrade's scheme was "especially complex"

and involved "especially intricate offense conduct pertaining to the execution" of the scheme. *Id.* app. note 9(B). Andrade set up numerous corporate entities, funneled money through numerous bank accounts, obtained numerous patents, and utilized a sophisticated international press scheme in which he traveled the world meeting with foreign officials and then spread misinformation through a network of misleading press articles, social media, and websites. Andrade employed a network of advisors, salesmen, and employees in multiple U.S. states, Canada, the United Kingdom, and Europe. Victims themselves emphasized, "This was an elaborate scheme—there were notices about patents coming, high profile people allegedly promoting the project…." Victim Impact Statement of B.W.S. Andrade's fraudulent product was sophisticated: a cryptocurrency technology purportedly containing biometric identity verification built into its block chain.

### D.    Andrade Was Convicted of Money Laundering Under 18 U.S.C. § 1956

The PSR correctly applies a two-level enhancement because Andrade was convicted under 18 U.S.C. § 1956 of money laundering. U.S.S.G. § 2S1.1(b)(2)(B).

### E.    Andrade Was a Leader and Organizer of the Offense

Section 3B1.1(b) requires imposition of a two-level enhancement "[i]f the defendant was an organizer, leader, manager or supervisor in any criminal activity…." U.S.S.G. § 3B1.1(b). Andrade was the founder and CEO of the NAC Foundation, created AML Bitcoin and AtenCoin, hired numerous employees and advisors, and directed sales, press, and media operations. Multiple witnesses testified that Andrade had the final word over decisions and authority over AML Bitcoin and the NAC Foundation. *See id.* app note 4 ("Factors the court should consider include the exercise of decision making authority."). Further, Andrade recruited co-schemer Jack Abramoff, and Andrade earned more from the fraud scheme—at least $2.1 million—than any other participant. Given the circumstances of this case, Andrade clearly qualifies for a two-level aggravating role adjustment.

### F.    The Enhancement for Obstruction of Justice Is Warranted

Section 3C1.1 of the Sentencing Guidelines mandates a two-level increase if a defendant's offense level "[i]f (1) the defendant willfully … attempted to obstruct or impede[] the administration of justice with respect to the investigation … of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely

related offense. U.S.S.G. § 3C1.1. Examples of covered conduct include "otherwise unlawfully influencing … a witness … or attempting to do so." *Id.* app note 4.

In 2020, after De La Guardia stopped working for AML Bitcoin, Andrade called and asked De La Guardia to reach out to members of the PMA and ask them to confirm the press releases and quotes AML Bitcoin had issued. As De La Guardia testified at trial, Andrade was trying to get the PMA employees to lie. Andrade was asking De La Guardia to get the PMA members to lie and say that in fact the PMA did have an interest in AML Bitcoin when they clearly did not have any such interest, but Andrade had propagated numerous false press and social media reports claiming that the PMA and Panamanian governmental authorities were actively negotiating with AML Bitcoin. Tellingly, Andrade did not put his request in writing when De La Guardia asked him to. Where, as here, a defendant tries to "procur[e] or coerc[e] silence from witnesses and victims," he "strikes at the heart of the system of justice itself." *United States v. Blackshire*, 98 F.4th 1146, 1152 (9th Cir. 2024) (first quoting *Davis v. Washington*, 547 U.S. 813, 833 (2006); and then quoting Fed. R. Evid. 804(b)(6) Advisory Committee Note to Amendment (1997)).

## IV.    SENTENCING RECOMMENDATION

The overarching goal of a sentencing court is to impose a sentence that is sufficient to "reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment." *United States v. Ressam*, 679 F.3d 1069, 1088-89 (9th Cir. 2012) (en banc); *see United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); 18 U.S.C. § 3553(a). The Court should begin the sentencing process by correctly calculating the applicable Guidelines range and must "remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). In this case, the breadth of the defendant's misconduct and the substantial economic harm it caused is reflected in the advisory Guidelines range: 210-262 months. ¶ 120. Applying the Guidelines and taking into account all of the factors set forth in 18 U.S.C. § 3553(a), as fully set forth below, the government respectfully recommends a sentence of 210 months.

### A.    The Nature and Circumstances of Andrade's Offense

Andrade's criminal conduct was extremely serious. He continuously lied to investors about his

digital currency projects in order to pocket their money. Andrade took investors' money indiscriminately. He defrauded investors from all over the U.S. and the world. He defrauded investors with only a few dollars to spare, including retirees, veterans, working-class professionals, as well as sophisticated venture capitalists. The effects of his fraud were far-reaching and severe: investors lost over $10 million. And Andrade made millions from his crime.

The Court should also consider as relevant conduct Andrade's AtenCoin scheme, which started in 2014 and continued to 2017 when it morphed into the AML Bitcoin scheme. Andrade's lies were brazen, serious, and convincing. He sold investors wary of digital currency that AML Bitcoin was safe and secure because it "had technology to support anti-money laundering laws." *Victim Impact Statement of J.D.B.* As one investor aptly summarized Andrade's scheme: "It was a perfect scam to hit me." *Id.*

He approved a manipulative and deceptive media campaign—preying on investors' trust in traditional publications such as *Investor's Business Daily*, *Forbes*, and *U.S. News and World Report* to spread his misstatements—then amplified these lies it through his social medial channels. Investors repeatedly testified that they trusted traditional media and relied on it in deciding to invest with Andrade.

The nature and circumstances of Andrade's crimes are aggravating because they were not isolated events or the result of poor choices on a single day. They were not limited to Andrade's treatment of a single investor. Instead, they represent years of fraud and deceit.

Andrade developed the AtenCoin scheme, bled investors of $2.1 million, and then, when AtenCoin was on its last legs, rolled the AtenCoin investors into the even bigger AML Bitcoin scheme. Over time, the lies grew bigger and Andrade amplified them. As a result, he brought in more investment—approximately $8.4 million from July 2017 to the end of 2018. Andrade's scheme diverted valuable funding from honest innovators and entrepreneurs to his fraudulent purposes. It also has the effect of discouraging investments generally in new technologies because investors cannot rely on honesty in the market when making investment decisions. In short, Andrade's criminal activities were serious, extended, and damaging. The nature and circumstances of his offense warrant a significant sentence.

US SENTENCING MEMO
CASE NO. 20-CR-249 RS                    19

1

### B.    Andrade's History and Characteristics

2   Andrade's history and characteristics do not warrant a downward variance. While Andrade

3   asserts that he faced hardships during his childhood, he has also experienced success and knows the

4   difference between right and wrong. Andrade was in the prime of his life when he committed his crimes.

5   His fraud scheme was not a youthful indiscretion; it was the result of years of conscious decisions and

6   was a deliberate, methodical and concerted years-long fraud scheme. Far from the defense effort to paint

7   Andrade as a hapless and bumbling, one victim said of Andrade: "He had the best sales pitch ever and

8   was so credible." *Victim Impact Statement of K.C.* Another victim-investor described Andrade as

9   "smooth talking." *Victim Impact Statement of J.D.* Andrade even used his status as a Marine as part of

10  his sales pitch to investors to lull them into trusting him, thus betraying the trust our nation places in

11  veterans of our armed forces. *See Victim Impact Statement of M.W.*

12       Further, Andrade was the leader and organizer of the scheme. He was the founder and CEO of

13  the NAC Foundation. He developed and propagated AML Bitcoin and AtenCoin. He hired numerous

14  employees and advisors in the U.S. and around the world. His companies operated in the U.S. and the

15  United Kingdom. He spent his investors' money to jet-set around the world to falsely promote AML

16  Bitcoin. He bought a large home and two luxury vehicles with their money. He spent investors' money

17  at strip clubs. He hired an army of lawyers, including to threaten and sue his investors when they

18  discovered Andrade's fraud and threatened to publicize it. Numerous victims, often lacking funds to pay

19  for a lawyer, suffered when Andrade sued them for speaking negatively about AML Bitcoin. *See Victim*

20  *Impact Statement of S.A.W.* "It did not seem like he had any remorse in what he was doing to others."

21  *Victim Impact Statement of R.A.*

22       Critically, Andrade has continually refused to accept any responsibility for his criminal conduct.

23  He blames his employees, his investors, and law enforcement. He spreads misinformation and dodges

24  responsibility in press releases and on the internet. PSR ¶¶ 51, 52. Even after his counsel assured

25  Probation that Andrade had taken down posts publishing photos of investigators, PSR ¶ 53, Andrade

26  published a GoFundMe campaign that highlights his refusal to accept any responsibility. *See*

27  https://www.givesendgo.com/amlbitcoin (last visited July 18, 2025) ("The DOJ in the NDCA has

28  threatened to take Marcus Andrade into custody if he doesn't cancel this campaign."). And Andrade

refuses to acknowledge the significant financial pain and suffering he caused hundreds of investors.

Finally, Andrade's recent financial history indicates that he may not be forthright with the Court about his financial circumstances. Andrade reported to Probation that his monthly income is $5,800. PSR ¶ 112. He also reported that his checking and savings accounts at Frost Bank have balances of only $75 and $730, respectively. *Id.* But Andrade deposited the following amounts into his Frost Bank account during recent 30-day periods: $8,010.72 between December 12, 2024 and January 13, 2025; $22,388.40 between January 15, 2025 and February 12, 2025; $11,299.70 between February 13, 2025 and March 13, 2024; $28,101.63 between March 13, 2025 and April 10, 2025; and $22,081.07 between April 14, 2025 and May 12, 2025.[3] See *FBI 302; Frost Bank Records (Exhibit 2, filed under seal).* Andrade's history and characteristics do not warrant a significant downward variance.

### C.    The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense

This Court should send a clear message to the community, the country, and victims around the world that white collar crime is serious and deserving of significant punishment. One victim-investor put it particularly well: The Court "[n]eeds to send a clear message fraud will not be tolerated and criminals will pay dearly for cheating innocent people." *Victim Impact Statement of A.P.* Another victim stated: "Laws and rules exist for a reason, and breaking them tears at the very fabric of a civilized society! These types of crimes are the worst, especially for people who made large investments." *Victim Impact Statement of M.S.L.* "There are too many financial crimes/fraud that are not seriously punished. These crimes destroy lives…. An example needs to be set here." *Victim Impact Statement of B.S.* Numerous victims have asked the Court to impose "the maximum sentence." See, e.g., *Victim Impact Statement of A.C.R.*

Andrade's crimes caused victims "significant" and "severe" financial hardship." See, e.g., Victim Impact *Statement of A.B; Victim Impact Statement of D.G.*; *cf.* U.S.S.G. § 2B1.1(b)(2) (increasing

---

[3] Given that Andrade claims to be CJA eligible and was the recipient of U.S. Marshal's Service funds during trial, it is worth noting that Andrade's bank records show that he spent tens of thousands of dollars from his Frost Bank accounts during these same months without disclosing such spending to Probation. *See* Exhibit 1 (filed under seal). Andrade's bank records also show that he made the following ATM cash withdrawals from the Hustler Club in San Francisco on the following dates: $550 on February 18, 2025; $220 on March 3, 2025; and $220 on March 10, 2025.

offense level if fraud caused "substantial financial hardship" to five or more victims, or 25 or more victims). Andrade's fraud caused numerous victims "anger, shame and disappointment." *See, e.g.*, *Victim Impact Statement of L.J.* Some victims required treatment for anxiety and depression caused by Andrade's crimes. *See Victim Impact Statement of B.B.* Others were duped out of funds needed for medical treatments. *See Victim Impact Statement of D.G.* Another victim-investor "lost money … that could have been used to put food on my family's table and take care of sick grandmother." *Victim Impact Statement of A.O.C.* Andrade's crime was serious and deserving of significant punishment because it "fundamentally eroded my trust in others and impacted my sense of security for the future." *Victim Impact Statement of O.I.* "[H]is actions have stolen not just money, but peace of mind and future opportunities…. I hope the sentence reflects the profound and lasting harm he has caused to innocent people like myself. *Id.* These victim impact statements, and many others, demonstrate the need for this sentence to reflect the seriousness of the offense and promote respect for the law.

### D.    The Need to Afford Adequate Deterrence

A sentence of 210 months in custody will serve to deter others from committing or contemplating committing white collar crimes, especially those who might consider taking advantage of cryptocurrency investors. General deterrence is of particular importance in white collar cases such as this one because would-be offenders need to be put on notice that there are severe consequences for engaging in this type of criminal conduct. *See, e.g.*, *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (citation and internal quotation omitted); *United States v. Goffer*, 721 F.3d 113, 132 (2nd Cir. 2013) (addressing the need for general deterrence for those who might otherwise feel that some white-collar crimes are "game[s] worth playing"). In the words of one victim-investor, "There does not seem to be harsh enough penalties to discourage people from pulling these fraudulent schemes…." *Victim Impact Statement of B.W.S.*

Andrade's criminal fraud scheme prayed on the optimism of investors in the early days of the cryptocurrency industry. Andrade claimed to be an innovator and entrepreneur with a game-changing product. Economic innovation, growth, and dynamism require investment. And investors require the

1    truth. The investment relationship is built, at least in part, on trust. The relationship between innovators

2    and investors generates tremendous good far beyond this community. Unfortunately, Andrade's crimes

3    damaged the trust and integrity that are necessary for this community to thrive. A significant custodial

4    sentence will serve not only to deter future startup fraud schemes, but it will also serve to rebuild the

5    trust investors must have when funding innovators.

6        **E.    The Need to Protect the Public From Future Crimes By Andrade**

7        Specific deterrence, due to the brazenness of Andrade's conduct and his refusal to accept

8    responsibility for his fraud, also counsels in favor of a sentence that is sufficiently punitive to deter

9    Andrade from ever contemplating committing fraud again. There is a real risk that Andrade will commit

10   fraud again after he is released from prison. Rather than acknowledge his role in this fraud, Andrade

11   continues to view himself as a victim—of his employees, advisors, co-schemers, and law enforcement.

12   Approaching sentencing, Andrade continues to seek support—and funding—on the internet because he

13   portrays himself as a victim. This Court cannot and should not have any confidence that that Andrade

14   has been deterred from future fraud. Therefore, the Court must deter future criminal fraud by Andrade

15   through a significant custodial sentence.

16       **F.    The Need to Avoid Unwarranted Sentencing Disparities**

17       The government recommends the Court impose a custodial sentence of 210 months'

18   imprisonment. Given the unique factors in this case—the significant harm suffered by hundreds (if not

19   thousands) of Andrade's victims, Andrade's leadership in the crime, his absolute refusal to accept

20   responsibility, the complex nature of his crime, his obstruction of justice, and the strong need for both

21   general and specific deterrence—a downward variance is not appropriate. This recommended sentence

22   satisfies the "sufficient but not greater than necessary" standard found in 18 U.S.C. § 3553(a).

23       The United States Probation Office argues that a variance is appropriate based on his

24   "tumultuous upbringing," physical health issues, and mental health issues." *PSR Addendum*. While the

25   government agrees that Andrade's history and characteristics are relevant factors this Court should

26   weigh at sentencing, the fact is that Andrade was a knowing, deliberate adult who has spent years

27   pivoting from one fraud scheme to the next, lying to investors, deceiving employees, partners, and

28   others, and leaving millions of dollars of losses in his wake. Probation's recommendation of a 10-year

US SENTENCING MEMO
CASE NO. 20-CR-249 RS                    23

1  variance from the applicable Guideline range is not justified given Andrade's fraudulent conduct, the

2  harm he has caused, the need for deterrence, and the need to promote respect for the law.

3      The determination that a custodial sentence is or is not reasonable should not be based upon its

4  absolute number alone, that is, their number of years. Instead, custodial sentences are reasonable through

5  the process that is followed to arrive at them. And if the process includes too significant a variance,

6  general deterrence and respect for the law suffer. In the government's view, a seven-year custodial

7  sentence would be the result of too significant a variance. As the Court knows from the trial, Andrade

8  was the founder, CEO, and leader of the NAC Foundation and the AML Bitcoin fraud scheme. He

9  sought out media attention for his company and spread false and misleading information about AML

10 Bitcoin to the media, via social media, and from his website. Andrade completely fails to accept

11 responsibility for his criminal conduct and blames others for his criminal charges. Thus, the Court also

12 should feel comfortable emphasizing the necessity of both general and specific deterrence at this

13 sentencing hearing. Additional support for the government's sentencing recommendation is found in

14 similar cases. The Judiciary Sentencing Information (JSIN) data supports the government's position that

15 Probation's recommended variance is too large. PSR ¶ 138. For defendants with Andrade's primary

16 guideline—§ 2S1.1—with a Total Offense Level of 37 and a Criminal History Category of I, the average

17 sentence in the last five years was 138 months and the median sentence was 144 months, excluding

18 offenders who received a § 5K1.1 substantial assistance departure. *Id.*

19     Further, a review of certain specific sentences imposed in similar cases demonstrate the wide

20 range of custodial sentences imposed for technology and cryptocurrency-centered investment frauds.

21 While each case is different, there is precedent for imposition of a significant custodial sentence in this

22 case.

23

| Defendant | Case No. | Approximate Loss Amount | Sentence |
|-----------|----------|-------------------------|----------|
| James Murray | 12-cr-278-EMC (N.D. Cal.) | Non-cryptocurrency investment scheme defrauded investors out of more than $7 million. | 180 months (no acceptance of responsibility; mandatory 24-month sentence for conviction under 18 U.S.C. § 1028A) |

| Roger Karlsson | 19-cr-340-CRB (N.D. Cal.) | Investment fraud scheme with losses over $16 million. Many investors-victims paid into the fraud with digital currency. | 168 months (accepted responsibility) |
|---|---|---|---|
| Ian Freeman | 21-cr-41-JL (D.N.H.) | Laundered over $10 million in proceeds from romance scams and other internet fraud. | 96 months (accepted responsibility) |
| Alan Anderson | 21-cr-397-EMC (N.D. Cal.) | Owner and CEO of failed internet startup defrauded investors out of approximately $8.825 million. | 88 months (accepted responsibility) |
| Abner Tinoco | 22-CR-1933-DCG (W.D. Tex.) | Ponzi scheme claiming to invest clients' money in crypto caused approximately $9 million in investor losses. | 84 months (accepted responsibility) |
| Alexander Mashinsky | 23-cr-347-JGK (S.D.N.Y.) | Founder and CEO of crypto asset platform holding approximately $25 billion in assets at its peak also created a proprietary token that Mashinsky manipulated by spending hundreds of millions of dollars purchasing it on the open market to artificially inflate its value. Profited approximately $48 million by selling his tokens. | 144 months (accepted responsibility) |

## V.    RESTITUTION

The Mandatory Victims Restitution Act of 1996 (the "MVRA") provides that "when sentencing a defendant convicted of an offense described in [§ 3663A(c)], the court shall order . . . that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). A "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id.* § 3663A(a)(2). The MVRA applies to cases of an offense resulting in damage to or loss or destruction of property of a victim. *Id.* § 3663A(b)(1). "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." *Id.* § 3664(f)(1)(A). Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. *Id.* § 3664(e).

Here, the preponderance of evidence shows that investor-victims who provided victim impact statements suffered a loss of $4,597,205.88. This amount was fully foreseeable by Andrade. The Court

should order restitution as required by the MVRA. Alternatively, if the Court determines that the victims' losses are not fully ascertainable at this time, the Government requests that the Court postpone a final determination of the restitution amount for 90 days. *See* 18 U.S.C. § 3664(d)(5).

Based on the PSR, it appears that Andrade has a positive net worth of almost $500,000. PSR ¶ 112. He also owns appears to receive payment in connection with Black Gold Coin (BGC), Inc. Before foregoing a fine, the Court should consider whether Andrade's management of his affairs reflects a genuine desire to make his investors whole.

## VI. ANDRADE SHOULD BE ORDERED TO FORFEIT ALL OF THE PROCEEDS OF HIS CRIMES

In the United States' Motion for Preliminary Order of Forfeiture (filed separately), the United States asks the Court to impose a forfeiture money judgment for the full amount of the fraudulent proceeds Andrade obtained, directly or indirectly, as a result of his fraud, and the total value of the property involved in his money laundering offense, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 921(a)(1). This forfeiture request was noticed in the Indictment, which included a forfeiture allegation requesting forfeiture of all property, real or personal, constituting or derived from proceeds Andrade obtained, directly or indirectly, as a result of his fraud, and all property, real or personal, involved in his money laundering offense, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 921(a)(1), and further requesting a forfeiture money judgment for the full amount of the fraudulent proceeds Andrade obtained and of the total value of the property laundered. The PSR concurs with this request.

Criminal forfeiture operates *in personam* against the defendant and is a part of a defendant's punishment. *United States v. Lazarenko*, 476 F.3d 642, 647 (9th Cir. 2007. As noted above, Andrade received at least $10,474,609 in criminal proceeds as a result of his fraudulent conduct, and he laundered at least $600,000 of those criminal proceeds, and he should be required to pay restitution in that amount. The United States requests that the Court also enter a forfeiture money judgement in the amount of $10,474,609, as the calculation of the amount of proceeds Andrade obtained from his crimes. It is necessary and appropriate that both restitution and forfeiture be ordered, as they serve different purposes. *United States v. Davis*, 706 F.3d 1081, 1082-84 (9th Cir. 2013). Restitution seeks to make victims whole by reimbursing them for their losses, while forfeiture is meant to punish the defendant by

divesting him of his ill-gotten gains. *Id*.; *see also United States v. Newman*, 659 F.3d 1235, 1241 (9th Cir. 2011) (appropriate to require defendants to pay both restitution and criminal forfeiture); *United States v. Joseph*, 743 F.3d 1350, 1354 (11th Cir. 2014).

The PSR recommends, and the United States requests, that Andrade be ordered to make full restitution to the victims of his fraud, and in addition that Andrade be required to pay a forfeiture money judgment equal to the total amount of fraud proceeds he received and the value of the property he laundered.

## VII.    CONCLUSION

For these reasons, the government respectfully recommends that the Court sentence the defendant to 210 months in prison followed by 3 years of supervised release, that the Court order him to pay $4,597,205.88 in restitution, that forfeiture be ordered as set forth in the Motion for Preliminary Order of Forfeiture, and that Andrade pay a special assessment of $200.

DATED:  July 22, 2025                                  Respectfully submitted,

                                                       CRAIG H. MISSAKIAN
                                                       United States Attorney

                                                              /s/
                                                       CHRISTIAAN HIGHSMITH
                                                       DAVID J. WARD
                                                       Assistant United States Attorneys

                                                       MATTHEW CHOU
                                                       Special Assistant United States Attorney