John M. Pierce (Bar No. 250443)
*jpierce@johnpiercelaw.com*
JOHN PIERCE LAW P.C.
21550 Oxnard Street, 3rd Floor
Woodland Hills, CA 91367
Tel. (321) 961-1848
*Attorney for Defendant*
*Rowland Marcus Andrade*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROWLAND MARCUS ANDRADE,<br><br>Defendant. | Case No. 3:2-cr-00249-RS<br><br>**CORRECTED DEFENDANT'S REPLY REGARDING BOND PENDING APPEAL AND RELATED RELIEF**<br><br>Judge: Hon. Richard Seeborg, Chief Judge |

1

# TABLE OF CONTENTS

2

3   I.      INTRODUCTION ................................................................................................ 1

    II.     ARGUMENT ...................................................................................................... 1
4
            A.     Mr. Andrade Has Established on Any Standard that He is Not a Flight Risk ........ 2
5
            B.     Mr. Andrade Has Established on Any Standard that He is Not a Danger ............. 4
6
            C.     Mr. Andrade Has Raised Substantial Questions for Appeal .................................. 5
7
                   1.     The instructions allowed the jury to convict Mr. Andrade of money
                          laundering for conduct other than that charged by the grand jury .............. 6
8
                   2.     The instructions created confusion about the burden of proof on good faith 7
9
                   3.     A multiple scheme instruction should have been given in light of evidence
10                        that the lone wire did not further the scheme charged in the indictment ..... 8

11                 4.     The testimony of FBI Special Agent Quinn, and the argument of the
                          government about, Exhibit 805 violated *Napue v. Illinois*, 360 U.S. 264
12                        (1959) ......................................................................................................... 9

13                 5.     Exculpatory evidence was excluded based on the erroneous application of
                          hearsay rules ........................................................................................... 12
14
                   6.     Damaging testimony offered by the government was admitted without any
15                        semblance of a foundation ....................................................................... 14

16                 7.     Rule 404(b) and other unfairly prejudicial evidence was erroneously
                          admitted ................................................................................................... 14
17
                   8.     The defense's evidence of government misconduct was at least sufficient to
                          require a hearing ..................................................................................... 15
18
                   9.     Clear evidence of potential Brady violations entitled Mr. Andrade a full
19                        and fair opportunity to be heard. ............................................................. 16

20                 10.    A short continuance was required by the government's delayed, eve-of-trial
                          production of voluminous and probative financial information ................. 18
21
                   11.    The cumulation of multiple errors requires reversal ................................. 19
22
            D.     The Court Should Also Consider Mr. Andrade's Extraordinary Circumstances .. 19
23
            E.     For the Same Reasons, the Enforcement of Any Forfeiture or Restitution Orders
                   Should Also Be Stayed Pending Appeal .......................................................... 20
24
    III.    CONCLUSION ................................................................................................. 22

25

26

27

28

1

## **TABLE OF AUTHORITIES**

2
**Page(s)**

3
**Cases**

4
*Alvarez v Montgomery*,

5
   2022 WL 868889 (CD Cal. Jan. 27, 2022) ............................................................10

*Arizona v. Gant*,
6
   556 U.S. 332 (2009)...........................................................................................13

7
*DePetris v. Kuykendall*,

8
   239 F.3d 1057 (9th Cir. 2001) ........................................................................14

9
*Earp v. Ornoski*,
   *431 F.3d 1158 (9th Cir. 2005)* ..........................................................................*16*

10

11

12
*Hayes v. Brown*,
   399 F.3d 972 (9th Cir. 2002).............................................................................11

13
*in Nken v. Holder*,

14
   556 U.S. 418 (2009)...........................................................................................20

15
*Irigaray Dairy v. Dairy Emps. Union Loc. No. 17 Christian Labor Ass'n of U.S. Pension*,

16
   153 F. Supp. 3d 1217 (E.D. Cal. 2015)............................................................13

17
*Michaelson v United States*,

18
   335 U.S. 469 (1948)...........................................................................................15

19
*Napue v. Illinois*,
   360 U.S. 264 (1959).......................................................................................9, 10

20

21
*Panah v. Chappell*,
   935 F.3d 657 (9th Cir. 2019) ...........................................................................10

22
*United States v. Asher*,

23
   910 F.3d 854 (6th Cir. 2018) ...........................................................................15

24
*United States v. Charley*,
   1 F.4th 637 (9th Cir. 2021) ..............................................................................15

25
*United States v. Chen Chiang Liu*,

26
   *631 F.3d 993 (9th Cir. 2001)*...............................................................................*8*

27

28

*United States v. Chung,*
  659 F.3d 815, 831 (9th Cir. 2011) ....................................................................18

*United States v. Dorsey,*
  418 F.3d 1038 (9th Cir. 2005) ........................................................................13

*United States v. Dorsey,*
  418 F.3d at 104 ...............................................................................................13

*United States v. DuShane,*
  623 Fed. App'x 332 (9th Cir. 2015)....................................................................6

*United States v. Garcia,*
  340 F.3d 1013 (9th Cir. 2003)..........................................................................19

*United States v. Garner,*
  507 F.3d 399 (6th Cir. 2007)............................................................................19

*United States v. Gianandrea,*
  38 Fed App'x 434 (9th Cir. 2002).......................................................................7

*United States v. Handy,*
  761 F.2d 1279 (9th Cir. 1985) ............................................................................6

*United States v. Hearst,*
  424 F. Supp. 318 (N.D. Cal. 1976) .....................................................................2

*United States v. Kakkar,*
  2017 WL 4163291 (N.D. Cal. 2017) ..................................................................4

*United States v Khan,*
  2014 WL 2930656 (N.D. Cal. 2014) ..................................................................4

*United States v. La Page,*
  231 F.3d 488 (9th Cir. 2000)............................................................................11

*United States v. Lamp,*
  606 F.Supp. 193 (W.D. Tx. 1985) ......................................................................1

*United States v. Lothian,*
  976 F.2d 1257 (9th Cir. 1992)............................................................................9

*United States v. Notaro,*
  363 F.2d 169 (9th Cir. 1966).............................................................................7

*United States v. Sedaghaty,*
  728 F.3d 885, 903 (9th Cir. 2013) ....................................................................18

*United States v. Soberon*,
   929 F.2d 935 (3d Cir. 1991)......................................................................................16

*United States v. Straker*,
   800 F.3d 570 (D.C. Cir. 2015) (per curiam) ..........................................................10

*United States v. Yalincak*,
   2015 WL 6456537 (D. Conn. Oct. 26, 2015) .........................................................20

## I.    INTRODUCTION

The government's opposition includes a rote acknowledgement of the settled law that an issue need only be "fairly debatable" to justify bond pending appeal, ECF 761 at 8:10.

To make matters worse, despite the fact that, for each of the ten errors highlighted in Mr. Andrade's motion, Mr. Andrade added a discussion addressing the reasons the Court gave in declining to order a new trial and demonstrating that those reasons were fairly debatable, the opposition largely avoids those discussions and instead falsely asserts that Mr. Andrade did not "offer[] any reason to undermine the Court's previous rulings." *Id.* at 19:19-20.  In the rare instances in which the opposition attempts to join issue, its arguments run afoul of the law, the facts, or both.  Its final refuge—the claim that its evidence was overwhelming—is also, at the very least, fairly debatable. *Id.* at 15 (claiming that any error would be harmless given the "overwhelming amount of evidence" against Mr. Andrade).

The issues raised by Mr. Andrade make clear that any supposed weight of the evidence stemmed from (1) withholding the contents of Abramoff's informant file from the defense and jury; (2) the false statements that were made to the jury; (3) admitting a flood of unfairly prejudicial evidence; (4) erroneously excluding pivotal exculpatory evidence; and (5) refusing to give the jury the instructions it needed to fairly assess Mr. Andrade's defenses.


## II.    ARGUMENT

Contrary to the opposition's assertion, *see* ECF 761 at 7:4, there is nothing "mandatory" about detention pending appeal.  *See* 18 USC 3143 (requiring detention if certain conditions are met and requiring release if they are not).  Nor is there "absolutely no reason for the law to . . . permit [release pending appeal] in the absence of exceptional circumstances." *Id.* at 7:11-13.  To the contrary, allowing a defendant with a substantial issue on appeal, who is neither a flight risk nor a danger, to remain on bond pending appeal avoids the unjust risk that someone whose conviction gets reversed spends time in jail, time that could never be returned to him.  *See United States v. Lamp*, 606 F.Supp. 193, 203 (W.D. Tx. 1985) ("The primary concern of due process . . .

is that no man be deprived of his liberty unless he is found guilty beyond a reasonable doubt in a trial unmarked by fundamental flaws in fairness. . . . A conviction in a trial court thus cannot be considered absolutely final . . . prior to the exhaustion of a defendant's direct appeals. Within this framework the Court must consider . . . bail pending appeal").  This is an especially important risk in this case given the unusual difficulties Mr. Andrade is likely to experience in prison.  *See* Defendant's Sentencing Memorandum, ECF 713 at 11:26-14:10; Presentence Report, ECF 706 at 45 (". . . any length of time [in custody] will be a significant punishment for Mr. Andrade."). *United States v. Hearst,* 424 F. Supp. 318, 321 (N.D. Cal. 1976) (Despite the defendant's conviction for armed bank robbery and use of a firearm to commit a felony, release was appropriate during the pendency of a non-frivolous appeal, in part reflecting the Bail Reform Act of 1966, which establishes a strong policy favoring both posttrial and pretrial release)).

### A.  Mr. Andrade Has Established on Any Standard that He is Not a Flight Risk

The opposition fills nearly two pages claiming Defendant's motion lacks evidence that Mr. Andrade is not a flight risk. ECF 761 at 9:21.  Instead of challenging themselves and refuting the evidence set forth in Defendant's motion that he poses no flight risk, Plaintiff instead pretends such evidence does not exist. *Id.*

First, as Defendant's motion clearly laid out, the Probation Office determined that Mr. Andrade was not a flight risk and recommended that he be allowed to self-surrender (which of course would occur after both his conviction and sentencing).  *See* ECF 706 at 45.

Second, Mr.  Andrade was indicted in June 2020, and has appeared at all judicial proceedings requiring his appearance since that date, and was even convicted two months ago and still never fled. Mr. Andrade even had communications with the probation department in trying to plan his self-surrender—further exhibiting self-initiative and compliance with the Court's orders. The government erroneously claims that a seven-year sentence incentivizes Andrade to flee. This baseless argument does not undermine Defendant's satisfaction of the initial clear-and-convincing threshold.

To briefly summarize why he poses no risk of flight, Andrade holds an ownership interest

1   in his home as well as in biometric-based, patent-protected intellectual property. These assets

2   have joint potential value estimated in the hundreds of millions of dollars, if not more. See Ex.

3   A. If Mr. Andrade were to flee — which he will not — he would risk losing his interest in all of

4   his assets, including those jointly held with his wife and children. Such an action would have

5   devastating consequences for his family. Not only financially, but his two young daughters, ages

6   6 and 10, would endure significant emotional strain and would be further traumatized by either

7   his incarceration or flight. Mr. Andrade is deeply committed to his family and would never take

8   any action that would endanger their mental state or their well-being.

9        Given his irreplaceable role as a father, the significant financial stake he would forfeit if

10  he fled, his non-dangerous status, and his continued active engagement in his defense, the Court

11  should recognize that these factors—among many others—strongly support Mr. Andrade

12  remaining on bond pending appeal.

13       But instead of refuting the above, what the opposition does say is no better than the

14  evidence it carefully avoids mentioning. It argues that Mr. Andrade is a flight risk because he

15  has not accepted responsibility, ECF 761 at 10:13-14, but that is true of pretty much everyone

16  who is appealing their sentence; if that is disqualifying, then Section 3143 is a waste of ink. *See*

17  Defendant's Reply to Government's Sentencing Memorandum, ECF 716 at 8:5-25. It argues

18  that Mr. Andrade "spreads misinformation and dodges responsibility in press releases and on the

19  internet," ECF 761 at 10:14, but it never addresses the refutation of those claims that Mr.

20  Andrade provided after the government made this same claim earlier, *see* ECF 716 at 9:24-12:27,

21  and it never suggests how internet postings evince a risk of flight. The opposite side of the

22  narrative shows hundreds, if not thousands, who support him and his innocence. See Ex. B.

23       Moreover, it argues that Mr. Andrade was not truthful with probation about his earnings,

24  ECF 761 at 10:17-20, but Mr. Andrade previously demonstrated that he was in fact accurate (and

25  that the government cherry-picked data to give the opposite impression). *See* ECF 716 at 10:8-

26  12:4. The opposition offers no answer to that demonstration — because there is none. Without

27  any explanation or support, nor a supporting declaration, it claims that Mr. Andrade has hidden

28

1   his assets, *see* ECF 761 at 10:20, but he has consistently disclosed the few assets he has, both to

2   the government and the probation department, including the one that has allowed him to earn the

3   small income about which the government complains.[1]

4          The government's reliance on *United States v Khan,* 2014 WL 2930656 (N.D. Cal. 2014)

5   and *United States v. Kakkar,* 2017 WL 4163291 (N.D. Cal. 2017) is misplaced, as in both cases

6   the flight risks were dramatically greater than with Mr. Andrade.  In *Khan*, the defendant had

7   extensive family and financial ties abroad, and his conduct during sentencing demonstrated he

8   "never fully appreciated that he would be incarcerated." *Khan*, 2014 WL 2930656 at *4.  Along

9   the same lines in *Kakkar*, the defendant was not a citizen, had been transferring assets to family

10  members, and the likelihood of deportation following his custodial sentence created an

11  "undeniably compelling motivation to flee."  2017 WL 4163291 at *2.  By contrast, Mr. Andrade

12  is a citizen, has not transferred the few assets he has, and his family resides in the United States.

13  *See* ECF 706 at 25.

14          **B.  Mr. Andrade Has Established on Any Standard that He is Not a Danger**

15          As it does with risk of flight, the government writes as if the determinative facts do not

16  exist: Probation determined that Mr. Andrade is not a danger, and recommended self-surrender

17  even in the face of the clear and convincing standard.  *Id.* at 45.  Plus, it has now been *seven*

18  *years* since the end of the crime for which Mr. Andrade was convicted, with the government

19  unable to offer any evidence of wrongdoing in which Mr. Andrade engaged during that seven-

20  year period.  The most it can do is repeat its version of the facts from his seven-year-old offense

21  and assert — falsely — that he continues to earn income from "cryptocurrency investors." ECF

22  761 at 11:24. The government was well-informed that Mr. Andrade has nothing to do with a

23  Black Gold Coin, Inc. digital currency *Id.; see also* Dent Decl. In fact, his income is from a

---

[1] *See, e.g.,* ECF 706 at 25, 32-34 (disclosing the patent portfolio assets and Mr. Andrade's sales of portions of them to probation), See Ex. C. Dent Decl. and a 2022.12.13 Email Traffic with Government Regarding Potential Sale of Patent Portfolio and assets to fund his forfeiture, while the government confirmed was only his house and that it holds no lien or holds on the patents (demonstrating that Mr. Andrade disclosed to the government his ownership interest and intent to sell the patent portfolio as early as 2022).

patent holding company where the patents were filed in 2015 and 2016, which trial evidence showed were valid and had actual value.  Tr. 1816:3-24; 2300:4-21; 2307:10-2311:5. The record makes this clear. Defense counsel informed the government on May 14, 2025, that one of its key witnesses appeared to have been involved in the creation of a digital currency called Black Gold Coin in January 2025, before trial—apparently in an effort to set up Andrade for prosecution. After this disclosure, the prosecution removed the Black Gold Coin digital currency from the restitution questionnaire, though it had already collected names of certain purchasers who may have been defrauded by that other, similarly named company.

The question must also be asked: why would the Government pursue such a fraudulent scheme It repeatedly offered Mr. Andrade substantial value for what it now characterizes as evidence of fraud. Either the Government was attempting to profit from this arrangement, or Mr. Andrade's conduct was lawful. The government has never disclosed the percentage amounts CHS's, informants, and UCE's make from forfeiture assets.

Needless to say, the opposition does not explain how earning legitimate income suggests dangerousness; instead, it underscores the sufficiency of Mr. Andrade's showing, along with the other facts above, that he is not a danger and holds property. The government also does not acknowledge or explain why it is UCE's, CHS, and those operating at the directive of the government, were trying to take possession of these very same patent assets. See Ex. D.

### C.  Mr. Andrade Has Raised Substantial Questions for Appeal

Among the risible statements in the opposition, a highlight is the notion that Mr. Andrade filed a "cursory motion" with "vague presentations" that are "insufficient to meet the substantial question standard and are thus barred."  ECF 761 at 12:9-11.  Mr. Andrade filed a 16-page motion, which in turn incorporated at least 77 pages from prior filings,[2] which together laid out in detail and with citations to the record the specific issues he considers substantial, explained why they are substantial, and addressed the reasons the Court offered for finding those issues

---

[2] The opposition cannot say that this tree-saving incorporation by reference is somehow "cursory," as it also engages in incorporation by reference.  See, e.g., ECF 761 at 13 n.1.

1  insufficient to trigger a new trial.  The government identifies nothing that was missing,

2  insufficiently explained, or ambiguous in any way.  Did the Court really want even more pages?

3         Instead, and ironically, it is the opposition that is "cursory," in that it almost entirely

4  ignores the portions of Mr. Andrade's opening brief demonstrating that the reasons provided by

5  the Court for its denial of his new trial motion are "fairly debatable."  As a result, the opposition

6  leaves unrebutted the basis for bond pending appeal.

7         1.   The instructions allowed the jury to convict Mr. Andrade of money laundering

8              for conduct other than that charged by the grand jury

9         Typical of the opposition's inability to respond to the reasons why the issues presented by

10  the defense are fairly debatable is the argument about the Count Two instruction. Addressing the

11  reasoning in the Court's new trial motion, adopted from the government, that any error was

12  harmless "because the record shows the jury voted to convict Andrade in Count Two based on

13  the transaction at issue," ECF 694 at 5, Mr. Andrade's motion laid out, with citations, the many

14  places in the record showing that the jury *was* presented with *at least ten other transactions* on

15  which it may have voted to convict Mr. Andrade.  *See* ECF 656 at 2:4-3:11 and n.2, ECF 684 at

16  3:9-4:3 and nn. 2-3, *see also* ECF 742 at 9:22-26, 10:1-6 and nn. 1-3.  The opposition has no

17  answer for any of them.

18         The remainder of the opposition on this issue does nothing more than repeat the Court's

19  reasoning that Ninth Circuit precedent and the pattern instruction suggest that the language

20  proposed by Mr. Andrade was not required. Here too the opposition totally ignores Mr.

21  Andrade's distinction of *United States v. DuShane*, 623 Fed. App'x 332, 333 (9th Cir. 2015), as

22  well as the Ninth Circuit's admonition that pattern instructions are not necessarily correct.  *See*

23  ECF 684 at 1:24-2:10.  As a result, whether the Count Two instructions were an error of

24  constitutional dimension is "fairly debatable," and given that in this case — unlike those cited by

25  the government and the Court — there was evidence of many other transactions, the Ninth

26  Circuit will be presented with an issue of first impression.  *United States v. Handy*, 761 F.2d

27  1279, 1281 (9th Cir. 1985) ("Included within this definition [of substantial question] have been

28

1    questions that are novel and not readily answerable").

2              2.   The instructions created confusion about the burden of proof on good faith

3         That Mr. Andrade got a good faith instruction even though, according to the opposition,

4    he was "not entitled to one," ECF 761 at 13:9, does not answer Mr. Andrade's contention that he

5    was prejudiced when the instruction that was given over his objection created confusion about

6    the burden of proof on good faith by not expressly stating that the government had to disprove it.

7    ECF 656 at 15-18; ECF 684 at 10-12; *see also United States v. Notaro*, 363 F.2d 169, 175 (9th

8    Cir. 1966) (explaining that "the desire of a careful judge to avoid language which to him may

9    seem unnecessarily repetitive should yield to the paramount requirement that a jury in a criminal

10   case be guided by instructions framed in language which is unmistakably clear," and reversing

11   conviction when one paragraph of entrapment instruction delineated burden of proof but other

12   paragraph did not).  As Mr. Andrade argued — and the opposition ignored — the instruction

13   created by the Court did not include the defense-friendly language in cases with good faith

14   instructions that were affirmed by the Ninth Circuit.  ECF 742 at 12:5-14.[3]  Whether the unique

15   instruction given by the Court left the jury confused about the burden of proof on the most

16   central issue to the defense is therefore both fairly debatable and an issue of first impression.

17

18   _____

19   [3] The opposition attempts to distinguish *United States v. Gianandrea*, 38 Fed App'x 434, 436 (9th
     Cir. 2002) by asserting that in that case a good faith instruction was "the model instruction" and
20   was "required by law," ECF 761 at 13:11-12, but these distinctions do not excuse the Court's
     instruction either.  First, the "model instruction" was not the Ninth Circuit's as the opposition
21   implies, but was an instruction from a treatise.  Second, *Gianandrea* did not say that a good faith
     instruction was required by law in bankruptcy cases (which is what was charged in *Gianandrea);*
22   rather it noted such an instruction was required by the Supreme Court in tax fraud cases, and
     reasoned that bankruptcy fraud cases were sufficiently similar that the instruction should be
23   given there too.  The opposition does not dispute Mr. Andrade's observation that the Ninth
24   Circuit's bankruptcy instructions have the same elements as wire fraud, and that the statute is
     modeled on wire fraud, suggesting that, as in *Gianandrea,* it was at least debatable that this
25   Court erred in not expressly stating that the government had the burden to disprove good faith.
     But even more importantly, the case leaves no doubt that any good faith instruction that is given
26   must leave no doubt that the burden is on the government to disprove good faith.  *Gianandrea* at
27   436 (reversing conviction based on court's omission of "a crucial statement" that "the
     government retained the burden of *disproving* the good faith defense") (emphasis in original).

28

_____

Corrected Defendant's Reply Regarding Bond Pending          Case Number:  3:20-cr-00249-RS - Page 7
Appeal and Related Relief

1    3.    A multiple scheme instruction should have been given in light of evidence that

2          the lone wire did not further the scheme charged in the indictment and that

3          there was evidence of multiple schemes.

4    The Government's lone front is that Mr. Andrade was tried alone and therefore ineligible

5    for the instruction but does not respond to Mr. Andrade's argument that being tried alone does

6    not matter. Which this is "fairly debatable" given the circumstances of this case.

7    Regardless of the government's position that a multiple-scheme jury instruction should

8    not have been given because it did not present evidence at trial of a second scheme, that

9    argument is misplaced. The Abramoff Syndicate's politically driven international money

10   laundering scheme included the use of AML Bitcoin and occurred within the timeframe covered

11   by the Andrade indictment. The trial record[4] supports this, and it should have been within the

12   jury's discretion to determine whether that second scheme reflected Abramoff's intent to engage

13   in false marketing. *Cf. United States v. Chen Chiang Liu,* 631 F.3d 993, 1000 (9th Cir. 2011)

14   (multiple conspiracy instruction was not required as there was no risk of "spillover guilt").

15   Unlike in Liu, there was surely "spillover guilt" in this Andrade case.

16   Furthermore, the defense was prohibited at trial from obtaining testimony from Agent

17   Quinn regarding the Butina-Abramoff-Erickson related Aml Bitcoin schemes during the same

18   period covered by Andrade's indictment (Trial Tr. 2283-84). As noted to the Court, Agent Quinn

19   failed to disclose to the prosecutors the existence of Aml Bitcoin-related documents discovered

20   at Butina's residence (Trial Tr. 2284:2). In fact, Quinn did not prepare a report on these

21   documents until five years later, after defense counsel learned about them through an Abramoff

22   recording and subsequently requested that the prosecutors provide the materials. This prevented

23   the defense from showing the jury that Quinn failed to conduct a proper investigation and

24   suppressed evidence. Had Andrade been able to do so, the defense could have prompted the jury

25   to ask themselves the crucial question: what else has Quinn suppressed that was for the benefit of

26   Abramoff and favorable for Andrade? (See Ex. E).In the one instance in which the opposition

27

28

---

[4] Trial Tr. at 1841:22-1843-7;1859:17-1861-23; and at 1873:7-1875-11.

makes a nod in the direction of Mr. Andrade's motion, it misses the point entirely.  In response to the Court's observation that Mr. Andrade was not charged with conspiracy (and therefore no multiple conspiracy instruction could be used), Mr. Andrade cited *United States v. Lothian*, 976 F.2d 1257, 1262-63 (9th Cir. 1992) for the proposition that "precedent import[s] conspiracy principles into mail and wire fraud schemes," and noted the lack of any reason why a scheme should be treated differently than a conspiracy for these purposes.  ECF 742 at 13:8-9.

In response, the opposition can do no more than note that *Lothian* dealt with a defendant's withdrawal from a scheme, ECF 761 at 13:18-21, but this does not change that the issue is fairly debatable.  The court in *Lothian* substantially imported into mail and wire fraud the withdrawal principles used in conspiracy cases, and on that basis reversed several convictions because the government failed to rebut Lothian's prima facie evidence of withdrawal. *Lothian,* 976 F.2d at 1262-66.  It did so because "mail and wire fraud are treated like conspiracy in several respects," *id.* at 1262, which the government used to its benefit in this case, such as the admission against Mr. Andrade of the statements and acts of his alleged co-conspirators.  *See* Tr. 1510; 1681; 2061.  As Mr. Andrade observed, under those circumstances, there is no reason why the multiple conspiracy principle should not also be imported into wire fraud scheme cases.  ECF 741 at 13:18-19.  That observation is especially true in this case, in which the acts of co-conspirators (that Mr. Andrade contends were acts in furtherance of a separate conspiracy) are critical to, among other things, the government's proof that the one and only charged wire was in furtherance of the alleged conspiracy.  It speaks volumes that in the face of that challenge, the opposition does not even try to offer a reason why multiple conspiracy principles should not apply to wire fraud schemes.

4. The testimony of FBI Special Agent Quinn, and the argument of the government about, Exhibit 805 violated *Napue v. Illinois*, 360 U.S. 264 (1959)

The opposition gives up the game about whether the *Napue* issue is at least fairly debatable when it offers in defense of its conduct that "there was nothing improper in presenting Exhibit 805 and having the jury draw a rational conclusion from the evidence."  ECF 761 at

1  14:16-17. This is flat wrong. Under the authorities Mr. Andrade has presented and the

2  opposition continues to ignore, it is not just improper but a violation of *Napue* and the

3  constitution for the government to elicit testimony and offer argument designed to give the

4  impression (what the opposition calls the "rational conclusion") that Exhibit 805 showed that Mr.

5  Andrade controlled the social medial accounts during any time period relevant to the case. For

6  the reasons Mr. Andrade has explained, *see, e.g.*, ECF 656 at 24:8-25:8, and the government has

7  never even tried to rebut, this impression – the so-called "rational conclusion" from Ex. 805 that

8  Mr. Andrade controlled the social media accounts during the relevant time period – was 100%

9  false, and the government knew it was false. *See, e.g.*, ECF 656 at 25:9-27:6. The government

10  in its opposition, once again, declines to make any effort to describe what it knew and when, let

11  alone to dispute that it knew that what it was doing with Ex. 805 was misleading.

12      What remains on this issue in the opposition does not move the needle. The opposition

13  wrongly asserts that the first element of a *Napue* claim is "actual[] false testimony." ECF 761 at

14  14:8, but settled law is to the contrary. *See Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019)

15  (Napue is triggered by testimony or evidence that is "false or misleading"); *Alvarez v*

16  *Montgomery*, 2022 WL 868889, at *24 (CD Cal. Jan. 27, 2022) (same); *United States v. Straker*,

17  800 F.3d 570, 602-03 (D.C. Cir. 2015) (per curiam) (same).

18      Next, the opposition asserts that the defense should have argued more about the social

19  media accounts, or the jury did not credit the arguments the defense made, ECF 761 at 14:18-19,

20  but this is wrong in multiple ways. For starters, the government violates *Napue* and the

21  Constitution regardless of what the defense does because the government's presentation of false

22  or misleading testimony corrupts the truth finding process and undermines the reliance of the

23  courts on prosecutors to reduce the danger of false convictions. *See* ECF 742 at 14:17-27. In

24  fact, even if defense counsel had figured everything out in the moment – a virtual impossibility

25  here given other government deceptions that Mr. Andrade has detailed and the government has

26

27

28

1    not denied[5] – *Napue* has still been violated.  *See United States v. La Page*, 231 F.3d 488, 491-92

2    (9th Cir. 2000).  In addition, the opposition's attempt to pass off its conduct, whether based on

3    saying the defense should have done more or that other witnesses also testified about the social

4    media accounts, never grapples with the governing standard, which directs that reversal is

5    "virtually automatic," *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2002), and is required unless

6    the testimony was "harmless beyond a reasonable doubt."  *La Page*, 331 F.3d at 491.

7         Without mentioning these standards, the opposition asserts that Ex. 805 and the

8    government's testimony and argument about it are immaterial.  This, too, at a minimum, is fairly

9    debatable.  Reflecting their materiality, the government devoted substantial attention to the social

10   media accounts and their connection to Mr. Andrade, offering sixty-two exhibits from social

11   media accounts,[6] and vigorously arguing that they showed Mr. Andrade's criminal intent.  *See*

12   ECF 656 at 23:19-24:5; ECF 684 at n.10.  But it was short on reliable evidence that he controlled

13   those accounts at any time any of the allegedly incriminating posts were made.  *See* ECF 684 at

14

15   [5] As Mr. Andrade has explained, and the government has not denied, in addition to all the usual
     24/7 trial tasks, Mr. Andrade's court-appointed defense counsel was chasing down (and

16   catching) Special Agent Quinn's other deception about Mr. Andrade not producing source code,
     sorting through 1507 very lengthy exhibits on the government's exhibit list, only 130 of which

17   were ever introduced, plowing through a mountain of critical financial data—12.4 gigabytes of
     electronic data comprising over 2,924 pages of dense material, *see* Defendant Andrade's Motion

18   in Limine to Exclude Use of AtenCoin Related Financial Data, ECF 511 at 2:5-7, and a
     substantial volume of paper documents, *see* Supplemental Declaration of Cindy A. Diamond in

19   Support of Defendant's Reply Regarding Amended Motion to Exclude or Continue, ECF 538-1
     at 3:24-4:3—that the government withheld for five years and did not produce until shortly before

20   trial, *see* ECF 742 at 15 n.5, and addressing 5TB of discovery to determine if government
     witness Boyer had provided a screen shot to the FBI as he testified.  *See* ECF 684 at 35:3-5.  To

21   make matters still worse, the underlying discovery of the device from which Ex. 805 was taken
     was incomplete – despite a court order to do so, the government never produced an unminimized

22   version of the device or an unminimized Cellebrite report, even though there was no question
     that the government at least at one point possessed both of them, *see* ECF 656 at 25 n.19 --

23   making it especially difficult and time-consuming to go through the device to see whether there
     was other information, helpful or harmful, that needed to be understood before making any

24   assertions or opening any doors about what was and was not on the device.

25   [6] See Exs. 389, 390, 391, 436, 437, 439, 442, 443, 446, 447, 449, 450, 451, 452, 453, 455, 458,
     460, 461, 462, 463, 464, 465, 466, 467, 471, 473, 386, 488, 494, 495, 497, 502, 505, 506, 512,

26   513, 515, 517, 518, 523, 525, 528, 529, 530, 531, 532, 533, 537, 538, 1144, 1146, 1150, 1151,

27   1152, 1153, 1154, 1156, 1479, 1480, 1481, and 1482.

28

15:24-18:14. As Mr. Andrade has shown, and the government has not disputed, every one of the arguably non-benign social media posts the government introduced pre-date the time that its "other witnesses" Cowan and Tran place Mr. Andrade in control of the social media accounts. *See also* ECF 684 at 16:6-16; 17:7-18:1 (showing that witnesses Darling, Foteh and Abramoff add nothing reliable in support of the government's position). If these other witnesses were as convincing as the government now claims, the government never would have needed to employ its gap-filling case agent Quinn to misuse Ex. 805.

It is also "fairly debatable" whether the government had the obligation to correct Boyer's false testimony before the jury was accidental or not, it remains significant that the government did not correct Boyer during his trial testimony making the jury falsely believe that Boyer wasn't part of any Aml Bitcoin related international money laundering scheme or was a part of a scheme to take control of Andrade's patent assets. SSA Ethan Quinn left a paper and audio trail in his efforts to suppress evidence. Which includes but isn't limited to: FBI-302-002965 and FBI-ITV-0000048. See Ex. F and Fn-7.

5.   Exculpatory evidence was excluded based on the erroneous application of hearsay rules

With a wave of its hand, the opposition offers no defense of the evidentiary rulings challenged by Mr. Andrade and instead dismisses the proffered evidence as immaterial. ECF 761 at 15:13-24. In so doing, it wrongly discounts the importance of, among other things, (1) the fact that Mr. Andrade disclosed his right to engage in market making activities if he chooses to in the Terms& Conditions to which buyers agreed, rather than hid them as the government argued, *see* Tr. 3009; ECF 656 at 31:14-32:1; (2) Government witness John Bryan testified that he didn't end up doing any market making. (3) the fact that when the government sent an undercover agent to pretend to be a purchaser in order to get Mr. Andrade to say falsely that his coins were functional and he instead said they were not, ECF 656 at 33:3-9, (4) the fact that Jack Abramoff was involved in a separate scheme that undermined Mr. Andrade's efforts to make AML Bitcoin a success and resulted in the AML Bitcoin ICO occurring before the finalized Aml Bitcoin

1   technology was ready, *see* ECF 656 at 34:16-24; (5) the fact that Abramoff, contrary to his

2   testimony and the government's argument, was raising money to pay for the Super Bowl

3   advertisement, *see* ECF 656 at 37:3-14; and (6) communications to Mr. Andrade showing the

4   success of AML Bitcoin with entities interested in using the technology.  ECF 656 at 37:25-38:8.

5        At the very least, it is "fairly debatable" that all this evidence was hearsay.  Contracts are

6   not hearsay to begin with, and even if they were, the fact that Mr. Andrade made a disclosure of

7   his market making and the other parts of the contracts, white paper, terms of sale, and even the

8   website confirmed people knew what they were buying an Aml Token that would be followed

9   with an Aml Bitcoin at a later date and that they couldn't even access the website or participate

10  in the ICO without agreeing to such terms, is not hearsay. See Ex. G. *Irigaray Dairy v. Dairy*

11  *Emps. Union Loc. No. 17 Christian Labor Ass'n of U.S. Pension*, 153 F. Supp. 3d 1217, 1234

12  (E.D. Cal. 2015) (operative documents such as contracts "are not hearsay"); *United States v.*

13  *Dorsey*, 418 F.3d 1038, 1044 (9th Cir. 2005) (citing Fed. R. Evid. 801(c) advisory committee's

14  notes on proposed rules) ("If the significance of an offered statement lies solely in the fact that it

15  was made, no issue is raised at to the truth of anything asserted, and the statement is not

16  hearsay."), abrogated on other grounds, *Arizona v. Gant*, 556 U.S. 332 (2009).  Similarly, Mr.

17  Andrade stating that his coin was not ready was not being offered for the truth – it supported *the*

18  *government's contention* about the status of the technology – but rather was offered because the

19  fact that it was said was a verbal act that demonstrated Mr. Andrade's good faith. *See United*

20  *States v. Dorsey*, 418 F.3d at 104.  The same is true of the other evidence the Court excluded on

21  hearsay grounds.  *See* ECF 656 at 35:6-13; 37:3-14; *see also* Andrade's Brief on Government

22  Hearsay Objections, ECF 597 at 2:17-3:3; 4:10-5:4; 6:12-17; 7:11-2.

23       Finally, it is at least fairly debatable that that these evidentiary rulings substantially

24  prejudiced Mr. Andrade.  Take just the first three examples above.  In one, the government

25  insisted to the jury as a main aspect of the alleged fraud that Mr. Andrade did not disclose his

26  market making activity, when in fact he did, even though the defenses witness said it never

27  ended up happening. In the second, the jury was told that people thought they were purchasing a

28

completed product instead of a token (place holder) for a future compliant digital currency, which the Pre ICO and Post ICO contracts, terms and conditions, and white paper could have shown that people knew what they were purchasing beforehand.  In the other, in a case with a defense built on Mr. Andrade's good faith and his difficulties perceiving and managing what was going on around him, the defense was not allowed to let the jury know that he was truthful and did not repeat the fraudulent social media statements the government tried to pin on him, even when the FBI set him up to make those statements personally. Not to mention, the FBI's own hand in causing the negativity in the social media online groups. See Ex. H. .Either one of these alone is a critical exculpatory fact, the exclusion of which substantially prejudiced the defense. *See DePetris v. Kuykendall*, 239 F.3d 1057, 1063 (9th Cir. 2001) (granting writ of habeas corpus based on exclusion of evidence going to defendant's state of mind that was critical to her ability to defend the charge).

    6. <u>Damaging testimony offered by the government was admitted without any semblance of a foundation</u>

  In contrast with the erroneous exclusion of the defense's exculpatory evidence, the government was allowed to admit evidence without any semblance of a foundation.  To take just one of the examples cited by Mr. Andrade, there was no foundation for Abramoff's testimony about John Bryan's market making activity, ECF 656 at 40:4-26, and the opposition does not attempt to supply any.  As Abramoff's speculative testimony was the only evidence offered by the government that anyone had engaged in any market making activity – John Bryan having not given the government any support, *see* ECF 656 at 40:8-11 -- this alone was a devastatingly prejudicial error on one of the government's main accusations.

    7. <u>Rule 404(b) and other unfairly prejudicial evidence was erroneously admitted</u>

  The focus of Mr. Andrade's challenge to the admission of the Aten Coin Rule 404(b) evidence was that the government failed to prove it was a fraud, and, to the extent it was admitted merely because it was "inextricably intertwined" with AML Bitcoin – that it somehow was needed to tell the story of what happened with AML Bitcoin -- there was no reason to

include within the proof all the victim testimony, complete with crying. *See, e.g.*, ECF 742 at 16:6-17. The opposition largely bypasses these arguments, never responding to Mr. Andrade's showing that the government failed to prove Aten Coin was a fraud. *See, e.g.*, ECF 656 at 43 n.45. Nor does it attempt to explain how proving the relationship between Aten Coin and AML Bitcoin was sufficient justification for the flood of prejudicial victim testimony it introduced.

As a result, these issues are at least fairly debatable, as is the fact that they meet the standard for prejudice. *See United States v. Charley*, 1 F.4th 637, 647 (9th Cir. 2021) ("the use of [404(b)] evidence must be narrowly circumscribed and limited"); *Michaelson v United States*, 335 U.S. 469, 475-76 (1948) (prior wrongdoing "is said to weigh too much with the jury and to overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge"); *United States v. Asher*, 910 F.3d 854, 863 (6th Cir. 2018) ("When jurors hear that a defendant has on earlier occasions committed essentially the same crime as that for which he is on trial, the information unquestionably has a powerful and prejudicial impact"). And all this still leaves aside the other gratuitous and unfairly prejudicial evidence that the government was allowed to admit over objection, such as that Mr. Andrade stiffed Gavin Newsom and ruined Carlos De La Guardia. *See* ECF 656 at 44:1-11.

8.  The defense's evidence of government misconduct was at least sufficient to require a hearing.

Seeking to justify the lack of a hearing, the opposition proclaims that there was no basis to suggest that the proffered witnesses would testify to the suppression of relevant evidence. ECF 761 at 18:14-17. This proclamation is at least "fairly debatable" given that at least one witness voluntarily provided a declaration that described relevant evidence being suppressed by the FBI and was within the subpoena power of the Court. *See* Declaration in Support of Andrade's Reply Brief in Support of Motion for an Evidentiary Hearing to Address Government Misconduct, ECF 529, Exhibit A; Declaration of Kerrie C. Dent in Support of Andrade's Motion for Reconsideration of Motion for an Evidentiary Hearing to Address Government Misconduct, ECF 548-1 at 3:1-10. Similarly, the claim that Mr. Andrade's arguments about the destruction of

Paul Erickson's phone misrepresent the facts, ECF 761 at 18:16-19, is fairly debatable given that those arguments were based on what *one of the prosecutors on this case said* to defense counsel about what happened to Erickson's phone – that he was looking at a computer that indicated that Erickson's phone was destroyed in March, 2022. *See, e.g.*, ECF 527 at 7:8-8:2; Declaration in Support of Andrade's Misconduct Motion, ECF 498-3 at 12:24-16:5 (containing typographical error corrected in ECF 527 at n.4).

If an evidentiary hearing had been granted and Shailendra Maheshwari would have been called to testify, we could have also asked him about his association with Naimer, CHS Mata, and his communications where he confirmed Attorney Client privilege with Andrade. See Ex.-I. Each of these individually is enough to meet the standard for a hearing, which requires only "reasonable suspicion." *United States v. Soberon,* 929 F.2d 935, 941 (3d Cir. 1991); *see also Earp v. Ornoski,* 431 F.3d 1158, 1169 (9th Cir. 2005) (upon an adequate basis for a claim of prosecutorial misconduct, Defendant is entitled to an evidentiary hearing where he is given a full and fair opportunity to develop the facts supporting his claim).

         9.   <u>Clear Evidence of Potential Brady violations entitled Mr. Andrade a full and fair opportunity to be heard.</u>

Additionally, there exists debatable constitutional concerns including whether the withholding of Jack Abramoff's informant file was genuinely based on national security considerations, or whether its concealment improperly infringed on Andrade's constitutional rights. The core question becomes whether the government appropriately balanced Andrade's civil liberties against legitimate national security interests, or whether the material was withheld (potentially through CIPA) for reasons inconsistent with the government's disclosure obligations under *Brady v. Maryland,* 373 U.S. 83 (1963).

Relevant and helpful documents from Abramoff's informant file—under the DOJ's own policies—would have included: initial and continuing suitability reviews, reports, and recommendations concerning Abramoff; instructions given to him; documents authorizing him to engage in otherwise illegal activity; documents regarding his unauthorized illegal activity; and

1   payment requests and approvals for his involvement in criminal conduct. The government's

2   withholding of this informant file—which contained information directly related to Andrade and

3   his digital currency—violated Brady v. Maryland, as the material was exculpatory and could

4   have been used to impeach Abramoff and other government witnesses concerning their conduct

5   during the period covered by Andrade's indictment. Both the public and sealed dockets confirm

6   that Andrade's prior counsel repeatedly requested this evidence, beginning as early as 2015,

7   when Abramoff first targeted Andrade, and continuing through 2022. See Ex. J.

8          Compounding on the injury, at trial, on February 24, 2025, Abramoff testified, in the

9   presence of Agent Wynar, that he was not an informant. (Trial Tr. 1788:18–19). Yet after trial,

10  Andrade's attorney obtained evidence to the contrary. In her declaration, she stated: *"An*

11  *attorney for former FBI agent Jonathan Buma informed me that his client could confirm that*

12  *Jack Abramoff has been a government informant... Mr. Buma's testimony would undermine Jack*

13  *Abramoff's trial testimony that he was not an informant."* (ECF 657-1). The suppressed

14  informant file could have provided critical impeachment evidence, including whether

15  Abramoff's laundering activities—such as the U.S. PR effort through Angola and the $2.3

16  million laundered with Nick Muzin and Joey Allaham in 2017 using AML Bitcoin—were

17  authorized, facilitated, or condoned by the government.[7] This information was directly relevant

18  to Abramoff's credibility and intent. The contents of Abramoff's informant file would have had a

19  huge effect on the jury. They would have learned what all criminal activity Abramoff was

20  authorized to engage in that directly related to Aml Bitcoin and what all other schemes he was

21  doing during the same time period of the Andrade indictment such as, election interference. This

22  evidence could have been used to impeach the government's case and Jack Abramoff himself.

23         Moreover, the Classified Information Procedures Act does not place a restriction on a

24  defendant's right to a full and meaningful presentation of his claim to innocence. *See United*

25

26  [7] The Court reviewed evidence within a USB drive at ECF 692-2, prior to issuing the ex parte order referenced at
     ECF-701. The contents of that drive—excluding the attorney-client privileged documents identified within the drive

27  in Exhibit D—will be provided to the government for review. As further demonstrated in Exhibit J, there is no doubt
     that Abramoff and his proxies—DelaGardia, Sunkin, Richard Naimer, John Bryan, Natko Vlahovic, and others—
     were all members of a global organized crime international money laundering network.

28

*States v. Sedaghaty,* 728 F.3d 885, 903 (9th Cir. 2013). Thus, the Ninth Circuit clearly has an avenue of examination on whether any classified information relevant to Andrade's defense was unlawfully withheld in violation of *Brady* or other due process protections. It is important that the 9th Circuit get access to the entire informant file regardless if it was shared with the district court or not.

Further, there will be additional debatable issues raised before the Ninth Circuit. These include but are not limited to: 1) the existence of a recording involving Melissa Foteh and Andrade in which Cowan, Tran and others are referenced as it relates to the social media postings—evidence that the government did not include in the Cellebrite extraction or forensic report of Andrade's device. This is exculpatory because it confirms that Andrade wasn't controlling or directing the contents of the social media accounts; and 2) the prosecutors' awareness that Foteh had informed them that she had been manipulated and coerced into providing false or misleading testimony before the grand jury prior to her trial. See Ex. K. This did not stop the prosecutors from quoting Foteh's grand jury testimony to the trial jury during Foteh's testimony and during closing statements. See Tr. 1128:13 to 1140 at Ln 16) and during closing arguments. See Tr. 3011:25-5; and 3019:19-24).

10. <u>A short continuance was required by the government's delayed, eve-of-trial production of voluminous and probative financial information</u>

The opposition ignores Mr. Andrade's contention that the five-year delayed production deprived the defense of the ability to follow up on helpful leads and witnesses identified in the production, unfairly limited the time the defense could devote to review of the government's exhibits and engage in other preparation, and degraded the memory of Mr. Ruzicka, an otherwise potentially helpful defense witness.  ECF 742 at 17:15-18:6.  Andrade was not able to use this evidence at trial. Cf. United States v. Chung, 659 F.3d 815, 831 (9th Cir. 2011) (finding the defendant was not prejudiced—despite the delay in document production—where the evidence was used effectively at trial). These unrebutted facts create at least a fairly debatable issue that the denial of a short delay deprived Mr. Andrade of "the first essential of trial fairness" and due

1    process.  *United States v. Garner*, 507 F.3d 399, 408 (6th Cir. 2007).

2               11.   The cumulation of multiple errors requires reversal

3          Compounding on error, Exhibit 805 was not included in the government's Cellebrite

4    report for the Andrade device during discovery. Instead, the government presented a placeholder

5    for a potential exhibit (Ex002-001) that incorrectly claimed the Cellebrite report / Image

6    contained 15,549 files totaling 27.6 GB. On March 7, 2024, counsel submitted a letter to the

7    Court prior to its ruling on Andrade's device (ECF-288), highlighting that the government had

8    only produced a 300 MB Cellebrite file. Subsequently, the agents attempted to produce just a

9    folder and not a Cellebrite report, which included a large amount of messages and images from a

10   public Telegram group channel with thousands of members, including UCEs. During a hearing,

11   the government informed Judge Beeler that they could not access the full device. However,

12   Exhibit 805, which was sent to Andrade from his attorney, later appeared as a trial exhibit (see

13   Corrected Declaration in Support of Andrade's Motion for a Retrial, ECF 657-1, para. 8.

14         There are so many errors that are at least "fairly debatable" that it is easy to lose sight of

15   the devastatingly prejudicial quality of most of them.  The authorities cited above demonstrate

16   that incorrect instructions, misleading government testimony, exclusion of critical exculpatory

17   evidence, admission of key government evidence that lacked foundation, are all, on their own,

18   sufficient to make the question of whether a new trial should have been granted fairly debatable.

19   Add to that the admission of a flood of prejudicial Rule 404(b) and other gratuitous prejudicial

20   testimony – also sufficient to justify a new trial – and the denial of a misconduct hearing and of a

21   continuance, and it is no answer to say that the evidence was overwhelming: even if it were

22   somehow true that the evidence was overwhelming, that would only be the result of improperly

23   admitting a flood of unfairly prejudicial evidence, erroneously excluding pivotal exculpatory

24   evidence, and not giving the jury the instructions it needed to assess Mr. Andrade's defenses.

25     **D.  The Court Should Also Consider Mr. Andrade's Extraordinary Circumstances**

26         Mr. Andrade's opening brief noted that his circumstances would "render the hardship of

27   prison unusually harsh" for him, *United States v. Garcia*, 340 F.3d 1013, 1019-20 (9th Cir. 2003),

28

added that Garcia applied 18 U.S.C. 3145(c), which governs defendants convicted of crimes of violence, and invited the Court to consider these hardships, given that his request should call for a lesser showing than that required for a violent offender.  ECF 742 at 19:4-22.  In response, the opposition merely notes that Section 3145(c) does not govern this motion, which Mr. Andrade already acknowledged.  The opposition does not contest that Mr. Andrade will suffer unusual hardships if imprisoned, or provide any reason the Court should not consider those hardships in determining whether to incarcerate him pending appeal.

### E.  For the Same Reasons, the Enforcement of Any Forfeiture or Restitution Orders Should Also Be Stayed Pending Appeal

In addition to all the issues identified above that make it fairly debatable that Mr. Andrade is entitled to a new trial – which would obviate both the restitution and forfeiture awards – both the forfeiture amount and the restitution amount also have fairly debatable issues themselves, such as whether forfeiture can be ordered for money that came to rest with Mr. Andrade's co-conspirators, whether money judgment forfeitures are permissible, *see* Defendant's Reply Regarding Restitution and Forfeiture, ECF 737 at 17:24-18:23, whether the forfeiture award was timely, *see id.* at 18:24-20:1, and whether the government sufficiently proved losses (as opposed to monies paid) for restitution, *see id.* at 14:8-24.  The opposition acknowledges the lack of governing standards and invites the Court to apply the standards *in Nken v. Holder,* 556 U.S. 418 (2009), even though that case addressed staying the removal of an undocumented immigrant, and the government rejected its application to restitution for that reason in another case.  *See United States v. Yalincak*, 2015 WL 6456537, at *2 (D. Conn. Oct. 26, 2015).  Mr. Andrade submits that the closest guidance the Court has is the law on the analogous question of bond pending appeal, and that the Court in exercising its discretion should look at whether there are fairly debatable issues that would materially change the forfeiture or restitution amounts, as there are in this case.

Both the forfeiture and restitution amounts remain miscalculated.[8] For instance, the government improperly included nearly $1 million in Cross Verify proceeds from before the indictment period. At the September 16, 2025 hearing, the government incorrectly suggested that, while AtenCoin proceeds were being removed as they were before the indictment period, the rest—such as CrossVerify—fell within the indictment period. This is factually incorrect. See Ex. L. This was also found within the Ruzicka late production.

Additionally, the government's financial expert was not provided with essential information, including a list of fiat and digital currency refunds, or a list of individuals who sold their digital currency on exchanges, such as what prior Counsels have already put on the record, that David Mata on behalf of Block Bits Capital, Ben Boyer, and Daniel Ahranoff. Remember, Mata was making from 1 to 3 bitcoins a day by selling Aml Tokens which was more than $20,000 a day they were making. Despite this, the government claimed that the exchanges never worked, yet simultaneously accused their witness, John Bryan, of engaging in market-making activities on those vary same foreign exchanges. The expert also lacked critical data on the sophisticated network of Abramoff-controlled proxy companies—such as Pangea, Landfair Capital, and Sugar Mountain Holding—that purchased AML Tokens during the ICO. Abramoff controlled entities and individuals contributed well over half of the funds raised in the ICO.

Moreover, the discovered recording that was on Andrade's mobile device, between Andrade and Foteh—missing from the government's production—reveals significant issues with the auditing of digital currency transactions conducted by Foteh employee Tran before she

---

[8] Beyond the accounting errors and lack of findings, there is a critical due process concern: third parties with joint interests in Andrade's assets—such as his wife and those who bought his stock in BGC—are at risk of losing their property rights without a hearing. While Rule 32.2(c) may allow the government to enforce a forfeiture money judgment without ancillary proceedings, miscalculations in the forfeiture amount can harm innocent parties. The fundamental question is whether third parties with joint interests are entitled to a hearing before their rights are extinguished. Rule 32.2(c)(1) allows forfeiture without such a hearing, but this creates a risk that innocent co-owners will lose their property rights without notice or due process—a risk that runs counter to the Fifth Amendment. *Was this Congress's intent to not allow joint property owners to seek access to the court when it codified criminal forfeiture in Rule 32.2 and 21 U.S.C. § 853?*

worked for Andrade. The recording highlights errors in the accounting process, including Tran's inability to use QuickBooks. As a result, the financial accounting was reassigned. Furthermore, the QuickBooks reports prepared by Karl Ruzicka were withheld from the defense until just before trial and are now stored in outdated formats that require costly expert assistance to access. Despite these flaws, the government relied on a faulty digital currency list to support its claim that the digital currency transactions exceeded $2 million.

The opposition notes that the restitution schedule is not onerous, but that's easy for the government to say because it is not in Mr. Andrade's shoes with two young daughters and a wife without any income, and the government seeking forfeitures that could put the home of his young daughters and wife at risk. That the restitution schedule is not onerous just underscores that it cannot be of any material help in the short term to the hundreds of eligible purchasers, and that, especially given that any wrongfully awarded money will never be returned, the Court should stay its restitution order. Similarly, the Court should stay any forfeitures in order to allow the family to remain in their home while the appeal is pending.

## III.    CONCLUSION

For the reasons above, Mr. Andrade requests that he be released on bond pending his appeal and renews his request that the Court stay any restitution and forfeiture issues. Regardless of the issues that Andrade is facing, he fully trusts the people at the probation department and appreciates the counseling services that Judge Spero has given him on numerous occasions. If Andrade were to be able to remain on bond pending appeal, he will stay in compliance, request monthly meetings with the probation department, and would request additional counseling services by Judge Spero.

1   DATED:  October 5, 2025

2

3                                       Respectfully Submitted,

4

5                              *John M. Pierce*

6                                JOHN M PIERCE,

7                                Attorneys for Defendant
                               ROWLAND MARCUS ANDRADE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28