DEAN AND RAY LLC
PO BOX 7745
NASHUA, NH



January 2, 2020

**<u>VIA ELECTRONIC MAIL</u>**
Agent Vicki Morgan
Vicki.Morgan@tigta.treas.gov

Re:           <u>NAC Foundation / Marcus Andrade</u>

Agent Morgan:

As you know from our recent discussions, this office represents Marcus Andrade ("Mr. Andrade") in connection with, among other things, an audit to which his firm, the NAC Foundation ("NAC") is currently subject. We enclose this letter with the documents, numbered 1-25 for reference, to provide some narrative context to Mr. Andrade's original complaint in this matter.

Mr. Andrade initially made contact with Jack Abramoff ("Mr. Abramoff") in 2015 to consult with Mr. Abramoff about lobbying services initially unrelated to the present matter. Mr. Andrade ultimately decided not to move forward with him. The two crossed paths again in 2017. Document #1 illustrates the political contacts Mr. Abramoff suggested he would utilize directly and indirectly to lobby on Mr. Andrade's behalf and to protect him and his business from political influence and to ease the transfer of Mr. Andrade's IP. Mr. Abramoff alleged that these contacts included the ████████████████████████████████, along with a former Congressman in Orange County, California, Senator ████████████, Senator ████████████, Representative ████████████, as well as other senators and representatives. Mr. Abramoff did inform Mr. Andrade while the two were meeting in the Marina Del Sol area in California that Mr. Abramoff had some U.S. government associates that wanted to purchase his company. Mr. Andrade made reference to these same government employees' proposed purchase to at least two other individuals in California shortly afterwards .

In 2019, two years into their relationship, Mr. Abramoff informed Mr. Andrade that Mr. Abramoff had a potential buyer for all of Mr. Andrade's intellectual property and various software technology which constitutes the bulk of the value of Mr. Andrade's businesses. Throughout 2019, Mr. Andrade was in negotiations with this potential buyer, which Mr. Abramoff as an intermediary. Mr. Abramoff refused to disclose the name of the potential buyer until Mr. Andrade signed the proposed agreement attached hereto as "Document #2" (the "Proposed Agreement"). Throughout this period, Mr. Abramoff styled himself a "broker."

In return for acting as an unsolicited intermediary, the Proposed Agreement provided Mr. Abramoff (through one of his intermediary entities) a significant broker fee. It remains unclear if the proposed buyer, Mr. Abramoff, or any of Mr. Abramoff's related entities are credentialed as broker-dealers with the Securities & Exchange Commission or any state securities division. Upon our own information and belief, Mr. Abramoff maintained residences in both California and Maryland during this time and to our knowledge was not registered as a broker-dealer with either state.

The negotiations became increasingly acrimonious. In August of 2019, Mr. Abramoff began to state in no uncertain terms that he would use his personal political influence with various government agencies to pressure Mr. Andrade into signing the Proposed Agreement. The threatened course of action was for Mr. Abramoff to cause the IRS, FBI, and SEC to enter into lengthy audits and investigations of Mr. Andrade and his various businesses in order to drain his finances, destroy his businesses, discourage other buyers or investors, and give him the perception that his potential buyer would be the only option.

Documents 8, 14, 24 and 25 contain further examples of threats that were issued after Mr. Andrade stated that he would not sign the Proposed Agreement on August 12, 2019. These threats should be read in light of Documents 4, 6, 7, 8, 13, 15, 17, 20, 23, 25, and 25a.

On August 15, 2019, Mr. Andrade received notice from IRS agent ███████, announcing an audit of the NAC Foundation under the Bank Secrecy Act (see

Document #11). This occurred mere days after Mr. Abramoff threatened to use his influence to use his influence to initiate an audit. Furthermore, correspondence between a California-based IRS agent and an associate of Mr. Abramoff's given to Mr. Andrade was unusually-worded, in a way that suggested a personalized tone not typical of IRS correspondence. This correspondence stated that Mr. Andrade and all his companies are under investigation by the IRS, for the purpose of damaging Mr. Andrade's credibility among his businesses, which include businesses not related to the NAC Foundation or any of its operations. (See, for example, Document 22: "and his businesses.") The IRS has never contacted Mr. Andrade or any of his legal counsel regarding these supposed other audits and investigations.

We are concerned that the tone and timing of the audit and investigation represented by Document 22, suggest a procedurally-improper retaliation against Mr. Andrade for his refusal to sign the Proposed Agreement and his refusal to transact business with Mr. Abramoff's buyer.

Please further note that the California SEC correspondence reflected in, for example, Document 12, does not contain a reference to a case number as it should. A case number would have been established by software used to open a case. The software also tracks when cases are opened. Document 12 further reflects that an "investigation" by the SEC had also been initiated via correspondence from Mr. Andrade's technology adviser. This former adviser notified Mr. Andrade of this correspondence attempted to verify the California SEC examiner's credentials, and the California SEC examiner ceased responding. This document was shown to some retired high ranking people with the SEC, and all have found policy violations in the email to Mr. Andrade's advisor.

Shortly after these frightening actions commenced and apparently showing foreknowledge of them, Mr. Abramoff issued further threats and demands for Mr. Andrade to sign the Proposed Agreement. See Documents 16, 17, 18, 25, and 25a.

For more information about Jack Abramoff and his past, please view the links below.

https://www.politico.com/story/2012/02/abramoff-wont-name-names-072543

http://www.washingtonpost.com/wp-dyn/content/article/2005/04/30/AR2005043001147_pf.html

http://www.washingtonpost.com/wp-dyn/content/article/2005/08/11/AR2005081101108_2.html?nav=hcmodule

https://www.justice.gov/archive/opa/pr/2008/September/08-crm-779.html

Nothing in this letter should be construed as a waiver of any right Mr. Andrade may have to any other remedies in this matter, nor should anything contained in this letter be viewed as a waiver or refusal to exercise any applicable whistleblower rights. Please find my contact information below for further questions.

Sincerely yours,

Christopher Ray, Esq.
P: █████████
E: christopher@deanandray.com

Attachments to Treasury Complaint Docs 1-10



Marcus Andrade <ceo@amlbitcoin.com>

## AML BitCoin Advisor

Japheth Dillman <jdillman@clevrplay.com>
To: Leslie Katz <katzle@gtlaw.com>, Marcus Andrade <ceo@amlbitcoin.com>    Tue, Dec 12, 2017 at 9:54 PM

Hi Leslie,

I just spoke with Marcus and he's excited to extend to you an invitation to be an advisor to AML BitCoin! He's very
appreciative of all of the introductions you've already made to date. I also shared with him the list below of potential
Introductions:

HSBC
US Bank
Sterling


SEC Commissioner Kara Stein
Sen. Feinstein
Sen. Baldwin
Sen. Whitehouse
Sen. Harris

Rep. Pelosi
Rep. Swalwell
Rep. Eshoo
Rep. Speaker
Rep. Takano
Rep. DeSaulnier
Rep. Thompson

SF Chief Innovation Officer
Ports of Oakland, Long Beach, L.A., Waimene (sp.?)
CA Treasurer (current State board of Equalization member) Fiona Ma
State Controller Betty Yee


Marcus would like to immediately gift you 5,000 tokens with the possibility of earning more in the future based on how many
of these deals come to fruition.

If this is acceptable, we'll have a contract drafted up and sent your way.

**Finally, I recall you wished to not be be publicly listed** on AML BitCoin's site and materials.... that your role would be
behind the scenes to help avoid the appearance of any conflicts of interest. This is acceptable.

Cheers,

--

**Japheth Dillman**
CEO & Co-Founder



8-2-19

2

## MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Agreement") is made and entered into as of August 1, 2019, (the "Effective Date") by and between Marcus Andrade ("Andrade") and all companies owned and or controlled by Marcus Andrade including without limitation Black Gold Coin, Inc. NAC Foundation and any other companies owned or controlled by Andrade unnamed in this Agreement ("Unnamed Andrade Companies") (collectively, all such companies including Unnamed Andrade Companies are hereafter referred to as the "Andrade Companies"), on the one hand, and Sepo Holdings, LLC ("Sepo"), on the other hand.    For clarity, Andrade and the Andrade Companies are sometimes referred to herein collectively as the "Andrade Parties".

In consideration of the mutual covenants herein contained, and for good and valuable consideration the sufficiency of which is hereby acknowledged, the parties agree as follows:

## AGREEMENT

1)     Prior Services/Consideration.  The Andrade Parties hereby acknowledge that Sepo has performed multiple services over several years for Andrade and the Andrade Companies including without limitation financial advisory services.   In consideration of such services and for other good and valuable consideration, the receipt of which is hereby acknowledged, in the event Andrade and/or the Andrade Companies enter into any agreement and/or agreements whatsoever for or in connection with the sale, lease, license, assignment, or other disposition of any of assets ("Assets") of Andrade or the Andrade Companies or the ownership of all or part of the Andrade Companies including without limitation, any agreements which do not require the transfer of Assets directly but do result in another party owning or controlling such Assets or Andrade Companies (collectively "Transactions"), Andrade and the Andrade Companies each jointly and severally agree to pay Sepo the following consideration:

A)     Twenty Five (25%) percent of any option payments ("Option Payments") received by Andrade and/or the Andrade Companies in connection with and/or from the Transactions; and

B)     Fifty (50%) percent of any other consideration received at any time by Andrade and/or the Andrade Companies including without limitation, cash, stock, digital currency, or any other item of value (regardless of value) (collectively "Principal Payments"), net only of payments approved by Sepo in writing in advance to (i) any Pre-ICO coin purchasers or other private sale purchasers and (ii) any third party vendors or agents (collectively "Approved Third Party Payments").

2)     Payment of Consideration.   With the exception of the Option Payments only, all Principal Payments to be made to Andrade and/or the Andrade Companies must be paid by the paying party directly to a third party escrow agent to be mutually approved by Sepo and Andrade which agent will execute instructions requiring such agent to pay all Approved Third Party Payments and to pay the balance 50% to Sepo or its designee and 50% to Andrade or his designee.

3)     Miscellaneous.

1

A)      This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed within the State of New York, that the State of New York has personal and subject matter jurisdiction over each of the parties and any disputes or litigation in any way pertaining to this Agreement; and that the sole proper and exclusive venue for any litigation or disputes in any way pertaining to this Agreement shall be within the New York City, New York. In the event of any such litigation, the prevailing party shall be entitled to all court costs and reasonable attorney's fees as determined by the court for that purpose.

B)      Representations and Warranties: Each party represents and warrants that each has the power and authority to enter into this Agreement, to grant the rights granted herein and to perform the duties and obligations described herein without the consent of any other parties including without limitation, any partners, shareholders, officers, directors, spouses, or agents. Each party further warrants and represents that each shall not take any action which might prevent the exercise by the other party hereto of the rights granted to such other party nor shall either take any steps which may encumber the rights granted to the other. The Andrade Parties are the exclusive legal owners of the Assets, and owns the Assets free and clear of all liens and adverse claims. The execution, delivery, and performance of this Agreement and the sale of the Assets by the Andrade Parties will not violate or cause a breach or default of any other material agreement, instrument, or obligation to which the Andrade Parties, or any of them, is a party, nor, to the actual knowledge of the Andrade Parties, shall it violate any applicable laws or statutes of any applicable governing body.

C)      This Agreement is the legal, valid, and binding agreement of the Andrade Parties, enforceable in accordance with its terms.

D)      This Agreement contains the full and complete understanding and agreement between the parties with respect to the within subject matter and supersedes all other agreements between the parties, whether written or oral, relating thereto, and may not be modified or amended except by written instrument executed by both of the parties hereto.

[signature pages follow]

2

2

9-12-19

8,12

DARREN
WINCZURA



← +1 (780) 336-5224

AUGUST 12, 2019

Call me  1:34 PM

After thinking about it more Darren I do appreciate you trying to help out and assist with this  6:30 PM ✓✓

But I am not going to sell the portfolio.  6:31 PM ✓✓

We have had an opportunity to take a preliminary look at the BTC patents and related technologies empowered by these patents that you have developed, including the CrossVerify system and the AML Bitcoin. We are interested to acquire these assets, under mutually acceptable terms.

In order for our company to proceed, however, we must perform the necessary due diligence on these assets, including having our attorneys thoroughly examine and ascertain the value of the underlying patent portfolio. To do a proper job, we will require nine months. We are prepared to pay you One Hundred Thousand Dollars ($100,000.00) for an exclusive nine month option period, enabling us to determine whether to proceed.

The option we propose would also include a strike price for purchase of these assets. We anticipate negotiating a price with you that would include a combination of cash and digital currency payments. To do so, we look forward to having a telephone conference at your earliest convenience.

Our experience, acumen, and market position in the world of Blockchain and digital currency place us in the perfect position to be able to monetize these patents, and bring the largest global players in as our partners. If needed, I think you will find we are distinguished in this field, and as such, are capable of bringing not only resources to the table, but expertise, relationships and political capital as well. We believe we are uniquely qualified to bring the project to the next level and create immense value going forward.  9:04 PM

Lol  9:05 PM ✓✓

Send the whole thing.  9:06 PM ✓✓

I do not see where it was made out to me  9:06 PM ⌄

It only mentions the 100K

Type a message

3



12:37

+1 (780) 336-5224
August 12, 9:04 PM

We have had an opportunity to take a preliminary look at the BGC patents and related technologies empowered by these patents that you have developed, including the CrossVerify system and the AML Bitcoin. We are interested to acquire these assets, under mutually acceptable terms.

In order for our company to proceed, however, we must perform the necessary due diligence on these assets, including having our attorneys thoroughly examine and ascertain the value of the underlying patent portfolio. To do a proper job, we will require nine months. We are prepared to pay you One Hundred Thousand Dollars ($100,000.00) for an exclusive nine month option period, enabling us to determine whether to proceed.

The option we propose would also include a strike price for purchase of these assets. We anticipate negotiating a price with you that would include a combination of cash and digital currency payments. To do so, we look forward to having a telephone conference at your earliest convenience.

Our experience, acumen, and market position in the world of Blockchain and digital currency place us in the perfect position to be able to monetize these patents, and bring the largest global payers in as our partners - if needed. I think you will find we are distinguished in this field, and as such, are capable of bringing not only resources to the table, but expertise, relationships and political capital as well. We believe we are uniquely qualified to bring this project to the next level and create immense value going forward.



3

8-12-19



**12:37**   +1 (780) 336-5224

AUGUST 12, 2019    9:08 PM ✓✓

Lol that is a scam Darren.   9:09 PM ✓✓

What does Jack have to gain if it's a scam. And no it doesn't mention the 100 million    9:11 PM

That was Jack's number right?
9:12 PM

Why would they mention CrossVerify??    9:12 PM ✓✓

It's Richard and 2030. David Siegel
9:12 PM ✓✓

They must want that technology also
9:13 PM

I can't show that. That is embarrassing    9:14 PM ✓✓

Thanks  9:14 PM ✓✓

AUGUST 18, 2019

Any better offers?   12:41 PM

And this point nothing is for sale

☺ Type a message

4



**Department of the Treasury
Internal Revenue Service
Small Business/Self-Employed**
110 City Parkway
Las Vegas, NV 89106
MS 4157 RM

NAC Foundation LLC
Dba National Aten Coin
7495 W. Azure Dr. Suite 110
Las Vegas, NV 89130
Attn: Marcus Andrade, CEO

Date:
08/15/2019
Date of appointment:
10/01/2019
Time:
TBD
Place:
TBD
Person to contact (examiner):
Name:  Robert Malinak
Telephone:  (702) 868-5196
E-mail:  Robert.Malinak@irs.gov
Employee ID number:
1001020062

Dear Mr. Andrade:

We scheduled an examination on the date and time listed above to ensure your money services business complies with the Bank Secrecy Act (BSA). Money services businesses are required to comply with the BSA provisions of Title 31 of the United States Code and Title 31 of the Code of Federal Regulations, Chapter X.

The period under examination is January 1, 2019    through June 30, 2019    .

**What you need to do**
Review the enclosed Form 4564, *Information Document Request*, for a list of documents to have available during the examination. Mail items 1 through 12  from the enclosed list to the address shown above to my attention before September 4, 2019. Have the other documents from the list ready for review during the examination.

**What you need to know about the examination**
A BSA examination is not an income tax examination. However, you may be liable for penalties for failure to comply with the BSA.

If you have questions or concerns regarding this request or the upcoming examination, you can call me at the telephone number listed at the top of this letter.

Thank you for your cooperation.

Sincerely,
Robert J.
Malinak

Digitally signed by Robert J.
Malinak
Date: 2019.08.14 13:04:58
-07'00'

Robert Malinak
Bank Secrecy Act - Internal Revenue Agent

Enclosures:
Form 4564

Letter 4313 (Rev. 11-2016)
Catalog Number 49899P

5

opportunity will disappear on its own. Time skills all deals and this group is already wondering why this is taking so long.

Lastly thank you for taking the time to read this and considering my approach.

Regards

-David

**David A. Cohen**

Some possible bad outcomes include:

1. Some of the coin holders filing fraud actions in court.

2. Some of the creditors suing for past debts and seeking to attach assets to foreclose upon.

3. Perhaps one of the patent violators taking the project to court to undo the patents. While they may not succeed under normal circumstances, a full blown legal case is not something you have the resources for and people with resources beat people who have none almost always in civil court.

4. The federal investigation by the FBI moves from investigation to grand jury indictments, with the attendant publicity killing any chance for the project. At that point, no one will want to get anywhere near this.

5. The federal criminal tax investigation of you moves forward with the federal government seizing the patents and your other companies and assets under their asset forfeiture laws - all in advance of obtaining a ruling against you, but enough to put the blood in the water for your competitors.

6. You completely run out of money and are forced to put the project and your companies into bankruptcy. Some people see bankruptcy as a protection, but this is not always the case. In fact, the court appointed trustee would be in charge, and likely move to fire sale assets to pay creditors and coin holders.

If you let this life preserver float away, for whatever reason, you can imagine on your own the possible bad outcomes several of which I have listed at the bottom of this email in blue.

I am in no way threatening you; I am trying to present you with possible outcomes so you can make a rational and unemotional decision.

If you opt to sell, you will have a company that has committed $100 million to buy the assets, and possibly another $100 million to turning the enterprise into a success. You will retain a large amount of digital currency that may enable you to achieve super wealth. And you won't have the stress and headaches and incur legal and other expenses to make that happen....the buyer will.

According to what I have read about them, the prospective buyer has been playing in the billions of dollars for a while, and according to Jack, they are keen to invest to make this into everything all of us ever hoped for. And you could win mightily if they do... but in the meantime, you will already be financially set even if they flop.

Speaking of Jack, I don't know why your relationship has fallen apart, but that is not important at this point. Love him or hate him, he has a life preserver in his hands for you. You are going to pay him for it, but you are going to benefit more than anyone and more than you have ever in your life.

As we discussed my understanding is you have agreed to compensate Jack with 30% of any gross proceeds from all of the three companies and I am proposing 10% for me. That leaves you and your family 60% before paying anyone else you need to pay. I am a respected business person used to dealing with very large and complex transactions. Deals are hard to get done and you will respect and appreciate the professionalism I will bring to a process and I believe my involvement and experience will maximize the chances of having a successful outcome and present potential additional upside for all.

If this is something you want to pursue I will take charge of such a process. However I am not interested in an exercise in futility so let's discuss if you want to move forward or say no to this opportunity. If you do wish to move forward, you need to do so rapidly, or the

 Gmail

Monex 247 <monex247@gmail.com>

## FW: As promised I outline my thinking below

**David Cohen** <davidcohenfamily@hotmail.com>
To: "monex247@gmail.com" <monex247@gmail.com>

Tue, Aug 20, 2019 at 2:16 PM

David A. Cohen

**From:** David Cohen <davidcohenfamily@hotmail.com>
**Sent:** Tuesday, August 20, 2019 10:18 AM
**To:** Marcus Andrade (ceo@amlbitcoin.com) <ceo@amlbitcoin.com>
**Subject:** As promised I outline my thinking below

Good morning Marcus,

As promised I outline my thinking on a proposed transaction below.

I realize that you want to make more money than is presently proposed to you. Undoubtedly, you have read stories about how Mark Zuckerberg (Facebook) turned down buy-out offers and went on to become one of the richest men in the world - thinking this could be you. I respect and appreciate people who have a dream, but there are times in life when one has to realize that a good chunk of a pie is better than no pie and starving. This is one of those times. In my personal business career as a leader and advisor to other very successful investors I have seen countless examples of founders missing key opportunities to sell only to end up regretting it for the rest of their lives. You never read about the tens of thousands of these failure stories but just about the one in a million stories which are more interesting.

On the table (or soon on the table, once we can get in there and make the offer real) is a potential $100 million buyout. The group is very real, and their interest is very real - contingent on their attorneys' due diligence.



I realize that, for some reason, you are angry at Jack, but angry people don't make deals - they usually blow them. So, I hope you can put emotion aside and look rationally at what's on the table.

At this time, as I understand it, you have no other serious funding options (other than whatever you can get from a loan against the house and other assets). You have no real, tangible prospect of a large investor coming to the rescue, enabling you to continue on your development path for this project. It is not productive at this point to get into the reasons why this is the case, but it is the case. The people who have been involved in this project who could have introduced you to major financing are not willing to do so at this time (other than Jack), so you are left with a great option on the table - but it's probably the only option.

If you take this option, and sell to this group, you will make a huge score, pay your creditors, satisfy your coin purchasers (including me), show the investigating authorities that this was not only not some fraud, but was a fantastic business proposition - with no room for any complaints since everyone will be satisfied.

If you wisely invest your family money (and I'm oversimplifying and treating your individual interest and your kids trust as collectively your family) - even if you were to receive $30,000,000-$40,000,000 and I believe it will be more than that - you could live the life of a very well off man, and take care of your family for several generations. You would also relieve the stress that must be tearing you apart inside.

You'll be the hero. The rich hero. You'll be sought after for advice and asked to participate in many other deals. Life would be great.

If you decide, however, to pass up this deal, there is no telling where things will go. The odds of you finding another major funding source while the coin trades at pennies, and while you have not been able to do anything yet with the patents are remote. And the prospect of the coin trading higher than this price are really remote as well - since there are no resources to capture the imagination of that community.

Obviously, as a significant coin holder, I want only the best for the project. I don't want to lose my money, as I am sure none of the coin holders want. A worst case scenario going forward would be a disaster for all of us, but you must come to realize that it is a far more likely scenario than you finding a large financial partner.



Marcus Andrade <ceo@amlbitcoin.com>

---

### next steps

**David Cohen** <davidcohenfamily@hotmail.com>                    Fri, Aug 23, 2019 at 4:41 PM
To: "Marcus Andrade (ceo@amlbitcoin.com)" <ceo@amlbitcoin.com>
Cc: Jack Abramoff <jack@abramoff.com>

Hi Marcus (and copying Jack Abramoff),

Based on our conversation yesterday I think we have a meeting of the minds on all but the option payment issue which, once we get attached agreements signed, I will work on. As you requested I will negotiate in good faith to get a $200,000 option payment from any prospective buyer of the assets.

Let's sign and get notarized ASAP as TIME KILLS DEALS! I feel obligated to point out that we need to strike fast with this buyer as its been a long time. Happy to discuss of course at any time.

Best Regards

-David

**David A. Cohen**

---

2 attachments

📄 **Memorandum of Agreement Sepo Andrade.doc**
57K

📄 **Memorandum of Agreement Cohen Andrade.doc**
59K

7



Marcus Andrade <ceo@amlbitcoin.com>

## Jack is on a plane but I wanted to send you this.

**David Cohen** <davidcohenfamily@hotmail.com>
To: Marcus Andrade <ceo@amlbitcoin.com>

Wed, Aug 28, 2019 at 11:54 PM

Marcus, I am sending this to you. Jack is on a plane until tomorrow afternoon. I have some thoughts. I realize this is a long email, and you probably don't want to read it all, but I strongly encourage you to do so.

We both know how much a sale of this proportion will help you (and all of us). The prospect of you having enough money to defend yourself fully against law enforcement, as well as live the rest of your life with financial security should be a huge motivation for you. When you add in the fact that doing a huge deal proves to your detractors that you were right all along, and settles and satisfies those who invested money in you and your dream, losing this deal is a very bad idea.

I realize that there are those telling you that a better deal will come along, or some other nonsense. Marcus, no one in this deal has done as many deals as I have. The price these guys are willing to pay you is extraordinary. Frankly, I don't know of anyone who would pay such a premium at this stage of development.

But the bigger issue is that, even if there were a better deal down the road in a few years, can you really last that long financially? Are there funds lining up to provide you money? How soon before you've finally exhausted all sources of funds? As I understand it, none of those who, in the past, have come to your financial rescue (including me) are willing to do any more with you on this project.

And what happens if the IRS or the DoJ decide to pursue asset forfeiture even before you are convicted of or plead to anything (without the money required to mount a defense against the federal government)? They do that all the time, as you might know. If they do so here, the project is dead. No one will get anywhere near this project. The assets (patents and anything else) will be frozen pending the outcome of your case. If you plead or are convicted, they will sell your assets (all your assets) at a sheriff's sale, and someone else will scoop them up, without you getting a dime.

And why is this happening? Because you are apparently listening to a patent lawyer and a securities lawyer. They have one interest: getting fees out of you. That's it. The prospect that you are selling your project means that the Marcus gravy train is coming to a halt for them. So, they are giving you terrible advice, because their interests are not aligned with yours.

And what is this advice? For you to make it impossible for anyone to help you negotiate the best deal possible. Jack and I want to make this work and make it big, not because it will only benefit you. But because it will benefit us. Do you think we want a smaller deal? Hell no. We want the best we can get from these buyers, so we all make as much money as possible.

When you demand, as your lawyers apparently have on your behalf, that Jack (and I, presumably) agree to have this deal terminated because the offer he presents might not fit your present conception of what you want, you are guaranteeing failure. No deal starts out the way you want it. you have to work with the other party to compromise and get what you both are satisfied with. I realize that your lawyers have no clue about how to do deals, but I find it very hard to believe that they are so dense as to think anyone would agree to the terms you have demanded of Jack.

I heard from Jack that you told him you told him to negotiate, because you, somehow, have put your attorneys into a veto position over this deal. I imagine that's just something you told him to negotiate, because you, somehow do such a thing? Even if they put up $250,000, you wouldn't give them control of the deal. I put up $200,000. I didn't ask for control of the deal. How could it be that someone with ¼ of 1% interest in this deal (that's what it is at $100,000,000) can now control the deal?

And how could it be that they would be so utterly unreasonable, if it is in fact they who are demanding these terms? The only explanation is that they are trying to tank the deal so they can continue sucking money out of you, or accruing fees owed so they can one day foreclose on you and take these assets for themselves. Don't kid yourself, Marcus. I've seen a lot worse.

So, Jack is on a plane. When he hits LA, he is going to call the buyers and set up a meeting for Friday morning (that's what he told me before he took off). When that happens, the deal is dead. There is no coming back, unless you later go begging Jack to somehow resume discussions because you are, perhaps in a few weeks, in a real death pinch. At that point, do you actually believe Jack is going to settle for 30%, assuming he does it at all? He'll likely offer you 30% and who knows what will be happening at that point – you might have to take it.



I think you need to think really hard about what you are doing. I think the approach you have taken has led you to the brink of losing this deal. In my view, you should sign the signed agreement he sent to you and let us get on with this. If not, I know he is going to end this, and we will all go our separate ways.

It's your call. You once mentioned that you didn't want to face the day when you had to tell your grandchildren that you sold a billion dollar deal for $100,000,000. How will you explain things to them if you gave up a huge deal for no deal? Or worse.
Let's get this signed and a deal done.
David

David A. Cohen



8-28-19



I was on a call with John Fay
10:19 AM ✓✓

Hi Marcus. I am going to head to sleep, but wanted to get you the revised agreement between us per our previous chat on the phone. Please review, make any changes you need (and let me know via email or whatsapp what changes you made – and actually forward back the revised version in Word so I can just do a comparison) and get this signed/ notarized today and back to me so we can move forward immediately. I have alerted the prospective buyer that we are going to need to move fast. Once I have this back from you, we'll get David Cohen on the phone with them to negotiate the key deal points, including shortening the timing of the option and purchase amount ($100M is what they are expecting to pay). I let David know that you will be in touch, without telling him too much else. I'll call you when I awake. Thanks

11:20 AM

Give me a call 11:20 AM ✓/

Type a message

9



status

Marcus Andrade <ceo@amlbitcoin.com>

Marcus Andrade <ceo@amlbitcoin.com>                                                    Thu, Aug 29, 2019 at 9:51 AM
To: Jack Abramoff <jack@abramoff.com>
Cc: David Cohen <davidcohenfamily@hotmail.com>

Hello Jack,

I did agree with you adding some things to the agreement but did not agree with you taking other things out of the agreement.

Your concerns were fully addressed. At least the concerns you fully disclosed.

I understand that you can't move forward and I fully respect your decision.

Thank you for trying and best of luck with all your future endeavors.

Marcus

On Wed, Aug 28, 2019 at 5:11 PM Jack Abramoff <jack@abramoff.com> wrote:

> Marcus, I have received your text responses (below) to my request to return to the paragraph we had agreed upon and I am sorry, but this does not come close to meeting my requirements.
>
> As I mentioned, only the full replacement of your new Section 3 with the original Section 3 that we agreed upon (as embodied in the signed agreement I returned to you) will satisfy on this issue.
>
> I am about to board my flight from Singapore to Los Angeles and am likely to be out of pocket until tomorrow afternoon. When I arrive in Los Angeles, I will be meeting with the prospective buyers and inform them that this deal is off the table.
>
> I am sorry we could not work this out.
>
> [12:10 AM, 8/29/2019] Marcus Andrade: Hello I forwarded your concerns and I got a response back already.
>
> [12:13 AM, 8/29/2019] Marcus Andrade: You do have some valid concerns and in order to address them, we are willing to extend the 7-Day termination to 14 days end
>
> [12:13 AM, 8/29/2019] Marcus Andrade: To extend the one year no contact period o a total of 3 years
>
> [12:14 AM, 8/29/2019] Marcus Andrade: They believe that should fully address the concerns that you listed.
>
> [4:17 AM, 8/29/2019] Jack Abramoff: This does not fully address my concerns. It partially addresses one concern.

--

Marcus Andrade, Founder
NAC Foundation, LLC
7495 W. Azure Drive, Suite 110
Las Vegas, Nevada 89130
Office: 1-702-515-4038

10