FD-1057 (Rev. 5-8-10)



UNCLASSIFIED

# FEDERAL BUREAU OF INVESTIGATION

### Electronic Communication

**Title:** (U) To Document AML Bitcoin related          **Date:** 11/10/2022
information

**CC:** HELSON KEVIN M

**From:** SAN FRANCISCO
          SF-C6
          **Contact:** Ethan A. Quinn, 415-553-7416

**Approved By:** SSA ANDISH DAUDSHAH S

**Drafted By:** Ethan A. Quinn

**Case ID #:** 58D-SF-2113481          (U) Operation Clutch Council
                                       CDPO-Federal Bribery - Other

**Synopsis:** (U) This EC documents information related to AML Bitcoin
contained in other FBI case files.

**Reference:** 105H-WF-2135481-302 Serial 44
               105H-WF-2135481 Serial 325

**Enclosure(s):** Enclosed are the following items:
1. (U) AML Bitcoin material seized during search of Butina's residence.

**Details:**

   The purpose of this Electronic Communication is to document
information related to AML Bitcoin found in other, related case files.

   Specifically, Special Agent Ethan Quinn reviewed the following case
files:  105H-WF-2135481, 105H-WF-3055568, 318E-MP-2542057.

   SA Quinn ran the following search terms: "AML Bitcoin", "Bitcoin"
"Andrade", "Marcus Andrade", "Rowland Andrade", "Rowland Marcus
Andrade".

UNCLASSIFIED

UNCLASSIFIED

Title:  (U) To Document AML Bitcoin related information
Re:  58D-SF-2113481, 11/10/2022


    SA Quinn then reviewed the responsive documents to determine if they
were referencing AML Bitcoin or other matters relating to AML Bitcoin.
Most responsive documents were documents which are also filed to the
captioned investigation.

    Responsive documents included the following:

    1. Digitally scanned copies of AML Bitcoin marketing materials, and
handwritten notes which appear to be authored by Paul Erickson, taken
from a meeting with Jack Abramoff on June 3, 2018.

    The original materials were retrieved during the execution of a court
authorized search warrant on Maria Butina's residence on July 15, 2018.

    The digital materials are kept in a digital only format in the 1A
Section of the file.

    2.  An interview of Maria Butina on January 3, 2019. The bulk of the
302 is not relevant to this query, and the relevant portion is reproduced
below:

*(U//FOUO) Describe any interactions with the AML Bitcoin meeting in June.*


*(U//FOUO) BUTINA said she did not have substantive interactions with
ABRAMOFF. She met him once in a Japanese restaurant, and it was
absolutely social with no room for actual discussion. She knows ERICKSON
had several meetings with ABRAMOFF relating to AML Bitcoin. She asked
ERICKSON if she should meet with ABRAMOFF since she does Bitcoin, but
ERICKSON said she did not need to meet him.*


*(U//FOUO) BUTINA said ABRAMOFF and ERICKSON had some weird project
together in spring 2018 related to a guy [Note: Shalli KUMAR] who wanted
to be appointed US Ambassador to India (under the TRUMP administration).
BUTINA said KUMAR would call ERICKSON in the middle of the night and
ABRAMOFF and ERICKSON together promised KUMAR to be appointed and were
paid to be his advisors. KUMAR did not get the position. ERICKSON said*

UNCLASSIFIED

UNCLASSIFIED

Title:  (U) To Document AML Bitcoin related information
Re:  58D-SF-2113481, 11/10/2022


*KUMAR moved away and dropped the idea. ERICKSON said KUMAR did not get the appointment because he did not follow ERICKSON's recommendations precisely. In response to a follow-up question from SA HELSON, BUTINA said Dana ROHRABACHER never came up in discussion regarding this.*

   Based on SA Quinn's review, there are no other responsive documents in the above case files which are not duplicative of documents in the captioned case.


◆◆

UNCLASSIFIED

Jack 6/5/18

- ✓ AML—KYC patent issued May 15, 2018
- ✓ Delete website video
- ✓ Pillsbury did patent work
- * Morgan Stanley investors
- * "Marvin" TX oil guy turned blockchain entrepreneur [Marcus Andrade]
- ✓ Meeting w/ banks / Facebook / Overpac (Wells Fargo?)
- ✓ b/w motive access
- (*) forced conversions from all existing crypto—currencies → AML Bitcoin
- (*) Today's Bitcoin exchange rate @ $7,500 / AML Bitcoin @ $10,000
- *

Key points
* massive buy-ins by major banks, websites (to stay ahead of govt regs)
* other coins are not required to adopt, but risk non-compliance
* the AML Bitcoin patent is so sweeping, essentially impossible to
        write your own "compliant" code
* i. adopt AML Bitcoin platform or die
*

| | |
|---|---|
| **United States Patent Application** | **20180115426** |
| **Kind Code** | **A1** |
| **Andrade; Marcus** | **April 26, 2018** |

# SYSTEMS AND METHODS FOR PROVIDING A UNIVERSAL DECENTRALIZED SOLUTION FOR VERIFICATION OF USERS WITH CROSS-VERIFICATION FEATURES

## Abstract

A system for providing a universal decentralized solution for verification of users with cross-verification features is described. The system may be configured to receive from a first entity, at a blockchain trust utility, information related to one or more verified first documents, the one or more verified first documents associated with a first user. The system may be configured to receive from a second entity, at the blockchain trust utility, a request for the information related to the one or more verified documents associated with the first user. The system may be configured to, upon receiving from the first user, at the blockchain trust utility, an approval of the request for the information related to the one or more verified documents associated with the first user, give access to the second entity to obtain access to information related to the one or more verified documents associated with the first user.

Inventors: **Andrade; Marcus**; *(Houston, TX)*

| Applicant: | Name | City | State | Country | Type |
|---|---|---|---|---|---|
| | **FINTECH FUND FAMILY LIMITED PARTNERSHIP** | Houston | TX | US | |

Assignee: **FINTECH FUND FAMILY LIMITED PARTNERSHIP**

Family ID: **1000002267725**

Appl. No.: **15/335344**

Filed: **October 26, 2016**

| | |
|---|---|
| **Current U.S. Class:** | **1/1** |
| **Current CPC Class:** | H04L 9/3231 20130101; H04L 9/0637 20130101; H04L 9/3236 20130101; H04L 9/14 20130101; H04L 9/30 20130101; H04L 9/0643 20130101 |
| **International Class:** | H04L 9/32 20060101 H04L009/32; H04L 9/06 20060101 H04L009/06; H04L 9/14 20060101 H04L009/14; H04L 9/30 20060101 H04L009/30 |

## *Claims*

1. A system for providing a universal decentralized solution for verification of users with cross-verification features, the system comprising: one or more hardware processors configured by machine-readable instructions to: receive from a first entity, at a blockchain trust utility, information related to one or more verified first documents, the one or more verified first documents associated with a first user; receive from a second entity, at the blockchain trust utility, a request for the information related to the one or more verified documents associated with the first user; upon receiving from the first user, at the blockchain trust utility, an approval of the request for the information related to the one or more verified documents associated with the first user, give

access, by the blockchain trust utility, to the second entity to obtain access to information related to the one or more verified documents associated with the first user; and upon receiving from the first user, at the blockchain trust utility, a denial of the request for the information related to the one or more verified documents associated with the first user, deny access, by the blockchain trust utility, to the second entity to obtain access to information related to the one or more verified documents associated with the first user.

**AML Bitcoin "AML KYC" Issued Patent:**

http://appft.uspto.gov/netacgi/nph-
Parser?Sect1=PTO2&Sect2=HITOFF&p=1&u=%2Fnetahtml%2FPTO%2Fsearch-
bool.html&r=1&f=G&l=50&co1=AND&d=PG01&s1=%22AML+KYC%22&OS=%22A
ML+KYC%22&RS=%22AML+KYC%22

Jack's



Jack's House
812 Edelblut Dr
Silver Spring, MD
20901

Copyright © and (P) 1988–2012 Microsoft Corporation and/or its suppliers. All rights reserved. http://www.microsoft.com/streets/
Certain mapping and direction data © 2012 NAVTEQ. All rights reserved. The Data for areas of Canada includes information taken with permission from Canadian authorities, including: © Her Majesty the Queen in Right of Canada, © Queen's Printer for Ontario. NAVTEQ and
NAVTEQ ON BOARD are trademarks of NAVTEQ. © 2012 Tele Atlas North America, Inc. All rights reserved. Tele Atlas and Tele Atlas North America are trademarks of Tele Atlas, Inc. © 2012 by Applied Geographic Solutions. All rights reserved. Portions © Copyright 2012 by
Woodall Publications Corp. All rights reserved.

Jack's



Jack's House
812 Edelblut Dr
Silver Spring, MD
20901

Copyright © and (P) 1988–2012 Microsoft Corporation and/or its suppliers. All rights reserved. http://www.microsoft.com/streets/
Certain mapping and direction data © 2012 NAVTEQ. All rights reserved. The Data for areas of Canada includes information taken with permission from Canadian authorities, including: © Her Majesty the Queen in Right of Canada, © Queen's Printer for Ontario. NAVTEQ and
NAVTEQ ON BOARD are trademarks of NAVTEQ. © 2012 Tele Atlas North America, Inc. All rights reserved. Tele Atlas and Tele Atlas North America are trademarks of Tele Atlas, Inc. © 2012 by Applied Geographic Solutions. All rights reserved. Portions © Copyright 2012 by
Woodall Publications Corp. All rights reserved.

Coincap
#656

# ABOUT AML BITCOIN

AML BitCoin was created with anti-money laundering, anti-terrorism and theft-resistant properties built into the code of the coin, and as a result, it is compliant with a host of laws. AML BitCoins are compliant with AML, CFT, AFF, OFAC, BSA, USA PATRIOT ACT, FACT and others.

The NAC Foundation utilizes a biometric identification system to verify owners of wallets that hold the AML BitCoin. This will provide additional security and safety features for ownership and use of the AML BitCoin.

There will be 76 Million AML BitCoin Tokens (AML Tokens) available for public purchase. Upon completion and activation of the AML BitCoin, AML Token holders will have the opportunity to exchange them for AML BitCoins on a 1:1 ratio. In making this exchange the token holder will have had to create a certified digital identity profile in association with the DTN.

* AML Bitcoin

* Ignition Creation

* Blockchain Entertainment

* Coin Market Cap

*

# 01.

## What is AML BitCoin?

AML BitCoin has been designed by the NAC Foundation, and builds on the AtenCoin platform. The cryptocurrency has built in KYC/AML, anti-theft and anti-criminal features, as well as biometric identification built into the platform. This enables it to be used by companies and individuals transacting with State, Semi-State, Regulated and Unregulated bodies.

All AML BitCoin transactions are transparent and recorded in a public ledger, and the senders and receivers are pseudonymous to the public. The transaction validation is decentralized. Every AML BitCoin holder can join this process through PoW/PoS mining.

# 02.

## Who can use AML BitCoin?

The AML Token can be purchased by token purchasers around the world. For those looking at using AML BitCoin for transactions, a series of KYC/AML and real-life verification is required. Once completed, all verified network users can transact with each other knowing counterparties are not on Sanctions Lists. AML BitCoin is the only cryptocurrency that is compliant with the U.S. Patriot Act, Bank Secrecy Act, Anti-Money Laundering and U.S. Office of Foreign Assets Control law as well as other worldwide standards.

# 03.

## Capital Makeover: Bitcoin Brigade

NAC Foundation in conjunction with Blockchain
Entertainment LLC and Superjacket Productions is creating
a reality TV show which will also feature AML BitCoin.
Working with Andrew Williamson and Mike Odair, the
show will follow the team as they introduce
cryptocurrencies to the US Congress.

BLOCKCHAIN ENTERTAINMENT

PRESS RELEASES

## Notorious Lobbyist Jack Abramoff to Coach Bitcoin Activists in New Washington, DC-based Reality Docu-series from Blockchain Entertainment and Ignition Creative

*"Capitol Makeover: Bitcoin Brigade"*

**LOS ANGELES, CA (July 31, 2017) – Blockchain Entertainment**, a newly formed television and motion picture production company dedicated to entertainment projects about digital currency and blockchain technology has partnered with visionary content innovator **Ignition Creative** to develop and produce the first season of the unscripted docu-series **CAPITOL MAKEOVER: BITCOIN BRIGADE.** The project brings famed and fearsome former lobbyist **Jack Abramoff** back to his Washington stomping grounds to coach activists from the innovative and revolutionary digital currency **AML Bitcoin** as they navigate the halls of Congress.





*Jack Abramoff addresses Utah legislature Rural Caucus (February 2012).*

Following AML Bitcoin (formerly Aten Coin) creator **Marcus Andrade** and his team of 'currency nerds,' CAPITOL MAKEOVER: BITCOIN BRIGADE tracks the brilliant technologists' crusade to prevent Congress from unintentionally destroying the digital currency industry. The cameras will follow the 'Bitcoin Brigade' through their boot camp with Abramoff as he transforms them from techies to lobbyists ready to take on Capitol Hill. The project brings television audiences inside two fascinating, yet closed worlds: the rough yet strategic arena of American political lobbying and the intriguing world of digital currency.



"We are fascinated by the story of crypto currency and how it could change the consumer world as we know it," says **Martin Kistler, CEO and Chief Creative Officer of Ignition Creative**, "We want this series to really get under the hood of one of the most relevant industrial changes happening today by shining a light on the people right at the center these heated debates – including the expert of what goes on inside the smoke-filled rooms of Washington: former lobbyist Jack Abramoff."

Notes **Andrew Williamson, president of Blockchain Entertainment and head of Production and Development for Kylin Pictures (Hacksaw Ridge, American Made),** "Digital currencies, such as Bitcoin, have been exploding in the past year, with much of the world looking on in wonder. However, the digital currency world itself is in a panic over recent and likely future moves by the United States Congress to halt the exponential growth of bitcoin. We wanted to delve into that conflict in a way that would be unique and riveting, and knew that the work of Marcus and his team at

AML Bitcoin, when combined with a coach with the experience and savvy of Jack Abramoff, was the perfect entry into this turbulent world."

Abramoff was one of America's most successful lobbyists before being brought down in a political scandal that landed him in federal prison. Since his release, Abramoff has worked tirelessly to reform the lobbying system. Abramoff will not be lobbying Congress for this cause, only training and molding the activists to survive the insider Washington game, which few know as well as he does.



"When Marcus approached me, I didn't know a bitcoin from a sirloin. But, after learning about this vital new technology, I quickly realized that his mission was essential if our nation is to continue to lead the world in innovation and finance – and so I pledged to do whatever I could to help – short of lobbying Congress myself," says **Abramoff** of the new project, "However, Marcus only wanted me to train his team. The request seemed odd, since I am used to training polished, crafty Washington insiders to lobby, not nerdy techies. But, AML Bitcoin's group, while naïve to the cutthroat world of Washington, are the kind of people that most Congressmen would love, if were they to get a chance. I signed right up and plan to train them to deal with the worst Washington has to offer!"

Co-executive producer Jesse Kennedy (HBO First Look, Brooklyn's Finest) adds, "Abramoff is this Apocalypse Now 'Colonel Kurtz' figure, both mysterious and THE expert on how to get something done in Washington. Despite the inevitable clash of styles and cultures, it's a partnership perfect for taking Capitol Hill by storm."

"AML Bitcoin has innovated technology in the digital currency world that Washington needs to know about. Congress is on the verge of destroying American opportunity in what is clearly the biggest financial restructuring in modern history – and our team needs to ensure they understand this

issue and do the right thing," explains Marcus Andrade, president of the National Aten Coin Foundation. "But we don't know the world of Washington – and most of official Washington is already in the hands of the very banking establishment that wants to shut down the digital currency world. We needed a wild card to teach us how to win, and the biggest wild card in recent Washington history is Jack Abramoff."

## ABOUT IGNITION CREATIVE
Ignition Creative is a world-renowned television and motion picture production and marketing firm. They are original content creators for major studios and brands, including Sony Pictures, Netflix, and ESPN.

Home

About

Productions

Press

Contact



BLOCKCHAIN ENTERTAINMENT

Copyright © 2017

# BLOCKCHAIN ENTERTAINMENT

## OUR TEAM



## ANDREW WILLIAMSON

### President, Blockchain Entertainment

**Creator & Producer, *Capital Makeover: Bitcoin Brigade***

Andrew Williamson has spent his life in the entertainment industry. He made his first splash as an award winning theatrical director at the early age of 18; directing and producing large-scale theatrical tours such as *Stephen Sondheim's Assassins*, *Cabaret*, and *Big River*.

After transitioning to Los Angeles, Andrew made a name for himself as a screenwriter, story

consultant, and even actor. Through these jobs he progressed to work behind the camera, editing for Hollywood studios, while staying involved in large scale productions.

Now one of the up and coming players in Hollywood, Andrew has recently co-produced such large-scale Hollywood films as *The King's Daughter*, *Birth of the Dragon*, and the upcoming *Shanghai*.

In his 15 years in the industry, Andrew has worked with Disney, HBO, Fox, Warner Bros., Lifetime, CBS, Hulu, The Weinstein Company, YouTube, and more. He brings the relationships he has made and the knowledge he's acquired to add his own personal touch to Blockchain Entertainment.



## JESSE KENNEDY

### Co-Executive Producer

Jesse has an extensive background in Marketing/Creative Advertising, Production and Finance. He has served as Co-Founder and CEO of Lagniappe Films (Producer of *Dallas Buyers Club*), as Co-Creative Director of boutique advertising agency TKO Pictures, as Chief of Corporate Strategy of The Cimarron Group and as Head of Corporate Strategy & Senior Creative Producer at Ignition Creative. Aside from his extensive experience in Marketing, Jesse has raised in excess of $70MM in production finance, $80MM in P&A financing, and an additional $30MM in structured corporate finance.

As a film producer, Jesse has produced feature films including *Brooklyn's Finest*, *Stolen*, *A Case of You* and *Ain't Them Bodies Saints*, and has developed and executed blockbuster marketing and brand initiatives for nearly every major Hollywood film studio (which includes Sony Pictures/Columbia, Paramount, 20th Century Fox, Warner Bros., Disney, Miramax/Weinstein Co., Universal, Relativity, and New Line Cinema).

Home

About

Productions

Press

Contact



# BLOCKCHAIN ENTERTAINMENT

Copyright © 2017

## Can Cryptocurrencies Be Placed in the Pop Culture?

**Big Picture Points:**



➤ *You never get a second chance to make a first impression.* We want cryptocurrencies to be correctly introduced, explained and used in pop culture. A false cryptocurrency narrative could profoundly affect future public acceptance and government regulation – and possibly destroy the "mainstreaming" of Bitcoin into the culture.

➤ *Politics is downstream from culture.* The best way to win the "idiotic regulation" war is to win the pop culture war first.

➤ *We are NOT marketing cryptocurrencies*, we are making it easier for the pop culture to correctly understand and reference them. The masses will take it from there.

## Movies / Television Shows:

*Operational Principle 1:* Most Hollywood creative types either know nothing about Bitcoin or "know" things that are incorrect.

*Operational Principle 2:* We don't want a few movies about Bitcoin, we want Bitcoin in a lot of movies.

➤ Meet with the producers, creative directors and writers at major movie studios, production companies and television networks to introduce them to Bitcoin. (Los Angeles, New York, London, Berlin)

➤ Focus on the realities of Bitcoin creation and use and interesting ways in which Bitcoin could touch characters' lives. (If "Tony Stark / Ironman" used only Bitcoin in his Avengers transactions today, half of America's youth will demand their allowances in Bitcoin tomorrow.)

➤ "Gift" a small amount of Bitcoin to truly major influencers in order for them to have a feel for and a stake in Bitcoin's future success.

## Books:

*Operational Principle:* We want bestsellers and bestseller characters to have cryptocurrencies as a routine part of their plots and lives.



➤ Meet with the top twenty bestselling authors in in the world to introduce them to Bitcoin. (Annual combined sales north of 200 million copies.)

➢ Three authors are of particular interest because of their series targeted at Generation Z and lagging Millennials:  James Patterson's "Middle School" and "Treasure Hunters"; John Gresham's "Theodore Boone: Kid Lawyer"; and Stephen King's "Charlie the Choo Choo."  Breeding future readers of adult fiction . . . and adult users of Bitcoin.

➢ Focus on the realities of Bitcoin creation and use and interesting ways in which Bitcoin could touch their characters' lives.

➢ "Gift" a small amount of Bitcoin to truly major influencers in order for them to have a feel for and a stake in Bitcoin's future success.

## Traditional News Media:



*Operational Principle:*  We don't (necessarily) want to drive news coverage of Bitcoin, but every time a television or radio show, newspaper or magazine wants to feature Bitcoin, we want to make it easy for outlets to call trusted sources for interviews and guidance.

➢ Meet the *bookers* for every major television and radio news network and their featured shows and introduce them to Bitcoin and its leading players.

➢ Meet the *assignment editors* of every major daily newspaper and weekly / monthly news and business magazine and introduce them to Bitcoin and its leading players.

➢ NO "gifting" of Bitcoin to this crowd.

## Social Media:



*Operational Principle:*  We want to create an anonymous, autonomous "viral Bitcoin army" that touches all social media platforms, but without the appearance of organization or sponsorship.

➢ In practice, this means identifying 10 to 100 trusted content thinkers / creators who generate everything from Bitcoin short videos to "real life" snapshots to art AND that scour the internet for such spontaneous creations.

➢ Existing leading social media account owners who are intrigued by what they've seen are then free to promote Bitcoin culture in any way they see fit – either by simply re-posting or perhaps sponsoring contests or competitions (funniest use of Bitcoin photo or video?), perhaps with prizes being awarded with Bitcoin.

➢ The effect being that Bitcoin becomes a type of social media wallpaper – everywhere, trusted and promoted by individuals free of self-interest.  The "viral Bitcoin army" has integrity precisely because it was never officially "sponsored."

## Schools:

*Operational Principle:*  Make the use of cryptocurrencies as easy for the
next generation as the adoption of any new app on their smart phones.



> Target key American and European universities (business schools
> or computer science departments) and properly introduce
> students (and their older professors) to the world of
> cryptocurrencies and blockchain.

> Appoint "Bitcoin ambassadors" to lead local university clubs, gifting the new student
> leaders or professors with a small amount of Bitcoin or similar currency for them to
> intellectually invest in the space.

## George Gilder's "Life After Google":

*Operational Principle:*  Gilder's book tour could be the perfect foil for
reaching each of these pop culture worlds.



> Schedule Gilder for an average of two or more events / month for a
> year, beginning with publication of his book in July.

> Consider pairing Gilder with a leading blockchain / cryptocurrency
> player for most or all of these appearances.

DC check-ins
* Daniel Abramoff  family dinner
* Ryan Schwarz  Australia lunch
* Mark McIntosh
* Dennis Stephens  lunch
* Danny Rice Wright / Pam  lunch
* Gregg Murphy dinner ( Dr. Berman? )
~~Kyle Richards "Near Harvard River"~~ n

*

**To:**

**Final**

Swift



## Maria Butina
Founding Chairman / Board Member

+7-(800)-775-5903 (office)
+7-(916)-356-1339 (cell)
67035553@gmail.com
www.ongun.ru
www.mariabutina.ru/english

6 Lithobornaya Embankment
Building 3, Office 2
Moscow, Russia   125438

**THE RIGHT TO BEAR ARMS**

(605) 553 3829

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF:
**3617 38th Street, NW Apt 208, Washington, DC 20016**

Case: 1:18−sw−00109
Assigned To : Chief Judge Howell, Beryl A.
Assign. Date : 4/25/2018
Description: Search and Seizure Warrant

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Roahn Wynar, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a warrant to search the premises described as a residence and home office located at 3617 38th Street NW #208, Washington, DC.

2. Items to be seized at both addresses are described in Attachment A.

3. I am a Special Agent of the Federal Bureau of Investigation and have served in that capacity fifteen years. I have worked a substantial number of white collar crime including multiple cases related to mail fraud and wire fraud, public corruption, antitrust violations, and other matters.[1]

---

[1] I am aware of a civil case filed in the Northern District of California on April 15, 2018, entitled Life Savers Concepts Association of California, et al v. Wynar, et al, in which I am the named defendant. That case is presently pending. I was also involved in a the collection of evidence for a case that led to a prosecution in the Northern District of California entitled United States v. Giraudo, et. al., In that case, a judge decided after a hearing to suppress some of the evidence I was involved in collecting. That opinion was not published in the Federal Supplement, but it is available on PACER or on Westlaw at 2016 WL 4072343.

associates has made him relevant to that investigation. In particular, during Gillian's interview

with the FBI Gillian explained that on March 13, 2018  Erickson told Gillian that Erickson was

slow to communicate with Gillian because of the burdens associated with an FBI investigation

related to the Special Counsel's office. I have inquired about this and I have determined that

there has been no contact between the FBI, Special Counsel's office, or any other federal law

enforcement agency known to me with Erickson.[2] I therefore believe Erickson is relying on the

_____

[2] After drafting this affidavit, I participated in a court-authorized search of Paul Erickson's home
and office in South Dakota, which was obtained based on a similar affidavit which did not
contain this paragraph. During this search I discovered documents indicating that Erickson was
served three subpoenas by the Senate Intelligence committee regarding his interactions with
Russian nationals. The date of the subpoenas was September 14, 2017. One of those subpoenas
was addressed to Erickson personally, and one was addressed to "Investing with Dignity, LLC."
Also, one of the documents I examined during the search was a letter from Erickson to George
O'Neill. In this letter Erickson requested that O'Neill help pay for Erickson's legal representation
regarding the subpoenas and that letter suggests the representation cost approximately $100,000.
Therefore, I believe that the comment in Erickson's email to Gillian could, in principle, be
referring to the expense associated with the legal fees regarding the response to the subpoenas.
On the other hand, in the same letter Erickson told O'Neill that Erickson will repay O'Neill for
these legal fees by April 2018. Erickson wrote to O'Neill, "I have moved to liquidate interests in
two of my business projects this month ... The proceeds should be realized by the end of March,
early April and will repay your kindnesses." Despite multiple subpoenas, extensive open source
research, and many interviews I have never seen any evidence of Erickson's involvement in any
legitimate business activity. The search of Erickson's home and office reinforced my belief that
virtually all of Erickson's "business" is fraud. For example, the offices of Compass Care,
Erickson's assisted living facility development company, was two small rooms, with no
employees and no indication of any realestate development activity (Architecture, entitlement
planning, construction financing, etc.) However, I did find plenty of promotional material (charts
and prospectuses for example), and I found information associated with individuals who invested
with Compass Care. This is consistent with a fraudulent operation. Likewise, in Erickson's
residence I discovered many files associated with Erickson's investors, but no information
suggesting that the underlying investments were real. The FBI seized computers at both
locations, but these computers have not been reviewed and, in principle, could contain the
missing exculpatory information. Therefore, although my belief that Erickson was not under any
overt scrutiny by the U.S. Government was incorrect, I still believe that Erickson's untruthful
statements taint his narrative.

69. Based on the above facts, circumstances, and information, permission is requested to seize the computer systems, discs, or functionally – equivalent digital data storage devices (including computer systems and peripheral housing data storage capability) and then image those items (a process which can take several hours) even though there may be unrelated information stored on them and then return this equipment to the location so it can continue to be used for legitimate business.

## CONCLUSION

70. Based upon my experience all the factors have been indicative of violation of federal criminal laws including 18 U.S.C. 1341 (Mail Fraud) and 1343 (Wire Fraud).

71. I therefore, respectfully request that the attached Warrant be issues authorizing the search of the locations pacified in the Attachment A and the seizure of the items described in Attachment B.

## REQUEST TO APPEAR BY TELEPHONIC MEANS

72.    I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. In support of this request, I inform the Court that I am currently assigned to the Department of Justice, Federal Bureau of Investigation, San Francisco Field Office, located in California, where I am working on the investigation of this and other matters.  If I were required to appear before the Court in person, it would be a considerable expense to the United States in time diverted from the substantive investigation.  I

28

FBI-302-011989

submit that Erik Kenerson, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

I do declare under the penalty of perjury that the foregoing is true and correct.

*Sworn to telephonically after being identified by AUSA.*

/s/
_____
Roahn Wynar
FBI Special Agent

Subscribed and sworn before me telephonically by Special Agent Roahn Wynar, per Fed. R. Crim. P. 41(d)(3) on this on 25th day of April, 2018

_____
THE HONORABLE BERYL A. HOWELL
CHIEF JUDGE

29

FBI-302-011990

Privileged & Confidential
K&S DRAFT 12-18-22

1        **FBI INTERVIEW**

2        **September 13, 2018**

3        Audio file FBI-ELSUR-002923.mp3

4

5        **SPEAKERS:**

6        Federal Bureau of Investigation:

7        • Agent Roahn Wynar

8        • Agent Ethan Quinn

9        Interviewee:

10       • Jack Abramoff

11

12

1

Privileged & Confidential
K&S DRAFT 12-18-22

1                              **PROCEEDINGS**

2                                                              (7:55 a.m.)

3              AGENT WYNAR:   [This is] Roahn Wynar handing this recorder to –

4                          **(Off-mic comments.)**

5              AGENT WYNAR:   -- yeah -- putting this recorder on.

6              AGENT QUINN:   Special Agent Ethan Quinn, and the case file is 58-Delta-

7    SF 211-3481.

8              AGENT WYNAR:   The date is August -- September 13, and the time is five

9    minutes to eight a.m.  Eastern Standard Time.

10             AGENT QUINN:  Yeah, you're right.   Perfect.

11                         **(Brief pause on the record.)**

12             MR. ABRAMOFF:  Hello.

13             AGENT QUINN:  Good morning.

14             MR. ABRAMOFF:   How are you today?

15             AGENT WYNAR:   Jack --

16             AGENT QUINN:  I have you.

17             AGENT WYNAR:   We're from the Department of Justice and the FBI, and

18   we have an urgent need to speak with you today.

19             MR. ABRAMOFF:   Okay.  Can I confirm your badges?

20             AGENT QUINN:  Sure.  Sure.

21             AGENT WYNAR:   Yes, sir.  Absolutely.

22             AGENT QUINN:  Oh, yes.

                                                                            2

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT WYNAR:  Sure, sure, sure.  Absolutely.

2          MR. ABRAMOFF:  Okay. So –

3          AGENT QUINN:  Oh, yeah.  I think he wants that call.

4          AGENT WYNAR:  Oh, yeah.  I'd be happy to give you the number.  Do you

5    mind?

6          MR. ABRAMOFF:  Yeah.

7          AGENT WYNAR:  The, the San Francisco field office -- the number is area

8    Code 415 –

9          MR. ABRAMOFF:  Well, I'm going to call -- do you mind if I call an agent

10   who (inaudible) move my case?

11         AGENT WYNAR:  Oh, yeah.

12         AGENT QUINN:  Absolutely.

13         AGENT WYNAR:  Sure, sure, sure.  Yeah, yeah, yeah, yeah.  I don't if

14   they'll know who we are personally, but they can certainly help verify.

15         We don't mean to disturb you so early in the morning, but we do have an

16   urgent assignment to, to speak with you.

17         MR. ABRAMOFF:  Sure.  Okay.  I just want to {off mic).

18         AGENT WYNAR:  I get it.  I get it, absolutely.

19         AGENT QUINN:  Yeah, yeah, yeah.  We could see some random guys

20   walking up with big badges.

21         AGENT QUINN:  I think the way we usually have people confirm our

22   identities is we call our home office, and they conNACt you to our cell phone, and you get

Privileged & Confidential
K&S DRAFT 12-18-22

1    that interaction that way.  That's how we usually do it.  But if you have a personal contact . . .

2                    MR. ABRAMOFF:   Okay.  Okay.

3                    AGENT WYNAR:   I can give you my card, too – or our card.  We had a little

4    trouble finding your home.

5                    MR. ABRAMOFF:   You had trouble finding the house?

6                    AGENT WYNAR:   Yeah, yeah, because the -- well, it wasn't a lot of trouble.

7                    But we, we like to try to come early.

8                    MR. ABRAMOFF:   All right, she's not picking up.  Well -- uh, well, look,

9    that's fine.  I mean --

10                   AGENT QUINN:  Let's – let, let's try the part about the, the – well, if you're –

11   if you're comfortable –

12                   MR. ABRAMOFF:   Well, yeah.  I think I'm fine.  (Inaudible).

13                   AGENT QUINN:   (Inaudible).

14                   AGENT WYNAR:   Thank, thank you so much, sir.  I, I realize it's a – but I'm

15   glad that we're able to come in early so that -- we like to maintain a small footprint.

16                   But we're here to talk about -- is -- we need to -- I'm going to show you a

17   picture.

18                   We would – the, the gentleman that has sort of triggered our, our engagement

19   with you is a man named Paul Erickson.  Um, we have -- I want to show you a picture of Mr.

20   Erickson, just to make sure that we're all talking about the same guy.  But -- .

21                   AGENT QUINN:   Do you want me to pull that one?

22                   AGENT WYNAR:   Yeah, I have it right here.

Privileged & Confidential
K&S DRAFT 12-18-22

1          This is Mr. Erickson.  Do you know Mr. Erickson?

2          INTERVIEWEE:  Yeah, sure.

3          AGENT WYNAR:   We have – we'd like to start by asking you pretty much

4  the universe of your understanding of this man – his history and activities.  It's a big deal, I

5  know, but –

6          MR. ABRAMOFF:   Yeah.  I mean, look, I've known him since 1980, maybe

7  '81.  I mean, I wrote about him extensively in my book, and --

8          AGENT WYNAR:   I haven't read your book, sir.  I'm – I, I do understand.  I

9  do know who –

10          MR. ABRAMOFF:   I mean, we've been friends for, for years.  So, I mean, it

11  would take days for me to go through.

12          AGENT WYNAR:   Well, we can focus the – what's --

13          MR. ABRAMOFF:   Yeah.

14          AGENT WYNAR:    -- in particular, we (inaudible) his activities (inaudible) –

15  yes, his activities, like, back in the days when he worked with Mr. Buchanan.  That that's not

16  relevant; it's more –

17          MR. ABRAMOFF:   Yeah, yeah, I knew him way before that.

18          AGENT WYNAR:   Like, we're thinking more like 2000 and after what?

19  What has he done for a?

20          AGENT WYNAR:   (Inaudible) Republican and (inaudible).

21          AGENT WYNAR:   We're thinking more like 2000 and after.  What has –

22  what has he done for a living?

5

Privileged & Confidential
K&S DRAFT 12-18-22

1          MR. ABRAMOFF:   2000 (inaudible).

2          AGENT WYNAR:   Yeah, what -- what has –

3          MR. ABRAMOFF:   Well, it's always been, frankly, a mystery to us -- all of

4    us who were friends of his.

5          AGENT WYNAR:   Um-hmm.

6          MR. ABRAMOFF:   Yeah, you know, the best -- he's always vague, I guess.

7    And the best I could tell was that he had something to do with something called Compass –

8          AGENT WYNAR:   Compass Care.

9          MR. ABRAMOFF:   -- some -- Compass Care, which he claimed was some

10   senior citizen thing, I think, in South Dakota or something like.

11         AGENT WYNAR:   When you – let's -- when you think about Compass Care,

12   because that is -- we know about that.

13         MR. ABRAMOFF:   Uh-huh.

14         AGENT WYNAR:   What did he tell you about this?  What, what kind of –

15         MR. ABRAMOFF:   See, he didn't really tell a lot, because -- to be honest

16   with you, I mean, I -- well, I like Paul.  He's not somebody whose veracity is generally –

17         AGENT WYNAR:   Well, we suspect that too.

18         MR. ABRAMOFF:   Yeah.  So when he would tell me about his big senior

19   whatever, I frankly tuned it out.

20         AGENT WYNAR:   Did you tune it out because you didn't believe it, or you

21   were uninterested?

22         AGENT WYNAR:   Yeah.

Privileged & Confidential
K&S DRAFT 12-18-22

1                   AGENT WYNAR:   You just didn't believe it.

2                   MR. ABRAMOFF:   I didn't believe it.  I was probably uninterested, also.  But

3    I -- I mean –

4                   AGENT WYNAR:   So he must have had a history with you that led you to

5    the point where you just --

6                   MR. ABRAMOFF:  Yeah, I mean, continuing.

7                   AGENT WYNAR:   Okay.

8                   MR. ABRAMOFF:   He's sort of a nice, lovable, uh, what seemed to be

9    pathological liar.

10                  AGENT WYNAR:  Right.

11                  AGENT QUINN:   Yeah.

12                  AGENT WYNAR:   Okay.  So our suspicions that he's a pathological liar

13   aren't crazy.

14                  MR. ABRAMOFF:  No, he's -- I think he actually has an illness about it.  I

15   mean, I think he actually -- I mean, it's not -- I'm sure it's undiagnosed because -- some

16   people get --

17                  AGENT WYNAR:  Well, I've diagnosed it; how about that?

18                  MR. ABRAMOFF:  Yeah, I mean – well, I think everybody who knows him

19   that I know has the exact same --

20                  AGENT WYNAR:  Except all of the people he stole the money from.

21                  MR. ABRAMOFF:  Yeah, I was shocked to read in the paper – like, Brent

22   Bozell and people like that gave him money.

Privileged & Confidential
K&S DRAFT 12-18-22

1          I mean, I have over the time just out of, frankly, feeling bad for him, lent him

2   money.  But it's minor money.  He'd call me and say he has to make an airline flight, and he -

3   - his credit card is somehow messed up.  So I'd buy -- I'd give him my credit card and let

4   them use it to buy an airplane ticket.

5          AGENT WYNAR:   Um-hmm.  Um-hmm, um-hmm.

6          MR. ABRAMOFF:   And it would take a month -- you know, "I'll get it to

7   you next week."

8          AGENT WYNAR:  And I'll, I'll be frank with you:  that's one of the reasons

9   we, we are here is we've seen those transactions –

10         MR. ABRAMOFF:   Yeah.

11         AGENT WYNAR:   -- and we kind of understand that, okay, Here's a guy

12   who probably will be able to help us understand, because you have such a long history with

13   the guy.

14         MR. ABRAMOFF:  Yeah, and I even tried to get him business.  In fact, I got

15   him some clients, which he -- you know, he actually paid a referral fee to us, which – he

16   then, you know, didn't perform for the guy.

17         AGENT WYNAR:  Guy, so why – so, okay.  So the, the core question we had

18   was, what has he done since 2000?   It sounds like he was doing something where you gave

19   him a client.  So what was that?

20         MR. ABRAMOFF:  Yeah, I – I think what it was with that one –

21         AGENT WYNAR:   In other words, what does he do for a living, is my

22   question -- my core –

Privileged & Confidential
K&S DRAFT 12-18-22

1              AGENT QUINN:   Yeah.

2              MR. ABRAMOFF:  I don't know the – I actually can't – I don't think I can

3    answer that.  You know, he's a unprofessional organizer, or –

4              AGENT WYNAR:   Um-hmm.

5              MR. ABRAMOFF:  I don't want to say professional, because that --

6              AGENT QUINN:  Yeah.  Well, I guess then, when you say you say you

7    referred him a client – so you referred him for some service.  What was that service?

8              MR. ABRAMOFF:   Yeah, so there was this fellow who -- named Shali

9    Shablah Kumar who has in trying to become an ambassador to something or other –

10             AGENT WYNAR:   Yeah, okay.

11             MR. ABRAMOFF:   -- and another character who you should be looking at

12   very closely..

13             AGENT WYNAR:  Now, I do – I do know the name –

14             MR. ABRAMOFF:   Okay.

15             AGENT WYNAR:   -- because we've tied him to Paul as well.  But we -- you

16   know.

17             MR. ABRAMOFF:  No, I don't mean he's NACessarily a character -- although

18   perhaps he is.  I was introduced to him by another character, who you should definitely be

19   looking into:  Nick Muzin –

20             AGENT QUINN:   Oh.

21             AGENT WYNAR:   Oh.

22             MR. ABRAMOFF:   -- who is a separate thing.  I don't – actually, you're –

9

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT QUINN:   Yeah.  (Inaudible).

2          AGENT WYNAR:  You know the name is -- the name is -- we have a long

3    list of names.

4          But let's -- let's stick with Paul.

5          MR. ABRAMOFF:  So basically, I -- for me to consult with and help Shali

6    and advise him, which I did for a little while until it became impossible and he became just

7    completely difficult to deal with --

8          AGENT WYNAR:  Shali or Paul?

9          MR. ABRAMOFF:   Shali.

10          AGENT WYNAR:  Shali.  Okay.

11          MR. ABRAMOFF:   You know, Paul's not difficult to deal with .

12          AGENT WYNAR:  Okay, so –

13          MR. ABRAMOFF:   Paul's actually – (inaudible) very nice.  You know, he

14    takes (inaudible).

15          AGENT WYNAR:  Do you mind if I take a few notes while you talk

16    (inaudible)?

17          MR. ABRAMOFF:  Shali, Shali is – Shali's not -- he's very pushy.

18          AGENT QUINN:   Okay.

19          MR. ABRAMOFF:   And so I, I had recommended a few other of my friends

20    for him to consult with or consult to him and help him.  And he was -- every one of them, he

21    was just very abusive to, so.

22          AGENT QUINN:  And what was he trying to accomplish?

Privileged & Confidential
K&S DRAFT 12-18-22

1          MR. ABRAMOFF:  He was trying to become an ambassador to, at that point

2    to, to India.

3          AGENT QUINN:  Got you.

4          MR. ABRAMOFF:  -- which he didn't succeed in doing.

5          AGENT QUINN:  Yeah.

6          MR. ABRAMOFF:  And so I—frankly, Paul wanted business, and he was

7    needing business. And I thought, okay.

8          AGENT QUINN: Yeah.  And so Paul was supposed to help him get that, that

9    --.

10         MR. ABRAMOFF:  And Paul basically was spinning the whole line -- which I

11   believe, too, because I didn't know -- you know, my – uh, it was hard to tell with Paul

12   whether or not he was really plugged in or not plugged in.

13         AGENT QUINN:  Uh-huh.  Yeah.

14         MR. ABRAMOFF:  Because, you – in encountering people, my, my default

15   position for Paul would be that he's not plugged in.

16         AGENT QUINN:  Yeah.

17         MR. ABRAMOFF:  But then you'd encounter people –

18         AGENT QUINN:  Yeah.

19         MR. ABRAMOFF:  -- who would say, oh, Paul Erickson, oh, he's really close

20   to the Trump people and all the rest.

21         AGENT QUINN:  Got it.

22         MR. ABRAMOFF:  So (inaudible),  I told that to Shali and set him up to do

Privileged & Confidential
K&S DRAFT 12-18-22

1    it.

2                    AGENT QUINN:   Um-hmm.

3                    MR. ABRAMOFF:   And, you know.

4                    AGENT WYNAR:  Who, who told you that?   Who suggested to you that

5    Paul was plugged in?  That's an important question, I guess.

6                    MR. ABRAMOFF:  Um . . . I'm going to have to think.

7                    AGENT WYNAR:  Oh, yeah, this is --

8                    MR. ABRAMOFF:  This was [more than] one person, by the way.

9                    AGENT QUINN:   Um-hmm.

10                   MR. ABRAMOFF:   It was -- and I wasn't involved with her personally -- the

11   Trump campaign.  So I didn't really know them at all.

12                   AGENT QUINN:   Um-hmm.

13                   MR. ABRAMOFF:   I remember going to a dinner, um, on Capitol Hill --  I

14   don't remember when this was -- during the campaign.  And I was invited by Dana

15   Rohrabacher to go to the dinner.

16                   AGENT QUINN:   Yeah.

17                   MR. ABRAMOFF:   And it was -- there were a bunch of people there.

18   Ambassador Faith Whittlesey; Sessions was there.

19                   AGENT QUINN:   Um-hmm.

20                   MR. ABRAMOFF:   Jeff Sessions, and some congressmen, and in walks Paul.

21                   AGENT QUINN:   Yeah.

22                   MR. ABRAMOFF:   And he didn't see me.  It was a big table.

Privileged & Confidential
K&S DRAFT 12-18-22

1           AGENT QUINN:   Yeah.

2           MR. ABRAMOFF:   And everybody was just latching all over him.

3           AGENT QUINN:   Yeah, well –

4           MR. ABRAMOFF:   He's the guy in the campaign; he's this; he's the that.

5           So I thought, all right.  You know, maybe.

6           AGENT QUINN:  So this was the people -- I mean, was Jeff Sessions one of

7    the people?

8           MR. ABRAMOFF:  No.  No, I mean Sessions –

9           AGENT QUINN:   -- okay, some of the other people –

10          MR. ABRAMOFF:   Yeah.

11          AGENT QUINN:   Okay.  Got you.

12          MR. ABRAMOFF:   I don't remember which ones.  Possibly, there's a director

13    and -- movie director –

14          AGENT QUINN:   All right.

15          MR. ABRAMOFF:   -- named Ron -- Ron Maxwell.

16          AGENT QUINN:   Okay.

17          MR. ABRAMOFF:  He may be them one of them who was.  It, it just struck

18    me as odd.

19          AGENT QUINN:   Yeah, because you – you had no –

20          MR. ABRAMOFF:   Because this is the same Paul I know that –

21          AGENT QUINN:   Because you had no – you had reason to think Paul

22    (inaudible).

13

Privileged & Confidential
K&S DRAFT 12-18-22

1          MR. ABRAMOFF:   Well, I didn't even believe he was – I could [beat] the

2    Buchanan campaign, frankly.

3          AGENT QUINN:   Oh, really?

4          AGENT WYNAR:   Oh, wow.

5          MR. ABRAMOFF:   (Inaudible) his picture in *Time Magazine*.

6          AGENT QUINN:   Yeah.

7          MR. ABRAMOFF:   I just – it's just hard to believe about him.

8          AGENT QUINN:   Yeah.

9          MR. ABRAMOFF:   But having said that, I mean, I -- you know, he is a

10   friend.

11         AGENT QUINN:   Yeah.

12         MR. ABRAMOFF:   And I feel bad for him.  He's always funny -- well, I

13   thought he was funny (inaudible) –should probably be reading the paper, I guess.  He had

14   some Russian money, or something.

15         AGENT QUINN:   Yeah.

16         MR. ABRAMOFF:   I don't know what I even looked at.

17         AGENT WYNAR:  Oh, you're, you're that detached from Paul Erickson's

18   drama that you're not – I mean, that's –

19         MR. ABRAMOFF:   Yeah.

20         AGENT WYNAR:   Yeah, because he has been tangentially dragged into the

21   Maria Butina narrative.

22         MR. ABRAMOFF:  Tangentially.  I thought they were boyfriend-girlfriend.

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT WYNAR:  Oh, yeah.  But when I say "tangentially," I mean, he

2    hasn't been arrested or indicted, but the press has kind of figured out who he is, and it's –

3          MR. ABRAMOFF:   Yeah.

4          AGENT WYNAR:   But what I mean is – yeah.  That's I what I mean, so.

5          MR. ABRAMOFF:  Yeah.  Yeah.

6          I met her, by the way.  We were supposed to have lunch one day and he

7    brought her.

8          AGENT WYNAR:  That was going to be one of our later questions.

9          MR. ABRAMOFF:  I mean, he was -- he gave me something about how she

10   was starting an NRA in Russia, which I listened to, and I thought, that's pretty stupid since

11   gun ownership's barred -- illegal in Russia.

12          AGENT QUINN:   Yeah.

13          MR. ABRAMOFF:   I mean, at least I thought it was.

14          AGENT WYNAR: it's because they don't have an NRA I guess; that's the

15   problem.

16          MR. ABRAMOFF:  Yeah, right.  Or (inaudible)

17          Anyway, so, I mean, anyway, so that was – that was it.  You know,

18   (inaudible) she didn't strike me as anything (inaudible) Paul's (inaudible).

19          AGENT WYNAR:   While we're on it, can you remember where and when,

20   roughly?

21          MR. ABRAMOFF:   It was at Sushi Taro Restaurant.  I don't remember

22   when.

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT WYNAR:   Sushi Taro, is that --.

2          AGENT QUINN:   That was –

3          AGENT WYNAR:   Should I know that place?

4          MR. ABRAMOFF:  It's a sushi place downtown.

5          AGENT WYNAR:  DC?

6          MR. ABRAMOFF:   DC.

7          AGENT WYNAR:   Okay.

8          AGENT QUINN:  And what – do you remember if it was last summer or the

9    summer before, or?

10          MR. ABRAMOFF:  When did this stuff all start?

11          AGENT QUINN:  Yeah, his –

12          MR. ABRAMOFF:  Like, publicly?

13          AGENT QUINN:   Yeah.  Probably, it'd be probably June of, of this year.

14          MR. ABRAMOFF:   It was before that.

15          AGENT QUINN:  Oka.

16          MR. ABRAMOFF:   Yeah, it was way before that.  I don't remember when it

17    was, but it was way before that.

18          AGENT WYNAR:  Okay, but we -- I'm sorry. So I was distracting you.

19    You didn't even believe he was part of the Erickson campaign.  Let's –

20          AGENT QUINN:   The Buchanan campaign, yeah.

21          AGENT WYNAR:   The Buchanan campaign, yeah.

22          In a quick, just in a nutshell, because I said we weren't too interested in the

Privileged & Confidential
K&S DRAFT 12-18-22

1    whole history.  But evidently your detection of his-- of his lying or deceptiveness or whatever

2    we want to call it must have started -- I mean, does it go all the way back to college, or?

3                        MR. ABRAMOFF:   Yeah.

4                        AGENT WYNAR:   Really?

5                        MR. ABRAMOFF:   Yeah.  Paul's Republican (inaudible) policy (inaudible).

6                        AGENT WYNAR:  I see.  So, maybe just one example from the history that,

7    that triggers this, you know?

8                        AGENT QUINN:  Yeah, like back of your 20s, like somewhere in there.

9                        AGENT WYNAR: I, I -- just one.   I --

10                       MR. ABRAMOFF:  I can give you one.

11                       AGENT WYNAR:   Yes, sir.

12                       MR. ABRAMOFF:   So – and by the way, Grover Norquist and Ralph Reeder

13   and a few other people who probably –

14                       AGENT QUINN:   Who knew him?

15                       MR. ABRAMOFF:   -- have passed – Grover had more present dealings with

16   him.  But they were involved with us in college -- Republicans.

17                       So Paul was in charge of our field (inaudible) program in 1981, and we sent

18   teams of four young people out in vans to cover -- in those five regions of the country and

19   recruit and go to campuses every day and do training seminars every week and things like

20   that.  And Paul, Paul was in charge of all of it.  He was the head of all of it.

21                       So it seemed to be going well, and it seemed actually to be a successful

22   program, and even afterwards.  And as the -- there was a day when all of the field man were

17

Privileged & Confidential
K&S DRAFT 12-18-22

1    returning -- or a couple days -- returning to DC.  And we were going to have a big meeting.

2    And this is 1982, roughly.

3                    AGENT QUINN:  A "field man" -- I'm assuming that these people are, like,

4    regional; like, working and stuff?

5                    MR. ABRAMOFF:  Right.

6                    AGENT QUINN:   Okay, I just wanted to make sure.

7                    MR. ABRAMOFF:  Right.

8                    So Paul basically had them all coming back.  We were going to have a big

9    meeting of all of them.  And, you know, we were going to cook barbecue or something.  We

10   had a lot of resources -- money – as college Republicans at that point.  These people had

11   worked their guts out for months and months living out of a van; you know, horrible

12   circumstances, in days when there were no cell phones, of course, so they had to go to the

13   payphone.

14                   AGENT QUINN:   Right.

15                   MR. ABRAMOFF:   And that's important because they weren't in touch with

16   each other.

17                   AGENT QUINN:   Right.

18                   MR. ABRAMOFF:   Right?  There was no way to be in touch with each other.

19                   AGENT WYNAR:   Yeah, it's true.  It's true, because I'm like, yeah.

20                   MR. ABRAMOFF:   You (inaudible).

21                   AGENT QUINN:   Okay.

22                   MR. ABRAMOFF:   It was -- there was no phone.  You had to use a

Privileged & Confidential
K&S DRAFT 12-18-22

1    payphone, right?

2              AGENT QUINN:   Yeah.

3              AGENT WYNAR:  This is back in the 80s, right?

4              AGENT QUINN:   Yeah.

5              MR. ABRAMOFF:   So, so the first group comes in, and they say -- and I

6    think Grover and I greeted them, or I greeted them at least.  And Paul wasn't there.

7              And they said, "Oh, great.  When's our White House" – "When's our Rose

8    Garden" – "When do we get to meet the President in the Rose Garden?"  The Rose Garden

9    lunch.

10              I'm like, what?

11              He said, "They said Paul told us that as a reward for our services, we could

12   have a Rose Garden lunch?

13              AGENT QUINN:   Right.

14              MR. ABRAMOFF:   And I said, "I – I don't know.  Good catch. (Inaudible)."

15              AGENT WYNAR:   Oh, my God.

16              MR. ABRAMOFF:  So [we first saw] Paul when another two groups came

17   back.  Now, mind you, they're coming in from different parts of the country, and they came

18   back and had the very same story.

19              AGENT QUINN:   Yeah.

20              MR. ABRAMOFF:   Each of them.

21              So, eventually, Grover and I confronted Paul and said, "What is this?"

22              He said, "Oh, that's totally ridiculous.  I never made any kind of promise."

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT QUINN:   Yeah.

2          MR. ABRAMOFF:   So he said, "Well, all of them had the exact same story;

3   how can they possibly have the same story, talking to you? You, you went out and visited

4   them, and you were in touch with them.  You're the only one.

5          "I don't know; they must have misunderstood or something."

6          The next one comes back:  same story.

7          AGENT QUINN:   Yeah.

8          MR. ABRAMOFF:   Now they're all together in a room, and they're – and

9   they are all being told that there's no Rose Garden.

10          AGENT QUINN:   Yeah.

11          MR. ABRAMOFF:   So I called Lee Atwater at the White House and said, "Is

12   there any way to get anything?"  And there was no way he had, and they were furious.

13          And I don't know that that's the first time I thought Paul was a pathological

14   liar.

15          AGENT QUINN:   Yeah.

16          MR. ABRAMOFF:   But it was very clear to me then.

17          AGENT WYNAR:  Because he lied twice.  He lied to them, and then he lied

18   to you about lying to them.

19          MR. ABRAMOFF:  Right, because I actually don't think he thinks he's lying.

20          AGENT WYNAR:  That's -- well, that's right.

21          MR. ABRAMOFF:  I think he's actually – I think he's --

22          AGENT WYNAR:  And this is a lie that was inevitably going to collapse.

Privileged & Confidential
K&S DRAFT 12-18-22

1          MR. ABRAMOFF:   Of course.

2          AGENT QUINN:   Right.

3          MR. ABRAMOFF:  They all are -- all lies collapse.

4          AGENT QUINN:  But, like –

5          AGENT WYNAR:   Now, well, but this, this one is --

6          MR. ABRAMOFF:  No, [all lies collapse], all right?

7          AGENT QUINN:  Yeah.

8          AGENT WYNAR:  Okay.

9          MR. ABRAMOFF:   But this one was going to collapse sooner than the rest of

10    them.

11          AGENT WYNAR:   I'll take your word for that.

12          MR. ABRAMOFF:   Well, they do.

13          AGENT WYNAR:   But this – I mean, I – I've dealt with – I've been -- you

14    know, Ethan and I've been working white collar crime for years and years.  And, definitely,

15    liars come in different stripes.  And you're telling me to start putting Paul -- well, your story

16    suggests to put Paul in a certain class of liars that literally doesn't think through their lies

17    weeks in advance, right?

18          AGENT QUINN:   Well, he just – you mean when he's saying stuff, he thinks

19    it's going –

20          MR. ABRAMOFF:   I think --

21          AGENT QUINN:   -- to happen and it doesn't happen?

22          MR. ABRAMOFF:  I think he's very smart.

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT QUINN:   Yeah.

2          MR. ABRAMOFF:  He's very smart.  He probably thinks through the lie.

3          AGENT QUINN:   Yeah.

4          MR. ABRAMOFF:   But I think he then takes a step that others may not,

5     which is I think he then starts believing his lies.

6          AGENT WYNAR:   Um-hmm.  Okay.

7          AGENT QUINN:   Got you.

8          MR. ABRAMOFF:  Okay.

9          I think he truly – if you put Paul on a lie detector test, I think he would

10     absolutely swear that, you know – uh, again, I don't know what Brent invested in.  Didn't he

11     invest in CompuCare (sic) or whatever it was called?

12          AGENT QUINN: So he's had a number of different businesses, and that's

13     one of the questions we were going to ask you.  Has he ever asked you to invest in any sort of

14     business schemes?  Like --

15          MR. ABRAMOFF:  He, he did.  He did at some point.  But there was never a

16     chance I was doing it.

17          AGENT QUINN: Yeah.

18          MR. ABRAMOFF:  You know, he, he was telling me, oh, oh, some oil thing

19     he wanted.  Some – you know, I told him when he brought up the Russian oil thing -- he told

20     me about.

21          AGENT QUINN:  Yeah.

22          MR. ABRAMOFF:   I said those are complete frauds.  They never happen.

Privileged & Confidential
K&S DRAFT 12-18-22

1    The only people over the last 20 years who have had a Russian oil deal or a Nigerian oil deal

2    – just full of crap.

3                    AGENT QUINN:   Yeah.

4                    MR. ABRAMOFF:   The only people who have oil deals are oil companies.

5                    AGENT QUINN:   Yeah.  Yep.

6                    MR. ABRAMOFF:   So that was one that he wanted me to invest (inaudible).

7                    AGENT WYNAR:  So, could –

8                    (Cross-talk).

9                    AGENT WYNAR:   Well, since we're -- since we're on it, why don't we go a

10   little more specific in what he told you if you don't mind?  What matters to us is the specific

11   things you recall him saying to you.  I know it gets a little minutia-oriented, but it is kind of

12   important.

13                   AGENT QUINN:   And I know, like, you know, because you're blowing him

14   off, you probably don't remember as much, but to the extent you can.

15                   MR. ABRAMOFF:  Yeah.  I mean, the truth is, I literally tune him out when

16   he starts talking.

17                   AGENT QUINN:   Yeah. Yeah.

18                   MR. ABRAMOFF:   Because I know it's just nonsense.

19                   AGENT WYNAR:  Well, for example, you say "Russian oil deals."  Now --

20                   MR. ABRAMOFF:  Yes, something about -- there was some -- I don't

21   remember the details of it.  As soon as he started saying it, I said Russian deals are fake.

22                   AGENT WYNAR:  Let me remind you, let me tell you what -- some of the

Privileged & Confidential
K&S DRAFT 12-18-22

1    four corners of what we know, and see if that triggers a recollection, sir.

2              When we think "oil deal," the first thing we think of when we add the word

3    "oil" with "Erickson," we think of Bakken Oil Fields in North Dakota; does that recall --

4              MR. ABRAMOFF:  Yeah, he was doing something like that.  I don't know

5    what he said he was doing.  Building hotels, housing, something like that, and there wasn't –

6    at every one of these junctures.  And I don't stay in regular touch with him.  He's sort of in

7    and out months later, you know.  And he's also, by the way, in touch with lots of other people

8    from the past, until I guess they finally, you know, tell him go F off.

9              AGENT QUINN:   Um-hmm.

10             MR. ABRAMOFF:   I don't do that, because I feel bad for him, and I, I like

11   him, you know.

12             AGENT QUINN:   And he's hasn't ripped you off for money that much.

13             MR. ABRAMOFF:   No.  I mean, I even got back the money eventually from

14   the flight, which took him six months.

15             AGENT WYNAR:  But you're defensive about it.  That's why you can

16   tolerate it.  I mean, you're, you're, you're actively not -- yeah.  Yeah, yeah.

17             MR. ABRAMOFF:  No, I'm not -- I'm not going to zero-chance that.

18             AGENT WYNAR:   Well, I mean, I've had friends like that, you know.

19             MR. ABRAMOFF:   I enjoyed Paul's (inaudible), but I don't – I don't -- I'm

20   just sad and surprised that some of these others didn't make the -- one or two phone calls is

21   all they had to make in town.  There are enough people in town who know him –

22             AGENT QUINN:   Right.

24

Privileged & Confidential
K&S DRAFT 12-18-22

1          MR. ABRAMOFF:   -- to tell, tell them, "Don't be out of your mind."

2          AGENT WYNAR:  Well, his, his victims are not all the people you're

3    thinking of.

4          I mean, do you have any --

5          AGENT QUINN:  Yeah.  I mean, because he kind of has a few different

6    categories of victims; one of which is folks, you know, from Republican politics.  And then

7    there's a significant portion that are back home in Sioux Falls that are friends of his mother;

8    like, people from his church; that sort of thing.  And then there's, like, another kind of just

9    group of people who are kind of like religious types and things like that, and it's just

10   (inaudible)

11         MR. ABRAMOFF:   Oh, from South Dakota?

12         AGENT QUINN:   From South Dakota.  Even around here, like --

13         SPEAKER 4:  Around here.

14         AGENT QUINN:  -- like, he'll go to a prayer group or something like that and

15   – for friends and folks, but that – it -- it's –

16         MR. ABRAMOFF:   But maybe political people though?

17         AGENT QUINN:   Some political people, like Mr. Bozell and Seth – Brent

18   and things like that, yeah.

19         AGENT WYNAR:  I think he's a coincident one.  He's a South – he's a

20   Dakotan and a political one.  So there's a –

21         MR. ABRAMOFF:   Who?  Ben Seth is also from South Dakota?

22         AGENT QUINN:   I don't think he is.

25

Privileged & Confidential
K&S DRAFT 12-18-22

1              AGENT WYNAR:   Well -- oh, no?  Okay.

2              AGENT QUINN:   So, I mean, there's a whole world of people who are

3    engaged in this, but there are –

4              AGENT WYNAR:  But there's plenty of people who can't make a single

5    phone call.

6              AGENT QUINN:   It's basically everyone you know --

7              (Unidentified person enters the room.)

8              AGENT WYNAR:   Hello, ma'am.  I'm sorry to interrupt your morning.

9              MRS. ABRAMOFF (?):   Oh, no.  It's fine.

10             MR. ABRAMOFF:   These guys are –

11             MRS. ABRAMOFF (?):   Would you like any water or anything?

12             AGENT QUINN:  No, I'm – I'm good.  Thank you.

13             MR. ABRAMOFF:   Can I tell her you are?

14             AGENT WYNAR:   Of course, yeah.

15             MR. ABRAMOFF:   They're from the FBI, asking about Paul.

16             AGENT QUINN:  Yeah.

17             MRS. ABRAMOFF (?):   Oh.

18             AGENT WYNAR:   Paul Erickson.

19             MRS. ABRAMOFF (?):   Oh.

20             MR. ABRAMOFF:   Yeah.

21             MRS. ABRAMOFF (?):   Okay.

22             AGENT WYNAR:   Yeah.  Yeah, but – yeah. He's -- I mean, the guy's – I

26

Privileged & Confidential
K&S DRAFT 12-18-22

1    mean --

2              AGENT QUINN:   It's essentially anyone he's come in contact, and I'm

3    talking – you look like you're concerned.  I wouldn't --

4              MR. ABRAMOFF:  Well, I mean, he's a friend of ours, and --

5              AGENT QUINN:  Well, of course, yeah.

6              MRS. ABRAMOFF (?):   He's not a good friend, but he's – I -- you know

7    what?  I feel bad for him.  I think he has a mental illness.

8              AGENT QUINN:   Yeah.

9              MRS. ABRAMOFF (?):   And so I feel bad for people with mental illnesses.

10             AGENT QUINN:   I – I --

11             AGENT WYNAR:  And it wouldn't be a problem, you know, if -- nobody's,

12   nobody's in trouble for being mentally ill.  But he steals money; you know, that's the

13   problem, you know, and it's severe enough to worry about.

14             MRS. ABRAMOFF (?):   Right.

15             AGENT WYNAR:   And, I mean, just to be straight about the whole story, I

16   mean, obviously the story is even bigger than that because a lot of the money he -- I'll just

17   sort of -- I mean, these are things you obviously probably wouldn't know, but I, I want to

18   give you his context.

19             He steals money -- we think/ that's our allegation -- and a lot of it ends up in

20   Maria's pocket, right?

21             I mean --

22             AGENT QUINN:   Yeah.

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT WYNAR:   I mean, don't we -- I mean, isn't that how we look at it?

2          AGENT QUINN:  Yeah, it's – I mean, his life was, and, and hers, was largely

3    funded by his fraudulent activities.

4          So essentially everyone (inaudible) seems every person interacts with and

5    makes friends with, he hits up with (inaudible) which are like yourself, and you, and now –

6    this, this sounds shady -- and unfortunately, many of which who he befriends, and then

7    they'll give him -- sometimes he's gotten a fairly significant amount of money.  Some are

8    relatively small, $5,000 or whatever, but -- well, actually, I can give you an example.

9          His hairdresser in Sioux Falls -- we interviewed her and, you know, she's a

10   25-year-old –

11          MR. ABRAMOFF:   His hairdresser?

12          AGENT QUINN:   -- hairdresser.  And, and she's – but, you know.  And all

13   the – all the rest of the story is to kind of give you context.

14          She's, you know, in her 20s and getting ready to go to school and things like.

15   Fall, winter, she, she cuts her hair, and they've known each other for, for, you know, a few

16   years.  And she's talking about -- he's trying to coach her on how to save for retirement and

17   that sort of thing because she's her in her 20s and (inaudible).  And he goes, "What you need

18   to do is open up, you know, an IRA and" -- he started with, "what you should do is give me

19   $5,000 to invest in one" –

20          I think that was a wheelchair company.

21          AGENT WYNAR:   Um-hmm.

22          AGENT QUINN:   -- in a wheelchair company.  You'll get a 50-percent return

Privileged & Confidential
K&S DRAFT 12-18-22

1    in six months, and then you --

2            AGENT WYNAR:  You'll be a great way to jumpstart your –

3            AGENT QUINN:   -- and then (inaudible) -- you know, capitalize it.  And

4    then he just takes it.  And this is, you know, a woman who cuts hair for a living outlying in

5    Sioux Falls; it's not like she's loaded with money.  And he -- and he took that.

6            And it's, it's funny because he -- you know, she liked him because he was

7    giving all sound advice for saving for retirement, and telling someone in their twenties to

8    save retirement is good advice because most of them aren't thinking about it.  But then used

9    that to, to steal her money.  And that's kind of the pattern and practice we've seen from him,

10    so.

11            AGENT WYNAR:  But this -- but that -- I guess, the point being is, if this

12    was all triggered by your, your statement that, hey, any of these people could have made a

13    call, we just want you know

14            MR. ABRAMOFF:   Well, (inaudible) --

15            AGENT WYNAR:   Yeah, of course, no.  That's right.  That's exactly my --

16            MR. ABRAMOFF:  -- you know, Frank Bozell:  what the heck?

17            AGENT QUINN:  Yeah.  Right.

18            MR. ABRAMOFF:   I mean, he knows – he knows all the people to --

19            AGENT WYNAR:  Well, well, you know the --

20            MR. ABRAMOFF:  -- talked to who would have told him differently, I mean.

21            MRS. ABRAMOFF (?):   The problem is Paul's very charismatic –

22            MR. ABRAMOFF:   Hmm.

Privileged & Confidential
K&S DRAFT 12-18-22

1          MRS. ABRAMOFF (?):  -- just like you.

2          AGENT WYNAR:  No, I think there – I, I think's that's –

3          AGENT QUINN:   That's, that's a painful comparison.

4          AGENT WYNAR:   I think that's -- I think that's I think that's accurate,

5   though.

6          AGENT QUINN:   Yeah.

7          MR. ABRAMOFF:   Do you want to sit down?  Or do you –

8          MRS. ABRAMOFF (?):   No, I'm, I'm interested.

9          AGENT WYNAR:   Well, well –

10          (Cross-talk).

11          MRS. ABRAMOFF (?):   (Inaudible) -- I feel bad.  It makes me feel bad.

12          AGENT WYNAR:  Well, well we actually should be talking less and listening

13   more.  That's sort of our –

14          (Laughter.)

15          AGENT QUINN:   Yeah, right..

16          MRS. ABRAMOFF (?):   Well, it's good to have context because –

17          AGENT WYNAR:   Yeah – no, I understand.

18          MRS. ABRAMOFF (?):   -- because the only context we actually have are

19   what we've read and what we've experienced.

20          And I know, I know Paul's probably tried to hit you up for some money.

21   Fortunately, we didn't have it.

22          AGENT WYNAR:  Yeah, we were just talking about that.

Privileged & Confidential
K&S DRAFT 12-18-22

1        MR. ABRAMOFF:   You know, if I had a trillion dollars, I wouldn't have

2    given it to him.

3        AGENT QUINN:   Yeah.

4        MR. ABRAMOFF:  Other than – other than – which I did give him -- look, I

5    feel bad.  I feel bad for him.  I'm not happy to hear what, what you're now saying, but --

6        AGENT QUINN:   Yeah.

7        MR. ABRAMOFF:   -- I feel bad for him, or what I read.

8        I think he's mentally ill, and he's always been sort of a down-on-his-luck guy.

9    He was a friend.  And, you know, you don't leave your friends there.  But, but I wouldn't

10   invest with him.

11       But that's one -- it's one thing to buy an airplane ticket for somebody because

12   he's – you know, "I'm at the airport; I my credit card is not working; can you help me?"

13   You know.

14       AGENT QUINN:   Yeah.

15       MR. ABRAMOFF:   I don't believe he has a credit card.  I'm certain he wasn't

16   at the airport, you know, that kind of thing.

17       AGENT QUINN:   Yeah.

18       MR. ABRAMOFF:   But, you know -- I know -- I know he bought the ticket

19   because I have that thing on my American Express where I see every charge that's made,

20   exactly when it's made.

21       AGENT QUINN:   Yeah.

22       MR. ABRAMOFF:   But, but again, it took me months to get this back from

Privileged & Confidential
K&S DRAFT 12-18-22

1    him.

2               AGENT QUINN:   um-hmm.

3               MR. ABRAMOFF:   He did it actually a couple -- he did it one time and gave

4    the money quickly.

5               AGENT WYNAR:   Yeah.

6               MR. ABRAMOFF:   But then the second time, it was --

7               AGENT WYNAR:   I wonder where the money that he returned to you came

8    from.

9               That's always our question is –

10               MR. ABRAMOFF:   I don't know.

11               AGENT WYNAR:   When somebody -- and they're not often out there.

12               When somebody tells a story about getting the money back, it's just a matter

13    of trying to backtrack and see, well –

14               MRS. ABRAMOFF (?):   Yeah, it's a Ponzi scheme –

15               AGENT WYNAR:   Yeah, it --

16               AGENT QUINN:   Exactly, yeah.

17               AGENT WYNAR:   It, it, it -- in sorts, yes.  We have a very –

18               (Cross-talk.)

19               AGENT QUINN:   -- yeah.

20               AGENT WYNAR:   We have a very particular definition of that.  But, yes, it's

21    actually very, very akin to that.

22               AGENT QUINN:   Yeah.

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT WYNAR:  But did you remember anything --

2          MR. ABRAMOFF:  Did you guys want something to drink, or?

3          AGENT QUINN:   Oh, no.  I'm (inaudible) very much.

4          MR. ABRAMOFF:   (Off mic.) I mean, you're –

5     Is she allowed to sit down?

6          AGENT WYNAR:   Yeah, I mean –

7          MR. ABRAMOFF:   I feel bad you're standing.

8          AGENT WYNAR:   I just don't -- I just don't want to absorb too much.  But

9     we do have, unfortunately, a lot of questions about this guy and, um – but, um, the

10    wheelchair thing, is that –

11         AGENT QUINN:  Oh, yeah.  We haven't talked about that.

12         MR. ABRAMOFF:  I haven't heard that one.  I don't think – I'd remember

13    hearing that one.  I think I would have remembered it because it would remind me of a

14    *Seinfeld* episode.

15         AGENT WYNAR:  When he talked about then the *Compass Care, which as

16    you did hear about, did you -- so the way this kind of works is he talks about Compass Care,

17    and he leaves an impression with people regarding sort of what this company is, the status of

18    it, what's going on.

19         Based on your, just, immediate recollection of his representations about

20    Compass Care, do you remember what he was – what he was trying to communicate that he

21    was doing with this company?

22         MR. ABRAMOFF:  Well, again, every time he brought it up . . . .

33

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT WYNAR:  I get it, yeah.

2          MR. ABRAMOFF:  Yeah.  You're building a senior home, or whatever you're

3   doing, in South Dakota, which to me --

4          AGENT WYNAR:  Okay, but that's -- but that's the kind of thing:  you're

5   building senior homes.  And you got that sense.

6          MR. ABRAMOFF:  Well, I don't actually remember.  It was definitely senior

7   homes or a senior facility; I don't know the difference between them.

8          AGENT WYNAR:  That's fine, that's fine.

9          MR. ABRAMOFF:  But, but my sense was, first of all, it was complete

10   nonsense because it was Paul.

11          AGENT QUINN:  Um-hmm.

12          MR. ABRAMOFF:  Second of all, it's clever of him to put it in South Dakota,

13   where nobody's going to go and be able to see this.

14          AGENT QUINN:  Okay.  Yeah.

15          MR. ABRAMOFF:  If he'd said it's in Northern Virginia, somebody could go

16   drive by.

17          AGENT QUINN:  Yeah.

18          MR. ABRAMOFF:  So, it's in South Dakota, and nobody's ever going to

19   South Dakota.

20          AGENT QUINN:  Um-hmm.

21          MR. ABRAMOFF:  And I never for a second thought it was real.

22          AGENT QUINN:  Right.

Privileged & Confidential
K&S DRAFT 12-18-22

1          MR. ABRAMOFF:   And in fact, other friends of his, like Janet Allen and

2     others – though I don't think she's had contact with him a long time.  I'm trying to think who

3     else was sort of in the Paul past.  Kind of, it was a running joke.  You know, 'yeah, he's a big

4     senior-care person'.  It was ridiculous.  You know, we didn't believe it for a second.

5          AGENT WYNAR:  So then, what you -- so now I guess we have to say

6     granted, you didn't believe it.  What was he trying to get you to believe?  What can you recall

7     about what he was trying to sell?

8          MR. ABRAMOFF:  I mean, he was just trying to –

9          AGENT WYNAR:   For example –

10          MR. ABRAMOFF:   Well, I mean, he was never -- he wasn't trying to pitch

11     me on investing in that, because any time he even tried to raise that, I would always say, "I

12     don't have any money," and would just end it.

13          AGENT WYNAR:  Well, how about how about this way:  Did you ever get

14     the impression that he was trying to convince people that he had created some sort of

15     physical facility somewhere?

16          MR. ABRAMOFF:  Yeah.

17          AGENT WYNAR:   As opposed to 'someday I will build them'?

18          MR. ABRAMOFF:  No, I think he -- it was under the -- I was under the

19     impression that it existed.

20          AGENT WYNAR:  Okay.

21          MR. ABRAMOFF:  Well, I didn't think it existed –

22          AGENT WYNAR:   I understand.

Privileged & Confidential
K&S DRAFT 12-18-22

1          MR. ABRAMOFF:   -- but I had the impression that he was conveying that it

2    existed.

3          AGENT WYNAR:  Good.  All, right.  That's sort of important, right?

4          MR. ABRAMOFF:  And then I remember vaguely -- was there something in

5    ConNACticut, also?

6          AGENT QUINN:  Actually, we– I don't think we've heard that, about that.

7          MR. ABRAMOFF:  Maybe.  Maybe I'm conflating.

8          AGENT QUINN:  I know you –

9          MR. ABRAMOFF:   Maybe it was somebody else, then.

10          AGENT QUINN: You might -- you might be -- I mean, it might be

11    something we just haven't heard about.

12          MR. ABRAMOFF:  There also might be somebody else who was actually in

13    the senior business in ConNACticut.

14          AGENT WYNAR:   Yeah, okay.

15          AGENT QUINN:  Oh, okay.

16          AGENT WYNAR:  I don't' think – I don't think so.

17          MR. ABRAMOFF:   But I remember just something -- he was in New York

18    for some reason, like, selling his business at some point. I, I don't know.

19          AGENT QUINN:   That's actually --

20          AGENT WYNAR:  That actually -- that jives.

21          AGENT QUINN:  Did you ever tell you, and you remember, like, when he

22    was selling this – and if the business -- for instance, was it Compass Care, do you think, he

Privileged & Confidential
K&S DRAFT 12-18-22

1    was trying to sell?  Or can you remember?

2              MR. ABRAMOFF:  Probably.  But again, you know, unfortunately, guys –

3              AGENT QUINN:   Yeah.

4              MR. ABRAMOFF:   -- every time he raised stuff to me, I just sort of shut off

5    the ears.

6              AGENT QUINN:   Yeah.

7              MR. ABRAMOFF:   Because, you know, I knew that no matter what he was

8    saying, it was a entertaining lie.

9              AGENT QUINN:   Um-hmm.

10             MR. ABRAMOFF:   And there was never a chance that it was real.

11             AGENT QUINN:  Yeah.  And, and when we first got started earlier

12   (inaudible), you mentioned that he had some sort of Russian oil deal, like he trying to coax

13   you to invest.  Do you remember when about he was pitching that to you?

14             MR. ABRAMOFF:  It was after I think he got together with Marina.

15             AGENT QUINN:   Yeah.

16             MR. ABRAMOFF:   Or, or Maria.

17             AGENT QUINN:  Got you.  and did they ever pitch any other businesses, do

18   you remember?

19             MR. ABRAMOFF:  Well, she didn't pitch; it was just him, no.

20             AGENT QUINN:   Just him.

21             MR. ABRAMOFF:   No -- well, I don't say no.  He may – again, he may have

22   been pitching a hundred business to me.

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT QUINN:   Yeah.

2          MR. ABRAMOFF:   But I wasn't listening to any of it.

3          AGENT QUINN:   I see.

4          MR. ABRAMOFF:   So it didn't – again, I mean, I just --

5          AGENT WYNAR:   Yeah, yeah, there seems to be –

6          MR. ABRAMOFF:   -- all background notes.

7          AGENT WYNAR:   There seems to be two -- there are two Russian oil deals.

8          AGENT QUINN:   Um-hmm.

9          AGENT WYNAR:   Sometimes, the word "Russian" comes up in terms of the

10  Bakken development, hotels and houses, and sometimes "Russian" comes up in terms of

11  aviation jet fuel.  Do you --

12          MR. ABRAMOFF:  No, that, that was the Russian one – aviation --

13          AGENT WYNAR:  So that's the --

14          MR. ABRAMOFF:  I remember the South -- North Dakota?

15          AGENT QUINN:   North Dakota, yeah.

16          MR. ABRAMOFF:   -- thing, him telling about a boomtown; everything was

17  amazing; he was making -- you know, building homes or doing something there.

18          And the – but the Russian oil -- yeah, I don't remember Russia in the context

19  of Bakken.

20          AGENT WYNAR:   Okay.  Okay, so there are two things you recall.  They're

21  separate:  the Bakken, and the Russians –

22          MR. ABRAMOFF:   Yeah.  Yeah.

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT WYNAR:  So maybe the same questions about the Bakken that we

2    just asked about Compass Care, did he give you the impression that he had successfully

3    completed home developments in Bakken?  Did -- was that the impression he was pushing?

4          MR. ABRAMOFF:  Probably.  I don't --

5          AGENT WYNAR:  Yeah, okay.

6          MR. ABRAMOFF:   I don't remember.  I don't remember.

7          AGENT WYNAR:   Okay.  Okay.  And the aviation jet fuel thing, do you

8    remember any details about that that?

9          MR. ABRAMOFF:  No.,  As soon as he started the discussion – he may have

10   even – no, I, I don't think so.  I mean, I'm trying to think if there's -- if it was some other

11   country involved, also, in his narrative, or if it was one of the other fake oil deals though that

12   were floating around.  Not with him.  But I think -- I think – I think he's --

13          AGENT QUINN:  Was there an African country involved at all?

14          MR. ABRAMOFF:  I don't remember.  There might have been.  There might

15   have been.

16          The problem is, these oil deals –

17          AGENT QUINN:   Yeah.

18          MR. ABRAMOFF:   -- have been floating around for, like, 20 years.  So,

19   often –

20          AGENT QUINN:   Yeah.

21          MR. ABRAMOFF:   -- people come:  "Oh, look" – and even I -- 20 years ago,

22   thought, Oh, wow, this could be very interesting," until somebody in the oil business

Privileged & Confidential
K&S DRAFT 12-18-22

1    probably said, hey, listen; let me explain this very clearly to you.

2              AGENT QUINN:   Yeah.

3              MR. ABRAMOFF:   You know, the gold business doesn't have gold running

4    out of their side door that you can pick up with -- you know.

5              So anyway, so I said to Paul -- when he brought up, I said these are all fake,

6              "No, no, no," and, you know.

7              AGENT WYNAR:  It almost sounds like you, you've heard of these kinds of

8    things before.

9              MR. ABRAMOFF:  Oh, yeah, for 20 years I've been hearing about these oil –

10             AGENT WYNAR:   Really?  Oh.

11             AGENT QUINN:   Sure.

12             MR. ABRAMOFF:   Nigerian.  I remember Nigerian deals.  There were other

13   African deals.  Sweet crude deals.  This is 20 years ago (inaudible).

14             AGENT WYNAR:  Well, so the person who kind of floats around this one --

15   who are the other people that floated around this oil deal?

16             AGENT QUINN:  Well, there's – well, actually, I mean, are you talking the

17   Keenes?

18             AGENT WYNAR:   Yeah.

19             AGENT QUINN:   Yeah. Did David Keene or his wife bring that up to you?

20             MR. ABRAMOFF:  No.  I mean, I, I know David, but I've had one two-

21   seconds 'how you doing' conversation with him in --

22             AGENT QUINN:   Yeah.

Privileged & Confidential
K&S DRAFT 12-18-22

1         MR. ABRAMOFF:  -- decades.

2         AGENT QUINN:  Oh, okay.  So you don't – you don't know him?

3         MR. ABRAMOFF:  No, I don't – no.

4         AGENT QUINN:  Okay, so you – and they never pitched to you on an oil –

5         MR. ABRAMOFF:  He – no.  No, David and I, my only contact with him, he

6    was with somebody; I forget who was now that we both met him, and he said, "Hey,

7    somebody wants to say hello to you."  And he said, "Hey, Jack.  David Keene.  And I said,

8    "Hey, David, how's it going," blah blah blah.  That was it.

9         AGENT QUINN:  Got you.

10        AGENT WYNAR:  Um-hmm.

11        AGENT QUINN:  And, and it sounds l like no interactions with his wife

12   Donna at all?

13        MR. ABRAMOFF:  I didn't even know he had a wife.

14        AGENT QUINN:  Okay.

15        MR. ABRAMOFF:  Yeah, I mean, I was under impression that he divorced.

16        AGENT QUINN:  Yeah.

17        MR. ABRAMOFF:  But I don't know what well.

18        AGENT WYNAR:  And so (inaudible) seems to know him quite well.

19        MR. ABRAMOFF:  I guess he put him – didn't he put him on a board?  Or

20   something (inaudible) he on the board –

21        AGENT QUINN:  Yeah, American Conservative Union?

22        MR. ABRAMOFF:  Yeah.

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT QUINN:   The CPAC folks?

2          MR. ABRAMOFF:   Yeah.

3          AGENT QUINN:  Okay, and it's – that sounds familiar too/ you remember

4   Paul --

5          MR. ABRAMOFF:  Yeah.  Well, in fact, I remember going to CPAC one

6   year, and Erickson was running it.  Paul was like, "What the hell's going on here?"

7          AGENT QUINN:   Yeah.

8          MR. ABRAMOFF:   (Inaudible) was like, Paul –

9          MRS. ABRAMOFF (?):   Wasn't that recently?

10          MR. ABRAMOFF:  No.  It was – it was probably four, five, six years ago.

11          MRS. ABRAMOFF (?):   Oh.  I thought he recently ran it.

12          MR. ABRAMOFF:   No.  No, in fact, recently, last CPAC, our son wanted to

13   go.

14          AGENT QUINN:   Yeah.

15          MR. ABRAMOFF:   So I contacted Erickson to get him tickets, and he said

16   that he's on the outs with him.

17          AGENT QUINN:  Yeah.

18          MR. ABRAMOFF:  So . . .

19          AGENT QUINN:   Because, Mr. Bozell --

20          MR. ABRAMOFF:   Bozell.  Bozell.

21          AGENT QUINN:   he was on – he was on it as well.

22          MR. ABRAMOFF:   Uh-huh.

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT QUINN:   And some guests -- I don't remember if they were --

2          MR. ABRAMOFF:  Well, actually, I ran into a guy named Matt Schlapp.  He

3    was probably somebody else you should talk to.

4          AGENT QUINN:   Okay.

5          MR. ABRAMOFF:   And Matt –

6          AGENT WYNAR:   I'm sorry; can I get you to spell that?

7          MR. ABRAMOFF:   Schlapp.  S-C-H-L-A-P-P.

8          AGENT WYNAR:  S-C-H-L-A-P-P.

9          MR. ABRAMOFF:  Yeah.  He was Bush's political director in the White

10   House; he's on Fox all the time now.

11          So I -- we were on a, a show together, and we were talking about Erickson

12   because of -- the Russia stuff was in the news.

13          AGENT QUINN:  Yeah.

14          MR. ABRAMOFF:   And he -- and I said that I thought, you know, when you

15   took -- he's now head of ACU.

16          AGENT QUINN:  Yeah.

17          MR. ABRAMOFF:   And he said he kicked Erickson right out of there.

18          AGENT QUINN:  Got you.

19          MR. ABRAMOFF:   So he --

20          AGENT WYNAR:  Did he do that -- was it predicated on an incident, or did

21   he do it based on reputation?

22          MR. ABRAMOFF:  He – it sounds like the second he arrived, he kicked him

Privileged & Confidential
K&S DRAFT 12-18-22

1    out.

2            AGENT WYNAR:  Oh, so he had – so he knew.

3            MR. ABRAMOFF:   Yeah.

4            AGENT WYNAR:   Okay.

5            INTERVIEWEE:  I mean, I can't imagine you're not running into hundreds of

6    people who know him.

7            AGENT QUINN:  Yeah, it's not an uncommon thing for us to hear what

8    you're saying.

9            MR. ABRAMOFF:   Yeah.

10            AGENT QUINN:  So, yeah.

11            AGENT WYNAR:  Okay, so no mention not Mr. Keene.

12            How about -- I actually have a photograph of Mr Kumar.

13            AGENT QUINN:  Paul?

14            AGENT WYNAR:   Yeah.

15            AGENT QUINN:  Is that what you're (inaudible)?

16            AGENT WYNAR:  So what do you know about that whole thing, with . . . ?

17            MR. ABRAMOFF:  Well, Shali wanted to be ambassador to India and was

18    hiring a series of people to lobby and, in my case, to strategize with him -- I didn't lobby

19    anybody – but to lobby senators and congressmen and the administration to get him in as

20    ambassador.

21            And when I thought Paul was plugged in with these people -- if you

22    remember, I mentioned that I thought he was close to the Trump guys.

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT WYNAR:  Um-hmm.  And, and you, you mentioned that you

2     thought that, because you went to an event in DC.

3          AGENT QUINN:  That's Mr Kumar?

4          MR. ABRAMOFF:  Um-hmm.

5          AGENT QUINN:  Okay.

6          AGENT WYNAR:  And Erickson was present, and people were fawning over

7     him in a way that you –

8          MR. ABRAMOFF:  Yeah, they –

9          AGENT WYNAR:   -- were surprised at.

10          MR. ABRAMOFF:  Yeah, they did.  There was a guy -- I think he's that guy,

11     who was, like, the deputy chairman of the campaign.  Big, big, big obese guy.  I forgot his

12     name.   He went to the Agricultural Department, then he had a problem there.  I can't

13     remember the guy's name.

14          AGENT WYNAR:   Hmm.

15          AGENT QUINN:   Sam Corbis?

16          MR. ABRAMOFF:   Yes, that's him.

17          AGENT QUINN:   Okay.

18          MR. ABRAMOFF:  Sam Corbis.

19          AGENT QUINN:   Yeah.

20          MR. ABRAMOFF:   And he and Faith Whittlesey and Maxwell, who was

21     involved in the campaign, and reassigned.  So, again, I wasn't involved at all in the

22     campaign.

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT QUINN:   Um-hmm.

2          MR. ABRAMOFF:   So these are people who represent -- and then there was

3    a guy who represented himself as, as Trump's speechwriter.

4          AGENT WYNAR:   Um-hmm.

5          MR. ABRAMOFF:   You know, who I met there,  I can't remember his name.

6    I thought it was quite ironic here, you know, Trump's speechwriter.

7          AGENT QUINN:   Yeah, he doesn't – he doesn't seem very spirited.

8          MR. ABRAMOFF:   (Inaudible) great speeches; you know, you know, "Great

9    job."

10          Yeah.  I forget his name.

11          AGENT WYNAR:  Okay.  So, do you -- so what do --

12          MR. ABRAMOFF:  But they were all, like -- they were all, like, "Oh," when,

13    when Paul walked in.  "Oh, Paul -- Paul's here . . . Paul's here," you know.

14          AGENT QUINN:   Yeah.

15          MR. ABRAMOFF:   So, and he had he had been separately telling me a few

16    weeks before that he was very close, you know, with them in the campaign.  And during the

17    transition, he represented that he was involved with the transition.  But he purposely had

18    enjoined the transition team so he wouldn't be restricted by the restrictions of the transition

19    team.

20          AGENT WYNAR: Oh, now we're actually getting to an important subject:

21    Paul's representations regarding the transition team.  So, that, that is another whole segment

22    of our inquiry here, so let's, let's not brush by this one quickly.

Privileged & Confidential
K&S DRAFT 12-18-22

1          Paul represented to you that he was involved with the transition, but he also

2   specifically told you that he didn't officially join it.

3          MR. ABRAMOFF:   Right.

4          AGENT WYNAR:   And he said that to you?

5          MR. ABRAMOFF:   Yes.

6          AGENT WYNAR:    And this was his choice, apparently, it sounds like, or his

7   -- the context was it was -- he chose not to officially join.

8          MR. ABRAMOFF:  Yes.  Yes, yes.

9          AGENT WYNAR:  And reason was?

10          MR. ABRAMOFF:  Because he didn't want the restrictions.  There was a no-

11   lobbying restriction put on people who were on the transition team.

12          AGENT QUINN:   Got you.

13          AGENT WYNAR:   And – okay.

14          AGENT QUINN:  And so he had intended on -- because he's not a registered

15   lobbyist, to your understanding, or you don't know?

16          MR. ABRAMOFF:  I don't know.  I don't know.  I, I don't know.

17          AGENT QUINN:   But you presumed he had intentions on doing lobbying

18   work post-transition work?

19          MR. ABRAMOFF:   Well, I mean, he told me explicitly, he didn't want to

20   join, because he didn't want the restrictions.

21          AGENT QUINN:  Okay.

22          MR. ABRAMOFF:   And by volunteering, he said -- whatever that meant --

Privileged & Confidential
K&S DRAFT 12-18-22

1    he could do that.

2            And, but then -- you know, I forgot who, but there was somebody I was trying

3    to help get a job.  And, "Oh, yeah, I got him in.  I got him in."  It was – it was a [joke] --

4            AGENT QUINN:   Um-hmm.

5            MR. ABRAMOFF:   -- kind of, you know.  And --

6            AGENT QUINN:  But he actually claimed to have placed someone in the

7    administration; is that --

8            MR. ABRAMOFF:  Yeah.  He claimed to place lots of people in the

9    administration.

10           AGENT QUINN:   Oh.  Oh, all right.

11           AGENT WYNAR:   Hmm.

12           MR. ABRAMOFF:   Which, again, led me to believe that he was closer.

13           AGENT WYNAR:   Um-hmm.

14           AGENT QUINN:   Got you.

15           MR. ABRAMOFF:  I, I didn't know.

16           AGENT QUINN:  Okay.  So, based on the fact that you saw people kind of

17    recognize him at this event that you went through earlier, and then his thing where

18    (inaudible) told not (inaudible) --

19           MR. ABRAMOFF:  Well, yes, because –

20           AGENT QUINN:   Yeah.

21           MR. ABRAMOFF:   -- I thought he was full of it.

22           Remember when he was in the Buchanan campaign?  Do you remember that

48

Privileged & Confidential
K&S DRAFT 12-18-22

1    at all?

2                    MRS. ABRAMOFF (?):   No response.

3                    MR. ABRAMOFF:   Okay.  All right –

4                    MRS. ABRAMOFF (?):   Who?

5                    MR. ABRAMOFF:   Paul claimed to me that he was running the Buchanan

6    campaign during '92.

7                    AGENT QUINN:   I think (inaudible) right now.

8                    MR. ABRAMOFF:   And I thought, okay.

9                    MRS. ABRAMOFF (?):   Were, were you even born then?

10                    AGENT QUINN:   I was – I was around.  I wasn't voting yet, but I was

11    around (inaudible).

12                    AGENT WYNAR:   You know, true story.  True story; are you ready for this?

13    Totally random – I mean, the Bureau's got 12,000 agents, right?  Twelve thousand agents.

14                    MRS. ABRAMOFF (?):   I think we know that.

15                    AGENT QUINN:   That's – you guys probably know better than we do.

16                    MR. ABRAMOFF:   We only know a few hundred.

17                    MRS. ABRAMOFF (?):   Yeah.

18                    (Cross-talk.)

19                    MRS. ABRAMOFF (?):    Something about 11,000 of them were on Jack's

20    case.

21                    AGENT WYNAR:   Well, so but what brings Ethan and I here – as you see,

22    our cars are from San Francisco -- is a very strange, random sequence of events.

49

Privileged & Confidential
K&S DRAFT 12-18-22

1          Yes, he's, he's a young boy.

2          I'm actually a little younger than you are, but not much.  Here's the funny part.

3   You and I went to the same high school.

4          MR. ABRAMOFF:   Yeah?  You went to Beverly Hills High School?

5          AGENT WYNAR:   Yeah, I did.  I did.

6          MR. ABRAMOFF:   Where'd you go to elementary school?

7          AGENT WYNAR:  Beverly Vista.

8          MR. ABRAMOFF:   Oh, okay.

9          AGENT WYNAR:   Yeah.

10         MR. ABRAMOFF:   What, what year did you graduate Beverly?

11         AGENT WYNAR:   1984.  Yeah,  It's a strange – it's a strange fact  I noticed

12  in your biography.  I was like, that is -- that is weird.  I mean, so these coincidences happen

13  all the time.

14         But, yes, we do know Pat Buchanan -- or I do.  I know him because I lived

15  through it; he knows him because he's a political wonk.

16         MR. ABRAMOFF:  Right.

17         AGENT WYNAR:   So.  Okay, but anyway.

18         MR. ABRAMOFF:   So, but Erickson said – then again, I'm repeat -- quoted

19  this before.  But he said that he was running his campaign, and I thought he was full of crap.

20         Then next thing I know, everywhere in the news, he's right at his hand, and

21  he's in *Time Magazine* leaning over telling him things.

22         AGENT QUINN:   Right.

Privileged & Confidential
K&S DRAFT 12-18-22

1     MR. ABRAMOFF:   And, and then I actually -- I knew Pat from my Reagan

2   days; he was communications director in the White House.  And I ran into Pat after, after the

3   campaign at some dinner, and I said, "Hey, you know, my buddy Paul Erickson, I guess,

4   (inaudible)."

5          "Yeah, Paul's the greatest," like that.

6          So I thought, wow.

7          So, when – so, therefore, the next -- he also said he was involved with the

8   Romney campaign.

9          AGENT WYNAR:  Yeah, he's –

10         MRS. ABRAMOFF (?):   (Off mic).

11         MR. ABRAMOFF:   Okay, do you want to --

12            **(Discussion off-mic).**

13         MR. ABRAMOFF:  So, then he, he said he was involved with the Mitt

14   Romney campaign also, twice.  Then I saw (inaudible) whatever.  He didn't make a big deal

15   of it.  And Romney always obviously didn't win so. . .

16         AGENT QUINN:   Yeah.

17         MR. ABRAMOFF:   You know.

18         AGENT WYNAR:  Yeah, but -- okay.  Did you confirm that one?

19         MR. ABRAMOFF:  Sorry?

20         AGENT WYNAR:  Did you confirm that, ever?

21         MR. ABRAMOFF:  No, I didn't really -- there was never a need to confirm it,

22   and there wouldn't have been a need to really confirm (inaudible), you know, except for the

Privileged & Confidential
K&S DRAFT 12-18-22

1    fact that Shali and a few others wanted somebody who could help them get in.

2              AGENT QUINN:  Um-hmm.

3              MR. ABRAMOFF:  I can't remember who else, but -- I'm [not] sure you can

4    help me remember.  And, and the whole --

5              AGENT WYNAR:  So I guess that's where this started.  This is all back to

6    Shali.

7              MR. ABRAMOFF:  And Shali, again, as I said, became such a pain in the

8    NACk, he –

9              AGENT WYNAR:  Um-hmm.

10             MR. ABRAMOFF:  What do you call it?  What are the other --

11             AGENT WYNAR:  Did he ever get an appointment?

12             MR. ABRAMOFF:  That's -- that is a question because he didn't get in there.

13   He claims he got appointed for Thailand, and then others who are sort of in the universe of

14   Shali -- because it wasn't just people I recommended to him.  I know so many people who

15   were somehow approached by Shali, and hired by Shali, and then not paid by Shali and, you

16   know, were abused by Shali, that this -- sort of like, a little Shali group.  And one of them

17   told me that he asked somebody at the White House or the State Department who said there's

18   no way in the world getting the ambassadorship to Thailand.  But others say that he's been

19   approved, and that the Thai government has approved him.  And so I, I have no idea.

20             AGENT QUINN:  Yeah.

21             MR. ABRAMOFF:  I mean, I'm out of that.  I haven't had any contact, really,

22   with Shali other than a periodic text, but that's from him during the holidays –

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT WYNAR:   Yeah.

2          MR. ABRAMOFF:   -- that he'll send me every now and again.

3          AGENT QUINN:   Okay.

4          AGENT WYNAR:   Yeah, so that, that is kind of --  so, still, this is a this is a

5    bit of a mystery about Erickson's actual – can -- because we see – you can see the awkward

6    position, right?  It, it's okay.  The default position, yours, is the wise one.  Every utterance he

7    says is probably a lie.

8          On the other hand, when he tells people that he's part of the transition team, or

9    when he tells people --

10          MR. ABRAMOFF:  Look, I believe -- I believe that too because of , again,

11    those confirmations there.

12          AGENT QUINN:   Um-hmm.

13          MR. ABRAMOFF:   And other people – and there were others, also.  There

14    wasn't just a dinner.  Others also were saying, "Oh, Paul's very involved," and (inaudible).

15    I'm trying to think of it, but it just doesn't come to mind.

16          So I, I started thinking, well, maybe he got involved with Trump.  But if you

17    get involved with Trump, you're -- if you look at the people early-involved with Trump.

18    They were these rogues; they were these (inaudible).

19          AGENT WYNAR:  So, so it's a little more plausible just because of the nature

20    of it, okay.

21          MR. ABRAMOFF:  Yes, definitely plausible.  I mean, I believed it.  I frankly

22    believe he was close to Trump or the Trump administration until he started to not be able to

Privileged & Confidential
K&S DRAFT 12-18-22

1    do anything for Shali, although -- and I kept getting caught in the middle of it because Shali

2    would call me, and I recommended him, and then we'd call Paul: "What's going on?"  And

3    Paul would have a great line of BS:  "Well, I talked -- I was in there and met with Reince

4    Priebus and this one and, and that one."  And I'm sure was all, all nonsense.

5               AGENT WYNAR:  Oh, but, but you know what?  That's important.  "I met

6    with Reince" -- it's – see, it's the utterances that he makes that are kind of important.  So he

7    suggested that he met with Priebus, right?  I mean, that's something you sound --

8               MR. ABRAMOFF:  I think.  I think.  I think.  I mean, again --

9               AGENT WYNAR:  Or somebody similar to Mr. Priebus?  I mean, he's

10   claiming to

11              MR. ABRAMOFF:  He said he was talking to people.  He was definitely

12   claiming he was talking people.

13              AGENT WYNAR:  I mean, he's claiming to meet with people.

14              AGENT QUINN:   And (inaudible) any real names to you (inaudible).

15              MR. ABRAMOFF:  Yeah, I think.

16              AGENT WYNAR:  Did he ever mention Miss Conway?

17              MR. ABRAMOFF:  Yes, I think he did.  He said he was talking to Kellyanne.

18              AGENT WYNAR:  Yeah, I should -- I mean, it'd be nice to ask her, but that's

19   a little awkward to just knock on – I mean, this, this place is hard to find, but getting to

20   (inaudible) –

21              MRS. ABRAMOFF (?):   I can –

22              (Cross-talk).

Privileged & Confidential
K&S DRAFT 12-18-22

1        MR. ABRAMOFF:   (Inaudible) imagine.

2        MRS. ABRAMOFF (?):   They probably also go back.  Way back.

3        MR. ABRAMOFF:  Yeah, Kellyanne was active in the sort of movement he

4   was involved in, so, yeah.

5        AGENT WYNAR:  So did you know her back in those days too?

6        MR. ABRAMOFF:  Sure.  Sure.  Yeah.  He was (inaudible) --

7        AGENT WYNAR:  Oh, okay.  So, so when he says he's known her forever –

8        MR. ABRAMOFF:   It's true.

9        AGENT WYNAR:   -- that may not actually be a lie?

10        MR. ABRAMOFF:  No, it's definitely true.

11        AGENT WYNAR:  Okay.

12        MR. ABRAMOFF:  I mean, because all of us were all friends.

13        AGENT QUINN:   (Inaudible).

14        MR. ABRAMOFF:   I can't imagine though -- I mean, it's possible.  Kellyanne

15   is very gracious, and she probably doesn't know Paul is a big liar –

16        AGENT QUINN:   Yeah.

17        MR. ABRAMOFF:   -- because she's not probably had a lot of interaction with

18   Paul.  If Paul was a sort of surface person you're meeting on the surface –

19        AGENT QUINN:   Yeah.

20        MR. ABRAMOFF:   -- he seems to be proud.  He's very articulate, funny,

21   personable.  You know, I would imagine -- I don't know, but I would imagine likely that her

22   interaction, unless there's something else I don't know about –

55

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT QUINN:   Right.

2          MR. ABRAMOFF:   -- was more like that.  So she may in fact have talked

3    him about Shali.  I don't know.  He certainly represented that to me.

4          AGENT WYNAR:   Okay.

5          MR. ABRAMOFF:   But (inaudible).

6          AGENT WYNAR:  He, he would frequently – so, so I guess that -- one of the

7    concerns is, is, yes, he did have a big role in the transition team, but he was not on it.  And

8    this could run afoul of all kinds of, of good government principles, right?

9          Is, is there any guidance you can give us to unpack how to sort of figure that

10   out?  How can – would -- is it plausible?

11         I guess it's hard to say, is it plausible.  I guess the answer is, in a normal

12   universe with a normal candidate, as opposed to a very individual and novel candidate like

13   the president --

14         MR. ABRAMOFF:  Would Paul get into the transition team of a normal

15   candidate?

16         AGENT WYNAR:  Well -- no, I guess – that's not what I mean.

17         AGENT QUINN:  Or, what if – what if someone who's not NACessarily like

18   Paul, as someone who doesn't have the sort of reputation as a pathological liar, would there

19   be this kind of like, hey, I'm unofficially on the transition team, kind of (inaudible)?

20         AGENT WYNAR:  I mean, does that usually exist in presidential politics?

21         MR. ABRAMOFF:  Now, during the (inaudible) transition team (inaudible)

22   out of all of them, these advisors or these -- you know, it's not official.

Privileged & Confidential
K&S DRAFT 12-18-22

1        AGENT QUINN:   Um-hmm.

2        MR. ABRAMOFF:   But they were – you know, it was running them.  I

3    remember when Interior – I was brought in to meet with the transition people of Interior to

4    advise them on territories and tribes.

5        AGENT QUINN:   All right.

6        MR. ABRAMOFF:   And they called it an advisor to transition team.  You

7    know, I don't remember --

8        AGENT QUINN:   All right.  Okay.  So there was these informal advisor roles

9    that weren't NACessarily – you're not getting the whole transition email or anything like

10    that?

11        MR. ABRAMOFF:   No.

12        AGENT QUINN:   Yeah.

13        MR. ABRAMOFF:   No, definitely not.

14        AGENT WYNAR:   But, but --

15        MR. ABRAMOFF:  But I – again, I don't know what this one did, but.

16        AGENT WYNAR:  Sure.  So, so, so a real member of the transition team

17    would interface with you directly regarding this sort of unofficial but relevant role; is that the

18    way it --

19        MR. ABRAMOFF:  Wait.  Say that again.

20        AGENT WYNAR:  But, but ultimately, your work in that context –

21        MR. ABRAMOFF:   Oh, no –

22        AGENT WYNAR:   -- was supervised.

Privileged & Confidential
K&S DRAFT 12-18-22

1          MR. ABRAMOFF:  -- it (inaudible) the transition office.

2          AGENT WYNAR:  Yeah.  Yeah.

3          MR. ABRAMOFF:  I met with (inaudible).

4          AGENT WYNAR:  Yeah.  Okay, yeah.  Right.

5          AGENT QUINN:  Yeah.

6          MR. ABRAMOFF:  That, that was the only interaction I had, was one time.

7   I, went in.  The people who were doing the Interior transition were in the transition office.

8          AGENT WYNAR:  Um-hmm.

9          MR. ABRAMOFF:  I met with them, we finished, and I left.

10         AGENT QUINN:  But, but the OMB situation, of course, I understand is a

11  totally different precedent.

12         AGENT WYNAR:  Yeah, it's really hard to compare these things.

13         AGENT QUINN:  But, you know – you know, Mr. Erickson's kind of

14  holding himself out as like -- almost like an unofficial senior person in the transition.  Like,

15  he would – he would -- he wasn't saying, "I was an advisor," but, like, kind of holding

16  himself out as a central figure to it.

17         MR. ABRAMOFF:  He was –

18         AGENT QUINN:  Yeah.

19         MR. ABRAMOFF:  Apparently, he was in there a lot, also.

20         AGENT QUINN: Yeah?  So --

21         MR. ABRAMOFF:  He was in the office –

22         AGENT QUINN:  And is that something you would have seen in your – like,

58

Privileged & Confidential
K&S DRAFT 12-18-22

1    a prior life?  Like, so you would come in and talk, and the – and you –

2                    (Crosstalk).

3                    MR. ABRAMOFF:  I believe –

4                    AGENT QUINN:  -- someone who wasn't –

5                    MR. ABRAMOFF:  Yeah, I did when I was --

6                    AGENT QUINN:  -- (inaudible) someone who always had someone who

7    wasn't on the active transition –

8                    MR. ABRAMOFF:  No.

9                    AGENT QUINN:  -- being a very central figure, going there, like, every day?

10   That --

11                   MR. ABRAMOFF:  Yeah, I don't know.  I don't know.

12                   AGENT QUINN:  Yeah.

13                   MR. ABRAMOFF:  I mean, I just was never involved in transitions, other

14   than that.

15                   AGENT QUINN:  Okay.  And, of course, I'm sure each president runs it in

16   very different ways.

17                   MR. ABRAMOFF:  Yeah.  Well, I mean, I presume you're talking to the

18   people who ran the transition.  I mean, they would (inaudible).

19                   AGENT WYNAR:  Well, you know, it's true.  And we're trying to figure out

20   who's the right person to ask.  And the reason it's tough is his claims are all over the map.

21                   Let me give an example.  I, I have a claim of his where he's saying, "Good

22   news. Today is nice because Governor Christie's not in the office and people are listening to

Privileged & Confidential
K&S DRAFT 12-18-22

1   me more," right?  I mean, in other words, you know, sort of a little bit of a dig on Governor

2   Christie's leadership style.  But the point is, is, he's representing that he's, like, the guy that's

3   in charge when Mr Christie's not.  I mean, does this make sense to you?

4                   MR. ABRAMOFF:  That is –

5                   AGENT QUINN:   Yeah.

6                   MR. ABRAMOFF:   It's crazy.  I tell you . . .

7                   AGENT WYNAR:  But, but, so -- but that would imply a relatively official

8   role, right?  I mean, you're not the number-two guy and unofficial at the same time, right?

9                   MR. ABRAMOFF:  Well, my recollection –

10                  AGENT WYNAR:  Yeah.

11                  MR. ABRAMOFF:   -- you know, after seeing what this transition was like --

12  but going into that transition office for Bush was literally like going into the White House.

13                  AGENT WYNAR:  Um-hmm.

14                  MR. ABRAMOFF:   You've got to be cleared in.  You've got to have –

15                  AGENT WYNAR:  Yeah.

16                  MR. ABRAMOFF:   You know, you couldn't just saunter in.

17                  AGENT WYNAR:  Yeah.

18                  MR. ABRAMOFF:   So either he never went there, which is my default

19  position, probably, or he had some volunteer thing that they set up and gave him a pass to go

20  in there.  But (inaudible) who probably --

21                  AGENT WYNAR:  So, even when you did your volunteer version, were you

22  cleared to access the space, or at least –

Privileged & Confidential
K&S DRAFT 12-18-22

1              MR. ABRAMOFF:

2              MR. ABRAMOFF:  I was brought in.

3              AGENT WYNAR:   You were brought in, yeah.

4              MR. ABRAMOFF:   I was brought in.  I remember I wase brought in, and I

5     (inaudible).  The building was near the White House.  And I remember going through

6     security and meeting them in the room with no windows, with these guys.  You know, it

7     wasn't – it wasn't like some random thing.  And when I was -- when I left, I was escorted out.

8     And it has to be that way; I mean, how could it not be that way?

9              AGENT QUINN:   Yeah.  Of course, yeah.

10             MR. ABRAMOFF:  You know, so, so anyways.  The (inaudible) getting right

11    there (inaudible).

12             AGENT WYNAR:  Well, the, the way it could not be that way is, you know,

13    the transition has -- I've learned – two phases.  There's the pre-inauguration phase and then

14    the post-inauguration phase.  And it has a little bit to do with who funds the transition.  And,

15    and so the pre-inauguration -- or no, no.  Actually, it's the post-nomination phase, right?  Up

16    to the election –

17             MR. ABRAMOFF:   Right. Yes, that's right.

18             AGENT WYNAR:   And then it's the post-election phase, up to the

19    inauguration.

20             (Cross-talk).

21             MR. ABRAMOFF:  Right, right (inaudible) --

22             AGENT WYNAR:  And then I think you're on your own –

Privileged & Confidential
K&S DRAFT 12-18-22

1          MR. ABRAMOFF:   -- the inauguration is (inaudible)

2          AGENT WYNAR:   Yeah, you're on your own.

3          So I -- so the -- we're trying to understand, where was he vis-a-vis these two

4   phases, the pre- -- the -- the post-nomination, which I think – my understanding was that was

5   what Mr. -- Governor Christie was actually focused on, is the authority of that element of

6   things.

7          MR. ABRAMOFF:   Well, he had a (inaudible),

8          AGENT WYNAR:   Until, until that –

9          MR. ABRAMOFF:   (Inaudible) he (inaudible).  [He wanted to do the whole

10   thing] (inaudible).

11          AGENT WYNAR:  But that was -- but that was definitely the zone he lived in

12   we think.

13          But anyway, the point is, I'm trying to figure out who would be the one to ask,

14   and obviously, you're not the person. You're just -- you observed that he was in fact

15   ingratiated with some pretty significant heavy-hitters at the campaign, which was important

16   to know.

17          MR. ABRAMOFF:  Yeah.

18          AGENT WYNAR:   Because I've never heard that before.  I've never heard

19   that from a firsthand account before.

20          MR. ABRAMOFF:  Yeah.

21          AGENT WYNAR:  So that's important.

22          MR. ABRAMOFF:  Well, I mean, again, I don't know *Paul Stolace [ph], or

Privileged & Confidential
K&S DRAFT 12-18-22

1   whatever his name was, represented himself as deputy chairman of the campaign at that

2   point.

3                   AGENT QUINN:   Yeah.

4                   MR. ABRAMOFF:   Maxwell, I don't know if he had a role in the campaign

5   or not.  He claimed he was sort of like a – like a Paul, but he was puffing himself up as very

6   involved.

7                   You know, a Faith Whittlesey was an important person.  She and Maxwell

8   both were referring to President Trump as "Donald" –

9                   AGENT WYNAR:   Um-hmm.

10                  MR. ABRAMOFF:   -- in this (inaudible) --

11                  AGENT QUINN:   Yeah.

12                  MR. ABRAMOFF:   -- which -- I've never met Trump, so I've – everything

13  I've heard is that nobody calls him "Donald,"  except maybe his wife.

14                  AGENT QUINN:   Yeah.

15                  MR. ABRAMOFF:   So, you know, I don't know.

16                  AGENT QUINN:   Yeah.

17                  MR. ABRAMOFF:   That was getting a little weird.

18                  I could see (inaudible) Faith (inaudible) maybe because she was she was

19  always –

20                  (Cross-talk).

21                  AGENT WYNAR:  Isn't it -- isn't it typical to call them, like, "the Donald"?

22  Isn't that a --

63

Privileged & Confidential
K&S DRAFT 12-18-22

1          MR. ABRAMOFF:  Yeah, that was –

2          MRS. ABRAMOFF (?):   That was his first wife.

3          AGENT WYNAR:  Oh.

4          AGENT QUINN:   (Inaudible).

5          MR. ABRAMOFF:   Yeah, but that would have been friendly people who

6   would be doing that.  Yeah.

7          AGENT WYNAR:  Okay.  I understand.

8          MR. ABRAMOFF:  Well, I think they're probably just trying to preen for each

9   other to show who was closer to Trump.

10          AGENT WYNAR:  And, and I should make this absolutely clear:  This is

11   entirely about Erickson, right?  I mean, the management and organization of the President's

12   campaign and stuff -- that's really not what this is about.

13          This is really, like, what represents did this guy make?

14          MR. ABRAMOFF:   Right.

15          AGENT WYNAR:   Because he was talking to people that wanted positions.

16   And I'm trying to decide, did he have a basis for this?  And I'm just trying to figure out who

17   to talk to without causing as much -- with -- trying to lay as low as possible. And I was kind

18   of hoping that maybe you would know that, oh, he -- you might know the whole story; he

19   might have told you because of your interactions through Shali.  He might have outlined to

20   you, this is it.

21          MR. ABRAMOFF:  Well, Shali was after the inauguration, yeah.

22          AGENT WYNAR:  Sure.  But, but the connections that he had made, he

64

Privileged & Confidential
K&S DRAFT 12-18-22

1    might have told you the full narrative of where he got to, or how he got in, who he dealt with,

2    who hired him or, not hired him, or who did he volunteer for, and who was working with

3    him.  He used the word "shadow transition team" at one point, and, and I don't even know

4    what – I, I don't even know where to start with a "shadow transition team."

5            MR. ABRAMOFF:  Well, he was putting people into the shadow government.

6    I have no idea.

7            AGENT WYNAR:   Yeah, all right.  Okay.

8            AGENT QUINN:  And actually, (inaudible) were talking to Shali– so you

9    were hired by someone else, or you were hired Shali?  I, I know you mentioned some --

10           MR. ABRAMOFF:  Well, Shali didn't hire me directly, because he didn't

11   want to have  me directly –

12           MR. ABRAMOFF:   Yeah.

13           MR. ABRAMOFF:   I wouldn't do anything for him that –

14           AGENT QUINN:   Okay.

15           MR. ABRAMOFF:   -- was -- I wouldn't have done anything for him where I

16   would have to register or anything.  So he hired – I think he basically hired my son's

17   company.

18           AGENT QUINN:   Okay.

19           MR. ABRAMOFF:   I know he just got paid from that and reported it.

20           AGENT QUINN:   Okay.

21           MR. ABRAMOFF:   But I didn't report it as lobbying because I didn't make

22   any lobbying contacts.

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT QUINN:   Got you.

2          MR. ABRAMOFF:   But I basically – but I was his – I was Shali's sounding

3    board and strategy, and I – he wanted to write a book.

4          AGENT QUINN:   Um-hmm.

5          MR. ABRAMOFF:   He wrote a book -- well, he didn't write a book.

6          AGENT QUINN:   Yeah.

7          MR. ABRAMOFF:   [I] got somebody to write the book.  He then rewrote the

8    book and then named this book – you're familiar this book, I presume.

9          AGENT QUINN:  I've seen a little bit of the book, but I haven't – I haven't

10   read the book.

11         MR. ABRAMOFF:   Yeah, it's stunning.

12         AGENT QUINN:  Yeah.

13         MR. ABRAMOFF:   And so that was sort of the project I was involved with.

14         AGENT QUINN:  Got you. And so, what was the – and so what were you –

15   you were strategizing the best way for him to --

16         MR. ABRAMOFF:  Well, he needed to – (inaudible) [Mont Mayadu] was to

17   have him do a book about South Asia policy –

18         AGENT QUINN:  Yeah.

19         MR. ABRAMOFF:   -- and the campaign and what he did in the campaign,

20   and put that out there.  And that -- as a book, a conservative book, could get him theoretically

21   on the Fox shows.

22         AGENT QUINN:   Yeah.

66

Privileged & Confidential
K&S DRAFT 12-18-22

1      MR. ABRAMOFF:   And Trump would see him, and, you know, he could put

2  himself out there --

3      AGENT QUINN:   Right.

4      MR. ABRAMOFF:   -- to conservative groups and that kind of thing, which

5  he wanted to do, I think he wanted.  But any sort of (inaudible) thing, I – it's something

6  (inaudible) [Abu] (inaudible).

7      AGENT WYNAR:  How one man flipped the Hindu-American vote and put –

8      MR. ABRAMOFF:   Yeah, right – and put Trump in office.

9      AGENT WYNAR:   Yes, that's right.  We saw the title.

10     MR. ABRAMOFF:  And the cover -- did you see the cover picture?

11     AGENT QUINN:   Oh, yeah.

12     MR. ABRAMOFF:   It was a classic, yeah.  (inaudible) an entire class on how

13  not to do a book on that book.

14     So, anyway, he -- so that's what I did with him.

15     And then he – he wanted – you know, who'd write it.  No, we're not -- I said,

16  look, I don't really know anyone.  I don't know anyone.

17     AGENT QUINN:   Yeah.

18     MR. ABRAMOFF:   I don't know – I have people who might know people.

19  And then, so I recommended a few people to him, and he was just really difficult to work

20  with, and, you know, he'd always be calling me, and I didn't want to be involved.

21     AGENT QUINN:   Um-hmm.

22     MR. ABRAMOFF:   and then, finally, um, "I, I need somebody who knows

Privileged & Confidential
K&S DRAFT 12-18-22

1    people." "Well," I said, "All right. Well, Paul does." This is perfect. I can (inaudible) on

2    the phone.

3                    AGENT QUINN:   Yeah.

4                    MR. ABRAMOFF:  You know, Paul can entertain him for, you know, the

5    little bit (inaudible).

6                    AGENT QUINN:   Right.

7                    MR. ABRAMOFF:  And Paul knew people in the White House.

8                    AGENT QUINN:   Right.

9                    MR. ABRAMOFF:   You know, he could do what he could do so.

10                   AGENT WYNAR:  You know, you -- so you, you brought up something that

11   also has caused, like, red alerts, which – "red alerts," meaning, we know about it because it

12   seems to be an issue/  But the son's company, that's Landfair .  Is that Landfair ?

13                   MR. ABRAMOFF:   Yes.

14                   AGENT WYNAR:   Because that's the -- that's the money -- that's the money

15   connection.

16                   MR. ABRAMOFF:  Paul paid and referral fee –

17                   AGENT QUINN:   Right.

18                   MR. ABRAMOFF:   -- of the, um – because Shali, [you know, repaid] him,

19   and he paid it to that company.

20                   AGENT QUINN:   All right.

21                   AGENT WYNAR:  Okay.  Okay, so let's see.  What about -- so there's a few

22   other people that we – how did we conNACt them to Erickson?

68

Privileged & Confidential
K&S DRAFT 12-18-22

1          I'm just trying to dig up those photographs again, sir.

2          AGENT QUINN:  Okay.  Well, I've got them open if you want them.

3          AGENT WYNAR:  So, so do you recognize this woman?

4          This is – does that –

5          MR. ABRAMOFF:   That's her, isn't it?  [Christina]?

6          AGENT WYNAR:   Did you – yeah.  Is this the woman you think you met

7   when –

8          MR. ABRAMOFF:   Yeah.

9          AGENT WYNAR:   Okay.  So then there's this -- there's this guy.

10          AGENT QUINN:   Okay.

11          AGENT WYNAR:   Right?  Do you know who this --

12          MR. ABRAMOFF:  Marcus Andrade.

13          AGENT WYNAR:  Marcus Andrade, yes.

14          What -- how does he know Paul?  Or, or I should -- I guess I should be clear.

15   I don't know that he knows Paul.

16          AGENT QUINN:   Yeah.

17          AGENT WYNAR:   But --

18          MR. ABRAMOFF:  I don't know.  I mean, I'm involved with Marcus, but I

19   don't know that Paul is.  He may have met Paul. I don't remember him meeting Paul.

20          AGENT WYNAR:  I -- so what's, what's the connection here?  Search warrant

21   of his house?

22          AGENT QUINN:  Oh, I mean, yeah.

Privileged & Confidential
K&S DRAFT 12-18-22

1          Well, so we found – when, when we searched Maria's home in DC, we found

2    a number of things relating to Mr. Andrade's project AML Bitcoin --

3          MR. ABRAMOFF:   Yeah.

4          AGENT QUINN:   -- in his, his house.  And we were taking extensive notes.

5    And this is one of the questions:  "Was this another one of Mr. Erickson's business ideas that

6    [you've seen before]?"

7          MR. ABRAMOFF:   No.

8          AGENT QUINN:   (Inaudible) has, has to do with –

9          MR. ABRAMOFF:   I don't think it has anything to do with him.

10         AGENT QUINN:   Okay.

11         MR. ABRAMOFF:   I mean, I may have told him about it.

12         AGENT QUINN:   Okay.  That's, that's actually a good --

13         MR. ABRAMOFF:   But I didn't have (inaudible) – yeah.  But I, I don't think

14    Paul knew (inaudible).

15         AGENT QUINN:   Yeah, I couldn't –

16         MR. ABRAMOFF:   I don't remember him being involved at all.

17         AGENT QUINN:   Yeah, Mr. Erickson's bought some sort of cryptocurrency

18    business, yeah.

19         MR. ABRAMOFF:   He told me that he was doing some crypto thing, and I

20    said I was involved in my – in our – in a different crypto thing, for a TV show I'm doing, and

21    AML Bitcoin, and AtenCoin.  You know, he may have gotten information on them there.

22    But I don't think Paul's involved in it at all.

Privileged & Confidential
K&S DRAFT 12-18-22

1        AGENT WYNAR:  But Paul does have a habit, so -- he has this habit.

2        MR. ABRAMOFF:   I don't think he ever met Marcus.

3        AGENT WYNAR:   I wouldn't know.  I wouldn't know.  But he –

4        MR. ABRAMOFF:   Yeah, but he --

5        AGENT WYNAR:    But he, he has a – he has a habit.  There was a person

6    who told us a story about their North Dakota housing development –

7        AGENT QUINN:   Yeah.

8        AGENT WYNAR:   -- which, as far as we know, was legitimate.  And all of a

9    sudden, the marketing material for that development shows up in Paul's marketing material

10   for –

11       MR. ABRAMOFF:   Oh, so –

12       AGENT QUINN:   So --

13       AGENT QUINN:   You know what I'm saying?

14       MR. ABRAMOFF:   So he -- did he take the [AML] stuff and (inaudible)?

15       AGENT WYNAR:  It's, it's conceivable.

16       AGENT QUINN:  So what is a possibility is – so, Mr. Erickson (inaudible) –

17   people, discusses their business idea, things like that --

18       MR. ABRAMOFF:  Takes it and –

19       AGENT QUINN:   -- takes it, uses that as a prop for his, his stuff later.  And

20   so that's one of the things that --

21       AGENT WYNAR:  Yeah, we don't know that he did that here, by the way.

22       AGENT QUINN:   Yeah, we don't.

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT WYNAR:  We don't know.  But

2          MR. ABRAMOFF:   Yeah, but I don't think -- I don't know for certain, but I

3    can't recall any – it would have had to have been in DC.

4          AGENT QUINN:  Um-hmm.

5          MR. ABRAMOFF:   And when Marcus is here, I'm with him all the time.

6    And I can't imagine why he would ever meet with Erickson.

7          AGENT QUINN:  Yeah.

8          MR. ABRAMOFF:   I don't even think we could probably run into him

9    somewhere.

10          AGENT QUINN:   Okay.

11          AGENT WYNAR:  So, but that does bring us to Marcus himself.

12          MR. ABRAMOFF:   Yeah.

13          AGENT WYNAR:   What do you know about this guy?

14          MR. ABRAMOFF:  Well, he was working the oil field separate from Erickson

15    in Texas.

16          AGENT WYNAR:   Is it Russian, Russian oil?

17          MR. ABRAMOFF:  He was in the Marines.

18          AGENT QUINN:  Yeah.

19          MR. ABRAMOFF:   Is a disabled vet.

20          Got involved in cryptocurrency very early on.

21          AGENT QUINN:  Um-hmm.

22          MR. ABRAMOFF:   Bought Bitcoin --

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT QUINN:   Um-hmm.

2          AGENT WYNAR:   -- very cheap, sold it at around $500.00 and made a bunch

3    of with that.

4          And then, decided to develop – he saw in Bitcoin a problem of its anonymity,

5    and it's used by terrorists and criminals like that.

6          AGENT QUINN:   Yeah.

7          MR. ABRAMOFF:   So he developed a coin called AtenCoin, which

8    eventually became AML Bitcoin, which is AML-KYC-compliant cryptocurrency –

9          AGENT QUINN:   Um-hmm.

10          MR. ABRAMOFF:   -- and has a biometric visual identification, using trusted

11   third-party system undergirding it.  And he's the head of the project.

12          AGENT QUINN:   Okay.

13          MR. ABRAMOFF:   Yeah.

14          AGENT WYNAR:  Right.  So.

15          MR. ABRAMOFF:   Is, is he a criminal or something?

16          AGENT WYNAR:  Well, I'll tell you what –

17          Ethan?

18          AGENT QUINN:  Yeah, I need to, to – (inaudible) one of the reasons why,

19   you know, we see – it's well-established that Mr. Erickson's a cause for . . .

20          Mr. Andrade:  there's, I would say, a number of questionable things that we've

21   seen about him and his business ideas over the course -- over the course of the last two years.

22   And so that's one reason we've talked to a number of different folks about him as well under

73

Privileged & Confidential
K&S DRAFT 12-18-22

1    the radar.  And, and that's it.

2            So I wouldn't say we've got him good.  Like, Mr. Erickson, we have business

3    fraud, and we know that his wealth doesn't exist.

4            Mr. Andrade's made a number of different claims to investors and things like

5    that, that we know to be untrue.

6            AGENT WYNAR:  Yeah, let -- let's just, just start with ones that you

7    mentioned –

8            AGENT QUINN:   Yeah.

9            AGENT WYNAR:   -- because you're repeating those claims right?

10           What do you know about his work in the oil fields?

11           MR. ABRAMOFF:  Just saying that he works in the oil fields.

12           AGENT WYNAR:  But did he say that that's where he generated wealth and

13   success?  Did he imply that at all?

14           MR. ABRAMOFF:  No.  No.

15           AGENT WYNAR:  No?

16           MR. ABRAMOFF:   He just said that he basically bought or mined Bitcoin.

17           AGENT WYNAR:  Bought or mined Bitcoin:  that was his source of his

18   wealth?

19           MR. ABRAMOFF:   Yeah.

20           AGENT WYNAR:   See, some people --

21           MR. ABRAMOFF:  And, and he didn't make that much money.

22           AGENT WYNAR:   Um-hmm.

Privileged & Confidential
K&S DRAFT 12-18-22

1          MR. ABRAMOFF:   He made some money.

2          AGENT WYNAR:   Yeah, he -- the claims we've heard from others is that, oh,

3    he's represented himself as a – as a Texas oil multi-millionaire.

4          AGENT QUINN:   Tens of millions of dollars.

5          AGENT WYNAR:   Tens of millions of dollars.

6          MR. ABRAMOFF:  Well, I mean, I, I've had some involvement with him.

7          AGENT QUINN:  Yeah.

8          MR. ABRAMOFF:   And people – some, some of the people -- he's got some

9    folks who he fights with.

10          AGENT QUINN:  Yeah.

11          AGENT WYNAR:   Um-hmm.

12          MR. ABRAMOFF:    And I've heard some of them, also -- I'm trying to think

13    of who – who'd come back and say stuff that I know that he didn't say.

14          AGENT QUINN:  Yeah.

15          MR. ABRAMOFF:   Because, you know, I was there when they talked.  But

16    I'd have to remember who that is.  So I don't know.

17          I mean, you know, I know he hasn't, to me.  He didn't represent to me that at

18    all.

19          AGENT WYNAR:   Okay.

20          MR. ABRAMOFF:   Okay -- nor to, by the way, some of the others that I've

21    introduced him to.

22          AGENT WYNAR:   Sure.  Okay.

75

Privileged & Confidential
K&S DRAFT 12-18-22

1          MR. ABRAMOFF:   All they said was that he mined Bitcoin or bought

2    Bitcoin at pennies and, and sold it at $500, and he made money.

3          AGENT QUINN:   Right.

4          MR. ABRAMOFF:   He didn't made fortunes of money, but he made money.

5          AGENT QUINN:   Um-hmm.

6          MR. ABRAMOFF:   He didn't say – he just said he was an oil – oil rigger, or

7    something.

8          AGENT QUINN:   Yeah.

9          MR. ABRAMOFF:   He worked on the –

10          AGENT WYNAR:   Okay.

11          AGENT QUINN:   So, like, he physically worked on oil rigs?

12          MR. ABRAMOFF:   Yeah, yeah.

13          AGENT QUINN:   Yeah.

14          MR. ABRAMOFF:   He didn't represent himself as an oil baron.

15          AGENT WYNAR:   Okay.

16          AGENT QUINN:   And that's important because we feel (inaudible) hold out

17    that he is, in fact, an oil baron and a multi –

18          MR. ABRAMOFF:   So you've heard him hold –

19          AGENT QUINN:   That – not that he is.  That they hold out that he is this

20    multi-millionaire who (inaudible) owning several oil fields and things like that and made a

21    fortunate at it.

22          AGENT WYNAR:   And others have repeated that narrative –

76

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT QUINN:   Yeah.

2          AGENT WYNAR:   -- to sort of a bit of an echo out there, and, and it's -- but

3   it's just one of several things, right?  I mean, there's also this problem of, uh, of some -- there

4   was a -- he did a prior business that involved energy from algae.

5          AGENT QUINN:  Yeah.  Have you heard of this company called Bright

6   Energy?

7          MR. ABRAMOFF:  No.

8          AGENT QUINN:   Did you remember Marcus ever talking about an algae

9   farming project he had -- he had put out?  Never anything about that or businesses there?

10         MR. ABRAMOFF:  No.  Um-mm.

11         AGENT WYNAR:  He, he had a partner named Diadamo.

12         AGENT QUINN:   Have you ever met Mark Diadamo?

13         MR. ABRAMOFF:  Um-hmm.

14         AGENT WYNAR:   Marcus, Mark Diadamo.

15         MR. ABRAMOFF:  I've met him.

16         AGENT QUINN:  Oh, could you tell us about Mr Diadamo?

17         MR. ABRAMOFF:  I think he lives in Florida or something, or he's kind of --

18   I mean, not impressive-to-me guy.

19         AGENT QUINN:   What's so unimpressive about him?

20         MR. ABRAMOFF:   He just seems thuggish.

21         AGENT QUINN:   thuggish?

22         MR. ABRAMOFF:   Yeah.

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT WYNAR:  Oh.

2          AGENT QUINN:   And, and one of the reasons is, is Mr. Diadamo's

3   obviously (inaudible)  -- and, you know, he's been a longtime associate of Mr. Andrade, and

4   he of course has been convicted of investment fraud activities.  And it sounds like you

5   weren't aware of that.

6          MR. ABRAMOFF:  No.  Who?  Marcus, or?

7          AGENT QUINN:  Mr. Diadamo.

8          MR. ABRAMOFF:   Really?

9          AGENT QUINN:   Yes.  He was – well, in his case, (inaudible) with oil, but

10   that -- he was selling a bunch of blogs on oil investments to investors in Canada, primarily.

11          MR. ABRAMOFF:  Wow.

12          AGENT QUINN:   Yeah, just boiler, boiler-room style, like, investment

13   frauds.  That's --

14          MR. ABRAMOFF:  So he's in (inaudible).

15          AGENT QUINN:  At least, Bennie, he's Canadian, so, and not – yeah, he

16   hasn't been convicted of anything here in the in the – in the U.S.  But he's banned from

17   trading in securities in Canada, and that's one of the questions that we have.

18          Do you know Mr. Andrade is aware of Mr Diadamo's selling investments in

19   AtenCoin and AML Bitcoin in Canada?

20          MR. ABRAMOFF:   I thought he was in Florida.

21          AGENT QUINN:  Okay, so --

22          MR. ABRAMOFF:  No, I don't know.

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT QUINN:   Yeah.

2          MR. ABRAMOFF:   I think he's in Florida.

3          AGENT QUINN:  he's in – got you.  And you're, but you're not aware if Mr.

4    Andrade's been soliciting investments – or Mr. Diadamo's been soliciting investments in

5    Canada?

6          MR. ABRAMOFF:   No.

7          AGENT QUINN:   Okay.  Have you ever heard of a man named Brian

8    Darrow.

9          MR. ABRAMOFF:   No.

10          AGENT QUINN:   Okay.  And do you know if Marcus has any other folks in

11    Florida who are -- who are selling in AML Bitcoin or (inaudible) AtenCoin?

12          MR. ABRAMOFF:  I don't think so – well, AtenCoin, I don't think exists

13    anymore.

14          AGENT QUINN:   Okay.

15          MR. ABRAMOFF:   But there were AtenCoin holders who were transitioned

16    over to AML Bitcoin token [holds].

17          AGENT QUINN:   Okay.

18          AGENT WYNAR:  Another claim:  "I bought AtenCoin back at $80 a coin."

19    Have you ever heard anybody make the claim that AtenCoin was repurchased by Mr.

20    Andrade?

21          MR. ABRAMOFF:  Well, the -- my understanding of, of it is that AtenCoin

22    rose to a Bitcoin level that would have been equivalent to $80  today.

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT QUINN:   Okay.

2          MR. ABRAMOFF:   Okay, so --

3          AGENT QUINN:   I understand – I (inaudible).

4          MR. ABRAMOFF:   In other words, AtenCoin was worth point-whatever

5     Bitcoin --

6          AGENT WYNAR:   Um-hmm.  Um-hmm.

7          MR. ABRAMOFF:    -- [let's say], that today would have been worth $80.

8          AGENT QUINN:   Okay.  But you never – Okay.

9          MR. ABRAMOFF:   That – I -- well, I mean, I, I thought, also, it was worth

10    $80, so I asked him –

11          AGENT QUINN:   Okay.

12          MR. ABRAMOFF:    -- as well --

13          AGENT QUINN:   Yeah.

14          MR. ABRAMOFF:    -- you know, what's, what's the story there?  And he said

15    that that's what it was.

16          AGENT QUINN:   Okay.  So at one point he was saying that --

17          MR. ABRAMOFF:   So, as far as buying them back, I, I don't know.

18

19          AGENT QUINN:   Okay.

20          MR. ABRAMOFF:   I don't – I think– I think he – he may have said that he

21    made an offer to people to buy them back, but I don't remember.

22          AGENT QUINN:   Okay, and -- but he, he hasn't told you that he bought them

Privileged & Confidential
K&S DRAFT 12-18-22

1    back at a certain coin level or a certain value -- at $80 or –

2                    MR. ABRAMOFF:   I don't remember.

3                    AGENT QUINN:   -- or $40, or anything like that?

4                    MR. ABRAMOFF:  Yeah, I don't – I don't remember that.

5                    AGENT QUINN:  Okay.

6                    AGENT WYNAR:  Yeah, okay.

7                    AGENT QUINN: Well, did -- when he talked about it, did he ever -- did he

8    say at one point that AtenCoin was actually AML -- know you're customer-compliant, or --

9                    MR. ABRAMOFF:  No.  He said it wasn't.

10                   AGENT QUINN:  It wasn't.

11                   MR. ABRAMOFF:   He said that's why they pulled it.

12                   AGENT QUINN:  Okay.

13                   MR. ABRAMOFF:   Because the -- he said he hired companies to do the

14   AML-KYC.

15                   AGENT QUINN:  Um-hmm.

16                   MR. ABRAMOFF:   And, that they put fake IDs through to test them, and

17   they all got through.

18                   AGENT QUINN: Okay.

19                   MR. ABRAMOFF:  And that's when he put a – pulled the product.

20                   AGENT QUINN: Okay.  But, do you remember if he was selling it, saying it

21   was AML-KYC at the time?

22                   MR. ABRAMOFF:  Well, I didn't know him then.

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT QUINN:  Oh, you didn't know him.

2          MR. ABRAMOFF:  No.

3          AGENT QUINN:   But when – and when he discusses it with you, did he --

4    does he – (inaudible)?

5          MR. ABRAMOFF:  Well, I, I think he said that it was -- (inaudible) was

6    created to be an AML- KYC coin –

7          AGENT QUINN:   Yeah.

8          MR. ABRAMOFF:   -- and that when he discovered it wasn't, he pulled it out.

9          AGENT QUINN:   Okay.

10          AGENT WYNAR:  What's the status of his new brainchild, this AML?  Is that

11    -- I mean, is that KYC-compliant?

12          MR. ABRAMOFF:  Well, he's – what the representation is, is that there's a

13    token –

14          AGENT WYNAR:   Um-hmm.

15          MR. ABRAMOFF:   -- that will be – converted to the coin when the AML-

16    KYC system, which was called a CrossVerify system, is finished. And they're very close to

17    finishing it.  The engineering teams in London and, and that kind of thing, there are -- and I,

18    I've heard --

19          AGENT WYNAR:  That's, that's Richard?

20          MR. ABRAMOFF:  Naimer.

21          AGENT WYNAR:  Naimer.

22          MR. ABRAMOFF:   But he's in – he's in Israel.  Yeah, he's based in Israel.

Privileged & Confidential
K&S DRAFT 12-18-22

1    He's overseeing that. But there, there are tech guys in London who have been working on it,

2    and they have the data model and demonstration model and things like that.

3                    AGENT QUINN:  Okay, and you've seen this model?

4                    MR. ABRAMOFF:  Yeah, I saw -- I saw the model.

5                    AGENT QUINN:   Okay.

6                    AGENT WYNAR:   What did it look like?

7                    MR. ABRAMOFF:  It's basically -- (inaudible).

8                    AGENT QUINN:   Of course -- (inaudible).

9                    MR. ABRAMOFF:  I mean, basically, your, your phone, you can – it's a

10   biometric visual identification system.  So, the one I saw didn't have the [iris] thing.

11                   AGENT QUINN:   Um-hmm.

12                   MR. ABRAMOFF:  But it had facial recognition and thumbprint –

13                   AGENT QUINN:   Okay.

14                   MR. ABRAMOFF:   -- on the smartphone.  And then it feeds in the system,

15   and they verify -- they do a check.

16                   It was -- again, it was a – it was a demonstration model, so it was simulated.

17   They weren't ready yet with the tag. And it was, then they check against the various lists of

18   terrorists and things like that.

19                   AGENT QUINN:   Um-hmm.

20                   MR. ABRAMOFF:   Make sure that you're not . . . .

21                   AGENT WYNAR:  So the -- so the claims that surround this thing that are

22   pretty unambiguous – the Port of San Francisco is going to start using this.  "We're in

Privileged & Confidential
K&S DRAFT 12-18-22

1    negotiations with the Port of San Francisco."  "We're in negotiations with the Panama

2    Canal."

3                    MR. ABRAMOFF:   Well, we're -- I --

4                    (Crosstalk).

5                    AGENT WYNAR:    "We're in negotiations with the London Stock

6    Exchange."

7                    MR. ABRAMOFF:  Actually, I'm, I'm very aware of that because I'm -- I was

8    involved with it.

9                    AGENT WYNAR:  Yeah?  Yeah?

10                   MR. ABRAMOFF:  (Inaudible) that they are – they met with the Port of San

11   Francisco several times.  They were in discussion with them.  The Port wanted to get the

12   Greenberg Traurig firm; this Leslie somebody-or-other in San Francisco who is on the Port;

13   she's a commissioner.

14                   AGENT QUINN:   Um-hmm.

15                   MR. ABRAMOFF:   She wanted to get all the Western -- West Coast ports to

16   implement the system, but system wasn't already yet –

17                   AGENT QUINN:   Yeah.

18                   MR. ABRAMOFF:   -- because they're supposedly on the (inaudible).  So it

19   wasn't fallacious.

20                   AGENT QUINN:   Yeah.

21                   MR. ABRAMOFF:   I mean, they were meeting with them.  She's, she's

22   somebody – Leslie, something.

Privileged & Confidential
K&S DRAFT 12-18-22

1              AGENT QUINN:   Okay, I may have something in here about her.

2              AGENT WYNAR:   Yeah, we --

3              MR. ABRAMOFF:   I, I've never met him so I wouldn't be able to identify

4     her.

5              AGENT WYNAR:   Oh, okay.

6              MR. ABRAMOFF:   But, but Leslie --

7              AGENT QUINN:   The name is Katz?

8              MR. ABRAMOFF:   Yes.

9              AGENT QUINN:   Yeah.

10             MR. ABRAMOFF:   She at least represented herself as a commissioner of the

11    – or a lawyer of the Ports or something like that.

12             AGENT WYNAR:  Did you meet with her, though?

13             MR. ABRAMOFF:   No, I didn't.

14             AGENT WYNAR:   So who did?

15             MR. ABRAMOFF:  Richard and I think Marcus.

16             AGENT WYNAR:  Because she denies ever considering AML Bitcoin as part

17    of the – I mean --

18             MR. ABRAMOFF:  Well, I never talked to her.  But there's a guy named

19    Japheth Dillman, who --

20             AGENT QUINN:   uh-huh.

21             AGENT WYNAR:  Yeah, well, we have questions about him too.  Yeah.

22             MR. ABRAMOFF:  Okay -- who basically was her client and brought her in.

Privileged & Confidential
K&S DRAFT 12-18-22

1    I overheard one – the beginning of one phone conversation, then I got off the line with them.

2              My understanding was she was very enthusiastic about this and wasn't just,

3    you know, meeting him.  And it wasn't just, you know, me hearing it.  I didn't --

4              AGENT WYNAR:  Was he -- was she his --

5              AGENT QUINN:   (Inaudible).

6              (Crosstalk).

7              AGENT WYNAR:   -- attorney?

8              I'm sorry.

9              MR. ABRAMOFF:  Yes.  Yes.  Well, he – so they – so both of them

10   represented.

11             AGENT QUINN:  And, and the (inaudible) you mean (inaudible) Katz, Mr.

12   Dillman, and Mr. Andrade or Naimer?  Who, who's the one telling you (inaudible) is very

13   enthusiastic about this?  All of them?

14             MR. ABRAMOFF:  Well, all of them.

15             AGENT QUINN:   All of them.

16             MR. ABRAMOFF:   All, all of them.  They all met with him.  I think Richard

17   went out there and met with – I think –

18             AGENT QUINN:  Um-hmm.

19             MR. ABRAMOFF:   -- the Port.   So that -- on that one -- so at least the -- you

20   know, again, I don't know who's claiming what, but –

21             AGENT WYNAR:  Um-hmm.

22             MR. ABRAMOFF:   I -- you know.

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT QUINN:  But I guess this is -- this is important.  So they say they're

2    currently -- they're enthusiastic about it.  Have they said, "We've got a contract signed or, and

3    we're [ready to get a deal]"?

4          MR. ABRAMOFF:  No, no, no.

5          AGENT QUINN:  Okay.

6          MR. ABRAMOFF:  No.  Of course not.

7          AGENT QUINN:  Yeah.

8          MR. ABRAMOFF:  Yeah, I mean, they're -- because they, they can't.  They

9    don't have – they don't yet know what the -- how the technology can be applied there.

10          AGENT QUINN:  Yeah.

11          MR. ABRAMOFF:  And the – and the AML guys put it on hold –

12          AGENT QUINN:  Yeah.

13          MR. ABRAMOFF:  -- because they were busy with the patents and

14    everything else that they've got.

15          AGENT QUINN:  Okay.  So if, if people associated with AML Bitcoin are

16    saying, "Hey, we've got a contract already signed with the Port of San Francisco; we've got a

17    contract signed with the Panama Canal; and they're going to start implementing this in two

18    months" --

19          AGENT WYNAR:  "We're going to announce a big deal with the London

20    Stock Exchange in a week and a half"?

21          AGENT QUINN:  Yeah.  And it, it --

22          MR. ABRAMOFF:  Yeah.  Well, I mean, the London Stock Exchange,

Privileged & Confidential
K&S DRAFT 12-18-22

1    Angela Knight, who is the former Secretary of the Treasury over there, had – they've been

2    working with the London Stock Exchange, with the FCA, with the FATF over there.  And

3    they've been extremely active.

4                    AGENT QUINN:   Okay.

5                    MR. ABRAMOFF:   The Stock Exchange, I don't know where it was left.  But

6    they're the deals that are done.  There's an FCA deal that is in the -- that they're going to be

7    signing by --

8                    AGENT WYNAR:  What's -- what is FCA?  Sorry.

9                    MR. ABRAMOFF:  Uh, Financial Compliance Authority, or Financial --

10                   AGENT QUINN:  And, and this is a British --

11                   MR. ABRAMOFF:   Yes.

12                   AGENT QUINN:   -- agency, right??

13                   MR. ABRAMOFF:  Yes.

14                   So they've been extremely active in the UK.

15                   AGENT QUINN:   All right.

16                   MR. ABRAMOFF:   And in fact, they spoke at the FCA – No, FA-, FATF

17   Conference -- that's also, I think it's a British thing; I'm not sure -- just like last week.

18                   AGENT QUINN:   All right.

19                   MR. ABRAMOFF:   So, and there is -- there is some – oh.  They've been

20   onboarded into, as a sandbox program with the FCA.

21                   AGENT QUINN:  Okay.

22                   MR. ABRAMOFF:  That's like a big deal.

Privileged & Confidential
K&S DRAFT 12-18-22

1              AGENT QUINN:  So they're, they're actually out there beta testing this

2    currently.

3              MR. ABRAMOFF:  Yeah, yeah, yeah.

4              AGENT QUINN:  Okay.

5              MR. ABRAMOFF:  I mean, this is -- this is –

6              AGENT QUINN:  Yeah.

7              MR. ABRAMOFF:   This is not – I mean, look, I'm not a techie, but this is the

8    real thing.

9              AGENT WYNAR:  Um-hmm.

10             MR. ABRAMOFF:  But this is a real thing.

11             AGENT QUINN:  Well, which is the point.

12             MR. ABRAMOFF:  This is a real -- they have real engineers –

13             AGENT QUINN:  Yeah.

14             MR. ABRAMOFF:   -- led by a guy named Nigel something.

15             AGENT QUINN:  Yeah.

16             MR. ABRAMOFF:   A team working on it.  Richard -- who I don't know if

17   you've talked to yet or not.

18             AGENT QUINN:  We have not.

19             MR. ABRAMOFF:   But he's extremely -- as much as Paul is a liar, Richard

20   is not.  I've known Richard for years,  I know he's a very honest lawyer from Israel, a

21   Canadian who moved to Israel.

22             AGENT QUINN:  Right.

Privileged & Confidential
K&S DRAFT 12-18-22

1                    MR. ABRAMOFF:  And he's in charge of that.

2                    AGENT QUINN:  Right.

3                    MR. ABRAMOFF:  Now, as to representations that anyone made to

4    somebody that there's a deal, yeah, there was a period of time when we were being told by

5    Japheth that the deal was imminent with the Port of San Francisco.

6                    AGENT QUINN:  Um-hmm.

7                    MR. ABRAMOFF:  But it required meeting him, and when Richard went out

8    there, he said, well, it's going to take more than just this.

9                    AGENT QUINN:  Um-hmm.

10                   MR. ABRAMOFF:  So, you know, that's probably --

11                   AGENT WYNAR:  We, we think that that that's actually a consistent notion,

12   that, that Japheth seems to be the focus of the extreme exaggerations here.

13                   MR. ABRAMOFF:  Yes.  He's, he reminds me of an (inaudible).

14                   AGENT QUINN:  (Inaudible).

15                   MR. ABRAMOFF:  So -- to be honest with you.

16                   AGENT WYNAR:  Okay.

17                   MR. ABRAMOFF:  Yeah.

18                   AGENT WYNAR:  Interesting.

19                   MR. ABRAMOFF:  And, yeah.  In fact, I remember a couple of times

20   Marcus getting angry at him –

21                   AGENT QUINN:  Yeah.

22                   MR. ABRAMOFF:  -- that he was handing out materials, and Marcus had not

90

Privileged & Confidential
K&S DRAFT 12-18-22

1    -- Marcus, to my knowledge, is extremely careful about materials or anything else.  He --

2    everything is run by his SEC lawyers about him (inaudible) named John Fahey.  Everything,

3    I mean, no matter what it is; even ideas for a promotion or anything like that.

4              So he's been – frankly, he's (inaudible) one [you probably looked at] who

5    wanted Japheth out of the project over this.

6              AGENT WYNAR:  He's still on the website as --

7              MR. ABRAMOFF:  He is on the website, and the website also has a bunch of

8    people who are not active in the coming.  They just haven't updated their website.

9              I think Neil Sunkin is still on the website.  He's not involved anymore,

10    although Neil may have gotten off.

11              There's --

12              AGENT QUINN:  And what was Mr. Sunkin's involvement?

13              MR. ABRAMOFF:  He was just a lawyer.  He was just a lawyer.

14              AGENT QUINN:   Okay.

15              MR. ABRAMOFF:   There was -- Carlos De La Guardia from Panama is, I

16    think, still on the website.

17              [Rap] Natko Vlahovic or whatever is still on the website.

18              The website has just not been updated.

19              AGENT QUINN:   Um-hmm.

20              MR. ABRAMOFF:   That, that's all.  I mean, they're not --

21              AGENT WYNAR:  Carlos, is he the connection for the whole Panama Canal

22    thing?

Privileged & Confidential
K&S DRAFT 12-18-22

1          MR. ABRAMOFF:  Yes.  Yes.

2          AGENT WYNAR:  And how's that?  How did – so is that a real thing?

3          MR. ABRAMOFF:  Yeah.  I mean – well, it's a real thing once the software –

4  the problem is that until the software is done -- and I went to Panama by the way, and was at

5  a meeting with some of these folks, with the law firm Morgan & Morgan down there who

6  were very interested to bring it down there for not only the ship registry but to get involved.

7          Now they had a guy on there who turned out to be a real, I think, bad guy

8  named Katten something or other, who was a former chairman of the Panama Canal who was

9  going to negotiate with the Panama Canal.

10          AGENT QUINN:  Um-hmm.

11          MR. ABRAMOFF:   That seemed to be going well, and then all of a sudden,

12  Katten told, uh, I guess, Marcus or one of the PR people to put out, uh, publicity about the

13  meetings, and the Panama Canal got all concerned and antsy, and so they pulled back a little

14  bit.

15          So, but until their -- the technology is finished, and that's months or a few

16  months away –

17          AGENT QUINN:  Right.

18          MR. ABRAMOFF:   Once it's finished, there's going to be a need for -- what

19  it is, is biometric digital identification system that -- through trusted third parties that

20  basically enables instant chat and verification of identity –

21          AGENT QUINN:  Um-hmm.

22          MR. ABRAMOFF:   -- here, which is the big issue.

Privileged & Confidential
K&S DRAFT 12-18-22

1                AGENT QUINN:   Yeah.

2                MR. ABRAMOFF:   Obviously.  And so they have -- it's patented.  I mean,

3        they're, they're really quite advanced on this.

4                AGENT QUINN:   Right.

5                MR. ABRAMOFF:   And it will be when the patent's revealed, and the patent

6        (inaudible) -- right?

7                AGENT QUINN:   Um-hmm.

8                MR. ABRAMOFF:   To give – to give them the placement of biometric digital

9        identification information on the blockchain. They have a patent on that, and it was granted.

10       So, when the patent's revealed – it should be next year -- and the technology is done --

11               AGENT WYNAR:  Well, "the patent's revealed"? I mean --

12               MR. ABRAMOFF:  Well, in the sense that it's not public.

13               AGENT WYNAR:   It -- okay.

14               MR. ABRAMOFF:   They haven't made a big press thing about it.

15               AGENT WYNAR:   Okay.

16               MR. ABRAMOFF:   But that's going to be a big deal.

17               AGENT WYNAR:  Yeah.

18               MR. ABRAMOFF:  and people who want to utilize the blockchain for the

19       placement, environment, and digital identity, which would be everybody (inaudible), you

20       know, this is -- this will be a significant enterprise.

21               AGENT QUINN:  All right.

22               AGENT WYNAR:   I see.  I see.

Privileged & Confidential
K&S DRAFT 12-18-22

1        AGENT QUINN:  So I guess (inaudible) I guess, go back to Japheth, why

2    hasn't Japheth, why hasn't Japheth (inaudible) on, on the – I think some of the reporting that

3    we've had of, of the statements that Japheth had made are quite old.  Like, he's been making

4    pretty grandiose claims for a while about this.

5        MR. ABRAMOFF:  Yeah.

6        AGENT WYNAR:  Like, let me give you an example.

7        MR. ABRAMOFF:  Okay.

8        AGENT WYNAR:  I don't want you to -- I mean your Erickson comparison

9    may be very app, right?

10        MR. ABRAMOFF:  I – I –

11        AGENT QUINN:  For some --

12        MR. ABRAMOFF:  He's not as polished as Erickson, but he's I think he's a

13    liar; I told Marcus this.  And Marcus agreed.

14        AGENT WYNAR:  Well, so, so when he says, "I've sent Marcus deals worth

15    hundreds of millions of dollars" --

16        MR. ABRAMOFF:  He's full of crap.  That's total nonsense.

17        AGENT WYNAR:  When he says, "I've" – "The" – God damn, there's,

18    there's just so many of these statements – yeah.

19        AGENT QUINN:  Every -- at one point, so he makes this claim that every

20    U.S. citizen, or -- any of the ex-patriots overseas will have to pay their taxes in AML Bitcoin.

21        AGENT WYNAR:  I mean, and --

22        AGENT QUINN:  He says that Marcus was negotiating a treaty or -- what --

Privileged & Confidential
K&S DRAFT 12-18-22

1    the -- what was it he said?  With economic – with international [relations] saying all of them

2    -- all taxes by, by people overseas will have to be paid in AML Bitcoin.  And these claims

3    he's making were to potential investors, and --

4                    AGENT WYNAR:  And then -- here's the funny part:  He wants the money to

5    go to him.

6                    AGENT QUINN:  Yeah, yeah.

7                    AGENT QUINN:   Yeah. And that's actually –

8                    AGENT WYNAR:   That --

9                    MR. ABRAMOFF:  To his company Blockbits?

10                   AGENT WYNAR:  Yeah.  Yeah.

11                   AGENT QUINN:  Yeah.

12                   MR. ABRAMOFF:   Look, this – look, Japheth -- I sadly brought Japeth into

13   this. A friend of mine encouraged me, and my son invested in Blockbits.

14                   AGENT QUINN:  Yeah.

15                   MR. ABRAMOFF:   Which was also, by the way, a complete fraud.

16                   AGENT WYNAR:   Blockbits was?

17                   MR. ABRAMOFF:   Yes.  Blockbits was represented as an autotrader bot to –

18   to arbitrage the difference between prices of cryptocurrencies across exchanges.

19                   AGENT QUINN:   Yep.

20                   MR. ABRAMOFF:   Okay?  And, um, not one time -- so we were involved in

21   the beta test.

22                   AGENT QUINN:   Um-hmm.

Privileged & Confidential
K&S DRAFT 12-18-22

1          MR. ABRAMOFF:   And we made money because he put -- it was all sitting

2   in Bitcoin.  And it was during the time Bitcoin went up.

3          AGENT QUINN:   Right.

4          MR. ABRAMOFF:   But I didn't – if we just put it in Bitcoin, we would have

5   made a lot more money.

6          AGENT QUINN:   Yeah.

7          MR. ABRAMOFF:   And, but they never one time had an arbitrage.

8          AGENT QUINN:  I see, yeah.

9          MR. ABRAMOFF:  Not one time, okay?  And --

10          AGENT QUINN:  So, effectively, they put money into the Blockbits fund and

11   then it --

12          MR. ABRAMOFF:  And I don't know what they did with it, and in fact, some

13   of these --

14          AGENT QUINN:  They --

15          AGENT WYNAR:  They speculated, right?  They did human arbitrage, right?

16          MR. ABRAMOFF:  They, they claimed that some money's still tied up

17   because he still owes my son money.

18          AGENT QUINN:  Okay.

19          MR. ABRAMOFF:   Some of it's still tied up.

20          AGENT QUINN:  Yeah.

21          MR. ABRAMOFF:  And, you know, I mean, Neil Sunkin's also involved.

22   Unfortunately, I told him about it and he invested as well.  And Neil, who's a business

96

Privileged & Confidential
K&S DRAFT 12-18-22

1    litigator, is contemplating whether he's suing me.

2                    AGENT QUINN:   Okay.

3                    MR. ABRAMOFF:   Okay?

4                    AGENT WYNAR:  Yeah, never bring an attorney to these things, because

5    they –

6                    MR. ABRAMOFF:   Well, no, I mean, he –

7                    AGENT WYNAR:   -- that actually was, was Erickson's undoing, is he stole

8    money from an attorney who actually sue him -- sued him and won, right?

9                    MR. ABRAMOFF:   Yeah.

10                   AGENT WYNAR:   That was like – oh, that was an easy one to see coming,

11   you know.

12                   MR. ABRAMOFF:  Yeah, Japheth, I think – again, Japheth strikes me as

13   either -- I think he's pathological.  I, I've told this to Marcus, and Marcus agrees as well.

14   And Marcus hates him.  But he, he's -- part of the problem is that Japheth has a lot of bravado

15   with all his connections and things like that, and it may be that Marcus is going gently –

16                   AGENT QUINN:   Yeah.

17                   MR. ABRAMOFF:   -- because he doesn't – he doesn't know whether Japheth

18   can actually hurt the project at this point.

19                   But I know that we were told by somebody who wanted to come in as an

20   investor – I don't know what this guy's name was.  He wanted to come in as an investor.

21   And he came to me through a different content; the guy's totally unrelated.

22                   AGENT QUINN:   Right.

Privileged & Confidential
K&S DRAFT 12-18-22

1          MR. ABRAMOFF:   He said that this guy wanted to get involved in

2     cryptocurrency and he asked this guy, who doesn't know anything about AML Bitcoin.  And

3     he said, "So I know you know about AML."  I said, "I do know about it; I haven't heard it

4     personally, but I know about it."  And I said, "I'll get him conNACted up."

5          So I talked to the guy, and all of a sudden Japheth contacted Marcus and said,

6     "Oh, this guy's my guy."

7          AGENT QUINN:   Yeah.

8          MR. ABRAMOFF:   So, and then. then Marcus -- so Marcus was dealing with

9     it.  He told me, he said, "Apparently, Japheth gave me some document; he has some

10    presentation."  But Japheth -- he says, "I haven't seen this; have you seen it?  I said, "I

11    haven't seen it either."

12         AGENT QUINN:   Yeah.

13         MR. ABRAMOFF:   He says, "I'm really upset because no presentation can be

14    made about this project without the SEC attorney at least seeing it.  And now I'm really

15    mad," and, "Japheth's denying" – I guess he said – he denied he gave him anything.

16         AGENT QUINN:   Yeah.

17         MR. ABRAMOFF:   You know, some -- something.  So there was that.

18         I mean, again, I didn't really get that involved with it.

19         AGENT QUINN:  Which is -- which is interesting because we, we got to

20    know -- which is how partially we know about Japheth – was that he was (inaudible) giving

21    presentations on –

22         AGENT WYNAR:   Lots of them.

Privileged & Confidential
K&S DRAFT 12-18-22

1              AGENT QUINN:   -- AML Bitcoin.

2              AGENT WYNAR:  With Leslie, at Greenberg Traurig.

3              AGENT QUINN:  Yeah.

4              AGENT WYNAR:   In a room full of speculators, investors.  I mean, this was

5    not an -- this was not a hard thing to, to expose.

6              AGENT QUINN:  Yeah.

7              AGENT WYNAR:  I mean, it's, it's not like he's sneaking around doing it.

8    He's just out there, like –

9              AGENT QUINN:  So --

10             MR. ABRAMOFF:  Over and over again.

11             AGENT QUINN:   Yes. So my -- so one more question is obviously -- I mean,

12   I'm not a businessman; I, I'm paid by the government.  But if I had guy like Japheth on the

13   board and he was making these claims, like, why is he still there?  You know.

14             MR. ABRAMOFF:  So, first of all, he's not on the board.

15             AGENT QUINN:  Well, I'm sorry.  I guess –

16             AGENT QUINN:  He's a – he's the chief strategy officer.

17             AGENT QUINN:   -- senior executive.  Yeah.

18             MR. ABRAMOFF:  Okay, which is hilarious.  Again, I – it's possible he's

19   there because Marcus just hasn't had a chance to go and get him off the website.

20             AGENT QUINN:  Yeah.

21             MR. ABRAMOFF:  Okay?

22             AGENT QUINN:  Well, my next question:  Has Mr. Dillman actually brought

Privileged & Confidential
K&S DRAFT 12-18-22

1    any investment money to –

2              MR. ABRAMOFF:  Yes.

3              AGENT QUINN:  Okay.

4              MR. ABRAMOFF:  He did.

5              AGENT QUINN:  Okay, could you tell me anything about that?

6              MR. ABRAMOFF:  There's a guy named Arthur something, who --

7              AGENT QUINN:  Who Arthur Weissman?

8              MR. ABRAMOFF:  I don't know.  I don't know.

9              AGENT QUINN:  Okay.

10             MR. ABRAMOFF:  I actually met this guy just at a restaurant in New York.

11             AGENT QUINN:  Okay.

12             MR. ABRAMOFF:  I didn't spend much time with him.

13             AGENT QUINN:  Yeah.

14             MR. ABRAMOFF:  I remember the name "Arthur," and he, he was Jewish.

15    So, it might have the last time; I don't remember.  But, apparently, he put together, like, a

16    million dollars, and they bought a coin --

17             AGENT QUINN:  Yeah.

18             MR. ABRAMOFF:  -- tokens with it.

19             AGENT QUINN:  Through Japheth, or?

20             MR. ABRAMOFF:  Yes, I think so.

21             AGENT QUINN:  All right.

22             MR. ABRAMOFF:  I think so. I don't know.  I'm not sure.

Privileged & Confidential
K&S DRAFT 12-18-22

1              AGENT QUINN:  Okay.  Does the name Benjamin Boyer mean anything to

2    you?

3              MR. ABRAMOFF:  No.

4              AGENT QUINN:  Okay.  But, is -- so the question I have is, we think that

5    Japheth has raised a not insignificant amount of money for the project.  And one of the things

6    that – concerns about us -- from us is, are there people investing because of the things

7    Japheth is telling them?

8              MR. ABRAMOFF:  Likely, because I don't think Marcus had any. any

9    interaction with these people.

10             AGENT QUINN:  Yeah.

11             MR. ABRAMOFF:  And maybe -- it's possible, by the way, that the oil

12   stories and the rest, unless you have other people Marcus has done this to -- I mean, I

13   wouldn't put it past David to embellish Marcus's (inaudible).

14             AGENT QUINN:  Okay.  Do you know how much money the AML Bitcoin

15   project has raised so far?

16             MR. ABRAMOFF:  I don't.

17             AGENT QUINN:  Not even a ballpark figure at all of what Marcus or any of

18   you guys told you, like, $60 million or $2 million or anything like that?

19             MR. ABRAMOFF:  Yeah – no, I have no idea.

20             AGENT WYNAR:  What happens to the money when it's delivered to -- like,

21   say, somebody buys tokens.  I guess that's how you get involved; you buy tokens, right?

22   Who do you give the money to, and who collects the money for the tokens?

Privileged & Confidential
K&S DRAFT 12-18-22

1              MR. ABRAMOFF:  The company does.

2              AGENT WYNAR:   And which company is that?  Sorry.

3              MR. ABRAMOFF:  The NAC Foundation.

4              AGENT WYNAR:   NAC Foundation.

5              MR. ABRAMOFF:   And, and the money has been used for expenses.  I

6      mean, I don't know; I haven't seen the books and I haven't –

7              AGENT WYNAR:   Well, I know what some of the money was used for.  It

8      went and bought a piece of real estate for Marcus.  He bought a million-dollar house with it.

9      So an investor provides money –

10             MR. ABRAMOFF:   When, when was that –

11             AGENT WYNAR:   Not too long ago.

12             AGENT QUINN:  He bought it a few months ago, so.

13             AGENT WYNAR:  So is that --

14             AGENT QUINN:  Basically, after the conclusion of the third phase of the

15     ICO, but -- I guess.  And, of course, we don't know all of it but I'd say 50 percent of the

16     invest – of the money's gone to purchasing a property.

17             AGENT WYNAR:  That -- we think he lives in -- although I haven't been to

18     Texas to look – Missouri City, Texas; does that sound familiar to you?

19             MR. ABRAMOFF:   I thought he was near Houston.

20             MR. ABRAMOFF:   That's the -- that's just a suburb of Houston.

21             AGENT QUINN:  It's a suburb of Houston, Yeah.

22             AGENT WYNAR:   But, but --

Privileged & Confidential
K&S DRAFT 12-18-22

1          MR. ABRAMOFF:  Are you – are you certain of this?

2          AGENT WYNAR:  Well, okay.  Certain of it?  I'm confident enough to say

3   it's a significant hypothesis about how the money was used.  I don't think -- I think, without

4   going into total detail, the trail isn't difficult.  It's a couple steps; it's a multi layered trail.  But

5   I, I won't say that it's absolutely intended to conceal, but there's no particular need for all

6   these layers.  But, yeah, it's -- I guess the weak link is we haven't actually interviewed the

7   source of the money, right?  So I suppose this guy could have given Marcus money for some

8   other purpose.  But as far as we know, there was no other.

9          MR. ABRAMOFF:  Wait, there was one person who put up this --

10          AGENT WYNAR:  Well, I don't --

11          AGENT QUINN:  Oh, yeah, it was complex. So, from the money we see

12   going -- and of course we may not have the whole universe of it – there is a single portion of

13   money that's small, people kicking in a few coins, like they go in the ICU and they purchase

14   $300 of coins, and that goes into the company.

15          There's a few larger ones, some of which are coming from, like, a retired

16   surgeon in Sonoma or something like that who puts in $200,000 based on a call from Mark

17   Diadamo or Brian Darrow or something like that, at which point Mr.  Diadamo and Darrow

18   earn up to a 30-percent commission on it. So it's --

19          AGENT WYNAR:  But that -- which is interesting.  They just skim –

20          AGENT QUINN:  Yes.

21          AGENT WYNAR:   -- right off the investor side.

22          AGENT QUINN: And so, and that's, like I say -- and that was -- especially

Privileged & Confidential
K&S DRAFT 12-18-22

1    pre-ICO, that was the main source of income.  It was, like, elderly people who one of these

2    Florida guys calls and, and hits them up (inaudible) invest in that, in AML Bitcoin.  Then

3    (inaudible) ICO.  And then there will be couple really big investors -- I can think of one

4    particularly big investor – puts a bunch of money into it, and that money flows to the house.

5              MR. ABRAMOFF:  Was that that Arthur?

6              AGENT QUINN:  No, we haven't -- we've, we've seen an Arthur put money

7    in, but --

8              MR. ABRAMOFF:  Well, I don't know if he would have done it in his name,

9    but – it may have come through Blockbits or something.

10              AGENT QUINN:  Correct, yeah.

11              MR. ABRAMOFF:  But I think it came as, like, $800,000 or something.

12              AGENT QUINN:   And that may have – that may have –

13              MR. ABRAMOFF:   Was that the money that went to the house?

14              AGENT QUINN:  We see – well, there was also one made by a single

15    individual, which also seems to be associated with Blockbits.

16              MR. ABRAMOFF:  Who was that?

17              AGENT QUINN:  Mr. Boyer, the, the name [I mentioned] earlier, so --

18              MR. ABRAMOFF:  Was that – and that was the house money?

19              AGENT QUINN:  And that was that money was -- so a lot of money goes in

20    at the same time, but that -- I'd say that money and maybe this other $800,000 was probably

21    the over half the money that goes into the NAC Foundation funds that we see.

22              The remainder comes from these small ICO-type investors and then these

Privileged & Confidential
K&S DRAFT 12-18-22

1   random people that Mr. Darrow  or Mr. Diadamo or some of the other guys call up who kind

2   of typical -- who are, like, elderly retirees.

3                    AGENT WYNAR:  The key being, though, we've never seen a hundred-

4   million-dollar type of numbers, like Japheth was saying, for sure.  The money we do see

5   seems just like grifters, grandmothers, you know, people off of the website, kind of low-level

6   contributors through the ICO, and --

7                    AGENT QUINN:  Yes.  The folks interviewed there are typically like -- I

8   mean, it's – they're elderly; they don't know and understand cryptocurrency and things like

9   that. And they get called by some of these individuals to invest in the AML Bitcoin or

10  AtenCoin.  And then they receive these large commissions.  And then we see this money

11  flow to lifestyle expenses for the principals of AML Bitcoin.  And that includes this large

12  sum of money, which came from Mr. Boyer who we have not spoken to yet.  But that seems

13  to be the money that then funded Mr. Andrade's real estate purchase.

14                    But at the same time, that money's coming in during the course of the ICO

15  and everything.  So the actual -- it all goes in one pool and then goes out to these -- a few

16  different pools, some which seems to be associated with the business, but actually the bulk of

17  which seems to be going to the individual people, these high commissions of Mr. Diadamo

18  for things like that, or Mr. Andrade.

19                    AGENT WYNAR:  And what, what we're skeptical of is that the fraction

20  going to the business is incommensurate with the requirements for the grandiosity of the

21  technology.

22                    Now, they're the claims of the technology, and I know you're not a tech guy,

105

Privileged & Confidential
K&S DRAFT 12-18-22

1   but the development that they're suggesting -- this is significant technology.  This is not

2   something that a 16-year-old kid who's good at computers is going to put together in his

3   basement.  This is not something that a team of one or two developers is going to do.  This is

4   like computer science-level theory.  This is -- this is going to take a development team, a

5   significant development team.

6            And you mentioned that CrossVerify exists, and it's in London, which is a

7   little hard to get to.  But it's in London.  But the money that flows there is just, in our view,

8   unlikely, although this is all part of our work, right?  It's all part of this -- our pending work.

9            MR. ABRAMOFF:  I think you've got to talk to Richard Naimer because I

10  don't -- I don't -- I don't know.  Obviously, I'm not a techie, so I don't know what level, but

11  they're spending, my understanding is, well over a hundred thousand a month on the tech

12  teams to do this; they've been doing it for a while.

13           AGENT WYNAR:  And where's the source of the hundred K a month?

14           MR. ABRAMOFF:  From NAC.  NAC, and [seller] coins and things like that.

15           AGENT QUINN:  Okay, so –

16           MR. ABRAMOFF:   And I, by the way, myself recommended people – well,

17  recommended people who wanted to come in.  I sent them their way.

18           AGENT QUINN:  Okay.

19           MR. ABRAMOFF:   But --

20           AGENT QUINN:  Have you personally purchased any tokens?

21           MR. ABRAMOFF:  No.

22           AGENT QUINN:   All right.

106

Privileged & Confidential
K&S DRAFT 12-18-22

1     AGENT WYNAR:  You mentioned that something that went through

2 Blockbits.  This is real – okay, so I'm trying to get a picture because this is a little more

3 Japheth.

4     MR. ABRAMOFF:  (Inaudible) so I think it's important to talk to Naimer –

5     AGENT WYNAR:   Yes, sir.

6     MR. ABRAMOFF:   -- to, to get a sense of what they're actually doing tech-

7 wise, because I don't know that it -- it's not a 16-year-old in his basement.

8     They're, they're making -- from what I can see as a layman, and I see the

9 reports; you know, Richard shares them with me – they're making very significant progress

10 for months and months and months on this, and it is extremely sophisticated technology for

11 what they're trying to do.

12     And they have people who are very big in the space, very involved within

13 governments, including the UK.

14     AGENT QUINN:   Um-hmm.

15     MR. ABRAMOFF:   And they've also started to interact with the Treasury

16 Department over here.

17     AGENT QUINN:   Yeah.

18     MR. ABRAMOFF:   So it's not -- it's not -- at least that part of it is not --

19     AGENT WYNAR:  Hey, that's a good --

20     MR. ABRAMOFF:  It's not a scam.

21     AGENT WYNAR:  Who, who at the Treasury  -- now there's a guy I can talk

22 to.  Who's at the Treasury?

107

Privileged & Confidential
K&S DRAFT 12-18-22

1            MR. ABRAMOFF:  I don't remember, although Richard would be able to tell

2    you.

3            AGENT WYNAR:  Okay.

4            MR. ABRAMOFF:   Yeah, Richard would be able to tell you.

5            AGENT QUINN:   Actually – I'm sorry, if you want to go, fine.

6            AGENT WYNAR:  I was  going to go back to the Blockbits question, which

7    is --

8            AGENT QUINN:  Yeah, let's,  let's resolve that now.

9            AGENT WYNAR:  So, so Japheth -- Japheth seems so -- the way I'm hearing

10    it from you is we should – and this is very helpful.  We should focus a little bit on Japheth

11    based on your –

12            AGENT QUINN:   Japheth.

13            AGENT WYNAR:   Japheth -- based on your observations, and that's -- and

14    that's -- we're not holding you to this. It's just, it seems to be this is what you're familiarity is,

15    is you're willing to suggest that he's of Erickson ilk, right?

16            MR. ABRAMOFF:  Yeah, I don't know.  He's (inaudible) Erickson, but he, he

17    would he – he would definitely be in competing in the same sport.

18            AGENT WYNAR:  I would say -- I would say he's --

19            AGENT QUINN:  I would say in some ways he's more grandiose than

20    Erickson is.

21            MR. ABRAMOFF:   Oh, really?

22            MRS. ABRAMOFF (?):   Yeah.

108

Privileged & Confidential
K&S DRAFT 12-18-22

1          MR. ABRAMOFF:  I just don't know him as well as I've known Erickson

2  (inaudible).

3          AGENT WYNAR:  So he does -- he does have something called Blockbits.

4          MR. ABRAMOFF:   Yeah.

5          AGENT WYNAR:   Right?

6          Let's see if I recall this correctly.  That's why we work together; there's, like,

7  all these facts.

8          But what we never knew about was the autotrading element of it.  But, agreed,

9  the financial structure of Blockbits, as far as we can tell, has no autotrading element to it.  It's

10  just an account.  It maintains, you know, a, a certain amount of crypto and a certain amount

11  of regular currency.  To us, it kind of looks like speculation in cryptocurrency.  You know,

12  you just buy some, sell some, buy some, sell some -- it looks like that.  But it's not – it doesn't

13  have –

14          AGENT QUINN:   Yeah, it's –

15          AGENT WYNAR:   It's not like millions and millions of dollars go through

16  this thing.

17          AGENT QUINN: Yeah, it's relatively – so I, I have a looked at the web page,

18  and the web page has, you know, has four different funds listed on there:  Blockbits Fund 1

19  through 3 and then the ICO Fund.  But we've only been able to find records of one of them,

20  one of these ones that's truly existing.  And the amount of money in it is much, much smaller

21  than he's asserting to, to potential investors in the Blockbits Fund.

22          But it sounds like Blockbits Fund may have directed some investments to --

Privileged & Confidential
K&S DRAFT 12-18-22

1   because Japheth also holds out that he, you know, has his own source of AML Bitcoin tokens

2   that he has his own claim on, that he can sell at a discount.  And that's one of the things that

3   we've heard about.

4           So, but he claims to be -- it's a fairly large amount of money that he claims to

5   have control over, but we haven't really seen that reflected in, in what we've looked at.  So I

6   guess that – and you've helped bolster it a little bit to us.  (Inaudible) so that he does, in fact,

7   through Blockbits Fund, direct people to purchase AML Bitcoin tokens, at least in your

8   understanding.

9           AGENT WYNAR:  You said some money came in through Blockbits; I guess

10  that's what you [meant].

11          MR. ABRAMOFF:  Yeah.  Well, I mean, that was my understanding.  I don't

12  know exactly –

13          AGENT WYNAR:  Okay.  Okay.

14          MR. ABRAMOFF:  I remember from Marcus being mad that the investor

15  Japheth wanted him to come in through Blockbits, put it in Blockbits.  But I don't know if

16  that's what happened.

17          AGENT QUINN:  Yeah.

18          AGENT WYNAR:  But what does that mean, "come in through Blockbits"?

19          MR. ABRAMOFF:  In other words, the investor's give Blockbits the money –

20          AGENT QUINN:  Blockbits –

21          MR. ABRAMOFF:   -- and Blockbits gives AML Bitcoin the money, which I

22  presumed was – at the time when I heard it, I presume it was Japheth raking off coins.

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT QUINN:   Yeah.

2          MR. ABRAMOFF:   In other words, saying, "Here's a million dollars for a

3    million coins," and he's telling the investors, "Thank you for the million dollars for 500,000

4    coins."

5          AGENT WYNAR:  Okay, so, so it's really a matter of -- it's quibbling –

6          MR. ABRAMOFF:   But I don't know that.  I mean, that's only speculation.

7          AGENT WYNAR:  Okay.  That is speculation, okay.

8          AGENT QUINN:  Okay.

9          MR. ABRAMOFF:  Yeah.  Otherwise, why do it like that?

10          AGENT WYNAR:  Well, what Japheth kind of claims is that he possesses a

11    huge chunk of coins, like, on hard drive, that their keys are on hard drives.  And you give

12    him the money, and you're actually buying his coins, right?  That's theory.  Does this make

13    any sense to you?

14          AGENT QUINN:  And because of his position, he's able to trade in a larger

15    volume than an individual trader, yeah.

16          AGENT WYNAR:  Oh, that's right.  Yes.  So Japheth – yes, so he's claiming

17    he has a trading team in LA, a trading team in -- where are the other places?

18          AGENT QUINN:  New York.

19          AGENT WYNAR:  New York.

20          AGENT QUINN:  And somewhere else.

21          AGENT WYNAR:  Is there any evidence, to your knowledge, that he has,

22    like, teams of people?

Privileged & Confidential
K&S DRAFT 12-18-22

1              MR. ABRAMOFF:  I've never seen them.  I mean –

2              AGENT WYNAR:  And he's –

3              MR. ABRAMOFF:   -- does he want the sort of -- the moment where the

4      discussion ended with me and Japheth was when I heard that he never had an autotrader and

5      it was just a lie.

6              AGENT QUINN:   Yeah.

7              MR. ABRAMOFF:   And, and at that point basically he, he asked Marcus if I

8      would meet with him because he was afraid I would do something to him politically or

9      something like that.  I was like, what the hell would I do to him politically?

10             AGENT QUINN: Well, that's actually -- you mentioned earlier, you said

11     your son had put into –

12             MR. ABRAMOFF:   Yeah.  Yeah.

13             AGENT QUINN:   So (inaudible) mean that your son may be the victim of a

14     fraud, it sounds like.

15             MR. ABRAMOFF:   Yeah, could be.  Could be.

16             AGENT QUINN:   How, how much money -- do you know how much money

17     he put in?

18             MR. ABRAMOFF:  Maybe 60 grand.

19             AGENT QUINN:   Okay.

20             MR. ABRAMOFF:   Well, here's the thing:  He's gotten back it may have

21     been 70 grand; he got back like a hundred-fifty grand.  So, because we talked about that,

22     whether he's defrauded us.  And I talked to Neil about it also.  And, you know, it's hard --

112

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT WYNAR:  If Neil's your attorney, do you --

2          MR. ABRAMOFF:  He's not – he's not my attorney.  He's a friend, but –

3    sorry. One second.

4          AGENT WYNAR:   Yes, sir.

5    **(Interviewee breaks for phone call [1:38:30-1:56:00 –** *Note from LBC: This is the break*

6    *where JA is being told there is a search warrant for his house and everything. He is calling*

7    *his attorney, he is being told there is a team of people waiting outside to search the house.*

8    *His wife is asking to talk to him before she is leaving the premises. JA seems really*

9    *anxious and taken aback by the situation.***)**

10          MR. ABRAMOFF:  Aren't you going to take my phone?

11          AGENT WYNAR:   We are, sir.  Yes, sir.

12          MR. ABRAMOFF:   How am I going to –

13          AGENT WYNAR:   We'll, we'll facilitate it, I promise.  You will have no

14    trouble communicating with everybody, and it will – just for a limited –

15          MR. ABRAMOFF:   Are you taking me?

16          AGENT WYNAR:   No, no.  Nobody's under arrest here.  This is a lot worse

17    than it – it looks worse than it is.  We just  -- there's just so many things that are coming back

18    to this address.

19          MRS. ABRAMOFF:  It looks really bad.

20          AGENT WYNAR:  I know.  I know.  But there's a lot of things that are

21    coming back to this address.

22          MR. ABRAMOFF:   So, see, the last time I cooperated, I mean, I, I gave

113

Privileged & Confidential
K&S DRAFT 12-18-22

1   everything over, which I'm willing to do now.  I, I don't -- I'm not -- I'm never -- I'm a

2   cooperator.  I'm not a --

3                    AGENT QUINN:   We'll make --

4                    AGENT WYNAR:  We'll be -- we'll be gone.  We'll be gone and.search

5                    MR. ABRAMOFF:  Yeah, but you'll take my computer.  I won't be able to do

6   business.  I won't be able to have a phone.  I mean, how am I --

7                    AGENT WYNAR:  We'll, we'll bring – we will bring everything right back.

8   We will bring everything right back.

9                    MR. ABRAMOFF:   What does that mean?  Right back, when?

10                   AGENT WYNAR: I, I think we can do it all – if we can't just take what we

11  need on site, we'll bring it back by Monday.  We'll be able to –

12                   MRS. ABRAMOFF:  Could I ask you a question?

13                   AGENT WYNAR:  Yeah.

14                   MRS. ABRAMOFF:  Was that whole Erickson thing a ruse?

15                   AGENT WYNAR:   No.  Erickson -- this is all the truth.  This is all the truth.

16  We -- there's, there's no -- nothing about our conversations was a deception.

17                   MR. ABRAMOFF:  Can't you just copy my phone now –

18                   AGENT WYNAR:  Yes.  Yes.  Yes, we can.

19                   MR. ABRAMOFF:   -- so I don't --

20                   AGENT WYNAR:  Yes.

21                   MR. ABRAMOFF:  -- again, I don't have to be without a phone?

22                   AGENT WYNAR:  Yes, we can.  We can do that.

Privileged & Confidential
K&S DRAFT 12-18-22

1            MR. ABRAMOFF:  Okay.

2            AGENT WYNAR:  We can do that.

3            MR. ABRAMOFF:   And the computer as well?

4            AGENT WYNAR:  Yes.  And same with the computer, as well.  Yes.

5            AGENT WYNAR:  And we're only looking for certain things --

6            MR. ABRAMOFF:  I mean, do you have things with you that you could do it

7    --

8            AGENT WYNAR:  Yes.

9            MR. ABRAMOFF:   So let's do it.

10           I, I'm not -- I'm not a fighter.  I mean I'm a corroborator.  I mean --

11           AGENT WYNAR:  I understand.  I , I understand.  So this will /-- this will --

12           MR. ABRAMOFF:  I mean, yeah, I'm, I'm a little surprised.  I mean, because

13   all you have to do is just tell me this is what you wanted -- my lawyers -- I would have given

14   you everything.

15           AGENT WYNAR:  I understand.

16           MR. ABRAMOFF:   As I did last time.

17           AGENT WYNAR:  I understand, sir.  You know, I --

18           MR. ABRAMOFF:  I have a history.  I don't think I did anything wrong, and I

19   certainly don't --

20           AGENT WYNAR:  My, my experience with your history is, is limited.

21   Unfortunately, we're kind of stove-piped in this organization, so I'm -- I don't know you

22   personally, and I'm sorry about that.

Privileged & Confidential
K&S DRAFT 12-18-22

1              We -- what you just said we can do, and we will do it.

2              MR. ABRAMOFF:  Okay.

3              AGENT WYNAR:   And we'll be out of here as quickly as we can.  It's -- we

4    have a very specific list; you'll see.  And it's all related to the very things we spoke about, so I

5    have a feeling that, like I said --

6              MRS. ABRAMOFF:  So you're not going to tear the house apart like other

7    peoples' houses have been?

8              AGENT WYNAR:  No, ma'am.  Absolutely not.

9              AGENT QUINN:   We don't do that.  We don't do that.

10             AGENT WYNAR:   That's a -- that's a bit of a myth.  And in this particular

11   case -- no, absolutely not.  That that's not what we're here for.

12             MR. ABRAMOFF:  All right.  So you have a list of things you want?

13             AGENT WYNAR:  I have a specific list, and we'll go through.

14             MR. ABRAMOFF:  All right.  I have things in folders, and --

15             AGENT WYNAR:  All right, sir.  But we -- so it'll be a few hours and then

16   we'll be gone, I promise you.

17             And, and, I do want to speak with your attorney, and I'll explain everything to

18   him.

19             MR. ABRAMOFF:  I can't get him, for some reason.

20             AGENT WYNAR:  Well, that's fine.  That's fine.  But we'll begin anyway.

21             MR. ABRAMOFF:   All right.

22             AGENT WYNAR:   And if you could help us inside, we can quickly -- we

116

Privileged & Confidential
K&S DRAFT 12-18-22

1    can very quickly get started.  We, we won't be here when you get back, I'm sure.

2                    MRS. ABRAMOFF:  Are there any of our other family members that are

3    going to be involved in this?

4                    AGENT WYNAR:   We will be serving a subpoena on the President of

5    Landfair, which is Alex.

6                    MR. ABRAMOFF:  Well, that's my so, Alex.

7                    AGENT WYNAR:  but he'll call you with the subpoena.  He'll just have a

8    subpoena for the company.

9                    MR. ABRAMOFF:   So why don't you just -- instead of subpoenaing, just

10    give us a list and we'll give you everything you want. We don't have to --

11                    AGENT WYNAR:  You know, that's just --

12                    MR. ABRAMOFF:  I wasn't subpoenaed one time in that last scandal.  Not

13    one time.

14                    AGENT WYNAR:  Well, this is -- we're subpoenaing Landfair, just to be

15    technically correct; we're not subpoenaing anybody individually.

16                    MR. ABRAMOFF:   Okay.

17                    AGENT WYNAR:   So it's just going to the custodian -- the most – the closest

18    person as we can identify as the custodian.

19                    MR. ABRAMOFF:  Okay.  What I'm saying is, we are not people who fight

20    with you guys .

21                    AGENT WYNAR:   I understand.

22                    MR. ABRAMOFF:   Okay?  None of nobody in our family.  I mean --

Privileged & Confidential
K&S DRAFT 12-18-22

1          AGENT WYNAR:  That's why we're expecting this to go very smoothly

2     and –

3          AGENT QUINN:   Yeah, we still have to go to the legal process.  We want

4     you to understand that.

5          MR. ABRAMOFF:  Well, I don't, because last time that didn't happen.

6     Nobody got a subpoena.  You basically told my lawyers what you wanted, and they gave

7     everything over.

8          AGENT WYNAR:  You know, I, I just –

9          MR. ABRAMOFF:   I just don't want my kids scared to death, you know, out

10    there.

11         AGENT WYNAR:  I'm sure he'll be able to – he'll -- we haven't done it yet,

12    so you'll have a chance to call him first.

13         MR. ABRAMOFF:  I mean I – can I tell him first?  Okay.

14         AGENT WYNAR:  So we're, -- they're waiting for us.

15         MR. ABRAMOFF:   Is that it, just the Landfair?

16         AGENT WYNAR:   That's the only thing, yes.  That's the only --

17         MR. ABRAMOFF:  Related to our family.

18         AGENT WYNAR:  You mentioned -- it's this coincidental fact that this, this

19    Alex is in charge of that company, so he's getting served, but there's nobody else.

20         MRS. ABRAMOFF:  Do you always show up with all these people?  I mean

21    Jack didn't murder anyone, honestly.

22         AGENT WYNAR:   It does –

Privileged & Confidential
K&S DRAFT 12-18-22

1          MRS. ABRAMOFF:  I mean, that --

2          AGENT WYNAR:  It does sometimes happen this way.  The problem is -- the

3    size of the house is what alarmed everybody/.

4          AGENT QUINN:   Yeah.

5          AGENT WYNAR:   But again, we'll be in and out so quickly, nobody will

6    notice.  And it's also going to help us go faster.  The point is, is --

7          MR. ABRAMOFF:  Well, everything is at my desk.

8          AGENT WYNAR:   That's –

9          MR. ABRAMOFF:   I mean on my computer and my phone.  I mean --

10          AGENT WYNAR:  And we won't be here when you get back, ma'am.  I

11    promise that, assuming --

12          MRS. ABRAMOFF:  I hope Jack is.

13          AGENT WYNAR:   Yes, Jack will – he -- that I promise you, too. He will be

14    here.

15          MR. ABRAMOFF:  All right.

16          I'll call you.

17          AGENT WYNAR:  Jack –

18          (Pause.)

19          AGENT WYNAR:   Let me – let me introduce you to, to Josh.  He'll be

20    asking you the specific questions that will help us get through this.

21          JOSH *:  Josh (inaudible) FBI in Baltimore.

22          MR. ABRAMOFF:   Do you want to just do this inside of my office.

119

**ATTACHMENT B**

*Property to be seized*

1.      The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of **18 U.S.C §§ 371 and 951 and 22 U.S.C. §611 *et seq.*** as described in the search warrant affidavit, including, but not limited to:

      a.  **Any electronic devices and storage media to include any computers, laptops, thumb drives and mobile phones.**

      b.  **Any paper documentation which appear to be instrumentalities/fruits or contains evidence of Person 1 acting as an Agent of or behalf of Foreign Power or Principal.**

      c.  **Any guns on the premise of 3617 38th NW Apartment 208, Washington, D.C. 20016 will be secured and held until completion of search unless instructed by AUSA otherwise.**

      d.  **Any safe or lockbox which may contact additional evidence of the above listed crimes.**

      e.  **Any associated storage areas rented by Person 1 related to Apartment 208.**

2.      Digital devices used in the commission of, or to facilitate, the above described offenses.

FBI-302-011992